ANTHONY THOMAS
WENDI THOMAS
7725 Peavine Peak Court
Reno, Nevada 89523
(408) 640-2795
Email: ATEmerald2@gmail.com

Debtors In Pro Per

UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEVADA

In re:

ANTHONY THOMAS and WENDI THOMAS

Debtors,

Case No.: BK-N-14-50333-BTB

CHAPTER 7

DECLARATION OF ANTHONY THOMAS IN SUPPORT OF DEBTORS OPPOSITION TO CREDITORS MOTION FOR ORDER APPROVING COMPROMISE AND SETTLEMENT AGREEMENT

DATE: February 25, 2015
TIME: 10:00 a.m.

I, Anthony Thomas, declare as follows:

1.      I am one of the Debtors in the above captioned proceeding. The other is my wife Wendi. I make this declaration on behalf of both of us.

2.      We have filed an *ex parte* application to continue the hearing date for two weeks and, in the alternative, respectfully request that this Court consider this late filed opposition.

3.      The Trustee seeks to settle a civil action that I brought against my former attorneys, Trepel McGrane Greenfield LLP (hereinafter "TMG"), Anthony Trepel (hereinafter "Trepel") and William McGrane (hereinafter "McGrane") in the California Superior Court for the County of Santa Clara. TMG, Trepel and McGrane are hereinafter collectively referred to as

the "Defendants." The litigation is entitled <u>Thomas vs. Trepel, et al.</u> Santa Clara County Superior Court Case No. 1-12-CV-219586.

4.  I initially and conditionally retained the services of Trepel and his newly formed partnership TMG in late August of 2010. I specifically hired Trepel try a case entitled <u>Kenmark Ventures, LLC vs. Thomas</u>, Santa Clara County Superior Court Case No. 1-08-CV-130677 (hereinafter "Kenmark Action") wherein I was a defendant and cross-complainant. The Kenmark action had an impending trial date in the California Superior Court. The Defendants were specifically hired as trial counsel, as all of the pre-trial litigation had been handled by my long time attorney, Joseph Kafka.[1]

5.  Prior to entering in the Fee Agreement attached as Exhibit "1" to the Declaration of Maureen Harrington, Trepel, Mr. Kafka and I met at length to go over the case, what was left to be done and what it would cost to take the case through trial.

6.  Trepel indicated that he had lengthy trial scheduled to start shortly before the Kenmark October 12, 2010 trial date. He stated that the other trial would take all of his time and that he would not even be able to start working on the Kenmark case for a minimum of two months. He therefore explained that he would only be able to try the Kenmark action if I agreed to continue the trial, <u>and</u> the court granted the request for a continuance. I advised Trepel that I was reluctant to lose the upcoming trial date. Trepel repeatedly told me and Mr. Kafka that he believed we would win the case and based on his reputation as an experienced trial lawyer, I agreed to continue the trial date.

---

[1] I was represented by Joseph Kafka for over a year and a half prior to retaining the Defendants to try the Kenmark action. Mr. Kafka had agreed to handle the case up until the time of trial. We had an understanding that trial counsel would be hired if necessary. When I hired Trepel to try the case in the late August 2010, the trial was set for October 12, 2010.

7. As far as the cost of trial, I advised Trepel that I was borrowing the money to hire him and needed to know what it would cost to try the case. Prior to signing the Fee Agreement or paying the $150,000.00, Trepel repeatedly indicated that it would not cost more than $150,000.00 and I would likely receive some money back at the end of the case/trial. I believed Trepel and relied on his statements. The amount requested by Trepel was far in excess of what I had paid Mr. Kafka to handle the case to that point and I therefore had no reason to question Trepel's statements that $150,000.00 would cover the trial. Further, the friend I was borrowing the money from required assurance directly from Trepel and was on a conference call wherein Trepel advised us that $150,000.00 would cover his services through trial.

8. The trial was continued to March of 2011. Despite Trepel's agreement and despite independent witnesses to the same, by early 2011 the Defendants claimed that they had provided services exceeding $150,000.00 and demanded, on less than 24 hours notice, that I deposit an additional $100,000.00 and advised the failure to do so would result in their withdrawing from the case.

9. I have uncovered an interoffice email from McGrane to Trepel and Greenfield dated January 29, 2011 saying that they needed to withdraw from my case. I will produce this email at the hearing or amend this declaration is the hearing is continue.

