1  Anthony G. Thomas
   7725 Peavine Peak Court
2  Reno, NV 89523
   Tel:       (408) 640-2795
3  E-mail:    atemerald2@gmail.com

4  Debtor In Propria Persona

5

6  **UNITED STATES BANKRUPTCY COURT**

7  **DISTRICT OF NEVADA - RENO**

8  IN RE:                              ) Case No.   BK-N-14-50333-BTB

9  ANTHONY THOMAS and                  ) Case No.   BK-N-14-60442-BTB

10 WENDI THOMAS                        ) (Jointly Administered)

11 AT EMERALD, LLC                     ) CHAPTER 7
                                       ) DECLARATION OF ANTHONY THOMAS
12        Debtors.                     ) IN SUPPORT OF MOTION FOR JUDICIAL
                                       ) NOTICE OF LAW & FACTS [FRE Rule 201]
13
                                       )
14                                     ) Date:      October 16, 2018
                                       ) Time:      2:00 pm
15                                     ) Judge:     Hon. Bruce T. Beesley
                                       ) Courtroom:     2
16 _____  )

17        I Anthony G. Thomas declare:

18        1.    I am the Debtor in the above referenced case and I am submitting this

19 Declaration in support of my Motion for the Court to take Judicial Notice of the law and

20 facts in this case that needs to be heard and decided before ruling on the merits on the

21 Turnover Motion filed by the U.S. Trustee on 7-10-2018.

22        2.    On 8-10-2018, this Court granted my former lawyer's Motion to withdraw

23 as counsel, and granted me 30 days to find a lawyer in the case. Yet at the same time,

24 the Court continued the hearing date on the turnover motion to the same date as the

25 Court's order granting me the extension to find a lawyer, i.e. on September 13th 2018.

26        3.    Due to my disability of dyslexia, I have found it difficult to understand and

27 without any legal background, I have been unable to figure out whether I was supposed

28 to file an opposition to the Turnover order by 8-31-2018, and I am only filing this late

-3-

RECEIVED
AND FILED

2018 SEP -5  PM 4: 16

U.S. BANKRUPTCY COURT
MARY A. SCHOTT, CLERK

1  opposition to the Turnover order due to the confusion and lack of clarity by the Court in
2  not clearly giving me a date or deadline to file an opposition to the Turnover Order. If I
3  am forced to file an Opposition to the Trustee's Turnover Motion by 8-31-2018, then the
4  Court only gave me 21 days from the 8-10-2018 hearing date to file legal papers when I
5  was and am still unrepresented by counsel.

6       4.     I have been unable to obtain counsel as of yet. Immediately after the
7  hearing, I went to my former counsel's office Mr. Lehner's office in Reno and asked if
8  he would represent me in this case to oppose the Trustee's turnover Motion. He stated
9  that he could not although he did offer to assist whatever lawyer I did obtain in asssiting
10  him in coming up to speed on the case. I asked his opinion if there was any merit in the
11  claim that we had somehow concealed the Portola home as an asset of the estate. Mr.
12  Lehners recalled that we made full disclosure of the transfer of the Portola home, both
13  in our initial BK filing and at the 341 meeting of creditors on 12-4-2014. Mr. Lehners
14  printout and provided a copy of the In re: Adeeb case that showed that there is no
15  concealment when the details of the asset are disclosed in the initial 341 meeting.

16       5.     Mr. Lehners told me clearly and unequivocally, that even though my and
17  my wife's name appear on title and on the tax records of the county records, we did in
18  fact legally transfer the property to the property in that there was:

19       1.     Physical Transfer of the Deed

20       2.     Intent to transfer (from myself and my wife)

21       3.     Acceptance of the Deed by my parents.

22       4.     For a valuable consideration ($200K in exchange for the property)
23  as on title, the fact that we transferred the property to my parents, Mr. Eli & Mrs.
24  Dorothy Thomas by physical transfer of the Deed in January of 2008, as clearly stated
25  on our Bankruptcy Petition filed on 3-4-2018, and that was disclosed in our initial BK
26  petition. He also recalled that we fully disclosed the details of this transfer at our 341
27  meeting of creditors, so according to him, and according to the holding in the In re:
28  Adeeb case, a copy of which he printed off for me, that I will be attaching as n Exhibit to

-4-

1  my Motion for Judicial Notice, there was no concealment that my wife & I can be
2  accused of.  As such, according to Attorney Lehners, the Trustee is required to proceed
3  by Adversary Action to obtain this property as the title to the property was transferred to
4  my parents in January of 2018 and this was fully disclosed in the initial BK filing and in
5  the 341 meeting.  There was no concealment, and the Trustee was aware of the facts
6  surrounding this no later than the 12-4-2014 meeting of creditors if she was not aware
7  of the facts as detailed in the 3-4-2014 bankruptcy petition.

8      4.      I want the court to take judicial notice of the fact that the attorney for the
9  Trustee Mr. Hartman did deceive this Court when he stated on the record at the hearing
10  on 8-10-2018 that the Trustee only found out about the property recently as well as the
11  fraud upon the court perpetrated by both of them in knowing about all of the facts
12  regarding the Portola property no later than 12-4-2014, the date of the 341 Meeting of
13  creditorss that is evidenced by the portions of the transcript attached to the Exhibit List
14  of documents facts and law that I am seeking this Court to take judicial notice of.

15      5.      Since this case involves the transfer if property by deed for a property
16  located in Plumas County, California, then California law applies.  Under California law,
17  there is the written law as defined under California Code of Civil Procedure Section
18  1896, and the Unwritten law as defined under CCP 1899.  In addition, on 4-13-1850,
19  the California legislature enacted a law adopting the common law of England as the
20  decisional law of this State. (Stats 1850 ch. 101, p. 221).  Even though Nevada law
21  does not apply to this case, the State of Nevada also adopted the common law of
22  England as the decisional law of the State of Nevada in 1864. The common law of
23  England is defined by the California Supreme Court in the 1917 Martin v. Superior
24  Court case.

25      5.      Under California's Evidence Code Section 451(d), a California Court
26  under California law must take judicial notice of the case law of the State of California.  I
27  am respectfully requesting that this Court take Judicial notice of the law of the case
28  from the case law attached to my Motion.

-5-

1        I declare under penalty of perjury under the laws of the States of California and

2    Nevada and the laws of the United States that the foregoing is true and correct.

3    Executed at San Francisco, CA.

4    Dated: 8-31-2018

                                 Anthony G. Thomas - Debtor

-6-

1

**CERTIFICATE OF SERVICE**

2

3

I certify that I am an adult, over the age of 18 years, not a party to the action herein who resides in Washoe County, Nevada. I caused to be served the foregoing document via e-mail to the following persons as listed below from my e-mail address of mickjoseph@sbcglobal.net as follows:

4

5

JEFFREY A. COGAN
jeffrey@jeffreycogan.com, beautausinga@gmail.com, beau@jeffreycogan.com

6

7

JERI COPPA-KNUDSON VIA E-MAIL AND U.S. MAIL:
renobktrustee@gmail.com, jcoppaknudson@ecf.episystems.com

8

KEVIN A. DARBY
kad@darbylawpractice.com, tricia@darbylawpractice.com, jill@darbylawpractice.com, hersh@darbylawpractice.com, sam@darbylawpractice.com

9

10

JEFFREY L. HARTMAN VIA E-MAIL AND U.S. MAIL
510 West Plumb Lane - Reno, NV 89509
notices@bankruptcyreno.com, sji@bankruptcyreno.com

11

12

TIMOTHY A. LUCAS
ecflukast@hollandhart.com

13

LAURY MILES MACAULEY
laury@macauleylawgroup.com

14

15

WILLIAM MCGRANE
ECF-8116edf28c97@ecf.pacerpro.com, mitch.chyette@mcgranellp.com

16

STEPHANIE T. SHARP
ssharp@rssblaw.com, cobrien@rssblaw.com

17

18

WAYNE A. SILVER
w_silver@sbcglobal.net, ws@waynesilverlaw.com

19

ALAN R. SMITH
mail@asmithlaw.com

20

21

STEVEN C. SMITH
ssmith@smith-lc.com, mbrandt@smith-lc.com

22

AMY N. TIRRE
amy@amytirrelaw.com, admin@amytirrelaw.com

23

24

U.S. TRUSTEE - RN - 7,7
USTPRegion17.RE.ECF@usdoj.gov

25

JOSEPH G. WENT
jgwent@hollandhart.com, vllarsen@hollandhart.com

26

27

28

I declare under penalty of perjury that the foregoing is true and correct.

Dated:          September 5th 2018.

/S/ Mick Joseph
MICK JOSEPH

1  Anthony G. Thomas
   7725 Peavine Peak Court
2  Reno, NV 89523
   Tel:        (408) 640-2795
3  E-mail:     atemerald2@gmail.com

4  Debtor In Propria Persona

5              UNITED STATES BANKRUPTCY COURT

6               DISTRICT OF NEVADA - RENO

7  IN RE:                      ) Case No.    BK-N-14-50333-BTB
                               )
8  ANTHONY THOMAS and          ) Case No.    BK-N-14-60442-BTB
                               )
9  WENDI THOMAS               ) (Jointly Administered)
                               )
10 AT EMERALD, LLC             ) CHAPTER  7
                               )
11         Debtors.            ) EXHIBIT LIST OF DOCUMENTS
                               ) SUBMITTED IN SUPPORT OF MOTION
12                             ) FOR JUDICIAL NOTICE [FRE 201]
                               ) Date: _____
13                             ) Time: _____
                               ) Judge: _____
14                             ) Courtroom: 2
                               )
15 _____)

16         Debtor Anthony G. Thomas hereby submits the following Exhibits that I am

17 requesting that this Court take judicial notice of.  These Exhibits are also submitted in

18 Opposition to the Turnover Motion currently set for hearing before this Court on 9-13-

19 2018.  I shall be filing a separate Motion seeking a continuance of the 9-13-2018

20 hearing on the Turnover Motion until this Court rules on this Motion for Judicial Notice in

21 this matter.

22 **Ex #**              **Description of Exhibit**

23 1.1               Excerpts from 3-4-2014 BK Filing - Page 11
                     Request that Court take Notice that Debtor listed
24                   Mrs. Dorothy Thomas, Debtor Anthony G. Thomas's
                     Mother as one of his top 20 creditors re: the $200K
25                   unsecured loan referenced on p. 36 of 46 of BK Pet
   1.2               Excerpts from 3-4-2014 BK Filing - Page 12
26                   Take Notice that Debtor listed the Plumas County
                     Tax Assessor as one of the top 20 creditors and
27                   the fact that Debtor disclosed the debt was for
                     "Property Taxes"
28 1.3               Excerpt from 3-4-2014 BK filing - page 36 of 46 -

                              - 1 -

1                Take Notice that Debtors disclosed under para 10
"Other Transfers"  - Date January 2008 -

2                Property Transferred:      Residence valued at $25,000
Value Received:         $200,000

3                Transfer to Parents - Mr. Eli & Mrs. Dorothy Thomas

4   2           DEBTOR BASIC QUESTIONNAIRE PROVIDED BY
U.S. BANKRUPTCY TRUSTEE SIGNED 11-22-2014

5

6   3           Case Law of the State of California - Belli v. Bonavia
(1959) 167 Cal. App.2d

7   4.          Learned Treatise on the Law of Real Property & Deeds
(1911) Devlin (3rd ed.) Ref.

8

9   5.          Case Law - Magolo v. Zeitz (1948) 333 U.S. 56

    6.          Case Law - In re: Doody (1937) 62 F. 653

10  7.          Case Law - In re: Adeeb (1986) 787 F.2d 1339

11

12  8.          Case Law - California Trust (1952) 111 Cal.App.2d 717

    9.          Learned Treatise on the Law of Judicial Notice

13  10.        L.A. Lawyer Magazine article BK Procedure Turnover Law

14

15  11.        Norton Annual Survey of BK Law 2012

    12.        Excerpts from 12-4-2014 341 Meeting of Creditors

16  13.        CA Law Transfer by Deed Osterberg (1945) 68 Cal.App.2d 254

17

18  14.        Blackburn v. Drake (1963) 211 Cal.App.2d 606

    15.        Gonzales (1968) 267 Cal.App.2d 428

19  16.        Transcript from Santa Clara case

20

21  16.1      US Senate Resolution - Dyslexia
    16.2      CA Dept of Education Dyslexia Guidelines
    17        Excerpts from 8-10-2018 hearing

22

23  Dated: 9-5-2018.                Respectfully submitted,

24

25                                 Anthony G. Thomas - Debtor

26

27

28

EXHIBIT LIST RE: MOTION FOR JUDICIAL NOTICE

B4 (Official Form 4) (12/07)

# United States Bankruptcy Court
### District of Nevada

In re  **ANTHONY THOMAS**
**WENDI THOMAS**

Debtor(s)

Case No. _____
Chapter   **11**

## LIST OF CREDITORS HOLDING 20 LARGEST UNSECURED CLAIMS

Following is the list of the debtor's creditors holding the 20 largest unsecured claims. The list is prepared in accordance with Fed. R. Bankr. P. 1007(d) for filing in this chapter 11 [or chapter 9] case. The list does not include (1) persons who come within the definition of "insider" set forth in 11 U.S.C. § 101, or (2) secured creditors unless the value of the collateral is such that the unsecured deficiency places the creditor among the holders of the 20 largest unsecured claims. If a minor child is one of the creditors holding the 20 largest unsecured claims, state the child's initials and the name and address of the child's parent or guardian, such as "A.B., a minor child, by John Doe, guardian." Do not disclose the child's name. See 11 U.S.C. § 112; Fed. R. Bankr. P. 1007(m).

| (1)<br><br>*Name of creditor and complete mailing address including zip code* | (2)<br><br>*Name, telephone number and complete mailing address, including zip code, of employee, agent, or department of creditor familiar with claim who may be contacted* | (3)<br><br>*Nature of claim (trade debt, bank loan, government contract, etc.)* | (4)<br><br>*Indicate if claim is contingent, unliquidated, disputed, or subject to setoff* | (5)<br><br>*Amount of claim [if secured, also state value of security]* |
|---|---|---|---|---|
| JOHN BEACH<br>C/O BRYCE C. ALSTEAD, ESQ.<br>HOLLAND & HART<br>5441 KIETZKE LANE, 2ND FLOOR<br>RENO, NV 89511 | JOHN BEACH<br>C/O BRYCE C. ALSTEAD, ESQ.<br>HOLLAND & HART<br>RENO, NV 89511 | PROMISSORY NOTE PLEDGE AND SECURITY AGREEMENT | | 540,000.00 |
| DOROTHY THOMAS<br>18945 KOSICH DRIVE<br>SARATOGA, CA 95070 | DOROTHY THOMAS<br>18945 KOSICH DRIVE<br>SARATOGA, CA 95070 | PERSONAL LOAN | | 200,000.00 |
| SMITH LC<br>1800 NORTH BROADWAY, STE. 200<br>SANTA ANA, CA 92706-2656 | SMITH LC<br>1800 NORTH BROABWAY, STE. 200<br>SANTA ANA, CA 92706-2656 | GOODS/SERVICES | | 180,958.94 |
| SHANN BRASSFIELD<br>208 WILDER AVENUE<br>LOS GATOS, CA 95030 | SHANN BRASSFIELD<br>208 WILDER AVENUE<br>LOS GATOS, CA 95030 | PERSONAL LOAN | | 150,000.00 |
| CITI CARD<br>99 PARK AVENUE<br>NEW YORK, NY 10022 | CITI CARD<br>99 PARK AVENUE<br>NEW YORK, NY 10022 | GOODS/SERVICES | | 62,210.00 |
| ROBERT A. MACHADO, ESQ.<br>MACHADO & MACHADO<br>1110 NORTH FIRST STREET<br>SAN JOSE, CA 95112 | ROBERT A. MACHADO, ESQ.<br>MACHADO & MACHADO<br>1110 NORTH FIRST STREET<br>SAN JOSE, CA 95112 | GOODS/SERVICES | | 50,000.00 |
| FRANK TABISH<br>219 MANSION HEIGHTS DRIVE<br>MISSOULA, MT 59803 | FRANK TABISH<br>219 MANSION HEIGHTS DRIVE<br>MISSOULA, MT 59803 | PERSONAL LOAN | | 50,000.00 |
| CHRIS PERNA<br>4686 ENGLEWOOD DRIVE<br>SAN JOSE, CA 95129 | CHRIS PERNA<br>4686 ENGLEWOOD DRIVE<br>SAN JOSE, CA 95129 | PERSONAL LOAN | | 10,000.00 |
| MACY'S<br>7 W. 7TH STREET, #10<br>CINCINNATI, OH 45202 | MACY'S<br>7 W. 7TH STREET, #10<br>CINCINNATI, OH 45202 | GOODS/SERVICES | | 8,000.00 |

B4 (Official Form 4) (12/07) - Cont.

In re   **ANTHONY THOMAS**
      **WENDI THOMAS**                             Case No.   _____

                Debtor(s)

## LIST OF CREDITORS HOLDING 20 LARGEST UNSECURED CLAIMS
### (Continuation Sheet)

| (1)<br><br>*Name of creditor and complete mailing address including zip code* | (2)<br><br>*Name, telephone number and complete mailing address, including zip code, of employee, agent, or department of creditor familiar with claim who may be contacted* | (3)<br><br>*Nature of claim (trade debt, bank loan, government contract, etc.)* | (4)<br><br>*Indicate if claim is contingent, unliquidated, disputed, or subject to setoff* | (5)<br><br>*Amount of claim [if secured, also state value of security]* |
|---|---|---|---|---|
| **LARRY BALAKIAN**<br>**3209 NORTH VAN NESS BLVD.**<br>**FRESNO, CA 93704** | **LARRY BALAKIAN**<br>**3209 NORTH VAN NESS BLVD.**<br>**FRESNO, CA 93704** | **PERSONAL LOAN** | | **5,000.00** |
| **MICHELE THOMAS**<br>**525 N. SPAULDING**<br>**LOS ANGELES, CA 90036** | **MICHELE THOMAS**<br>**525 N. SPAULDING**<br>**LOS ANGELES, CA 90036** | **PERSONAL LOAN** | | **5,000.00** |
| **PLUMAS COUNTY TREASURER**<br>**P.O. BOX 176**<br>**QUINCY, CA 95971** | **PLUMAS COUNTY TREASURER**<br>**P.O. BOX 176**<br>**QUINCY, CA 95971** | **PROPERTY TAXES** | | **1,200.00** |
| **KOHL'S**<br>**N56W17000 RIDGEWOOD DRIVE.**<br>**MENOMONEE FALLS, WI 53051** | **KOHL'S**<br>**N56W17000 RIDGEWOOD DRIVE.**<br>**MENOMONEE FALLS, WI 53051** | **GOODS/SERVICES** | | **1,200.00** |
| **WELLS FARGO BANK**<br>**PO BOX 54349**<br>**LOS ANGELES, CA 90054-0349** | **WELLS FARGO BANK**<br>**PO BOX 54349**<br>**LOS ANGELES, CA 90054-0349** | **GOODS/SERVICES** | | **1,000.00** |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

B7 (Official Form 7) (04/13)
4

---

**8. Losses**

None
■

List all losses from fire, theft, other casualty or gambling within **one year** immediately preceding the commencement of this case **or since the commencement of this case**. (Married debtors filing under chapter 12 or chapter 13 must include losses by either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

| DESCRIPTION AND VALUE OF PROPERTY | DESCRIPTION OF CIRCUMSTANCES AND, IF LOSS WAS COVERED IN WHOLE OR IN PART BY INSURANCE, GIVE PARTICULARS | DATE OF LOSS |
|---|---|---|

---

**9. Payments related to debt counseling or bankruptcy**

None
☐

List all payments made or property transferred by or on behalf of the debtor to any persons, including attorneys, for consultation concerning debt consolidation, relief under the bankruptcy law or preparation of the petition in bankruptcy within **one year** immediately preceding the commencement of this case.

| NAME AND ADDRESS OF PAYEE | DATE OF PAYMENT, NAME OF PAYER IF OTHER THAN DEBTOR | AMOUNT OF MONEY OR DESCRIPTION AND VALUE OF PROPERTY |
|---|---|---|
| **LAW OFFICES OF ALAN R. SMITH 505 RIDGE STREET RENO, NV 89501** | **2/28/14** | **$5,000.00** |

---

**10. Other transfers**

None
☐

a. List all other property, other than property transferred in the ordinary course of the business or financial affairs of the debtor, transferred either absolutely or as security within **two years** immediately preceding the commencement of this case. (Married debtors filing under chapter 12 or chapter 13 must include transfers by either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

| NAME AND ADDRESS OF TRANSFEREE, RELATIONSHIP TO DEBTOR | DATE | DESCRIBE PROPERTY TRANSFERRED AND VALUE RECEIVED |
|---|---|---|
| **ELI & DOROTHY THOMAS 18945 KOSICH DRIVE SARATOGA, CA 95070 PARENTS** | **JANUARY, 2008** | **RESIDENCE VALUED AT $25,000.00 IN PORTOLA, CA $200,000.00** |
| **ELI & DOROTHY THOMAS 18945 KOSICH DRIVE SARATOGA, CA 95070 PARENTS** | **MARCH, 2012** | **CMC 1998 MOTORCYCLE VALUED AT $10,000.00 $25,000.00** |

None
■

b. List all property transferred by the debtor within **ten years** immediately preceding the commencement of this case to a self-settled trust or similar device of which the debtor is a beneficiary.

| NAME OF TRUST OR OTHER DEVICE | DATE(S) OF TRANSFER(S) | AMOUNT OF MONEY OR DESCRIPTION AND VALUE OF PROPERTY OR DEBTOR'S INTEREST IN PROPERTY |
|---|---|---|

---

**11. Closed financial accounts**

None
☐

List all financial accounts and instruments held in the name of the debtor or for the benefit of the debtor which were closed, sold, or otherwise transferred within **one year** immediately preceding the commencement of this case. Include checking, savings, or other financial accounts, certificates of deposit, or other instruments; shares and share accounts held in banks, credit unions, pension funds, cooperatives, associations, brokerage houses and other financial institutions. (Married debtors filing under chapter 12 or chapter 13 must include information concerning accounts or instruments held by or for either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

| NAME AND ADDRESS OF INSTITUTION | TYPE OF ACCOUNT, LAST FOUR DIGITS OF ACCOUNT NUMBER, AND AMOUNT OF FINAL BALANCE | AMOUNT AND DATE OF SALE OR CLOSING |
|---|---|---|
| **WELLS FARGO BANK** | **CHECKING XXXX6516** | **$5.00** |

---

## PART II – STATEMENT OF BASIC FACTS

### DEBTOR and/or CO - DEBTOR

My name is: Anthony Thomas

My name is: Wendi Thomas

My physical address is: 7725 Peavine Peak Ct. 89523

My physical address is: 7725 Peavine Peak Ct. 89523

My phone numbers are: _____

My phone numbers are: _____

(hm) None

(hm) None

(wk) N/A

(wk) None

(cell) 408-640-2795

(cell) 408-843-6652

email Atemerald2@gmail.com

email Wenditacmas6@gmail.com

Marital status is: Married

Marital status is: _____

(Please specify, Single, Married, Divorced, Widowed)

(Please specify, Single, Married, Divorced, Widowed)

No. of dependents claimed on last Tax Return: 5

No. of dependents claimed on last Tax Return: 5

Filing status on tax return Married

Filing status on tax return Married

How many dependents live with you now? 5

How many dependents live with you now? 5

The number of people living at your address: 6

The number of people living at your address: 6

## PART III - STANDARD QUESTIONS

(This section must be answered by both the Debtor and the Co-Debtor, where applicable. If an answer to a
question requires further explanation, attach a separate sheet of paper and supporting documentation)

| | | Debtor | | Co-Debtor | |
|---|---|---|---|---|---|
| | | \multicolumn{4}{c}{Circle response} | | |
| 1. | Did you personally review and then sign the Petition, Schedules and other Documents Filed with the court? | Yes | (No) | Yes | (No) |
| 2. | Is the information contained in your documents true, complete and accurate? | Yes | (No) | Yes | (No) |
| | Former atty submitted forms with errors and missing information | | | | |
| 3. | Have you listed everything you own in these schedules? and addresses. | (Yes) | No | (Yes) | No |
| 4. | Have you lived in Nevada continuously for the last 3½ years? If not, please list all your addresses during the last 3½ years on a separate sheet of paper and attach to this Questionnaire. | Yes. | (No) | Yes | (No) |
| 5. | Do you have any ownership interest (present, future, contingent or disputed) in any real property, personal property, corporation, partnership, business venture, stock options, investment plans, or life insurance policies that are not listed in your Schedules? | Yes | (No) | Yes | (No) |
| 6. | Have you ever filed bankruptcy before?      If yes when? _____ | Yes | (No) | Yes | (No) |
| 7. | Have you transferred, sold or given away any thing to anyone during the last 12 months? | Yes | (No) | Yes | (No) |
| 8. | Have you owned, sold or transferred any real estate during the last four (4) years? | Yes | (No) | Yes | (No) |
| 9. | Does anyone owe you any money for any reason? | Yes | (No) | Yes | (No) |
| 10. | Do you have any claim against anyone that is not listed in your Schedules? | Yes | (No) | Yes | (No) |
| 11. | Have you filed or do you have a reason to file any lawsuit against any one for any reason? | (Yes) | No | (Yes) | No |
| 12. | Are you a beneficiary of any will, trust or estate? | Yes | (No) | Yes | (No) |
| 13. | Are you entitled to any life insurance proceeds or an inheritance as a result of someone's death? | Yes | (No) | Yes | (No) |

14. Has there been a change in your ___ situation since the filing of the bankruptcy?    Yes   No   |   Yes   No

15. Did you make any payments totaling over $600, to any unsecured creditor, during the last 90 DAYS PRIOR to filing Bankruptcy?    Yes   No   |   Yes   No

16. Did you rearrange your financial affairs in any way in preparation for filing this bankruptcy?    Yes   No   |   Yes   No

17. Have you transferred any credit card balances from one to another during the last six months?    Yes   No   |   Yes   No

18. Is anyone holding or storing anything on your behalf?    Yes   No   |   Yes   No

19. Do you have any safe-deposit boxes or a self-storage unit? (If yes, please provide its location and list of its contents)    Yes   No   |   Yes   No

20. Have you repaid any loans to any friends and/or relatives during the past 12 months?    Yes   No   |   Yes   No

21. If you own your home, when did you purchase it?   What was the Purchase Price?_____    Yes   No   |   Yes   No

22. Are you currently participating in any type of educational savings plans, sending your child to a private school and/or paying extra educational expenses?    Yes   No   |   Yes   No

## PART IV – DOCUMENTS TO BE SUBMITTED WITH THIS QUESTIONNAIRE

**THE FOLLOWING DOCUMENTS MUST BE SUBMITTED TO THE TRUSTEE ALONG WITH THIS QUESTIONNAIRE UNLESS PREVIOUSLY FILED WITH THE COURT WITH YOUR BANKRUPTCY PAPERS:**

### COPIES —MUST BE MAILED TO THE TRUSTEE 10 DAYS PRIOR TO THE MEETING OF CREDITORS.
*The Trustee will not make copies for you or return the documentation provided.*
*Do not sent documents by certified or registered mail- do not fax documents*

1. Copy of the complete tax return (s)( incl. schedules) for the prior two (2) years ending immediately preceding the bankruptcy filing. Must be provided to the trustee's office at least 10 days prior to the Meeting of Creditors.
   a. For bankruptcies filed between January 1st and April 15th where preparation of the tax return is still pending on the date of the Meeting of Creditors, the return must be delivered to the trustee's office within 10 days after the return is prepared, but no later than April 15th. The copy must be delivered in person or by mail.

2. Statements on all financial accounts: ( for the prior 4 months and thru the date the petition was filed)
   a. checking accounts, savings accounts, money market accounts, IRA's, ROTH IRA's, Educational IRA's, pensions, brokerage accounts, mutual funds, life insurance, etc., that you own or that you co-sign on with anyone else. Copies of checks over $600.00 or a check register may be provided. This also includes copies of Notes receivable, Accounts receivable & stock certificates.

3. Evidence of current income: (the most recent 3 months: pay stubs, dividends, income and expense). Documentation for any and all sources of income, ( i.e. Soc. Sec. Dividends, annuities, etc)

4. Picture I.D. establishing identity: **MUST BE BROUGHT TO THE MEETING OF CREDITORS**
   a. ( i.e.- driver's license or a passport, work card, health card, or military I.D.)

5. Social Security Verification: **MUST BE BROUGHT TO THE MEETING OF CREDITORS**
   a. in the form of a document establishing the Social Security Number such as a Social Security Card, W-2 or Military I.D.

6. — OMITTED —

7. — OMITTED —

8. Copy of the property settlement agreement from any divorce obtained within 4 years of filing for bankruptcy.

9. If you are filing bankruptcy without your spouse, on a separate sheet, list the date married, assets which are held in the spouse's name or both names which are not already listed on the Schedules.

10. If Renting, copy of rental agreement with the landlord.

11. **OBLIGATION FOR CHILD SUPPORT/ALIMONY** If you have any obligation~~~~~ld Support/Alimony payments please provide:    **PLEASE MARK N/A if Not Applicable and initial.**

(a) the name, the last-known address and telephone number of the adult receiving or supposed to be receiving such payments, and

(b) documentation to support these obligation such as Marital Settlement Agreement, Separation or Divorce Agreement or a Court Order. If you are unable to provide this information or the documents please attach a written explanation. If you have such an obligation to more than one party, please attach a separate sheet of paper showing the following information for additional parties.

Ø    NAME:                                                      Ø    NAME:

Ø    TELEPHONE NO. _____      Ø    TELEPHONE NO. _____

Ø    ADDRESS: _____      Ø    ADDRESS: _____

Ø    City, State  Zip:                                      Ø    CITY, STATE ZIP:
➢

12.  **Self Employment Income:** If you have an interest in or own a closely held corporation or business interest, **please contact your Trustee immediately** to discuss the matter. As the owner, employer, stockholder, partner, etc. who derives compensation /income, OR is entitled to derive compensation, in any form from the business interest, please provide the following.

(a) Nature and type of the business interest.
(b) Your interest in the business ( i.e. owner, stockholder, partner, investor)
(c) Location of the business.
(d) Equipment and inventory evaluation listings
(e) Copies of bank accounts for 3 months prior to the filing.
(f) If not reported on 1040 Schedule C, a copy of the corporate tax return as for the preceding and current year.
(g) Profit and Loss statement indicating your income and/or loss for the filing year duly certified by you or an officer representing the business. A copy of the Regulation P or Privacy Statement, if one has been prepared.
(h) If you have employees a copy of the Benefit PLAN DOCUMENTS, if any,.

Given the nature of the business and your participation in the business additional documentation may be requested.

List of **ALL documents BEING SUBMITTED WITH** this questionnaire to the Trustee: (used separate sheet if needed)

1. _____      6. _____

2. _____      7. _____

3. _____      8. _____

4. _____      9. _____

5. _____      10 ._____

## PART V – DECLARATION UNDER PENALTY OF PERJURY

I DECLARE UNDER PENALTY OF PERJURY THAT I HAVE PERSONALLY READ THIS QUESTIONNAIRE AND TRUTHFULLY ANSWERED ALL THE QUESTIONS. I FURTHER DECLARE THAT THE INFORMATION AND DOCUMENTS PROVIDED WITH THIS QUESTIONNAIRE ARE ALSO TRUE, COMPLETE AND ACCURATE TO THE BEST OF MY KNOWLEDGE AND BELIEF.

DATE _____      DEBTOR   _Tony Thomas_

DATE _11-22-14_                  CO-DEBTOR  _Dines Thomas_

# Belli v. Bonavia, 167 Cal. App. 2d 275 - Cal: Court of Appeal 1959

## 167 Cal.App.2d 275 (1959)

## RENO J. BELLI, as Special Administrator, etc., Plaintiff and Respondent,
## v.
## ANTHONY BONAVIA, Appellant; LEON BELLI, SR., as Administrator, etc., Defendant and Respondent.

### Civ. No. 18120.

### California Court of Appeals. First Dist., Div. Two.

Jan. 22, 1959.

Ferrari & Ferrari for Appellant.

Joseph L. Casalnuovo for Plaintiff and Respondent.

Charles P. Molinari for Defendant and Respondent.

KAUFMAN, P. J.

Plaintiff, Reno Belli, as special administrator of the estate of Caterina Bonavia, commenced this action to quiet title to an improved parcel of real property at 1730-32 Filbert Street in San Francisco, and to certain shares of stock, and for an accounting of rentals and dividends. Defendant, Leon Belli, Sr., administrator of the estate of Anita Belli, answered and cross- complained to quiet title to the real property and asked for an accounting of the rentals from the real property by the defendant and cross-defendant Anthony Bonavia. Anthony Bonavia answered and asserted complete ownership of the real property under a deed dated September 1954, and complete ownership of the stock. The court below found that by reason of a deed dated August 19, 1933, Anita Belli and Anthony Bonavia each owned an undivided one-half interest in fee in the real property, and that Anthony Bonavia owned the shares of stock. The sole issue on appeal is the validity of the deeds to the Filbert Street property.

On appeal, Anthony Bonavia contends that: (1) The 1933 deed was not delivered with the intent to pass present title, but with the intention that title should not pass until the death of the grantor; (2) The evidence was insufficient to support the trial court's finding that the 1954 deed was invalid because the grantor lacked mental capacity to execute 278

*278 the deed and because it was the result of the undue influence of Anthony Bonavia; (3) Even if the 1933 deed was validly delivered and passed title, such title was lost by the continuous adverse possession of the grantor from 1933 to 1954.

The estate of Caterina Bonavia argues that as Anthony Bonavia did not accept his interest under the 1933 deed and the law does not force anyone to take title to real property against his will, it is proper for this court to reverse the finding of the court below as to the one-half interest of Anthony Bonavia and hold that the estate of Caterina Bonavia is the owner thereof.

Caterina Bonavia, the mother of Anthony Bonavia and Anita Belli, was the owner of the property at 1730-1732 Filbert Street. On August 19, 1933, Caterina Bonavia executed and acknowledged a deed of gift to her two children, Anita and Anthony. The deed was signed and delivered and acknowledged in the presence of Anita Belli, her husband Leon Belli, Sr., Rosa Curlo and a notary public, Joseph Pensa, the entire transaction taking place in the office of Mr. Pensa. Anita accepted the deed, and she and her husband deposited it in their safe deposit box. Anthony testified that neither his sister nor his mother ever mentioned the 1933 deed to him and that he never accepted it.

After the 1933 deed, as before, Caterina Bonavia continued to live on the Filbert Street property which consisted of an improved lot with two cottages. Anita helped her in the management of the property by paying taxes, collecting rents, calling repairmen, etc. The expenses were paid indirectly by Caterina who received the benefit of the rents. Insurance was carried in the name of Caterina Bonavia. In the early 1940's, Anthony Bonavia moved in with his mother. Anita Belli died on July 13, 1941, survived by her sons, Reno Belli (plaintiff herein) and Leon Belli, Jr., and her husband Leon Belli, Sr. The 1933 deed was not recorded until after the death of Caterina Bonavia in 1954.

On April 16, 1953, Anthony Bonavia went to the city hall in San Francisco, and asked a Mr. Howard to draw up a gift deed granting the Filbert Street property to Anthony. Anthony took the deed home and placed it away until September 30, 1954, when his mother told him that she was ready to sign it. Anthony called Mr. Colapietro, a notary public, and another witness to acknowledge the deed. Caterina was taken out of bed and propped up at a desk and chair to sign the deed. The entire transaction took only three to five minutes. 279

*279 Caterina Bonavia died a few days later on October 4, 1954. She was 87 years old. The cause of death was coronary thrombosis. For several months before her death, Caterina had been ill and failing. One week before her death, a close friend moved to the rear cottage on the property to take care of Caterina. Caterina had been unable to manage her own affairs. Anthony managed her affairs from 1952 on. Several witnesses testified that during the period before her death, Caterina was listless, forgetful and unresponsive and otherwise showed signs of advancing age and senility.

[1] As to appellant Anthony Bonavia's first contention that the 1933 deed was not delivered with the intent to pass present title, the record reveals ample evidence to substantiate the trial court's finding to the contrary. (Civ. Code, 1054; Osborn v. Osborn, 42 Cal.2d 358 [267 P.2d 333] ; Hitch v. Hitch, 24 Cal.App.2d 291 [74 P.2d 1098] .) When she executed the deed, Caterina gave the deed to Anita and said, "Take this." Anita accepted the deed and placed it in a safe deposit box where it remained until her death in 1941. At the time of Anita's death, Leon Belli, Sr. had forgotten about the 1933 deed. He removed all the

documents from the safe deposit box and kept them in his possession. Thus, Anita Belli had possession of the deed from 1933 until her death in 1941. After her death, her husband continued to hold it with his other papers.

[2] A presumption of delivery arises from the possession of the deed by the grantee. ( Stewart v. Silva, 192 Cal. 405 [221 P. 191] ; Severn v. Ruhde, 58 Cal.App.2d 704 [137 P.2d 466] .) There is a further presumption that the delivery took place at the time of execution. (Civ. Code, 1055; Marple v. Jackson, 184 Cal. 411 [193 P. 940] .) These presumptions are applicable even if the deed is not recorded until after the death of the grantor, who in the meantime exercises acts of control over the property by collecting rent, paying insurance in his own name, etc. ( Merritt v. Rey, 104 Cal.App. 700 [286 P. 510] ; Shaver v. Canfield, 21 Cal.App.2d 734 [70 P.2d 507] ; Drummond v. Drummond, 39 Cal.App.2d 418 [103 P.2d 217] ; Estate of Schmidt, 49 Cal.App.2d 86 [121 P.2d 104] ; Lewis v. Burns, 122 Cal. 358 [55 P. 132] ; Lewis v. Brown, 22 Cal.App. 38 [133 P. 331] .)

[3] Possession of the deed by the grantee also creates prima facie evidence of valid delivery. ( Labadie v. Labadie, 57 Cal.App.2d 456 [134 P.2d 858] .) [4] Once a prima facie case is made out, or the presumption established, the 280

*280 burden shifts to the party attacking the validity of the deed. ( California Trust Co. v. Hughes, 111 Cal.App.2d 717 [245 P.2d 374] .) "Nothing but the most satisfactory evidence of non-delivery should prevail against the presumptions." ( Stewart v. Silva, 192 Cal. 405 [221 P. 191] .) [5] Payment of taxes and keeping up insurance by the grantor are consistent with the intent to pass title. ( Hitch v. Hitch 24 Cal.App.2d 291 [74 P.2d 1098] .) [6] The validity of the document is not affected by the failure to record or change possession. ( Knox v. Kearney, 40 Cal.App. 290 [180 P. 661] .) [7] The fact that one of the grantees has no knowledge of the deed or intent to pass present title, has no bearing on the grantor's intent to divest himself of title. ( Green v. Skinner, 185 Cal. 435 [197 P. 60] .) [8] Delivery to one joint owner is delivery to both. ( Smith v. Lombard, 201 Cal. 518 [258 P. 55] ; Eshleman v. Henrietta Vineyard Co., 102 Cal. 199 [36 P. 579] .) [9] Acceptance is presumed where a grant is beneficial, even where a grantee has no knowledge of the deed. ( Estate of Kalt, 16 Cal.2d 807 [108 P.2d 401, 138 A.L.R. 1424] ; Smith v. Lombard, 201 Cal. 518 [258 P. 55] ; Herman v. Mortensen, 72 Cal.App.2d 413 [164 P.2d 551] .)

[10] As to appellant Anthony Bonavia's contention relating to the validity of the 1954 deed, there was sufficient evidence to sustain the trial court's finding that Caterina Bonavia was incompetent and that the deed was executed by reason of Anthony Bonavia's undue influence. Appellant Anthony Bonavia makes much of the conflicts between his testimony and that of the other witnesses. On appeal, all conflicts must be resolved in favor of the conclusion reached below. ( Ahern v. S. H. Kress & Co., 97 Cal.App.2d 691 [218 P.2d 108] .) There is uncontroverted evidence that at the time of the 1954 deed, Caterina Bonavia no longer recalled whom her family consisted of and what persons had claim upon her bounty. ( Estate of Dunne, 130 Cal.App.2d 216 [278 P.2d 733] .) The doctor testified that Caterina was in a semicomatose condition for the period of time before her death. She had to be propped up in order to sign the deed. On the evidence presented, the trial court was justified

in finding that Caterina Bonavia was generally mentally incompetent by reason of illness, old age and increasing senility. ( Hughes v. Grandy, 78 Cal.App.2d 555 [177 P.2d 939] .)

The evidence also established a confidential relationship between Anthony Bonavia and his mother. He made and withdrew deposits from a joint bank account, cashed her 281

*281 dividend checks, and paid taxes and necessary expenses. His activity in the preparation of the 1954 deed is discussed above. [11] A presumption of undue influence arises from the proof of existence of a confidential relationship between the grantor and grantee, coupled with activity on the part of the grantee in the preparation of the document. ( Estate of White, 128 Cal.App.2d 659 [276 P.2d 11] ; see also Nobles v. Hutton, 7 Cal.App. 14 [93 P. 289] ; Hughes v. Grandy, supra , and Estate of Abert, 91 Cal.App.2d 50 [204 P.2d 347] .)

[12a] As to appellant Anthony Bonavia's final argument relating to adverse possession, there is no evidence of adverse possession by Caterina Bonavia after 1933. Her occupation is presumed to be subordinate to the legal title. (Code Civ. Proc., 321.) [13] If a grantor is to acquire title by adverse possession against his own conveyance, a disclaimer by an assertion of adverse title with notice to the owners is necessary. ( Madden v. Alpha Hardware & Supply Co., 128 Cal.App.2d 72 [274 P.2d 705] ; Oglesby v. Hollister, 76 Cal. 136 [18 P. 146, 9 Am.St.Rep. 177] .) [12b] The evidence indicates that there was always a close and affectionate relationship between Caterina Bonavia and her two children, her son-in-law, Leon Belli, Sr., and her grandsons. In family transactions, possession, payment of taxes, management of the property are all consistent with the legal title. ( Merritt v. Rey, 104 Cal.App. 700 [286 P. 510] ; Tully v. Tully, 137 Cal. 60 [69 P. 700] ; Reed v. Smith, 125 Cal. 491 [58 P. 139] ; Allen v. Allen, 159 Cal. 197 [113 P. 160] .) In the somewhat similar case of Merritt v. Rey, supra , the grantor lived on the property for 17 years after the execution and delivery of the deed, mortgaged the property in her own name, paid taxes, repairs, expenses and insurance, and was repaid by income from the property.

[14a] We turn now to the sole contention on appeal made by the estate of Caterina Bonavia. The estate argues that since Anthony Bonavia never accepted his interest under the 1933 deed and subsequently disclaimed it in open court, it is proper for this court to reverse the lower court's finding as to one-half interest of Anthony Bonavia and hold that the estate of Caterina is the owner thereof. As we have pointed out above, acceptance of benefits will be presumed and knowledge of the grantee is not essential in a situation such as this one. [15] The intention with which a grantor puts a deed in the hands of a third person is a question of fact 282

*282 to be determined from all the circumstances surrounding the transaction. ( Hotaling v. Hotaling, 193 Cal. 368 [224 P. 455, 56 A.L.R. 734] ; Kimbro v. Kimbro, 199 Cal. 344 [249 P. 180] .) [14b] As we stated above, the record supports the finding of the trial court that the 1933 deed was delivered with intent to pass title at that time. Nor can we attach a great deal of significance to Anthony Bonavia's disclaimer of the 1933 deed in open court during the course of this litigation, in which he based his position on the validity of the 1954 deed.

We conclude that the judgment finds ample support in the record before us.

Judgment affirmed.

Dooling, J., and Draper, J., concurred.

# THE LAW OF

# REAL PROPERTY

### AND

# DEEDS

BY ROBERT T. DEVLIN

UNITED STATES ATTORNEY, SAN FRANCISCO, CAL.

AUTHOR OF "THE TREATY POWER UNDER THE CONSTITUTION
OF THE UNITED STATES."

### THIRD EDITION

### Vol. I

CHICAGO:

CALLAGHAN & COMPANY

1911

Copyright 1887
By ROBERT T. DEVLIN

———

Copyright 1897
By ROBERT T. DEVLIN

———

Copyright 1911
By ROBERT T. DEVLIN

# CHAPTER XIX.

## ACKNOWLEDGMENT OF DEEDS.

§ 464. Acknowledgment of deeds.
465. Acknowledgment not nec-
essary between the par-
ties.
465a. Estoppel to deny signature.
466. Statutory provisions.
467. Admissibility of acknowl-
edged deed in evidence.
468. By whom the acknowledg-
ment should be made.
469. Time within which deed
may be acknowledged.
470. Qualification of officers.
471. Acknowledgment before an
officer *de facto.*
471a. Certificate authenticating
acknowledgment taken
out of State.
471b. Same subject, continued.
472. Temporary appointment.
473. Acknowledgment before
deputy.
474. Deputy taking acknowledg-
ment in his own name.
475. Presumption as to appoint-
ment of deputy.
476. Officer cannot take ac-
knowledgment of deed
in which he is interested.
477. Where the officer taking the
acknowledgment is a
trustee.
477a. Degree of interest.
477b. Acknowledgment before
stockholder of corpora-
tion.

§ 477c. Instances of application of
this rule.
477d. Disqualification not depend-
ent on statute.
477e. Collateral attack.
477f. Contrary view—Stockhold-
er not disqualified.
477g. Reasoning that taking ac-
knowledgment is minis-
terial act.
477h. Officer who is not a stock-
holder, not disqualified.
477i. Registration as giving not-
ice.
477j. Comments.
478. Effect of taking acknowl-
edgment by party.
478a. Acknowledgment of one
grantor taken by another
grantor.
479. Length of acquaintance
with person making ac-
knowledgment.
480. Comments on this rule.
481. Omission of date does not
invalidate acknowledg-
ment.
482. Omission to state place of
taking acknowledgment.
483. When certificate does not
show in what State ac-
knowledgment was made.
484. Proof of locality in which
officer had jurisdiction.
484a. Stating name of county.

§ 485. Treating two certificates as one.
486. Presumption that acknowledgment was taken within jurisdiction of officer.
487. Jurisdiction of officer.
488. Comments.
489. Officer if required by statute must attach seal.
490. Where there is no statutory provision.
491. Reference to official seal.
492. Same subject—Contrary decision.
493. Comments.
494. Use of private seal.
495. What will constitute an official seal.
495a. Officer using another's seal.
496. Signature of officer must be attached to certificate.
497. Certificate of foreign officer, *prima facie* evidence of conformity to law.
498. Taking an acknowledgment is ministerial act.
499. Official character of officer should appear.
500. Certificate *prima facie* evidence.
501. Abbreviations sufficient designation of official character.
502. Proof *aliunde* of official character.
503. Stating name of grantor in certificate.
504. Certificate sufficient, if it shows grantor's name by reference.
505. Presumption that parties use their real names.
506. Acknowledgment in court.
507. Acknowledgment by trustee.

§ 508. Certificate should affirmatively show compliance with statute.
509. Facts showing compliance with statute must be stated.
510. Equivalent words to those mentioned in statute.
511. Illustrations.
512. Omission of the word "personally."
513. Surplusage does not vitiate certificate.
514. Clerical mistakes in certificate.
515. Other illustrations.
516. Omission to state immaterial facts.
517. Comments.
518. Fact must appear that grantor was known to officer or his identity established.
519. Statement that officer is satisfied with identity insufficient.
520. In some States, officer not required to certify to personal identity.
521. Fact of acknowledgment must appear.
522. Equivalent words indicating acknowledgment.
523. Omission of the word "voluntary."
524. Omission of certain words under particular statutes.
525. Presuming an acknowledgment.
526. Comments.
527. Certifying an acknowledgment on same paper on which deed is printed or written.
527a. Liability of officer for false certificate.

§ 527b. Assuming fact to exist.
527c. What evidence required.
527d. Burden of proof.
527e. Not guarantor—But liable for false certificate.
527f. Negligence barring recovery.
527g. Property valueless.
528. Officer cannot impeach his own certificate.
529. Between the parties the acknowledgment may be impeached for fraud.
529a. Taking acknowledgment through telephone.
530. Grantee must have knowledge of fraud or of facts sufficient to put him on inquiry.
531. To overcome the certificate the evidence must be clear and convincing.
532. Evidence.
533. Illustrations.
533a. Further consideration of this subject.
533b. In some cases considered prima facie evidence only.
534. Comments.
535. Innocent grantee protected.
536. Omission of essential word not cured by insertion in record.
537. Acknowledgment through interpreter.

§ 538. Comments.
539. Amendment of certificate—Decisions that such power exists.
540. In Mississippi.
541. In Missouri.
541a. In Texas.
541b. In Delaware and Iowa.
541c. In Colorado and Michigan.
541d. In Tennessee.
542. Decisions that such power does not exist.
543. In Illinois.
544. In Virginia.
544a. In Kentucky.
544b. In North Carolina.
544c. In Alabama.
544d. In Florida.
545. In the Supreme Court of the United States.
546. Comments.
547. Proof by subscribing witness.
547a. Statutes curing defective acknowledgments.
547b. What defects within purview of statute.
547c. Retrospective statutes.
547d. Statutes cannot disturb vested rights.
547e. Statutes curing acknowledgments of married women.
547f. Statutes validating acknowledgments of stockholder of corporation.

**§ 464. Acknowledgment of deeds.**—In all of the States, statutes exist which provide for the acknowledgment of deeds. Generally, the statute prescribes a particular form with which substantial compliance is necessary. The object of these statutes is to prove the execution of the conveyance, so as to insure its authenticity when presented for registration, and to enable it to be used in evidence without further proof of its

execution by the grantor. The certificate of acknowledgment is not essential to the validity of the deed, which is operative, without acknowledgment between the parties. The certificate is simply evidence of the execution of the deed supplying the place of direct proof, and, like all other evidence, should receive a reasonable construction.[1] Ordinarily the proper ac-

---

[1] Harrington v. Fish, 10 Mich. 415, 421; Gray v. Ulrich, 8 Kan. 112. In the former case a deed was executed and acknowledged in the year 1842, in New York, conveying lands in Michigan. The certificate of the proper clerk was made and attached several years afterward, stating that the deed was executed and acknowledged according to the "existing" law of that State. Objection was made to the admission of the deed in evidence because the clerk's certificate did not state that the deed was acknowledged in compliance with the laws in force at that time. Upon this point, the court, per Martin, C. J., remark: "The second objection relates to the admission of the deed as evidence, without actual proof of its execution. The clerk's certificate, without which—as the deed was executed in another State—it would not be 'authorized to be recorded,' would unquestionably be good were it not for the word 'existing' contained in it; but from the interval of time between the execution of the deed and the date of the certificate—which is December, 1859—it is insisted that the word limits the certificate to the time of such date. Had the certificate been made at or near the time of the deed, no question would arise, nor would one were the word 'existing' stricken out; as, in either case, it would be construed as a certificate of the due and legal execution of the deed according to the laws of the State of New York as they existed at the time of such execution. In my opinion, the occurrence of the word 'existing' does not invalidate the certificate, or qualify its construction. I cannot presume that it was inserted as a word of limitation, especially as the clerk could not legally execute any except such as would establish the lawful execution of the deed; but rather that he attempted to comply with the law, and that the word was inadvertently used, or perhaps inadvertently retained in the certificate if a blank form was used, or regarded by the clerk as referring to the time when the deed was executed. The certificate is not as essential part of the deed, nor necessary to its validity. It is only required to authorize its being recorded, and I think it more reasonable, instead of avoiding the registry for the ignorance or inadvertence of the certifying officer, to hold the word 'existing' as immaterial, or understand it as though the word 'then' preceded it. The certificate being no part of the deed, or of its execution, and not the act of the parties to the deed, should not be construed with tech-

knowledgment of a deed is a condition precedent to its admission to record.[3]   Hence constructive notice is not imparted by recording an unacknowledged or defectively acknowledged instrument.[3]   Where the acknowledgment, however, upon its

nical nicety unless upon imperative necessity.  It is *evidence* of the execution of the deed, and like all other evidence should be reasonably construed.  I therefore think the deed was properly admitted."

[3] Reid v. Kleyensteuber, 7 Ariz. 58, 60 Pac. 879; Lee v. Murphy, 119 Cal. 364, 51 Pac. 549; Ohio etc. Bank v. Berlin, (D. C.) 26 App. Cas. 218; Kothe v. Krag-Reynolds Co., 20 Ind. App. 293, 50 N. E. 594; Waterhouse v. Black, 87 Ia. 317, 54 N. W. 342; Smith v. Clark, 100 Ia. 605, 69 N. W. 1011; Sherod v. Ewell, 104 Ia. 253, 73 N. W. 493; Kock v. West, 118 Ia. 468, 92 N. W. 663, 96 Am. St. Rep. 394; Farmers' etc. Bank v. Stockdale, 121 Ia. 748, 96 N. W. 732; Swafford v. Herd, 23 Ky. L. Rep. 1556, 65 S. W. 803; Belcher v. Polly, 32 Ky. L. Rep. 623, 106 S. W. 818; Dolm v. Haskin, 88 Mich. 144, 50 N. W. 108; Chicago etc. Co. v. Powell, 120 Mich. 51, 78 N. W. 1022; Tweto v. Horton, 90 Minn. 451, 97 N. W. 128; Elmslie v. Thurman, 87 Miss. 537, 40 So. 67; German-American Bank v. Real Estate Co., 150 Mo. 570, 51 S. W. 691; Finley v. Babb, 173 Mo. 257, 73 S. W. 180; Williams v. Butterfield, 182 Mo. 181, 81 S. W. 615; Vincent v. Means, 207 Mo. 709, 106 S. W. 8; Leavitt v. Thornton, 108 N. Y. Supp. 162, 123 App. Div. 683; Moran v. Strader, 103 N. Y. Supp. 175, 52 Misc. 385; Bernhardt v. Brown, 122 N. C. 587, 29 S. E. 884, 65 Am. St.

Rep. 725; Blanton v. Bostic, 126 N. C. 418, 35 S. E. 1035; Hatcher v. Hatcher, 127 N. C. 200, 37 S. E. 207; Lance v. Tainter, 137 N. C. 249, 49 S. E. 211; Allen v. Burch, 142 N. C. 524, 55 S. E. 354; Amick v. Woodworth, 58 Ohio St. 86, 50 N. E. 437; Straman v. Rechtine, 58 Ohio St. 443, 51 N. E. 44; Geneseo etc. Bank v. Nat. etc. Bank, 13 Okl. 719, 76 Pac. 130; Nodine v. Union, 42 Ore. 613, 72 Pac. 582; Williams v. Ontario etc. Bank, 48 Ore. 571, 87 Pac. 890; Price v. Madison, 17 S. D. 247, 95 N. W. 933; Heintz v. Thayer, 92 Tex. 658, 50 S. W. 929, 51 S. W. 640; Punchard v. Masterson, 100 Tex. 479, 101 S. W. 204; Riviere v. Wilkens, 31 Tex. Civ. App. 454, 72 S. W. 608; Schultz v. Lumber Co., 36 Tex. Civ. App. 448, 82 S. W. 353; Simmons v. Hewitt, (Tex.) 87 S. W. 188; Murray v. Beal, 23 Utah, 548, 65 Pac. 726; Iron Belt etc. Assn. v. Groves, 96 Va. 138, 31 S. E. 23; Leftwich v. Richmond, 100 Va. 164, 40 S. E. 651; Hunton v. Wood, 101 Va. 54, 43 S. E. 186; Hatfield v. Haubert, 51 W. Va. 190, 41 S. E. 144; State v. Harman, 57 W. Va. 447, 50 S. E. 828; Webb v. Ritter, 60 W. Va. 193, 54 S. E. 484; South Penn Coal Co. v. Smith, 63 W. Va. 587, 60 S. E. 593.

[3] Lee v. Murphy 119 Cal. 364, 51 Pac. 549; Ohio Nat. Bank v. Berlin, (D. C.) 26 App. Cas. 218; Kothe v. Krag-Reynolds Co., 20 Ind. App. 293, 50 N. E. 594; City Bank v.

face is regular, and there is nothing to show that it is defective, it will, according to a number of authorities, impart constructive notice.[4] Still this view is not universally accepted and there are other authorities which dissent from this view.[5]

§ 465. Acknowledgment not necessary between the parties.—The rule which obtains in most of the States is, that as between the parties, no acknowledgment is necessary. The provisions relating to the acknowledgment of deeds are made for the protection and security of creditors and purchasers. But so far as the grantor is concerned, the title vested in him passes by the deed to the grantee as completely as it would if the conveyance had been acknowledged and recorded.[6] "The

Radtke, 87 Ia. 363, 54 N. W. 435; Smith v. Clark, 100 Ia. 605, 69 N. W. 1011; Bardsley v. German-American Bank, 113 Ia. 216, 84 N. W. 1041; Farmers' etc. Bank v. Stockdale, 121 Ia. 748, 96 N. W. 732; St. Paul etc. Co. v. Berkey, 52 Minn. 497, 55 N. W. 60; Ligon v. Barton, 88 Miss. 135, 40 So. 555; Elmslie v. Thurman, 87 Miss. 537, 40 So. 67; Finley v. Babb, 173 Mo. 257, 73 S. W. 180; Williams v. Butterfield, 182 Mo. 181, 81 S. W. 615; Leavitt v. Thornton, 108 N. Y. Supp. 162, 123 App. Div. 683; Geneseo etc. Bank v. Nat. etc. Bank, 13 Okl. 719, 76 Pac. 130; Williams v. Ontario etc. Bank, 48 Ore. 571, 87 Pac. 890; Watts v. Whetstone, 79 S. C. 357, 60 S. E. 703; Cannon v. Deming, 3 S. D. 421, 53 N. W. 863; Banbury v. Sherin, 4 S. D. 88, 55 N. W. 723; Webb v. Ritter, 60 W. Va. 193, 54 S. E. 484; South Penn etc. Co. v. Smith, 63 W. Va. 587, 60 S. E. 593; Johnson v. Eversole Lumber Co., 147 N. C. 249, 60 S. E. 1129.

Deeds. Vol. 1.—52

[4] Ogden etc. Assn. v. Meusch, 196 Ill. 554, 63 N. E. 1049, 89 Am. St. Rep. 330; Blauton v. Bostic, 126 N. C. 418, 35 S. E. 1035; Kee v. Ewing, 17 Okl. 410, 87 Pac. 297; Ardmore etc. Bank v. Briggs etc. Co. (Okl.) 94 Pac. 533; Southwestern Mfg. Co. v. Hughes, 24 Tex. Civ. App. 637, 60 S. W. 684; Henke v. Stacy, 25 Tex. Civ. App. 272, 61 S. W. 509; Boswell v. Laramie etc. Bank, 16 Wyo. 161, 92 Pac. 624.

[5] Kothe v. Krag-Reynolds Co., 20 Ind. App. 293, 50 N. E. 594; Smith v. Clark, 100 Ia. 605, 69 N. W. 1011; Bardsley v. German-American Bank, 113 Ia. 216, 84 N. W. 1041; Farmers' etc. Bank v. Stockdale, 121 Ia. 748, 96 N. W. 732; Hunton v. Wood, 101 Va. 54, 43 S. E. 186.

[6] Hastings v. Vaughn, 5 Cal. 315; Stewart v. Matthews, 19 Fla. 752; Gibbs v. Swift, 12 Cush. 393; Raines v. Walker, 77 Va. 92; Strong v. Smith, 3 McLean, 362; Harrison v. McWhirter, 12 Neb. 152; Goodenough v. Warren, 5

# REPORTS OF CASES

### ARGUED AND DETERMINED IN

# THE SUPREME COURT

#### OF THE

## STATE OF CALIFORNIA,

### IN THE YEAR 1855.

#### BY

## WM. GOUVERNEUR MORRIS.

### VOLUME V.

### *SECOND EDITION.*

## WITH NOTES AND REFERENCES

### BY J. S. BLATCHLEY, ESQ.,

#### OF THE SAN FRANCISCO BAR.

### SAN FRANCISCO:

## SUMNER WHITNEY,

#### 613 CLAY STREET.

## H. H. BANCROFT & CO.,

#### MARKET STREET.

### 1870.

Points decided.

JERRY FORD, Appellant, *vs.* N. B. SMITH, Respondent.    [314]

Receipts executed by a third party, acknowledging the payment of money, are but secondary evidence, as the party executing them is a competent witness to prove the payments, or any other person who saw the payments made.

APPEAL from the County Court of Contra Costa County.
The material facts appear in the opinion of the Court.
*Mills & Allen*, for Appellant.
*M. J. Chase*, for Respondent.
No briefs on file.
HEYDENFELDT, J., delivered the opinion of the Court.    MURRAY, C. J., concurred.
Upon the trial, the defendant introduced receipts of one Hesse to prove payments made to Hesse by defendant, on the joint account of plaintiff and defendant, and for a proportion of which plaintiff was claimed to be liable to defendant.
These receipts were mere secondary evidence; the best evidence would have been the sworn testimony of Hesse as to the payment made to him, or of any one else who saw the money paid.
For the error in admitting this evidence, the judgment is reversed, and the cause remanded.

---

S. C. HASTINGS, Respondent, *vs.* JOSEPH P. VAUGHN    [315]
& PAUL SHIRLEY, Defendants, and THE MAYOR AND
COMMON COUNCIL OF THE CITY OF BENICIA, Intervenors and
Appellants.

An impression upon paper constitutes a good seal, and this may be made as well by a pen as by a stamp ; therefore, a scrawl, with the word seal written within it, or with the initials L. S., is sufficient.
Delivery of a conveyance is a question of fact to be determined by the jury, and depends more upon the intention of the parties, than upon the mode of fulfilling the intention.
The statute requires the seal of the officer taking the acknowledgment to be attached, as preliminary to fitting the deed for registration, and without conforming strictly to the statute, the registration will not be of such a character as to charge constructive notice.

Argument for Respondent.

Although a deed be defective in the acknowledgment, so as not to entitle it to registration, it is not void but is still good as between the parties, and as to all the world, except subsequent purchasers without notice.

A deed defective in the acknowledgment, should not be rejected as evidence for that reason, but should be admitted, with instructions to the jury as to its effect in giving notice to third persons.

APPEAL from the District Court of the Seventh Judicial District, Solano County.

The plaintiff commenced an action against the defendants, Vaughn and Shirley, to recover the possession of a certain lot in the city of Benicia.

Shirley answered, disclaiming any interest or title in the property, and Vaughn answered by denying generally the allegations in the complaint.

The Mayor and Common Council of Benicia intervened and claimed title to the property in dispute, through a deed from Malinda Cooper and her children, who had become possessed of the land by a deed from Stephen Cooper. This deed was drawn in the usual form, and signed by Stephen Cooper, and opposite his name was written the word " seal."

The deed, which had been recorded, was acknowledged before the County Recorder of Solano County, but does not bear upon its face his official seal.

[316]       * The Court refused to permit the original deed to be read to the jury in evidence. Defendants excepted. The jury found that there had been a sufficient delivery, and gave a verdict for the plaintiff.

The intervenors appealed.

*Lee & Leslie*, for Appellants.

No brief on file.

*John Currey*, for Respondent.

I. A deed is not entitled to be recorded until it is duly acknowledged. Comp. L. p. 517, §§ 24, 25, and p. 839, § 4.

The certificate of acknowledgment must be under seal. Comp. L. p. 513, §§ 4, 5.

The certificate of acknowledgment, etc., may be rebutted. Comp. L. p. 518, § 30.

By the production of the instrument itself, it appeared: First,

that it was not a deed; second, that it was not entitled to be recorded, and consequently it failed to impart notice; and third, that as it failed to impart notice it was void as against the plaintiff, who was a purchaser in good faith for a valuable consideration.   Comp. L. p. 517, § 26.

The question of the due execution of a deed is open to free inquiry.   *Hopkins* v. *Leek*, 12 Wend. 105.   *Jackson* v. *Perkins*, 2 Wend. 308.   *Powers* v. *Russell*, 13 Pick. 69.

II. The objection to the instrument in writing, as a deed from Stephen Cooper to his wife and children, was well taken.

A scroll is not a seal, nor is it equivalent to a seal.   *Warren* v. *Lynch*, 5 Johns. 244.

A deed is a writing sealed and delivered.   1 Blackstone's Com. b. 2, ch. 20.   4 Kent's Com. 452, etc.

At common law, a seal is indispensable to convey an estate in fee simple, fee tail, or for life.   1 Black. Com. b. 2, ch. 20. *Jackson* v. *Cook*, 12 Johns. 75.

An impression upon some tenacious substance is necessary at common law to constitute a seal.   *Coit* v. *Milliken*, 1 Denio, 376, and cases cited.

An impression upon paper alone is not a seal, except where it has been made so by statute.   1 Denio, 376.   2 Hill, 227.   3 Hill, 493.

*Our statute concerning Conveyances requires that   [317] all conveyances of land, or of any estate or interest thereon, shall be by deed.   Comp. Laws. p. 513, § 1.

The common law of England, in respect to this question, is our law.   Comp. Laws, p. 186.

The law presumes in favor of the absolute verity of sealed instruments; a seal imports a consideration, and the law precludes any inquiry, in a court of law, to impeach the consideration; this is because of the deliberate nature and solemnity of the act creating such instrument.   *Dorr* v. *Munsell*, 13 Johns. 430.   *Mead* v. *Sterger*, 5 Porter, 505.   *Bush* v. *Stevens*, 24 Wend. 256.

It is not necessary to allege, in declaring on a specialty, any

Opinion of the Court — Heydenfeldt, J.

consideration, for the seal imports a consideration. *Bush* v. *Stevens*, 24 Wend. 527.

III. The instrument in writing mentioned was not delivered to the grantees therein named; nor to any one authorized by them to receive it; nor to a stranger, as an escrow.

A deed is a writing sealed and delivered.  1 Black. Com. b. 2, 306, 307.

Unless a deed be delivered, it is void, *ab initio*.  Ibid.  1 Shep. Touchstone, 57, 58.

The consent of the grantee is requisite to a complete delivery. *Powers* v. *Russell*, 13 Pick. 75.  *Owings* v. *Grubb's Adm.* 6 J. J. Marsh. 32.  1 Johns. Cases, 114.  12 Mass. 461.  20 Johns. 184. 15 Wend. 658.  6 Cow. 617.

The placing a deed on record by the grantor, is not a delivery of it.  *Barns* v. *Hatch*, 3 N. H. 304.  10 Mass. 458.  1 Stewart & Porter, 61.

If the question of delivery is in doubt, presumptions in favor thereof should be rejected, when the interests of creditors and purchasers in good faith are to be affected by such presumptions. *Jackson* v. *Phipps*, 12 Johns. 418.  4 Viner's Ab. 27, 552.  4 Kent, 453, 454.

HEYDENFELDT, J., delivered the opinion of the Court.  MURRAY, C. J., and BRYAN, J., concurred.

The only question necessary to be examined, is the [318]   exclusion from *the jury of the deed made by Cooper to his wife and children; the Court deciding that the deed was void, because, first, it was not executed with a seal by the grantor; second, that the record did not impart notice, for the want of the seal of the officer before whom it was acknowlededged.

To these objections to the deed, the respondent adds, that the deed was not delivered.

In *Connolly* v. *Goodwin & Co.*, July Term, 1855, (p. 220 of this vol.,) we decided that an impression upon paper constituted a good seal.  We see no good reason why such impression should not be made with a pen, as well as with what is technically a stamp.  The object is to give character to the instru-

Opinion of the Court — Heydenfeldt, J.

ment, and enable it to be distinguished and recognized for that which it was intended to be. This is as well effected by a scrawl, with the word seal written within it, or with the initials L. S., a common mode resorted to in copying sealed instruments. . The authorities cited to the contrary, we look upon as founded upon too purely technical reasons, and are unsound expositions of the common law.

In regard to the question of delivery, the authorities are conflicting  In *Maynard* v. *Maynard,* 10 Mass. the execution and delivery for the purpose of registration is held not to be a delivery.

In *Barns* v. *Hatch,* 3 N. H., the same act was held to be on delivery, where it was coupled with the declaration that it was made to prevent the land from being taken to pay an unjust debt. The correct doctrine, we think, is laid down in *Doe on the demise of Gamons* v. *Knight,* 5 Barn. & Cres. 673. There, it was left to the jury to decide as to the intention of the grantor. Many authorities are cited, and much good reasoning brought out in support of the position that a deed will be operative although never parted with by the person who executed it. In other words, that delivery depends more upon intention, than upon the mode of fulfilling the intention.  That delivery is a question of fact, to be determined by the jury, is, we think, undeniable, and has been so held, not only in the case above cited, but also in *Lindsay* v. *Lindsay,* 11 Verm. 521 ; *Vanhook* v. *Barnett,* 4 Dev. 268 ; *Hannah* v. *Swainer,* 8 Watts, 9 ; and many others.

The remaining question is as to the want of the seal of the officer taking the acknowledgment. The statute requires it as a preliminary *to the fitness of the deed for regis-    [319] tration, and without conforming strictly to the statute, the registration will not have character to charge constructive notice. But although it may not have been entitled to registration, this does not make the deed void. It is still good as between the parties, and as to all the world, except subsequent purchasers without notice. It should have been allowed in evidence, with instructions to the jury as to its effect in giving notice to third persons. If this was the only reason given for

320        FORD *v.* HOLTON.        [Sup. Ct.

Statement of Facts.

rejecting the deed, it would be unnecessary to reverse the judgment; but as it was also held to be void for want of a seal, it was useless for the defendants to attempt to prove that the plaintiff had actual notice of the deed, which possibly they may be able to do.

For this reason the judgment is reversed, and the cause remanded.

---

WILLIAM FORD, Respondent, *vs.* S. P. HOLTON, Appellant.

Error will not be presumed, but must be affirmatively shown, and all intendments are in favor of the regularity of the Court below.

In an action of ejectment where no proof is introduced to show damages, it is no error to refuse to allow the defendant to prove the value of the improvements made by him on the property.

At common law no allowance was ever made for improvements, and our Practice Act only permits it to the extent of being used as a set-off to the damages for withholding the property recovered.

APPEAL from the District Court of the Seventh Judicial District, Contra Costa County.

Ejectment for certain lots of land situated in the town of Martinez. The complaint contained the usual averments, and the answer admitted possession, but claimed title to the property by virtue of a tax collector's deed.

Plaintiff, to prove his title, introduced in testimony the records of the Probate Court, showing that Commissioners had [320] been appointed to ⁎ divide the estate of one William Welch, deceased, and that the property in dispute had been set aside by the Commissioners as the share of his widow. The Court admitted the testimony and defendant excepted. The plaintiff then proved the mesne conveyances from Mrs. Welch to him. The defendant offered to show that he held possession of the land through a tax deed from the Sheriff, which plaintiff objected to as evidence, until all necessary proceedings prior to the sale of the land should be shown to have been duly performed. The court sustained the objection and defendant excepted.

# Maggio v. Zeitz, 333 US 56 - Supreme Court 1948

## 333 U.S. 56 (1948)

## MAGGIO
### v.
## ZEITZ, TRUSTEE IN BANKRUPTCY.

### No. 38.

### Supreme Court of United States.

Submitted October 13, 1947.
Decided February 9, 1948.

CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE SECOND CIRCUIT.

58

*58 *Max Schwartz* submitted on brief for petitioner.

*Joseph Glass* and *Sidney Freiberg* submitted on brief for respondent.

MR. JUSTICE JACKSON delivered the opinion of the Court.

Joseph Maggio, the petitioner, was president and manager of Luma Camera Service, Inc., which was adjudged bankrupt on April 23, 1942. In January of 1943 the 59

*59 trustee asked the court to direct Maggio to turn over a considerable amount of merchandise alleged to have been taken from the bankrupt concern in 1941, and still in Maggio's possession or control. After hearing, the referee found that "the Trustee established by clear and convincing evidence that the merchandise hereinafter described, belonging to the estate of the bankrupt, was knowingly and fraudulently concealed by the respondent [Maggio] from the Trustee herein and that said merchandise is now in the possession or under the control of the respondent." A turnover order issued and was affirmed by the District Court and then unanimously affirmed by the Circuit Court of Appeals, Second Circuit, without opinion other than citation of its own prior cases. *Zeitz* v. *Maggio,* 145 F.2d 241 . Petition for certiorari was denied by this Court. 324 U.S. 841 .

As Maggio failed to turn over the property or its proceeds, the Referee found him in contempt. After hearing, the District Court affirmed and ordered Maggio to be jailed until he complied or until further order of the court. Again the Circuit Court of Appeals affirmed. 157 F.2d 951 .

But in affirming the Court said: "Although we know that Maggio cannot comply with the order, we must keep a straight face and pretend that he can, and must thus affirm orders which first direct Maggio `to do an impossibility, and then punish him for refusal to perform it.'" Whether this is to be read literally as its deliberate judgment of the law of the case or is something of a decoy intended to attract our attention to the problem, the declaration is one which this Court, in view of its supervisory power over courts of bankruptcy, cannot ignore. Fraudulent bankruptcies probably present more difficulties to the courts in the Second Circuit than they do elsewhere. These conditions are reflected in conflicting views within the Court of Appeals, which we need not detail as they are 60

*60 already set out in the books: *In re Schoenberg,* 70 F.2d 321 ; *Danish* v. *Sofranski,* 93 F.2d 424 ; *In re Pinsky-Lapin & Co.,* 98 F.2d 776 ; *Seligson* v. *Goldsmith,* 128 F.2d 977 ; *Rosenblum* v. *Marinello,* 133 F.2d 674 ; *Robbins* v. *Gottbetter,* 134 F.2d 843 ; *Cohen* v. *Jeskowitz,* 144 F.2d 39 ; *Zeitz* v. *Maggio,* 145 F.2d 241 .

The problem is illustrated by this case. The court below says that in the turnover proceedings it was sufficiently established that, towards the end of 1941, a shortage occurred in this bankrupt's stock of merchandise. It seems also to regard it as proved that Maggio personally took possession of the corporation's vanishing assets. But this abstraction by Maggio occurred several months before bankruptcy and over a year before the turnover order was applied for. The only evidence that the goods then were in the possession or control of Maggio was the proof of his onetime possession supplemented by a "presumption" that, in the absence of a credible explanation by Maggio of his disposition of the goods, he continues in possession of them or their proceeds. Because the Court of Appeals felt constrained by its opinions to adhere to this "presumption" or "fiction" it affirmed the turnover order. Now it says it is convinced that in reality Maggio did not retain the goods or their proceeds up to the time of the turnover proceedings and that the turnover order was unjust. But it considers the turnover order *res judicata* and the injustice beyond reach on review of the contempt order.

The proceeding which leads to commitment consists of two separate stages which easily become out-of-joint because the defense to the second often in substance is an effort to relitigate, perhaps before another judge, the issue supposed to have been settled in the first, and because while the burden of proof rests on the trustee, frequently evidence of the facts is entirely in possession of his adversary, the bankrupt, who is advantaged by nondisclosure. 61

*61 Because these separate but interdependent turnover and contempt procedures are important to successful bankruptcy administration, we restate some of the principles applicable to each, conscious however of the risk that we may do more to stir new than to settle old controversies.

# I.



The turnover procedure is one not expressly created or regulated by the Bankruptcy Act. It is a judicial innovation by which the court seeks efficiently and expeditiously to accomplish ends prescribed by the statute, which, however, left the means largely to judicial ingenuity.

The courts of bankruptcy are invested "with such jurisdiction in law and in equity as will enable them" to "Cause the estates of bankrupts to be collected, reduced to money and distributed, and determine controversies in relation thereto. . . ." 11 U.S.C. § 11 (a) (7). And the function to "collect and reduce to money the property of the estates" is also laid upon the trustee. 11 U.S.C. § 75 (a) (1). A correlative duty is imposed upon the bankrupt fully and effectually to turn over all of his property and interests, and in case of a corporation the duty rests upon its officers, directors or stockholders. 11 U.S.C. § 25 .

To compel these persons to discharge their duty, the statute imposes criminal sanctions. It denounces a comprehensive list of frauds, concealments, falsifications, mutilation of records and other acts that would defeat or obstruct collection of the assets of the estate, and prescribes heavy penalties of fine or imprisonment or both. 11 U.S.C. § 52 (b). It also confers on the courts power to arraign, try and punish persons for violations, but "in accordance with the laws of procedure" regulating trials of crimes. 11 U.S.C. § 11 (a) (4). And it specifically provides for jury trial of offenses against the Bankruptcy 62

*62 Act. 11 U.S.C. § 42 (a), (c). Special provisions are also made to induce vigilance in prosecuting such offenses. It is the duty of the referee and trustee to report any probable grounds for believing such an offense has been committed to the United States Attorney, who thereupon is required to investigate and report to the referee. In a proper case he is directed to present the matter to the grand jury without delay, and if he thinks it not a proper case he must report the facts to the Attorney General and abide his instructions. 11 U.S.C. § 52 (e).

Courts of bankruptcy have no authority to compensate for any neglect or lack of zeal in applying these prescribed criminal sanctions by perversion of civil remedies to ends of punishment, as some judges of the Court of Appeals suggest is being done.

Unfortunately, criminal prosecutions do not recover concealed treasure. And the trustee, as well as the Court, is commanded to collect the property. The Act vests title to all property of the bankrupt, including any transferred in fraud of creditors, in the trustee, as of the date of filing the petition in bankruptcy, 11 U.S.C. § 110 , which puts him in position to pursue all plenary or summary remedies to obtain possession.

To entertain the petitions of the trustee the bankruptcy court not only is vested with "jurisdiction of all controversies at law and in equity" between trustees and adverse claimants concerning property acquired or claimed by the trustee, 11 U.S.C. § 46 , but it also is given a wide discretionary jurisdiction to accomplish the ends of the Act, or in the words of the statute to "make such orders, issue such process, and enter such judgments,

in addition to those specifically provided for, as may be necessary for the enforcement of the provisions of this title." 11 U.S.C. § 11 (a) (15).

In applying these grants of power, courts of bankruptcy have fashioned the summary turnover procedure as one 63

*63 necessary to accomplish their function of administration. It enables the court summarily to retrieve concealed and diverted assets or secreted books of account the withholding of which, pending the outcome of plenary suits, would intolerably obstruct and delay administration. When supported by "clear and convincing evidence," the turnover order has been sustained as an appropriate and necessary step in enforcing the Bankruptcy Act. *Oriel* v. *Russell,* 278 U.S. 358 ; *Cooper* v. *Dasher,* 290 U.S. 106 . See also *Farmers & Mechanics National Bank* v. *Wilkinson,* 266 U.S. 503 .

But this procedure is one primarily to get at property rather than to get at a debtor. Without pushing the analogy too far, it may be said that the theoretical basis for this remedy is found in the common law actions to recover possession — detinue for unlawful detention of chattels and replevin for their unlawful taking — as distinguished from actions in trespass or trover to recover damages for the withholding or for the value of the property. Of course the modern remedy does not exactly follow any of these ancient and often overlapping procedures, but the object — possession of specific property — is the same. The order for possession may extend to proceeds of property that has been disposed of, if they are sufficiently identified as such. But it is essentially a proceeding for restitution rather than indemnification, with some characteristics of a proceeding *in rem;* the primary condition of relief is possession of existing chattels or their proceeds capable of being surrendered by the person ordered to do so. It is in no sense based on a cause of action for damages for tortious conduct such as embezzlement, misappropriation or improvident dissipation of assets.

The nature and derivation of the remedy make clear that it is appropriate only when the evidence satisfactorily establishes the existence of the property or its proceeds, 64

*64 and possession thereof by the defendant at the time of the proceeding. While some courts have taken the date of bankruptcy as the time to which the inquiry is directed, we do not consider resort to this particular proceeding appropriate if, at the time it is instituted, the property and its proceeds have already been dissipated, no matter when that dissipation occurred. Conduct which has put property beyond the limited reach of the turnover proceeding may be a crime, or, if it violates an order of the referee, a criminal contempt, but no such acts, however reprehensible, warrant issuance of an order which creates a duty impossible of performance, so that punishment can follow. It should not be necessary to say that it would be a flagrant abuse of process to issue such an order to exert pressure on friends and relatives to ransom the accused party from being jailed.

# II.

It is evident that the real issue as to turnover orders concerns the burden of proof that will be put on the trustee and how he can meet it. This Court has said that the turnover order must be supported by "clear and convincing evidence," *Oriel* v. *Russell,* 278 U.S. 358 , and that includes proof that the property has been abstracted from the bankrupt estate and is in the possession of the party proceeded against. It is the burden of the trustee to produce this evidence, however difficult his task may be.

The trustee usually can show that the missing assets were in the possession or under the control of the bankrupt at the time of bankruptcy. To bring this past possession down to the date involved in the turnover proceedings, the trustee has been allowed the benefit of what is called a presumption that the possession continues until the possessor explains when and how it ceased. This inference, which might be entirely permissible in 65

*65 some cases, seems to have settled into a rigid presumption which it is said the lower courts apply without regard to its reasonableness in the particular case.

However, no such presumption, and no such fiction, is created by the bankruptcy statute. None can be found in any decision of this Court dealing with this procedure. [1] Language can, of course, be gleaned from judicial pronouncements and texts that conditions once existing may be presumed to continue until they are shown to have changed. But such generalizations, useful enough, perhaps, in solving some problem of a particular case, are not rules of law to be applied to all cases, with or without reason.

Since no authority imposes upon either the Court of Appeals or the Bankruptcy Court any presumption of law, either conclusive or disputable, which would forbid or dispense with further inquiry or consideration of other evidence and testimony, turnover orders should not be issued, or approved on appeal, merely on proof that at some past time property was in possession or control of the accused party, unless the time element and other factors make that a fair and reasonable inference. [2] Under some circumstances it may be permissible, in resolving the unknown from the known, to reach the conclusion of present control from proof of previous possession. Such a process, 66

*66 sometimes characterized as a "presumption of fact," is, however, nothing more than a process of reasoning from one fact to another, an argument which infers a fact otherwise doubtful from a fact which is proved.

Of course, the fact that a man at one time had a given item of property is a circumstance to be weighed in determining whether he may properly be found to have it at a later date. But the inference from yesterday's possession is one thing, that permissible from possession twenty months ago quite another. With what kind of property do we deal? Was it salable or consumable? The inference of continued possession might be warranted when applied to books of account which are not consumable or marketable, but quite inappropriate under the same circumstances if applied to perishable merchandise or salable goods in considerable demand. Such an inference is one thing when applied to a thrifty person who withdraws his savings account after being involved in an accident, for no apparent purpose except to get it beyond the reach of a tort creditor, see *Rosenblum* v. *Marinello,* 133 F.2d

674 ; it is very different when applied to a stock of wares being sold by a fast-living adventurer using the proceeds to make up the difference between income and outgo.

Turnover orders should not be issued or affirmed on a presumption thought to arise from some isolated circumstance, such as onetime possession, when the reviewing court finds from the whole record that the order is unrealistic and unjust. No rule of law requires that judgment be thus fettered; nor has this Court ever so prescribed. Of course, deference is due to the trial court's findings of fact, as prescribed by our rules, but even this presupposes that the trier of fact be actually exercising his judgment, not merely applying some supposed rule of law. In any event, rules of evidence as to inferences from facts are to aid reason, not to override it. And 67

*67 there does not appear to be any reason for allowing any such presumption to override reason when reviewing a turnover order.

We are well aware that these generalities do little to solve concrete issues. The latter can be resolved only by the sound sense and good judgment of trial courts, mindful that the order should issue only as a responsible and final adjudication of possession and ability to deliver, not as a questionable experiment in coercion which will recoil to the discredit of the judicial process if time proves the adjudication to have been improvident and requires the courts to abandon its enforcement.

# III.

Unlike the judicially developed turnover proceedings, contempt proceedings for disobedience of a lawful order are specifically authorized by two separate provisions of the Act and are of two distinct kinds. The court is authorized to "enforce obedience by persons to all lawful orders, by fine or imprisonment or fine and imprisonment." 11 U.S.C. § 11 (a) (13). This creates the civil contempt proceeding to coerce obedience, now before us. There is also provision for a criminal contempt proceeding whose end is to penalize contumacy, the court also being authorized to "punish persons for contempts committed before referees." 11 U.S.C. § 11 (a) (16). These contempts before referees are defined to include disobedience or resistance to a lawful order, and the statute provides for a summary proceeding before the District Judge who, if the evidence "is such as to warrant him in so doing," may punish the accused or commit him upon conditions. 11 U.S.C. § 69 .

The proceeding before us sought only a coercive or enforcement sanction. The petition asked commitment "until he shall have complied with the aforesaid turnover order." The commitment was only until he "shall have 68

*68 purged himself of such contempt by complying with said turnover order, or until the further order of this Court." Thus no punishment whatever was imposed for past disobedience, and every penalty was contingent upon failure to obey. This is a decisive characteristic of civil contempt and of the truly coercive commitment for enforcement purposes, which, as often is said, leaves the contemnor to "carry the key of his prison in his

own pocket." *Penfield Co.* v. *Securities & Exchange Commission,* 330 U.S. 585 . We thus have before us now a civil contempt of the same kind that was before the Court in *Oriel* v. *Russell,* 278 U.S. 358, 363 . What we say, therefore, is not applicable to criminal contempt proceedings designed solely for punishment and vindication of the court's flouted authority, such, for example, as a proceeding to sentence one for destroying or mutilating books of account or property in his possession which the court had ordered him to turn over.

The question now arises as to whether, in this contempt proceeding, the Court may inquire into the justification for the turnover order itself. It is clear however that the turnover proceeding is a separate one and, when completed and terminated in a final order, it becomes *res judicata* and not subject to collateral attack in the contempt proceedings. This we long ago settled in *Oriel* v. *Russell,* 278 U.S. 358 , and, we think, settled rightly.

The court order is increasingly resorted to, especially by statute, [3] to coerce performance of duties under sanction 69

*69 of contempt. It would be a disservice to the law if we were to depart from the long-standing rule that a contempt proceeding does not open to reconsideration the legal or factual basis of the order alleged to have been disobeyed and thus become a retrial of the original controversy. The procedure to enforce a court's order commanding or forbidding an act should not be so inconclusive as to foster experimentation with disobedience. Every precaution should be taken that orders issue, in turnover as in other proceedings, only after legal grounds are shown and only when it appears that obedience is within the power of the party being coerced by the order. But when it has become final, disobedience cannot be justified by re-trying the issues as to whether the order should have issued in the first place. *United States* v. *United Mine Workers,* 330 U.S. 258 ; *Oriel* v. *Russell,* 278 U.S. 358 . Counsel appears to recognize this rule, for the record in the case now before us does not include the evidence on which the turnover order was based. We could learn of it only by going outside of the present record to that in the former case, which would be available only because an application was made to this Court to review that earlier proceeding.

We therefore think the Court of Appeals was right insofar as it concluded that the turnover order is subject only to direct attack, and that its alleged infirmities cannot be relitigated or corrected in a subsequent contempt proceeding.

# IV.

But does this mean that the lower courts "must thus affirm orders which first direct a bankrupt `to do an impossibility, and then punish him for refusal to perform it'"?

Whether the statement by the Court of Appeals that it knows Maggio cannot comply with the turnover order 70

*70 is justified by the evidence in this record, we do not stop to inquire. We have regarded turnover and contempt orders, and petitions for certiorari to review them, as usually raising



only questions of fact to be solved by the careful analysis of evidence which we expect to take place in the two lower courts. The advantage of the referee and the District Court in having the parties and witnesses before them, instead of judging on a cold record, is considerable. The Court of Appeals for each circuit also has the advantage of closer familiarity with the capabilities, tendencies, and practices of the referee and District Judge. Both lower courts better know the fruits of their course of decision in actual practice than can we. Consequently, we have been loath to venture a review of particular cases, especially where the turnover order carries approval of the referee, the District Court and the Court of Appeals.

However, the court below appears to have affirmed the order for commitment in this case by relying on the earlier finding of previous possession to raise a presumption of wilful disobedience continuing to the time of commitment, even though that conclusion is rejected by the court's good judgment. While the court protests that such a presumed continuance of possession from the time of bankruptcy to the time of the turnover order is unrealistic, it seems to have affirmed the contempt order by extending the presumption from the time of the turnover order to the time of the contempt proceedings, although persuaded that Maggio had overcome the presumption if it were rebuttable.

The fact that the contempt proceeding must begin with acceptance of the turnover order does not mean that it must end with it. Maggio makes no explanation as to the whereabouts or disposition of the property which the order, earlier affirmed, declared him to possess. But time 71

*71 has elapsed between issuance of that order and initiation of the contempt proceedings in this case. He does tender evidence of his earnings after the turnover proceedings and up until November 1944; his unemployment after that time allegedly due to his failing health; and of his family obligations and manner of living during the intervening period. He has also sworn that neither he nor his family has at any time since the turnover proceedings possessed any real or personal property which could be used to satisfy the trustee's demands. And he repeats his denial that he possesses the property in question.

It is clear that the District Court in the contempt proceeding attached little or no significance to Maggio's evidence or testimony, although the Court gave no indication that the evidence was incredible. The District Court in its opinion cites only *In re Siegler,* 31 F.2d 972, in which the Court of Appeals reversed a District Judge who, because he believed the bankrupt's testimony, had refused to commit him for contempt. The *Siegler* case and other cases decided by the Court of Appeals apparently led the District Judge to conclude that no decision other than commitment of Maggio would be approved by that court.

Nor did the Court of Appeals reject this view. Indeed it affirmed the commitment for contempt because it considered either that present inability to comply is of no relevance or that there is an irrebuttable presumption of continuing ability to comply even if the record establishes present inability in fact. It seems to be of the view that this presumption stands indefinitely, if not permanently, and can be overcome by the accused only when he affirmatively shows some disposition of the property by him subsequent to the turnover

proceedings. We do not believe these views are required by *Oriel* v. *Russell,* 278 U.S. 358 , despite some conflicting statements in the opinion, 72

*72 which the Court of Appeals construed as compelling affirmance of the contempt decree.

This Court said in the *Oriel* case that "a motion to commit the bankrupt for failure to obey an order of the Court to turn over to the receiver in bankruptcy the property of the bankrupt is a civil contempt and is to be treated as a mere step in the proceedings to administer the assets of the bankrupt as provided by law, and in aid of the seizure of those assets and their proper distribution. While in a sense they are punitive, they are not mere punishment — they are administrative but coercive, and intended to compel, against the reluctance of the bankrupt, performance by him of his lawful duty." 278 U.S. 358 at 363 .

Of course, to jail one for a contempt for omitting an act he is powerless to perform would reverse this principle and make the proceeding purely punitive, to describe it charitably. At the same time, it would add nothing to the bankrupt estate. That this Court in the *Oriel* case contemplated no such result appears from language which it borrowed from a Circuit Court of Appeals opinion which, after pointing out that confinement often failed to produce the money or goods, said, "'Where it has failed, and where a reasonable interval of time has supplied the previous defect in the evidence, and has made sufficiently certain what was doubtful before, namely, the bankrupt's inability to obey the order, he has always been released, and I need hardly say that he would always have the right to be released, as soon as the fact becomes clear that he can not obey.'" [4] Moreover, the authorities relied upon in Chief Justice Taft's opinion [5] make it clear that his decision did not contemplate that a coercive contempt order should issue when it appears that there is at that 73

*73 time no wilful disobedience but only an incapacity to comply. [6] Indeed, the quotation from *In re Epstein,* cited *supra* (note 4), also stated at p. 569: "In the pending case, 74 *74 or in any other, the court may believe the bankrupt's assertion that he is not now in possession or control of the money or the goods, and in that event the civil inquiry is at an end . . .." [7]

The source of difficulties in these cases has been that in the two successive proceedings the same question of possession and ability to produce the goods or their proceeds is at issue, but as of different points of time. The earlier order may not be impeached, avoided or attacked in the later proceedings and no relief can be sought against its command. But when the trustee institutes the later proceeding to commit, he tenders the issue as to present wilful disobedience, against which the court is asked to direct its sanctions. The latter issue must be tried just as any other issue, and the court is entitled to consider all evidence relevant to it. The turnover order 75

*75 adjudges the defendant to be in possession at the date of its inquiry, but does it also cut off evidence as to nonpossession at the later time? Thus, the real problem concerns the evidence admissible in the contempt proceeding. Of course we do not attempt to lay down a comprehensive or detailed set of rules on this subject. They will have to be formulated as specific and concrete cases present different aspects of the problem.

In *Oriel's* case, this Court said: ". . . on the motion for commitment the only evidence that can be considered is the evidence of something that has happened since the turnover order was made showing that since that time there has newly arisen an inability on the part of the bankrupt to comply with the turnover order." This language the Court of Appeals has construed to mean that the accused can offer no evidence to show that he does not now have the goods if that evidence, in the absence of an affirmative showing of when and how he disposed of the goods, might tend to indicate that he never had them and hence to contradict findings of the turnover order itself. We agree with the Court of Appeals that the turnover order may not be attacked in the contempt proceedings because it is *res judicata* on this issue of possession at the time as of which it speaks. But application of that rule in these civil contempt cases means only that the bankrupt, confronted by the order establishing prior possession, at a time when continuance thereof is the reasonable inference, is thereby confronted by a *prima facie* case which he can successfully meet only with a showing of present inability to comply. He cannot challenge the previous adjudication of possession, but that does not prevent him from establishing lack of present possession. Of course, if he offers no evidence as to his inability to comply with the turnover order, or stands mute, he does not meet the issue. Nor does he do so by 76

*76 evidence or by his own denials which the court finds incredible in context. [8]

But the bankrupt may be permitted to deny his present possession and to give any evidence of present conditions or intervening events which corroborate him. The credibility of his denial is to be weighed in the light of his present circumstances. It is everywhere admitted that even if he is committed, he will not be held in jail forever if he does not comply. His denial of possession is given credit after demonstration that a period in prison does not produce the goods. The fact that he has been under the shadow of prison gates may be enough, coupled with his denial and the type of evidence mentioned above, to convince the court that his is not a wilful disobedience which will yield to coercion.

The trial court is obliged to weigh not merely the two facts, that a turnover order has issued and that it has not been obeyed, but all the evidence properly before it in the contempt proceeding in determining whether or not there is actually a present ability to comply and whether failure so to do constitutes deliberate defiance which a jail term will break.

This duty has nowhere been more clearly expressed than in the *Oriel* case: [9] ". . . There is a possibility, of course, of error and hardship, but the conscience of judges in weighing the evidence under a clear perception of the consequences, together with the opportunity of appeal and review, if properly taken, will restrain the courts from 77

*77 recklessness of bankrupt's rights on the one hand and prevent the bankrupt from flouting the law on the other. . ."

Such a careful balancing was said to be required in turnover proceedings because "coercive methods by imprisonment are probable and are foreshadowed." [10] Certainly the same considerations require as careful and conscientious weighing of the evidence relevant in the

contempt proceeding. At that stage, imprisonment is not only probable and foreshadowed — it is imminent. And, without such a weighing, it becomes inevitable.

# V.

We deal here with a case in which the Court of Appeals was persuaded that the bankrupt's disobedience was not wilful. It appears, however, that the District Court did not, in the contempt proceedings, weigh and evaluate the evidence before it but felt bound almost automatically to order Maggio's commitment in deference to clear precedents established by the Court of Appeals. Moreover, the Court of Appeals affirmed the commitment order although it was convinced that Maggio was not deliberately disobeying but had established his contention that he was unable to comply. On such findings the *Oriel* case would require Maggio's discharge even if he were already in jail. It is hardly consistent with that case, or with good judicial administration, to order his commitment on findings that require his immediate release.

When such a misapprehension of the law has led both courts below to adjudicate rights without considering essential facts in the light of the controlling law, this Court will vacate the judgments and remand the case to the District Court for further proceedings consistent with the principles laid down in this Court's opinion. *Manufacturers'* 78

*78 *Finance Co. v. McKey,* 294 U.S. 442, 453, *Gerdes* v. *Lustgarten,* 266 U.S. 321, 327, and cases cited. [11] That practice is appropriate in this case in view of what has been said herein concerning the judgments below.

*Vacated and remanded.*

Separate opinion of MR. JUSTICE BLACK, in which MR. JUSTICE RUTLEDGE concurs.

August 9, 1943, the referee in bankruptcy found that petitioner had possession of certain merchandise belonging to a bankrupt corporation and ordered him to turn it or the proceeds over to the bankruptcy trustee. In these contempt proceedings (April 18, 1945) the District Court found that petitioner had failed to prove he no longer had possession of the property, and ordered him to be held in jail until he delivered the property or its proceeds to the trustee.

Had the petitioner been charged with embezzling this same property after the 1943 turnover order, doubtless no one would even argue that a doctrine of res judicata barred him from introducing evidence to show that the turnover findings of possession were wrong, and that in truth he did not have possession of the property or its proceeds either on, before, or after August 9, 1943, or April 18, 1945. One basic reason why the findings of fact in a turnover proceeding would not be res judicata in an embezzlement proceeding is that the burden of proof is different in the two types of proceedings. In the first, a turnover proceeding, "clear

and convincing proof" is enough; in the second, embezzlement, "proof beyond a reasonable doubt" is required. The burden of proof is 79

*79 heavier in the embezzlement case because a judgment of conviction may embody a criminal punishment, while a turnover judgment does not — it is merely an order for the surrender of property, similar to an order of delivery in a replevin suit.

There is no such reason for different measurements of proof in contempt and embezzlement cases; consequentially, the two are almost identical. Fine, imprisonment, or both can result from a conviction of either. Here if this contempt judgment is carried out against the petitioner, he might be compelled to remain in prison longer than he would had he been convicted and sentenced on a charge of embezzlement. It is true that, if the court was correct in finding that petitioner had possession of the property or its proceeds (and if he still has it), he carries the keys of the jail in his pocket, because he can turn the property or proceeds over to the trustee at any time and thus get his freedom. The crucial question to petitioner in this contempt proceeding was whether he had possession of the property or its proceeds June 5, 1945. And that crucial question was decided against petitioner by the trial court without holding that the evidence was sufficient to prove beyond a reasonable doubt that petitioner still had possession of the property.

I am unwilling to agree to application of a doctrine of res judicata that results in sending people to jail for contempt of court upon a measure of proof substantially the same as that which would support the rendition of a civil judgment for the plaintiff on a promissory note, an open account, or some other debt. All court proceedings, whether designated as civil or criminal contempt of court or given some other name, which may result in fine, prison sentences, or both, should in my judgment require the same measure of proof, and that measure should be proof beyond a reasonable doubt. See *Gompers v. United* 80

*80 *States,* 233 U.S. 604, 610-611 ; *Michaelson* v. *United States,* 266 U.S. 42, 66-67 ; *Pendergast* v. *United States,* 317 U.S. 412, 417-418 .

The foregoing is written on the assumption that the turnover-contempt procedure is legal, an assumption which I do not accept. I share the opinion of the Circuit Court of Appeals that this procedure is unauthorized by statute and that it should not be permitted to take the place of criminal prosecutions for fraud as apparently was done here. [1] This whole procedure savors too much of the old discredited practice of imprisonment for debts — debts which people are unable to pay. For here, if petitioner did wrongfully dispose of the property, whether or not he was guilty of a crime, he was probably liable in some sort of civil action, basically similar to, if not actually, one for debt. Had a judgment been obtained against him in such a civil case, I doubt if it would be thought at this period that the bankruptcy court could have thrown petitioner in jail for his failure to obey what would have been in effect a court order to pay the debt embodied in the judgment.

Furthermore, the finding of possession of the merchandise as of 1943 may rest on an evidential foundation firm enough to support a civil turnover order but it is too shaky to support a sentence to prison. Accepting that 81

*81 finding, however, the presumption of present or 1945 possession from the possible 1941 or 1943 possession achieves a procedural result which runs counter to basic practices in our system of laws. For as the District Court said, it gave the prosecution the advantage of a "presumption" which, of itself, was held to relieve it from offering further proof of petitioner's guilt in a case where forfeiture of his personal liberty and property was sought; it threw upon the petitioner the burden of proving his innocence. [2]

For the foregoing reasons, among others, I would reverse the judgment of the Circuit Court of Appeals, with directions that the petitioner be released and that no further contempt proceedings be instituted against him based on his refusal to obey the turnover order.

MR. JUSTICE FRANKFURTER, dissenting.


This is one of those rare cases where I find myself in substantial agreement with the direction and main views of an opinion, but am thereby led to a different conclusion. Too often we are called upon to disentangle a snarled skein of facts into a thread of legal principles. In this case, the Court's opinion seems to me to snarl a straight thread of facts into a confusing skein of legal principles. It was the record in a prior case involving the same litigants that invited correction of a rule of bankruptcy administration in the Second Circuit. We denied review. [1] 82

*82 The record in this case precludes such correction, but the Court's opinion is an effort to whip the devil round the stump.

The precise question before us may be simply stated. The District Court ordered the bankrupt to turn over goods withheld by him from the trustee. On the basis of two prior cases, [2] the Circuit Court of Appeals affirmed this order, *per curiam.* 145 F.2d 241 . These earlier cases in turn relied on a previous case. [3] All three enforced a rule of the Second Circuit that goods in the possession of a bankrupt on the day of bankruptcy are presumed to continue in his possession regardless of the time that may have elapsed. In all three cases, the Circuit Court of Appeals had affirmed the turnover orders although it was maintained that the bankrupts could not obey them. [4] Likewise, in all three cases, that court had declared its impotence to change what it regarded as an untenable rule of bankruptcy administration, although fashioned by it and not by this Court. [5] In almost imprecating language review and reversal by this Court in these cases were invited. [6] In one of these cases, the bankrupt filed a petition 83

*83 for certiorari, which this Court denied. [7] Then came the prior case involving the litigants now before us, with this Court's refusal to review the turnover order. To be sure, the denial of a petition for certiorari carries no substantive implications. Reference to it here is relevant as proof of the finality with which the turnover order, as affirmed by the Circuit Court of Appeals, was invested.

In *Oriel* v. *Russell,* 278 U.S. 358 , a unanimous bench, including in its membership judges of wide experience with bankruptcy law, [8] held that upon a citation for contempt to compel obedience of a turnover order the issues adjudicated by that order could not be relitigated. That case decided nothing if it did not decide that what the turnover order adjudicated —

that the bankrupt withheld certain property from the bankrupt estate and was still in control of this property on the day he was ordered to turn it over — is the definitive starting point for contempt proceedings to exact obedience to the turnover order. In short, the contempt proceedings must proceed from the turnover order and cannot go behind it. We should not ignore this relevant sentence in *Oriel* v. *Russell* : "Thereafter on the motion for commitment the only evidence that can be considered is the evidence of something that has happened since the turnover order was made showing that since that time there has newly arisen an inability on the part of the bankrupt to comply with the turnover order." [9]

84

*84 The Court today reaffirms *Oriel* v. *Russell* . At the same time it makes inroad on the practical application of *Oriel* v. *Russell* . On virtually an identical record [10] it reverses where *Oriel* v. *Russell* affirmed. The nature and scope of the inroad are uncertain because the Court's opinion, to the best of my understanding, leaves undefined how the District Court is to respect both *Oriel* v. *Russell* and today's decision.

About some aspects of our problem there ought to be no dispute. We are all agreed that while the bankrupt cannot relitigate the determination of a turnover order that he had such and such goods on the day of the order, he can avoid the duty of obedience to that order if he "can show a change of situation after the turnover order relieving him from compliance." [11] The right to be relieved from obeying the turnover order by sustaining the burden of inability to perform, on proof of circumstances not questioning the turnover order, has never been disputed. Again, if a judgment of civil contempt is rendered and the bankrupt is sent to jail until he chooses to obey the court's command, he will not be kept there when keeping him no longer gives promise of performance. *Oriel* v. *Russell* so pronounced. [12]

And so, since the fact that the bankrupt had possession of the goods on the day of the turnover order is a fact 85

*85 that cannot be controverted or relitigated because his possession of the goods on that day was the very thing adjudicated, the case reduces itself to this simple question: Where, on failure to obey the turnover order, the bankrupt stands mute, offers no evidence as to a change of circumstances since the order or offers evidence of a kind which the District Court may justifiably disbelieve, has he met his burden of proof so as to preclude the District Court from enforcing obedience by commitment for civil contempt?

On the record and the findings of the District Court this is the precise question now presented. There is nothing else in the record, except Judge Frank's statement below that the bankrupt was ordered to perform although the court knew that it was impossible for him to perform. [13] But this assertion of "impossibility" was not derived from the record in these contempt proceedings. It derives from Judge Frank's familiar hostility to what he deems the unfairness of his court's rule of presumption in ordering turnover. [14] Judge Frank here merely repeats his conviction that a turnover order like that rendered against Maggio is an order to turn over goods which could not be 86

*86 turned over. But that was water over the dam in the contempt proceeding. To give it legal significance when enforcement of the turnover order is in issue is to utter contradictory things from the two corners of the mouth. It is saying that the turnover order cannot be relitigated — that we cannot go back on the adjudication that the bankrupt had the goods at the time he was ordered to turn them over — but we know he did not have the goods, so we contradict the turnover order and do not respect it as *res judicata*.

I cannot reconcile myself to saying that we adhere to *Oriel* v. *Russell* and yet reject its only meaning, namely, that we cannot go behind the judicial determination made by the turnover order that the bankrupt on such and such a day had the enumerated goods. Moreover, the authorities relied upon in Chief Justice Taft's opinion [15] make it clear that his decision *did* contemplate that a coercive contempt order should issue when it appears that the bankrupt has introduced no evidence or, what is the same, evidence that may properly not satisfy the District Court by establishing incapacity to comply since the turnover order. [16] In this case, the District Court was 87

*87 entirely warranted in finding that the bankrupt had produced no evidence to contradict the adjudication of the turnover order that he had the goods when he was told to 88 *88 turn them over, unless, in place of what is usually deemed evidence, an infirmity has been found to seep, by a process of osmosis, into the turnover order respect for which in its entirety is the starting point of our problem.

The time to have acted on the inference of impossibility of performance of the turnover order, or to have taken notice of the imprisoning rule of the Second Circuit as to the presumption of continued possession of a bankrupt's withheld goods, was when we were asked to review the Circuit Court of Appeals' denigrating affirmance of the turnover order. [17] When we declined to review that turnover 89

*89 order, it became a final and binding adjudication. Neither court below was under a misapprehension as to the applicable law in the instant contempt proceeding. The District Court relied on *In re Siegler,* 31 F.2d 972 . But surely reliance on a case that was correctly decided is hardly an indication of misapprehension of law. If the *Siegler* decision had preceded instead of followed [18] *Oriel* v. *Russell* , it might well have been one of the authorities relied upon in Chief Justice Taft's opinion. [19] Nor do we have to speculate as to whether Judge Frank's conclusion that Maggio was unable to comply was based on evidence in this record or on doubt as to the propriety of the turnover order. We have the same printed record before us that he had and it is barren of such evidence. Presumably 90 *90 Judge Frank did not travel outside this record and act on undisclosed private knowledge. The whole course of this issue in the Second Circuit in recent years makes it obvious that his observation was merely another animadversion on that Circuit's practice in issuing turnover orders. The Circuit Court of Appeals did not purport to make an independent evaluation of Maggio's evidence bearing on his incapacity to obey the turnover order. It was beyond its power to do so. The Circuit Court was not at large. Its power was limited to a consideration of the justifiability of the District Court's findings on the basis of the record before that court.

The cure for this procedural situation, if cure is called for, is correction of the rule of the Second Circuit regarding presumptions in turnover orders. [20] It ought not to be dealt with indirectly and at the cost of beclouding the doctrine of *res judicata* in proceedings for civil

contempt. If Maggio has become the unhappy victim of the procedural snarl into which the Circuit Court of Appeals for the Second Circuit has involved itself by its decisions on the appeals of turnover orders and by this Court's refusal to review such adjudications, the law is not without ample remedies. The District Court has power to discharge a contemnor when confinement has become futile, or release may be had through use of *habeas corpus,* which, in the now classic language of Mr. Justice Holmes, "cuts through all forms and goes to the very tissue of the structure. It comes in from the outside, not in subordination to the proceedings. . . ." *Frank* v. *Mangum,* 237 U.S. 309, 346 . These are means available to correct whatever specific hardship this case may present without generating cloudiness indeterminate in range upon a legal principle of such social significance as that of *res judicata* and upon 91

*91 a remedy so vital as civil contempt for the sturdy administration of justice.

How is the conscientious District Court to carry out the directions conveyed by the Court's opinion? If the District Court gives unquestioned respect, as it is told to do, to the turnover order of August 9, 1943, it will start with the fact that on August 9, 1943, the bankrupt was able to comply with that order. With that as a starting-point, will the District Court not be entitled to find again, as it has already found, [21] that nothing presented by the bankrupt in exculpation for not complying with the turnover order disproves that he continued to have the property, which he was found to have had as of August 9, 1943? If the District Court should so find, would not the Circuit Court of Appeals and this Court, if the case came here for review, be duty bound to hold that, on the basis of the situation as adjudicated by the turnover order, the District Court could reasonably make such a finding? Or is the District Court to infer that in view of the snarl into which these proceedings have got by reason of the failure to upset the turnover order when directly under review, this Court was indulging in benign judicial winking — that while the fact of the possession of the property had been adjudicated by the turnover order and could not verbally be questioned, the District Court need not accept the determination of that order as facts? But if the District 92

*92 Court may so drain the adjudication of the turnover order of its only legal significance, why assert that *Oriel* v. *Russell* is left without a scratch? Why reaffirm that an adjudication sustaining a turnover order may not be relitigated when obedience is sought to such turnover order? These are questions which will confront not merely the district judge to whom this case will be remanded. After all, we are concerned with the practical administration of the Bankruptcy Act by district judges all over the United States.

By abstaining from expressing views regarding the requisites of a turnover order, I mean neither to agree nor disagree with observations made by the Court. There has been opportunity in the past for adjudication of that matter, and there may be such an opportunity in the future. This case does not present it. From all of which I conclude that the judgment below should be affirmed, leaving for another day, when the occasion makes it appropriate, to consider directly and explicitly the principle that should govern the issue of turnover orders by bankruptcy courts. [22]

93

*93

[1] The Court of Appeals itself said: ". . . the Supreme Court has never decided in favor of the fictitious `presumption' here invoked. . . ." 157 F.2d 951, 954 .

[2] Other circuits have treated the presumption of continued possession as one which "grows weaker as time passes, until it finally ceases to exist" (C.C.A. 8th in *Marin* v. *Ellis,* 15 F.2d 321 ) and as one "only as strong as the nature of the circumstances permits" and which "loses its force and effect as time intervenes and as circumstances indicate that the bankrupt is no longer in possession of the missing goods or their proceeds" (C.C.A. 4th in *Brune* v. *Fraidin,* 149 F.2d 325 ). See also Comments in 95 U. of Pa. L. Rev. 789 (1947) and 42 Ill. L. Rev. 396 (1947).

[3] For examples of statutory provisions, see Interstate Commerce Act, 49 U.S.C. § 12 (3); Securities Exchange Act of 1934, 15 U.S.C. § 78 (u) (c); Public Utility Holding Company Act of 1935, 15 U.S.C. § 79 (r) (d); Communications Act of 1934, 47 U.S.C. § 409 (d); National Labor Relations Act, 29 U.S.C. § 161 (2); Federal Trade Commission Act, 15 U.S.C. § 49 ; Administrative Procedure Act of 1946, 5 U.S.C. 1946 ed. § 1005 (c); and Atomic Energy Act of 1946, 42 U.S.C.A. (1947 Supp.) § 1816 (d).

[4] 278 U.S. 358, 366, quoting from *In re Epstein* (cited as *Epstein* v. *Steinfeld* ), 206 F. 568, 570 .

[5] 278 U.S. 358, 364 .

[6] The late Chief Justice said ". . . the following seem to us to lay down more nearly the correct view," and cited *Toplitz* v. *Walser.* 27 F.2d 196, a contempt case in which it is said (at p. 197) "The sole question is whether the bankrupt is presently able to comply with the turnover order previously made and, accordingly, whether he is disobeying that order. . . ."; *Epstein* v. *Steinfeld,* 210 F. 236, a turnover proceeding, in which the Court delineates both turnover and contempt procedures and states that a contempt order should not be issued unless there is present ability to comply; *Schmid* v. *Rosenthal,* 230 F. 818, a turnover case, citing *Epstein* v. *Steinfeld, supra;* *Frederick* v. *Silverman,* 250 F. 75, a contempt case, reciting the necessity for present ability to comply; *Reardon* v. *Pensoneau,* 18 F.2d 244, a contempt case, holding the evidence there insufficient to establish present inability to comply; *United States ex rel. Paleais* v. *Moore,* 294 F. 852, involving a commitment for contempt, stating ". . . the court should be satisfied of the present ability of the bankrupt to comply . . .."; *In re Frankel,* 184 F. 539, a contempt case in which the evidence was held insufficient to show present inability to comply; *Drakeford* v. *Adams,* 98 Ga. 722, 25 S.E. 833, a State contempt case requiring present ability to comply to be "clearly and satisfactorily established"; and Collier, Bankruptcy (Gilbert's ed., 1927) 652. The cumulative effect of these authorities seems clearly to be that, while a bankrupt's denial of present possession, standing alone, may not be sufficient to establish his inability to produce the property or its proceeds, if the Court is satisfied, from all the evidence properly before it, that the bankrupt has not the present ability to comply, the commitment order should not issue.

Other decisions are to the same effect. See, for example, *American Trust Co.* v. *Wallis,* 126 F. 464 ; *Samel* v. *Dodd,* 142 F. 68, cert. den. 201 U.S. 646 ; *In re Nisenson,* 182 F. 912 ; *In re Holden,* 203 F. 229, cert. den. 229 U.S. 621 ; *In re McNaught,* 225 F. 511 ; *Dittmar* v. *Michelson,* 281 F. 116 ; *In re Davison,* 143 F. 673 ; *In re Marks,* 176 F. 1018 ; *In re Elias,* 240 F. 448 ; *Freed* v. *Central Trust Co. of Illinois,* 215 F. 873 ; *In re Nevin,* 278 F. 601 ; *Johnson* v. *Goldstein,* 11 F.2d 702 ; *In re Magen,* 14 F.2d 469 ; *id.,* 18 F.2d 288 ; *In re Walt,* 17 F.2d 588 ; *Clark* v. *Milens,* 28 F.2d 457 ; *Berkower* v. *Mielziner,* 29 F.2d 65, cert. den. 279 U.S. 848 ; *In re Tabak,* 34 F.2d 209 ; *In re Weisberger,* 43 F.2d 258 . See also Collier, Bankruptcy (14th ed.) pp. 244-249; 2 *id.* pp. 535-542; 5 Remington, Bankruptcy (4th ed.) pp. 624-681; 8 C.J.S. pp. 681-686; 6 Am. Jur. § 369, pp. 752-753.

[7] Similarly, the following cases involving contempt orders for failure to pay alimony were cited ( 278 U.S. at 365 ) as illustrating rules of evidence concerning ability to comply, "much the same as are here laid down for bankruptcy": *Smiley* v. *Smiley,* 99 Wash. 577, 169 P. 962, affidavit as to lack of ability to comply being undenied, commitment for contempt by failure to pay held erroneous; *Barton* v. *Barton,* 99 Kan. 727, 163 P. 179, evidence held sufficient to justify commitment although it is said ". . . The defendant can not, of course, be committed for the failure to do something which is beyond his power. . . ."; *In re Von Gerzabek,* 58 Cal. App. 230, 208 P. 318, a showing of inability to comply said to be "the most effectual answer" to a contempt order; *Hurd* v. *Hurd,* 63 Minn. 443, 65 N.W. 728,

*Heflebower* v. *Heflebower,* 102 Ohio St. 674, 133 N.E. 455, and *Fowler* v. *Fowler,* 61 Okla. 280, 161 P. 227, defendant's evidence insufficient to establish inability to comply which would have prevented commitment.

[8] These conclusions are supported by the cases cited in the *Oriel* case as laying down "more nearly the correct view." See note 6, *supra.* Of course cases such as *Gompers* v. *United States* (233 U.S. 604), *Michaelson* v. *United States* (266 U.S. 42), *Pendergast* v. *United States* (317 U.S. 412) and *Cooke* v. *United States* (267 U.S. 517), all involving criminal contempt charges, are of no relevance here, as we deal only with civil contempts. See text, p. 10.

[9] 278 U.S. at 364 .

[10] 278 U.S. at 363 .

[11] *Cf. Kay* v. *United States,* 303 U.S. 1, 10 ; *Prairie Farmer Publishing Co.* v. *Indiana Farmer's Pub. Co.,* 299 U.S. 156, 159 ; *Buzynski* v. *Luckenbach S.S. Co.,* 277 U.S. 226, 228 .

[1] "We would hold that a *turnover proceeding may not, via a fiction, be substituted for a criminal prosecution so as to deprive a man of a basic constitutional right, the right of trial by jury.* We would note, too, that one consequence of the fiction is that the respondent may be twice punished for the same offense, since, if he is later indicted for violation of 11 U.S.C.A. § 52 (b), his imprisonment for contempt will not serve as a defense. We would add that nowhere in the Bankruptcy Act has Congress even intimated an intention to authorize such results, and that they stem solely from a judge-made gloss on the statute." *In re Luma Camera Service,* 157 F.2d 951, 953-954 .

[2] In holding petitioner in contempt, the District Court said: "Respondent has not sustained his burden of satisfactorily accounting for the disposition of the assets by his mere denial of possession under oath." It then made the following finding of fact: "4. The respondent, Joseph F. Maggio, has wholly failed to comply with said turnover order, and he has failed to explain to the satisfaction of this court his failure to comply."

[1] 324 U.S. 841 .

[2] *Robbins* v. *Gottbetter,* 134 F.2d 843, and *Cohen* v. *Jeskowitz,* 144 F.2d 39 .

[3] *Seligson* v. *Goldsmith,* 128 F.2d 977 .

[4] *Seligson* v. *Goldsmith,* 128 F.2d 977, 978-79 ; *Robbins* v. *Gottbetter,* 134 F.2d 843, 844 ; *Cohen* v. *Jeskowitz,* 144 F.2d 39, 41 (concurring opinion of Frank, J.) .

[5] Presumably, this avowed inability of the Circuit Court of Appeals for the Second Circuit to free itself from its own prior decision in this situation is not the reflection of a principle similar to that which binds the House of Lords to its past precedents. It must be attributable to the fact that the Second Circuit has six circuit judges who never sit *en banc* and that presumably they deem it undesirable for the majority of one panel to have a different view from that of a majority of another panel.

[6] 128 F.2d at 979 ; 134 F.2d at 844 ; 144 F.2d at 40-41 .

[7] In the first two of these cases, the bankrupt did not seek review in this Court; in the *Jeskowitz* case, the bankrupt took the hint, but this Court denied certiorari. 323 U.S. 787 .

[8] Judge A.N. Hand's observation concurring, in the *Robbins* case, 134 F.2d at 845, is also pertinent: ". . . all the justices of a court of which those exceptionally alert guardians of civil rights, Justices Holmes, Brandeis and Stone, were members, unanimously concurred in the opinion of Chief Justice Taft . . .."

[9] 278 U.S. at 363 .

[10] See Appendix.

[11] 278 U.S. at 364 .

[12] "'I have known a brief confinement to produce the money promptly, thus justifying the court's incredulity, and I have also known it to fail. Where it has failed, and where a reasonable interval of time has supplied the previous defect in the evidence, and has made sufficiently certain what was doubtful before, namely, the bankrupt's inability to obey the order, he has always been released, and I need hardly say that he would always have the right to be released, as soon as the fact becomes clear that he can not obey.'" 278 U.S. at 366, quoting from Judge McPherson's opinion in *In re Epstein,* 206 F. 568, 570 .

[13] "Although we know that Maggio cannot comply with the order, we must keep a straight face and pretend that he can, and must *thus* affirm orders which first direct Maggio `to do an impossibility, and then punish him for refusal to perform it.'" 157 F.2d at 955 (italics supplied). Judge Frank made this statement concerning the presumption of continued possession in turnover order proceedings, and was not addressing his remarks to the record before him in the contempt proceeding. The dictum began with this sentence: "Were this a case of first impression involving the validity of a turnover order, we would not accept such reasoning." 157 F.2d 951, 953 . The "thus" in his statement indicates hostility to the basis of the turnover order because of a virus which the lower court feels unable to extract but which automatically infects the contempt proceedings.

[14] "With the turnover order once sustained, the contempt order necessarily followed." *Id.* at 954.

[15] 278 U.S. 358, 364 .

[16] The Chief Justice said ". . . the following seem to us to lay down more nearly the correct view," and cited *Toplitz* v. *Walser,* 27 F.2d 196, a Third Circuit contempt case in which it is said (at p. 197) "It therefore devolves upon the bankrupt in the latter [contempt] proceeding to show how and when the property previously adjudged in his possession or control had passed out of his possession or control . . . The trouble with the evidence in the contempt proceeding, the only evidence properly here for review, is that it is directed to the issue of the bankrupt's possession and control of property at the date of bankruptcy raised and definitely decided against her in the turnover proceeding . . . Though not in form this is in substance a collateral attack upon the now finally established turnover order, which of course is not permissible."; *Epstein* v. *Steinfeld,* 210 F. 236, a turnover proceeding, in which the Third Circuit delineated its procedure, different from that followed in the Second Circuit, whereby if the referee found a shortage at the time of bankruptcy the turnover order was automatically entered, and the question of present possession or ability to comply with that order was left open for possible contempt proceedings, the presumption of continued possession being applied in such proceedings since the bankrupt had to show that by reason of events occurring since the bankruptcy he was unable to comply (cf. *In re Eisenberg,* 130 F.2d 160 ) (this distinction has no real bearing on the instant issue as to either collateral attack or the presumption of continued possession); *Schmid* v. *Rosenthal,* 230 F. 818, a Third Circuit turnover case, citing *Epstein* v. *Steinfeld, supra; Frederick* v. *Silverman,* 250 F. 75, a Third Circuit contempt case citing *Epstein* v. *Steinfeld, supra; Reardon* v. *Pensoneau,* 18 F.2d 244, an Eighth Circuit contempt case, holding that the bankrupt had not met his burden of establishing present inability to comply, in which it is said (at pp. 245-46) "They [turnover orders] establish the bankrupt's possession and control on the day the referee's order was made. The burden was on him to show what disposition had been made of the $6,900. Until that showing is made relieving him of an intentional loss of its possession and control, it must be presumed that he still has it. . . . a bankrupt cannot escape an order for the surrender of property belonging to his estate `by simply denying under oath that he has it.'"; *United States ex rel. Paleais* v. *Moore,* 294 F. 852, a Second Circuit *habeas corpus* case following a commitment for contempt, stating (at p. 857) "If, at the time the turn-over order was made,

the books and papers were in the bankrupt's hands, the presumption is that they continued to be in his possession or under his control until he has satisfactorily accounted to the court of bankruptcy for their subsequent disposition or disappearance. The burden is upon him satisfactorily to so account for them. He cannot escape an order for their surrender by simply denying under oath that he no longer has them."; *In re Frankel,* 184 F. 539, a contempt case in which L. Hand, then a District Judge, refused to commit for contempt because he did not deem the turnover order binding as *res judicata,* but on rehearing reversed himself, holding that the bankrupt could not show present inability by evidence constituting an indirect attack on the turnover order, stating (at p. 542) "Therefore, in so far as the [turnover] order directs anyone to do anything, he may not in the contempt proceeding question the propriety of the direction; and in so far as the order determines an existing fact, which is necessary in law to the validity of the direction, he may not question its truth. To question such a fact is to question the validity of the direction which depends upon it, and is only an indirect way of reviewing the order. Therefore now to deny the fact that the bankrupt had the money in his possession is in this case to assert that the order directing him to pay it over was erroneous. On this account, therefore, that fact is concluded, once it be granted that it was necessary to the validity of the order, which I have shown. Quite reluctantly, therefore, I can only conclude that I was wrong originally to inquire into the merits, and that a committal must issue." The cumulative effect of these authorities is that a bankrupt's denial of present possession, standing alone, is not sufficient to establish his inability to produce the property or its proceeds, and that the bankruptcy court will not permit the bankrupt to prove present inability to comply with the turnover order by evidence which indirectly constitutes a collateral attack on that order.

[17] For almost forty years, the Second Circuit has tenaciously abided by the presumption of continued possession. While this presumption was previously *sub silentio* utilized ( *e.g., In re Schlesinger,* 102 F. 117, affirming 97 F. 930 ), *In re Stavrahn* in 1909, 174 F. 330, appears to have been the Second Circuit's case of first impression, and the decision that sired the presumption. There the court stated that the bankrupt could not defend against a contempt citation following a turnover order on the assertion that he had never taken the assets in question, but had to come forward with some reasonable explanation as to what had become of the assets since the turnover order. In 1912, the Second Circuit reiterated the reasoning of its earlier decision in *In re Weber Co.,* 200 F. 404 . The presumption had been somewhat inarticulately phrased in the earlier opinion, and the court in this case commended the District Judge for aptly carrying out the mandate of the *Stavrahn* decision. The cases up to 1925 and before the *Oriel* case are listed and discussed at length in *In re H. Magen Co.,* 10 F.2d 91, in which the court observed that "The law relating to turn-over orders is pretty well established in this circuit." 10 F.2d at 93 . *In re Siegler,* note 18 *supra,* was decided three months after this Court's decision in the *Oriel* case. Then came: *Danish* v. *Sofranski,* 93 F.2d 424 ; *In re Pinsky-Lapin & Co.,* 98 F.2d 776 ; *Seligson* v. *Goldsmith,* note 3 *supra; Robbins* v. *Gottbetter,* note 2 *supra; Cohen* v. *Jeskowitz,* note 2 *supra;* and the *per curiam* affirmance of the turnover order in the instant bankruptcy proceedings.

[18] "Any difference of opinion respecting the force and effect of a turnover order, which may have prevailed before the decision of the Supreme Court, in Prela v. Hubshman [companion case to *Oriel* v. *Russell* ] . . . is now out of place in any discussion of the subject." 31 F.2d at 973 .

[19] Cf. *In re Frankel,* note 16 *supra.*

[20] Cf. *Brune* v. *Fraidin,* 149 F.2d 325 .

[21] In the opinion dated April 18, 1945, holding petitioner in contempt of court, the District Court stated that: "Respondent [petitioner here] has not sustained his burden of satisfactorily accounting for the disposition of the assets by his mere denial of possession under oath." And that court's fourth finding of fact was as follows: "The respondent, Joseph F. Maggio, has wholly failed to comply with said turnover order, and he has failed to explain to the satisfaction of this court his failure to comply."

[22] "The proceedings in these two cases have been so long drawn out by efforts on the part of the bankrupts to retry the issue presented on the motion to turn over as to be, of themselves, convincing argument that if the bankruptcy statute is not to be frittered away in constant delays and failures of enforcement of lawful orders, the rule we have laid down is the proper one." 278 U.S. at 363 .

**92 F.2d 653 (1937)**

# In re DOODY.
# BARRETT
## v.
# DOODY.

### No. 6173.

### Circuit Court of Appeals, Seventh Circuit.

October 18, 1937.

James J. Danaher, of Chicago, Ill., for appellant.

Arthur Goldblatt, of Chicago, Ill. (Edward Goldblatt, of Chicago, Ill., of counsel), for appellee.

Before EVANS and SPARKS, Circuit Judges, and LINDLEY, District Judge.

SPARKS, Circuit Judge.

This is an appeal from an order of the District Court confirming the report of a referee in bankruptcy, dismissing appellant's objections to the bankrupt's discharge, and discharging the bankrupt from all provable debts.

The facts presented to the referee, as set forth in his report, are substantially as follows: On January 23, 1932, the Universal State Bank closed its doors, and appellant was appointed its receiver by the Superior Court of Cook County. At and prior to this time the debtor owned one hundred shares of that bank's capital stock, was 654 one of its directors, and chairman of its real *654 estate board. At the same time the debtor and his wife held in joint tenancy six parcels of real estate here in question.

Soon after his appointment as receiver, appellant filed suit in the Superior Court on the stock liability, and the debtor was served with summons on April 13, 1933. On April 20, 1933, the debtor, while insolvent, executed deeds, in which his wife joined, for the real estate here involved, to Elsie Hensel, unmarried, and a servant of the attorney who prepared the deeds. No consideration was paid by this grantee, or by anyone in her behalf, although revenue stamps were placed upon the deeds sufficient to cover a consideration of $36,000. On April 22, 1933, Miss Hensel executed her deeds for the same properties to the debtor's wife and daughter. All the deeds were acknowledged before the same notary public on April 28, 1933. Those of the first group were recorded on May 12, 1933, but the last ones were never recorded. The debtor entered his appearance in the stock liability suit on May 1, 1933, and judgment was rendered against him for his stock liability on December 28, 1934, in the sum of $10,013.16.

On October 14, 1935, appellant filed a creditor's bill in the Superior Court of Cook County against the debtor and others. On January 21, 1936, the debtor filed his petition in bankruptcy, omitting from his schedule of assets any of the real estate covered by the deeds hereinbefore referred to. On the next day appellant was enjoined by the bankruptcy court from further proceeding against the debtor under the creditor's bill. The debtor was adjudicated a bankrupt, and on March 6, 1936, he filed his petition for discharge.

Thereupon, on April 9, 1936, appellant filed his petition in the bankruptcy proceeding, in which he substantially set forth most of the facts hereinbefore recited, and alleged on information and belief that the bankrupt was still the owner of, or in some manner beneficially interested in, the property conveyed as hereinbefore stated; that said property was fraudulently conveyed by the bankrupt, and his interest therein was fraudulently concealed by him to defeat the payment of his creditors. He asked that the cause be re-referred to a referee, and that a trustee be appointed.

On April 27, 1936, appellant filed his objections to the bankrupt's discharge on the grounds that the transfer to Elsie Hensel was made for the purpose of hindering, delaying and defrauding the bankrupt's creditors; that at the time of filing debtor's petition in bankruptcy said property was held for him by Elsie Hensel in secret trust; and that he knowingly and fraudulently omitted said property from his schedule of assets, and knowingly and fraudulently concealed that property from his creditors.

On May 18, 1936, the court denied appellant's petition for a re-reference and for the appointment of a trustee. There was no appeal from this order. Appellant's objections to the discharge were referred to a referee for examination and report. On May 21, 1936, appellant filed a petition asking that the injunction issued by the bankruptcy court on January 22, 1936, be vacated, inasmuch as the court, when denying the motion for a re-reference and the appointment of a trustee, had stated that such procedure would be too expensive, and that the injunction might be vacated so that the petitioner could proceed against the bankrupt in the State Courts in Cook County, Illinois. The record does not disclose that this petition was acted upon, but the injunction was not made permanent in the final order of discharge.

On November 19, 1936, the referee filed his report in which he recommended a dismissal of appellant's objections to the discharge, to which appellant excepted. On January 11, 1937, the court confirmed the report, dismissed appellant's objections, and discharged the bankrupt from all debts provable against his estate under the Bankruptcy Act (11 U.S.C.A. § 103) which were in existence on January 21, 1936, except such debts as are excepted by law from such discharge. From this order the appeal is taken.

The assignments of error are: (1) The court should have found that Elsie Hensel held the property on a secret trust for the benefit of the bankrupt; (2) the court should have found that the bankrupt had an interest in the property at the time he filed his petition which he failed to schedule; (3) the court erred in dismissing petitioner's objections to the discharge; (4) the court erred in approving the referee's report and in discharging the bankrupt; and (5) the order of the discharge was against the weight of the evidence.

Section 14(b) (4) of the Bankruptcy Act as amended, 11 U.S.C.A. § 32(b) (4) provides that if the bankrupt has at any time subsequent to the first day of the twelve months immediately preceding the filing of his petition, 655 transferred, removed, destroyed *655 or concealed any of his property, or permitted the same to be done, with intent to hinder, delay, or defraud his creditors, it shall be a bar to his discharge. It is conceded that a fraudulent transfer of property prior to the twelve months referred to in this section will not, in and of itself, constitute a bar to the bankrupt's discharge. Moriyama v. Allen (C.C.A.) 13 F. (2d) 117; In re Plank (D.C.) 289 F. 900; In re Huntley (D.C.) 14 F.Supp. 784; In re Hennebry (D.C.) 207 F. 882.

Appellant contends, however, that the transfer here was in fraud of creditors, and even though it was executed almost three years before the petition in bankruptcy was filed, yet it was concealed continuously from its inception until the time of the presentation of appellant's objections to the discharge, and that the property thus conveyed was, and is now, held by the grantee or grantees for the bankrupt on secret trust. It is conceded that if these contentions were fairly supported by the evidence, the District Court would have been warranted in granting the relief demanded by appellant, but it is contended by the bankrupt that there was no fraud, no trust in his favor, and no concealment.

The referee made no specific finding as to fraudulent intent in the execution of the deeds, but he found that there was no trust created in which the bankrupt had any interest, and that there was no concealment, and that under section 14(b) (4) 11 U.S.C.A. § 32(b) (4) there was no basis for refusing the discharge. With these conclusions we are in accord. We find no error in the court's order of approval and discharge. It must be borne in mind that this appeal is solely from that order. There is no question raised here relative to the disposal of the injunction, or the failure of the court to appoint a trustee. Under these circumstances we may not consider the existence of fraudulent intent, if shown, in the absence of a concealed secret trust in favor of the bankrupt.

The record discloses nothing in the nature of a trust relationship, secret or otherwise, in which the bankrupt could be said to have retained a beneficial interest. True, it may be rationally inferred from subsequent events,

that the grantee in the first deeds held the property in trust for the sole purpose of conveying it to the bankrupt's wife and daughter, but that created no beneficial interest of the bankrupt in the property conveyed. By that transfer the property went beyond his control, and he thereby divested himself of all interest in it, except the right to have it transferred to his wife and daughter, and this he could not do if he were guilty of a fraudulent intent to defeat his creditors. That contingency, however, never arose, for the subsequent deeds were signed by the first grantee within two days after she had received title. All the deeds were acknowledged before the same notary public on the same day, within a week thereafter, and two weeks later the first group were recorded in the Recorder's office of Cook County, which was almost three years prior to the institution of the proceedings in bankruptcy.

The only secrecy with respect to this entire transaction was the fact that the second deeds were never recorded. It may be said, however, that at the first meeting of creditors the bankrupt fully disclosed the transaction, and at the referee's hearing on appellant's objections to the discharge, the bankrupt fully described the entire transaction and submitted the second deeds for inspection. Under these circumstances we think there was no error in holding that there was neither trust nor fraudulent concealment proved. In re Hennebry, supra.

Order affirmed.

Save trees - read court opinions online on Google Scholar.

In re Adeeb, 787 F. 2d 1339 - Court of Appeals, 9th Circuit 1986

**787 F.2d 1339 (1986)**

**In re George Edward ADEEB, Debtor-Appellant.**
**FIRST BEVERLY BANK, Plaintiff-Appellee,**
**v.**
**George Edward ADEEB, fdba Discount Gas, faw Discount Gas, Inc., faw**
**Tires & Tune-Ups, Inc., Defendant-Appellant.**
**CONSUMERS OIL COMPANY, R & M Petroleum Company, and H.F. Cox,**
**Inc., Plaintiffs-Appellees,**
**v.**
**George Edward ADEEB, fdba Discount Gas, faw Discount Gas, Inc., faw**
**Tires & Tune-Ups, Inc., Defendant-Appellant.**

No. 85-5704.

**United States Court of Appeals, Ninth Circuit.**

Argued and Submitted February 5, 1986.

Decided April 21, 1986.

1340

*1340 1341
*1341 Alan M. Mirman, Epport, Kaseff & Mirman, Beverly Hills, Cal., for plaintiffs-appellees.

Mark T. Young, Mayer & Glassman Law Corp., Los Angeles, Cal., for defendant-appellant.

Before ANDERSON, PREGERSON, and WIGGINS, Circuit Judges.

WIGGINS, Circuit Judge:

George Edward Adeeb (Adeeb) appeals from the district court's order denying his appeal from a bankruptcy court judgment. The bankruptcy court found that Adeeb transferred property out of his estate within one year of bankruptcy with intent to hinder or delay his creditors. It therefore denied Adeeb's discharge in bankruptcy under 11 U.S.C. § 727 (a)(2)(A) (1982). We have jurisdiction over this appeal pursuant to 28 U.S.C. § 158 (d) (Supp. II 1984).

# FACTS AND PROCEEDINGS BELOW

Adeeb operated several gas stations in the Los Angeles, California area. He experienced financial difficulties during a period of fluctuating gasoline prices. One of his creditors, ITL, Inc. (ITL), demanded that Adeeb secure his debts to it with deeds of trust on his real property. ITL threatened to seek an attachment against all of Adeeb's property if he did not comply.

Faced with these threats, Adeeb consulted with Cooper, an attorney with little or no bankruptcy experience. Cooper advised Adeeb to transfer title to some of his real property for no consideration to third parties who could be trusted. In reliance on this advice, Adeeb transferred title to several parcels of real property to friends and associates for no consideration. Beneficial ownership at all times remained in Adeeb.

As his financial condition continued to worsen, Adeeb sought advice from Mayer, a bankruptcy attorney. Mayer advised Adeeb to reverse the transfers and to disclose them to his creditors. Adeeb immediately began to reverse the transfers. While he was in this process, Adeeb called 1342

*1342 a meeting of his creditors. At that meeting, he told his creditors about the earlier transfers and stated that he was reversing them.

On April 6, 1983, after the meeting at which Adeeb disclosed the transfers, three of Adeeb's trade creditors filed an involuntary bankruptcy petition against him. Adeeb decided not to contest that petition and filed a voluntary bankruptcy petition on April 11, 1983, seeking a discharge of his indebtedness. The transfers from Adeeb to his friends and associates were made within one year of the filing of these petitions. Adeeb was apparently unable to recover all of the transferred property before the petitions were filed. [1]

In June, 1983, plaintiff First Beverly Bank filed a complaint in the bankruptcy court seeking to block Adeeb's discharge in bankruptcy under 11 U.S.C. § 727 (a)(2)(A) (1982). In the alternative, First Beverly Bank sought to have Adeeb's debt to it held nondischargeable under 11 U.S.C. § 523 (1982 & Supp. II 1984). On the same date, plaintiffs Consumers Oil Company, R & M Petroleum Company, and H.F. Cox, Inc., filed a complaint against Adeeb also seeking relief under sections 727 and 523.

The bankruptcy court consolidated the two actions. On the section 727 claims, the court found that Adeeb, within one year of his petition in bankruptcy, had transferred property without consideration and with actual intent to hinder or delay his creditors. It therefore held that section 727(a)(2)(A) barred his discharge. The court's decision on the section 727 claims made it unnecessary for the court to reach the section 523 claims.

Adeeb appealed the bankruptcy court's decision to the district court. After a hearing, the district court issued an order denying Adeeb's appeal, and Adeeb appealed to this court.

# STANDARD OF REVIEW

A bankruptcy court's findings of fact are reviewed for clear error, and its conclusions of law are subject to *de novo* review. *In re Devers,* 759 F.2d 751, 753 (9th Cir.1985) . The court's finding that Adeeb transferred his property with intent to defraud creditors is a finding of fact. *See Losner v. Union Bank,* 374 F.2d 111, 112 (9th Cir.1967) (per curiam) .

# DISCUSSION

Adeeb argues that three grounds support reversal of the bankruptcy court's denial of his discharge: (1) the court's finding that he intended to hinder or delay his creditors is clearly erroneous; (2) his actions could not have harmed his creditors, and such actions should not be grounds for denying a discharge; and (3) a debtor who voluntarily reverses transfers penalized by section 727(a)(2)(A) should not be denied discharge of his debts. We address each of these contentions in turn.

## A. *Actual Intent to Hinder, Delay, or Defraud a Creditor*

The bankruptcy court denied discharge of Adeeb's debts pursuant to 11 U.S.C. § 727 (a)(2)(A) (1982). Section 727(a)(2)(A) provides that a debtor shall not be granted a discharge if within one year of the filing of a petition in bankruptcy he "has transferred, removed, destroyed, mutilated, or concealed" his property "with intent to hinder, delay, or defraud a creditor."

Section 727's denial of discharge is construed liberally in favor of the debtor and strictly against those objecting to discharge. *In re Devers,* 759 F.2d 751, 754 (9th Cir.1985) . Accordingly, discharge of debts may be denied under section 727(a)(2)(A) only upon a finding of actual intent to hinder, delay, or defraud creditors. 1343

*1343 Constructive fraudulent intent cannot be the basis for denial of a discharge. *Id.* at 753. However, intent "may be established by circumstantial evidence, or by inferences drawn from a course of conduct." *Id.* at 753-54.

The bankruptcy court found that Adeeb transferred real property out of his estate with actual intent to hinder or delay a creditor. Adeeb argues that the court's finding of actual intent is clearly erroneous. He contends that circumstances surrounding the transfers and events subsequent to the transfers indicate that he did not actually intend to defraud his creditors. In support of this argument, Adeeb points out that he disclosed the transfers to his creditors and recovered or attempted to recover the property. He also points out that he transferred

the property on the advice of his attorney and that he intended to protect the property from
one creditor for the benefit of the other creditors.

Adeeb's reliance on circumstantial evidence and inferences from his conduct to prove that
he lacked actual intent is misplaced. Adeeb admitted that he transferred the property
intending to put it out of the reach of one of his creditors. When a debtor admits that he
acted with the intent penalized by section 727(a)(2)(A), there is no need for the court to rely
on circumstantial evidence or inferences in determining whether the debtor had the requisite
intent. Under these circumstances, the district court was not clearly erroneous in finding that
Adeeb acted with actual intent to hinder or delay a creditor.

Further, Adeeb's claim that he lacked actual intent to hinder or delay his creditors because
he relied on the advice of his attorney is mistaken. Generally, a debtor who acts in reliance
on the advice of his attorney lacks the intent required to deny him a discharge of his debts.
*See, e.g., Hultman v. Tevis,* 82 F.2d 940, 941 (9th Cir.1936) ; *In re Nerone,* 1 B.R. 658, 660
(Bankr.S.D.N.Y.1979) . However, the debtor's reliance must be in good faith. *See Hultman,*
82 F.2d at 941 ; *Nerone,* 1 B.R. at 660 . In this case, the bankruptcy court found that both
Cooper and Adeeb "knew that the purpose of the transfers was to hinder or delay creditors
of the debtor." Such a finding precludes the defense of good faith reliance on the advice of
an attorney even if the client is otherwise innocent of any improper purpose. A debtor who
knowingly acts to hinder or delay his creditors acts with the very intent penalized by section
727(a)(2)(A).

Adeeb is also mistaken in his assertion that he lacked actual intent because he intended to
protect some of his creditors. Our inquiry under section 727(a)(2)(A) is whether Adeeb
intended to hinder or delay a creditor. If he did, he had the intent penalized by the statute
notwithstanding any other motivation he may have had for the transfer. *Cf. Matter of Trinity
Baptist Church,* 25 B.R. 529, 532-33 (Bankr.M.D.Fla.1982) (admirable of debtor to attempt
to protect assets from one creditor for benefit of all creditors; nevertheless, the result is
hinderance and delay of creditors that makes the transfer voidable). Further, the statute
requires only that the debtor make the transfer with intent to hinder, delay, or defraud "a
creditor." There is no requirement that the debtor intend to hinder all of his creditors. *See
Matter of Goldberg,* 2 B.R. 15, 17 (Bankr.S.D.Fla.1979) .

## B. *Injury to Creditors*

Adeeb next argues that his discharge should not be denied because these transfers did not
injure his creditors. He argues that he was reversing the transfers when the involuntary
petition was filed and none of his creditors has been injured. We reject this contention. Our
decision on this point is controlled by our prior holdings that lack of injury to creditors is
irrelevant for purposes of denying a discharge in bankruptcy. *Duggins v. Heffron,* 128 F.2d
546, 549 (9th Cir.1942) ; *Harris v. Baker,* 86 F.2d 936, 937-38 (9th Cir.1936) .

# C. *Disclosure of Transfers and Recovery of Property Transferred*

Finally, Adeeb contends that a debtor who is able to recover improperly transferred 1344

*1344 property prior to the filing of a bankruptcy petition should not be denied a discharge of his debts. In other words, Adeeb urges us to read section 727(a)(2)(A) so as to require that the property "transferred" with the requisite intent within one year of the filing of the bankruptcy petition must also *remain* transferred on the filing date. As far as we have been able to determine, this is a question of first impression under the new Bankruptcy Code. [2]

We are concerned in this case with section 727(a)(2)(A)'s prohibition of transfers within one year of bankruptcy. The resolution of Adeeb's contention turns on the meaning of "transferred" as it is used in section 727(a)(2)(A). The bankruptcy act's general definition of "transfer," found in 11 U.S.C. § 101 (48) (1982), is of little help in resolving the issue before us. [3] The legislative history of section 727(a)(2)(A) also sheds no light on the proper interpretation of "transferred" in this context. If Congress has not defined a term in a manner that is helpful in a given context and the legislative history does not aid in the proper interpretation of the term, "our best approach is to construe the statutory language in accordance with its purpose." *Burroughs v. Operating Engineers Local Union No. 3,* 686 F.2d 723, 727 (9th Cir.1982) (citing *Chapman v. Houston Welfare Rights Organization,* 441 U.S. 600, 608, 99 S.Ct. 1905, 1911, 60 L.Ed.2d 508 (1979) ).

In our view, reading "transferred" as used in section 727(a)(2)(A) to mean "transferred and remained transferred" is most consistent with the legislative purpose of the section. The language of section 1345

*1345 727(a)(2)(A) demonstrates that Congress intended to deny discharge to debtors who take actions designed to keep their assets from their creditors either by hiding the assets until after they obtain their discharge in bankruptcy or by destroying them. *See* D. Cowans, *Cowans Bankruptcy Law and Practice* § 5.20 (interim ed. 1983). The only type of transfer that has the effect of keeping assets from creditors is a transfer in which the property remains transferred at the time the bankruptcy petition is filed.

Our conclusion is supported by the purpose of the Bankruptcy Code. As we have said:

The bankruptcy statutes have a two-fold purpose — first, to secure the equitable distribution of the bankrupt's estate among his creditors, [citations omitted] and, second, "'to relieve the honest debtor from the weight of oppressive indebtedness and permit him to start afresh from the obligations and responsibilities consequent upon business misfortune.'" *Matter of Esgro, Inc.,* 645 F.2d 794, 798 (9th Cir.1981) (quoting *Williams v. United States Fidelity & Guarantee Co.,* 236 U.S. 549, 554-55, 35 S.Ct. 289, 290, 59 L.Ed. 713 (1915) ).



*In re Devers,* 759 F.2d 751, 754-55 (9th Cir.1985) . Both of these purposes are served by reading "transferred" in section 727(a)(2)(A) to mean "transferred and remained transferred." First, this reading encourages honest debtors to recover property they have transferred during the year preceding bankruptcy. Encouraging debtors to recover improperly transferred property facilitates the equitable distribution of assets among creditors by ensuring that the trustee has possession of all of the debtor's assets. Second, this reading permits the honest debtor to undo his mistakes and receive his discharge.

We are also persuaded by practical considerations that a discharge should not be denied in the present situation. It is not uncommon for an uncounseled or poorly counseled debtor faced with mounting debts and pressure from his creditors to attempt to protect his property by transferring it to others. Upon later reflection or upon obtaining advice from experienced bankruptcy counsel, the debtor may realize that his original transfer of the property was a mistake. If the debtor is informed that his mistake bars him from a discharge in bankruptcy, he will have no incentive to attempt to recover the property or to reveal its existence to his creditors. Rather, he will have a strong incentive to continue to hide his assets.

If possible, these results should be avoided. They are avoided by reading "transferred" in section 727(a)(2)(A) to mean that the property transferred within one year of bankruptcy must remain transferred at the time the bankruptcy petition is filed. Such a reading encourages debtors to reveal transfers and to attempt to recover the property previously transferred. It also gives bankruptcy attorneys who are retained after the debtor has made some mistakes an incentive to see that those mistakes are corrected.

We conclude that a debtor who transfers property within one year of bankruptcy with the intent penalized by section 727(a)(2)(A) may not be denied discharge of his debts if he reveals the transfers to his creditors, recovers substantially all of the property before he files his bankruptcy petition, and is otherwise qualified for a discharge.

Our conclusion is consistent with cases interpreting "concealed" as used in section 727(a)(2)(A). Those cases state that a "debtor who fully discloses his property transactions at the first meeting of creditors is not fraudulently concealing property from his creditors." *In re Waddle,* 29 B.R. 100, 103 (Bankr.W.D.Ky.1983) ; *see* 4 Collier on Bankruptcy ¶ 727.02[6][b] (15th ed. 1985). Although a concealment may be undone simply by disclosing the existence of the property, disclosure does not undo a transfer. However, a transfer may be undone by recovering the property.

As we have indicated, Adeeb may not have recovered all of the transferred property prior to the time his creditors filed the 1346

*1346 involuntary bankruptcy petition in this case. Therefore, he may not meet the requirement we have articulated above of recovering substantially all the transferred property prior to the filing of the bankruptcy petition. However, our discussion assumes the filing of a voluntary petition by the debtor. In that situation, the debtor controls the time of

filing the petition. He is therefore able to time the filing to allow recovery of substantially all of his property.

In this case, Adeeb was not allowed to time the filing of his petition. [4] Rather, an involuntary petition was filed by his creditors soon after he told them about the transfers. It would be inequitable for us to allow the voluntary debtor to plan the filing of his bankruptcy petition so as to allow himself time to recover all the property he transferred and yet to allow the creditors of a debtor to cut him off in his attempt to recover the property by filing an involuntary petition and thereby deny the debtor a discharge of his debts. *Cf. In re Andreotti,* 16 B.R. 28, 31 (Bankr.E.D.Cal.1981) ("It would be inequitable for this Court to allow the voluntary debtor to plan out his exemptions well in advance of the date he volitionally files his petition and yet to deny the involuntary debtor any such opportunity to plan his exemptions.").

We therefore hold that a debtor who has disclosed his previous transfers to his creditors and is making a good faith effort to recover the property transferred at the time an involuntary bankruptcy petition is filed is entitled to a discharge of his debts if he is otherwise qualified. We emphasize that the debtor must be making a good faith effort to recover the property prior to the filing of the involuntary petition, and he must actually recover the property within a reasonable time after the filing of the involuntary petition. A debtor's failure to establish these conditions would justify relief under section 727(a)(2)(A).

The record does not indicate whether Adeeb has recovered substantially all of the property he transferred and, if he has, whether he did so prior to the time the bankruptcy petition was filed or within a reasonable time after it was filed. We therefore remand this case to the district court for further proceedings not inconsistent with this opinion. Because the bankruptcy court did not reach the section 523 issues, we express no opinion on the plaintiffs' claims under that section.

## REVERSED AND REMANDED.

[1] In his testimony at trial, Adeeb indicated that he had recovered all of the property before the petitions were filed. At that time some questions were raised regarding one of the parcels he had transferred. Those questions were not adequately resolved. In oral argument before this court, Adeeb's attorney conceded that not all of the property had been recovered before the petitions were filed. The attorney was not certain whether all of the parcels had been recovered by the time of oral argument before this court.

[2] *Collier on Bankruptcy* states that a "split of authority ... exists concerning property that has been transferred within the statutory period but then retransferred to the debtor before he filed his petition." 4 *Collier on Bankruptcy* ¶ 727.02[2] (15 ed. 1985). The cases cited for this proposition are not useful in deciding the issue before us.

All of the cases cited in *Collier* were decided under the old Bankruptcy Act. That Act contained two similar grounds for denial of a discharge in bankruptcy. First, it provided for denial of discharge to a debtor who committed an offense punishable under the bankruptcy laws by imprisonment. Bankruptcy Act of 1898 § 14(b)(1), 30 Stat. 544, 550 (1898) (repealed 1978). One of these bankruptcy offenses was knowingly and fraudulently concealing property from the *trustee in bankruptcy. Id.* § 29(b)(1), 30 Stat. 544, 554 (1898) (current version at 18 U.S.C. § 152 (1982)). Second, the Act provided for denial of discharge to a debtor who transferred property with the intent to hinder, delay,

or defraud his creditors. *Id.* § 14(b)(4), 32 Stat. 797, 797-98 (1903) (current version at 11 U.S.C. § 727 (a)(2)(A) (1982)); *see In re Jacobson,* 9 F.2d 139, 140-41 (D.S.D.1925) .

Many of the old cases held that a debtor who transferred property out of his estate would be denied a discharge of his debts only if the property transferred remained transferred at the time the petition for bankruptcy was filed. *See, e.g., In re Williams,* 286 Fed. 135, 140-41 (W.D.S.C.1921), and cases cited therein. Others, however, held that the debtor would be denied discharge of his debts regardless of whether he recovered the property prior to filing a bankruptcy petition. *See, e.g., In re Jacobson,* 9 F.2d at 141-42 . As the *Jacobson* court points out, the difference in these old cases can be explained by the existence of the two similar grounds for denying a discharge under the old Act. *Id.* at 141. Section 29(b)(1) required that the transfer be a fraud on the trustee in bankruptcy, but section 14(b)(4) had no such requirement. A transfer is a fraud on the trustee in bankruptcy only if it exists at a time when there *is* a trustee; i.e., after filing of the bankruptcy petition. *Id.*

Confusion arises because many of the cases granting a discharge do not specify under which section they are decided. *Williams* is such a case. *See Williams,* 286 Fed. at 141, and cases cited therein. However, it is fairly clear that *Williams* was decided under section 29(b)(1) because *Williams* requires that the concealment be "'from his trustee,'" which is the language of section 29(b)(1). *Id.* at 140. Further, all of the cases cited in *Williams* either specifically cite section 29(b)(1) or do not state under which section they are decided. *Id.*

When Congress enacted the Bankruptcy Code in 1978, it dropped the section denying a discharge in bankruptcy for bankruptcy offenses. 92 Stat. 2549, 2609 (1978). Although we could rest our decision on the literal language of *Williams* and cases like it, we decline to do so because of the confusion surrounding those cases.

[3] Section 101(48) provides:

"transfer" means every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or with an interest in property, including retention of title as a security interest and foreclosure of the debtor's equity of redemption....

[4] The fact that Adeeb filed a voluntary petition after the filing of the involuntary petition does not change this analysis. The involuntary petition in this case began the bankruptcy process. Adeeb's voluntary petition was filed only in response to the involuntary petition.

# California Trust Co. v. Hughes (1952) 111 Cal. App. 2d 717

### 111 Cal.App.2d 717 (1952)

## CALIFORNIA TRUST COMPANY (a Corporation), Respondent,
## v.
## JAMES L. HUGHES, Appellant.

### Civ. No. 18951.

### California Court of Appeals. Second Dist., Div. Three.

### June 17, 1952.

Burke Mathes for Appellant.

Gibson, Dunn & Crutcher and Francis M. Wheat for Respondent.

SHINN, P. J.

California Trust Company, as administrator of the estate of Aloysius P. Hughes (A. P. Hughes), deceased, instituted this action to quiet title to real property in the city of Los Angeles and for an accounting of income therefrom. Findings and judgment were in favor of plaintiff quieting its title as administrator and awarding it a money judgment against James L. Hughes in the sum of $24,680.34. By his answer, James L. Hughes, referred to as defendant, claimed title to the property and he has appealed from the judgment. The question of title is the only one involved on the appeal; the money judgment is merely incidental.

Plaintiff claims title by virtue of a deed executed October 2, 1944, by James L. Hughes to his brother, Aloysius P. Hughes. The court found that the deed was duly acknowledged by the grantor and was delivered by him to the grantee with intent on the part of the grantor to pass title to the property. The question on appeal is whether there was sufficient evidence to support this finding. It is the contention of defendant that he placed the deed in the possession of his brother conditionally, and without any intention on the part of himself or his brother that it was to be effective as a conveyance. He gave testimony to that effect. The deed came into possession 719

*719 of plaintiff administrator in 1949 under circumstances to be related.

The evidence was conflicting upon the issue of legal delivery. We shall have occasion to speak of "delivery" in the sense of "manual," as distinguished from "legal" delivery. The evidence which was favorable to plaintiff's claim of title consisted of a presumption of law that the deed was delivered with intent to pass title, and the testimony of James that he delivered the deed to the grantee personally. [1] In support of the presumption plaintiff quotes from Dinneen v. Younger, 57 Cal.App.2d 200, 204 [134 P.2d 323], as follows: "There can be no doubt that upon proof that Rose Dinneen signed and acknowledged the deed and handed the same to the grantee, the plaintiff established a prima facie case of complete execution--that is, of delivery with intent to make the grant operative immediately as a transfer of title." It is a well settled rule. The burden of proof therefore was cast upon the defendant grantor to rebut this presumption. It has been said that this



may be done only by the production of clear and convincing evidence. ( Ward v. Dougherty, 75 Cal. 240, 243 [17 P. 193, 7 Am.St.Rep. 151] ; Towne v. Towne, 6 Cal.App. 697, 701 [92 P. 1050] ; Severn v. Ruhde, 58 Cal.App.2d 704, 707 [137 P.2d 466] .) Defendant does not dispute this rule, but he contends that it does not apply because the deed was delivered to A. P. Hughes more than a year prior to his death but was not recorded by him. He says that when the grantee does not record a deed it requires clear and convincing proof that it was intended to operate as a transfer of title.

[2] The property here involved may be referred to as the Western Avenue property. There was evidence that defendant also executed a deed in favor of A. P. Hughes to property which may be called the Long Beach property. The two deeds were acknowledged October 2, 1944, and were handed by the grantor to the grantee. There was evidence that some six months or more before his death the grantee handed to his fiancee, Ethel Toney, an envelope containing the two deeds, with instructions to "put it away." She did not know what was in the envelope until she discovered the deeds after the death of Mr. Hughes. The envelope had been in her safe deposit box. She later, through her attorney, delivered the deeds to plaintiff. Title to the Long Beach property was involved in a companion case in which James L. Hughes prevailed. That decision, however, was not upon the ground of 720

*720 nondelivery of the deed to the Long Beach property to A. P. Hughes. The present case involves only the Western Avenue property.

In his testimony defendant related what he claimed to be the circumstances under which the deeds were executed and delivered. Euldene Hughes, wife of A. P. Hughes, was suing him for divorce and claiming title to both parcels of property. He testified that A. P. Hughes asked him to give him the deeds because he was negotiating with his wife for settlement of the pending divorce action and he wished to be able to transfer the property to his wife if that should become necessary in order to effect a settlement. He also testified, upon further questioning, that it was not his intention, in executing the deeds, to enable his brother to pass title to the property to his wife, and that if such transfer should become necessary new deeds would be required. He also testified that if A. P. Hughes used the deeds he was to receive a 16-unit court at 104th Street and Normandie Avenue, and another 16- unit court at 103d Street and Normandie Avenue. He testified that he received nothing for the deeds and later asked his brother for the deeds, and that the latter told him they had been destroyed.

A. P. Hughes made his will the 25th of September, 1945, after judgment had been entered in the divorce case. Ethel Toney testified that in the four days that intervened between the making of the will and Mr. Hughes' death, he asked her to tear up the deeds but she did not do so, nor did she look at them. By his will, Mr. Hughes made specific bequests of four pieces of property, but made no mention of the Western Avenue or the Long Beach parcels. Ethel Toney was named residuary legatee under the will. She made no claim to these properties. A. P. Hughes had conveyed the Western Avenue property to defendant by deed dated March 20, 1943, and had conveyed the Long Beach property to defendant by deed dated March 8, 1941. After conveying the Western Avenue property to defendant, A. P. Hughes collected the rents from it for a year or a year and a half; otherwise defendant managed and collected rents from both properties. It would serve no useful purpose to give a more extended statement of the evidence. The unconflicting evidence with respect to possession of the deed by the grantee and by plaintiff and also as to the circumstances of the delivery was sufficient to furnish substantial support for the finding that the deed was delivered with the intent on the part of the grantor that it 721

*721 pass title. [3] While acceptance is an essential part of delivery, possession of a deed by a grantee, or those holding under him, is prima facie evidence of both delivery and acceptance (

Hodoian v. Garabedian, 79 Cal.App. 762, 769 [251 P. 227] ). [4] Failure of A. P. Hughes to record the deed did not establish as a matter of law that the deed was not delivered with intent to pass title. ( Merritt v. Rey, 104 Cal.App. 700, 707 [286 P. 510] .) It was merely a circumstance for the consideration of the trial court. The failure of recordation of a deed during the lifetime of the grantee has never been deemed a reason for not giving effect to the presumption that arises from possession of the deed by the grantee or those claiming under him. (See Stewart v. Silva, 192 Cal. 405 [221 P. 191] ; Hodoian v. Garabedian, supra ; Dinneen v. Younger, supra, 57 Cal.App.2d 200 .) The statement in Morgan v. Matthieson, 103 Cal.App. 510, 517 [285 P. 325], that where a deed is not recorded during the lifetime of the grantee the intent to pass title must be proved by clear, unequivocal and convincing evidence, should be understood as applying to the facts of that case. It is not a rule of general application. And, in any event, it is the trial court that must be satisfied with the evidence. [5] Reviewing courts inquire whether the evidence was substantial, not whether it was clear or convincing. ( Beeler v. American Trust Co., 24 Cal.2d 1, 7 [147 P.2d 583] ; Baines v. Zuieback, 84 Cal.App.2d 483, 488 [191 P.2d 67] ; cf. J. & H. Goodwin, Ltd. v. Franich, 37 Cal.App. 493 [174 P. 83] .)

Defendant's entire argument is addressed to the weight of the evidence. Numerous circumstances are mentioned which tend more or less to show that A. P. Hughes did not consider himself to be the owner of the Western Avenue property; he allowed defendant to manage it and collect the rents and mentioned neither the Western Avenue nor the Long Beach property in his will. There was testimony that he told Ethel Toney to tear up the deeds. Defendant claims the court ignored this testimony, which, of course, the court could have disbelieved. But these were only circumstances which were addressed to the trial judge. That they were given thoughtful consideration clearly appears from the court's memorandum decision contained in the clerk's transcript. It states that the court found no evidence which was in conflict with the presumption of complete delivery, but that, upon the contrary, the testimony of the defendant served to confirm the presumption 722

*722 of delivery; that if, as defendant testified, he gave the deeds to his brother to enable the latter to convey title, if necessary, to effect a property settlement, it was clear that he intended the deeds to be effective, and if there was a condition attached to the use of the deeds it was one that could not detract from the effectiveness of the delivery.

[6] The court properly applied the rule of section 1056 of the Civil Code, which reads: "A grant cannot be delivered to the grantee conditionally. Delivery to him, or to his agent as such, is necessarily absolute, and the instrument takes effect thereupon, discharged of any condition on which the delivery was made." Under this rule, the delivery of the deed to A. P. Hughes, with no condition expressed therein, was absolute and free from any expressed qualification that it was to be used only for a particular purpose. ( Stewart v. Silva, supra, 192 Cal. 405, 410 ; Bias v. Reed, 169 Cal. 33, 44 [145 P. 516] ; Blackledge v. McIntosh, 85 Cal.App. 475, 482 [259 P. 770] ; Ilodoian v. Garabedian, supra, 79 Cal.App. 762, 769 ; Weldon v. Lawrence, 76 Cal.App. 530, 535 [245 P. 451] .)

[7] Defendant asserts that A. P. Hughes in the trial of his divorce case testified that he, defendant, owned the Western Avenue property and that although the deed in question was executed before the divorce case was decided, A. P. Hughes did not inform the court of that fact. It is claimed that the plaintiff administrator is estopped by this testimony to claim title under the deed. No estoppel was pleaded nor was there any evidence that defendant relied or acted upon the testimony allegedly given by A. P. Hughes. No facts were misrepresented to defendant, nor was he shown to have been in ignorance of any facts which would have had a bearing upon his actions and intentions in executing the deed. There is no basis for the claim of estoppel.

The judgment is affirmed.

Wood (Parker), J., and Vallee, J., concurred.

# THE

# AMERICAN LAW REGISTER.

## SEPTEMBER 1885.

## THE LAW OF JUDICIAL NOTICE.

As a general principle of trial-practice courts are to be guided, in reaching their conclusions, only by the evidence adduced in the particular case and by the rules of law applicable to it. There are, however, certain classes of facts which are not properly the subject of testimony, or which are regarded as universally established by common notoriety, and these, being held to rest within the knowledge of the judge, need not be proved in the case. Of such facts the court is said to "take judicial notice." It is the purpose of this article to describe in outline the chief subjects of judicial notice and the principles by which courts are directed in taking official cognisance of them.

I. *Constitution and Laws of the United States.*—In the first place, courts are always presumed to know the laws under which they act and which they are to administer. This is obviously essential to the first steps in judicial proceedings. And accordingly, any branch or division of the body of the law which applies to the territory within the jurisdiction of the court need not be established as matter of fact, but will be officially noted. And since the Constitution of the United States, the public acts of Congress, and the treaties made by the Federal Government with foreign nations form a part of the " supreme law of the land," it follows that all courts, whether national or state, will take judicial notice of their provisions.

This content downloaded from 75.25.126.229 on Wed, 15 Aug 2018 11:20:40 UTC
All use subject to https://about.jstor.org/terms

Case 14-50333-btb    Doc 395    Entered 09/06/18 15:39:27    Page 71 of 191

As to treaties, see *United States* v. *Schooner Peggy*, 1 Cranch 103.
So state courts are bound to take notice of the internal revenue laws
of Congress, and to refuse to aid parties in any attempt to violate
them, whether the point is raised by counsel or not: *Kessel* v. *Albertis*, 56 Barb. 362. The same is true of national bankrupt laws
and their practical operation: *Mims* v. *Swartz*, 37 Texas 13. And
it has been held that the President's proclamation of "universal
amnesty and pardon" is a public act of which all the courts of the
United States are bound to take notice and to which they are bound
to give effect: *Armstrong* v. *United States*, 13 Wall. 154. So also
courts will take notice of the government survey and the legal subdivisions of the public land: *Atwater* v. *Schenck*, 9 Wis. 160. But
the state courts are not bound to notice the *rules* of the departments
of the federal government, or of the board of land commissioners or
surveyor-general, *e. g.*, that original papers are not to be taken from
their files. Such rules, if essential, must be shown by affidavit or
otherwise: *Hensley* v. *Tarpey*, 7 Cal. 288. Nor are courts required to know officially the various orders issued by a military
commander in the exercise of the military authority conferred upon
him: *Burke* v. *Miltenberger*, 19 Wall. 519.

II. *Public Laws of the State.*—Since the common or unwritten
law of the state, together with its general and public statutes, constitute an integral part of the domestic jurisprudence, these also
are proper subjects for the judicial cognisance of the court: *Lane*
v. *Harris*, 16 Ga. 217. As also the time when a public law takes
effect: *State* v. *Bailey*, 16 Ind. 46. And it is held that the appellate court, if in doubt as to the true reading of a statute, will
of its own motion inform itself thereof by referring to the original
act on file in the office of the secretary of state: *Clare* v. *State*, 5
Iowa 509. Whether or not the official knowledge of the court
should be understood to extend to the journals of the two houses
of the legislature, is a mooted question. It has been so held in
Alabama and Michigan: *Moody* v. *State*, 48 Ala. 115; *People* v.
*Mahaney*, 13 Mich. 481; and denied elsewhere: *Grob* v. *Cushman*, 45 Ill. 119; *Coleman* v. *Dobbins*, 8 Ind. 156. But at any
rate it appears to be settled that when it becomes the duty of the
court to inquire into the validity or constitutionality of a statute,
recourse may be had to the legislative journals. The courts are required to be acquainted with the whole body of domestic law; but
of course it is an essential prerequisite to such acquaintance that

This content downloaded from 75.25.126.229 on Wed, 15 Aug 2018 11:20:40 UTC
All use subject to https://about.jstor.org/terms

Case 14-50333-btb    Doc 395    Entered 09/06/18 15:39:27    Page 72 of 191

they should have knowledge of any acts which are invalid, uncon-
stitutional, or not in force.   The judges must be able to determine
whether or not a bill has been passed in accordance with all the con-
stitutional provisions, whether or not it received the requisite major-
ity to pass it over the governor's veto, whether or not it answers the
law in respect to singleness of subject-matter and title, and so on ;
and such determination becomes impossible unless reference can be
made to the official records of the legislative body.   *People* v. *Ma-
haney*, 13 Mich. 481; *Moody* v. *State*, 48 Ala. 115; *Opinion of
the Judges*, 35 N. H. 579; *Pangborn* v. *Young*, 32 N. J. Law 29.
But it is equally settled that the court cannot go behind the records
of the legislature to inquire into the regularity of their proceedings
in passing an act: *People* v. *Devlin*, 33 N. Y. 269.   On the whole,
we are inclined to favor the liberal and wise rule laid down by the
United States Supreme Court in the case of *Gardner* v. *The Col-
lector*, 6 Wall. 511: " We are of opinion, on principle as well as
authority, that whenever a question arises in a court of law of the
existence of a statute, or of the time when a statute took effect, or
of the precise terms of a statute, the judges who are called upon to
decide it, have a right to resort to any source of information which
in its nature is capable of conveying to the judicial mind a clear
and satisfactory answer to such question ; always seeking first for
that which in its nature is most appropriate, unless the positive law
has enacted a different rule."   But in considering the proceedings
of the legislature, the court has no judicial knowledge whether or
not there are proper and legitimate modes of expending money in
procuring the passage of an act; and therefore it cannot say that
an averment in an answer. of such expenditure, with such purpose
and result, is either immaterial or vicious : *Judah* v. *Trustees*, 16
Ind. 56.

  Nor is the court restricted, in noticing the laws of the state, to
the allegations of the pleader.   For example, where a bill concerns
the interests of the state and is professedly for their protection, the
court will take official notice of the established law, even though it
contradicts such allegations : *State* v. *Jarrett*, 17 Md. 309.   It
follows as a corollary from what has already been said that the
court will take judicial notice of the *repeal* of any law of the state :
*State* v. *O'Connor*, 13 La. Ann. 486.   Even where proceedings are
begun under a certain statute, and, pending an appeal, that statute
is repealed, the appellate court is bound to notice such repeal,

This content downloaded from 75.25.126.229 on Wed, 15 Aug 2018 11:20:40 UTC
All use subject to https://about.jstor.org/terms

though it forms no part of the case as reported for their judgment: *Springfield* v. *Worcester*, 2 Cush. 52.   The laws relating to highways are public statutes of which the courts will take judicial notice: *Town of Griswold* v. *Gallup*, 22 Conn. 208.   And the same is true of bank-charters: *Davis* v. *Bank of Fulton*, 31 Ga. 69; though see *Bank* v. *Gruber*, 87 Penn. St. 468.

But private and special acts of the legislature, relating only to a limited number of persons, are not laws of which the courts are required to take official cognisance.   This rests upon two reasons. In the first place, they are not matters of such public notoriety that judges are presumed to know them at all events.   And secondly, they are not in reality the public laws of the state, but rather in the nature of a contract between the legislature, in their representative capacity, and the individuals who are supposed to derive benefit from them.   *Leland* v. *Wilkinson*, 6 Pet. 317; *Timlow* v. *Reading Railroad*, 10 W. N. C. 436; *Bank* v. *Gruber*, 87 Penn. St. 468; *Legrand* v. *Sidney College*, 5 Munf. (Va.) 324. It is often essential to determine whether a given act is public or private, and to this end the court in Indiana has laid down the following rule: To constitute a statute a public act it is not necessary that it should extend to all parts of the state; it is a public act if it extends equally to all persons within the territorial limits described in the statute: *Levy* v. *State*, 6 Ind. 281.   Yet a special act for the survey of a particular tract of land is not such a public law as the courts are required to know judicially: *City of Allegheny* v. *Nelson*, 25 Penn. St. 332.   And, as further illustrating this distinction, it is held that while the court knows judicially all the statutes under which plank-road companies are organized, yet it cannot know judicially under which one any particular company was formed, or whether it has not adopted the provisions of some other act: *Danville, &c., Co.* v. *State*, 16 Ind. 456.   In accordance with the principles of the rule above stated, it is decided that an act relating to the powers of a single municipal corporation is in its nature public, though not in terms declared to be so, and must be judicially noticed by the courts; *Fauntleroy* v. *Hannibal*, 1 Dill. 118.   So also special laws enacted by a territorial legislature, creating towns or cities municipal corporations, are public acts: *Prell* v. *McDonald*, 7 Kans. 426.   And the courts will take judicial notice of · the power and authority of a city to improve its streets: *Macey* v. *Titcombe*, 19 Ind. 135; and that the streets of a

This content downloaded from 75.25.126.229 on Wed, 15 Aug 2018 11:20:40 UTC
All use subject to https://about.jstor.org/terms

Case 14-50333-btb    Doc 395    Entered 09/06/18 15:38:27    Page 74 of 191

city are public highways: *Whittaker* v. *Eighth Ave. Railroad Co.*, 5 Robt. (N. Y.) 650; but not of the width of the streets or of the side-walks, in a city, nor of the city ordinances establishing the same or prescribing or limiting their extent: *Porter* v. *Waring*, 69 N. Y. 250. It is well settled that courts of general jurisdiction, established by the authority of the state, cannot take judicial notice of the city ordinances or police regulations of any municipal corporation: *Case* v. *Mobile*, 30 Ala. 538; *Porter* v. *Waring*, *supra*. But a *city* court will officially notice such ordinances; because it stands in the same attitude towards the municipal laws of the city that a state court occupies in reference to the public laws of the state: *State* v. *Leiber*, 11 Iowa 407. It appears that private laws, though requiring proof by evidence, need not be specially pleaded, but may be exhibited as other documents, unless admitted by consent: *Legrand* v. *College*, 5 Munf. (Va.) 324.

III. *International Law.*—The law of nations, being co-extensive with civilization, must also be judicially noticed by all courts. Thus the law merchant, so far as the same is a part of the private international law, is not a subject for proof as matter of fact, but will be noticed and applied by the court: *Jewel* v. *Center*, 25 Ala. 498. So also it has been said in Connecticut, " By common consent and general usage, the seal of a court of admiralty has been considered as sufficiently authenticating its records. No objection has prevailed against the reception of a decree of a court acting on the law of nations when established by its seal. The seal is deemed to be evidence of itself, because such courts are considered as courts of the whole civilized world, and every person interested as a party." *Thompson* v. *Stewart*, 3 Conn. 181. And the same is equally true of the general principles of the laws of navigation. Thus, where a set of rules of navigation (prescribing the different kinds of lights to be used on vessels) has been issued by a foreign government, and accepted as obligatory by more than thirty of the principal commercial nations of the world, the courts may take judicial notice of the fact that by common consent of mankind these rules have been acquiesced in as of general obligation. The law maritime does not require proof as a foreign law: *The Scotia*, 14 Wall. 170. So also the national flag and seal of all civilized countries is recognised by the courts: *Watson* v. *Walker*, 23 N. H. 496. And to further illustrate the same principle—acts which are criminal by the common law and the laws of all civilized countries will be pre-

This content downloaded from 75.25.126.229 on Wed, 15 Aug 2018 11:20:40 UTC
All use subject to https://about.jstor.org/terms

sumed to be contrary to the laws of any state of the Union: *Cluff* v. *M. B. Ins. Co.*, 13 Allen 308.

As a principle somewhat analogous to the preceding, it is held that the official seal of a notary public is self-proving everywhere; in other words, that the courts of one jurisdiction will take notice of the authority of a notary public, commissioned in another state to administer oaths and perform other duties incident to his official capacity, without any other authentication than his signature and notarial seal, and will infer therefrom that he was duly appointed by the governor of such state: *Denmead* v. *Maack*, 2 McArthur 475: *Browne* v. *Philadelphia Bank*, 6 S. & R. 484.

IV. *Judicial Notice of State Law in the Federal Courts.*— Whenever questions arise in the courts of the United States which depend upon points of state law, the adjudicating tribunals will take judicial notice of all such laws: *Merrill* v. *Dawson*, 1 Hemp. 563; *Jones* v. *Hays*, 4 McLean 521; *Mewster* v. *Spalding*, 6 Id. 24; *Pennington* v. *Gibson*, 16 How. 65. So the Supreme Court will take official cognisance of any law of any state which may be necessary to the determination of the questions before it, and the circuit courts will notice the laws of all states within their territorial jurisdiction. This principle may rest upon either of two foundations. (1.) "The circuit courts of the United States are created by Congress, not for the purpose of administering the local laws of a single state alone, but to administer the laws of all the states of the Union, in cases to which they respectively apply:" *Owings* v. *Hull*, 9 Pet. 625; and since, as we have already seen, every court is presumed to know the whole body of the law which it is intended to administer, it follows that these courts must be acquainted with the state laws. (2.) In the contemplation of the federal tribunals the states are not "foreign," but are all component parts of the general government and territorially within its jurisdiction: *Bennett* v. *Bennett*, Deady 309. In this matter the United States courts are governed by the same rules which direct the tribunals of the particular state; *e. g.* as respects the difference between public and private statutes, and the fact that the latter cannot be judicially noticed. So, where a certain act of incorporation is declared to be a public act, so that the state courts may include it within their judicial notice, the federal courts will do likewise: *Covington Drawbridge Co.* v. *Shepherd*, 20 How. 227. And so of a statute giving a county authority to subscribe for stock in a

This content downloaded from 75.25.126.229 on Wed, 15 Aug 2018 11:20:40 UTC
All use subject to https://about.jstor.org/terms

Case 14-50333-btb    Doc 395    Entered 09/06/18 15:39:27    Page 76 of 191

railroad company, and to issue its bonds in payment thereof: *Smith v. Tallapoosa Co.*, 2 Woods 574. To this rule, however, there is an important exception, viz.: that while the courts of one state cannot generally notice the laws of a sister state, the judicial knowledge of a national court is not confined to the enactments of the state where it happens to be sitting at the particular time, but extends at all times to the laws of all other states within its jurisdiction. For it would be absurd to make the scope of the judicial knowledge shift and vary in correspondence with the venue of the particular action.

As a general rule, when the proper construction of a state statute has been fixed and settled by the court of last resort in that state, the same construction will be adopted by the federal courts sitting within her borders: *Elmendorf* v. *Taylor*, 10 Wheat. 152.

V. *Laws of Sister States, how regarded.*—It is a general rule that foreign laws are matters of fact to be pleaded and proved. As municipal laws have no extra-territorial force, they cannot be regarded, strictly speaking, as *law* when they are brought before a tribunal foreign to the jurisdiction that enacted them. And the only reason why such tribunals enforce them at all is, because it is supposed that contracts made in foreign countries are made with reference to the laws there prevalent, and that those laws have thus become incorporated in such contracts. To enforce the contracts, therefore, it is necessary to enforce the laws. But as they are not proper subjects for the administration of the domestic tribunal, they must be alleged as matter of fact, and their existence and tenor must be established by testimony. Now the states of the American Union, except in so far as it is otherwise provided in the federal constitution, are regarded as independent sovereignties, and their mutual relations as those of foreign powers in close alliance and friendship. It follows from this that the laws of each state are " foreign" in the other states, and cannot be judicially noticed, but must be pleaded and proved as facts. This proposition is abundantly supported by the authorities: *State* v. *Stade*, 1 D. Chip. 303; *Territt* v. *Woodruff*, 19 Vt. 182; *Hempstead* v. *Reed*, 6 Conn. 480; *Kline* v. *Baker*, 99 Mass. 253; *Knapp* v. *Abell*, 10 Allen 485; *Ames* v. *McCamber*, 124 Mass. 85; *Miller* v. *Avery*, 2 Barb. Ch. 582; *Hosford* v. *Nichols*, 1 Paige Ch. 226; *Dorsey* v. *Dorsey*, 5 J. J. Marsh. 280; *Whitesides* v. *Poole*, 9 Rich. (S. C.) 68; *Simms* v. *Southern Ex. Co.*, 38 Ga. 129; *Shed* v. *Augustine*, 14

This content downloaded from 75.25.126.229 on Wed, 15 Aug 2018 11:20:40 UTC
All use subject to https://about.jstor.org/terms

560        THE LAW OF JUDICIAL NOTICE.

Kan. 282; *Irving* v. *McLean*, 4 Blackf. 52; *Rothrock* v. *Perkinson*, 61 Ind. 39; *Hyman* v. *Bayne*, 83 Ill. 256; *Carey* v. *Railroad*, 5 Iowa 357; *Brimhall* v. *Van Campen*, 8 Minn. 13; *Rape* v. *Heaton*, 9 Wis. 328; 1 Daniel on Negotiable Instruments, § 865.

But there are certain modifications which have been engrafted upon this rule. Thus, where one state recognises acts done in pursuance of the laws of another state, its courts will take judicial notice of those laws, so far as may be necessary to determine the validity of the acts alleged to be in conformity with them: *Carpenter* v. *Dexter*, 8 Wall. 513. So also, where a question arises under the Act of Congress requiring that full faith and credit be given in each state to the public acts, records, and proceedings of every other state, the domestic tribunal will take judicial notice of the local laws of the state from which the record comes; for the very sensible reason that their proceedings, in such case, are subject to review in the Supreme Court of the United States, and since in *that* court the states are not regarded as foreign, and their individual laws are officially noticed, the same rule should obtain, under these circumstances, in the state courts. As remarked by Woodward, J., " It would be a very imperfect and discordant administration for the court of original jurisdiction to adopt one rule of decision, while the court of final resort was governed by another; and hence it follows that, in questions of this sort, we should take notice of the local laws of a sister state in the same manner the Supreme Court of the United States would do on a writ of error to our judgment:" *State of Ohio* v. *Hinchman*, 27 Penn. St. 479; *Paine* v. *Insurance Co.*, 11 R. I. 411; *Rae* v. *Hulbert*, 17 Ill. 572; *Butcher* v. *Bank*, 2 Kans. 70. It has been said, in Georgia, that the judges, on the trial of a cause, may proceed on their personal knowledge of the laws of another state, and that their judgment will not be reversed, in consequence of their so doing, unless it appears that their decision was erroneous as to those laws: *Herschfeld* v. *Dexler*, 12 Ga. 582. But this seems to be an isolated case. As showing the practical operation of this rule, we may cite the following: The courts cannot judicially know the rate of legal interest in a sister state: *Clarke* v. *Pratt*, 20 Ala. 470; *Dorsey* v. *Dorsey*, 5 J. J. Marsh. 280; nor what share would fall to a given heir of an intestate who died domiciled in another state: *McDaniel* v. *Wright*, 7 J. J. Marsh. 475; in an action on a contract made in another state, and specifying no particular place of

This content downloaded from 75.25.126.229 on Wed, 15 Aug 2018 11:20:40 UTC
All use subject to https://about.jstor.org/terms

performance, the court will not, on a demurrer to the declaration, take judicial notice of a law of such state which, applied to the contract, would render it void: *Jones* v. *Palmer*, 1 Dougl. (Mich.) 379; an averment of *lis pendens* in the courts of another state does not necessarily import that the defendant has appeared or been served with process, and hence is not a good plea in abatement: *Newell* v. *Newton*, 10 Pick. 470.

Another important exception to the rule that the laws of one state are foreign to the courts of another and must be pleaded and proved, is found in the fact that where one state is formed out of territory originally belonging to another, the courts of the new state will recognise as a part of their domestic jurisprudence all laws of the other state which were in force at the time of the separation, unless repealed, directly or by implication, in the new state. Thus the courts of Kentucky will take judicial notice of the laws of Virginia existing before the former state became independent of the latter: *Delano* v. *Jopling*, 1 Litt. (Ky.) 417. And the same is true of states which were formerly within the dominion of foreign nations. So the Spanish laws which prevailed in Louisiana before its cession to the United States, and upon which the titles to land in that state depend, must be judicially noticed and expounded by the courts of Louisiana: *United States* v. *Turner*, 11 How. 663. So also our courts will take judicial notice of the statute law of Great Britain in force before the separation; but the statutes of that country created since the revolution cannot be judicially noticed or established before our courts, except in the same manner and by the same proofs as the criminal laws of any foreign state: *Ocean Ins. Co.* v. *Fields*, 2 Story 59.

VI. *Foreign Laws—How Proved.*—The laws of any foreign state or country being thus seen to be without the judicial cognisance, we are next to consider the methods of proving them before the court when they become material to the controversy. A concise rule has been laid down by the United States Supreme Court, as follows: "The existence of a foreign law, written or unwritten, cannot be judicially noticed, unless it be proved as a fact, by appropriate evidence. The written foreign law may be proved by a copy of the law properly authenticated. The unwritten must be proved by the parol testimony of experts:" *Ennis* v. *Smith*, 14 How. 426; *Frith* v. *Sprague*, 14 Mass. 455. In regard to the written law, and first as to the mode of authenticating it, it is held that the great seal of

This content downloaded from 75.25.126.229 on Wed, 15 Aug 2018 11:20:40 UTC
All use subject to https://about.jstor.org/terms

562            THE LAW OF JUDICIAL NOTICE.

a state affixed to the exemplification of a law is sufficient proof
of itself, inasmuch as the public seal is a matter of notoriety
and will be judicially noticed as a part of the law of nations
acknowledged by all: *Robinson* v. *Gilman*, 20 Me. 300; *State* v.
*Carr*, 5 N. H. 367. And it has been decided by the supreme
federal tribunal that, under the Act of May 26th 1790, prescribing
the manner in which the public acts, records and proceedings of the
several states shall be authenticated, no other authentication of an
act of the legislature is required than the annexation of the seal
of the state; and it is presumed that the person who affixed the
seal had competent authority to do so: *United States* v. *Amedy*, 11
Wheat. 392. In regard to foreign countries, however, it is essential
that the person certifying the exemplification of the law should be
one whose duty and prerogative it is to do so. Thus, it is not a
consular function to authenticate the laws of a foreign state, and
the certificate of a United States consul to that effect is not evi-
dence: *Church* v. *Hubbart*, 2 Cranch 187. And again, "the
certificate and seal of the minister resident from Great Britain in
Hanover is not a proper authentication for the proceedings of a
foreign court, or of the proceedings of an officer authorized to take
depositions. It is not connected in any way with the functions
of the minister. His certificate and seal could only authenticate
those acts which are appropriate to his office:" *Stein* v. *Bowman*,
13 Pet. 209. The general rule, then, is that the exemplification
must be under the great seal of the state. As between the several
states of the Union, however, a more liberal rule obtains. In
general, the written laws of a sister state may be proved by printed
volumes, printed by the authority of such state, and purporting to
contain the public acts of its legislature. In point of fact, this
rule is dictated by principles of convenience, and affords a method
of proof more satisfactory even than that by certified copy. It
may now be regarded as established in a majority of the states.
Thus it is said in Pennsylvania: "Printed volumes purporting to
be on the face of them the laws of a sister state, are admissible as
*prima facie* evidence to prove the statute laws of that state:"
*Mullen* v. *Morris*, 2 Penn. St. 87. And in Massachusetts it is
held that where a printed volume of the laws of another state
contains the words "By authority" on the title-page, that is a
sufficient authentication to allow it to be introduced in evidence:
*Merrifield* v. *Robbins*, 8 Gray 150. In New Hampshire it was

This content downloaded from 75.25.126.229 on Wed, 15 Aug 2018 11:20:40 UTC
All use subject to https://about.jstor.org/terms

Case 14-50333-btb    Doc 395    Entered 09/06/18 15:39:27    Page 80 of 191

once said that such printed volume was admissible if, according to
the testimony of a counsellor of that state, it was there cited and
received by the courts: *Lord* v. *Staples*, 23 N. H. 448; but a
later decision holds it sufficient if it purports on its face to be
printed by authority: *Emery* v. *Berry*, 28 N. H. 487. And see,
to the same effect, *Thomas* v. *Davis*, 7 B. Mon. 227; *Clanton* v.
*Barnes*, 50 Ala. 260; *Barkman* v. *Hopkins*, 11 Ark. 157; *State*
v. *Abbey*, 29 Vt. 60; *Simms* v. *Southern Ex. Co.*, 38 Ga. 129;
*Rothrock* v. *Perkinson*, 61 Ind. 39; *Bradley* v. *West*, 60 Mo. 34.
A contrary doctrine is held in North Carolina: *State* v. *Twitty*, 2
Hawks 441. Whether or not a similar authentication is sufficient
for the statute law of a foreign country is a question not yet
entirely decided; but the current of judicial opinion seems to
require that the volume offered to prove such laws must be shown,
by extraneous evidence, to be duly authorized by the government
of the foreign country. Thus, a printed copy of the Irish statutes,
when supported by the oath of an Irish barrister to the effect that
he had received them from the king's printer in Ireland, and that
they are good evidence there, may be used to show the laws
of Ireland: *Jones* v. *Maffet*, 5 S. & R. 523. So, also, where a
printed volume of the laws of a British province is shown by the
testimony of witnesses to have received the sanction of the
executive and judicial officers of the province, as containing its
laws: *Owen* v. *Boyle*, 15 Me. 147. But an act of the Parliament
of Great Britain cannot be proved by an alleged transcript of it in
the "Canada Gazette," although the latter is an official newspaper:
*Beach* v. *Workman*, 20 N. H. 379.

It is generally settled that the common or unwritten law of a for-
eign state may be proved by parol evidence of experts. And to
constitute one an expert, for this purpose, it is not necessary that
he should be a lawyer, provided it appears that he has been in a
position which might reasonably be supposed to require familiarity
on his part with such laws. Thus it is said: "The law of a foreign
country on a given subject may be proved by any person who, though
not a lawyer, or not having filled any public office, is or has been
in a position to render it probable that he would make himself ac-
quainted with it;" *American, &c., Co.* v. *Rosenagle*, 77 Penn. St.
515; *Hall* v. *Costello*, 48 N. H. 179. The construction given to
a statute of a foreign state, by usage and by judicial decisions, is
a part of its unwritten law, and should be proved by the testimony

This content downloaded from 75.25.126.229 on Wed, 15 Aug 2018 11:20:40 UTC
All use subject to https://about.jstor.org/terms

564          THE LAW OF JUDICIAL NOTICE.

of experts: *Dyer* v. *Smith*, 12 Conn. 384.   In Massachusetts it is
provided by statute that the books of reports of cases adjudged in
the courts of other states are admissible in evidence to prove the
unwritten law of those states: *Cragin* v. *Lamkin*, 7 Allen 395;
*Ames* v. *McCamber*, 124 Mass. 91.

While it is firmly settled that foreign laws must be proved as
*facts*, there is much diversity of opinion as to whether the proof
of them should be addressed to the court or to the jury.   On the
one hand, it is the province of the jury to decide upon questions of
fact.   On the other hand, it is the undoubted prerogative of the court
to rule upon matters of law.   Judge STORY (Conflict of Laws,
§ 638) says: " The court are to decide what is the proper evidence
of the laws of a foreign country; and, where evidence is given of
those laws, the court are to judge of their applicability, when proved,
to the case in hand."   And the same rule has been asserted in New
Hampshire: *Pickard* v. *Bailey*, 26 N. H. 152.   But in Massachu-
setts it is held that the construction to be put upon foreign laws
after they are proved is a question for the jury, with such instruc-
tions to assist them in ascertaining and applying the law as may be
deemed proper: *Holman* v. *King*, 7 Met. 384.   And again: " When
the evidence consists of the parol testimony of experts as to the exist-
ence or prevailing construction of a statute, or as to any point of
unwritten law, the jury must determine what the foreign law is, as
in the case of any controverted fact depending upon like testimony.
* * * Where the evidence admitted consists entirely of a written
document, statute, or judicial opinion, the question of its construc-
tion and effect is for the court alone:" *Kline* v. *Baker*, 99 Mass.
254.   Perhaps the rule that is most closely in accordance with both
reason and elementary law is that laid down in the following lan-
guage: " The existence of a foreign law is a fact.   The court can-
not judicially know it, and therefore it must be proved; and the
proof, like all other, necessarily goes to the jury.   But when estab-
lished, the meaning of the law, its construction and effect, is the
province of the court.   It is a matter of professional science; and,
as the terms of the law are taken to be ascertained by the jury,
there is no necessity for imposing on them the burden of affixing a
meaning on them, more than on our own statutes.   It is the office
of reason to put a construction on any given document, and there-
fore it naturally arranges itself among the duties of the judge."
*State* v. *Jackson*, 2 Dev. (N. C.) 563.   These latter views are logi-

This content downloaded from 75.25.126.229 on Wed, 15 Aug 2018 11:20:40 UTC
All use subject to https://about.jstor.org/terms

Case 14-50333-btb    Doc 395    Entered 09/06/18 15:38:27    Page 82 of 191

cally, ably, and dogmatically supported by the learned author of Bishop on Marriage and Divorce, Vol. I., § 419.

VII. *Presumption that the Foreign Law is the same as Our Own.*—We frequently see it stated that the law of any foreign country is presumed to be the same as our own. This means that where a contract, or other matter in dispute, is on its face to be governed by a foreign law, and no proof of that law has been adduced, and it is not such that the court can take judicial notice of it, the adjudicating tribunal will proceed upon the basis of its *own* laws, not being informed in what respect the foreign law differs, or presuming, within certain restrictions, that it is identical. Thus, as a general rule, it is presumed that the "common law" prevails in each of the United States: *Monroe* v. *Douglass*, 5 N. Y. 447 ; *Whitford* v. *Panama Railroad Co.*, 23 Id. 465 ; *Copley* v. *Sandford*, 2 La. Ann. 335 ; *Rape* v. *Heaton*, 9 Wis. 328 ; 1 Whart. on Ev., § 314. In illustration of this rule, it is held that champerty, being an offence at common law, is to be presumed to be against the law of another state, the contrary not appearing: *Thurston* v. *Percival*, 1 Pick. 415. Again, in Massachusetts the giving of a promissory note is evidence of payment of a pre-existing debt—the law will be presumed the same in Maine : *Ely* v. *James*, 123 Mass. 44. Whether or not the *statutes* of another state are presumed the same as ours is a question propounded, but not decided, by the New York court in the case of *McCulloch* v. *Norwood*, 58 N. Y. 563. Probably not ; since foreign statute-law is so easily susceptible of proof.

There are several exceptions to this rule of presumption. In the first place, it is plainly in accordance with natural justice that all contracts and judicial proceedings had abroad should be presumed legal and valid, until the contrary is shown. Hence, if a contract, made with reference to foreign laws and to be governed thereby, would be void or illegal by the law of the forum, the court will not presume the foreign law to be the same as the domestic, for the mere purpose of defeating the contract, but on the contrary, in the absence of proof, will understand the contract to be valid by the foreign law. In other words, the presumption of legality and validity is stronger than the presumption of identity of laws : 1 Bishop on Mar. & Div., § 412 ; 1 Whart. on Ev., §§ 314, 1250 ; *Jones* v. *Palmer*, 1 Dougl. (Mich.) 379. For example, if the defence is *usury*, and the contract would be usurious under the

This content downloaded from 75.25.126.229 on Wed, 15 Aug 2018 11:20:40 UTC
All use subject to https://about.jstor.org/terms

THE LAW OF JUDICIAL NOTICE.

domestic law, the court will not presume that the *lex loci contractus*
is identical and so overthrow the contract; the defendant must
prove the foreign law as matter of fact: *Campion* v. *Kille*, 15 N.
J. Eq. 476 ; *Cutler* v. *Wright*, 22 N. Y. 472 ; *Davis* v. *Bowling*,
19 Mo. 651.   So also courts will not take judicial notice of the
*revenue* laws of another country : *Randall* v. *Rensselaer*, 1 Johns.
94.   So where suit was instituted upon a promissory note made in
Jamaica by one who was under age, and no evidence was offered of
the laws of Jamaica, it was held that the court would not presume
those laws to be the same, in respect to minority as a defence, as
the laws of the forum, and the plaintiff was entitled to recover :
*Thompson* v. *Ketcham*, 8 Johns. 190.   In the second place, this
presumption cannot reasonably be extended to countries whose
usages and customs are wholly different from ours, and whose
system of laws has nothing in common with our own jurisprudence,
either in respect of origin, traditions or theories.   Thus there is
no presumption that the common law is in force in Russia : *Savage*
v. *O'Neil*, 44 N. Y. 298.   Nor among the Cherokee nation : *Duval*
v. *Marshall*, 30 Ark. 230.   Nor in Turkey : *Dainese* v. *Hale*, 91
U. S. 13.   Nor, finally, can the presumption of identity of laws
be attached to any local idiosyncrasies or peculiarly intra-territorial
regulations.   As remarked by a distinguished writer, " It would
be preposterous to assume, even *prima facie*, that our Statute of
Frauds, or our fluctuating liquor laws, or our laws for the collection
of revenue, prevail in Japan."   1 Bishop M. & D., § 412.   And
by another : " Nor can a judge, as to a notoriously peculiar domes-
tic rule, assume without absurdity that such rule obtains in a sister
state."   1 Whart. on Ev., § 315.   In conclusion of this part of
our subject, it is held that where a statute of another state has
once been recognised as the law of that state by a decision of the
domestic courts, the latter will thereafter take judicial cognisance
of the statute, and until it be proved that the law has been changed,
will presume it still in existence : *Graham* v. *Williams*, 21 La.
Ann. 594.

VIII. *Judicial Notice taken of other Courts and their Judges.*
—As a general rule, all courts in the United States will take judi-
cial notice of the fact that tribunals are established in the several
states for the adjustment of controversies and the ascertainment of
rights : *Dozier* v. *Joyce*, 8 Port. (Ala.) 303.   But in regard to
recognising particular courts in other states, the practice is not so

This content downloaded from 75.25.126.229 on Wed, 15 Aug 2018 11:20:40 UTC
All use subject to https://about.jstor.org/terms

THE LAW OF JUDICIAL NOTICE.                567

harmonious.   Thus the courts of Kansas will take judicial notice
of the constitutions of sister states, and in an action on a judgment
of the Court of Common Pleas in Pennsylvania, will recognise the
fact that by the constitution of that state that court is a common-
law court having original and appellate jurisdiction: *Butcher* v.
*Brownsville*, 2 Kans. 70.   On the other hand, the courts of Wis-
consin will not take judicial notice that there are county judges in
New York or that they are authorized to administer oaths: *Fellows*
v. *Menasha*, 11 Wis. 558.   Of course all courts will officially re-
cognise those which are superior to them or co-ordinate with them,
and their practice.   And it may now be regarded as settled that
appellate courts will take notice of the inferior courts and who are
their judges: *Tucker* v. *State*, 11 Md. 322; *Kilpatrick* v. *Com-
monwealth*, 31 Penn. St. 198.   But see *Ripley* v. *Warren*, 2 Pick.
596.   So the circuit court will take judicial cognisance of who are
the justices of the peace for the county in which it is held, and
will require no proof of their official character unless that particular
point is directly in issue: *Chambers* v. *People*, 5 Ill. 351; *Hibbs*
v. *Blair*, 14 Penn. St. 413.   And the Supreme Court of a state
should take notice of the times prescribed by law for holding the
terms of the various courts of the state: *Lindsay* v. *Williams*, 17
Ala. 229; *McGinnis* v. *State*, 24 Ind. 500; *Davidson* v. *Petico-
las*, 34 Tex. 27.   But the superior courts will not take judicial
notice of the customs, rules, practice or proceedings of inferior courts
of limited jurisdiction, unless justice requires it, when revising the
judgments of such courts: *March* v. *Commonwealth*, 12 B. Mon.
25.   Or unless, we may add, the organization and practice of such
courts is regulated by statute, in which case it would be included in
the judicial knowledge which the court has of all the laws of the
state.   In California it is stated that where a party relies upon the
rules of practice of the district courts he must have them incorpo-
rated in the record, as the Supreme Court cannot judicially notice
them: *Cutter* v. *Caruthers*, 48 Cal. 178.   The court will always
take judicial notice of all prior proceedings in a case; hence it is
unnecessary to offer evidence of a former trial and the verdict re-
turned on such trial, on the hearing of a plea in bar of "once in
jeopardy" by such trial and verdict: *State* v. *Bowen*, 16 Kans.
475.   And where an appearance is entered in the inferior court,
and is not withdrawn, and an appeal is taken to this court, and the
judgment below is reversed and remanded, and, after proceedings

This content downloaded from 75.25.126.229 on Wed, 15 Aug 2018 11:20:40 UTC
All use subject to https://about.jstor.org/terms

there, another appeal is taken to this court, this court will judicially
know what attorneys have appeared in the cause : *Symmes* v. *Major*,
21 Ind. 443.

IX. *Executive and other Officers.*—The courts of a state are
presumed to know who the state executive may be at any time when
the fact may be called in question: *Dewees* v. *Colorado County*,
32 Texas 570. So it will be judicially noticed that a certificate,
indorsed on the bond of a county treasurer by the deputy auditor-
general of the state, was so indorsed by an officer of the state :
*People* v. *Johr*, 22 Mich. 461. And the same is true of the officers
of a county. Thus courts will officially notice the appointment or
election of sheriffs, as well as of other executive or administrative
officers, and treat them as officers *de facto* when the validity of their
acts is called in question in a collateral manner ; *Thompson* v. *Has-
kell*, 21 Ill. 215; *Dyer* v. *Flint*, Id. 80. So of tax-collector and
his signature : *Wetherbee* v. *Dunn*, 32 Cal. 106. And of the
genuineness of the signatures of the county officers and of such
deputies as the law authorizes : *Himmelmann* v. *Hoadly*, 44 Cal.
213. But see, as a peculiar case, *Shropshire* v. *State*, 12 Ark. 190.
It is well settled that a court may take judicial notice of who are
its own officers: *Dyer* v. *Last*, 51 Ill. 179. And also of the
genuineness of its own records and of the signatures of its own
officers: *State* v. *Postlewait*, 14 Iowa 446.

X. *Historical Events.*—All courts are presumed to have an offi-
cial knowledge of general history, and they will require no proof
of events and circumstances which were of such universal notoriety
and affected so large a proportion of the population, at the time of
happening or afterwards, that they may be regarded as a part of
the public history of the country. Further than this it would be
extremely difficult to lay down an affirmative principle of distinction.
Such matters are judicially noticed by reason of their *notoriety ;*
and Wharton's description of notoriety is as follows : " Evidence is
not needed to establish that which is so notorious to persons of or-
dinary intelligence that it either admits of no doubt, or could at
the moment be established by a profusion of indisputable testimony :"
Law of Evidence, Vol. I., § 330. As illustrations of this public
notoriety, though not as embodying a principle of distinction, may
be cited the following instances : The separation of the Methodist
Church, in 1844, into two bodies north and south of a line, was an
event that connected itself with and formed a part of the history

This content downloaded from 75.25.126.229 on Wed, 15 Aug 2018 11:20:40 UTC
All use subject to https://about.jstor.org/terms

Case 14-50333-btb    Doc 395    Entered 09/06/18 15:39:27    Page 86 of 191

of the country, and hence will be judicially noticed: *Humphrey* v. *Burnside*, 4 Bush (Ky). 215. The courts of Alabama will officially notice the fact, as a part of contemporary history, that in 1867 the people of that state were in a condition of great financial embarrassment and insolvency, and that in consequence of such state of affairs it may not have been practicable for a guardian, at that time, to make a safe investment of a large sum of money, without some delay after its receipt: *Ashley* v. *Martin*, 50 Ala. 587. The court will judicially notice the agreement between Lord Baltimore and William Penn relating to the boundary line between the two provinces, as it is a part of the public history of Pennsylvania: *Thomas* v. *Stigers*, 5 Penn. St. 480. So also the history of the Six Nations of Indians is a part of the history of New York of which the courts will take judicial notice, as well as of the extinction of the Indian title to a certain tract of land within the state: *Howard* v. *Moot*, 64 N. Y. 271. But it is said that while courts will judicially notice matters of public history, yet it is generally necessary to produce *some* evidence upon the point sought to be established, as by contemporary chronicles, &c.: *McKinnon* v. *Bliss*, 21 N. Y. 206.

XI. *The Course of Nature.*—In the next place, it is well settled that judicial notice will be taken of the ordinary course of nature and the rotation of the seasons; and so of the general course of agriculture, with reference, for example, to the maturity of the crops: *Floyd* v. *Ricks*, 14 Ark. 286. So a court will take notice without proof that a mortgage made in January upon a cotton crop is upon a crop not yet in being: *Tomlinson* v. *Greenfield*, 31 Ark. 557. But on the other hand, it cannot be judicially known to the court that the concentric layers in the trunk of a tree mark each a year's growth of the tree and thus indicate its age: *Patterson* v. *McCausland*, 3 Bland (Md.) 69. Nor can notice be taken of mere vicissitudes of climate or of the seasons or special alternations of weather: *Dixon* v. *Nicholls*, 39 Ill. 372. So it is said that the almanac has long been regarded and held as a part of the law of the land. And the court will notice the coincidence of days of the month with days of the week, as shown by the almanac: *Allman* v. *Owen*, 31 Ala. 167. As, if a bill or note bears date on a certain day of the month, the court will judicially notice if such day were Sunday: 1 Daniel on Negot. Instr., § 70. And further, the court will take judicial notice that the date on which a judgment by

This content downloaded from 75.25.126.229 on Wed, 15 Aug 2018 11:20:40 UTC
All use subject to https://about.jstor.org/terms

Case 14-50333-btb    Doc 395    Entered 09/06/18 15:39:27    Page 87 of 191

default was recorded in a given year was or was not a day of a term such that the same was not prematurely rendered: *Bethune* v. *Hale*, 45 Ala. 522. Moreover, the ordinary limitations of human life are a proper subject for judicial cognisance. For example, where it is evident, from the time of their ancestor's death, that his children must have arrived at full age before suit was commenced, the court will judicially notice such fact: *Floyd* v. *Johnson*, 2 Litt. (Ky.) 109.

XII. *Geographical Features and Civil Divisions.*—Courts are bound to take judicial notice of the leading geographical features of the country; but the minuteness of such knowledge is inversely proportional to the distance, being much more specific and detailed in regard to the territory over which the court has jurisdiction than with respect to foreign lands or even different states. Thus courts will be presumed to be acquainted with the great geographical features of the states—such as lakes, rivers and mountains, and of the division of the state into counties, cities and towns, and their relative position: *Winnipiseogee Lake Co.* v. *Young*, 40 N. H. 420; *Hinckley* v. *Beckwith*, 23 Wis. 328; *Goodwin* v. *Appleton*, 22 Me. 453; *Martin* v. *Martin*, 51 Id. 366. And of the navigability of streams: *Neaderhouser* v. *State*, 28 Ind. 257. But not of the precise boundaries and distances, nor of the local situation and distances of the different places in counties from each other: *Goodwin* v. *Appleton, supra.* But the area of an established county is known to the court without proof: *Commissioners* v. *Spitler*, 13 Ind. 235.

In regard to the names of towns and their situation, (a controverted point), it was said in Illinois that where the premises in litigation were described as "lot five in block one in Haley's addition to the city of Monmouth," the Supreme Court would take judicial notice that there is a city of Monmouth in Warren county, Illinois, and would presume that to be the city intended: *Harding* v. *Strong*, 42 Ill. 148. But it is the general rule that the higher courts of the state can only notice those civil divisions which are established and prescribed by the legislature. Thus the Supreme Court of Indiana cannot judicially know the names of the townships composing a given county, for the townships are established by the board of county commissioners, not by the legislature: *Bragg* v. *Rush County*, 34 Ind. 406. However, it is permitted them to notice that the state and the township are distinct political organiza-

This content downloaded from 75.25.126.229 on Wed, 15 Aug 2018 11:20:40 UTC
All use subject to https://about.jstor.org/terms

tions: *LaGrange* v. *Chapman*, 11 Mich. 499. As to how much knowledge is required of points outside the state, the decisions are not entirely harmonious. It has been held that the courts cannot officially know of the existence of a town or city of a specified name, as New Orleans, New York, Janesville, not lying within the state; *Riggin* v. *Collier*, 6 Mo. 568; *Woodward* v. *Railroad*, 21 Wis. 309; *Whitlock* v. *Castro*, 22 Tex. 108; *Richardson* v. *Williams*, 2 Port. (Ala.) 239. But these decisions are not satisfactory, and it is difficult to conceive any substantial reason why courts should be presumed ignorant of the existence and location of those well known centres of traffic and commerce which are so familiar in the every-day parlance of private individuals. And see *Rice* v. *Montgomery*, 4 Biss. 75. At any rate, it is apprehended that this restriction could not be applied to the courts of the United States; for the reasons given above for their judicial knowledge of the laws of various states. And the more important geographical features of the United States, considered as one country, may be judicially noticed; *e. g.* that the state of Missouri is east of the Rocky Mountains: *Price* v. *Page*, 24 Mo. 65. In regard to the length of time required to make a railway journey, or for carriers to transport goods, from one designated city to another, the prevailing doctrine seems to be that a court will require proof, not being able to determine officially what time should be allowed: *Rice* v. *Montgomery*, *supra.* But in a recent Pennsylvania case it was said: "We apprehend that the ordinary speed of railway trains is a matter for judicial cognisance, and hence a very simple calculation will demonstrate with approximate certainty the time within which mails may be transported between such cities as New York and Pittsburgh;" and hence an instruction that "there was nothing improbable in the idea that a notice of protest could reach Pittsburgh the day following the maturity of the note," was not erroneous; although "perhaps the learned [trial] judge went too far in stating that a train leaving New York at five or six in the evening would reach Pittsburgh the next morning at eight:" *Pearce* v. *Langfit*, 101 Penn. St. 512. And in another instance the court took judicial notice of the usual duration of voyages across the Atlantic by steam or other packet ships, so far as to determine that one who was proved to have taken passage on a particular vessel, which vessel had not yet been heard from after a great lapse of time, must be dead: *Oppenheim* v. *Wolf*, 3 Sandf. Ch. 571.

This content downloaded from 75.25.126.229 on Wed, 15 Aug 2018 11:20:40 UTC
All use subject to https://about.jstor.org/terms

THE LAW OF JUDICIAL NOTICE.

There are but few cases illustrating the rules of judicial notice as applied to the geographical features of foreign countries, but those cases exhibit an unexpected liberality. Thus the Louisiana court once took notice that the river Mersey in England is filled with salt water, the tide ebbing and flowing therein to a great height: *Whitney* v. *Gauche*, 11 La. Ann. 432. And in the case of *The Peterhoff*, Blatchf. Prize Cas. 463, the court even went so far as to take judicial notice of the situation of a town in a foreign country, and that a bar exists at the mouth of the river on which that town lies, which vessels of the draught of the ship in suit cannot cross.

XIII. *Customs and Usages.*—Whenever a custom is public, general and notorious, it will be judicially noticed by the court without proof. This is true, for example, of the custom of merchants to charge interest on their accounts after six months: *Koons* v. *Miller*, 3 W. & S. 271; *Watt* v. *Hoch*, 25 Penn. St. 411. And so of ordinary and familiar abbreviations, such as "admr" for "administrator:" *Moseley* v. *Mastin*, 37 Ala. 216. But not where the custom is confined to a particular trade, with which the court cannot reasonably be supposed to be acquainted. Thus the court cannot know officially the meaning of printers' marks at the foot of an advertisement, and, in the absence of further proof upon the subject, will not infer that such marks indicate the date and number of times a notice has been published: *Johnson* v. *Robertson*, 31 Md. 476. The court will take judicial notice of the wages of ordinary labor: *Bell* v. *Barnet*, 2 J. J. Marsh. (Ky.) 516.

XIV. *Matters of Political Economy and Conclusions of Science.*—The different classes of notes and bills in circulation as money at a particular time will also be judicially noticed: *Hart* v. *State*, 55 Ind. 599. It is in accordance with this principle that the Massachusetts court said: "We must take notice, in common with the people, that bank notes derive their value not only from the certainty but the facility of payment; consequently that a man in trade in Boston, holding a bill issued by a bank at a distance from Boston, can less easily obtain payment than he could if the issuing bank was near to him: and that the different facility of procuring payment of different bills may create a difference in their value:" *Jones* v. *Fales*, 4 Mass. 252. The courts will also recognise the legal coins made at the United States mint pursuant to law, and such foreign coins as are made current by law. Hence, in prosecutions for counterfeiting, it is not necessary to prove that there are

This content downloaded from 75.25.126.229 on Wed, 15 Aug 2018 11:20:40 UTC
All use subject to https://about.jstor.org/terms

B. & O. TELEGRAPH CO. *v.* BELL TELEPHONE CO.    573

genuine coins of which those alleged to have been made are imitations: *United States* v. *Burns*, 5 McLean 23.

It is not error to instruct the jury that they may infer that gin is intoxicating, without any evidence of its properties or qualities: *Commonwealth* v. *Peckham*, 2 Gray 514. And the same is true of whiskey: *Egan* v. *State*, 53 Ind. 162. But not of malt liquors: *Shaw* v. *State*, 56 Ind. 188. But whether or not benzine is of a like nature with camphene or spirit gas, is not a matter of which the court can take judicial notice; it must be left to the jury: *Mears* v. *Insurance Co.*, 92 Penn. St. 15. But the court will notice the magnetic variation from the true meridian: *Bryan* v. *Beckley*, 6 Litt. (Ky.) 91. And so of the art of photography, the mechanical and chemical principles employed, the scientific principles on which they are based, and their results: *Luke* v. *Calhoun Co.*, 52 Ala. 115. And finally, the court will take judicial notice of the construction and uses of that useful instrument, the ice-cream freezer: *Brown* v. *Piper*, 91 U. S. 37

H. CAMPBELL BLACK.

Williamsport, Pa.

---

## RECENT AMERICAN DECISIONS.
### *Circuit Court, E. D. Missouri.*

### STATE OF MISSOURI ex rel. BALTIMORE & OHIO TELEGRAPH CO. *v.* BELL TELEPHONE CO.

A., a Massachusetts corporation, and the owner of a patent on a telephone, licensed B., a Missouri corporation, to do the telephone business of St. Louis, upon condition that B. should not establish telephonic connection with any telegraph company unless specially authorized by A. A. permitted B. to establish telephonic connection with the Western Union Telegraph Company. Thereafter the Baltimore & Ohio Telegraph Company applied for a mandamus to compel B. to permit telephonic communication between it and the petitioner. A. was not made a party: *Held* (1), that A. was not a necessary party; (2) that all other telegraph companies were entitled to the same privilege granted the W. U. Co., upon paying the same price; and that the petitioner was entitled to the relief asked. TREAT, J., dissenting

APPLICATION for a mandamus.

*Garland Pollard,* for petitioner.

*E. T. Allen,* for defendant.

This content downloaded from 75.25.126.229 on Wed, 15 Aug 2018 11:20:40 UTC
All use subject to https://about.jstor.org/terms

Special Pullout

# Los Angeles Lawyer

**EARN MCLE CREDIT**

## Corporate Responsibility

## Surviving MST

. . . . . . . . . . . . . . .

Los Angeles lawyer
Amir A. Amini discusses
homeowner rights and
responsibilities involved
in protecting scenic views

On Direct:
Mia Yamamoto

Turnover and
Preference Law

# CONTENTS



## FEATURES

## DEPARTMENTS

Los Angeles Lawyer
*the magazine of*
the Los Angeles County
Bar Association
September 2016
Volume 39, No. 6

COVER PHOTO: TOM KELLER

**9  On Direct**
Mia Yamamoto
INTERVIEW BY DEBORAH KELLY

**11  Barristers Tips**
The challenges of working with
first-time experts
BY SARAH KELLY-KILGORE

**12  Practice Tips**
Bankruptcy procedure in the context
of turnover and preference law
BY CATHY TA

**15  Practice Tips**
Guidelines for managing a forensic
inspection of ESI
BY KATHERINE V.A. SMITH AND MICHAEL HOLECEK

**40  Closing Argument**
Using assignment and charging orders
to enforce judgments and orders
BY IRA M. FRIEDMAN AND DAVID FRIEDMAN

**39  Index to Advertisers**

LOS ANGELES LAWYER (ISSN 0162-2900) is published monthly, except for a combined issue in July/August, by the Los Angeles County Bar Association, 1055 West 7th Street, Suite 2700, Los Angeles, CA 90017 (213) 896-6503. Periodicals postage paid at Los Angeles, CA and additional mailing offices. Annual subscription price of $14 included in the Association membership dues. Nonmember subscriptions $38 annually. Single copy price $5, plus handling. Address changes must be submitted six weeks in advance of next issue date. POSTMASTER: Address Service Requested. Send address changes to Los Angeles Lawyer, P. O. Box 55020,

tips

# Bankruptcy Procedure in the Context of Turnover and Preference Law

**IN THE COURSE OF COLLECTIONS ACTIVITIES,** a creditor can become singularly focused on aggressively pursuing enforcement of a debt by levying against the debtor's property or by demanding and receiving payment from the debtor. However, if and when a debtor files for bankruptcy, the creditor may become the target of unwanted litigation when it levied against or received property that, through the mere occurrence of the debtor's bankruptcy filing, is considered property of the bankruptcy estate. Thus, the creditor becomes part of the bankruptcy estate trustee's litigation efforts to marshal property back into the bankruptcy estate under either turnover or preference law, depending on whether the creditor's collections activities extinguished the debtor's interest in property prior to the bankruptcy filing.

To put a bankruptcy estate trustee's marshaling efforts against a creditor into context, it is helpful to understand that today's bankruptcy law exists to provide a debtor a financial "fresh start" from burdensome debts. As stated by the Supreme Court in 1934, the law's purpose has both a public and a private interest, in that "it gives to the honest but unfortunate debtor who surrenders for distribution the property which he owns *at the time of bankruptcy*, a new opportunity in life and a clear field for future effort, unhampered by the pressure and discouragement of preexisting debt."[1]

To provide this fresh start, modern bankruptcy law has been formulated as an exchange between a debtor and his creditors of assets for a discharge. This exchange is rooted in Congressional legislation passed in 1833, abolishing the English-originated legal practice of imprisonment for debt and paving the way for today's decriminalization of bankruptcy.[2] Fundamental to effectuating this modern exchange are the several ways in which the current Bankruptcy Code provides for the maximization and marshaling of a debtor's assets from the way in which property of the estate is broadly defined to turnover and preference law provisions. These recovery tools are designed to maximize payment to creditors on a ratable basis, so that when a discharge is ultimately granted to a debtor, the exchange is not only modern, but fair.[3]

## Property of the Estate

Under the Bankruptcy Code, a major tool for maximizing a bankruptcy estate is how property of the estate is defined, which includes 1) all nonexempt "legal or equitable interests of the debtor in property," as of the bankruptcy filing—otherwise known as the petition date,[4] 2) all interests of the debtor and the debtor's spouse in community property as of the petition date,[5] and 3) certain property that the debtor acquires (or becomes entitled to acquire) within 180 days after the petition date.[6]

Property of the estate is also defined to take into account a trustee's marshaling work against creditors by including property in which a debtor has no possessory interests as of the petition date but which the trustee recovers from creditors.[7] Moreover, the term "property" has been generously construed to include "all kinds of



property, including causes of action, disputed, contingent or reversionary interests, and all other forms of property."[8]

### Turnover and Preference Law

A bankruptcy estate trustee has two principal tools to recover property that was levied by or paid to a creditor prior to the petition date. They are turnover and preference law.

Under the Bankruptcy Code, turnover law is focused on bringing back property of the estate that is in the hands of a third party so that the bankruptcy estate may monetize the property for the benefit of the bankruptcy estate and its creditors. Specifically, turnover law applies when a noncustodian[9] entity[10] is in possession, custody, or control of estate property at any time during the case, and the property is of a type that a trustee may use, sell, or lease, to the benefit of creditors.[11] Unless the property is of inconsequential value or benefit to the estate, the entity is required to deliver and turn over the property or its value to the trustee.[12]

In fact, this turnover power has been construed to allow a trustee

---

**Cathy Ta is an attorney with Best Best & Krieger LLP. Her practice focuses on bankruptcy, insolvency, and business litigation.**

RICHARD EWING

to recover property or its value from a creditor who once had, but no longer has, possession, custody, or control of the property at the time a turnover motion is filed.[13] Current possession, custody, or control is not required, but possession, custody, or control at any time during the case is sufficient.[14] By allowing a trustee to seek recovery from any creditor so long as it had possession, custody, or control of estate property at some point during the case reinforces the principles underlying turnover law, which are to marshal assets back into the bankruptcy estate and to affirmatively require a creditor to turn over estate property that comes into the creditor's possession.

Similarly, preference law is aimed at bringing back property of the estate into the hands of a third party, but unlike property subject to turnover law, this property had been transferred to the third party prior to the petition date. Additionally, preference law serves the additional purpose of guarding against a debtor who, while sliding into bankruptcy, favored one creditor over another by making a payment or other transfer to that creditor. Preference law avoids the preferential transfer so that the recovered property may be marshaled back into the bankruptcy estate to be redistributed ratably among its creditors.

Specifically, under the Bankruptcy Code, any transfer made by a debtor within 90 days of the petition date[15] is statutorily defined as preferential if and when the transfer is made to or for the benefit of a creditor, for or on account of an antecedent debt, and the result of which enables the creditor to receive more than it would have received—in a Chapter 7 liquidation, had the transfer not been made—and in the bankruptcy case, as otherwise provided for under the Bankruptcy Code.[16]

There are some defenses, for example new value, ordinary course of business, and contemporaneous exchange.[17] However, in essence, under preference law, a creditor is targeted for recovery on account of a certain payment or transfer statutorily defined as preferential so that assets may be marshaled back into the estate for a ratable distribution to creditors.

Whether a trustee uses turnover or preference law against a creditor will depend on whether there was a transfer in ownership or title of property. If there was an incomplete transfer, the debtor and the estate would retain some identifiable property interest that would be included in the broadly defined property of the estate, and turnover law would apply. If there was a complete transfer in ownership or title, the debtor and the estate would not maintain any identifiable property interest to be included in property of the estate. In this circumstance, the property must be recovered first through avoidance

of the transfer before the property may be included in property of the estate.[18]

Whether there was a transfer in ownership or title of property prior to the petition date will depend on state law. While bankruptcy law provides for what a debtor's interests in property is included in property of the estate, it is state law that determines the extent of a debtor's interests, if any, in property itself.[19]

## Illustrative Cases

*In re Churchill Nut Co.* is an unusual case that highlights how turnover and preference law are two sides of the same coin.[20] In this case, a walnut grower delivered 236 tons of walnuts to the debtor, a nut processor, for processing. After receiving minimal payment, the grower sued the debtor for damages and to foreclose on its producer's lien. The grower obtained a judgment in its favor and thereafter obtained a writ of execution. The sheriff levied on the writ by seizing 166 tons of shelled nuts from the debtor, but before the actual sale of nuts, the debtor filed for bankruptcy. The bankruptcy court found that under California law when the sheriff seized the shelled nuts, possession was transferred to the benefit of the grower. However, this transfer did not extinguish the debtor's interest in the shelled nuts because 1) they were still subject to other producers' liens and 2) they were tangible property with uncertain value that had to be liquidated into money in order to effectuate a title transfer. As a result, the grower and the sheriff, as a custodian of the debtor's property, were ordered to turn over the shelled nuts to the bankruptcy estate trustee.

Had the sheriff completed the sale prior to the debtor's bankruptcy filing, so that the only duty left for the sheriff would be to turn over money to the grower,[21] the sale would have extinguished the debtor's interest prior to the bankruptcy filing and placed the money outside of turnover law. Nevertheless, the sale would be subject to avoidance under preference law as the sale would be a preferential transfer from the debtor to the grower.

In contrast to *In re Churchill Nut Company*, in which there was a money asset involved, *In re Paul*[22] was a case in which the California State Board of Equalization levied the debtor's bank accounts—a money asset—prior to the petition date. The bankruptcy court held that under California law, at the moment the notice of levy was served, ownership of the funds transferred to the Board. As a result, the bankruptcy court concluded that the funds were not property of the estate and therefore would only be recoverable as a preferential transfer.

Even when a money asset is involved, however, there may be a scenario in which a creditor's levying activities will not terminate or

overcome a debtor's interest in the money asset because the debtor's interest may be special or superior to any one creditor's claim. In *Hernandez*,[23] the sheriff levied funds on behalf of a judgment creditor but had yet to turn them over to the creditor when the bankruptcy was filed. The Bankruptcy Appellate Panel for the Ninth Circuit U.S. Court of Appeals found that the levied funds were exempt Social Security benefits; therefore, ownership had not transferred. "Because debtor had an exempt property interest in the [Social Security] funds, we conclude that [the creditor's] levy did not operate to extinguish those interests."[24]

Another distinctive and nuanced scenario involving levying a money asset is a wage garnishment. In the *Carlsen* case,[25] the IRS levied wages that had been earned prepetition. Because in California a wage garnishment merely creates a lien and does not divest the debtor of all interest in the wages, the bankruptcy court held that the garnished wages constituted property of the estate. The court determined that the IRS had a duty to take positive action to halt the postpetition continuation of the garnishment, and it had to return the garnished wages.[26]

To the extent a collection activity creates a lien, a lien may be subject to avoidance under preference law unless the lien is perfected prior to the 90-day preference period. In the *Hilde* case,[27] the Ninth Circuit U.S. Court of Appeals found that under California law a lien is created on all of the debtor's nonexempt personal property from the date of an order to appear for a debtor's examination once the debtor is served with the order, otherwise known as an ORAP lien. Likewise, an ORAP lien is created on the debtor's personal property in the hands of a third party when the third party is served with a notice of the order.[28] If a turnover order is issued at the end of the debtor's examination, another lien is created that relates back to the ORAP lien. Therefore, if a bankruptcy proceeding is filed more than 90 days after an ORAP lien is created, the ORAP lien is not avoidable under preference law and has priority over the claim of a bankruptcy trustee. In this case, the Ninth Circuit held that the ORAP lien was not avoidable because it was created more than 90 days prior to the petition date and therefore attached to all of the debtor's nonexempt personal property in the bankruptcy.[29]

Under California law, creditors are within their rights and powers to proceed against a debtor to enforce and collect on debts. However, creditors should be aware that should a debtor file for bankruptcy, all that a creditor may have completed, whether it be levying on property or receiving payment on the debt, may be subject to unwinding, and the creditor may be required to return property included

in property of the estate. A bankruptcy estate trustee, or a debtor-in-possession in a Chapter 11 reorganization case,[30] under turnover or preference law, would be tasked in the fundamental work of marshaling property of the estate for the benefit of the bankruptcy estate and its creditors, as an essential part of modern bankruptcy law. ∎

---

[1] Local Loan Co. v. Hunt, 292 U.S. 234, 244 (1934) (emphasis in original).

[2] Charles J. Tabb, *The History of Bankruptcy Laws in the United States*, 3 AM. BANKR. INST. L. REV. 5, 6, 16 (1995).

[3] Ehring v. Western Cmty. Moneycenter (In re Ehring), 91 B.R. 897, 903 (B.A.P. 9th Cir. 1988).

[4] 11 U.S.C. §541(a)(1).

[5] 11 U.S.C. §541(a)(2) (all community property is included in property of the estate, except for community property that is under the sole management of the debtor's spouse).

[6] 11 U.S.C. §541(a)(5).

[7] 11 U.S.C. §§541(a)(3), 542, 543, 547, 548, 550.

[8] United States v. Sims (In re Feiler), 218 F. 3d 948 (citing S. REP. No. 989 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5868; H.R. REP. No. 595 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6323 (footnote omitted)).

[9] The Bankruptcy Code provides a separate section for turnover of estate property by custodians. *See* 11 U.S.C. §543.

[10] The term "entity" is defined as including person, estate, trust, governmental unit, and U.S. trustee. 11 U.S.C. §101(15).

[11] 11 U.S.C. §542(a).

[12] *Id.*

[13] Shapiro v. Henson, 739 F. 3d 1198, 1200-01 (9th Cir. 2014).

[14] *Id.*

[15] This 90-day preference period is extended to one year as to insider-creditors. 11 U.S.C. §547(b)(4)(b). *See also* 11 U.S.C. §101(31) ("insider" is defined to include an individual debtor's relatives, general partners, partnership, and corporation of which the debtor is a director, officer, or person in control, among others).

[16] 11 U.S.C. §547(b).

[17] 11 U.S.C. §547(c).

[18] United States v. Whiting Pools, Inc., 462 U.S. 198, 209 (1983). *See also* In re Anaheim Elec. Motor, Inc., 137 B.R. 791, 794-96 (Bankr. C.D. Cal. 1992).

[19] Paul v. State Bd. of Equalization (In re Paul), 85 B.R. 850, 853 (Bankr. E.D. Cal. 1988).

[20] Richardson v. Wells Fargo Bank (In re Churchill Nut Co.), 251 B.R. 143 (Bankr. C.D. Cal 2000) (the bankruptcy court also conducted a preference analysis to conclude that the shelled nuts constituted recoverable property of the estate, but its main reasoning was that a transfer of ownership had not occurred prior to the bankruptcy).

[21] *See also* Ramirez v. Fuselier (In re Ramirez), 183 B.R. 583 (B.A.P. 9th Cir. 1995) (The B.A.P. reversed the bankruptcy court, finding that the California levy statute did not specify that a completed levy—in this case, an installation of a keeper on the premises by the Marshal—transfers ownership in property; the property had to be liquidated; and the property of client files was necessary for the attorney- debtor's representation of clients. The B.A.P. held that the judgment debtor retained a possessory and reversionary interest in all the levied property, thus the property constituted property

of the estate. The B.A.P. remanded the case to determine whether the Marshal's violation of the automatic stay was willful and whether actual and punitive damages were appropriate.)

[22] In re Paul, 85 B.R. 850.

[23] Collect Access I.I.C v. Hernandez (In re Hernandez), 483 B.R. 713 (B.A.P. 9th Cir. 2012).

[24] *Id.* at 724.

[25] Carlsen v. Internal Revenue Service (In re Carlsen), 63 B.R. 706 (Bankr. C.D. Cal 1986).

[26] *But see* In re Crosier, No. LAX 90-52768 VZ, 1991 Bankr. LEXIS 1102 (Bankr. C.D. Cal. July 5, 1991) (The IRS levied the debtor's IRA prior to the bankruptcy filing. The bankruptcy court held that the IRA was intangible property and that the levy transferred title and ownership to the IRS, thus the IRA was not property of the estate).

[27] Southern Cal. Bank v. Zimmerman (In re Hilde), 120 F.3d 950 (9th Cir. 1997).

[28] *See* CIV. PROC. CODE §§708.110(d), 708.120(c).

[29] *See, e.g.,* Dewhirst v. Citibank (In re Contractors Equipment Supply Co.), 861 F. 2d 241, 245 (9th Cir. 1988) (The debtor gave a creditor a security interest in its accounts receivable. The debtor then contracted with a company to provide equipment before filing bankruptcy. The debtor completed the order postpetition and the company paid the debtor direct instead of the creditor. The Ninth Circuit held that the accounts receivable were part of the estate because the assignment involved only a security interest, not a transfer title; therefore, the debtor retained an interest in the accounts receivable and was sufficient to bring the accounts receivable into the debtor's reorganization estate).

[30] 11 U.S.C. §1107(a) (a Chapter 11 debtor-in-possession shall have all the rights, powers, and duties of a trustee, except for the right to compensation).

# NORIEGA CHIROPRACTIC CLINICS, INC.

## JESS T. NORIEGA, D.C.

### *Is proud to announce the opening of our Lynwood location*

**SERVICING: SOUTHGATE • BELLFLOWER • CUDAHY • NORTH LONG BEACH • WATTS**

## LYNWOOD HEALTH CENTER

11123 LONG BEACH BLVD.
LYNWOOD, CA 90262

### (310) 726-8818

**HUNTINGTON PARK HEALTH CENTER**
3033 E. Florence Ave.
Huntington Park, CA 90255
(323) 582-8401

**ONTARIO HEALTH SERVICES**
602B N. Euclid Ave.
Ontario, CA 91764
(909) 395-5598

**WHITTIER HEALTH SERVICES**
13019 Bailey Ave. Suite F
Whittier, CA 90601
(562) 698-2411

**MONTEBELLO HEALTH CENTER**
604 North Monetebllo Blvd.
Montebello, CA 90640
(323) 726-8818

**SOUTH CENTRAL HEALTH CENTER**
4721 S. Broadway Blvd.
Los Angeles, CA 90037
(323) 234-3100

**HIGHLAND PARK HEALTH CENTER**
5421 N. Figueroa St.
Highland Park, CA 90042
(323) 478-9771

## 1•800•NORIEGA   Personal Injury cases accepted on lien basis.   1•800•667•4342

# SECTIONS 542 AND 543—TURNOVER OF PROPERTY OF THE ESTATE

*By Bruce Grohsgal\**

## I. Introduction

Section 542 of the Bankruptcy Code generally requires a noncustodial entity who has possession, custody, or control of property of the estate that the trustee may use, sell, or lease under section 363 or may exempt under section 522 to deliver to the trustee and account for the property or the value of such property.[1] Section 543 generally requires a custodian with knowledge of the commencement of the case to deliver to the trustee and account for such property of the estate and the proceeds of such property.[2] This paper reports on opinions regarding turnover published since the 2011 update.[3]

## II. Jurisdiction and Sovereign Immunity

Bankruptcy jurisdiction is essentially in rem, based on the court's jurisdiction over the property of the bankruptcy estate.[4] The bankruptcy court, by the standing order of reference from its district court, has exclusive jurisdiction over property of the debtor's estate wherever located.[5] It follows that a turnover action with respect to such property is a core proceeding, and the jurisdictional statute that governs bankruptcy proceedings expressly so provides.[6]

---

[*]Bruce Grohsgal is a Partner in the Delaware Office of Pachulski Stang Ziehl & Jones LLP. His Practice is Focused in the Areas of Business Reorganization and Bankruptcy, Representing Debtors, Creditors' Committees, and Chapter 11 Trustees.

[1]11 U.S.C.A. § 542.

[2]11 U.S.C.A. § 543.

[3]The opinions considered in this update are mostly from early 2010 through early 2011. The author welcomes additional opinions, published and unpublished, on the subject.

[4]*Central Virginia Community College v. Katz*, 546 U.S. 356, 126 S. Ct. 990, 163 L. Ed. 2s 945 (2006).

[5]28 U.S.C.A. § 1334(c).

[6]28 U.S.C.A. § 157(b)(2)(E).

947

## Jurisdiction—Generally

A turnover action under section 542 or 543 generally cannot be used, however, to demand assets whose title is in dispute. And the courts have struggled with whether the prosecution of a disputed claim against a third party is a core proceeding—even though, clearly, such a claim is property of the estate, and even though such claim, once successfully prosecuted to judgment, will give rise to a turnover action which will be subject to the bankruptcy court's core jurisdiction. Moreover, the Supreme Court's 2011 decision in *Stern v. Marshall* has called into questions the bankruptcy courts' authority and, arguably, jurisdiction to hear even those matters that are designated as "core" in 28 U.S.C.A. § 157(b).[7] Several recent decisions were made regarding this gray area of turnover jurisdiction.

In *In re Point Blank Solutions, Inc.* the debtor entered into a prepetition settlement agreement, conditioned on entry of a final order approving the settlement, and deposited the $32 million settlement payment in escrow. Prior to the settlement order's becoming final, the debtor filed for bankruptcy and rejected the settlement agreement as an executory contract. The debtor then commenced an adversary proceeding for declaratory relief that the debtor had a right to the escrowed funds, and seeking turnover of the escrowed funds under section 542.[8]

The court held that the proceedings were core. The claim for declaratory relief asked the court to determine debtor's rights to the escrowed funds. The bankruptcy court noted that it "is well established that proceedings to determine what constitutes property of the bankruptcy estate under section 541(a) of the Bankruptcy Code are core proceedings." That the dispute may involve the application of New York state law did not undermine the core finding.[9]

"Properly understood in this way," the court continued, the debtor's claims for declaratory relief and for turnover of estate assets were core proceedings because they were "matters concerning the administration of the estate" and "orders to turn over property of the estate," under 28 U.S.C. § 157(b)(2)(A) and (E)." These claims arose directly from the substantive bankruptcy law right to reject executory contracts, a fundamental issue of bankruptcy law unique to the Bankruptcy Code. Additionally, the

---

[7]*Stern v. Marshall*, __ U.S. __, 131 S. Ct. 2594, 180 L. Ed. 2d 475 (2011).

[8]*In re Point Blank Solutions, Inc.*, 449 B.R. 446, 448 (Bankr.D.Del. 2011).

[9]*In re Point Blank Solutions, Inc.*, 449 B.R. at 449–450 (citing cases).

### Jurisdiction—Generally

A turnover action under section 542 or 543 generally cannot be used, however, to demand assets whose title is in dispute. And the courts have struggled with whether the prosecution of a disputed claim against a third party is a core proceeding—even though, clearly, such a claim is property of the estate, and even though such claim, once successfully prosecuted to judgment, will give rise to a turnover action which will be subject to the bankruptcy court's core jurisdiction. Moreover, the Supreme Court's 2011 decision in *Stern v. Marshall* has called into questions the bankruptcy courts' authority and, arguably, jurisdiction to hear even those matters that are designated as "core" in 28 U.S.C.A. § 157(b).[7] Several recent decisions were made regarding this gray area of turnover jurisdiction.

In *In re Point Blank Solutions, Inc.* the debtor entered into a prepetition settlement agreement, conditioned on entry of a final order approving the settlement, and deposited the $32 million settlement payment in escrow. Prior to the settlement order's becoming final, the debtor filed for bankruptcy and rejected the settlement agreement as an executory contract. The debtor then commenced an adversary proceeding for declaratory relief that the debtor had a right to the escrowed funds, and seeking turnover of the escrowed funds under section 542.[8]

The court held that the proceedings were core. The claim for declaratory relief asked the court to determine debtor's rights to the escrowed funds. The bankruptcy court noted that it "is well established that proceedings to determine what constitutes property of the bankruptcy estate under section 541(a) of the Bankruptcy Code are core proceedings." That the dispute may involve the application of New York state law did not undermine the core finding.[9]

"Properly understood in this way," the court continued, the debtor's claims for declaratory relief and for turnover of estate assets were core proceedings because they were "matters concerning the administration of the estate" and "orders to turn over property of the estate," under 28 U.S.C. § 157(b)(2)(A) and (E)." These claims arose directly from the substantive bankruptcy law right to reject executory contracts, a fundamental issue of bankruptcy law unique to the Bankruptcy Code. Additionally, the

---

[7]*Stern v. Marshall,* __ U.S. __, 131 S. Ct. 2594, 180 L. Ed. 2d 475 (2011).

[8]*In re Point Blank Solutions, Inc.,* 449 B.R. 446, 448 (Bankr.D.Del. 2011).

[9]*In re Point Blank Solutions, Inc.,* 449 B.R. at 449–450 (citing cases).

court held that the claims qualified as core because they required the court to interpret and enforce its own rejection order.[10]

In *In re Republic Windows & Doors, LLC*, the trustee sought turnover of an unpaid obligation in the "possession, custody and control" of the defendant. The defendant posited that dismissal of the claim was "warranted in light of the jurisdictional limitations on bankruptcy courts imposed by *Stern v. Marshall*. The bankruptcy court found that, if the trustee prevailed on the claim, he would "bring money into the bankruptcy estate for distribution, affecting the allocation of property among creditors. Accordingly, "the Court ha[d] related-to jurisdiction" over the turnover count, and did not dismiss that count.[11]

In *In re Heller Ehrman LLP*, the liquidating debtor and former law firm commenced an action against two defendants to recover an account receivable, for breach of contract and quantum meruit, and for turnover. The court held that the adversary proceeding was not a core proceeding, notwithstanding Heller's designation of one claim for relief as a turnover action under section 542. "Turnover actions involve the 'return of undisputed funds.'" Here, the defendants disputed their liability to Heller, and the estate's property was "the claim for damages itself, which is not subject to turnover." There was "no specific, identifiable fund belonging to Heller in Defendants' possession. A suit by a debtor against a non-creditor arising out of breach of contract, absent more . . . is not a turnover action under § 542."[12]

In *In re Salem Baptist Church of Jenkintown*, the debtor had commenced a malpractice action in federal district court prepetition against its law firm in connection with a construction project.[13] In the bankruptcy case, the debtor initiated an adversary proceeding (1) for declaratory judgment as to whether the defendants' malpractice insurance policy provided coverage in connection with the district court litigation and whether the proceeds of the policy were property of the estate, (2) for turnover of the proceeds of the policy, (3) for injunctive relief barring the defendants from expending any of the proceeds of the policy in

---

[10]*In re Point Blank Solutions, Inc.*., 449 B.R. at 450 (citing cases).

[11]*In re Republic Windows & Doors, LLC*, 460 B.R. 511, 514, 516 (Bankr.N. D.Ill. 2011), citing *Stern v. Marshall*, __ U.S. __, 131 S.Ct. 2594, 180 L.Ed.2d 475 (2011).

[12]*In re Heller Ehrman LLP*, 2011 WL 3878347 *1 (Bankr.N.D.Cal.), quoting *In re Gurga*, 176 B.R. 196, 199–200 (9th Cir.BAP1994).

[13]*In re Salem Baptist Church of Jenkintown*, 455 B.R. 857, 860 (Bankr.E.D. Pa. 2011).

connection with their defense of the district court litigation, and (4) for an accounting of all proceeds of the policy. At the hearing, the debtor's counsel informed the bankruptcy court that the essence of its complaint sought to enjoin the defendants from expending the proceeds of the policy. "With this acknowledgement in mind," the court found that the debtor was essentially seeking prejudgment attachment of the proceeds of the policy.[14]

The defendants sought to dismiss, including on the ground that the bankruptcy court lacked jurisdiction. The court stated that, although the debtor styled the complaint as an action pursuant to section 542 and 543 for turnover of specific assets, its claim against the policy arose "from state tort law and not in the context of a bankruptcy." The court drew the distinction between core turnover proceedings and related-to state-law contract actions that have been styled as turnover proceedings, and determined that the proceeding before it was subject to the court's core jurisdiction only if the debtor's estate had an interest in the policy.[15] The court analyzed the terms of the policy and found that the debtor lacked any interest in the policy or its proceeds. As a result the bankruptcy court lacked subject matter jurisdiction to adjudicate the matters raised by the complaint.[16]

Similarly, in *In re Kotyuk*, the Chapter 7 trustee filed a complaint "styled as one for turnover or to recover property of the estate," alleging that the defendant owed the debtor $8,000.00 on account of a "receivable" that the defendant allegedly had owed to the debtor on the petition date. The defendant failed to answer or otherwise respond to the complaint, the Clerk of the United States Bankruptcy Court entered and gave notice of default to the defendant, and the trustee filed a motion for default judgment. The bankruptcy court determined that the complaint, "although styled effectively as one for turnover under 11 U.S.C. § 542," actually sought "to liquidate a contract claim based on State-created rights formerly held by the Debtor but now included within the property of the estate under 11 U.S.C. § 541. The "adjudication of such claims, in the absence of consent of the parties, falls within 'the judicial power' that may be exercised only

---

[14]*In re Salem Baptist Church of Jenkintown*, 455 B.R. at 861.

[15]*In re Salem Baptist Church of Jenkintown*, 455 B.R. at 863, citing *Beard v. Braunstein*, 914 F.2d 434, 444 (3rd Cir.1990) (distinguishing between core turnover proceeding and related-to state-law contract actions that have been styled as turnover proceedings) and 28 U.S.C. § 157(b)(2)(a) (establishing "matter concerning the administration of the estate" as being within a bankruptcy court's core jurisdiction).

[16]*In re Salem Baptist Church of Jenkintown*, 455 B.R. at 869.

connection with their defense of the district court litigation, and
(4) for an accounting of all proceeds of the policy. At the hearing,
the debtor's counsel informed the bankruptcy court that the es-
sence of its complaint sought to enjoin the defendants from
expending the proceeds of the policy. "With this acknowledge-
ment in mind," the court found that the debtor was essentially
seeking prejudgment attachment of the proceeds of the policy.[14]

The defendants sought to dismiss, including on the ground that
the bankruptcy court lacked jurisdiction. The court stated that,
although the debtor styled the complaint as an action pursuant
to section 542 and 543 for turnover of specific assets, its claim
against the policy arose "from state tort law and not in the context
of a bankruptcy." The court drew the distinction between core
turnover proceedings and related-to state-law contract actions
that have been styled as turnover proceedings, and determined
that the proceeding before it was subject to the court's core juris-
diction only if the debtor's estate had an interest in the policy.[15]
The court analyzed the terms of the policy and found that the
debtor lacked any interest in the policy or its proceeds. As a
result the bankruptcy court lacked subject matter jurisdiction to
adjudicate the matters raised by the complaint.[16]

Similarly, in *In re Kotyuk*, the Chapter 7 trustee filed a com-
plaint "styled as one for turnover or to recover property of the
estate," alleging that the defendant owed the debtor $8,000.00 on
account of a "receivable" that the defendant allegedly had owed
to the debtor on the petition date. The defendant failed to answer
or otherwise respond to the complaint, the Clerk of the United
States Bankruptcy Court entered and gave notice of default to
the defendant, and the trustee filed a motion for default
judgment. The bankruptcy court determined that the complaint,
"although styled effectively as one for turnover under 11 U.S.C.
§ 542," actually sought "to liquidate a contract claim based on
State-created rights formerly held by the Debtor but now included
within the property of the estate under 11 U.S.C. § 541. The
"adjudication of such claims, in the absence of consent of the par-
ties, falls within 'the judicial power' that may be exercised only

---

[14]*In re Salem Baptist Church of Jenkintown*, 455 B.R. at 861.

[15]*In re Salem Baptist Church of Jenkintown*, 455 B.R. at 863, citing *Beard v. Braunstein*, 914 F.2d 434, 444 (3rd Cir.1990) (distinguishing between core turnover proceeding and related-to state-law contract actions that have been styled as turnover proceedings) and 28 U.S.C. § 157(b)(2)(a) (establishing "matter concerning the administration of the estate" as being within a bankruptcy court's core jurisdiction).

[16]*In re Salem Baptist Church of Jenkintown*, 455 B.R. at 869.

by a court with the 'essential attributes' of federal judicial power prescribed in Article III of the United States Constitution." The bankruptcy court determined that it lacked such attributes,[17] and thus "lacked jurisdiction to enter final judgment in such a situation, and that it must proceed by recommending that the District Court grant the motion for default judgment, rather than by granting the motion and entering judgment itself." Accordingly, the court did not enter the judgment but recommended to the District Court that it do so.[18]

A disputed contract claim is not a turnover claim under section 542(b). See § X below. However, the bankruptcy court in *In re Legal Xtranet* noted that a defendant "cannot resist section 542(b) by *manufacturing* a dispute where there in fact is none. And simply resisting recovery is not enough to create a legitimate dispute."[19] The court further observed that the "real point of the Plaintiff's couching this action as one arising under section 542(b) is clear: if the matter is truly one arising under section 542(b), then it may be a core proceeding, on which this court can rule with finality. If, on the other hand, this is not a matter arising under section 542(b), then it may well be an action the basis for which in no way derives from or is dependent on bankruptcy law. In the latter event, this court could not adjudicate the dispute to final judgment." The court determined that it "need not decide that question on this motion, which seeks only dismissal under Rule 12(b)(6). The fact that the court denie[d] relief on this motion in no way decide[d] the questions raised by the *Stern v. Marshall* decision, which questions" the court "reserved for another day."[20]

Turnover is available to a trustee or debtor in possession under section 542(b) to recover a matured debt owed to the estate. The trustee in *In re Smith* alleged that a note under which the defendants were obligors was in default and constituted property of the bankruptcy estate, contended that the full remaining balance was due and owing, and sought an order pursuant to section 542 requiring the defendants to turn over and deliver to the trustee the sum of $92,000.00, plus interest from the trustee's

---

[17]*In re Kotyuk*, 2011 WL 1596228 *1 (Bankr.W.D.Mich.), citing *Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 485 U.S. 50, 102 S.Ct. 2858 (1982).

[18]*In re Kotyuk*, 2011 WL 1596228 *1–2.

[19]*In re Legal Xtranet*, 2011 WL 3236053 *1, N. 1 (Bankr.W.D.Tex.).

[20]*In re Legal Xtranet*, 2011 WL 3236053 *1, citing See *Stern v. Marshall*, __ U.S. __, 180L.Ed.2d 475, 489–95 (2011).

written notice of default. The bankruptcy court held, simply, that this was a core proceeding under 28 U.S.C. § 157(b)(2) as it concerned a request for turnover of property of the estate pursuant to 11 U.S.C. § 542(b).[21]

The decision of the bankruptcy court in *In re AFY, Inc.* regarding turnover of a matured debt may be the nadir of bankruptcy court jurisdiction. The express requirement that "an entity that owes a debt that is property of the estate and that is matured, payable on demand, or payable on order" must "pay such debt to, or on the order of, the trustee" is four-square within the turnover provisions of section 542(b).[22]

The court determined that the trustee in *AFY* was attempting to collect a debt that was "undisputed and presumably is matured and payable on demand." The court noted that while the trustee's action fell within the scope of section 542(b), it nevertheless was "simply a collection action." It was "a claim that would not be before the bankruptcy court but for the fact that the debtor filed a bankruptcy petition. As a collection action, it could, and normally would, be adjudicated outside of bankruptcy." Because the action did not arise under Title 11 or arise in the bankruptcy case itself, nor would it be resolved in the claims allowance process, it was "not a core proceeding within the constitutional authority of the bankruptcy court to enter judgment." Instead, the bankruptcy court ruled, "the case should be transferred to the United States District Court for the District of Nebraska for entry of final judgment."[23]

The same court held that held in another adversary proceeding in the *AFY* bankruptcy case that it was not deprived of subject matter jurisdiction simply because the resolution of the suit before it might require the application of state law.[24]

In *In re Kindernecht* the bankruptcy court held that a claim for an accounting under section 542(e) is also a core proceeding.[25]

In *In re Miller*, the bankruptcy court held that as a result of the dismissal of the debtor's Chapter 13 case, there was "no longer any 'estate property' " in the case, "nor a debtor or trustee" to

---

[21]*In re Smith*, 2011 WL 2518890 *1, 3 (Bankr.D.Colo.).

[22]11 U.S.C. § 542(b).

[23]*In re AFY, Inc.*, 2011 WL 3800041 *2 (Bankr.D.Neb.); *In re AFY, Inc.*, 2011 WL 3800120 *2 (Bankr.D.Neb.).

[24]*In re AFY, Inc.*, 2011 WL 3812598, *1 (Bankr. D. Neb. 2011), citing *In re Salander O'Reilly Galleries*, __ B.R. __, 2011 WL 2837494, at *10–13 (Bankr.S. D.N.Y. July 18, 2011).

[25]*In re Kinderknecht*, 2011 WL 841141 *2 (Bankr.D.Kan.).

written notice of default. The bankruptcy court held, simply, that this was a core proceeding under 28 U.S.C. § 157(b)(2) as it concerned a request for turnover of property of the estate pursuant to 11 U.S.C. § 542(b).[21]

The decision of the bankruptcy court in *In re AFY, Inc.* regarding turnover of a matured debt may be the nadir of bankruptcy court jurisdiction. The express requirement that "an entity that owes a debt that is property of the estate and that is matured, payable on demand, or payable on order" must "pay such debt to, or on the order of, the trustee" is four-square within the turnover provisions of section 542(b).[22]

The court determined that the trustee in *AFY* was attempting to collect a debt that was "undisputed and presumably is matured and payable on demand." The court noted that while the trustee's action fell within the scope of section 542(b), it nevertheless was "simply a collection action." It was "a claim that would not be before the bankruptcy court but for the fact that the debtor filed a bankruptcy petition. As a collection action, it could, and normally would, be adjudicated outside of bankruptcy." Because the action did not arise under Title 11 or arise in the bankruptcy case itself, nor would it be resolved in the claims allowance process, it was "not a core proceeding within the constitutional authority of the bankruptcy court to enter judgment." Instead, the bankruptcy court ruled, "the case should be transferred to the United States District Court for the District of Nebraska for entry of final judgment."[23]

The same court held that held in another adversary proceeding in the *AFY* bankruptcy case that it was not deprived of subject matter jurisdiction simply because the resolution of the suit before it might require the application of state law.[24]

In *In re Kinderknecht* the bankruptcy court held that a claim for an accounting under section 542(e) is also a core proceeding.[25]

In *In re Miller*, the bankruptcy court held that as a result of the dismissal of the debtor's Chapter 13 case, there was "no longer any 'estate property'" in the case, "nor a debtor or trustee" to

---

[21]*In re Smith*, 2011 WL 2518890 *1, 3 (Bankr.D.Colo.).

[22]11 U.S.C. § 542(b).

[23]*In re AFY, Inc.*, 2011 WL 3800041 *2 (Bankr.D.Neb.); *In re AFY, Inc.*, 2011 WL 3800120 *2 (Bankr.D.Neb.).

[24]*In re AFY, Inc.*, 2011 WL 3812598, *1 (Bankr. D. Neb. 2011), citing *In re Salander O'Reilly Galleries*, __ B.R. __, 2011 WL 2837494, at *10–13 (Bankr.S. D.N.Y. July 18, 2011).

[25]*In re Kinderknecht*, 2011 WL 841141 *2 (Bankr.D.Kan.).

whom the court could order the funds turned over. Accordingly, the court "was divested of jurisdiction of Plaintiff's claim for turnover when the underlying case, from which the claim arose, was dismissed."[26]

Sections 542 and 543 do not apply in Chapter 9 cases, for the adjustment of the debts of a municipality.[27] In *In re Jefferson County, Ala.*, a receiver was appointed prepetition by the Alabama state court the county's sewer system assets, following which the county filed its Chapter 9 petition. The indenture trustee for certain warrant holders, the receiver and other parties in interest asked the bankruptcy court "(1) to abstain 'from taking any action to interfere with' the Alabama state court receivership case for Jefferson County's sewer system, (2) to determine that the automatic stays of 11 U.S.C. §§ 362(a), 922(a), [did] not apply to the Alabama receivership case" or to the receiver; (3) to hold that the receiver was "entitled to continue as receiver of Jefferson County's sewer system properties, and (4) to modify the automatic stays of §§ 362(a) or § 922(a) should they apply to the Alabama receivership case" or the receiver, so the receivership proceedings might "continue unabated by Jefferson County's chapter 9 bankruptcy."[28]

Many of the arguments made by the movants were "premised on the assumption that the jurisdictional grants of a bankruptcy court are actions of the court and not those self effectuating on the filing of a bankruptcy case. A few misapprehend[ed] the 'first in time' concurrent court rules regarding *in rem* jurisdiction."[29] The court found and held that, "[i]mmediately on the filing of the County's chapter 9 case, the Alabama receivership court lost its possession and control over the County's property interests in its sewer system. Under Alabama's receivership law and comparable federal and state laws on receiverships, a court appointed receiver of the kind appointed in the Alabama receivership case holds all properties for the appointing court and has no interest in the properties held. Neither does the receivership court, other than for holding the properties in *custodia legis*." This applied to the receiver in the *Jefferson County* case. Under the Supreme Court precedent, "filing of the County's bankruptcy case automatically and immediately transferred the properties held by the Receiver for the Alabama receivership court to" the bankruptcy court's

---

[26]*In re Miller*, 2011 WL 6217342 *2 (Bankr.D.Colo.).

[27]11 U.S.C. § 901(a).

[28]*In re Jefferson County, Ala.*, 465 B.R. 243, 248 (Bankr.N.D.Ala. 2012).

[29]*In re Jefferson County, Ala.*, 465 B.R. at 249.

"exclusive jurisdiction under the grant of 28 U.S.C. § 1334(e)(1) and the Receiver, at best," held the County's sewer system for the bankruptcy court, "not another court."[30]

In reaching this conclusion, the court held that "[t]he absence of § 543 turnover authority" in Chapter 9 cases did "not alter the *in rem* jurisdiction of a bankruptcy court or the application of the automatic stays with respect to property subject to this Court's *in rem* jurisdiction." A "turnover provision is not necessary under federal case law for the County to obtain possession of its property interests."[31] As a practical matter, the court considered that the "absence of 11 U.S.C. 543 in chapter 9 cases does not necessarily leave a chapter 9 debtor without the ability to obtain its property from others. Before enactment of the Chandler Act of 1938, June 22, 1938, ch. 575, 52 Stat. 883, amending former title 11, a trustee would frequently seek property of the bankruptcy estate by suit in a court of competent jurisdiction, be it a state or federal one. Some of what happened under the Chandler Act amendments to the prior bankruptcy statute is the plenary jurisdiction prerequisite for a turnover action was eliminated by basing such proceedings on summary jurisdiction over the *res*."[32] In sum, the *Jefferson County* court held that a bankruptcy court has jurisdiction over a Chapter 9 debtor's property upon the filing of the case, even if a receiver was previously appointed, and that a Chapter 9 debtor can obtain turnover of its property from a receiver and other any parties, notwithstanding that the turnover provisions of sections 542 and 543 do not apply in a Chapter 9 case.

### Jurisdiction after Chapter 11 Plan Confirmation

Jurisdiction over turnover actions must be preserved—and can be lost—by the provisions of a confirmed Chapter 11 plan. The debtor in *In re Crescent Resources, LLC* obtained confirmation of its plan, and the litigation trust commenced an adversary proceeding against Duke Energy Corporation, alleging that the transaction that had created the debtor in 2006 had rendered it

---

[30]*In re Jefferson County, Ala.*, 465 B.R. at 249, citing *Taylor v. Sternberg*, 293 U.S. 470, 55 S.Ct. 260, 79 L.Ed. 599 (1935).

[31]*In re Jefferson County, Ala.*, 465 B.R. at 268.

[32]*In re Jefferson County, Ala.*, 465 B.R. at 268, n. 10, citing *Emil v. Hanley (In re John M. Russell, Inc.)*, 318 U.S. 515, 517–19, 63 S.Ct. 687, 87 L.Ed. 954 (1943); and *In re Seven Springs Apartments, Phase II*, 33 B.R. 458, 468–69 (Bankr. N.D. Ga. 1983).

"exclusive jurisdiction under the grant of 28 U.S.C. § 1334(e)(1) and the Receiver, at best," held the County's sewer system for the bankruptcy court, "not another court."[30]

In reaching this conclusion, the court held that "[t]he absence of § 543 turnover authority" in Chapter 9 cases did "not alter the *in rem* jurisdiction of a bankruptcy court or the application of the automatic stays with respect to property subject to this Court's *in rem* jurisdiction." A "turnover provision is not necessary under federal case law for the County to obtain possession of its property interests."[31] As a practical matter, the court considered that the "absence of 11 U.S.C. 543 in chapter 9 cases does not necessarily leave a chapter 9 debtor without the ability to obtain its property from others. Before enactment of the Chandler Act of 1938, June 22, 1938, ch. 575, 52 Stat. 883, amending former title 11, a trustee would frequently seek property of the bankruptcy estate by suit in a court of competent jurisdiction, be it a state or federal one. Some of what happened under the Chandler Act amendments to the prior bankruptcy statute is the plenary jurisdiction prerequisite for a turnover action was eliminated by basing such proceedings on summary jurisdiction over the *res*."[32] In sum, the *Jefferson County* court held that a bankruptcy court has jurisdiction over a Chapter 9 debtor's property upon the filing of the case, even if a receiver was previously appointed, and that a Chapter 9 debtor can obtain turnover of its property from a receiver and other any parties, notwithstanding that the turnover provisions of sections 542 and 543 do not apply in a Chapter 9 case.

### Jurisdiction after Chapter 11 Plan Confirmation

Jurisdiction over turnover actions must be preserved—and can be lost—by the provisions of a confirmed Chapter 11 plan. The debtor in *In re Crescent Resources, LLC* obtained confirmation of its plan, and the litigation trust commenced an adversary proceeding against Duke Energy Corporation, alleging that the transaction that had created the debtor in 2006 had rendered it

---

[30]*In re Jefferson County, Ala.*, 465 B.R. at 249, citing *Taylor v. Sternberg*, 293 U.S. 470, 55 S.Ct. 260, 79 L.Ed. 599 (1935).

[31]*In re Jefferson County, Ala.*, 465 B.R. at 268.

[32]*In re Jefferson County, Ala.*, 465 B.R. at 268, n. 10, citing *Emil v. Hanley (In re John M. Russell, Inc.)*, 318 U.S. 515, 517–19, 63 S.Ct. 687, 87 L.Ed. 954 (1943); and *In re Seven Springs Apartments, Phase II*, 33 B.R. 458, 468–69 (Bankr. N.D. Ga. 1983).

insolvent.[33] The defendant moved to dismiss on the ground that the bankruptcy court lacked jurisdiction because the action had not been preserved to the estate in the plan.[34]

The court considered the plan's provisions and case law, and agreed with the "specific and unequivocal" test established in *Texas Wyoming Drillling*. Under that test, the court must determine "'whether the language in the [p]lan was sufficient to put creditors on notice that [the debtor] anticipated pursuing the [c]laims after confirmation.'" If so, the language meets the "specific and unequivocal" requirement and the action survives confirmation.[35]

The language in the plan stated that:

> "The Litigation Trust Assets shall include, but are not limited to, those Causes of Action arising under Chapter 5 of the Bankruptcy Code including those actions which could be brought by the Debtors under §§ 544, 547, 548, 549, 550, and 551 against any Person or Entity other than the Litigation Trust Excluded Parties."

The court noted that this language fell "somewhere between 'any and all claims' and listing turnover claims by statute number . . . Chapter 5 is referenced as well as six specific code sections. So the question before the Court [was] whether a reference to Chapter 5 of the Bankruptcy Code, in conjunction with Sections 544, 547, 548, 549, 550, and 551," was sufficiently "'specific and unequivocal' to retain a turnover cause of action under Section 542." The court found "that a cause of action for turnover was specifically and unequivocally retained by this language in the Plan."[36] Further, "[u]sing the test from *Texas Wyoming* it seem[ed] far-fetched to believe that a creditor would not be on notice that the Trust anticipated pursuing turnover claims after confirmation."[37] The court held that the plan "preserved turnover claims with language which was specific and unequivocal." Therefore the trust had standing to pursue the turnover claims and the court had subject matter jurisdiction.[38]

---

[33]*In re Crescent Resources, LLC*, 455 B.R. 115, 116 (Bankr.W.D.Tex. 2011).

[34]*In re Crescent Resources, LLC*, 455 B.R. at 117.

[35]*In re Crescent Resources, LLC*, 455 B.R. at 129, citing *Spicer v. Laguna Madre Oil & Gas, LLC (In re Texas Wyoming Drilling, Inc.)*, 422 B.R. 612, 627–628 (Bankr.N.D.Tex.2010).

[36]*In re Crescent Resources, LLC*, 455 B.R. at 129.

[37]*In re Crescent Resources, LLC*, 455 B.R. at 129–130.

[38]*In re Crescent Resources, LLC*, 455 B.R. at 130.

## Sovereign Immunity

The Sixth Circuit in *U.S. v. Carroll* considered the sovereign immunity of the IRS in a case that, strangely, was brought by the IRS, and involved standing orders requiring the IRS to turn over Chapter 13 debtors' tax refunds directly to the Chapter 13 standing trustees. In the court's words, this was "not an everyday case . . . Governments do not usually invoke the jurisdiction of the federal courts in order to contest it; they normally raise sovereign immunity as a defense to an action already filed against them."[39]

The case arose out of procedures established in the bankruptcy courts of the Eastern District of Michigan with respect to federal tax refunds paid to Chapter 13 debtors. The Sixth Circuit observed that "[o]ne asset of Chapter 13 individual debtors that sometimes makes a difference in the completion of a reorganization plan is a tax refund. That might come as a surprise. Is it really the case that individuals seeking bankruptcy protection have a proclivity for *overpaying* their taxes? The explanation is that the overpayment is not voluntary; the taxes are withheld by law, and the absence of a high income leads to a low to non-existent taxable income, resulting in meaningful tax refunds. Perhaps less surprising is the reality that people who seek bankruptcy protection do not always pay their creditors first when they come across unanticipated disposable income. When the IRS paid these tax refunds directly to the affected taxpayers, a significant number of them put the money to their own uses, not to pay off creditors as required by the terms of their reorganization plans."[40]

To address this problem, beginning in 2008 the bankruptcy judges of the Eastern District of Michigan began entering orders in Chapter 13 plans that required the IRS to send individual tax refunds directly to the Chapter 13 trustees, and not to the individual taxpayers as contemplated by the Internal Revenue Code. The IRS did not initially oppose entry of these orders, and redirected the affected tax refunds directly to the trustees who redistributed them in accordance with the Chapter 13 plans.[41]

In 2009, the IRS had a "change of heart" spurred by the need to process each return by hand and the dramatic, more than tenfold increase in the number of affected returns. Thus, "[a]t the request of the Chief Counsel to the Internal Revenue Service, the

---

[39]*U.S. v. Carroll*, 667 F.3d 742, 743 (6th Cir. 2012).

[40]*U.S. v. Carroll*, 667 F.3d at 744.

[41]*U.S. v. Carroll*, 667 F.3d at 744.

## Sovereign Immunity

The Sixth Circuit in *U.S. v. Carroll* considered the sovereign immunity of the IRS in a case that, strangely, was brought by the IRS, and involved standing orders requiring the IRS to turn over Chapter 13 debtors' tax refunds directly to the Chapter 13 standing trustees. In the court's words, this was "not an everyday case . . . Governments do not usually invoke the jurisdiction of the federal courts in order to contest it; they normally raise sovereign immunity as a defense to an action already filed against them."[39]

The case arose out of procedures established in the bankruptcy courts of the Eastern District of Michigan with respect to federal tax refunds paid to Chapter 13 debtors. The Sixth Circuit observed that "[o]ne asset of Chapter 13 individual debtors that sometimes makes a difference in the completion of a reorganization plan is a tax refund. That might come as a surprise. Is it really the case that individuals seeking bankruptcy protection have a proclivity for *overpaying* their taxes? The explanation is that the overpayment is not voluntary; the taxes are withheld by law, and the absence of a high income leads to a low to non-existent taxable income, resulting in meaningful tax refunds. Perhaps less surprising is the reality that people who seek bankruptcy protection do not always pay their creditors first when they come across unanticipated disposable income. When the IRS paid these tax refunds directly to the affected taxpayers, a significant number of them put the money to their own uses, not to pay off creditors as required by the terms of their reorganization plans."[40]

To address this problem, beginning in 2008 the bankruptcy judges of the Eastern District of Michigan began entering orders in Chapter 13 plans that required the IRS to send individual tax refunds directly to the Chapter 13 trustees, and not to the individual taxpayers as contemplated by the Internal Revenue Code. The IRS did not initially oppose entry of these orders, and redirected the affected tax refunds directly to the trustees who redistributed them in accordance with the Chapter 13 plans.[41]

In 2009, the IRS had a "change of heart" spurred by the need to process each return by hand and the dramatic, more than tenfold increase in the number of affected returns. Thus, "[a]t the request of the Chief Counsel to the Internal Revenue Service, the

---

[39]*U.S. v. Carroll*, 667 F.3d 742, 743 (6th Cir. 2012).

[40]*U.S. v. Carroll*, 667 F.3d at 744.

[41]*U.S. v. Carroll*, 667 F.3d at 744.

United States filed this lawsuit against the standing Chapter 13 bankruptcy trustees of the Eastern District of Michigan in their official capacities, complaining that the refund-redirection orders violated the United States' sovereign immunity."[42]

The court described the merits of the IRS' sovereign-immunity claim as proceeding "in three steps. Step one: the bankruptcy code abrogates any governmental unit's sovereign immunity 'to the extent set forth' in 11 U.S.C. § 106. Step two: one provision set forth in § 106 says that 'an entity that owes a debt that is property of the estate and that is matured, payable on demand, or payable on order, shall pay such debt to, or on the order of, the trustee.' 11 U.S.C. § 542(b). Step three: this language, according to the government, does not clearly waive its immunity from the bankruptcy courts' refund-redirection orders."[43]

"Consistent with this theory, the United States sought two forms of relief: a declaratory judgment preventing the trustees from enforcing the existing refund-redirection provisions and a writ of mandamus prohibiting the bankruptcy court from including these provisions in future Chapter 13 plans. The district court granted both forms of relief. The trustees appeal[ed]."[44]

The Sixth Circuit reversed, but not on substantive grounds. Though both sets of parties preferred that the court resolve the suit on the merits, the court held that it lacked the jurisdiction to do so. "The government sued the wrong parties, depriving it of standing to bring this lawsuit." The court reasoned that of "the three 'irreducible constitutional minimum[s]' of standing—injury in fact, causation and redressability,—the government satisfie[d] just one of them"—the requisite injury.[45] Causation and redressability were another matter. Causation was not satisfied because the government had sued a group of bankruptcy trustees, "but the harm it suffered—administrative costs associated with processing tax refunds—flow[ed] not from the trustees' actions but from the bankruptcy court's orders."[46] The government also came up short on redressability. A judgment against the trustees would not eliminate the problem. In particular, nothing would

---

[42]*U.S. v. Carroll*, 667 F.3d at 744.

[43]*U.S. v. Carroll*, 667 F.3d at 744–745, citing *United States v. Nordic Village, Inc.*, 503 U.S. 30, 38, 112 S.Ct. 1011, 117 L.Ed.2d 181 (1992).742, 743 (6th Cir. 2012).

[44]*U.S. v. Carroll*, 667 F.3d at 745.

[45]*U.S. v. Carroll*, 667 F.3d at 745, citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992).

[46]*U.S. v. Carroll*, 667 F.3d at 745.

prevent debtors, creditors, or other parties from asking the bankruptcy court to issue the same order, or the bankruptcy court from "doing the same on its own, exercising its equitable powers over the bankruptcy process to fashion an equivalent order."[47]

The court held that the government lacked standing to seek declaratory or injunctive relief against the trustees, vacated the district court's judgment, and remanded the case for an order dismissing the action for lack of jurisdiction. The court observed, however, that the "lawsuit was apparently born of three good intentions: (1) a need to resolve the government's sovereign-immunity defense to the redirection orders; (2) a timing exigency in view of the growing administrative burden of the orders; and (3) a desire not to sue federal judges—thank you—unless absolutely necessary." The court suggested the government's "unusual vehicle for handling these concerns was not the only one available. The government could have filed a direct appeal from the entry of a redirection order in one (or more) of the cases in which the IRS is a party," which course the government had followed in other cases involving similar redirection provisions. Nothing prevented government from taking this conventional path to protecting its sovereign immunity."[48]

## III. Preemption of State Law by the Bankruptcy Code; Preemption of the Bankruptcy Code by Other Federal Law

The author is not aware of any published opinions since last year's Annual Survey addressing the issues of preemption in connection with turnover actions.

## IV. Form of Action/Service

Federal Rule of Bankruptcy Procedure 7001(1)[49] includes in the list of adversary proceedings "a proceeding to recover money or property, other than a proceeding to compel the debtor to deliver property to the trustee." Thus a turnover of estate property from a debtor[50] and a turnover action for recorded information under

---

[47]*U.S. v. Carroll*, 667 F.3d at 746.

[48]*U.S. v. Carroll*l, 667 F.3d at 746.

[49]Fed. R. Bankr. P. 7004(m). 7001(1).

[50]*See e.g.*, *In re McCrory*, 2011 WL 4005455 *3 (Bankr.N.D.Ohio); *In re Rogove*, 2010 WL 3748151 (Bkrtcy.S.D.Fla. 2010).

prevent debtors, creditors, or other parties from asking the bankruptcy court to issue the same order, or the bankruptcy court from "doing the same on its own, exercising its equitable powers over the bankruptcy process to fashion an equivalent order."[47]

The court held that the government lacked standing to seek declaratory or injunctive relief against the trustees, vacated the district court's judgment, and remanded the case for an order dismissing the action for lack of jurisdiction. The court observed, however, that the "lawsuit was apparently born of three good intentions: (1) a need to resolve the government's sovereign-immunity defense to the redirection orders; (2) a timing exigency in view of the growing administrative burden of the orders; and (3) a desire not to sue federal judges—thank you—unless absolutely necessary." The court suggested the government's "unusual vehicle for handling these concerns was not the only one available. The government could have filed a direct appeal from the entry of a redirection order in one (or more) of the cases in which the IRS is a party," which course the government had followed in other cases involving similar redirection provisions. Nothing prevented government from taking this conventional path to protecting its sovereign immunity."[48]

## III.  Preemption of State Law by the Bankruptcy Code; Preemption of the Bankruptcy Code by Other Federal Law

The author is not aware of any published opinions since last year's Annual Survey addressing the issues of preemption in connection with turnover actions.

## IV.  Form of Action/Service

Federal Rule of Bankruptcy Procedure 7001(1)[49] includes in the list of adversary proceedings "a proceeding to recover money or property, other than a proceeding to compel the debtor to deliver property to the trustee." Thus a turnover of estate property from a debtor[50] and a turnover action for recorded information under

---

[47] U.S. v. Carroll, 667 F.3d at 746.

[48] U.S. v. Carroll l, 667 F.3d at 746.

[49] Fed. R. Bankr. P. 7004(m). 7001(1).

[50] See e.g., In re McCrory, 2011 WL 4005455 *3 (Bankr.N.D.Ohio); In re Rogove, 2010 WL 3748151 (Bkrtcy.S.D.Fla. 2010).

section 542(e)[51] may be brought by motion, while Rule 7001(1) requires all other actions for turnover of estate property under section 542(a) and (b) (i.e., an action against a nondebtor) and section 543(a) to be commenced by an adversary proceeding.[52]

The Rule is not slavishly applied. In *In re Olson* the Chapter 7 trustee sought turnover from a non-debtor by motion and the bankruptcy court scheduled the matter for trial.[53] The court also observed that the trustee had not specified whether he was seeking turnover under section 542 or section 543, and that since further proceedings were necessary with respect to the motion, "the trustee may clarify in such future proceedings" whether his motion was filed pursuant to section 542 or section 543. The court noted that "[i]t seems apparent that such sections are mutually exclusive."[54]

Moreover, the court in *In re Stasz* held that "a bankruptcy court's decision not to require an adversary proceeding is subject to a harmless error analysis, and under that standard, if the failure to commence an adversary proceeding did not cause prejudice, form should not be elevated over substance."[55]

Further, notwithstanding this Rule, the provisions of section 542(a)of the Bankruptcy Code, governing the turnover of tangible property, are intended to be self-executing. The bankruptcy court in *In re Century City Doctors Hosp., LLC* noted that the duty to turn over property of the estate is not contingent on any order or demand, and arises on the filing of the petition. The court emphasized, though, that these obligations apply only to *undisputed* funds or other estate property. Because the trustee had "made no allegations in the complaint or submitted any evidence in opposition to the summary judgment motion to suggest that the transferred funds" were "*indisputably* estate property subject to the turnover requirements under § 542," and the defendant had disputed the trustee's right to recovery under any theory of

[51]*See e.g., In re MV Pipeline CO.*, 2007 WL 1452591 at *8 (Bankr.E.D.Okla. 2007). A turnover action against a debtor may also be brought by adversary proceeding. *In re McKenzie*, 2011 WL 4600407 *6 (Bankr.E.D.Tenn.).

[52]*See e.g., In re Spence*, 2009 WL 3756621 (Bankr.W.D.Tex. 2009), *In re Hodge*, 2009 WL 3645172 (Bkrtcy.W.D.Tex. 2009), and *In re Clark*, 2009 WL 2849785 (Bankr.D.Dist.Col. 2009).

[53]*In re Olson*, 2011 WL 6010226 *1-2 (Bankr.D.Neb.).

[54]*In re Olson*, 2011 WL 6010226 *1.

[55]*In re Stasz*, 2011 WL 3299162 *4 (9th Cir.BAP), citing *Korneff v. Downey Reg'l Med. Ctr.-Hosp., Inc. (In re Downey Reg'l Med. Ctr.-Hosp, Inc.)*, 441 B.R. 120, 127–28 (9th Cir.BAP2010), citing *Austein v. Schwartz (In re Gerwer)*, 898 F.2d 730, 734 (9th Cir.1990).

959

recovery, the defendant was entitled to summary judgment on the turnover count "because there simply [was] no legal basis for a stand-alone 'turnover' claim" in the case.[56]

A party's obligation to turn over property under section 542(a) is further subject to the "good faith" exception, discussed in § XI below.

By contrast, in *In re Randolph Towers Cooperative, Inc.*, turnover under section 542(b)—of a debt that is property of the estate and that is matured, payable on demand, or payable on order— was held to be not self-executing, and to require the filing of an adversary proceeding.[57]

## V.  Standing

A trustee clearly has standing to bring an action under Code section 542.[58] The bankruptcy court in *In re Young* held that in a Chapter 7 case the trustee, not the debtor, is entitled to turnover.[59]

Standing to pursue turnover claims can be conferred on a litigation trust or liquidating trust or similar entity form pursuant to a plan, provided the plan preserves turnover claims and transferred or vested those claims in the trust.[60] *See In re Crescent Resources, LLC* discussed in § II above.

A Chapter 13 trustee would appear to lack standing and authority to seek turnover. The bankruptcy court in *In re Adams* reasoned that "[o]ne of the elements of a turnover action is that the property being sought is 'property that the trustee may use, sell, or lease under section 363 of this title.' 11 U.S.C. § 542(a). This poses a potential problem when a chapter 13 trustee seeks an action for turnover because a chapter 13 trustee is prohibited from using, selling, or leasing property of the estate: Section 1303 provides that the debtor, exclusive of the trustee, has the rights and powers of a trustee under section 363(b), the subsection

---

[56]*In re Century City Doctors Hosp., LLC*, 466 B.R. 1, 19 (Bankr.C.D.Cal. 2012).

[57]*In re Randolph Towers Cooperative, Inc.*, 2011 WL 2940664 *4 (Bankr.D. Dist.Col.).

[58]*See e.g., In re Flanagan*, 415 B.R. 29, 36 (D.Conn. 2009) ("turnover is not a cause of action available to debtors at the time they file for bankruptcy. The language of statute clearly demonstrates that it is a claim available only to trustees after a bankruptcy petition has been filed.").

[59]*In re Young*, 439 B.R. at 217–218.

[60]*In re Crescent Resources, LLC*, 455 B.R. at 130 (plan preserved claims and litigation trust formed pursuant to the plan had standing to pursue those claims).

recovery, the defendant was entitled to summary judgment on the turnover count "because there simply [was] no legal basis for a stand-alone 'turnover' claim" in the case.[56]

A party's obligation to turn over property under section 542(a) is further subject to the "good faith" exception, discussed in § XI below.

By contrast, in *In re Randolph Towers Cooperative, Inc.*, turnover under section 542(b)—of a debt that is property of the estate and that is matured, payable on demand, or payable on order—was held to be not self-executing, and to require the filing of an adversary proceeding.[57]

## V. Standing

A trustee clearly has standing to bring an action under Code section 542.[58] The bankruptcy court in *In re Young* held that in a Chapter 7 case the trustee, not the debtor, is entitled to turnover.[59]

Standing to pursue turnover claims can be conferred on a litigation trust or liquidating trust or similar entity form pursuant to a plan, provided the plan preserves turnover claims and transferred or vested those claims in the trust.[60] *See In re Crescent Resources, LLC* discussed in § II above.

A Chapter 13 trustee would appear to lack standing and authority to seek turnover. The bankruptcy court in *In re Adams* reasoned that "[o]ne of the elements of a turnover action is that the property being sought is 'property that the trustee may use, sell, or lease under section 363 of this title.' 11 U.S.C. § 542(a). This poses a potential problem when a chapter 13 trustee seeks an action for turnover because a chapter 13 trustee is prohibited from using, selling, or leasing property of the estate: Section 1303 provides that the debtor, exclusive of the trustee, has the rights and powers of a trustee under section 363(b), the subsection

---

[56] *In re Century City Doctors Hosp., LLC*, 466 B.R. 1, 19 (Bankr.C.D.Cal. 2012).

[57] *In re Randolph Towers Cooperative, Inc.*, 2011 WL 2940664 *4 (Bankr.D. Dist.Col.).

[58] *See e.g., In re Flanagan*, 415 B.R. 29, 36 (D.Conn. 2009) ("turnover is not a cause of action available to debtors at the time they file for bankruptcy. The language of statute clearly demonstrates that it is a claim available only to trustees after a bankruptcy petition has been filed.").

[59] *In re Young*, 439 B.R. at 217–218.

[60] *In re Crescent Resources, LLC*, 455 B.R. at 130 (plan preserved claims and litigation trust formed pursuant to the plan had standing to pursue those claims).

which gives a trustee authority to use, sell, or lease property of the estate."[61] In the court's view, "the beg[ged] the question: If a § 542 turnover action must seek turnover of property that the trustee may use, sell, or lease, and a chapter 13 trustee is prohibited from using, selling, or leasing property, how can such chapter 13 trustee seek turnover pursuant to § 542?" But because the parties had not addressed this question in their briefs or at the hearing, and because the Chapter 13 trustee had not had an opportunity to make his case before the court, the court was "not comfortable" finding that the trustee had shown that he was entitled to judgment as a matter of law on this issue, and denied the trustee's motion for partial summary judgment on this and other grounds.[62]

The court in *In re Diaz Esteras* was clear, however, stating that "the trustee's use of Section 542 in a chapter 13 case is thwarted by Section 1303. " 'Literal application of the turnover power in § 542 produces nonsense in a Chapter 13 case: delivery of property to the trustee will never be required because the Chapter 13 trustee is prohibited from using or possessing estate property, at least until entry of a contrary confirmation order.' "[63]

The bankruptcy court in *In re Miller* held that, upon a dismissal of a debtor's bankruptcy case, "there is no longer any 'estate property' in [the] case, nor a debtor or trustee to whom the Court can order the funds turned over." Accordingly, the court is divested of jurisdiction of a claim for turnover "when the underlying case, from which the claim arose, was dismissed." Accordingly, the turnover claim also was dismissed."[64]

See also *U.S. v. Carroll* discussed in § II above.

## VI. Burden of Proof

The party seeking turnover has the burden of proof,[65] and "must prove that the subject property constitutes property of the estate

---

[61]*In re Adams*, 453 B.R. 774, 777 (Bankr.N.D.Ala. 2011), citing 11 U.S.C. § 1303 and 11 U.S.C. § 363(b).

[62]*In re Adams*, 453 B.R. at 777.

[63]*In re Diaz Esteras*, 2011 WL 5953483 *3 (Bankr.D.Puerto Rico), quoting Keith M. Lundin & William H. Brown, Chapter 13 Bankruptcy, 4th Edition, § 52.1, Rev. Aug. 16, 2004, www.Ch13online.com.

[64]*In re Miller*, 2011 WL 6217342 *2 (Bankr.D.Colo.).

[65]*In re Miller*, 2011 WL 3741846 *2 (Bankr.N.D.Ohio); *In re Asif*, 455 B.R. 768, 797 (Bankr.D.Kan.); *In re McCrory*, 2011 WL 4005455 *3 (Bankr.N.D. Ohio); *In re Crump*, 2010 WL 4501629 *2 (Bankr.M.D.Ga. 2010); *In re Brubaker*, 426 B.R. 902, 905 (Bankr.M.D.Fla. 2010); *In re Schneider*, 417 B.R. 907, 919 (Bankr.N.D.Ill. 2009).

and that the defendant is in possession of that property."[66] The courts continue to split on whether the preponderance of the evidence or the clear and convincing evidence standard applies.

In *In re Indian Capitol Distributing, Inc.* the bankruptcy court stated the general rule that section 542 "is self-operative and mandatory" and "requires any entity with control of property of a bankruptcy estate to deliver that property to the trustee." Nonetheless, "[i]n any action to compel compliance with this section, the burden of proof is on the trustee. The trustee must prove: 1) during the case; 2) an entity (other than a custodian); 3) was in possession, custody or control; 4) of property that the trustee could use, sell or lease; and 5) that such property is not of inconsequential value or benefit to the estate."[67]

In *In re DBSI, Inc.* the bankruptcy court stated, similarly, that in a turnover action it is the trustee's burden "to establish every element of the cause of action, that is: '(1) the property is in the possession, custody or control of another entity;(2) the property can be used in accordance with the provisions of section 363; and (3) the property has more than inconsequential value to the debtor's estate.' "[68]

In *In re Jokiel* the trustee moved for turnover of a severance payment received by the debtor. The bankruptcy court stated that the trustee bore "the burden of establishing a *prima facie* case for turnover." Once a prima facie case has been established, the debtor has to "provide a reason for going forward with the case, but the ultimate burden of persuasion remains with the trustee at all times."[69]

---

[66]*In re McCrory*, 2011 WL 4005455 *3 (Bankr.N.D.Ohio); *In re Rogove*, 2010 WL 3748151 *2 (Bankr.S.D.Fla. 2010). See also, In re Brubaker, 426 B.R. at 905 and *In re Green*, 423 B.R. 867, 869 (Bankr.W.D.Ark. 2010).

[67]*In re Indian Capitol Distributing, Inc.*, 2011 WL 4543954 *1 (Bankr.D.N. M.), citing *Boyer v. Davis (In re USA Diversified Products, Inc.)*, 193 B.R. 868, 872 (Bankr.N.D.Ind.1995), aff'd., 196 B.R. 801 (N.D.Ind.1996), aff'd. 100 F.3d 53 (7th Cir.1996); and *Evans v. Robbins (In re Robbins)*, 897 F.2d 966, 968 (8th Cir.1990).

[68]*In re DBSI, Inc.*, 2011 WL 6934544 *4 (Bankr.D.Del.), quoting *In re Steel Wheels Transport, L.L.C.*, 2011 WL 5900958, at *5 (Bankr.D.N.J.).

[69]*In re Jokiel*, 447 B.R. 868, 872 (Bankr.N.D.Ill. 2011), citing *In re Meyers*, 616 F.3d 626, 629 (7th Cir.2010).

and that the defendant is in possession of that property."[66] The courts continue to split on whether the preponderance of the evidence or the clear and convincing evidence standard applies.

In *In re Indian Capitol Distributing, Inc.* the bankruptcy court stated the general rule that section 542 "is self-operative and mandatory" and "requires any entity with control of property of a bankruptcy estate to deliver that property to the trustee." Nonetheless, "[i]n any action to compel compliance with this section, the burden of proof is on the trustee. The trustee must prove: 1) during the case; 2) an entity (other than a custodian); 3) was in possession, custody or control; 4) of property that the trustee could use, sell or lease; and 5) that such property is not of inconsequential value or benefit to the estate."[67]

In *In re DBSI, Inc.* the bankruptcy court stated, similarly, that in a turnover action it is the trustee's burden "to establish every element of the cause of action, that is: '(1) the property is in the possession, custody or control of another entity;(2) the property can be used in accordance with the provisions of section 363; and (3) the property has more than inconsequential value to the debtor's estate.' "[68]

In *In re Jokiel* the trustee moved for turnover of a severance payment received by the debtor. The bankruptcy court stated that the trustee bore "the burden of establishing a *prima facie* case for turnover." Once a prima facie case has been established, the debtor has to "provide a reason for going forward with the case, but the ultimate burden of persuasion remains with the trustee at all times."[69]

---

[66]*In re McCrory*, 2011 WL 4005455 *3 (Bankr.N.D.Ohio); *In re Rogove*, 2010 WL 3748151 *2 (Bankr.S.D.Fla. 2010). See also, In re Brubaker, 426 B.R. at 905 and *In re Green*, 423 B.R. 867, 869 (Bankr.W.D.Ark. 2010).

[67]*In re Indian Capitol Distributing, Inc.*, 2011 WL 4543954 *1 (Bankr.D.N. M.), citing *Boyer v. Davis (In re USA Diversified Products, Inc.)*, 193 B.R. 868, 872 (Bankr.N.D.Ind.1995), aff'd., 196 B.R. 801 (N.D.Ind.1996), aff'd. 100 F.3d 53 (7th Cir.1996); and *Evans v. Robbins (In re Robbins)*, 897 F.2d 966, 968 (8th Cir.1990).

[68]*In re DBSI, Inc.*, 2011 WL 6934544 *4 (Bankr.D.Del.), quoting *In re Steel Wheels Transport, L.L.C.*, 2011 WL 5900958, at *5 (Bankr.D.N.J.).

[69]*In re Jokiel*, 447 B.R. 868, 872 (Bankr.N.D.Ill. 2011), citing *In re Meyers*, 616 F.3d 626, 629 (7th Cir.2010).

In *In re Rood*, by contrast, the court stated that the trustee, as movant, must "demonstrate by clear and convincing evidence that the assets in question are part of the bankrupt's estate."[70]

Similarly, in *In re Kana* the bankruptcy court held that the " 'burden of proof in a turnover proceeding is at all times on the receiver or trustee; he must at least establish a *prima facie* case. After that, the burden of explaining or going forward shifts to the other party, but the ultimate burden or risk of persuasion is upon the receiver or trustee.' As part of a *prima facie* case, the trustee must demonstrate by clear and convincing evidence that the assets in question are part of the bankrupt's estate."[71]

The turnover of documents involves as somewhat different standard, though the burden remains on the movant. In *In re Crescent Resources, LLC* the bankruptcy court determined that, for the purposes of turnover of attorney-client files under section 542(a), the movant bears the burden of proving that the files re property of the estate "by a preponderance of the evidence." The same files in addition may be sought pursuant to section 542(e). For turnover under that provision, the movant "must first show that the documents relate" to the debtor's "property or financial affairs." If the movant meets this initial burden, then the objecting party must show the existence of an attorney-client relationship between it and the counsel from whom turnover is sought.[72]

The court in *In re Asif* held simply that, in an action seeking the turnover of documents, the trustee "has the burden of proving what property belongs to the estate, and thus has to be turned over to the estate."[73] The court found that the trustee had not established that the itemized information sought existed, was in debtor's possession, and had not been turned over. After reviewing the evidence presented at trial, the court found that none of the property sought by the trustee was in the debtor's possession, and denied the trustee's turnover motion.[74]

---

[70] *In re Rood*, 2011 WL 4459094 *17 (Bankr.D.Md.), quoting *In re Himes*, 179 B.R. 279, 282 (Bankr.E.D. Okla.1995).

[71] *In re Kana*, 2011 WL 1753208 *2 (Bankr.D.N.D.), quoting *Evans v. Robbins*, 897 F.2d 966, 968 (8th Cir.1990).

[72] *In re Crescent Resources, LLC*, 2011 WL 3022554 *7 (Bankr.W.D.Tex.).

[73] *In re Asif*, 455 B.R. at 797.

[74] *In re Asif*, 455 B.R. at 797–798.

## VII.   Section 542(a)—Property of the Estate That the Debtor May Use, Lease, Sell, or Exempt

### Generally—Property of the Estate

"It is crucial to the trustee's claim that the asset to be turned over is property of the estate."[75]

This rule does not apply to records, which need only be related to the debtor's property or interests,[76] as discussed in § VI above and in § XII below.

A "creditor has an affirmative duty to return estate property, regardless of whether the creditor obtained the property pre- or post-petition."[77]

The bankruptcy court in *In re Atwood* held that claims that arise postpetition are not property of the estate, and thus are not subject to turnover.[78]

In *In re Seminole Walls & Ceilings Corp.*, the bankruptcy court held that property that is revested in a reorganized debtor on the effective date of a confirmed plan, and then sold by the reorganized debtor, is no longer property of the estate. Converting the case to Chapter 7 does not bring the property back into the estate, and accordingly the Chapter 7 trustee's cannot obtain turnover of such property.[79]

State and federal law applies to such determination. In *In re Waiehu Aina, LLC* the trustee sought turnover of property that the defendants argued was not part of the bankruptcy estate because it was included in the "crown lands" or the "government lands" that still belonged to the Kingdom of Hawaii and were owned by its monarch. The bankruptcy court held that it was bound by the laws of the United States of America and the State of Hawaii, that "American law does not recognize the continued existence of the former Kingdom of Hawaii," and that "[u]nder

---

[75]*In re Hoerr*, 2004 WL 2926156 at *2 (Bankr. C.D. Ill. 2004). "Federal law determines what property is included in the estate, while state law controls whether the debtor has a legal or equitable interest in the property at the time the bankruptcy case is filed." *In re Living Hope Southwest Medical SVCS, LLC*, 450 B.R. 139, 157 (Bankr.W.D.Ark. 2011); *In re Miller*, 2011 WL 6217342 *2 (Bankr.D.Colo.), citing *Butner v. United States*, 440 U.S. 48, 55 (1979).

[76]*In re McKenzie*, 2011 WL 4600407 *6. (Bankr.E.D.Tenn.).

[77]*In re Forkner*, 2010 WL 5462543 *4 (Bankr.N.D.Iowa 2010), citing *In re Knaus*, 889 F.2d 773, 775 (8th Cir.1989).

[78]*In re Atwood*, 452 B.R. 249, 256–257 (Bankr.D.N.M. 2011).

[79]*In re Seminole Walls & Ceilings Corp.*, 446 B.R. 572, 598 (Bankr.M.D. 2011).

## VII.  Section 542(a)—Property of the Estate That the Debtor May Use, Lease, Sell, or Exempt

### Generally—Property of the Estate

"It is crucial to the trustee's claim that the asset to be turned over is property of the estate."[75]

This rule does not apply to records, which need only be related to the debtor's property or interests,[76] as discussed in § VI above and in § XII below.

A "creditor has an affirmative duty to return estate property, regardless of whether the creditor obtained the property pre- or post-petition."[77]

The bankruptcy court in *In re Atwood* held that claims that arise postpetition are not property of the estate, and thus are not subject to turnover.[78]

In *In re Seminole Walls & Ceilings Corp.*, the bankruptcy court held that property that is revested in a reorganized debtor on the effective date of a confirmed plan, and then sold by the reorganized debtor, is no longer property of the estate. Converting the case to Chapter 7 does not bring the property back into the estate, and accordingly the Chapter 7 trustee's cannot obtain turnover of such property.[79]

State and federal law applies to such determination. In *In re Waiehu Aina, LLC* the trustee sought turnover of property that the defendants argued was not part of the bankruptcy estate because it was included in the "crown lands" or the "government lands" that still belonged to the Kingdom of Hawaii and were owned by its monarch. The bankruptcy court held that it was bound by the laws of the United States of America and the State of Hawaii, that "American law does not recognize the continued existence of the former Kingdom of Hawaii," and that "[u]nder

---

[75] *In re Hoerr*, 2004 WL 2926156 at *2 (Bankr. C.D. Ill. 2004). "Federal law determines what property is included in the estate, while state law controls whether the debtor has a legal or equitable interest in the property at the time the bankruptcy case is filed." *In re Living Hope Southwest Medical SVCS, LLC*, 450 B.R. 139, 157 (Bankr.W.D.Ark. 2011); *In re Miller*, 2011 WL 6217342 *2 (Bankr.D.Colo.), citing *Butner v. United States*, 440 U.S. 48, 55 (1979).

[76] *In re McKenzie*, 2011 WL 4600407 *6. (Bankr.E.D.Tenn.).

[77] *In re Forkner*, 2010 WL 5462543 *4 (Bankr.N.D.Iowa 2010), citing *In re Knaus*, 889 F.2d 773, 775 (8th Cir.1989).

[78] *In re Atwood*, 452 B.R. 249, 256–257 (Bankr.D.N.M. 2011).

[79] *In re Seminole Walls & Ceilings Corp.*, 446 B.R. 572, 598 (Bankr.M.D. 2011).

American law, all of the former 'crown lands' and 'government lands' are controlled by the State of Hawaii or the United States government." The court found that the property at issue was property of the estate and granted the trustee's motion for summary judgment on the turnover count.[80]

The question of who holds title is not dispositive. In *In re Henry*, the bankruptcy court held that the debtor's right to purchase a car under a retail installment purchase agreement gave the debtor the right to turnover of the car, notwithstanding that title had not yet been transferred to the debtor.[81]

In *In re Miller*, though the debtor's right to receive a bonus from his employer "was conditioned on his continued employment" and on his employer's decision to declare a bonus, the debtor "had an interest in the bonus at the time he filed his case based on his prepetition employment, and that interest [was] an asset of his bankruptcy estate." Since, however, based on the debtor's initial and amended exemption claims, the money which the trustee was seeking to have turned over had been "exempted by the debtor without objection," the debtor was not required to turn over the funds."[82]

In *In re Harajli*, while the defendant and the debtor were still married, they jointly obtained a line of credit from the bank with a limit of $238,000.00, which was secured by a mortgage on the marital home. In 2004 the defendant and the debtor were divorced, and the defendant was awarded the marital home "as her sole property" required to " 'hold [Debtor] harmless for same.' " The divorce judgment "said nothing" about the line of credit. In 2009, the defendant made draws totaling $238,000.00 on the line of credit, which encumbered the defendant's home. The debtor never made any draws on the line of credit, and did not receive any of the $238,000.00 in proceeds that the defendant borrowed. In 2010, the debtor filed a voluntary petition for relief under Chapter 7, and listed on Schedule F an unsecured claim of the bank in the amount of $238,138.00, based on the debtor's joint liability with the defendant on the line of credit. On the date on which the debtor filed his Chapter 7 petition, the defendant still had at least $225,127.55 of the $238,000.00 in cash

---

[80]*In re Waiehu Aina, LLC*, 2011 WL 862657 *1–2 (Bankr.D.Hawai'i).

[81]*In re Henry*, 2011 WL 1402767 *2–3, 5 (Bankr.D.Mont.).

[82]*In re Miller*, 2011 WL 6217342 *4.

advance proceeds. The Chapter 7 trustee sought turnover from the defendant of $119,000, one-half of the amount drawn.[83]

The court denied the motion. The court reasoned that, "[b]ecause the parties were divorced, Debtor no longer had any interest in any of Defendant's property, including the $238,000.00 in cash advance proceeds Defendant obtained on the line of credit. Assuming that after the divorce, Debtor still retained the right to make draws on the line of credit, on the date of filing the petition, the only interest Debtor had in the line of credit was *an unexercised right to make a draw on the line of credit up to the contractual limit.* Because the contractual limit had already been reached, however, Debtor's property interest in the line of credit, if any, was effectively worthless on the petition date. Any contractual right(s) of the Debtor under the . . . line of credit that the Trustee succeeded to, upon the filing of the bankruptcy petition, was worth $0.00. So there [was] nothing for the Trustee to recover from anyone, based on the line of credit.[84]

*In re Adams* demonstrates the interplay between Chapter 13 and Chapter 7 with respect to a turnover proceeding. The facts were not disputed. The debtor filed a voluntary Chapter 13 bankruptcy petition and the bankruptcy court confirmed the debtor's plan. The confirmation order prohibited the debtor from disposing of any property without the consent of the court. While the Chapter 13 case was pending, the debtor received unreported income in excess of $55,000.00. The debtor conceded that this unreported income became property of the Chapter 13 case estate, yet spent all of it. The debtor and his ex-wife subsequently filed a joint federal tax return and received a refund of $10,350.00. The debtor did not disclose the receipt of the tax refund to the Chapter 13 Trustee. The debtor also conceded that the tax refund became property of the Chapter 13 estate, yet allowed his ex-wife to keep the entire tax refund and did not receive anything in return.

The Chapter 7 trustee commenced an adversary proceeding seeking a money judgment for $60,175.00: $55,000.00 for the undisclosed income received and spent by the debtor while the Chapter 13 case was pending, and $5,175.00 for one-half of the undisclosed tax refund received and given away by the debtor

---

[83] *In re Harajli*, 2012 WL 255326 *2–3 (Bankr.E.D.Mich.).

[84] *In re Harajli*, 2012 WL 255326 *6.

advance proceeds. The Chapter 7 trustee sought turnover from the defendant of $119,000, one-half of the amount drawn.[83]

The court denied the motion. The court reasoned that, "[b]ecause the parties were divorced, Debtor no longer had any interest in any of Defendant's property, including the $238,000.00 in cash advance proceeds Defendant obtained on the line of credit. Assuming that after the divorce, Debtor still retained the right to make draws on the line of credit, on the date of filing the petition, the only interest Debtor had in the line of credit was *an unexercised right to make a draw on the line of credit up to the contractual limit.* Because the contractual limit had already been reached, however, Debtor's property interest in the line of credit, if any, was effectively worthless on the petition date. Any contractual right(s) of the Debtor under the . . . line of credit that the Trustee succeeded to, upon the filing of the bankruptcy petition, was worth $0.00. So there [was] nothing for the Trustee to recover from anyone, based on the line of credit.[84]

*In re Adams* demonstrates the interplay between Chapter 13 and Chapter 7 with respect to a turnover proceeding. The facts were not disputed. The debtor filed a voluntary Chapter 13 bankruptcy petition and the bankruptcy court confirmed the debtor's plan. The confirmation order prohibited the debtor from disposing of any property without the consent of the court. While the Chapter 13 case was pending, the debtor received unreported income in excess of $55,000.00. The debtor conceded that this unreported income became property of the Chapter 13 case estate, yet spent all of it. The debtor and his ex-wife subsequently filed a joint federal tax return and received a refund of $10,350.00. The debtor did not disclose the receipt of the tax refund to the Chapter 13 Trustee. The debtor also conceded that the tax refund became property of the Chapter 13 estate, yet allowed his ex-wife to keep the entire tax refund and did not receive anything in return.

The Chapter 7 trustee commenced an adversary proceeding seeking a money judgment for $60,175.00: $55,000.00 for the undisclosed income received and spent by the debtor while the Chapter 13 case was pending, and $5,175.00 for one-half of the undisclosed tax refund received and given away by the debtor

---

[83] *In re Harajli*, 2012 WL 255326 *2–3 (Bankr.E.D.Mich.).

[84] *In re Harajli*, 2012 WL 255326 *6.

while the Chapter 13 case was pending.[85] The Chapter 7 trustee sought summary judgment.[86]

The court denied the Chapter 7 trustee's motion. The court reasoned that a "finding that a trustee has cause to bring a § 542 cause of action does not necessitate a finding that the trustee has an interest in the cause of action itself; rather, the power to seek turnover pursuant to § 542 is a 'statutorily created power to recover property,' not an interest in property itself." Therefore, the court found that the alleged section 542 cause of action was not an interest in property and did not become property of the Chapter 13 estate pursuant to section 541(a)(7). As a result, the court also found that the Chapter 7 trustee failed to show that he was entitled to judgment as a matter of law, and thus had failed to show that he was entitled to summary judgment.[87]

A similar requirement that the property sought to be turned over must be "property of the debtor" or "property of the estate" is found in Code section 543 regarding a custodian's turnover obligations.[88] Recent cases under section 543 are discussed in § XIII of this article, below.

## The Property Must be Property That the Debtor May Use, Lease, Sell or Exempt

### Property that the Debtor May Use, Lease of Sell

In *In re DBSI, Inc.*, the trustee of the litigation trust sought turnover from certain former employees of the debtors of computer equipment and confidential financial information that the debtors gave to those employees postpetition. The transfers were not approved by the court. The trustee further alleged that the property was of substantial value, benefit and use to the debtors' estates. The court determined that the complaint "simply failed to allege" that the computer equipment and financial records held by the defendants could be "be used, leased, or sold pursuant to § 363. Further, the trustee made "no factual allegations" showing that the property was "of substantial value, benefit and use" to the estates. Having found that the pleading of the turn-

---

[85] *In re Adams*, 453 B.R. 774, 775 (Bankr.N.D.Ala. 2011).

[86] *In re Adams*, 453 B.R. at 780.

[87] *In re Adams*, 453 B.R. at 781.

[88] 11 U.S.C.A. § 543(a), (b).

over claim was deficient, the court dismissed the count with leave to amend.[89]

### Property that the Debtor May Exempt

The application of the turnover provisions to a trustee's motion for turnover of property asserted by the debtor to be subject to an exemption is somewhat peculiar, since the debtor's exemption would appear to put the exempt property beyond a trustee's reach.

The bankruptcy court in *In re Moore* held that the debtor's assertion of an exemption, which the trustee had indicated he intended to dispute, was not a defense to a turnover action by the trustee.[90]

Similarly, in *In re Jokiel*, the bankruptcy court held that "[e]ven if property is subject to a valid exemption, it is not automatically removed from the estate. Rather, the debtor must claim the exemption." Since the court had "found that at least a portion of the severance payment was property of the estate, and the Debtor ha[d] not yet properly asserted an exemption under Illinois law, whether valid or not," the property was still subject to turnover under section 542(a).[91]

In *In re Stewart*, the court allowed the Chapter 7 trustee's objection to the debtors' claim of exemption, and ordered the debtors to promptly turn over to the trustee an escrow refund check and a homestead proceeds check.[92]

By contrast, in *In re Ellis*, the bankruptcy court held that the debtor's annuity was exempt and thus denied the trustee's motion for turnover.[93]

The court in *In re Tennihill* took the same approach, holding that certain checks constituted domestic support and child support payments under Florida law and the statutory definition of section 101(14A) of the Bankruptcy Code, and thus were exempt pursuant to section 522(d)(10)(D) and not subject to turnover pursuant to section 542(a).[94]

In *In re Randall*, the court held that the trustee's time to challenge the claimed exemption in certain of the debtor's property

---

[89]*In re DBSI, Inc.*, 2011 WL 6934544 *4 (Bankr.D.Del.).

[90]*In re Moore*, 2011 WL 2182884 *3 (Bankr.D.Dist.Col.).

[91]*In re Jokiel*, 447 B.R. 875.

[92]*In re Stewart*, 452 B.R. at 745.

[93]*In re Ellis*, 454 B.R. 404, 414 (Bankr.S.D.Tex.,2011).

[94]*In re Tennihill*, 2012 WL 293633 *5 (Bankr.M.D.Fla.).

over claim was deficient, the court dismissed the count with leave to amend.[89]

## Property that the Debtor May Exempt

The application of the turnover provisions to a trustee's motion for turnover of property asserted by the debtor to be subject to an exemption is somewhat peculiar, since the debtor's exemption would appear to put the exempt property beyond a trustee's reach.

The bankruptcy court in *In re Moore* held that the debtor's assertion of an exemption, which the trustee had indicated he intended to dispute, was not a defense to a turnover action by the trustee.[90]

Similarly, in *In re Jokiel*, the bankruptcy court held that "[e]ven if property is subject to a valid exemption, it is not automatically removed from the estate. Rather, the debtor must claim the exemption." Since the court had "found that at least a portion of the severance payment was property of the estate, and the Debtor ha[d] not yet properly asserted an exemption under Illinois law, whether valid or not," the property was still subject to turnover under section 542(a).[91]

In *In re Stewart*, the court allowed the Chapter 7 trustee's objection to the debtors' claim of exemption, and ordered the debtors to promptly turn over to the trustee an escrow refund check and a homestead proceeds check.[92]

By contrast, in *In re Ellis*, the bankruptcy court held that the debtor's annuity was exempt and thus denied the trustee's motion for turnover.[93]

The court in *In re Tennihill* took the same approach, holding that certain checks constituted domestic support and child support payments under Florida law and the statutory definition of section 101(14A) of the Bankruptcy Code, and thus were exempt pursuant to section 522(d)(10)(D) and not subject to turnover pursuant to section 542(a).[94]

In *In re Randall*, the court held that the trustee's time to challenge the claimed exemption in certain of the debtor's property

---

[89]*In re DBSI, Inc.*, 2011 WL 6934544 *4 (Bankr.D.Del.).

[90]*In re Moore*, 2011 WL 2182884 *3 (Bankr.D.Dist.Col.).

[91]*In re Jokiel*, 447 B.R. 875.

[92]*In re Stewart*, 452 B.R. at 745.

[93]*In re Ellis*, 454 B.R. 404, 414 (Bankr.S.D.Tex.,2011).

[94]*In re Tennihill*, 2012 WL 293633 *5 (Bankr.M.D.Fla.).

had passed, and ordered turnover of the property directly to the debtor.[95]

And in *In re Biondo*, the Chapter 13 debtor sought turnover from his credit union of retirement and pension fund totaling approximately $135,000 that the debtor alleged the credit union had unlawfully attached and seized because it had been pledged as collateral for a loan.[96] The debtor claimed that the funds were exempt. The court held that the "fact that a debtor may claim an exemption in property does not preclude the property from being used as collateral for a loan, or debtors would be filing bankruptcy in droves to avoid all deeds of trust on their homesteads and liens on their cars." The court found "the Debtor's argument to be untenable as Debtor previously reaffirmed and acceded to payoff" of another loan "based on its being secured by his retirement funds." The court rejected the debtor's argument "that this type of property, *per se*," could not "be used to secure one debt when Debtor reaffirmed it as security for another." Further, "in view of the court's inability to find that Debtor ha[d] scheduled" certain termination benefits turnover of which the debtor also sought, the turnover motion was denied "in part as it does not go to property 'that Debtor may exempt under section 522 of this title.'"[97]

Nonetheless, rather than deny the debtor's motion for turnover, the court in *In re Biondo* issued an order on the lender's lift stay motion and the debtor's turnover motion "granting the parties relief to pursue their rights and remedies according to applicable nonbankruptcy law, without prejudice to Debtor's assertion of claims or defenses against the Credit Union." The credit union's objection to exemptions was sustained based on the court's finding that the debtor had not scheduled or claimed an exemption in the termination benefits.[98]

See also *In re Miller*, discussed in the § VII, "Generally—Property of the Estate," above.

### Types of Property Interests Subject to Turnover

Several opinions in the last year have made the threshold determination of whether the property sought was estate property, with respect to myriad types of property interests, as set forth in the following subsections of this § VII.

---

[95]*In re Randall*, 2011 WL 5417092 *2 (Bankr.N.D.Iowa).

[96]*In re Biondo*, 2012 WL 162285 *4 (Bankr.D.Md.).

[97]*In re Biondo*, 2012 WL 162285 *5.

[98]*In re Biondo*, 2012 WL 162285 *8.

NORTON ANNUAL SURVEY OF BANKRUPTCY LAW, 2012 EDITION

### Bank and Checking Account Balances

The courts continue to consider the obligation of a debtor to turn over checking account balances as of the petition date, notwithstanding that uncashed checks might be presented against those accounts postpetition. As a general rule, "[f]unds in the debtors' checking account, upon which no checks have been written as of the date of the petition, are property of the estate."[99]

In *In re Henson* the trustee sought turnover from the debtor of funds held in her checking account on the petition date, which had been diminished by the bank's honoring postpetition checks that the debtor had written prepetition. The bankruptcy court held that checks "written pre-petition by Debtor became property of the estate because they had not been honored when Debtor filed for bankruptcy," but despite this conclusion, "because Debtor no longer had possession of the funds when the motion for turnover was filed, Trustee could not compel turnover of the value of those funds pursuant to 11 U.S.C. § 542(a)." The trustee appealed.[100]

The district court considered the split in the Courts of Appeals, and affirmed. The court reasoned that, "[u]nder 11 U.S.C. § 542(a), a trustee may not compel turnover of property of the estate unless the entity against whom the trustee seeks turnover is in possession of the property sought, or its proceeds, *at the time the motion for turnover is filed*. In this case, Debtor was not in possession of the funds Trustee seeks, nor its proceeds, *when the motion for turnover was filed*."[101]

By contrast, the Tenth Circuit BAP reversed the bankruptcy court's decision in *In re Ruiz*, discussed in last year's Annual Survey. The BAP reasoned that, "[a]t any time prior to the filing of the petition, and up to the time the funds were withdrawn by the third parties to whom Debtors had written pre-petition checks, Debtors had the ability to withdraw all funds in their account, to close the account, to stop payment on any outstanding checks, and to transfer the funds from the account to another account. There [could] really be no question that these Debtors had nearly total control over these funds on the date they filed the petition, and this control extended through the following Monday for one check, Tuesday for two checks, and Wednesday for the last of those checks." That left "the final question of

---

[99] *In re Anderson*, 410 B.R. 289, 294 (Bankr.W.D.Mo. 2009).

[100] *In re Henson*, 449 B.R. 109, 111–112 (Bankr.D.Nev. 2011).

[101] *In re Henson*, 449 B.R. at 112–114 (emphasis supplied).

NORTON ANNUAL SURVEY OF BANKRUPTCY LAW, 2012 EDITION

### Bank and Checking Account Balances

The courts continue to consider the obligation of a debtor to turn over checking account balances as of the petition date, notwithstanding that uncashed checks might be presented against those accounts postpetition. As a general rule, "[f]unds in the debtors' checking account, upon which no checks have been written as of the date of the petition, are property of the estate."[99]

In *In re Henson* the trustee sought turnover from the debtor of funds held in her checking account on the petition date, which had been diminished by the bank's honoring postpetition checks that the debtor had written prepetition. The bankruptcy court held that checks "written pre-petition by Debtor became property of the estate because they had not been honored when Debtor filed for bankruptcy," but despite this conclusion, "because Debtor no longer had possession of the funds when the motion for turn-over was filed, Trustee could not compel turnover of the value of those funds pursuant to 11 U.S.C. § 542(a)." The trustee appealed.[100]

The district court considered the split in the Courts of Appeals, and affirmed. The court reasoned that, "[u]nder 11 U.S.C. § 542(a), a trustee may not compel turnover of property of the estate unless the entity against whom the trustee seeks turnover is in possession of the property sought, or its proceeds, *at the time the motion for turnover is filed*. In this case, Debtor was not in possession of the funds Trustee seeks, nor its proceeds, *when the motion for turnover was filed*."[101]

By contrast, the Tenth Circuit BAP reversed the bankruptcy court's decision in *In re Ruiz*, discussed in last year's Annual Survey. The BAP reasoned that, "[a]t any time prior to the filing of the petition, and up to the time the funds were withdrawn by the third parties to whom Debtors had written pre-petition checks, Debtors had the ability to withdraw all funds in their account, to close the account, to stop payment on any outstanding checks, and to transfer the funds from the account to another account. There [could] really be no question that these Debtors had nearly total control over these funds on the date they filed the petition, and this control extended through the following Monday for one check, Tuesday for two checks, and Wednesday for the last of those checks." That left "the final question of

---

[99] *In re Anderson*, 410 B.R. 289, 294 (Bankr.W.D.Mo. 2009).

[100] *In re Henson*, 449 B.R. 109, 111–112 (Bankr.D.Nev. 2011).

[101] *In re Henson*, 449 B.R. at 112–114 (emphasis supplied).

whether that control, which lasted for at least two days after the case was filed, constitute[d] control 'during the case,' which is required by § 542(a)." The BAP held that it did, and reversed.[102]

Simpler cases are those involving transfers of a debtor's funds to accounts controlled by the defendants to the turnover action, which are subject to turnover, as in the case of *In re Rood*.[103]

### Tax Payments and Refunds

The courts also continued to be concerned with tax payments and refunds.

In *In re McCrory* the primary issue presented was whether the debtor had an interest "in the entire $8,000 first-time homebuyer credit refunded to him and his non-debtor spouse after filing their joint 2010 federal income tax return." The second issue was "whether Debtor's non-debtor spouse ha[d] any interest in the total income tax refund received by them since no taxes were withheld from her income."[104] Generally, under Ohio law, which applied, neither spouse has any interest in the property of the other.[105] The court determined that the $8,000 first-time home-buyer credit was allowed only because the debtor and his wife filed a joint tax return. Had they each individually filed a sepa-rate return, they each would have been entitled to a $4,000 credit, notwithstanding that the debtor's wife paid no withholding or estimated taxes for the 2010 tax year. Thus, the court found that the debtor's wife had an interest in $4,000 of the $8,000 first-time homebuyer credit that was refunded, and that her interest was not property of the estate subject to turnover to the trustee.[106] By contrast, since there was no tax withheld from the debtor's wife's income, and her income alone resulted in no tax liability, the debtor had an interest in the entire portion of the tax refund attributed to overpayment of withholding taxes. Thus, the debtor's $4,000 share of the credit and the entire tax refund were subject to turnover by the debtor to the Chapter 7 trustee.[107]

In *In re Rynda*, the debtor came into possession of certain tax refunds during the case that arose from prepetition overpayment of taxes. The bankruptcy court ordered turnover, and the debtor

---

[102]*In re Ruiz*, 455 B.R. 745, 750. 755 (10th Cir. BAP 2011).

[103]*In re Rood*, 2011 WL 4459094 *17.

[104]*In re McCrory*, 2011 WL 4005455 *1 (Bankr.N.D.Ohio).

[105]*In re McCrory*, 2011 WL 4005455 *3.

[106]*In re McCrory*, 2011 WL 4005455 *4.

[107]*In re McCrory*, 2011 WL 4005455 *5.

appealed, contending that the turnover order "should be set aside because she accounted for the costs to prepare and file the tax returns, notified the Trustee she no longer possessed the Refunds, and offered the Trustee monthly payments to repay the amount of the Refunds." The debtor provided "no legal authority to support her argument that 'accounting for' the property" meant that she could "simply offer to pay the Trustee in whatever manner or time" she chose. The 9th Circuit BAP affirmed the bankruptcy court's turnover order.[108]

### Avoidable Transfers

Avoided transfers are subject to turnover, but the courts continue to divide on the question of whether a transfer that is merely avoidable is subject to turnover.

In *In re Innovative Communication Corp.* the court held that a Chapter 11 trustee who was pursuing turnover and avoidance was "pursuing alternative theories to achieve recovery based upon the same facts." Accordingly, he was not seeking inconsistent remedies and was not precluded from proceeding on both counts, based upon the election of remedies doctrine.[109]

Similarly, in *In re Garrison*, the trustee's counterclaim against the purported secured party sought both avoidance of that party's lien and turnover. The court found that the lien had not been perfected and ordered turnover.[110]

By contrast, the court in *In re Financial Resources Mortg., Inc.* held that the complaint sufficiently alleged an action for prepetition fraudulent transfers, but failed to state a claim for turnover, since the property was transferred prepetition and thus was not property of the estate.[111] This approach would appear to require a 2-step process—first obtaining a judgment on the avoidance actions, and second seeking turnover of such property in the defendant's possession or the value of such property if the defendant has disposed of it.

---

[108]*In re Rynda*, 2012 WL 603657 *2–3 (9th Cir.BAP).

[109]*In re Innovative Communication Corp.*, 2011 WL 3439291*4 (Bankr.D. Virgin Islands).

[110]*In re Garrison*, 2011 WL 5593025 *18 (Bankr.W.D.Ark.).

[111]*In re Financial Resources Mortg., Inc.*, 454 B.R. 6 (Bankr.D.N.H. 2011).

appealed, contending that the turnover order "should be set aside because she accounted for the costs to prepare and file the tax returns, notified the Trustee she no longer possessed the Refunds, and offered the Trustee monthly payments to repay the amount of the Refunds." The debtor provided "no legal authority to support her argument that 'accounting for' the property" meant she could "simply offer to pay the Trustee in whatever manner or time" she chose. The 9th Circuit BAP affirmed the bankruptcy court's turnover order.[108]

### Avoidable Transfers

Avoided transfers are subject to turnover, but the courts continue to divide on the question of whether a transfer that is merely avoidable is subject to turnover.

In *In re Innovative Communication Corp.* the court held that a Chapter 11 trustee who was pursuing turnover and avoidance was "pursuing alternative theories to achieve recovery based upon the same facts." Accordingly, he was not seeking inconsistent remedies and was not precluded from proceeding on both counts, based upon the election of remedies doctrine.[109]

Similarly, in *In re Garrison*, the trustee's counterclaim against the purported secured party sought both avoidance of that party's lien and turnover. The court found that the lien had not been perfected and ordered turnover.[110]

By contrast, the court in *In re Financial Resources Mortg., Inc.* held that the complaint sufficiently alleged an action for prepetition fraudulent transfers, but failed to state a claim for turnover, since the property was transferred prepetition and thus was not property of the estate.[111] This approach would appear to require a 2-step process—first obtaining a judgment on the avoidance actions, and second seeking turnover of such property in the defendant's possession or the value of such property if the defendant has disposed of it.

---

[108]*In re Rynda*, 2012 WL 603657 *2–3 (9th Cir.BAP).

[109]*In re Innovative Communication Corp.*, 2011 WL 3439291*4 (Bankr.D. Virgin Islands).

[110]*In re Garrison*, 2011 WL 5593025 *18 (Bankr.W.D.Ark.).

[111]*In re Financial Resources Mortg., Inc.*, 454 B.R. 6 (Bankr.D.N.H. 2011).

## Disputed Title and Disputed Claims

Code sections 542 and 543 "may not be used to determine the rights of parties, however, where the interest in property is disputed" or where the parties "dispute title to the assets."[112]

"Section 542 presumes the property sought to be turned over is clearly the property of the Debtor that simply is in the possession of another. A turnover proceeding cannot be used to determine 'rights of the parties in legitimate contract disputes.' "[113] In *In re Southern Hosiery Mill, Inc.* the trustee sought to recover the credit balance held by CIT, the debtor's factor. The court held that "the proper cause of action [was] a suit on the contract, the Factoring Agreement." Neither party specifically pled the contract claim. Each acknowledged that the debtor was owed a credit balance, but disagreed about whether certain commission fees, ledger debts and the factor's attorney's fees could be deducted from that sum. Accordingly, while the trustee's request for turnover of the credit balance was denied, and summary judgment was granted to CIT, the court "entertain[ed] the underlying contract claim."[114]

In *In re National Jockey Club*, the bankruptcy member of an LLC sought turnover from the LLC's president of funds that the president allegedly misappropriated. The bankruptcy court considered to the claim to be more in the nature of a breach of contract claim. The court stated that a "breach of contract action may not be transformed into an action for turnover," and that by asserting a turnover claim, the plaintiff had put "the cart before the horse." The plaintiff's assertion that its allegation that the president's alleged misappropriation of $1.2 million entitled it to recover those funds, even when backed by a resolution of the LLC's board, did "not create a legally enforceable obligation of the type contemplated by § 542(a). There is a difference between property potentially *owed to* a debtor and property *owned by* the debtor."[115] The court dismissed the turnover count with prejudice because the plaintiff had failed to allege "a basis upon which to

---

[112]*In re Moshannon Valley Citizens, Inc.*, 2009 WL 522906 *3 (Bankr.M.D. Pa. 2009).

[113]*In re Southern Hosiery Mill, Inc.*, 2011 WL 2651580 *6 (Bankr.W.D.N.C.), quoting *FLR Co. v. United States (In re FLR Co.)*, 58 B.R. 632, 634 (Bankr.W.D. Pa.1985).

[114]*In re Southern Hosiery Mill, Inc.*, 2011 WL 2651580 *6–7.

[115]*In re National Jockey Club*, 451 B.R. 825, 830 (Bankr.N.D.Ill. 2011).

believe the misappropriated funds were property of the estate on the date Debtor filed bankruptcy."[116]

In *In re Las Vegas Casino Lines, LLC* the debtor operated "cruises to nowhere," on which their customers could gamble beyond the three-mile territorial limit of U.S. coastal waters. The customers typically purchased gambling cards which denoted the balance available to the customer for further gambling, or which could be cashed out by the customer at the end of the cruise. One customer hit a completely unexpected jackpot, but not at the slots or the tables, when the debtor inadvertently issued to him a card with a $99,999,999.99 initial balance. The customer transferred money between that gambling card and other gambling cards that he had obtained from the debtor; "he put money on cards; he cashed out some portions of card balances; he purchased gambling tokens; and he tipped" the debtor's "employees with cash and gambling tokens," all while the ship was in waters beyond Florida's three-mile territorial limit."[117]

When the ship docked in at Port Canaveral, the customer's luck took a turn toward the losing side when the debtor's employees prevented him from leaving the disembarkation area and took him to the office of Mr. Giles Malone, the debtor's managing partner. The customer—a NASA employee—was inside Malone's office "for approximately two hours. Brevard County Sheriff's deputies stood outside the office while Malone and three others" in the debtor's employ accused the customer of using gambling cards to commit theft on the ship. The customer "felt remorseful and admitted some wrongdoing. He knew he had improperly used gambling cards and might have taken more money off the ship than he should have, but he thought [the debtor's] assertion that he had stolen $70,000.00 was outrageous. He felt threatened by the presence of the deputies" and by the debtor's "employees' references to the harm this could do to his career." The customer signed a written agreement to pay the debtor $70,000.00 "in order to avoid being arrested or fired." He and Malone left the office and went to the customer's home, where the customer gave Malone $15,100.00 in cash, a $9,900.00 check, and title to a car. The customer stopped payment on the check the next day.[118]

The customer denied that he owed the debtor any money. He correctly asserted, in the court's view, that "all of the alleged

---

[116] *In re National Jockey Club*, 451 B.R. 831.

[117] *In re Las Vegas Casino Lines, LLC*, 454 B.R. 223, 225 (Bankr.M.D.Fla. 2011).

[118] *In re Las Vegas Casino Lines, LLC*, 454 B.R. at 225–226.

believe the misappropriated funds were property of the estate on the date Debtor filed bankruptcy."[116]

In *In re Las Vegas Casino Lines, LLC* the debtor operated "cruises to nowhere," on which their customers could gamble beyond the three-mile territorial limit of U.S. coastal waters. The customers typically purchased gambling cards which denoted the balance available to the customer for further gambling, or which could be cashed out by the customer at the end of the cruise. One customer hit a completely unexpected jackpot, but not at the slots or the tables, when the debtor inadvertently issued to him a card with a $99,999,999.99 initial balance. The customer transferred money between that gambling card and other gambling cards that he had obtained from the debtor; "he put money on cards; he cashed out some portions of card balances; he purchased gambling tokens; and he tipped" the debtor's "employees with cash and gambling tokens," all while the ship was in waters beyond Florida's three-mile territorial limit."[117]

When the ship docked in at Port Canaveral, the customer's luck took a turn toward the losing side when the debtor's employees prevented him from leaving the disembarkation area and took him to the office of Mr. Giles Malone, the debtor's managing partner. The customer—a NASA employee—was inside Malone's office "for approximately two hours. Brevard County Sheriff's deputies stood outside the office while Malone and three others" in the debtor's employ accused the customer of using gambling cards to commit theft on the ship. The customer "felt remorseful and admitted some wrongdoing. He knew he had improperly used gambling cards and might have taken more money off the ship than he should have, but he thought [the debtor's] assertion that he had stolen $70,000.00 was outrageous. He felt threatened by the presence of the deputies" and by the debtor's "employees' references to the harm this could do to his career." The customer signed a written agreement to pay the debtor $70,000.00 "in order to avoid being arrested or fired." He and Malone left the office and went to the customer's home, where the customer gave Malone $15,100.00 in cash, a $9,900.00 check, and title to a car. The customer stopped payment on the check the next day.[118]

The customer denied that he owed the debtor any money. He correctly asserted, in the court's view, that "all of the alleged

---

[116]*In re National Jockey Club*, 451 B.R. 831.

[117]*In re Las Vegas Casino Lines, LLC*, 454 B.R. 223, 225 (Bankr.M.D.Fla. 2011).

[118]*In re Las Vegas Casino Lines, LLC*, 454 B.R. at 225–226.

theft occurred more than three miles off the shore of Florida, outside of Florida's territorial waters." Though he admitted that he wrongfully took $15,000.00 from the debtor, he contended that he satisfied that debt when he paid the debtor $15,000.000 and gave the debtor title to the car. He further argued that the agreement he signed in Malone's office was unenforceable because it was the product of extortion and lacked consideration by the customer.[119]

The court stated that turnover under section 542 "is an appropriate cause of action only where title to the tangible property or money due is not in dispute." The debtor relied on "the ship's records for its allegation it suffered damages of $86,000.00" through the customer's use of the gambling cards, and that the $86,000.00 was property of the bankruptcy estate subject to turnover. But the ship's records did not establish what funds of the debtor's, if any, the defendant had obtained through his use of the gambling cards. "There were hundreds of transactions on the cards with money flowing off and onto the cards. Some of the funds were [the customer's] winnings and cash infusions," and the customer disputed that he was liable to the debtor for $86,000.00. Since the debtor had failed to identify property in the customer's possession that was clearly property of the debtor, no action for turnover existed.[120]

In *In re Century City Doctors Hosp., LLC* the Chapter 7 trustee sought turnover, but "made no allegations in the complaint or submitted any evidence in opposition to the summary judgment motion to suggest that the transferred funds [were] *indisputably* estate property subject to the turnover requirements under section 542. To the contrary, the party from whom turnover was sought disputed that the trustee had "any right to the refund under any theory of recovery." Accordingly, the defendant was entitled to summary judgment on the section 542 count, "because there simply [was] no legal basis for a stand-alone 'turnover' claim in this case."[121]

See also the discussion of cases in § II, above, and § X of this article, below.

### Garnishment, Pawn Transactions, Repossession, Execution, Foreclosure, and Abandonment

The question of when in the course of a garnishment, pawn

---

[119] *In re Las Vegas Casino Lines, LLC*, 454 B.R. at 226.

[120] *In re Las Vegas Casino Lines, LLC*, 454 B.R. at 227–228.

[121] *In re Century City Doctors Hosp., LLC*, 466 B.R. 1, 19 (Bankr.C.D.Cal. 2012).

transaction, repossession, execution, or foreclosure proceeding property of the estate is metamorphosed into property of the lender, and accordingly is not subject to turnover, is a question of state law under *Butner v. U.S.*[122]

In *In re DiGregorio* the debtor's condominium association took away her condominium unit prepetition for her failure to pay her condominium assessments. Illinois law, which applied, permitted such actions by the association, and also provided that the debtor as unit owner "retain[ed], in addition to her ownership interest, the right to reclaim the unit by satisfying the final judgment pursuant to which the Order for Possession was entered and then having that judgment vacated."[123] The debtor commenced her Chapter 11 bankruptcy proceeding, and asserted that section 542 "restore[d] her right to possession in the unit," citing *Whiting Pools* for the proposition that the statute works to "bring into the estate property in which the debtor did not have a possessory interest at the time the bankruptcy proceedings commenced."[124] The *DiGregorio* court held that *Whiting Pools* was distinguishable, however, "because in that case no final judgment of any court had terminated Debtor's right to possession. In this case, the Debtor's property right to possession of her unit was terminated upon execution of the state court Order for Possession." This was not an interest that could "be reclaimed" by the debtor "under § 542 because it was terminated prebankruptcy by judgment subject to her right to pay the required money and get the judgment vacated."[125]

In *In re Bolton*, the Chapter 13 debtor sought turnover of her car that Quick Cash company had repossessed prepetition. The court concluded that, under applicable Mississippi law, the ownership of the debtor's car had been transferred by operation of law "such that only Bolton's right to redeem, not the vehicle itself," was included in property of the estate. Hence, the car was not subject to turnover and Quick Cash did not violate the stay by refusing to return it to vehicle to Bolton. The court further found that Bolton's right to redeem was exercisable only by payment in full on within the statutory redemption period, "not

---

[122]*Butner v. U.S.*, 440 U.S. 48, 99 S. Ct. 914, 59 L. Ed. 2d 136, 19 C.B.C. 481, Bankr. L. Rep. (CCH) P 67046 (1979).

[123]*In re DiGregorio*, 2011 WL 4494215 *4 (Bankr.N.D.Ill.).

[124]*In re DiGregorio*, 2011 WL 4494215 *4 (Bankr.N.D.Ill.), quoting *United States v. Whiting Pools*, 462 U.S. 198, 204, 103 S.Ct. 2309, 76 L.Ed.2d 515 (1983).

[125]*In re DiGregorio*, 2011 WL 4494215 *4 (Bankr.N.D.Ill.).

transaction, repossession, execution, or foreclosure proceeding property of the estate is metamorphosed into property of the lender, and accordingly is not subject to turnover, is a question of state law under *Butner v. U.S.*[122]

In *In re DiGregorio* the debtor's condominium association took away her condominium unit prepetition for her failure to pay her condominium assessments. Illinois law, which applied, permitted such actions by the association, and also provided that the debtor as unit owner "retain[ed], in addition to her ownership interest, the right to reclaim the unit by satisfying the final judgment pursuant to which the Order for Possession was entered and then having that judgment vacated."[123] The debtor commenced her Chapter 11 bankruptcy proceeding, and asserted that section 542 "restore[d] her right to possession in the unit," citing *Whiting Pools* for the proposition that the statute works to "bring into the estate property in which the debtor did not have a possessory interest at the time the bankruptcy proceedings commenced."[124] The *DiGregorio* court held that *Whiting Pools* was distinguishable, however, "because in that case no final judgment of any court had terminated Debtor's right to possession. In this case, the Debtor's property right to possession of her unit was terminated upon execution of the state court Order for Possession." This was not an interest that could "be reclaimed" by the debtor "under § 542 because it was terminated prebankruptcy by judgment subject to her right to pay the required money and get the judgment vacated."[125]

In *In re Bolton*, the Chapter 13 debtor sought turnover of her car that Quick Cash company had repossessed prepetition. The court concluded that, under applicable Mississippi law, the ownership of the debtor's car had been transferred by operation of law "such that only Bolton's right to redeem, not the vehicle itself," was included in property of the estate. Hence, the car was not subject to turnover and Quick Cash did not violate the stay by refusing to return it to vehicle to Bolton. The court further found that Bolton's right to redeem was exercisable only by payment in full on within the statutory redemption period, "not

---

[122]*Butner v. U.S.*, 440 U.S. 48, 99 S. Ct. 914, 59 L. Ed. 2d 136, 19 C.B.C. 481, Bankr. L. Rep. (CCH) P 67046 (1979).

[123]*In re DiGregorio*, 2011 WL 4494215 *4 (Bankr.N.D.Ill.).

[124]*In re DiGregorio*, 2011 WL 4494215 *4 (Bankr.N.D.Ill.), quoting *United States v. Whiting Pools*, 462 U.S. 198, 204, 103 S.Ct. 2309, 76 L.Ed.2d 515 (1983).

[125]*In re DiGregorio*, 2011 WL 4494215 *4 (Bankr.N.D.Ill.).

through her Chapter 13 plan." Should she fail to timely redeem, the court continued, she would forfeit her right to redeem and any potential interest in the vehicle, and Quick Cash would retain its absolute ownership interest in the vehicle under Mississippi state law. Accordingly, the complaint was denied "in that the right to redeem ha[d] not been exercised."[126]

See also In re Holiday Tree and Trim, Co. in this § VII, "Property of Others," below.

### Property in Trust or IRAs

A debtor's beneficial interest in a spendthrift trust is excluded from property of the estate under Code § 541(c)(2)[127] and thus is not subject to turnover under section 542 or 543.

In In re Stasz, the debtor had self-settled a trust prepetition and the trustee sought turnover. The bankruptcy court "found that the trust was either a sham, or that it had been rescinded before the filing of Stasz's bankruptcy petition."[128] Stasz appealed.

The BAP found that the trustee had "submitted evidence that all funds in the [trust] came from Stasz and that there had been no trustee of that trust since 2006. Together with the evidence that the trust did not comply with the requirements of Nevada law to establish a trust and that Stasz had contributed all funds in the trust," the BAP concluded "that the bankruptcy court did not err in determining that the [trust] was a sham."[129] The BAP further affirmed the bankruptcy court's holding that the debtor had rescinded the trust, based on Stasz's failure to dispute that determination in her brief, and on its concluding that such determination was law of the case, having been made previously by the bankruptcy court and affirmed by the BAP and the 9th Circuit, following which certiorari was denied by the Supreme Court.[130]

### Property of Others

Property of others is not property of the estate and thus is not subject to turnover.

Funds in escrow nonetheless may be property in which a debtor has an interest. In In re Holiday Tree and Trim, Co. the debtor sold certain property prepetition and voluntarily placed some of the sale proceeds in escrow for the benefit of Ms. Nancy Minchello

---

[126] In re Bolton, 2012 WL 27497 *7 (Bankr.S.D.Miss.).

[127] 11 U.S.C.A. § 541(c)(2).

[128] In re Stasz, 2011 WL 3299162 *4.

[129] In re Stasz, 2011 WL 3299162 *6.

[130] In re Stasz, 2011 WL 3299162 *7.

in connection with a dispute regarding a retirement agreement with her.[131]

Nancy commenced an action in the state court in an effort to obtain her interest in the proceeds, and obtained a judgment in her favor in the amount of $945,739.40. The accompanying letter opinion by the state court judge, however, "was limited to the issue of how much Nancy was owed." The state court "did not decide whether Nancy had a right to any specific funds," including the escrow account. At Ms. Minchello's request, the sheriff levied on the escrow account, and Ms. Minchello filed a motion for turnover of the funds in the state court. That motion was pending when the debtor filed its bankruptcy petition, and the debtor's trustee sought turnover of the funds.[132]

The court held that the prepetition state court levy did not cut off the debtor's equitable interest in the funds, and since the state court motion for turnover had not been decided at the time the debtor filed its petition the debtor "retained at the very least an equitable interest" in the escrow account as of the filing date. The court further held that the retirement agreement simply gave "Nancy a right to be paid. It [did] not make forty percent (40%) of the sale proceeds her property or grant her a security interest in those specific funds. The Debtor could have paid Nancy out of any source of funds. While the Court [was] sympathetic to her interest, Nancy [was] simply a general unsecured creditor under state law and the Bankruptcy Code." The escrow account was held in trust in the debtor's name "with no evidence that it was created for Ms. Minchello's sole or primary benefit." The court ordered turnover of the funds to the trustee.[133] below.

## Community Property; Prenuptial Agreements

Community property held by a debtor and his non-debtor spouse is property of the estate, subject to turnover, as was held by the bankruptcy court in *In re Mastro*.[134]

Prenuptial agreements may create property of a bankruptcy estate. In *In re Fritch* the debtor Sharon and her husband David Fritch entered into a prenuptial agreement and were married. David subsequently sought to dissolve the marriage, following which Sharon filed her Chapter 7 petition, and after that, the

---

[131]*In re Holiday Tree and Trim, Co.*, 2011 WL 1885688 *1 (Bankr.D.N.J.).

[132]*In re Holiday Tree and Trim, Co.*, 2011 WL 1885688 *2.

[133]*In re Holiday Tree and Trim, Co.*, 2011 WL 1885688 *3.

[134]*In re Mastro*, 2011 WL 4498834 *25–26 (Bankr.W.D.Wash.); *In re Mastro*, 2011 WL 5552949 *25–26 (Bkrtcy.W.D.Wash.).

NORTON ANNUAL SURVEY OF BANKRUPTCY LAW, 2012 EDITION

in connection with a dispute regarding a retirement agreement with her.[131]

Nancy commenced an action in the state court in an effort to obtain her interest in the proceeds, and obtained a judgment in her favor in the amount of $945,739.40. The accompanying letter opinion by the state court judge, however, "was limited to the issue of how much Nancy was owed." The state court "did not decide whether Nancy had a right to any specific funds," including the escrow account. At Ms. Minchello's request, the sheriff levied on the escrow account, and Ms. Minchello filed a motion for turnover of the funds in the state court. That motion was pending when the debtor filed its bankruptcy petition, and the debtor's trustee sought turnover of the funds.[132]

The court held that the prepetition state court levy did not cut off the debtor's equitable interest in the funds, and since the state court motion for turnover had not been decided at the time the debtor filed its petition the debtor "retained at the very least an equitable interest" in the escrow account as of the filing date. The court further held that the retirement agreement simply gave "Nancy a right to be paid. It [did] not make forty percent (40%) of the sale proceeds her property or grant her a security interest in those specific funds. The Debtor could have paid Nancy out of any source of funds. While the Court [was] sympathetic to her interest, Nancy [was] simply a general unsecured creditor under state law and the Bankruptcy Code." The escrow account was held in trust in the debtor's name "with no evidence that it was created for Ms. Minchello's sole or primary benefit." The court ordered turnover of the funds to the trustee.[133] below.

## Community Property; Prenuptial Agreements

Community property held by a debtor and his non-debtor spouse is property of the estate, subject to turnover, as was held by the bankruptcy court in *In re Mastro*.[134]

Prenuptial agreements may create property of a bankruptcy estate. In *In re Fritch* the debtor Sharon and her husband David Fritch entered into a prenuptial agreement and were married. David subsequently sought to dissolve the marriage, following which Sharon filed her Chapter 7 petition, and after that, the

---

[131]*In re Holiday Tree and Trim, Co.*, 2011 WL 1885688 *1 (Bankr.D.N.J.).

[132]*In re Holiday Tree and Trim, Co.*, 2011 WL 1885688 *2.

[133]*In re Holiday Tree and Trim, Co.*, 2011 WL 1885688 *3.

[134]*In re Mastro*, 2011 WL 4498834 *25–26 (Bankr.W.D.Wash.); *In re Mastro*, 2011 WL 5552949 *25–26 (Bkrtcy.W.D.Wash.).

state court entered its order dissolving the marriage. The trustee sought turnover of the amount to which the debtor was entitled under the prenuptial agreement.[135]

The bankruptcy court found that, "[b]ecause a marital estate is created upon the filing of a petition for dissolution of marriage in Indiana, . . . the Debtor's interest in the proceeds from the prenuptial agreement constituted a legal and/or equitable interest in property as of the commencement of the case regardless of when the divorce became final." Accordingly, the debtor's interest in the prenuptial agreement in the amount of $130,000.00 was property of the bankruptcy estate and subject to turnover.[136]

## VIII.   Section 542(a)—Deliver to the Trustee and Account for the Property or the Value of Such Property in Possession, Custody, or Control During the Case of the Entity, Other Than a Custodian, from Whom Turnover is Sought

The party from whom turnover is sought under section 542(a) must be "in possession, custody, or control, during the case, of the property,"[137] that is, at some point "during the case."[138]

Possession at some time during the case is essential if the turnover action is to succeed. In *In re Indian Capitol Distributing, Inc.* the court stated that, despite its "distrust of Defendant's

---

[135]*In re Fritch*, 2011 WL 2181661 *1 (Bankr.S.D.Ind.).

[136]*In re Fritch*, 2011 WL 2181661 *4.

[137]11 U.S.C.A. § 542(a). In addition, the party may not be a custodian. Turnover from a custodian is pursuant to section 543 as discussed in § XIII of this article.

[138]*In re JMC Telecom LLC*, 416 B.R. 738, 745 (C.D.Cal.,2009) (account into which funds, turnover of which was sought, were deposited was closed in 2000; bankruptcy case commenced in 2007; party from whom turnover was sought was never in custody, control or possession of the funds during the case). *See also, In re Bancredit Cayman Ltd.*, 419 B.R. 898, 917 (Bankr.S.D.Fla. 2009) ("Even if the Plaintiff had a viable claim against the Defendant arising from the allegedly unauthorized Funds Transfer, the Defendant never had funds in its possession that would have been subject to turnover under 11 U.S.C. § 542."); *In re Schneider*, 417 B.R. 907, 919–920 (Bankr.N.D.Ill. 2009) ("There is no evidence in the record, however, that [the defendant] was in possession of any of the Artwork and Furnishings at any time during the pendency of the bankruptcy case. Indeed, the Trustee state[d] in his post-trial brief that '[t]here is no evidence at all that the [Artwork and Furnishings] has ever been in the possession of anyone but the Debtor.' The Trustee has not shown that [the defendant] was in possession of the Artwork and Furnishings at any time since the Petition Date. The Trustee has therefore failed to demonstrate one required element of his turnover claim. Accordingly, judgment will be entered in [the defendant's] favor on Count IV.").

979

testimony, it was consistent in two respects: 1) he claimed to have no idea where the vehicles were and 2) he was very clear that they were not in his possession." Though the plaintiff "did a great job documenting what Defendant had or should have had in his possession or control before the bankruptcy case, . . . there was nothing that showed he had control or possession after the filing of the case." Therefore, the court was compelled to enter judgment in favor of the defendant and dismiss the plaintiff's case with prejudice.[139]

In *In re Financial Resources Mortg., Inc.* the court held that because the complaint lacked any allegations that, "as of the commencement of the case, the Debtors had any legal or equitable interests in the property the Trustee" sought "to include as part of the Debtors' bankruptcy estates," and because, in fact, the complaint alleged that the property at issue hadbeen transferred by the debtors prepetition, the court found that that count of the complaint failed to state a claim under § 541(a) and § 542(a) upon which relief could be granted."[140]

Similarly, in *In re Asif*, the only evidence presented at trial was the funds sought to be turned over were used by the debtor to repay personal loans to friends who had lent him money. The trustee had not advanced any other basis for judgment in the amount sought, and did not show that the debtor had these funds, or any other unreported assets, in his possession on the date of filing. Therefore, the court found there was no basis for awarding the trustee a monetary judgment.[141]

In *In re Rood*, the bankruptcy court held that funds in the defendant's possession at any time during the case are subject to turnover, "provided that they still exist and can be located."[142] The court clarified that the "trustee is not limited to recovering specific property or its proceeds. Instead, the trustee is also given the ability to recover 'the value of such property.' Defendants cannot equate 'the absence of present possession with the absence of liability, as this would require the court to disregard the language of section 542(a) which makes the statute applicable to anyone who possessed property of the estate during the case

---

[139]*In re Indian Capitol Distributing, Inc.*, 2011 WL 4543954 *3 (Bankr.D.N. M.).

[140]*In re Financial Resources Mortg., Inc.*, 454 B.R. at 15–16.

[141]*In re Asif*, 455 B.R. at 798.

[142]*In re Rood*, 2011 WL 4459094 *17.

testimony, it was consistent in two respects: 1) he claimed to have no idea where the vehicles were and 2) he was very clear that they were not in his possession." Though the plaintiff "did a great job documenting what Defendant had or should have had in his possession or control before the bankruptcy case, . . . there was nothing that showed he had control or possession after the filing of the case." Therefore, the court was compelled to enter judgment in favor of the defendant and dismiss the plaintiff's case with prejudice.[139]

In *In re Financial Resources Mortg., Inc.* the court held that because the complaint lacked any allegations that, "as of the commencement of the case, the Debtors had any legal or equitable interests in the property the Trustee" sought "to include as part of the Debtors' bankruptcy estates," and because, in fact, the complaint alleged that the property at issue hadbeen transferred by the debtors prepetition, the court found that that count of the complaint failed to state a claim under § 541(a) and § 542(a) upon which relief could be granted."[140]

Similarly, in *In re Asif*, the only evidence presented at trial was the funds sought to be turned over were used by the debtor to repay personal loans to friends who had lent him money. The trustee had not advanced any other basis for judgment in the amount sought, and did not show that the debtor had these funds, or any other unreported assets, in his possession on the date of filing. Therefore, the court found there was no basis for awarding the trustee a monetary judgment.[141]

In *In re Rood*, the bankruptcy court held that funds in the defendant's possession at any time during the case are subject to turnover, "provided that they still exist and can be located."[142] The court clarified that the "trustee is not limited to recovering specific property or its proceeds. Instead, the trustee is also given the ability to recover 'the value of such property.' Defendants cannot equate 'the absence of present possession with the absence of liability, as this would require the court to disregard the language of section 542(a) which makes the statute applicable to anyone who possessed property of the estate during the case

---

[139]*In re Indian Capitol Distributing, Inc.*, 2011 WL 4543954 *3 (Bankr.D.N.M.).

[140]*In re Financial Resources Mortg., Inc.*, 454 B.R. at 15–16.

[141]*In re Asif*, 455 B.R. at 798.

[142]*In re Rood*, 2011 WL 4459094 *17.

and gives the trustee the ability to recover 'the value of such property.' "[143]

Some courts have concluded that, notwithstanding the clear language of the statute, property that comes into a third party's possession after the commencement of the case is not subject to turnover. In *In re Minh Vu Hoang* the debtor had hidden real estate in various partnerships prior to the commencement of her bankruptcy case. Certain of the real estate was sold postpetition without disclosure to or authorization by the court. The Chapter 7 trustee sought turnover of the proceeds of sale from a title company, a law firm and other defendants. The bankruptcy court held that section 542 is limited in its application to property that is in the defendant's possession at the time of the filing of the bankruptcy case, and denied turnover, noting nonetheless that "the issue of whether § 542 can be applied to a post-petition transfer is not free from doubt."[144]

The court in *In re Olson* stated the Eighth Circuit's rule, that "an entity lacking possession of the property or its proceeds *at the time of a turnover demand* cannot be the subject of a motion to compel turnover,"[145] which would appear to be at odds with the plain language of section 542(a).

### Deliver to the Trustee Property or the Value of Such Property

Most courts have held that the defendant must have possessed at some time in the case the property turnover of which is sought, and that even if the property itself has been transferred or dissipated, the value may be recovered under section 542(a).

The court in *In re Stewart* held that, "[i]f property that should have been turned over but wasn't is subsequently spent or dissipated, a trustee may nevertheless recover the 'value of such property.' "[146]

In *In re Ostendorf*, the debtor's stock that was subject to turnover to the Chapter 7 trustee increased in value after the petition date, at which time the debtor sold some of it. The debtor delivered to the trustee not the appreciated value as of the sale date, but the lower value as of the petition date. The trustee

---

[143] *In re Rood*, 2011 WL 4459094 *17, quoting *In re USA Diversified Prods., Co.*, 193 B.R. 868, 878 (BC.N.D.Ind.1995).

[144] *In re Minh Vu Hoang*, 2011 WL 3879493 *2 (Bankr.D.Md.).

[145] *In re Olson*, 2011 WL 6010226 *2 (Bankr.D.Neb.) (emphasis added), citing *In re Pyatt*, 486 F.3d 423, 429 (8th Cir. 2007).

[146] *In re Stewart*, 452 B.R. 726, 744 (Bankr.C.D.Ill. 2011).

sought turnover of the full value. The court found that the debtor had "attempted to thwart the trustee's efforts by selling some of the stock and paying the estate less than the current value thereof. By doing so, Debtor ha[d] ignored the fact that only the trustee ha[d] the right to determine, with court approval, whether and when to sell the property." The court ordered turnover of the remaining stock and the full appreciated value of the stock that had been sold.[147]

The reverse is also true, as shown by *In re Mastro*. If the proceeds subject to turnover arose from the transfer of fully encumbered property, then the value subject to turnover is zero.[148]

See also *In re Henson* and *In re Ruiz*, discussed in § VII, "Bank and Checking Account Balances," above, *In re Rynda* discussed in § VII, "Tax Payments and Refunds," above, and *In re American Home Mortg. Holding* discussed in § X, below.

### Action for Accounting

Section 542(a) also requires an entity to account for property subject to turnover.[149]

Seeking an accounting under section 542(a) is preferable to seeking an equitable accounting under state or common law, since any equitable remedy "requires the absence of an adequate remedy at law." The court in *In re Rood* held that its having ordered the turnover constituted such an adequate remedy and denied the plaintiff's request for an accounting.[150]

See also *In re Rynda* discussed in § VII, "Tax Payments and Refunds," above, regarding a debtor's inability to use an accounting offensively to pay in installments the amounts ordered to be turned over to the trustee.

A custodian also is obligated to account, under section 543.

## IX. Unless Such Property is of Inconsequential Value or Benefit to the Estate

Section 542(a) does not require turnover of "property that is of inconsequential value or benefit to the estate."[151]

In *In re C.W. Min. Co.* the Chapter 7 trustee sought recovery of $384,000 that the debtor had deposited with its bank to secure a

---

[147]*In re Ostendorf*, 2011 WL 1060992 (Bankr.D.Neb.).

[148]*In re Mastro*, 2011 WL 5552949 *26.

[149]11 U.S.C.A. § 542(a).

[150]*In re Rood*, 2011 WL 4459094 *17.

[151]11 U.S.C.A. § 542(a).

sought turnover of the full value. The court found that the debtor had "attempted to thwart the trustee's efforts by selling some of the stock and paying the estate less than the current value thereof. By doing so, Debtor ha[d] ignored the fact that only the trustee ha[d] the right to determine, with court approval, whether and when to sell the property." The court ordered turnover of the remaining stock and the full appreciated value of the stock that had been sold.[147]

The reverse is also true, as shown by *In re Mastro*. If the proceeds subject to turnover arose from the transfer of fully encumbered property, then the value subject to turnover is zero.[148]

See also *In re Henson* and *In re Ruiz*, discussed in § VII, "Bank and Checking Account Balances," above, *In re Rynda* discussed in § VII, "Tax Payments and Refunds," above, and *In re American Home Mortg. Holding* discussed in § X, below.

## Action for Accounting

Section 542(a) also requires an entity to account for property subject to turnover.[149]

Seeking an accounting under section 542(a) is preferable to seeking an equitable accounting under state or common law, since any equitable remedy "requires the absence of an adequate remedy at law." The court in *In re Rood* held that its having ordered the turnover constituted such an adequate remedy and denied the plaintiff's request for an accounting.[150]

See also *In re Rynda* discussed in § VII, "Tax Payments and Refunds," above, regarding a debtor's inability to use an accounting offensively to pay in installments the amounts ordered to be turned over to the trustee.

A custodian also is obligated to account, under section 543.

## IX.  Unless Such Property is of Inconsequential Value or Benefit to the Estate

Section 542(a) does not require turnover of "property that is of inconsequential value or benefit to the estate."[151]

In *In re C.W. Min. Co.* the Chapter 7 trustee sought recovery of $384,000 that the debtor had deposited with its bank to secure a

---

[147]*In re Ostendorf*, 2011 WL 1060992 (Bankr.D.Neb.).

[148]*In re Mastro*, 2011 WL 5552949 *26.

[149]11 U.S.C.A. § 542(a).

[150]*In re Rood*, 2011 WL 4459094 *17.

[151]11 U.S.C.A. § 542(a).

letter of credit that the bank issued to a third party. The transaction was structured by the bank's delivering a certificate of deposit to the debtor that the debtor then assigned to the bank. The certificate of deposit was cross-collaterized to secure the debtor's other loan obligations to the bank.[152] The debtor filed its Chapter 11 petition, and its case was converted to Chapter 7. The bank did not renew the letter of credit, and postpetition it "liquidated" the certificate of deposit and applied the proceeds in partial payment of the loan. The Chapter 7 trustee filed a complaint seeking turnover and recovery of the funds.[153] The court held that the bank was not required to turn over the funds because the certificate of deposit was fully encumbered at the time it was liquidated, the debtor had no equity in it, and thus it was of inconsequential value to the estate.[154]

The bankruptcy court in *In re Iuliano* also held that fully encumbered property, in which the debtor has no equity, is of inconsequential value and is not subject to turnover. Simply put, "[w]here there is no equity, it makes no sense for a Bankruptcy Court to order the surrender of possession of property to the Trustee."[155]

See also *In re DBSI, Inc.*, discussed in § VII, "Property That the Debtor May Use, Lease, Sell or Exempt," and *In re Mastro*, discussed in § VIII, "Deliver to the Trustee Property or the Value of Such Property," above.

## X.  Section 542(b)—Debts Matured or Payable on Demand or Order But § 542 not Available to Liquidate Disputed Contract Claims

Bankruptcy Code section 542(b) provides that, subject to the exceptions in section 542(c) and (d) and to offset under section 553, "an entity that owes a debt that is property of the estate and that is matured, payable on demand, or payable on order, shall pay such debt to, or on the order of, the trustee."[156] "The terms 'matured, payable on demand, or payable on order' create a strong textual inference than an action should be regarded as a turn-

---

[152]*In re C.W. Min. Co.*, 2011 WL 4597443 *1 (Bankr.D.Utah).

[153]*In re C.W. Min. Co.*, 2011 WL 4597443 *2.

[154]*In re C.W. Min. Co.*, 2011 WL 4597443 *4, n. 30, *11.

[155]*In re Iuliano*, 2011 WL 1627172 *3 (M.D.Fla.).

[156]11 U.S.C.A. § 542(b).

over only when there is no legitimate dispute over what is owed to the debtor."[157]

The court in *In re Randolph Towers Cooperative, Inc.* held that an action for turnover of a bank account must be brought under section 542(b). The court further noted that section 542(a) governs the turnover of tangible personal property.[156]

In *In re Smith*, the trustee sought payment on a note that was made to the debtor in connection with the buyout of his membership interest in an LLC that was developing a real estate project. The defendants argued that they were excused from making any further payments under the note because the debtor had materially breached a non-disparagement clause in his agreement with the defendants entered into on the date that the note was made.[159] The court found that the debtor had not breached the agreement, and even if he had, that such breach did not constitute grounds for not paying on the note, and ordered turnover of the amount due.[160]

By comparison, the defendant in *In re Las Vegas Casino Lines, LLC*, also discussed in § VII above, disputed the enforceability of the note he signed promising to pay $70,000.00 to the plaintiff "because it was the product of extortion and lacked consideration." Because the plaintiff had failed to establish that the defendant owed an undisputed debt to the plaintiff that was property of the bankruptcy estate, the court held that no action for turnover existed under section 542(b).[161]

The Eighth Circuit BAP in *In re Falzerano* held that "§ 542(b) applies only to debts that are 'matured, payable on demand, or payable on order.' An action to collect a disputed debt based on unjust enrichment is not any of these."[162]

Similarly, in *In re Heller Ehrman LLP*, also discussed in § II, "Jurisdiction—Generally," above, the court held that, whatever the label, the action was "not an action for turnover of estate property." Essentially, it was an action to recover an account receivable, for breach of contract and quantum meruit. "Turnover actions involve the 'return of undisputed funds.' " The defendants

---

[157]*In re Andrew Velez Const., Inc.*, 373 B.R. 262, 273 (Bankr. S.D. N.Y. 2007) (quoting *In re CIS Corp.*, 172 B.R. 748, 760 (S.D. N.Y. 1994)).

[158]*In re Randolph Towers Cooperative, Inc.*, 2011 WL 2940664 *3.

[159]*In re Smith*, 2011 WL 2518890 *1–3 (Bankr.D.Colo.).

[160]*In re Smith*, 2011 WL 2518890 *4–5.

[161]*In re Las Vegas Casino Lines, LLC*, 454 B.R. at 228.

[162]*In re Falzerano*, 454 B.R. 81, 84–85 (8th Cir. BAP 2011).

over only when there is no legitimate dispute over what is owed to the debtor."[157]

The court in *In re Randolph Towers Cooperative, Inc.* held that an action for turnover of a bank account must be brought under section 542(b). The court further noted that section 542(a) governs the turnover of tangible personal property.[158]

In *In re Smith*, the trustee sought payment on a note that was made to the debtor in connection with the buyout of his membership interest in an LLC that was developing a real estate project. The defendants argued that they were excused from making any further payments under the note because the debtor had materially breached a non-disparagement clause in his agreement with the defendants entered into on the date that the note was made.[159] The court found that the debtor had not breached the agreement, and even if he had, that such breach did not constitute grounds for not paying on the note, and ordered turnover of the amount due.[160]

By comparison, the defendant in *In re Las Vegas Casino Lines, LLC*, also discussed in § VII above, disputed the enforceability of the note he signed promising to pay $70,000.00 to the plaintiff "because it was the product of extortion and lacked consideration." Because the plaintiff had failed to establish that the defendant owed an undisputed debt to the plaintiff that was property of the bankruptcy estate, the court held that no action for turnover existed under section 542(b).[161]

The Eighth Circuit BAP in *In re Falzerano* held that "§ 542(b) applies only to debts that are 'matured, payable on demand, or payable on order.' An action to collect a disputed debt based on unjust enrichment is not any of these."[162]

Similarly, in *In re Heller Ehrman LLP*, also discussed in § II, "Jurisdiction—Generally," above, the court held that, whatever the label, the action was "not an action for turnover of estate property." Essentially, it was an action to recover an account receivable, for breach of contract and quantuum meruit. "Turnover actions involve the 'return of undisputed funds.'" The defendants

---

[157]*In re Andrew Velez Const., Inc.*, 373 B.R. 262, 273 (Bankr. S.D. N.Y. 2007) (quoting *In re CIS Corp.*, 172 B.R. 748, 760 (S.D. N.Y. 1994)).

[158]*In re Randolph Towers Cooperative, Inc.*, 2011 WL 2940664 *3.

[159]*In re Smith*, 2011 WL 2518890 *1–3 (Bankr.D.Colo.).

[160]*In re Smith*, 2011 WL 2518890 *4–5.

[161]*In re Las Vegas Casino Lines, LLC*, 454 B.R. at 228.

[162]*In re Falzerano*, 454 B.R. 81, 84–85 (8th Cir. BAP 2011).

disputed liability to Heller. The estate's property was "the claim for damages itself, which [was] not subject to turnover. There [was] no specific, identifiable fund belonging to Heller in Defendants' possession. A suit by a debtor against a non-creditor arising out of breach of contract," absent more than had been alleged by Heller, was "not a turnover action under "§ 542."[163]

The debtor in possession in *In re American Home Mortg. Holding* sought turnover by adversary proceeding of funds that it alleged were its property. The debtor alleged that the funds had been transferred from the debtor's account to an account of a co-member of an LLC in which the debtor also was a member, and that the funds were in the possession of the defendants, the co-member and the co-member's president. The defendants moved to dismiss. The bankruptcy court noted that "Section 542 of the Bankruptcy Code provides the cause of action for turnover, which requires an entity in possession of property of the estate to deliver the property, or value thereof, to the trustee. A properly pled complaint asserting a claim for turnover must allege an undisputed right to recover the claimed debt. Turnover is not appropriate where there is a legitimate dispute over ownership of the property." Accepting the "allegations as true and all inferences in the light most favorable" to the debtor, the debtor had "sufficiently pled a cause of action for turnover." The debtor "had alleged that its funds were held in its member's" account and in a second account, and that the co-member and the president were in possession of the funds and that they had no right to such possession. The complaint failed to "indicate or imply any dispute over ownership" of the funds. While a legitimate dispute might have existed, the motion to dismiss was "limited to the facts alleged in the complaint." The court denied the motion to dismiss as to the turnover count.[164]

Further, if the court can resolve the underlying claim in favor of the trustee or debtor in possession seeking turnover, it is a more efficient use of judicial resources for the court to order turnover in connection with its judgment on that claim. The court in *In re Dorsey* followed this path, finding that the trustee had proven that the debtor's property transfers to his wife in the six years preceding the bankruptcy case were done "with the actual intent to hinder, delay, and defraud his creditors" under state law, and that the facts proved constructive fraud under state law

---

[163] *In re Heller Ehrman LLP*, 2011 WL 3878347 *1.

[164] *In re American Home Mortg. Holding*, 2011 WL 4863894 *3 (Bankr.D. Del.).

in regards to those transfers. As such, the transfers being fraudulent were avoided under state law. Accordingly, the court ordered that the property of the voided transfers be turned over to the trustee for sale pursuant sections 542 and 363(h).[165]

In *Martin v. DirectBuy, Inc.*, the complaint was labeled as a turnover complaint. The court determined that they were in actually breach of contract claims and dismissed that count of the complaint, but gave the plaintiff the opportunity to amend the complaint to plead that count as a breach of contract claim.[166]

In *In re All Season Gallery, Inc.* the trustee sought turnover on what was essentially a claim for an unpaid invoice. The complaint did not specify whether the action was brought under section 542(a) or section 542(b). The defendant disputed that the amount was payable. Rather than dismiss the action as inappropriate for turnover, the court held a trial, determined the matter on its merits, and dismissed the trustee's action.[167]

In *In re Al Muehlberger Concrete Const., Inc.* the debtor sought turnover of amounts it claimed were owing on a constrtction contract, and moved for summary judgment. The debtor, again, did not specify whether the action was brought under section 542(a) or section 542(b). The court found that there were facts in dispute, and denied the debtor's summary judgment motion.[168]

See also *In re AFY, Inc.*, discussed in § II, "Jurisdiction—Generally," above, in which the court held that even a request for turnover of a debt that is property of the estate and that is matured, payable on demand, or payable on order, is not subject to the bankruptcy court's core jurisdiction.

See also *In re Randolph Towers Cooperative, Inc.* discussed in § IV, above.

See also cases discussed in § VII, "Disputed Title and Disputed Claims," above.

## XI. Section 542(c)—the "Good Faith" Exception to Turnover

Bankruptcy Code section 542(c) provides that:
Except as provided in § 362(a)(7) of this title [setoffs of prepetition debts owing to a debtor against any claim against a debtor are

---

[165] *In re Dorsey*, 2011 WL 2313158 *16 (Bankr.M.D.Ala.).

[166] *Martin v. DirectBuy, Inc.*, 2011 WL 5101913 *3 (N.D.Ind.).

[167] *In re All Season Gallery, Inc.*, 2011 WL 710461 (Bankr.E.D.N.Y.).

[168] *In re Al Muehlberger Concrete Const., Inc.*, 2011 WL 560483 (Bankr.D. Kan.).

NORTON ANNUAL SURVEY OF BANKRUPTCY LAW, 2012 EDITION

in regards to those transfers. As such, the transfers being fraudulent were avoided under state law. Accordingly, the court ordered that the property of the voided transfers be turned over to the trustee for sale pursuant sections 542 and 363(h).[165]

In *Martin v. DirectBuy, Inc.*, the complaint was labeled as a turnover claim. The court determined that they were in actually breach of contract claims and dismissed that count of the complaint, but gave the plaintiff the opportunity to amend the complaint to plead that count as a breach of contract claim.[166]

In *In re All Season Gallery, Inc.* the trustee sought turnover on what was essentially a claim for an unpaid invoice. The complaint did not specify whether the action was brought under section 542(a) or section 542(b). The defendant disputed that the amount was payable. Rather than dismiss the action as inappropriate for turnover, the court held a trial, determined the matter on its merits, and dismissed the trustee's action.[167]

In *In re Al Muehlberger Concrete Const., Inc.* the debtor sought turnover of amounts it claimed were owing on a construtction contract, and moved for summary judgment. The debtor, again, did not specify whether the action was brought under section 542(a) or section 542(b). The court found that there were facts in dispute, and denied the debtor's summary judgment motion.[168]

See also *In re AFY, Inc.*, discussed in § II, "Jurisdiction—Generally," above, in which the court held that even a request for turnover of a debt that is property of the estate and that is matured, payable on demand, or payable on order, is not subject to the bankruptcy court's core jurisdiction.

See also *In re Randolph Towers Cooperative, Inc.* discussed in § IV, above.

See also cases discussed in § VII, "Disputed Title and Disputed Claims," above.

## XI. Section 542(c)—the "Good Faith" Exception to Turnover

Bankruptcy Code section 542(c) provides that:

Except as provided in § 362(a)(7) of this title [setoffs of prepetition debts owing to a debtor against any claim against a debtor are

[165]*In re Dorsey*, 2011 WL 2313158 *16 (Bankr.M.D.Ala.).

[166]*Martin v. DirectBuy, Inc.*, 2011 WL 5101913 *3 (N.D.Ind.).

[167]*In re All Season Gallery, Inc.*, 2011 WL 710461 (Bankr.E.D.N.Y.).

[168]*In re Al Muehlberger Concrete Const., Inc.*, 2011 WL 560483 (Bankr.D.Kan.).

986

subject to the automatic stay], an entity that has neither actual notice nor actual knowledge of the commencement of the case concerning the debtor may transfer property of the estate, or pay a debt owing to the debtor, in good faith and other than in the manner specified in subsection (d) of this section, to an entity other than the trustee, with the same effect as to the entity making such transfer or payment as if the case under this title concerning the debtor had not been commenced.[169]

The author is not aware of any cases involving the "good faith" exception since last year's Annual Survey.

## XII.  Section 542(e)—Obligation to Turn Over Recorded Information

Bankruptcy Code section 542(e) provides that "[s]ubject to any applicable privilege, after notice and a hearing, the court may order an attorney, accountant, or other person that holds recorded information, . . . to turn over or disclose such recorded information to the trustee."[170]

The court in *In re Marathe* noted that it had "abundant legal authority to order the retrieval of information concerning a debtor and his estate from persons and entities who are not parties in a bankruptcy case, i.e., persons or entities who have neither filed a voluntary petition under 11 U.S.C. § 301 nor filed a proof of claim or interest under § 501."[171]

In *In re Hotels Nevada, LLC*, the trustee sought turnover of client files held by the debtors' outside counsel. The court found that there was "no doubt" that the law firm represented the debtors and held recorded information about them. There also was no doubt that under Nevada law, which governed, clients such as the debtors "have a property right in their attorneys' files," and under Nevada law "the file amassed by an attorney in representing a client belongs to the client." The court also noted that even attorney notes and research memoranda that were prepared in representing the debtors are property of the estate under section 541.[172]

Section 542(e), however, qualifies the trustee's powers. The ability to compel turnover is subject to any applicable privilege. The law firm asserted "the privilege of a nondebtor in the files and items." The court observed that this was not the situation

[169]11 U.S.C.A. § 542(c).

[170]11 U.S.C.A. § 542(e).

[171]*In re Marathe*, 459 B.R. 850, 859 (Bankr.M.D.Fla. 2011), citing § 542.

[172]*In re Hotels Nevada, LLC*, 2011 WL 4344551 *3 (Bankr.D.Nev.).

"Congress had in mind when qualifying the turnover obligation. Section 542(e)'s legislative history suggests that it 'was designed to prevent attorneys and accountants from coercing debtors to pay claims in full ahead of other creditors.' "[173]

The court found that the law firm had "failed in at least three showings." It had not shown that the joint-client privilege applied to the items it sought to shield from turnover. It had not shown that, even if the joint-client privilege did apply, why that privilege precluded the trustee, "as the debtors' successor," from obtaining items to which the debtors were privy and which were claimed privileged. Finally, the firm had not shown that the adversary exception to the joint-client privilege did not apply on these facts. Finally, as "a separate and sufficient holding," even if the firm had shown that the joint-client privilege applied, it had not met its burden to demonstrate that the individual items on the privilege log produced were protected by the privilege. The court ordered the firm to turn over all documents referred to in the privilege log.[174]

The court in *In re Crescent Resources, LLC* noted that "upon filing bankruptcy, control of the company changed from the former owners . . . to the new bankruptcy estate. The privilege then passed to the Litigation Trust by operation of the plan of reorganization."[175] The *Crescent* court also considered the applicability of a joint-privilege asserted by the debtor's parent on the litigation trustee's turnover request. The court found a joint representation and privilege between the debtor and its parent with respect to certain transactions with respect to which the files were sought. The court held that the litigation trust could "not unilaterally waive the joint-client privilege and use jointly privileged information in proceedings involving third parties, absent a waiver" from the parent, but could use the files in matters between the parent and the trust.[176]

In *In re Michael S. Goldberg, L.L.C.* the trustee sought turnover of certain financial records delivered to a divorce mediator.

---

[173] *In re Hotels Nevada, LLC*, 2011 WL 4344551 *3, citing *In re Norsom Med. Ref. Lab., Inc.*, 10 B.R. 165, 168 (Bankr.N.D.Ill.1981); H. REP. NO. 95–595, at 369–70 (1977), reprinted in 1978 U.S.C.C.A.N. 5963, 6325–26; S. REP. NO. 95-989, at 84 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 5870; *Am. Metrocomm Corp. v. Duane Morris & Heckscher LLP (In re American Metrocomm Corp.)*, 274 B.R. 641, 652 (Bankr.D.Del.2002); and *In re Highland Park Assoc. Ltd. P'ship.*, 132 B.R. 358, 358 (Bankr.N.D.Ill.1991).

[174] *In re Hotels Nevada, LLC*, 2011 WL 4344551 *14–15.

[175] *In re Crescent Resources, LLC*, 2011 WL 3022554 *18 (Bankr.W.D.Tex.).

[176] *In re Crescent Resources, LLC*, 2011 WL 3022554 *22.

"Congress had in mind when qualifying the turnover obligation. Section 542(e)'s legislative history suggests that it 'was designed to prevent attorneys and accountants from coercing debtors to pay claims in full ahead of other creditors.' "[173]

The court found that the law firm had "failed in at least three showings." It had not shown that the joint-client privilege applied to the items it sought to shield from turnover. It had not shown that, even if the joint-client privilege did apply, why that privilege precluded the trustee, "as the debtors' successor," from obtaining items to which the debtors were privy and which were claimed privileged. Finally, the firm had not shown that the adversary exception to the joint-client privilege did not apply on these facts. Finally, as "a separate and sufficient holding," even if the firm had shown that the joint-client privilege applied, it had not met its burden to demonstrate that the individual items on the privilege log produced were protected by the privilege. The court ordered the firm to turn over all documents referred to in the privilege log.[174]

The court in *In re Crescent Resources, LLC* noted that "upon filing bankruptcy, control of the company changed from the former owners . . . to the new bankruptcy estate. The privilege then passed to the Litigation Trust by operation of the plan of reorganization."[175] The *Crescent* court also considered the applicability of a joint-privilege asserted by the debtor's parent on the litigation trustee's turnover request. The court found a joint representation and privilege between the debtor and its parent with respect to certain transactions with respect to which the files were sought. The court held that the litigation trust could "not unilaterally waive the joint-client privilege and use jointly privileged information in proceedings involving third parties, absent a waiver" from the parent, but could use the files in matters between the parent and the trust.[176]

In *In re Michael S. Goldberg, L.L.C.* the trustee sought turnover of certain financial records delivered to a divorce mediator.

---

[173]*In re Hotels Nevada, LLC*, 2011 WL 4344551 *3, citing *In re Norsom Med. Ref. Lab., Inc.*, 10 B.R. 165, 168 (Bankr.N.D.Ill.1981); H. REP. NO. 95–595, at 369–70 (1977), reprinted in 1978 U.S.C.C.A.N. 5963, 6325–26; S. REP. NO. 95-989, at 84 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 5870; *Am. Metrocomm Corp. v. Duane Morris & Heckscher LLP (In re American Metrocomm Corp.)*, 274 B.R. 641, 652 (Bankr.D.Del.2002); and *In re Highland Park Assoc. Ltd. P'ship.*, 132 B.R. 358, 358 (Bankr.N.D.Ill.1991).

[174]*In re Hotels Nevada, LLC*, 2011 WL 4344551 *14–15.

[175]*In re Crescent Resources, LLC*, 2011 WL 3022554 *18 (Bankr.W.D.Tex.).

[176]*In re Crescent Resources, LLC*, 2011 WL 3022554 *22.

The mediator filed a motion to quash asserting that the records were privileged because they were delivered in connection with the mediation.[177] The court found that, "[n]otwithstanding the importance of confidentiality in the mediation process, the 'special significance' of mediation materials, and the 'heightened protection' attending such materials to preserve the value of the mediation process," such concerns were "clearly outweighed by complete and full financial disclosure of the documents presently demanded. The disclosure of assets is a component of every bankruptcy case." A "complete and accurate portrait of the Debtor's assets and financial condition, as well as the disposition and corroboration thereof," was "essential to the Trustee's discharge of his fiduciary duties" and to "the interests of justice, and fairness to creditors." The court "having carefully weighed the concerns of confidentiality in mediation and the requisite necessity for complete and accurate financial disclosure in bankruptcy, and in light of the particular circumstances," found and determined "that the interest of justice outweigh[ed] the need for confidentiality in the mediation process, in accordance with which, and pursuant to Bankruptcy Code section 542(e) and Connecticut state law.[178]

The bankruptcy court in *In re McKenzie* held simply that "the Bankruptcy Code requires files pertaining to the debtor's interests to be turned over to the trustee."[179] Further, it was not necessary for the trustee to specify section § 542(e) in his complaint seeking turnover of records—a reference to section 542(a) was sufficient.[180]

In *In re Rapid Freight Systems, Inc.* the bankruptcy court noted that the "majority of courts to have considered the issue conclude that an attorney who turns over the documents to a trustee, as required under 11 U.S.C. § 542(e) 'may be entitled to a replacement lien or administrative expense measured by the value the documents provide, if any, in revealing assets or assisting in the administration of the estate.' "[181] Thus, because the firm that turned over the files "had a retaining lien over Debtor's business records and files and because Debtor's bankruptcy did not void said retaining lien," the law firm was "entitled to a replacement

---

[177] *In re Michael S. Goldberg, L.L.C.*, 2012 WL 71594 *1 (Bankr.D.Conn.).

[178] *In re Michael S. Goldberg, L.L.C.*, 2012 WL 71594 *1.

[179] *In re McKenzie*, 2011 WL 4600407 *13.

[180] *In re McKenzie*, 2011 WL 4600407 *7.

[181] *In re Rapid Freight Systems, Inc.*, 2011 WL 1300441 *11 (Bankr.D.N.J.), quoting *In re Herrera*, 390 B.R. 746, 748–49 (Bankr.S.D.Fla 2008).

lien/administrative expense claim measured by the value of the documents provided." The value was to determined based on "the documents' role in revealing assets or assisting in the administration of the estate," and would "not be the full one third (1/3) contingency fee" the law firm alleged it was owed on any postpetition recovery of the debtor's assets. The court stated that, unless the parties consensually resolved this issue, they would be given the opportunity to participate in a valuation hearing to determine the value of documents subject to the retaining lien.[182]

## XIII.   Section 543—Turnover of Property by a Custodian

Bankruptcy Code section 543[183] is entitled "Turnover of Property by a Custodian" and is the parallel to section 542. The party from whom the turnover is sought must be a custodian for section 543 to apply. A "custodian" is defined in Code section 101(11) as:

(A)  receiver or trustee of any of the property of the debtor, appointed in a case or proceeding not under this title;

(B)  assignee under a general assignment for the benefit of the debtor's creditors; or

(C)  trustee, receiver, or agent under applicable law, or under a contract, that is appointed or authorized to take charge of property of the debtor for the purpose of enforcing a lien against such property, or for the purpose of general administration of such property for the benefit of the debtor's creditors.[184]

Subsections 543(a) and (b) provide that:

(a)  A custodian with knowledge of the commencement of a case under this title concerning the debtor may not make any disbursement from, or take any action in the administration of, property of the debtor, proceeds, product, offspring, rents, or profits of such property, or property of the estate, in the possession, custody, or control of such custodian, except such action as is necessary to preserve such property.

(b)  A custodian shall—

(1)  deliver to the trustee any property of the debtor held by or transferred to such custodian, or proceeds, product, offspring, rents, or profits of such property, that is

---

[182]*In re Rapid Freight Systems, Inc.*, 2011 WL 1300441 *11.

[183]11 U.S.C.A. § 543.

[184]11 U.S.C.A. § 101(11).

lien/administrative expense claim measured by the value of the documents provided." The value was to determined based on "the documents' role in revealing assets or assisting in the administration of the estate," and would "not be the full one third (1/3) contingency fee" the law firm alleged it was owed on any postpetition recovery of the debtor's assets. The court stated that, unless the parties consensually resolved this issue, they would be given the opportunity to participate in a valuation hearing to determine the value of documents subject to the retaining lien.[182]

## XIII.    Section 543—Turnover of Property by a Custodian

Bankruptcy Code section 543[183] is entitled "Turnover of Property by a Custodian" and is the parallel to section 542. The party from whom the turnover is sought must be a custodian for section 543 to apply. A "custodian" is defined in Code section 101(11) as:

(A)  receiver or trustee of any of the property of the debtor, appointed in a case or proceeding not under this title;

(B)  assignee under a general assignment for the benefit of the debtor's creditors; or

(C)  trustee, receiver, or agent under applicable law, or under a contract, that is appointed or authorized to take charge of property of the debtor for the purpose of enforcing a lien against such property, or for the purpose of general administration of such property for the benefit of the debtor's creditors.[184]

Subsections 543(a) and (b) provide that:

(a)  A custodian with knowledge of the commencement of a case under this title concerning the debtor may not make any disbursement from, or take any action in the administration of, property of the debtor, proceeds, product, offspring, rents, or profits of such property, or property of the estate, in the possession, custody, or control of such custodian, except such action as is necessary to preserve such property.

(b)  A custodian shall—

(1)  deliver to the trustee any property of the debtor held by or transferred to such custodian, or proceeds, product, offspring, rents, or profits of such property, that is

---

[182]*In re Rapid Freight Systems, Inc.*, 2011 WL 1300441 *11.

[183]11 U.S.C.A. § 543.

[184]11 U.S.C.A. § 101(11).

in such custodian's possession, custody, or control on the date that such custodian acquires knowledge of the commencement of the case; and

(2) file an accounting of any property of the debtor, or proceeds, product, offspring, rents, or profits of such property, that, at any time, came into the possession, custody, or control of such custodian.[185]

As in the case of section 542, the property turnover of which is sought under section § 543 must be property of the debtor or the estate.

The court may delay the requirement that the custodian turn over the property. Section 543(d) provides that, "[a]fter notice and hearing, the bankruptcy court—(1) may excuse compliance with subsection (a), (b), or (c) of this section if the interests of creditors and, if the debtor is not insolvent, of equity security holders would be better served by permitting a custodian to continue in possession, custody, or control of such property."[186]

In *In re China Village, LLC*, the bankruptcy court noted that "[d]espite the apparent automatic nature of the turnover obligation, one leading bankruptcy treatise explains that, 'courts have recognized that this provision contains no time limit in which property must be turned over. As a practical matter, most custodians retain the property until requested or ordered to turn it over to the trustee or debtor-in-possession.' "[187] Further, "efforts expended by a state court receiver resisting an involuntary bankruptcy have been found to be non-compensable because they provided no benefit to the estate," while, "[o]n the other hand, reasonable compensation for expenses incurred in preparation for or in effectuating a turnover is allowable under Code § 543(c)(2), which mandates that the court 'shall provide for the payment of reasonable compensation for services rendered and cost and expenses incurred" by a superseded custodian.' " The question for the China Village court was whether the fees that the receiver incurred "were reasonably necessary to preserve the receivership estate or to effectuate the turnover."[188] The court found no evidence that the receiver "ever resisted turning over the property." To the contrary, emails indicated his "growing frustration with the sluggishness of the process," and the evidence indicated that

---

[185] 11 U.S.C.A. § 543.

[186] 11 U.S.C.A. § 543(d).

[187] *In re China Village, LLC*, 2012 WL 32684 *8 (Bankr.N.D.Cal.), quoting 4 Norton Bankruptcy Law and Practice § 62.10 (3d ed.2008),

[188] *In re China Village, LLC*, 2012 WL 32684 *8, quoting 11 U.S.C. § 543(c)(2).

991

the receiver's "efforts were directed at facilitating the turnover, not opposing it." The court concluded that there was "no basis for a wholesale denial of all fees and costs associated with the services of the receiver" following denial of the bank's motion to excuse turnover. "The better question under § 543(c) [was] whether the tasks that the receiver performed were necessary and whether the fees incurred were reasonable."[189] The court then considered the fees and expenses of the receiver under section 503(b), which it noted governed the award of compensation to both the receiver and his counsel.[190]

See also *In re Jefferson County, Ala.* regarding turnover in a Chapter 9 case from a receiver appointed prepetition, discussed in § II above.

## XIV. Automatic Stay/Adequate Protection

The courts in the last year continued to address the nexus between turnover under sections 542 and 543 and the automatic stay under section 362.

### Adequate Protection

Most courts have held that a secured party's right to adequate protection does not excuse its obligation to turn the property over to the debtor if the requirements of section 542 are met.

### Damages Under §§ 362(k) and 105(a)

A debtor may recover damages for violation of the automatic stay in the context of a third party's exercising of control over property of the estate subject to a turnover proceeding or demand. The Bankruptcy Code section providing for damages for a stay violation was section 362(h) prior to the October 2005 Amendments. It is now section 362(k).

The bankruptcy court in *In re DiGregorio* observed that section 362(k) "allows a party aggrieved by a willful violation of the stay to recover actual damages, including costs and attorney's fees and, in some cases, punitive damages. Read in conjunction with § 542 of the Code, the failure of a third party to turn over property of the estate to the trustee or debtor constitutes a violation of the automatic stay. However, § 362 protects only property of the estate or property in possession of the estate from actions to collect or that interfere with that property." Where, as in the *DiGregorio* case, "the property right in question is not property of the estate because Debtor's right thereto was terminated pre-

---

[189]*In re China Village, LLC*, 2012 WL 32684 *8–9.

[190]*In re China Village, LLC*, 2012 WL 32684 *9.

the receiver's "efforts were directed at facilitating the turnover, not opposing it." The court concluded that there was "no basis for a wholesale denial of all fees and costs associated with the services of the receiver" following denial of the bank's motion to excuse turnover. "The better question under § 543(c) [was] whether the tasks that the receiver performed were necessary and whether the fees incurred were reasonable."[189] The court then considered the fees and expenses of the receiver under section 503(b), which it noted governed the award of compensation to both the receiver and his counsel.[190]

See also *In re Jefferson County, Ala.* regarding turnover in a Chapter 9 case from a receiver appointed prepetition, discussed in § II above.

## XIV. Automatic Stay/Adequate Protection

The courts in the last year continued to address the nexus between turnover under sections 542 and 543 and the automatic stay under section 362.

### Adequate Protection

Most courts have held that a secured party's right to adequate protection does not excuse its obligation to turn the property over to the debtor if the requirements of section 542 are met.

### Damages Under §§ 362(k) and 105(a)

A debtor may recover damages for violation of the automatic stay in the context of a third party's exercising of control over property of the estate subject to a turnover proceeding or demand. The Bankruptcy Code section providing for damages for a stay violation was section 362(h) prior to the October 2005 Amendments. It is now section 362(k).

The bankruptcy court in *In re DiGregorio* observed that section 362(k) "allows a party aggrieved by a willful violation of the stay to recover actual damages, including costs and attorney's fees and, in some cases, punitive damages. Read in conjunction with § 542 of the Code, the failure of a third party to turn over property of the estate to the trustee or debtor constitutes a violation of the automatic stay. However, § 362 protects only property of the estate or property in possession of the estate from actions to collect or that interfere with that property." Where, as in the *DiGregorio* case, "the property right in question is not property of the estate because Debtor's right thereto was terminated pre-

---

[189] *In re China Village, LLC,* 2012 WL 32684 *8–9.

[190] *In re China Village, LLC,* 2012 WL 32684 *9.

bankruptcy, the automatic stay does not apply." The property right implicated in *DiGregorio* was the right of possession that was transferred to the homeowners association by judgment of the state court. The debtor retained title to her unit but she could regain possession only by paying the assessment fees and expenses as adjudicated. Accordingly, since the stay did not apply, it was not violated, and the debtor was not entitled to any damages.[191]

A depository bank's freezing a debtor's deposit account at the commencement of the bankruptcy case does not constitute a stay violation, as stated by the bankruptcy court in *In re St. Vincent*, citing *Citizens Bank v. Strumpf*.[192]

## XV.  Setoff

Section 542(b) specifically excepts a matured debt from turnover to the extent that such debt may be offset under section 553 against a claim of the debtor, as follows:

> Except as provided in subsection (c) or (d) of this section, an entity that owes a debt that is property of the estate and that is matured, payable on demand, or payable on order, shall pay such debt to, or on the order of, the trustee, except to the extent that such debt may be offset under section 553 of this title against a claim against the debtor.[193]

The author is not aware of any significant opinions since the last Annual Survey involving the nexus between section 542 and setoff.

## XVI.  Fourth and Fifth Amendment Privilege

The author is not aware of any significant opinions since the last Annual Survey addressing the nexus between Fourth or Fifth Amendment privilege and turnover actions.

## XVII.  Seventh Amendment—Right to Jury Trial

In *In re Ballway*, the bankruptcy court held that the defendant had no right to a jury trial on the section 542 claim against it. "There was no common law turnover action before the enactment

---

[191] *In re DiGregorio*, 2011 WL 4494215 *4–5 (Bankr.N.D.Ill.).

[192] *In re St. Vincent*, 2011 WL 1258479 *3–4 (Bankr.N.D.Ill.), citing *Citizens Bank v. Strumpf*, 516 U.S. 16, 21, 116 S.Ct. 286, 290 (1995).

[193] 11 U.S.C.A. § 553.

of the Seventh Amendment, and the turnover remedy is equitable."[194]

A defendant may waive its right to a jury trial, or may step into the shoes of a party who waived, and thus find itself bound by the waiver. In *In re ImagePoint, Inc.*, the court struck Wells Fargo Bank's jury demand on the section 542 claim against it because its predecessor in interest waived its right to a jury trial by filing proofs of claim, thereby submitting itself to the jurisdiction of the court. But because no legal basis had been presented for extending Wells Fargo Bank's waiver to its parent Wells Fargo & Company, the trustee's motion to strike the latter's jury demand was denied. Accordingly, the trustee's claim against Wells Fargo Bank would be decided by the court, and the trustee's claim against Wells Fargo & Company would be decided by a jury.[195]

## XVIII.  Revocation or Denial of Discharge and Other Sanctions for Failure to Turnover or Comply with Turnover Order

The court may sanction a debtor for violation of a section 542 turnover order by revoking of a debtor's discharge, and in addition may sanction the debtor and other parties by other means for such violation.

The bankruptcy "court has few more powerful remedies at its disposal than those provided in § 727(d). That section allows a court to revoke a debtor's discharge when the trustee demonstrates that the debtor has refused to obey a court order and acquired, but failed to account for property of the estate."[196] Bankruptcy Code section 727(d)(3) incorporates by reference section 727(a)(6)(A) which provides that a debtor may not be granted a discharge if he has refused to obey a lawful order of the court.[197]

The claims of a party who has failed to turn over property which is recoverable under section 542 may be disallowed under section 502(d), unless such party has turned over any such property.[198]

The non-debtor who fails to comply with the dictates of section

---

[194]*In re Ballway*, 2011 WL 1770996 *2 (Bankr.D.Kan.), citing *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 1090 S.Ct. 2782, 106 L.Ed.2d 26 (1989).

[195]*In re ImagePoint, Inc.*, 2011 WL 1500124 *4 (Bankr.E.D.Tenn.).

[196]*In re Wright*, 371 B.R. 472, 479 (Bankr. D. Kan. 2007).

[197]*In re Wright*, 371 B.R. 472, 479 (Bankr. D. Kan. 2007).

[198]11 U.S.C. § 502(d). See e.g., *In re Paschall*, 2011 WL 5553483 *7 (Bankr. E.D.Va.).

of the Seventh Amendment, and the turnover remedy is equitable."[194]

A defendant may waive its right to a jury trial, or may step into the shoes of a party who waived, and thus find itself bound by the waiver. In *In re ImagePoint, Inc.*, the court struck Wells Fargo Bank's jury demand on the section 542 claim against it because its predecessor in interest waived its right to a jury trial by filing proofs of claim, thereby submitting itself to the jurisdiction of the court. But because no legal basis had been presented for extending Wells Fargo Bank's waiver to its parent Wells Fargo & Company, the trustee's motion to strike the latter's jury demand was denied. Accordingly, the trustee's claim against Wells Fargo Bank would be decided by the court, and the trustee's claim against Wells Fargo & Company would be decided by a jury.[195]

## XVIII. Revocation or Denial of Discharge and Other Sanctions for Failure to Turnover or Comply with Turnover Order

The court may sanction a debtor for violation of a section 542 turnover order by revoking of a debtor's discharge, and in addition may sanction the debtor and other parties by other means for such violation.

The bankruptcy "court has few more powerful remedies at its disposal than those provided in § 727(d). That section allows a court to revoke a debtor's discharge when the trustee demonstrates that the debtor has refused to obey a court order and acquired, but failed to account for property of the estate."[196] Bankruptcy Code section 727(d)(3) incorporates by reference section 727(a)(6)(A) which provides that a debtor may not be granted a discharge if he has refused to obey a lawful order of the court.[197]

The claims of a party who has failed to turn over property which is recoverable under section 542 may be disallowed under section 502(d), unless such party has turned over any such property.[198]

The non-debtor who fails to comply with the dictates of section

---

[194] *In re Ballway*, 2011 WL 1770996 *2 (Bankr.D.Kan.), citing *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 1090 S.Ct. 2782, 106 L.Ed.2d 26 (1989).

[195] *In re ImagePoint, Inc.*, 2011 WL 1500124 *4 (Bankr.E.D.Tenn.).

[196] *In re Wright*, 371 B.R. 472, 479 (Bankr. D. Kan. 2007).

[197] *In re Wright*, 371 B.R. 472, 479 (Bankr. D. Kan. 2007).

[198] 11 U.S.C. § 502(d). See e.g., *In re Paschall*, 2011 WL 5553483 *7 (Bankr. E.D.Va.).

542 or section 542 may be held in contempt or sanctioned. Some courts have held, nonetheless, that section 542(b) "is not self-executing, and a refusal to honor a trustee's demand for turnover pursuant to § 542(b) cannot give rise to a finding of contempt. The statute is self-operative only in the sense of vesting in the trustee (in lieu of the debtor), without the necessity of a court order, the right to receive payments of obligations that are otherwise payable on demand." Instead, a "trustee's remedy when an account obligor fails to comply with 11 U.S.C. § 542(b) is to sue to enforce that provision. If the account obligor proceeds to defend in bad faith, the trustee may be entitled to recover attorney's fees in accordance with an exception to the American rule or pursuant to Fed. R. Bankr. P. 9011. If, however, the account debtor does not defend or defends on plausible grounds, attorney's fees ought not be recoverable." "Nor ought a refusal to comply with § 542(b) constitute a violation of § 362(a)(3). The failure to pay remains just that, and, under the rationale of *Strumpf,* not an exercise of control over property of the estate."[199] For these reasons and others, the court disagreed with the conclusion of the Ninth Circuit BAP in *Mwangi* that a violation of section 542(b) gives rise to contempt.[200]

See also the discussion under § XIV of this article above for cases addressing damages under Code section 362(k).

## XIX.   Time Limitations for Action; Claim Preclusion

The Bankruptcy Code contains no express time limitation for the commencement of a turnover proceeding.

Laches may apply to time bar the claim if there has been an unreasonably delay by the plaintiff or movant in bringing the claim. In *In re American Home Mortg. Holding,* also discussed in § X above, the defendants raised the defense of laches to the debtors' turnover claim among others. The bankruptcy court held that the "determination of unreasonable delay is left to the discretion of the court." The defendants had "not cited any case law holding that a delay of two and one-half years is unreasonable *per se,*" and the complaint itself did not show an unreasonable delay. The court also noted "the chaotic nature of the circumstances surrounding the Debtors' bankruptcy filing. The Debtors were in the business of investing in mortgage-backed securities that resulted from the securitization of mortgage loans originated

---

[199]*In re Randolph Towers Cooperative, Inc.*, 2011 WL 2940664 *5.

[200]*In re Randolph Towers Cooperative, Inc.*, 2011 WL 2940664 *6, citing *In re Mwangi,* 432 B.R. 812, 820 (B.A.P. 9th Cir.2010).

by its subsidiaries and other companies. In 2007, as a result of declining real estate prices and increasing defaults on mortgage obligations, the Debtors closed their origination business, terminated the majority of their employees and filed for Chapter 11 protection, seeking to sell substantially all of their assets. With the sudden bankruptcy filing and deterioration of the secondary mortgage market, the Debtors were faced with having to referee inter-creditor disputes and manage the influx of creditors' and clients' attempts to exercise remedies against the Debtors while endeavoring to conduct due diligence to determine the value of the bankruptcy estate and successfully sell the assets." The debtors postpetition "were soon faced with a barrage of turnover motions and motions for relief from the automatic stay as well as the need to defend against several objections to the asset sales. Despite being inundated with large amounts of litigation, the Debtors still managed to file the present action within the prescribed statutes of limitation." The defendants had not shown there was an unreasonable delay by the debtors. "Moreover, the circumstances surrounding the Debtors' bankruptcy filing and the plethora of litigation during the bankruptcy proceedings further support[ed] the conclusion that the imposition of laches" was not appropriate. The defendants' motion was denied as to the defense of the equitable doctrine of laches.[201]

In *In re C.R. Stone Concrete Contractors, Inc.* the Chapter 7 trustee brought a turnover claim among others against Anderson and other defendants. Anderson died, the debtor sought to substitute the executor of his estate, and the executor sought to dismiss including on the ground that the turnover claim did not survive Anderson's death.[202] The bankruptcy court noted that the "first step in assessing whether a federal claim survives the death of a party is to look to the statute underlying the cause of action to determine the intent of Congress." There is no express provision of the Bankruptcy Code or the Federal Rules of Bankruptcy Procedure providing for the survival of an action for turnover under section 542 after the death of the defendant. Because the statute did not provide the answer, the court had to turn to the federal common law.[203]

Generally, "causes of action based on 'penal' statutes abate,

---

[201]*In re American Home Mortg. Holding*, 2011 WL 4863894 *6.

[202]*In re C.R. Stone Concrete Contractors, Inc.*, 2011 WL 6330168 *1 (Bankr. D.Mass.).

[203]*In re C.R. Stone Concrete Contractors, Inc.*, 2011 WL 6330168 *12.

by its subsidiaries and other companies. In 2007, as a result of
declining real estate prices and increasing defaults on mortgage
obligations, the Debtors closed their origination business,
terminated the majority of their employees and filed for Chapter
11 protection, seeking to sell substantially all of their assets.
With the sudden bankruptcy filing and deterioration of the sec-
ondary mortgage market, the Debtors were faced with having to
referee inter-creditor disputes and manage the influx of creditors'
and clients' attempts to exercise remedies against the Debtors
while endeavoring to conduct due diligence to determine the value
of the bankruptcy estate and successfully sell the assets." The
debtors postpetition "were soon faced with a barrage of turnover
motions and motions for relief from the automatic stay as well as
the need to defend against several objections to the asset sales.
Despite being inundated with large amounts of litigation, the
Debtors still managed to file the present action within the
prescribed statutes of limitation." The defendants had not shown
there was an unreasonable delay by the debtors. "Moreover, the
circumstances surrounding the Debtors' bankruptcy filing and
the plethora of litigation during the bankruptcy proceedings fur-
ther support[ed] the conclusion that the imposition of laches" was
not appropriate. The defendants' motion was denied as to the
defense of the equitable doctrine of laches.[201]

In *In re C.R. Stone Concrete Contractors, Inc.* the Chapter 7
trustee brought a turnover claim among others against Anderson
and other defendants. Anderson died, the debtor sought to
substitute the executor of his estate, and the executor sought to
dismiss including on the ground that the turnover claim did not
survive Anderson's death.[202] The bankruptcy court noted that the
"first step in assessing whether a federal claim survives the death
of a party is to look to the statute underlying the cause of action
to determine the intent of Congress." There is no express provi-
sion of the Bankruptcy Code or the Federal Rules of Bankruptcy
Procedure providing for the survival of an action for turnover
under section 542 after the death of the defendant. Because the
statute did not provide the answer, the court had to turn to the
federal common law.[203]

Generally, "causes of action based on 'penal' statutes abate,

---

[201] *In re American Home Mortg. Holding*, 2011 WL 4863894 *6.

[202] *In re C.R. Stone Concrete Contractors, Inc.*, 2011 WL 6330168 *1 (Bankr.
D.Mass.).

[203] *In re C.R. Stone Concrete Contractors, Inc.*, 2011 WL 6330168 *12.

while those based on 'remedial' statutes survive."[204] Generally speaking, "[a] remedial action is one that compensates an individual for a specific harm suffered, while a penal action imposes damages upon the defendant for a general wrong to the public."[205] A main purpose of the Bankruptcy Code is to secure equal distribution among creditors. The turnover provisions of the Code invoke the court's "most basic equitable powers to gather and manage property of the estate."[206] "In this sense, an action for turnover merely seeks to put the Trustee in possession of property which 11 U.S.C. § 541(a) has already defined as property of the estate so that it may be properly distributed for the benefit of all creditors." Accordingly, the court found that the turnover count was "not penal, but remedial in nature," and survived the death of Anderson.[207]

## XX. Appeals

The bankruptcy court in *In re Protron Digital Corp.* ordered a law firm to turn over documents under section 542(e), and the law firm appealed. The district court held that it lacked jurisdiction over the law firm's appeal pursuant to 28 U.S.C. § 158(a)(1) because the bankruptcy court's order that was at issue was not final.[208] The court also declined to exercise jurisdiction pursuant to 28 U.S.C. § 158(a)(3), which vests district courts with jurisdiction over appeals of "other interlocutory orders and decrees" when district courts grant leave to file such appeals, because the order neither involved a controlling question of law where there was substantial ground for difference of opinion, nor was the appeal in the interest of judicial economy because an immediate appeal might materially advance the ultimate termination of the litigation.[209]

Finally, in *Livecchi v. Gordon* the debtor stated, "without citing any authority, that '[a]nytime that a case is brought before the court on appeal, any act conducted by the Bankruptcy court that was illegal is deemed proper to be brought to the attention of the

[204]*In re C.R. Stone Concrete Contractors, Inc.*, 2011 WL 6330168 *12, quoting *Hawkins v. Eads (In re Eads)*, 135 B.R. 380, 385 (Bankr.E.D.Cal.1991).

[205]*In re C.R. Stone Concrete Contractors, Inc.*, 2011 WL 6330168 *12, quoting *United States v. NEC Corp.*, 11 F.3d 136, 137 (11th Cir.1993).

[206]*In re C.R. Stone Concrete Contractors, Inc.*, 2011 WL 6330168 *12, quoting *Braunstein v. McCabe (In re McCabe)*, 571 F.3d 108, 122 (1st Cir. 2009).

[207]*In re C.R. Stone Concrete Contractors, Inc.*, 2011 WL 6330168 *12.

[208]*In re Protron Digital Corp.*, 2011 WL 1585564 *3 (C.D.Cal.).

[209]*In re Protron Digital Corp.*, 2011 WL 1585564 *4.

appealing judge.' " The court observed that while it certainly could take notice of the Bankruptcy Court's prior orders in the case, insofar as they related to the appeal, the appeal was "nonetheless limited in scope to review of the order appealed from, i.e., the turnover order. Other orders and acts, such as the order converting the case from Chapter 11 to Chapter 7, the Trustee's alleged failure to maximize the value of Debtor's estate, and so on," were not directly before the court, and the debtor could not use his interlocutory appeal "as a vehicle to challenge virtually everything that has occurred thus far in his bankruptcy case."[210] The court saw no basis for reversal of the bankruptcy court's turnover order, and affirmed.[211]

---

[210]*Livecchi v. Gordon*, 2011 WL 6148627 *1 (W.D.N.Y.).

[211]*Livecchi v. Gordon*, 2011 WL 6148627 *2.

appealing judge.'" The court observed that while it certainly could take notice of the Bankruptcy Court's prior orders in the case, insofar as they related to the appeal, the appeal was "nonetheless limited in scope to review of the order appealed from, i.e., the turnover order. Other orders and acts, such as the order converting the case from Chapter 11 to Chapter 7, the Trustee's alleged failure to maximize the value of Debtor's estate, and so on," were not directly before the court, and the debtor could not use his interlocutory appeal "as a vehicle to challenge virtually everything that has occurred thus far in his bankruptcy case."[210] The court saw no basis for reversal of the bankruptcy court's turnover order, and affirmed.[211]

---

[210]*Livecchi v. Gordon*, 2011 WL 6148627 *1 (W.D.N.Y.).

[211]*Livecchi v. Gordon*, 2011 WL 6148627 *2.

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEVADA (RENO)

|  | | |
|---|---|---|
| IN RE: | . | Case No.  14-50333-BTB |
|  | . | Chapter 7 |
| ANTHONY THOMAS and | . |  |
| WENDI THOMAS, | . | (Jointly administered) |
|  | . |  |
| Debtors. | . |  |
| . . . . . . . . . . . . | . | Case No.  14-50331-BTB |
| IN RE: | . |  |
|  | . | Chapter 7 |
| AT EMERALD, LLC, | . |  |
|  | . |  |
| Debtor. | . |  |
| . . . . . . . . . . . . | . |  |

TRANSCRIPT OF 341 MEETING OF CREDITORS

Reno, Nevada

December 4, 2014

APPEARANCES:

Trustee:                    JERI COPPA-KNUDSON, ESQ.
                            3495 Lakeside Drive
                            PMB #62
                            Reno, NV 89509
                            (775) 329-1528

For the Debtors:            MICHAEL LEHNERS, ESQ.
                            429 Marsh Avenue
                            Reno, NV  89509
                            (775) 786-1895

APPEARANCES CONTINUED

Transcription Company:      Access Transcripts, LLC
                            10110 Youngwood Lane
                            Fishers, IN 46038
                            (855) 873-2223
                            www.accesstranscripts.com

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

2

APPEARANCES (Continued):

For the Beach Family          Holland & Hart
Trust:                        By:  TIMOTHY LUKAS, ESQ.
                              5441 Kietzke Lane, Suite 200
                              Reno, NV 89511


For Kenmark                   WAYNE A. SILVER, ESQ.
Ventures, LLC:                333 West El Camino Real, Suite 310
                              Sunnyvale, CA 94807
                              (408) 720-7007

Also Present:                 Law Offices of Alan R. Smith
                              By:  HOLLY E. ESTES, ESQ.
                              505 Ridge Street
                              Reno, NV 89501

8

1          MR. LUKAS:  And where was this property located at?

2          MR. THOMAS:  Morgantown.

3          MR. LUKAS:  And when you say "property," did it have

4    a house on it?

5          MR. THOMAS:  No.

6          MR. LUKAS:  Okay.  Just vacant property.

7          MR. THOMAS:  Yes.  It had a house on it at one time,

8    and it burned.

9          MR. LUKAS:  Okay.  When did the house burn?

10         MR. THOMAS:  2006.

11         MR. LUKAS:  From 2006 to the time it sold in 2011 and

12   '12, did you have any other real property?

13         MR. THOMAS:  A U-Haul.  From what time?

14         MR. LUKAS:  From the time the house burnt down to the

15   time that you sold the lot.

16         MR. THOMAS:  Yes.

17         MR. LUKAS:  What other real property did you own

18   during that time period?

19         MS. THOMAS:  The house in Portola.

20         MR. THOMAS:  Yeah, but I believe we had some places

21   in Texas, too.

22         MS. THOMAS:  Oh.

23         MR. THOMAS:  So I don't want to be -- if you want to

24   fill it in.

25         MS. THOMAS:  I don't know.

ACCESS TRANSCRIPTS, LLC        1-855-USE-ACCESS (873-2223)

9

1          MR. THOMAS:  I'm trying to find the answer.  I don't
2  know the answer.

3          MS. THOMAS:  Tony sold most of the places in Texas.
4  I don't know if he sold them prior to that to invest in
5  (**indiscernible 7:55).

6          MR. LUKAS:  Okay.  Let's set Texas aside for a
7  moment.  Anything outside of Texas, what did you own during
8  that period?  Portola?

9          MS. THOMAS:  We had -- yeah, we had a house in
10 Portola.

11         MR. LUKAS:  Okay.  And when did you buy the house in
12 Portola?

13         MS. THOMAS:  1999.

14         MR. LUKAS:  And when did you sell that house?

15         MS. THOMAS:  We deeded it over to his parents.

16         MR. LUKAS:  Is that Thomas and Dorothy or --

17         MS. THOMAS:  Yeah, Eli Thomas.

18         MR. LUKAS:  Or Eli and Dorothy?

19         MS. THOMAS:  Yeah.

20         MS. COPPA-KNUDSON:  When was that deeded?

21         MS. THOMAS:  2008, I believe.

22         MR. THOMAS:  Yeah, sometime.

23         MR. LUKAS:  Did you continue to live in that house in
24 that period?

25         MS. THOMAS:  It's never been lived in.  It's not

10

1  finished.

2        MR. LUKAS:  After your house burned in 2006, where
3  did you live?

4        MS. THOMAS:  We leased another home in Morgantown.

5        MR. LUKAS:  And he indicated there was property that
6  was in Texas.  Can you tell me what was in Texas and when it
7  was sold.

8        MS. THOMAS:  The duplex that we owned.  It wasn't
9  sold.  The bank repossessed it.

10       MR. LUKAS:  I thought a moment ago, he had said that
11 it had been sold, though.

12       MS. THOMAS:  No, we had several rental properties in
13 Texas earlier on, but we sold them in the early 2000s.

14       MR. LUKAS:  Okay.  Dorothy Thomas is your mother,
15 Mr. Thomas?

16       MR. THOMAS:  Yes.

17       MR. LUKAS:  Okay.  And so that explains -- she's
18 listed in creditors.  You took a loan out of $200,000 from her?

19       MR. THOMAS:  Yes.

20       MR. LUKAS:  Okay.  Is there a promissory note or
21 documentation for that loan?

22       MR. THOMAS:  Yes.

23       MR. LUKAS:  I notice in your personal bankruptcy, you
24 have listed John Beach, or the Beach Family Trust, as a
25 promissory note.  I don't -- I wish, but I don't have any

11

1  direct guarantee language that you individually owe them that

2  amount.  Do you know why you listed that?

3            MR. LEHNERS:  Owed what amount?

4            MR. LUKAS:  (Indiscernible).

5            MR. LEHNERS:  Yeah.

6            MR. LUKAS:  And I said, I've looked at -- I wish your

7  name was on the promissory note, but I'll represent for the

8  record it's not.

9            MR. LEHNERS:  It says that there's a promissory note.

10            MS. COPPA-KNUDSON:  Who was on the --

11            MR. LUKAS:  AT Emerald was.

12            MS. COPPA-KNUDSON:  Okay.

13            MR. LEHNERS:  Promissory note --

14            MR. LUKAS:  And there wasn't a guarantee on it.

15            MS. COPPA-KNUDSON:  Oh, there wasn't a personal

16  guarantee, no.

17            MR. LEHNERS:  Okay.  Do you know any other document,

18  such as a guarantee document, Tony, that you would have signed

19  guaranteeing the obligation of AT Emerald?

20            MR. THOMAS:  I don't recall.  It was prepared by the

21  attorneys.  It was -- the documents --

22            MS. COPPA-KNUDSON:  You're probably going to have to

23  speak up because we're being recorded, so -- so it was the

24  documents that --

25            MR. LUKAS:  I'll represent to you, Ms. Trustee, I

12

 1 don't have any record of any direct liability of the Thomases.
 2 Hence the most recent proof of claim that we filed.
 3         MS. COPPA-KNUDSON:  Okay.  Okay.
 4         MR. LUKAS:  It's not based upon any document because
 5 I don't have any.
 6         MS. COPPA-KNUDSON:  Okay.
 7         MR. LUKAS:  And you're not aware of any, are you,
 8 Mr. Thomas?
 9         MR. THOMAS:  I'm not aware.  Whatever documents I
10 signed, John Beach would have.
11         MR. LUKAS:  Okay.  They're listed on the schedules
12 and statements because by advice of counsel?  Is that what
13 you're saying?
14         MS. THOMAS:  Must have been.
15         MR. LUKAS:  Must have been?
16         MS. THOMAS:  I don't know.
17         MR. LUKAS:  Okay.  Fair enough.
18         There is a Plumas County Treasurer's property taxes
19 for $1,200, Quincy, California.  That's usually --
20         MS. COPPA-KNUDSON:  Is that that Portola property?
21         MS. THOMAS:  Those are old taxes.
22         MS. COPPA-KNUDSON:  Oh.
23         MS. THOMAS:  Tony's mom hasn't been able to pay, and
24 we haven't had the money to pay them for her.
25         MS. COPPA-KNUDSON:  But you're obligated to pay

13

1 those?

2        MR. THOMAS:  We're not, but she has the deed on the
3 house and has had the deed on the house for five years or four
4 years.

5        MS. THOMAS:  But we have back taxes in our name, so
6 we just put it all in our name.

7        MS. COPPA-KNUDSON:  Oh, okay.  So somehow, they were
8 in your name.  I don't quite understand that.

9        MS. THOMAS:  Which is long past any statute of
10 limitations period of tax deed period.

11        MS. COPPA-KNUDSON:  Right.

12        MS. THOMAS:  I raise that.  So you don't have any
13 property, though, other than what you described before.

14        MR. THOMAS:  Right.

15        MR. LUKAS:  Do you have some type of listing of what
16 the property taxes are for or billing statement for them?

17        MS. THOMAS:  We still get a billing statement for the
18 property taxes.

19        MR. THOMAS:  That's why we listed them.

20        MS. THOMAS:  She didn't put it in her name.

21        MR. LUKAS:  So you're saying the Portola house has
22 not been put into your mother's name, it's still in your name?

23        MS. THOMAS:  We deeded it over to her, but she didn't
24 -- she just holds the --

25        MR. LUKAS:  She never recorded the deed?

ACCESS TRANSCRIPTS, LLC        ⚖        1-855-USE-ACCESS (873-2223)

14

1        MS. THOMAS:  Yeah, she just holds it.

2        MS. COPPA-KNUDSON:  Uh-oh.  Uh-oh.

3        MR. LUKAS:  We have found assets.

4        MS. COPPA-KNUDSON:  We have found assets.

5        MS. THOMAS:  It's not much of an asset though, but --

6     (Counsel and debtor confer)

7        MS. COPPA-KNUDSON:  It's in Portola?

8        MR. THOMAS:  It's --

9        MS. COPPA-KNUDSON:  Where is it?

10        MR. LUKAS:  What county is it in?

11        MS. THOMAS:  Plumas County.

12        MR. LEHNERS:  It is in -- Portola Valley is in Plumas

13  County?

14        MS. THOMAS:  It's not Portola Valley.

15        MR. LEHNERS:  Oh, I thought you said Portola Valley.

16        MS. THOMAS:  It's Portola, California.

17        MS. COPPA-KNUDSON:  Portola.

18        MR. LEHNERS:  Portola.

19        MS. THOMAS:  It's a little, tiny railroad town.

20        MS. COPPA-KNUDSON:  Not -- no, no, no, no.  It's out

21  by Quincy.

22        MR. LUKAS:  Yeah, railroad town.  I thought it was.

23        MS. COPPA-KNUDSON:  It's out by Quincy.

24        MR. LUKAS:  Yeah, exactly right, Quincy.

25        MR. LEHNERS:  Makes sense, okay.

ACCESS TRANSCRIPTS, LLC        1-855-USE-ACCESS (873-2223)

15

1          MS. COPPA-KNUDSON:  But it --

2          MR. LUKAS:  Feather River College.

3          MS. COPPA-KNUDSON:  Yeah.  So that deed was never

4    transferred?

5          MS. THOMAS:  She holds it.

6          MR. THOMAS:  It was transferred.  We transferred it

7    four years ago.

8          MS. COPPA-KNUDSON:  But if she didn't record the

9    deed, it's not -- it's still in your name.

10         MR. THOMAS:  I don't know whether she recorded it or

11   not.  I just know that we signed it over to us, and they sent

12   us -- they keep sending us these things, so we -- it's part of

13   our creditor --

14         MS. COPPA-KNUDSON:  Obviously, it wasn't recorded.

15         MR. LEHNERS:  Wasn't recorded.

16         MR. LUKAS:  And so you're getting still property tax

17   bills for that property.

18         MS. COPPA-KNUDSON:  What about mortgage?  Is there

19   any money owing on that?

20         MS. THOMAS:  No, we bought it for $12,000.  It's a

21   shell of a house.  It's not --

22         MS. COPPA-KNUDSON:  And is she living there?

23         MS. THOMAS:  Nobody lives there.  There's nothing in

24   it.  It's just walls.  It's completely gutted.  We bought it,

25   it was a teardown.  So we bought it and did a little work on

1  it, and then we didn't have the money to finish it or the time.

2  We were just --

3              MS. COPPA-KNUDSON:  And why did you deed it to her?

4              MS. THOMAS:  Because we owed Dorothy money, and

5  that's the only asset we had at the time.

6              MR. THOMAS:  When we deeded it over to her.

7              MS. COPPA-KNUDSON:  And do you -- to your knowledge,

8  has she attempted to try to sell this?

9              MS. THOMAS:  She's talked about it, but she hasn't

10  sold it.

11             MR. THOMAS:  It's probably not going to sell.

12             MS. THOMAS:  It's not worth a lot.

13             MR. THOMAS:  It's not worth anything.

14             MS. COPPA-KNUDSON:  Well, I don't know if the land is

15  worth something --

16             MR. LUKAS:  Let's ask about what's --

17             MS. COPPA-KNUDSON:  Okay, sorry.

18             MR. LUKAS:  You said it was worth $200,000.

19             MS. THOMAS:  No.

20             MR. THOMAS:  No, I didn't.

21             MR. LUKAS:  Oh, well --

22             MS. THOMAS:  We'd never say that.

23             MR. LUKAS:  Counsel, why don't you look at the

24  schedules and statements what they put as the value of that.

25             MS. THOMAS:  No, we would not put that.

17

1             MR. THOMAS:  We bought it for 12 grand.

2             MR. LUKAS:  I'm just saying you put 200- on your

3   schedules and statements.

4             MS. THOMAS:  Well, we didn't put that.

5             MR. LUKAS:  Look at the transfers.  It's $200,000.

6             MR. LEHNERS:  Yeah, residence valued at 25,000.

7             MR. LUKAS:  And that's a motorcycle, isn't it?

8             MR. THOMAS:  No, other transfers.  Residence value --

9             MS. ESTES:  $200,000 is the amount that they borrowed

10  from their mom.

11            MR. LUKAS:  Oh, okay, okay.  Sorry for the --

12            MS. COPPA-KNUDSON:  Oh, okay.

13            MS. ESTES:  Sorry about the mathing.  It's --

14            MR. LEHNERS:  Residence valued at 25,000 in Portola,

15  transferred January of '08.  200,000 appears here.  Do you know

16  why?

17            MR. THOMAS:  That's what we borrowed from my mom.

18            MR. LEHNERS:  Okay.

19            MR. LUKAS:  Okay.  So --

20            MR. LEHNERS:  It would appear that the 200,000 is the

21  amount of the debt.  The 25,000 is the value of the real

22  estate.

23            Mr. Thomas, is that correct?

24            MR. THOMAS:  Yes.

25            MR. LUKAS:  Okay.  So residence value is 25,000.

ACCESS TRANSCRIPTS, LLC        ⚖        1-855-USE-ACCESS (873-2223)

18

1          MS. THOMAS:  Yeah.  I mean --

2          MR. LUKAS:  Give or take.  Okay, fair enough.  I

3   didn't do the schedules and statements.  I didn't sign them

4   under penalty of perjury.

5          MR. LEHNERS:  Just ask questions.

6          MR. LUKAS:  There is -- I know -- and I guess we

7   would have at least -- well, I don't know if you want to amend

8   them.  Would you look at -- other than what's most recently

9   been filed, of which one of the -- the McGraner [sic] lawsuit

10  indicates that it was not listed on the schedules and

11  statements.  Can you look at question four, and it carries over

12  on the other side here -- Mike, if you can help them -- that

13  these are actually all the other lawsuits because --

14         MR. LEHNERS:  Did you tell Mr. Smith's staff about

15  the McGraner [sic] lawsuit?

16         MR. THOMAS:  Yes, we did.

17         MR. LEHNERS:  Okay.  Apparently, it just didn't find

18  its way in there.

19         MR. LUKAS:  Okay.

20         MR. LEHNERS:  Well, it's (indiscernible).

21         MR. LUKAS:  But are there any others?

22         MR. LEHNERS:  Any other lawsuits?

23         MR. LUKAS:  And you may want to look at the list.

24         MR. LEHNERS:  Yeah, take a look at --

25         MR. LUKAS:  Because I'm going to say he's looked at

63

1  That's fine.

2            All right.  Mr. Thomas, paragraph 6 of that

3  declaration that I just referenced, you state that you're

4  familiar with buyers who would be interested in purchasing the

5  Emerald.  Can I have the names of those buyers?

6            MR. THOMAS:  Well, Koyo was one of them.

7            MR. SILVER:  You're not supposed to say that.  That's

8  all right.

9            MR. LUKAS:  That's all right.  I put that in the

10  record, so don't --

11            MR. SILVER:  Yeah.  But are there any others?

12            MR. THOMAS:  There are other brokers that I was

13  working with that had buyers.

14            MR. SILVER:  What were the names of the brokers?

15            MR. THOMAS:  Michelle [sic] Youssef.

16            MR. SILVER:  Can you spell the last name, please?

17            MR. THOMAS:  I'm dyslexic, so you're asking the wrong

18  person.

19            MR. SILVER:  Okay.  Say it again.  Say the word.

20            MR. THOMAS:  Youssef.

21            MR. SILVER:  And where is Michelle [sic] Youssef's

22  office or what is her address?  How could we reach her?

23            MR. THOMAS:  He's Washington, D.C.

24            MR. SILVER:  It's a he.  Okay.  And do you have

25  contact information for Mr. Youssef?

```
 1  cell phone number, for M. Youssef.  We will provide the same
 2  for Shawn Chicola.
 3          We will produce all documents that we have with
 4  respect to the European group with respect to the $140 million
 5  that was discussed, unless there's anything in there that have
 6  applicable privilege.  If there is, we will identify it.  Is
 7  that it?
 8          MS. COPPA-KNUDSON:  And -- no.  I need --
 9          MR. SILVER:  Emails.
10          MS. COPPA-KNUDSON:  -- the information on the tax
11  bill -- copy of the tax bill on the Portola property so that I
12  can go ahead and look into that.  If that's never been
13  transferred, it's an asset of Thomas, I believe, not AT
14  Emerald.
15          MR. LEHNERS:  Can I get you the AT -- assessor's
16  parcel number?
17          MS. COPPA-KNUDSON:  It would be helpful if I just had
18  a copy of the tax bill.  Really helpful.  I mean, and that'll
19  have the assessor's parcel number on it.
20          And, you know, I just recall that I reviewed all the
21  files from the U.S. Trustee's office, and I did not see any
22  bank statements for AT Emerald.
23          MR. LEHNERS:  Okay.  We'll get them.
24          MS. COPPA-KNUDSON:  The file was very limited.  And,
25  you know, whether -- I don't know if they came by email or how
```

76

1  they were sent.  There were no hard copies.  So --

2         MR. LEHNERS:  Mr. Silver, I believe -- we'll arrange

3  this.  I have no problem if you get all the information on the

4  Gmail account, so long as procedures can be set up where any

5  communication to Mr. Thomas's or AT Emerald's counsel can be

6  made into a privilege log.  Everything else is fine.

7         But if you subpoena it, they're going to dump it on

8  you.  We would like an opportunity to have it come to us first.

9  Anything that is identified will be marked and identified.  It

10 just simply will be omitted.  However, if you want to set that

11 up, I'm willing to work with you.

12        MR. SILVER:  Okay.  I appreciate that.  But I'm

13 probably going to serve discovery directly on Mr. Thomas.  I'll

14 copy your office.

15        MR. LEHNERS:  Okay.

16        MR. SILVER:  We'll do it that way.  And, for the

17 record, I'm not waiving the argument that there is no

18 attorney-client privilege, whether it be personal or AT

19 Emerald.

20        MR. LEHNERS:  Agreed.

21        MS. COPPA-KNUDSON:  All right.  So, for the record,

22 this -- the 341 then is concluded.  We will not have a

23 continued 341.  Any further questions can be addressed at the

24 2004.

25        MR. LEHNERS:  Okay.

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)

77

1          MR. SILVER:  Fair enough.  Mike, have you got a

2 business card?

3          MR. LEHNERS:  I believe I do.

4          MR. SILVER:  I'll trade you.

5       (Proceedings concluded)

6                          * * * * *

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

78

# C E R T I F I C A T I O N

1

2

3        I, Alicia Jarrett, court-approved transcriber, hereby

4  certify that the foregoing is a correct transcript from the

5  official electronic sound recording of the proceedings in the

6  above-entitled matter.

7

8

9

10  _____

11  ALICIA JARRETT, AAERT NO. 428      DATE:   August 9, 2018

12  ACCESS TRANSCRIPTS, LLC

13

14

15

16

17

18

19

20

21

22

23

24

25