HASTINGS COLLEGE OF THE LAW LIBRARY

# REPORTS OF CASES

### DETERMINED IN

# THE DISTRICT COURTS OF APPEAL

### OF THE

# STATE OF CALIFORNIA

## FEBRUARY 9, 1945, TO APRIL 24, 1945

### B. E. WITKIN
#### REPORTER OF DECISIONS

### WM. NANKERVIS, JR.
#### ASSISTANT REPORTER

## VOLUME 68 2d

### SAN FRANCISCO
## BANCROFT-WHITNEY COMPANY
### 1945

[Civ. No. 7062.   Third Dist.   Feb. 28, 1945.]

## JOHANNA OLSON OSTERBERG, Appellant, v. WILLIAM OSTERBERG, Respondent.

[1a, 1b] **Deeds—Evidence—Consideration: Validity.**—In an action against the son of plaintiff's deceased husband to cancel a deed executed by the father prior to his marriage with plaintiff, the evidence supported findings that the deed was made and title conveyed, subject to a life estate, for an adequate consideration, free from fraud or undue influence, where, pursuant to the father's agreement to convey, the son aided in maintaining the home and farm, and helped financially to educate his brothers and sisters until his father's death, and where he requested his father to leave matters the way they were, and first learned of the deed subsequent to its execution.

[2] **Id.—Presumptions—Validity of Deed.**—Mere proof of the existence of a confidential relationship between a grantor and a grantee does not raise a presumption of fraud or undue influence, or require the conveyance to be deemed void, unless it also appears that the grantee was active in procuring the deed, or that it was executed without consideration.

[3] **Id.—Consideration—Sufficiency.**—There was adequate consideration for a father's deed to his son, notwithstanding the fact that the agreement to convey was made during the son's minority and the father was entitled to his earnings under Civ. Code, § 197, where the circumstances indicated a waiver of the father's right to wages, the deed was executed long after the son became of age, and the agreement called for continuing services and contributions of funds, the greatest portion of which was rendered and supplied during a 30-year period following the son's attainment of majority.

[4] **Id.—Evidence—Fraud.**—In an action against the son of plaintiff's deceased husband to cancel a deed executed by the father prior to his marriage with plaintiff, the evidence refuted the theory of fraud or deceit on the ground that defendant and his brothers and sisters concealed the fact of the execution of

---

[2] See 9 **Cal.Jur.** 231; 16 **Am.Jur.** 660; 39 **Am.Jur.** 744.
**McK. Dig. References:** [1] Deeds, §§ 184, 185; [2] Deeds, § 166; [3] Deeds, § 36; [4] Deeds, § 185(3); [5] Acknowledgments, § 1; [6] Alteration of Instruments, § 9; [7] Deeds, § 168(4); [8] Cancellation of Instruments, § 37; [9] Deeds, § 14; [10] Alteration of Instruments, § 8.

the deed from plaintiff, where there was positive testimony on the part of one sister that before the wedding she told plaintiff about the conveyance, and plaintiff had replied that she did not care about the conveyance, but merely wanted to live on the premises.

5] **Acknowledgments — Necessity—Validity of Instrument.**—The acknowledgment of a deed is not essential to its validity, being merely evidentiary in character and required only to entitle the deed to be recorded so as to render it competent evidence of the conveyance without further proof.

6] **Alteration of Instruments—Effect—Time.**—The alteration of a deed after its signing and acknowledgment but before its recordation or delivery by inserting therein, at the grantor's request, a reservation of a life estate, does not invalidate the instrument as originally executed.

7] **Deeds — Presumptions — Delivery—Recordation.**—The recording of a deed at the grantor's request is prima facie proof of delivery with intention on the part of the grantor presently to convey title.

8] **Cancellation of Instruments—Defenses.**—In an action against the son of plaintiff's deceased husband to cancel a deed executed by the father prior to his marriage with the plaintiff, plaintiff could not complain of an alteration of the deed by insertion of a reservation of a life estate to the father, after the signing of the deed but before recordation and delivery, such alteration being favorable to the grantor, and plaintiff not being an innocent purchaser for a valuable consideration, but having full knowledge of the conveyance prior to her marriage, and bringing her action more than a year after the recordation of the deed. (Civ. Code, § 1207.)

9] **Deeds — Designation of Parties — Grantees.** — A grant deed which contains no name of a grantee and no sufficient identification of the party to whom the property is to be conveyed is a nullity and void. (Civ. Code, § 1092.)

10] **Alteration of Instruments—Effect—Consent—Ratification.**—A deed is not rendered void by the insertion, after its signing and acknowledgment but before recordation and delivery, of a provision reserving a life estate to the grantor, where this is done by his direction and in his presence, or, if not actually

---

[5] See 1 Cal.Jur. 222; 9 Cal.Jur. 113; 1 **Am.Jur.** 320.

[6] Effect of alteration after acknowledgment or attestation, note, 67 **A.L.R.** 364. See, also, 1 **Cal.Jur.** 1080; 2 **Am.Jur.** 613.

[9] See 9 **Cal.Jur.** 125; 16 **Am.Jur.** 482.

in his presence, where he requests it to be done, and ratifies the change when, with full knowledge thereof, he directs the deed to be recorded and procures its delivery to the grantee in his presence.

APPEAL from a judgment of the Superior Court of Stanislaus County. Gustav B. Hjelm, Judge. Affirmed.

Action to cancel a deed, and for other relief. Judgment for defendant affirmed.

Edward R. Solinsky and Philip C. Boardman for Appellant.

Cleary & Zeff and Sherrill Halbert for Respondent.

THOMPSON, J.—The plaintiff has appealed from a judgment rendered in a suit against the son of her deceased husband, to cancel a deed executed by the father prior to his marriage with plaintiff on the grounds of lack of consideration and undue influence. Plaintiff also asked the court to quiet title in her to a one-third interest in the ranch, and also asked for an accounting of the proceeds therefrom.

The defendant is the oldest son of John Osterberg by a former wife who died in 1908. There were six children as issue of John's first marriage. The father bought a 17-acre ranch near Modesto upon which his family resided. The farm was mortgaged, and the father maintained his family with great difficulty. The defendant was 17 years of age when his mother died. He never married. When the mother died, the father told the defendant that if he would "stay with him" and help maintain and educate his younger brothers and sisters he would convey the home ranch to him. Pursuant to that agreement the defendant left school and worked for five years for wages on adjoining ranches, turning all of his wages over to his father for the maintenance of the family. He also assisted his father in the performance of farm work and spent his evenings with him. In 1913 the father acquired a well-drilling outfit and the defendant assisted him for five years in carrying on that enterprise. In 1918 the defendant joined the Army, serving for four months during the first World War, until the Armistice. He then returned to his home and continued to assist in the farm work and contributed to the maintenance of his father and the family until the death of his father in March, 1942.

In 1920 their house was destroyed by fire. The defendant rocured an old barn which he moved to the home property nd he improved it for the use of the family as a temporary ome. He later borrowed $2,500 which he added to a similar oan obtained by his father, with which they constructed a new ome. The defendant paid his said loan in regular installments. That debt was not fully satisfied until 1932. The defendant paid the taxes on the ranch. The father and son engaged in an oil exploring enterprise on the property at a oss of over $6,000. In 1920 the defendant purchased and planted five acres of peaches on the ranch at his own expense. Later he planted several other acres of fruit trees on the property, at his own cost. After 1919 the son practically assumed the entire charge of the ranch. There is evidence that in the 10 years following the last mentioned date William contributed to the maintenance of the family. He purchased machinery and operated the ranch, expending therefor several thousand dollars which he either paid or for which he assumed the obligation.

In 1919, after William returned from the war, his father told him he was "then ready to turn the place over" to him. William told him "there was no hurry about that; just to leave it the way it was." He said that he did not ask him for the deed. The first time William learned that his father had executed the deed was in June, 1932, when his father returned from town and told him "Bill, the place is now yours." His sister Elsie, who was then employed in a real estate office in Modesto, testified that she drew the deed at the request of her father. Bill was not present when the deed was executed. The children knew that was in accordance with their father's agreement and purpose. A clause reserving the life estate in the grantor was later inserted at his request. Elsie placed the deed in a safe deposit box and later left it with the Modesto Title Company, at the request of her father. In July, 1937, Elsie's father asked her to have the deed recorded. She instructed the title company to do so, and it was recorded at the request of the company July 20, 1937. The deed was manually delivered to William by Elsie at the direction of the father and in his presence in July, 1937.

The plaintiff was related to defendant's mother. She had been previously married and had children by her first husband. He died. She was left without resources or a home.

The plaintiff became engaged to marry John Osterberg. Before their marriage, which occurred March 22, 1933, Mrs. Esther Smith, a daughter of the grantor, told the plaintiff in the presence of plaintiff's daughter, Mrs. Sears, about the conveyance of the property to her brother William. Esther testified that the plaintiff told her regarding that deed that she had been working hard in San Francisco, and "she couldn't do it any more and she had to give it up, and she was glad to come out there and live with my Dad." In reply to the question propounded, "And that she didn't want anything after [his death]?" the plaintiff replied "Absolutely." Q. Just so she had a living? A. Just so she had a home there. . . . Q. Just a home for the time that your father was alive? A. Yes." The plaintiff admitted that John Osterberg told her he was unable to care for the ranch and that he had "turned it over to Bill," subject to the reservation of a life estate in himself. Regarding the transfer of title to the son, the following colloquy occurred during the examination of the plaintiff:

"The Court: He couldn't manage it so he turned it over and took a life estate? A. Yes. The Court: And not for the purpose of cheating you? A. No. He said I was going to be protected. . . . He also told me when he was in the hospital *that there was money left for me, that I was supposed to have.* . . . He said, 'You don't need to worry about it, there is money there for you. He [the defendant] has money for you, and there is some money'."

The plaintiff never at any time asked her husband to have the deed changed or cancelled. She evidently expected he would leave her some money and not an interest in the ranch. July 20, 1937, four years and eight months before the death of her husband, the plaintiff abandoned his home and went to live with her married daughter in San Francisco. She testified in that regard, "I couldn't be there any longer, I couldn't do the work and he knew all about it; it was too much for me to do." The spouses did thereafter associate together, but she never returned to his home at Modesto.

Within two and a half months after the death of John Osterberg this suit was commenced. The defendant answered the complaint, denying the material allegations thereof, and filed a cross-complaint alleging that the ranch was conveyed to him by his father for a good and sufficient consideration, free from fraud or undue influence, and that he was the owner

reof, praying that title thereto be quieted in him. The
urt adopted findings favorable to the defendant and cross-
mplainant in every essential respect. A judgment was
cordingly rendered to the effect that plaintiff was entitled
nothing by her complaint, and title to the ranch was quieted
the defendant. From that judgment this appeal was per-
cted.

The appellant seeks to reverse the judgment on the grounds
at it is not supported by the evidence, and that the deed to
e home property was procured by the defendant without
nsideration and by means of coercion, fraud and undue in-
ience.

[1a]   While there is some conflict of evidence, and we have
t attempted to recite the testimony favorable to the appel-
nt, we are of the opinion there is adequate proof to support
e findings and the judgment. The little 17-acre Modesto
nch was bought by the defendant's father for $45 per acre.
hen the dwelling house was destroyed by fire in 1920 it was
built at a cost of $5,000, at least one-half of which sum was
ntributed by the defendant. It was a modest, inexpensive
me. The property was worth less than $10,000. In 1908,
ter the death of defendant's mother, and 25 years before
aintiff came to live in the family, his father agreed to convey
e property to him in consideration of his aid and assistance
maintaining the home and farm and in helping to educate
s brothers and sisters. He faithfully did so until the time
the death of his father in March, 1942. He worked for
ljacent farmers for wages, all of which he turned over to
is father. He worked on the farm and planted and cared
r some 10 acres of fruit trees at his own expense. He pur-
ased machinery and helped to rebuild the dwelling house.
e contributed to his father's oil drilling enterprise at a cost
excess of $6,000. He furnished his father with funds dur-
g that entire period of time amounting to several thousand
ollars. He gave up the completion of his education to thus
ssist his father. It may not be said there was not adequate
nsideration for the deed.

[2]   The mere proof of the existence of a confidential rela
ionship between a grantor and a grantee of land does not
aise the presumption of fraud or undue influence. (*Best* v.
*aul*, 101 Cal.App. 497 [281 P. 1089].) Nor is a conveyance
eemed to be void merely because such confidential relation

ship existed. (*Jorgensen* v. *Dahlstrom,* 53 Cal.App.2d 322, 333 [127 P.2d 551].) It is only when it also appears that the grantee exercised activity in procuring the deed, or that it was conveyed without consideration, that the burden is placed on the grantee to show that the deed was not obtained by fraud, or undue influence. (*Best* v. *Paul, supra; Jorgensen* v. *Dahlstrom, supra; Hatch* v. *Penzner,* 44 Cal.App.2d 874, 879 [113 P.2d 295]; 39 Am.Jur. § 99, p. 744, and § 100, p. 745.)

[1b]   In the present case there is sufficient evidence to support the findings of the court that the deed was made and the title to the land conveyed, subject to a reservation of a life estate in the grantor, for a valuable and adequate consideration, free from fraud or undue influence or even activity to procure the deed, on the part of the grantee. There is no evidence that the son importuned or coerced or even asked his father at any time to convey the property to him. On the contrary, there is evidence that when William returned from the war in 1919, and his father told him he was then ready to deed him the ranch, William replied that there was no necessity to hurry about that. He requested his father to "leave it the way it was." William testified that he never asked his father to make that deed; that the first time he learned of the execution of the deed was when his father told him in June, 1932, that he had executed the deed. William had nothing to do with procuring the execution of the deed. He was not present when it was made or when it was placed in the custody of the Modesto Title Company. There is ample evidence that the grantee was not active in procuring the deed.

[3]   There is no merit in the contention that the deed was made without consideration since the agreement to convey the title was made during William's minority and that his father was entitled to his earnings, under section 197 of the Civil Code, until he reached the age of his majority. The circumstances of this case indicate that the father waived his legal right to his son's wages during his minority. Moreover, the deed was not executed until long after William became of age. The original voluntary agreement of the grantor was made in consideration of *continuing services* and of contributions of funds by his son. The greatest proportion of services performed and funds supplied by the son was contributed during a period of 30 years after he became of age. Those contributions continued for 10 years after the deed was exe-

cuted in June, 1932, to the time of the grantor's death, with full knowledge of that conveyance on the part of the plaintiff. There was adequate consideration for the deed, independent of the wages contributed before William reached the age of his majority.

[4] The appellant contends that the concealing by the grantee and his brothers and sisters of the fact of the execution of the deed to the defendant furnishes evidence of fraud. The deed was acknowledged June 28, 1932. The children had knowledge of that fact. They also knew their father intended to marry the plaintiff. The marriage did not occur until March 22, 1933. Regarding plaintiff's previous knowledge of that deed, there is a conflict of evidence. But there is positive testimony on the part of Mrs. Esther Smith, a sister of the defendant, that the children had talked of the expected marriage and thought it would be fair to tell the plaintiff about the previous conveyance of the property. Mrs. Smith said that two or three months before the wedding she told the plaintiff about her father's conveyance of the home to William, and his reasons therefor, saying to her "I want you to know that before you marry." At the request of the plaintiff, Mrs. Smith told Mrs. Sears, the daughter of plaintiff, about the conveyance, saying, "I felt it only fair that she should know." In response to that information, the plaintiff replied that she didn't care about the conveyance of the property; that she had been working in an apartment house in San Francisco too hard; that she couldn't stand such hard work, and "she would be glad to live there with that understanding." Mrs. Smith testified that plaintiff said, "I am not asking for anything but just to stay here. . . . To come out there and live with my Dad." That evidence refutes the theory of fraud or deceit on the part of the children.

[5] The deed was not rendered invalid by the addition of the clause inserted at the request of the grantor reserving a life interest in the property, after he had signed the deed and before it was delivered or recorded. The deed was prepared by Elsie Carroll, the daughter of the grantor, at his request. It was dated June 10, 1932, and signed by him. It was duly acknowledged by him June 28, 1932, and was left in the custody of Elsie. It was not recorded or delivered to the grantee until July 20, 1937. In the meantime, the clause reserving the life estate in the grantor was inserted in the deed at his

request. In California the acknowledgment of a deed is not essential to its validity. The acknowledgment of a deed is merely evidentiary in character and is required only to entitle it to be recorded so as to render it competent evidence of the conveyance without further proof. (*Williston* v. *City of Yuba City,* 1 Cal.App.2d 166, 171 [36 P.2d 445] ; *Kimbro* v. *Kimbro,* 199 Cal. 344 [249 P. 180] ; *Dutton* v. *Locke-Paddon,* 37 Cal. App. 693 [174 P. 674] ; 9 Cal.Jur. § 18, p. 113.)

[6] The alteration of the deed by inserting therein before it was recorded or delivered the clause reserving to the grantor a life estate, at his request, did not invalidate the instrument as it was originally executed. (2 Am.Jur. § 23, p. 613 ; 3 C.J.S. § 56, p. 972 and § 58, p. 974 ; 67 A.L.R. 364, note ; *Dutton* v. *Locke-Paddon, supra.*)  In 2 American Jurisprudence at page 613 it is said in that regard :

"The rule seems to be generally established that, in the absence of a statute making acknowledgment or attestation of an instrument, such as a deed or mortgage, a prerequisite to the validity thereof, an alteration made in such an instrument, by consent of the parties, after execution and acknowledgment or attestation, and either before or after delivery, or even after recording, does not, as between the parties thereto, render invalid the instrument as originally executed."

In 3 Corpus Juris Secundum at page 974, *supra,* it is likewise said :

"The parties to an instrument under seal may by consent make a change in it before complete execution, and, since a complete execution of a deed is consummated by final delivery, the mere signing and sealing of an instrument does not preclude changes by consent before delivery."

In the present case there is no doubt the alteration of the deed was made at the request of the grantor, after which he directed it to be recorded and delivered. It was delivered to the grantee in the presence of the grantor, as altered and recorded. It was therefore not invalid on account of the alteration or otherwise. It was accepted by the grantee, subject to the life estate retained by his father. [7] In addition to the positive evidence that the deed was manually delivered to William at the request and in the presence of his father, the recording of the instrument at the request of the grantor was prima facie proof of delivery with the intention on the part of the grantor to presently convey title to the property subject to his reserved life estate. (*Hitch* v.

·h, 24 Cal.App.2d 291, 293 [74 P.2d 1098]; 28 C.J.S.
, p. 245, and § 187, p. 598.)   In the authority last cited it is
at page 600:

The delivery of a deed for record, by one who has executed
acknowledged it, with unqualified instructions to record
;ill raise the presumption in the absence of any rebutting
umstances that the grantor intends to part with his

. . . .

The presumption of delivery arising from recording is
ittable, especially where the deed is recorded by or under
direction of the grantor; *and the burden of overcoming*
*presumption rests on the person who denies delivery."*
ilics added.)

