1  Anthony G. Thomas
   7725 Peavine Peak Court
2  Reno, NV 89523
   Tel:        (408) 640-2795
3  E-mail:     atemerald2@gmail.com

4  Debtor In Propria Persona

RECEIVED
AND FILED

2018 SEP 13  PM 1: 39

U.S. BANKRUPTCY COURT
MARY A. SCHOTT, CLERK

5            **UNITED STATES BANKRUPTCY COURT**

6             **DISTRICT OF NEVADA - RENO**

7  IN RE:                          ) Case No.   BK-N-14-50333-BTB
                                   ) Case No.   BK-N-14-60442-BTB
8  ANTHONY THOMAS and              ) (Jointly Administered)⁵
                                   ) CHAPTER  7
9  WENDI THOMAS                    )
                                   ) OPPOSITION TO REPLY BRIEF
10 AT EMERALD, LLC                 )
                                   ) Date:      September 13th 2018
11          Debtors.               ) Time:      10:00 a.m.
                                   ) Judge:     Hon. Bruce T. Beesley
12                                 ) Courtroom: 2
                                   )
13 ────────────────────────────────)

14         Debtor Anthony G. Thomas hereby submits this Opposition to the Reply Brief

15 filed on 9-11-2018 as DE 404, starting with the Declaration of Attorney Jeffrey L.

16 Hartman wherein he states:

17         "I make this Declaration in support of the Trustees Reply Brief to Debtor's

18         Opposition to Motion for Turnover **DE 398** and to correct an error in the

19         Turnover Motion, **DE 353.**"

20         Although as stated in the Trustee's Reply to the Debtor's Opposition to Motion

21 for Turnover of Real property:

22         "The Hartman Declaration makes it clear that the Thomas's <u>did not</u>

23         <u>conceal</u> the existence of the Portola Property from the Trustee and

24         information regarding the Portola Property was discussed a the § 341

25         meeting of creditors conducted on December 4, 2014."

26         Neither the Trustee nor Mr. Hartman concede that the Debtor's did not conceal

27 the existence of the Portola property from the Debtor's initial BK Petition filed on 12-4-

28 2014, as well as their Amended Petition.

1    Althoug Hartman admits to correcting "an error", there is no corresponding

2    admission from the U.S. Trustee's false allegations of concealment of the Portola

3    property, nor any correction of her false allegations claiming that the Thomas's were

4    illegally renting the property or living in the property despite the fact that the U.S.

5    Trustee knew that there was no one living in the house, as disclosed at the § 341

6    meeting when:

7        "Ms. Coppa Knudsen:        Is anyone living there?

8        Mr. Thomas:                Nobody lives there There's nothing in it. It's just

9                                    walls, it's completely gutted. We bought it, it wass a

10                                   teardown. So we bought it and did a little work on it,

11                                   and then we didn't have the money to finish at the

12                                   time"

13    Transcript of § 341 meeting

14        Although Mr. Hartman attempts to correct the singular error now admitting that

15    the Thomas's did not conceal the existence of the Portola property, he continues to

16    mislead the court, like for example in paragraph 6 of his Declaration when he states:

17        "6.    In response to Question 10 of the Statement of Financial Affairs,

18                under penalty of perjury the Thomases stated that in 2008 they had

19                transferred a residence in Portola California (the "Property") to

20                Debtor Anthony Thomas's parents for $200,000"

21    Declaration of Hartman p.2, lines 9-12

22        The truth is that on Question 10, in response to the question "List all other

23    property...transferred either absolutely or as security...", the Debtors responded under

24    the hearing "DESCRIBE PROPERTY TRANSFERRED AND VALUE RECEIVED"

25    responded to the "DESCRIBE PROPERTY TRANSFERRED" as: "RESIDENCE

26    VALUED AT $25,000.00 IN PORTOLA CALIFORNIA" and responded for VALUE

27    RECEIVED as $200,000.

28        This issue was more fully addressed in the § 341 meeting:

- 2 -

1    On p.11 of the Debtor's 46 page initial bankruptcy filing on 3-4-2014, the

2    following disclosure regarding the transfer of the Portola property to the parents of

3    Debtor Anthony Thomas was made:

4

5

**10. Other transfers**

6       None    a. List all other property, other than property transferred in the ordinary course of the business or financial affairs of the debtor,
        □        transferred either absolutely or as security within two years immediately preceding the commencement of this case. (Married debtors
7                 filing under chapter 12 or chapter 13 must include transfers by either or both spouses whether or not a joint petition is filed, unless the
                  spouses are separated and a joint petition is not filed.)

| NAME AND ADDRESS OF TRANSFEREE, RELATIONSHIP TO DEBTOR | DATE | DESCRIBE PROPERTY TRANSFERRED AND VALUE RECEIVED |
|---|---|---|
8  | ELI & DOROTHY THOMAS | JANUARY, 2008 | RESIDENCE VALUED AT $35,000.00 IN |
   | 19846 KOSICH DRIVE | | PORTOLA, CA |
9  | SARATOGA, CA 95070 | | $200,000.00 |
   | PARENTS | | |

10

11

12

13    Docket Entry 1 - Initial BK Filing page 36 of 46, also attached as Exhibit to
      Motion for Judicial Notice Docket 395 - p. 11 of 191 filed on 9-6-2018
14

OTHER EVIDENCE SHOWING DISCLOSURES RE: PROPERTY
15
       The Debtor is requesting that the Court take Judicial Notice that Portola,
16
California is located in Plumas County California, and take Judicial Notice that on p.10
17
of the 46 page filing listing the top 20 creditors, the following disclosure related to the
18
Portola property was made:
19

20

21

22

23

24

25

26

27

28

- 3 -

1

2

3   B4 (Official Form 4) (12/07) - Cont.
    **ANTHONY THOMAS**
    In re  **WENDI THOMAS**                                    Case No.

4                              Debtor(s)

5              **LIST OF CREDITORS HOLDING 20 LARGEST UNSECURED CLAIMS**
                                    (Continuation Sheet)

6

| (1) | (2) | (3) | (4) | (5) |
|---|---|---|---|---|
| Name of creditor and complete mailing address including zip code | Name, telephone number and complete mailing address, including zip code, of employee, agent, or department of creditor familiar with claim who may be contacted | Nature of claim (trade debt, bank loan, government contract, etc.) | Indicate if claim is contingent, unliquidated, disputed or subject to setoff | Amount of claim [if secured, also state value of security] |
| LARRY BALAKIAN 3209 NORTH VAN NESS BLVD. FRESNO, CA 93704 | LARRY BALAKIAN 3209 NORTH VAN NESS BLVD. FRESNO, CA 93704 | PERSONAL LOAN | | 5,000.00 |
| MICHELE THOMAS 525 N. SPAULDING LOS ANGELES, CA 90036 | MICHELE THOMAS 525 N. SPAULDING LOS ANGELES, CA 90036 | PERSONAL LOAN | | 5,000.00 |
| PLUMAS COUNTY TREASURER P.O. BOX 176 QUINCY, CA 95971 | PLUMAS COUNTY TREASURER P.O. BOX 176 QUINCY, CA 95971 | PROPERTY TAXES | | 1,200.00 |
| KOHL'S | KOHL'S | COODS/SERVICES | | 1,000.00 |

13

14

15      The disclosure of the claim of the Plumas County Treasurer, providing the name

16   of the Creditor, the address of the Plumas County Treasurer in Quincy, CA, and

17   disclosure that the Nature of the Claim is for Property Taxes in the amount $1,200,

18   shows that the Debtors did disclose all material facts regarding the Portola property.

19   These disclosures were followed up in the questioning by the US Trustee regarding the

20   Portola property, that was followed up by the Debtor's sending a copy of the latest

21   property tax bill, submitted to the Trustee through the Law Offices of Michael Lehners,

22   Esq. showing further good faith disclosures regarding the Portola CA property.

23   EXCERPTS FROM TRANSCRIPTS OF 341 MEETING OF CREDITORS:

24   EXCERPTS FROM TRANSCRIPT OF 341 MEETING HELD ON 12-4-2014:
     MR. LUKAS:          You said it was worth  $200,000.
25   MS. THOMAS:         No.
     MR. THOMAS:         No, I  didn't.
26   LUKAS:              Oh, well  -
     MS. THOMAS:         We'd never say that.
27   MR. LUKAS:          Counsel, why don't you look at the schedules and statements
                         what they put as the value of that.
28   MS. THOMAS:         No, we would not put that.

                                      - 4 -

```
 1   MR. THOMAS:          We bought it for 12 grand.
     MR. LUKAS:           I'm just saying you put 200- on your schedules and
 2                        statements.
     MS. THOMAS:          Well, we didn't put that.
 3   MR. LUKAS:           Look at the transfers.  It's $200,000.
     MR. LEHNERS:         Yeah, residence valued at 25,000.
 4   MR. LUKAS:           And that's a motorcycle, isn't it?
     MR. THOMAS:          No, other transfers.  Residence value
 5   MS. ESTES:           $200,000 is the amount that they borrowed from their mom.
     MR. LUKAS:           Oh, okay, okay.  Sorry for the -•
 6   MS.COPPA-KNUDSON:    Oh, okay.
     MS. ESTES:           Sorry about the mathing.  It's --
 7   MR. LEHNERS:         Residence valued at 25,000 in Portola, transferred January
                          of '08.  200,000 appears here.  Do you know why?
 8   MR. THOMAS:          That's what we borrowed from my mom.
     MR. LEHNERS:         Okay.
 9   MR. LUKAS:           Okay.  So
     MR. LEHNERS:         It would appear that the 200,000 is the amount of the debt.
10                        The 25,000 is the value of the real estate. Mr. Thomas, is
                          that correct?
11   MR. THOMAS:          Yes.
     MR. LUKAS:           Okay.  So residence value is 25,000.
12   MS. THOMAS:          Yeah.  I mean
     MR. LUKAS:           Give or take.  Okay, fair enough.  I didn't do the schedules
13                        and statements.  I  didn't sign them under penalty of
                          perjury.
14   MR. LEHNERS:         Just ask questions.
```

15  | Excerpts from 341 meeting, attached as Exhibit 12 to Motion for Judicial Notice, Docket
16  | 395 - pages 174-191

17  The above excerpts from the 341 meeting of creditors, establishes that the

18  Trustee was fully aware of all of the facts surrounding the Portola property and that the

19  Debtor's did not conceal the asset, and were the ones that identified the fact that debtor

20  Anthony Thomas's parents did not record the deed.  As such, the only basis for the

21  Turnover Motion is on the mistaken belief that the property still belongs to the Thomas's

22  only because they are still listed of record on the Tax Records of Plumas County, and

23  the Thomas parents did not record the Deed with the County Recorder's Office.

24  In the Reply brief filed on 9-11-2018 as DE 403. p.3 it states:

25  "The Trustee contends that the legal issue in this case is whether her

26  rights under § 544 are superior to whatever rights might be asserted by Eli

27  & Dorothy Thomas as the holders of a purported, unrecorded deed to the

28  Portola Property."

1   As such, the Trustee admits above that there is a legitimate dispute over title to
2   the Portola property, and as such, under the attached case law, the Turnover Motion
3   procedure cannot be used when title is in dispute. As such, the Turnover Motion must
4   be denied in it's entirety.

5   Another reason for denial of the Turnover Motion is that the action must be by
6   Adversary action, not Turnover Motion and that the Statute of Limitations for going after
7   the Portola property is long past, according to Attorney Lehners, who stated to me after
8   the 8-10-2018 meeting that the Trustee has a maximum of 4 years to go after the
9   property under the State Fraudulent conveyances act, and that Federal law, allow for a
10  maximum additional 2 year "piggyback" provision, that gives the Trustee a maximum of
11  6 years from the BK Petition filing date, a period that has passed.

12  The only case that the Trustee cited in her Reply brief In re Duel 504 F.3d 1073
13  does not apply here since that case involves a lender who failed to record a deed of
14  trust. In this case, the facts involve an absolute grant in fee simple absolute from the
15  Thomas's to their parents by Deed, which is entirely valid as an absolute conveyance
16  off all right title and interest in the Portola property from the Thomas's to Anthony
17  Thomas's parents Eli & Dorothy Thomas. There are no liens or other encumbrances
18  involving this transfer. Transfer was complete upon the delivery and acceptance of the
19  Deed by the Thomas parents in January 2008.

20  This is in addition to the clear fact that neither Eli nor Dorothy Thomas, despite
21  the fact that their names and addresses appear in 3 diffferent places in the initial BK
22  petition were never notified of these Turnover proceedings, thus constituting an illegal
23  attempt to deprive them of their property rights in violation of the 5th Amendment and
24  14th Amendment Due Process clauses of the U.S. Constitution, violations of which
25  cannot be ignored by this Court, and form a further basis for the denial of the Turnover
26  Motion in its' entirety.

27  The case law and legal aurhorities attached to this pleading include:

28

1    <u>§ 30:29: Legitimate disputes</u>, 3A Bankr. Service L.Ed. § 30.29

2    <u>In re: CONEX HOLDINGS</u> (2014) 518 B.R. 792

3    <u>In re: American Home Mortg. Holding</u> (2011) 458 B.R. 161

4    <u>In re: Excel Storage Products L.P.</u> (2011) 458 B.R. 175

5    <u>In re: Stancil</u> (2012) 473 B.R. 478

6    <u>In re: McCarthy</u> (2012) 473 B.R. 485

7    <u>In re: W.S.F.-WORLD SPORTS FANS, LLC</u> (2009) 367 B.R. 786

8    <u>In re: Silver</u> (2007) 367 B.R. 795

9    <u>In re: Joey's Steakhouse, LLC</u> (2012) 474 B.R. 167

10   <u>In re: Sapphire Resources LLC</u> (2016) 2016 WL 320823

11   <u>In re: Pali Holdings, Inc.</u> (2013) 488 B.R. 841

12   <u>In re: Soundview Elite Ltd.</u> (2016) 543 B.R. 78

13

14   Date: September 13th 2018.                    Respectfully submitted,

15                                                  _Anthony Thomas_
                                                    Anthony G. Thomas - Debtor
16                                                  In Propria Persona

17

18

19

20

21

22

23

24

25

26

27

28

1

**CERTIFICATE OF SERVICE**

I certify that I am an adult, over the age of 18 years, not a party to the action herein who resides in
2   Washoe County, Nevada.  I caused to be served the foregoing document via e-mail to the
following persons as listed below from my e-mail address of mickjoseph@sbcglobal.net as
3   follows:
JEFFREY A. COGAN
4   jeffrey@jeffreycogan.com, beautausinga@gmail.com, beau@jeffreycogan.com
JERI COPPA-KNUDSON VIA E-MAIL AND US MAIL: 3495 Lakeside Dr. Reno, NV 89509
5   renobktrustee@gmail.com, jcoppaknudson@ecf.epiqsystems.com
KEVIN A. DARBY
6   kad@darbylawpractice.com, tricia@darbylawpractice.com, jill@darbylawpractice.com,
hersh@darbylawpractice.com, sam@darbylawpractice.com
7   JEFFREY L. HARTMAN VIA E-MAIL AND US MAIL: 510 W. Plumb Lane Suite B - Reno, NV
89509
8   notices@bankruptcyreno.com, sji@bankruptcyreno.com
TIMOTHY A. LUCAS
9   ecflukast@hollandhart.com
LAURY MILES MACAULEY
10  laury@macauleylawgroup.com
WILLIAM MCGRANE
11  ECF-8116edf28c97@ecf.pacerpro.com, mitch.chyette@mcgranellp.com
STEPHANIE T. SHARP
12  ssharp@rssblaw.com, cobrien@rssblaw.com
WAYNE A. SILVER
13  w_silver@sbcglobal.net, ws@waynesilverlaw.com
ALAN R. SMITH
14  mail@asmithlaw.com
STEVEN C. SMITH
15  ssmith@smith-lc.com, mbrandt@smith-lc.com
AMY N. TIRRE
16  amy@amytirrelaw.com, admin@amytirrelaw.com
U.S. TRUSTEE - RN - 7,7
17  USTPRegion17.RE.ECF@usdoj.gov
JOSEPH G. WENT
18  jgwent@hollandhart.com, vllarsen@hollandhart.com
I declare under penalty of perjury that the foregoing is true and correct.
19  Dated:  September 13th 2018.

20                                          /S/ Mick Joseph

21
                                            MICK JOSEPH
22

23

24

25

26

27

28

**OPPOSITION TO U.S. TRUSTEE REPLY BRIEF**

Case 14-50333-btb    Doc 406    Entered 09/13/18 13:50:38    Page 9 of 171

§ 30:29.Legitimate disputes, 3A Bnkr. Service L. Ed. § 30:29

3A Bankr. Service L. Ed. § 30:29

Bankruptcy Service, Lawyers Edition    July 2018 Update
Chapter 30. Bankruptcy Code §§ 542, 543
Code § 542. Turnover of Property to the Estate
Part Two. Digest of Decisions
I. In General

§ 30:29. Legitimate disputes

<u>Summary</u>

Turnover is not appropriate when there is legitimate dispute over ownership of property. <u>11 U.S.C.A. § 542(a)</u>. <u>In re Conex Holdings, LLC, 518 B.R. 792, 60 Bankr. Ct. Dec. (CRR) 58, 114 A.F.T.R.2d 2014-6439 (Bankr. D. Del. 2014)</u>.

Turnover is not appropriate where there is a legitimate dispute over ownership of the property. <u>11 U.S.C.A. § 542(a)</u>. <u>In re American Home Mortg. Holding, 458 B.R. 161 (Bankr. D. Del. 2011)</u>.

Even when creditor only believes that it has possessory lien on debtor's property, but does not actually have such a lien, turnover of property is not required absent a turnover order. <u>11 U.S.C.A. § 542(a)</u>. <u>In re Hall, 502 B.R. 650, 59 Bankr. Ct. Dec. (CRR) 6 (Bankr. D. D.C. 2014)</u>.

Dispute as to title to assets must be legitimate or bona fide in order for turnover action to be considered premature. <u>11 U.S.C.A. § 542</u>. <u>In re Stancil, 473 B.R. 478 (Bankr. D. D.C. 2012)</u>.

Debtor failed to establish that he had any interest in property he sought to have turned over to bankruptcy estate, as required for turnover order, where debtor failed to present evidence establishing any right to the claimed property under state law or that he had any right to redeem such property under state law as of commencement of his bankruptcy case, he failed to establish that parties he sought to have turn over property actually had possession of the property, and he failed to establish that such property was necessary for a successful reorganization. <u>In re Paletti, 242 B.R. 65 (Bankr. M.D. Fla. 1999)</u>.

Genuine issue of material fact, as to exempt or nonexempt nature of trust assets that were the subject of Chapter 7 trustee's turnover complaint, precluded entry of summary judgment on complaint that trustee filed against debtors, as trust beneficiaries. <u>11 U.S.C.A. § 542</u>. <u>In re Kester, 339 B.R. 764 (Bankr. D. Kan. 2005)</u>, aff'd, <u>339 B.R. 749 (B.A.P. 10th Cir. 2006)</u>, certified question answered, <u>284 Kan. 209, 159 P.3d 1004 (2007)</u> and aff'd, <u>493 F.3d 1208, Bankr. L. Rep. (CCH) P 80983 (10th Cir. 2007)</u>.

Turnover claim was premature, where Chapter 7 trustee's amended complaint did not identify any undisputed assets of estate. <u>11 U.S.C.A. § 542(a)</u>. <u>In re Madeoy, 576 B.R. 484 (Bankr. D. Md. 2017)</u>.

Principle that turnover action might not be appropriate if debtor's right in property for which turnover was sought was disputed did not apply in adversary proceeding in which turnover claim was ancillary relief to Chapter 11 trustee's claim for declaratory relief, and could be determined after bankruptcy court resolved declaratory judgment claims. <u>11 U.S.C.A. § 542</u>. <u>In re Abell, 549 B.R. 631 (Bankr. D. Md. 2016)</u>.

Principle that turnover action might not be appropriate if debtor's right in property for which turnover was sought was disputed did not apply in adversary proceeding in which turnover claim was ancillary relief to Chapter 7 trustee's claim

for declaratory relief, such that court could order turnover as a remedy after resolving dispute on declaratory judgment claim. 11 U.S.C.A. § 542. In re Reuter, 499 B.R. 655 (Bankr. W.D. Mo. 2013).

11 USCA § 542 speaks only to trustee's right to obtain possession of property and is in no way dispositive of any ultimate rights of parties claiming interest in such property. In re LiTenda Mortg. Corp., 246 B.R. 185 (Bankr. D. N.J. 2000), subsequently aff'd, 276 F.3d 578 (3d Cir. 2001); In re Rosenzweig, 245 B.R. 836 (Bankr. N.D. Ill. 2000).

Turnover actions under the Bankruptcy Code cannot be used to demand assets whose title is in dispute. 11 U.S.C.A. § 542. In re W.S.F.-World Sports Fans, LLC, 367 B.R. 786 (Bankr. D. N.M. 2007).

Mere general denial by defendants of debtor's entitlement to funds that were the subject of Chapter 7 trustee's turnover complaint, without explanation or any documentary support, was insufficient grounds for court to find, for purposes of motion to dismiss trustee's complaint as failing to state plausible claim for relief, that debtor's right to these funds was subject to bona fide dispute. 11 U.S.C.A. § 542; Fed. R. Civ. P. 12(b)(6). In re CIL Limited, 582 B.R. 46 (Bankr. S.D. N.Y. 2018).

Trustee's turnover power can be improperly invoked, especially when it is used as a Trojan Horse for bringing garden variety contract claims, when the property in question is not already property of the estate, or when the turnover statute is used to recover assets with disputed title when the estate's claim of ownership is legitimately debatable. 11 U.S.C.A. § 542. In re Soundview Elite Ltd., 543 B.R. 78 (Bankr. S.D. N.Y. 2016).

Debtor cannot use turnover provisions to liquidate contract disputes or to otherwise demand assets whose title is in dispute; disputed debt is not property that trustee may use, sell or lease, within meaning of Code provision that authorizes turnover of "property that the trustee may use, sell or lease." 11 U.S.C.A. § 542. In re Andrew Velez Const., Inc., 373 B.R. 262 (Bankr. S.D. N.Y. 2007).

Turnover action is not proper where a bona fide dispute exists as to whether assets sought are estate property. 11 U.S.C.A. § 542(a). In re Joey's Steakhouse, LLC, 474 B.R. 167 (Bankr. E.D. Pa. 2012).

An account receivable action cannot be considered one for turnover of property of the estate, as long as there is some doubt as to defendant's liability. 11 U.S.C.A. § 542(a). In re Builders Group & Development Corp., 580 B.R. 593 (Bankr. D. P.R. 2017).

Westlaw. © 2018 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

---

**End of Document**                                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

**518 BANKRUPTCY REPORTER**

individualized fact-specific analysis that can turn "on a case-by-case basis from the totality of the circumstances....") (citing *CPY Co. v. Ameriscribe Corp. (In re Chas. P. Young Co.),* 145 B.R. 131, 136 (Bankr. S.D.N.Y.1992) (citation omitted)), and (2) if the Defendants are deemed to be "insiders," whether the Defendants are able to rebut the presumption of bad faith, *see D'Alessandro,* 2014 WL 4746209, at *12 (holding that a transfer to an "insider" is not per se made in bad faith, but rather presents a rebuttable presumption) (comparing *Allen Morris Commercial Real Estate Servs. Co. v. Numismatic Collectors Guild,* No. 90 CIV. 264, 1993 WL 183771, at *9 (S.D.N.Y. May 27, 1993) (holding that transfer from insolvent debtor to insiders were "per se violative of the good faith requirement"), with *Bank of Commc'ns v. Ocean Dev. Am., Inc.,* 904 F.Supp.2d 356, 361 (S.D.N.Y.2012) (limiting the presumption against good faith for transfers made by insolvent debtor to "insiders" to transfers discharging antecedent debts for services previously rendered that do not offer any present value for the debtor)).

### III.  CONCLUSION

For the reasons stated above, the cross-motions for partial summary judgment are **GRANTED** in part and **DENIED** in part. This opinion and order therefore constitutes an interlocutory order; proposed findings of fact and conclusions of law need not be entered at this stage of the case and appellate review is only available under 28 U.S.C. § 158(a)(3) and Bankruptcy Rule 8003.[23]

### IT IS SO ORDERED.



23. *See O'Toole v. McTaggart (In re Trinsum Grp., Inc.),* 467 B.R. 734, 740–41 (Bankr.

S.D.N.Y.2012).

## IN RE CONEX HOLDINGS, LLC, et al., Debtors.

**Charles A. Stanziale, Jr., in his capacity as the Chapter 7 Trustee of Conex Holdings, LLC, Conex International, LLC, and Advantage Blasting & Coating, Inc. Plaintiff,**

v.

**CopperCom, Inc., Defendant.**

Case No. 11–10501(CSS) Jointly Administered

Adv. Proc. No.: 13–50939(CSS)

United States Bankruptcy Court, D. Delaware.

Signed October 23, 2014

**Background:** Trustee of Chapter 7 estate of bankrupt single-member limited liability company (LLC) brought adversary proceeding against debtor's corporate parent, seeking to compel turnover and to recover on "unjust enrichment," "unauthorized postpetition transfer," and "breach of implied covenant of good faith and fair dealing" theories based on parent's use of debtor's net operating losses (NOLs) to reduce taxes payable on consolidated returns that it filed on behalf of debtor and its other closely held entities. Corporate parent moved to dismiss trustee's complaint for failure to state cause of action.

**Holdings:** The Bankruptcy Court, Sontchi, J., held that:

(1) debtor, as single-member limited liability company (LLC) that had not elected to be treated as association for federal tax purposes, did not have un-

disputed right to net operating losses (NOLs) generated by its operations, as required to support turnover claim by trustee;

(2) allegations in trustee's complaint, regarding parent company's use of net operating losses (NOLs) generated by debtor in order to reduce its federal tax obligations, did not state plausible claim against parent for breach of implied covenant of good faith and fair dealing;

(3) trustee did not state plausible claim to recover from parent on unjust enrichment theory; and

(4) trustee, did not adequately allege transfer of any property of the estate, in connection with parent's use of the NOLs, and did not state plausible claim for avoidance of any unauthorized postpetition transfer and recovery of its value from parent.

Motion granted.

## 1. Bankruptcy ⇐3066(1)

Properly pleaded complaint for turnover must allege an undisputed right to recover the claimed debt. 11 U.S.C.A. § 542(a).

## 2. Bankruptcy ⇐3063.1

Turnover is not appropriate when there is legitimate dispute over ownership of property. 11 U.S.C.A. § 542(a).

## 3. Bankruptcy ⇐3063.1
### Internal Revenue ⇐3624, 3910, 4475

Chapter 7 debtor, as single-member limited liability company (LLC) that had not elected to be treated as association for federal tax purposes, did not have undisputed right to net operating losses (NOLs) generated by its operations, as required to support turnover claim by trustee against its corporate parent for using NOLs generated by debtor's operations in order to

reduce its federal tax obligations without reimbursing debtor for tax benefits gained by this use of the NOLs; pursuant to federal tax law, debtor's assets, liabilities, income items, and deduction items were treated as owned, owed, received, and incurred directly by its corporate parent, given debtor's failure to elect to be treated as association, thereby triggering pass-through taxation to its sole member. 11 U.S.C.A. § 542(a); 26 C.F.R. §§ 301.7701-3(a), 301.7701-2(c)(2)(i), 301.7701-3(b)(1)(ii).

## 4. Bankruptcy ⇐2531, 2532, 2535(1), 2539, 2558

Scope of "property of the estate" is broad, and in fact every conceivable interest of debtor, future, nonpossessory, contingent, speculative and derivative, is within its reach. 11 U.S.C.A. § 541(a).

## 5. Internal Revenue ⇐3624, 3910, 4475

Single member limited liability company (LLC) may elect either: (1) to be classified as an association taxable as corporation; or (2) to be disregarded as a separate entity, resulting in pass-through taxation of its sole member. 26 C.F.R. § 301.7701-3(a).

## 6. Internal Revenue ⇐3624, 3910, 4475

If single member limited liability company (LLC) does not elect to be classified as an association, it is treated as a disregarded entity, and its assets, liabilities, income items, and deduction items are treated as owned, owed, received, and incurred directly by its owner. 26 C.F.R. §§ 301.7701-2(c)(2)(i), 301.7701-3(b)(1)(ii).

## 7. Contracts ⇐168

Under Delaware law, implied covenant of good faith and fair dealing is recognized only when contract is silent as to issue in dispute.

**794**            **518 BANKRUPTCY REPORTER**

**8. Contracts ⊜326**

To state claim under Delaware law for breach of implied covenant of good faith and fair dealing, plaintiff must allege: (1) a specific implied contractual obligation, (2) a breach of that obligation by defendant, and (3) resulting damage to plaintiff.

**9. Contracts ⊜312(1)**

Under Delaware law, absent a contractual provision dictating a standard of conduct, there is no legal difference between bad faith breaches of contract and breaches of contract not in bad faith; both are simply breaches of express terms of contract.

**10. Contracts ⊜168**

Under Delaware law, doctrine of implied covenant of good faith and fair dealing operates only in that narrow band of cases where contract as a whole speaks sufficiently to suggest an obligation and point to a result, but does not speak directly enough to provide an explicit answer.

**11. Contracts ⊜168**

Under Delaware law, doctrine of implied covenant of good faith and faith dealing is best understood as way of implying terms in agreement, whether employed to analyze unanticipated developments or to fill gaps in contract's provisions.

**12. Bankruptcy ⊜2162**

Allegations in Chapter 7 trustee's complaint, regarding parent company's use of net operating losses (NOLs) generated by its bankrupt, single-member limited liability company (LLC) in order to reduce its federal tax obligations, regarding the subsequent recording, in books and records of LLC, of receivable owing from parent to LLC for tax benefits arising from parent's use of these NOLs, and regarding parent's subsequent reversal of this accounting entry in order to eliminate this inter-company receivable, did not

state plausible claim against parent for breach of implied covenant of good faith and fair dealing; trustee did not adequately allege any agreement between parent and debtor-LLC as to allocation of tax benefits from NOLs based solely on these bookkeeping entries, and parent, in taking NOLs for its sole benefit, was merely doing what federal tax law allowed to owners of single-member LLCs that had not elected to be treated as associations. 26 C.F.R. §§ 301.7701-3(a),        301.7701-2(c)(2)(i), 301.7701-3(b)(1)(ii).

**13. Contracts ⊜27**

Under Delaware law, implied-in-fact contract is one inferred from conduct of parties, though not expressed in words; parties' intent and mutual assent to implied-in-fact contract is proved through their conduct.

**14. Implied and Constructive Contracts ⊜3**

Under Delaware law, unjust enrichment is the unjust retention of benefit to the loss of another, or the retention of money or property of another against fundamental principles of justice or equity and good conscience.

**15. Implied and Constructive Contracts ⊜3**

Elements of unjust enrichment claim under Delaware law are: (1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and impoverishment, (4) the absence of justification, and (5) the absence of remedy provided by law.

**16. Bankruptcy ⊜2162**

Allegations in Chapter 7 trustee's complaint, regarding parent company's use of net operating losses (NOLs) generated by its bankrupt, single-member limited liability company (LLC) in order to reduce its federal tax obligations without compensating the debtor-LLC for tax benefits

realized by this use of the NOLs, did not state plausible claim to recover from parent on unjust enrichment theory, absent any allegation that debtor had realized taxable income at any time prior to its bankruptcy filing, as required for debtor to carry the NOLs back or forward to reduce its own taxable income, and absent any allegation by trustee that debtor, as LLC that had ceased operating and was in process of liquidating under Chapter 7, had any prospect for future income.

**17. Bankruptcy ⟨⟩2588**

Chapter 7 trustee may avoid as unauthorized postpetition transfer (1) a transfer, (2) of property of bankruptcy estate, (3) that occurs after commencement of bankruptcy case, and (4) that was not authorized by any provision of the Bankruptcy Code or by order of bankruptcy court. 11 U.S.C.A. § 549.

**18. Bankruptcy ⟨⟩2724**

Allegations in Chapter 7 trustee's complaint, regarding parent company's use of net operating losses (NOLs) generated by its bankrupt, single-member limited liability company (LLC) in order to reduce its federal tax obligations on consolidated returns that it filed postpetition, did not adequately allege transfer of any property of the estate, given that assets, liabilities, income items, and deduction items of debtor-LLC, as single-member LLC which had not elected to be treated as association, were treated by federal tax law as owned, owed, received, and incurred directly by its corporate parent, and did not state plausible claim for avoidance of any unauthorized postpetition transfer and recovery of

its value from parent. 11 U.S.C.A. §§ 549, 550; 26 C.F.R. §§ 301.7701-3(a), 301.7701-2(c)(2)(i), 301.7701-3(b)(1)(ii).

———

Cousins Chipman & Brown, LLP, William E. Chipman, Jr., Mark D. Olivere, 1007 North Orange Street, Suite 1110, Wilmington, DE 19801 and Sperling & Slater, P.C., Bruce S. Sperling, Robert D. Cheifetz, Eamon P. Kelly, 55 W. Monroe, Suite 3200, Chicago, IL 60603, Counsel for Defendant

McCarter & English, LLP, Katharine L. Mayer, 405 N. King Street, 8th Floor, Wilmington, DE 19801 and Charles A. Stanziale, Jr., Jeffrey T. Testa, Michael J. Reynolds, Four Gateway Center, 100 Mulberry Street, Newark, NJ 07102, Counsel to Plaintiff, Charles A. Stanziale, Jr., Chapter 7 Trustee

Chapter 7
**OPINION** [1]

*INTRODUCTION*

Charles A. Stanziale, Jr., Chapter 7 Trustee (the "Trustee") for Conex Holdings, LLC ("Holdings"), Conex International, LLC ("Conex"), and Advantage Blasting & Coating, Inc. ("ABC" and together with Holdings and Conex, the "Debtors") filed a complaint [2] against their parent company CopperCom, Inc. ("CopperCom" or the "Defendant") (i) seeking turnover of property pursuant to Bankruptcy Code Section 542, (ii) alleging breach of the implied covenant of good

---

1.  "The court is not required to state findings or conclusions when ruling on a motion under Rule 12...." Fed R. Bankr.P. 7052(a)(3). Accordingly, the Court herein makes no findings of fact and conclusions of law pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure.

2.  Adv. Pro. No. 13–50939, D.I. 1 ("Complaint"). Unless otherwise noted, all references to the docket are for Adv. Pro. No. 13–50939.

**796**                    **518 BANKRUPTCY REPORTER**

faith and fair dealing, (iii) alleging unjust enrichment, and (iv) seeking avoidance and recovery of transfers pursuant to Bankruptcy Code Sections 549 and 550, respectively. As the parent company of the Debtors, CopperCom filed consolidated federal income tax returns that included Conex, Holdings, and ABC (the "Copper-Com Group"). The Trustee's claims rely on allegations concerning CopperCom's use and retention of net operating losses ("NOLs") and the federal income tax benefits derived therefrom.

CopperCom moves to dismiss the Complaint in its entirety (the "Motion to Dismiss"). For the reasons set forth below, the Court will grant with prejudice the Motion to Dismiss Count I for turnover of an alleged $2.559 million receivable due to Conex from CopperCom for use of Conex's 2008 NOL. The Court will grant without prejudice the Motion to Dismiss Count II for breach of the implied covenant of good faith and fair dealing, Count III for unjust enrichment, Count IV for avoidance of transfers pursuant to Bankruptcy Code Section 549, and Count V for recovery and preservation of any transfers avoided pursuant to Bankruptcy Code Section 550. The Trustee has not pleaded adequate facts in support of his claims; however, the Court grants the Trustee leave to amend the Complaint within twenty-eight (28) days of the issuance of this opinion to adequately plead facts to support Counts II, III, IV, and V.

### JURISDICTION

This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(1) and (b)(2)(A),(E), and (O). The Court has the judicial authority to enter a final order.

### STATEMENT OF FACTS

#### A. Procedural Background

On February 20, 2011 (the "Petition Date"), Wells Fargo Bank, N.A., Bank of Montreal, and The Prudential Insurance Company of America filed involuntary petitions for relief against the Debtors.[3] On February 24, 2011, the Court entered an order for relief under Chapter 7 of the Bankruptcy Code with respect to the Debtors' cases.[4] On February 24, 2011, the Office of the United States Trustee for the District of Delaware appointed Charles A. Stanziale, Jr. as the Chapter 7 Trustee of the Debtors' estates.[5] On March 11, 2011, the Court entered an order providing for the joint administration of the Debtors' cases.[6]

On April 22, 2013, the Trustee initiated an adversary proceeding against the Debtors' parent company, CopperCom, for turnover of an open receivable due to Conex arising from the Defendant's use of Conex's 2008 NOL and the tax benefit derived therefrom; breach of the implied covenant of good faith and fair dealing based on the Defendant's breach of an (alleged) implied-in-fact tax allocation agreement (the "TAA") relating to the Defendant's use of the tax benefit derived from Conex's 2009–2011 NOLs; or, in the alternative, unjust enrichment for the retention and utilization of Conex's 2009–2011 NOLs; and for avoidance and recovery of the value of the Debtors' 2010–2011 NOLs to the extent the NOLs were used

3. Del. Bankr.No. 11–10501, D.I. 1.

4. Del. Bankr.No. 11–10501, D.I. 21.

5. Del. Bankr.No. 11–10501, D.I. 25.

6. Del. Bankr.No. 11–10501, D.I. 46.

by the CopperCom Group in its consolidated federal income tax returns filed for those years.[7] The Defendant filed the Motion to Dismiss,[8] the Trustee filed an objection,[9] and the Defendant filed a reply brief.[10] Briefing is complete and the matter is ripe for decision.

## B. Parties

CopperCom, a subsidiary of Heico Holding, Inc. ("Heico"), is a Florida corporation with its principal place of business in Florida.[11] Holdings is a Delaware limited liability company with its principal place of business in Illinois and an acquisition company of Heico.[12] CopperCom owns 100% of all interests in Holdings.[13] Conex is a Texas limited liability company with its principal place of business in Texas.[14] Holdings owns 100% of all interests in Conex.[15] ABC is a corporation organized under the laws of the State of Texas with its principal place of business in Texas.[16] CopperCom, as designee of Heico, holds more than 80% of the common shares of ABC.[17]

On August 7, 2008, Conex International, Corp., predecessor-in-interest to Conex, changed its form and structure so as to sell itself to Heico. Conex converted to a limited liability company and changed its name from Conex International Corp. to Conex International, LLC. On that date, Conex was a wholly owned subsidiary of Conex Holdings, Inc. On August 8, 2008, Conex Holdings, Inc. transferred to Holdings, a special purpose LLC created to facilitate the acquisition, its interests in Conex and ABC.

On or about September 19, 2009, CopperCom and its subsidiaries filed a 2008 federal income tax return ("2008 Consolidated Tax Return").[18] The first tax year that Holdings, Conex, and ABC were included in the CopperCom Group's consolidated tax return was for the year ending December 31, 2008.[19] Holdings and Conex were treated as disregarded entities for federal income tax purposes, and CopperCom, as the single member of the disregarded entities, was treated as directly holding Holdings' and Conex's assets and liabilities.[20]

## C. Factual Background

### 1. Facts Relevant to the Utilization of Conex's 2008 NOL and the Recordation of the Receivable Due to Conex from CopperCom

For the year ending December 31, 2008, CopperCom, as the Debtors' parent company, included the Debtors in the 2008 Consolidated Tax Return.[21] Conex's pretax book loss for the post-acquisition stub period (August 9, 2008 to December 31, 2008) was $7.797 million. CopperCom used Conex's 2008 NOL in the 2008 Con-

7.  Complaint at ¶¶ 1, 46–68.

8.  D.I. 15 ("Motion to Dismiss").

9.  D.I. 21 ("Opposition"), p. 19.

10.  D.I. 25 ("Reply").

11.  Complaint at ¶ 10.

12.  *Id.* at ¶ 7.

13.  *Id.*

14.  *Id.* at ¶ 8.

15.  *Id.*

16.  *Id.* at ¶ 9.

17.  *Id.*

18.  *Id.* at ¶ 27.

19.  *Id.*

20.  *Id.*

21.  *Id.* at ¶ 30.

**518 BANKRUPTCY REPORTER**

solidated Tax Return to reduce the taxable income of the profitable members of the CopperCom Group. The estimated income tax benefit derived by the CopperCom Group for the use of Conex's 2008 NOL was $2,644,171.41.[22]

The tax benefit to CopperCom was recorded in Conex's General Ledger Account as a federal income tax expense with an offsetting entry in the same amount described as "Due From Parent Company." As a result of certain year-end adjustments, the tax benefit amount originally accrued was reduced. Conex's audited statement of earnings for the period from August 8, 2008 to December 31, 2008 reflects Conex's loss before income taxes being reduced to $7.256 million. Conex's General Ledger Account reflects a receivable due Conex from CopperCom of $2,559,369.81 (the "Receivable") as of December 31, 2008.

The Receivable due Conex from Copper-Com's use of Conex's 2008 NOL is reflected in an audit report prepared by Deloitte & Touche LLP for the year ending December 31, 2008 (the "2008 Audit Report").[23] The 2008 Audit Report identifies the Receivable due Conex from CopperCom and provides in relevant part: "In addition ..., a tax benefit to be derived from the Parent [CopperCom] for federal

income taxes of $2,559[,000] has been recorded in other long-term liabilities."[24] Similarly, the Debtors' 2009 draft audited consolidated financial statements reflect the Receivable due Conex from Copper-Com on the Debtors' balance sheet as of December 31, 2009. The 2009 consolidated financial statement provides that "the tax benefit to be derived from the Parent [CopperCom] for federal income taxes of $2.559 million has been recorded in other long-term liabilities in 2008 and remains recorded as of December 31, 2009."[25]

Conex's management-prepared financial statements for the year ending December 31, 2010 also reflect the Receivable due from CopperCom. Conex's balance sheet as of December 31, 2010 reflects the Receivable as due and owing in its balance sheet asset account. The Receivable was never paid and remains due and owing to Conex.

**2. Facts Relevant to the Utilization of Conex's 2009, 2010, and Subsequent Years' NOLs**

For 2009, Conex reported a book loss before taxes of approximately $160.7 million and a taxable loss of approximately $22.8 million. The CopperCom Group reported a consolidated book loss of approximately $149 million and a taxable loss of approximately $19.3 million. The profit-

---

**22.** *Id.* The Trustee multiplies Conex's $7.797 million pre-tax book loss by the effective tax rate of 34% to determine the estimated tax benefit amount. *Id.* at ¶ 32 n.3.

**23.** The 2008 Audit Report provides in relevant part:

The Company [Holdings, Conex and ABC] files a consolidated federal income tax return with the Parent [CopperCom]. The benefit for federal income taxes recorded in the consolidated financial statements represents the allocated benefit to be derived from the Parent without regard to the lower marginal tax rates which may be retained by the Parent.

The Company is a member of a group of companies that file a consolidated income tax return. As a member of that group, the tax benefit has been allocated to the Company as if the Company were a separate tax payer. As a result of the allocation of the tax benefit, the Company has recorded a receivable from the Parent [CopperCom], which is recorded in other long-term liabilities on the accompanying consolidated balance sheet.
*Id.* at ¶¶ 34–35.

**24.** *Id.*

**25.** *Id.*

able members of the CopperCom Group utilized $7,367,751 of Conex's taxable loss to offset the profitable members taxable income resulting in a tax savings of $2,505,035.

The Trustee asserts that the General Ledger Accounts demonstrate that Conex was recording a reduction to its federal income tax expense on a monthly basis based on the accrued benefit it was expecting to derive from the utilization of its 2009 NOL by the profitable members of the CopperCom Group and recording the benefit as an increase in the receivable due from CopperCom. Conex recorded an increase in its receivable due from Copper-Com on a monthly basis throughout 2009 and through March 2010. Conex's 2009 General Ledger Account reflects a monthly addition to the balance of the receivable due Conex from CopperCom throughout 2009 and also contains an offsetting entry. The Trustee alleges that the description "FIT Benefit" provided in the General Ledger for the increase in the receivable account means "Federal Income Tax Benefit."

The aggregate of the 2009 monthly tax benefits recorded as a receivable due to Conex from CopperCom was reversed by a single audit entry reflected in the 2009 General Ledger which purports to be re-

corded on December 31, 2009. The Trustee believes, however, that this entry was in fact actually recorded in April 2010, because Conex's 2010 General Ledger Account No. 17150 does not reflect the reversal being recorded until April 13, 2010.

## LEGAL DISCUSSION

### A. Motion to Dismiss Standard

The Defendant seeks dismissal of the action on the grounds that the Trustee has failed to state a claim for which relief can be granted. This motion, under Rule 12(b)(6),[26] tests the sufficiency of factual allegations pleaded in the Plaintiff's complaint.[27] With the Supreme Court's decisions in *Bell Atlantic Corp. v. Twombly*[28] and *Ashcroft v. Iqbal*,[29] "pleading standards have seemingly shifted from simple notice pleading to a more heightened form of pleading, requiring a plaintiff to plead more than the possibility of relief to survive a motion to dismiss."[30]

In *Iqbal*, the Supreme Court makes clear that the *Twombly* "facial plausibility" pleading requirement applies to all civil suits in the federal courts.[31] "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements" are insufficient to survive motions to dismiss.[32] Rather, "all civil complaints

26. Rule 7012(b) of the Federal Rules of Bankruptcy Procedure incorporates Rule 12(b)(6) of the Federal Rules of Civil Procedure in adversary proceedings.

27. *Kost v. Kozakiewicz,* 1 F.3d 176, 183 (3d Cir.1993) ("The pleader is required to set forth sufficient information to outline the elements of his claim or to permit inferences to be drawn that these elements exist." (citations omitted)).

28. 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007).

29. 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009).

30. *Fowler v. UPMC Shadyside,* 578 F.3d 203, 210 (3d Cir.2009).

31. *See Fowler,* 578 F.3d at 210.

32. *Iqbal,* 556 U.S. at 678, 129 S.Ct. 1937. *See also Sands v. McCormick,* 502 F.3d 263, 268 (3d Cir.2007) ("[A] court need not credit a plaintiff's 'bald assertions' or 'legal conclusions' when deciding a motion to dismiss." (quotations omitted)); *Bartow v. Cambridge Springs SCI,* 285 Fed.Appx. 862, 863 (3d Cir. 2008) ("While facts must be accepted as alleged, this does not automatically extend to bald assertions, subjective characterizations, or legal conclusions." (quotations omitted)).

518 BANKRUPTCY REPORTER

must now set out sufficient factual matter to show that the claim is facially plausible."[33] A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[34] Determining whether a complaint is "facially plausible" is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.[35] But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged, but not effectively shown, that the pleader is entitled to relief."[36]

After *Iqbal*, the Third Circuit has instructed this Court to "conduct a two-part analysis. First, the factual and legal elements of a claim should be separated. The [court] must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions."[37] The court "must then determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a plausible claim for relief."[38] The Third Circuit has further instructed that "[s]ome claims will demand relatively more factual detail to

satisfy this standard, while others require less."[39]

## B. Net Operating Losses

The claims asserted in this adversary proceeding concern the Defendant's use of NOLs generated by Conex in federal income tax returns filed by the Defendant. The Internal Revenue Code ("I.R.C.") rules govern the use of NOLs:

> NOLs occur when a corporation's operating losses exceed income. In such instances, corporate taxpayers are entitled to deduct NOL carryovers and NOL carrybacks in determining their taxable income in each taxable year. Carrying back NOLs for that purpose entitles the taxpayer to a refund of taxes attributable to the prior year's income offset by the carryback. When carrying back NOLs, the taxpayer must first apply the NOLs to the oldest tax year to which it is permitted to carry back NOLs and in which it had reported income. The taxpayer's income for a given tax return year could be reduced to zero if the NOLs carried back are large enough to cancel out income entirely for that year.[40]

33. *Fowler*, 578 F.3d at 210 (internal quotations omitted).

34. *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937.

35. *Id.* at 679, 129 S.Ct. 1937.

36. *Id.* (citations and internal quotations omitted).

37. *Fowler*, 578 F.3d at 210–11; *Iqbal*, 556 U.S. at 679, 129 S.Ct. 1937 ("When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief."); *Carino v. Stefan*, 376 F.3d 156, 159 (3d Cir.2004). The Court may also consider documents attached as exhibits to the complaint, any documents incorporated into the complaint by reference, and matters of the public record. *In re Fruehauf Trailer*

*Corp.*, 250 B.R. 168, 183 (D.Del.2000) (citing *PBGC v. White*, 998 F.2d 1192, 1196 (3d Cir. 1993)); *see also Sands*, 502 F.3d at 268. Yet "if the allegations of [the] complaint are contradicted by documents made a part thereof, the document controls and the Court need not accept as true the allegations of the complaint." *Sierra Invs., LLC v. SHC, Inc. (In re SHC, Inc.)*, 329 B.R. 438, 442 (Bankr.D.Del. 2005) (quoting *ESI, Inc. v. Coastal Power Prod. Co.*, 13 F.Supp.2d 495, 497 (S.D.N.Y. 1998)).

38. *Fowler*, 578 F.3d at 211 (internal quotations omitted).

39. *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 361 (3d Cir.2010).

40. *In re Marvel Ent. Grp., Inc.*, 273 B.R. 58, 64 (3d Cir.2002) (internal citations omitted).

IN RE CONEX HOLDINGS, LLC    **801**

Cite as 518 B.R. 792 (Bkrtcy.D.Del. 2014)

Under IRS regulations during the periods relevant to this dispute, NOLs incurred by Conex could be carried back three years and could also be carried forward for fifteen taxable years.[41] Each of the Trustee's claims involves CopperCom's use of Conex's (alleged) NOLs as discussed below.

## C. Count I: Turnover of Estate Property under 11 U.S.C. § 542

[1, 2] Section 542 provides the cause of action for turnover, which requires an entity in possession of property of the estate to deliver the property, or value thereof, to the trustee.[42] A properly pleaded complaint asserting a claim for turnover must allege an undisputed right to recover the claimed debt.[43] Turnover is not appropriate where there is a legitimate dispute over ownership of the property.[44]

[3] The Defendant argues that Count I should be dismissed because the Trustee has failed to allege that the Receivable is the undisputed property of Conex. In support, the Defendant contends that federal income tax law treats Conex as a disregarded entity for federal income tax purposes, and as a result, all of Conex's income and losses passed through to the Defendant as the parent of Conex. Therefore, Conex's NOLs for the tax years of 2008–2011 were deemed to be the losses of the Defendant for federal income tax purposes, and neither the NOLs nor the tax

benefits derived therefrom are property of Conex's estate.

The Trustee alleges that "[a]s single member LLCs, both Conex and Holdings were treated as 'disregarded entities' for federal income tax purposes. Under these circumstances, Coppercom, as owner of the disregarded entities, was treated as holding directly each entity's assets and liabilities."[45] Conversely, the Trustee also alleges that the Receivable due to Conex results from the Defendant's use of Conex's 2008 NOL.

[4] On the Petition Date, a bankruptcy estate was created to hold "all legal or equitable interests of the debtor in property as of the commencement of the case."[46] The Petition Date sets a "date of cleavage" and "establishes the moment at which the parties' respective rights in property must be determined."[47] The scope of an estate's property interests is broad.[48]

> Estate property includes all of a debtor's rights and expectancies and is a concept that "has been construed most generously and an interest is not outside its reach because it is novel or contingent or because enjoyment must be postponed." *Segal v. Rochelle*, 382 U.S. 375, 379, 86 S.Ct. 511, 15 L.Ed.2d 428 (1966); *see also, e.g.*, 11 U.S.C. § 541(c)(1)(A) (providing that assets become estate property notwithstanding any provision of nonbankruptcy law that would prevent their being liquidated or transferred by the debtor); H.R. REP.

---

**41.** 26 U.S.C. § 172.

**42.** 11 U.S.C. § 542(a).

**43.** *In re Hechinger Investment Co. of Delaware, Inc.*, 282 B.R. 149, 162 (Bankr.D.Del. 2002).

**44.** *Giuliano v. Fairfield Health Care Centers Limited P'ship (In re Lexington Healthcare Grp., Inc.)*, 363 B.R. 713, 716 (Bankr.D.Del. 2007).

**45.** Complaint at ¶ 26.

**46.** 11 U.S.C. § 541(a)(1).

**47.** *In re IndyMac Bancorp, Inc.*, 2:08–BK–21752–BB, 2012 WL 1037481, *12 (Bankr. C.D.Cal. Mar. 29, 2012).

**48.** *Id.* (citing *United States v. Whiting Pools, Inc.*, 462 U.S. 198, 204, 103 S.Ct. 2309, 76 L.Ed.2d 515 (1983) and *In re Central Ark. Broad. Co.*, 68 F.3d 213, 214 (8th Cir.1995)).

No. 95–595, at 175–76 (1977), reprinted in 1978 U.S.C.C.A.N. 5963, 6136 (making clear that "property of the estate" includes all "contingent interests and future interests, whether or not transferable by the debtor").[49] "In fact, every conceivable interest of the debtor, future, nonpossessory, contingent, speculative, and derivative, is within the reach of [section] 541."[50]

[5, 6]  A single member limited liability company ("SMLLC") "may elect to be classified as an association taxable as a corporation or to be disregarded as a separate entity, resulting in passthrough taxation of its sole member."[51] If the SMLLC does not elect to be classified as an association, it is treated as a disregarded entity.[52] As a disregarded entity, the SMLLC's assets, liabilities, income items, and deduction items will be treated as owned, owed, received, and incurred directly by its owner.[53] The result is that the member is treated as "personally engaging in the transactions engaged in" by the SMLLC.[54]

The allegations show that Conex's claim to the Receivable is not undisputed because, on the one hand, the Trustee alleges that Holdings' and Conex's assets and liabilities (including tax benefits related to NOLs) were treated as held directly by the Defendant for federal income tax purposes, and on the other hand, alleges that the Receivable is due and owing to Conex.

Because the Trustee has alleged that Conex and Holdings were disregarded entities for federal income tax purposes, federal income tax law indicates that the Defendant directly held Conex's assets and liabilities, which included any tax benefits or liabilities derived from its operating losses in 2008. Section 542 is a remedy available to debtors to obtain what is acknowledged to be property of the bankruptcy estate,[55] and the Trustee has failed to allege an *undisputed* right to recover the Receivable. Indeed, the I.R.C. precludes the Trustee from pleading this undisputed right to the Receivable—and thus a turnover claim—because Conex's NOLs and the right to use them passed through

**49.** *Id.*

**50.** *Matter of Yonikus*, 996 F.2d 866, 869 (7th Cir.1993) (citations omitted).

**51.** *Kandi v. U.S.*, 2006 WL 83463, *2 (W.D.Wash. Jan. 11, 2006) (citing 26 C.F.R. § 301.7701–3(a)). For federal income tax purposes, an eligible entity, such as a single member LLC, can elect to be classified as an association, and thus a corporation under 26 C.F.R. § 301.7701–2(b)(2), or a partnership, or disregarded as an entity separate from its owner. 26 C.F.R. § 3307.7701–3(a).

**52.** 26 C.F.R. § 301.7701–3(b)(1)(ii); *see Kandi*, 2006 WL 83463 at *2.

**53.** 26 C.F.R. § 301.7701–2(c)(2)(i). A business entity that has a single owner and is not a corporation, such as a single member LLC, is disregarded as an entity separate from its owner. *Id.* "Under federal tax law, a single-member LLC that does not make an election is a disregarded entity –a tax nothing." *Mar-*

*kell Co., Inc. v. C.I.R.*, 107 T.C.M. (CCH) 1447 n. 12 (2014) (citing 26 C.F.R. § 301.7701–3(b)(1)(ii)). 26 C.F.R. § 301.7701–2(a).

**54.** *Markell Co., Inc. v. C.I.R.*, 107 T.C.M. (CCH) 1447 n. 12 (2014) (citing 26 C.F.R. § 301.7701–3(b)(1)(ii)). "A significant amount of case law has emerged in determining ownership of tax refunds between parents and their subsidiaries arising from consolidated tax returns filed on behalf of the group." *In re Vineyard Nat. Bancorp*, 2013 WL 1867987, *7 (Bankr.C.D.Cal. May 3, 2013). Several courts have held that NOLs are property of a debtor's estate in the context of a tax allocation agreement, *see, e.g., In re Prudential Lines Inc.*, 928 F.2d 565 (2d Cir.1991), however those cases are distinguishable because they involved tax-paying C-corporations, not single member LLCs that have not elected to be taxed as corporations.

**55.** *Hechinger*, 282 B.R. at 161–62 (quoting *In re Asousa P'ship.*, 264 B.R. 376, 384 (Bankr. E.D.Pa.2001)).

by operation of federal income tax law to the Defendant.[56] Any tax benefits derived from the Defendant's use of Conex's NOLs inured solely to the benefit of the Defendant as Conex's single member.[57] Based on the facts alleged in the Complaint and the inferences reasonably drawn therefrom, Count I fails to state a claim upon which relief can be granted. The Court will dismiss the Trustee's turnover claim with prejudice.[58]

**D. Count II: Breach of the Implied Covenant of Good Faith and Fair Dealing with Respect to the CopperCom Group's Use of Conex's 2009–2011 NOLs**

[7–9] Delaware courts have "recognized the occasional necessity of implying contract terms to ensure the parties' reasonable expectations are fulfilled."[59] The "implied covenant of good faith and fair dealing is recognized only where a contract is silent as to the issue in dispute."[60] To state a claim for breach of the implied covenant of good faith and fair dealing, a party "must allege (i) a specific implied contractual obligation, (ii) a breach of that obligation by the defendant, and (iii) resulting damage to the plaintiff."[61]

Absent a contractual provision dictating a standard of conduct, there is no legal difference between breaches of contract made in bad faith and breaches of contract not made in bad faith. Both are simply breaches of the express terms of the contract.[62]

[10, 11] "The doctrine thus operates only in that narrow band of cases where the contract as a whole speaks sufficiently

---

**56.** *In re Majestic Star Casino, LLC,* 716 F.3d 736, 759 (3d Cir.2013) (quoting *Official Comm. Of Unsecured Creditors of Forman Enters., Inc. v. Forman (In re Forman Enters., Inc.),* 281 B.R. 600, 612 (Bankr.W.D.Pa. 2002))) ("Any tax benefits resulting from the NOL and the right to use it inure solely to the benefit of ... shareholders and would not be available to satisfy claims of the corporation's creditors."). The debtor in *Majestic Star Casino* was an S-corporation. Federal income tax law provides that an S-corporation, like a SMLLC, is a disregarded entity and is not taxed on its income. *See* 26 U.S.C. § 1363(a).

**57.** *Majestic Star Casino,* 716 F.3d at 759.

**58.** The Trustee clarifies Count I in his Opposition: "The Trustee also does not dispute that Defendant, as the sole member of Holding LLC, the parent of Conex, had control over the utilization of Conex's NOLs. But, those facts are not relevant in this dispute." Opposition, pp. 19–20. Rather, the Trustee argues that the Defendant and Conex from entered into the TAA as evidenced by the parties' course of performance recordation of the Receivable. *Id.* These allegations are made in the Opposition, not in the Complaint, and do not make the claim any more plausible. In substance, the Trustee argues that the Defendant's breach of the TAA by not delivering the

Receivable to Conex creates an undisputed right to the Receivable. On these grounds, the Trustee has also failed to allege a claim upon which relief can be granted because the Trustee "cannot use the turnover provisions to liquidate contract disputes or otherwise demand assets whose title is in dispute." *U.S. v. Inslaw, Inc.,* 932 F.2d 1467, 1472 (D.C.Cir.1991); *see also In re Charter Co.,* 913 F.2d 1575, 1579 (11th Cir.1990); *In re Satelco, Inc.,* 58 B.R. 781, 786 (Bankr.N.D.Tex. 1986); *In re Chick Smith Ford, Inc.,* 46 B.R. 515, 518 (Bankr.M.D.Fla.1985); *In re FLR Co.,* 58 B.R. 632 (Bankr.W.D.Pa.1985).

**59.** *Dunlap v. State Farm Fire & Cas. Co.,* 878 A.2d 434, 442 (Del.2005) (citations and internal quotations omitted). *See also AQSR India Private, Ltd. v. Bureau Veritas Holdings, Inc.,* C.A. No. 4021–VCS, 2009 WL 1707910, at *11 (Del.Ch. June 16, 2009).

**60.** *AQSR India Private, Ltd. v. Bureau Veritas Holdings, Inc.,* C.A. No. 4021–VCS, 2009 WL 1707910, at *11 (Del.Ch. June 16, 2009).

**61.** *Kelly v. Blum,* 2010 WL 629850, at *13 (Del.Ch. Feb. 24, 2010).

**62.** *AQSR India Private, Ltd. v. Bureau Veritas Holdings, Inc.,* C.A. No. 4021–VCS, 2009 WL

**804**          **518 BANKRUPTCY REPORTER**

to suggest an obligation and point to a result, but does not speak directly enough to provide an explicit answer." [63] "The covenant is best understood as a way of implying terms in the agreement, whether employed to analyze unanticipated developments or to fill gaps in the contract's provisions." [64]

[12] The Defendant argues that Count II should be dismissed because (i) there is no free-standing cause of action for breach of the implied covenant of good faith and fair dealing pursuant to Delaware law, [65] (ii) the Court cannot imply or infer an obligation by the Defendant to pay Conex for use of the NOLs when allocation of Conex's losses are addressed in the Operating Agreement, (iii) the Trustee fails to allege that Conex could have reasonably expected payment for the use of the NOLs, and (iv) there is no rational reason to require the Defendant to pay for tax savings resulting from Conex's NOLs.

Count II for breach of the implied covenant of good faith and fair dealing alleges that the Defendant breached the covenant by failing to reimburse Conex for the amount of tax savings ($2,505,035) realized for the 2009–2011 tax years and by unilaterally rescinding the TAA in April 2010, thereby frustrating the purpose of the TAA.

The Court will consider the Operating Agreements of Conex and Holdings annexed to the Motion to Dismiss and still treat the matter under the Fed.R.Civ.P. 12(b)(6) standard because the Operating Agreements fall within the Third Circuit's "integral exception" doctrine. [66] The Operating Agreements are integral to the Complaint and explicitly relied on by the Trustee because the Trustee alleges that Conex and Holdings are single member LLCs and were treated as disregarded entities for federal income tax purposes. [67] This

---

1707910, at *11 (Del.Ch. June 16, 2009) (citations omitted). *See* 17A Am.Jur.2d Contracts § 712 ("[A]llegations of malicious, knowing, wanton and willful behavior do not give rise to a separate tort action where no wrongful conduct, except the breach of contract, is asserted.").

63.  *Airborne Health, Inc. v. Squid Soap, LP*, 984 A.2d 126, 146 (Del.Ch.2009).

64.  *Dunlap v. State Farm Fire and Cas. Co.*, 878 A.2d 434, 441 (Del.2005).

65.  The Defendant contends that "[u]nder the Operating Agreement, Delaware law applies to claims against CopperCom." Motion to Dismiss at p. 13 n.8. The Trustee applies Delaware law. Opposition at p. 27 n.10. Section 16.2 of Conex's Operating Agreement provides that Texas law governs, whereas Section 14.2 of Holdings's Operating Agreement provides that Delaware law governs. Motion to Dismiss, Exhs. A–B. Conex is a Texas corporation, Holdings is a Delaware corporation, and CopperCom is a Delaware corporations.

66.  *In re Mervyn's Holdings, LLC*, 426 B.R. 488, 496 (Bankr.D.Del.2010); *see also In re Burlington Coat Factory Securities Lit.*, 114 F.3d 1410, 1426 (3d Cir.1997) (noting that an exception to the general rule that a court may not consider matters extraneous to the pleadings is that a "document integral to or explicitly relied upon in the complaint" may be considered "without converting the motion [to dismiss] into one for summary judgment") (quoting *Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1220 (3d Cir.1996)). The Trustee is presumably on notice of the Operating Agreements by virtue of being the trustee of the Debtors' estates. *See Burlington Coat*, 114 F.3d at 1426 ("[T]he rationale underlying this exception is that the primary problem raised by looking to documents outside the complaint—lack of notice to the plaintiff—is dissipated.").

67.  Indeed, the Trustee alleges:

Both Conex and Holdings are single member limited liability companies ("LLCs") with Conex wholly owned by Holdings, and Holdings wholly owned by CopperCom. As

IN RE CONEX HOLDINGS, LLC    805
Cite as 518 B.R. 792 (Bkrtcy.D.Del. 2014)

information is contained in the Conex Operating Agreement and the Holdings Operating Agreement, which provide that the 100% interest member of Conex is Holdings and the 100% interest member of Holdings is CopperCom, respectively.[68] Sections 8.2 of the Conex Operating Agreement and Holdings Operating Agreement both provide that "[e]xcept as otherwise required by applicable provisions of tax law, Company taxable income and loss shall be allocated to the Member in proportion to its Percentage Interest."[69]

Notwithstanding the Operating Agreements, the Trustee's claim for breach of the implied covenant is premised on the existence of the (alleged) implied-in-fact TAA that the Trustee seeks to establish through the parties' course of performance. The Trustee argues that Conex's practice of recording the tax benefit derived from the utilization of its 2009 and 2010 NOL on a monthly basis suggests that it was following a protocol whereby CopperCom would pay to Conex the amount by which Conex's NOLs reduced the CopperCom Group's consolidated tax liability. The Trustee further argues that CopperCom' s reversal of the accounting entries indicating a receivable due to Conex for use of its NOLs constituted "arbitrary or unreasonable conduct which ha[d] the effect of preventing [Conex] from receiving the fruits" of the TAA.[70]

Taking all of the allegations in the Complaint as true, the Trustee has failed to allege sufficient facts to support a claim for breach of the implied covenant of good faith and fair dealing because the Operating Agreements and federal income tax law permit the exact conduct of which the Trustee complains.[71] The Trustee alleges, and the Operating Agreements show, that Conex's single member is Holdings, and in turn, Holdings' single member is CopperCom. As discussed *supra*, for federal income tax purposes, the Defendant was treated as directly holding Conex's assets and liabilities, including NOLs and the tax benefits derived therefrom, because of Conex's status as a disregarded entity. The terms of the Operating Agreement control and federal income tax law provides the Defendant with the right to use Conex's NOLs and the related federal income tax benefits to offset the CopperCom groups taxable income.

[13] To the extent the Trustee relies on the existence of the (alleged) implied-in-fact TAA for this claim, the Trustee has failed to allege sufficient facts plausibly establishing the agreement. A valid contract exists when "(1) the parties intended that the contract would bind them, (2) the terms of the contract are sufficiently definite, and (3) the parties exchange legal consideration."[72] An implied-in-fact con-

---

single member LLCs, Both Conex and Holdings were treated as "disregarded entities" for federal income tax purposes. Under these circumstances, CopperCom, as owner of the disregarded entities, was treated as holding directly each entity's assets and liabilities.
Complaint at ¶¶ 25–27.

**68.** *Id.*

**69.** Motion to Dismiss, Exhs. A–B.

**70.** *Dunlap v. State Farm Fire and Cas. Co.*, 878 A.2d 434, 442 (Del.2005) (citing *Wilgus v.

*Salt Pond Inv. Co.*, 498 A.2d 151, 159 (Del.Ch. 1985) (construing Restatement § 205)).

**71.** *Dunlap*, 878 A.2d at 441. "Existing contract terms control, however, such that implied good faith cannot be used to circumvent the parties' bargain, or to create a 'free-floating duty ... unattached to the underlying legal document.' " *Id.* (quoting *Glenfed Financial Corp., Commercial Finance Div. v. Penick Corp.*, 276 N.J.Super. 163, 647 A.2d 852, 858 (App.Div.1994)).

**72.** *Osborn v. Kemp*, 991 A.2d 1153, 1158 (Del. 2010).

tract "is one inferred from the conduct of the parties, though not expressed in words. The parties' intent and mutual assent to an implied-in-fact contract is proved through conduct rather than words." [73]

The only allegations to support the existence of the TAA are that Conex carried on its books and records an open and due receivable arising from the Defendant's use of the tax benefits derived from Conex's 2009–2011 NOLs, and that the Defendant made an entry in its general ledger offsetting the receivables due to Conex. The Trustee failed to plead facts plausibly show the parties' intent and mutual assent to bind them to contract. [74] The Court will dismiss Count II of the complaint without prejudice. The Trustee may amend the Complaint to allege additional facts consistent with this Opinion.

### E. Count III: Unjust Enrichment

[14, 15]  Unjust enrichment is "the unjust retention of a benefit to the loss of another, or the retention of money or

property of another against the fundamental principles of justice or equity and good conscience.'" [75] The elements of unjust enrichment are: (1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and impoverishment, (4) the absence of a justification, and (5) the absence of a remedy provided by law. [76]

[16]  The Defendant argues that Count III should be dismissed because the Trustee has failed to plausibly allege facts establishing a claim for unjust enrichment, specifically that the Defendant's retention and use of Conex's 2009, 2010, and 2011 NOLs resulted in an impoverishment to Conex. In support, the Defendant asserts that the Trustee has failed to allege that Conex had prior income or expected future income and would have been able to use the NOLs to enhance the estate.

The Trustee alleges that Conex's 2009, 2010, and 2011 NOLs are property of the estate, and the Defendant was unjustly enriched by demanding and procuring the benefit of Conex's tax losses. As a result,

---

**73.** *Capital Management Co. v. Brown,* 813 A.2d 1094, 1098 (Del.2002) (internal citations omitted). The Supreme Court has defined an implied-in-fact contract as one "founded upon a meeting of the minds, which, although not embodied in an express contract, is inferred, as a fact, from conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding." *Baltimore & Ohio R.R. Co. v. United States,* 261 U.S. 592, 597, 43 S.Ct. 425, 67 L.Ed. 816 (1923).

**74.** The Trustee made certain allegations with respect to the parties' intent in his Opposition; however these allegations were not made in the Complaint, and the Court will not consider them. The Opposition includes exhibits annexed thereto totaling almost 600 pages including tax returns, accounting guidelines, and the declaration of Bernard W. Costich. Pursuant to this Court's Order dated May 16, 2011 [Del. Bankr.No. 11–10501, D.I. 99], the Trustee retained Crowe Horwath LLP

("Crowe") as his accountants. Mr. Costich is the partner-in-charge at Crowe's New York City Office's Bankruptcy and Insolvency Practice. Adv. Pro. No. 13–50939, D.I. 22, Declaration of Bernard W. Costich (the "Costich Declaration"), ¶¶ 2–3. The Costich Declaration describes and asserts that Heico directed the Defendant to reimburse Conex for utilization the tax benefits derived from Conex's NOLs. *Id.* at ¶¶ 7–23. However, the Court will not consider allegations in the Opposition that are not made in the Complaint. "It is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss." *Frederico v. Home Depot,* 507 F.3d 188, 202 (3d Cir.2007).

**75.** *MCG Capital Corp. v. Maginn,* 2010 WL 1782271, at *24 (Del.Ch. May 5, 2010) (quoting *Schock v. Nash,* 732 A.2d 217, 232 (Del. 1999)).

**76.** *Jackson Nat. Life Ins. Co. v. Kennedy,* 741 A.2d 377, 393 (Del.Ch.1999).

the Defendant and other profitable members of the consolidated tax group received a substantial benefit at Conex's expense. The Trustee urges the Court to deny the Motion to Dismiss because, at this stage in the pleading, the Trustee "is entitled to the benefit of discovery to prove" his claims.[77]

Relevant provisions of the I.R.C. require the CopperCom Group's profitable members carry each year's NOLs back the statutorily mandated number of years.[78] If the NOLs were exhausted after the carryback, there was nothing left to carry over.[79] The I.R.C. allows the carryover of NOLs against future taxable income to the extent the NOLs are not extinguished when carrying them back against prior taxable income. The CopperCom Group would have lost the NOLs had it not used them because the I.R.S. would have deemed the NOLs to have been carried back.[80] Further, nothing in the I.R.C. or Treasury Regulations requires members of a consolidated group to compensate the group, the parent, or any other member for the incurrence of income or loss that may generate either a tax liability or benefit for the group.[81]

Taking all of the allegations in the Complaint as true, the Trustee has failed to allege sufficient facts to support a claim for unjust enrichment. The complaint does not allege that Conex had prior or current taxable income that could have been offset by carrying back the NOLs. The complaint does not allege that Conex realized taxable income at any time prior to the bankruptcy, and therefore could have carried the NOLs back or forward to reduce that taxable income. The Trustee does not allege that Conex has any prospect for future income. Conex is in a chapter 7 liquidation and no longer operates. The Trustee has failed to allege that the Defendant's use and retention of Conex's NOLs resulted in an impoverishment to Conex. The Court will dismiss Count III without prejudice. The Trustee may amend the Complaint to allege additional facts consistent with this Opinion.

77.  Opposition at p. 31. The Trustee relies on *In re Forman Enters., Inc.*, 273 B.R. 408 (Bankr.W.D.Pa.2002), to support the unjust enrichment claim. The shareholder-defendants in *Forman* argued, as the Defendant does in this instance, that the net operating losses did not have value to the debtor because the debtor (an S-Corporation in *Forman*) did not pay taxes. *Id.* at 412. The *Forman* Court reasoned that "whether the NOL had any value *for debtor* misses the point.... The NOL might be viewed as providing a substantial benefit *for defendants* which debtor conferred on them as a result of their own course of conduct and which would be unconscionable for them to retain." *Id.* (emphasis in original).

78.  26 U.S.C. § 172.

79.  *In re White Metal Rolling and Stamping Corp.*, 222 B.R. 417, 426 (Bankr.S.D.N.Y. 1998).

80.  *Marvel*, 273 B.R. 58 (citing 26 C.F.R. §§ 1.1502–2; 1.1502–11; 1.1502–12; 1.1502–21A).

81.  *Id.* at 65. Nonetheless, it is not uncommon for members of a consolidated group to provide for the allocation of these liabilities and benefits among themselves by entering into tax sharing agreements. *Id.*
> The NOL had value only to the extent that the subsidiary could use it to offset future income or bargain with other members of the affiliated group for its use. Since the subsidiary was undergoing liquidation, the NOL had no carryover value because the subsidiary had no prospect of future income. Further, the subsidiary had no bargaining leverage because it had consented to the filing of the consolidated return and the governing regulations, and the use of the NOLs was presumably consistent with those rules.

*Id.* at 425 (citing *Jump v. Manchester Life & Cas. Management Corp.*, 579 F.2d 449, 453–54 (8th Cir.1978)).

**F. Counts IV and V: Avoidance of Transfers Pursuant to 11 U.S.C. Section 549 and Recovery and Preservation of the Transfers Pursuant to 11 U.S.C. Section 550**

[17]  Pursuant to Section 549, a chapter 7 trustee may avoid: (1) a transfer, (2) of property of the bankruptcy estate, (3) that occurs after the commencement of the bankruptcy case, and (4) that was not authorized by any provision of the Bankruptcy Code or by order of the bankruptcy court.[82]  Section 550 provides that "to the extent that a transfer is avoided under section . . . 549 . . . of this title, the trustee may recover . . . the property transferred . . . from the initial transferee of such transfer or the entity for whose benefit such transfer was made."[83]

[18]  Count IV asserts a claim for avoidance to the extent the Debtors transferred any of their 2010 or 2011 tax losses to the Defendant for utilization in the consolidated federal income tax filings for 2010 and 2011.  Count V asserts a claim for recovery and preservation of the transfers asserted in Count IV.

The Defendant argues that Count IV, and thus Count V, should be dismissed because there was no transfer within the meaning of the Bankruptcy Code. In support, the Defendant contends that the 2010 and 2011 NOLs were never Conex's property because it was a disregarded entity for federal income tax purposes.  And as a

disregarded entity, there was never a transfer of the NOLs from Conex to the Defendant within the meaning of the Bankruptcy Code because the Defendant was treated as holding directly the NOLs.

The Trustee argues that Section 549 does not require the debtor to affirmatively act in order to constitute a transfer of property.[84]  The Trustee argues that the 2010 and 2011 NOLs are property of Conex's estate.

The Defendant filed consolidated federal tax returns for the CopperCom Group in accordance with the I.R.C. In doing so, the Defendant was required to apply the CopperCom Group's consolidated NOLs, and the Defendant as the parent of the CopperCom Group, was responsible for filing the consolidated federal income tax return and paying any federal income tax due on behalf of all group members regardless of whether the Defendant and Conex entered into a TAA.[85]

The CopperCom Group's consolidated tax return reflects the income and losses of the CopperCom Group as a single entity, even though the individual members, including Conex, had to first calculate its taxable income in the same manner as if it were filing its own federal tax return.[86] The Defendant, as the parent of the CopperCom Group, did not have discretion as to whether to take NOLs from its group members, rather the manner in which NOLs were consolidated and applied is

---

**82.** 11 U.S.C. § 549.

**83.** 11 U.S.C. § 550.

**84.** Opposition at pp. 30–31; *see Forman,* 273 B.R. at 416 ("Nowhere is there any indication in the Bankruptcy Code that action, as opposed to inaction, by a debtor is required for there to be a transfer.").

**85.** *In re Marvel Ent. Grp., Inc.,* 273 B.R. 58, 84 (D.Del.2002) (citing 26 C.F.R. §§ 1.1502–6). "No agreement entered into by one or more members of the group with any other member of such group or with any other person shall in any case have the effect of reducing the liability prescribed under this section." 26 C.F.R. §§ 1.1502–6.

**86.** 26 C.F.R. §§ 1.1502–11; 1.1502–12.

mandated by the I.R.C. and corresponding regulations.[87]

Assuming, *arguendo*, that the parties entered into the TAA, the Debtors would necessarily calculate hypothetical stand-alone NOLs in order to file a consolidated tax return.[88] These hypothetical stand-alone NOLs are not "property of the debtor because they [are] a legal fiction."[89] Here, the receivables listed on Conex's books and records appear to be calculations to determine Conex's individual NOLs so that the Defendant could determine the CopperCom Group's consolidated NOLs for the consolidated federal income tax return. No actual transfer as contemplated by the Bankruptcy Code occurred when the Defendant applied Conex's NOLs to the calculation of income tax due from the CopperCom Group because those NOLs were held directly by the Defendant for purposes of federal income tax law.[90] And, as explained, *supra*, the Trustee fails to allege that the NOLs had value to Conex. Therefore, the policy behind avoidance actions is not implicated.[91] The Court will dismiss Count IV without prejudice. Likewise, the Court will dismiss Count V without prejudice. The Trustee may amend the Complaint to allege additional facts consistent with this Opinion.

## G. Leave to Replead

The Trustee requests that the Court allow leave to file an amended complaint in the event that the Court concludes that more factual detail is needed or the claims are insufficient in some manner.[92]

Federal Rule of Civil Procedure 15(a), as made applicable to adversary actions pursuant to Federal Rule of Bankruptcy Procedure 7015, provides that "leave [to amend] shall be freely given when justice so requires." The Court grants the Trustee leave to replead with respect to Counts II, III, IV, and V—those dismissed without prejudice.

## CONCLUSION

For the foregoing reasons, the Motion to Dismiss Count I will be granted with prejudice and the Motion to Dismiss Counts II, III, IV, and V will be granted without prejudice. The Court grants the Trustee leave to amend the Complaint within twenty-eight (28) days of the issuance of this Opinion. An order will be issued.



---

87. *Marvel*, 273 B.R. at 84; *see also White Metal Rolling*, 222 B.R. at 424 ("the parent has no discretion; the consolidated NOL is applied to prior years in the statutorily mandated order, and then carried forward only if that prior years' consolidated income does not fully absorb it.")

88. *Marvel*, 273 B.R. at 85.

89. *Id.*

90. *Id.* ; *see also United Dominion Indus. v. U.S.*, 532 U.S. 822, 121 S.Ct. 1934, 150 L.Ed.2d 45 (2003) (concept of separate NOLs for individual members of a consolidated tax group does not exist).

91. *White Metal Rolling*, 222 B.R. at 427 ("[I]f the debtor transfers property that would not have been available for distribution to his creditors in a bankruptcy proceeding, the policy behind the avoidance power is not implicated.") (citing *Begier v. Internal Revenue Serv.*, 496 U.S. 53, 58, 110 S.Ct. 2258, 110 L.Ed.2d 46 (1990)). "This is consistent with the longstanding rule that a creditor cannot recover transferred property if the property could not have been used to satisfy the creditor's claim." *Id.*; *see, e.g., Bryce v. National City Bank*, 93 F.2d 300, 302 (2d Cir.1937).

92. Opposition at p.7.

IN RE AMERICAN HOME MORTG. HOLDING    **161**
Cite as 458 B.R. 161 (Bkrtcy.D.Del. 2011)

In re AMERICAN HOME MORTGAGE
HOLDING, et al., Debtors.

American Home Mortgage
Corp., Plaintiff,

v.

Showcase of Agents, L.L.C. and
Piero Orsi, Defendants.

Bankruptcy No. 07–11047 (CSS).
Adversary No. 10–50913.

United States Bankruptcy Court,
D. Delaware.

Oct. 13, 2011.

**Background:** Corporate Chapter 11 debtor brought adversary proceeding against member of limited liability company (LLC) for which debtor was managing member and member's president, asserting claims for turnover, conversion, unjust enrichment, and accounting, or, alternatively, for imposition of constructive trust. Defendants moved to dismiss.

**Holdings:** The Bankruptcy Court, Christopher S. Sontchi, J., held that:

(1) complaint satisfied general pleading rule;

(2) debtor sufficiently pleaded cause of action for turnover;

(3) debtor stated claim for conversion;

(4) debtor adequately alleged president's individual liability for conversion;

(5) complaint stated claim for unjust enrichment;

(6) complaint stated claim for accounting; and

(7) dismissal of claim for constructive trust was warranted.

Motion granted in part and denied in part.

**1. Bankruptcy ⟺2162**

Pleading need not state with detail the facts that provide the basis for the claim to satisfy general pleading rule requiring short and plain statement of claim showing entitlement to relief. Fed.Rules Bankr. Proc.Rule 7008, 11 U.S.C.A.; Fed.Rules Civ.Proc.Rule 8(a), 28 U.S.C.A.

**2. Bankruptcy ⟺2162**

Pleading is sufficiently specific to withstand a motion to dismiss under general pleading rule so long as it provides fair notice of the claim's nature and the grounds for the claim. Fed.Rules Bankr. Proc.Rule 7008, 11 U.S.C.A.; Fed.Rules Civ.Proc.Rule 8(a), 28 U.S.C.A.

**3. Bankruptcy ⟺2162, 3066(1)**

Facts alleged in debtor's adversary complaint asserting claims for turnover, conversion, unjust enrichment, and accounting provided defendants with sufficient notice of grounds and nature of claims asserted, and thus satisfied general pleading rule. 11 U.S.C.A. § 542(a); Fed. Rules Bankr.Proc.Rule 7008, 11 U.S.C.A.; Fed.Rules Civ.Proc.Rule 8(a), 28 U.S.C.A.

**4. Bankruptcy ⟺2162, 3066(1)**

Timing was not issue in debtor's adversary proceeding alleging turnover, conversion, unjust enrichment, and accounting, other than three-year period that passed between incidents giving rise to claims and filing of complaint, and therefore complaint complied with rule providing that specific allegations of time or place, when made, were material. 11 U.S.C.A. § 542(a); Fed.Rules Civ.Proc. Rule 9(f), 28 U.S.C.A.

**5. Bankruptcy ⟺2162**

Procedural rule providing that "allegation of time or place is material when testing the sufficiency of a pleading" does not require specificity in pleading time and place, but provides only that when specific allegations are made, they are material. Fed.Rules Civ.Proc.Rule 9(f), 28 U.S.C.A.

**6. Bankruptcy ⟨key⟩2162**

Party filing motion to dismiss for failure to state claim bears the burden of persuasion. Fed.Rules Bankr.Proc.Rule 7012, 11 U.S.C.A.; Fed.Rules Civ.Proc. Rule 12(b)(6), 28 U.S.C.A.

**7. Bankruptcy ⟨key⟩3066(1)**

Chapter 11 debtor sufficiently pleaded cause of action for turnover against member of limited liability company (LLC) for which debtor was managing member and member's president, who managed LLC's daily operations, by asserting that its own funds were held in LLC's bank account, that member's president transferred entire balance of LLC's bank account, including debtor's funds, to member's account and closed LLC's account, and that member or president were in possession of debtor's funds, to which they had no right of possession. 11 U.S.C.A. § 542(a).

**8. Bankruptcy ⟨key⟩3066(1)**

Properly pleaded complaint asserting a claim for turnover must allege an undisputed right to recover the claimed debt. 11 U.S.C.A. § 542(a).

**9. Bankruptcy ⟨key⟩3063.1**

Turnover is not appropriate where there is a legitimate dispute over ownership of the property. 11 U.S.C.A. § 542(a).

**10. Conversion and Civil Theft ⟨key⟩100**

Under Illinois law, a claim for conversion requires a plaintiff to establish (1) a right to property, (2) an absolute and unconditional right to immediate possession, (3) wrongful, unauthorized control over property, and (4) a demand for possession.

**11. Conversion and Civil Theft ⟨key⟩106**

In stating a claim for the conversion of money under Illinois law, plaintiff must show an entitlement to a specific fund,

account, or specific money in coin or bills, not merely a particular amount of money.

**12. Conversion and Civil Theft ⟨key⟩106**

Under Illinois law, although money that is subject of conversion claim need not be earmarked to support a claim for conversion, it must be capable of being described, identified, or segregated in a specific manner.

**13. Corporations and Business Organizations ⟨key⟩3638**

Managing member of limited liability company (LLC) stated claim for conversion under Illinois law against LLC member and its president where managing member alleged that it owned funds that were in LLC's bank account and that member's president lacked authorization to transfer those funds, which created inference that managing member had right to funds and immediate possession thereof, and also alleged that member's president was not LLC's manager and that transfer of funds from LLC's bank account was not authorized or in ordinary course of LLC's business, that member or its president were in wrongful possession of managing member's funds, and that it made demand for return of funds that was either ignored or confused.

**14. Corporations and Business Organizations ⟨key⟩3646**

Under Illinois law, managing member for limited liability company (LLC) adequately alleged individual liability for conversion of president for LLC member, which itself was LLC, by alleging that president actively participated in conversion of managing member's funds by entering bank's offices and, without managing member's knowledge, permission, or consent, wrongfully transferred funds from LLC's bank account to member's account.

**15. Corporations and Business Organizations ⟜1950**

Generally, under Illinois law, corporate officers are not personally liable for corporate obligations.

**16. Corporations and Business Organizations ⟜2007(4)**

Under Illinois law, issue of corporate officer's personal liability in conversion is not an affirmative defense to be raised by defendant, but rather is part of plaintiff's case to be pleaded and proved.

**17. Corporations and Business Organizations ⟜1971**

Under Illinois law, corporate officer's liability for conversion is established by proof of active participation in the conversion.

**18. Corporations and Business Organizations ⟜1971**

For corporate officer to be liable for conversion under Illinois law, each element of conversion need not be satisfied by the officer, but personal liability only attaches if officer actively participated in wrongful act initially giving rise to corporation's liability.

**19. Corporations and Business Organizations ⟜1971**

Under Illinois law, corporate officer may be personally liable for conversion by corporation in which officer actively participated even though he does not personally benefit.

**20. Corporations and Business Organizations ⟜3637**

**Implied and Constructive Contracts ⟜3**

Complaint of managing member for limited liability company (LLC) stated claim for unjust enrichment against LLC member and its president under Illinois law by alleging that president transferred entire amount of funds in LLC's bank account to member's account, thereby conferring benefit on member, that managing member suffered detriment due to unavailability of its funds for its use, and that managing member had suffered and could continue to suffer damage, permitting inference that allowing member and president to retain funds would be unjust.

**21. Implied and Constructive Contracts ⟜3**

Under Illinois law, "unjust enrichment" is a quasi-contract theory that permits courts to imply the existence of a contract where none exists to prevent unjust results.

> See publication Words and Phrases for other judicial constructions and definitions.

**22. Implied and Constructive Contracts ⟜3**

Under Illinois law, in pleading a claim for unjust enrichment, plaintiff must show that defendant retained a benefit to plaintiff's detriment and that the retention of the benefit violates fundamental principles of justice, equity, and good conscience.

**23. Account ⟜1**

Complaint of managing member for limited liability company (LLC) stated claim for accounting against LLC member and its president under Illinois law by alleging that managing member's remedies at law were not or might not be fully adequate, that managing member needed discovery to determine whereabouts of funds that were transferred from LLC's bank account to member's account by president, and that LLC's account was mutual account of complex nature.

**24. Account ⟜1**

Under Illinois law, an accounting is a claim for equitable relief that requires plaintiff to allege an absence of a legal

**164**                    **458 BANKRUPTCY REPORTER**

remedy and (1) a breach of a fiduciary relationship, (2) a need for discovery, (3) fraud, or (4) the existence of mutual accounts which are of a complex nature.

**25. Trusts ⟺91, 371(2)**

Dismissal of claim for constructive trust was warranted under Illinois law where claim was asserted as separate cause of action and complaint did not assert any causes of action that would support imposition of constructive trust as remedy.

**26. Trusts ⟺91**

Under Illinois law, imposition of a constructive trust is a remedy, not a separate cause of action, such that to the extent that plaintiff asserts separate claim for constructive trust, it is superfluous.

**27. Trusts ⟺91**

Dismissal of claim for constructive trust as a cause of action does not preclude the award of a constructive trust as a remedy under Illinois law.

**28. Trusts ⟺94.5, 102(1)**

Under Illinois law, imposition of a constructive trust may be appropriate once breach of fiduciary duty or actual fraud has been proven.

**29. Trusts ⟺91**

Claim for unjust enrichment does not give rise to the imposition of a constructive trust under Illinois law.

**30. Bankruptcy ⟺2162**

While most defenses are to be pleaded affirmatively, defense may take the form of a motion to dismiss for failure to state a claim upon which relief can be granted. Fed.Rules   Civ.Proc.Rule   12(b)(6),   28 U.S.C.A.

**31. Bankruptcy ⟺2162**

Generally, an affirmative defense is not a proper basis to dismiss a claim by a

motion to dismiss unless the face of the complaint shows beyond doubt that an affirmative defense is dispositive.   Fed. Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

**32. Bankruptcy ⟺2162**

To warrant dismissal on motion to dismiss for failure to state claim, affirmative defense must show with certainty that plaintiff would not be entitled to relief under any statement of facts which could be proved in support of the claim.   Fed. Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

**33. Bankruptcy ⟺2157, 2162, 3066(1)**

Face of Chapter 11 debtor's adversary complaint alleging turnover, conversion, unjust enrichment, and accounting against member of limited liability company (LLC), for which debtor was managing member, and member's president did not demonstrate unreasonable delay, precluding dismissal based on affirmative defense of laches, even though debtor waited nearly three years from time of underlying transfers of funds from LLC's bank account to file complaint; complaint was filed within applicable statute of limitation, and debtor's sudden bankruptcy filing around time of transfers, along with deterioration of secondary mortgage market in which debtor operated, created chaotic circumstances in which debtor, and its debtor affiliates, were inundated with large amounts   of   litigation.   11   U.S.C.A. § 542(a); S.H.A. 735 ILCS 5/13–205.

**34. Equity ⟺84**

Whether to apply the equitable doctrine of laches is left to the sound discretion of the court.

**35. Equity ⟺84**

Although laches defense was originally only available to refute equitable claims, laches doctrine also applies to claims at law under Illinois law.

IN RE AMERICAN HOME MORTG. HOLDING          **165**
Cite as 458 B.R. 161 (Bkrtcy.D.Del. 2011)

**36. Equity ⟜72(1)**

In asserting laches defense under Illinois law, defendants must prove an unreasonable delay and undue prejudice resulting from the delay, which must substantially, materially, or seriously prejudice defendants' ability to prepare defense.

**37. Equity ⟜72(1)**

Under Illinois law, prejudice necessary to establish laches defense requires a showing that the delay harmed the ability to prepare a defense by resulting in documentary evidence or key witnesses no longer being available or witnesses who are available no longer having a recall of relevant facts.

**38. Equity ⟜70**

Generally, under Illinois law, party against whom defense of laches is asserted must have knowledge of the facts upon which his claim is based yet fail to proceed in a timely manner.

**39. Pretrial Procedure ⟜562**

Defense of laches can be raised in a motion to dismiss under Illinois law if (1) an unreasonable delay appears on the face of the pleading, (2) no sufficient excuse for delay appears or is pleaded, and (3) the motion specifically points out the defect.

**40. Estoppel ⟜114**

Complaint asserting claims for turn-over, conversion, unjust enrichment, and accounting did not, on its face, demonstrate waiver, under Illinois law, by managing member for limited liability company (LLC) of its right to its funds that were purportedly held in LLC's bank account and transferred by LLC member's president to member's own bank account by waiting nearly three years to bring action for funds' return, precluding dismissal of complaint for failure to state claim based

on affirmative defense of waiver. 11 U.S.C.A. § 542(a).

**41. Estoppel ⟜52.10(2, 3)**

Under Illinois law, "waiver" requires the intentional relinquishment of a known right, through an express agreement or implied from a party's conduct.

> See publication Words and Phrases for other judicial constructions and definitions.

**42. Estoppel ⟜52.10(2)**

Under Illinois law, defense of waiver requires a showing of (1) the existence of a right, privilege, advantage, or benefit which may be waived, (2) the actual or constructive knowledge thereof, and (3) an intention to relinquish such right, privilege, advantage, or benefit.

**43. Estoppel ⟜52.10(2)**

Under Illinois law, before a party is deemed to have waived or relinquished a right or remedy available to it under law, a clear and distinct manifestation of such an intent must be found.

**44. Equity ⟜65(2)**

Complaint in which managing member for limited liability company (LLC) asserted claims against LLC member and its president based upon president's transfer of funds from LLC's bank account to member's bank account and closing of LLC's account did not demonstrate on its face that doctrine of unclean hands would apply under Illinois law to preclude managing member's claims for turnover, conversion, unjust enrichment, and accounting, precluding dismissal of complaint for failure to state claim based on affirmative defense of unclean hands; there was no showing that managing member participated in, consented to, or benefited from closing of account. 11 U.S.C.A. § 542(a).

**166**                    **458 BANKRUPTCY REPORTER**

**45. Equity ⟺65(1)**

Under Illinois law, doctrine of "unclean hands" prevents a party from recovering where the party engaged in, acquiesced in, or benefited from asserted misconduct.

> See publication Words and Phrases for other judicial constructions and definitions.

**46. Equity ⟺65(1)**

**Implied and Constructive Contracts ⟺3, 70**

Under Illinois law, claim for unjust enrichment may be denied under the doctrine of unclean hands if plaintiff's recklessness caused his injury.

**47. Equity ⟺65(3)**

Under Illinois law, an unclean hands defense requires a showing of misconduct by plaintiff involving the transaction being considered that amounts to misconduct, fraud, or bad faith toward defendant making the contention.

———

Cross & Simon, LLC, Michael J. Joyce, Wilmington, DE, Mark D. Belongia, Bruce de'Medici, Elizabeth M. Schutte, Belongia, Shapiro & Franklin LLP, Chicago, IL, for Showcase Agents, LLC and Piero Orsi.

Young Conaway Stargatt & Taylor, LLC, Sean M. Beach, Curtis J. Crowther, Michael S. Neiburg, Justin H. Rucki, Wilmington, DE, for Plaintiff American Home Mortgage Corp.

*OPINION*[1]

CHRISTOPHER S. SONTCHI, Bankruptcy Judge.

*INTRODUCTION*

American Home Mortgage Corporation ("AHM") initiated this adversary proceeding by filing a complaint against Showcase of Agents ("Showcase") and Piero Orsi (collectively, the "Defendants") asserting claims for turnover, conversion, unjust enrichment, and an accounting almost three years after the incident giving rise to the claims. The Defendants filed a motion (the "Motion") to dismiss arguing that the complaint fails to state a claim upon which relief can be granted, and is barred by the equitable doctrines of laches, waiver, or unclean hands. For the reasons explained below, the Court will grant, in part, and deny, in part, the Motion.

*BACKGROUND*

**A.  Factual Background**

In 1995, Mortgage First Showcase LLC ("MFS") was formed with two members: Showcase and VJJ Corporation ("VJJ").[2] Orsi, who was the President of both Showcase and VJJ executed an operating agreement under which VJJ would serve as the managing member of MFS and the net profits and net losses would be equally allocated between both members.

In 1999, First Home Mortgage Corp. ("FHM") merged with VJJ and acquired VJJ's interest in MFS. In 2000, AHM merged with FHM, and acquired FHM's interest in MFS. As a result of the merger, AHM became the new manager of MFS and, pursuant to the operating agreement,

---

1. "The court is not required to state findings or conclusions when ruling on a motion under Rule 12...." FED. R. BANKR. P. 7052(a)(3). Accordingly, the Court herein makes no findings of fact and conclusions of law pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure.

2. MFS was in the business of originating mortgage loans.

maintained a separate bank account for each member of MFS. Despite the managing member changes, Orsi continued to manage the day-to-day operations of MFS.

Six days before the bankruptcy filing, while AHM was suffering "severe financial distress," Orsi transferred $350,000 from MFS's bank account to Showcase's bank account. In October 2007 (after the bankruptcy filing), Orsi transferred the remaining funds from MFS's bank account to Showcase's bank account, ultimately closing MFS's account. As MFS's managing member, AHM did not authorize the transfers or the closing of the account and the transactions were not in the ordinary course of MFS's business. In February 2009, this Court confirmed the Debtors' plan of reorganization, which became effective in November 2010.

**B. Procedural Posture**

In April, 2010, a year following confirmation of the plan, but prior to the plan's effective date, AHM initiated this adversary proceeding, alleging conversion and unjust enrichment, seeking turnover of the transferred funds, and an accounting. Alternatively, AHM seeks to have the Defendants deemed to hold the transferred funds in a constructive trust for AHM's benefit.

The Defendants filed the motion to dismiss pursuant to Federal Rules of Civil Procedure 8(a)(2), 9(f), and 12(b)(6) asserting that the complaint fails to state a claim, does not provide notice of the asserted claims, and is barred by the equitable doctrines of laches, waiver, and unclean hands. Briefing was completed in July, 2010 and shortly thereafter the Court issued a scheduling order for discovery on the Motion.

3. Fed.R.Civ.P. 8(a).

Subsequently, Orsi moved to bifurcate adjudication of the Motion claiming that the ongoing discovery did not relate to him. Orsi seeks (i) a ruling on his dismissal from the complaint based on the pleadings already submitted or, in the alternative, (ii) a separate schedule and hearing on his dismissal. Orsi alleges that the only issue in the Motion that pertains to him is whether AHM has pled a cause of action against Orsi individually. Orsi claims that it is unfair and unnecessary to await the completion of discovery before adjudicating the Motion as it relates to him.

***LEGAL DISCUSSION***

**A. *Pleading Standards Under Fed. R.Civ.P. 8(a)(2) and 9(f)***

The Defendants argue that AHM has made only conclusory allegations in the complaint instead of providing facts sufficient to demonstrate an entitlement to relief. Specifically, the Defendants claim that AHM has failed to establish its interest in MFS because it mischaracterized MFS as a joint venture; the alphabet soup of transfers of interest in MFS from VJJ to FHM to AHM were improper; and AHM failed to plead how it is entitled to the assets of MFS. The Defendants also argue that AHM's allegations related to timing are insufficient under federal pleading standards.

*1. Fed.R.Civ.P. 8(a)*

[1–3] Federal Rule of Civil Procedure 8(a) applies to adversary proceedings pursuant to Federal Rule of Bankruptcy Procedure 7008 and requires "a short and plain statement of the claim showing that the pleader is entitled to relief." [3] The pleading need not state with detail the

facts that provide the basis for the claim.[4] "Because Rule 8 is fashioned in the interest of fair and reasonable notice, not technicality, more extensive pleading of facts is not required."[5] The pleading is sufficiently specific to withstand a motion to dismiss under Rule 8(a) so long as it provides fair notice of the claim's nature and the grounds for the claim.[6]

Rule 8(a) does not require AHM to prove its interest in MFS nor to establish how it acquired its entitlement to relief. AHM need only provide the Defendants with notice of the claim. The facts alleged in the complaint provide the Defendants with sufficient notice of the grounds and nature of the actions asserted and, thus, the Motion is denied as to Rule 8(a).

### 2. Fed.R.Civ.P. 9(f)

[4,5] Federal Rule of Civil Procedure 9(f) provides that "[a]n allegation of time or place is material when testing the sufficiency of a pleading." " 'Rule 9(f) does not require specificity in pleading time and place, but provides only that when specific allegations are made, they are material.' "[7] Timing is not an issue here other than the three year period from the incidents giving rise to the claims and the filing of the

complaint. The Motion is denied as to Rule 9(f).

### B. Fed.R.Civ.P. 12(b)(6) Failure to State a Claim

The Defendants assert that the complaint should be dismissed because AHM has failed to plead a basis for recovery against both of the Defendants. Federal Rule of Civil Procedure 12(b)(6), made applicable to these proceedings by Federal Rule of Bankruptcy Procedure 7012, enables a court to dismiss a complaint for failure to state a claim upon which relief may be granted. The purpose of the Rule 12(b)(6) motion to dismiss is not to decide the merits of the case, but to test the sufficiency of the factual allegations in a complaint.[8] In considering a motion to dismiss filed under Rule 12(b)(6), a court reviews the complaint and any "document integral or explicitly relied on in the complaint."[9]

[6] The court must accept all of the allegations in the complaint as true and view any inferences drawn from such allegations in the light most favorable to the plaintiff.[10] The moving party bears the

---

**4.** *In re Plassein Int'l Corp.*, 352 B.R. 36, 42 (Bankr.D.Del.2006) (citing *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 167, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993)); *In re TWA Post Confirmation Estate*, 305 B.R. 228, 232 (Bankr.D.Del.2004).

**5.** *In re DVI, Inc.*, 326 B.R. 301, 306 (Bankr. D.Del.2005) (quoting *Wynder v. McMahon*, 360 F.3d 73, 77 (2d Cir.2004)); *TWA*, 305 B.R. at 232 (granting leave to file an amended complaint after dismissing claim for insufficient facts).

**6.** *Plassein*, 352 B.R. at 42 (citing *Leatherman*, 507 U.S. at 167, 113 S.Ct. 1160); *TWA*, 305 B.R. at 232.

**7.** *Jairett v. First Montauk Sec. Corp.*, 203 F.R.D. 181, 186 (E.D.Pa.2001) (quoting *Bor-*

*rell v. Weinstein Supply Corp.*, Civ.A. No. 94–2857, 1994 WL 530102 at *3 n. 4 (E.D.Pa. Sept. 27, 1994)).

**8.** *In re Uni–Marts, LLC*, 405 B.R. 113, 129 (Bankr.D.Del.2009) (citing *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955); *Plassein*, 352 B.R. at 39; *DVI*, 326 B.R. at 305; *In re Lexington Healthcare Grp., Inc.*, 363 B.R. 713, 715 (Bankr.D.Del.2007).

**9.** *U.S. Express Lines, Ltd. v. Higgins*, 281 F.3d 383, 388 (3d Cir.2002) (citing *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir.1997)).

**10.** *TWA*, 305 B.R. at 232; *Plassein*, 352 B.R. at 39.

IN RE AMERICAN HOME MORTG. HOLDING                    **169**
Cite as 458 B.R. 161 (Bkrtcy.D.Del. 2011)

burden of persuasion.[11] The court must decide whether the complaint provides sufficient facts to allow the plaintiff the opportunity to offer evidence supporting the claims.[12] Mere recitation of the elements of a claim is insufficient to survive a Rule 12(b)(6) motion to dismiss.[13] The motion to dismiss should be granted only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."[14]

### 1. Count I: Turnover of Estate Property Under 11 U.S.C. § 542

[7–9] Section 542 of the Bankruptcy Code provides the cause of action for turnover, which requires an entity in possession of property of the estate to deliver the property, or value thereof, to the trustee.[15] A properly pled complaint asserting a claim for turnover must allege an undisputed right to recover the claimed debt.[16] Turnover is not appropriate where there is a legitimate dispute over ownership of the property.[17]

Here, accepting all allegations as true and all inferences in the light most favorable to AHM, AHM has sufficiently pled a cause of action for turnover. AHM alleges that its funds (the "AHM Funds") were held in MFS's account. AHM further alleges that Orsi transferred the entire balance of MFS's account, including the AHM Funds, to Showcase's account and closed MFS's account. AHM alleges that Show-

case and/or Orsi are in possession of the AHM Funds and that they have no right to such possession. The complaint fails to indicate or imply any dispute over ownership of the AHM Funds. While a legitimate dispute may exist, the motion to dismiss is limited to the facts alleged in the complaint. The Motion is denied as to the turnover count.

### 2. Count II: Conversion

[10–13] The Defendants argue that AHM fails to state a claim for conversion because AHM shows neither wrongful control over the AHM Funds nor AHM's interest in the account. The Defendants further argue that the AHM Funds were not identifiable chattel because they were commingled in MFS's account. Under Illinois state law, a claim for conversion requires a plaintiff to establish (1) a right to the property at issue; (2) an absolute and unconditional right to the immediate possession; (3) wrongful, unauthorized control over the property; and (4) a demand for possession.[18] In stating a claim for the conversion of money, the plaintiff must show an entitlement to a specific fund, account, or "specific money in coin or bills," not merely a particular amount of money.[19] While the money need not be earmarked to support a claim for conversion, it must be "'capable of being de-

---

11. *Plassein*, 352, B.R. at 39.

12. *In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 311 F.3d 198, 215 (3d Cir.2002).

13. *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955.

14. *Lexington Healthcare*, 363 B.R. at 715 (quoting *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)); *TWA*, 305 B.R. at 232.

15. 11 U.S.C. § 542(a).

16. *In re Hechinger Investment Co. of Delaware, Inc.*, 282 B.R. 149, 162 (Bankr.D.Del. 2002).

17. *Lexington Healthcare*, 363 B.R. at 716.

18. *Howard v. Chicago Transit Authority*, 402 Ill.App.3d 455, 341 Ill.Dec. 684, 931 N.E.2d 292, 298 (2010).

19. *Horbach v. Kaczmarek*, 288 F.3d 969, 975 (7th Cir.2002).

scribed, identified, or segregated in a specific manner.' " [20]

Here, the complaint alleges that AHM owns the AHM Funds and Orsi lacked authorization to transfer the AHM Funds. These allegations create an inference that AHM had a right to the AHM Funds and the immediate possession thereof. The complaint further alleges that Orsi was not the manager of MFS, and that the transfer was not authorized nor in the ordinary course of MFS's business. AHM also alleges that Showcase and/or Orsi are in possession of the funds and that such possession is wrongful. Finally, AHM alleges that it made a demand for return of the funds that was either ignored or refused. The Motion is denied as to the conversion count.

### i. *Personal Liability of an Officer/Director*

[14] The Defendants argue that Orsi cannot be personally liable for conversion by virtue of his position as President of Showcase because even though Showcase is a member of MFS, MFS is a distinct legal entity. The Defendants also claim that AHM has not provided any support for holding Orsi personally liable for the transfer of the funds nor pled an alter ego theory that would permit the piercing of two corporate veils.

[15–19] Generally, corporate officers are not personally liable for corporate obligations.[21] The issue of an officer's personal liability in conversion "is not an affirmative defense to be raised by [the] defendant, but rather is part of the plaintiff's case to be pled and proved." [22] Under Illinois law, an officer's liability for conversion is established by proof of active participation in the conversion.[23] To be liable, each element of conversion need not be satisfied by the officer.[24] Personal liability only attaches if the officer actively participated in "the wrongful act *initially giving rise* to the corporation's liability." [25] The corporate officer may be personally liable for conversion even though he does not personally benefit.[26]

AHM need only allege that Orsi actively participated in the act giving rise to the conversion to sustain a cause of action against Orsi individually. Here, AHM alleges that "Orsi entered the offices of First Chicago [Bank] and, without AHM's knowledge, permission or consent, wrongfully transferred" funds from MFS's account to Showcase's account.[27] The Motion is denied as to Orsi's individual liability for conversion.

### 3. *Count III: Unjust Enrichment*

[20–22] The Defendants argue that the unjust enrichment claim should be dismissed because Showcase was authorized to make withdrawals from the account and

20. *Prescott v. Allstate Life Ins. Co.*, 341 F.Supp.2d 1023, 1028 (N.D.Ill.2004) (quoting *Bill Marek's The Competitive Edge, Inc. v. Mickelson Group, Inc.*, 346 Ill.App.3d 996, 282 Ill.Dec. 305, 806 N.E.2d 280, 285 (2004)).

21. *IOS Capital, Inc. v. Phoenix Printing, Inc.*, 348 Ill.App.3d 366, 283 Ill.Dec. 640, 808 N.E.2d 606, 611 (2004).

22. *Nat'l Acceptance Co. of America v. Pintura Corp.*, 94 Ill.App.3d 703, 50 Ill.Dec. 120, 418 N.E.2d 1114, 1116 (1981).

23. *Id.*, 50 Ill.Dec. 120, 418 N.E.2d at 1117.

24. *IOS Capital*, 283 Ill.Dec. 640, 808 N.E.2d at 611.

25. *Id.*

26. *Nat'l Acceptance*, 50 Ill.Dec. 120, 418 N.E.2d at 1117 (citing 12 C.J.S. Corporations § 849 (1940)).

27. Complaint at ¶ 32.

## IN RE AMERICAN HOME MORTG. HOLDING
### Cite as 458 B.R. 161 (Bkrtcy.D.Del. 2011)

AHM suffered no detriment because it was not entitled to the funds. "Unjust enrichment is a 'quasi-contract' theory that permits courts to imply the existence of a contract where none exists in order to prevent unjust results." [28] Under Illinois law, in pleading a claim for unjust enrichment, a "plaintiff must show that the defendant retained a benefit to the plaintiff's detriment, and that the retention of the benefit violates fundamental principles of justice, equity, and good conscience." [29]

Here, AHM alleges that Orsi transferred the entire amount of the funds from MFS's account to Showcase's account, thereby conferring a benefit upon Showcase. AHM further alleges that it suffered a detriment because the "AHM Funds have not been available for AHM's use" [30] and "AHM has suffered and will continue to suffer damage." [31] These allegations raise an inference that allowing the Defendants to retain the benefit of the AHM Funds would be unjust and the Motion is denied as to that count.

### 4. Count IV: Accounting

[23, 24] The Defendants argue that AHM is not entitled to an accounting because AHM has failed to show the absence of an adequate remedy at law and failed to plead the grounds required to support the alleged need for an accounting. Under Illinois law, an accounting is a claim for equitable relief that requires a plaintiff to allege an absence of a legal remedy and "(1) a breach of a fiduciary relationship, (2) a need for discovery, (3) fraud, or (4) the existence of mutual accounts which are of a complex nature." [32]

Here, AHM alleges that "its remedies available at law are not or may not be fully adequate." [33] AHM further alleges a necessity for discovery to determine the whereabouts of the funds, and that MFS's account was a mutual account of a complex nature. Although the allegation of MFS's account's complexity may be conclusory, alleging a need for discovery is sufficient to support a claim for an accounting. The Motion is denied as to the accounting count.

### 5. Count V: Constructive Trust

[25–29] The Defendants argue that AHM's claim for a constructive trust cannot stand as a separate cause of action. The imposition of a constructive trust is a remedy, not a separate cause of action. [34] To the extent that a plaintiff asserts "a separate claim for a constructive trust, it is superfluous." [35] Dismissal of a constructive trust as a cause of action does not preclude the award of a constructive trust

28. *Cordes & Co., LLC v. Mitchell Cos., LLC,* 605 F.Supp.2d 1015, 1023 (N.D.Ill.2009) (citing *Hayes Mech., Inc. v. First Indus., L.P.,* 351 Ill.App.3d 1, 285 Ill.Dec. 599, 812 N.E.2d 419, 426 (2004)).

29. *Id.* at 1023–4 (citing *Hayes Mech.,* 285 Ill.Dec. 599, 812 N.E.2d at 426).

30. Complaint at ¶ 54.

31. Complaint at ¶ 56.

32. *Kempner Mobile Electronics, Inc. v. Southwestern Bell Mobile Systems,* 428 F.3d 706, 715 (7th Cir.2005) (citing *Mann v. Kemper*

*Fin. Cos.,* 247 Ill.App.3d 966, 187 Ill.Dec. 726, 618 N.E.2d 317 (1992)); *Cole–Haddon, Ltd. v. Drew Philips Corp.,* 454 F.Supp.2d 772, 778 (N.D.Ill.2006); *3Com Corp. v. Electronics Recovery Specialists, Inc.,* 104 F.Supp.2d 932, 942 (N.D.Ill.2000);.

33. Complaint at ¶ 58.

34. *3Com Corp.,* 104 F.Supp.2d at 942; *Fujisawa Pharmaceutical Co. v. Kapoor,* 16 F.Supp.2d 941, 952 (N.D.Ill.1998) ("A constructive trust is an equitable remedy, not an independent cause of action.").

35. *Fujisawa,* 16 F.Supp.2d at 952.

**172**          **458 BANKRUPTCY REPORTER**

as a remedy.[36] Imposition of a constructive trust may be appropriate once breach of fiduciary duty or actual fraud has been proven.[37] However, a claim for unjust enrichment does not give rise to the imposition of a constructive trust.[38]

Here, the imposition of a constructive trust is asserted as a separate claim for relief and the complaint does not assert any causes of action that would support the imposition of a constructive trust as a remedy at this time. Accordingly, even though the Court, at a later date, may determine that imposition of a constructive trust is an appropriate remedy, the Motion is granted as to this count.

### C.  Affirmative Defenses

[30–32] "While most defenses are to be pled affirmatively under the Federal Rules, Rule 12(b)(6) provides that the defense may take the form of a motion to dismiss for failure to state a claim upon which relief can be granted."[39] Generally, an affirmative defense "is not a proper basis to dismiss a claim by a motion to dismiss unless the face of the complaint shows beyond doubt that an affirmative defense is dispositive."[40] The affirmative

defense must show with "certainty that the plaintiff would not be entitled to relief under any statement of facts which could be proved in support of the claim."[41]

### 1.  Laches

[33] The Defendants assert that AHM's claims should be barred by the defense of laches because AHM waited nearly three years from the time of the transfer before it filed the complaint. The Defendants claim that the delay in initiating the suit caused the Defendants prejudice because they are now required to recover old documents and records.

[34, 35] Whether to apply the equitable doctrine of laches is left to the sound discretion of the court.[42] Laches is defined as "such neglect or omission to assert a right as, taken in conjunction with lapse of time of more or less duration, and other circumstances causing prejudice to the adverse party."[43] Although the laches defense was originally only available to refute equitable claims, Illinois courts now recognize that the doctrine also applies to claims at law.[44] Illinois courts have applied the doc-

**36.**  *3Com*, 104 F.Supp.2d at 942.

**37.**  *Id.*

**38.**  *ABN AMRO, Inc. v. Capital Intern. Ltd.*, 595 F.Supp.2d 805, 850 (N.D.Ill.2008); *Charles Hester Enter. Inc. v. Ill. Founders Ins. Co.*, 137 Ill.App.3d 84, 91 Ill.Dec. 790, 484 N.E.2d 349, 354 (1985) (noting that unjust enrichment is not mentioned in precedential cases as one of the criteria that gives rise to the imposition of a constructive trust); *Steinberg v. Chicago Medical Sch.*, 69 Ill.2d 320, 328, 13 Ill.Dec. 699, 371 N.E.2d 634 (1977) ("In equity a constructive trust may be imposed to redress unjust enrichment where there is either actual fraud or implied fraud resulting from a fiduciary relationship.").

**39.**  *Continental Collieries v. Shober*, 130 F.2d 631, 635 (3d Cir.1942).

**40.**  *ABN AMRO*, 595 F.Supp.2d at 851.

**41.**  *Continental Collieries*, 130 F.2d at 635.

**42.**  *In re Midway Airlines, Inc.*, 221 B.R. 411, 458 (Bankr.N.D.Ill.1998) (citing *Baker Mfg. Co. v. Whitewater Mfg. Co.*, 430 F.2d 1008, 1011–1015 (7th Cir.1970)).

**43.**  *Arclar Co. v. Gates*, 17 F.Supp.2d 818, 823 (S.D.Ill.1998) (citing *Holt v. Duncan*, 33 Ill. App.2d 477, 180 N.E.2d 36, 38 (4th Dist. 1962)).

**44.**  *Lee v. City of Decatur*, 256 Ill.App.3d 192, 194 Ill.Dec. 614, 627 N.E.2d 1256, 1259 (1994)

IN RE AMERICAN HOME MORTG. HOLDING          **173**
Cite as 458 B.R. 161 (Bkrtcy.D.Del. 2011)

trine of laches even where the law provides a statute of limitations.[45]

[36, 37]  In asserting this defense, the Defendants must prove an unreasonable delay and undue prejudice resulting from the delay.[46]  The delay must "substantially, materially, or seriously prejudice[ ] the debtors' ability to prepare its defense."[47]  Prejudice requires a showing that the delay harmed the ability to prepare a defense by "resulting in documentary evidence or key witnesses no longer being available or witnesses who are available no longer having a recall of relevant facts."[48]

[38, 39]  Generally, "the party must have knowledge of the facts upon which his claim is based yet fail to proceed in a timely manner."[49]  The defense of laches can be raised in a motion to dismiss if "(1) an unreasonable delay appears on the face of the pleading; (2) no sufficient excuse for delay appears or is pled; and (3) the motion specifically points out the defect."[50]

Here, the complaint, on its face, does not demonstrate an unreasonable delay.  The determination of unreasonable delay is left to the discretion of the court.  As the Defendants have not cited any case law holding that a delay of two and one-half years is unreasonable *per se*, and the complaint itself does not show an unreasonable

delay.  While the existence of a statute of limitations does not bar the defense of laches, AHM filed the action well within the limitations periods of all causes of action.[51]

Moreover, the Court takes note of the chaotic nature of the circumstances surrounding the Debtors' bankruptcy filing.  The Debtors were in the business of investing in mortgage-backed securities that resulted from the securitization of mortgage loans originated by its subsidiaries and other companies.  In 2007, as a result of declining real estate prices and increasing defaults on mortgage obligations, the Debtors closed their origination business, terminated the majority of their employees and filed for chapter 11 protection, seeking to sell substantially all of their assets.  With the sudden bankruptcy filing and deterioration of the secondary mortgage market, the Debtors were faced with having to referee inter-creditor disputes and manage the influx of creditors' and clients' attempts to exercise remedies against the Debtors while endeavoring to conduct due diligence to determine the value of the bankruptcy estate and successfully sell the assets.

Although the provisions of the Bankruptcy Code afforded the Debtors with

---

45.  *Teamsters & Employers Welfare Trust of Ill. v. Gorman Bros. Ready Mix*, 283 F.3d 877, 881 (7th Cir.2002).

46.  *Case v. Wells Fargo Bank NA*, 394 B.R. 469, 474 (Bankr.E.D.Wisc.2008).

47.  *Id.*

48.  *Id.*

49.  *Senese v. Climatemp, Inc.*, 222 Ill.App.3d 302, 164 Ill.Dec. 236, 582 N.E.2d 1180, 1190 (1991).

50.  *Arclar Co. v. Gates*, 17 F.Supp.2d 818, 823 (S.D.Ill.1998) (citing *Holt v. Duncan*, 33 Ill.

App.2d 477, 180 N.E.2d 36, 38 (4th Dist. 1962)).

51.  The Bankruptcy Code does not provide a statute of limitations for turnover.  *Midway Airlines*, 221 B.R. at 458.  The Illinois statute of limitations provides that actions for conversion, unjust enrichment, and accounting must be brought within five years of the cause of action's accrual.  735 ILCS 5/13–205 ("... actions on unwritten contracts, expressed or implied, ... or to recover the possession of personal property or damages for the detention or conversion thereof, and all civil actions not otherwise provided for, shall be commenced within 5 years next after the cause of action accrued.").

**174**              **458 BANKRUPTCY REPORTER**

certain tools to manage the chaos of the chapter 11 filing, the Debtors were soon faced with a barrage of turnover motions and motions for relief from the automatic stay as well as the need to defend against several objections to the asset sales. Despite being inundated with large amounts of litigation, the Debtors still managed to file the present action within the prescribed statutes of limitation.

The Defendants have not shown there was an unreasonable delay by AHM. Moreover, the circumstances surrounding the Debtors' bankruptcy filing and the plethora of litigation during the bankruptcy proceedings further support the conclusion that the imposition of laches is not certain in this case. The Motion is denied as to the defense of the equitable doctrine of laches.

### 2. Waiver

[40–43] The Defendants also asserts that AHM waived its right to the AHM Funds by waiting nearly three years to file a suit for their return. "Waiver requires the intentional relinquishment of a known right"[52] through an express agreement or implied from a party's conduct.[53] The defense of waiver requires a showing of: "(1) the existence of a right, privilege, advantage or benefit which may be waived; (2) the actual or constructive knowledge thereof; and (3) an intention to relinquish such right, privilege advantage or benefit."[54] "'Before a party is deemed to have waived or relinquished a right or remedy available to it under law, a clear and dis-

tinct manifestation of such an intent must be found.'"[55]

Here, the complaint fails to allege that AHM waived any of its rights, does not demonstrate any of the elements of waiver nor shows an intent to relinquish any rights. There is certainly no basis at this time to conclude that it is certain the Court will find AHM has waived its claims. The Motion is denied as to the defense of waiver.

### 3. Unclean Hands

[44] The Defendants claim that AHM should be barred from recovery because AHM did not properly obtain an interest in MFS, was self-appointed as managing member, and failed to seek recovery of the AHM Funds for nearly three years. The Defendants also argue that AHM should not be allowed to assert an interest in MFS's account because it failed to take action and allowed MFS to be involuntarily dissolved.

[45–47] The doctrine of unclean hands prevents a party from recovering where the party "engaged in, acquiesced in or benefited from the conduct at issue."[56] "A claim for unjust enrichment may be denied under the doctrine of 'unclean hands' if a plaintiff's recklessness caused his injury."[57] Under Illinois law, an unclean hands defense requires a showing of misconduct by the plaintiff involving the transaction being considered that amounts to "misconduct, fraud or bad faith toward the defendant making the contention."[58]

---

**52.** *Case,* 394 B.R. at 474.

**53.** *City of Chicago v. Chicago Fiber Optic Corp.,* 287 Ill.App.3d 566, 222 Ill.Dec. 821, 678 N.E.2d 693, 700 (1997).

**54.** *Midway Airlines,* 221 B.R. at 460.

**55.** *Id.* (quoting *American Nat. Bank & Trust Co. v. K–Mart Corp.,* 717 F.2d 394, 398 (7th Cir.1983)).

**56.** *Cement-Lock v. Gas Tech. Inst.,* 618 F.Supp.2d 856, 888 (N.D.Ill.2009).

**57.** *ABN AMRO,* 595 F.Supp.2d at 850.

**58.** *Cunningham v. EquiCredit Corp. of Ill.,* 256 F.Supp.2d 785, 797–8 (N.D.Ill.2003) (quoting *Baal v. McDonald's Corp.,* 97 Ill.App.3d 495, 52 Ill.Dec. 957, 422 N.E.2d 1166, 1171 (1981)).

The Defendants have not established that AHM participated in, consented to or benefitted from the closing of MFS's account. Again, there is no basis to conclude it is certain the Court will invoke the doctrine of unclean hands and, thus, the Motion is denied as to this issue.

### D. Motion for Separate Adjudication

Orsi claims that adjudication of the Motion should be separated because the only issue that applies to him is whether AHM has pled a claim against Orsi individually. Orsi alleges that delaying adjudication as it relates to him is unfair and unnecessary. As the Court is denying the Motion on the merits (except for Count V) as AHM adequately pled causes of action against both Showcase and Orsi the motion for separate adjudication is denied as moot.

### CONCLUSION

For the foregoing reasons, the Motion is granted, in part, and denied in part. Specifically, the Court will grant the Motion as to Count V, which seeks imposition of a constructive trust, and will deny the Motion as to Counts I–IV. In addition, the Court finds, at this stage, that the affirmative defenses of laches, waiver and unclean hands are not adequately pled. An order will be issued.



In re EXCEL STORAGE PRODUCTS, L.P., Debtor.

William G. Schwab, Trustee for the Estate of Excel Storage Products, L.P., Plaintiff

v.

Peddinghaus Corporation, Defendant.

Bankruptcy No. 5–10–bk–07862 RNO.
Adversary No. 5–11–ap–00146 RNO.

United States Bankruptcy Court, M.D. Pennsylvania.

Sept. 16, 2011.

**Background:** Chapter 7 trustee brought adversary proceeding to avoid, as preference, a prepetition payment in amount of $3,987.06 that creditor received less than 90 days prepetition. Creditor moved to dismiss on theory that proceeding could be venued only in judicial district where it resided or, in alternative, that trustee's claim was barred by de minimis exception to his avoidance power, and trustee asserted that de minimis exception did not apply in what had originally begun as involuntary case.

**Holdings:** The Bankruptcy Court, Robert N. Opel, II, J., held that:

(1) statutory exception to general rule that any proceeding in bankruptcy case is properly venued in judicial district where petition was filed, pursuant to which, if amount in controversy does not exceed certain specifically enumerated floors, trustee may commence a proceeding "arising in" or "related to" such bankruptcy case only in judicial district where defendant resides, was by its plain terms inapplicable to preference proceeding, as one "arising under" the Code, and

(2) regardless of whether de minimis exception would apply in involuntary case

In re Gary STANCIL, Debtor.

Gary Stancil, Plaintiff,

v.

Bradley Investments, LLC,
et al., Defendants.

Bankruptcy No. 11–00747.
Adversary No. 12–10006.

United States Bankruptcy Court,
District of Columbia.

June 19, 2012.

**Background:** Debtor brought turnover action to recover property that was the subject of postpetition foreclosure action by creditor that had not moved for stay relief, and creditor moved to dismiss.

**Holdings:** The Bankruptcy Court, S. Martin Teel, Jr., J., held that:

(1) that non-spouse who improperly joined with debtor in filing joint Chapter 13 petition was not dismissed until after creditor conducted postpetition foreclosure sale did not mean that no stay was in effect when foreclosure sale occurred and that sale was not void;

(2) because postpetition foreclosure sale was void ab initio, there was no legitimate dispute as to whether foreclosure sale purchaser might have title to property foreclosed on, such as might preclude turnover request; and

(3) establishing that property was of inconsequential value or benefit to bankruptcy estate was affirmative defense to turnover action, and debtor did not have to expressly allege the contrary.

Motion denied.

**1. Bankruptcy** ⟜2311

Permitting the filing of joint petition by spouses is designed to reduce costs of administration, and to allow payment of only one filing fee. 11 U.S.C.A. § 302.

**2. Bankruptcy** ⟜2311

Joint petition filed by debtors who are married to each other results automatically in joint administration, without necessity of motion under Bankruptcy Rule, by one trustee, and allows for a single docket by clerk. 11 U.S.C.A. § 302; Fed.Rules Bankr.Proc.Rule 1015, 11 U.S.C.A.

**3. Bankruptcy** ⟜2202, 2257, 2261, 2311

While entities who are not spouses are not entitled to obtain joint administration by filing a joint bankruptcy petition, when such entities nonetheless file a single petition listing each as debtor, with each of them signing the petition, they evidence an intention to commence bankruptcy case as to each entity, and better view is not to dismiss, but to treat petition as commencing a bankruptcy case as to each such entity. 11 U.S.C.A. § 302.

**4. Bankruptcy** ⟜2311

Unless bankruptcy court decides to dismiss cases, appropriate remedy, when debtors who are not married to each other improperly join in filing a single bankruptcy petition, is to sever cases. 11 U.S.C.A. § 302.

**5. Bankruptcy** ⟜2257

Filing of two bankruptcy cases using a single petition is inappropriate, but not jurisdictionally fatal, if debtors are not spouses. 11 U.S.C.A. § 302.

**6. Bankruptcy** ⟜2257, 2361, 2393

Even if bankruptcy court decides to dismiss one of the bankruptcy cases improperly filed, using a single petition, by debtors who are not married to each other, automatic stay and other incidents of bankruptcy case arose as to each debtor by reason of the filing of petition, and for the remaining debtor whose case is not

IN RE STANCIL                                        479

Cite as 473 B.R. 478 (Bkrtcy.D.Dist.Col. 2012)

dismissed, those incidents were continuously in place from commencement of case. 11 U.S.C.A. §§ 302, 362(a).

**7. Bankruptcy ⟂2257, 2261**

As alternative remedy to address bankruptcy petition filed by non-spouses, court has discretion to dismiss cases. 11 U.S.C.A. § 302.

**8. Bankruptcy ⟂2257, 2261, 2393**

That bankruptcy court had discretion to dismiss cases filed under a single bankruptcy petition by debtors who were not married to each other did not mean that no automatic stay arose as to debtors upon filing of their bankruptcy petition, and unless court directed annulment of stay, stay had to be viewed as having arisen. 11 U.S.C.A. §§ 302, 362(d).

**9. Bankruptcy ⟂2404, 2462**

That non-spouse who improperly joined with debtor in filing joint Chapter 13 petition was not dismissed until after creditor conducted postpetition foreclosure sale did not mean that no stay was in effect when foreclosure sale occurred and that sale was not void as violative of automatic stay. 11 U.S.C.A. §§ 302, 362(a).

**10. Bankruptcy ⟂3063.1**

Dispute as to title to assets must be legitimate or bona fide in order for turnover action to be considered premature. 11 U.S.C.A. § 542.

**11. Bankruptcy ⟂2462, 3063.1**

Because postpetition foreclosure sale was void ab initio as violative of automatic stay, there was no legitimate dispute as to whether foreclosure sale purchaser might have title to property foreclosed on, such as might preclude turnover request. 11 U.S.C.A. §§ 362(a), 542.

**12. Bankruptcy ⟂3066(1)**

Establishing that property was of inconsequential value or benefit to bankruptcy estate was affirmative defense to turnover action, and debtor did not have to expressly allege the contrary, i.e., that property was not of inconsequential value or benefit to estate, in order to state turnover claim. 11 U.S.C.A. § 542.

**13. Bankruptcy ⟂3137**

Party seeking abandonment of estate property bears burden of setting forth a prima facie case that property is of inconsequential value and benefit to estate. 11 U.S.C.A. § 554.

**14. Bankruptcy ⟂3066(1)**

Even if it was debtor's burden, as part of its prima facie case for turnover of estate property, to establish that property was not of inconsequential value or benefit to estate, debtor did not have to include express allegation to this effect in its complaint in order to state turnover claim; debtor, simply by bringing turnover proceeding, had implicitly alleged that property was not of inconsequential value or benefit. 11 U.S.C.A. § 542.

———————

Jeffrey M. Sherman, John Ernest Tsikerdanos, Lerch, Early & Brewer, Bethesda, MD, for Plaintiff.

Bradley Investments LLC, Rockville, MD, pro se.

Lawrence Posner, Rockville, MD, pro se.

Corinna Posner, Rockville, MD, pro se.

Joseph Zytnick, Rockville, MD, pro se.

P. Hannah Davis Zytnick, Rockville, MD, pro se.

Greg S. Friedman, Rockville, MD, pro se.

Susan H. Friedman, Rockville, MD, pro se.

Morton J. Frome, Rockville, MD, pro se.

Sharon S. Van Pelt, Gen. Counsel to General Funding Corp., Washington, DC, Morton A. Faller, Stephen A. Metz, Shulman, Rogers, Gandal, Pordy & Ecker, Potomac, MD, for Defendants.

*MEMORANDUM DECISION REMOTION OF 12TH STREET REAL ESTATE, LLC TO DISMISS*

S. MARTIN TEEL, JR., Bankruptcy Judge.

As of the start of the day of June 17, 2011, Gary Stancil and his mother, Delores Stancil, owned property located on 12th Street, NW, Washington, D.C. Gary Stancil, as the debtor in possession in a bankruptcy case under chapter 11 of the Bankruptcy Code (11 U.S.C.), Case No. 11–00747, has filed a *Complaint to Compel Turnover of Real Property as Result of Willful Violation of the Automatic Stay, Breach of Fiduciary Duty and Sanctions* alleging that a foreclosure sale of the property conducted during the pendency of an earlier bankruptcy case violated the automatic stay of section 362(a) of the Bankruptcy Code (11 U.S.C.), and seeking a turnover of the property. One of the defendants, 12th Street Real Estate, LLC, the purchaser at the foreclosure sale, has moved to dismiss on these grounds:

(1) the automatic stay was not in effect at the time of the foreclosure sale because the bankruptcy case was an unauthorized joint filing by Gary Stancil and his mother, Delores Stancil, and because the foreclosure sale occurred before Delores Stancil was dismissed from the unauthorized joint filing;

(2) the turnover provisions set forth in 11 U.S.C. § 542 do not apply to assets whose title is in dispute; and

(3) the complaint fails to contain any factual allegation that the subject property, if turned over to Gary Stancil, is not "of inconsequential value or benefit to the estate" pursuant to 11 U.S.C. § 542.

The motion will be denied for the following reasons.

I

The complaint establishes these facts. On June 17, 2011 at 9:29 a.m., Gary Stancil and Delores filed a petition under chapter 13 of the Bankruptcy Code naming themselves as debtors and signed by each of them. The joint petition was docketed as Case No. 11–00465. Later that day, the foreclosure sale occurred, and 12th Street purchased the property at the foreclosure sale. Still later that day, the court dismissed the case as to Delores Stancil because she was ineligible to file a bankruptcy case as a result of an order entered on March 7, 2011, in her earlier bankruptcy case, Case No. 11–00097, that dismissed that earlier case with prejudice for 180 days.

II

For the following reasons, I reject 12th Street Real Estate, LLC's argument that because the bankruptcy case was an unauthorized joint filing by Gary Stancil and his mother, Delores Stancil, and because the foreclosure sale occurred before Delores Stancil was dismissed from the unauthorized joint filing, no automatic stay was in effect at the time of the foreclosure sale.

[1, 2] Permitting the filing by spouses of a joint petition pursuant to 11 U.S.C. § 302 is designed to reduce the cost of administration and to permit only one filing fee. *Reider v. FDIC (In re Reider)*, 31 F.3d 1102, 1109 (11th Cir.1994). A joint petition results automatically in joint administration (without the necessity of a motion under Fed. R. Bankr.P. 1015) by

one trustee, and allows for a single docket by the clerk. *Id.*

[3–5] Entities that are not spouses are *not* entitled to obtain joint administration by filing a single petition. Nevertheless, when such entities file a single petition listing each as a debtor, with each of them signing the petition, they evidence an intention to commence a bankruptcy case as to each entity.[1] The better view is that a bankruptcy case *is* commenced as to each such entity under 11 U.S.C. § 301, albeit with the entities treated as having improperly joined together in the same petition. *See In re Wilkerson,* 2006 WL 3694638, *3 (Bankr.M.D.Ga. Mar. 29, 2006) (improper joint petition by individuals eligible to be debtors is a case of misjoinder, not a case of a jurisdictionally defective petition).[2] Unless the court decides to dismiss the cases, the appropriate remedy to address the improper joinder is to sever the cases. *Id.*[3] To elaborate, filing two bankruptcy cases using a single petition is inappropriate, but not jurisdictionally fatal, if the debtors are not spouses.[4] Such a petition must be treated as commencing separate

cases limited to one entity for each such case, with a filing fee to be paid for each case, and with the cases *not* jointly administered unless the court later orders such joint administration.

[6] Earlier decisions than *In re Wilkerson* gave non-spouses who filed on the same petition the option of dismissing one of the debtors or face dismissal of the entire case. *See Bone v. Allen (In re Allen),* 186 B.R. 769, 774 (Bankr.N.D.Ga. 1995); *In re Lam,* 98 B.R. 965, 966 (Bankr. W.D.Mo.1988); *In re Malone,* 50 B.R. 2, 3 (Bankr.E.D.Mich.1985). The better course, as in *In re Wilkerson,* is to treat the petition as opening two separate cases (one for each debtor), as the earlier approach deprives at least one of the debtors of having a case remain pending as to that debtor. Nevertheless, those earlier decisions illustrate, as does *In re Wilkerson,* that a bankruptcy case has been commenced as to each debtor even though the petition was an improper attempt at joining non-spouses as debtors in a single case. Even if the case is dismissed as to one of the debtors, nevertheless the auto-

---

1. If it is evident that the entities are *not* spouses, as in the case of a petition for John Doe and X Corporation, the entities are not allowed to pay but one filing fee. If the petition is unaccompanied by a filing fee for each entity, the clerk arguably could properly refuse to accept the petition for filing. *See* Fed. R. Bankr.P. 1006. But once a petition presented by non-spouses is accepted for filing, the petition is a filed petition, and the issue is how then to treat the petition.

2. *See also In re Moore,* 73 B.R. 607, 609 (Bankr.N.D.Ala.1987) (case not dismissed based on corporation and individual having filed single petition as debtors under Chapter 12 of Bankruptcy Code).

3. *See also In re Jackson,* 28 B.R. 559, 564 (Bankr.E.D.Pa.1983) (petition filed by Walter Jackson and his parents treated as a joint filing by the parents and an individual filing by Walter).

4. Under *Arbaugh v. Y & H Corp.,* 546 U.S. 500, 515–16, 126 S.Ct. 1235, 163 L.Ed.2d 1097 (2006), a statutory requirement should be treated as subject-matter jurisdictional only when Congress evinces a clear intent to make it so. With respect to the analogous question of whether the requirements of 11 U.S.C. § 303(b) are jurisdictional, the better view is that they are not. *See, e.g., King v. Fidelity Nat'l Bank of Baton Rouge,* 712 F.2d 188, 190 (5th Cir.1983) (impropriety of *involuntary* petition regarding two spouses can be cured by severance or by dismissal of one spouse); *In re Bowshier,* 313 B.R. 232, 238 (Bankr.S.D.Ohio 2004); Rachel Green, *Treating Section 303(b) of the Bankruptcy Code as Subject–Matter Jurisdictional—Sound Approach or Involuntary Reflex?,* 75 BROOK. L.REV. 865, 904 (2010) (concluding based on *Arbaugh* that § 303(b) is not jurisdictional).

matic stay and other incidents of a bankruptcy case arose as to each debtor by reason of the filing of the case, and, for the remaining debtor, those incidents were continuously in place after the commencement of the case. *See In re Lucero,* 408 B.R. 348, 351 (Bankr.C.D.Cal.2009) (allowing the case to remain pending as to one of the debtors, after the other had requested to be dismissed from the case, and noting that if the entire case were dismissed, preference or fraudulent transfer claims might no longer be available by the time a new case was filed).[5]

Yet another approach for addressing a petition filed by non-spouse debtors, followed only by *Fitzgerald v. Hudson (In re Clem),* 29 B.R. 3, 5 (Bankr.D.Idaho 1982), is to treat the first listed debtor as having commenced a bankruptcy case without the other debtor having commenced a bankruptcy case. I reject that approach because both debtors evidence an intention to commence a bankruptcy case when they

file such a petition.[6] In any event, Gary Stancil was the first listed debtor in this case.

[7,8]  As an alternative remedy to address a petition filed by non-spouses, the court has discretion to dismiss the cases. *See In re 4–1–1 Fla. Ga., L.P.,* 125 B.R. 565, 566 (Bankr.W.D.Mo.1991) (case dismissed when at least four separate and distinct partnerships improperly joined together in one petition, and filed in a district that would not be "the venue of choice" if they filed separate petitions); *In re Jephunneh Lawrence & Assocs. Chartered,* 63 B.R. 318 (Bankr.D.D.C.1986) (petition filed for an individual and a corporation).[7] The discretion to dismiss the cases, however, does not demonstrate that an automatic stay does not arise as to the debtors upon the filing of the petition. In appropriate circumstances, the court could annul the stay under 11 U.S.C. § 362(d),[8] but unless that is done the automatic stay ought to be viewed as having arisen in the

5.  The court in *In re Lucero* opined in what was necessarily dictum (because the issue was not before it) that upon dismissing only one of the debtors, Ms. Aguirre, from the case, the case would still be pending, and thus not be a dismissed case for purposes of 11 U.S.C. § 362(c)(3) if Ms. Aguirre were to file a new case. That dictum does not square with this court's view that a petition for two non-spouses creates two separate bankruptcy cases, with a filing fee owed for each case. Necessarily, when one of the debtors is dismissed from the case that can be viewed as a dismissal of that entity's bankruptcy case.

6.  Nevertheless, the rule against non-spouses filing a joint petition has appropriately been used as an aid in addressing an ambiguity raised by a petition filed for an individual listed in the petition as trustee of trusts, and to conclude that the petition was a filing only of the individual, and only *his* assets are property of the estate. *See In re Simon,* 179 B.R. 1, 6 (Bankr.D.Mass.1995) (addressing petition filed as *In re Matthew Simon, Individually, and as Trustee of the 466 Broadway Trust, and Trustee of the 616 Realty Trust* ).

7.  To the extent that *In re Jephunneh Lawrence & Assocs. Chartered* viewed the petition as "irremediably defective," it disregarded the remedy of severing the petition into two separate cases, and is unpersuasive.

8.  In effect, that was what the court in *Norris v. Norris,* 1994 WL 529405 (Tenn.Ct.App. Sept. 15, 1994), did by treating a petition, fraudulently filed as a joint petition, as not giving rise to an automatic stay. A state court, however, lacks authority to annul the automatic stay, and it is dubious that a state court has authority to decree that no automatic stay arose from such a petition. In any event, Gary Stancil and Delores Stancil did not indicate that they were spouses (having failed to list either of them as a debtor under the box for "Name of Joint Debtor (Spouse)" and having listed themselves together above the box for "Name of Debtor.") There is no suggestion that Gary Stancil and Delores Stancil were committing a fraud by filing a single petition as to the two of them.

case. Here, the court opted not to dismiss the entire case as based on an improper joinder of non-spouses on a single petition, but even if the court had dismissed the entire case on that basis, an automatic stay would have been in place as to Gary Stancil until the dismissal order was entered.

[9] The *In re Wilkerson* approach of severing the petition would usually result in the court directing the clerk to open a second docket as to one of the debtors and to treat the first docket opened as limited to the other debtor, but with both of the cases deemed commenced as of the date of the filing of the petition. Here, however, Mrs. Stancil was barred from commencing a bankruptcy case, and the court dispensed with opening a separate docket as to her, and simply dismissed her as having been barred from filing a petition.[9] That left the case pending as to only Gary Stancil.

Although Delores Stancil was not dismissed from the case until after the foreclosure sale had been held, the case was pending as to Gary Stancil when the foreclosure sale was held, and an automatic stay had arisen in *his* case that barred the foreclosure sale.[10] The complaint cannot be dismissed on the basis that no automatic stay arose in the bankruptcy case.

### III

[10] In support of its argument that the turnover provisions set forth in 11 U.S.C. § 542 do not apply to assets whose title is in dispute, 12th Street Real Estate, LLC observes that "the law is settled that 'the debtor cannot use the turnover provisions to liquidate contract disputes or otherwise demand assets whose title is in dispute.' *U.S. v. Inslaw, Inc.,* 932 F.2d 1467 (D.C.Cir.1991)." Nonetheless, the dispute as to title to the assets must be "legitimate" or "bona fide" for a turnover action to be considered premature. *See Krasny v. Bagga (In re Jamuna Real Estate, LLC),* 357 B.R. 324, 333–34 (Bankr. E.D.Pa.2006) ("[T]urnover is not proper where a bona fide dispute exists."); *In re FLR Co.,* 58 B.R. 632, 634 (Bankr.W.D.Pa. 1985) ("Turnover, 11 U.S.C. § 542, is not the provision of the Code to determine the rights of the parties in legitimate contract disputes."); *Hassett v. BancOhio Nat'l Bank (In re CIS Corp.),* 172 B.R. 748, 760 (S.D.N.Y.1994) ("[A]n action should be regarded as a turnover only when there is no legitimate dispute over what is owed to the debtor.").

[11] An act in violation of the automatic stay, however, is void, such that the foreclosure sale pursuant to which 12th Street Real Estate, LLC purchased the property is deemed not to have occurred. Accordingly, 12th Street Real Estate, LLC has no basis for asserting that it holds title to the property and, therefore, no legitimate dispute exists. *See Porter-Hayden*

---

9. In hindsight, the court should have opened a separate docket for Mrs. Stancil, treating the case as to her as being commenced at the time of the filing of the original petition signed by her and her son. Two filing fee obligations were incurred, one by Gary Stancil and one by Delores Stancil. It is unclear who was the source of the one filing fee that *was* paid. An order could have issued directing Gary Stancil and Delores Stancil to address that issue or suffer dismissal of the case as to both of them. However, no case is pending now as to either debtor, dismissal having been on grounds other than the lack of a filing fee, and the failure to pay a filing fee can no longer serve as a basis for dismissal as there is no pending case to dismiss. Nevertheless, the court will direct the two debtors to show cause why they ought not be each held jointly and severally liable to pay the unpaid filing fee.

10. By reason of 11 U.S.C. § 362(b)(21), no stay had arisen in Delores Stancil's case commenced by the filing of her and Gary Stancil's petition.

**484**    **473 BANKRUPTCY REPORTER**

*Co. v. First State Mgmt. Grp., Inc. (In re Porter–Hayden Co.),* 304 B.R. 725, 732 (Bankr.D.Md.2004) ("[F]or an action to be a turnover proceeding, it is not relevant that the defendant disputes the existence of the debt by ... denying the complaint's allegations, as long as those allegations state the existence of a mature debt." (quoting *Nat'l Enters., Inc. v. The Koger P'ship, Ltd. (In re Nat'l Enters., Inc.),* 128 B.R. 956, 959 (E.D.Va.1991))). Even if it has an argument against that analysis, upon the court adjudicating that the automatic stay was violated and that the sale was void, the remedy of turnover will be appropriate. In any event, even if section 542(a) is unavailable as a remedy, the facts alleged establish a basis for recovery of possession of the property under D.C.Code § 16–1501. That suffices to defeat the motion to dismiss.[11]

## IV

12th Street Real Estate, LLC further argues that the complaint fails to allege that the property is not of inconsequential value or benefit to the estate and, as a result, does not state a claim for turnover under section 542(a). Section 542(a) provides:

> Except as provided in subsection (c) or (d) of this section, an entity, other than a custodian, in possession, custody, or control, during the case, of property that the trustee may use, sell, or lease under section 363 of this title, or that the debtor may exempt under section 522 of this title, shall deliver to the trustee, and account for, such property or the value of such property, unless such property is of inconsequential value or benefit to the estate.

The issue is whether establishing that the property is of inconsequential value or benefit to the estate is an affirmative defense or whether, as part of its prima facie case, the trustee (or debtor in possession) must set forth that the property is not of inconsequential value or benefit, an issue as to which courts do not agree. *Compare Desmond v. Baker (In re McDonnell),* 2007 WL 1031300, *2 (Bankr.D.Mass. Mar. 30, 2007) (stating that proving that the property is of inconsequential value or benefit to the estate is an affirmative defense), *with Boyer v. Davis (In re U.S.A. Diversified Prods., Inc.),* 193 B.R. 868, 872 (Bankr.N.D.Ind.1995) (stating that the trustee carries the burden of proving that the property is not of inconsequential value or benefit to the estate).

[12] The plain language of section 542(a) demonstrates that establishing inconsequential value or benefit to the estate is an affirmative defense to a turnover action. Section 542(a) first provides the elements the trustee must establish for turnover, with the other party required to deliver the property (or the value of such property) to the trustee "*unless such property is of inconsequential value or benefit to the estate.*" (Emphasis added). The term "unless" and its juxtaposition after

---

11. *See Hunter v. Secretary of U.S. Army,* 565 F.3d 986, 992 (6th Cir.2009) (" 'To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain either direct or inferential allegations respecting all the material elements to sustain a recovery under some viable legal theory.' " (quoting *Advocacy Org. for Patients & Providers v. Auto Club Ins. Ass'n,* 176 F.3d 315, 319 (6th Cir.1999))); *Rathborne v. Rathborne,* 683 F.2d 914, 917 n. 8 (5th Cir. 1982) ("[A] complaint need not correctly categorize the legal theories giving rise to the claims; it must merely allege facts upon which relief can be granted."); *Peyton v. First Citizens Corp. (In re Veatch),* 232 B.R. 346, 350 (Bankr.E.D.Va.1999) ("In evaluating a motion to dismiss, the court should actively examine all of the facts alleged to determine whether any theory of recovery is possible and should not merely limit its inquiry to the claim as set forth by the plaintiff.")

the obligation to make turnover is stated clearly indicates that the showing of inconsequential value or benefit is a defense to a turnover action. 11 U.S.C. § 542(a).

[13]  In addition, in opposing the claim for turnover of property to the estate on the basis that the property is of inconsequential value or benefit to the estate, 12th Street Real Estate, LLC is inherently seeking abandonment of that property. The party seeking abandonment of property pursuant to 11 U.S.C. § 554 carries the burden of setting forth a prima facie case that the property is of inconsequential value and benefit to the estate.[12] *Mostoller v. Citicapital Commercial Corp. (In re Stetson & Assocs., Inc.),* 330 B.R. 613, 624 (E.D.Tenn.2005); *In re Vel Rey Properties, Inc.,* 174 B.R. 859, 867 (Bankr.D.D.C. 1994); *In re Paolella,* 79 B.R. 607, 610 (Bankr.E.D.Pa.1987). Therefore, it follows that in an action for turnover, a showing that the property is of inconsequential value or benefit to the estate is an affirmative defense.

[14]  Finally, even if it is the debtor's burden to establish as part of its prima facie case for turnover that the property is not of inconsequential value or benefit to the estate, the debtor, simply by bringing this adversary proceeding, has implicitly alleged that the property is not of inconsequential value or benefit to the estate.[13]

## V

For all of these reasons, 12th Street Real Estate, LLC's motion to dismiss the complaint is denied.  A separate order follows.



In re Paul D. McCARTHY, Tacheryn A. McCarthy, Debtors.

Stewart Title Guaranty Company, Plaintiffs

v.

Paul D. McCarthy, Defendant.

Bankruptcy No. 09–42842–MSH.
Adversary No. 10–4143.

United States Bankruptcy Court,
D. Massachusetts,
Central Division.

June 14, 2012.

**Background:**  Title insurance company that employed attorney to issue title insurance policies on its behalf brought adversary proceeding in attorney's Chapter 7 case, seeking to except from discharge, on variety of theories, attorney's obligation to indemnify insurer for title defect that he had allegedly failed to notice, and for which he had failed to maintain malpractice insurance with no gaps in coverage. Parties cross-moved for summary judgment.

---

12.  Section 554 provides in relevant part:
(a) After notice and a hearing, the trustee may abandon any property of the estate that is burdensome to the estate or that is of inconsequential value and benefit to the estate.
(b) On request of a party in interest and after notice and a hearing, the court may order the trustee to abandon any property

of the estate that is burdensome to the estate or that is of inconsequential value and benefit to the estate.

13.  Moreover, if section 542(a) is not an appropriate remedy, an action for recovery of possession of the property under D.C.Code § 16–501 is still an available remedy under state law. *See* n. 11, *supra.*

erty. In this case, Debtors did not transfer an equitable interest in property, only bare legal title. Because the Court finds for the Defendants on the basis of constructive or resulting trust, the Court need not address the arguments relating to the validity of the warranty deed. Judgment will be entered for the Defendants.



In re W.S.F.–WORLD SPORTS FANS, LLC, an Arizona limited liability company, Debtor.

Raven II Holdings, an Arizona LLC, Plaintiff,

v.

Quest Title Company, a New Mexico Corporation, Duane Slade, Jennifer Slade, Guy Williams, Lisa Williams, Duane Slade and Guy Williams d/b/a WSF, World Sports Fans, LLC, Defendants.

and

WSF—World Sports Fans, LLC, Intervenor–Defendant/Counterclaimant.

Bankruptcy No. 11–05–27795 PHX GBN.
Adversary No. 07–1002 M.

United States Bankruptcy Court, D. New Mexico.

April 13, 2007.

**Background:** Company with which two individuals who were Chapter 11 debtor-Arizona limited liability company's (LLC's) sole members and owners had entered into an agreement for the purchase, marketing, and sale of real property brought postpetition action in New Mexico state court against the two individuals, seeking share of sale proceeds. Debtor, which claimed an ownership interest in the property, intervened in the state-court action, asserted counterclaims for violations of the automatic stay and turnover of sale proceeds, removed proceeding to New Mexico bankruptcy court, and filed motion to transfer venue to the Arizona bankruptcy court in which its case was pending. Company filed motion for mandatory abstention and remand.

**Holdings:** The Bankruptcy Court, Mark B. McFeeley, J., held that:

(1) the state-court action was a non-core proceeding, and

(2) mandatory abstention applied.

Motion for abstention granted and proceeding remanded.

1. Bankruptcy ⟷2083, 2090
   Federal Courts ⟷65

When a proceeding has been removed to the bankruptcy court and the party who removed the proceeding seeks to transfer venue while the opposing party seeks abstention and remand, the court should first consider whether to abstain and remand before addressing the request to change venue.

2. Federal Courts ⟷47.5

Mandatory abstention statute addresses situations where the court must abstain, and pertains only to non-core proceedings, whereas permissive abstention statute allows for permissive abstention from core matters when abstention best serves the interest of justice, judicial economy, or respect for state law. 28 U.S.C.A. § 1334(c)(1, 2).

3. Bankruptcy ⟷2043(2)

"Core proceedings" are proceedings which involve rights created by bankruptcy law, or which would only arise within a

bankruptcy proceeding. 28 U.S.C.A. § 157(b)(2)(A)–(O).

 See publication Words and Phrases for other judicial constructions and definitions.

**4. Bankruptcy ⬥2043(2)**

 "Non-core proceedings" do not invoke substantive rights created by bankruptcy law, and can exist independent from the bankruptcy.

 See publication Words and Phrases for other judicial constructions and definitions.

**5. Bankruptcy ⬥2043(3)**

 Bankruptcy court has jurisdiction over non-core proceedings when they are related to the bankruptcy in that they could conceivably have an effect on the bankruptcy estate.

**6. Bankruptcy ⬥2043(3)**

 "Related proceedings" include causes of action owned by the debtor which become property of the bankruptcy estate.

 See publication Words and Phrases for other judicial constructions and definitions.

**7. Bankruptcy ⬥2060.1**

 Exclusive jurisdiction over all property of the estate and property of the debtor has been conferred on the district court in which a bankruptcy case is filed. 28 U.S.C.A. § 1334(e).

**8. Bankruptcy ⬥2060.1**

 Bankruptcy court has non-exclusive jurisdiction over both core civil proceedings and non-core civil proceedings related to a case under title 11. 28 U.S.C.A. § 1334(b).

**9. Bankruptcy ⬥2053**
**Federal Courts ⬥47.5**

 Removed state-court action, which had been brought against two individuals who were Chapter 11 debtor-limited liability company's (LLC's) sole members and owners by company that had entered into an agreement with the individuals for the

purchase, marketing, and sale of real property, and which sought a declaratory judgment to determine proper distribution of proceeds from postpetition sale of the property, was a "non-core proceeding," for purposes of determining whether mandatory abstention should apply; debtor's asserted interest in the property, and hence its interest in the sale proceeds, was based upon prepetition conduct regarding the formation and terms of a contract, and debtor had failed to file an adversary complaint in bankruptcy court to adjudicate its ownership interest in the property. 28 U.S.C.A. §§ 157(b)(2)(A)–(O), 1334(c)(2).

 See publication Words and Phrases for other judicial constructions and definitions.

**10. Bankruptcy ⬥3063.1**

 Turnover actions under the Bankruptcy Code cannot be used to demand assets whose title is in dispute. 11 U.S.C.A. § 542.

**11. Bankruptcy ⬥2050**

 Actions seeking a turnover of assets whose title is in dispute can only constitute, at the most, non-core rather than core proceedings, given that such actions are not true turnover actions within the meaning of the Bankruptcy Code. 11 U.S.C.A. § 542(a); 28 U.S.C.A. § 157(b)(2)(E).

**12. Bankruptcy ⬥2048.5**

 Actions seeking damages for violation of the automatic stay are core proceedings. 11 U.S.C.A. § 362; 28 U.S.C.A. § 157(b)(2)(A)–(O).

**13. Federal Courts ⬥47.5, 65**

 Mandatory abstention was warranted with respect to removed state-court action, which was brought against two individuals who were Chapter 11 debtor-limited liability company's (LLC's) sole members and owners by company that had entered into an agreement with the individuals for the

788        367 BANKRUPTCY REPORTER

purchase, marketing, and sale of real property, and which sought a declaratory judgment to determine proper distribution of proceeds from postpetition sale of the property; proceeding was non-core, the motion for abstention was timely, having been filed within 31 days of the filing of the notice of removal, state-court action was based on state law, was commenced in state court, and could be timely adjudicated by state court, and there was no independent basis for federal jurisdiction other than the bankruptcy. 28 U.S.C.A. § 1334(c)(2).

———————

Eric R. Burris, Browstein Hyann Farber Schreck, PC, Albuquerque, NM, Jonathan Ibsen, Jaburg & Wilk, P.C., Pheonix, AZ, for WSF-World Sports Fans, LLC.

Dennis W. Hill, Albuquerque, NM, Joel E. Sannes, Lake & Cobb, PLC, Phoenix, AZ, for Raven II Holdings.

***ORDER GRANTING MOTION FOR ABSTENTION AND REMANDING ADVERSARY PROCEEDING TO THE THIRTEENTH JUDICIAL DISTRICT COURT***

MARK B. McFEELEY, Bankruptcy Judge.

THIS MATTER is before the Court on the Plaintiff's Motion for 28 U.S.C. § 1334(c)(2) Mandatory Abstention, and in the Alternative, Response to Motion to Transfer Venue. ("Motion for Abstention"). Also before the Court is Defendant WSF—WorldSports Fans, LLC's Motion to Transfer Venue ("Motion to Transfer Venue").[1] Each party filed a response to the other's motion, and also filed a reply in support of its own motion. The Court heard oral argument on the Motion for Abstention and the Motion to Transfer

Venue on March 20, 2007, and took the matter under advisement.

This Adversary Proceeding is the second removal by WSF—World Sports Fans, LLC ("WSF") of a proceeding filed by Raven II Holdings, LLC, an Arizona limited liability company ("Raven") in the Thirteenth Judicial District Court, County of Cibola, State of New Mexico as Case No. CV 2006–00085 ("State Court Action"). After consideration of the record of this proceeding in light of the arguments of counsel and the relevant statutes and case law, the Court finds that the Motion for Abstention should be granted and this adversary proceeding remanded to the Thirteenth Judicial District Court, County of Cibola, State of New Mexico ("State Court").

## BACKGROUND AND PROCEDURAL HISTORY

1. WSF filed a petition for Chapter 11 bankruptcy relief in the Bankruptcy Court for the District of Arizona on November 13, 2005, which is pending under Case No. 05–27995 GBN. In January of 2006, the Arizona Bankruptcy Court ordered that WSF's bankruptcy proceeding be jointly administered with the Chapter 11 bankruptcy proceedings of Mathon Fund, LLC (Case No. 05–27993 PHX–GBN) and Mathon Fund I, LLC (Case No. 05–27994) under Case No. 05–27993 GBN.

2. Defendants Duane Slade and Guy Williams are the sole members and owners of WSF. Duane Slade and Guy Williams are also owners of Mathon Management Corporation, the sole member of Mathon Fund, LLC and Mathon Fund I, LLC. (*See* Disclosure Statement for Debtors' Joint Plan of Reorganization date July 7, 2006, pp. 8–9, attached as part of Exhibit

———————

1. The Court will enter a separate Order on    the Motion to Transfer Venue.

A (Part 8) to Notice of Removal; Docket # 1).

3.  This dispute arises out of the sale of certain real property in Cibola County, New Mexico (the "Property").

4.  WSF listed an ownership interest in the Property on its bankruptcy schedules.[2]

5.  The Property was sold in March of 2006.  Apparently WSF did not sign the sale documents.

6.  Raven filed the State Court Action on April 25, 2006, seeking declaratory relief regarding the distribution of the proceeds from the sale of the Property.  The Complaint[3] filed in the State Court Action alleges that Raven and Duane Slade and Guy Williams entered into an agreement for the purchase and subsequent marketing and sale of the Property.  Raven alleges that Duane Slade and Guy Williams agreed that upon the sale of the Property, Duane Slade and Guy Williams would be reimbursed for all capital expenditures, and that the remaining proceeds would be distributed fifty percent to Raven, and fifty percent to Duane Slade and Guy Williams, collectively.  (Complaint, ¶ 10).

7.  Duane Slade and Guy Williams admitted certain allegations contained in Raven's Complaint, including paragraphs 10, 12, and 17, which alleged that the Property was purchased in the name of Raven (¶ 12), that Duane Slade and Guy Williams are entitled to reimbursement of their capital investment from the proceeds of the sale of the Property (¶¶ 10 and 17), and that the remaining net proceeds are to be divided equally between Raven on the one hand and Duane Slade and Guy Williams on the other hand (¶¶ 10 and 17).  However, the answer of Duane Slade and Guy Williams to the Complaint also avers that the allegations in paragraphs 10 and 12 do not reflect the entirety of the agreement between Raven, Duane Slade and Guy Williams.

8.  Raven did not name WSF as a defendant in the State Court Action, although WSF, World Sports Fans, LLC is referred to in the Caption of the State Court Action as a business name (d/b/a) used by Duane Slade and Guy Williams.

9.  WSF denies that it was a business name (d/b/a) used by Duane Slade and Guy Williams, and maintains that it is an Arizona limited liability company.  (See WSF—World Sports Fans, LLC's Answer to Complaint and Counterclaim ("Answer and Counterclaim"), ¶ 6. attached as part of Exhibit A (Part 14) to the Notice of Removal; Docket # 1).

10.  Raven did not seek relief from the automatic stay imposed by 11 U.S.C. § 362 in WSF's Arizona bankruptcy proceeding prior to the sale of the Property or the filing of the State Court Action.

11.  On or about May 19, 2006, WSF removed the State Court Action to this Court as Adversary Proceeding No. 06–1128 M, and on August 29, 2006, this Court entered an Order Granting Motion to Remand, finding that because WSF was not a party in the State Court Action, it had no

2.  A copy of WSF's bankruptcy schedules has not been made a part of the record of this removed proceeding.

3.  The complaint filed in the State Court Action was not attached to the Notice of Removal as an Exhibit and has not been made a part of the record of this adversary proceeding.  However, because the complaint was attached to the prior removal of the State Court Action to this Court as Adversary Proceeding No. 06–

1128 M, and because WSF attached a copy of its Answer and Counterclaim filed in the State Court Action as part of its Exhibit A to the Notice of Removal filed in this Adversary Proceeding, and because both parties freely referenced the allegations in Raven's complaint in their arguments on the Motion for Abstention and the Motion to Transfer Venue, the Court will reference certain allegations in the Complaint as part of this Order.

**790**          **367 BANKRUPTCY REPORTER**

standing to remove it. *See* Order Grant-
ing Motion to Remand, p. 4 (Adversary
Proceeding No. 06–1128 M; Docket # 21).

12. Since then, WSF was allowed to
intervene in the State Court Action. (*See*
Order Granting WSF–World Sports Fans,
LLC's Motion to Intervene, attached as
part of Exhibit A (Part 14) to the Notice of
Removal; Docket # 1).

13. WSF's Answer and Counterclaim
denies all allegations contained in the
Complaint, and asserts counterclaims
against Raven, alleging violation of the
automatic stay imposed by 11 U.S.C. § 362
and requesting turnover of the proceeds
from the sale of the Property pursuant to
11 U.S.C. § 542. (*See* Answer and Coun-
terclaim attached as part of Exhibit A
(Part 14) to the Notice of Removal; Dock-
et # 1).

14. WSF did not file a motion or adver-
sary proceeding in its Arizona bankruptcy
proceeding seeking damages against Rav-
en based on a willful violation of the auto-
matic stay under 11 U.S.C. § 362.

15. WSF did not file an adversary pro-
ceeding in its Arizona bankruptcy proceed-
ing seeking an adjudication of its claimed
ownership interest in the Property.

16. In June 2006, in connection with
the Arizona bankruptcy proceeding, a Set-
tlement Agreement and Stipulation in Aid
of Plan of Reorganization ("Stipulation")
was entered into among, Mathon Fund,
LLC, Mathon Fund I, LLC, WSF, Duane
Slade, Guy Williams, James Sell, as con-
servator[4], and the Arizona Corporation
Commission. The Stipulation was joined
by the Official Committee of Unsecured
Creditors, Jennifer Slade, and Lisa

Williams, for certain limited purposes.
(*See* Stipulation, attached as part of Exhib-
it A (Part 9 and 10) to Notice of Removal;
Docket # 1).

17. The Stipulation provides that
Duane Slade and Guy Williams will trans-
fer certain assets, including their interests
in WSF, into a trust, to be established as
part of the Chapter 11 plan of reorganiza-
tion of the jointly administered bankruptcy
estates to pay participating investor
claims. (*See* Stipulation, p. 20, attached as
part of Exhibit A (Part 9 and 10) to Notice
of Removal; Docket # 1).

18. Exhibit 2 attached to the Stipula-
tion, lists the additional assets to be con-
tributed by Duane Slade and Guy Williams
under the Stipulation. Exhibit 2 to the
Stipulation includes the following item:
"Principals' beneficial interest, if any, in
the New Mexico Property." (*See* Exhibit
2 attached to Stipulation, attached as part
of Exhibit A (Part 10) to Notice of Remov-
al; Docket # 1).

19. The Disclosure Statement filed in
the jointly administered bankruptcy pro-
ceeding recites that the Plan of Reorgani-
zation provides for implementation of the
Stipulation. (*See* Disclosure Statement to
Accompany Debtors' Joint Plan of Reorga-
nization dated July 7, 2006, p. 4, ¶ 2, at-
tached as part of Exhibit A (Part 8) to
Notice of Removal; Docket # 1).

20. The Plan of Reorganization pro-
vides for the debtors (including WSF) to
transfer all assets, including the proceeds
from the Stipulation, to a liquidating trus-
tee. (*See* Plan of Reorganization dated
July 7, 2006, ¶¶ 7.1 and 8.1, attached as

---

4. The Arizona Corporation Commission com-
menced an action in the Superior Court for
Maricopa County, Arizona against Mathon
Fund I, LLC, Mathon Fund, LLC, Duane
Slade, Guy Williams, an other related entities
seeking, among other things, the appointment
of a receiver over the assets of the defendant

entities based on alleged violations of Arizona
securities laws. James Sell was appointed
receiver of the defendant entities as part of
that action, which was later changed to a
conservatorship by stipulation and order en-
tered in that action.

part of Exhibit A (Parts 11, 12, and 13) to Notice of Removal; Docket # 1).

21. The Plan of Reorganization provides for the bankruptcy court to retain jurisdiction to determine questions and disputes regarding title to assets of the bankruptcy estate. (*See* Plan of Reorganization dated July 7, 2006, ¶ 16.2, attached as part of Exhibit A (Part 13) to Notice of Removal; Docket # 1).

## DISCUSSION

[1, 2] When a proceeding has been removed to the bankruptcy court, and the party who removed the proceeding seeks to transfer venue while the opposing party seeks abstention and remand, the Court should first consider whether to abstain and remand before addressing the request to change venue. *See Frelin v. Oakwood Homes Corp.*, 292 B.R. 369, 380 (Bankr. E.D.Ark.2003) (concluding that "not only does this [bankruptcy] Court have jurisdiction to decide the Plaintiffs' motion to remand and/or abstain, the Court should and will decide whether remand and/or abstention is required before determining whether venue is proper in [a different bankruptcy court].")[5] Abstention is governed by 28 U.S.C. § 1332(c), which provides:

(1) Nothing in this section prevents a district court in the interest of justice, or in the interest of comity with State courts or respect for State law, from abstaining from hearing a particular proceeding arising under title 11 or arising in or related to a case under title 11.

(2) Upon timely motion of a party in a proceeding based upon a State law claim or State law cause of action, related to a case under title 11 but not arising under title 11 or arising in a case under title 11, with respect to which an action could not have been commenced in a court of the United States absent jurisdiction under this section, the district court shall abstain from hearing such proceeding if an action is commenced, and can be timely adjudicated, in a State forum of appropriate jurisdiction.

28 U.S.C. § 1334(c)(1) and (2).

Section 1334(c)(2) addresses situations where the court must abstain, and pertains only to non-core proceedings, whereas § 1334(c)(1) allows for permissive abstention from core matters when abstention best serves the interest of justice, judicial economy, or respect for state law. *See In re Premier Hotel Dev. Group*, 270 B.R. 243, 250 (Bankr.E.D.Tenn.2001) ("Mandatory abstention does not apply to core proceedings ...").

[3–6] "Core" proceedings are proceedings which involve rights created by bankruptcy law, or which would only arise within a bankruptcy proceeding. *Gardner v. United States (In re Gardner)*, 913 F.2d 1515, 1518 (10th Cir.1990) ("Core proceedings are proceedings which have no existence outside of bankruptcy.") (citation omitted); 28 U.S.C. § 157(b)(2)(A)—(O) (listing matters included within core proceedings). "Non core" proceedings do not

5.  *See also, Ni Fuel Co., Inc. v. Jackson*, 257 B.R. 600, 609 (N.D.Okla.2000) (agreeing that a motion to remand should be considered prior to determining whether to transfer venue because the court cannot transfer a proceeding over which the court lacks jurisdiction); *Global Underwriting Mgmt., Inc. v. Chatham Underwriting Mgmt., Inc.*, 147 B.R. 601, 603 (Bankr.S.D.Fla.1992) (noting "that where both a motion to abstain and a motion to transfer venue are pending, it is proper to consider the motion to abstain first because it

is jurisdictional and dispositive.") (citing *Lone Star Indus., Inc. v. Liberty Mutual Ins.*, 131 B.R. 269 (D.Del.1991)). *But see, e.g., Nelson v. First Lenders Indem. Co.*, 1998 WL 378376 (N.D.Miss.1998) (finding that court to which state action has been removed should serve as a "conduit" and transfer the proceeding to the court in which the bankruptcy case is pending so that the "home court" can then determine whether to remand the proceeding); *Thomas v. Lorch (In re Wedlo, Inc.)*, 212 B.R. 678 (Bankr.M.D.Ala.1996) (same).

invoke substantive rights created by bankruptcy law, and can exist independent from the bankruptcy. *In re Wood,* 825 F.2d 90, 97 (5th Cir.1987). The bankruptcy court has jurisdiction over non-core proceedings when they are related to the bankruptcy in that they could conceivably have any effect on the bankruptcy estate. *Gardner,* 913 F.2d at 1518 ("the proceeding is related to the bankruptcy if the outcome could alter the debtor's rights, liabilities, options or freedom of action in any way, thereby impacting on the handling and administration of the bankruptcy estate.") (citing *Pacor, Inc. v. Higgins,* 743 F.2d 984, 994 (3rd Cir.1984) ("[T]he test for determining whether a civil proceeding is related in bankruptcy is whether the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy.")). "'Related' proceedings include 'causes of action owned by the debtor ... which become property of the estate pursuant to 11 U.S.C. § 541.'" *Maryland Cas. Co. v. Aselco, Inc.,* 223 B.R. 217, 220 (D.Kan. 1998) (quoting *Gardner,* 913 F.2d at 1518) (quoting *Celotex Corp. v. Edwards,* 514 U.S. 300, 307, n. 5, 115 S.Ct. 1493, 131 L.Ed.2d 403, 514 U.S. 300, 115 S.Ct. 1493, 131 L.Ed.2d 403 (1995)).

Raven asserts that all elements for mandatory abstention under 28 U.S.C. § 1334(c)(2) have been met, and requests

that the Court remand this proceeding to state court.[6] Alternatively, Raven urges the Court to exercise its discretion and abstain from hearing this adversary proceeding under the permissive abstention statute. WSF claims that this adversary proceeding is a "core" proceeding such that mandatory abstention does not apply. In support of its position WSF raises the following arguments: 1) that the Property was listed as an asset of WSF's bankruptcy estate, so that the Property constitutes property of the estate under 11 U.S.C. § 541; 2) that Raven's sale of the Property when it was aware of WSF's bankruptcy proceeding violated the automatic stay under 11 U.S.C. § 362; 3) that Raven should have participated in WSF's bankruptcy proceeding by requesting that its claim be adjudicated by the bankruptcy court or by filing a claim in WSF's bankruptcy proceeding; and 4) that the distribution of the proceeds from the sale of the Property are subject to a confirmed plan of reorganization in WSF's bankruptcy proceeding.

[7–9]  Section 28 U.S.C. § 1334(e) confers on the district court in which a bankruptcy case is filed exclusive jurisdiction over all property of the estate and property of the debtor. 28 U.S.C. § 1334(e).[7] While this section defines the bankruptcy court's exclusive jurisdiction (as referred by the district court[8]), the jurisdictional

---

**6.** The parties do not contest that the following elements necessary to mandatory abstention under 28 U.S.C. § 1332(2) are present: 1) that an action has been commenced in state court; 2) that Raven has timely filed its Motion for Abstention; 3) that there is no independent basis for federal jurisdiction such as diversity or federal question; and 3) that the claims can be timely adjudicated in state court.

**7.** That section provides:

The district court in which a case under title 11 is commenced or is pending shall have exclusive jurisdiction—

(1) of all the property, wherever located, of the debtor as of the commencement of such case, and of property of the estate; and

(2) over all claims or causes of action that involve construction of section 327 of title 11, United States Code, or rules relating to disclosure requirements under section 327.

28 U.S.C. § 1334(e).

**8.** Pursuant to 28 U.S.C. § 157(a), the district court automatically refers "all proceedings arising under title 11 or arising in or related to a case under title 11" to the bankruptcy court.

grant under 28 U.S.C. § 1334(b) confers "original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11" such that a bankruptcy court has non-exclusive jurisdiction over both core civil proceedings and non-core civil proceedings related to a case under title 11. *See* 1 Collier on Bankruptcy ¶ 3.01[4][c] (Henry J. Sommer and Alan N. Resnick, eds., 15th ed. rev.2006) (noting that "all three categories of civil proceedings [i.e., those arising under title 11, those arising in cases under title 11, and those related to cases under title 11] are encompassed within section 1334(b)'s grant of original but not exclusive jurisdiction to the district court."). The State Court Action is related to the WSF bankruptcy proceeding inasmuch as WSF claims an interest in the proceeds which are to be distributed pursuant to the terms of its plan of reorganization. Thus, because the outcome of the State Court Action may have an effect on the administration of WSF's bankruptcy estate, it is, at the very least, a "related to" proceeding over which this Court has jurisdiction under 28 U.S.C. § 1334(b). The more difficult question is whether the State Court Action constitutes a "core" proceeding over which mandatory abstention applies.

[10, 11]  WSF's arguments focus on its assertion that there was an "unauthorized" sale of Property which was an asset of WSF's bankruptcy estate. If the Property is property of the bankruptcy estate, the State Court Action concerning Raven's claim against property of the bankruptcy estate would constitute a core proceeding that falls within the bankruptcy court's exclusive jurisdiction. However, WSF fails to explain how the Property constitutes property of the bankruptcy estate, other than to assert that the Property was listed in WSF's bankruptcy schedules, and that its Plan of Reorganization dictates how the proceeds from the sale of the Property are to be distributed. Indeed,

WSF's Answer and Counterclaim states that it claims an interest in the proceeds, and alleges that the proceeds must be turned over because they are property of WSF's bankruptcy estate. "However, '[i]t is settled law' that (a) turnover actions under § 542 cannot be used 'to demand assets whose title is in dispute.'" *In re Allegheny Health Educ. & Research Found.*, 233 B.R. 671, 677 (Bankr.W.D.Pa. 1999) (quoting *U.S. v. Inslaw, Inc.*, 932 F.2d 1467, 1472 (D.C.Cir.1991)). "[A]ctions seeking a turnover of assets whose title is in dispute can only constitute, at the most, noncore rather than core proceedings given that such actions are not true turnover actions within the meaning of § 542(a) and 28 U.S.C. § 157(b)(2)(E)." *Id.* at 677–78 (citations omitted).

Here, it is clear from the allegations in the Complaint, WSF's intervention in the State Court Action, and WSF's counterclaims, that there is a dispute over the parties' interest in the proceeds from the sale of the Property which WSF contends was property of its bankruptcy estate. Yet, WSF took no action in its bankruptcy proceeding to adjudicate its ownership interest in the Property. Nor did WSF file any action in its bankruptcy proceeding after the Property was sold alleging violation of the automatic stay. Merely listing a parcel of real property on the statements and schedules of a bankruptcy petition when the debtor does not hold legal title to the property does not adjudicate ownership, nor does it transmute a civil proceeding to determine competing interests in the proceeds from the sale of the property arising from a contract dispute into a "core" proceeding. Having failed to file an adversary proceeding in the Arizona bankruptcy court to adjudicate its ownership interest in the Property, it is not appropriate for WSF to intervene in the State Court Action, remove the matter to this Court, assert that it constitutes a core

**794**                 **367 BANKRUPTCY REPORTER**

proceeding, and request that the matter be transferred to the Arizona bankruptcy court. WSF's assertion that Raven should have raised the issue in the Arizona bankruptcy proceeding when Raven was not a listed creditor of WSF is an improper attempt to shift responsibility to Raven to determine what, if any, interest WSF has in the Property.

In addition, contrary to what WSF asserts, the State Court will not be called upon to adjudicate the Plan of Reorganization. The State Court will determine how the proceeds from the sale of the Property should be disbursed. Because WSF has intervened, the nature of WSF's interest in the proceeds will also be determined, but such determination will not interfere with the Plan of Reorganization. The Stipulation, entered into in aid of carrying out the Plan of Reorganization, provides that Duane Slade and Guy Williams will contribute "their beneficial interest, *if any*, in the New Mexico Property." (emphasis added). The amount of proceeds the State Court determines should be disbursed to Duane Slade and Guy Williams, if any, will then be contributed to the trust as provided under the terms of the Stipulation and the Plan of Reorganization. Similarly, if the State Court determines that WSF has any interest in the proceeds of the sale, such proceeds will be disbursed to WSF, and ultimately disbursed under the Plan of Reorganization. The construction of terms of the Plan of Reorganization are not implicated by the adjudication of WSF's interest, if any, in the proceeds from the sale of the Property.

**[12]**  The State Court Action initiated by Raven seeks a declaratory judgment to determine proper distribution of the proceeds from the sale of the Property. The proceeding can, and does exist independent of the bankruptcy context, as it raises the contractual dispute over the terms of an agreement to acquire, market, and sell certain real property and divide the profits therefrom. While WSF asserts an interest in the proceeds, no such determination has been made. And because WSF's interest in the proceeds is based upon prepetition conduct regarding the formation and terms of a contract, it constitutes a non-core, related proceeding. *See Piombo Corp. v. Castlerock Properties (In re Castlerock Properties)*, 781 F.2d 159, 162 (9th Cir.1986) (concluding that a breach of contract action is a related proceeding, even if it fits within the broad definitions of core proceedings under 28 U.S.C. § 157(b)(2)(A) and (O)).  The fact that the sale of the Property occurred post-petition, does not alter this analysis. WSF's interest in the Property, which forms its basis for asserting an interest in the proceeds from the sale of the Property, is the pre-petition contract. The Court, therefore, finds that the proceeding is non-core.[9]

**[13]**  Having determined that the State Court Action is non-core, mandatory abstention applies. *See* 28 U.S.C. § 1334(c)(2).  Raven has sufficiently demonstrated the presence of the remaining elements necessary to mandatory abstention: 1) the Motion for Abstention was timely, since it was filed within thirty-one days of the filing of the notice of removal;

---

9.  WSF is correct in stating that actions seeking damages for violation of the automatic stay are core proceedings. *See In re Commercial Fin. Services, Inc.*, 239 B.R. 586, 594 (Bankr.N.D.Okla.1999) (finding that request for civil contempt for alleged violation of automatic stay is a core proceeding over which the court has plenary jurisdiction). However,

WSF's counterclaim in the State Court Action seeking damages for willful violation of the automatic stay could be initiated in WSF's bankruptcy proceeding independent from the State Court Action, and does not, therefore, transform the entire State Court Action into a core proceeding.

IN RE SILVER                    **795**

Cite as 367 B.R. 795 (Bkrtcy.D.N.M. 2007)

2) the State Court Action is based on state law; 3) the State Court Action was commenced in state court; 4) the State Court Action can be timely adjudicated by the state court, since there is no evidence indicating that there is some impediment or known cause to delay the proceedings in the state court; and 5) there is no independent basis for federal jurisdiction other than the bankruptcy. *See Personette v. Kennedy (In re Midgard Corp.),* 204 B.R. 764, 776–78 (10th Cir. BAP 1997) (discussing each element enumerated in 28 U.S.C. § 1334(c)(2). Based on the foregoing, the Court concludes that it should abstain from hearing this non-core proceeding under 28 U.S.C. § 1334(c)(2). Remand under 28 U.S.C. § 1452(b)[10] is, therefore appropriate. *See Midgard,* 204 B.R. at 775 (finding that if abstention is required under 28 U.S.C. § 1334(c)(2), a court should remand the matter to state court); *Premier Hotel Development,* 270 B.R. at 258 ("The presence of … factors requiring mandatory abstention under 1334(c)(2) provides ample equitable grounds for remand of the lawsuit to state court.' ") (quoting *Roddam v. Metro Loans, Inc. (In re Roddam),* 193 B.R. 971, 981 (Bankr. N.D.Ala.1996) (citation omitted)).

WHEREFORE, IT IS HEREBY ORDERED that the Motion for Abstention is GRANTED. The State Court Action is remanded to the Thirteenth Judicial District Court, County of Cibola, State of New Mexico.



---

**10.** The remand statute provides:
The court to which such claim or cause of action is removed may remand such claim or cause of action on any equitable ground.

In re Jerilyn H. SILVER, Debtor.

The Lincoln National Life Insurance Company, individually and as assignee of Santa Fe Private Equity Fund II, LP, Plaintiff,

v.

Jerilyn H. Silver, Defendant.

Bankruptcy No. 7–96–11878 SS.
Adversary No. 98–1281 S.

United States Bankruptcy Court,
D. New Mexico.

April 16, 2007.

**Background:** Creditor holding judgment against Chapter 7 debtor's ex-husband brought adversary proceeding to revoke debtor's discharge as fraudulently procured, and on theory that debtor had failed to disclose or turn over estate assets to trustee.

**Holdings:** The Bankruptcy Court, James S. Starzynski, J., held that:

(1) judgment creditor of debtor's former husband, who obtained judgment prior to their divorce based on tortious misconduct in which husband engaged while he was married to debtor, was presumptively a community creditor, with standing to seek revocation of debtor's discharge;

(2) creditor satisfied burden of showing that debtor had participated in series of asset transfers with actual intent to hinder, delay or defraud her creditors;

(3) creditor satisfied burden of showing that debtor had knowingly and fraudulently made material false oaths;

(4) in order to satisfy "lack of knowledge" element of cause of action to revoke

28 U.S.C. § 1452(b).

alleges that Adalian has testified receiving a note assigned and payable to him in the amount of $95,000.00, but he is unable to recall who owed him the money and he has testified that he has no record of the transaction. With these allegations, I find that Jou has sufficiently plead a cause of action under § 727(a)(5). The Motion to Dismiss this count is denied.

**IV. Conclusion**

Consistent with the reasoning given above, the Motion to Dismiss is Granted as to Counts One and Three of the Complaint and is Denied as to Counts Two, Four and Six. As to Count Five, the Motion is Granted inasmuch as the count is based on § 727(a)(4)(C), and Denied to the extent that it is based on § 727(a)(4)(A). Jou is granted leave to amend the Counts which were dismissed. If he chooses to do so, Jou may file an amended complaint within twenty-one (21) days of the date of this Opinion. Adalian shall then file a responsive pleading to any subsequently amended complaint within twenty-one (21) days. If no subsequent amended complaint is filed, Adalian shall answer Counts Two, Four, Five and Six of the Complaint within forty-two (42) days of the date of this Opinion.

An Order will follow.



In re JOEY'S STEAKHOUSE, LLC, Debtor(s).

Gary F. Seitz, Trustee, Plaintiff

v.

6130 West, LLC, Henry P. Alfano, John DeVirgilis, Robert Laflar, and Anthony Alberto, Defendants.

Bankruptcy No. 09–17170.
Adversary No. 11–745.

United States Bankruptcy Court, E.D. Pennsylvania.

June 14, 2012.

**Background:** Trustee brought adversary proceeding against owners of restaurant, bar, and gentlemen's club, asserting claims related to owners' alleged breach of joint venture agreement pursuant to which principal for debtor-limited liability company (LLC) was to have renovated restaurant that was then to be operated by debtor, asserting claims for, inter alia, constructive trust, conversion, unjust enrichment, breach of contract, avoidance, and turnover. Trustee moved for leave to amend complaint to add new defendant.

**Holdings:** The Bankruptcy Court, Stephen Raslavich, Chief Judge, held that:

(1) proposed amended complaint arose out of same conduct, transaction, or occurrence set forth in original complaint, as required for amended complaint to relate back for limitations purposes;

(2) company sought to be added as defendant had timely, constructive notice of proceeding, as required for relation back;

(3) company should have expected to be defendant in action, as required for relation back;

(4) request for declaratory relief was moot;

**168**                    **474 BANKRUPTCY REPORTER**

(5) complaint failed to state claim for injunctive relief;

(6) trustee adequately pleaded claim for constructively fraudulent transfer; and

(7) trustee failed to state claim for turnover.

Motion granted in part and denied in part.

**1. Bankruptcy ⟺2162**

Determination as to whether leave to amend complaint should be granted or denied is left to sound discretion of trial judge. Fed.Rules Bankr.Proc.Rule 7015, 11 U.S.C.A.; Fed.Rules Civ.Proc.Rule 15(a), 28 U.S.C.A.

**2. Bankruptcy ⟺2162**

In deciding whether to grant or deny leave to amend complaint, court is required to consider the positions of both parties and the effect that the request will have on them. Fed.Rules Bankr.Proc. Rule 7015, 11 U.S.C.A.; Fed.Rules Civ. Proc.Rule 15(a), 28 U.S.C.A.

**3. Bankruptcy ⟺2162**

Court may deny a request to amend complaint when the moving party has demonstrated undue delay, bad faith or dilatory motive, or where the amendment would prejudice the opposing party. Fed.Rules Bankr.Proc.Rule 7015, 11 U.S.C.A.; Fed. Rules Civ.Proc.Rule 15(a), 28 U.S.C.A.

**4. Bankruptcy ⟺2162**

Leave to amend complaint will be denied where amendment is futile. Fed. Rules Bankr.Proc.Rule 7015, 11 U.S.C.A.; Fed.Rules Civ.Proc.Rule 15(a), 28 U.S.C.A.

**5. Bankruptcy ⟺2162**

Moving party seeking leave to amend complaint bears the burden of proof in explaining the reasons for delay in seeking leave to amend. Fed.Rules Bankr.Proc. Rule 7015, 11 U.S.C.A.; Fed.Rules Civ. Proc.Rule 15(a), 28 U.S.C.A.

**6. Bankruptcy ⟺2162**

Proposed amendment of complaint which is untimely will be found to be "futile." Fed.Rules Bankr.Proc.Rule 7015, 11 U.S.C.A.; Fed.Rules Civ.Proc.Rule 15(a), 28 U.S.C.A.

See publication Words and Phrases for other judicial constructions and definitions.

**7. Bankruptcy ⟺2157**

Rule governing joinder of parties is not excepted from applicability of relation back requirement, and therefore amendment of complaint to join defendant after right to amend has passed must likewise relate back in time to date of original pleading to be timely. Fed.Rules Civ. Proc.Rules 15(c), 20(a)(2), 28 U.S.C.A.

**8. Bankruptcy ⟺2157**

Three conditions must be met for amendment adding a party to relate back to original complaint for statute of limitations purposes: (1) the claim against the newly named defendant arose out of the same conduct, transaction, or occurrence set forth in the original complaint, (2) within the 120–day period for service of the summons and complaint, the newly named party received notice of the institution of the action such that it will not be prejudiced in maintaining a defense on the merits, and (3) within same period of time, the newly named party must or should have known that, but for a mistake, he or she would have been named as defendant in the first place. Fed.Rules Bankr.Proc. Rule 7015, 11 U.S.C.A.; Fed.Rules Civ. Proc.Rule 15(c), 28 U.S.C.A.

**9. Bankruptcy ⟺2157**

Doctrine governing relation back of amended complaint to date of original complaint for limitations purposes is distinct from equitable tolling, which applies where the reason that plaintiff missed filing peri-

IN RE JOEY'S STEAKHOUSE, LLC    **169**
Cite as 474 B.R. 167 (Bkrtcy.E.D.Pa. 2012)

od is due to defendant's affirmative concealment or other circumstance beyond plaintiff's control.

**10. Bankruptcy ⟜2157**

Where proponent of amendment to complaint can show that its change would relate back to original, timely-filed claim, amendment may be allowed on legal grounds, without proponent having to resort to equity. Fed.Rules Bankr.Proc. Rule 7015, 11 U.S.C.A.; Fed.Rules Civ. Proc.Rule 15(c), 28 U.S.C.A.

**11. Bankruptcy ⟜2157**

Proposed amended complaint by which trustee sought to add new defendant in adversary proceeding against debtor's joint venturers arose out of same conduct, transaction, or occurrence set forth in original complaint, as required for amended complaint to relate back to filing of original complaint for limitations purposes; claims against new defendant did not amend substantive claims against other defendants, such that there were no material changes to allegations of fact or conclusions of law. Fed.Rules Bankr.Proc.Rule 7015, 11 U.S.C.A.; Fed.Rules Civ.Proc. Rule 15(c), 28 U.S.C.A.

**12. Bankruptcy ⟜2157**

Notice can be actual, constructive, or imputed to satisfy timely notice condition for relation back, for limitations purposes, of amended complaint adding a party to original complaint. Fed.Rules Bankr.Proc. Rule 7015, 11 U.S.C.A.; Fed.Rules Civ. Proc.Rule 15(c), 28 U.S.C.A.

**13. Bankruptcy ⟜2157**

Imputed notice satisfying timely notice condition for relation back of amended complaint adding a party to original complaint, for limitations purposes, requires either a shared attorney or an identity of interest.    Fed.Rules    Bankr.Proc.Rule 7015, 11 U.S.C.A.; Fed.Rules Civ.Proc. Rule 15(c), 28 U.S.C.A.

**14. Bankruptcy ⟜2157**

Where existing defendant and party to be added via amended complaint share the same counsel, constructive notice of action upon latter party will be found to exist for relation back of amended complaint to original complaint for limitations purposes.    Fed.Rules    Bankr.Proc.Rule 7015, 11 U.S.C.A.; Fed.Rules Civ.Proc. Rule 15(c), 28 U.S.C.A.

**15. Bankruptcy ⟜2157**

Company that trustee sought to add as defendant in adversary proceeding did not have constructive notice of action via common counsel, so as to support relation back of amended complaint to original complaint for limitations purposes, where law firm that represented original defendants did not represent company at the time summons was pending, and, as of filing of its objection, firm had yet to enter its appearance on company's behalf. Fed. Rules Bankr.Proc.Rule 7015, 11 U.S.C.A.; Fed.Rules Civ.Proc.Rule 15(c), 28 U.S.C.A.

**16. Bankruptcy ⟜2157**

Present parties in action may be sufficiently related to future parties that notice of action may be imputed to the latter, supporting relation back of amended complaint adding future parties to original complaint for limitations purposes. Fed. Rules Bankr.Proc.Rule 7015, 11 U.S.C.A.; Fed.Rules Civ.Proc.Rule 15(c), 28 U.S.C.A.

**17. Bankruptcy ⟜2157**

Company that trustee sought to add as defendant in adversary proceeding had timely, constructive notice of proceeding, as required for amended complaint to relate back, for limitations purposes, to date of original complaint, where principal of company was among original defendants served with complaint, at same address as

**170**                              **474 BANKRUPTCY REPORTER**

company's registered address, within 120-day summons period. Fed.Rules Bankr. Proc.Rule 7015, 11 U.S.C.A.; Fed.Rules Civ.Proc.Rule 15(c), 28 U.S.C.A.

**18. Bankruptcy** ⌐2157

Company that trustee sought to add as defendant in adversary proceeding, which asserted claims related to alleged breach of joint venture agreement by owners of restaurant that was to be renovated by debtor's principal and operated by debtor, should have expected to be defendant in action, as required for amended complaint to relate back to original complaint for limitations purposes; company was lessee of property on which restaurant was located, debtor received prepetition payments from company, and defendants shared common business address. Fed. Rules Bankr.Proc.Rule 7015, 11 U.S.C.A.; Fed.Rules Civ.Proc.Rule 15(c), 28 U.S.C.A.

**19. Bankruptcy** ⌐2162

Non-moving party cannot merely claim prejudice in opposing amendment of complaint, but must show that it was unfairly disadvantaged or deprived of the opportunity to present facts or evidence which it would have offered had amendments been timely. Fed.Rules Bankr. Proc.Rule 7015, 11 U.S.C.A.; Fed.Rules Civ.Proc.Rule 15(a), 28 U.S.C.A.

**20. Bankruptcy** ⌐2162

Defendants opposing amendment of complaint bear the burden of proof as to prejudice. Fed.Rules Bankr.Proc.Rule 7015, 11 U.S.C.A.; Fed.Rules Civ.Proc. Rule 15(a), 28 U.S.C.A.

**21. Bankruptcy** ⌐2162

In and of itself, delay does not require that motion to amend complaint be denied; however, at some point, delay will become undue, placing an unwarranted burden on the court, and may work prejudice to the adversary. Fed.Rules Bankr.Proc.Rule

7015, 11 U.S.C.A.; Fed.Rules Civ.Proc. Rule 15(a), 28 U.S.C.A.

**22. Bankruptcy** ⌐2162

Potential defendant is prejudiced from delay in seeking amendment of complaint if it must set about assembling evidence and constructing a defense when the case is already stale. Fed.Rules Bankr.Proc. Rule 7015, 11 U.S.C.A.; Fed.Rules Civ. Proc.Rule 15(a), 28 U.S.C.A.

**23. Bankruptcy** ⌐3117

Trustee did not delay in seeking to add lessee of property on which restaurant was located as defendant in adversary proceeding asserting claims related to alleged breach of joint venture agreement by owners of restaurant that was to be renovated by debtor's principal and operated by debtor, and defendants were not prejudiced if any delay occurred, and therefore denial of trustee's motion to amend complaint was not warranted on such grounds; defendants frustrated trustee's attempts to investigate his claims, debtor's receipt of prepetition checks from lessee did not put trustee on notice of claims against lessee, proposed amendment did not change factual basis or legal theories underlying claims, and lessee's sharing of counsel with other defendants lessened any learning curve. Fed.Rules Bankr.Proc.Rule 7015, 11 U.S.C.A.; Fed.Rules Civ.Proc.Rule 15(a), 28 U.S.C.A.

**24. Bankruptcy** ⌐2162

Amendment of complaint is "futile" if it would not survive a motion to dismiss for failure to state a claim upon which relief could be granted. Fed.Rules Bankr.Proc. Rule 7015, 11 U.S.C.A.; Fed.Rules Civ. Proc.Rules 12(b)(6), 15(a), 28 U.S.C.A.

**25. Bankruptcy** ⌐2162

In determining whether amendment of complaint would be futile for failure to state claim, court applies standard for mo-

## IN RE JOEY'S STEAKHOUSE, LLC     **171**
### Cite as 474 B.R. 167 (Bkrtcy.E.D.Pa. 2012)

tions to dismiss on such ground, and accordingly accepts as true all of the allegations contained in the complaint and draws reasonable inferences in favor of plaintiff. Fed.Rules Bankr.Proc.Rule 7015, 11 U.S.C.A.; Fed.Rules Civ.Proc.Rules 12(b)(6), 15(a), 28 U.S.C.A.

### 26. Declaratory Judgment ⚖68

Under Pennsylvania law, declaratory judgment is not appropriate to determine rights in anticipation of events that may never occur, but is appropriate where there is imminent and inevitable litigation. 42 P.S. §§ 7532, 7533.

### 27. Declaratory Judgment ⚖3

Federal courts, including bankruptcy courts, may grant declaratory relief pursuant to the Declaratory Judgment Act. 28 U.S.C.A. § 2201.

### 28. Declaratory Judgment ⚖62

When there is an actual controversy between the parties, Declaratory Judgment Act allows a court to settle the parties' respective rights, even before there is a violation of law, exercise of right, or breach of duty. 28 U.S.C.A. § 2201.

### 29. Declaratory Judgment ⚖45

Trustee's request for declaratory relief in adversary proceeding arising out of prepetition joint venture involving debtor was "moot," given that parties were already engaged in full-blown litigation, each side was clear as to what its respective rights were in their joint venture, with regard to profits and personal property, and adjudication of issues raised would determine rights of each party.

See publication Words and Phrases for other judicial constructions and definitions.

### 30. Trusts ⚖91

Under Pennsylvania law, "constructive trust" arises where a person who holds title to property is subject to an equitable duty to convey it to another on the ground that he would be unjustly enriched if he were permitted to retain it.

See publication Words and Phrases for other judicial constructions and definitions.

### 31. Trusts ⚖91

Under Pennsylvania law, constructive trust is not really a trust at all, but rather is an equitable remedy.

### 32. Trusts ⚖91

Generally, under Pennsylvania law, equitable duty to convey property to another supporting imposition of constructive trust arises only in the presence of fraud, duress, undue influence, mistake, or abuse of a confidential relationship.

### 33. Trusts ⚖91

Under Pennsylvania law, there is no rigid standard for determining whether the facts of a particular case require a court of equity to impose a constructive trust; the test is merely whether unjust enrichment can be avoided.

### 34. Trusts ⚖107

Under Pennsylvania law, presumption of right in an action to impose a constructive trust lies in favor of the one in whom legal title is situated.

### 35. Trusts ⚖95

Complaint stated viable claim for imposition of constructive trust under Pennsylvania law by alleging that restaurant was property of limited liability company (LLC), that it was wrongly taken from LLC, that money generated by restaurant was likewise wrongly taken, and that, under the circumstances, defendants were unjustly profiting from their wrongful conduct.

**36. Conversion and Civil Theft ⟨⟩100**

Under Pennsylvania law, "conversion" is the deprivation of another's right of property in, or use or possession of, a chattel, or other interference therewith, without the owner's consent and without lawful justification.

> See publication Words and Phrases for other judicial constructions and definitions.

**37. Conversion and Civil Theft ⟨⟩109, 124**

Complaint stated claim for conversion under Pennsylvania law by alleging that restaurant was property of limited liability company (LLC) and that property was wrongfully taken from LLC when defendants locked out LLC's principal, which suggested lack of consent.

**38. Injunction ⟨⟩1002**

Under Pennsylvania law, an "injunction" is a court order that can prohibit or command virtually any type of action.

> See publication Words and Phrases for other judicial constructions and definitions.

**39. Injunction ⟨⟩1007, 1035, 1046**

Under Pennsylvania law, injunction is an extraordinary remedy that should be issued with caution and only where the rights and equity of plaintiff are clear and free from doubt, and where the harm to be remedied is great and irreparable.

**40. Injunction ⟨⟩1032**

Under Pennsylvania law, required elements of injunctive relief are a clear right to relief, an urgent necessity to avoid an injury that cannot be compensated in damages, and a finding that greater injury will result from refusing, rather than granting, the relief requested.

**41. Injunction ⟨⟩1016**

Even where the essential prerequisites of an injunction are satisfied under Pennsylvania law, the court must narrowly tailor its remedy to abate the injury.

**42. Injunction ⟨⟩1009**

Under Pennsylvania law, power to grant or to refuse an injunction rests in the sound discretion of the court under the circumstances and facts of the particular case.

**43. Injunction ⟨⟩1372**

Complaint failed to state claim for injunctive relief under Pennsylvania law by alleging that trustee for bankruptcy estate of limited liability company (LLC) would be left with no adequate remedy at law to recover restaurant that allegedly was estate property, or its proceeds, if defendants were not enjoined; allegations did not demonstrate that extreme relief was warranted, and there was no explanation as to urgency or allegation as to why more harm would result from not enjoining defendants.

**44. Implied and Constructive Contracts ⟨⟩3**

Under Pennsylvania law, action based on unjust enrichment is an action which sounds in quasi-contract or contract implied in law.

**45. Implied and Constructive Contracts ⟨⟩3**

Under Pennsylvania law, a "quasi-contract" imposes a duty not as a result of any agreement, whether express or implied, but in spite of the absence of an agreement, when one party receives unjust enrichment at the expense of another.

> See publication Words and Phrases for other judicial constructions and definitions.

**46. Implied and Constructive Contracts ⟨⟩3**

Elements of claim for unjust enrichment under Pennsylvania law are benefits

conferred on defendant by plaintiff, appreciation of such benefits by defendant, and acceptance and retention of benefits under such circumstances that it would be inequitable for defendant to retain the benefit without payment of value.

### 47. Implied and Constructive Contracts ⟜3

Allegations that restaurant was wrongly taken from limited liability company (LLC) and that defendants were profiting from that wrongdoing stated claim for unjust enrichment under Pennsylvania law.

### 48. Contracts ⟜326

To state a claim for breach of contract under Pennsylvania law, plaintiff must plead (1) the existence of a contract, including its essential terms, (2) a breach of duty imposed by the contract, and (3) resultant damages.

### 49. Joint Adventures ⟜5(2)

Complaint adequately alleged claim for breach of contract under Pennsylvania law by pleading existence of joint venture agreement between parties, defendants' breach of agreement by allegedly conspiring to lock limited liability company (LLC) out of restaurant premises, and LLC's resulting damages of more than $800,000, given permissible inferences that LLC was required to develop restaurant through its principal's expertise, investment of capital, and other property, that defendants provided existing restaurant for renovation by LLC, and that LLC would get profits from restaurant while defendants, as owners of associated bar and night club, would earn increased profits as result of restaurant's synergistic effect.

### 50. Bankruptcy ⟜2724

Typically, where a count alleges fraud, a heightened standard of pleading is required, but trustee is afforded greater liberality in pleading fraud since he is a third-party outsider to debtor's transactions; however, trustee must do more than merely identify allegedly fraudulent transfers. 11 U.S.C.A. § 548; Fed.Rules Civ. Proc.Rule 9(b), 28 U.S.C.A.

### 51. Bankruptcy ⟜2724

Trustee's allegations adequately pleaded claim for constructively fraudulent transfer under Bankruptcy Code, even under heightened pleading standards applicable to allegations of fraud, by asserting that debtor had interest in restaurant which it was to renovate pursuant to joint venture agreement, that debtor put more than $323,000 into restaurant, that restaurant was forcibly taken from debtor and its principal, that such transfer occurred while debtor was insolvent, that parties memorialized their agreement less than two years before debtor's petition filing, and that debtor had not received any payments from defendants. 11 U.S.C.A. §§ 101(54)(D), 548(a)(1)(B); Fed.Rules Civ. Proc.Rule 9(b), 28 U.S.C.A.

### 52. Bankruptcy ⟜3063.1

Essential element of a turnover action is that the property sought by the trustee is, in fact, property of the estate. 11 U.S.C.A. § 542(a).

### 53. Bankruptcy ⟜3063.1

Turnover action is not proper where a bona fide dispute exists as to whether assets sought are estate property. 11 U.S.C.A. § 542(a).

### 54. Bankruptcy ⟜3066(1)

Trustee failed to state claim for turnover where trustee alleged that restaurant that was subject of joint venture and debtor's interest in joint venture were estate property, but defendants disputed trustee's claims to restaurant and denied trustee's right to turnover. 11 U.S.C.A. § 542(a).

**174**                    **474 BANKRUPTCY REPORTER**

**55. Bankruptcy ⬅3064, 3066(1)**

Debtor's joint venturers in restaurant renovation project did not fall within statutory definition of "custodian," which included receivers, assignees, and trustees, and therefore trustee could not state claim against joint venturers for accounting of restaurant proceeds under Bankruptcy Code, under which custodian of estate property had to file accounting of property of debtor or proceeds.    11 U.S.C.A. §§ 101(11), 543(b)(2).

**56. Contracts ⬅1**

Under Pennsylvania law, a contract or term is "unconscionable," and therefore avoidable, where there was a lack of meaningful choice in the acceptance of the challenged provision and the provision unreasonably favors the party asserting it.

See publication Words and Phrases for other judicial constructions and definitions.

**57. Joint Adventures ⬅5(2)**

Complaint failed to state claim for unconscionability warranting voiding of joint venture agreement under Pennsylvania law; there were no allegations that parties somehow bargained from unequal footing, term "joint venture" was used throughout complaint, suggesting that parties negotiated at arms length, and complaint did not state contract's terms or have contract attached, which prevented determination as to whether it was unreasonably skewed in defendants' favor.

**58. Joint Adventures ⬅4(1)**

Where parties have entered into a joint venture, there exists a fiduciary duty between them under Pennsylvania law.

**59. Joint Adventures ⬅5(2)**

To sufficiently plead a claim for breach of joint venture under Pennsylvania law, plaintiff first must plead the elements of a joint venture.

**60. Joint Adventures ⬅1.2(1)**

For relationship to be a "joint venture" under Pennsylvania law, certain factors are essential: (1) each party to the venture must make a contribution, not necessarily of capital, but by way of services, skill, knowledge, materials, or money, (2) profits must be shared among the parties, (3) there must be a joint proprietary interest and right of mutual control over the subject matter of the enterprise, and (4) usually, there is a single business transaction, rather than a general and continuous transaction.

See publication Words and Phrases for other judicial constructions and definitions.

**61. Joint Adventures ⬅4(1)**

Under Pennsylvania law, rights, duties, and obligations of joint venturers, as between themselves, depend primarily upon the terms of the contract by which they assume that relationship.

**62. Joint Adventures ⬅5(2)**

Complaint adequately pleaded claim under Pennsylvania law for breach of joint venture agreement and corresponding fiduciary duty, even though joint venture agreement was not attached to complaint or specifically referenced therein, given allegations as to what plaintiff's contribution to joint venture was to be, renovating and operating restaurant that was part of entertainment facility that also included bar and night club, and inference that defendants contributed real estate for entertainment facility, allegations that plaintiff was promised profits from restaurant and some control over way in which it was managed and that defendants had expectation of profits, allegations that both plaintiff and defendants had common interest in enterprise, and allegations that one or more of defendants breached joint venture agreement.

Gary F. Seitz, Esquire, Rawle & Henderson LLP, Philadelphia, PA, pro se.

Kenneth E. Aaron, Esquire, Lauren N. Schwimmer, Esquire, Weir & Partners LLP, Philadelphia, PA, for Defendants.

## OPINION

STEPHEN RASLAVICH, Chief Judge.

### Introduction

Before the Court is the Trustee's Motion for Leave to Amend Complaint. The Motion is opposed by the Defendants. A hearing on the motion was held on May 3, 2012 after which the Court took the matter under advisement. For the reasons set forth below, the Motion will be granted in part and denied in part. The Trustee may file an amended complaint which is consistent with this ruling within 20 days of this date.[1]

### Summary of Holding

Count I—Declaratory Judgment

● Basis for Contention: Defendants maintain that the proposed amendment to this count is either prejudicial or legally deficient.

● Holding: Plaintiff's request for leave to amend Count I will be denied because it fails to state a claim for a declaratory judgment.

Count II—Constructive Trust

● Basis for Contention: Defendants maintain that the proposed amendment to this count is either prejudicial or legally deficient.

● Holding: Plaintiff's request for leave to amend will be granted as the count sufficiently states a claim for a constructive trust.

Count III—Conversion

● Basis for Contention: Defendants maintain that the proposed amendment to this count is prejudicial or legally deficient.

● Holding: Plaintiff's request for leave to amend will be granted as the count sufficiently states a claim for conversion.

Count IV—Injunction

● Basis for Contention: Defendants maintain that the proposed amendment to this count is prejudicial or legally deficient.

● Holding: Plaintiff's request for leave to amend Count IV will be denied because it fails to state a claim for an injunction.

Count V—Unjust Enrichment

● Basis for Contention: Defendants maintain that the proposed amendment to this count is either time-barred, prejudicial or legally deficient.

● Holding: Plaintiff's request for leave to amend will be granted as the count sufficiently states a timely claim for unjust enrichment.

Count VI—Breach of Agreement (breach of contract)

● Basis for Contention: Defendants maintain that the proposed amendment to this count is either prejudicial or legally deficient.

● Holding: Plaintiff's request for leave to amend Count VI will be granted as the count sufficiently states a claim for breach of contract.

Count VII—Avoidance (preferential and/or fraudulent transfers)

● Basis for Contention: Defendants maintain that the proposed amendment to this count is either time-barred, prejudicial or legally deficient.

1. Although this complaint alleges both core and noncore jurisdictional matters, the Defendants do not consent to entry of a final judgment. *See* Answer ¶ 1.

- Holding: Plaintiff's request for leave to amend Count VII will be granted as the count sufficiently states a timely claim for avoidance.

Count VIII—Turnover

- Basis for Contention: Defendants maintain that the proposed amendment to this count is either prejudicial or legally deficient.
- Holding: Plaintiff's request for leave to amend Count VIII will be denied because it fails to state a claim for turnover or for an accounting.

Count IX—Unconscionable and Void

- Basis for Contention: Defendants maintain that the proposed amendment to this count is either prejudicial or legally deficient.
- Holding: Plaintiff's request for leave to amend Count IX will be denied because it fails to state a claim that the agreement may be voided as unconscionable.

Count X—Breach of Joint Venture/Fiduciary Duty

- Basis for Contention: Defendants maintain that the proposed amendment to this count is either prejudicial or legally deficient.
- Holding: Plaintiff's request for leave to amend will be granted as the proposed amendment sufficiently states a claim for breach of fiduciary duty arising out of a joint venture.

*Allegations*

In June 2008, the Debtor was formed by its president and sole shareholder Joseph Polutro to operate as a restaurant. Amended Complaint, ¶ 4. The establishment which it would operate already existed along with a bar and gentlemen's club located at 6130 W. Passyunk Avenue in Philadelphia. *Id.* ¶¶ 4, 5 The existing restaurant, bar and club were owned by the Defendants. *Id.* As part of a joint venture agreement, the Debtor's principal, an executive chef, would renovate the existing restaurant. *Id.* ¶ 13 To that end, the Debtor invested $323,000 into the enterprise. *Id.* ¶ 17 The Trustee's complaint alleges that the Defendants conspired to deprive the Debtor of the profits from the operation of that restaurant. *Id.* ¶¶ 14, 19. The Complaint calculates the Debtor's losses at more than $850,000. *Id.* ¶ 21.

On September 29, 2009, the Debtor commenced the instant bankruptcy case and the Trustee was appointed on the same day. On September 2, 2011, the Trustee filed a ten count complaint against the Defendants alleging causes of action related to breaches of the Joint Venture Agreement. On December 2, 2011, the Defendants filed an answer to the complaint. The Court entered a pretrial scheduling order and discovery commenced. On April 2, the Trustee filed the instant motion to amend; on April 23, the Defendants moved for summary judgment. This ruling deals solely with the Trustee's request.

*Applicable Legal Standard*

[1–5] Rule 15[2] of the Federal Rules of Civil Procedure governs amendments of pleadings:

(a) *Amendments Before Trial.*

(1) *Amending as a Matter of Course.* A party may amend its pleading once as a matter of course within:

(A) 21 days after serving it, or

(B) if the pleading is one to which a responsive pleading is required, 21 days after service of a responsive pleading or 21 days after service of a motion under Rule 12(b), (e) or (f) whichever is earlier.

(2) *Other Amendments.* In all other cases, a party may amend its pleading

2. Made applicable by B.R. 7015.

only with the opposing party's written consent *or the court's leave.* The court *should freely give leave when justice so requires.*

Fed.R.Civ.P. 15(a) (emphasis added). Where a party must obtain consent to amend, the Supreme Court has made it clear that the presumption in favor of leave is "a mandate to be heeded." *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962). It furthers the policy of trying cases on their merits. *Id.* The precise delineation of when leave should be granted or denied is impossible; therefore, the determination is left to the sound discretion of the trial judge. *Rolo v. City Investing Co. Liquidated Trust,* 155 F.3d 644, 645 (3d Cir.1998). This requires the Court to consider the positions of *both* parties and the effect that the request will have on them. 6 Charles Alan Wright, et al., *Federal Practice and Procedure* § 1487 (3d ed.) For that reason, the Court may deny a request to amend when the moving party has demonstrated undue delay, bad faith or dilatory motive, or where the amendment would prejudice the opposing party. *See Foman, supra, id.; Grayson v. Mayview State Hosp.,* 293 F.3d 103, 108 (3d Cir.2002) Equally, an amendment will be denied where it is futile. *Id.* As the moving party, the Trustee bears the burden of proof in explaining the reasons for delay in seeking leave to amend. *See Payne v. City of Phila.,* 2005 WL 1863188, *2 (E.D.Pa.Aug. 3, 2005).

### Proposed Amendment

The motion seeks to add one defendant, to substitute another, and to correct a typographical error. The defendant to be added is New Club, LLC. The defendant to be substituted is the estate of one of the defendants since deceased. The typographical error sought to be corrected is an incorrect dollar amount in the demand.

### Defendants' Objection

The Defendants do not object to all three proposed amendments. They point out that substitution of a decedent's estate does not require an amendment. *See* Defendants' Objection ¶ 10. Although Defendants make no mention of the Trustee's request to correct what is characterized as a typing error, the Court is empowered to conform the pleadings to the proofs. *See* F.R.C.P. 15(b)(2). It is only the amendment to add a defendant to which they object.

And on that score, the Defendants make two principal objections: one on limited and specific grounds and the other for general reasons. The *limited* challenge is as to Counts V and VII. Defendants contend that these counts are avoidance claims which are now time-barred. The *general* objection is made as to the remaining 8 counts and is two-fold: first, the proposed amendments fail to state a claim against New Club; and second, even if a claim is stated as to New Club, then the delay in bringing them now is unduly prejudicial.

### Timeliness of Avoidance Claims

[6] Beginning with the two avoidance counts, the Court observes that a proposed amendment which is untimely will be found to be futile. *See Riad v. U.S.,* 2012 WL 986753, at *4 (E.D.Pa. March 22, 2012). The Defendants say that it is too late to add New Club to either Count V or VII because of the Bankruptcy Code's limitations for avoidance claims. Section 546(c) of the Code provides that:

An action or proceeding under section 544, 545, 547, 548, or 553 of this title may not be commenced after the earlier of—

(1) the later of—

(A) 2 years after the entry of the order for relief; or

(B) 1 year after the appointment or election of the first trustee under section 702, 1104, 1163, 1202, or 1302 of this title if such appointment or such election occurs before the expiration of the period specified in subparagraph (A); or

(2) the time the case is closed or dismissed.

11 U.S.C. § 546(a). Defendants explain that more than two years have passed since the case was commenced and so these two counts are stale.[3] Neither, Defendants add, is that deadline subject to equitable tolling. Finally, they say, if the Court does hold that this provision may be equitably tolled, then the Trustee has not demonstrated that his claim against New Club relates back in time for limitations purposes under Rule 15. *See* Defendants' Objection, ¶¶ 17–36.

*Relation Back*

[7–10]  The same rule which provides for amendment of pleadings also preserves the timeliness of certain amendments.[4]

(c) *Relation Back of Amendments.*

(1) *When an Amendment Relates Back.* An amendment to a pleading relates back to the date of the original pleading when:

(A) the law that provides the applicable statute of limitations allows relation back;

**3.** That deadline was September 29, 2011. There is no dispute that the deadline had passed when the request for leave to amend was filed.

**4.** The Court is aware that the Federal Rules contain a specific rule regarding the joinder of parties. Likewise made applicable by the Bankruptcy Rules, Rule 20 of the Federal Rules of Civil Procedure provides that persons ... may be joined in one action as defendants if the claims against all defendants arise out the same transactions or occurrences and common questions of law and fact will arise in the action. *See* F.R.C.P. 20(a)(2).

(B) the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading; or

(C) the amendment changes the party or the naming of the party against whom a claim is asserted, if Rule 15(c)(1)(B) is satisfied and if, within the period provided by Rule 4(m) for serving the summons and complaint, the party to be brought in by amendment:

(i) received such notice of the action that it will not be prejudiced in defending on the merits; and

(ii) knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity.

*See* F.R.C.P. 15(c). As the Third Circuit has explained, three conditions must be met in order for an amendment adding a party to relate back to the original complaint for statute of limitations purposes:

(1) that the claim against the newly named defendants arose out of the same conduct, transaction, or occurrence set forth in the original complaint,

(2) that within the 120–day period for service of the summons and complaint, the newly named party have received notice of the institution of the action

Although this rule does not mention any limitations period, it is not excepted from the applicability of Rule 15(c)'s relation back requirement. Thus, an amendment to join a defendant after the right to amend has passed must likewise relate back in time as required by Rule 15(c). *See Commodity Futures Trading Commission v. American Metal Exch. Corp.*, 693 F.Supp. 168, 189 (D.N.J.1988) (holding that leave to amend was required to add new parties.) *See also* 4 Moore's Federal Practice, § 20.02[2][a][iii] (stating that Rule 20 should be subject to Rule 15(c)'s relation back requirement).

such that it will not be prejudiced in maintaining a defense on the merits, and (3) that within that same time period of time, the newly named party must have known, or should have known, that "but for a mistake," he or she would have been named as a defendant in the first place.

*Singletary v. Pennsylvania Dept. of Corrections.*, 266 F.3d 186, 194 (3d Cir.2001) The doctrine is distinct from "equitable tolling" whereby the reason that the plaintiff missed the period is due to defendant's affirmative concealment or other circumstance beyond plaintiff's control. *Watkins v. Lujan*, 922 F.2d 261, 263 (5th Cir.1991). If the proponent of an amendment can show that its change would relate back to the original, timely-filed claim, then it may be allowed on legal grounds without having to resort to equity.

*Same Transaction*

[11] Beginning with commonality, the Court observes that the claims against New Club do not amend the substantive claims against the other Defendants. With slight exceptions,[5] they remain as they were *verbatim*. In fact, the proposed changes do no more than add New Club to the universe of already existing defendants. Only the number of persons in the definition of "Defendants" has increased from five to six. There are, then, simply no material changes to the allegations of fact or conclusions of law.

*Notice*

As to whether New Club received notice of the suit during the summons service period, the Trustee maintains that New Club received both actual as well as constructive notice. Motion ¶ 25. Actual notice occurred, explains the Trustee, by virtue of New Club having shared the same address as two of the defendants. *Id.* 26. Constructive notice may also be found from the fact that New Club and the existing Defendants share the same attorney. *Id.* 27. Finally, the Trustee adds that New Club is directly involved with Defendants business, i.e., "inextricably intertwined," such that notice may likewise be inferred. *Id.* 30.

For their part, Defendants raise two points: first, the fact that New Club shared the same registered office address with other Defendants proves nothing. No agency relationship is alleged. Objection ¶ 27. Second, there is no evidence of a shared attorney during the 120 day summons period. New Club explains that the Weir firm had not yet entered its appearance for New Club. *Id.* 29.

[12, 13] For purposes of the relation back doctrine, notice can be "actual, constructive, or imputed." *Singletary*, 266 F.3d at 195. The Third Circuit considers "imputed" notice to be a form of "constructive" notice. *In re Color Tile, Inc.*, 475 F.3d 508, 512 (3d Cir.2007). The Third Circuit has continued to adhere to the proposition that imputed notice falls under the doctrine of constructive notice, so that imputed notice under Rule 15(c)(3) requires either a shared attorney or an identity of interest. *Garvin v. City of Phila.*, 354 F.3d 215, 222–223 (3d Cir.2003).

*Shared Attorney*

[14, 15] Where an existing defendant and a party to be added share the same counsel, constructive notice of the suit

**5.** The amended complaint would increase the amount of money that the Debtor invested into the enterprise. *Compare* Complaint, ¶ 15 with Amended Complaint, ¶ 17. It also states

that there may be more than one version of the parties' agreement. *Compare* Complaint, ¶¶ 20–21 with Amended Complaint, ¶ 23.

upon the latter party will be found to exist. *See Miller v. Hassinger,* 173 Fed.Appx. 948, 956 (3d Cir.2006) (citing *Singletary v. Pa. Dept. of Corrections,* 266 F.3d 186(3d Cir.2001)). Under this theory, "when an originally named party and the party who is sought to be added are represented by the same attorney, the attorney is likely to have communicated to the latter party that he may very well be joined in the action." *Singletary,* 266 F.3d at 196. As New Club correctly points out, the record does not demonstrate that the firm which represents the original defendants (Weir & Partners), also represented New Club when the summons was pending. As of the filing of its Objection, New Club goes on, the Weir firm had yet to enter its appearance on New Club's behalf. Without more, then, the Court cannot find that New Club had constructive notice of the suit via common counsel.

*Identity of Interest*

[16]  Present parties, however, may be sufficiently related to future parties such that notice of suit may likewise be imputed to the latter. Referred to as "identity of interest," the newly named Defendant and the original Defendants may be so closely intertwined in their business operations or other activities that the filing of suit against one effectively provides notice of the action to the other. 6A Charles Alan Wright et al., *Federal Practice And Procedure* § 1499 (3d ed.) The Supreme Court has endorsed this method of imputing notice for Rule 15(c)(3). *See Schiavone v. Fortune,* 477 U.S. 21, 29, 106 S.Ct. 2379, 2384, 91 L.Ed.2d 18 (1986) ("Timely filing of a complaint, and notice within the limitations period to the party named in the complaint, permit imputation of notice to a subsequently named and sufficiently related party."); *see also Singletary,* 266 F.3d at 198 (remarking on Supreme Court's endorsement of this method).

[17]  The Trustee sees an identity of interest between New Club and Defendant 6130 West LLC in their shared address. 6130 West has its registered office address at 1707 Rittenhouse Square, Philadelphia. This defendant was served at that address. *See* Executed Summons Service, Docket # 3. New Club also has its registered office address at 1707 Rittenhouse Square in Philadelphia. *Compare* Department of State filing for defendant 6130 West LLC (Ex. A to Motion) with same document for New Club LLC (Ex. B to Motion). While there is no denying that the address is the same, that is not necessarily a guarantee that New Club learned of the suit when 6130 West was served with the summons. There is no mention in the record as to whether the parties shared the same registered agent who would have been duty bound to inform New Club of the suit. In short, the fact of the common address is probative but inconclusive.

What helps the Trustee's case is what is attached to his Response. Exhibit A to that document is a lease between Passyunk Avenue Realty Enterprises LLC and New Club dated October 2008. It represents the leasehold of the real estate upon which is located the bar, nightclub and restaurant of the joint venture; that is, 6130 West Passyunk Avenue. New Club is the lessee under the lease. Importantly, Defendant John DeVirgilis executed the lease on behalf of New Club as a member. *See* Trustee's Response, Ex. A. Mr. DeVirgilis was also served with the Complaint at that same address (1707 Rittenhouse Square, Philadelphia) as was 6130 West. *See* Executed Summons Service, Docket # 6. Thus, the record demonstrates that a principal of New Club is also among the original defendants served with the Complaint within the 120 days summons period. This constitutes timely, constructive notice upon

New Club for purposes of relation back
under Rule 15(c).

*Expectation*

[18] Lastly, the Court turns to the
question of whether New Club ought to
have expected to have been named as a
defendant earlier but for a mistake. At
the hearing, New Club's counsel argued
that the Trustee had not been "mistaken"
in failing to name New Club sooner; rath-
er, his lack of knowledge about New Club
simply renders the rule inapplicable.
Transcript of Hearing (T–), 5/3/12, 10. A
leading commentator explains that in this
context the classic example of mistake is
misnomer; that is, when a plaintiff mis-
names or misidentifies a party in its plead-
ings. 3 *Moore's Federal Practice Civil*
§ 15.19[3][d]. However, mistake may also
include the failure to name a party alto-
gether:

> Relation back is not limited to the strict
> misnomer situation, however, provided
> the requirements of the rule are satis-
> fied. In applying the rule, the focus is
> on the party to be brought in by the
> amendment. Relation back applies if
> that party knew or should have known
> (during the time allowed by Rule 4(m))
> that it would be named but for an error.
> The rule asks what the defendant knew
> or should have known during this peri-
> od, not what the plaintiff knew or should
> have known at the time of filing the
> original complaint. This approach, an-
> nounced by the Supreme Court in *Krup-
> ski v. Costa Crociere S.p.A.,*[6] resolved a
> circuit split. Before *Krupski*, many
> courts had held that a lack of knowledge
> as to who the correct party was did not
> constitute a "mistake," so that a plaintiff
> who did not know the identity of the
> defendant could not rely on relation

back. Other courts disagreed with this
view, finding no linguistic basis for the
distinction in the rule. These courts
held that both misnomer and lack of
knowledge of the proper defendant could
constitute a "mistake concerning the
proper party's identity" as required by
Rule 15(c)(1)(C)(ii).

In *Krupski,* the Supreme Court sided
with this second, better reasoned, line of
authority. Information in the plaintiff's
possession is relevant to the relation
back inquiry only if it bears on the
defendant's understanding of whether
the plaintiff made a mistake regarding
the proper party's identity. For this
purpose, *knowledge of a party's exis-
tence may not be equated with the ab-
sence of mistake.* A plaintiff who knows
of a person's existence may still be mis-
taken as to the person's status, or as to
the role the person played in the trans-
action or occurrence, or in other ways.
Moreover, the reasonableness of the
mistake is not at issue; the relevant
inquiry is whether the party to be
brought in knew that the action would
have been brought against it but for the
mistake, reasonable or not.

*Id.* (emphasis added). *See also Arthur v.
Maersk, Inc.,* 434 F.3d 196, 208 (3d Cir.
2006) (holding that mistake, for purposes
of this rule, may result from lack of knowl-
edge) Based on the record, New Club
should have expected to be a defendant in
this suit. New Club is the lessee of the real
property on which the restaurant is locat-
ed. *See* Lease attached to Trustee's Re-
sponse. Defendants themselves contend
that the Debtor received prepetition pay-
ments from New Club so the parties are in
some degree of privity. They also share a
common business address as discussed, *su-*

6. *Krupski v. Costa Crociere S. p. A.,* — U.S.
   —, 130 S.Ct. 2485, 177 L.Ed.2d 48, 57–58

(2010).

*pra.* All of this suggests that the proposed amendment is not a complete surprise to New Club. Having found that all three conditions for applying this rule's relation back doctrine exist, the Court finds the addition of New Club to the suit is not time-barred.

### Delay and Prejudice

[19–22]  As to the other 8 counts, Defendants argue first that the delay in bringing such claims against New Club is unfair. The Third Circuit has emphasized that prejudice to the non-moving party is the touchstone for the denial of an amendment. *Arthur v. Maersk, Inc.,* 434 F.3d at 204. That being said, the non-moving party cannot merely claim prejudice, but "must show that it was unfairly disadvantaged or deprived of the opportunity to present facts or evidence which it would have offered had the ... amendments been timely." *Bechtel v. Robinson,* 886 F.2d 644, 652 (3d Cir.1989) (citations omitted). In other words, the Defendants bear the burden of proof as to prejudice. *See AMS Construction Co. v. Reliance Insurance Co.,* 2006 WL 1967336, at *3 (E.D.Pa. July 12, 2006). In and of itself, delay does not require that a motion to amend a complaint be denied; however, at some point, the delay will become 'undue' placing an unwarranted burden on the court and may work prejudice to the adversary. *See Cureton v. Nat'l Collegiate Athletic Ass'n,* 252 F.3d 267, 273 (3d Cir.2001). A potential defendant is prejudiced from delay if it "must set about assembling evidence and constructing a defense when the case is already stale." *Curry v. Johns–Manville Corp.,* 93 F.R.D. 623, 626 (E.D.Pa.1982).

[23]  Defendants identify unfairness in the fact that discovery has just completed and that they have filed a Motion for Summary Judgment. Defendants' Objection, ¶ 38. Allowing the Trustee to add a new defendant, they say, would cause them to incur significant costs and delay trial. *Id.* ¶ 39. At the inception of the bankruptcy, Defendants contend, the Trustee failed to promptly use his investigatory powers which would have revealed New Club's identity sooner. *Id.* ¶ 41. Available information showed that the Debtor was receiving checks from New Club during the 3 months prior to bankruptcy. *Id.* ¶ 40. It would, then, be unfair, the Defendants conclude, to allow the Trustee to add New Club at this late stage of the case.

The Trustee's rejoinder is that he made numerous requests of the Debtor for its books and records. Trustee's Response, ¶ 15. He explains that the Debtor's principal testified that the books and records were kept at the restaurant and that because the Defendants locked him out of the restaurant he could not deliver that information to the Trustee. *Id.* ¶ 16. When the Trustee finally did get the records, they contained no mention of New Club. *Id.* ¶ 15. He first learned of New Club, the Trustee explained, when he received the Defendants' initial disclosures in January 2012. Motion, ¶ 14. To the Trustee's mind, if there is any delay here, it is not on his account; he was working as diligently as possible given existing restraints. Response, ¶¶ 15–17.

The Court finds neither delay on the Trustee's part nor any prejudice assuming such delay were demonstrated. The record shows that his attempts at investigation were frustrated by the very persons claiming prejudice. And the contention that the Debtor's receipt of checks from New Club should have put him on notice of the claims against New Club are an exaggeration. It is very possible that the Debtor received prepetition checks from a number of sources. But even assuming that the Trustee should have probed deeper and sooner into Debtor's affairs, the

Court does not see how the Defendants are harmed as a result. The proposed amendment would not change the factual basis or legal theories; only New Club is added to the already existing universe of defendants. And because there are no material substantive changes to either the allegations or law, it is hard to see how this will place on the Defendants any additional burden of trial preparation. Moreover, New Club and the other defendants share the same counsel so the learning curve—to the extent one exists—cannot be all that steep. But even assuming it is, the Defendants will be granted more time to prepare if it is needed. In short, the Court sees no risk of harm to the Defendants in granting leave.

*Failure to State a Claim*

[24, 25]  Alternatively,  Defendants maintain that adding New Club would be futile because no viable claim is stated against it. An amendment is futile if it would not survive a motion to dismiss for failure to state a claim upon which relief could be granted. *See In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410,

1434 (3d Cir.1997). In determining whether the amendment would be futile, the district court applies the standard for motions under Fed.R.Civ.P. 12(b)(6) ("failure to state a claim upon which relief may be granted"); *see id.* Accordingly, the Court accepts as true all of the allegations contained in the complaint and draws reasonable inferences in favor of the plaintiff. *See Erickson v. Pardus,* 551 U.S. 89, 93–94, 127 S.Ct. 2197, 2200, 167 L.Ed.2d 1081 (2007) (per curiam). To survive dismissal, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (citing *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)).

*Declaratory Judgment*

[26–28]  The Court begins with the request for a declaratory judgment. Although the Complaint does not state the *statutory* predicate for declaratory relief,[7]

---

7.  Pennsylvania is one of 43 states to have adopted the Uniform Declaratory Judgment Act. *See* 42 P.S. Pt. VII Ch. 75. The act provides that "[c]ourts of record, within their respective jurisdictions, shall have power to declare rights, status, and other legal relations whether or not further relief is or could be claimed." 42 Pa.C.S. § 7532. As pertains to the case *sub judice,* the act also provides that "[a]ny person interested under a deed, will, written contract, or other writings constituting a contract, or whose rights, status, or other legal relations are affected by a statute, municipal ordinance, contract, or franchise, may have determined any question of construction or validity arising under the instrument, statute, ordinance, contract, or franchise, and obtain a declaration of rights, status, or other legal relations thereunder." 42 Pa.C.S. § 7533. The Pennsylvania act serves much the same purpose as the federal act. The purpose of awarding declaratory relief is to settle and make certain rights or legal status of parties. *Geisinger Clinic v. Di*

*Cuccio,* 606 A.2d 509, 519, 414 Pa.Super. 85, 109 (Pa.Super.1992), appeal denied 637 A.2d 285, 536 Pa. 625, reconsideration denied, certiorari denied 513 U.S. 1112, 115 S.Ct. 904, 130 L.Ed.2d 788; *see also Curtis v. Cleland,* 552 A.2d 316, 318, 122 Pa.Cmwlth. 328, 331 (Pa.Cmwlth.1988) (explaining that the Declaratory Judgments Act is remedial in nature and is intended to provide relief from uncertainty and establish various legal relationships). A declaratory judgment is not appropriate to determine rights in anticipation of events that may never occur, but is appropriate where there is imminent and inevitable litigation. *Pennsylvania Turnpike Com'n v. Hafer,* 597 A.2d 754, 756, 142 Pa.Cmwlth. 502, 507 (Pa.Cmwlth.1991) *Shaffer–Doan ex rel. Doan v. Com., Dept. of Public Welfare,* 960 A.2d 500, 517 n. 32 (Pa.Cmwlth.2008) ("Declaratory judgments are nothing more than judicial searchlights, switched on at the behest of a litigant to illuminate an existing legal right, status, or other relation, and they

federal courts, including bankruptcy courts, may grant such relief pursuant to the Declaratory Judgment Act ("the Act"), 28 U.S.C. § 2201. That Act provides, in relevant part, that "[i]n a case of actual controversy within its jurisdiction, ... any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such a declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201. When there is an actual controversy between the parties, the Act allows a court to settle the parties' respective rights, even before there is a violation of law, exercise of right, or breach of duty. *In re Downingtown Indus. & Agr. School,* 172 B.R. 813, 819 (Bankr.E.D.Pa.1994); *see also Océ–Office Systems, Inc. v. Eastman Kodak Co.,* 805 F.Supp. 642, 646 (N.D.Ill. 1992) ("Resolving the uncertainty and anxiety resulting from a looming lawsuit is, indeed, the purpose of the Declaratory Judgment Act."). A declaratory judgment may well be appropriate in the context of a contract dispute even before an actual breach of the contract occurs. *See, e.g., Hardware Mutual Casualty Co. v. Schantz,* 178 F.2d 779, 780 (5th Cir.1949) ("The purpose of the Declaratory Judgment Act is to settle 'actual controversies' before they ripen into violations of law or a breach of some contractual duty."); *American Type Founders, Inc. v. Lanston Monotype Machine Co.,* 137 F.2d 728, 729 (3d Cir.1943) (court "entertain[ed] no doubt that an actual controversy exist[ed] within the purview of the Declaratory Judgment Act" where plaintiff sought declaration of right to cancel contract while defendant sought its enforcement); *Lehigh Coal &*

*Navigation Co. v. Central R.R. N.J.,* 33 F.Supp. 362, 365 (E.D.Pa.1940) ("Construction and interpretation of written instruments ... is the principle function of a declaratory judgment proceeding.").

[29]  The Act is intended to address uncertainty as to legal rights between the parties towards expediting a conclusion of a pending dispute or avoiding one altogether.  The parties here, however, are well past that point; they are engaged in full-blown litigation.  Each side is clear as to what its respective rights are in their joint venture and that is with regard to profits as well as personal property.  Adjudication of these issues will perforce determine the rights of each party.  In other words, the request for declaratory relief is, at this juncture, moot.

*Constructive Trust*

[30–34]  Count II requests that the Court impress upon the restaurant and its proceeds a constructive trust.  Under Pennsylvania law, "[a] constructive trust arises where a person who holds title to property is subject to an equitable duty to convey it to another on the ground that he would be unjustly enriched if he were permitted to retain it." *Kern v. Kern,* 892 A.2d 1, 8 (Pa.Super.2005).  A constructive trust is not really a trust at all but rather an equitable remedy. *Buchanan v. Brentwood Savings and Loan Ass'n,* 457 Pa. 135, 150, 320 A.2d 117, 126 (1974).  Like all remedies in equity, it is flexible and adaptable. *Id.* Generally, however, an equitable duty to convey property to another arises only in the presence of fraud, duress, undue influence, mistake, or abuse of a confidential relationship.  There is, however, no

may not be used to search out new legal doctrines.") *Crown Cork & Seal Co., Inc. v. Borden, Inc.,* 779 F.Supp. 33, 35 (E.D.Pa. 1991) (inasmuch as request for declaratory relief constituted "procedural fencing" and

litigation costs manufacturer sought to avoid by suit were not the type of "uncertainty and insecurity" that Acts were intended to relieve); *see also* 11 *Standard Pa. Prac. 2d* § 66:4.

rigid standard for determining whether the facts of a particular case require a court of equity to impose a constructive trust; the test is merely whether unjust enrichment can be avoided. *Koffman v. Smith*, 453 Pa.Super. 15, 32, 682 A.2d 1282, 1291 (Pa.Super.1996). The presumption of right in an action to impose a constructive trust lies in favor of the one in whom legal title is situated. *In re McKay*, 110 B.R. 764, 770 (Bankr.W.D.Pa.1990) *(citing Metzger v. Metzger*, 338 Pa. 564, 14 A.2d 285 (1940)).

[35] The complaint alleges that the restaurant is the property of the debtor; that it was wrongly taken from the debtor; that the money it generated was likewise wrongly taken; and that under the circumstances the defendants are unjustly profiting from their wrongful conduct. As a matter of pleading, this is enough to state a viable claim for a constructive trust.

*Conversion*

[36, 37] The same may be said of the conversion claim in Count III. Conversion is the "deprivation of another's right of property in, or use or possession of, a chattel, or other interference therewith, without the owner's consent and without lawful justification." *McKeeman v. Corestates Bank, N.A.*, 751 A.2d 655, 659 n. 3 (Pa.Super.2000). Again, the restaurant is alleged to be the estate's property. Notwithstanding, such property is alleged to have been wrongfully taken from the Debtor when the Defendants locked out Debtor's principal. These circumstances suggest a lack of consent. The motion to dismiss the conversion count, therefore, will likewise be denied at this juncture.

*Injunctive Relief*

[38–42] Count IV seeks to enjoin the Defendants from the restaurant. An injunction is a court order that can prohibit or command virtually any type of action. *Big Bass Lake Comm. Ass'n v. Warren*, 950 A.2d 1137, 1144 (Pa.Commw.2008). It is an extraordinary remedy that should be issued with caution and "only where the rights and equity of the plaintiff are clear and free from doubt, and where the harm to be remedied is great and irreparable." 15 *Standard Pennsylvania Practice 2d*, § 83:2 (2012) *citing Schaeffer v. Frey*, 403 Pa.Super. 560, 589 A.2d 752 (1991). The required elements of injunctive relief are: a clear right to relief; an urgent necessity to avoid an injury that cannot be compensated in damages; and a finding that greater injury will result from refusing, rather than granting, the relief requested. *Id.* at § 83:19 *citing Unified Sportsmen of Penna. v. PGC*, 950 A.2d 1120 (Pa. Commw.2008). Even where the essential prerequisites of an injunction are satisfied, the court must narrowly tailor its remedy to abate the injury. *John G. Bryant Co., Inc. v. Sling Testing & Repair, Inc.*, 471 Pa. 1, 7, 369 A.2d 1164, 1167 (1977). It has often been said that "the decree of a chancellor is of grace, not of right. This does not, of course, mean that decree is to be granted or withheld merely at the whim or caprice of the chancellor." *Asbury v. Caroll*, 54 Pa.Super. 97, 1913 WL 4747, at *3 (Dec. 17, 1912). The power to grant or to refuse an injunction "rests in the sound discretion of the court under the circumstances and the facts of the particular case. . . ." *Rick v. Cramp*, 357 Pa. 83, 91, 53 A.2d 84, 88 (1947).

[43] The amended complaint alleges generally that the Trustee will be left with no adequate remedy at law to recover the restaurant or its proceeds should the Defendants not be enjoined. Amended Complaint ¶ 48 This, however, begs the question why this is so. To be sure, assuming that the Trustee is correct regarding ownership of the establishment, there is a

clear right to *some* measure of relief. However, that does not demonstrate that *extreme* relief is warranted. There is simply no explanation as to urgency. Neither is there an allegation as to why more harm would result from *not* enjoining the Defendant. In short, even under the relatively liberal pleading standard, this claim is insufficient for stating a claim for an injunction. Accordingly, it will be dismissed but without prejudice.

*Unjust Enrichment*

[44–47] Count V is entitled Unjust Enrichment. A claim for unjust enrichment is not materially different from the count requesting imposition of a constructive trust. "An action based on unjust enrichment is an action which sounds in quasi-contract or contract implied in law." *Sevast v. Kakouras*, 591 Pa. 44, 915 A.2d 1147, 1153 n. 7 (2007). "A quasi-contract imposes a duty, not as a result of any agreement, whether express or implied, but in spite of the absence of an agreement, when one party receives unjust enrichment at the expense of another." *AmeriPro Search, Inc. v. Fleming Steel Co.*, 787 A.2d 988, 991 (Pa.Super.2001). The elements of unjust enrichment are benefits conferred on defendant by plaintiff, appreciation of such benefits by defendant, and acceptance and retention of such benefits under such circumstances that it would be inequitable for defendant to retain the benefit without payment of value. *Stoeckinger v. Presidential Fin. Corp. of Delaware Valley*, 948 A.2d 828, 833 (Pa.Super.2008). Given the allegation that the restaurant was wrongly taken from Debtor and that the Defendants are profiting from

this wrongdoing, Count V states a claim for unjust enrichment.

*Breach of Agreement*

[48] Count VI alleges the existence of an agreement between the parties, the Debtor's full performance, breaches by Defendants of such agreement, and injury resulting from the Defendants' failure to perform. *See* Amended Complaint ¶¶ 57–62. Although styled as Breach of Agreement, Count VI alleges basic common law breach of contract. To state a claim for breach of contract, "a plaintiff must plead: 1) the existence of a contract, *including its essential terms*; 2) a breach of duty imposed by the contract; and 3) resultant damage." *Kane v. State Farm Fire & Cas. Co.*, 841 A.2d 1038, 1042 (Pa.Super.2003) (emphasis added).

[49] Count VI pleads the existence of a contract: the parties' relationship is based upon the joint venture agreement. It also pleads the Defendants'[8] breach of that agreement: they allegedly conspired to lock Debtor out of the premises. As a result of that breach, the count goes on, the Debtor suffered damages of more than $800,000. Where the count becomes somewhat unclear is as to the material (i.e., essential) terms of the agreement. Admittedly, while the Amended Complaint never expressly explains what the Debtor's "obligations" under the agreement were (*see* Amended Complaint, ¶ 13) it can be inferred that the Debtor was required to develop the restaurant through its principal's expertise, investment of capital and other property. On the other side of the coin, it appears that the Defendants provided the existing restaurant which would

---

**8.** New Club also maintains that it cannot be guilty of breach of contract because it was not in existence until after the joint venture was entered into. T–8. In his amendment, the Trustee alleges that various versions of the agreement have been identified. Amended Complaint ¶ 22. That, then, is a factual matter which may be addressed better on summary judgment.

be renovated.[9]  Given that the joint venture contemplated the addition of the Debtor's restaurant to the Defendant's already existing bar and night club, all parties envisioned making money from the arrangement.  The Debtor would get the profits from the restaurant, and the Defendants expected increased profits from the existing bar and night club as a result of the restaurant's synergistic effect.  To be sure, having a copy of the parties' agreement attached to the complaint might have clarified all of this, but this seems a fair reading of what is alleged.  Accordingly, the Court finds that a breach of contract has been stated.

*Constructive Fraudulent Transfer*

[50] Count VII is entitled "avoidance" and seeks to recover transfers to the Defendants on a theory of "constructive" fraud: [10]

> The trustee may avoid any transfer ... of an interest of the debtor in property, or any obligation ... incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily—
>
> * * *
>
> (B)(i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and
>
> (ii)(I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;
>
> (II) was engaged in business or a transaction, or was about to engage in busi-

ness or a transaction, for which any property remaining with the debtor was an unreasonably small capital;

> (III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured; or
>
> (IV) made such transfer to or for the benefit of an insider, or incurred such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business.

*See* 11 U.S.C. § 548(a)(1)(B); *see also In re D'Ambrosio*, 452 B.R. 562, 571 Bankr. E.D.Pa.2011 (listing elements) Typically, where a count alleges fraud, a heightened standard of pleading is required.  *See Saporito v. Combustion Eng., Inc.*, 843 F.2d 666, 675 (3d Cir.1988).  However, courts in this circuit continue to follow the rule that "[a] trustee is generally afforded greater liberality in pleading fraud, since he is a third-party outsider to the debtor's transactions.  Nevertheless, these relaxed Rule 9(b) requirements require the trustee to do more than merely identify the allegedly fraudulent transfers."  *Aphton Corp. v. Sonafi Pasteur (In re Aphton Corp.)*, 423 B.R. 76, 85 (Bankr.D.Del.2010) (footnotes omitted); *see also Moratzka v. Pomaville (In re Pomaville)*, 190 B.R. 632, 637 (Bankr.D.Minn.1995) (explaining that "unlike the usual civil case where a plaintiff at least has the advantage of being a party to the underlying transaction, a bankruptcy trustee must rely almost entirely on a third party (the debtor) to provide the

---

9.  The restaurant is located on the real property which New Club holds as tenant.  *See* Ex. A to Trustee's Response.

10.  Interspersed throughout this count are references to a preferential transfer.  *See e.g.* ¶¶ 67, 71.  This perhaps explains why the Count is generally entitled Avoidance as op-

posed to Fraudulent Transfer.  In any event, the allegations do not support a preference claim chiefly for the reason that the Amended Complaint does not allege an antecedent debt, a required element under § 547.  Accordingly, the count will be judged on whether it states a fraudulent transfer.

**188**          **474 BANKRUPTCY REPORTER**

information necessary to uncover avoidable transfers.")

[51] Here, the complaint alleges an interest in the property; to wit, the restaurant. The Debtor is alleged to have put in upwards of $323,000 into that business. Amended Complaint ¶ 17. A transfer is likewise alleged notwithstanding that the business is alleged to have been forcibly taken from him. *Id.* ¶ 19. "Transfer" is broadly defined in the Bankruptcy Code to include *involuntary* transfers as well as voluntary. *See* 11 U.S.C. § 101(54)(D); *see also In re Fruehauf Trailer Corp.,* 444 F.3d 203, 211–212 (3d Cir.2006) (noting broad definition of transfer) and *see also In re Walker,* 2005 WL 6522758, at *10 (Bkrtcy.E.D.Pa.May 31, 2005) (noting inclusion of involuntary transfers in definition) The complaint alleges that such transfer occurred while the debtor was insolvent. Amended Complaint ¶ 69 As to exactly when the "transfer" occurred, the Amended Complaint is not specific but it can be inferred that it occurred within the two years prior to bankruptcy (9/23/07 to 9/23/09). It is alleged that the parties memorialized their agreement in June 2008 (¶ 22) so it must have occurred after that date. Finally, because the Debtor has not received any payment from the Defendants, (*Id.* ¶ 69), there was no exchange of reasonably equivalent value. On a pleading level, and given the not uncommon disadvantage to which a trustee is subject regarding a debtor's prepetition history, these allegations—albeit somewhat thin—are enough to survive a motion to dismiss even under the heightened pleading standard applicable to fraud.

*Turnover and Accounting*

Count VIII demands from the Defendants that they turn over the restaurant and Debtor's membership interest in the joint venture. Amended Complaint, ¶ 77.

The same count also demands an accounting of all proceeds from the restaurant. *Id.* ¶ 78.

[52, 53] The Bankruptcy Code provides that property of the estate shall be turned over to the trustee. *See* 11 U.S.C. § 542(a). The essential element of a turnover action is that the property sought by the trustee is, in fact, property of the estate. *In re White,* 389 B.R. 693, 699 (9th Cir. BAP 2008). However, a turnover action is not proper where a bona fide dispute exists. *See In re Allegheny Health Education and Research Foundation,* 233 B.R. 671, 677 (Bankr.W.D.Pa.1999) *citing U.S. v. Inslaw, Inc.,* 932 F.2d 1467, 1472 (D.C.Cir.1991) ("It is settled law that turnover actions under § 542 cannot be used to demand assets whose title is in dispute") *see also In re 2045 Wheatsheaf Associates,* 1998 WL 910228 *10 (Bankr.E.D.Pa.1998) (quoting *In re Johnson,* 215 B.R. 381, 386 (Bankr.N.D.Ill.1997), to the effect that "[t]urnover under § 542 of the Code 'is not intended as a remedy to determine disputed rights of parties to property. Rather, it is intended as a remedy to obtain what is acknowledged to be property of the bankruptcy estate.' "); *In re FLR Company, Inc.,* 58 B.R. 632, 634 (Bankr.W.D.Pa.1985) ("Implicit in the bankruptcy context of turnover is the idea that the property being sought is clearly the property of the Debtor but not in the Debtor's possession. Turnover, 11 U.S.C. § 542, is not the provision of the Code to determine the rights of the parties in legitimate contract disputes.") The Third Circuit has explained that a "bona fide dispute" exists only when there is "a genuine issue of material fact that bears upon the debtor's liability, or a meritorious contention as to the application of law to undisputed facts." *B.D.W. Associates v. Busy Beaver Bldg. Ctrs.,* 865 F.2d 65, 66 (3d Cir.1989) (quoting *In re Busick,* 831 F.2d 745, 746 (7th Cir.1987)

(quoting *In re Lough,* 57 B.R. 993, 997 (Bankr.E.D.Mich.1986))).

[54] The Trustee, as expected, alleges in this regard that the restaurant and the Debtor's interest in the venture is property of this bankruptcy estate. Amended Complaint, ¶¶ 23, 26. Yet even taking these allegations as true, there is no denying here that the Defendants dispute the Trustee's claims to the restaurant. The Defendants have already filed an answer to the complaint denying the right to turnover as well as a motion for summary judgment which contests the Trustee's premises. Accordingly, the Trustee's request for leave to plead a turnover count must be denied.

[55] The same result must obtain as to the demand for an accounting. Section 543 of the Bankruptcy Code requires any *custodian* of estate property to file an accounting of property of the debtor or proceeds. 11 U.S.C. § 543(b)(2) (emphasis added). The Code defines "custodian" as

(A) receiver or trustee of any of the property of the debtor, appointed in a case or proceeding not under this title;

(B) assignee under a general assignment for the benefit of the debtor's creditors; or

(C) trustee, receiver, or agent under applicable law, or under a contract, that is appointed or authorized to take charge of property of the debtor for the purpose of enforcing a lien against such property, or for the purpose of general administration of such property for the benefit of the debtor's creditors.

11 U.S.C. § 101(11). *See In re Mushroom Transportation Co., Inc.,* 366 B.R. 414, 437 (Bkrtcy.E.D.Pa.2007) *quoting* H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 310 (1977) (observing that legislative history explains that the term "custodian" refers to "prepetition liquidator of debtor's prop-

erty, such as assignee for benefit of creditors, a receiver of debtor's property, or administrator of debtor's property as well as other officers of the court if their function is substantially similar to those of a receiver or trustee") The Defendants are not alleged to have any such status other than joint venturer with the Debtor. They are neither receiver, assignee nor trustee. For that reason, no claim for an accounting under § 543 can be stated and leave to amend this count will be denied.

*Unconscionable and Void*

It is alleged in Count IX that the conduct of the Defendants constitutes grounds for voiding the agreement outright. Simply put, says the complaint, the Defendants have acted unconscionably thereby entitling the Trustee to avoidance.

[56, 57] A contract or term is unconscionable, and therefore avoidable, where there was a lack of meaningful choice in the acceptance of the challenged provision and the provision unreasonably favors the party asserting it. *See Denlinger, Inc. v. Dendler,* 415 Pa.Super. 164, 177, 608 A.2d 1061, 1068 (Pa.Super.1992) citing *Witmer v. Exxon Corp.,* 495 Pa. 540, 551, 434 A.2d 1222, 1228 (1981). The aspects entailing lack of meaningful choice and unreasonableness have been termed procedural and substantive unconscionability, respectively. *See Clerk v. First Bank of Delaware,* 735 F.Supp.2d 170, 181 (E.D.Pa.2010); *and see generally* 17A Am.Jur.2d Contracts § 278 (2006). Here, there is no allegation that the parties somehow bargained from unequal footing. The term joint venture is used throughout the complaint which suggests that they negotiated at arms length. And given that the pleading neither attaches the agreement nor states its terms, the Court cannot tell if it is unreasonably skewed in Defendants' favor. For both of

these reasons, Count IX fails to plead a claim of unconscionability.

### Breach of Joint Venture Fiduciary Duties

[58–61]  Count 10, the last count, alleges a breach of the parties' joint venture agreement and the corresponding fiduciary duty.  Where parties have entered into a joint venture, there exists a fiduciary duty between them.  *ITP, Inc. v. OCI, Co. Ltd.*, 2012 WL 1019604, at *6 (E.D.Pa. Mar 26, 2012) (stating that "a joint venturer owes a fiduciary duty of the utmost good faith and must act toward his associate with scrupulous honesty").  In order to sufficiently plead a claim for breach of joint venture, a plaintiff first must plead the elements of a joint venture.  *AT&T Corp. v. Synet, Inc.*, 1997 WL 109969 at *6 (N.D.Ill. Feb. 13, 1997).  As one Pennsylvania court has explained, a joint venture is a species of contract which is influenced by partnership principles:

A joint venture is not a status created or imposed by law; it is a relationship voluntarily assumed and arising wholly from contract.  2 Williston on Contracts 557, § 318A (3rd ed. 1959).  Whether persons have engaged in it must depend primarily upon their intention as expressed in their agreement and the construction they have placed upon it.  "To constitute a joint venture certain factors are essential: (1) each party to the venture must make a contribution, not necessarily of capital, but by way of services, skill, knowledge, materials or money;  (2) profits must be shared among the parties;  (3) there must be a 'joint proprietary interest and right of mutual control over the subject matter' of the enterprise;  (4) usually, there is a single business transaction rather than a general and continuous transaction."  *McRoberts v. Phelps*, 391 Pa. 591, 599, 138 A.2d 439, 443–444 (1958).  A joint venture partakes in many ways of a partnership, the principal difference being that it usually, though not necessarily, applies to a single transaction instead of being formed for the conduct of a continuing business.  *West v. Peoples First National Bank & Trust Co.*, 378 Pa. 275, 281–282, 106 A.2d 427, 431 (1954).

The rights, duties, and obligations of joint venturers, as between themselves, depend primarily upon the terms of the contract by which they assume that relationship.  46 Am.Jur.2d, Joint Ventures § 36.

*See Snellbaker v. Herrmann*, 315 Pa.Super. 520, 526, 462 A.2d 713, 716 (1983); *Bernsten v. Balli Steel, PLC*, 2008 WL 862470, at *3 (E.D.Pa. March 31, 2008).

[62]  Although the joint venture agreement is neither attached to the complaint nor specifically referenced, some conclusions may be drawn from what is alleged.  Beginning with member contributions, the complaint specifically sets forth only what Debtor put into the enterprise.  No specific mention is made of what the Defendants' contribution was; however, it seems clear that they "contributed" the real estate for what would become the "entertainment facility," i.e., restaurant, bar and night club.  The same can be said about profits.  The Debtor alleges that it was promised the profits from the restaurant and given a say in how it was to be managed.  Amended Complaint ¶ 92 As to profits for the Defendants, all that is said is that they had an "expectation" of profits.  *Id.* ¶ 88 Notwithstanding, it is again fair to infer that if the Debtor would get the profits from the restaurant, then the Defendants would get the profits from the existing bar and club.  As explained, *supra*, the Defendants counted on enhanced business at their bar and nightclub from the new and refurbished restaurant next door.  As to joint

interest and control, both the Debtor and the Defendants are alleged to have a common interest in the enterprise and a right to govern the conduct of the other members. *Id.* ¶¶ 87, 90 Finally, the joint venture is limited to the creation of the "entertainment facility;" to wit, the renovated restaurant along with the existing club and bar; no other projects were contemplated. In sum, while these are not the most comprehensive allegations of a joint venture, they will suffice for purposes of a motion to dismiss. The corollary to that finding is that an allegation that one or more of the Defendants breached that agreement means that they are guilty of a fiduciary failing as well.

*Summary*

The Plaintiff's motion for leave to amend the Complaint will be granted in part and denied in part without prejudice. Leave is granted to amend counts II, III, V, VI, VII, and X as proposed. The remaining counts fails to state a claim upon which relief may be granted and will be dismissed without prejudice.

An appropriate Order follows.

**ORDER**

AND NOW, upon consideration of the Plaintiff's Motion For Leave to Amend and Supplement the Complaint, the Defendants' Opposition thereto, after hearing held on May 3, 2012, and for the reasons set forth in the attached Opinion, it is hereby

**ORDERED**, that the Motion is granted in part and denied in part; and it is

**FURTHER ORDERED** the Plaintiff may amend Counts II, III, V, VI, VII, and X as proposed within 20 days of the date of this Order. The request to amend the remaining counts is denied without prejudice.



Luther Allen WEST, Sr.

Harold J. Barkley, Jr.,
**Trustee, Plaintiff**

v.

Grace West and H & G
Land Company, L.P.,
**Defendants.**

Bankruptcy No. 06–10482–DWH.
Adversary No. 09–1080–DWH.

United States Bankruptcy Court,
N.D. Mississippi.

June 6, 2012.

**Background:** Trustee brought adversary proceeding against Chapter 12 debtor's mother and limited partnership that she controlled, seeking to set aside certain transfers on strong-arm, preference, and unauthorized post-petition transfer grounds, and defendants asserted limitations defense.

**Holdings:** The Bankruptcy Court, David W. Houston, III, J., held that:

(1) statutes of limitations on trustee's strong-arm, preference, and unauthorized post-petition transfer claims were not equitably tolled;

(2) trustee who was time-barred from seeking to avoid pre- and post-petition transfers which Chapter 12 debtor had made to creditor filing proof of claim against estate could not utilize creditor's receipt of these transfers as basis for disallowing creditor's proof of claim;

2016 WL 320823
Only the Westlaw citation is currently available.
OPINION NOT FOR PUBLICATION
United States Bankruptcy Court,
C.D. California,
Los Angeles Division.

In re: Shapphire Resources, LLC, Debtor.

Shapphire Resources, LLC, a Utah Limited Liability Company, Plaintiff,
v.
Stanley Tambingon, an Individual, Defendant.
Case No. 2:10–bk–57493–RK
|
Adv. No. 2:12–ap–02532–RK

|
Signed January 25, 2016

Attorneys and Law Firms

Raymond H. Aver, Law Offices of Raymond H. Aver APC, Los Angeles, CA, for Plaintiff.

Stanley Tambingon, pro se.

FINDINGS OF FACT AND CONCLUSIONS OF LAW AFTER TRIAL

Robert Kwan, United States Bankruptcy Judge

*1 The above-captioned adversary proceeding for turnover of real property and for declaratory relief came on for trial before the undersigned United States Bankruptcy Judge on March 13, 2015, April 30, 2015 and July 29, 2015. Pursuant to Section 542 of the Bankruptcy Code, 11 U.S.C. ("Bankruptcy Code"), and 28 U.S.C. § 2201, Plaintiff Shapphire Resources, LLC ("Shapphire Resources" or "Plaintiff") brought this adversary proceeding seeking declaratory relief that it has the ownership interest and right to possession in the Property located at 2770 Cold Plains Drive, Hacienda Heights, California 91745 (the "Property"), and turnover of the Property from Defendant Stanley Tambingon ("Mr. Tambingon" or "Defendant"). Raymond H. Aver, Kateryna Belenka and Han–Hsien Miletic, Law Offices Of Raymond H. Aver, A Professional Corporation, appeared for Plaintiff. Defendant appeared for himself.

On May 13, 2015, Plaintiff timely lodged its "[Proposed] Findings of Fact and Conclusions of Law." ECF 60; see also, Scheduling Order, filed on May 14, 2016, ECF 61. On June 17, 2015, Defendant timely lodged his "Proposed Findings of Facts [sic] and Conclusions of Law." ECF 64. On July 24, 2015, Plaintiff late-filed an objection to Defendant's "Proposed Findings

of Facts [sic] and Conclusions of Law." ECF 65. On September 24, 2015, Plaintiff late-filed its "[Proposed] Amended Findings of Fact and Conclusions of Law" on September 24, 2015. ECF 69. On September 29, 2015, Defendant filed a response to Plaintiff's late-filed "[Proposed] Amended Findings of Fact and Conclusions of Law," requesting an extension of time to file a substantive response by October 22, 2015. ECF 70. The court granted this request by its order entered on October 1, 2015. ECF 71. On November 9, 2015, Defendant filed a request to further extend the deadline to respond to November 20, 2015. ECF 76. The court also granted this request by its order entered on November 24, 2015, but required that any objection of Plaintiff to Defendant's response be filed no later than December 1, 2015. ECF 78. Defendant filed his response to Plaintiff's "[Proposed] Findings of Fact and Conclusions of Law" on November 23, 2015, ECF 77, and an "Explanation of delay of response to Plaintiff's [proposed] amended findings of facts [sic] and conclusions of law" on November 25, 2015, ECF 79. Plaintiff filed an objection to Defendant's response on December 2, 2015, ECF 81, after which, the court took the matter under submission.

Having considered the testimony of the witnesses, the documentary evidence received at trial, and the oral arguments of the parties; and the proposed findings of fact and conclusions of law submitted by the parties, and the objections thereto, the court makes the following findings of fact and conclusions of law pursuant to <u>Rule 7052 of the Federal Rules of Bankruptcy Procedure and Rule 52 of the Federal Rules of Civil Procedure</u>.[1]

[1] Any findings of fact that should be properly characterized as conclusions of law will be considered as such, and any conclusions of law that should be properly characterized as findings of fact will be considered as such.

*FINDINGS OF FACT*

*2 1. Shapphire Resources is a Utah limited liability company doing business in Los Angeles County, California. *Testimony of Susana Tubianosa ("Tubianosa Testimony")*, March 13, 2015, at 10:32 a.m.; *Tubianosa Testimony*, April 30, 2015, 9:57–9:59 a.m.

2. Shapphire Resources is involved in the business of leasing real estate that houses "developmentally disabled" people and has leased real property to United Care Homes, Inc. ("United Care Homes"), among other entities. *Tubianosa Testimony*, March 13, 2015, at 10:32–10:33 a.m. Susana Tubianosa is the manager of Shapphire Resources. *Id.*

3. Mr. Tambingon is an individual residing at the Property. *Defendant's "Response to Plaintiff's [proposed] amended findings of facts [sic] and conclusions of law,"* filed by Mr. Tambingon, ECF 77, at 16:9–10 (page:line) and *"Proposed Findings of Facts [sic] and Conclusions of Law,"* lodged by Mr. Tambingon, ECF 64, at 2:11 (page:line) ("I legally reside at 2770 Cold Plains Drive...."); *Tubianosa Testimony*, March 13, 2015, at 10:59 a.m.

4. Ms. Tubianosa and her ex-husband, George E. Gopez ("Mr. Gopez"), acquired title to the Property as "husband and wife, as joint tenants," on April 15, 1982 by means of a Grant Deed, which was recorded on May 28, 1982 in the Official Records of Los Angeles County, California (the "1982 Grant Deed"). *Plaintiff's Exhibit 2, 1982 Grant Deed.*

5. Ms. Tubianosa and Mr. Gopez executed a Grant Deed transferring sole ownership of the Property to Ms. Tubianosa as an "Unmarried Woman" on May 6, 2003 as part of their division of marital property in their divorce (the "2003 Grant Deed"). *Plaintiff's Exhibit 3, 2003 Grant Deed*; *see also, Tubianosa Testimony*, March 13, 2015, 10:36–10:37 a.m. The 2003 Grant Deed was recorded on June 6, 2003 with the County Recorder of Los Angeles County, California. *See Plaintiff's Exhibit 3, 2003 Grant*

*Deed.*

6. The Property is a 4–bedroom, 2–bathroom single-family residence and 2,400 square feet in area and was built in 1980. *Tubianosa Testimony,* March 13, 2015, at 10:48–10:49 a.m. The court finds that as such, the Property is not of inconsequential value or benefit to the bankruptcy estate.

7. Mr. Tambingon and Ms. Tubianosa were legally married on July 22, 2003 as shown by a License and Certificate of Confidential Marriage issued by the County of Los Angeles, State of California. *Defendant's Exhibit N, License and Certificate of Confidential Marriage; Testimony of Stanley Tambingon ("Tambingon Testimony"),* April 30, 2015, at 10:18 a.m.; *see also, Tubianosa Testimony,* March 13, 2015, 11:04–11:05 a.m., 11:44 a.m.

8. On May 19, 2004, Mr. Tambingon executed an Interspousal Transfer Grant Deed, granting the Property to Ms. Tubianosa, which contained a separate statement reciting that "Stanley Tambingon, Spouse of Grantee herein, hereby executes this deed for the express purpose of relinquishing any and all property interest, community or otherwise, Stanley Tambingon may have or may hereinafter acquire in the herein referenced property" [i.e., the Property] to "Susana Tubianosa, a Married Woman, as Her Sole and Separate Property." *Plaintiff's Exhibit 4, Interspousal Transfer Grant Deed* (bolding in original); *see also Tubianosa Testimony,* March 13, 2015, 10:38–10:39 a.m. On June 10, 2004, the Interspousal Transfer Grant Deed was recorded with the County Recorder of Los Angeles County, California. *Plaintiff's Exhibit 4, Interspousal Transfer Grant Deed.*

*3 Mr. Tambingon testified at trial that he signed the Interspousal Transfer Grant Deed because Ms. Tubianosa said the Property belonged to them and that he trusted her since she was his wife, but that he did not read it and he did not know what he was signing. *Tambingon Testimony, April 30, 2015,* at 10:21–10:23 a.m. The court finds that this testimony of Mr. Tambingon is self-serving and lacks credibility and does not give it much weight. Besides, Mr. Tambingon did not present any documentary evidence at trial showing that he acquired any ownership interest in the Property, community or otherwise, prior to, during or after the execution of the Interspousal Transfer Grant Deed. The court also finds that there was no undue influence on Mr. Tambingon to sign the Interspousal Transfer Grant Deed based on his failure to read the document before signing it and his high level of education with 22 years of completed education and his being a medical doctor in his country, Indonesia. *Defendant's Exhibit N, License and Certificate of Confidential Marriage* (marriage license signed by Mr. Tambingon representing that he had 22 years of completed education and indicating that his "state of birth" was Indonesia); *Defendant's Exhibit B, Family Law Case Minute Orders,* at 4 (the family law court noted in one of its minute orders that "RESPONDENT IS APPARENTLY A MEDICAL DOCTOR IN HIS COUNTRY").
9. Ms. Tubianosa testified that at the time that Mr. Tambingon executed the Interspousal Transfer Grant Deed, Mr. Tambingon did not have a legal or equitable interest in the Property, but that the bank had requested the Interspousal Transfer Grant Deed for the refinancing of the mortgage on the Property. *Tubianosa Testimony,* March 13, 2015, at 10:38–10:39 a.m.

10. Ms. Tubianosa testified that in early 2006, she offered to allow Mr. Tambingon to move to the Property and live there temporarily until the end of 2006, because she then still believed that she and Mr. Tambingon were going to have a church wedding and in order to sell the real property where Mr. Tambingon was living at the time, referred to at trial by her and Mr. Tambingon as the "Box Springs Property," which was owned by Shapphire Resources, so as to avoid the foreclosure of the Box Springs Property. *Tubianosa Testimony,* March 13, 2015, at 11:03–11:05 a.m., 11:17–11:18 a.m., 11:29–11:30 a.m., 11:39–11:44 a.m.; *Tubianosa Testimony,* April 30, 2015, at 9:37–9:38 a.m., 9:50 a.m. She further testified that Mr. Tambingon did not move into the Property in 2006 as she offered and that he stayed at the Box Springs Property until 2009 when it was foreclosed upon. *Tubianosa Testimony,* March 13, 2015, at 11:40–11:43 a.m.

11. Based on Mr. Tambingon's testimony, it is unclear exactly when he moved into the Property; however, he admits in his proposed findings of fact and conclusions of law that he currently resides at the Property, *Defendant's "Response to Plaintiff's*

*[proposed] amended findings of facts [sic] and conclusions of law,"* ECF 77, at 16:9–10 (page:line(s)) and *"Proposed Findings of Facts [sic] and Conclusions of Law,"* ECF 64, at 2:11 (page:line); and claims as he testified at trial that he acquired a community property ownership interest in the Property during his marriage to Ms. Tubianosa, *Tambingon Testimony,* April 30, 2015, at 10:21–10:22 a.m., 10:25–10:29 a.m., 10:34 a.m.

12. Ms. Tubianosa testified that Shapphire Resources became the sole owner of the Property in 2008, *Tubianosa Testimony,* March 13, 2015, at 10:40 a.m., 11:09–11:10 a.m., which testimony was corroborated by a Grant Deed executed by Ms. Tubianosa in favor of Shapphire Resources on August 8, 2008 and recorded with the County Recorder's Office of Los Angeles County on August 20, 2008 (the "Shapphire Resources Grant Deed"), *see Plaintiff's Exhibit 5, Shapphire Resources Grant Deed.* The Grant Deed recited that Ms. Tubianosa as "a married woman as her sole and separate property" transferred all of her interest in the Property to Shapphire Resources. *Id.*

13. Ms. Tubianosa testified that after she transferred the Property to Shapphire Resources, Shapphire Resources started "setting [the Property] up to be a home for the developmentally disabled," including installing fire sprinklers and ramps, renovating the doors and shower rooms to accommodate wheelchair access, and doing all of the things necessary to accommodate the developmentally disabled. *Tubianosa Testimony,* March 13, 2015, at 10:40–10:43 a.m. She also testified that, while the construction was underway, the Property was vacant. *Id.*

*4 14. Ms. Tubianosa filed proceedings in state court for annulment of her marriage with Mr. Tambingon in 2008. *Tubianosa Testimony,* April 30, 2015, at 9:41 a.m. She testified at trial that in 2009, she first discovered Mr. Tambingon living at the Property, without her authorization or that of Shapphire Resources, and that Mr. Tambingon had changed the locks to the Property. *Tubianosa Testimony,* March 13, 2015 at 10:43 a.m., 11:40–11:42 a.m. She testified that Shapphire Resources never entered into a rental agreement with Mr. Tambingon for use of the Property, nor did he make any rental payments to Shapphire Resources for use of the Property. *Id.,* at 10:44 a.m. She also testified that she asked Mr. Tambingon to move out of the Property in 2009 during the annulment proceedings, *id.,* at 11:15 a.m., but Mr. Tambingon did not vacate the Property, *id.,* at 10:59 a.m.

15. Mr. Tambingon testified at trial that he acquired a community property ownership interest in the Property during their marriage because Ms. Tubianosa used her community property earnings to pay the mortgage against the Property and refinanced the mortgage in 2004 during their marriage. *Tambingon Testimony,* April 30, 2015, at 10:21–10:22 a.m., 10:25–10:29 a.m., 10:34–10:35 a.m. Mr. Tambingon did not submit any evidence corroborating his testimony that Ms. Tubianosa used any community property earnings to make the mortgage payments during their marriage, nor did he offer any corroborative evidence otherwise showing that he acquired a community property ownership interest in the Property through the refinancing of the Property or otherwise during their marriage.

16. At trial, Ms. Tubianosa testified that United Care Homes was making the mortgage payments on the Property. *Tubianosa Testimony,* April 30, 2015, at 10:47–10:49 a.m.; *see also, Tambingon Testimony,* April 30, 2015, at 10:27–10:28 a.m. (acknowledging mortgage funds paid by United Care Homes). However, Ms. Tubianosa admitted in her testimony before the court that she refinanced the mortgage on the Property in 2004 during her marriage with Mr. Tambingon. *Tubianosa Testimony,* March 13, 2015, at 10:38–10:39 a.m.

17. Shapphire Resources filed its voluntary petition for relief under Chapter 11 of the Bankruptcy Code on November 4, 2010, Case Number 2:10–bk–57493–EC, ECF 1 (filed in the main bankruptcy case before this court), and listed a fee simple ownership interest in the Property on its Schedule A, Real Property, ECF 9 (filed in the main bankruptcy case before this court).[2]

2   The court may and does take judicial notice of its own files and records. *Reyn's Pasta Bella, LLC v. Visa USA, Inc.,* 442 F.3d 741, 746 n. 6 (9th Cir.2006) (citation omitted); Federal Rule of Evidence 201.

18. Mr. Tambingon submitted at trial a copy of the Case History Activity Log in the state court unlawful detainer action entitled

*Shapphire Resources, LLC v. Stanley Tambingon,* Case No. KC060597, Superior Court of California, County of Los Angeles. *Defendant's Exhibit D, Case History Activity Log.* On September 9, 2011, this court entered an order lifting the automatic stay in bankruptcy under 11 U.S.C. § 362, which permitted the unlawful detainer action to be adjudicated before the Superior Court. ECF 46 and 49 (filed in the main bankruptcy case before this court). On December 21, 2011, the Superior Court made the following findings in the unlawful detainer action:

> The Court finds in favor of defendant and against the plaintiff. The unlawful detainer is denied. *The Court finds that the Premises located at 2770 Cold Plains Drive, Hacienda Heights, CA 91745, is the sole property of Shapphire Resources, LLC.* Pursuant to agreement between Shapphire Resources and defendant Stanley Tambingon, the court finds there is a use agreement for the defendant of the aforementioned property. The court finds that no evidence has been presented that the use of the property is unlimited. Commissioner Gastner from Department 15 in the Rancho Cucamonga Court is to determine the duration of the use agreement.

*5 Defendant's Exhibit D, Case History Activity Log,* at 11–12 (emphasis added). Ms. Tubianosa testified that she was aware of the unlawful detainer action and its result. *Tubianosa Testimony,* April 30, 2015, at 9:47–9:48 a.m.

19. On November 27, 2012, Shapphire Resources commenced this adversary proceeding in this court for turnover of the Property pursuant to Section 542 of the Bankruptcy Code, 11 U.S.C., and for declaratory relief regarding its ownership interest and right to possession in the Property. ECF 1.

## CONCLUSIONS OF LAW

The court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157(b) and 1334(b). This is a core proceeding under 28 U.S.C. §§ 157(b)(2)(A) and (E). Venue is proper in this court pursuant to 28 U.S.C. § 1409(a).

Section 542 of the Bankruptcy Code provides in pertinent part the following:

> (a) ... an entity, other than a custodian, in possession, custody, or control, during the case, of property that the trustee may use, sell, or lease under section 363 of this title, or that the debtor may exempt under section 522 of this title, shall deliver to the trustee, and account for, such property or the value of such property, unless such property is of inconsequential value or benefit to the estate.

11 U.S.C. § 542(a). As of the date of filing the bankruptcy petition in a bankruptcy case, "noncustodial entities with notice of a bankruptcy case holding estate property (or owing a matured debt to the debtor) have an *affirmative duty* to deliver that property (or pay the debt) to the trustee and to account for the property or its value" unless the property in question is of inconsequential value or benefit to the bankruptcy estate. 4 March, Ahart and Shapiro, *California Practice Guide: Bankruptcy,* ¶ 21:1671 at 21–186 and ¶ 21:1710 at 21–192 (2014)(emphasis in original), *citing,* 11 U.S.C. §§ 542(a) and (b).

"The trustee has the burden of proving the estate is entitled to turnover." *In re Jacobson,* 676 F.3d 1193, 1200–1201 (9th Cir.2012), *citing,* 5 Resnick and Sommer, *Collier on Bankruptcy,* ¶ 542.02 (16th ed.2011). To support a cause of action for turnover pursuant to Section 542 of the Bankruptcy Code, the bankruptcy trustee has the burden of proof, by a preponderance of the evidence, to establish that: (1) the property is in the possession, custody or control of a noncustodial third party entity; (2) the property constitutes property of the estate; (3) the property is of the type that the

trustee could use, sell or lease pursuant to Code Section 363 or that the debtor could exempt under section 522, and (4) that the property is not of inconsequential value or benefit to the estate. 5 Resnick and Sommer, *Collier on Bankruptcy,* ¶ 542.02 at 542–8—542–9 (16th ed.2015); *see also In re Labib,* 2013 WL 5934326, slip op. at \*4 (Bankr.C.D.Cal.2013), *citing* 5 Resnick and Sommer, *Collier on Bankruptcy,* ¶ 542.02 at 542–5 (16th ed.2013).

A debtor-in-possession in a Chapter 11 reorganization case, as is the case here, has the standing to assert the right for turnover of assets of the bankruptcy estate on the estate's behalf. 4 March, Ahart and Shapiro, *California Practice Guide: Bankruptcy,* ¶ 21:1733 at 21–194, *citing Georgia Pacific Corporation v. Sigma Service Corporation,* 712 F.2d 962, 965 (5th Cir.1983); *see also,* 11 U.S.C. § 1107(a) ("Subject to any limitations on a trustee serving in a case under this chapter, and to such limitations or conditions as the court prescribes, a debtor in possession shall have all the rights, other than the right to compensation under section 330 of this title, and powers, and shall perform all the functions and duties, except the duties specified in sections 1106(a)(2), (3), and (4) of this title, of a trustee serving in a case under this chapter."); *United States v. Whiting Pools, Inc.,* 462 U.S. 196, 201–212 (1983) (a debtor-in-possession in a Chapter 11 reorganization case was authorized to seek turnover of property seized by a secured creditor, the Internal Revenue Service, holding a tax lien attaching to estate property under 11 U.S.C. § 542(a)).

\*6 A bankruptcy trustee or debtor-in-possession under 11 U.S.C. § 542(a) may seek turnover relief against an entity (other than a custodian) who *has* possession of the property of the estate, or *had* possession of that property at some point during the bankruptcy case. *Shapiro v. Hensen,* 739 F.3d 1198, 1200–1204 (9th Cir.2014), *citing,* 11 U.S.C. § 542(a).

The court finds that the evidence demonstrates that Mr. Tambingon as a "person" qualifies as an "entity" under Section 101(15) of the Bankruptcy Code, 11 U.S.C.[3] 11 U.S.C. § 101(15). No evidence was presented at trial showing that Mr. Tambingon is a custodian of the Property as defined under Section 101(11) of the Bankruptcy Code.[4] 11 U.S.C. § 101(11).

[3]   "The term 'entity' includes person, estate, trust, governmental unit and United States trustee." 11 U.S.C. § 101(15).

[4]   11 U.S.C. § 101(11) provides that:
    The term 'custodian' means—(A) receiver or trustee of any of the property of the debtor, appointed in a case or proceeding not under this title; (B) assignee under a general assignment for the benefit of the debtor's creditors; or (C) trustee, receiver, or agent under applicable law, or under a contract, that is appointed or authorized to take charge of property of the debtor for the purpose of enforcing a lien against such property, or for the purpose of general administration of such property for the benefit of the debtor's creditors.

Ms. Tubianosa's testimony that Mr. Tambingon never vacated the Property after she asked him to do so in 2009, *Tubianosa Testimony,* March 13, 2015, at 10:59 a.m., and his admissions in his proposed findings of fact and conclusions of law that he currently resides at the Property, *Defendant's "Response to Plaintiff's [proposed] amended findings of facts [sic] and conclusions of law,"* ECF 77, at 16:9–10 (page:line) ("My residence at 2770 Cold Plains Drive is for support ...."), and *"Proposed Findings of Facts [sic] and Conclusions of Law,"* ECF 64, at 2:11 (page:line) ("I legally reside at 2770 Cold Plains Drive ...."), demonstrate that Mr. Tambingon is currently in possession, custody, or control of the Property during the pendency of this Chapter 11 bankruptcy case of Sapphire Resources.

Therefore, the court finds that Sapphire Resources has satisfied its burden of establishing by a preponderance of the evidence the first element of a turnover claim that Mr. Tambingon, a non-custodial third-party entity, is in possession, custody, or control of the Property, an asset of the bankruptcy estate, during the pendency of the bankruptcy case.

"[F]ederal bankruptcy law governs the extent to which a debtor's property is *included in the bankruptcy estate.*" 4 March, Ahart

and Shapiro, *California Practice Guide: Bankruptcy*, ¶ 21:1702 at 21–190 (emphasis in original), *citing, In re Farmers Markets, Inc., 792 F.2d 1400, 1402 (9th Cir.1986)* and *In re MacDonald, 164 B.R. 325, 328 (Bankr.C.D.Cal.1994)*. Section 541(a) of the Bankruptcy Code expressly provides that property of the estate includes, *inter alia,* "(1) ... all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a).

However, "[s]tate law determines whether a particular right, power or interest is 'property' and the nature and extent of the debtor's interest therein." 4 March, Ahart and Shapiro, *California Practice Guide: Bankruptcy*, ¶ 21:1701 at 21–190, *citing, Butner v. United States, 440 U.S. 48, 54 (1974)* and *In re Coupon Clearing Service, Inc., 113 F.3d 1091, 1099 (9th Cir.1997)*.

*7 Under California law, "[p]roperty acquired before marriage is the acquiring spouse's separate property, as is property obtained during marriage that can be *traced* to a premarital acquisition." 2 Hogoboom and King, *California Practice Guide: Family Law*, ¶ 8:71 at 8–25 (2015)(emphasis in original), *citing* California Family Code § 770(a)(1) and (3)); *see also, In re Marriage of Valli, 58 Cal.4th 1396, 1400 (2014)* ("Property that a spouse acquired before the marriage is that spouse's separate property [*citing* California Family Code § 770(a)(1) ]. Property that a spouse acquired during the marriage is community property [*citing* California Family Code § 760] unless it is[, among other things,] (1) traceable to a separate property source."). "Like community property, separate property does not lose its character as such by a mere change in *form or identity.*" 2 Hogoboom and King, *California Practice Guide: Family Law*, ¶ 8:71 at 8–25 (emphasis in original), *citing, Marriage of Koester, 73 Cal.App.4th 1032, 1037–1038 (1999)* and *Marriage of Rossin, 172 Cal.App.4th 725, 735–736 (2009)*.[5]

<u>5</u>   The court holds that the community property presumption that arises from California Family Code § 760 ("Except as otherwise provided by statute, all property, real or personal, wherever situated, acquired by a married person *during* the marriage while domiciled in this state is community property") (emphasis added) does not apply in this case, since the parties do not dispute that the Property was acquired by Ms. Tubianosa in her name alone *prior to* her marriage to Mr. Tambingon and not during their marriage as provided for under § 760.

The parties do not dispute that Ms. Tubianosa acquired sole legal and beneficial ownership interest in the Property *prior to* her marriage to Mr. Tambingon and that this fact characterizes the Property as Ms. Tubianosa's separate property at the time of her marriage to Mr. Tambingon pursuant to California Family Code § 770(a)(1). What they do dispute is whether Mr. Tambingon acquired any community property interest in the Property during their marriage.

Specifically, Ms. Tubianosa asserts that the Property was her sole and separate property when she transferred it to Shapphire Resources on August 8, 2008. *Tubianosa Testimony,* March 13, 2015, at 10:40 a.m.; 11:09–11:10 a.m. Her testimony was corroborated by the recorded 1982 Grant Deed, 2003 Grant Deed, Interspousal Transfer Grant Deed, and Shapphire Resources Grant Deed, *see Plaintiff's Exhibits 2 (1982 Grant Deed),* 3 (*2003 Grant Deed*), 4 (*Interspousal Transfer Grant Deed*), and 5 (*Shapphire Resources Grant Deed*). Mr. Tambingon contends that Ms. Tubianosa said that the Property belonged to them when he signed the Interspousal Transfer Grant Deed and that he acquired a community property ownership interest in the Property during his marriage to Ms. Tubianosa because Ms. Tubianosa used her community property earnings to pay the mortgage against the Property during the marriage and refinanced the mortgage in 2004. *Tambingon Testimony,* April 30, 2015, at 10:21–10:23 a.m., 10:25–10:29 a.m., 10:34 a.m.; *Defendant's "Response to Plaintiff's [proposed] amended findings of facts [sic] and conclusions of law,"* ECF 77, at 2:17–24 (page:line(s)) ("I have equal interest [in the Property] when the funding comes from my hard word [sic] to United Care Homes. The community asset is responsible to pay after the refinance x2 and borrowed against by hundreds of thousand [sic]. The property was not paid off when it was passed on. It was bad shape financially. It requires payment from our community asset. Thus community interest regardless whose name it is. We are not the only people in the U.S. that has that kind of arrangement.") and *"Proposed Findings of Facts [sic] and Conclusions of Law,"* ECF 64, at 2:14–19 (page:line) ("The property though it is under my wife's name, it is a community property as it was refinanced more than once during the course of our marriage with our hard earned money through our work at United Care Homes.") However, Mr. Tambingon's testimony is not corroborated by the documentary or other evidence in the record in this case.

*8 "Historically, marital property characterization [in California] has started with *form of title,* which, in some cases, may be dispositive." 2 Hogoboom and King, *California Practice Guide: Family Law*, ¶ 8:31 at 8–9 (emphasis in original), *citing inter*

*alia,* California Evidence Code § 662 and *Marriage of Lucas,* 27 Cal.3d 808, 813 (1980). Section 662 of the California Evidence Code codified the title presumption recognized in the California case law. *See* 7 California Law Revision Commission Reports 1, at 1100 (1965). This statute expressly provides that "[t]he owner of the legal title to property is presumed to be the owner of the full beneficial title. [And t]his presumption may be rebutted only by *clear and convincing proof.*" California Evidence Code § 662 (emphasis added). "Absent a contrary statute, and unless ownership interests are otherwise established by sufficient proof, *record title has been determinative of characterization.*" 2 Hogoboom and King, *California Practice Guide: Family Law,* ¶¶ 8:31–8:32 at 8–9 (emphasis added), *citing* California Evidence Code § 662; *Marriage of Lucas,* 27 Cal.3d at 813; and *Marriage of Fossum,* 192 Cal.App. 4th 336, 344–345 (2011).

The recorded 1982 and 2003 Grant Deeds show that Ms. Tubianosa acquired the Property in her name alone prior to her marriage to Mr. Tambingon. *Plaintiff's Exhibits 2 and 3, 1982 Grant Deed* and *2003 Grant Deed.* The Grant Deeds characterize the Property as her sole and separate property at the time of her marriage to Mr. Tambingon. California Family Code § 770(a)(1). Mr. Tambingon did not present any documentary evidence at trial showing that he acquired any ownership interest, community or otherwise, in the Property before, during or after the execution of the recorded Interspousal Transfer Grant Deed or before or at the time Ms. Tubianosa transferred the Property to Shapphire Resources. Accordingly, the court finds that Mr. Tambingon has failed to rebut the title presumption raised by the recorded 1982 Grant Deed, 2003 Grant Deed, Interspousal Transfer Grant Deed, and Grant Deed to Shapphire Resources by clear and convincing evidence. California Evidence Code § 662. These documents demonstrate that the Property was Ms. Tubianosa's sole and separate property at the time she transferred the Property to Shapphire Resources and that Shapphire Resources acquired sole legal and beneficial interest in the Property on August 8, 2008 prior to the commencement of its Chapter 11 bankruptcy case, thus establishing that the Property was property of the bankruptcy estate pursuant to 11 U.S.C. § 541(a) as of the date the bankruptcy petition was filed in this bankruptcy case.

Perhaps the only ways which Mr. Tambingon could overcome the title presumption would be to show: (1) "undue influence" by Ms. Tubianosa on him in the execution of the Interspousal Transfer Grant Deed, *see, Fadel v. DCB United LLC (In re Fadel),* 492 B.R. 1, 12 (9th Cir. BAP2013) (observing that when the community property undue influence presumption of California Family Code § 721 arises because the interspousal transaction advantages one spouse over the other, the title presumption and application of California Evidence Code § 662 are improper); *see also,* 2 Hogoboom and King, *California Practice Guide: Family Law,* ¶¶ 8:35.1–8:35.4 at 8–10–8–13 (analyzing California Family Code § 721) (citations omitted); or (2) a transmutation of the character of the Property from separate property to community property, *see, Marriage of Valli,* 58 Cal.4th at 1406 (the form of title presumption does not apply where it conflicts with the transmutation statutes in marital dissolution proceedings).

"Spouses have the right to enter into property-related transactions with each other." *Marriage of Fossum,* 192 Cal.App.4th at 343, *citing* California Family Code § 721(a). However, based on the confidential and fiduciary relationship with each other, if one spouse secured an advantage from the interspousal transaction, a statutory presumption arises under California Family Code § 721 that "the advantaged spouse exercised undue influence and the transaction will be set aside." *Id.* at 344–345 (citations omitted). "When a presumption of undue influence applies to a transaction, the spouse who was advantaged by the transaction must establish [by a preponderance of the evidence] that the disadvantaged spouse's action was freely and voluntarily made, with a full knowledge of all the facts, and with a complete understanding of the effect of the transaction." *Id.* at 344 (internal quotations omitted) (citations omitted).

*9 The parties did not present any evidence at trial of a transaction between Ms. Tubianosa and Mr. Tambingon during the marriage regarding the Property other than the Interspousal Transfer Grant Deed. Since no evidence was presented at trial showing a transaction between Ms. Tubianosa and Mr. Tambingon transmuting the character of the Property from Ms. Tubianosa's separate property to their community property prior to the execution of the Interspousal Transfer Grant Deed, the court finds that Ms. Tubianosa could not have secured an advantage from the Interspousal Transfer Grant Deed, nor could Mr. Tambingon have been disadvantaged by the Interspousal Transfer Grant Deed, since the characterization of the Property did not change as a result of the Interspousal Transfer Grant Deed. The Interspousal Transfer Grant Deed only confirmed the preexisting character of the Property as Ms. Tubianosa's sole and separate property. In fact, the court notes that had the characterization of the Property changed from Ms. Tubianosa's separate property to their community property, Mr. Tambingon would have been the advantaged spouse and Ms. Tubianosa would have been the disadvantaged one. It is also difficult to see how as a factual matter that there was

undue influence here based on the evidence in the record because Mr. Tambingon admitted that he never read the Interspousal Transfer Grant Deed before he signed it and he is highly educated as indicated by his 22 completed years of education as noted on his marriage license with Ms. Tubianosa (*Plaintiff's Exhibit N*) and by him being a medical doctor in his own country, Indonesia (*Plaintiff's Exhibit B* at 4—the family law court noted in one of its minute orders that "RESPONDENT IS APPARENTLY A MEDICAL DOCTOR IN HIS COUNTRY"). Accordingly, the court finds that the undue influence presumption of <u>California Family Code § 721(a)</u> did not arise and does not prohibit the application of the record title presumption and <u>California Evidence Code § 662</u> in this case.

"Married persons may, through a transfer or an agreement, transmute—that is, change—the character of property from community to separate or from separate to community." *Marriage of Valli*, 58 Cal.4th at 1400, *citing*, <u>California Family Code § 850</u>. Pursuant to <u>California Family Code § 852(a)</u>,

> A transmutation of real or personal property is not valid unless made in writing by an express declaration that is made, joined in, consented to, or accepted by the spouse whose interest in the property is adversely affected.

"To satisfy the requirement of an 'express declaration,' a writing signed by the adversely affected spouse must expressly state that the character or ownership of the property at issue is being changed." *Marriage of Valli*, 58 Cal.4th at 1400 (citation omitted).

Mr. Tambingon did not present any documentary evidence at trial showing that Ms. Tubianosa expressly declared in writing that she agreed to transmute or change the character of the Property from her separate property to their community property. Further, as explained above, the Intersposual Transfer Grant Deed did not attempt to change the character of the Property, but merely confirmed the existing character of the Property as Ms. Tubianosa's sole and separate property. Accordingly, based on the evidentiary record, the court finds that there was no transmutation of the Property changing the character of the Property from Ms. Tubianosa's separate property to their community property, and the transmutation statutes do not conflict with the application of the title presumption and <u>California Evidence Code § 662</u> in this case.

As explained below, the court finds that Mr. Tambingon's uncorroborated testimony that Ms. Tubianosa said the Property belonged to them and that he acquired a community property ownership interest in the Property during his marriage to Ms. Tubianosa because Ms. Tubianosa used her community property earnings to pay the mortgage against the Property during their marriage and refinanced the mortgage in 2004 (*Tambingon Testimony*, April 30, 2015, at 10:21–10:23 a.m., 10:25–10:29 a.m., 10:34 a.m.) is insufficient to rebut the title presumption by clear and convincing evidence.

"The form of title presumption cannot be rebutted simply by tracing to the source of funds used to acquire the property or by testimony of either spouse's undisclosed intentions." 2 Hogoboom and King, *California Practice Guide: Family Law*, ¶ 8:34 at 810, *citing*, *Marriage of Lucas*, 27 Cal.3d at 813 and *Marriage of Fossum*, 192 Cal.App.4th at 345 and n. 5. Thus, Mr. Tambingon's uncorroborated testimony that Ms. Tubianosa allegedly said the Property belonged to them is insufficient to rebut the title presumption because the court does not find such testimony to be credible, but even if it were credible, such testimony of an oral transmutation is legally insufficient under <u>California Family Code § 852(a)</u> which requires a writing. Furthermore, even if Mr. Tambingon had provided sufficient evidence showing that Ms. Tubianosa had used community property funds to pay the mortgage during the marriage, which he did not, this also would have been insufficient to rebut the title presumption. Although Ms. Tubianosa admitted that she refinanced the Property in 2004 during their marriage (*see Tubianosa Testimony*, March 13, 2015, at 10:38–10:39 a.m.), Mr. Tambingon failed to provide any documentary evidence showing that the refinancing of the Property changed the character of the Property from Ms. Tubianosa's separate property to their community property. "The party seeking to overcome the presumption must, at a minimum, present evidence of a *communicated intention, agreement or common understanding* between the spouses that ownership status is to be other than as indicated by the form of title," which

Mr. Tambingon has failed to do by clear and convincing evidence. 2 Hogoboom and King, *California Practice Guide: Family Law*, ¶ 8:34 at 8–10, *citing, Marriage of Lucas, 27 Cal.3d at 813* and *Marriage of Fossum, 192 Cal.App.4th at 345 and n. 5*. This was not done, and the court so finds.

<u>6</u>      At most, Mr. Tambingon, upon proper proof, could obtain "a pro tanto community property interest in such property in the ratio that the payments on the purchase price with community funds bear to the payments made with separate funds." *In re Marriage of Marsden, 130 Cal.App.3d 426, 436–437 (1982), citing, In re Marriage of Moore, 28 Cal.3d 366, 371–372 (1980)*. "The same *Moore/Marsden* apportionment approach applies where there is a premarital loan secured by a party's separate property and, instead of making payments during marriage on the original mortgage with community funds, the property is *refinanced* during marriage and the original mortgage is paid in full with proceeds of a community property loan obtained jointly by the parties." *See* 2 Hogoboom and King, *California Practice Guide: Family Law*, ¶ 8:308 at 8–114, *citing Marriage of Branco, 47 Cal.App.4th 1621,1627 (1996)*). The evidence of a *Moore/Marsden* claim is lacking here because there is no evidence that the payments on the refinanced mortgage came from community property. The evidence from the testimony of the parties is that a third party, United Care Homes, made the payments on the refinanced mortgage and there was no explanation, let alone documentary evidence, showing how such payments constituted community property of Mr. Tambingon and Ms. Tubianosa. Mr. Tambingon's conclusory statements during trial do not make them so. Even if Mr. Tambingon could have shown that the *Moore/Marsden* rule applied in this case, which he did not due to the lack of evidence submitted by him in support of his arguments, Mr. Tambignon could only obtain a pro tanto community property interest in the Property, which does not amount to ownership rights in the Property.

*10 Therefore, based on the foregoing, the court finds that the Property constitutes property of the bankruptcy estate of Shapphire Resources pursuant to <u>Section 541(a) of the Bankruptcy Code</u>, 11 U.S.C.

An entity in possession of property that the debtor-in-possession *may* use, sell or lease under <u>11 U.S.C. § 363</u> "shall" deliver that property to the debtor in possession and account for the property or its value, *unless* the property is of inconsequential value or benefit to the estate. 4 March, Ahart and Shapiro, *California Practice Guide: Bankruptcy*, ¶ 21:1682 at 21–187 (emphasis in original), *citing 11 U.S.C. § 542(a)*. The debtor in possession "need *not actually* use the property subject to turnover; it is sufficient that such property *may* be used." *Id.* (emphasis in original).

The court finds that Shapphire Resources has shown, by a preponderance of the evidence, that the Property may be used, sold or leased pursuant to <u>Section 363</u>, since Shapphire Resources is in the business of leasing real estate that houses developmentally disabled individuals, *Tubianosa Testimony*, March 13, 2015, at 10:32 10:33 a.m., and the Property is a residential property and has been renovated for that business purpose, *id.*, at 10:42–10:43 a.m., 10:48–10:49 a.m.

As explained above, turnover of property belonging to the estate is excused only where the property is of inconsequential value or benefit to the estate. <u>11 U.S.C. § 542(a)</u>. The court finds that, given the nature of the Property, *see Tubianosa Testimony*, March 13, 2015, at 10:31–10:33 a.m.; 10:42–10:43 a.m.; 10:48–10:49 a.m., and that no party has argued that the Property is of inconsequential value or benefit to the estate, Shapphire Resources has shown, by a preponderance of the evidence, that the Property is not of inconsequential value or benefit to the estate.

Therefore, based on the above analysis and the evidentiary record, the court finds and declares that the Property is property of the bankruptcy estate of Shapphire Resources pursuant to <u>Section 541(a) of the Bankruptcy Code</u> and that Shapphire Resources as the debtor-in-possession is entitled to turnover and right to possession of the Property on behalf of the estate pursuant to <u>Section 542 of the Bankruptcy Code</u>. "[N]on-custodial entities with notice of a bankruptcy case holding estate property have an *affirmative duty* to deliver that property to the trustee [or debtor-in-possession] ..." pursuant to <u>11 U.S.C. § 542</u>. 4 March, Ahart and Shapiro, *California Practice Guide: Bankruptcy*, ¶ 21:1671 at 21–186 (emphasis in original), *citing <u>11 U.S.C. §§ 542(a)</u>*.

As to Mr. Tambingon's rights to possession and use of the Property under state law, the court finds that at most, Mr. Tambingon was a tenant at will of Ms. Tubianosa and later Shapphire Resources for the reasons stated below.

A tenancy for years conveys the right to exclusive use and possession of the premises for a definite or fixed period of time, terminable automatically upon the specified expiration date. 1 Friedman, Garcia and Hagarty, *California Practice Guide: Landlord and Tenant,* ¶¶ 2:6–2.7 at 2A–6 (2015), *citing inter alia,* California Civil Code § 944. "The fixed term can be for any stated period of time ... but the term must be *specified* in the lease or be capable of certain determination from the lease provisions. If no fixed term is ascertainable from the lease, the tenancy is *not* an estate for years (it will be deemed a tenancy from month-to-month)." *Id.*

*11 A periodic (or month-to-month) tenancy is most common in the residential (particularly, apartment) context. *Id.,* ¶ 2:16 at 2A–8—2A–9, *citing inter alia,* California Civil Code §§ 1946 and 1946.1. "They have no fixed term; rather, a periodic tenancy continues for successive periods of the same duration for an *indefinite* term ..." *Id.* (emphasis in original). "The tender of rent and acceptance of rent for each successive period continues the periodic tenancy for the same term." *Id.* A tenancy at will, "although 'consensual' in nature, is not based on an express rental agreement. It arises when the tenant takes possession of the premises *with the landlord's permission,* but for no stated term and without provisions for payment of rent." *Id.,* ¶ 2:11 at 2A–7, *citing, Covina Manor, Inc. v. Hatch,* 133 Cal.App.2d Supp. 790, 793 (1955). Both the periodic tenancy and tenancy at will are terminable by either party; however, the landlord's termination must be preceded by 30 days written notice. *Id.,* ¶¶ 2:12 at 2A–7 ("The landlord's termination [of a tenancy at will] must be preceded by 30 days' written notice"), *citing inter alia,* California Civil Code § 789, and 2 Friedman, Garcia and Hagarty, *California Practice Guide: Landlord and Tenant,* ¶¶ 7:197—7:198 at 7–100 ("A month-to-month tenancy generally may be terminated upon a minimum 30 days' [written] notice"), *citing inter alia,* California Civil Code § 1946. Generally, the notice to terminate may be served for any reason or no reason at all. *Id.,* ¶ 7:202 at 7–102, *citing, People ex rel. Department of Transportation v. Lucero,* 114 Cal.App.3d 166, 174–176 (1980).

Ms. Tubianosa testified that in early 2006 she offered to allow Mr. Tambingon to move to the Property and live there temporarily until the end of 2006. *Tubianosa Testimony,* March 13, 2015, at 11:03–11:05 a.m., 11:17–11:18 a.m., 11:29–11:30 a.m., 11:39–11:41 a.m., 11:43–11:44 a.m.; *Tubianosa Testimony,* April 30, 2015, at 9:37–9:38 a.m., 9:50 a.m. Since the alleged fixed term was not specified in a lease agreement or capable of certain determination from the lease provisions, *see Tubianosa Testimony,* March 13, 2015, at 10:44 a.m., the court finds that a tenancy for years was not created. Instead, in light of the facts that Ms. Tubianosa initially permitted Mr. Tambingon to remain on the Property without a provision for payment of rent, and the lack of a lease agreement specifying a fixed term, a tenancy at will appears to have been created as opposed to a month-to-month tenancy, which generally requires the tender of rent and acceptance of rent for each successive period.

This conclusion that a tenancy for years was not created and that at most, a tenancy at will was created is also substantiated by the evidence of the state court proceedings between the parties, Mr. Tambingon, Ms. Tubianosa and Shapphire Resources. In the unlawful detainer case, the state court had denied the claim of Shapphire Resources for unlawful detainer against Mr. Tambingon, holding that a use agreement between Shapphire Resources and him allowed his use of the Property. Apparently, as Mr. Tambingon argues, there was some agreement between him and Ms. Tubianosa regarding his use of the Property in the family law case as shown by Exhibit C, the letter of Ms. Tubianosa's family law counsel to his family law counsel dated October 8, 2009, stating "Additionally, and as we agreed yesterday, my client does not believe it is a good idea to have Mr. Tambingon stay at her property in Chino Hills with her. Based on this, Mr. Tambingon may remain on the property on Cold Plains, if he so desires."). Subsequently, in 2011, although the state court denied the unlawful detainer claim of Shapphire Resources, the state court found that the Property is "the sole property of Shapphire Resources, LLC." *Defendant's Exhibit D, Case History Activity Log,* at 12. The state court further found that although "there is a use agreement for the defendant [Mr. Tambingon] of the aforementioned property," it also found that "no evidence has been presented that the use of the property is unlimited." *Id.* The state court directed that "Commissioner Gastner from Department 15 in the Rancho Cucamonga Court is to determine the duration of the use agreement." *Id.* There is no evidence in the record that the state court by Commissioner Gastner ever made any determination of the duration of the use agreement, though a referral to him for such determination was made over four years ago.

*12 Although Ms. Tubianosa testified that she asked Mr. Tambingon to vacate the Property in 2009 during their annulment proceedings, *id.,* at 11:15 a.m., and Mr. Tambingon presented evidence that an unlawful detainer action was commenced by

Shapphire Resources against him regarding the Property, *Defendant's Exhibit D, Case History Activity Log,* which the court believes is sufficient notice for Mr. Tambingon to know that he is no longer welcome on the Property), no evidence was presented regarding a 30–day notice to terminate or vacate the Property.

These circumstances notwithstanding, the court, having found that Shapphire Resources as the debtor-in-possession is entitled to turnover and right to possession of the Property pursuant to Section 542 of the Bankruptcy Code, which supersedes any State law notice requirements that are contrary to or conflict with Section 542, *see* United States Constitution, Article VI, Clause 2 ("This Constitution, and the laws of the United States which shall be made in pursuance thereof; and all treaties made, or which shall be made, under the authority of the United States, shall be the supreme law of the land; and the judges in every State shall be bound thereby, anything in the Constitution or laws of any State to the contrary notwithstanding."), finds that Mr. Tambingon has an affirmative duty to turn over the Property as property of the bankruptcy estate he has in his possession or custody to Shapphire Resources, the debtor-in-possession. Therefore, the court will grant Shapphire Resources's claim for turnover relief and will order Mr. Tambingon to vacate the Property and turn over possession to Shapphire Resources.

In so granting the turnover claim and ordering Defendant to turn over the Property to Shapphire Resources, the court has considered and rejects Defendant's argument that the turnover claim must be denied and dismissed based on the *Rooker–Feldman* doctrine. *Response to Plaintiff's [proposed] Amended Findings of Fact and Conclusions of Law,* ECF 77 at 13–16, *citing inter alia, In re Schwartz,* 409 B.R. 240 (1st Cir. BAP2008). As the United States Court of Appeals for the Ninth Circuit has stated,

> The *Rooker–Feldman* doctrine has evolved from two Supreme Court cases from which its name is derived. *See Rooker v. Fidelity Trust Co.,* 263 U.S. 413, 44 S.Ct. 149, 68 L.Ed. 362 (1923); *District of Columbia Court of Appeals v. Feldman,* 460 U.S. 462, 103 S.Ct. 1303, 75 L.Ed.2d 206 (1983). *Rooker–Feldman* prohibits a federal district court from exercising subject matter jurisdiction over a suit that is a de facto appeal from a state court judgment. In part, this prohibition arises through a negative inference from 28 U.S.C. § 1257, which grants jurisdiction to review a state court judgment in the United States Supreme Court. That is, while § 1257 explicitly authorizes the United States Supreme Court to hear an appeal from a state court judgment, it impliedly prohibits the lower federal courts from doing so. If a plaintiff brings a de facto appeal from a state court judgment, *Rooker–Feldman* requires that the district court dismiss the suit for lack of subject matter jurisdiction. Determining what constitutes a forbidden de facto appeal, however, has sometimes proven difficult for the lower courts.

*Kougasian v. TMSL, Inc.,*359 F.3d 1136, 1139 (9th Cir.2004) (citations omitted). The Ninth Circuit has provided general guidance on the doctrine:

> If a federal plaintiff asserts as a legal wrong an allegedly erroneous decision by a state court, and seeks relief from a state court judgment based on that decision, *Rooker–Feldman* bars subject matter jurisdiction in federal district court. If, on the other hand, a federal plaintiff asserts as a legal wrong an allegedly illegal act or omission by an adverse party, *Rooker–Feldman* does not bar jurisdiction. If there is simultaneously pending federal and state court litigation between the two parties dealing with the same or related issues, the federal district court in some circumstances may abstain or stay proceedings; or if there has been state court litigation that has already gone to judgment, the federal suit may be claim-[or issue-] precluded under [28 U.S.C.] § 1738. But in neither of these circumstances does *Rooker-Feldman* bar jurisdiction.

*13 *Id.* at 1139–1140, quoting, *Noel v. Hall,* 341 F.3d 1148, 1164 (9th Cir.2003). "*Rooker–Feldman* applies only when the federal plaintiff both asserts as her injury legal error or errors by the state court and seeks as her remedy relief from the state court judgment." *Kougasian v. TMSL, Inc.,* 359 F.3d at 1140.

The circumstances of this case are unusual in that the court had granted the motion of Shapphire Resources for relief from the automatic stay to allow the state court litigation proceedings in its unlawful detainer case and in the family law

case between Ms. Tubianosa and Mr. Tambingon to proceed post-petition, but that the state court in the unlawful detainer action found for Mr. Tambingon, denying unlawful detainer relief, holding that a use agreement between Shapphire Resources and him allowed his use of the Property. Afterwards, Shapphire Resources brought the instant adversary proceeding for turnover of the Property from Mr. Tambingon, and on its face, Mr. Tambingon makes a colorable argument based on the *Rooker–Feldman* doctrine that the adversary proceeding under federal bankruptcy law for turnover of the Property is an impermissible de facto appeal of the state court unlawful detainer judgment in his favor because it only brought the turnover action in bankruptcy court only after being denied relief for possession of the Property in the state court unlawful detainer action. However, the circumstances of this case, though unusual, indicate that the adversary proceeding is not an impermissible de facto appeal of the state court judgment in the unlawful detainer case under the *Rooker–Feldman* doctrine because the court's exercise of jurisdiction over the turnover claim of Shapphire Resources under federal bankruptcy law is not inconsistent with the state court's judgment and findings in the unlawful detainer case reflected in the case history for proceedings on December 21, 2011. Although the state court denied the unlawful detainer claim of Shapphire Resources, the state court found that the Property is "the sole property of Shapphire Resources, LLC." *Defendant's Exhibit D, Case History Activity Log*, at 12. The state court further found that although "there is a use agreement for the defendant [Mr. Tambingon] of the aforementioned property," it also found that "no evidence has been presented that the use of the property is unlimited." *Id.* The state court directed that "Commissioner Gastner from Department 15 in the Rancho Cucamonga Court is to determine the duration of the use agreement." *Id.* There is no evidence in the record that the state court by Commissioner Gastner ever made any determination of the duration of the use agreement, though a referral to him for such determination was made over four years ago. Thus, there is no judgment of the state court determining the duration of Mr. Tambingon's use of the Property, which would preclude this court under the *Rooker–Feldman* doctrine from making such a determination now in adjudicating the turnover relief claim of Shapphire Resources under <u>Section 542 of the Bankruptcy Code</u>.

The court's determination here that Mr. Tambingon is a tenant at will on the Property owned by Shapphire Resources is not inconsistent with the state court's judgment and findings in the unlawful detainer case. The state court found that there was no evidence that Mr. Tambingon had unlimited use of the Property and made a referral to a court commissioner to determine the duration of the agreement for Mr. Tambingon's use of the Property, which apparently was not done, and which can be done by this court, particularly since it has been at least four years since the state court commissioner was supposed to determine this. As determined by the state court, which this court also determines, Mr. Tambingon does not have unlimited use of the Property, and his use may be terminated immediately in that he is using property of the bankruptcy estate, which does not provide any benefit to the bankruptcy estate or creditors as he is not paying rent or providing any other benefit to the bankruptcy estate for his use of the Property. Although this court granted stay relief for the state court to proceed with the unlawful detainer case, this court has not abstained from hearing any claims with respect to the Property, which is an asset of the bankruptcy estate. This court as discussed previously has subject matter jurisdiction over the turnover claim under federal law, and the state court did not have exclusive rights to determine the rights to possession of the Property. As noted previously, a bankruptcy trustee or debtor-in-possession under <u>11 U.S.C. § 542(a)</u> may seek turnover relief against an entity (other than a custodian) who *has* possession of the property of the bankruptcy estate, or *had* possession of that property at some point during the bankruptcy case. *Shapiro v. Hensen*, 739 F.3d at 1200–1204, citing, <u>11 U.S.C. § 542(a)</u>. Thus, Shapphire Resources as the debtor-in-possession in this bankruptcy case may still seek turnover relief against Mr. Tambingon now.

*14 As also noted previously, "*Rooker–Feldman* applies only when the federal plaintiff both asserts as her injury legal error or errors by the state court *and* seeks as her remedy relief from the state court judgment." *Kougasian v. TMSL, Inc.*, 359 F.3d at 1140. This is not such a situation here since the federal plaintiff, Shapphire Resources, is not asserting as its injury legal errors by the state court and does not seek relief from the state court judgment from the unlawful detainer case. As to the family law case in state court, the evidence in the record does not support Mr. Tambingon's argument that the *Rooker–Feldman* doctrine applies here. Mr. Tambingon in his Exhibit B has provided copies of several of the state court's minute orders in the family law case, but none of these orders is the judgment of the state court in the family law case, and none indicated any factual finding that the Property was community property. One minute order dated August 4, 2009 provided for Mr. Tambingon's use of the Property on an interim basis ("UNTIL THE NEXT HEARING, PETITIONER [sic] STANLEY TAMBINGON CAN USE, CONTROL, AND POSSESS THE FOLLOWING PROPERTY AND THINGS LOCATED AT 2770 COLD PLAINS DRIVE, HACIENDA HEIGHTS,

CALIFORNIA 91745." *Exhibit B, Family Law Case Minute Orders* at 1. Another minute order dated October 6, 2009 stated: "COURT FINDS: PER AGREEMENT OF COUNSEL: THE ISSUE REGARDING EXCLUSIVE USE AND POSSESSION OF THE RESIDENCE IS SETTLED." *Id.* at 3. If the reference to "RESIDENCE" meant the Property, there is no indication what was the terms of the settlement regarding use of the Property. As such, this did not preclude the state court in the unlawful detainer case from finding the Property to be "the sole property of Shapphire Resources, LLC." *Defendant's Exhibit D, Case History Activity Log,* at 12, that "there is a use agreement for the defendant [Mr. Tambingon] of the aforementioned property," and that "no evidence has been presented that the use of the property is unlimited." *Id.* Moreover, the state court in the unlawful detainer case then referred the matter to a court commissioner as to how long Mr. Tambingon could use the Property since his use was not unlimited, which determination apparently was never made, so that this court can now make that determination. Finally, the minute order dated May 27, 2011 in the family law case which apparently set forth the intended disposition of that case made no findings regarding the character of the Property as community property and did not even refer to the Property at all. Thus, there is insufficient evidence of a state court judgment from the family law case to support a *Rooker–Feldman* defense that Shapphire Resources as Ms. Tubianosa's party in privity is taking an impermissible de facto appeal of the state court's judgment in the family law case that Mr. Tambingon was the owner of the Property based on his community property interest, and the court also rejects his *Rooker–Feldman* defense based on the family law case.

For the foregoing reasons, the court determines that Shapphire Resources has met its burden of proving by a preponderance of the evidence that it is entitled to turnover of the Property by Mr. Tambingon on its claim under Section 542 of the Bankruptcy Code, 11 U.S.C., and for declaratory relief under 28 U.S.C. § 2201 that it is the owner of the Property and is entitled to judgment on its claims pursuant to Rule 7001(1) and (9) of the Federal Rules of Bankruptcy Procedure. The court orders counsel for Shapphire Resources to lodge a proposed judgment for review and approval by the court which is consistent with these findings of fact and conclusions of law within 30 days of the date of entry of these findings of fact and conclusions of law.

IT IS SO ORDERED.

All Citations

Slip Copy, 2016 WL 320823

---

**End of Document**                     © 2018 Thomson Reuters. No claim to original U.S. Government Works.

488 B.R. 841
United States Bankruptcy Court,
S.D. New York.

In re PALI HOLDINGS, INC., Debtor.

Yann Geron, Chapter 7 Trustee of the Estate of Pali Holdings, Inc., Plaintiff,
v.
David Peebler, Defendant.
Bankruptcy No. 10–11727 (REG).
|
Adversary No. 11–02912 (REG).
|
March 25, 2013.

Synopsis
Background: Chapter 7 trustee brought adversary proceeding to compel turnover of amount owing on promissory note executed by debtor's former employee, and ex-employee resisted on ground, inter alia, that the Bankruptcy Court, as non-Article-III court, lacked constitutional authority to enter final judgment on turnover claim.

[Holding:] The Bankruptcy Court, Robert E. Gerber, J., held that bankruptcy court, even as non-Article-III court, could constitutionally exercise its in rem jurisdiction to issue final judgment for turnover of amount owing on promissory note that Chapter 7 debtor's ex-employee had executed prepetition after note became due.

Summary judgment for trustee.

West Headnotes (13)

[1]    Bankruptcy◆Judgment or Order

Cases seeking recovery on promissory notes are particularly suitable for disposition via summary judgment, as moving party need merely establish the absence of genuine issue as to execution and default.

Cases that cite this headnote

[2]    Bankruptcy◆Judgment or Order

Setoff claims do not bar summary judgment in proceeding to recover amounts owing on promissory note, unless setoff claims and maker's payment obligations under note are contractually "dependent" promises.

Cases that cite this headnote

[3]    Bankruptcy⬥Judgment or Order

Ex-employee's obligation to pay amount owing on promissory note which he had previously executed in favor of Chapter 7 debtor-employer after note became due and payable was not in any way "dependent" on debtor-employer's performance of whatever obligation it had to pay performance bonus that it had secretly decided to award employee before receiving his notice of resignation, so that ex-employee's raising of setoff claim, for amount that debtor had decided to award him as bonus, did not preclude entry of summary judgment for Chapter 7 trustee in turnover proceeding for amount owing on promissory note, especially where debtor-employer had never communicated its decision to award performance bonus to employee or made any commitment in that regard. 11 U.S.C.A. § 542(b).

Cases that cite this headnote

[4]    Federal Courts⬥Bankruptcy

Regardless of whether any grounds existed for withdrawal of reference based on bankruptcy court's alleged lack of constitutional authority to enter summary judgment finally resolving dispute, bankruptcy court would not exercise its discretion to permissively abstain to allow party to file motion for withdrawal of reference with district court, where party had not yet filed such a motion despite fact that briefing on summary judgment motion had already begun, his abstention request smacked of gamesmanship, and abstention at that late stage, to allow party to file, and district court to then decide, withdrawal motion, would disrupt court's calendar. 28 U.S.C.A. § 1334(c)(1).

1 Cases that cite this headnote

[5]    Federal Courts⬥Bankruptcy

Granting of request for permissive abstention is discretionary with bankruptcy court. 28 U.S.C.A. § 1334(c)(1).

Cases that cite this headnote

[6]    Bankruptcy⬥Jurisdiction over property
       Bankruptcy⬥Turnover proceedings
       Bankruptcy⬥Bankruptcy judges

Bankruptcy court, even as non-Article-III court, can constitutionally exercise its in rem jurisdiction to issue final judgment for turnover of estate property, or to monetize it, when party from whom turnover is sought has no serious defenses to estate's turnover rights. 11 U.S.C.A. § 542.

11 Cases that cite this headnote

[7]     Bankruptcy ⬥ Jurisdiction over property
        Bankruptcy ⬥ Turnover proceedings
        Bankruptcy ⬥ Bankruptcy judges

Bankruptcy court, even as non-Article-III court, could constitutionally exercise its in rem jurisdiction to issue final judgment for turnover of amount owing on promissory note that Chapter 7 debtor's ex-employee had executed prepetition after note became due, where ex-employee had no serious defense to payment. 11 U.S.C.A. § 542(b).

2 Cases that cite this headnote

[8]     Bankruptcy ⬥ Limited, in personam, and in rem jurisdiction

Bankruptcy jurisdiction, at its core, is in rem jurisdiction.

4 Cases that cite this headnote

[9]     Bankruptcy ⬥ Jurisdiction over property

Bankruptcy court's in rem jurisdiction permits it to determine all claims that anyone has to property or thing in question.

2 Cases that cite this headnote

[10]    Bankruptcy ⬥ Turnover proceedings

Turnover action invokes bankruptcy court's most basic equitable powers to gather and manage property of the estate. 11 U.S.C.A. § 542.

3 Cases that cite this headnote

[11]    Bankruptcy ⬥ Representation of debtor, estate, or creditors

One of most important functions of bankruptcy trustee is to marshal existing assets of estate for benefit of estate's creditors.

Cases that cite this headnote


[12]    Bankruptcy⬥Collection and Recovery for Estate; Turnover

Turnover action's essence is in bringing estate's property into its custody, or in the promissory note and accounts receivable collection actions for which turnover also may be invoked, in converting a note or account receivable that already is property of the estate into cash. 11 U.S.C.A. § 542(a, b).

5 Cases that cite this headnote


[13]    Bankruptcy⬥Turnover proceedings
        Bankruptcy⬥Collection and Recovery for Estate; Turnover

When turnover power is properly invoked, it is simply an effort to recover property, or on property, that is already property of bankruptcy estate, thereby invoking the court's in rem jurisdiction over bankruptcy res. 11 U.S.C.A. § 542.

9 Cases that cite this headnote


Attorneys and Law Firms

*842 Fox Rothschild LLP, By: John Wait, Esq., Oksana Wright, Esq. (argued), New York, NY, for Plaintiff Yann Geron, Chapter 7 Trustee.

Jones & Associates, By: Roland Gary Jones, Esq., New York, NY, Law Office of Ira R. Abel, By: Ira R. Abel, Esq. (argued), New York, NY, for Defendant David Peebler.


DECISION ON MOTION FOR SUMMARY JUDGMENT


ROBERT E. GERBER, Bankruptcy Judge.

In this adversary proceeding under the umbrella of the chapter 7 case of Debtor Pali Holdings, Inc., plaintiff Yann Geron, the chapter 7 Trustee (the "Trustee"), seeks turnover, under section 542 of the Bankruptcy Code, of the proceeds of a promissory note (the "Note") defendant David Peebler executed in favor of Pali Holdings. Peebler's defenses to payment on the Note are frivolous. Peebler's only contention that even warrants a written opinion¹ is his contention that a bankruptcy *843 judge lacks the constitutional power to issue a final judgment for the requested relief.

> This decision memorializes and amplifies upon the decision issued orally from the bench at the conclusion of oral argument.

1

For the reasons that follow, the Court confirms its earlier oral ruling that when, as here, a trustee's turnover rights under section 542 of the Code are appropriately invoked (e.g. to secure the return of property of the estate, or to monetize it), bankruptcy judges plainly have the constitutional power to issue final judgments for turnover. On the merits, the Court confirms its oral ruling that there here are no material disputed issues of fact, and that Peebler has no defenses under the Note.

*Facts*

*1. The Loan*

Beginning in January 2004, defendant Peebler was a full-time employee of the Debtor's affiliate, Pali Capital, Inc. Peebler was employed as a trader at Pali's Global Derivatives Desk.

In June 2007, in connection with a share purchase plan Debtor Pali Holdings, Inc. ("Pali") offered to certain employees, Peebler borrowed $105,000 (the "Loan") from Pali. Peebler signed the Note in exchange for the money he borrowed. The Note obligated Peebler to repay the $105,000 principal amount of the Loan, plus interest at 8% per annum, in monthly installments of $700 commencing June 30, 2007.

Peebler then used the Loan amount to purchase shares in Pali. In connection with his purchase, Peebler executed a subscription agreement (the "Subscription Agreement") under which he agreed to purchase 4,000 shares. Peebler also executed a pledge agreement (the "Pledge Agreement") under which he granted Pali a security interest in the shares he purchased.

Each of the Subscription Agreement, the Pledge Agreement and the Note also provided, expressly, that Pali would have recourse against both the shares purchased under the Subscription Agreement and borrower Peebler personally, for full satisfaction of his obligations under the Note. The Subscription Agreement stated, at the end of its first page and running on to the second:

> The undersigned understands and agrees that the Shares shall be collateral under the Pledge Agreement, that upon an Event of Default (as defined in the Pledge Agreement), the Company *shall have recourse* to the Shares *and to the undersigned* for full satisfaction of the undersigned's obligations with respect to payment of the unpaid portion of such balance, together with accrued and unpaid interest, *and that the Company shall be entitled to initiate a claim of any nature against the undersigned,* regarding payment of such obligations hereunder.²

> Subscription Agreement at 1–2 (emphasis added).

2

Likewise, the Pledge Agreement provided:

Full Recourse. Without limiting the applicability of any provision herein, Pledgor assumes full liability for the payment of the Obligations.[3]

> Pledge Agreement ¶ 8 (bold face and underlining in original).

3

Likewise the Note provided:

Full Recourse. Without limiting the applicability of the foregoing Section 2, Borrower assumes full liability for the payment of the Obligations (as defined in the Pledge Agreement).[4]

> Note at ¶ 3 (bold face and underlining in original).

4

*844 Peebler contends that notwithstanding the unambiguous language of each of those three documents, he was "led to believe" that the Loan was without recourse to his personal assets, and that the estate's recovery was limited to the security for the Loan. But he offers no evidentiary support for that contention—not even telling the Court the source of that understanding.

Additionally, Peebler executed a shareholders' agreement (the "Shareholders' Agreement") which provided, among other things, that if any court proceeding were brought in connection with the Shareholders' Agreement, the prevailing party "shall be entitled to recover from the other party all costs, expenses and reasonable and verifiable attorneys' fees incidental to any such proceeding."[5] But the Shareholders' Agreement (whose subject matter was principally Pali's rights with respect to Peebler's conduct and shares after he purchased them, including in connection with a desire by Peebler to transfer the shares, or his death, disability, insolvency, divorce or termination of employment) did not incorporate into it Peebler's duty to pay on the Note. And neither the Subscription Agreement, the Pledge Agreement nor (most significantly) the Note had a comparable attorneys fees provision.

> Shareholders' Agreement at ¶ 11.

5

## 2. Peebler's "Bonus" or "Commission"

During the time at which Peebler was employed at Pali, derivatives traders at Pali were compensated in various forms in addition to a base salary. According to Richard Anthony, (former Head of Global Derivatives at Pali), in addition to base salary, derivatives traders were "entitled to commissions," which were collected into a "bonus pool" to be distributed to derivatives traders.[6] Also according to Anthony, as head of the derivatives desk he had sole authority to decide the amount of each person's bonus based on his or her performance.[7] In an affidavit provided in connection with this litigation, Anthony stated that he *intended* to "give David Peebler $169,000.00 as his share in the 'bonus pool' " but that this amount was never paid to Peebler because of Anthony's resignation from his position at Pali on December 10, 2009.[8]

> Anthony Aff. ¶ 4.

6

7    Anthony Aff. ¶ 5; *see also* Belton Dep. at 47–48.

8    Anthony Aff. ¶ 10.

Importantly, Peebler provided no evidence that Anthony communicated this intention to anyone at Pali, or that Anthony otherwise acted on his stated intention. Nor did Peebler introduce any evidence showing that Anthony or Pali promised him anything by way of bonus or commission.

### 3. Peebler's Resignation; Pali's Bankruptcy Filing

On December 15, 2009, Peebler resigned from Pali. On April 1, 2010, Pali filed a voluntary chapter 11 petition in this Court. About six months later, upon a motion of the Debtor, the case was converted to chapter 7. By letter dated October 11, 2011, the Trustee demanded that Peebler pay the amount due under the Loan. But Peebler failed to do so.

### 4. Attorneys Fees

After summary judgment was granted, the Trustee submitted evidence of his legal fees in collecting on the Note. The amount shown was reasonable. But the Trustee did not offer any evidence of a contractual entitlement to fees except under the Shareholders' Agreement.

*845 *Discussion*

*I.*

*The Merits*

### A. Summary Judgment Standards

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[9] The moving party bears the initial burden of showing that the undisputed facts entitle it to judgment as a matter of law.[10] Then, if the movant carries this initial burden, the non-moving party must set forth specific facts to show that there are triable issues of fact, and cannot rely on pleadings containing mere allegations or denials.[11]

[9]   Fed.R.Civ.P. 56(a), made applicable to this adversary proceeding by Fed. R. Bankr.P. 7056; *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The Court notes that Rule 56 was amended in December 2010. By order of the Supreme Court, the amendment governs "insofar as just and practicable, [in] all proceedings ... pending." Supreme Court Order of April 28, 2010. The amended Rule applies to this motion, but the Court also notes that the substantive standard for summary judgment has not been altered. Advisory Committee Notes to December 2010 Amendment to Rule 56 ("The standard for granting summary judgment remains unchanged.").

[10]   *See Rodriguez v. City of New York,* 72 F.3d 1051, 1060–61 (2d Cir.1995); *Ferrostaal, Inc. v. Union Pacific R.R. Co.,* 109 F.Supp.2d 146, 148 (S.D.N.Y.2000) ("The initial burden rests on the moving party to demonstrate the absence of a genuine issue of material fact....").

11    See *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Kittay v. Peter D. Leibowits Co., Inc. (In re Duke & Benedict, Inc.)*, 265 B.R. 524, 529 (Bankr.S.D.N.Y.2001) ("[T]he nonmoving party must set forth specific facts that show triable issues, and cannot rely on pleadings containing mere allegations or denials.").

In determining a summary judgment motion, it is well settled that the court should not weigh the evidence or determine the truth of any matter, and must resolve all ambiguities and draw all reasonable inferences against the moving party.[12] A fact is material if it "might affect the outcome of the suit under the governing law."[13] An issue of fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[14]

12    See *Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348 (summary judgment is appropriate "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party"); *Virgin Atlantic Airways Ltd. v. British Airways PLC*, 257 F.3d 256, 262 (2d Cir.2001); *Lovejoy–Wilson v. NOCO Motor Fuel, Inc.*, 263 F.3d 208, 212 (2d Cir.2001) ("We ... constru[e] the evidence in the light most favorable to the non-moving party.").

13    See *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505.

14    *Id.*

## B. Application to Facts Here

The Trustee contends that the Note was full recourse, as the three documents Peebler signed provided, and that there are no other defenses to payment. This aspect of the Trustee's motion requires minimal discussion.

[1] "Cases seeking recovery on promissory notes are particularly suitable for disposition via summary judgment, as the moving party need merely establish the absence of a genuine issue as to execution and default."[15] After a prima facie case for judgment on the note is made, the *846 burden shifts to the non-moving party to present competent evidence establishing a genuine issue for trial.[16]

15    *Pereira v. Cogan*, 267 B.R. 500, 506 (S.D.N.Y.2001) (Sweet, J.) ("*Cogan*").

16    *Id.* at 506–07.

Here it is undisputed that payment under the Note was due, and that Peebler has not repaid it. But he attempts to defeat summary judgment by raising, as asserted genuine issues for trial, defenses that (1) he believed the Note to be non-recourse; and (2) that he was entitled to bonus compensation which would offset amounts due under the Note. Neither is a satisfactory defense here.

The first contention is frivolous. Documents that Peebler signed provided in three separate places that his duty to pay on the Note was full recourse to him personally. In fact, two of them—the Note and the Pledge Agreement—said that in bold face. The third—the Subscription Agreement—said that again, and went on to say that Pali (in whose shoes the Trustee now stands) would have the right to initiate a claim of any nature against him.

The Court does not need to decide whether the parol evidence rule would here apply in the absence of express integration clauses. There here is no basis in the record for Peebler's contention that there was *any* agreement to the contrary, much less that documents he signed should be nugatory because of his wholly unsupported assertion that he was "led to believe" otherwise.

In re Pali Holdings, Inc., 488 B.R. 1 (2013)

Particularly in light of the lack of any evidence to the contrary, the Court must hold that Peebler was bound by the terms of the three documents' plain language.

[2] Peebler's second contention, that he was entitled to unpaid bonus compensation which would offset the amounts owed under the Note, is likewise insufficient to defeat summary judgment. Offset (sometimes alternatively referred to as "setoff") claims do not bar summary judgment on promissory notes unless the offset claims and the payment obligations under any such notes are contractually "dependent" promises.[17] "Unrelated offset claims may be relevant only at the point when the Court considers whether to render final and enforceable a previously granted summary judgment."[18] And here there is insufficient evidence to find *any* rights on Peebler's part to unpaid bonus compensation, much less to find obligations that were dependent.

17    *Id. at 507.* Peebler asserts that two later cases, *Pereira v. Nelson (In re Trace Int'l Holdings, Inc.),* 284 B.R. 32, 39–40 (Bankr.S.D.N.Y.2002) (Bernstein, C.J.) and *Cohen v. Elephant Wireless, Inc.,* 2004 U.S. Dist. LEXIS 16583, at *10–13, 2004 WL 1872421, at *3–4 (S.D.N.Y. Aug. 13, 2004) (Motley, J.), hold that "the doctrine of setoff may apply even if the debt or credit arises from different transactions than the contract being sued upon." Peebler Br. at ¶¶ 56–57. Of course that is true. But that is not determinative of whether a motion for summary judgment on a promissory note can be defeated. Under Fed.R.Civ.P. 54(b), applicable in this adversary proceeding under Fed.R.Bankr.P. 7054(a), the Court would take the potential existence of a valid setoff claim into account before entry of a final, enforceable, judgment on the Note if any evidence had been established to establish a right of setoff, but here there is none.

18    *Cogan,* 267 B.R. at 507.

[3] Peebler has provided no evidence showing that the obligations were dependent. To the contrary, all of the evidence provided to the Court shows that the obligation under the Note and any obligation to pay Peebler bonus compensation arose at different times—in 2007 and 2009, respectively—and for different reasons. The obligations to pay under the Note as it was drafted are unconditional, saying nothing about a right to offset future compensation *847 or bonus payments against the obligations due under the Note.[19]

19    Peebler points to language in the Note which states "Unless the Holder is instructed in writing otherwise, interest payments, when and as due, under this Note will be deducted from compensation due Maker from Holder or its affiliate, and any shortfall shall be paid by Maker separately." Note at ¶ 1.1. But the Court fails to see the basis upon which Peebler properly can rely upon this language. It effectively gives rise to a setoff option with respect to interest (though interest alone) of which the Maker can avail himself (if any "compensation [is] due Maker"). But here there has been no proof of any "compensation due Maker." And even then, the Note says nothing to make obligations on Note repayment and on bonus payments dependent on each other.

Nonetheless, the Court would likely defer granting entry of the judgment authorizing collection on the Note (even one issued on a motion for summary judgment) if there were any evidence of a duty on Pali's part to pay Peebler any potentially offsetting amounts. But Peebler has failed to put forward any evidence of unpaid obligations to him. Anthony's vague testimony that he *intended* to allocate certain amounts to Peebler is unaccompanied by any evidence that Anthony followed through on that intention, or that he or anyone else made a legally binding promise. At the same time, the affidavits of Trustee witnesses that no sums were due to Peebler when he left Pali were uncontroverted.

Because the Trustee made the necessary prima facie showing, and Peebler made no showing whatever to controvert it, summary judgment on the Note must be granted in favor of the Trustee.[20]

20   However, the Trustee has not shown a like entitlement to his attorneys fees in collecting on the Note, even though those fees were satisfactorily proven and reasonable. As discussed above, attorneys fees were authorized under the Shareholders' Agreement. But there were no comparable attorneys fees provisions in the Note, Pledge Agreement, or Subscription Agreement. The Shareholders' Agreement provided for attorneys fees if any court proceeding were brought in connection with it, but the rights the Trustee here is seeking to enforce arose under the Note instead. The Trustee's entitlement here does not in any way arise from covenants under the Shareholders' Agreement, which addressed Pali's rights with respect to Peebler's conduct and shares after he purchased them, including in connection with a desire by Peebler to transfer the shares, or his death, disability, insolvency, divorce or termination of employment.

*II.*

*Final Judgment from a Bankruptcy Judge*

Apart from the merits, Peebler has raised additional contentions. In his memorandum in opposition to summary judgment, Peebler's lead counsel argued that "[a]lternatively, the Bankruptcy Court should abstain from making a final judgment in this adversary proceeding and grant the defendant additional time to file a motion to withdraw the reference."[21] Peebler's "appearance counsel"[22] then *848 made a variant of that argument at the hearing on the Trustee's summary judgment motion, raising as an additional defense an argument that a bankruptcy judge lacks the power, as a constitutional matter, to issue a final judgment in a turnover proceeding.

21   Peebler Br. at ¶ 21.

22   The second of Peebler's two lawyers here identified himself in correspondence to the Court as "appearance counsel for Jones and Associates...." *See* ECF # 20 (endorsed order on letter by appearance counsel seeking dispensation for late filing of papers by Jones & Associates). This is an example of an increasingly common practice in this Court, particularly on relief from stay motions and simpler avoidance actions, for a law firm to arrange for substitute counsel to appear in court in its place. Because "appearance counsel," even one identifying himself or herself as "of counsel" to a law firm, necessarily must actually be counsel for the original firm's *client* and not the original firm, "appearance counsel" here is simply listed as co-counsel for Peebler in the "Appearances" at the outset of this decision.

The Court finds no merit in either contention.

*A. Request for Abstention Pending Motion for Withdrawal of Reference*
[4] The first contention requires little in the way of discussion. Since *Stern v. Marshall*[23] was decided, district and bankruptcy courts here and across the country have been assaulted with a deluge of motions, and expressions of desire to file motions, to withdraw the reference, premised on arguments that a bankruptcy judge lacks the constitutional authority to enter a final order or judgment in that proceeding.[24] Though such motions, after they are filed, are decided by district judges, bankruptcy judges are repeatedly asked, as here, to defer proceedings pending those motions' filing and determination.[25]

62    Dailey Decl. Exh. K at 5.

In the June 2013 Midanek Letter, Ms. Midanek still referred to Solon ("via its President, Deborah Hicks Midanek") as a director, though the June 13, 2013 date appearing on the letter is the day after Mr. Fletcher says that Solon was removed. (It is not clear whether Ms. Midanek was unaware of the other directors' actions in attempting to remove Solon as a director, or simply disputed their power to do so; later in the letter, she stated that Mr. Fletcher "indicated his desire to terminate the directorship of the Solon Group," but she expressed the view that any such effort would be invalid.)[63]

        Id.
63

In any event, the June 2013 Midanek Letter provided a table of redemption requests received by each fund since the last redemption was paid,[64] which showed, for Composite, "Estimated Net Assets" of $6.36 million; "Estimated Redemptions Pending" of $6.36 million; and "Estimated Remaining Net Assets" of zero.

        Attached to the June 2013 Midanek Letter at p. 58 as Exhibit A4.
64

Mr. Fletcher admits that this amount is also shown within the shareholder register, but contends that it is merely an estimate.[65]

        Fletcher Aff. ¶ 24.
65


8. *July 2013 Richcourt Funds Letter*

By letter dated June 10, 2013 (but which all agree should read *July* 10, 2013, when it was actually sent), six Richcourt Funds, including Elite and Composite,[66] sent the letter to CIMA (the "July 2013 Richcourt Funds Letter") upon which they had been working since June 10.[67] In accordance with instructions that Mr. Fletcher had given during the preparation of July 2013 Richcourt Funds Letter drafts,[68] the July 2013 Richcourt Funds Letter was not signed by named human beings, but simply by the six funds. One of the signatories was Elite, and another was Composite.[69]

        Elite, Composite, Soundview Star Ltd., Soundview Premium Ltd., Pitagora Fund Ltd., and New Wave Fund SPC (collectively, the
66    "Richcourt Funds").

67    Letter to Cayman Islands Monetary Authority, June 10, 2013, attached to the Dailey Decl. as Exh. J. at 15–16.

68    *See id.* at 2 ("We're sending it signed by the funds rather than directors.").

69    *Id.* at 16.

At least in respects relevant here, the July 2013 Richcourt Funds Letter was not materially different than Turner's July 1 draft. It stated that, as of the date of that letter, Composite had one "pending" or "outstanding" redemption request with an estimated value of $5 million,[70] and that *92 the directors of the Richcourt Funds intended to "complete the Richcourt Funds' financials and then appropriately satisfy the pending redemptions in accordance with the governing documents.'"[71]

70     The reason for showing only $5 million, as contrasted to the $6.36 million Ms. Midanek had shown four weeks earlier, was not stated. Necessarily, the difference must be attributed to different perceptions of the value of the assets then at Composite; of liabilities of Composite; or some combination of the two.

71     Dailey Decl. Exh. J. at 15–16.

The July 2013 Richcourt Funds Letter also stated that "[e]ach of Soundview Elite Ltd., Soundview Premium Ltd., and Soundview Star Ltd. [but once more, not Composite] has gated redemptions. None of the Richcourt Funds has suspended redemptions."[72]

72     *Id.* at 16.

*9. December 2013 Katz Affidavit*

Under an order entered in November 2013, CohnReznick Advisory Group ("CohnReznick") was retained as financial advisor for Elite.[73] Bernard A. Katz, a partner at CohnReznick, told this Court, in an affidavit dated December 2, 2013 ("Katz Affidavit"), that the value of Elite's redemption receivable owed to it by Composite was approximately $3.875 million as of July 31, 2013.[74] The Katz Affidavit was submitted on behalf of Elite in connection with the evidentiary hearing on the motion to appoint a chapter 11 trustee for Elite.[75]

73     Main Case ECF No. 96, attached to the Dailey Decl. as Exh. E.

74     *Id.* at 6.

75     *Id.*

*10. January 2014 Martin Letter*

On January 21, 2014, Warren Martin, Jr. (a partner of Porzio Bromberg & Newman P.C. ("Porzio"), counsel for Soundview Debtors before the Trustee was appointed) sent a letter (the "January 2014 Martin Letter") to this Court.[76] Responding to an "Emergency Motion" by the Cayman Liquidators (referred to in the letter, and thus here, as the "JOLs"), that letter stated:

> The Soundview Debtors-in-possession did not receive a phone call or any advance notice of the request by the purported JOLs which has now been made via the above-referenced "Emergency Motion" filed last evening. Had such a phone call been made, consent would have been provided immediately. The Soundview Debtors support preserving and protecting non-debtor affiliate Soundview Composite's funds of approximately $3.874 million, *particularly given the fact that the Soundview Debtors presented evidence at trial that Soundview Composite owes Soundview Elite that amount* (Katz Affidavit, Doc. No. 96 at page 8 of 10, at row 8 of 9) and *particularly given the fact that both the Debtors and non-Debtor Soundview Composite are managed by the same entity, Soundview Capital Management.*[77]

After another paragraph, in which Mr. Martin advised this Court that the Soundview Debtors supported a more durable "freeze" of the funds than was suggested in the Cayman Liquidators' motion,[78] the January 2014 Martin Letter continued:

*93 Third, the Soundview Debtors, *together with non-Debtor Soundview Composite, which again is managed by the same manager as the Soundview Debtors,* would prefer to embody the freeze and the two tweaks addressed above via a consensual amendment to the Wilmington Trust Order previously entered by this Court, which non-debtor Soundview Composite has agreed it will sign onto.

Mr. Martin continued:

The Soundview Debtors wish to avoid entry of any TRO under these circumstances out of concerns over continued damage they might suffer among creditors and investors as a result of the entry of a TRO. The repetition of loose allegations, found for example in this Emergency Motion, *e.g., see* paragraph 7, where it is stated that "The JOLs proved that the Fletcher Team is untrustworthy, committed fraud, and mismanaged the funds of the Debtors," if such allegations are immediately followed by the entry of a TRO, could be used as evidence against the Debtor *and its affiliates* in other jurisdictions to establish that this Court sanctioned *Soundview Composite* and these Debtors for some unspecified improper conduct."

76    Main Case ECF No. 151, attached to the Dailey Decl. as Exh. B.

77    *Id.* at 1 (emphasis added).

78    *Id.* at 2. The Soundview Debtors suggested, instead, that "Composite's funds be preserved 'until further order of the Court specifically addressing use of the Soundview Composite Funds.' " *Id.* (internal quotation marks in original).

79    *Id.* at 2 (emphasis added).


*11. March 2014 Martin Statements*


At a March 19, 2014 hearing before this Court in Elite's underlying chapter 11 case (shortly after the Trustee had been appointed), the Court considered a motion filed on February 21, 2014, about a month earlier (the "Administrative Expense Motion"),⁸⁰ for payment of administrative expenses assertedly incurred while the Soundview Debtors were still in possession—including fee requests by Porzio, Mr. Fletcher, Mr. Ladner, Mr. Saunders, and the Management Company. The motion explained that:

As each of the Debtors is structured, and is common in the investment fund industry, none of the Debtors ever had any direct employees. Rather, services were provided to the Debtors by associated management companies and unassociated service providers, as well as by the Debtors' officers and directors.⁸¹

The motion continued that although the former Debtors in Possession (who now called themselves "Debtors Out–of–Possession"⁸²) considered bringing a "comfort order" application for authority to make the requested payments while they were still in possession, they chose not to do so. They made that decision, Mr. Martin explained, because with the exception of one expert witness, "each of the third-party contractors, who were essentially serving as the Debtors' "employees", were insiders...."⁸³

80    Main Case ECF No. 192.

81    *Id.* ¶ 5.

82    *Id.* at p. 1.

83    *Id.* ¶ 7.

The motion listed the people "behind the entities, so to speak,"[84] including Messrs. Fletcher and Ladner—who

> served as the captains of the ship during the four-month period that these Debtors were debtors-in-possession. This included frequent and continued participation in lengthy daily conference calls with the Debtors' counsel and financial advisors, making determinations as to the direction of the case, directing the Debtors' counsel and financial advisors *94 and addressing all of the day to day problems that arose during the case.[85]

Further on, the Administrative Expense Motion—which it will be recalled was filed on behalf of Messrs Fletcher, Ladner, Saunders and the Management Company—stated that:

> In general terms, Soundview Management [*i.e.,* the Management Company] directed the efforts of the Debtors' counsel and financial advisors on all matters pertaining to the estate's investments, which stated differently, means estate assets.[86]

The "estate's investments" included, of course, Elite's investment in Composite.


84    *Id.* ¶ 10.

85    *Id.* ¶ 10, first bullet point.

86    *Id.* ¶ 17.

When speaking to the assets that would be available to pay the requested fees, Mr. Martin made statements relevant to this controversy on the record and in open court.[87] In those statements (the "March 2014 Martin Statements"), Mr. Martin stated:

> I neglected to [address] one of Your Honor's questions, which was about seeing the full extent of the table being set as to administrative claims. There's 22 million in unencumbered cash; a 10– or 11 million dollar claim against FILB, which remains to be worked out, and Ms. Ball is obviously working on that; and 9 million dollars of third-party securities. None of the assets are encumbered. And so I would sincerely—and in addition to that, there's another—*there's a 3.8–million–dollar receivable from a related entity, which Your Honor will recall my last act in the case before Your Honor's ruling was to get the consent of that entity to freeze that 3.8 million dollars so that the trustee can pursue that receivable.*[88]

> *See* Tr. of Hrg. of 3/19/2014 (Main Case ECF No. 242).

87

88    *Id.* at 54 (transcription error corrected; written-out numbers changed to Arabic form for readability; emphasis added).

Although the hearing was attended by Messrs. Fletcher, Ladner, and Turner (each of whom was seeking to be paid under the Administrative Expense Motion), none of them corrected or supplemented anything Mr. Martin said. The "related entity" described in the last-quoted paragraph of Mr. Martin's remarks was of course Composite. But Composite contends that Mr. Martin's statement is inadmissible—a contention addressed in the discussion to follow.


### E. Prior Proceedings in Chapter 11 Case and Here

The Soundview Debtors' chapter 11 case was filed on September 24, 2013,[89] just prior to a previously-scheduled hearing to be held on the same day in the Grand Court of the Cayman Islands with respect to winding up proceedings filed by creditors of each of the Soundview Debtors. At the hearing in the Cayman Islands, the Cayman Grand Court entered winding up orders appointing

Joint Official Liquidators—the JOLs—with respect to each of Debtors Elite, Soundview Premium, Ltd. and Soundview Star, Ltd.

<u>89</u>    *See* Petition, filed 9/24/2013 (Main Case ECF No. 1).

Early in the chapter 11 cases, the Soundview Debtors sought to use the Bankruptcy Code's automatic stay to prevent the Cayman winding up proceedings from moving forward.[90] In response, the *95 JOLs sought to dismiss the chapter 11 cases so that the Cayman proceedings could continue down there. After litigation on the issues, this Court ruled, among other things, that it should not dismiss the chapter 11 cases, but that it should direct the appointment of a chapter 11 trustee.[91]

<u>90</u>    *See* Fletcher Rule 1007–2 Decl. ¶ 24 ("This proceeding is filed firstly, in order to obtain the benefit of the automatic stay and provide the enhanced procedural and substantive protections that U.S. Courts provide to creditors and all parties of interest.").

<u>91</u>    *See* *Trustee Decision,supra* n. 3, 503 B.R. at 581–83.

The Trustee commenced this adversary proceeding on April 1, 2014, with the filing of a complaint here in the bankruptcy court. On May 2, 2014, Composite filed an answer to the complaint, and a motion to withdraw the reference.[92] On May 19, 2014 (before the motion to withdraw the reference had been decided), the Trustee filed her motion for summary judgment.

<u>92</u>    ECF # 8.

On July 3, 2014, Judge Scheindlin of the district court denied Composite's motion to withdraw the reference, without prejudice.[93] She observed, among other things, that a summary judgment determination, which would decide purely questions of law, would be subject to *de novo* review in any event, and that judicial economy and efficiency favored determination of the issues here in the bankruptcy court.[94]

<u>93</u>    *See* *Ball v. Soundview Composite Ltd. (In re Soundview Elite Ltd.), 2014 U.S. Dist. LEXIS 91267, *1, 2014 WL 2998529, *1 (S.D.N.Y. July 3, 2014)* (Scheindlin, J).

<u>94</u>    2014 U.S. Dist. LEXIS 91267 at *20–21, 2014 WL 2998529 at *4.

*Discussion*

*I.*

*Authority of a Bankruptcy Judge to Rule Here*

Without dispute, this Court has subject matter jurisdiction over this adversary proceeding under 28 U.S.C. § 1334.[95] But a second

provision of the Judicial Code, 28 U.S.C. § 157, addresses the extent to which bankruptcy judges (who are appointed under Article I of the Constitution, in contradistinction to district judges, who are appointed under Article III) are empowered to "hear and determine"—*i.e.,* to issue final judgments and orders in—proceedings that fall under the subject matter jurisdiction of the district and bankruptcy courts. There are limits to the authority of bankruptcy judges to enter final judgments and orders in the matters over *96 which they have subject matter jurisdiction, under the Constitution[96] and by statute.

95  District courts and bankruptcy courts exercise jurisdiction in bankruptcy-related matters—including those in this adversary proceeding—under one of the several provisions of the Judicial Code (title 28 of the U.S.Code) in which federal trial courts are granted subject matter jurisdiction. The Judicial Code's provision conferring subject matter jurisdiction for consideration of bankruptcy-related matters, 28 U.S.C. § 1334 (which directly follows like-provisions granting subject matter jurisdiction in federal question, diversity and admiralty cases), confers original subject matter jurisdiction on district courts (and, accordingly, on bankruptcy courts, which are units of the district court under 28 U.S.C. § 151) with respect to bankruptcy cases and proceedings. Section 1334(e) gives courts sitting in bankruptcy *exclusive* jurisdiction over property of debtors' bankruptcy estates, while section 1334(b) grants such courts with "original but not exclusive" jurisdiction over "civil *proceedings* arising under title 11, or arising in or related to cases under title 11"—which include, in addition to contested matters in cases, adversary proceedings like this one. Accordingly, there are three types of original jurisdiction that district (and hence bankruptcy) courts may exercise under § 1334, colloquially referred to as "arising under," "arising in," and "related to" jurisdiction.
At the least, this Court has "related to" jurisdiction, because a result favorable to Elite would benefit the Elite estate and Elite's creditors, easily satisfying the broad test for such jurisdiction articulated by the Third Circuit in *In re Pacor, Inc. v. Higgins,* 743 F.2d 984 (3d Cir.1984) and applied in this circuit in *Publicker Industries Inc. v. U.S.A. (In re Cuyahoga Equip. Corp.),* 980 F.2d 110, 114 (2d Cir.1992).

96  *See Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.,* 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982) ("*Marathon*"); *Stern v. Marshall,* 564 U.S. ——, 131 S.Ct. 2594, 180 L.Ed.2d 475 (2011) ("*Stern*"). Those limits do not require further discussion here.

That same 28 U.S.C. § 157, addressing bankruptcy judges' statutory authority, grants authority to bankruptcy judges to hear and determine matters in "cases under title 11" (*e.g.,* the Elite chapter 11 case) and in proceedings arising under title 11 or arising in a case under title 11—*e.g.,* this adversary proceeding—if they are "core." "Core proceedings "include, but are not limited to" 16 enumerated categories of proceedings,[97] which nearly entirely relate to bankruptcy courts' historic core functions.

97  28 U.S.C. § 157(b).

### A. Limits on Use of the Turnover Power

The limits on bankruptcy judges' powers to decide disputes when estates seek to augment their assets and bring claims arising under state or other nonbankruptcy law can delay litigation. In an effort to shortcut such litigation delays, the Trustee relies on the Bankruptcy Code's "Turnover" provision, Bankruptcy Code section 542. That section, captioned "Turnover of property to the estate," provides, in relevant part (with exceptions not relevant here):

(a) ... [A]n entity, other than a custodian, in possession, custody, or control, during the case, of property that the trustee may use, sell, or lease under section 363 of this title ... shall deliver to the trustee, and account for, such property or the value of such property, unless such property is of inconsequential value or benefit to the estate.

(b) ... [A]n entity that owes a debt that is property of the estate and that is matured, payable on demand, or payable on order, shall pay such debt to, or on the order of, the trustee, except to the extent that such debt may be offset under section 553 of this title against a claim against the debtor.

And 28 U.S.C. § 157, in recognition of bankruptcy courts' historic *in rem* jurisdiction, and bankruptcy courts need to bring in and

administer property of the estate, lists "orders to turn over property of the estate" as included within core proceedings.\*

**98**    *See* 28 U.S.C. § 157(b)(2)(E).

But "mere characterization of an action as a complaint for turnover does not mean that it is a turnover action pursuant to 28 U.S.C. § 157(b)(2)(E))."⁹⁹ To have the statutory and constitutional power to issue a final order that the Turnover Power provides,¹⁰⁰ a bankruptcy judge does not need to conclude that the estate will prevail, either in full or in any particular respect. But the bankruptcy judge does need to be comfortable that the Turnover Power has been properly invoked. This presents a threshold issue that doesn't impede the Trustee's ability to ultimately win, but may require this Court to make a \*97 Report and Recommendation before a final order can be entered by the district court.

**99**    *Shea & Gould v. Red Apple Companies, Inc. (In re Shea & Gould),* 198 B.R. 861, 865 (Bankr.S.D.N.Y.1996) (Garrity, J.) ("*Shea & Gould* ").

**100**    *Stern* makes clear that the constitutional and statutory limits are not necessarily the same, and that a claim that is a core matter under 28 U.S.C. § 157 may nevertheless be beyond a bankruptcy judge's constitutional power to issue a final order. But the distinction does not matter here.

[1]This Court addressed the conceptual underpinnings of turnover actions in its opinion in *Pali Holdings,*¹⁰¹ and that discussion need not be repeated in comparable length here. As explained more fully in *Pali Holdings,* turnover actions assist the bankruptcy court in the exercise of its *in rem* jurisdiction by enabling trustees to marshal the *existing* assets of an estate for the benefit of the estate's creditors.¹⁰² Under section 542's first subsection, section 542(a), turnover of property may be sought and obtained by what is in substance a federal right of replevin—a right to recover the estate's property in kind, with the ability to get the value of the property as a substitute.¹⁰³ Section 542's second subsection, section 542(b), provides what is in substance a mechanism for monetizing a receivable that is property of the estate.¹⁰⁴ "Each, importantly, provides a means for the estate to secure the benefits of property that *already* is property of the estate."¹⁰⁵

**101**    *Geron v. Peebler (In re Pali Holdings, Inc.),* 488 B.R. 841 (Bankr.S.D.N.Y.2013) (Gerber, J.) ("*Pali Holdings* ").

**102**    *See id.* at 851–53.

**103**    *Id.* at 849.

**104**    *Id.*

**105**    *Id.* Thus, section 542(b) can be used to monetize estate assets such as notes or accounts receivable that are already property of the estate. *Id. Pali Holdings* was a garden-variety example of that.

[2]Where the turnover power is properly invoked, it is simply an effort to recover property—or *on* property—that is *already* property of the estate. That invokes the court's *in rem* jurisdiction over the bankruptcy *res.*¹⁰⁶

**106**    *See id.* at 851–52.

[3]But as this Court explained in *Pali Holdings,* "the turnover power can be improperly invoked, especially when it is used as a Trojan Horse for bringing garden variety contract claims; when the property in question is not already property of the estate; or when the turnover statute is used to recover assets with disputed title when the estate's claim of ownership is legitimately

debatable. It is well established that the turnover power may not be used for such purposes."[107]

107   *Id.* at 851 n. 39. *See also In re Fairfield Sentry Ltd.,* 458 B.R. 665, 683 (S.D.N.Y.2011) (Preska, C.J.) ("Numerous courts have therefore held that an action is non-core when property which is the subject of a significant dispute between the parties is sought to be recovered through a turnover action.... These actions are subject to significant dispute, resolution of which will determine whether the funds redeemed are in fact property of the Funds' estates.") (citations and internal quotations omitted).

[4]Though the matter is close—as the Court finds Composite's defenses here to be largely frivolous, and the Court cannot even find that they are *bona fide*—the Court nevertheless is not in a position to determine that the cash or property to be delivered to Elite is *already* estate property. And though (as discussed above and below), Elite's redemption request has repeatedly been acknowledged to be pending and unpaid, and has been quantified in concept, the uncertainties as to the amount to be turned over make use of the turnover power inappropriate.[108] Unlike the entitlement *98 to payment on an account receivable or a promissory note, which is simply to be converted into cash, Elite does not yet own the redemption proceeds, and its entitlement here is not yet equivalent to recovery of a fixed sum, or tantamount to substituting one kind of asset for another.

108   *See Savage & Assocs., P.C. v. Mandl (In re Teligent, Inc.),* 325 B.R. 134, 137–38 (Bankr. S.D.N.Y.2005) (Bernstein, C.J.) (citing law holding, among other things, that an action should be regarded as a turnover "only when there is no legitimate dispute over what is owed to the debtor") (citations omitted); *Shea & Gould,* 198 B.R. at 867 (issuing report and recommendation, instead of final judgment, in debtor's action to recover fees for legal services rendered to the debtor, where court was doubtful that claim was sufficiently "specific in its terms as to amount due and date payable," and observing that "[a] turnover action may be inappropriate where the debtor's claim lacks such certainty").

As tempting as it is to push the statutory and constitutional envelope here given the conduct of Fletcher, the Management Company and others acting for Composite, the Court does not believe that it should stretch the turnover power that far. Prudence suggests that bankruptcy judges be wary of pushing the limits of their statutory and constitutional authority to avoid more problems of the type occasioned by *Stern.*

The Trustee may pursue her claims by a host of alternative means, but she cannot do so by means of the Turnover Power. Construing its turnover authority to avoid the Constitutional issue, the Court determines that her claims are non-core matters. And for that reason, the Court cannot enter the final judgment that 28 U.S.C. § 157(b)(2)(E)) would permit a bankruptcy judge to enter if the Turnover Power were appropriately invoked.

### B. What a Bankruptcy Judge May Nevertheless Do

Though the Trustee is unable to invoke the Turnover Power, that does not mean that Composite can stymie, especially for more than a short time, her efforts to enforce Composite's obligations. The Court can still issue a Report and Recommendation.[109]

109   *See* 28 U.S.C. § 157(c)(1) ("A bankruptcy judge may hear a proceeding that is not a core proceeding but that is otherwise related to a case under title 11. In such proceeding, the bankruptcy judge shall submit proposed findings of fact and conclusions of law to the district court, and any final order or judgment shall be entered by the district judge after considering the bankruptcy judge's proposed findings and conclusions and after reviewing de novo those matters to which any party has timely and specifically objected.").

[5]Additionally, the limits on bankruptcy judges' ability to enter final orders and judgments do not apply in situations where (as here, for reasons discussed below) a bankruptcy judge is issuing an order granting only *partial* summary judgment.[110] Even after *Marathon, Stern* and their progeny, a bankruptcy judge can still issue interlocutory orders, even in proceedings in which a bankruptcy judge does not have authority to issue a final judgment.[111]

110   _Bakst v. U.S.A. (In re Kane & Kane), 479 B.R. 617, 633–34 (Bankr.S.D.Fla.2012)_ (Kimball, J.) ("_Kane & Kane_"); _West v. Peterson (In re Noram Res., Inc.), 2012 Bankr.LEXIS 2991, *3–4, 2012 WL 2571154, *1 (Bankr.S.D.Tex. July 2, 2012)_ (Isgur, J.) ("_Noram Resources_").

111   _Noram Resources_, 2012 Bankr.LEXIS 2991, at *3–4, 2012 WL 2571154, at *1.

[6]A partial summary judgment that is not dispositive of claims is an interlocutory order, and doesn't implicate the constitutional limitations on the Court's authority to enter final judgments.[112] As explained in _Kane & Kane_:

*99 In this order, the Court grants partial summary judgment in favor of the Trustee.... Because this order is not dispositive with regard to all of the claims addressed in this adversary proceeding, and the Court will not enter partial judgment as a result of this ruling, this order "does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities." _Fed.R.Civ.P. 54(b)_, made applicable to this adversary proceeding by _Fed. R. Bankr.P. 7054(a)_. This order is not a final order.... Thus, even if the causes of action presented here would not be subject to entry of final judgment in this Court, the present order is not a "final judgment" subject to the Article III concerns addressed by the Supreme Court in _Stern_.[113]

112   _Id.; Kane & Kane, 479 B.R. at 633–34_ (a partial summary judgment order was not a final order for purposes of _Stern v. Marshall_ analysis). _See also West v. WRH Energy Partners LLC (In re Noram, Inc.), 2011 Bankr.LEXIS 5183, *3, 2011 WL 6936361, *1 (Bankr.S.D.Tex. Dec. 30, 2011)_ (Isgur, J.) (same, vis-à-vis a motion to dismiss under Rule 12(b)(6), where less than all claims were dismissed).

113   _Kane & Kane, 479 B.R. at 633–34_.

For reasons discussed below, the Court is not now in a position to award a money judgment in a fixed amount in favor of the Trustee. The more limited relief the Court now grants does "not end the action as to any of the claims or parties...."[114] Thus, any partial summary judgment order this Court might enter would not be a "final judgment," subject to the Article III concerns addressed in _Stern_.[115]

114   _Id._

115   _See Stern_, 131 S.Ct. at 2615, 2620 (specifically limiting the Supreme Court's analysis to "final judgments").

_II._

_Summary Judgment_

Composite's defense to summary judgment here effectively rests on two things. First, Composite argues that of the eight (and, the Court finds, now eleven) separate communications acknowledging Elite's redemption request; the absence of gating; the approximate amount owed to Elite; or some combination of those things, _only two_ are admissible in evidence—and that those two are too ambiguous to support Elite's entitlement.

Second, Composite submits an affidavit by Mr. Fletcher (who individually and through the Management Company, controls

Composite, as he previously controlled Elite), saying that he does not recall making the Redemption Request, and that he has looked for it and now cannot find it—though significantly (especially since Fletcher and companies and personnel he controlled were on both sides of the Redemption Request, and the request was made to the prior administrator HSBC, whose files Mr. Fletcher failed to check and repeatedly stated had not been fully turned over), *he never says that the Redemption Request was not in fact made.* Then, based on Fletcher's artful affidavit and its efforts to exclude the Trustee's evidence, Composite argues that the Trustee has not proven her case, or that there remain material disputed issues of fact. The Court disagrees.

The Court determines first that of the 11 items, 8 are admissible. The Court further determines that Mr. Fletcher's crafty responses do not raise issues of fact as to Elite's entitlement, except as to the exact amount that Elite is owed. Partial summary judgment in the Trustee's favor is appropriate now.

### A. Evidentiary Issues

Preliminarily, the Court must address Composite's contentions that the Trustee has moved for summary judgment "[r]elying on inadmissible documents and hearsay *100 statements,"¹¹⁶ and that only two of the eleven admissions supporting the Trustee's motion can be considered by the Court.¹¹⁷ Composite argues that documents have not been satisfactorily authenticated,¹¹⁸ though Composite is vague as to which, and never says that any particular document is not authentic. Composite also contends that six of the communications on which the Trustee relies are hearsay.

116    Composite Memorandum of Law In Opposition to Trustee's Motion for Summary Judgment (ECF No. 21) ("Composite SJ Br.") at 1.

117    Composite then goes on to argue that the remaining record—"three sentences in two letters written well after the alleged transaction," *id.*—is "ambiguous." But the Trustee's showing is supported by a great deal more than "three sentences in two letters," and even if it were (given what those letters said), the Court sees no ambiguity at all. *See* page 45 below.

118    Composite SJ Br. at 11.

It is clear, of course, that on a motion for summary judgment, parties may rely only on evidence that would be admissible at trial.¹¹⁹ But on the merits of the evidentiary objections, the Court overrules the authentication contention in its entirety. The Court sustains the hearsay objection with respect to two of the challenged communications (and excludes a third document on relevance grounds), and overrules it with respect to the remainder.

119    Fed.R.Civ.P. 56(c)(2) ("A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."). Fed.R.Civ.P. 56 is applicable in bankruptcy adversary proceedings under Fed.R.Bankr.P. 7056. Hereafter the Court refers only to Civil Rule 56 or other Civil Rules, without additional reference to Bankruptcy Rules, like Bankruptcy Rule 7056, that make the Federal Rules of Civil Procedure applicable in adversary proceedings.

### 1. Authentication

As one of the predicates for its assertions that most of the evidence offered against it is inadmissible, Composite argues that in order to be considered on this motion, each of the documents upon which the Trustee relies had to be authenticated through an affidavit or declaration made upon personal knowledge.¹²⁰ The Court disagrees.

120    *See* Composite SJ Br. at 16–17.

To address this, a court must focus on what Civil Rule 56(c)(2), quoted above,[121] actually says. It provides for the exclusion of matter that cannot be presented in a form that would be admissible in evidence—not that it is *not so* presented. *Collier*'s chapter on dealing with summary judgment in bankruptcy adversary proceedings makes this exact point, in so many words.[122] *Collier* then continues:

> It has been held, properly, that authentication of a document is not required at the summary judgment stage, and that is particularly proper in bankruptcy litigation. A different rule would result in often unnecessary expense for creditors and other stakeholders, and impose requirements inconsistent with efficient bankruptcy administration, in which relevant contractual documents are frequently submitted with no more than an attorney's affidavit or declaration attaching them to present them to the court. But other evidentiary objections (such as those that a document cannot *ever* be *101 authenticated or is hearsay, and could not, under any circumstances, be admissible) can provide bases for a court's determination not to consider them under Civil Rule 56(c)(2).

> *See* n.119 *supra.*

121

122    10 *Collier on Bankruptcy* ("*Collier*") ¶ 7056.05 (16th ed. 2015) ("[I]t is important to note that Civil Rule 56(c)(2) provides that a party 'may object that the material cited to support or dispute a fact *cannot* be presented in a form that would be inadmissible in evidence,' not that it *is not* so presented.") (emphasis in original).

[7]Composite understandably does not argue that the matter on which the Trustee relies could never be authenticated. While *bona fide* evidentiary objections can and should be considered at the summary judgment stage (which is why the Court considers each of the hearsay objections below), as to authenticity there is no basis for concluding that any of the documents is anything other than what it purports to be. And the fact that documents were attached to an attorney declaration without a supplemental affidavit by a document custodian or another with knowledge does not make them inadmissible for that reason.[123] To the extent the authenticity of the matter here presented to the Court is not obvious (as it is with respect to the January 2014 Martin Letter sent to the Court, and the transcripts of proceedings in this Court), there is no reasonable basis for concluding that the evidentiary material could *never* be authenticated; it simply would be time-consuming and expensive to do so.

> *See Lebewohl v. Heart Attack Grill LLC,* 890 F.Supp.2d 278, 297–99 (S.D.N.Y.2012) (Engelmayer, J.) ("*Lebewohl* ") (admitting documents downloaded from the Internet without an accompanying affidavit from document custodians).

123

And even at trial, under Federal Rule of Evidence 901(b), a document may be authenticated based on its "appearance, contents, substance, internal patterns, or other distinctive characteristics of the item, taken together with all the circumstances," the issue being whether a reasonable juror could find the evidence in question authentic.[124] A similar analysis can and should be performed at the summary judgment stage when a party raises a colorable authentication objection, but here such an objection is frivolous.

> *See, e.g., Lebewohl,* 890 F.Supp.2d at 298 (admitting documents attached to the declaration of a party's attorney, after discussing each of Rules 901(a) and 901(b) and noting that "[t]he bar for authentication of evidence is not particularly high").

124

By declaration,[125] Jones Day associate Michael J. Dailey described in great detail the process by which the documents upon which the Trustee relied were obtained from Mr. Fletcher; Fletcher Asset Management; personnel working for each; Pinnacle (the funds' Administrator); and the Porzio firm, which had received documents from each.[126] Mr. Dailey then stated that the documents attached to his declaration, having been received by that means, were "true and correct"[127]—which effectively means "unaltered." Having considered that declaration—which states, among other things, that the Trustee presented documents obtained from the very people now raising issues as to the documents' authenticity—the Court has no doubts whatever that they are authentic.

> ECF # 14.

125

126    *Id.* ¶¶ 3–11.

127    *Id.* ¶ 13.


*2. Hearsay*


The Court then considers the 11 individual documents and other forms of evidentiary matter to determine the extent to which any is inadmissible under the Hearsay Rule.


*1. May 2012 Loeb E–Mail*

[8]Ms. Loeb was an employee of Richcourt USA at the time she sent the e-mail, and the employees of Richcourt USA *102 provided administrative services to Composite, reporting to the directors of Soundview Capital Management, the investment manager for Composite. More fundamentally, Ms. Loeb and the others with whom she was communicating (including Composite directors Turner and Saunders, Mr. de Saram, counsel for Composite and other Soundview funds, and her Richcourt colleague, Michael Siedlecki) were working together to formulate responses to CIMA—including with respect to redemption requests, which were among Richcourt's areas of responsibility.


The May 2012 Loeb E–Mail plainly reflects the role of Ms. Loeb and Mr. Siedlecki as team members (and agents) in that collective effort. As a Richcourt employee with at least partial responsibility for advising the directors of the Management Company about redemption requests,[128] Ms. Loeb's statements were well within the scope of her role at Richcourt USA.[129]

128    *See Pappas v. Middle Earth Condo. Ass'n,* 963 F.2d 534, 537 (2d Cir.1992).

129    *See id.* at 538 ("The authority granted in the agency relationship need not include authority to make" the specific statement at issue, "but simply the authority to take action about which the statements relate."); *Union Mut. Life Ins. Co. v. Chrysler Corp.,* 793 F.2d 1, 8 (1st Cir.1986) (There is nothing in Rule 801(d)(2)(D) that requires an admission be made by a management level employee. A lower level employee, may make admissions under Rule 801(d)(2)(D) based on information he acquired through his employment, so long as the employee doesn't lack the authority to make the routine admission.).

The Court flatly disagrees with Composite's contention that the e-mails comprising Exhibit F to the Dailey Declaration, including the May 2012 Loeb E–Mail, "are not party admissions, because they contain statements made on behalf of Elite, not Composite."[130] The e-mail chain was part of the collective effort to prepare the "Soundview letters," relating to Elite, Premium, Star *and Composite,* that were to be sent to CIMA on behalf of all of the Richcourt Funds, and the May 2012 Loeb E–Mail directly addressed issues with respect to the Composite response.

130    *See* Composite SJ Br. at 4.

The Court especially disagrees with Composite's contention insofar as it covers the May 2012 Loeb E–Mail itself—whose last two paragraphs expressly make reference to Composite; state facts with respect to Composite; and seek more information with respect to Composite—all for the purpose of the response to CIMA that was the subject of the team's joint effort, on behalf of Composite and other Fletcher Funds.

The Court therefore rejects Composite's arguments that the May 2012 Loeb E–Mail is inadmissible. The May 2012 Loeb E–Mail is not hearsay because it satisfies the requirements under Fed.R.Evid. 801(d)(2)(D) that a party must establish "(1) the existence of the agency relationship, (2) that the statement was made during the course of the relationship, and (3) that [the statement] relates to a matter within the scope of the agency."

The May 2012 Loeb E–Mail is admissible, and will be considered on this motion.

### 2. May 2012 Letter de Saram Letter
Mr. de Saram was an attorney for Composite; his response concerned his client Composite; he was asked by Composite's Board to respond to the Cayman Authorities earlier letter; and he was doing so on Composite's behalf.

Understandably, Composite does not object to the admissibility of the May 2012 de Saram Letter.[131] Having been written by *103 Composite's counsel, on Composite's behalf, to respond to CIMA's inquiry to Composite, it is a classic admission, falling squarely under Fed.R.Evid. 801(d).[132] It is not hearsay for that reason. The May 2012 de Saram Letter is admissible, and will be considered on this motion.

[131]  *See* Composite SJ Br. at 1.

[132]  *See* in particular Fed.R.Evid. 801(d)(2)(C) (excluding from hearsay a statement "made by a person whom the party [against whom the statement is offered] authorized to make a statement on the subject") and 801(d)(2)(D) (excluding from hearsay a statement "made by a party's agent or employee on a matter within the scope of that relationship and while it existed").

### 3. May 2013 Midanek Letter

[9]Ms. Midanek was a director of, among other funds, Composite. In that role, Ms. Midanek had a legal obligation to serve the company and its shareholders, with which she was attempting to comply. The May 2013 Midanek Letter provided information to the Cayman Authority in furtherance of what Ms. Midanek perceived as her and Composite's obligations to its stakeholders.

The May 2013 Midanek Letter clearly related to matters of legitimate concern to any corporate director; Mr. Fletcher's disapproval of her whistle-blowing does not change that fact. She was a director with the right, if not also the duty, to act in good faith to protect stakeholder interests.

And it does not matter that Ms. Midanek did not personally issue redemption requests, or handle other administrative matters. She had a legitimate concern as to whether Composite and the other funds were meeting their obligations to their investors—if for no reason other than CIMA could be anticipated to expect as much.

The May 2013 Midanek Letter is an admission. It is admissible, and will be considered on this motion.

### 4. June 2013 Siedlecki E–Mail

The hearsay analysis with respect to the June 2013 Siedlecki E–Mail is very much the same as with respect to the May 2012 Loeb E–Mail. At the time he sent the June 2013 Siedlecki E–Mail, Mr. Siedlecki (like Ms. Loeb) was a Richcourt employee, dealing with the administrative end of Composite's business. And here too, more fundamentally, Mr. Siedlecki was communicating incident to the team effort to formulate a submission to CIMA—including with respect to redemption requests, which were among Richcourt's areas of responsibility. The June 2013 Siedlecki E–Mail plainly reflects his role as team member in that collective effort. His discussion of facts to be incorporated into the letter then being drafted was well within the scope of his responsibilities.

The June 2013 Siedlecki E–Mail is an admission. It is admissible, and will be considered on this motion.

*5. June 2013 Fletcher E–Mail*
Mr. Fletcher made the statements in the June 2013 Fletcher E–Mail in the scope of his own employment, for each of the funds (including Composite) for whom he was acting. Mr. Fletcher's statements also confirm that Mr. Siedlecki, when he made the statements in the June 2013 Siedlecki E–Mail, was acting within the scope of Mr. Siedlecki's employment as well.

The June 2013 Fletcher E–Mail is an admission. It is admissible, and will be considered on this motion.

*6. July 2013 Turner E–Mail*
The hearsay analysis with respect to the July 2013 Turner E–Mail is closely similar to that with respect to the June 2013 Fletcher E–Mail, and especially the June *104 2013 Siedlecki E–Mail and the earlier May 2012 Loeb E–Mail. At the time he sent the July 2013 Turner E–Mail, Mr. Turner was a Composite director and working on Composite business. And more fundamentally, here too, Mr. Turner was communicating incident to the team effort to formulate a submission to CIMA—including with respect to redemption requests. The July 2013 Turner E–Mail plainly reflects his role as team member in that collective effort. His discussion of facts to be incorporated into the letter then being drafted was well within the scope of his responsibilities.

The June 2013 Turner E–Mail is an admission. It is admissible, and will be considered on this motion.

*7. June 2013 Midanek Letter*
[10]The Court is mindful of Solon's—and hence Ms. Midanek's—status as a Composite director at the time of many of the key events in question here, and is likewise mindful of its ruling that her earlier May 2013 Midanek Letter, written in her capacity as such and to advance the welfare of Composite stakeholders, was well within her authority and admissible as an admission.

But the hearsay issue here is more difficult, because while Ms. Midanek once more wrote CIMA as the Solon director of Composite (among other funds), the Composite Board, at least purportedly, had terminated Solon's status as such the preceding day. And while Ms. Midanek knew of Mr. Fletcher's intent to remove Solon from its directorship, and while she said any such effort would be improper, the Court is reluctant to allow the admission of a document premised on Solon's status as a director at the time that she wrote it when the Court would first have to find either that Mr. Fletcher's statement that Solon had been removed the preceding day was false, or that its removal was legally invalid—a determination that presumably would have to be made under Cayman law, with no help from either side on what Cayman law provides with respect to that issue.

Some hearsay exceptions rely on considerations of reliability, but this one does not; it rests on status—as an agent of a corporate party. It appears that rightly or wrongly, Mr. Fletcher and his fellow director Mr. Saunders determined to take away Ms. Midanek's status as a director-agent who could speak for Composite. Whether that firing of a troublesome whistleblower was a breach of fiduciary duty (or an additional breach of fiduciary duty) does not appear to be relevant to the evidentiary issue. In light of Solon's change in status, the June 2013 Midanek Letter cannot qualify as an admission, and it will be excluded and not relied upon by the Court on this motion.

*8. July 2013 Richcourt Funds Letter*
Understandably, Composite does not challenge the admissibility of the July 2013 Richcourt Funds Letter.[133] The Court determines that it is not hearsay, since it is a party admission,[134] and it is admissible here.

133    Composite SJ Br. at 1.

134    *See* Fed.R.Evid. 801(d)(2)(A) (excluding from hearsay a statement made by the party against whom the statement is offered).

*9. December 2013 Katz Affidavit*

[11]Mr. Katz was an accounting professional retained by the Elite estate back when it was a debtor-in-possession. The Katz Affidavit was submitted by Elite in opposition to the ultimately successful motion to appoint a chapter 11 trustee. In *105 contrast to the circumstances surrounding most of the other documents, it does not appear that Mr. Katz's services were enlisted as part of a team effort to benefit Composite. Rather, it appears that in fact as well as in law, he was serving only Elite—the entity for whom he had been retained to serve.

Under these circumstances, the Court cannot find that Mr. Katz was an agent for Composite, or that what he said was an admission of Composite. And as a professional brought in after the events at issue here, Mr. Katz lacked firsthand knowledge of the facts relating to Elite's redemption request.

There being no other potential hearsay exception shown to be applicable (as a predicate was not laid for admitting the underlying financial information as a business record, for example), the Katz Affidavit must be excluded, and it will not be considered on this motion.

*10. January 2014 Martin Letter*
The Court need not, and does not, determine whether Mr. Martin's remarks should be admitted as admissions bearing on summary judgment. It will not be relying on them in its summary judgment determination anyway, as they are insufficiently relevant to that inquiry. The Court can, and will, consider the January 2014 Martin Letter as containing admissions relevant to the asset freezing injunction request, considered separately below.

*11. March 2014 Martin Statements*
Mr. Martin's remarks—and especially the motion that he had filed occasioning those remarks—support, and ultimately justify,

the admissibility of the March 2014 Martin Statements.

As noted above, Mr. Martin's remarks in court on March 19, 2014 were made while prosecuting a motion filed, as relevant here, on behalf of Mr. Fletcher, Mr. Ladner, Mr. Saunders, Mr. Turner, and the Management Company. The motion filed on their behalf (which thus was an admission of each of them) stated that none of the Soundview Debtors had any "direct employees," and that services were provided to them by "associated management companies and unassociated service providers." The motion stated that "Soundview Management [*i.e.*, the Management Company] *directed the efforts of the Debtors' counsel* and financial advisors on all matters pertaining to the estate's investments, which stated differently, means estate assets."[135] And the Management Company was likewise the manager for Composite. The same company—run by the same Mr. Fletcher—was directing both. Under these circumstances, the Court is unwilling to find, as Composite argues, that Mr. Martin was speaking only for Elite, and not Composite. He was taking directions from the same Mr. Fletcher, who until displaced by the Trustee on the Soundview Debtors' side, was managing both.

135    *See* page 23 *supra.*

Wholly apart from that, the Court is mindful of what Mr. Martin was trying to accomplish by the motion and the remarks he made in court supporting it. He was appearing on behalf of Mr. Fletcher, Mr. Ladner, Mr. Turner, and Fletcher Asset Management, among others, *to get them paid.* He was acting for *their* benefit—not, at this time, for Elite, Premium or Star. They cannot now be heard to say that Mr. Martin was not really speaking for them.[136]

136    *See United States v. McKeon,* 738 F.2d 26, 30 (2d Cir.1984) (it is "well established" that "[s]tatements made by an attorney concerning a matter within his employment may be admissible against the party retaining the attorney") (internal citation omitted).

*106 The March 2014 Martin Statements are admissions, and thus not hearsay. They are admissible and will be considered on this motion.

* * *

For the reasons stated, the hearsay objections to the June 2013 Midanek Letter and the Katz Affidavit on summary judgment are sustained. The Court will not consider the January 2014 Martin Letter for summary judgment purposes, as the Court regards that letter to be insufficiently relevant to summary judgment. All other evidentiary objections are overruled.

## B. Merits of Summary Judgment Motion

Having considered the admissible evidence put forward by the Trustee on her summary judgment motion, and Mr. Fletcher's affidavit in opposition, the Court determines that it does not yet have enough information to fix the exact amount due from Composite to Elite. But the Trustee has satisfactorily shown everything else. Mr. Fletcher's responsive affidavit, discussed below, is notable for its evasiveness and indirection, and its efforts to disavow what Composite told CIMA when CIMA was investigating, among other things, issues of the very type present here—the extent to which Composite and other funds under Mr. Fletcher's control were failing to honor redemption obligations to their customers. More fundamentally, Mr. Fletcher's affidavit is notable for its failure to put forth any evidence to contradict, by actual evidence, the many earlier admissions on which the Trustee relies, addressed above and below.

Mr. Fletcher's responses fail to create issues of fact. Partial summary judgment will be granted on all but the amount due, and, incident to that, the Court will issue the particular determinations set forth below.

*1. Summary Judgment Standards*

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[137] The moving party bears the initial burden of showing that the undisputed facts entitle it to judgment as a matter of law.[138] Then, if the movant carries this initial burden, the non–moving party must set forth specific facts to show that there are triable issues of fact, and cannot rely on pleadings containing mere allegations or denials.[139]

[137] Fed.R.Civ.P. 56(a); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

[138] *See Rodriguez v. City of New York,* 72 F.3d 1051, 1060–61 (2d Cir.1995); *Ferrostaal, Inc. v. Union Pacific R.R. Co.,* 109 F.Supp.2d 146, 148 (S.D.N.Y.2000) ("The initial burden rests on the moving party to demonstrate the absence of a genuine issue of material fact...."); *Pali Holdings,* 488 B.R. at 845.

[139] *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *Jeffreys v. City of New York,* 426 F.3d 549, 554 (2d Cir.2005); *Kittay v. Peter D. Leibowits Co., Inc. (In re Duke & Benedict, Inc.),* 265 B.R. 524, 529 (Bankr.S.D.N.Y.2001) ("[T]he nonmoving party must set forth specific facts that show triable issues, and cannot rely on pleadings containing mere allegations or denials.").

In deciding a summary judgment motion, it is well settled that the Court should not weigh the evidence or determine the truth of any matter, and must resolve all *107 ambiguities and draw all reasonable inferences against the moving party.[140] A fact is material if it "might affect the outcome of the suit under the governing law."[141] An issue of fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[142]

[140] *See Matsushita,* 475 U.S. at 587, 106 S.Ct. at 1356 (summary judgment is appropriate "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party"); *Virgin Atlantic Airways Ltd. v. British Airways PLC,* 257 F.3d 256, 262 (2d Cir.2001); *Lovejoy–Wilson v. NOCO Motor Fuel, Inc.,* 263 F.3d 208, 212 (2d Cir.2001) ("We ... constru[e] the evidence in the light most favorable to the non-moving party.").

[141] *See Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510.

[142] *Id.*

*2. The Trustee's Showing*

For reasons discussed above, the great bulk of Composite's evidentiary objections to the Trustee's showing have been overruled. By Composite's own admissions—including some that Mr. Fletcher himself endorsed[143]—the Trustee put forward admissible evidence establishing:

(1) Composite's only outside investor during the relevant period has been Elite;[144]

(2) Elite requested a full redemption,[145] by no later than May 2012;[146] and even more clearly by July 2013;[147]

(3) The trade date for Elite's redemption was September 30, 2011;[148]

(4) Composite's redemptions have never been suspended;[149]

(5) Composite's redemptions have never been gated;[150]

(6) There has been no reason for Composite to gate redemptions, since Composite has only one investor;[151]

(7) Elite's redemption request was outstanding as early as May 2012,[152] and remains outstanding today;

(8) The value of Elite's redemption request, as estimated by Composite, ranges from $5 million[153] to $3.8 million,[154] and thus is no less than $3.8 *108 million;[155] and

(9) The estimated value of Composite's portfolio as of July 2013 was $5.155 million.[156]

143    *See* June 2013 Fletcher E–Mail (telling Mr. Turner to incorporate the matter stated by Michael Siedlecki into what became the July 2013 Richcourt Funds Letter, which included Mr. Siedlecki's observations, among others, that only Elite, Premium and Star had gated redemptions, and thus that Composite had not).

144    *See* May 2012 Loeb E–Mail; May 2012 de Saram Letter; May 2013 Midanek Letter.

145    *See* May 2012 Loeb E–Mail; May 2012 de Saram Letter; May 2013 Midanek Letter; July 2013 Richcourt Funds Letter.

146    *See* May 2012 Loeb E–Mail; May 2012 de Saram Letter.

147    *See* May 2013 Midanek 2013 Letter (confirming that Elite's redemption request was pending as of May 2013); July 2013 Turner E–Mail (same, as of July 2013); July 2013 Richcourt Funds Letter (same, as of July 2013).

148    *See* May 2013 Midanek Letter.

149    *See* 2012 Loeb E–Mail; May 2012 de Saram Letter; May 2013 Midanek Letter.

150    *See* 2012 Loeb E–Mail; May 2012 de Saram Letter; May 2013 Siedlecki E–Mail; July 2013 Turner E–Mail; July 2013 Richcourt Funds Letter

151    May 2012 Loeb E–Mail.

152    May 2012 de Saram Letter. It was also said to be outstanding as of May 2013, *see* May 2013 Midanek Letter; June 2013, *see* June 2013 Siedlecki E–Mail; and July 2013, *see* July 2013 Turner E–Mail and July 2014 Richcourt Letter.

153    July 2013 Turner E–Mail; July 2013 Richcourt Letter.

154    March 2014 Martin Statements.

155    Elite, as Composite's only shareholder, was entitled to the entirety of Composite's net assets. But declines in the value of those assets could (and likely would) result in the differences between the $5 million and $3.8 million figures. This could be confirmed or disproved in the trial to follow when Elite's exact entitlement will be determined.

156    July 2013 Turner E–Mail.


*3. Composite's Response—The Redemption Request*


Apart from its contentions that most of the Trustee's showing was inadmissible (which, except with respect to the June 2013 Midanek E–Mail and Katz Affidavit, the Court now has rejected), that the Trustee's evidence is "ambiguous," and that the above facts are still not enough, Composite relies solely on an affidavit by Mr. Fletcher in opposition to the Trustee' summary judgment motion. That affidavit is insufficient to rebut the Trustee's showing, or even to create issues of material fact.


Mr. Fletcher's affidavit consists of 39 paragraphs. In none of them does Mr. Fletcher ever say that the redemption request was not made. Nor does he say that the redemption request—directly acknowledged four times,[157] including by the Richcourt team whom he personally directed,[158] and whose submission to CIMA he personally edited[159]—does not exist.

157    *See* page 47 & n.145 *supra*.

158    *See* e-mails from Mr. Fletcher of June 26, 2013 (2:53 p.m.), June 27, 2013 (2:43 and 2:59 p.m.), June 28, 2013 (5:27 p.m.), June 30, 2013 (9:28 p.m.), July 9, 2013 (1:53 p.m., 3:31 p.m. and 6:50 p.m.), all parts of Dailey Decl. Exh. J. For example, as appearing in those e-mails, Mr. Fletcher wrote on June 26, "Stewart, Please draft a letter, on behalf of the Cayman Richcourt funds to the Cayman Islands Monetary Authority, that incorporate the information from Michael's earlier email below and the following suggestions which address the derogatory letter that Deborah sent to CIMA the after [*sic.*] she was removed as a director. After the four of us review it and finalize edits, Floyd can share it with Cayman counsel." On the next day, Mr. Fletcher asked "When might a draft be ready?" and 16 minutes later, "Please try to provide a first draft today."
       Finally, in the July 9, 2013 (3:31 p.m.) e-mail, Mr. Fletcher wrote "Thank you very much. Floyd, I think the letter is ready."

159    *See id.* For example, on July 10, 2013 (9:18 a.m.), Mr. Fletcher directed his team: "We're sending it signed by the funds rather than directors." Thus the signatories on the July 2013 Richcourt Funds Letter were not Mr. Fletcher or any of the others on the team he directed, but rather "Soundview Composite Ltd." and other Richcourt funds.

Rather, Mr. Fletcher says a variety of other things—presumably to imply, though without saying, that the admitted redemption request was not made—which fall well short of refuting Composite's earlier admissions. Thus, Mr. Fletcher says that the Trustee (who got what documents she could from Mr. Fletcher, companies Mr. Fletcher controlled, and their counsel) "does not present the actual redemption request."[160] He says "[t]he Trustee does not provide *direct* proof that any of this happened."[161] But "direct proof" (assuming that means producing the document embodying the request itself) is not the point. The Trustee has adduced eight separate admissions that it did, indeed, happen.[162]


160    Fletcher Aff. ¶ 2.

161    *Id.* ¶ 3 (emphasis added).

162    Additionally, Mr. Fletcher submits two more—in Ex. 6 to his affidavit, reflecting "Trade Instructions" showing a trade for Composite, dated June 5, 2011, for the "Full Amount" of a redemption with a "Dealing Date" of 9/30/2011, for a "Redemption," with Notes stating "Full Position Redemption. Approx. $5.66mm," followed, two pages later, by "Projected Payout Schedules" showing a payout for Composite of $5.663 million in Oct. 2011.

*109 Mr. Fletcher goes on to say that "I have searched both Composite's files and [the Management Company's] files and I have not found the redemption request...."[163] But he does not say that he searched the files of HSBC, Composite's administrator at the time—to whom the request would have been sent. And merely saying that he had not found the Redemption Request (apart from his failure to address the fact that *he failed to look in the most likely place where it would be* ) says nothing about whether the previously acknowledged redemption request ever existed.

163    *Id.* ¶ 10. He also says that Elite "presumably" kept a copy of the request, and "the Trustee has all of Elite's files."

In fact, Mr. Fletcher acknowledges this very problem. Recognizing that he and his colleagues expressly acknowledged the Redemption Request in the July 2013 Richcourt Funds Letter, he seeks relief from the admission by saying that it "was prepared at a time of great turmoil."[164] He notes that after resigning as fund administrator in July 2011, HSBC held the documents pertaining to the funds that the Management Company managed (including Composite),[165] and that without those documents, it would be "impossible to ascertain the exact status of the transactions for the [Management Company]-managed funds"[166]—which included Elite and Composite. Yet as noted, Mr. Fletcher does not say that he searched HSBC's files. And he does not say that documents Composite received from HSBC were complete. Thus Mr. Fletcher's assertions as to what he could not find—especially given the places that he searched and did not search—cannot rebut what people with actual knowledge of the facts said at the time.

164    Fletcher Aff. ¶ 22.

165    *Id.*

166    *Id.*

Nor do Mr. Fletcher's other responses give the Court anything substantive. He says, once again (this time with respect to Elite's other two directors, Messrs. Turner and Kiely), that he has "seen no evidence" that either of the other directors "knew of or ratified the alleged request in 2011," but ignores the fact that Mr. Turner, the original drafter of the July 2013 Richcourt Funds Letter, knew of the Elite Redemption Request when the letter Mr. Turner drafted in June and July 2013 *expressly made mention of it* (and Mr. Fletcher obviously knew of it then as well), and Mr. Fletcher is notably silent about ever having talked to anyone else at Elite about it.

In fact, Mr. Fletcher says cryptically, that "I have, however, found a proposal for a similar request that was never approved."[167] And he admits that on June 6, 2011, Dean Rubino, a Richcourt employee, sent "a group of proposed redemptions" to his fellow director Mr. Kiely, and that "[t]he group included a redemption of Elite's remaining position in Composite with a 'dealing date' of September 30, 2011."[168] Mr. Fletcher claims that the request was not approved by anyone with authority to honor it.[169] But his denial does not negate the fact that the request was made.

167    *Id.* ¶ 15.

168    *Id.* ¶ 16.

169    *Id.*

Then, further to his "I have found no evidence" defenses, Mr. Fletcher says that *110 "I have found no evidence that a redemption request from Elite to Composite ever went through a full formal review and was approved by authorized executives."[170] But Mr. Fletcher never details the review that was required, what that review might determine, or why it would be an impediment to honoring the redemption. It will be recalled that the Composite Articles merely prescribed that any redemption request "be in writing"; that it specify the number and class of shares to be redeemed; and that it be "signed by the holder thereof."[171] No "full

formal review" and approval was required.

> *Id.* ¶ 10.

170

171    *See* page 5 *supra.*

Then Mr. Fletcher explains that the July 2013 Richcourt Funds Letter (which he acknowledges he "helped write"[172]), rather than giving "an assurance of payment" of a redemption request, was no more than a statement of an intent to "appropriately satisfy the pending redemptions in accordance with the governing documents."[173] This, he explains, was not really a statement of an intent to honor the redemption (despite its natural interpretation), but rather of an intent to parse the documents for the ability to decline the request. Thus he says:

> Though a redemption request to Composite may have been made, the request had to be reviewed and would have to abide a vetting in accordance with the governing documents, including Composite's Articles of Association (which requires the redemption request to be signed by an authorized representative), and the Private Placement Memorandum (which requires delivery to the fund administrator). There is no statement in the letter that the purported request met the requirements of those documents, was valid, and was due and owing."[174]

But these qualifications grossly overstate the requirements of the approval process—which, as just noted, required nothing more for a redemption than a writing, a statement of the amount to be redeemed, and a signature. If there were an unstated requirement for more, what was told to CIMA was a half-truth at best. But there was no requirement for more. Mr. Fletcher has failed to raise a valid defense to the existence of the repeatedly acknowledged redemption demand, or even to create an issue of fact with respect to it.

> Fletcher Aff. ¶ 21.

172

173    *Id.*

174    *Id.*

Finally, with respect to a redemption request having been made, Mr. Fletcher says "Well, if I wanted the redemption done and controlled all the participants, then the redemption should have been done when I gave the order, but there never was a redemption."[175] But apart from its reliance on inference and not facts, this says nothing upon which the Court can base a finding other than that there never was a redemption, and that after the request was made, Mr. Fletcher did *not* want the redemption made.

Thus, nothing Mr. Fletcher said is sufficient to contradict the admissions, which squarely acknowledged the redemption requests, and stated that the redemption requests were still pending.

### 4. Composite's Response—Gating

Composite likewise relies on Mr. Fletcher's affidavit with respect to its Gating *111 defense.[176] Mr. Fletcher contends, in substance, that Composite's documents had always given it the right to gate redemption requests[177] (unless that right was waived by Composite's directors, which he says had not happened),[178] and implies (without quite saying) that the fact that Composite had never gated redemptions in the past didn't mean that it couldn't do so in the future. Mr. Fletcher further says Mr. de Saram was wrong when he said Composite had never been gated,[179] and disputes Ms. Loeb's statement that there would be no reason to gate redemptions when Composite had only one investor—as this, Mr. Fletcher asserts in his affidavit, "would give Composite additional time to maximize the value of its holdings and earn a profit while the redemption paid gradually [*sic*]."[180] He also

contends that there was a reason that an asserted Composite right to gate redemptions was not mentioned in the July 2013 Richcourt Funds Letter responding to CIMA—because there had been no redemptions *since May 2012*, and that this was the only thing that CIMA asked Composite about.

| | |
|---|---|
| 175 | Fletcher Aff. ¶ 11. |
| 176 | *See* Fletcher Aff. ¶¶ 30–34. |
| 177 | *See id.* ¶ 30–31 |
| 178 | *Id.* ¶ 31. |
| 179 | *Id.* |
| 180 | *Id.* ¶ 32. |

The Court agrees with Mr. Fletcher that Composite's documents gave it the right to gate redemptions, and that (putting aside what would have been fully honest responses to CIMA), there would be a distinction between Composite's having the right to gate redemptions and its actually exercising that right—a distinction that Composite, if it really wanted to make that distinction, blurred in its several communications internally, and more importantly to CIMA. But the Court disagrees with Composite in every other respect. And it finds Mr. Fletcher's gating contentions to be insufficient to provide a defense to the Trustee's claims now.

The Court rejects Composite's gating defense for three separate reasons.

First, assuming that Composite had the right under its documents to gate redemptions, the record is devoid of any indication that Composite did so. Mr. Fletcher proffers no board minutes or other contemporaneous indications of any action on his part, or his associates', to make or communicate a gating determination, even after this controversy blew up.[181] And even in his affidavit on this motion, Mr. Fletcher does not say when and how any determinations to exercise the right to gate were ever made.

| | |
|---|---|
| 181 | Ms. Loeb stated in the May 2012 Loeb E–Mail that redemptions from Composite had never been gated, and that was passed on to CIMA by Mr. de Saram in the May 2012 de Saram Letter the next day. Those statements were accurate; Composite had never invoked gating to deny an investor the right to the prompt return of its NAV. But if, as Mr. Fletcher now says, Composite *reserved the right* to gate redemptions without having *yet exercised* that right (and gating justified Composite's failure, prior to May 2012, to honor Elite's 2011 redemption request to Composite), Composite told CIMA a half-truth—not because Mr. de Saram was less than candid, but because (assuming Mr. Fletcher's gating contentions to be true) Composite had not told Mr. de Saram of the asserted right that purportedly had been reserved. In any event, gating was not the reason for Composite's failure to honor Elite's redemption request in the period from June 2011 to May 2012, if, in fact, it ever was. |

Second, Ms. Loeb was right that gating would serve no purpose when Composite had only a single investor. It now is sophistry for Mr. Fletcher to contend that he could withhold the full redemption requested *112 by his only investor to try to make a bigger profit. A bigger profit for whom? The profit (or loss[182]) *would go to Composite's single investor Elite in any event* —and Composite's single investor had stated that it wanted its money back then. Mr. Fletcher could not appropriately withhold the redemption for any other kind of gain or profit, *e.g.*, to achieve continued management fees for the Management Company or himself.

| | |
|---|---|
| 182 | As of March 31, 2011, Composite records valued Elite's remaining shares at $6.358 million. By the time of Composite's various admissions, July 2013, the value had dropped to $5 million. By the time of the March 2014 Statements, the value dropped further to $3.8 million. |

Third, there is an additional problem with Composite's gating excuse here. Assuming that Composite had the right to gate (and putting aside Fletcher's lack of candor to CIMA if he intended to invoke a gating right without saying so), that right only gave Composite the authority to defer, not refuse, redemptions. Composite still had to pay out 10% of the NAV per quarter—*i.e.,* 40% per year. With the redemption request having been made no later than May 2012, at least 12 quarters now have passed, obligating Composite to have returned to Elite, by June 2015, the entirety of Elite's redemption request. Even assuming the right to gate when the Redemption Request came in, the time to pay Elite in full has now come and gone.

The gating right is a red herring. The Court rejects it as a defense.

*5. Composite's Response—Redemption Amount*

Composite further disputes the Trustee's showing of the amount of Elite's claim. Composite contends that the May 2013 Midanek Latter, the June 2013 Midanek Letter, and the Katz Affidavit are all inadmissible in evidence[183] (thus assertedly resulting in a failure of proof on the amount of Elite's entitlement), and that Elite's entitlement is only to the Composite NAV at the time of redemption—which, Composite says, could not be determined, because Composite had ceased to be audited. The Court agrees that only the approximate amount of Composite's claim is established on the existing record, but rejects all of Composite's remaining contentions.

183    *See* Fletcher Aff. ¶¶ 25–26.

As an evidentiary matter, the Court has excluded the June 2013 Midanek Letter and the Katz Affidavit, but the May 2013 Midanek letter has been admitted, and is part of the record. Moreover, Composite fails to address the July 2013 Turner E–Mail (noting not just the redemption request, but that it was in the estimated amount of $5 million); the July 2013 Richcourt Funds Letter (stating, once again, that the one pending redemption had an estimated value of $5 million); and the March 2014 Martin Statements (making reference to the redemption request, but quantifying it as only $3.8 million). They all are effectively saying the same thing, merely pegging a then-existing redemption request to the communicator's belief as to the value of Composite's net assets at that time.

The Court can and does quantify the Trustee's claim as "at least" $3.8 million, but is not otherwise in a position to now fix it in amount. But the Court rejects Composite's implication that the amount due to Elite can never be fixed. Further proceedings can clarify whether Elite's redemption entitlement is to $5 million, $3.8 million, or something in between. And an audit (which was never identified as a reason for failing to honor Elite's redemption *113 request) is not essential to determining the amount that must be returned to Elite. Elite's entitlement can be ascertained by all of the traditional means by which plaintiffs prove up their damages and similar entitlements when their counterparties have failed to honor contractual obligations, or by an accounting.

The parties have not sufficiently briefed the issues surrounding the amount of other creditors' claims; whether Elite's claim would be junior to, or *pari passu* with, those other creditors' claims; and whether claims against Composite by insiders (such as the Management Company, Fletcher, Saunders and Ladner) would be senior to (or even *pari passu* with) Elite's entitlement.[184] These matters typify why the Court, as convinced as it is that Composite's defenses to honoring its redemption argument are frivolous, cannot enter a full judgment—or, more precisely, make a full Report and Recommendation—now.

184    Depending on the answers to these questions, determining where, in the spectrum between $5 million and $3.8 million, Elite's entitlement falls may not matter, if even the lowest amount exceeds the assets Composite would have left. At this point, however, it is too soon to say.

*C. Judicial and Equitable Estoppel*

Apart from the merits of the Trustee's request for summary judgment, the Trustee makes a further argument as well—that summary judgment is warranted under the doctrines of equitable and judicial estoppel, based on prior positions taken in the underlying chapter 11 case—first, in the January 2014 Martin Letter; second, in statements by Mr. Martin in open court later on that same day, January 21; and third, when trying to recover fees for Mr. Fletcher and other Soundview Debtors' directors and the Management Company in March. The Court cannot, and does not, rely on the first two communications; they are inadmissible hearsay. But the third communication, while it does not support equitable estoppel, is admissible, providing a potential second basis for the Court's award of partial summary judgment here.

Ultimately, however, the Court determines that judicial estoppel is applicable only to the Trustee's request for the continued asset freeze, and not to her request for summary judgment.

*1. Evidentiary Matters*

Preliminarily, as a factual matter, the record on which the estoppel claims rest cannot include statements in the first two communications. In the January 2014 Martin Letter, Mr. Martin acknowledged that Elite and other Soundview Debtors had "*presented evidence* at trial that Soundview Composite owned Soundview Elite that amount,"[185] but his statement fell short of saying that amount was actually owed. And at the time, he was speaking for Elite alone, and Elite's interests at the time were adverse to Composite's.[186]

[185]   January 2014 Martin Letter at 1 (emphasis added).

[186]   By contrast, in March 2014, Mr. Martin was speaking for the Management Company, Fletcher, Ladner, Saunders and Turner, directing and controlling both entities, which is why the Court is unwilling to hold that he was speaking for Elite alone, and regards the March 2014 Warren Statements as an admission.

Later in court the same day, Mr. Martin's remarks were made in the same context as his letter. And though this time Mr. Martin expressly recognized the existence of Composite's debt, the interests of the Soundview Debtors and others (*e.g.,* the Management Company and Mr. Fletcher), while aligned in opposing the asset freezing TRO, were still adverse with *114 respect to the issues here on summary judgment. Thus the Court can consider Mr. Martin's statements then to be an admission only on the issue as to which their interests were aligned—*i.e.,* the asset freeze, discussed below.

Matters stated in the third of the communications on which the Trustee relies—the March 2014 Martin Statements—are, however, admissible for purposes of judicial estoppel, just as they were on summary judgment itself. At this time, as previously noted,[187] when seeking approval to get among others, Messrs. Fletcher, Ladner and Turner paid, Mr. Martin was acting for those individuals' benefit—with Mr. Fletcher present telephonically, and Messrs. Ladner and Turner present in court. They were benefitting from what Mr. Martin told the Court. But if they were benefitting from anything false that Mr. Martin might have said, they could have, and should have, said so. The Court finds unpersuasive their arguments that they could properly remain silent if a false statement was being made to the Court. Just as the March 2014 Martin Statements were ordinary admissions, the silence of Messrs. Fletcher, Ladner and Turner constituted adoptive ones.

[187]   *See* page 44 *supra.*

*2. Equitable Estoppel*

The Trustee then argues that equitable estoppel "principles" bar Composite from "walking away from its obligations."[188] The Trustee goes on to say that the Fletcher team "operated on and controlled both sides of the redemption request"[189]—and "should not be heard to raise objections about the mechanics of how the redemption request was placed and processed, the state of its own records, or its own lack of valuation data,"[190] or to renounce admissions made by people working on the Fletcher team's behalf.[191]

| | |
|---|---|
| 188 | Trustee Opening Br. at 25; see also *id.* at 26. |
| 189 | *Id.* at 26. |
| 190 | *Id.* |
| 191 | *See id.* |

The Court understands the Trustee's frustration. But it is compelled to agree with points Composite makes in opposition to the Trustee's equitable estoppel argument. With the inability to make credibility determinations on a summary judgment motion, the Court cannot rely on this yet. And the Court cannot see the requisite reliance by Elite, and resulting injury, resulting from statements made by Mr. Fletcher and those acting on Mr. Fletcher's behalf.

What the Trustee is really saying, in substance, is that Mr. Fletcher's excuses now, after controlling both sides of the redemption transaction, are highly offensive. That is true, but the Trustee's showing falls short of an equitable estoppel.[192]

| | |
|---|---|
| 192 | The Trustee also mentions, in passing, promissory estoppel. That doctrine is inapplicable here, as Elite's claim is premised on an actually existing contract, well supported by consideration. |

*3. Judicial Estoppel*

[12] [13]Judicial estoppel presents different issues. As explained by the Supreme Court in *New Hampshire v. Maine,*[193] and by the Second Circuit in *Adelphia Recovery Trust v. Goldman Sachs & Co.,*[194] the exact criteria for invoking judicial estoppel varies based on specific *115 factual contexts. But "courts have uniformly recognized that its purpose is to protect the integrity of the judicial process by prohibiting parties from deliberately changing positions according to the exigencies of the moment."[195] Courts invoke judicial estoppel when litigants "play 'fast and loose with the courts' by taking inconsistent positions in related proceedings."[196] In deciding whether judicial estoppel is warranted, courts in this circuit consider whether:

(i) the party's later position is clearly inconsistent with its earlier position,

(ii) the party succeeded in persuading a court to accept the party's earlier position, so that judicial acceptance of the inconsistent position in a later proceeding would create the perception that either the first or the second court was misled, and

(iii) the party seeking to assert an inconsistent position would derive an unfair advantage, or impose an unfair detriment on the opposing party, if not estopped.[197]

193    *532 U.S. 742, 121 S.Ct. 1808, 149 L.Ed.2d 968 (2001)* ("*New Hampshire* ").

194    *748 F.3d 110, 116 (2d Cir.2014)* ("*Adelphia–Goldman Sachs* ").

195    *New Hampshire,* 532 U.S. at 749–51, 121 S.Ct. 1808; *Adelphia–Goldman Sachs,* 748 F.3d at 116.

196    *Sperling v. U.S.,* 692 F.2d 223, 227 (2d Cir.1997) (Van Graafeiland, J., concurring), *superseded by statute on other grounds, as recognized by Triestman v. United States,* 124 F.3d 361, 368–69 (2d Cir.1997).

197    *Adelphia–Goldman Sachs,* 748 F.3d at 116 (citing *New Hampshire,* 532 U.S. at 750–51, 121 S.Ct. 1808).

Here, the position taken by Mr. Fletcher is plainly inconsistent with the statements made by Mr. Martin—and by Mr. Fletcher himself, in adoptive admissions when he remained silent if, as Mr. Fletcher now contends, Mr. Martin was wrong. And the reversal in position would give rise to both an unfair advantage and impose an unfair detriment on the opposing party—*i.e.,* the Trustee. But insofar as judicial estoppel is argued to support summary judgment itself, the second element is lacking. In March 2014, the Court assumed that the $3.8 million could be recovered by Elite from Composite (and thus that the Soundview Debtors' estates would have the funds to pay the requested fees), but made no findings on the existence of the redemption debt at that time.[198] Rather, the Court rejected the fee requests at that time for a host of other reasons—one of which was "claims going in the other direction [*i.e.,* by Elite and other Soundview Debtors against Mr. Fletcher and others] that might have to be addressed."[199]

198    *See* Tr. of Hrg. of 3/19/2014 at 31–32.

199    *Id.* at 32.

As judicial reliance on the March 2014 Martin Statements is lacking, judicial estoppel based on them on this summary judgment motion is not warranted.

*III.*

*Preliminary Injunction Freezing Composite's Assets*

[14]Though the Court can grant the Trustee's summary judgment motion only in part at this time, it can, and does, issue the requested preliminary injunction freezing the disposition of Composite's assets pending the completion of this case—which effectively means no more than determining the amount of Elite's monetary entitlement, and the entry of a final judgment by the district court embodying Composite's duty to pay it. The Court does so under each of Fed.R.Civ.P. 65(a) and Bankruptcy Code section 105(a), each of which provides separate authority for such measures.

*116 A. Traditional Civil Rule 65(a) Doctrine*
[15] [16]Civil Rule 65(a), made applicable to adversary proceedings by virtue of Bankruptcy Rule 7065, provides that a court

may issue a preliminary injunction after notice to the party against whom the injunction will be enforced. The issuance of a preliminary injunction is an equitable remedy and within the discretion of the court.[200] The purpose is "to maintain the status quo pending the trial and determination of the action."[201] The Court can and does grant a preliminary injunction freezing the disposition of Composite's assets—until the Trustee's monetary entitlement is computed, and the district court issues a final judgment—under traditional preliminary injunction standards, applicable in nonbankruptcy as well as bankruptcy-related matters.

200    *See, e.g., Collier* ¶ 7065.02.

201    *Id.; see also Deckert v. Independence Shares Corp.*, 311 U.S. 282, 290, 61 S.Ct. 229, 234, 85 L.Ed. 189 (1940) (preliminary injunction approved as "a reasonable measure to preserve the status quo pending a final determination of the questions raised").

[17]The standards for entry of a preliminary injunction in the Second Circuit, as set out in its well-known decision in *Jackson Dairy*[202] and its progeny,[203] are well established. As stated in *Jackson Dairy*, "the standard in the Second Circuit for injunctive relief clearly calls for a showing of (a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief."[204] Those requirements are easily met here.

202    *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70 (2d Cir.1979) ("*Jackson Dairy*").

203    *See, e.g., Christian Louboutin S.A. v. Yves Saint Laurent Am. Holdings, Inc.*, 696 F.3d 206, 215 (2d Cir.2012) (applying the *Jackson Dairy* standard, though not citing *Jackson Dairy* directly); *UBS Fin. Servs., Inc. v. W. Va. Univ. Hosps., Inc.*, 660 F.3d 643, 648 (2d Cir.2011) (citing *Jackson Dairy* ); *Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 (2d Cir.2010) (same); *In re Motors Liquidation Co.*, 513 B.R. 467, 479 (Bankr.S.D.N.Y.2014) (Gerber, J.) (same).

204    *See Jackson Dairy*, 596 F.2d at 72.


*1. Irreparable Injury*


If this Court allows Composite to dispose of its remaining assets now—especially after the Court's summary judgment ruling, making Composite's ultimate loss a certainty—Elite will be irreparably injured. Composite will be judgment-proof. And while a disposition of assets after this ruling would be a slam-dunk intentional fraudulent conveyance, recovering Composite assets from diverse transferees may well be impossible—and plainly extraordinarily burdensome and expensive.


Moreover, the risk of the dissipation of Composite's assets in the absence of an injunction barring such is very real. As more fully explained in an opinion of Judge Woods of the district court[205] (in which Judge Woods, on standing grounds, dismissed Mr. Fletcher's appeal from a 2014 order of this Court which, among other things, preserved the consensual restraints on Composite's assets[206]), Mr. Fletcher caused funds to be withdrawn from Composite's Wilmington Trust account under an order authorizing only a lesser amount of funds to be withdrawn, and for different *117 purposes. Mr. Fletcher used frozen funds not just for the purposes of paying counsel for Composite to defend it on these motions and in an investigation by the SEC (as this Court had authorized), but for a host of impermissible purposes. As Judge Woods stated, Mr. Fletcher and the Richcourt funds:

> eventually provided a more detailed accounting of the disbursed funds, which confirmed that they had been used to pay various fees to Fletcher and his associates and attorney, to post bonds in a separate appeal in this Court, and to pay debts owed by other entities owned by Fletcher.[207]

| 205 | See *Fletcher v. Ball (In re Soundview Elite Ltd.)*, 2015 U.S. Dist. LEXIS 60942, 2015 WL 2166023 (S.D.N.Y. May 8, 2015) (Woods, J.). |
|---|---|
| 206 | *Id.* at *13–14; 2015 WL 2166023 at *4–5. |
| 207 | *Id.* at *9–10 n. 4, 2015 WL 2166023 at *4 n. 4. |

Because Mr. Fletcher's prior actions were discovered quickly, it was possible, incident to the contempt proceedings that followed, to secure the return of the unauthorized withdrawals from Wilmington Trust, and the Trustee's injury turned out not to be irreparable. But she may not be as lucky the next time. Mr. Fletcher's past actions[206] underscore this Court's view that Mr. Fletcher cannot be allowed to do this again.[207] And if, as Composite contends, it is free to draw funds from the Wilmington Trust account because it was not bound by the earlier promises to keep the funds safe, the risk of injury to Elite *118 unless this Court enters an order that unmistakably binds Composite to the protection of those funds is even clearer.

| 208 | The Court considers these to be more than sufficient to explain its concerns. It declines, on hearsay grounds, to accept the Trustee's suggestion that the Court additionally rely on the findings of the FILB Trustee. |
|---|---|
| 209 | In its response to the preliminary injunction motion, and the Trustee's understandable concern that Composite reneged on assurances to the Court that funds at Wilmington Trust would not be dissipated, Composite justifies its actions on the contention that "none of the 'assurances' ... were made by anyone with authority to act on behalf of Soundview Composite." Composite PI Br. at 22 (ECF # 78). The Court disagrees. |

In providing an alternative to an immediate TRO, Mr. Martin was speaking to advance the interests not just of the Soundview Debtors, but also their affiliates—including, as Mr. Martin expressly stated, Composite. Statements in the January 2014 Martin Letter and at the January 21, 2014 hearing are admissible, as admissions, with respect to the preliminary injunction prong of the Trustee's motions, even though not admissible with respect to the summary judgment prong, because of what Mr. Martin said and their obvious purpose. Those statements were expressly made for the benefit of the Management Company and Mr. Fletcher personally, who were then hoping to preserve their reputations. Mr. Fletcher and the Management Company then had a joint interest in avoiding the entry of a TRO and subsequent preliminary injunction that could destroy the remainder of their business. As Mr. Martin stated:

The Soundview Debtors wish to avoid entry of any TRO under these circumstances out of concerns over continued damage they might suffer among creditors and investors as a result of the entry of a TRO. The repetition of loose allegations, found for example in this Emergency Motion, *e.g., see* paragraph 7, where it is stated that "The JOLs proved that the Fletcher Team is untrustworthy, committed fraud, and mismanaged the funds of the Debtors," if such allegations are immediately followed by the entry of a TRO, could be used as evidence against the Debtor *and its affiliates* in other jurisdictions to establish that this Court sanctioned *Soundview Composite* and these Debtors for some unspecified improper conduct.

January 2014 Martin Ltr. at 2 (emphasis added).

Composite further tries to minimize the danger to Elite in the absence of a preliminary injunction by saying that the Trustee does not allege that the purpose of taking money out of the Wilmington Trust account was to defraud creditors in collecting on their debts or to frustrate the enforcement of any future judgment that could be obtained by the Trustee. *See* Composite PI Br. at 22. Even if an intentional fraudulent conveyance was not the purpose of that transfer, that was its effect. And it gives the Court little solace in knowing that the prior actions were taken solely to achieve personal gain.

## 2. Likelihood of Success

Here the Trustee has shown much more than a likelihood of success. Except for ascertaining her monetary entitlement, and securing a district court judgment implementing her recovery, the Trustee has already fully won. The question now is not *whether* Elite will be entitled to the return of its investment (or what is left of it), but *when*.

## 3. Serious Issues and Tipping of Equities

An alternative basis for relief—serious issues going to the merits, coupled with a tipping of the equities in favor of the injunction—need not be considered to grant an asset-freezing preliminary injunction here, because of the Trustee's overwhelming showing on the merits. But if it were, it would easily be satisfied. The Trustee has shown much more than serious issues in her favor. And her showing is equally strong on the tipping of the equities. Elite will suffer grievously if Composite's funds are dissipated, especially since the residual ownership of the funds effectively already belongs to Elite. And Composite would not be prejudiced in the least; Composite has no claim to the funds whatever. Anything in the Wilmington Trust account belongs to either Elite or Composite's creditors.[210]

210    Normally the public interest is not a factor on preliminary injunction applications involving private disputes. If it were, it would likewise strongly support issuance of injunctive relief as well. There is a strong public interest in avoiding the dissipation of corporate assets that rightfully should go to creditors or other stakeholders.

## B. Section 105(a) Doctrine

[18]Additionally, where, as here, the plaintiff is a bankruptcy estate trying to recover its assets for funding a reorganization—even under a liquidating plan—there is an additional basis for injunctive relief preserving the property to be recovered. Section 105 of the Bankruptcy Code provides bankruptcy courts with a broad range of equitable powers in proceedings within its jurisdiction, including the power to issue any order "necessary or appropriate to carry out the provisions of this title." Among the actions that may be taken pursuant to this authority is an injunction freezing the assets of a defendant when the plaintiff is seeking equitable relief, such as the recovery of property or an accounting, both of which are requested here.[211] Such relief may also be awarded when it facilitates a reorganization plan. Here the Trustee is unlikely to confirm a plan calling for an operational reorganization, but a reorganization plan can also include an orderly liquidation—the most likely scenario here.

211    See *Adelphia Commc'ns Corp. v. Rigas (In re Adelphia Commc'ns Corp.)*, 2003 U.S. Dist. LEXIS 9349, at *12, 2003 WL 21297258, at *4 (S.D.N.Y. June 4, 2003) (Daniels, J.) ("*Adelphia–Rigas*") (bankruptcy court has authority to issue preliminary injunction when plaintiff seeks equitable remedy); *In re Keene Corp.*, 168 B.R. 285, 292 (Bankr.S.D.N.Y.1994) ("[T]he court can enjoin activities that threaten the reorganization process or impair its jurisdiction.").

The applicable law relating to the exercise of the section 105(a) injunction power was restated in the *Calpine* decisions.[212] As noted in *Calpine–District*, courts have applied the "traditional preliminary injunction *119 standard as modified to fit the bankruptcy context."[213] The *Calpine–District* court engaged in its analysis using the following factors: (1) whether there is a likelihood of successful reorganization; (2) whether there is an imminent irreparable harm to the estate in the absence of an injunction;[214] (3) whether the balance of harms tips in favor of the moving party; and (4) whether the public interest weighs in favor of an injunction.[215]

212    See *Calpine Corp. v. Nevada Power Co. (In re Calpine Corp.)*, 354 B.R. 45 (Bankr.S.D.N.Y. 2006) (Lifland, C.J.) ("*Calpine–Bankruptcy*"), aff'd 365 B.R. 401 (S.D.N.Y.2007) (Scheindlin, J.) ("*Calpine–District*").

213    365 B.R. at 409 & n. 25, citing *Hawaii Structural Ironworkers Pension Trust Fund v. Calpine Corp., Inc. (In re Calpine Corp.)*, 2006 U.S. Dist. LEXIS 92499, 2006 WL 3755175, *4 (S.D.N.Y. Dec. 20, 2006) (Castel, J.).

214    However, it has been repeatedly held in this district that the usual grounds for injunctive relief, such as irreparable injury, need not be shown in a proceeding for an injunction under section 105(a). See *LTV Steel Co. v. Board of Educ. (In re Chateaugay Corp.), 93 B.R. 26, 29 (S.D.N.Y.1988)* (Leval, J., then a District Judge); *Garrity v. Leffler (In re Neuman), 71 B.R. 567, 571 (S.D.N.Y.1987)* (Sweet, J.); *C & J Clark America, Inc. v. Carol Ruth, Inc. (In re Wingspread Corp.), 92 B.R. 87, 92 (Bankr.S.D.N.Y.1988)* (Brozman, C.J.); *Adelphia Communications Corp. v. The American Channel, LLC (In re Adelphia Communications Corp.), 345 B.R. 69, 85 (Bankr.S.D.N.Y.2006)*. In this case, irreparable injury to the Debtors' estate plainly is threatened anyway, as Elite has an undisputed interest in the funds held by Composite and there is a significant risk that Elite will be deprived of those funds (or a portion of them) in the absence of an injunction.

215    *Calpine–District* at 409.

Here too the circumstances strongly favor imposing a freezing injunction on Composite's assets. The four factors favor the Trustee in every respect.


*1. Likelihood of Success*
Although any reorganization plan the Trustee might propose would almost certainly be a liquidating plan, that does not foreclose this Court from finding the requisite likelihood of success.[216] The Trustee has had the support of the Soundview Debtors' creditors in her efforts to manage this chapter 11 case, and, as especially relevant here, to recover assets to benefit the estate. Any chapter 11 plan she might propose is unlikely to be controversial; after payments for expenses of reorganization, it is likely to conform to traditional bankruptcy obligations for *pari passu* treatment after satisfying any statutory priorities. Courts do not demand certainty of a successful reorganization; they expect only reasonable prospects of such.[217]


216    *Myerson & Kuhn v. Brunscwick Assocs. Limited Partnership (In re Myerson & Kuhn), 121 B.R. 145, 154 (Bankr.S.D.N.Y.1990)* (Abram, J.) ("Section 105 grants bankruptcy courts ample power to enjoin actions excepted from the automatic stay which might interfere in the rehabilitative process, whether in a liquidation or in a reorganization case.") (citations omitted); *The Lautenberg Foundation v. Picard (In re Bernard L. Madoff Inv. Sec., LLC), 512 Fed.Appx. 18, 20 (2d Cir.2013)* (granting preliminary injunction under section 105(a) in liquidation under SIPA); *McHale v. Alvarez (In re The 1031 Tax Grp., LLC), 397 B.R. 670, 686 (Bankr.S.D.N.Y.2008)* (Glenn, J.) (issuing preliminary injunction under section 105(a) to aid chapter 11 process even though chapter 11 trustee was pursuing chapter 11 liquidation plan)

217    See *Lyondell Chem. Co. v. Centerpoint Energy Servs. Inc. (In re Lyondell Chemical Co.), 402 B.R. 571, 590 (2009)* (Gerber, J.) ("*Lyondell Chemical* ") ("While if there are reasons to conclude that the debtor(s) *could not* reorganize, that plainly should affect debtors' ability to invoke this factor, where debtors are proceeding "on track" and have met the challenges they have faced so far, that is sufficient. The 'Likelihood of Successful Reorganization' factor has been satisfied here.") (emphasis in original, internal citation omitted).


*2. Irreparable Harm*

The Court has already addressed irreparable harm in the discussion above. Additionally, *120 courts in the Second Circuit have determined that irreparable harm need not be shown as a requirement for issuance of a preliminary injunction in the bankruptcy context where the action to be enjoined is one that threatens the reorganization process or which would impair the court's jurisdiction with respect to the case before it.[218] Thus, where the movant shows "that the action sought to be enjoined would embarrass, burden, delay or otherwise impede" the bankruptcy proceedings, or "if the stay is necessary to preserve or protect the debtor's estate," a bankruptcy court may issue injunctive relief.[219]

218    See *id.* ("Courts in the Second Circuit have recognized a limited exception to the irreparable harm requirement for issuance of a preliminary injunction in the bankruptcy context where the action to be enjoined is one that threatens the reorganization process or which would impair the court's jurisdiction with respect to the case before it. Thus, where the movant shows 'that the action sought to be enjoined would embarrass, burden, delay or otherwise impede the reorganization proceedings or if the stay is necessary to preserve or protect the debtor's estate or reorganization prospects, the Bankruptcy Court may issue injunctive relief.' ") (citing *Alert Holdings, Inc. v. Interstate Protective Servs., Inc. (In re Alert Holdings, Inc.),* 148 B.R. 194, 200 (Bankr.S.D.N.Y.1992) (Brozman, C.J.)).

219    *Id.* at 591.

### 3. Balance of Harms

The Court has likewise already addressed the balance of harms in the discussion above. For reasons there stated, Composite would not be harmed in the slightest by the preservation of the status quo, and Elite would be grievously injured if the investment it is about to recover is dissipated first.

### 4. Public Interest

Here too, the Public Interest factor favors the Trustee. It is in the public interest that entities meet obligations to creditors and other stakeholders, and it is in the public interest that commercial obligors not dissipate their assets—or, when they have already done so, that they not do it again.

For these reasons too, the Court finds issuance of an asset-freezing injunction appropriate.

### C. Grupo Mexicano Concerns

Additionally, Composite contends that the Court cannot preserve the status quo by reason of limits imposed under the Supreme Court's decision in *Grupo Mexicano.*[220] Once more, the Court disagrees.

220    *Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.,* 527 U.S. 308, 119 S.Ct. 1961, 144 L.Ed.2d 319 (1999) ("*Grupo* Mexicano").

Composite's *Grupo Mexicano* defense is unsupported for two reasons. First, it has been repeatedly held, in this District and elsewhere, and even at the Circuit Court of Appeals level,[221] that *Grupo Mexicano* *121 does not constrain the powers to freeze the disposition of assets held by bankruptcy courts, whose equitable authority is not derived from generally applicable, pre–1789 authority. As the Third Circuit, speaking through Judge Ambro, stated in *Owens Corning:*

In short, the Court's opinion in *Grupo Mexicano* acknowledged that bankruptcy courts *do* have the authority to deal with the problems presented by that case. One way to conceptualize this idea is to recognize that, had the company in *Grupo Mexicano* been in bankruptcy, the bankruptcy court would have had the authority to implement the remedy the district court lacked authority to order under general equity power outside the bankruptcy context.[222]

Here, where the Trustee is attempting to marshal the Elite estate's assets for the benefit of its creditors, and to protect those creditors from efforts to dissipate property that may technically not yet be estate property but will be imminently,

the Third Circuit's analysis in *Owens Corning* makes for a perfect fit.

221   *See In re Owens Corning,* 419 F.3d 195 (3rd Cir.2005) ( *"Owens Corning"* ) (quoted in main text); *Adelphia–Rigas,* 2003 U.S. Dist. LEXIS 9349 at *12, 2003 WL 21297258 at *4 ( *"Grupo Mexicano's* holding specifically applied to the district courts, and therefore is inapplicable in the bankruptcy court context."); *Shubert v. Premier Paper Prods., LLC, (In re American Tissue, Inc.),* 2006 Bankr.LEXIS 3266, *10–11, 2006 WL 3498065, *3 (Bankr.D.Del, Dec. 4, 2006) (Gross, J.) ("American Tissue") ("The duty of the Court is to preserve the relative positions of the parties pending a trial on the merits.... In the bankruptcy setting, the Court should be especially sensitive to situations which could result in the dissipation of estate assets ... and the Court's responsibility to prevent a wrongful taking of the bankrupt's assets provides it with a broader equitable power.") (citations, including a quotation from the portion of *Owens Corning* that distinguished *Grupo Mexicano,* omitted).

222   419 F.3d at 209 n. 14 (emphasis in original).

Second, the Court here would have the authority to issue an asset freezing injunction against Composite even if *Grupo Mexicano* applied to bankruptcy courts. Courts have routinely held that when equitable claims have been asserted, the *Grupo Mexicano* rule barring issuance of a preliminary injunction freezing assets does not apply.[223] The fact that a plaintiff may *also* have valid claims for damages does not result in a forfeiture of the asset- *122 freezing power.[224]

223   *See, e.g. Rubin v. Pringle (In re Focus Media, Inc.),* 387 F.3d 1077, 1085 (9th Cir.2004) ("*Focus Media*"), cert. denied, 544 U.S. 923, 125 S.Ct. 1674, 161 L.Ed.2d 482 (2005) ("we hold that where, as here, a party in an adversary bankruptcy proceeding alleges fraudulent conveyance or other equitable causes of action, Grupo Mexicano does not bar the issuance of a preliminary injunction freezing assets"); *CSC Holdings, Inc. v. Redisi,* 309 F.3d 988, 996 (7th Cir.2002) ("*CSC Holdings*") (*Grupo Mexicano* "held that a district court may not issue an injunction freezing assets in an action for money damages where no equitable interest is claimed"; where equitable relief—for an accounting and resulting profits—was sought, in the alternative to claims for money damages, *Grupo Mexicano* was inapplicable, and asset-freezing injunction was proper); *United States ex rel. Rahman v. Oncology Assocs., P.C.,* 198 F.3d 489, 496–97 (4th Cir.1999) ("*Rahman*") (observing, in Civil Rule 64 context, that "when the plaintiff creditor asserts a cognizable claim to specific assets of the defendant or seeks a remedy involving those assets, a court may in the interim invoke equity to preserve the status quo pending judgment where the legal remedy might prove inadequate and the preliminary relief furthers the court's ability to grant the final relief requested"); *Paradigm Biodevices, Inc. v. Centinel Spine, Inc.,* 2013 U.S. Dist. LEXIS 66858, at *5–7, 2013 WL 1915330, at *2–3 (S.D.N.Y. May 9, 2013) (Furman, J.) (same, citing, *inter alia, Rahman,* and noting that "as many courts have held, 'where plaintiffs seek both equitable and legal relief in relation to specific funds, a court retains its equitable power to freeze assets' "); *Tiffany (NJ) LLC v. Forbse,* 2012 U.S. Dist. LEXIS 72148, at *37 & n. 12, 2012 WL 1918866, at *12 n. 12 (S.D.N.Y. May 23, 2012) (Buchwald, J.) ("*Tiffany*") (claim for accounting for profits under the Lanham Act constituted discretionary equitable relief sufficient to give court the equitable power to issue a prejudgment restraint on the defendants' assets), *reconsideration with respect to other issues denied,* 2012 U.S. Dist. LEXIS 121361, 2012 WL 3686289 (S.D.N.Y. Aug. 23, 2012), *aff'd in part, vacated in part on other grounds, Tiffany (NJ) LLC, Tiffany & Co. v. China Merchants Bank,* 589 Fed.Appx. 550 (2d Cir.2014); *United States v. Keyspan Corp.,* 763 F.Supp.2d 633, 638–39 & n. 3 (S.D.N.Y.2011) (Pauley, J.) (claim for disgorgement of revenues earned under a swap allegedly executed for the purpose of restraining trade was equitable in nature, making *Grupo Mexicano* inapplicable). *See also* Collier ¶ 7065.01 (citing those and many other cases).

224   *See, e.g., Adelphia–Rigas,* 2003 U.S. Dist. LEXIS 9349, at *12–14, 2003 WL 21297258 at *5 (where plaintiff estate sought not only money damages, but also equitable relief—imposition of a constructive trust and a demand for an accounting—*Grupo Mexicano* was inapplicable); *Motorola Credit Corp. v. Uzan,* 202 F.Supp.2d 239, 250 (S.D.N.Y.2002) (Rakoff, J.), *rev'd with respect to other issues,* 322 F.3d 130 (2d Cir.2003) (*Grupo Mexicano* did not bar plaintiffs' request for a preliminary injunction since, in addition to asserting money damages, plaintiffs there also asserted a demand for a constructive trust, and other equitable remedies); *Wishnatzki & Nathel, Inc. v. H.P. Island–Wide, Inc.,* 2000 U.S. Dist. LEXIS 15664, at *3–5, 2000 WL 1610790, *1 (S.D.N.Y. Oct. 26, 2000) (Martin, J.) ("courts since *Grupo Mexicano* have found that where plaintiffs seek both equitable and legal relief in relation to specific funds, a court retains it[s] equitable power to freeze assets").

Here, the Trustee has asked for an accounting, which is a classic basis for an asset-freezing order,[225] and which, as recognized by the First Department in *Kaminsky v. Kahn,*[226] "is a well-recognized form of equitable relief."[227] Here—specially given Composite's position with respect to all of the things that need to be done in order to compute Elite's entitlement—the Court considers an accounting to be a perfectly appropriate remedy.

225    See *Focus Media*, 387 F.3d at 1085; *CSC Holdings*, 309 F.3d at 996; *Tiffany*, 2012 U.S. Dist. LEXIS 72148 at *37 & n. 12, 2012 WL 1918866 at *12 n. 12; *Adelphia–Rigas*, 2003 U.S. Dist. LEXIS 9349 at # 12–14, 2003 WL 21297258 at *5.

226    23 A.D.2d 231, 259 N.Y.S.2d 716 (1st Dept.1965) ( "*Kaminsky* ").

227    23 A.D.2d at 240, 259 N.Y.S.2d at 726.

Composite disputes that, however, arguing that under New York law, a plaintiff seeking an accounting must show "relations of a mutual and confidential nature."[228] From that, Composite contends (1) that this standard requires the existence of a *fiduciary relationship* between Elite and Composite, and (2) that "no [confidential or fiduciary] relationship exists between the sellers and buyers of corporate stock when dealing at arms' length."[229] But neither contention supports Composite's position here.

228    Composite PI Br. at 33.

229    *Id.* (brackets in original).

Composite's contention that a fiduciary relationship is essential to an accounting was expressly rejected by the Appellate Division in *Kaminsky*. There the First Department reversed a trial court ruling that had dismissed a claim for an accounting when he trial court believed that the plaintiff's allegations "did not establish such a relationship between the parties, fiduciary or otherwise, as would entitle the plaintiff to an accounting."[230] In *Kaminsky*, the plaintiff had entrusted stock with the defendant,[231] with an interest in the dividends received on the stock and any proceeds from its sale, after the payment of stated obligations.[232] The plaintiff had a right of "first option" to get the stock back if the defendant received an offer for it,[233] which the defendant did not honor. In rejecting the contention that a fiduciary relationship was required in order to justify an accounting, the First Department stated:

> [T]he right of the plaintiff to judgment [for an accounting] *is not to be foreclosed* upon the narrow ground, urged by the defendant, that the agreement between the parties *did not create a fiduciary relationship and that, therefore,* *123 *the plaintiff is not entitled to an accounting.* The question instead is, did the plaintiff, on the basis of the allegations of his pleadings, establish a right to any relief at the hands of the court, and, if so, were the directions for an accounting and the other provisions of the judgment proper.[234]

230    23 A.D.2d at 235, 259 N.Y.S.2d at 721.

231    23 A.D.2d at 234, 259 N.Y.S.2d at 720.

232    *Id.*

233    23 A.D.2d at 235, 259 N.Y.S.2d at 721.

234    23 A.D.2d at 236, 259 N.Y.S.2d at 721–22.

Then, obviously, Composite cannot rely on a general rule that "no [confidential or fiduciary] relationship exists between the sellers and buyers of corporate stock when dealing at arms length." Here the relationship between Elite and Composite—with Mr. Fletcher, his colleagues, and the Management Company on both sides of the relationship—was most decidedly not at arms' length. And it is at least arguable, if not obvious, that Mr. Fletcher's failure to complete the redemption when he was still at the helm of Elite was a breach of the fiduciary duties he owed to Elite. Under these circumstances, the Court is unwilling to regard cases dealing with ordinary buyer and seller relationships in the securities market to be controlling.

Additionally, Composite disregards another basis for an accounting under New York law: "The fact that a case involves the consideration and adjudication of issues relating to an account of a complicated character, *even in the absence of any element of*

*mutuality or of trust relationship,* is ordinarily a sufficient reason for a court of equity to assume jurisdiction thereof, upon the ground of its superior equipment to handle and dispose of such issues."[235]

235   1 N.Y. Jur.2d Accounts and Accounting § 34 (citing *Townsend v. John B. Carter Co.,* 165 A.D. 973, 150 N.Y.S. 757 (1st Dep't 1914); *Chase v. Knickerbocker Phosphate Co.,* 32 A.D. 400, 53 N.Y.S. 220 (2d Dep't 1898)). These authorities are old, but none has been overruled. And this same principle has been articulated in courts in other jurisdictions very recently. Under Florida law, for example, to be entitled to an equitable accounting, "a party must show either (1) *a sufficiently complicated transaction* and an inadequate remedy at law *or* (2) the existence of a fiduciary relationship." *Zaki Kulaibee Establishment v. McFliker,* 771 F.3d 1301, 1310 & n. 21 (11th Cir.2014) ("*Zaki Kulaibee* ") (emphasis added); *Blitz Telecom Consulting, LLC v. Peerless Network, Inc.,* 2015 U.S. Dist. LEXIS 170093, 2015 WL 9269413, at *8 (M.D.Fla. Dec. 21, 2015) ("*Blitz Telecom* ") (same, quoting *Zaki Kul aibee* ). In *Zaki Kulaibee,* the Eleventh Circuit found an accounting to be the appropriate remedy where "without the foundational information that an accounting would have provided, [the plaintiff] was incapable of quantifying its damages, and was thereby precluded from obtaining any meaningful relief." 771 F.3d at 1314.
  While an equity court can "exercise its discretion in the matter and deny the accounting where it appears that the complexity is not of such extent or degree as to render legal remedies inadequate, or that the accounting would result in a great inconvenience and possible oppression to the defendant," 1 N.Y. Jur.2d Accounts and Accounting § 34, it is too soon for this Court to make such a determination in this case. Composite contends that the Trustee has failed so far to establish her damages. The reason for that, in whole or substantial part, is that Composite, which has much better information than the Trustee, has failed to provide an NAV or otherwise provide the information from which the Trustee's redemption entitlement can be ascertained. This is the kind of situation in which authority like *Zaki Kulaibee* authorizes an accounting.

Here the Trustee has sought both equitable and legal remedies in this adversary proceeding, including an equitable remedy—for an accounting, to which the Court believes, if the Trustee's entitlement cannot more easily be determined,[236] the Trustee *124 should be entitled. For this reason too, *Grupo Mexicano* is not a bar to an asset-freezing injunction here.

236   It sometimes is the case that before a court tries to fix damages by more traditional means, it cannot determine whether an accounting will ultimately be necessary. The *Kaminsky* court, recognizing that, held that the possibility that traditional means of fixing damages would be sufficient did not destroy the potential right to an accounting. The *Kaminsky* court stated:
  At this stage of the action, *it is immaterial that the relief eventually to be accorded to the plaintiff by a final judgment herein may be limited to a monetary recovery* .... The court, within the framework of the pleadings in any case, may draw upon its broad reservoir of powers established by law or formulated under the principles of equity, and utilize any of them to afford complete relief to a party. ... *And, in a proper case, an accounting may be directed for the purpose of fixing the amount of such damages.*
  23 A.D.2d at 236–37, 259 N.Y.S.2d at 721–22 (emphasis added).

  Some courts have criticized *Kaminsky, see Nero v. RCA,* 1982 U.S. Dist. LEXIS 11848 (S.D.N.Y. Mar. 22, 1982) (Conner, J.), or regarded its very direct statement that a fiduciary relationship is not required to be *dictum* or overtaken by time. *See Chambers v. Weinstein,* 44 Misc.3d 1224(A), 997 N.Y.S.2d 668 (Table) (Supr.Ct.N.Y.Co.2014) (Unreported Disposition). By the same token, *Kaminsky* has been relied on in this District, for the broader principle that plainly emerges from it: "The remedy of an accounting as provided under New York law is available where special circumstances are present warranting equitable relief in the interest of justice." *Shimer v. Fugazy (In re Fugazy Express),* 114 B.R. 865, 876 (Bankr.S.D.N.Y.1990) (Lifland, C.J.), aff'd 124 B.R. 426 (S.D.N.Y.1991) (Duffy, J.), *appeal dismissed,* 982 F.2d 769 (2d Cir.1992). Respectfully, this Court has difficulty seeing how *Kaminsky,* especially in all the respects it is relevant here, can be regarded merely as *dictum.* It conveys a very strong message that when necessary to provide adequate relief, courts have great flexibility as to the appropriate remedy, including by means of an accounting. At the very least, it is obvious that the Trustee has sought the accounting in good faith.

*D. Judicial Estoppel*

[19] Finally, the Trustee relies not just on traditional asset-freezing doctrine, discussed above, but also judicial estoppel. She is right in this respect as well. Though judicial estoppel did not apply to her request for summary judgment, it applies to her request for the continued asset freeze.

As the Trustee properly observes, her preliminary injunction motion is one "the Trustee should not have to bring."[237] It was necessitated by Composite's attempt to renege on assurances given to this Court when not just the Soundview Debtors, but also Composite, "sign[ed] onto"[238] a consensual freeze on the assets in the Wilmington Trust account, to avoid the TRO and preliminary injunction that would have been entered against them in January 2014.

**237**    Trustee PI Br. at 1 (ECF # 74).

**238**    *See* January 2014 Martin Letter, discussed at page 21 *supra*.

As discussed above,[239] in deciding whether judicial estoppel is warranted, courts in this circuit consider whether the party's later position is clearly inconsistent with its earlier position; the party succeeded in persuading a court to accept the party's earlier position; and the party seeking to assert the inconsistent position would derive an unfair advantage, or impose an unfair detriment on the opposing party. Here Composite's conduct satisfies all three of those requirements.

**239**    *See* page 60 *supra*.

Back in January 2014, the JOLs filed an emergency motion seeking a TRO and preliminary injunction seeking essentially the same relief the Trustee seeks now. The Soundview Debtors, and, importantly here, Composite—which as this Court was told, "are managed by the same entity, Soundview Capital Management," wanted to avoid that. The Court was told that they "wish[ed] to avoid entry of any TRO under *125 these circumstances out of concerns over continued damage they might suffer among creditors and investors as a result of the entry of a TRO."[240] And they *agreed that the entry of the freeze was appropriate*, first in the January 2014 Martin Letter and then again in the January 2014 Martin Statements in open court. Based on that statement, and the voluntary undertaking, the Court found the JOLs' TRO application moot.

**240**    January 2014 Martin Letter at 2.

Composite has now taken exactly the opposite position. The earlier position induced the Court not to then enter the TRO, as the Court believed what it was told: that Composite's agreement to the consensual freeze—one that "Composite has agreed it will sign onto"—would be sufficient. Now Composite has reneged on the promise on which the other parties, and the Court, relied.

Composite's decision to "sign onto" a consensual asset freeze did not happen by accident. Counsel for the JOLs was nervous about the lack of a TRO and subsequent preliminary injunction, and looked for assurances that a consensual freeze would be sufficient. At the hearing on the TRO, James Beha, Esq., counsel for the JOLs, began the colloquy that led to the representation upon which the JOLs and the Court later relied:

MR. BEHA: Your Honor, the JOLs are simply concerned about this cash being dissipated before this Court makes a decision. We are happy to take Mr. Martin's representation. Our only concern is whether—we understand that Mr. Martin is *debtors'* counsel. Our only concern is *whether he has the ability to bind all of the parties* that may have the ability to dissipate these funds. And if he is representing that he does, and he is representing that *the Fletcher team at large* will not dissipate these funds before the Court basically sorts out what's happening here, then that is good enough for us....

But again, if Mr. Martin is able to ensure that these funds do not go anywhere before Your Honor makes a decision, then I think that should be good enough.[241]

Mr. Martin stated, in response:

Yes. I mean, without subjecting myself to a motion to be disqualified as representing parties that I shouldn't be representing and I don't represent, the managers of the Soundview debtors, who are my clients, are the identical managers of the [*sic.*] Soundview Composite, which is the entity that owns these funds....

I have the representation from those people who do stand as my clients, with respect to the Soundview debtors, that Soundview Composite will do nothing to move those funds absent the presentation of an acceptable consent order to the Court.

I take that representation at face value. I accept it. I think the—particularly given the long road that we have all traveled on in these cases, that it would be an exercise that would make no sense to do something other—something else with these funds, other than protect them and to make sure that to the extent that Soundview Elite has the primary claim, that Soundview Elite's claim is satisfied.[242]

241    Tr. of Hrg. of 1/21/2014 (ECF No. 157) at 8 (emphasis added).

242    *Id.* at 9.

Documents in the record confirm that many members of the Fletcher team, including *126 Mr. Fletcher himself, reviewed and approved the January 2014 Martin Letter before it was submitted to this Court.[243] Mr. Fletcher responded to Mr. Martin's draft of the letter with "Thank you very much. This seems good."[244] But astoundingly, Composite claims that even Mr. Fletcher's review and approval of the January 2014 Martin Letter was not enough to bind him to the statements in the January 2014 Martin Letter.[245] Given the express representations made to the Court, the Court finds Composite's protestations that it was not really bound by them, and that they were made without authority, absurd.

243    *See* Exh. T to Declaration of Michael J. Dailey in Support of Trustee's Motion for a Preliminary Injunction, dated 12/1/2014 (ECF No. 75).

244    *Id.*

245    *See* Composite PI Br. at 10 ("Similarly, though Fletcher had the capacity to act as Soundview Composite's agent, here, as in *Teamsters,* the Trustee has not cited any evidence that Fletcher was acting in that capacity when he reviewed and approved the January 21, 2014 Letter.").

The Court finds the requisite change in position; reliance by the Court; and unfairness all to be present here. It holds that Composite is judicially estopped from now contending that the continued asset freeze is inappropriate.

## Conclusion

For the reasons set forth below, the Court grants summary judgment to the Trustee on all issues other than the amount of Elite's entitlement, and the extent to which other creditors' claims are senior to, or *pari passu* with, Elite's claims. The Court grants partial summary judgment to the Trustee determining that:

(1) Composite's only outside investor is Elite;

(2) Elite duly requested a full redemption, by no later than May 2012;

(3) The trade date for Elite's redemption was September 30, 2011;

(4) Composite's redemptions have never been suspended;

(5) Composite's redemptions have never been gated;

(6) There has been no reason for Composite to gate redemptions, since Composite has only one investor;

(7) Composite had the right to gate redemptions, but never exercised that right;

(8) Elite's redemption request was outstanding as of May 2012, and remains outstanding today;

(9) The value of Elite's redemption request, as estimated by Composite, ranges from $5 million to $3.8 million, and thus is no less than $3.8 million;

(10) Composite failed to comply with its obligations to honor Elite's redemption request;

(11) Composite must honor Elite's redemption request;

(12) Composite owes Elite the NAV of Elite's shares in Composite as of the close of business of September 30, 2011;

(13) If less elaborate means to fix Elite's monetary entitlement are impractical, the Trustee is entitled to an accounting for the purpose of fixing Elite's entitlement as a consequence of its redemption demand.


The Court will hold a conference to ascertain whether discovery is necessary incident to the trial on the computation of Elite's entitlement pursuant to its redemption demand, or if there are any other impediments to a prompt trial to fix the amount of Elite's entitlement. Counsel *127 should be prepared to address the extent to which other creditors' claims need to be ascertained; the amount of any senior creditor claims; the extent to which the Court must rule on the priority of any claims asserted against Composite; and the extent to which any other matters need to be judicially determined before this action can be sent up to the district court for entry of a final judgment.

A trial in the bankruptcy court will thereafter be held as soon as practical to resolve the open issues.

The Trustee is to settle two orders (one with respect to summary judgment,[246] and one with respect to the continued asset freeze) consistent with these rulings.

246    The Trustee's order granting partial summary judgment may include determinations on matters not included in the above list if they are supported by the Court's rulings as stated in this Decision.

APPENDIX A



All Citations

543 B.R. 78

— U.S. ——, 131 S.Ct. 2594, 180 L.Ed.2d 475 (2011) ( "*Stern* ").

23

24    As another judge of this Court has aptly observed, in a matter differing in its procedural context but reflecting the same reality, *Stern* "has become the mantra of every litigant who, for strategic or tactical reasons, would rather litigate somewhere other than the bankruptcy court." *In re Ambac Financial Group, Inc.*, 457 B.R. 299, 308 (Bankr.S.D.N.Y.2011) (Chapman, J.) ("*Ambac* ").

25    That is so even though Fed.R.Bankr.P. 5011, which governs motions to withdraw the reference, provides that unless the bankruptcy judge orders otherwise, the filing of a motion to withdraw the reference does not stay the proceeding or case. *See* Fed.R.Bankr.P. 5011(c).

In some, but much less than all, of the instances in which such motions are made or threatened, the bankruptcy judge does indeed lack the constitutional power to issue a final order or judgment. But even when a motion to withdraw the reference might otherwise have merit, it should be filed promptly when the perceived basis for seeking such relief is apparent—and certainly not when briefing on a summary judgment motion has already begun.

[5] There is no good reason for a litigant to ask the court to "abstain" pending a motion for withdrawal of the reference so late in the game. On this motion to "abstain"—the granting of which is discretionary with the Court—any one of the combination of (1) Peebler's gamesmanship here, (2) the disruption to the Court's calendar that would otherwise result, and (3) the default rule under Fed.R.Bankr.P. 5011 that proceedings are not stayed unless the bankruptcy judge orders otherwise would cause the Court to decline to "abstain" here. Here all three of those factors appear in combination, and that conclusion is even easier.

*B. Constitutional Authority to Enter a Final Judgment*

[6] [7] More fundamentally, however, the Court disagrees with Peebler's second contention—that a bankruptcy judge lacks the constitutional power to enter a final judgment in this adversary proceeding.[26] *849 A turnover proceeding like this one is a paradigmatic exercise of the Court's *in rem* jurisdiction, very different from the scenarios considered in *Marathon*[27] and *Stern.*

26    Understandably, Peebler does not contend that the bankruptcy court lacks subject matter jurisdiction here. It plainly exists. Under 28 U.S.C. § 1334(b), district (and hence bankruptcy) courts have subject matter jurisdiction in civil proceedings "arising under" title 11 (*i.e.*, the Bankruptcy Code), and "arising in" and "related to" cases under title 11. Here, the Trustee's turnover claims, which arise under section 542 of the Code; which are to recover property of an estate that would not exist but for Pali Holdings' chapter 11 (and now chapter 7) case; and which would monetize estate property for the benefit of its creditors, satisfy all three requirements. *Stern*, which affects the constitutional power of a bankruptcy judge to issue a final judgment in a matter as to which the bankruptcy court already has subject matter jurisdiction, does not in any way deprive bankruptcy courts of subject matter jurisdiction. *See, e.g., Stern*, 131 S.Ct. at 2607 ("Section 157 allocates the authority to enter final judgment between the bankruptcy court and the district court. See § 157(b)(1), (c)(1). That allocation does not implicate questions of subject matter jurisdiction.").

27    *Northern Pipeline Const. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 87, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982) ("*Marathon* ").

The statute under which the Trustee seeks turnover, section 542 of the Bankruptcy Code, provides, in relevant part, with exceptions not relevant here:

(a) ... [A]n entity, other than a custodian, in possession, custody, or control, during the case, of property that the trustee may use, sell, or lease under section 363 of this title, or that the debtor may exempt under section 522 of this title, shall deliver to the trustee, and account for, such property or the value of such property, unless such property is of inconsequential value or benefit to the estate.

(b) ... [A]n entity that owes a debt that is property of the estate and that is matured, payable on demand, or payable on order, shall pay such debt to, or on the order of, the trustee....[28]

28    Section 542(b) goes on to provide an exception, where "such debt may be offset under section 553 of this title against a claim against the debtor." That would require honoring any right of setoff Peebler might have here if one existed. But as discussed above, he failed to show an entitlement to any setoff.

Subsection (a) provides a remedy closely similar to a right of replevin—a right to recover the estate's property in kind—though with a right of recovery of the value of that property as a substitute. Subsection (b) provides what is in substance a mechanism for monetizing a debt that is property of the estate. Each, importantly, provides a means for the estate to secure the benefits of property that *already* is property of the estate.[29]

29    Of course, neither provision provides a means for suing to bring *new property* into the estate. When section 542 is used in that fashion, many courts, including two in this district, have held such a use to be an improper invocation of section 542 as a statutory construction matter, to be beyond the constitutional power of a bankruptcy judge to issue a final judgment, or both. *See* nn. 33 and 39 below.

A turnover action is expressly listed in 28 U.S.C. § 157(a)(2) as one of several kinds of "core proceedings"[30]—matters that, even after *Marathon,* Congress perceived to be "core" bankruptcy functions within the traditional purview of bankruptcy judges—and with respect to which, accordingly, bankruptcy judges could still enter final orders.[31] After *Stern,* it now is clear that whether a matter is "core" as a statutory matter is not dispositive of the *850 bankruptcy judge's power, as a constitutional matter, to issue a final judgment in it.[32] But the reported post-*Stern* decisions have overwhelmingly held that bankruptcy judges can constitutionally enter final judgments in turnover actions.[33] And Peebler *851 cites no case to the contrary.[34]

30    *See* 28 U.S.C. § 157(b)(2)(E) (Core proceedings include, but are not limited to "orders to turn over property of the estate.").

31    Peebler is incorrect in several respects when he contends (Peebler Br. at ¶ 62) that "this adversary proceeding is based on a non-core, common law claim by the Plaintiff." First, of course, a turnover action like this one is *expressly listed* a core matter. Second, while the same claim no doubt could *also* be asserted under common law, it here is asserted as a right under federal statutory law, section 542 of the Bankruptcy Code, 11 U.S.C. § 542.

32    *See Stern,* 131 S.Ct. at 2608 ("Although we conclude that § 157(b)(2)(C) permits the Bankruptcy Court to enter final judgment on Vickie's counterclaim, Article III of the Constitution does not.").

33    *See* *Badami v. Sears (In re AFY, Inc.),* 461 B.R. 541 (8th Cir. BAP 2012) (speaking through Kressel, C.J.) (concluding that bankruptcy judge could issue a final judgment in a turnover proceeding; noting that "the Supreme Court itself has cautioned that its holding is a narrow one, affecting only ... one small part of the bankruptcy judges' authority. Unless and until the Supreme Court states other provisions of Section 157(b)(2), we take the Supreme Court at its word and hold that the balance of the authority granted to bankruptcy judges by Congress in 28 U.S.C. § 157(b)(2) is constitutional"); *In re Crescent Resources, LLC,* 457 B.R. 506, 510 & n. 2 (Bankr.W.D.Tex.2011) (Gargotta, J.) (concluding that bankruptcy court could issue a final judgment in a turnover matter, explaining that *Stern* dealt with issues different than those in the turnover matter before him, and likewise concluding that *Stern* should be applied narrowly); *In re McCrory,* 2011 Bankr.LEXIS 3403, at *2, 2011 WL 4005455, at *1 (Bankr.N.D.Ohio Sept. 8, 2011) ("*McCrory*") (Whipple, J.) (A turnover proceeding was one "that 'stems from the bankruptcy itself' that is within this court's jurisdiction to decide.") (quoting *Stern,* 131 S.Ct. at 2618); *In re Hernandez,* 468 B.R. 396, 401 n. 4 (Bankr.S.D.Cal.2012) (Mann, J.) ("*Hernandez*") (court had constitutional authority in a turnover proceeding based, among other things, on fact that it stemmed from the bankruptcy itself, quoting *McCrory* and *Stern*); *Rentas v. Claudio (In re Garcia* ), 471 B.R. 324, 330 (Bankr.D.P.R.2012) (Lamoutte, J.) ("*Garcia*") ("a turnover action is a fundamental bankruptcy matter that 'stems from the bankruptcy itself' and 'would necessarily be resolved in the claims allowance process' because it intricately hinges on the proper constitution of the bankruptcy estate," and noting that as ruled in *Braunstein v. McCabe,* 571 F.3d 108, 122 (1st Cir.2009) ("*Braunstein* "), a turnover proceeding "invokes the [bankruptcy] court's most basic equitable powers to gather and manage the property of the estate") (internal quotations omitted; typographical error corrected); *Shaia v. Taylor (In re Connelly),* 476 B.R. 223, 231–34 (Bankr.E.D.Va.2012) (Huennekens, J.) (bankruptcy court had statutory and constitutional power to enter a final judgment in a turnover proceeding where the trustee was attempting to recover a promissory note in the Trustee's possession that was payable to bearer, because, among other things, it affected claims allowance process); *Burns v. Dennis (In re Southeastern Materials, Inc.),* 467 B.R. 337, 357 (Bankr.M.D.N.C.2012) (Waldrep, J.) ("*Southeastern Materials* ") (court had constitutional power to enter a final judgment in section 542 action against corporate officers, who had filed claims against the estate, for recovery on loans debtor had made to them, not just because they had filed claims and turnover right would necessarily be resolved in claims allowance process, but also because it stemmed from bankruptcy itself. "Both prongs of the *Stern* test have been met."); *see also* *In re Miller,* 2011 Bankr.LEXIS 3240, at *1, 2011 WL 3741846, at *1 (Bankr.N.D.Ohio Aug. 24 2011) (Morgenstern–Clarren, J.) (concluding that court had both statutory and constitutional authority to issue a final judgment in a turnover proceeding, but in opinion not intended for print or electronic publication, not expanding on reasons).

    Recognizing the principle, but distinguishing the case before it on the facts, is *In re Fairfield Sentry Ltd.,* 458 B.R. 665, 683, 687 (S.D.N.Y.2011) (Preska, C.J.) ("*Fairfield Sentry* ") (explaining that an action for turnover of property would be core (and an action in which a bankruptcy judge could constitutionally enter a final judgment) only when its purpose was the *collection* of a matured debt, as contrasted to an action where the property to be recovered was the subject of a significant dispute—and finding that action there invoked "classic common law claims for money had and received or mistaken payment").

    The one outlier, *Moyer v. Koloseik (In re Sutton),* 470 B.R. 462 (Bankr.W.D.Mich.2012) ("*Moyer* "), though without citation to any of the preceding cases, or the *in rem* character of turnover actions, concluded that a bankruptcy judge lacked the constitutional authority to enter even a default money judgment to recover on open accounts, reasoning that such was equivalent to a *Marathon*-style contract action. In promissory note cases like this one (and even open accounts cases when the debts clearly exist and are matured, which is what section 542 requires), this Court cannot agree. This Court chooses instead to go with the otherwise unanimous decisions to the contrary, and declines to follow *Moyer,* for the reasons stated in those other decisions and this one.

34    *See* Peebler Br. at ¶¶ 59–62. The single case Peebler cites for his contention, *Claybrook v. Les Schwab Tires Centers of Oregon, Inc.,* 2008 Bankr.LEXIS 2417, 2008 WL 4489771 (Bankr.D.Del. Sept. 30, 2008) (Walsh, J.) ("*Claybrook*"), did not in any way address the extent to which bankruptcy judges could constitutionally issue final judgments in section 542 turnover actions after *Stern.* In fact, *Claybrook* preceded *Stern* by almost three years. Rather, *Claybrook* involved a determination of whether the claims in that adversary proceeding were core or non-core—ultimately concluding that they were non-core. Though "turnover of estate property" was the name given to one of the four claims asserted (the others being for breach of contract, unjust enrichment and quantum meruit), the *Claybrook* court contrasted the case before it to one invoking a substantive right created by federal bankruptcy law, and noted that "[i]t is without dispute that this is essentially a contract dispute which could be addressed outside the bankruptcy arena."

[8] [9] The many cases recognizing the power of bankruptcy judges constitutionally to enter final judgments in turnover actions—repeatedly observing that turnover actions "stem[ ] from the bankruptcy itself"³³—are easy to understand when one considers the conceptual underpinnings of a turnover action. It has long been established, and confirmed by the United States Supreme Court in two decisions in the last decade, that "[b]ankruptcy jurisdiction, at its core, is *in rem.*"³⁴ "A bankruptcy court's *in rem* jurisdiction permits it to 'determin[e] all claims that anyone ... has to the property or thing in question.' "³⁵

35  *See McCrory*, 2011 Bankr.LEXIS 3403, at *2, 2011 WL 4005455, at *1; *Hernandez*, 468 B.R. at 401 n. 4; *Garcia*, 471 B.R. at 330; *Southeastern Materials*, 467 B.R. at 357.

36  *Central Virginia Community College v. Katz*, 546 U.S. 356, 362, 126 S.Ct. 990, 163 L.Ed.2d 945 (2006); *accord Tennessee Student Assistance Corp. v. Hood*, 541 U.S. 440, 448, 124 S.Ct. 1905, 158 L.Ed.2d 764 (2004) ("*Hood*").

37  *Hood*, 541 U.S. at 448, 124 S.Ct. 1905 (quoting 16 *Moore's Federal Practice* § 108.70[1] (3d ed. 2004)).

[10] [11] [12] A turnover action "invokes the court's most basic equitable powers to gather and manage property of the estate."[35] One of the most important functions of any trustee is to marshal the existing assets of an estate for the benefit of the estate's creditors. Turnover actions provide an important means by which that is done. A turnover action's essence is in bringing the estate's property into its custody—or in the promissory note and accounts receivable collection actions for which turnover also may be invoked as a statutory matter, in converting a note or account receivable that already is property of the estate into cash. A note receivable, like any other asset that undisputedly belongs to the debtor, properly may appear on a debtor's balance sheet, being replaced by a corresponding asset entry for cash when the note is paid off.

38  *Braunstein*, 571 F.3d at 122.

[13] When the turnover power is properly invoked,[39] it is simply an effort to *852 recover property—or *on* property—that is *already* property of the estate. That, in turn, invokes the court's *in rem* jurisdiction over the bankruptcy *res*.

39  Of course, the turnover power can be improperly invoked, especially when it is used as a Trojan Horse for bringing garden variety contract claims; when the property in question is not already property of the estate; or when the turnover statute is used to recover assets with disputed title when the estate's claim of ownership is legitimately debatable. It is well established that the turnover power may not be used for such purposes. *See, e.g., Fairfield Sentry*, 458 B.R. at 683 ("Numerous courts have therefore held that an action is non-core when property which is the subject of a significant dispute between the parties is sought to be recovered through a turnover action.... These actions are subject to significant dispute, resolution of which will determine whether the funds redeemed *are in fact property of the Funds' estates*.") (citations and internal quotations omitted; emphasis added); *Savage v. Mandl (In re Teligent)*, 325 B.R. 134, 137–38 (Bankr.S.D.N.Y.2005) (Bernstein, C.J.) ("*Teligent*") (citing "settled law that the debtor cannot use the turnover provisions to liquidate contract disputes or otherwise demand assets whose title is in dispute"; other law holding that an action to determine the amount of a claimed debt to the estate that is, as yet, wholly disputed and unliquidated cannot properly be styled an action to turn over estate "property"; and other law holding that an action should be regarded as a turnover "only when there is no legitimate dispute over what is owed to the debtor") (citations omitted); *Shea & Gould v. Red Apple Companies, Inc. (In re Shea & Gould)*, 198 B.R. 861, 867 (Bankr.S.D.N.Y.1996) (Garrity, J.) (issuing report and recommendation, instead of final judgment, in debtor's action to recover fees for legal services rendered to the debtor, where court was doubtful that claim was sufficiently "specific in its terms as to amount due and date payable," and observing that "[a] turnover action may be inappropriate where the debtor's claim lacks such certainty"). Judge Bernstein recognized in *Teligent* that exercising jurisdiction over an improperly brought turnover action could eviscerate the Supreme Court's holding in *Marathon* by allowing the bankruptcy court to exercise judicial power reserved for Article III courts. 325 B.R. at 138. Thus, that the turnover power be properly invoked is integral to the bankruptcy court's ability to constitutionally exercise its *in rem* jurisdiction in entering a final judgment.

Though the summary jurisdiction that bankruptcy courts had under the 1898 Bankruptcy Act may not be dispositive of modern bankruptcy courts' *in rem* jurisdiction, it is instructive.[40] Under the 1898 Act, as Klee explains:

40    If a matter was within the summary jurisdiction of a referee under the former Bankruptcy Act, which was quintessentially an *in rem* statute, that is a strong indication that it is within the power of a bankruptcy judge to enter a final order under the present Bankruptcy and Judicial Codes. As Kenneth Klee observes (in the first edition of a work written before *Stern,* when "core" matters and matters within the constitutional power of bankruptcy judges to enter final orders were generally perceived to be substantially congruent): Although the core/noncore distinction is not identical with the jurisdictional scheme under the Bankruptcy Act of 1898, the older jurisdictional decisions retain some vitality in shaping the contours of jurisdiction under the 1978 Bankruptcy Code. To be sure, the list of core proceedings in section 157(b)(2) of the Judicial Code is broader than summary jurisdiction conferred under the Act. It is doubtful, however, that the [Supreme] Court would find a matter that it formerly included within summary jurisdiction to be outside the scope of core proceedings. Thus, knowledge of the Act precedents may prove persuasive in resolving future jurisdictional disputes, even though not binding under the jurisdictional scheme of the Bankruptcy Code.

Kenneth N. Klee, *Bankruptcy and the Supreme Court* 215 (LexisNexis 2008) ("*Klee* ") However, that is not to say that the opposite is necessarily true. If a matter was not then within the summary jurisdiction, it may still be within the power of a bankruptcy judge to issue a final judgment, at least in instances where the bankruptcy judge is enforcing a right arising under title 11. The matter here, however, is simply an unusually easy one.

If the debtor had actual or constructive possession of an asset that was property of the bankruptcy estate, the bankruptcy court could exercise summary jurisdiction because the *res* was *in custodia legis;* that is, based on the court's custody *853 over the asset in the possession of the estate, the court could exercise pervasive *in rem* jurisdiction.[41]

41    *Klee* at 210.

Thus, under the 1898 Act, bankruptcy referees could exercise summary jurisdiction over turnover actions in instances where any adverse claim to that property was not bona fide.[42] And they had the power in the first instance to determine whether they had jurisdiction to proceed, and to examine (as this Court has examined here) whether the defense was bona fide.[43]

42    Under the 1898 Act, if the property was not in the court's possession and a third person asserted a bona fide claim adverse to the trustee, the third party had the right to have the merits of his claim adjudicated in a plenary lawsuit. *See Cline v. Kaplan,* 323 U.S. 97, 98, 65 S.Ct. 155, 89 L.Ed. 97 (1944) ("*Cline* "). But "the mere assertion of an adverse claim [would] not oust a court of bankruptcy of its jurisdiction." *Id.* at 99, 65 S.Ct. 155. Rather, the bankruptcy court had "both the power and the duty to examine a claim adverse to the bankrupt estate to the extent of ascertaining whether the claim is ingenuous and substantial." *Id.* Only once it was established that the claim was not colorable nor frivolous did the claimant have the right to have the merits of his claim passed on in a plenary suit and not summarily. *Id.* at 99, 65 S.Ct. 155; *accord Harrison v. Chamberlin,* 271 U.S. 191, 194, 46 S.Ct. 467, 70 L.Ed. 897 (1926) ("*Harrison* ").

43    *See Harrison,* 271 U.S. at 194, 46 S.Ct. 467. As the Supreme Court held in *Harrison:*
   However, the court is not ousted of its jurisdiction by the mere assertion of an adverse claim; but, *having the power in the first instance to determine whether it has jurisdiction to proceed, the court may enter upon a preliminary inquiry to determine whether the adverse claim is real and substantial* or merely colorable. And *if found to be merely colorable the court may then proceed to adjudicate the merits summarily;* but if found to be real and substantial it must decline to determine the merits and dismiss the summary proceeding.
   *Id.* (emphasis added). Here Peebler's defenses are frivolous, and under the 1898 Act could have been considered, and rejected, summarily.

As Judge Chapman observed in *Ambac, Stern* "has nothing to do with the Court's in rem jurisdiction to administer property of the estate."[44] Where, as here, there are no serious defenses to the estate's section 542 turnover rights, a bankruptcy judge can exercise the bankruptcy court's *in rem* jurisdiction to issue a final judgment for the turnover of the estate's property, or to monetize it. Just as bankruptcy courts under the 1898 Act could exercise summary jurisdiction over turnover claims when the defenses to such claims were not "real and substantial,"[45] they can do the equivalent of that now. Whatever constitutional limits might exist with respect to bringing *new* property into the estate (such as in actions at common law on contracts), those limits cannot be said to exist with respect to recovering property—or *on* property—that is already there.

**44**    457 B.R. at 308.

**45**    *Harrison,* 271 U.S. at 194, 46 S.Ct. 467.

*Conclusion*

Summary judgment on the Note is granted in favor of the Trustee, and a final judgment will be entered in the Trustee's favor. Pursuant to Fed.R.Civ.P. 58, made applicable to this adversary proceeding under Fed.R.Bankr.P. 7058, the Trustee is to settle, on no less than two business days' notice by hand, fax or email (or 14 calendar days' notice if the Trustee elects to use traditional mail), two documents:

(1) an order granting summary judgment in the Trustee's favor, and

(2) a standalone[46] judgment for the amount due, including prepetition and postpetition interest claimed, but not including *854 the Trustee's attorneys fees in attempting to recover on the Note.

**46**    *See* 10 *Collier* ¶ 7058.03.

The Trustee is to accompany any request for interest with a letter, served with the Notice of Settlement and posted on ECF, explaining the contractual, legal and mathematical bases for the interest claimed.

Consistent with Fed.R.Civ.P. 62(a), as made applicable to this adversary proceeding under Fed.R.Bankr.P. 7062, the judgment is to provide, expressly, that no execution may issue on the judgment, nor may proceedings be taken to enforce it, until 14 days have passed after its entry.[47]

**47**    This will provide defendant Peebler the opportunity to post a supersedeas bond, if he is of a mind to do so. But the Court will not grant a stay of enforcement of the resulting judgment in the absence of the posting of a supersedeas bond. If defendant Peebler wishes to seek a stay pending appeal without posting a bond, he may, and should, seek that from the district court.

All Citations

488 B.R. 841

---

**End of Document**    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

543 B.R. 78
United States Bankruptcy Court,
S.D. New York.

In re Soundview Elite Ltd., et al., Debtors.

Corinne Ball, as Chapter 11 Trustee of Soundview Elite Ltd., Plaintiff,
v.
Soundview Composite Ltd., Defendant.
Case No. 13–13098 (REG) (Jointly Administered)
|
Adv. Proc. No. 14-01923 (REG)

|
Signed January 4, 2016

Synopsis
Background: Trustee appointed in Chapter 11 case of mutual fund brought adversary proceeding against investment company, seeking to recover net value of debtor's investment and seeking a preliminary injunction freezing the company's assets to avoid their dissipation. Trustee moved for summary judgment.

Holdings: The Bankruptcy Court, Robert E. Gerber, J., held that:

[1] use of trustee's turnover power would be inappropriate, given the uncertainties as to the amount to be turned over;

[2] fact that documents upon which trustee relied were attached to an attorney declaration without a supplemental affidavit by a document custodian or another with knowledge did not make them inadmissible based on lack of authentication;

[3] e-mail from employee of business that provided administrative services to investment company was not inadmissible hearsay;

[4] letter from director of funds providing information to financial services regulator was an admission, and therefore admissible;

[5] letter from director of funds, written after director had been terminated by investment company, was not an admission, and therefore was inadmissible;

[6] affidavit of accounting professional retained by debtor would be excluded as hearsay;

[7] preliminary injunction freezing the disposition of investment company's assets was appropriate; and

[8] investment company was judicially estopped from contending that continued asset freeze was inappropriate.

Ordered accordingly.

West Headnotes (19)

[1]    Bankruptcy◆Collection and Recovery for Estate;  Turnover

Turnover actions assist the bankruptcy court in the exercise of its in rem jurisdiction by enabling trustees to marshal the existing assets of an estate for the benefit of the estate's creditors. 11 U.S.C.A. § 542.

Cases that cite this headnote

[2]    Bankruptcy◆Jurisdiction over property
Bankruptcy◆Collection and Recovery for Estate;  Turnover

Where trustee's turnover power is properly invoked, it is simply an effort to recover property, or on property, that is already property of the estate; that invokes the court's in rem jurisdiction over the bankruptcy res. 11 U.S.C.A. § 542.

1 Cases that cite this headnote

[3]    Bankruptcy◆Collection and Recovery for Estate;  Turnover

Trustee's turnover power can be improperly invoked, especially when it is used as a Trojan Horse for bringing garden variety contract claims, when the property in question is not already property of the estate, or when the turnover statute is used to recover assets with disputed title when the estate's claim of ownership is legitimately debatable. 11 U.S.C.A. § 542.

1 Cases that cite this headnote

[4]    Bankruptcy◆Collection and Recovery for Estate;  Turnover

Use of trustee's turnover power would be inappropriate in Chapter 11 case of debtor mutual fund to recover net value of debtor's investment from investment company after debtor made a redemption request that the company repeatedly acknowledged but refused to honor, given the uncertainties as to the amount to be turned over. 11 U.S.C.A. § 542.

Cases that cite this headnote

[5]    Bankruptcy◆Bankruptcy Jurisdiction

Limits on bankruptcy judges' ability to enter final orders and judgments do not apply in situations where a bankruptcy judge is issuing an order granting only partial summary judgment.

Cases that cite this headnote

[6]   Bankruptcy◆Bankruptcy Jurisdiction
      Bankruptcy◆Judgment or Order

A partial summary judgment that is not dispositive of claims is an interlocutory order, and does not implicate the constitutional limitations on the bankruptcy court's authority to enter final judgments. U.S.C.A. Const. Art. 3, § 1 et seq.; Fed. R. Civ. P. 54(b); Fed. R. Bankr. P. 7054(a).

1 Cases that cite this headnote

[7]   Bankruptcy◆Judgment or Order

Fact that documents, upon which trustee appointed in Chapter 11 case of mutual fund relied at summary judgment stage in adversary proceeding seeking to recover debtor's investment, were attached to an attorney declaration without a supplemental affidavit by a document custodian or another with knowledge did not make them inadmissible based on lack of authentication; court had no doubts that the documents were authentic, as attorney declaration described in great detail the process by which the documents were obtained and stated that the documents were true and correct. Fed. R. Civ. P. 56(c)(2); Fed. R. Evid. 901.

Cases that cite this headnote

[8]   Bankruptcy◆Evidence; witnesses

E-mail from employee of business that provided administrative services to investment company was not inadmissible hearsay in adversary proceeding brought by trustee appointed in Chapter 11 case of mutual fund against investment company seeking to recover debtor's investment, where employee and the others with whom she was communicating were working together to formulate responses with respect to redemption requests, which were among the business's areas of responsibility, and employee's statements were well within the scope of her role at business. Fed. R. Evid. 801(d)(2)(D).

Cases that cite this headnote

[9]   Bankruptcy◆Evidence; witnesses

Letter from director of funds providing information to financial services regulator was an admission, and therefore admissible in adversary proceeding brought by trustee appointed in Chapter 11 case of mutual fund against investment company seeking to recover net value of debtor's investment; while director did not personally issue redemption requests or handle other administrative matters, she had a legitimate concern as to whether investment company and other funds were meeting their obligations to investors.

Cases that cite this headnote

[10]    Bankruptcy—Evidence; witnesses

Letter from director of funds written after investment company had terminated director, providing information to financial services regulator, was not an admission, and therefore was inadmissible in adversary proceeding brought by trustee appointed in Chapter 11 case of mutual fund against investment company seeking to recover net value of debtor's investment.

Cases that cite this headnote

[11]    Bankruptcy—Evidence; witnesses

Affidavit of accounting professional retained by Chapter 11 debtor mutual fund would be excluded as hearsay in adversary proceeding brought by trustee against investment company seeking to recover net value of debtor's investment, after debtor made a redemption request that the company repeatedly acknowledged but refused to honor, given that accounting professional was not an agent for investment company, and as a professional brought in after the events at issue, he lacked firsthand knowledge of the facts relating to debtor's redemption request.

Cases that cite this headnote

[12]    Estoppel—Claim inconsistent with previous claim or position in general

Courts invoke judicial estoppel when litigants play fast and loose with the courts by taking inconsistent positions in related proceedings.

Cases that cite this headnote

[13]    Estoppel—Claim inconsistent with previous claim or position in general

In deciding whether judicial estoppel is warranted, courts consider whether: (1) the party's later position is clearly inconsistent with its earlier position, (2) the party succeeded in persuading a court to accept the party's earlier position, so that judicial acceptance of the inconsistent position in a later proceeding would create the perception that either the first or the second court was misled, and (3) the party seeking to assert an inconsistent position would derive an unfair advantage, or impose an unfair detriment on the opposing party, if not estopped.

Cases that cite this headnote

[14]    Bankruptcy◆Preliminary injunctions and restraining orders

Preliminary injunction freezing the disposition of investment company's assets was appropriate in adversary proceeding brought by trustee appointed in Chapter 11 case of mutual fund seeking to recover net value of debtor's investment after debtor made a redemption request that the company repeatedly acknowledged but refused to honor; risk of dissipation of company's assets in the absence of an injunction was very real, as individual who controlled company previously withdrew funds from company's account for impermissible purposes, debtor would be irreparably harmed, as company would be judgment-proof, trustee showed likelihood of success, as question was not whether debtor would be entitled to the return of its investment but when, and it was in the public interest that entities meet obligations to creditors and other stakeholders and that commercial obligors not dissipate their assets. Fed. R. Civ. P. 65(a); Fed. R. Bankr. P. 7065; 11 U.S.C.A. § 105(a).

Cases that cite this headnote

[15]    Injunction◆Nature of remedy in general
        Injunction◆Discretionary Nature of Remedy

Issuance of a preliminary injunction is an equitable remedy and within the discretion of the court.

Cases that cite this headnote

[16]    Injunction◆Preservation of status quo

Purpose of a preliminary injunction is to maintain the status quo pending trial and determination of the action.

Cases that cite this headnote

[17]    Injunction◆Grounds in general; multiple factors

Standard in for preliminary injunctive relief calls for a showing of irreparable harm and either likelihood of success on the merits or sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief.

Cases that cite this headnote

[18]    Bankruptcy➔Equitable powers and principles
        Bankruptcy➔Injunction or stay of other proceedings

Among the actions that may be taken pursuant to bankruptcy court's equitable powers to issue any order, process, or judgment necessary or appropriate to carry out Bankruptcy Code provisions is an injunction freezing the assets of a defendant when the plaintiff is seeking equitable relief, such as the recovery of property or an accounting. 11 U.S.C.A. § 105.

Cases that cite this headnote

[19]    Estoppel➔Claim inconsistent with previous claim or position in general

Investment company was judicially estopped from contending that continued asset freeze was inappropriate in adversary proceeding brought by trustee appointed in Chapter 11 case of mutual fund seeking to recover net value of debtor's investment after debtor made a redemption request that the company repeatedly acknowledged but refused to honor, where company had previously stated that it agreed to entry of freeze to avoid a temporary restraining order (TRO) sought by joint official liquidators out of concerns over continued damage it might suffer among creditors and investors as a result of entry of TRO, and bankruptcy court found the TRO application moot based on those statements.

Cases that cite this headnote

Attorneys and Law Firms

*81 JONES DAY, Counsel for Plaintiff Corinne Ball, as Chapter 11 Trustee of Debtor Soundview Elite Ltd., 222 East 41st Street, New York, New York 10017, By: William J. Hine, Esq. (argued), Veerle Roovers, Esq.

LAW OFFICE OF PETER M. LEVINE, Former¹ Counsel for Defendant Soundview Composite Ltd., 99 Park Avenue, Suite 330, New York, New York 10016, By: Peter M. Levine, Esq. (argued)

SHER TREMONTE LLP, Successor Counsel for Defendant Soundview Composite Ltd., 80 Broad Street, Suite 1301, New York, New York 10004, By: Robert Knuts, Esq.²

1    After the filing of his brief and oral argument on the summary judgment elements of this decision, Mr. Levine sought permission to withdraw from his representation of defendant Soundview Composite Ltd. His motion was granted.

2    Mr. Knuts filed a brief on the asset-freezing injunction elements of this decision. The Court did not need, nor hold, oral argument as to these.

DECISION ON MOTIONS FOR SUMMARY JUDGMENT AND ASSET FREEZING PRELIMINARY INJUNCTION

<u>ROBERT E. GERBER</u>, UNITED STATES BANKRUPTCY JUDGE:

In the chapter 11 cases of debtors Soundview Elite Ltd. ("Elite") and its affiliates (collectively, and with Elite, the "Soundview Debtors"), plaintiff Corinne Ball (the "Trustee") was appointed chapter 11 trustee for the Soundview Debtors after this Court removed Alphonse Fletcher ("Fletcher") and others under Mr. Fletcher's control from possession.[3] Until the *82 Soundview Debtors needed to be liquidated (in the Cayman Islands, under which they were organized, and the United States, where they were headquartered), the Soundview Debtors were investment companies—"open ended mutual funds"[4]—taking investor money and placing that money in other investments.

| 3 | See <u>*In re Soundview Elite, Ltd.*, 503 B.R. 571 (Bankr.S.D.N.Y.2014)</u> (Gerber, J.) (the "<u>*Trustee Decision*</u>") (addressing a number of issues in this case, including the appointment of a chapter 11 trustee).<br>Earlier, in a distinct, but related, chapter 11 case involving another investment fund controlled and managed by Mr. Fletcher, *In re Fletcher Int'l Ltd. of Bermuda.*, No. 12–12796 (Bankr.S.D.N.Y. case filed June 29, 2012), referred to by the parties, and eventually this Court, as "FILB," the Court likewise appointed a trustee—in that case, Richard Davis, Esq. (the "FILB Trustee"). For further background with respect to some of FILB matters, see <u>*In re Fletcher Int'l Ltd.*, 2014 Bankr.LEXIS 2558, 2014 WL 2619690 (Bankr.S.D.N.Y. June 11, 2014)</u> (Gerber, J.). |
|---|---|
| 4 | Decl. of Alphonse Fletcher, Jr. Pursuant to Local Rule 1007–2, filed 9/24/2013 (Main Case ECF No. 2) ("Fletcher Rule 1007–02 Decl."), ¶ 4. |

One such investment (in this case, by debtor Elite, one of the six companies that are debtors in this chapter 11 case) was in another investment company, defendant Soundview Composite Ltd. ("Composite"), which is not a debtor in this Court. As of the time of the events relevant here, Composite was also under Mr. Fletcher's control, and it remains under Mr. Fletcher's control.

In this adversary proceeding under the umbrella of the Soundview Debtors' chapter 11 cases, the Trustee, on behalf of debtor Elite, sues to recover the "Owed Amount," *i.e.*, the net asset value of Elite's investment—which effectively is everything Composite would have after the payment of Composite's creditor liabilities,[5] since Elite is the only shareholder with an economic interest in Composite[6]—after Elite made a redemption request that Composite repeatedly acknowledged but now refuses to honor. The Trustee also seeks a preliminary injunction (replacing a consensual hold on Elite's assets that was put into place when this controversy first came up) freezing Composite's assets to avoid their dissipation.

| 5 | As discussed below, Elite's contractual entitlement is to the net asset value ("NAV") as of the close of business on the relevant quarterly redemption date, not the time of any payment or of any judicial determination. And because the value of Composite's assets has gone down since the redemption request was made, the amount Composite now could pay, net of its expenses, would be less than Elite's entitlement at the earlier time. Obviously, Composite cannot pay more than it has. Thus the Trustee's entitlement on behalf of Elite, Composite's only shareholder, is effectively to everything Composite would still have left after Composite's payment of any more senior creditor claims. |
|---|---|

<u>6</u>    Composite has shareholders of two types—those with voting rights (Mr. Fletcher, and/or people or entities Mr. Fletcher controls), and those who, like the average holder of shares in a mutual fund, might contribute money or property into Composite (*e.g.*, Elite), but have no voting power. Only the shareholders in the latter category have the right to redeem their investments, and Elite is the only one of them. Hereafter, instead of accompanying "shareholder" with the qualifier "with an economic interest" every time, the Court will simply refer to Elite as Composite's only shareholder.

More specifically, the Trustee seeks (i) turnover, under <u>sections 541</u> and <u>542 of the Bankruptcy Code</u>, of the net asset value of Elite's holdings; (ii) an accounting; (iii) attorneys' fees, costs, and litigation expenses, and (iv) other relief that the Court considers proper.

The Trustee now moves, pursuant to <u>Fed.R.Bankr.P. 7056</u> and <u>Fed.R.Civ.P. 56</u>, for summary judgment—though this might better be regarded as partial summary judgment, because (as the Trustee readily acknowledges) the Debtor's redemption entitlement—while to the entirety of Composite's remaining assets—is to those assets after the payment of any senior third-party creditor claims, which are not yet known with precision.

Composite's position—*i.e.*, Mr. Fletcher's position—is inexplicable, and offensive to the Court. It is obvious that once any existing senior Composite liabilities have been satisfied, the entire remaining balance of Composite's assets rightfully belongs to Elite. That Elite made a redemption *83 request has been repeatedly acknowledged by persons and entities acting for Mr. Fletcher, or entities under Mr. Fletcher's control. Mr. Fletcher, acting through companies he controlled, was on both sides of the redemption request at the time it was made. But Mr. Fletcher (who, as noted, still controls Composite) nevertheless refuses to return Elite's investment—or what is left of it.

On behalf of Composite, Mr. Fletcher contends that almost all of the evidence supporting the redemption request is inadmissible, and that what is admissible is "ambiguous"; that he can find no record of the redemption request and (though he and his staff were on both sides of the transaction at the time, and repeatedly acknowledged it before) cannot remember it; and that he isn't sure whether, assuming any redemption request was made, the request complied with necessary formalities. Mr. Fletcher also contends that Composite has the right, under "gating" provisions in the investment documents, to "gate" Elite's redemption request—even though there are no other Composite shareholders to protect; gating here would serve no purpose; and he offers no evidence to support the notion that Composite took any action to gate this redemption request.

<u>7</u>    "Gating" or "gate" provisions authorize managers of investment funds to limit the amount of withdrawals on shareholders' requested redemptions as a means of protecting the fund, to avoid a run on the bank and protect other shareholders.

Sooner or later, the Trustee will win. But Mr. Fletcher's resistance to meeting his obligations to his investors, and constraints on the statutory and constitutional authority of a bankruptcy judge to enter a final order bringing the resistance to an end, have tied this case up in knots.

To minimize the delay Fletcher's resistance has occasioned, and given how obvious her entitlement (at least in overall terms) is, the Trustee has sought to recover her entitlement by the Bankruptcy Code's "Turnover" provision, <u>section 542</u> of the Code. But for reasons discussed below, the Trustee's entitlement is not one that <u>section 542</u> can enforce, and her main entitlements are to declaratory relief, an accounting, and a related judgment—as to which a bankruptcy judge cannot enter a final order. And the Court also needs to quantify Composite's creditor claims before it can fix the amount of the inevitable judgment. The most the Court can grant at this point is partial summary judgment (though this, because it is not a final order, is fully within the Court's statutory and constitutional authority) and an injunction freezing Composite's assets until the issues are fully determined and (as is certain) the Trustee ultimately wins.

The Court grants each, for the reasons described below.

<u>Facts</u>

Under familiar principles, the Court relies solely on undisputed facts.

*A. The Composite Articles of Association and Private Placement Memorandum*

Composite was formed in May 2007 under the "Articles of Association of Soundview Composite, Ltd." (the "Composite Articles").[8] That same month, Composite issued a Confidential Private Placement Memorandum (the "Placement Memorandum") setting forth the terms and conditions of a stock offering by which Composite would offer six classes of non-voting shares.[9]

<hr>

8     Affidavit of Alphonse Fletcher, Jr. ¶ 4, dated June 16, 2014 (ECF No. 19) ("Fletcher Aff.").

9     Trustee's Statement of Undisputed Material Facts ¶ 1, dated May 19, 2014 (ECF No. 12) ("Trustee's Undisputed Facts"); Response of Defendant to the Trustee's Statement of Undisputed Material Facts ¶ 1, dated June 16, 2014 (ECF No. 20) ("Def. Response to Undisputed Facts").

\*84 Among other things, the Placement Memorandum described shareholders' entitlement to redeem their shares. As described in the Placement Memorandum, a shareholder has the right to redeem some or all of its Composite shares on any quarterly redemption date by sending a facsimile request for redemption to Composite's subadministrator.[10] The Composite Articles prescribe that any redemption request:

"[ (i) ] shall be in writing,

[ (ii) ] shall specify the number and Class of Participating Shares to which it relates or indicate the manner in which the number of Participating Shares to be redeemed is to be determined and

[ (iii) ] shall be signed by the holder thereof ..."[11]

<hr>

10     Def. Response to Undisputed Facts ¶ 8; Private Placement Memorandum of Soundview Composite Ltd., dated May 14, 2007, at 30, attached as Exh. D to the Declaration of Michael J. Dailey, dated May 19, 2014 (ECF # 14) ("Dailey Decl.").

11     Composite Articles ¶ 29(c), attached to the Fletcher Aff. as Exh. 1.

The Placement Memorandum established that redemptions may only be made on the last business day of each calendar quarter (each, a "Redemption Date"), and that a redemption request must be received at least 45 days prior to a Redemption Date in order for the redemption to be honored on that date.[12] Unless waived by the directors of Composite, a redemption request received within 45 days of a Redemption Date would be deferred until the subsequent Redemption Date.[13]

<hr>

12     Placement Memorandum at 31–32, attached to the Dailey Decl. as Exh. D.

13      *Id.*

The Placement Memorandum also provided that redemption of shares is "contingent upon the Fund having sufficient assets to discharge its liabilities on the Redemption Date," and that the "maximum Net Asset Value of Shares that may be redeemed on any Redemption Date is 10% of the Net Asset Value of the Fund, unless such limitation is waived by the Directors in their sole discretion."[14] The Composite Articles also included a limitation of this kind as follows:

> If one or more Redemptions Requests are received in respect of any one Redemption Day that would, if satisfied, result in the redemptions of an amount equal to more than 10% of the total net asset value of the Company or any Master Fund, the Directors may determine in their absolute discretion to reduce the amount of each Redemption Request so that Redemption Requests represent in aggregate an amount equal to no more than 10% of the total net asset value of the Company or any Master Fund.[15]

The Placement Memorandum also stated that Composite's directors could suspend redemptions and the determination of Net Asset Value under certain circumstances.[16]

14      *Id.* at 32.

15      Composite Articles at ¶ 29(j).

16      Placement Memorandum at 34. While it has not been asserted that Composite ever suspended its redemptions, Fletcher has indicated that Composite suspended its determination of Net Asset Value in March 2011 without providing any evidence of that suspension. *See* Fletcher Aff. ¶ 24. As discussed below, *see infra* pages 56–57, the determination of the Net Asset Value of Composite's shares by audit is not essential to determining the amount that must be returned to Elite, or any other issues decided by Court in this opinion.

Absent such restrictions on redemptions, the Placement Memorandum required payment *85 of "not less than 90% of the estimated value of the Shares requested to be redeemed" to be made within 40 days following the Redemption Date of redeemed shares, with "the remaining balance of the net redemption proceeds" being paid "within ten Business Days after the official Net Asset value of the applicable Class is published."[17] The Placement Memorandum granted Composite the right to make redemptions "in kind"—*i.e.,* by providing securities it owned instead of cash.[18] And the Placement Memorandum also provided that "[s]hares also may be redeemed at such other times on such terms and conditions as the Directors, acting in their sole discretion, may decide."[19]

17      Placement Memorandum at 31.

18      *Id.* at 31.

19      *Id.* at 30.

In August 2009, Elite subscribed to Composite shares issued under the Placement Memorandum, purchasing 15,311 Class H Shares for approximately $12.87 million (the "Composite Shares").[20] Since it purchased the Composite Shares, Elite has been the *only* holder of Composite shares, holding 100% of the nonvoting interest in Composite—or, putting it another way, the entirety of Composite's net asset value.[21]

20      Trustee's Undisputed Facts ¶¶ 2, 19; Fletcher Aff. ¶ 6.

<u>21</u>    Trustee's Undisputed Facts ¶ 21; Def. Response to Undisputed Facts ¶ 21.

*B. Ownership and Control of Elite, Composite and Soundview Capital Management*

As described in the Placement Memorandum, the investment manager of Composite was (and so far as the record reflects, still is) Soundview Capital Management (the "Management Company").[22] Until it was at least effectively displaced upon the appointment of a chapter 11 trustee, the Management Company was also the investment manager for Elite and the other Soundview Debtors. In addition to serving as investment manager for each of Elite and Composite, the Management Company also owned all the voting shares (which it will be recalled were non-economic) of Composite.[23]

<u>22</u>    Placement Memorandum at 1.

<u>23</u>    Def. Response to Undisputed Facts ¶¶ 4, 18.

The Management Company is owned by Richcourt Holding, Inc. ("Richcourt"), at least 85% of which has been owned since June 2008 (through several parent entities) by Fletcher Asset Management, wholly owned by Mr. Fletcher.[24] Since September 4, 2013, Mr. Fletcher has served as a director of the Management Company, Composite, and (though this would have little meaning after the appointment of the Trustee) Elite.[25]

<u>24</u>    Fletcher Aff. ¶ 4. On June 12, 2008, Fletcher Asset Management (the same entity that, until it was displaced by a trustee, managed FILB) and affiliates purchased 85% of the Management Shares of the "Limited Debtors" (three of the Soundview Debtors, of which one was Elite) and certain other entities. Fletcher Rule 1007–Decl. ¶ 9.

<u>25</u>    Fletcher Aff. ¶ 1.

The Management Company—"*Soundview* Capital Management"—is a company distinct from "*Fletcher* Asset Management," whose activities were a focus of the FILB chapter 11 case. But both are under the control of Mr. Fletcher, and on the first day of the umbrella chapter 11 cases here, Mr. Fletcher made reference to the *86 Soundview Debtors' ownership structure "following the acquisition of the [Soundview] Debtors by Fletcher Asset Management and affiliates."[26] The organizational chart Mr. Fletcher attached to his declaration showed Fletcher Asset Management at the top of the ownership structure, owning (directly and through an entity of which it was general partner) 100% (or in one case, 85%) of the entities below it, including the Management Company, and (with "100% Voting Control of Each") each of the Soundview Debtors.

<u>26</u>    Fletcher Rule 1007–2 Decl. ¶ 10 ("Attached hereto as Exhibit C, is a copy of an organizational chart as it exists today following the acquisition of the Debtors by Fletcher Asset Management and affiliates."). A copy of that organizational chart is attached as Appendix A.
Fletcher Asset Management was frequently referred to as "FAM." Mr. Fletcher's Rule 1007–2 Declaration in the umbrella case here showed as assets of Elite and other debtors in the umbrella chapter 11 case approximately $5.2 million in "FAM Related Investments." *See id.* Schedule 3, "Assets."

In June 2008, two of Mr. Fletcher's associates, Messrs. Denis Kiely ("Kiely") and Stewart Turner ("Turner"), were appointed directors of each of Composite and Elite. Messrs. Kiely and Turner were also directors of the Management Company in July 2011,[27] although their dates of appointment are not in the record. Mr. Kiely resigned as director of each of Elite and Composite in November 2011, and Mr. Turner resigned as director of each of Elite and Composite in June 2012. In June 2013, Mr. Kiely was replaced by Floyd Saunders ("Saunders"), and Mr. Turner was replaced by George Ladner ("Ladner")—each also an associate of Mr. Fletcher's.[28] For a three-month period from March 26, 2013 through June 12 (or 19), 2013, Deborah Hicks Midanek, of the Solon Group Inc., served as a "non-management" director of Elite, Composite, and the other Richcourt funds.[29] As stated by

Mr. Fletcher, Ms. Midanek "resigned from the Debtors on June 19, 2013. Midanek's resignation came after the Debtors' Boards had removed her as a Director on June 12, 2013."[30]

27

|   | Fletcher Aff. ¶ 8. |
|---|---|
| 28 | Trustee's Undisputed Facts ¶ 24; Fletcher Aff. ¶ 4; Def. Response to Undisputed Facts ¶¶ 23, 24, 28 |
| 29 | Def. Response to Undisputed Facts ¶ 26. |
| 30 | Fletcher Rule 1007–2 Decl. ¶ 14. |

### C. Requests for Redemption of Composite Shares

Composite has confirmed that it redeemed all shares owned by Composite's original shareholder on March 31, 2009 after that investor delivered a redemption request on February 12, 2009.[31] In July 2010, Elite delivered a redemption request for approximately half of its Composite holdings at the time. That request was honored, and Elite thereby reduced its holdings in Composite to 7,191.06 shares.[32]

31

|   | Fletcher Aff. ¶ 6. |
|---|---|
| 32 | Def. Response to Undisputed Facts ¶¶ 31–32. |

The Trustee asserts (and the Court ultimately finds, though with less precision as to the exact date) that a redemption request (the "Redemption Request") for Elite's remaining holdings was sent "[o]n or around July 2011" to HSBC Bank (Cayman) Limited ("HSBC"), the fund administrator for Composite at the time.[33] HSBC resigned as Composite's administrator on July 25, 2011.[34] Pinnacle Fund Administration LLC ("Pinnacle") became the successor *87 administrator for Composite and Elite as of January 1, 2013.[35]

33

|   | Trustee's Undisputed Facts ¶ 36. |
|---|---|
| 34 | Fletcher Aff. ¶ 5. |
| 35 | *Id.* (and *sic.*). The Court notes the substantial gap period. |

The Trustee—who had not yet been appointed by 2011, and, once appointed, needed to obtain the Soundview Debtors' documents from Fletcher-controlled entities—could not, and did not, present a copy of the Redemption Request to the Court. Mr. Fletcher has stated in an affidavit on this motion that he searched the files of Composite and the Management Company (though not those of HSBC) and his search did not yield a copy of the Redemption Request.[36] The Redemption Request has not been found in the records of Pinnacle Fund Administration LLC, to whom all relevant files were said to have been sent by HSBC.[37] The record does not reflect whether or not HSBC—the entity most likely to have been the recipient of the redemption request—now has a copy.

36    Fletcher Aff. ¶ 10.

37    Fletcher Aff. ¶ 14.

To date, Composite has declined to honor, and has not honored, the Redemption Request.[38]

38    Trustee's Undisputed Facts ¶¶ 66–67.

*D. Asserted Admissions re Elite's Redemption Request*

In support of her motion for summary judgment, the Trustee relies on eight separate communications (by letter, e-mail, affidavit, or statements in court on the record) from 2012 to 2014 (all but one preceding the appointment of the Trustee) acknowledging the Redemption Request, discussing the gating of redemptions of Composite shares, or both. The Court's review of exhibits submitted on this motion, but addressed less extensively by either side, revealed three more. Composite argues that all but two of them must be ignored by the Court, as inadmissible in evidence. The Court addresses the evidentiary issues, and thus the extent to which they may be considered on the motions here, in the Discussion to follow. For now, it sets forth the content of each of them.

*1. May 2012 Loeb E–Mail*

On May 10, 2012, Ann Loeb, an employee of Richcourt USA—which provided administrative services for the Richcourt Funds, including Elite and Composite—sent an e-mail (the "May 2012 Loeb E–Mail") to Alan de Saram (Cayman Islands counsel for Elite; for at least several other Soundview Debtors; and, most importantly, for Composite), along with Messrs. Turner, Saunders, and other employees of the Richcourt or Fletcher entities.[39] E-mails and a letter surrounding it, also submitted to the Court, confirm that the May 2012 Loeb E–Mail was transmitted incident to a group effort to formulate responses to a May 2, 2012 request by the Cayman Islands Monetary Authority (often referred to in correspondence and elsewhere as "CIMA") for information as to several matters, including the Fletcher Funds' processing of redemptions.[40]

39    E–Mail Chain from de Saram to Loeb Discussing and Attaching Draft of Letter to Cayman Islands Monetary Authority, May 10, 2012, attached to the Dailey Decl. as Exh. F.

40    *See* the May 12 de Saram Letter, sent the next day, which quoted CIMA's questions, and then, following each, provided Composite's response.

The May 2012 Loeb E–Mail stated that

Soundview Composite was never suspended or gated. There was no reason to since it only has no [*sic.*] outside *88 investor. It's [*sic.*] only investor is Soundview Elite, which requested a full redemption.

Mike can you please provide Alan with the date that Elite submitted its full redemption request to Soundview Composite.

*2. May 2012 de Saram Letter*

On the next day, May 11, 2012, Mr. de Saram sent a letter (the "May 2012 de Saram Letter") to CIMA delivering the information that was the subject of the May 2012 Loeb E–Mail on the day before. Mr. de Saram stated:

This letter concerns Soundview Composite Ltd.

We have been asked by the Board of Directors of the Fund [Composite] to respond on its behalf to your letter dated 2 May 2012.

In the time available it has not been possible to deal with all of your queries in detail requested, but we have endeavoured to answer your questions (repeated below) to the best of our ability.

We will deal with your queries to each question with our answers in bold type below the question.[41]

    *See* Dailey Decl. Exh. G. at 1.

<u>41</u>

In response to CIMA's fourth inquiry,[42] Mr. de Saram wrote:

    The Fund is unable to submit a copy of each redemption request, as these redemption requests were made directly to the administrator in accordance with standard operating procedure. However note that the sole investor in the Fund [Composite] is Soundview Elite, which has put in a redemption request which is outstanding.[43]

    The fourth inquiry said:

<u>42</u>  4. Please submit a copy of each redemption request that remains outstanding, including any subsequent or additional redemption requests by each redeeming investors [*sic.*] of the Funds.
      *Id.*

<u>43</u>  *Id.*

In response to CIMA's fifth inquiry,[44] Mr. de Saram wrote:

    With respect to the Fund [Composite], it has not been gated or suspended. It has one investor, Soundview Elite Ltd.[45]

    The fifth inquiry said:

<u>44</u>  5. We refer to 2008 Audited Financial Statements for the Funds whereby it is noted that the respective Board of Directors suspended the calculation of Net Asset value, subscription and redemptions. We note further that certain redemptions were fulfilled by way of redemption in-kind through shares in special purpose vehicles, namely Elite Designated Ltd., Star Designated Ltd. and Premium Designated Ltd.
      Please confirm whether or not the suspensions for each Funds [*sic.*] have been terminated and if not, please confirm how the Directors intend to fulfill their obligations to redeeming investors.

      *Id.*

<u>45</u>  *Id.* at 2.

*3. May 2013 Midanek Letter*

Solon Group, Inc. ("Solon") was appointed by each of the Richcourt Funds, including Composite, as a "non-management director" in March 2013 (about 10 months after the communications just quoted), and Ms. Deborah Midanek represented Solon in its director role.⁴⁶

*See* Dailey Decl. Exh. H at 1; Fletcher Aff. ¶ 25.

46

On May 28, 2013 (now about a year after the communications just quoted, at a time when she was still a director of Composite and had not yet either "resigned" or "been removed"), Ms. Midanek sent an eight-page single-spaced letter (the "May 2013 Midanek Letter") to CIMA, with respect *89 to six investment funds, including Elite and Composite,⁴⁷ of which she and Mr. Fletcher were directors. Expressing concerns as to "the condition of the Funds I serve," Ms. Midanek asked CIMA to consider removing Mr. Fletcher, to allow the funds "to perform their obligations to their shareholders and redemption creditors."⁴⁸

Dailey Decl. Exh. H at 1.

47

48      *Id.*

For the most part, Ms. Midanek's statements as to Mr. Fletcher and his management of the six funds that were the subject of Ms. Midanek's letter are not relevant to this controversy, and the Court makes no findings with respect to them. They are relevant here only with respect to Ms. Midanek's statements as pending redemptions and gating. In that connection, Ms. Midanek stated, in a section captioned "Funds' Condition," that:

> Following my appointment, as I then learned more about the status of the Funds, I learned that most of the Funds had not been able to calculate a net asset value report ("NAV") since December 31, 2010 and none later than March 31, 2011; that many redemption requests received since then had not been honored, that redemptions had not been suspended even after it had been determined that NAVs had not or could not be calculated and redemption obligations continued to crystallize....⁴⁹

*Id.* at 2.

49

In the next section, "Current Situation," Ms. Midanek stated that she had "attempted to compile, on a Fund by Fund basis, all available information on assets, shareholders, directors, governing documents, valuation dates, most recent NAV and minute books and registers,"⁵⁰ and she followed that with a table providing some of that information. For each of the six funds, she listed "Last NAV," "Last Audited Accounts," and "Redemptions (Holders)." For Composite (the fourth fund she showed), she listed dates in the boxes for "Last NAV" and "Last Audited Accounts," respectively, of "31 March 2011" and "2008." More importantly, in the box for "Redemptions (Holders)," she entered:

> 100% shareholder placed a full redemption request for trade date September 30, 2011.⁵¹

*Id.* at 3.

50

51      *Id.* at 4.

*4. June 2013 Siedlecki E–Mail*

The May 2013 Midanek Letter triggered a response from CIMA, dated June 6, 2013, seeking more information. CIMA desired a response within a week.⁵² The same day the CIMA letter was received, Michael Padarin, at the Walkers law firm in the British Virgin Islands, sent CIMA's letter to Ms. Midanek (who was still a director at the time) and Mr. Fletcher with a view to compiling the information CIMA had requested.⁵³ The CIMA letter then went from Mr. Fletcher to Mr. Saunders, who sent it on to Michael Siedlecki, a Richcourt employee working with them, on the following Monday.

<u>52</u>    Attached to the Dailey Decl. as Exh. J. at 13.

<u>53</u>    *Id.*

By e-mail dated June 10, 2013 (the "June 2013 Siedlecki E–Mail"), Mr. Siedlecki circulated draft responses. Two, with respect to CIMA's Inquiries # 4 and # 5, dealt with redemptions and gating. Mr. Siedlecki stated:

4. Only Soundview Elite, Soundview Premium, and Soundview Star have gated redemptions. However, none of the *90 Funds has a recent NAV or has paid out redemption proceeds for quite some time ... The latest final NAV for Soundview Composite and New Wave Fund is as of March 31, 2011 and neither fund has paid out any redemption proceeds since that date.

5. I'm not sure how the Directors intend to address the pending redemption requests.⁵⁴

<u>54</u>    *Id.* at 12.

*5. June 2013 Fletcher E–Mail*

The May 2013 Midanek Letter also triggered a desire on the part of Mr. Fletcher and Composite's remaining leadership to address it. On June 26, 2013, Mr. Fletcher sent an e-mail (the "June 2013 Fletcher E–Mail") to his fellow director Mr. Turner—it being remembered that by this time, Solon and Ms. Midanek had either resigned or been dismissed from that directorship. Mr. Fletcher asked Mr. Turner to draft a letter, on behalf of the Cayman Richcourt funds (which included Composite) to be sent to CIMA, "to address the derogatory letter that Deborah sent to CIMA."⁵⁵ The letter Turner was instructed to draft was to "incorporate the information from Michael's earlier email below"⁵⁶—*i.e.,* the June 2013 Siedlecki E–Mail, which included Michael Siedlecki's statements that only Elite, Premium and Star had gated redemptions—significantly leaving out Composite.

<u>55</u>    Dailey Decl. Exh. J. at 11.

<u>56</u>    *Id.*

*6. July 2013 Turner E–Mail*

The work by Mr. Fletcher and his colleagues to submit a response to CIMA continued after the June 2013 Fletcher E–Mail. On July 1, 2013, Mr. Turner sent an e-mail (the "July 2013 Turner E–Mail") reporting that "after following up with Michael

Siedlecki, I have made some factual changes and inserted two tables" into the letter that would be sent to CIMA. Mr. Turner's revised letter stated, among other things, that "Soundview Capital Management Ltd. ("SCM") [is] the Investment Manager to Soundview Composite Ltd., Soundview Elite Ltd., Soundview Premium Ltd. and Soundview Star, Ltd. ...."[57] Mr. Turner then included a table:[58]

57    *Id.* at 4.

58    *Id.* at 4.

| | # of Outstanding Redemption Requests | Estimated Value of Outstanding Redemption Requests |
|---|---|---|
| ... | | |
| Soundview Composite Ltd. | 1 | $5,000,000 |
| ... | | |

The July 2013 Turner E–Mail then stated that each of Elite, Premium and Star had gated redemptions, but once again did not include Composite in that list. Mr. Turner continued that "[n]one of the Funds have suspended redemptions but due to the delays caused by the outgoing administrator, HSBC, to forward materials to Pinnacle, redemptions are not currently being processed at this time."[59]

59    *Id.* at 5.

*91 Finally, as relevant here, the July 2013 Turner E–Mail included another table in which Mr. Turner stated that the estimated value of Composite's portfolio was $5.155 million.[60]

60    *Id.*

*7. June 2013 Midanek Letter*

Meanwhile, Ms. Midanek responded by the deadline CIMA had set. On June 13, 2013 (which, as noted above,[61] was after Mr. Fletcher states that Solon was removed as a director, though before it resigned), Ms. Midanek sent a second letter to CIMA (the "June 2013 Midanek Letter") which, among other things, responded to CIMA's letter of June 6.[62]

61    *See* page 9 *supra.*