10. In the email McGrane explains that they need to be serious about collecting money, which I believe had to do with the fact that they had lost the trial Trepel was in and a judgment on jury verdict in that matter was rendered on January 11, 2011. Despite the fact that the January 3, 2011 bill attached to the Harrington Declaration evidences that there was over $72,000.00 left in trust, McGrane tells his partners that they have to withdraw from my case.

11. To make matters worse, after the Defendants demanded the $100,000.00 on or about January 28, 2011, McGrane started intercepting my attempts to communicate with Trepel. He demanded that all contact be with him. He would not let me have contact with Trepel, whom I had hired, and demanded that everything go through at the Defendants' San Francisco office. Again, I had hired Trepel to try the case while he was in the process of merging his office with the McGrane Greenfield office

12. Even though I disputed that the Defendants were owed anything and advised them that I still had money in trust, I tried to raise the funds. I did so because getting the case to trial was of upmost importance to me and my family. I was able to borrow $50,000.00 and attempted to give that amount to the Defendants, but since I could not _immediately_ raise $100,000.00, the Defendants moved to withdraw on February 7, 2011.

13. That was not the end, however. The Defendants continued their course of conduct, fraud and breach of fiduciary duty, by disparaging me in front of the trial court and taking positions adverse to me.

14. This motion is premised on the Trustee's determination that it is unlikely that I will prevail against the Defendants because my dispute with them is over the interpretation of the Fee Agreement.

15. Despite claiming to have provided over One Hundred Fifty Thousand Dollars ($150,000.00) in services in a few months the Defendants the Defendants did virtually nothing to prepare the case for trial.

16. The Defendants took two depositions and attended one deposition wherein I was providing testimony as the PMK for AT Emerald. Those three depositions took place in January of 2011 and aside from those depositions, the Defendants provided nothing of value to

me. Unbelievably, they did not even respond to a set of supplemental discovery requests and a request for production of documents that served before they substituted into the case. All other written discovery had been completed by Attorney Kafka, including the disclosure of expert witnesses. The Defendants obtained extensions to answer the discovery, but never prepared the responses. They failed to answer the discovery despite multiple reminders and requests from opposing counsel. The failure to prepare the responses resulted in a waiver of any objections that I possessed. The responses were ultimately prepared by the trial attorney I hired after the Defendants.

17. A cursory review of the billings attached to the Harrington Declaration shows that that most of the entries are padded, if not completely fictional. I am unable, however, to provide a complete analysis at this time.

18. I also oppose the motion on the basis that the Trustee has abandoned the claim.

19. I had multiple conversations with the Trustee, including conversations while we were in Florida to inspect the Thomas Emerald. The Trustee advised me that the estate would not be prosecuting the malpractice action or three other civil actions currently pending in California. Not only did the Trustee advise me that she was abandoning the cases, she has not prosecuted them and instead has allowed me to prosecute all of them at my own expense. For example, I just recently paid over $4,000.00 to the American Arbitration Association ("AAA") so that the arbitration with McGrane could proceed. I also paid over $9,000.00 to procure the appellate record in case pending before the California Court of Appeal for the Second District.

20. I have appeared before the AAA and have taken all of necessary steps to prosecute the malpractice action since the automatic stay was lifted. TMG and Trepel did not move to compel arbitration nor did they participate in the initiation of the pending AAA

proceeding. They in fact opposed McGrane's petition to compel arbitration. While I was opposed arbitrating the claims, I nonetheless recently moved to have TMG and Trepel be joined as parties to the arbitration. Since McGrane has been operating independent of his former firm and partner, the case was procedurally in limbo. I have diligently prosecuted the claims following the Trustee's representations that the estate was abandoning the cases.

21. Despite her representations and failure to prosecute the malpractice action, the Trustee now seeks to settle my claims for less than half of just the arbitration fees paid by Thomas. The settlement includes a waiver of the Defendants' patently false claim that they are owed some $39,0000.00, and includes a provision asking this Court to specifically reserve the Defendants' claims for malicious prosecution against me and one of his lawyers.

22. I respectfully request that this Court deny the Trustee's motion

I declare under penalty of perjury under the laws of the United States of America and the State of Nevada that the foregoing is true and correct and that this declaration is executed this 24th day of February 2015.

_____
ANTHONY THOMAS