'or the rule regarding the burden of proof, see, also, the case
*izevedo* v. *Azevedo,* 1 Cal.App.2d 504, 507 [36 P.2d 1078].

8] The plaintiff may not complain of the alteration of
deed. It was favorable to the grantor. She was not an
ocent purchaser for a valuable consideration. She had
. knowledge of the deed and conveyance before she married
grantor. Moreover, this suit was not filed for nearly five
rs after the deed with its alteration was duly recorded.
er one year had elapsed from the time of the recording
the deed, the plaintiff was charged with notice of the con-
ts and of any defect, omission or informality which the
d may have contained. Section 1207 of the Civil Code pro-
es in part:

'Any instrument affecting the title to real property, one
ir after the same has been copied into the proper book of
ord, kept in the office of any county recorder, imparts no-
e of its contents to subsequent purchasers and encumbranc-
, notwithstanding any defect, omission, or informality in
execution of the instrument, or in the certificate of acknowl-
ment thereof, or the absence of any such certificate; . . .''

We find nothing in the authorities cited by the appellant
conflict with what we have previously said regarding the
lidity of the deed, its alteration, the adequate consideration
erefor, or its delivery to and acceptance by the grantee.

The case of *Trout* v. *Taylor,* 220 Cal. 652 [32 P.2d 968],
lied upon by the appellant, is not in point. In that case,
e plaintiff, an elderly lady without education or business
perience, was induced to agree to exchange her real prop-
ty for shares of stock in Running Springs Park, Inc. She

signed, acknowledged and delivered to the agent her deed without naming any grantee therein. No authority was given by the grantor for anyone to enter the name of a grantee in the blank space left in the deed which she had executed and delivered. The court said in that regard: ''The record shows no agency, and no authority, express or implied given by plaintiff to defendant R. H. Taylor.'' The court properly held in that case that the deed was void for the reason that it contained the name of no grantee, and the grantor did not authorize the insertion therein of the name of a grantee. **[9]** The authorities are uniform to the effect that a deed which contains no name of the grantee and no sufficient identification of the party to whom the property is to be conveyed, is a nullity and void. (*Tumansky* v. *Woodruff*, 14 Cal.App.2d 279, 283 [57 P.2d 1372] ; 9 Cal.Jur. § 28, p. 125 ; 32 A.L.R. 737, note.) The form of a grant deed, prescribed by section 1092 of the Civil Code, requires that instrument to designate the grantee by name.

**[10]** In the present case the deed contained no such omission or infirmity, and it was not void on that account. In this case there was definite authority from the grantor to insert the clause reserving in him the life estate. If it was not actually done in his presence, he requested it to be done and he ratified that change when, with full knowledge thereof, he directed the recording of the deed and subsequently procured it to be delivered to the grantee in his presence.

The case of *Videau* v. *Griffin*, 21 Cal. 389, upon which the appellant also relies, is not in point. In that case the court properly held that a deed which purported to have been signed and executed by a person other than the owner of the land, was not entitled to be admitted in evidence as the deed of the grantor, because of the lack of written authorization or power of attorney for an agent to sign and execute the deed. The land belonged to Henry Sparks. The deed was signed and acknowledged by John A. Clark, ''as the attorney'' or agent of the grantor. No power of attorney or written authority for Clark to sign or execute the deed was shown. The court properly held that it was not competent evidence of the conveyance of title to the real property. The instrument was held to be a nullity and void. Section 1091 of the Civil Code provides that:

''An estate in real property, other than an estate at will

or for a term not exceeding one year, *can be transferred only by operation of law, or by an instrument in writing, subscribed by the party disposing of the same, or by his agent thereunto authorized by writing.''*   (Italics added.)

In the present case the agent of the grantor did not sign or acknowledge or execute the deed.   The grantor himself signed and acknowledged it.   He instructed his daughter to insert the clause reserving the life estate.   If that was not actually done in the presence of the grantor, it was the duty of the plaintiff to prove that fact.   The deed was valid on its face.   The plaintiff failed to furnish evidence of the absence of the grantor.   He instructed his daughter to record the deed after the change had been made, and he was present when it was actually delivered to the grantee.   Certainly that was sufficient ratification and approval of the change in the deed which was made at his special instance and request, to render it valid as against anyone except a purchaser in good faith for a valuable consideration.   We are of the opinion the deed was not void, under the circumstances of this case, on that account, or at all.

For the foregoing reasons the judgment is affirmed.

Adams, P. J., and Peek, J., concurred.

A petition for a rehearing was denied March 27, 1945, and appellant's petition for a hearing by the Supreme Court was denied April 26, 1945.

---

HASTINGS COLLEGE OF THE LAW LIBRARY

# REPORTS OF CASES

### DETERMINED IN

# THE DISTRICT COURTS OF APPEAL

### OF THE

# STATE OF CALIFORNIA

---

**DECEMBER 17, 1962, TO JANUARY 16, 1963**

---

### WM. NANKERVIS, Jr.
### REPORTER OF DECISIONS

---

## VOLUME 211 2d

SAN FRANCISCO

**BANCROFT-WHITNEY COMPANY**

1963

Our conclusion in the premises render unnecessary a sideration of the other grounds for reversal urged b plaintiff.

The judgment is reversed.

Griffin, P. J., concurred.

---

[Civ. No. 20444.    First Dist., Div. One.    Jan. 15, 1963.

## J. F. BLACKBURN, Plaintiff and Respondent, v. HAR M. DRAKE et al., Defendants and Appellants.

[1] **Deeds—Actions—Questions of Fact—Delivery.**—The int pass title is an essential element of delivery of a dee the question of intent is a question of fact to be determi the trial court or jury on all the circumstances surrol the transaction.

[2] **Id.—Requisites—Delivery—Intent.**—The intent import the delivery of a deed is the intent of the grantor a that of the grantee.

[3] **Id.—Requisites—Delivery—Intent.**—In addition to p delivery, and an acceptance by the grantee, to const valid delivery of a deed there must exist a mutual in on the part of the parties, and particularly on the grantor, to pass title to the property immediately

[4] **Id.—Requisites—Delivery—Necessity for Delivery in Lifetime.**—An instrument, purporting to be a deed o terest in real property, delivered with the intent that take effect only on the death of the grantor, is an att a testamentary disposition and the instrument is, t void as a deed.

[5] **Id. — Presumptions — Delivery.**—Possession of a de grantee, once delivery has been established, raises a p tion that the deed was delivered to grantee on the deed bears.

---

[2] See Cal.Jur.2d, Deeds, § 84; Am.Jur., Deeds (1st e 119).

McK. Dig. References: [1] Deeds, § 190(2); [2, 3] De (1); [4] Deeds, § 73; [5-7] Deeds, § 168(3); [8] Witness (1); [9] Deeds, § 68; [10] Deeds, § 114; [11] Deeds Deeds, § 168(5) [13-15, 20] Deeds, § 66(8); [16] Husb Wife, § 29; [17] Homesteads, § 20; [18] Homesteads, Homesteads, § 3.

[6] **Id. — Presumptions — Delivery.** — Possession of a deed by a
grantee raises an inference, rather than a presumption, that
there has been a valid delivery of the deed by the grantor.

[7] **Id.—Presumptions—Delivery.**—The inference of delivery and
the presumption of the date of delivery, brought about by the
grantee's possession of a deed, are rebuttable, and, in the face
of contrary evidence, are considerations of fact for the trial
court or jury to determine.

[8] **Witnesses — Determination of Credibility — Uncontradicted
Testimony.**—A trial court is not bound to accept an interested
party's testimony as true, even though it is not contradicted
by other testimony, particularly where there are other facts
or circumstances present which constitute a contradiction.

[9] **Deeds—Requisites—Delivery—Recording.** — While it is true
that recordation is not essential to the validity of a deed,
and failure to record in and of itself does not vitiate delivery
or the intent to make a present transfer, failure to record
until after the death of the grantor is a circumstance for the
court to consider with the other circumstances surrounding
a transaction in ascertaining whether the grantor intended the
deed to be presently operative.

[10] **Id. — Interpretation — Time of Taking Effect.**—Decedent's
statements that she did not want to leave her portion of the
community property to her husband but rather thought she
would leave it to her daughters, and that she was going to
make a deed to her daughters, supported the trial court's de-
cision that by the execution of a purported deed to her daugh-
ters she did not intend a present transfer of title, but rather
the deed was intended as a testamentary disposition of the
property to take effect on the grantor's death.

[11] **Id.—Requisites—Delivery—To Third Person.**—Delivery of a
deed by a grantor to one grantee, as a joint owner of the prop-
erty conveyed under the deed, is a sufficient delivery to the
other joint owners.

[12] **Id.—Presumptions—Delivery.**—Where a grantor delivers a
deed to a grantee as a joint owner, the acceptance of the other
joint owners will be presumed even though they had no knowl-
edge of the deed, since the grant is beneficial to them.

[13] **Id. — Requisites — Delivery — Subsequent Possession.**—Acts
of control over property by the grantor do not vitiate the
title of the grantee where there has been a delivery of a deed
by the grantor to the grantee with the intention of conveying
a present title in that property. However, such acts of control
are circumstances which, when added to all the other circum-
stances in the case, may show that there was initially no de-
livery of the deed by the grantor to the grantee.

[14] Id.—Requisites—Delivery—Subsequent Possession.—The subsequent payment of taxes and the keeping up of insurance by the grantor on property, after giving the grantee physical possession of a deed, is consistent with the intent to pass title to the property.

[15] Id.—Requisites.—Delivery—Subsequent Possession.—Exercise of dominion over property by the grantor, after execution of a deed, is incompatible with delivery and inconsistent with divestiture of title.                                            [8]

[16] Husband and Wife — Property — Cotenancy.—A conveyance of property to a husband and wife as joint tenants destroys the statutory presumption that they hold the property as community property.

[17] Homesteads — Property Subject — Community and Separate Property.—A wife may make a declaration of homestead on the separate property of her husband with or without his knowledge, and even over his objections.

[18] Id.—Property Subject.—A homestead in no manner depends on the character of the title that the homestead claimant has, and merely naked possession, without other title, may be impressed with the homestead characteristic.

[19] Id.—Nature of Right.—A homestead claimant acquires only such right of occupancy as he had before the creation of the homestead.

[20] Deeds — Requisites — Delivery — Subsequent Possession.—A declaration of homestead by the grantor of land after execution of a deed (which if effectively delivered, would have resulted in the land's being owned one-half by the grantees and one-half by the grantor's husband), while not in itself negating the fact of delivery of the deed to the grantees, is a factor to be considered by the trial court in determining whether the deed was to be presently operative or operative only at death of the grantor and thus invalid as a deed.

APPEAL from a judgment of the Superior Court of Alameda County.  Joseph A. Murphy, Judge.  Affirmed.

Action to quiet title to real property.  Judgment for plaintiff affirmed.

Johnson & Harmon for Defendants and Appellants.

Brown, Kellogg & Taber for Plaintiff and Respondent.

[16] See Cal.Jur.2d, Community Property, §§ 7, 8, 18, Husband and Wife, § 39; Am.Jur., Husband and Wife (1st ed § 87).

[17] See Cal.Jur.2d, Homesteads, § 22; Am.Jur., Homesteads (1st ed § 65).

MOLINARI, J.—This is an appeal from a judgment quieting title in the respondent to certain real property in Oakland, California.

### Question Presented

In this action to quiet title brought by a surviving husband against his three stepdaughters, the sole question on appeal is whether there is sufficient evidence to support the trial court's finding that a deed executed by the deceased wife was not delivered to the said stepdaughters.

### The Record

The respondent, J. F. Blackburn, is the surviving husband of Josephine Blackburn. Beatrice Giesser, and appellants, Mary Hughes and Harriet Drake, are Mrs. Blackburn's daughters by a previous marriage. During their marriage the Blackburns acquired premises at 8877 Shafter Avenue, Oakland, by a joint tenancy deed. They resided on said premises until Mrs. Blackburn's death on June 5, 1957. During the period that the Blackburns resided together on said premises, Mr. Blackburn paid the taxes, insurance and the costs of repairs and improvements thereon from his earnings. Mrs. Blackburn participated in making repairs and improvements on the house by the performance of manual work.

In 1955, Mrs. Blackburn executed a deed, bearing date of January 21, 1955, purporting to convey her interest in said property to her three daughters. Mrs. Giesser, a defendant in the action below but not a party to this appeal, testified concerning the circumstances surrounding the execution of the deed as follows: that she and Mrs. Blackburn went to the real estate office of a Mrs. Gibb; that Mrs. Blackburn entered said office while she (Mrs. Giesser) parked the car; that she did not know who prepared the deed; that when she entered the office after parking her car the deed had already been prepared; that she didn't recall seeing it before it was signed or notarized; that Mrs. Blackburn signed the deed in question in her presence; that at said time Mrs. Blackburn said to Mrs. Giesser, " 'Well, here it is. You can put me out now, if you want to. Take it and record it' "; that the deed was then handed to her by Mrs. Gibb, "the notary," whereupon she and her mother left the said office. At another stage of her testimony, Mrs. Giesser described this statement of her mother at Mrs. Gibb's office as follows: "Oh, she just kiddingly said, 'There it is. You can put me out now, if you want to,' and I kind of laughed and said,

'Well, it has been done.' "  Mrs. Giesser testified further that she kept the deed at her home and did not record it until after her mother's death, explaining that, because Mr. and Mrs. Blackburn were having domestic difficulties and were on the verge of a divorce she kept "putting off having it recorded," feeling that if she recorded the deed she "might precipitate more trouble between them. . . ."  Mrs. Giesser also testified that from the date of the execution of the deed by her mother until the date of her mother's death she did not exercise any claim of ownership to the property in question in any manner.

In January or February of 1957 Mr. Blackburn was involved in an automobile accident.  Mrs. Blackburn thereupon filed a declaration of homestead on the property without discussing it with Mr. Blackburn and without his knowledge.  The said homestead recited, among other things, that it was made for the joint benefit of herself and her husband.

Mr. Blackburn testified that he did not learn of the execution of this deed or of the homestead until after his wife's death.  He also testified that there was no change in the manner in which he and Mrs. Blackburn conducted themselves toward this property after June 21, 1955, the date on which the deed in question was purportedly executed.

It was stipulated between counsel at the trial that if Mrs. Gibb were called as a witness she would testify that Mrs. Blackburn and Mrs. Giesser appeared before her on January 21, 1955, and that she did, on that date, notarize the deed in question and then handed it to Mrs. Giesser.

Mrs. Hughes, one of the appellants, testified that following the funeral she stated to the respondent "that Mama had left her half of the property to us and that my two sisters and myself had discussed it before . . . and that we had all decided that Pa should have the place to live in as long as he would live. . . ."  Mr. Blackburn continued to live on said premises after his wife's death and still does.  Mrs. Hughes also stated that her mother had told her "that there was much trouble between she and Pa and that she didn't feel like leaving her half of the property to him in view of the fact that apparently their marriage was so far on the rocks that he couldn't say a civil word to her anymore"; that Mrs. Blackburn felt she should leave the property to her and her sisters; and that "she was going to make a deed to us."  There was also testimony adduced from Mrs. Giesser with respect to the deed that she and her mother had explained

an attorney that Mrs. Blackburn "wanted to leave her part to us and we wanted to know if it could be done that way." Mrs. Giesser caused the deed in question to be recorded on June 7, 1957, two days after Mrs. Blackburn's death. Thereafter, Mrs. Giesser quitclaimed her interest in the subject property in exchange for a quitclaim by the respondent of his interest in another parcel. The respondent brought the instant action to quiet title to the property naming as the defendants the three daughters, individually, and Mrs. Giesser, as administratrix of the decedent's estate. Mrs. Giesser answered and disclaimed any interest in the property either on her own behalf or on behalf of the estate. The two other defendants each claimed a one-sixth interest in the property and cross-complained to have such title quieted in them. The trial court held for the respondent, finding that there had been no delivery of the deed to the grantees and that the deed did not convey any interest in the property.

### *Did The Trial Court Err In Finding That The Deed Was Not Delivered*

[1]  Delivery or absence of delivery is a question of fact to be determined by the trial court. (*Condencia* v. *Nelson,* 187 Cal.App.2d 300, 302 [9 Cal.Rptr. 759]; *Chaffee* v. *Sorensen,* 107 Cal.App.2d 284, 288 [236 P.2d 851].)  Intent to pass title is an essential element of delivery and the question of intent is a question of fact to be determined by the trial court or jury upon all the circumstances surrounding the transaction.  (*Jones* v. *Jones,* 183 Cal.App.2d 468, 472 [6 Cal.Rptr. 819]; *Williams* v. *Kidd,* 170 Cal. 631, 638 [151 P. 1, Ann.Cas. 1916 E 703]; *Priest* v. *Bell,* 123 Cal.App.2d 528, 531 [267 P.2d 49]; *Donahue* v. *Sweeney,* 171 Cal. 388 [153 P. 708].)  [2]  The important intention is that of the grantor and not that of the grantee. (*Huth* v. *Katz,* 30 Cal.2d 605, 608 [184 P.2d 521]; 15 Cal.Jur.2d § 84, p. 481.)  A deed delivered with the intent that it shall take effect only on the death of the grantor is an attempted testamentary disposition and therefore void.  (*Williams* v. *Kidd, supra,* 170 Cal. 631, 644.)  [3]  The applicable rule is well-stated in *Henneberry* v. *Henneberry,* 164 Cal.App.2d 125 [330 P.2d 250]: "In addition to physical delivery, and an acceptance by the grantee, to constitute a valid delivery there must exist a mutual intention on the part of the parties, and particularly on the part of the grantor, to pass title to the property immediately.  In other words, to be a valid delivery,

the instrument must be meant by the grantor to be presently operative as a deed, that is, there must be the intent on the part of the grantor to divest himself presently of the title. [4] Even if the document is manually delivered, but the evidence shows that the parties or the grantor intended the document to become operative only upon death, the document is testamentary in character and void as a deed.'' (P, 129.)

The appellants contend that there is a presumption that a deed in the possession of the grantee has been delivered; that this presumption is present in the instant case; and that it has not been rebutted. They rely upon *Stewart* v. *Silva,* 192 Cal. 405 [221 P. 191], wherein it was held that possession of a deed by the grantee constituted prima facie evidence of delivery. There is some confusion among the authorities, however, as to whether possession of a deed raises a presumption or an inference. (See *Estate of Galvin,* 114 Cal.App.2d 354, 360-362 [250 P.2d 333].) A number of cases have held in favor of the existence of the presumption. (*Stewart* v *Silva, supra,* 192 Cal. 405; *Belli* v. *Bonavia,* 167 Cal.App.2d 275 [334 P.2d 196]; *California Trust Co.* v. *Hughes,* 111 Cal App.2d 717 [245 P.2d 874]; *Hill* v. *Donnelly,* 43 Cal.App.2d 47 [110 P.2d 135]; *Thompson* v. *McKenna,* 22 Cal.App. 129 [133 P. 512]; *Central Trust Co.* v. *Stoddard,* 4 Cal.App. 647 [88 P. 806].) Others have held that such possession merely raises an inference of delivery. (See *Miller* v. *Jansen,* 21 Cal.2d 473, 477 [132 P.2d 801], and 13 cases there cited; see also *Hennelly* v. *Bank of America,* 102 Cal.App.2d 754 [228 P.2d 79]; *Jones* v. *Jones, supra,* 183 Cal.App.2d 468. The confusion apparently stems from the interpretation of section 1055 of the Civil Code which provides that ''A grant duly executed is presumed to have been delivered at its date.'' [5] In *Miller* v. *Jansen, supra,* it was held that the presumption created by this section pertains only to the date, not to the fact of delivery; and that a duly signed and *delivered* instrument is presumed to have been delivered at its date. Stated another way, the interpretation of *Miller* is that once delivery in fact is established a presumption attaches that the deed was delivered on the date it bears. [6] As to the fact of delivery, says *Miller,* possession by the grantee gives rise to an *inference* that the instrument was duly delivered. It would appear, therefore, that *Miller* has finally settled the confusion by deciding that possession raises an inference rather than a presumption. (See *Estate of Galvin, supra,* pp. 360-361; *Jones* v. *Jones, supra.*) [7] W

have in the law of our state a statutory presumption as the date of delivery of an instrument, and a nonstatutory inference as to the fact of delivery of the instrument where it is in the possession of the grantee. Whatever the niceties of the law be as between a presumption and an inference insofar as the kind or amount of evidence necessary to dispel such presumption or inference, it is settled law that the inference of delivery and the presumption of date of delivery are rebuttable and in the face of contrary evidence become considerations of fact for the trial court or jury to determine. (Jones v. Jones, supra, 183 Cal.App.2d 468; Hennelly v. Bank of America, supra, 102 Cal.App.2d 754, 758; Estate of Galvin, supra, 114 Cal.App.2d 354.)

As to the fact of delivery, the appellants contend that there is no evidence dispelling the presumption claimed by them. The precise question at hand is whether there are circumstances or other contradicting evidence which dispel the inference of delivery. The respondent is not concerned with the effect of the inference of delivery, or the claimed presumption of delivery, but is content to rest his argument on the assertion that the evidence in support of the trial court's findings was overwhelming and convincing, and that any one of eight items of evidence alluded to would support the court's finding of nondelivery. We do not agree with the respondent that the evidence adduced by the respondent in sustaining his burden of proof as plaintiff, and its effect as evidence dispelling the inference of delivery, was overwhelming; nor are we in accord that each of the items of claimed evidence supports the lower court's findings. Upon a consideration of the entire record we are satisfied, however, that there is sufficient evidence to sustain the trial court's finding of nondelivery, and we shall hereafter allude to the evidentiary items, the cumulative effect of which establishes such sufficiency. Whether there was a delivery involved a disputed question of fact which was the function of the trial judge to determine from the facts and circumstances in evidence, it being within his province to pass upon the credibility of the witnesses, to weigh their testimony, and draw therefrom his inferences.

The appellants lay considerable stress upon the fact that the testimony of Mrs. Giesser as to the delivery of the deed is uncontradicted and that because of that fact and the claimed presumption which follows from her possession of the

814            BLACKBURN v. DRAKE            [211 C.A.

deed, the trial court was not warranted in disregarding testimony. To begin with, there was merely an inference of delivery which was to be weighed with all other evidence in the case. In his memorandum opinion the trial judge stated that he "was not impressed by the testimony of Mrs. Giesser that there was an actual delivery of the deed...." [8] A trial court is not bound to accept an interested party's testimony as true, even though it is not contradicted, particularly where there are other circumstances which constitute a contradiction. (Estate of Galvin, supra, 114 Cal.App.2d 354, 363.) In Lohman v. Lohman, 29 Cal.2d 144, 149 [178 P.2d 657], the court said: "Moreover, a trial judge is not required to accept as true the sworn testimony of a witness, even in the absence of evidence directly contradicting it...." In passing upon Mrs. Giesser's credibility, the court was authorized to consider her interest in the case. And while at the time of trial she no longer had any interest in the particular property because she had quitclaimed it in favor of the respondent, the fact that she did so in exchange for a quitclaim deed from the respondent to her as to another parcel of property, was a circumstance for the trial court's consideration of her interest in the case. Although Mrs. Giesser may not have been directly impeached, yet the judge was not bound to give implicit faith to her testimony. (Estate of Galvin, supra, 114 Cal.App.2d 354, 363; Morgan v. Matthieson, 103 Cal.App. 510, 517 [285 P. 325].)

From the evidence before us, the trial court could find that Mrs. Blackburn did not intend that the deed should be presently operative. This inference could be drawn from Mrs. Giesser's testimony that her mother "just *kiddingly* said, 'There it is. You can put me out now, if you want to'..." (Emphasis added.) Appellants' assertion that Mrs. Blackburn was not "kidding" when she told her daughter to record the deed creates, at best, a conflict in the evidence. [9] While it is true that recordation is not essential to the validity of a deed and that the failure to record in and of itself does not vitiate delivery or the intent to make a present transfer (Belli v. Bonavia, supra, 167 Cal.App.2d 275, 280; Stewart v. Silva, supra, 192 Cal. 405, 410), the failure to record until after the death of the grantor is a circumstance for the court to consider with the other circumstances surrounding the transaction in ascertaining whether the grantor intended the deed to be presently operative. (Estate of Galvin, supra, p. 363; Priest v. Bell, supra, 123 Cal.App.2d 528, 531.)

[10]   The decedent's statements that she "didn't feel like leaving her half of the property" to her husband; that "she felt that she ought to leave it" to her daughters; that "she wanted to leave her part to us"; and that "she was going to make a deed to us," were such as to support the conclusion drawn by the trial court, namely, that Mrs. Blackburn did not intend to part with the title but merely intended the deed as a testamentary disposition to take effect upon her death.   The appellants cite Webster's Collegiate Dictionary in support of their assertion that the word "leave" has many meanings, including "to give up, relinquish" and "To put, place, deposit, deliver, or the like, so as to allow to remain." The respondent, in turn, cites the first listed definition of "leave" in Webster's International Dictionary, to wit: "to allow or cause to remain; to cause to remain, or be followed by, after passing away or cessation; to have remaining at death; hence, to bequeath or devise; . . ."  In *Estate of Nelson*, 132 Cal. 182 [64 P. 294], we find this applicable statement with reference to the meaning of words, to wit: "Philology is, at best, an unsafe criterion for ascertaining the meaning of words which are in common use, and the definition thus obtained is always subordinate to the meaning derived from the context, or from the circumstances under which the word is used."   (P. 191.)   In the instant case we cannot say, as a matter of law, that the trial court was not warranted, under the circumstances, in interpreting the words used as suggestive of a gift at death by way of testamentary disposition.

The appellants assert that even if the grantor intended to "leave" the property to her daughters, the effect is to immediately pass a fee simple, subject to a reserved life estate. Three cases are cited in support of this contention, to wit: *Osborn* v. *Osborn*, 42 Cal.2d 358 [267 P.2d 333]; *Bury* v. *Young*, 98 Cal. 446 [31 P. 338, 35 Am.St.Rep. 186], and *Belli* v. *Bonavia, supra*, 167 Cal.App.2d 275.  None of these cases support the appellants' proposition.  To the contrary, they support the rule that delivery is a question of intent. *Osborn* and *Bury* hold that the deposit of a deed granting an estate in fee simple with a third party and with instructions that it be transmitted to the grantee upon the death of the grantor, conveys a remainder interest in fee simple with a life estate reserved in the grantor, *if the grantor intended the deposit to be irrevocable*.  In each of these cases the deed was delivered to a third party with such instructions.  It was

there held that under the facts and circumstances an intention was evinced by the grantor to make valid delivery of the deed vesting title immediately in the grantees subject to a life tenancy in the grantor. In the instant case we not only have the question of whether there was a valid delivery, but we have a purported delivery to the grantees directly without an intermediate third party acting under instructions to transmit the fee to the grantee upon the death of the grantor. [11] In the present case if there were a valid delivery it was made to the grantees themselves, and while purportedly made to Mrs. Giesser, it was a delivery to all of the sisters because delivery to one joint owner is delivery to the others. (*Belli* v. *Bonavia, supra,* 167 Cal.App.2d 275, 280.) [12] Moreover, it should be here pointed out that if a valid delivery was made to Mrs. Giesser, acceptance on the part of the appellants would be presumed even though they had no knowledge of the deed because the grant is beneficial to them. (*Belli* v. *Bonavia, supra,* p. 280; *Estate of Kalt,* 16 Cal.2d 807, 813 [108 P.2d 401, 133 A.L.R. 1424].) The *Belli* case is not in point because a valid delivery was found to have been made directly to the grantee.

We next consider the course of conduct wherein the decedent, after the execution of the deed and the alleged delivery thereof, continued to live on the premises, permitted her husband to pay all of the taxes from community property (his earnings) and to use the same funds to pay for insurance and various maintenance costs. Appellants assert that similar conduct was held not to overcome the "presumption" of delivery in other decided cases, namely, *Stewart* v. *Silva, supra,* 192 Cal. 405, and *Belli* v. *Bonavia, supra,* 167 Cal.App. 2d 275. In *Stewart,* the grantor executed the deed in compliance with a promise made by his godchild that she would come to live with him and that she would work for him during the rest of his life. There was uncontradicted testimony that the grantor, as he handed the deed in question to the grantee, said: "'This is the deed of your property that I give you. From now on this property is yours, but during the time I live I will receive all the interest and I shall pay the taxes and then after I die send this paper to the recorder. . . .'" (P. 407.) The grantee retained the deed until the grantor's death at which time she recorded it. There was other testimony by third persons as to statements made by the grantor evidencing a present intention to transfer title. The trial court found that the deed was not delivered. In

versing the lower court, the Supreme Court held that under the facts of the case, and as a matter of law, the presumption of delivery was not overcome. As we have pointed out above, the *Stewart* case, which has tacitly been overruled by *Miller* (the *Miller* case did not mention or cite *Stewart*) held that possession of a deed by the grantee raised a presumption of delivery. *Stewart* holds further that a prima facie case is made by such possession and that " 'nothing but the most satisfactory evidence of nondelivery should prevail against the presumption.' " (P. 409.) Consonant with this rule the court held that under the circumstances the grantor's continued residence with the grantee on the property, his exercise of acts of ownership over the property during his lifetime, and the recording of the deed upon his death, were not sufficient to overcome the prima facie case. The rationale of the holding in *Stewart* is that these circumstances would not prevent the delivery from becoming effective "if the grantor in fact *intended* to deliver the deed." (P. 410; emphasis added.) *Stewart* recognized that the intention of the grantor to make a present transfer of title is the paramount consideration. In arriving at its holding, under the rule announced by it, the Supreme Court evaluated the circumstances narrated above against the presumption and found them wanting. Under the present state of our decisional law, however, the exercise of acts of ownership or dominion by the grantor, as well as the absence of such acts on the part of the grantee, are evidentiary circumstances which are weighed by the trier of fact against the *inference* of delivery. **[13]** As pointed out in *Estate of Galvin*, the acts of control by the grantor do not vitiate the title of the grantee *where there has been a delivery*, nor are they shown for the purpose of vitiating the deed. "They were circumstances which if standing alone might not evidence nondelivery, but which added to all the other circumstances in the case strongly show that there was no delivery." (P. 363.) **[14]** *Belli*, which held there *was* a delivery under the facts of the case, reiterated the rule that the "[p]ayment of taxes and keeping up insurance by the grantor are consistent with the intent to pass title." (P. 280). *Belli* does not hold that such circumstances may not be considered in determining whether or not the grantor intended to pass title immediately. While *Belli* follows *Stewart* in holding that possession of the deed by the grantee raises a presumption of delivery, the essence of its

holding is that the payment of taxes and insurance by the grantor and the other circumstances presented did not prevail against the presumption.

[15]   Exercise of dominion over property after the execution of a deed is incompatible with delivery and inconsistent with divestiture of title. (*Condencia* v. *Nelson, supra,* 187 Cal.App.2d 300, 303; *Owens* v. *Ring,* 117 Cal.App.2d 672, 677 [256 P.2d 1040].)   While such dominion does not negate delivery as a matter of law, its incompatibility with delivery renders it a circumstance to be considered by the trier of fact on the question of delivery or nondelivery, particularly when coupled, as here, with the circumstance of nonexercise of dominion by the grantees.   Another circumstance of dominion for the trial court's consideration in the instant case is the declaration of homestead by Mrs. Blackburn after the execution of the deed in question.   Under section 1238, Civil Code, a married female may select a homestead from community property, the separate property of her husband or from that held by the spouses as tenants in common or in joint tenancy. (*Squibb* v. *Squibb,* 190 Cal.App.2d 766, 768 [12 Cal.Rptr. 346].)   In the instant case there was no finding that the property in question was the community property of the parties.   [16]   In the absence of such a finding, the interests of the husband and wife in said property are separate because the property having been conveyed to them as joint tenants, the form of the conveyance destroyed the statutory presumption that it was community property. (*Mears* v. *Mears,* 180 Cal.App.2d 484, 500 [4 Cal.Rptr. 618].)   If, then, there was a valid delivery of the deed in question, Mrs. Blackburn would thus have conveyed her separate one-half interest to her daughters, the other half remaining in her husband. The effect of the declaration of homestead would then have amounted to a declaration of homestead on the one-half interest owned by her husband and the one-half interest of her daughters.   [17]   A wife may make a declaration of homestead on the separate property of her husband, with or without his knowledge, and even over his objection. (Civ. Code, § 1238; *Warner* v. *Warner,* 144 Cal. 615 [78 P. 24]; *Morrison* v. *Barham,* 184 Cal.App.2d 267 [7 Cal.Rptr. 442].) [18]   It has also been decided in this state that a homestead in no wise depends upon the character of the title which the homestead claimant has, and that mere naked possession, without other title, may be impressed with the homestead characteristic. In such a case, the character of the title im-

pressed is of no concern to the creditor and the homestead right may be maintained against all the world but the owner of the superior title. (*Bell* v. *Wilson*, 172 Cal. 123, 126-127 [155 P. 625]; *Spencer* v. *Geissman*, 37 Cal. 96 [99 Am.Dec. 248]; *In re Rauer's Collection Co.*, 87 Cal.App.2d 248, 261 [196 P.2d 803].) The rationale of the last cited cases is that the homestead right is not an estate in the land but a mere privilege of exemption from execution of such estate as the holder occupies. It appears, therefore, since Mrs. Blackburn was in possession of the instant property at the time of the declaration of homestead, that she could declare a homestead on property which was owned one-half by her husband and one-half by her daughters. (See *Estate of Kachigian*, 20 Cal. 2d 787, 789 [128 P.2d 865].) **[19]** Such declaration would not, however, affect the rights of the cotenants because a homestead claimant acquires only such rights of occupancy as he had before the creation of the homestead. The cotenant, in such case, may sell or assign his undivided share or seek partition. (*Squibb* v. *Squibb*, *supra*, 190 Cal.App.2d 766, 769; *Estate of Kachigian*, *supra*, 20 Cal.2d 787.)

The trial court stated in its memorandum opinion that in view of sections 1238, 1242, and 1265 of the Civil Code, applying to homesteads, ''it must be presumed that when the decedent executed and recorded the homestead on March 7, 1957, that she believed that she had some freehold title, interest or estate in the property with the right of possession even though such possession was not exclusive; further, that in the execution and recording of such homestead the decedent exercised an act of proprietorship by her which is evidence of ownership and lack of delivery. . . .'' In view of the foregoing principles applicable to homesteads the trial court was not warranted in indulging in such a presumption. Moreover, the opinion of the trial judge may not be used to impeach, modify or add to his findings because the findings supersede such opinion. (*Gantner* v. *Gantner*, 39 Cal.2d 272 [246 P.2d 923]; *Strudthoff* v. *Yates*, 28 Cal.2d 602 [170 P.2d 873].) Such opinion may, however, be considered for the purpose of discovering the process by which he arrived at his conclusion, and as an aid in interpreting his findings where interpretation is necessary. (*1st Olympic Corp.* v. *Hawryluk*, 185 Cal.App.2d 832, 838 [8 Cal.Rptr. 728].) The trial court found that the homestead was executed by Mrs. Blackburn without the knowledge of Mr. Blackburn of its existence until

HASTINGS COLLEGE OF THE LAW LIBRARY

# REPORTS OF CASES

### DETERMINED IN

## THE COURTS OF APPEAL

#### OF THE

## STATE OF CALIFORNIA

---

**OCTOBER 30, 1968, TO DECEMBER 9, 1968**

---

### WM. NANKERVIS, JR.

**REPORTER OF DECISIONS**

---

## VOLUME 267 2d

SAN FRANCISCO

BANCROFT-WHITNEY COMPANY

1969

[Civ. No. 30859.   Second Dist., Div. Three.   Nov. 15, 1968.]

FORTUNATA A. GONZALES, Plaintiff, Cross-defendant and Respondent, v. EMMETT H. GONZALES, Defendant, Cross-complainant and Appellant.

[1] **Appeal—Questions of Law and Fact—Sufficiency of Evidence to Support Findings—Power of Appellate Court.**—When a finding of fact is attacked on the ground that there is no substantial evidence to sustain it, the power of an appellate court is limited to the determination of whether there is any substantial evidence, contradicted or uncontradicted, which supports the finding of fact.

[2] **Id.—Questions of Law and Fact—Findings on Evidence Subject to Different Inferences—Power of Appellate Court.**— When two or more inferences can reasonably be drawn from the facts, a reviewing court is not empowered to substitute its deductions for those of the trial court.

[3] **Witnesses—Determination of Credibility—Province of Court and Jury.**—In a case tried to the court, the determination of the credibility of each witness and the weight to be given to his or her testimony is within the exclusive province of the trial judge as the trier of fact.

[4] **Id.—Determination of Credibility—Disregarding Part of Testimony of Witness.**—The trier of fact may properly reject part of the testimony of a witness, though not directly contradicted, and combine the accepted portions with bits of testimony or inferences from the testimony of other witnesses thus weaving a cloth of truth out of selected available material.

[5] **Deeds—Execution.**—Although a deed in which several persons are named as grantors is ineffective as against any such person who has not executed it, such an instrument is operative to convey the interest of any person named as grantor who does execute it, unless it is drawn with the obvious intention that it shall not take effect until executed by all the persons named as grantors.

[1] See **Cal.Jur.2d**, Appeal and Error, § 606; **Am.Jur.2d**, Appeal and Error, § 839.

[5] See **Cal.Jur.2d**, Deeds, § 74.

**McK. Dig. References:** [1] Appeal and Error, § 1268(2); [2] Appeal and Error, § 1292(3); [3] Witnesses, § 281; [4] Witnesses, § 296; [5] Deeds, § 27; [6, 13] Quieting Title, § 92; [7] Cotenancy, § 2; [8] Cotenancy, § 7; [9] Deeds, § 66(7); [10] Deeds, § 66(10); [11] Deeds, § 66(3); [12] Deeds, § 66(1); [14] Deeds, § 66(16); [15] Deeds, § 106.

[6] **Quieting Title—Evidence—Weight and Sufficiency.**—In an action to quiet title to an undivided one-half interest in real estate derived under a conveyance naming two joint tenants as grantors, one of whom did not execute the deed, the trier of fact was warranted in drawing the inference that the joint tenant who executed the deed intended it to be effective with respect to his own interest in the property although his joint tenant would not join therein, where, whatever his intent when the deed was originally drawn, he knew for some time before delivery of the deed to plaintiff that his joint tenant did not wish to execute it, but thereafter delivered the deed to plaintiff.

[7] **Cotenancy—Joint Tenancy.**—A joint tenancy may exist as to an undivided interest in property.

[8] **Id.—Joint Tenancy—Conveyances.**—Assuming an effective delivery of the deed, a deed naming a father and son, joint tenant owners, as grantors, and the father and his wife as joint tenants grantees, to an undivided one-half interest in real estate, and the son and his wife as grantees to the other undivided half interest, operated to place title in the father and his wife as joint tenants with respect to an undivided half interest in the property, although the deed was executed by the father but not the son, as the father was free to dispose of his interest without the consent of his son, the effect of such disposition being the termination of the joint tenancy between father and son.

[9] **Deeds—Delivery—Intent.**—In addition to physical delivery of a deed and an acceptance by the grantee, to constitute a valid delivery there must exist a mutual intent on the part of the parties, and particularly on the part of the grantor, to pass title to the property immediately.

[10] **Id.—Delivery—Intention as Question of Fact.**—Even if the document is manually delivered, but the evidence shows that the parties or the grantor intended the document to become operative only upon death, the document is testamentary in character and void as a deed; and the question of intent is one of fact to be determined by the trier of facts on all the evidence.

[11] **Id.—Delivery—Manual Tradition of Instrument.**—The fact that the grantor in a deed to himself and another as joint tenant grantees continued to share in the rents and the burdens inherent in ownership was not inconsistent with an intent that the joint tenancy deed should be immediately effective as of the date upon which it was handed to the joint grantee.

[12] **Id.—Delivery—Effect of Lack of Acknowledgment or Recording of Instrument.**—A finding of effective delivery of a deed

[9] See **Cal.Jur.2d**, Deeds, § 84; **Am.Jur.2d**, Deeds, § 82.

is not precluded by the fact that the deed was not acknowledged or by the fact that it was not recorded prior to the grantor's death.

**[13a, 13b] Quieting Title—Evidence—Weight and Sufficiency—Delivery of Deed.**—In an action to quiet title to an undivided half interest in real estate derived under a conveyance naming two joint tenants as grantors, one of whom did not execute the deed, there was substantial support in the evidence for the trial court's implied finding of fact that the grantor executing the deed intended it to be immediately effective when he handed it to the grantee where, 22 days after he returned home from a hospital after an operation, when he was not feeling well, the husband grantor opened a locked metal box and handed his wife grantee the deed telling her, "This is your papers for your protection," and where, although he put the papers back in the box, not giving his wife the keys thereto, the trier of fact was warranted in drawing an inference that the deed was returned to the box so that it would be safely kept for the wife grantee and not with any intent on the part of the grantor or grantee that the deed should not be immediately effective.

**[14] Deeds—Delivery—Subsequent Possession or Custody of Instrument by Grantor.**—Where the formality of the delivery of a deed with the intent of making the same an immediately effective conveyance has been gone through with by the parties thereto, the fact that after such delivery the grantor retains possession of the deed for purposes of its safekeeping does not affect the validity thereof as accomplishing a present transfer of title.

**[15] Id.—Interpretation—Intention of Parties.**—The primary object of the interpretation of a deed is to ascertain and give effect to the intention of the parties, especially that of the grantor, as it existed at the time of the execution of the instrument.

APPEAL from a judgment of the Superior Court of Los Angeles County. John Stuart Frazer, Judge. Affirmed.

Action and cross-action to quiet title to an undivided one-half interest in real property. Judgment for plaintiff and cross-defendant affirmed.

Samuel W. Blum and Samuel R. Leemon for Defendant, Cross-complainant and Appellant.

Painter, Templeton, Miller & Carlin and Louis Miller for Plaintiff, Cross-defendant and Respondent.

FORD, P. J.—The plaintiff Fortunata A. Gonzales sought to quiet title as against Emmett H. Gonzales and others as to an undivided one-half interest in a parcel of real property. Emmett H. Gonzales answered and, in addition, filed a cross-complaint in which he prayed for a decree quieting title in him. He has appealed from a judgment in favor of Fortunata A. Gonzales.

Sotero Gonzales was the father of the defendant Emmett H. Gonzales. At the time of Sotero's death he was married to the plaintiff Fortunata, that marriage having occurred after Sotero and Emmett had acquired title to the real property as joint tenants on or about March 15, 1949, while Sotero was a widower.

Findings of fact of particular significance on this appeal are as follows: 1. From March 15, 1949, to the month of July of 1960 Emmett and Sotero owned the real property as joint tenants. 2. During the month of July of 1960 that joint tenancy was terminated by the delivery to the plaintiff Fortunata of a deed dated November 15, 1950, "signed and executed by Sotero Gonzales in which Sotero Gonzales and plaintiff [Fortunata Gonzales] are designated [as] grantees as joint tenants." 3. Thereafter Sotero "confirmed said grant and delivery by giving to plaintiff the keys to the box where said deed was kept so that plaintiff had sole control of said deed." 4. From the date of delivery of said deed in July 1960 to the death of Sotero on January 26, 1963, plaintiff Fortunata and Sotero were the owners as joint tenants of an undivided one-half interest in the real property and the defendant Emmett was the owner of an undivided one-half interest therein. 5. The plaintiff Fortunata is the owner of an undivided one-half interest in the real property as the surviving joint tenant under the deed dated November 16, 1950.

For reasons which will be stated we hold that the findings of fact are sustained by substantial evidence and that the judgment must be affirmed.

[1] In reviewing the record this court is governed by the law that when a finding of fact is attacked on the ground that there is no substantial evidence to sustain it, the power of an appellate court is limited to the determination of whether there is any substantial evidence, contradicted or uncontradicted, which supports the finding of fact. [2] Moreover, when two or more inferences can reasonably be drawn from the facts, a reviewing court is not empowered to substitute its deductions for those of the trial court. (*Green Trees Enter-*

*prises, Inc.* v. *Palm Springs Alpine Estates, Inc.,* 66 Cal.2d
782, 784-785 [59 Cal.Rptr. 141, 427 P.2d 805].) **[3]** The
determination of the credibility of each witness and the
weight to be given to his or her testimony is within the exclu-
sive province of the trial judge as the trier of fact. (*Bruce* v.
*Ullery,* 58 Cal.2d 702, 710-711 [25 Cal.Rptr. 841, 375 P.2d
833].) **[4]** The trier of fact ''properly may reject part of
the testimony of a witness, though not directly contradicted,
and combine the accepted portions with bits of testimony or
inferences from the testimony of other witnesses thus weaving
a cloth of truth out of selected available material.'' (*Nevarov*
v. *Caldwell,* 161 Cal.App.2d 762, 777 [327 P.2d 111].)

Evidence which supports the findings of fact will be noted.
Sotero and Fortunata were married on April 28, 1950. She
testified that on November 16, 1950, she went to the office of
Mr. Ochoa, a man in the real estate business, with her hus-
band at his request. There she saw a document entitled ''Joint
Tenancy Deed''[1] and another document entitled ''Amend-
ments to Instructions.''[2] Mr. Ochoa said, ''Mrs. Gonzales,
these papers, if Mr. Gonzales wants to sign it, these papers is
going to be to protect you with the property.'' She signed the
document entitled ''Amendments to Instructions'' after her
husband, Sotero, signed it. Sotero signed the deed. Mr. Ochoa

---

[1]The document received in evidence (exhibit 5) bears the date of
November 16, 1950. The body thereof is in part as follows (the type-
written portions inserted in the printed form being underlined herein):
''In consideration of ONE AND No/100 – – – Dollars, receipt of which
is hereby acknowledged, SOTERO GONZALES, a married man, who acquired
title as a widower and EMMETT H. GONZALES, a married man do hereby
GRANT to SOTERO GONZALES and FORTUNATA A. GONZALES, husband and
wife, as joint tenants, as to an undivided one-half interest and EMMETT
H. GONZALES AND [blank space] HUSBAND AND WIFE, as joint tenants,
as to an undivided one-half interest the real property in the City of Los
Angeles . . . .''

The acknowledgment contains the typewritten names ''Sotero Gonzales
and Emmett H. Gonzales'' but it does not bear the signature of any
notary public.

[2]This document (exhibit 6) was signed only by Sotero and Fortunata.
In the body thereof it is stated that the designated escrow company is
authorized and instructed to draw a deed to the property showing title
vested in ''SOTERO GONZALES and FORTUNATA A. GONZALES, husband and
wife, as joint tenants, as to an undivided one-half interest, and EMMETT
H. GONZALES and [blank space] GONZALES, husband and wife, as joint
tenants, as to an undivided one-half interest.'' The document contains
further instructions, part thereof being as follows: ''Upon receipt of this
signed deed record same. After recordation have recorder's office return
deed to Mr. and Mrs. Gonzales, c/o Mr. Ochoa, 113 N. Rowan, Los
Angeles 63, California.''

said, "I am going to keep these papers over here to ask Emmett to come and sign this paper." The papers were left with Mr. Ochoa.

She next saw the documents at her home in the latter part of January of 1951. Sotero told her that he had gone to Mr. Ochoa's office and obtained the papers that day, that Emmett had not signed them, and that he was "going to put it right in the suitcase and . . . save it."[3] He put the papers in a steel box and then put the box in a suitcase.[4] She did not have a key to either the box or the suitcase. The keys were kept by Sotero. Fortunata further testified that she had the documents in her hands that day and recognized them.

The next discussion which Fortunata had with Sotero concerning the deed was in the latter part of July of 1960. At that time Sotero had been home from the hospital, where he had had an operation, for about 22 days. Sotero opened the suitcase. The papers were in the locked metal box which Sotero then opened. Sotero handed her the two documents (the deed and the "Amendments to Instructions"). He told her, "So this is your papers for your protection." Thereafter Sotero put the papers back in the box, placed the box in the suitcase and returned the suitcase to the closet. He did not give Fortunata the keys to the box and the suitcase. In January 1963, three weeks before Sotero died, he told her to go to the place where the keys were hidden and get them. That was the first time that she had had the keys in her hands. He told her to keep the keys and hide them. Fortunata further testified that when she first got the keys, Sotero told her where they were; they were in an envelope which was under the carpet in the living room; she had not seen them there previously. She gave the keys to Sotero and he gave them to her, telling her that she was the only one who was to have them. Thereafter she retained the keys. The box was not opened until the will was removed from it after Sotero's death.

On redirect examination Fortunata testified further with respect to the incident of July 1960, which occurred after Sotero returned from the hospital: "Well, he give to me the papers one day, taken from the box, and he said, 'I don't feel so good. I don't know what is going to happen to me, so I don't know how long I am going to live.' . . ." In response to a question by the court as to whether anything else was

---

[3]On cross-examination Fortunata testified that in December 1950, Sotero told her that Emmett did not want to sign the papers.

[4]On cross-examination Fortunata said that the "suitcase" was actually a metal trunk which had two locks.

said on that occasion, Fortunata testified: "No, just gave me the papers and that is all. 'I pass away, you have something to do something.'"

Mrs. Scanlan, called as a witness on behalf of the plaintiff, Fortunata, testified that she was "pretty confident" that the deed bearing the date of November 16, 1950 (see fn. 1 of this opinion) was prepared in the office of the escrow company of which she was part owner and vice president; she based her statement upon the fact that her company had a typewriter that had that kind of "type." The number on the instructions (exhibit 6) indicated a miscellaneous file in which matters of that nature were handled, namely "merely requests for the preparing of the document at somebody's request."

Emmett Gonzales testified that his father, Sotero, and Fortunata lived in one of the houses on the property while he lived in another. The third building contained three apartments which were rented.

As a rebuttal witness on behalf of the plaintiff, Sotero's brother Manuel P. Gonzales testified that in 1961 he had a conversation with Sotero in which he said he did not trust his children and he was going to leave a paper to Fortunata about the property. In a later conversation Sotero again said that he left her a paper. He never showed the paper to the witness. Sotero said that he had put it away with the rest of the papers.

[5] The fact that Emmett did not sign the deed did not, as a matter of law, preclude an effective conveyance of Sotero's interest. The governing law has been stated as follows: "A deed in which several persons are named as grantors obviously is ineffective as against any such person who has not executed it. However, such an instrument is operative to convey the interest of any person named as grantor who does execute it, unless it is drawn with the obvious intention that it shall not take effect until executed by all the persons named as grantors, as in the case of a deed of partition." (15 Cal.Jur.2d, Deeds, § 74, p. 473; to the same effect, see 4 Tiffany on Real Property (3d ed. 1939) § 1023, p. 181.) [6] Whatever Sotero's intent may have been when the deed was originally drawn, he knew at the time when the deed was returned to him in January of 1951 that Emmett did not wish to execute the deed. In view of the circumstances existing when Sotero handed the deed to Fortunata in July of 1960, the trier of fact was warranted in drawing the inference that Sotero then intended the deed to be effective with respect

to his own interest in the property even though Emmett
would not join in the deed.

[7]   A joint tenancy may exist as to an undivided interest
in property. (*Estate of Galletio,* 75 Cal.App.2d 580, 585 [171
P.2d 152].)   [8]   Assuming that there was an effective
delivery of the deed, a matter hereinafter considered, the deed
operated to place title in Sotero and Fortunata, as joint ten-
ants, with respect to an undivided one-half interest in the
property. Sotero was free to dispose of his interest without
the consent of Emmett, the effect of such a disposition being
the termination of the joint tenancy. (*Wilk* v. *Vencill,* 30
Cal.2d 104, 108-109 [180 P.2d 351]; *Estate of Harris,* 9 Cal.2d
649, 659 [72 P.2d 873].) The contention of the appellant,
Emmett, that Sotero could not effectively convey his share in
the joint tenancy to himself and Fortunata as joint tenants
because of the provisions of section 683 of the Civil Code[5] is
untenable. Sotero was the sole owner of that share. (See
*Lowenthal* v. *Kunz,* 104 Cal.App.2d 181, 184 [231 P.2d 62];
see also *Blevins* v. *Palmer,* 172 Cal.App.2d 324, 326-329 [342
P.2d 356].) Witkin states: "C.C.683, the frequently amended
governing statute, abandons the common law requirement of
'unity of time, title, interest and possession,' and makes
unnecessary the use of an intermediate conveyance through a
dummy to achieve unity of title. The sole technical requisite
is an express declaration of joint tenancy in the instrument."
(2 Witkin, Summary of Cal. Law (7th ed. 1960) Real
Property § 104, p. 958; see *Blevins* v. *Palmer, supra,* 172 Cal.
App.2d 324, 327-328.)

[9]   Turning to the question of delivery, the **governing**
principle is stated in *Henneberry* v. *Henneberry,* 164 Cal.
App.2d 125, at page 129 [330 P.2d 250]: "In addition to
physical delivery, and an acceptance by the grantee, to consti-
tute a valid delivery there must exist a mutual intention on
the part of the parties, and particularly on the part of the
grantor, to pass title to the property immediately. In other
words, to be a valid delivery, the instrument must be meant
by the grantor to be presently operative as a deed . . . .
[10]   Even if the document is manually delivered, but the

[5]Section 683 of the Civil Code is in pertinent part as follows: "A joint
interest is one owned by two or more persons in equal shares, by a title
created by a single will or transfer, when expressly declared in the will
or transfer to be a joint tenancy, or by transfer from a sole owner to
himself and others, or from tenants in common or joint tenants to them-
selves or some of them, or to themselves or any of them and others, . . .
when expressly declared in the transfer to be a joint tenancy . . . ."

evidence shows that the parties or the grantor intended the document to become operative only upon death, the document is testamentary in character and void as a deed. . . . Fundamentally, the question of intent is one of fact to be determined by the trier of facts on all the evidence.'' **[11]** The fact that Sotero continued to share in the rents and in the burdens inherent in ownership was not inconsistent with an intent that the joint tenancy deed should be immediately effective as of the date upon which it was handed to Fortunata. (See *Longley* v. *Brooks*, 13 Cal.2d 754, 762 [92 P.2d 394].) **[12]** Moreover, a finding of effective delivery was not precluded by the fact that the deed was not acknowledged (*Osterberg* v. *Osterberg*, 68 Cal.App.2d 254, 262 [156 P.2d 46])[6] or by the fact that it was not recorded prior to Sotero's death. (*Blackburn* v. *Drake*, 211 Cal.App.2d 806, 814 [27 Cal. Rptr. 651].)[7] **[13a]** There was substantial support in the evidence, as hereinabove set forth, for the trial court's implied finding of fact that Sotero intended that the deed should be immediately effective when he handed it to Fortunata in July of 1960. Consequently, upon appellate review this court is not free to interfere with that finding of delivery. (*Longley* v. *Brooks, supra,* 13 Cal.2d 754, 760; *Cirimele* v. *Lucchesi,* 100 Cal.App.2d 371, 377 [223 P.2d 681].)[8]

In reaching the determination just stated this court has not overlooked the fact that after Sotero handed the deed to Fortunata it was returned to him and was placed in the box

---

[6]In *Osterberg* the court stated (68 Cal.App.2d, at page 262): ''In California the acknowledgment of a deed is not essential to its validity. The acknowledgment of a deed is merely evidentiary in character and is required only to entitle it to be recorded so as to render it competent evidence of the conveyance without further proof.''

[7]In *Blackburn* the significance of recordation was discussed as follows (211 Cal.App.2d, at page 814): ''While it is true that recordation is not essential to the validity of a deed and that the failure to record in and of itself does not vitiate delivery or the intent to make a present transfer [citations], the failure to record until after the death of the grantor is a circumstance for the court to consider with the other circumstances surrounding the transaction in ascertaining whether the grantor intended the deed to be presently operative.''

[8]The appellant, Emmett, argues that the ''alleged delivery was based solely upon the uncorroborated testimony of Fortunata—the weakest and most unsatisfactory type of evidence when the only person who could successfully contradict such testimony is dead.'' But, as stated in *Scherb* v. *Nelson,* 155 Cal.App.2d 184, at pages 186-187 [317 P.2d 164]: ''It is contended further that evidence of a statement and agreement of a person since deceased is weak evidence, and must be clear and convincing to be acceptable as sufficient proof of the making of the statement or agreement. But the argument is unavailing at this stage of the litigation. The rule is for the trier of fact.'' (See also *Cirimele* v. *Lucchesi, supra,* 100 Cal.App.2d 371, 377.)

which was then redeposited in the metal trunk, the keys to both receptacles being retained by Sotero until shortly before his death. A finding of effective delivery was not thereby precluded. **[14]** As stated in *Goodman* v. *Goodman,* 212 Cal. 730, at page 732 [300 P. 449] : ''The testimony of the grantee, however, was positively to the effect that the deed was handed to her by her husband upon the date of execution thereof and was only retained in the possession of the grantor thereafter for safekeeping. The situation thus presented is sufficiently covered by the almost identical case of *Stone* v. *Daily,* 181 Cal. 571, 581 [185 P. 665], wherein it was held that where the formality of the delivery of a deed with the intent of making the same an immediately effective conveyance has been gone through with by the parties thereto, the fact that after such delivery the grantor retains possession of the deed for purposes of its safekeeping does not affect the validity thereof as accomplishing a present transfer of title.'' Reasoning of the same nature is found in *Longley* v. *Brooks, supra,* 13 Cal.2d 754, at pages 761-762.

**[13b]** In the present case the trier of fact was warranted in drawing the inference that the deed was returned to Sotero's box so that it would be safely kept for Fortunata and not because of any intention on the part of either Sotero or Fortunata that the deed should not be immediately effective. There being substantial support for that inference, this court is not free to interfere therewith.

Finally, the appellant, Emmett, argues that the judgment is prejudicially erroneous in that if the deed was effective for any purpose, Emmett as a named grantee therein was entitled to an undivided one-half interest in and to the property conveyed. But it is manifest that Sotero could not undertake to convey more than his own share or interest in the joint tenancy and that it was his intent to transfer the whole of that share or interest to himself and Fortunata as joint tenants. **[15]** As stated in *Palos Verdes Corp.* v. *Housing Authority,* 202 Cal.App.2d 827, at page 835 [21 Cal.Rptr. 225] : ''The primary object of the interpretation of a deed is to ascertain and give effect to the intention of the parties, especially that of the grantor, as it existed at the time of the execution of the instrument.'' The contention is devoid of merit.

The judgment is affirmed.

Cobey, J., and Moss, J., concurred.

# DEPOSITION OF
# ANTHONY THOMAS, VOLUME I

## Taken on January 15, 2010

# KENMARK VENTURES, LLC -VS- TONY THOMAS, ET AL.

### PAGE 1 TO PAGE 229

### COMPLIMENTARY CONDENSED

# Advantage Reporting
# ARS
# Services, LLC

**1083 Lincoln Ave.**
**San Jose, CA 95125**
**Phone 408-920-0222**
**Fax 408-920-0188**

DEPOSITION OF ANTHONY THOMAS, VOLUME I

KENMARK VENTURES, LLC, a
California limited liability
company,

        Plaintiff,

-vs-                                    No.   108CV130677

TONY THOMAS, an individual;
et al.,

        Defendants.

DEPOSITION OF ANTHONY THOMAS

VOLUME I

(Pages 1 to 229)

Date:     Friday, January 15, 2010

Time:     9:11 a.m.

Location:  MILLER, MORTON, CAILLAT & NEVIS
           25 Metro Drive
           7th Floor
           San Jose, CA   95110

Reported by:  Gina Minnis
              CSR No. 11996

#35081

DEPOSITION OF ANTHONY THOMAS, VOLUME I

```
                                                     Page 2
 1                 A P P E A R A N C E S:

 2

 3   For the Plaintiff:  MILLER, MORTON, CAILLAT & NEVIS
                         BY:   JOSEPH A. SCANLAN, ESQ.
 4                       25 Metro Drive
                         7th Floor
 5                       San Jose, CA  95110
                         (408) 292-1765
 6

 7
     For the Defendants: LAW OFFICES OF JOSEPH R. KAFKA
 8                       BY:   JOSEPH R. KAFKA, ESQ.
                         1541 The Alameda
 9                       San Jose, CA  95126
                         (408) 993-8441
10

11
     Also Present:       KEN TERSINI
12

13
     The Reporter:       ADVANTAGE REPORTING SERVICES
14                       BY:  GINA MINNIS, CSR 11996
                         1083 Lincoln Avenue
15                       San Jose, CA  95125
                         (408) 920-0222
16

17

18                       ---o0o---

19

20

21

22

23

24

25
```

DEPOSITION OF ANTHONY THOMAS, VOLUME I

Page 3

1        I N D E X   O F   E X A M I N A T I O N S:

2                                                      Page

3    Examination by Mr. Scanlan                          4

4

5

6

7        I N D E X   O F   E X H I B I T S:

8    Plaintiff's
     Exhibits                                         Page

9

         1        Document Entitled "Memorandum re      51
10                e-Smart litigation" and letter
                  to Whom it May Concern from Glen
11                T. Jonas dated 6/26/07

12       2        Document Entitled "History of the     161
                  Thomas Emerald," Bates stamped
13                K0160 and K0161

14       3        Harrison Steele Partners PP           168
                  Appraisal dated 12/3/06, Bates
15                stamped K0123 and K0124

16       4        jnh World Forensics, LLC              175
                  Appraisal dated 2/22/07,
17                Bates stamped K0146 to K0152

18       5        Ringsrud Gemology Emerald Report      181
                  dated 3/23/07, Bates stamped
19                K0158 and K0159

20       6        Ringsrud Gemology Emerald Report      187
                  dated 9/23/09, Bates stamped
21                ATE0033 through ATE0036

22       7        Letter to Whom it May Concern         200
                  from Lori Puccinelli Stern dated
23                11/4/09, Bates stamped ATE0019
                  with attachment

24                      ---o0o---

25

DEPOSITION OF ANTHONY THOMAS, VOLUME I

Page 4

1                    ANTHONY THOMAS,

2     being first duly sworn by the Certified Shorthand

3     Reporter to tell the truth, the whole truth, and

4     nothing but the truth, testified as follows:

5

6            EXAMINATION BY MR. SCANLAN:

7     Q  Good morning, Mr. Thomas.  We have met before

8     but I want to reintroduce myself.  My name is Joe

9     Scanlan.  I'm an attorney and I represent Kenmark

10    Ventures, LLC, with regard to a lawsuit that's now

11    pending in Santa Clara County including certain

12    cross-actions in that, and it is in that regard

13    that I've asked you to come here to answer some

14    questions.

15           Before today you and I have met on one

16    occasion -- and I don't know if you recall --

17    involving the Tony Gonzales case.

18    A  Oh, okay.

19    Q  I was Mr. Gonzales's attorney.

20    A  Okay.

21    Q  So we have met before but I did want to

22    reintroduce myself.  My first question to you is

23    have you ever been deposed before?

24    A  Yes.

25    Q  On how many occasions have you been deposed?

1  deposition that you saw the documents for the first time the

2  previous night, but your testimony is now that you saw them

3  five years' prior?

4  A    Well, I went back and looked at my emails and documents

5  that I had and saw that I received the documents.

6            THE COURT:  When did you do that?

7            THE WITNESS:  What's that?

8            THE COURT:  When did you do that?  When did you go

9  back and look at your emails?

10            THE WITNESS:  I went back and looked after my

11  deposition.

12            THE COURT:  Okay.

13  BY MR. COGAN

14  Q    So approximately five years ago?

15  A    Yeah.  And then I called my -- I called the attorney and

16  asked why didn't you tell me that these were the documents that

17  we needed -- Ken Tersini?

18  Q    Okay.  Do you have any reading disabilities?

19  A    I have a hard time recognizing documents.

20  Q    And why is that?

21  A    Because I'm dyslexic, very dyslexic, and it's hard for me.

22  Q    Okay.  Could you go to -- I'm not sure it's admitted --

23  Plaintiff's 26.

24            THE CLERK:  No.  It's not admitted.

25  BY MR. COGAN:

DEPOSITION OF ANTHONY THOMAS, VOLUME I

Page 161

1          (Whereupon, Plaintiff's Exhibit 2 was

2    marked for identification.)

3    BY MR. SCANLAN:

4    Q  Mr. Thomas, take a minute, please, and look at

5    Exhibit 2.

6    A  Okay.

7    Q  A few questions for you.  First of all, there's

8    a signature that appears about two-thirds of the

9    way down that looks like Anthony Thomas.

10   A  Yep.

11   Q  Is that your signature?

12   A  My signature says, "Tony Thomas," yes.

13   Q  But the Tony Thomas is your signature?

14   A  Yes.

15   Q  And you signed the first page of Exhibit 2 on

16   February 17, 2004?

17   A  Yes.

18   Q  And you meant for everything to be contained in

19   Exhibit 2 to be true and correct; is that right?

20   A  I meant for it to be.

21   Q  And in fact you had it notarized?

22   A  Yeah.  But there were some things in here that

23   weren't true.

24   Q  What wasn't true?

25   A  Well, I was supposed to be part of the mine

DEPOSITION OF ANTHONY THOMAS, VOLUME I

Page 162

1  owner but that didn't result, that didn't come to

2  fruition.  Those things fell out.  At the time

3  that this document was done, I thought I was going

4  to be part of the mine.  That didn't come to

5  fruition, and I didn't prepare this letter and I

6  didn't --

7  Q  Let me see, before we get into what else is

8  incorrect about it, you got the emerald in 2001.

9  Correct?

10  A  Yeah.

11  Q  And by 2004 you still didn't know whether you

12  were going to be part of the mine or not?

13  A  I didn't prepare this document, and I noticed

14  after this document was prepared that there was

15  something on here that wasn't the truth.  That's

16  all.  I didn't read it correct- -- didn't read

17  through this properly when I signed it.

18  Q  Who drafted the document?

19  A  I don't recall but I think it was the attorneys

20  at Berliner and Cohen.

21  Q  For what purpose was Exhibit 2 created?

22  A  I don't recall.  There was some funding thing

23  that Christina was working on -- Christine.

24        MR. KAFKA:  Long.

25        THE WITNESS:  Long.

DEPOSITION OF ANTHONY THOMAS, VOLUME I

Page 163

1   BY MR. SCANLAN:

2   Q   Some kind of funding thing for whom?

3   A   For me.

4   Q   Personally or AT Emerald, LLC?

5   A   For AT Emerald, LLC.

6   Q   And was that funding thing pledging the Thomas

7   Emerald as collateral to someone?

8   A   No.

9   Q   Then what do you recall about the funding

10   thing?

11   A   It was some type of -- I don't have a full

12   understanding of it today.  It was some type of

13   trade program that she was familiar with, and this

14   is one of the documents that they prepared for the

15   programs, and I still don't understand it today.

16   Q   But you signed it?

17   A   Yeah.  I signed it.

18   Q   Is it your custom and practice to sometimes

19   sign things that are not true and correct?

20   A   No.  It's -- I'm dyslexic and sometimes I don't

21   understand, don't always get the gist of something

22   I'm reading.

23   Q   I'm not being facetious at all.  Because of

24   some things that Mr. Gardiner said, which I'll go

25   into in a minute, do you have difficulty reading

DEPOSITION OF ANTHONY THOMAS, VOLUME I

Page 164

1    and understanding English?

2    A    I have difficulties reading, yes, but not

3    understanding English in a verbal manner, but I

4    don't always pick up everything when I am reading

5    it.

6    Q    I will represent to you that Mr. Gardiner said

7    to me and to Mr. Tersini that you had sometimes

8    said you are illiterate or that it was his opinion

9    that you were illiterate.

10           Fair statement or an unfair statement?

11    A    I don't think I'm illiterate.  Just because

12    somebody, you know -- different people learn

13    different things different ways, and I don't pick

14    up things particularly well on documents and don't

15    always catch everything on a document that's

16    written.  So I've been dyslexic my whole life.

17    It's been a difficulty for me.  Everybody excels

18    in life a different way.  I couldn't excel through

19    the college and all that stuff.  I excelled

20    through business.

21    Q    I'm with you and I truly did not mean that to

22    be -- members of my family are dyslexic.  I

23    understand it.  I understand the way it works.

24    The only reason I bring it up is I don't know

25    whether there are going to be other documents

DEPOSITION OF ANTHONY THOMAS, VOLUME I

Page 165

1    where you say I didn't understand that, and I

2    wanted to put it out on the table.

3         Your dyslexia was not severe enough to

4    prevent you from graduating from high school.

5    Right?

6    A  No.  It wasn't but it wasn't easy for me to get

7    through high school.  I didn't get through high

8    school -- you know, I had to work a lot harder at

9    it than most people, and English wasn't my strong

10   suit, you know.  I took different classes that

11   they provided so that I could get through that

12   curriculum in the school so I could get my

13   graduation, but it wasn't easy for me.  My skill

14   set in spelling in all that stuff is probably not

15   as good as my kids' and they are young kids, but

16   it doesn't mean that, you know, I'm not smart.

17   Q  Agreed.  And the one last thing is you were

18   able to take and pass the Contractors License

19   Board test notwithstanding that dyslexia?

20   A  Yeah.  It wasn't easy for me, you know.  I

21   worked my ass off to get through that test.  It

22   was not something I just walked through.  I

23   studied hard and worked at it and I passed it, but

24   this is not my strong suit.

25   Q  I'm with you.  So having said all of this, from

DEPOSITION OF ANTHONY THOMAS, VOLUME I

Page 166

```
 1   time to time I'll be asking you if there were

 2   documents you didn't understand and in hindsight

 3   don't understand now and so on and so forth, and

 4   that's the only reason I brought it up.

 5          You had begun by identifying things in

 6   Exhibit 2 that are incorrect.  One is that this

 7   implies that you had an interest in the mine.

 8          You didn't in 2004, you didn't in 2001,

 9   and you don't now.  Correct?

10   A   That's correct.

11   Q   Anything else in there that's incorrect?

12   A   Can you give me a minute to read through it?

13   Q   You bet.

14   A   Because I didn't prepare this document.

15   Q   You bet.

16   A   Do you have any glasses that I can use?

17          MR. KAFKA:  I don't.

18          THE WITNESS:  The print is small.  As I

19   sit here today, I don't know whether it's true or

20   it's not true because these were things that were

21   told to me by the Brazilians, and as I sit here

22   today, I know that they lied to me about several

23   things.  That's how I can answer that question.  I

24   was defrauded on several different levels with

25   them.  So as I sit here today, I don't know
```

DEPOSITION OF ANTHONY THOMAS, VOLUME I

Page 167

1   whether that's true or not true.

2   BY MR. SCANLAN:

3   Q   Let me ask you this:  Exhibit 2 seems to

4   indicate that you were given the emerald in

5   consideration of your investment.

6           Just confirming your testimony this

7   morning, you actually paid for it.  You bought it

8   for 20,000?

9   A   Yeah.  I bought it.  I had a wire transfer.  I

10  bought it and I have a bill of sale.

11  Q   Do you still have that bill of sale?

12  A   No.

13  Q   No?

14  A   No.  I had a house fire in '06, and I lost a

15  lot of those documents.

16  Q   Before I put that up, did you provide a copy of

17  Exhibit 2 to Ken Tersini or Kenmark?

18  A   I don't believe I provided them with these

19  copies.

20  Q   Do you have a belief as to someone else who

21  did?

22  A   Yeah.

23  Q   Who?

24  A   Todd Carper.

25  Q   Did you ask Mr. Carper to deliver Exhibit 2 to

III

114TH CONGRESS
2D SESSION

# S. RES. 576

Calling on Congress, schools, and State and local educational agencies to recognize the significant educational implications of dyslexia that must be addressed and designating October 2016 as "National Dyslexia Awareness Month".

———————

## IN THE SENATE OF THE UNITED STATES

SEPTEMBER 26, 2016

Mr. CASSIDY (for himself, Ms. MIKULSKI, Mr. MURPHY, and Ms. WARREN) submitted the following resolution; which was considered and agreed to

———————

# RESOLUTION

Calling on Congress, schools, and State and local educational agencies to recognize the significant educational implications of dyslexia that must be addressed and designating October 2016 as "National Dyslexia Awareness Month".

Whereas dyslexia is—

(1) defined as an unexpected difficulty in reading for an individual who has the intelligence to be a much better reader; and

(2) most commonly due to a difficulty in phonological processing (the appreciation of the individual sounds of spoken language), which affects the ability of an individual to speak, read, spell, and often, learn a second language;

2

Whereas dyslexia is the most common learning disability and affects 80 percent to 90 percent of all individuals with a learning disability;

Whereas dyslexia is highly prevalent, affecting as many as 1 out of 5 individuals, and persistent;

Whereas dyslexia is a paradox such that an individual with dyslexia may have—

(1) weaknesses in decoding that results in difficulties in accurate or fluent word recognition; and

(2) strengths in higher-level cognitive functions, such as reasoning, critical thinking, concept formation, or problem solving;

Whereas great progress has been made in understanding dyslexia on a scientific level, including the epidemiology and cognitive and neurobiological bases of dyslexia; and

Whereas early diagnosis of dyslexia is critical for ensuring that individuals with dyslexia receive focused, evidence-based intervention that leads to the promotion of self-awareness and self-empowerment and the provision of necessary accommodations so as to ensure school and life success: Now, therefore, be it

1    *Resolved*, That the Senate—

2        (1) calls on Congress, schools, and State and

3    local educational agencies to recognize that dyslexia

4    has significant educational implications that must be

5    addressed; and

6        (2) designates October 2016 as "National Dys-

7    lexia Awareness Month".

○

# California Dyslexia Guidelines

**California Department of Education**
**Sacramento, 2017**

(Last Modified October 2017)



## Publishing Information

*California Dyslexia Guidelines* was prepared under the direction of the Special
publication was edited by John McLean, working in cooperation with Allison
Smith, Special Education Consultant, Policy and Program Services Unit, CDE
Special Education Division. The document was prepared for publication by the
staff of CDE Press. Aristotle Ramirez created the cover and interior design. It
was published by the Department of Education, 1430 N Street, Sacramento, CA
95814, and was distributed under the provisions of the Library Distribution Act
and *Government Code* Section 11096.

© 2017 by the California Department of Education
All rights reserved

ISBN: 978-0-8011-1783-1

## Notice

The guidance in *California Dyslexia Guidelines* is not binding on local educational
decisions that are referenced herein, the document is exemplary, and
compliance with it is not mandatory. (See *Education Code* Section 33308.5.)

## Additional Publications and Educational Resources

For information about publications and educational resources available from
the California Department of Education, please visit the CDE's Educational
*Resources Catalog* page or call the CDE Press sales office at 1-800-995-4099.

# Contents

A Message from the State Superintendent of Public Instruction ........................... v

Acknowledgments ................................................................. vii

Introduction ...................................................................... 1

Chapter 1: A Twenty-First-Century Definition of Dyslexia ................................. 3

Chapter 2: The Neuroscience of Dyslexia ................................................. 6

Chapter 3: Dyslexia as a Language-Learning Disability ................................... 9

Chapter 4: Characteristics of Dyslexia by Age Group—Strengths and Weaknesses ......... 14

Chapter 5: Socioemotional Factors of Dyslexia .......................................... 24

Chapter 6: When the Concern May Not Be Dyslexia ...................................... 26

Chapter 7: Dyslexia in English Learners ................................................ 33

Chapter 8: Pre-Service and In-Service Preparation for Educators ......................... 38

Chapter 9: Screening and Assessment for Dyslexia ...................................... 42

Chapter 10: Special Education and 504 Plans ........................................... 59

Chapter 11: Effective Approaches for Teaching Students with Dyslexia .................... 63

Chapter 12: Assistive Technology ...................................................... 75

Chapter 13: Information for Parents and Guardians ...................................... 81

Chapter 14: Frequently Asked Questions ............................................... 95

Appendix A: Assessment Tools ........................................................ 99

Appendix B: Assistive Technology Resources .......................................... 103

Appendix C: Legal Citations .......................................................... 104

Glossary ........................................................................... 106

References ......................................................................... 110



# A MESSAGE FROM THE

I am pleased to present *California Dyslexia Guidelines,* which was written in response to the passage of Assembly Bill 1369, Chapter 647, Statutes of 2015, and which added sections 56334 and 56335 to California's *Education Code.* The purpose of these guidelines is to assist regular education teachers, special education teachers, and parents in identifying, assessing, and supporting students with dyslexia.

The work of the California Department of Education was accomplished with the invaluable contributions of a broad range of stakeholders who provided their expertise in the many topic areas addressed in the guidelines. These guidelines draw on both current research and the collective professional wisdom and experience of the members of the Dyslexia Guidelines Work Group, which met in a series of seven meetings from April 2016 through March 2017.

The ability to read is a fundamental skill in modern society. It is the foundation on which we can build lifelong learning. When we learn to read, we are liberated: the entirety of the world's knowledge is available to us, and we are empowered to take control of our own education. Yet for people with dyslexia, this ability can be frustratingly out of reach. They struggle to master the code that translates groups of letters into meaningful words, sentences, passages, and books.

Over the past several decades, we have learned a great deal about dyslexia. For example, we have learned that dyslexia is a real disability that is neurobiological in nature and affects millions of people around the world. We have also learned that for most people with dyslexia, the primary problem is difficulty in being able to recognize and manipulate the smallest units of sounds, called *phonemes,* in human language. This makes it difficult to link these sounds to the letter or letters, called *graphemes,* that represent the sounds in print. Difficulty making the connections between sounds and letters leads to problems with reading words, sentences, and passages fluently.

We have learned how to identify people with dyslexia at a very early age and later in life. And we have learned that early identification and intervention is very important.

We have also learned how to teach people with dyslexia to read fluently and with comprehension. Extensive research has shown us that reading instruction for students with

dyslexia must teach phonemic awareness—the ability to recognize and manipulate phonemes in words. Students must be taught how to link these phonemes to letters and how to blend sounds and segment words when reading and spelling—a method of teaching early reading known as "phonics." This reading instruction must also teach vocabulary, fluency, and reading comprehension strategies.

Additionally, we have learned that effective reading programs for students with dyslexia incorporate multisensory techniques to explicitly and systematically teach all of the skills mentioned above, so that each new skill builds logically and coherently on the skills that were taught before.

Perhaps most importantly, we have learned that there is hope for people with dyslexia—but to translate that hope into reality takes a concerted and relentless effort.

The purpose of California's dyslexia guidelines is to provide educators, parents, and other stakeholders with a road map for supporting students with dyslexia in California's public schools.

*Tom Torlakson*

**Tom Torlakson**
State Superintendent of Public Instruction

# Introduction

Educating students with dyslexia is a dynamic field of inquiry and practice; each year brings new discoveries about this condition. California's dyslexia guidelines represent a snapshot in time. They attempt to provide up-to-date information to parents, general educators, and special educators while building on hard-won knowledge confirmed over decades of research.

Although the information provided in these guidelines is not legally binding on local educational agencies, the goal in publishing *California Dyslexia Guidelines* is to create a document that provides practical resources for identifying and educating students who are struggling academically because they cannot read.

This document is structured to present technical information in an accessible format by organizing text with introductory chapter bullets, brief paragraphs, graphic elements, and relatively short chapters. Entire books have been written on many of the areas covered by these guidelines, so Web links to additional resources are provided at the conclusion of every chapter for readers who want to know more about specific topics.

The California Department of Education believes that the following principles are essential to educating students with dyslexia. These principles form the foundation of the guidelines and inform the perspective from which the guidelines were written:

- Students with dyslexia need a knowledge-based and active system of support that includes families, educators, and other professionals.
- Learning needs related to dyslexia exist on a continuum; therefore, systems of support must be designed to meet the diversity of students' needs.
- An educational system should address the needs of individual students within an integrated and tiered system of support.
- Students who have dyslexia are "general education students" first, can be educated in general education classrooms, and benefit from a wide variety of supports. Those supports must include a comprehensive, evidence-based approach to reading and language instruction that is implemented by trained educators. Required supports may include various accommodations and assistive technology. Students with dyslexia sometimes require special education.
- An interdisciplinary team approach is most effective when it takes advantage of everyone's expertise and includes all team members in decision making, problem solving, and instructional leadership.

- Guiding principles for educating students with dyslexia must be anchored in programs that are evidence based, whenever possible, and that incorporate structured literacy instruction that is comprehensive, systematic, explicit, cumulative, and multisensory.

With these principles in mind, and the content provided in the following chapters, California's dyslexia guidelines seek to improve the academic outcomes for all students with dyslexia in all education settings.

## CHAPTER 1
# A Twenty-First-Century Definition of Dyslexia



The International Dyslexia Association (IDA) provides the following definition of dyslexia, which was adopted by the United States National Institutes of Child Health and Human Development (Lyon, Shaywitz, and Shaywitz 2003). This definition has been widely cited by researchers and educators, and it is currently included in many state education codes, including those of Washington, Arkansas, New Jersey, and Ohio:

> Dyslexia is a specific learning disability that is neurobiological in origin. It is characterized by difficulties with accurate and/or fluent word recognition and by poor spelling and decoding abilities. These difficulties typically result from a deficit in the phonological component of language that is often unexpected in relation to other cognitive abilities and the provision of effective classroom instruction. Secondary consequences may include problems in reading comprehension and reduced reading experience that can impede growth of vocabulary and background knowledge. (IDA 2002)

Dyslexia may also be understood as one type of a "specific learning disability," which is defined in California's regulations pertaining to students who qualify for special education services. Title 5, *California Code of Regulations,* Section 3030(b)(10)(A) discusses specific learning disabilities and dyslexia as follows:

> Specific learning disability means a disorder in one or more of the basic psychological processes involved in understanding or in using language, spoken or written, that may have manifested itself in the imperfect ability to listen, think, speak, read, write, spell, or to do mathematical calculations, including conditions such as perceptual disabilities, brain injury, minimal brain dysfunction, **dyslexia,** and developmental aphasia. The basic psychological processes include attention, visual processing, auditory processing, **phonological processing,** sensory-motor skills, cognitive abilities including association, conceptualization and expression . . . Specific learning disabilities do not include learning problems that are primarily the result of visual, hearing, or motor disabilities, of intellectual disability, of emotional disturbance, or of environmental, cultural, or economic disadvantage.

Science continues to progress, and new knowledge about the epidemiology—the cognitive basis and neurobiology of dyslexia—is available. The following information helps to provide an understanding of dyslexia, including its basis, impact, and symptoms:

- Dyslexia is an unexpected difficulty in reading for an individual who has the intelligence to be a much better reader, due most commonly to a difficulty in phonological processing—that is, in appreciating the individual sounds of spoken language—which affects the ability of an individual to speak, read, spell, and often learn a second language.

- Dyslexia is a paradox; an individual with dyslexia may have weakness in decoding that results in difficulties in accurate and fluent word recognition and strengths in higher-level cognitive functions, such as reasoning, critical thinking, concept formation, or problem solving. These strengths reflect the "Sea of Strengths Model of Dyslexia" (Shaywitz 2003).

- Great progress has been made in understanding dyslexia on a scientific level, including the epidemiology and cognitive and neurobiological bases of dyslexia.

- Early diagnosis is especially critical for narrowing the achievement gap, which is present as early as first grade; this is accomplished by screening, followed by identification and remediation with evidence-based approaches. Early diagnosis is also critical for ensuring that students with dyslexia receive focused, evidence-based intervention leading to self-awareness, self-empowerment, and the provision of necessary accommodations for success in school and life.

- According to the IDA (2016b), dyslexia affects people from different cultural, ethnic, and socioeconomic backgrounds nearly equally.

- It has long been known that dyslexia is heritable, so it runs in families. When assessing a student for dyslexia, it is important to ask about family history.

- Dyslexia often occurs in combination with other handicapping conditions (e.g., dysgraphia, dyscalculia, oral language impairment, and attention-deficit/hyperactivity disorder [ADHD]).

## MORE INFORMATION

- The IDA provides a series of <u>Fact Sheets</u> covering topics such as "Dyslexia Basics" and "Helpful Terminology." The organization also maintains a list of <u>Frequently Asked Questions</u>.

- *Dyslexia Connection*, an e-newsletter published by the IDA for parents and families, offers current information related to dyslexia.

- The <u>Examiner</u>, a monthly e-newsletter also published by the IDA, provides information about the IDA, dyslexia, and literacy-related events and topics in the field and around the world. Readers may subscribe to the *Examiner* free of charge.

- In September 2016, the United States Senate passed <u>Senate Resolution 576</u>, which called upon Congress, schools, and state and local educational agencies to "recognize the significant educational implications of dyslexia that must be addressed" and designated October 2016 as National Dyslexia Awareness Month. The <u>full text of the resolution</u> also provided a current definition of dyslexia.

- Links to state and federal laws and regulations about dyslexia are provided in appendix C.



## CHAPTER 2
# The Neuroscience of Dyslexia

Dyslexia is a neurobiological disorder with brain patterns ("neural signatures") that reflect poor phonological and orthographic processing (Shaywitz et al. 1998); see chapter 3. These signatures include, but are not limited to, function and structure of the left-hemisphere language regions such as the left temporo-parietal region related to phonological processing, and the left occipito-temporal region related to orthographic processing (Linkersdörfer et al. 2012); see figure 2.1. Other brain measures that are important for communication across brain cells and regions—for example, amount of chemicals in certain parts of the brain and degree of synchronization of brain waves (neural oscillation), as well as small differences in the structure of a large number of risk genes for dyslexia (Plomin et al. 2016)—are also important differences that neuroscientists are finding in dyslexia.

**BRAIN PATTERNS THAT DYSLEXIC STUDENTS MAY SHOW**

**BRAIN PATTERNS THAT NON-DYSLEXIC STUDENTS MAY SHOW**




● **LEFT FRONTAL REGION:** Important for compensation

● **LEFT TEMPORO-PARIETAL REGION:** Important for phonological processing and grapheme-phoneme association

● **LEFT OCCIPITO-TEMPORAL REGION:** Important for orthographic processing

**Figure 2.1.** Key brain structures that are often impacted in dyslexia. Developed by and used with permission from Fumiko Hoeft.

Regardless of age, these "neural signatures of dyslexia" are often seen in students with dyslexia. Even before they are formally taught how to read, children show these unusual patterns if they are at high risk for developing dyslexia (Ozernov-Palchik and Gaab 2016). A child at high risk for dyslexia may have a related family member (e.g., a parent or sibling) with dyslexia, or the child may demonstrate weaknesses in foundational measures of reading (e.g., letter identification, letter–sound knowledge, phonological awareness, and rapid naming); see chapter 3.

These neural signatures are evident in students with dyslexia even if they speak languages and use writing systems other than English (Martin, Kronbichler, and Richlan 2016). Neural signatures for dyslexia are likely to change with reading intervention and can show a pattern that becomes similar to that seen in students without dyslexia (Barquero, Davis, and Cutting 2014). Brain patterns can also predict reading outcomes of students with dyslexia (Hoeft et al. 2011). Interestingly, students with dyslexia show these neural signatures (the left temporo-parietal dysfunction) regardless of how they are defined (i.e., whether there is a discrepancy between reading ability and cognitive measures like IQ or when looking at reading ability alone—without a discrepancy). These findings support the Individuals with Disabilities Education Act (IDEA) 2004 criteria that identification of individuals with dyslexia does not require a discrepancy between reading and other cognitive abilities, such as IQ (Tanaka et al. 2011).

On the other hand, gifted students with reading ability lower than their cognitive capacities (but still within typical range, which means that these students often end up being misidentified as not having dyslexia) also show this neural signature (left temporo-parietal dysfunction). This new and exciting evidence suggests that these gifted children with discrepantly low reading ability, albeit within the average range and not necessarily classified as poor readers, may also be identified as having dyslexia and be qualified to receive services (Hancock, Gabrieli, and Hoeft 2016).

In summary, although it is still too early to use neural signatures of dyslexia to determine an instructional plan for individual students—and brain imaging should never be prescribed as part of a psychoeducational evaluation unless it is recommended clinically and medically—neuroscience research has demonstrated the following findings:

- Neural signatures of dyslexia are reliable.
- Neural signatures of dyslexia are predictive of dyslexia risk and outcome.
- Neural signatures of dyslexia change with intervention.
- Neural signatures of dyslexia are present even in gifted students whose discrepant reading may be masked because it is within the average range, resulting in misdiagnosis as not having dyslexia.

## What Does This Mean for Parents and Educators?

Neurological research shows that dyslexia is a real condition and that scientists have been able to locate unique identifiers, not only in different areas of the brain and how they function but also in variation of important chemicals in the brain and in the way brain cells communicate with each other. Scientists have also discovered that the structure of some genes out of the many genes that are likely to be important for dyslexia are different in people with dyslexia compared to those without it. Each of these many genes likely increases the chances of having dyslexia, each by a very small amount.

These exciting advances in neuroscience also show that, with appropriate reading interventions, the unique identifiers in the brain can be altered to resemble the reading patterns seen in the brain of a person who does not have dyslexia. In addition, neuroscience is showing new evidence that aligns with earlier work on the importance and possibility of earlier identification (even before a child is able to read) in individuals with a high risk for developing dyslexia, on the basis of information such as a family history of dyslexia or a weakness in critical prereading skills (e.g., letter identification, letter–sound knowledge, phonologicial awareness, and rapid naming).

### MORE INFORMATION

The following articles provide more in-depth information about the neuroscience of dyslexia. Please note that some of these articles must be purchased online.

- "Neuroimaging of Reading Intervention: A Systematic Review and Activation Likelihood Estimate Meta-Analysis"
- "Neurogenetics and Auditory Processing in Developmental Dyslexia"
- "Shared Temporoparietal Dysfunction in Dyslexia and Typical Readers with Discrepantly High IQ"
- "Neural Systems Predicting Long-Term Outcome in Dyslexia"
- "Grey Matter Alterations Co-Localize with Functional Abnormalities in Developmental Dyslexia: An ALE Meta-Analysis"
- "Dyslexic Brain Activation Abnormalities in Deep and Shallow Orthographies: A Meta-Analysis of 28 Functional Neuroimaging Studies"
- "Tackling the 'Dyslexia Paradox': Reading Brain and Behavior for Early Markers of Developmental Dyslexiax"
- "Functional Disruption in the Organization of the Brain for Reading in Dyslexia"
- "The Brain Basis of the Phonological Deficit in Dyslexia Is Independent of IQ"

# CHAPTER 3
# **Dyslexia as a Language-Learning Disability**



Dyslexia is one type of a language-learning disability that negatively affects an individual's written language skills (e.g., reading and written expression). Currently, the most widely cited model used to describe what is meant by the term "language" was provided by Bloom and Lahey (1978) and Lahey (1988). In this model, language consists of three major components: form (phonology, morphology, and syntax); content (semantics); and use (pragmatics). Each of the five subcomponents refers to a specific aspect of language, and they all are interrelated.

## Language-Based Systems

Language *form* relates to the structure of language. "*Phonology* is the sound system of a language and the rules that govern the sound combinations. *Morphology* is the system that governs the structure of words and the construction of word forms. *Syntax* is the system governing the order and combination of words to form sentences, and the relationships among the elements within a sentence" (American Speech-Language-Hearing Association 1993).

Language *content* pertains to the meaning of language. "*Semantics* is the system that governs the meanings of words and sentences" (American Speech-Language-Hearing Association 1993). Language *use* refers to the function of language. "*Pragmatics* is the system that combines the above language components in functional and socially appropriate communication" (American Speech-Language-Hearing Association 1993). Pragmatics also includes the purposes for using language (i.e., conversational, narrative, expository, and persuasive discourse).

## Dyslexia as One Type of a Language-Learning Disability

The American Speech-Language-Hearing Association has defined a language disorder as an impairment in the "comprehension and/or use of a spoken, written and/or other symbol systems." The disorder may involve (1) the form of language (phonology, morphology, and syntax); (2) the content of language (semantics); and/or (3) the function of language in communication (pragmatics), in any combination (American Speech-Language-Hearing

Association 1993). Students who are identified as having both a language disorder and a specific learning disability may also be referred to as students with a language-learning disability.

Students with dyslexia represent a subgroup of students who experience difficulties in reading and written expression. Although students with dyslexia may also experience difficulty with their spoken language abilities (e.g., pronunciation of multisyllabic words), the most widely reported characteristics of dyslexia are problems in word-level reading (i.e., accurate and fluent word identification-decoding) of both real and predictable pseudo-words (i.e., nonwords)—and spelling.

Students are typically identified as having dyslexia when they exhibit a deficit that primarily affects their ability to decode (i.e., to translate graphemes, which are a letter or letters that represent a single speech sound [phoneme] into their corresponding speech sounds [phonemes] and synthesize [blend] these sounds to form words) (Paul and Norbury 2012). Dyslexia involves a specific deficit in single-word decoding that is based on a weakness in the phonological aspect of language and has only a secondary impact on reading comprehension, which distinguishes it from other types of reading disabilities (Catts and Kamhi 2005). However, spelling is almost always affected.

Some students without dyslexia may struggle to read for various reasons that have been speculated to include a lack of interest and motivation, inadequate or insufficient instruction, low general intellectual ability, less exposure to language within the home environment, or weak English language skills when learning English as a second language (Snow, Burns, and Griffin 1998). The "Simple View of Reading" (Catts, Adlof, and Weismer 2006; Gough and Tunmer 1986; Hoover and Gough 1990; Kamhi 2009) is the most prevalent view of reading researchers today and provides a useful framework for differentiating typical readers from those with dyslexia and other types of reading disabilities. It suggests that reading is dependent on both efficient word recognition and language comprehension abilities.

Another type of reading disability is one that is described as a "specific reading comprehension deficit," which is primarily characterized by accurate word identification (decoding) but poor reading comprehension. These comprehension deficits are often related to problems with morphology, syntax, and semantics, in addition to phonology.

## Dyslexia and Phonological Processing

The majority of people with dyslexia have a core deficit in the phonological processing component of language. Phonological processing includes phonological memory, phonological awareness, and speed of naming (Wagner et al. 2013). Because of deficits in phonological processing, students with dyslexia have significant difficulty acquiring the sound–letter (phoneme–grapheme) and letter–sound (grapheme–phoneme) correspondences (i.e., phonics) that are the foundation for accurate and fluent spelling and decoding skills. Figure 3.1 illustrates the elements of phonological processing.



**Figure 3.1.** The elements of phonological processing. Developed by Nancy Cushen White and used with permission.

## Phonological Awareness

Phonological awareness refers to an individual's awareness of and access to the sound structure of oral language (Mattingly 1972). It is the understanding that spoken language can be divided into smaller units (i.e., words, syllables, onset-rime and phonemes) and that those units can be identified and manipulated. Although phonological awareness is a skill of spoken language, it is an essential foundation to learning phonics, the systematic instruction of reading and spelling based on letter–sound (grapheme–phoneme) and sound–letter (phoneme–grapheme) relationships in the English language. Difficulties in phonological awareness and phonemic awareness (see below) are typically seen in students with dyslexia and affect the ability to associate letters (graphemes) with sounds (phonemes) to decode words and to associate sounds (phonemes) with letters (graphemes) to spell words.

There is a continuum of complexity within phonological awareness. On the simpler end, phonological awareness includes using rhyme in songs and nursery rhymes and recognizing that sentences are made up of a set of unique, separate units called words. More complex and later-developing phonological awareness includes understanding that words are made up of chunks, such as syllables, and that words can be manipulated to rhyme by changing the onset

(beginning consonant sound[s]) in a word. With some exceptions (e.g., book handling and print awareness), phonological awareness begins to develop early, well before children acquire other associated literacy skills. Difficulty in phonological awareness, especially phonemic awareness, is a key predictor of dyslexia.

## Phonemic Awareness

Phonemic awareness is a subset of phonological awareness that refers specifically to the understanding of and ability to manipulate the discrete, individual sounds of language called phonemes—and the understanding that it is possible to create words with different meanings simply by adding, deleting, or substituting individual sounds (phonemes) within a word. Phoneme awareness is the most advanced skill under the phonological awareness umbrella and is typically not fully developed until a student is five or six years old. Examples of the manipulation of phonemes are provided below:

- Deletion of /t/ in /cart/ to pronounce /car/
- Substitution of /ch/ in /charm/ with /f/ to produce /farm/
- Substitution of /ē/ in /feet/ with /ī/ to produce /fight/
- Deletion of /l/ in /black/ to produce /back/

Phonemic awareness is the component of phonological processing most directly linked to acquisition of decoding and spelling skills. Rudimentary ability to blend, segment, and manipulate phonemes within words and syllables is a prerequisite for *understanding* phonics (grapheme–phoneme association for word identification and phoneme–grapheme association for spelling). These basic skills of blending, segmenting, and manipulating phonemes facilitate students' understanding of the "place value" of the sequence of graphemes and phonemes within words.

## Phonological Memory

Phonological memory refers to coding information in working or short-term memory (e.g., storing a phone number temporarily in working memory as you walk toward the phone to dial the number by storing a phonological representation of the sounds of the digit names rather than a visual representation of the numbers). Phonological coding in working memory is important when attempting to decode unfamiliar words, especially multisyllabic words when intermediate phonemes and syllables need to be stored during the process of applying decoding strategies (e.g., blending the phonemes associated with the graphemes in the first syllable, then holding onto that spoken syllable as the graphemes in the next syllable are associated with their phonemes and blended into a syllable, and then blending those syllables into a word) (Wagner et al. 2013).

## Rapid Naming

Rapid naming refers to the ability to quickly name digits, letters, objects, or colors. It requires efficient retrieval of phonological information from long-term memory, the same type of ability that is the foundation of word identification-decoding. Individuals who have deficits in both rapid naming and phonemic awareness appear to have greater difficulty learning to read words accurately and fluently than those who have deficits in just one of these abilities.

A significant deficit in one or more of these three aspects of phonological processing is often viewed as the primary cause of the majority of cases of dyslexia (Wagner et al. 2013). However, some students with dyslexia demonstrate average phonological processing abilities with deficits in orthographic processing (Berninger et al. 2010).

## Dyslexia and Speech and Language Deficits

In addition to phonological processing deficits, students with dyslexia may have a history of delayed speech or language development. These individuals may also have a history of impairment in articulation or phonological production and/or receptive or expressive spoken language skills. Although students with dyslexia may exhibit various types of language problems in the toddler and preschool years, their language problems typically become very obvious once they begin trying to learn to read and write (Catts and Kamhi 2005). Early oral language difficulties involving the phonologic code frequently evolve into later reading problems (Goldsworthy 2003).

There is a significant amount of evidence that links early childhood spoken language problems with reading and writing difficulties in school-age children and adolescents (Nelson 2010; Paul and Norbury 2012; Wallach and Miller 1988). A strong reciprocal relationship exists between spoken language (listening and speaking) and the development of written language (reading and writing). Spoken language serves as a foundation for the development of written language skills, and written language development also positively affects spoken language development by facilitating growth in various aspects of language, including vocabulary, syntax, and comprehension.

### MORE INFORMATION

- The American Speech-Language-Hearing Association published a relevant paper in 1993 titled **"Definitions of Communication Disorders and Variations."**



International
**DYSLEXIA**
Association

## Definition of Dyslexia



*"Dyslexia is a specific learning disability that is neurobiological in origin. It is characterized by difficulties with accurate and/or fluent word recognition and by poor spelling and decoding abilities. These difficulties typically result from a deficit in the phonological component of language that is often unexpected in relation to other cognitive abilities and the provision of effective classroom instruction. Secondary consequences may include problems in reading comprehension and reduced reading experience that can impede growth of vocabulary and background knowledge."*

Adopted by the IDA Board of Directors, Nov. 12, 2002. Many state education codes, including New Jersey, Ohio and Utah, have adopted this definition. Learn more about how consensus was reached on this definition: *Definition Consensus Project (https://dyslexiaida.org/definition-consensus-project/)*.

**Share This:**   

STATE OF CALIFORNIA
AUTHENTICATED
ELECTRONIC LEGAL MATERIAL

## Assembly Bill No. 1369

## CHAPTER 647

An act to add Sections 56334 and 56335 to the Education Code, relating to special education.

[Approved by Governor October 8, 2015. Filed with
Secretary of State October 8, 2015.]

LEGISLATIVE COUNSEL'S DIGEST

AB 1369, Frazier. Special education: dyslexia.

(1) Existing law requires all children with disabilities residing in the state, regardless of the severity of their disabilities, and who are in need of special education and related services, to be identified, located, and assessed. Existing law provides that a pupil who is assessed as being dyslexic and meets certain eligibility criteria for the federal Individuals with Disabilities Education Act category of specific learning disabilities is entitled to special education and related services. Existing law defines a "specific learning disability" as a disorder in one or more of the basic psychological processes involved in understanding or in using language, and includes in that definition dyslexia and other specified conditions.

This bill would require the Superintendent of Public Instruction to develop, and to complete in time for use no later than the beginning of the 2017–18 academic year, program guidelines for dyslexia to be used to assist regular education teachers, special education teachers, and parents to identify and assess pupils with dyslexia, and to plan, provide, evaluate, and improve educational services, as defined, to pupils with dyslexia. The bill would require the Superintendent to disseminate the program guidelines through the State Department of Education's Internet Web site and to provide technical assistance regarding their use and implementation to specified persons.

(2) Existing regulations adopted by the State Board of Education include specific basic psychological processes in the definition of "specific learning disability."

This bill would require the state board to include "phonological processing" in that description of basic psychological processes.

*The people of the State of California do enact as follows:*

SECTION 1. Section 56334 is added to the Education Code, to read:

56334. The state board shall include "phonological processing" in the description of basic psychological processes in Section 3030 of Title 5 of the California Code of Regulations.

95

SEC. 2.  Section 56335 is added to the Education Code, to read:

56335.  (a) The Superintendent shall develop program guidelines for dyslexia to be used to assist regular education teachers, special education teachers, and parents to identify and assess pupils with dyslexia, and to plan, provide, evaluate, and improve educational services to pupils with dyslexia. For purposes of this section, "educational services" means an evidence-based, multisensory, direct, explicit, structured, and sequential approach to instructing pupils who have dyslexia.

(b) The program guidelines shall include, but shall not be limited to, characteristics typical of pupils with dyslexia and strategies for their remediation, as well as information to assist educators in distinguishing between characteristics of dyslexia and characteristics of normal growth and development.

(c) In developing program guidelines pursuant to subdivision (a), the Superintendent shall consult with teachers, school administrators, other educational professionals, medical professionals, parents, and other professionals involved in the identification and education of pupils with dyslexia.

(d) The Superintendent shall complete the program guidelines in time for use no later than the beginning of the 2017–18 academic year.

(e) The Superintendent shall disseminate the program guidelines through the department's Internet Web site and provide technical assistance regarding their use and implementation to parents, teachers, school administrators, and faculty members in teacher training programs of institutions of higher education.

O

THOMSON REUTERS
**WESTLAW** California Code of Regulations

Home Table of Contents

**§ 3030. Eligibility Criteria.**
5 CA ADC § 3030
BARCLAYS OFFICIAL CALIFORNIA CODE OF REGULATIONS

Barclays Official California Code of Regulations Currentness
 Title 5. Education
  Division 1. California Department of Education
   Chapter 3. Individuals with Exceptional Needs
    Subchapter 1. Special Education
     Article 3.1. Individuals with Exceptional Needs

5 CCR § 3030

§ 3030. Eligibility Criteria.

(a) A child shall qualify as an individual with exceptional needs, pursuant to Education Code section 56026, if the results of the assessment as required by Education Code section 56320 demonstrate that the degree of the child's impairment as described in subdivisions (b)(1) through (b)(13) requires special education in one or more of the program options authorized by Education Code section 56361. The decision as to whether or not the assessment results demonstrate that the degree of the child's impairment requires special education shall be made by the IEP team, including personnel in accordance with Education Code section 56341(b). The IEP team shall take into account all the relevant material which is available on the child. No single score or product of scores shall be used as the sole criterion for the decision of the IEP team as to the child's eligibility for special education.

(b) The disability terms used in defining an individual with exceptional needs are as follows:

(1) Autism means a developmental disability significantly affecting verbal and nonverbal communication and social interaction, generally evident before age three, and adversely affecting a child's educational performance. Other characteristics often associated with autism are engagement in repetitive activities and stereotyped movements, resistance to environmental change or change in daily routines, and unusual responses to sensory experiences.

(A) Autism does not apply if a child's educational performance is adversely affected primarily because the child has an emotional disturbance, as defined in subdivision (b)(4) of this section.

(B) A child who manifests the characteristics of autism after age three could be identified as having autism if the criteria in subdivision (b)(1) of this section are satisfied.

(2) Deaf-blindness means concomitant hearing and visual impairments, the combination of which causes such severe communication and other developmental and educational needs that they cannot be accommodated in special education programs solely for children with deafness or children with blindness.

(3) Deafness means a hearing impairment that is so severe that the child is impaired in processing linguistic information through hearing, with or without amplification that adversely affects a child's educational performance.

(4) Emotional disturbance means a condition exhibiting one or more of the following characteristics over a long period of time and to a marked degree that adversely affects a child's educational performance:

(A) An inability to learn that cannot be explained by intellectual, sensory, or health factors.

(B) An inability to build or maintain satisfactory interpersonal relationships with peers and teachers.

(C) Inappropriate types of behavior or feelings under normal circumstances.

(D) A general pervasive mood of unhappiness or depression.

(E) A tendency to develop physical symptoms or fears associated with personal or school problems.

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEVADA (RENO)

| | |
|---|---|
| IN RE:<br><br>ANTHONY THOMAS and<br>WENDI THOMAS,<br><br>        Debtors.<br>. . . . . . . . . . . . . . . . | .  Case No.  14-50333-BTB<br>.<br>.  Chapter 7<br>.<br>.  300 Booth Street<br>.  Reno, NV  89509<br>.<br>.  Friday, August 10, 2018<br>.  10:03 a.m. |

TRANSCRIPT OF MOTION TO WITHDRAW AS ATTORNEY OF
RECORD AND FOR CLARIFICATION OF STATUS AS COUNSEL, ETC.,
FILED BY LAURY MILES MACAULEY ON BEHALF OF
MACAULEY LAW GROUP, P.C. [358]
**BEFORE THE HONORABLE BRUCE T. BEESLEY**
**UNITED STATES BANKRUPTCY COURT JUDGE**

APPEARANCES:

| | |
|---|---|
| For the Debtor: | ANTHONY THOMAS, Pro Se<br>7725 Peavine Peak Court<br>Reno, NV  89523 |
| For Macauley Law<br>Group, P.C. | Macauley Law Group, P.C.<br>By:  LAURY MILES MACAULEY, ESQ.<br>5470 Kietzke Lane, Suite 300<br>Reno, NV  89511-2099<br>(775) 323-1510 |
| For the Chapter 7<br>Trustee: | Hartman & Hartman<br>By:  JEFFREY L. HARTMAN, ESQ.<br>510 West Plumb Lane, Suite B<br>Reno, NV 89509<br>(775) 324-2800 |
| Audio Operator: | David Lindersmith, ECR |
| Transcription Company: | Access Transcripts, LLC<br>10110 Youngwood Lane<br>Fishers, IN 46038<br>(855) 873-2223<br>www.accesstranscripts.com |

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

2

I N D E X
8/10/18

WITNESS                          DIRECT   CROSS   REDIRECT   RECROSS
FOR THE DEBTOR:

Anthony Thomas                      5 - (voir dire by the Court)

3

1    (Proceedings commence at 10:03 a.m.)

2         THE COURT:  Good morning.  Please be seated.  First

3    matter on the ten o'clock calendar is the case of <u>Anthony</u>

4    <u>Thomas and Wendi Thomas</u>, case number 14-50333.  Appearances,

5    please.

6         MS. MACAULEY:  Morning, Your Honor.  Laury Macauley

7    appearing for Macauley Law Group, the movant.

8         MR. HARTMAN:  And Jeff Hartman on behalf of the

9    trustee, Jeri Coppa-Knudson.

10        THE COURT:  Okay.  It's my understanding that -- in

11   reading the pleadings is your contention is that you have not

12   signed on to be counsel for Mr. and Mrs. Thomas with respect to

13   the case that is being -- or the pleadings that were filed by

14   Ms. Knudson.  Is that correct?

15        MS. MACAULEY:  Yes, Your Honor.  When I first came to

16   the case, I came on after the <u>Kenmark</u> judgment had been

17   entered, and I entered as appellate counsel only.  And then,

18   later, I also entered as appellate counsel only in the <u>Beach</u>

19   appeal, but I've never appeared on behalf of the debtors in the

20   main case and never agreed to do so.  And, you know, I do

21   believe Mr. Thomas, one of the debtors, is here today and would

22   like to make a statement, so I want to make sure the Judge --

23   the Court knows that, excuse me.

24        So, yes, so I've never entered, but I -- on last

25   Friday, I was contacted by Mr. Thomas, who notified me that he

ACCESS TRANSCRIPTS, LLC           1-855-USE-ACCESS (873-2223)

1 believed I was his bankruptcy counsel.  Now, I just want to
2 state for the record that when I first appeared in the Kenmark
3 appeal, it was on March 7th, 2016, and at no time since then
4 have I ever been notified that I was considered the bankruptcy
5 counsel, either by the Court or by any of the debtors.  My
6 understanding is that both of the appeals are concluded, and so
7 I've asked for clarification that I'm not bankruptcy counsel.
8         THE COURT:  I hope you didn't reverse me.
9         MS. MACAULEY:  What was --
10         THE COURT:  I said, I hope you didn't reverse me.
11         MS. MACAULEY:  Your Honor, I'm batting 500.  You were
12 reversed in one of them, just the Beach appeal.  Because in
13 Beach was the appeal of the summary judgment motion that
14 revoked the debtor's entire discharge.  The BAP did reverse
15 that, and the Ninth Circuit affirmed you.
16         So I would ask for clarification that I'm not
17 bankruptcy counsel and also removal from the ECF for all
18 purposes.  And if this Court decides that I am somehow counsel,
19 I would ask to withdraw from the case.  So that's why I'm here
20 today.
21         THE COURT:  Okay.  Mr. Thomas, do you have something
22 to say?  Please come forward and be sworn.
23         THE CLERK:  Mr. Thomas, if I could have you come
24 right up here, please.
25         MR. THOMAS:  Sure.

A. Thomas - Voir Dire Examination                    5

1          THE CLERK:  Thank you.  Please raise your right hand.

2               ANTHONY THOMAS, DEBTOR, SWORN

3          THE CLERK:  Thank you.  Please be seated.

4          THE COURT:  Please take the stand.  There's some

5    water here if you need some.  If you need to take a break for

6    any reason, let me know, and we'll take a break.

7          THE WITNESS:  Thank you, Your Honor.

8          THE COURT:  Go ahead.

9          THE WITNESS:  Get a little water here.

10         Good morning, Your Honor, and thank you for letting

11   me make this statement this morning.  I want to put the Court

12   on notice, and I have on several other occasions, that I have a

13   disability.  I'm very dyslexic, and that disability is

14   recognized by the American with Disabilities Act.  And in civil

15   courts and in federal courts, it is recognized that the Court

16   is supposed to assist me with my disability.  And up until this

17   date, I have not been assisted one time.

18                   VOIR DIRE EXAMINATION

19   BY THE COURT:

20   Q    And what assistance have you asked for?

21   A    Well, I've let the Court know on several occasions that I

22   have a severe disability with recognizing documents and reading

23   and understanding things.

24   Q    And have you asked for additional time to do that?

25   A    Have I asked for additional time?

ACCESS TRANSCRIPTS, LLC          ⚖          1-855-USE-ACCESS (873-2223)

1  Q    What remedy have you asked the Court to provide, or what

2  assistance have you asked the Court to provide?

3  A    I don't know what the remedies or what -- I'm not an

4  attorney, and I don't know what the Court is supposed to

5  provide, but I know that they're supposed to provide me with

6  assistance in my disability because I have a disability.

7  Q    Okay.  I'm not disagreeing with you that you have a

8  disability.

9  A    Okay.

10 Q    What does that have to do with whether or not Ms. Macauley

11 is representing you with respect to the motion by the trustee?

12 A    Because part of my disability is I believed that

13 Ms. Macauley was my attorney and is my attorney in the

14 bankruptcy court.

15 Q    Based on what?

16 A    Based on that I am represented by Mr. Thomas in the LLC,

17 and the LLC is required, by bankruptcy law, to have an

18 attorney.  And three times during this -- during the time I've

19 been in bankruptcy, you have taken my attorneys away from me

20 and my LLC was not represented.  One of the times was when you

21 converted me from Chapter 7 to 11.  You -- Mr. Smith asked to

22 stay on to represent me during the hearing, and you told

23 Mr. Smith that he was not allowed to represent me during the

24 hearing.  You took my counsel away.  I asked the Court to have

25 a counsel and that I did not want to proceed without counsel,

A. Thomas - Voir Dire Examination                    7

1  and you denied me.  And not only did you deny me, you told me

2  that if I didn't get up and agree to what you wanted me to

3  agree to, that you were going to throw my bankruptcy case out.

4  Q    Well, this is not germane to Ms. Macauley's contention

5  that she does not represent you, so please address that.

6  A    Well, I -- if you take Ms. Macauley away from me, then I

7  will not be --

8  Q    I would not be taking Ms. Macauley away from you.

9  Ms. Macauley says she doesn't represent you with respect to the

10 action that has been brought by the trustee.

11 A    My understanding is that she did represent me, and

12 that's --

13 Q    Based on what?

14 A    That she has been my only attorney in the bankruptcy court

15 for the last year.

16 Q    And did she ever do anything with respect to the

17 bankruptcy itself rather than the appeal she did -- she worked

18 on?

19 A    I don't know.  She's my counsel, so --

20 Q    Did you ever ask her to?

21 A    Yes, I have.

22 Q    What did you ask her to do?

23 A    Just recently, I asked her to oppose -- you know, when I

24 found out about all this stuff with the house and the

25 allegations, I have asked her to request for an extension of

A. Thomas - Voir Dire Examination                    8

1  time so that I could get the documents to show that the trustee
2  was not telling the truth, that I have never lived in the home
3  and that nobody's ever lived in the home, and that my prior
4  attorneys made mistakes because we disclosed to them in emails
5  that we owned the home when I first filed for bankruptcy.  My
6  attorneys, Mr. Alan Smith, never disclosed to me anything about
7  -- or talked to me about any exemptions or anything on my
8  filings when --
9  Q    So stop.  What does that have to do with Ms. Macauley?
10 A    What does it have to do with Ms. Macauley?
11 Q    Yeah.  You're saying that one of your prior counsel didn't
12 do a good job.  What does that have to do with Ms. Macauley's
13 contention that she is not your lawyer?
14 A    Well, because --
15 Q    With respect to this.
16 A    Because I thought that she was my lawyer, and I was asking
17 her to --
18 Q    What does Mr. Smith -- your dissatisfaction with Mr. Smith
19 have to do with your belief that Ms. Macauley is your lawyer
20 with respect to the house in Portola?
21 A    That's -- my belief is that she is my only counsel.
22 Q    Based on what?
23 A    Based on conversations with her and her representing me in
24 the appeals and --
25 Q    Did she ever say to you that she was representing you with

A. Thomas - Voir Dire Examination                    9

1  respect to the bankruptcy, generally, not just the appeals?

2  A    That was my understanding.

3  Q    What was the basis for your understanding?

4  A    That she was my only attorney representing me in the

5  bankruptcy, and under the bankruptcy law, I have to have an

6  attorney to represent me in the LLC.

7  Q    And was anything going on in the LLC case that required

8  you to have an attorney?

9  A    Is there anything -- yes.

10 Q    Was there anything going on --

11 A    Yes.

12 Q    What was going on?

13 A    Well, my understanding is that the trustee -- and I

14 reported this to Ms. Macauley, that she needed to report this

15 to you and to the courts, that Ms. -- the trustee was violating

16 the bankruptcy rules and that she didn't get approval from you

17 to go to Sarasota Vault.  I called Sarasota Vault, and they

18 said she took the emerald out of the vault.  And she didn't get

19 court approval from you to do so.

20 Q    Why would she need to get court approval from me?  She's

21 the trustee.

22 A    That's what I asked Ms. Macauley, and she's also made

23 false accusations about my --

24 Q    No, stop.

25 A    -- about my home.

A. Thomas - Voir Dire Examination                    10

1  Q    Why is it improper for the trustee in the case to pick up
2  property of the estate in the vault in Sarasota?
3  A    Your Honor, this is why I need an attorney, because I
4  don't know.
5  Q    I understand you think you need an attorney.
6  A    Yes.
7  Q    But I'm asking you why you think Ms. Macauley is your
8  attorney.
9  A    Because I believe she's my attorney.
10 Q    Nothing more than that?
11 A    Nothing more than that.
12 Q    What do you have to -- what else do you have to say about
13 Ms. Macauley, you believing she's your attorney?
14 A    I believe that Ms. Macauley is the only one who's been
15 representing me for the last year, and my belief is that she's
16 my attorney through conversations that we've had on different
17 issues.  I believe that she's my attorney.
18 Q    Has she ever told you that she was your attorney in the
19 bankruptcy, generally?
20 A    She has told me recently that she doesn't believe that she
21 is my attorney.
22 Q    My question was did she ever tell you, to your
23 recollection, that she was your attorney in the bankruptcy?
24 A    I believe this all is under the bankruptcy here, so I
25 don't understand the question, Your Honor, and that's why I

A. Thomas - Voir Dire Examination                11

1  need counsel.

2  Q    I don't doubt that you need counsel, but why is it you

3  think Ms. Macauley is your lawyer?  Did she ever tell you she

4  was representing you in the bankruptcy?

5  A    Because I paid Ms. Macauley fees to be my attorney, and

6  that's why I believe that she's my attorney.  She's the only

7  attorney that I have right now, and I believe that, you know, I

8  have to have an attorney to represent me and the LLC.  That's

9  court requirements.  It's the bankruptcy requirements, from

10 what I understand.

11 Q    Well, just because you have to have an attorney does not

12 mean it has to be Ms. Macauley, who contends that she is not

13 your attorney in the bankruptcy case.  She says she did two

14 appeals.

15 A    She did do the two appeals, and I --

16 Q    And did she ever do anything in the bankruptcy case

17 proper?

18 A    I thought that this was all part fo the bankruptcy case,

19 that my appeals were part of the bankruptcy case.

20 Q    Okay.  Well, your --

21 A    That's my understanding.

22 Q    -- your lack of understanding is not proof that she is

23 your attorney.

24 A    That may be true, Your Honor, but that's why I need

25 somebody to assist me with my disability and I need somebody to

A. Thomas - Voir Dire Examination            12

1  assist me with counsel, because I don't have the ability to do

2  this on my own.  And three times, you've taken my attorneys

3  away from me.

4  Q    I have never taken your attorneys away.

5  A    Yes, you have.

6  Q    Your attorneys have quit.

7  A    Your Honor, Mr. Smith asked to represent me that day in

8  court, and you told him no, he could not represent me, and that

9  he needed to resign.

10 Q    I don't recall that, but did you appeal that?

11 A    Have I appealed that?

12 Q    Well, it's too late.  Did you appeal it at the time?

13 A    Your Honor, I have a disability, and when you take my

14 attorneys away, I don't know what the rules of the courts are.

15 That's why I need an attorney.

16 Q    Well, my recollection of looking at it is the attorneys

17 asked to be relieved as counsel for you, so you may step down,

18 sir.

19 A    Okay.  Your Honor, you know that I have a disability.

20 Q    You may step down, sir.

21 A    Yes, Your Honor.

22     (Witness excused)

23         MR. THOMAS:  Your Honor, can I ask that everything be

24 stayed until I can get another attorney, 90-day stay?

25         THE COURT:  Not with respect to Ms. Macauley's

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)

1 withdrawal.

2          MR. THOMAS:  Well, I would need it.  If she

3 withdraws, can I get --

4          THE COURT:  I've give you more time to respond to the

5 trustee if she withdraws, yeah.

6          MR. THOMAS:  Okay.

7          THE COURT:  Okay.

8          MR. THOMAS:  Thank you, Your Honor.

9          MS. MACAULEY:  May I respond --

10         THE COURT:  You may.

11         MS. MACAULEY:  -- just to one point?  And obviously,

12 I'm very conflicted because Mr. Thomas was my client, so in my

13 motion, I did -- you know, there's a lot that I didn't say

14 because I feel that it's privileged, but he obviously has made

15 a statement and waived some of that privilege in terms of our

16 discussions.  So I do want to state for the record that we did

17 have discussions about whether or not I represented him in the

18 main bankruptcy case.  There are also -- if the Court felt that

19 he's satisfied you in any way that I agreed to that, I did not.

20 There are writings.  There's an engagement letter that states

21 the opposite.

22         Also, Mr. Thomas and I, from early on in the Kenmark

23 appeal, had specific discussions about what even happened if

24 the Kenmark case got retried, and I specifically said that I

25 did not feel I was the appropriate counsel to even do the

1  retrial in <u>Kenmark</u>, that I was specifically dealing with the

2  two appeals and that was all that I was doing.  We had many

3  discussions about that, and there are writings.  So those could

4  be submitted if you felt that was necessary.

5          THE COURT:  Let me ask you this.  You have an

6  engagement agreement that specifically says you are not

7  representing him in the bankruptcy generally?

8          MS. MACAULEY:  I -- what I have -- well, I have one

9  that says that I'm just -- it's just limited to the <u>Kenmark</u>

10  appeal.  Now, I did enter -- when I entered the <u>Beach</u> appeal, I

11  don't believe I had a second engagement letter, but the

12  original <u>Kenmark</u> engagement letter did say it was limited to

13  <u>Kenmark</u> and I was coming in for the appeal.

14          And I, in all discussions with Mr. Thomas, I always

15  said, I am not your bankruptcy counsel.  That's why, for the

16  first time when he said to me last Friday, August 3rd, that he

17  believed I was his bankruptcy counsel, that's why that prompted

18  me to bring the instant motion, because since I first entered

19  the case in 2016, he had the <u>Beach</u> big motion for summary

20  judgment.  There are numerous motions that have been filed, and

21  never once was I advised by Mr. Thomas or by his wife, the

22  co-debtor, that I was -- that they felt that I was his

23  bankruptcy counsel.  The first time I was advised of that was

24  last Friday, which is what prompted the instant motion on

25  shortened time.

15

1       THE COURT:  Okay.  I'm -- two things.  I find that

2   you were not and never have been counsel in the bankruptcy.

3   You've been hired by Mr. Thomas for two appeals, which you've

4   handled.  I would appreciate it if you would redact any

5   information that shouldn't be public in your first engagement

6   agreement and file that withe Court.

7       MS. MACAULEY:  Yes.  Should I just redact the fees or

8   what would I redact?

9       THE COURT:  Yeah, whatever.  I have not looked at it,

10  but redact the fees, and if there's anything that appears to be

11  confidential, take that out, as well.

12      MS. MACAULEY:  Yes, Your Honor.

13      THE COURT:  But file that with the court.

14      MS. MACAULEY:  Just with -- attached like a

15  declaration?

16      THE COURT:  Yeah, attached with a declaration.

17      MS. MACAULEY:  Okay.

18      THE COURT:  And if I am wrong and you are somehow

19  found to be -- have been the lawyer for the bankruptcy, I am

20  granting your motion to withdraw.

21      MS. MACAULEY:  Thank you, Your Honor.  Now --

22      THE COURT:  So please prepare an order.

23      MS. MACAULEY:  I will.  So either I'm not counsel or

24  I --

25      THE COURT:  You are not counsel, but if for some

1    reason I don't understand you are found to be, your motion to

2    withdraw is allowed.

3            MS. MACAULEY:  Thank you, Your Honor.  And then, I

4    will also -- if I could put in the order that I would like to

5    be removed from the ECF --

6            THE COURT:  Yeah, that's fine.

7            MS. MACAULEY:  -- so that I'm out of the case.  Now,

8    I know -- I did also ask, because I obviously want to make sure

9    that Mr. Thomas can respond to the turnover motion, that he be

10   granted an extension to find counsel and obviously address, but

11   Your Honor could deal with him, excuse me, on that if that's

12   more appropriate.  But I did want to reiterate that I did

13   ask --

14           THE COURT:  Certainly.

15           MS. MACAULEY:  -- for an extension of time for him so

16   that he can get counsel to the extent that I will no longer be

17   involved.

18           THE COURT:  So, Mr. Thomas, could you come forward

19   again, please.

20           MR. THOMAS:  Yes, Your Honor.  And can I respond to

21   some of those things?

22           THE COURT:  You may not.  I have ruled.  How long do

23   you think it will take you to find counsel?

24           MR. THOMAS:  Ninety days.

25           THE COURT:  Why do you think that?

1          MR. THOMAS:  Because of my financial situation.

2          THE COURT:  Is your financial situation going to get

3  better in 90 days?

4          MR. THOMAS:  I'm hoping it's going to get better

5  within 90 days, yes.

6          THE COURT:  Is there some event that will make it get

7  better in 90 days?

8          MR. THOMAS:  I'm trying to work to pay attorneys and

9  do whatever I need to do so that I can get an attorney on board

10  within 90 days.

11         THE COURT:  Mr. Hartman.

12         MR. HARTMAN:  Your Honor, I think that 90 days is

13  unreasonable under the circumstances.  I set forth in the

14  trustee's motion a pretty specific set of facts as to the

15  history of this property in Portola.  And when Mr. Thomas was

16  on the stand, he was talking about Mr. Smith having not advised

17  him with respect to exemptions and so forth.

18         THE COURT:  Right.

19         MR. HARTMAN:  Well, Mr. Thomas lived in Reno when the

20  petition was filed.

21         THE COURT:  Right.

22         MR. HARTMAN:  He couldn't claim an exemption in a

23  California property.  It wasn't disclosed.  When the trustee

24  found out about it very recently, she promptly moved to change

25  the locks, get it listed for sale, and if we find a buyer, we

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)

1  want to bring it to the Court.  So I understand the Court

2  considering a delay for purposes of Mr. Thomas being able to

3  respond to the motion, but I don't think 90 days is reasonable.

4         THE COURT:  Well, I'm going to do this.  I'm going to

5  give you 30 days.  I'm going to set a hearing for 30 days from

6  now on the status.  I would hope you'd have been able to find a

7  lawyer within 30 days.  I think if you can't find a lawyer in

8  30 days, it's going to be very difficult for you to find one at

9  all.  Have you tried to contact anybody?

10        MR. THOMAS:  Yes, Your Honor.  And could I respond to

11 him about not knowing about the property.  The property was

12 disclosed to both of my attorneys, and it was -- and then

13 there's emails to both of my attorneys.  Mr. Leonard [sic] was

14 supposed to amend our -- Michael Leonard [sic] was supposed to

15 amend our property and statements, and we have emails to that

16 effect.

17        And Mr. Smith, Alan Smith, there was emails to him

18 directly about the property, and my parents had the note on the

19 property, and that was in the very beginning.  It was also

20 disclosed in the 341 meeting, which --

21        THE COURT:  And I've read the transcript.  You said

22 you transferred it to your mother or mother-in-law, and your

23 mother or mother-in-law --

24        MR. THOMAS:  My mother holds the deed on the property

25 for $200,000.  I don't have the deed.  I assigned the deed over

1  to her.

2            THE COURT:  Yeah, but she never recorded the deed.

3            MR. THOMAS:  Huh?

4            THE COURT:  She never filed the deed.

5            MR. THOMAS:  She never filed the deed.

6            THE COURT:  So it's still in your name.

7            MR. THOMAS:  It's -- but my counsel never advised me

8  that I could have --

9            THE COURT:  That's not my problem.  That's your

10  problem.

11            MR. HARTMAN:  And it's not the trustee's problem.

12            THE COURT:  And it's not the trustee's problem.

13            MR. THOMAS:  But, Your Honor, the law says that you

14  can make an amendment, and I -- and that's what I want to do.

15  I'm going to make an amendment to my property status and to

16  amend it and -- for the exemption.  I believe the law says that

17  I can do that, and I want an attorney to be able to advise me

18  on what my rights are so that my rights aren't taken away.

19            THE COURT:  That's fine.  And you have 30 days to

20  find an attorney and to take that action, or you can do it

21  yourself because you can act pro se.

22            MR. THOMAS:  Your Honor, I respectfully request,

23  could I at least have 60 days because of my financial situation

24  and because of my disability.  And it -- I'm probably going to

25  have to have somebody pro vice because this is a small

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)

20

1  community of attorneys and they all talk to each other, and

2  it's not easy to get an attorney here.  So I would like to have

3  somebody come from the outside that I can get proper

4  representation in this court because I don't believe that I

5  have got proper representation so far.  Every one of my

6  attorneys knew that I was dyslexic.  Every one of my attorneys,

7  I disclosed.

8         THE COURT:  Your problem isn't dyslexia, sir.  Your

9  problem is dishonesty.

10         MR. THOMAS:  I don't believe that's true, Your Honor.

11  I disclosed the property.

12         THE COURT:  Well, I do, and I'm the one who counts.

13  So you have 30 days.  We'll have a status hearing in 30 days.

14  If you have a counsel at that point, you can proceed.  If you

15  don't have counsel at that point, you can tell me what efforts

16  you have made.  You can tell me who you've contacted.  You can

17  tell me, to your best understanding, why they have not agreed

18  to undertake your case.  And I may or may not give you

19  additional time.

20         What do we have in 30 days?

21         THE CLERK:  Your Honor, the closest I can give you is

22  September the 13th at 10 a.m.  It's a Thursday.

23         THE COURT:  We'll see you then.

24         MR. THOMAS:  Thank you, Your Honor.

25         THE COURT:  Mr. Hartman?

21

1        MR. HARTMAN:  We'd need -- we then would need a
2   continued hearing date for our motion, which is scheduled for
3   next week.
4        THE COURT:  Let's continue it to the same day.
5        MR. HARTMAN:  Okay.  September 12th --
6        THE CLERK:  September the 13th --
7        MR. HARTMAN:  13th, okay.
8        THE CLERK:  -- at 10 a.m.
9        MR. HARTMAN:  Okay.  All right, thank you.
10       THE CLERK:  I'll block the morning.
11       MR. HARTMAN:  Thank you.
12       THE COURT:  We'll be in recess.
13       MR. HARTMAN:  Thank you, Your Honor.
14       THE COURT:  Thank you.
15       MS. MACAULEY:  Thank you, Your Honor.
16       THE CLERK:  All rise.
17     (Proceedings concluded at 10:25 a.m.)
18                    *  *  *  *  *
19
20
21
22
23
24
25

1            **C E R T I F I C A T I O N**

2

3        I, Alicia Jarrett, court-approved transcriber, hereby

4 certify that the foregoing is a correct transcript from the

5 official electronic sound recording of the proceedings in the

6 above-entitled matter.

7

8

9

10 _____

11 ALICIA JARRETT, AAERT NO. 428     DATE:  August 12, 2018

12 ACCESS TRANSCRIPTS, LLC

13

14

15

16

17

18

19

20

21

22

23

24

25