

Anthony G. Thomas
7725 Peavine Peak Court
Reno, NV 89523
Tel:          (408) 640-2795
E-mail:      atemerald2@gmail.com

RECEIVED
AND FILED

2018 OCT 15   AM 11: 05

Debtor In Propria Persona

## UNITED STATES BANKRUPTCY COURT

## DISTRICT OF NEVADA - RENO

| | |
|---|---|
| IN RE: | ) Case No.   BK-N-14-50333-BTB |
| | ) |
| ANTHONY THOMAS and | ) Case No.   BK-N-14-50331-BTB |
| | ) |
| WENDI THOMAS | ) (Jointly Administered) |
| | ) |
| AT EMERALD, LLC | ) CHAPTER  7 |
| | ) |
| Debtors. | ) AMENDED EXHIBIT LIST OF DOCUMENTS |
| | ) SUBMITTED IN SUPPORT OF MOTION |
| | ) FOR JUDICIAL NOTICE [FRE 201] |
| | ) Date:        Friday November 2nd 2018 |
| | ) Time:       10:00 a.m. |
| | ) Judge:      Hon. Bruce T. Beesley |
| | ) Courtroom:  2 |
| | ) |

Debtor Anthony G. Thomas hereby submits the following Amended Exhibit List to

replace supplement and correct the original Exhibit list filed on 9-5-2018 as Docket

Entry 395 pages 7-8 that was used as the Template for the Proposed Order taking

Judicial Notice of Law & Facts filed on 9-28-2018 as Docket Entry 411.

| Ex # | Docket# | Description of Exhibit | Pages |
|---|---|---|---|
| 1.1 | 395 | Excerpts from 3-4-2014 BK Filing - Page 11 Request that Court take Notice that Debtor listed Mrs. Dorothy Thomas, Debtor Anthony G. Thomas's Mother as one of his top 20 creditors re: the $200K unsecured loan referenced on p. 36 of 46 of BK Pet | 09 |
| 1.2 | 395 | Excerpts from 3-4-2014 BK Filing - Page 12 Take Notice that Debtor listed the Plumas County Tax Assessor as one of the top 20 creditors and the fact that Debtor disclosed the debt was for "Property Taxes" | 10 |

//

//

| Ex# | Docket | DESCRIPTION OF EXHIBIT | PAGES |
|-----|--------|------------------------|-------|
| 1.3 | 395 | Excerpt from 3-4-2014 BK filing - page 36 of 46 - Take Notice that Debtors disclosed under para 10 "Other Transfers" - Date January 2008 - Property Transferred:    Residence valued at $25,000 Value Received:    $200,000 Transfer to Parents - Mr. Eli & Mrs. Dorothy Thomas | 11 |
| 2 | 395 | DEBTOR BASIC QUESTIONNAIRE PROVIDED BY U.S. BANKRUPTCY TRUSTEE SIGNED 11-22-2014 | 12-14 |
| 3 | 395 | Case Law of the State of California - Belli v. Bonavia (1959) 167 Cal. App.2d | 15-19 |
| 4. | 395 | Learned Treatise on the Law of Real Property & Deeds (1911) Devlin (3rd ed.) Ref. | 20-27 |
| 5A. | 395 | CA Case Law: Hastings v. Vaughn (1855) 5 Cal. 315 | 28-34 |
| 5. | 395 | Case Law - Magolo v. Zeitz (1948) 333 U.S. 56 | 35-54 |
| 6. | 395 | Case Law - In re: Doody (1937) 62 F. 653 | 55-57 |
| 7. | 395 | Case Law - In re: Adeeb (1986) 787 F.2d 1339 | 59-65 |
| 8. | 395 | Case Law - California Trust (1952) 111 Cal.App.2d 717 | 66-69 |
| 9. | 395 | Learned Treatise on the Law of Judicial Notice | 70-90 |
| 10. | 395 | L.A. Lawyer Magazine article BK Procedure Turnover Law | 91-95 |
| 11. | 395 | Norton Annual Survey of BK Law 2012 | 96-173 |
| 12. | 395 | Excerpts from 12-4-2014 341 Meeting of Creditors | 174-191 |

**EXHIBITS 13-17 FILED ON 9-5-2018 - DOCKET ENTRY 395-1 - PAGES 1-98:**

| Ex# | Docket | DESCRIPTION OF EXHIBIT | PAGES |
|-----|--------|------------------------|-------|
| 13. | 395-1 | CA Law Transfer by Deed Osterberg (1945) 68 Cal.App.2d 254 | 01-13 |
| 14. | 395-1 | Blackburn v. Drake (1963) 211 Cal.App.2d 606 | 15-28 |
| 15. | 395-1 | Gonzales (1968) 267 Cal.App.2d 428 | 29-39 |
| 16. | 395-1 | Transcript from Santa Clara case | 40-52 |
| 16.1 | 395-1 | US Senate Resolution - Dyslexia | 53-54 |
| 16.2 | 395-1 | CA Dept of Education Dyslexia Guidelines | 55-76 |
| 17 | 395-1 | Excerpts from 8-10-2018 hearing | 77-98 |

//

AMENDED EXHIBIT LIST RE: MOTION FOR JUDICIAL NOTICE

**EXHIBITS 18-27 FILED ON 9-13-2018 AS DOCKET ENTRY 406 PAGES 9-171:**

| Ex# | Docket | DESCRIPTION OF EXHIBIT | Pages |
|-----|--------|------------------------|-------|
| 18. | 406 | § 30.29 Legitimate Disputes, 3A Bankr. Service L.Ed. | 09-10 |
| 19. | 406 | In re: CONEX HOLDINGS (2014) 518 B.R. 792 | 11-28 |
| 20. | 406 | In re: American Home Mortg. Holding (2011) 458 B.R. 792 | 29-43 |
| 21. | 406 | In re: STANCIL (2012) 473 B.R. 478 | 44-51 |
| 22. | 406 | In re: W.S.F. WORLD SPORTS FANS (2009) 357 B.R. 786 | 52-61 |
| 23. | 406 | In re: Joey's Steakhouse (2012) 474 B.R. 167 | 62-86 |
| 24. | 406 | In re: Sapphire Resources, LLC (2016) 2016 WL 320823 | 87-100 |
| 25. | 406. | In re: Pali Holdings, Inc. (2013) 488 B.R. 841 | * PGS* |
|     |      | PAGES 1-10<br>PART 2 - PAGE 11 | 101-110<br>149-154 |
| 26. | 406. | In re: Soundview Elite Ltd. (2016) 543 B.R. 78<br>PAGES  01-17<br>PAGES 18-55 | * PGS*<br>155-171<br>111-148 |

**EXHIBITS 25- ON 10-10-2018 AS DOCKET ENTRY 423 - PAGES 1-99:**
**(RENUMBERED EXHIBITS 1-5 AS EXHIBITS 25-29:**

| NEW<br>EX # | OLD<br>EX# | DESCRIPTIION OF EXHIBIT | Pages |
|-------------|------------|-------------------------|-------|
| 27. | 423 | 1 | PRINTED PHOTOGRAPH OF ORIGINAL GRANT DEED FROM JANUARY OF 2008 IN POSSESSION OF ELI & DOROTHY THOMAS | 10 |
| 28 | 423 | 2 | Excerpts from Transcript of Hearing of 9-13-2018 | 11-20 |
| 29 | 423 | 3 | 9th Circuit Case Law - Re: Inquiry Notice and Section 544(a)(3) Strong-Arm Powers Patel v. Rupp. (Dist. Court D. Utah 1996) 196 B.R. 779 | 21-23 |
| 30 | 423 | 4 | 9th Circuit California Case re: Section 544(a)(3) and law That constructive notice of prior transferees unrecorded Interest defeats priority of bona-fide purchasor that records and deprives bona fide purchaser of recording acts.<br><br>Weisman v. Peters (1992) 131 B.R. 148. | 24-34 |
| 31. | 423 | 5 | Learned Treatise on the Law of Inquiry Constructive and Actual Notice | 35-99 |

AMENDED EXHIBIT LIST RE: MOTION FOR JUDICIAL NOTICE

2 Pomeroy Eq. Jur. (4th Ed. 1919) Sections 591-613
pages 1100-1162

**EXHIBITS ATTACHED TO THIS EXHIBIT LIST
IN SUPPORT OF REPLY BRIEF
IN SUPPORT OF MOTION FOR JUDICIAL NOTICE**

| Ex# | DESCRIPTION OF EXHIBIT | Pages |
|---|---|---|
| 32. | Letter dated 8-13-2018 from Hartman Law Firm | 06 |
| 33. | Web Page entitled "Who are Raskob Students?" | 07-08 |
| 34. | Letter dated 10-23-2015 from US Department Education Office of Special Education and Rehabilitative Services Secretary re: Dyslexia as specific learning disability under both the ADA (Americans with Disabilities Act) & the IDEA (Individuals with Disabilities Education Act. | 09-12 |
| 35. | Envelope postmarked 1976 sent to Dorothy Thomas with cover letter from Dr. Harold N. Levinson re: offer of Diagnostic procedure to make adequate diagnosis and Test findings ref: Fee of $500 in 1976 dollars, equal to $2500 in today's dollars | 13-14 |
| 36. | United States v. Whiting Pools, Inc. (1983) 462 U.S. 198 | 15-30 |
| 37. | In re: Howard's Appliance Corp. (2nd Cir. 1989) 874 F. 2d 88 | 31-39 |
| 38. | In re: Professional Inv. Properties of America (9th Cir. 1992) 953 F. 2d 623 | 40-48 |
| 39. | Martin v. Superior Court (1917) 176 Cal. 289 | 49-61 |

For the convenience of the Court, the Debtor is hereby attaching Exhibits 32-39 to this Exhibit List, and is concurrently filing with this Exhibit List, a Declaration of Anthony Thomas, a Memorandum of Points & Authorities in Support of this Reply Brief, and making a few more requests for the Court to take Judicial Notice of Adjudicative Facts that include published decisions, in the form of a continuation of the Proposed Order filed on 9-28-2018 as DE 411 consisting of 28 pages with check boxes for YES or NO to indicate whether or not the Court does or does not take Judicial Notice of each specific request.

//

//

//

1  Dated: Friday October 12ᵗʰ 2018.                    Respectfully submitted,

2

3                                                       Anthony G. Thomas
                                                        Debtor In Propria Persona
4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

AMENDED EXHIBIT LIST RE: MOTION FOR JUDICIAL NOTICE

# HARTMAN
# &
# HARTMAN
A PROFESSIONAL CORPORATION

JEFFREY L. HARTMAN, ESQ.
STEPHEN D. HARTMAN
(RETIRED)

510 WEST PLUMB LANE, SUITE B
RENO, NEVADA 89509
TELEPHONE (775) 324-2800
FACSIMILE (775) 324-1818

August 13, 2018
(Via email to *ATEmerald2@gmail.com*)

Anthony and Wendi Thomas
7725 Peavine Peak Court
Reno, NV 89523

Re:    **Anthony and Wendi Thomas, Case No. 14-50333-btb**

Dear Mr. and Mrs. Thomas:

Please provide copies of any and all documents you have (correspondence, agreements, promissory notes, real estate documents, recorded documents, etc.) in connection with the purported 2008 transfer of the Portola property to Mr. and Mrs. Thomas in Saratoga, California. Please provide these documents within the next two weeks.

Thank you,

Jeffrey L. Hartman

c:  Jeri Coppa-Knudson Trustee

-6-

**Exhibit 32**



Home | About Raskob | Admissions | Day School | Clinic | Faculty and Staff | Support Raskob | Contact Us

# Who are Raskob Students?



*"Raskobian's"* are bright, inquisitive, and creative. Some are social butterflies while others may prefer to hang with a couple close buds. Raskob students have average to above average academic potential, but are underachieving at their current schools.

The Raskob Day School program is designed to meet the needs of our students through an individualized academic program that incorporates one-on-one instruction and small group experience. As a result, Raskob's curriculum operates on multiple levels from remedial to advanced. Raskob is committed to the development of self-directed learners who understand their disability and how it impacts them in a variety of settings.

Raskob's program is designed for students who:

- are of average to above average cognitive ability
- have difficulty with decoding, spelling and writing
- have difficulty with math calculation and reasoning
- have well developed problem solving skills
- struggle with slow processing, executive functioning, or working memory challenges
- Students who are diagnosed with:
    - **Specific Learning Disability**
    - **Dyslexia, or other Reading Disorders**
    - **Dysgraphia, or other Disorders of Written Expression**
    - **ADHD**
    - **Auditory Processing Disorder**

Our program <u>does not</u> meet the needs of students who have:

- Moderate to severe emotional or behavioral issues

Raskob's Unique Program

Who are Raskob Students?

Educational Program

Enrichment & Additional Services

-7-

**Exhibit** 33

- Academic delays resulting primarily from visual, hearing, or motor handicaps
- Autism Spectrum Disorder
- Benefit from behavioral interventions

In reviewing applications and test results for placement in the Day School, some factors taken into consideration are:

1. **Age**: The age range for acceptance is 7 through 15 years upon graduation
2. **Grade Placement**: Individual educational programming is part of Raskob Day School. Small groups are formed within the classroom according to individual educational needs. Once a student is enrolled, retention or "skipping a grade" are not parts of our policy.

**Confidentiality of Information** All information concerning your child's academic and psychological records and progress reports are confidential under Federal and State laws (Public Laws 94-142 and 93-380) and California Laws, Chapter 1229, States of 1974.) These reports may not be distributed to any professional or other persons who are not a Raskob Institute/Day School staff member without the written consent, in advance, by the parents or legal guardians of the child, under the Family Educational Rights and Privacy Act of 1974, except by court order.

*I feel like I am ready to start high school. I know what I need to do to get help, and I know I can do it.*
*—8th Grade Raskob Student*

Map and Directions
Site Map
Contact Us
Institute Established 1953 Day School Established 1973
3520 Mountain Blvd. Oakland, CA 94619
Tel: (510) 436-1275, Fax: (510) 436-1106
A division of Holy Names University in the Oakland Hills
Executive Director: Edith Ben Ari
All content © Raskob Day School and Learning Institute, 2012

**Exhibit 33**

-8-

10-09-2018 08:17 pm



**UNITED STATES DEPARTMENT OF EDUCATION**
OFFICE OF SPECIAL EDUCATION AND REHABILITATIVE SERVICES

THE ASSISTANT SECRETARY

October 23, 2015

Dear Colleague:

Ensuring a high-quality education for children with specific learning disabilities is a critical responsibility for all of us. I write today to focus particularly on the unique educational needs of children with dyslexia, dyscalculia, and dysgraphia, which are conditions that could qualify a child as a child with a specific learning disability under the Individuals with Disabilities Education Act (IDEA). The Office of Special Education and Rehabilitation Services (OSERS) has received communications from stakeholders, including parents, advocacy groups, and national disability organizations, who believe that State and local educational agencies (SEAs and LEAs) are reluctant to reference or use dyslexia, dyscalculia, and dysgraphia in evaluations, eligibility determinations, or in developing the individualized education program (IEP) under the IDEA. The purpose of this letter is to clarify that there is nothing in the IDEA that would prohibit the use of the terms dyslexia, dyscalculia, and dysgraphia in IDEA evaluation, eligibility determinations, or IEP documents.

Under the IDEA and its implementing regulations "specific learning disability" is defined, in part, as "a disorder in one or more of the basic psychological processes involved in understanding or in using language, spoken or written, that may manifest itself in the imperfect ability to listen, think, speak, read, write, spell, or to do mathematical calculations, including conditions such as perceptual disabilities, brain injury, minimal brain dysfunction, *dyslexia*, and developmental aphasia." See 20 U.S.C. §1401(30) and 34 CFR §300.8(c)(10) (emphasis added). While our implementing regulations contain a list of conditions under the definition "specific learning disability," which includes dyslexia, the list is not exhaustive. However, regardless of whether a child has dyslexia or any other condition explicitly included in this definition of "specific learning disability," or has a condition such as dyscalculia or dysgraphia not listed expressly in the definition, the LEA must conduct an evaluation in accordance with 34 CFR §§300.304-300.311 to determine whether that child meets the criteria for specific learning disability or any of the other disabilities listed in 34 CFR §300.8, which implements IDEA's definition of "child with a disability."

For those students who may need additional academic and behavioral supports to succeed in a general education environment, schools may choose to implement a multi-tiered system of supports (MTSS), such as response to intervention (RTI) or positive behavioral interventions and supports (PBIS). MTSS is a schoolwide approach that addresses the needs of all students, including struggling learners and students with disabilities, and integrates assessment and intervention within a multi-level instructional and behavioral system to maximize student achievement and reduce problem behaviors.

MTSS, which includes scientific, research-based interventions, also may be used to identify children suspected of having a specific learning disability. With a multi-tiered instructional

400 MARYLAND AVE., S.W.  WASHINGTON, D.C.  20202-2600
www.ed.gov
*The Department of Education's mission is to promote student achievement and preparedness for global competitiveness by fostering educational excellence and ensuring equal access.*

- 9 -

**Exhibit 34**

framework, schools identify students at risk for poor learning outcomes, including those who may have dyslexia, dyscalculia, or dysgraphia; monitor their progress; provide evidence-based interventions; and adjust the intensity and nature of those interventions depending on a student's responsiveness. Children who do not, or minimally, respond to interventions must be referred for an evaluation to determine if they are eligible for special education and related services (34 CFR §300.309(c)(1)); and those children who simply need intense short-term interventions may continue to receive those interventions. OSERS reminds SEAs and LEAs about previous guidance regarding the use of MTSS, including RTI, and timely evaluations,[1] specifically that a parent may request an initial evaluation at any time to determine if a child is a child with a disability under IDEA (34 CFR §300.301(b)), and the use of MTSS, such as RTI, may not be used to delay or deny a full and individual evaluation under 34 CFR §§300.304-300.311 of a child suspected of having a disability.

In determining whether a child has a disability under the IDEA, including a specific learning disability, and is eligible to receive special education and related services because of that disability, the LEA must conduct a comprehensive evaluation under §300.304, which requires the use of a variety of assessment tools and strategies to gather relevant functional, developmental, and academic information about the child. This information, which includes information provided by the parent, may assist in determining: 1) whether the child is a child with a disability; and 2) the content of the child's IEP to enable the child to be involved in, and make progress in, the general education curriculum. 34 CFR §300.304(b)(1). Therefore, information about the child's learning difficulties, including the presenting difficulties related to reading, mathematics, or writing, is important in determining the nature and extent of the child's disability and educational needs. In addition, other criteria are applicable in determining whether a child has a specific learning disability. For example, the team determining eligibility considers whether the child is not achieving adequately for the child's age or to meet State-approved grade-level standards when provided with learning experiences and instruction appropriate for the child's age or the relevant State standards in areas related to reading, mathematics, and written expression. The team also must determine that the child's underachievement is not due to lack of appropriate instruction in reading or mathematics. 34 CFR §300.309(a)(1) and (b). Section 300.311 contains requirements for specific documentation of the child's eligibility determination as a child with a specific learning disability, and includes documentation of the information described above. Therefore, there could be situations where the child's parents and the team of qualified professionals responsible for determining whether the child has a specific learning disability would find it helpful to include information about the specific condition (e.g., dyslexia, dyscalculia, or dysgraphia) in documenting how that condition relates to the child's eligibility determination. 34 CFR §§300.306(a)(1), (c)(1) and 300.308.

---

[1] *See* OSEP Memo 11-07 (January 21, 2011) available at: www.ed.gov/policy/speced/guid/idea/memosdcltrs/osep11-07rtimemo.pdf Under 34 CFR §300.307(a)(2)-(3), as part of their criteria for determining whether a child has a specific learning disability, States must permit the use of a process based on the child's response to scientific, research-based intervention, and may permit the use of other alternative research-based procedures in making this determination.

Exhibit 34

Page 3 – Dear Colleague: Dyslexia Guidance

Stakeholders also requested that SEAs and LEAs have policies in place that allow for the use of the terms dyslexia, dyscalculia, and dysgraphia on a child's IEP, if a child's comprehensive evaluation supports use of these terms. There is nothing in the IDEA or our implementing regulations that prohibits the inclusion of the condition that is the basis for the child's disability determination in the child's IEP. In addition, the IEP must address the child's needs resulting from the child's disability to enable the child to advance appropriately towards attaining his or her annual IEP goals and to enable the child to be involved in, and make progress in, the general education curriculum. 34 CFR §§300.320(a)(1), (2), and (4). Therefore, if a child's dyslexia, dyscalculia, or dysgraphia is the condition that forms the basis for the determination that a child has a specific learning disability, OSERS believes that there could be situations where an IEP Team could determine that personnel responsible for IEP implementation would need to know about the condition underlying the child's disability (e.g., that a child has a weakness in decoding skills as a result of the child's dyslexia). Under 34 CFR §300.323(d), a child's IEP must be accessible to the regular education teacher and any other school personnel responsible for its implementation, and these personnel must be informed of their specific responsibilities related to implementing the IEP and the specific accommodations, modifications, and supports that must be provided for the child in accordance with the IEP. Therefore, OSERS reiterates that there is nothing in the IDEA or our implementing regulations that would prohibit IEP Teams from referencing or using dyslexia, dyscalculia, or dysgraphia in a child's IEP.

Stakeholders requested that OSERS provide SEAs and LEAs with a comprehensive guide to commonly used accommodations[2] in the classroom for students with specific learning disabilities, including dyslexia, dyscalculia, and dysgraphia. The IDEA does not dictate the services or accommodations to be provided to individual children based solely on the disability category in which the child has been classified, or the specific condition underlying the child's disability classification. The Office of Special Education Programs (OSEP) funds a large network of technical assistance centers that develop materials and resources to support States, school districts, schools, and teachers to improve the provision of services to children with disabilities, including materials on the use of accommodations. The U.S. Department of Education does not mandate the use of, or endorse the content of, these products, services, materials, and/or resources; however, States and LEAs may wish to seek assistance from entities such as the National Center on Intensive Intervention at: http://www.intensiveintervention.org, the Center for Parent Information and Resources available at: http://www.parentcenterhub.org, and the National Center on Accessible Educational Materials available at: http://aem.cast.org/. For a complete list of OSEP-funded technical assistance centers please see: http://ccrs.osepideasthatwork.org/.

In implementing the IDEA requirements discussed above, OSERS encourages SEAs and LEAs to consider situations where it would be appropriate to use the terms dyslexia, dyscalculia, or dysgraphia to describe and address the child's unique, identified needs through evaluation, eligibility, and IEP documents. OSERS further encourages States to review their policies,

---

[2] Although the IDEA uses the term "accommodations" primarily in the assessment context, OSERS understands the request to refer to the various components of a free appropriate public education, including special education, related services, supplementary aids and services, and program modifications or supports for school personnel, as well as accommodations for students taking assessments.

Exhibit 34

Page 4 — Dear Colleague: Dyslexia Guidance

procedures, and practices to ensure that they do not prohibit the use of the terms dyslexia, dyscalculia, and dysgraphia in evaluations, eligibility, and IEP documents. Finally, in ensuring the provision of free appropriate public education, OSERS encourages SEAs to remind their LEAs of the importance of addressing the unique educational needs of children with specific learning disabilities resulting from dyslexia, dyscalculia, and dysgraphia during IEP Team meetings and other meetings with parents under IDEA.

I hope this clarification is helpful to both parents and practitioners in ensuring a high-quality education for children with specific learning disabilities, including children with dyslexia, dyscalculia, and dysgraphia. If you have additional questions or comments, please email them to sld@ed.gov.

Sincerely,

/s/

Michael K. Yudin

**Exhibit** 34

Exhibit 35

**HAROLD N. LEVINSON, M.D., P.C.**
**AND ASSOCIATES**
600 NORTHERN BOULEVARD
GREAT NECK, NEW YORK 11021
—
TELEPHONE (516) 482-2888

Dear Correspondent:

As a result of the influx of individuals interested and inquiring about
Dr. Levinson's methods of diagnosing and treating dyslexic individuals,
this form letter was expediently drafted.

The diagnostic procedure takes approximately 2½ hours and is completed
in one visit.  It includes all neurological, ocular, "inner ear" and
psycho-educational testing to make an adequate diagnosis.  This
diagnosis can be made and explained in almost 100% of the cases seen.

In addition, a treatment plan is determined on the basis of the test
findings.  Thus far, 75% of individuals will have a favorable thera-
peutic response to various combinations of medications and 25% will not.
The favorable response will vary from mild to dramatic, and is thus far
not predictable.

The total fee for this diagnostic-treatment evaluation, performed by
Dr. Levinson or his associate, is $500.  This fee must be paid at the
time of the examination.  All testing is medical, and may be reimbursable
according to the manner in which your particular  insurance policy
covers you for other out-of-hospital medical services.

At the present time, Dr. Levinson and his associate are the only
physicians performing the above described diagnosis and treatment.

I hope this letter clearly explains Dr. Levinson's office procedure.
Should you have any questions, please write or phone.

Sincerely yours,

*Carolyn*

Carolyn Malman,
Secretary to Dr. Levinson

P.S. To insure proper testing, all individuals with appointments should:
1. be medication free for 24 hours - if possible,
2. eat lightly prior to testing, and
3. if you have a tendency to accumulate wax,have your physician
   check and clean your ears.

**Exhibit** 35

# UNITED STATES REPORTS

## VOLUME 462

———

## CASES ADJUDGED

IN

# THE SUPREME COURT

AT

## OCTOBER TERM, 1982

JUNE 6 THROUGH JUNE 23, 1983

———

### HENRY C. LIND

REPORTER OF DECISIONS

———

UNITED STATES
GOVERNMENT PRINTING OFFICE
WASHINGTON : 1986

**Exhibit** 36

OCTOBER TERM, 1982

Syllabus                    462 U. S.

# UNITED STATES *v.* WHITING POOLS, INC.

## CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

No. 82–215.   Argued April 19, 1983—Decided June 8, 1983

Section 542(a) of the Bankruptcy Reform Act of 1978 (Act) requires an entity, other than a custodian, in possession of property of the debtor that the trustee in bankruptcy can use, sell, or lease under § 363 to deliver that property to the trustee.   Section 543(b)(1) requires a custodian in possession or control of any property of the debtor to deliver the property to the trustee.   Promptly after the Internal Revenue Service (IRS) seized respondent swimming pool firm's tangible personal property to satisfy a tax lien, respondent filed a petition for reorganization under the Act.   The Bankruptcy Court, pursuant to § 543(b)(1), ordered the IRS to turn the property over to respondent on the condition that respondent provide the IRS with specified protection for its interests.   The District Court reversed, holding that a turnover order against the IRS was not authorized by either § 542(a) or § 543(b)(1).   The Court of Appeals in turn reversed the District Court, holding that a turnover order could issue against the IRS under § 542(a).

*Held:*

1. The reorganization estate includes property of the debtor that has been seized by a creditor prior to the filing of a petition for reorganization.   Pp. 202–209.

(a) Both the congressional goal of encouraging reorganization of troubled enterprises and Congress' choice of protecting secured creditors by imposing limits or conditions on the trustee's power to sell, use, or lease property subject to a secured interest, rather than by excluding such property from the reorganization estate, indicate that Congress intended a broad range of property, including property in which a creditor has a secured interest, to be included in the estate.   Pp. 203–204.

(b) The statutory language reflects this view of the scope of the estate.   Section 541(a)(1) of the Act, which provides that the estate shall include "all legal or equitable interests of the debtor in property as of the commencement of the case," is intended to include any property made available to the estate by other provisions of the Act such as § 542(a).   In effect, § 542(a) grants to the estate a possessory interest in certain property of the debtor that was not held by the debtor at the commencement of reorganization proceedings.   Pp. 204–207.

(c) This interpretation of § 542(a) is supported by its legislative history and is consistent with judicial precedent predating the Act.

**Exhibit** 36

UNITED STATES *v.* WHITING POOLS, INC.        199

198                    Opinion of the Court

Any other interpretation would deprive the reorganization estate of the assets and property essential to its rehabilitation effort and thereby would frustrate the congressional purpose behind the reorganization provisions. Pp. 207–208.

2. Section 542(a) authorizes the Bankruptcy Court to order the IRS to turn over the seized property in question. Pp. 209–211.

(a) The IRS is bound by § 542(a) to the same extent as any secured creditor. Nothing in the Act or its legislative history indicates that Congress intended a special exception for tax collectors. P. 209.

(b) While § 542(a) would not apply if a tax levy or seizure transferred to the IRS ownership of the property seized, the Internal Revenue Code does not transfer ownership of such property until the property is sold to a bona fide purchaser at a tax sale. Pp. 209–211.

674 F. 2d 144, affirmed.

BLACKMUN, J., delivered the opinion for a unanimous Court.

*Stuart A. Smith* argued the cause for the United States. With him on the briefs were *Solicitor General Lee, Assistant Attorney General Archer, Wynette J. Hewett,* and *George L. Hastings, Jr.*

*Lloyd H. Relin* argued the cause and filed a brief for respondent.

JUSTICE BLACKMUN delivered the opinion of the Court.

Promptly after the Internal Revenue Service (IRS or Service) seized respondent's property to satisfy a tax lien, respondent filed a petition for reorganization under the Bankruptcy Reform Act of 1978, hereinafter referred to as the "Bankruptcy Code." The issue before us is whether § 542(a) of that Code authorized the Bankruptcy Court to subject the IRS to a turnover order with respect to the seized property.

I

A

Respondent Whiting Pools, Inc., a corporation, sells, installs, and services swimming pools and related equipment and supplies. As of January 1981, Whiting owed approximately $92,000 in Federal Insurance Contribution Act taxes and federal taxes withheld from its employees, but had failed

**Exhibit** 36

to respond to assessments and demands for payment by the IRS. As a consequence, a tax lien in that amount attached to all of Whiting's property.[1]

On January 14, 1981, the Service seized Whiting's tangible personal property—equipment, vehicles, inventory, and office supplies—pursuant to the levy and distraint provision of the Internal Revenue Code of 1954.[2] According to uncontroverted findings, the estimated liquidation value of the property seized was, at most, $35,000, but its estimated going-concern value in Whiting's hands was $162,876. The very next day, January 15, Whiting filed a petition for reorganization, under the Bankruptcy Code's Chapter 11, 11 U. S. C. § 1101 *et seq.* (1976 ed., Supp. V), in the United States Bankruptcy Court for the Western District of New York. Whiting was continued as debtor-in-possession.[3]

The United States, intending to proceed with a tax sale of

---

[1] Section 6321 of the Internal Revenue Code of 1954, 26 U. S. C. § 6321, provides:

"If any person liable to pay any tax neglects or refuses to pay the same after demand, the amount . . . shall be a lien in favor of the United States upon all property and rights to property, whether real or personal, belonging to such person."

[2] Section 6331 of that Code, 26 U. S. C. § 6331, provides:

"(a) Authority of Secretary

"If any person liable to pay any tax neglects or refuses to pay the same within 10 days after notice and demand, it shall be lawful for the Secretary to collect such tax (and such further sum as shall be sufficient to cover the expenses of the levy) by levy upon all property and rights to property . . . belonging to such person or on which there is a lien provided in this chapter for the payment of such tax. . . .

"(b) Seizure and sale of property

"The term 'levy' as used in this title includes the power of distraint and seizure by any means. . . . In any case in which the Secretary may levy upon property or rights to property, he may seize and sell such property or rights to property (whether real or personal, tangible or intangible)."

[3] With certain exceptions not relevant here, a debtor-in-possession, such as Whiting, performs the same functions as a trustee in a reorganization. 11 U. S. C. § 1107(a) (1976 ed., Supp. V).

**Exhibit** 36

UNITED STATES *v.* WHITING POOLS, INC.                    201

the property,[4] moved in the Bankruptcy Court for a declaration that the automatic stay provision of the Bankruptcy Code, § 362(a), is inapplicable to the IRS or, in the alternative, for relief from the stay.   Whiting counterclaimed for an order requiring the Service to turn the seized property over to the bankruptcy estate pursuant to § 542(a) of the Bankruptcy Code.[5]   Whiting intended to use the property in its reorganized business.

B

The Bankruptcy Court determined that the IRS was bound by the automatic stay provision.   *In re Whiting Pools, Inc.,* 10 B. R. 755 (1981).   Because it found that the seized property was essential to Whiting's reorganization effort, it refused to lift the stay.   Acting under § 543(b)(1) of the Bankruptcy Code,[6] rather than under § 542(a), the court directed the IRS to turn the property over to Whiting on the condition that Whiting provide the Service with specified protection for its interests.   10 B. R., at 760–761.[7]

---

[4] Section 6335, as amended, of the 1954 Code, 26 U. S. C. § 6335, provides for the sale of seized property after notice.   The taxpayer is entitled to any surplus of the proceeds of the sale.   § 6342(b).

[5] Section 542(a) provides in relevant part:

"[A]n entity, other than a custodian, in possession, custody, or control, during the case, of property that the trustee may use, sell, or lease under section 363 of this title, or that the debtor may exempt under section 522 of this title, shall deliver to the trustee, and account for, such property or the value of such property, unless such property is of inconsequential value or benefit to the estate."   11 U. S. C. § 542(a) (1976 ed., Supp. V).

[6] Section 543(b)(1) requires a *custodian* to "deliver to the trustee any property of the debtor transferred to such custodian, or proceeds of such property, that is in such custodian's possession, custody, or control on the date that such custodian acquires knowledge of the commencement of the case."

The Bankruptcy Court declined to base the turnover order on § 542(a) because it felt bound by *In re Avery Health Center, Inc.,* 8 B. R. 1016 (WDNY 1981) (§ 542(a) does not draw into debtor's estate property seized by IRS prior to filing of petition).

[7] Section 363(e) of the Bankruptcy Code provides:

"Notwithstanding any other provision of this section, at any time, on request of an entity that has an interest in property used, sold, or leased, or

**Exhibit** 3C

The United States District Court reversed, holding that a turnover order against the Service was not authorized by either § 542(a) or § 543(b)(1).  15 B. R. 270 (1981).  The United States Court of Appeals for the Second Circuit, in turn, reversed the District Court.  674 F. 2d 144 (1982).  It held that a turnover order could issue against the Service under § 542(a), and it remanded the case for reconsideration of the adequacy of the Bankruptcy Court's protection conditions.  The Court of Appeals acknowledged that its ruling was contrary to that reached by the United States Court of Appeals for the Fourth Circuit in *Cross Electric Co.* v. *United States*, 664 F. 2d 1218 (1981), and noted confusion on the issue among bankruptcy and district courts.  674 F. 2d, at 145, and n. 1.  We granted certiorari to resolve this conflict in an important area of the law under the new Bankruptcy Code.  459 U. S. 1033 (1982).

## II

By virtue of its tax lien, the Service holds a secured interest in Whiting's property.  We first examine whether § 542(a) of the Bankruptcy Code generally authorizes the turnover of a debtor's property seized by a secured creditor prior to the commencement of reorganization proceedings.  Section 542(a) requires an entity in possession of "property that the trustee may use, sell, or lease under section 363" to

---

proposed to be used, sold, or leased, by the trustee, the court shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest.  In any hearing under this section, the trustee has the burden of proof on the issue of adequate protection."  11 U. S. C. § 363(e) (1976 ed., Supp. V).

Pursuant to this section, the Bankruptcy Court set the following conditions to protect the tax lien: Whiting was to pay the Service $20,000 before the turnover occurred; Whiting also was to pay $1,000 a month until the taxes were satisfied; the IRS was to retain its lien during this period; and if Whiting failed to make the payments, the stay was to be lifted.  10 B. R., at 761.

Exhibit 36

UNITED STATES *v.* WHITING POOLS, INC.            203

deliver that property to the trustee.   Subsections (b) and (c) of §363 authorize the trustee to use, sell, or lease any "property of the estate," subject to certain conditions for the protection of creditors with an interest in the property.   Section 541(a)(1) defines the "estate" as "comprised of all the following property, wherever located: . . . all legal or equitable interests of the debtor in property as of the commencement of the case."   Although these statutes could be read to limit the estate to those "interests of the debtor in property" at the time of the filing of the petition, we view them as a definition of what is included in the estate, rather than as a limitation.

A

In proceedings under the reorganization provisions of the Bankruptcy Code, a troubled enterprise may be restructured to enable it to operate successfully in the future.   Until the business can be reorganized pursuant to a plan under 11 U. S. C. §§1121–1129 (1976 ed., Supp. V), the trustee or debtor-in-possession is authorized to manage the property of the estate and to continue the operation of the business.   See §1108.   By permitting reorganization, Congress anticipated that the business would continue to provide jobs, to satisfy creditors' claims, and to produce a return for its owners. H. R. Rep. No. 95–595, p. 220 (1977).   Congress presumed that the assets of the debtor would be more valuable if used in a rehabilitated business than if "sold for scrap."   *Ibid.* The reorganization effort would have small chance of success, however, if property essential to running the business were excluded from the estate.   See 6 J. Moore & L. King, Collier on Bankruptcy ¶3.05, p. 431 (14th ed. 1978).   Thus, to facilitate the rehabilitation of the debtor's business, all the debtor's property must be included in the reorganization estate.

This authorization extends even to property of the estate in which a creditor has a secured interest.   §§363(b) and (c); see H. R. Rep. No. 95–595, p. 182 (1977).   Although Congress might have safeguarded the interests of secured credi-

**Exhibit** 36

Opinion of the Court                    462 U. S.

tors outright by excluding from the estate any property subject to a secured interest, it chose instead to include such property in the estate and to provide secured creditors with "adequate protection" for their interests. § 363(e), quoted in n. 7, *supra*. At the secured creditor's insistence, the bankruptcy court must place such limits or conditions on the trustee's power to sell, use, or lease property as are necessary to protect the creditor. The creditor with a secured interest in property included in the estate must look to this provision for protection, rather than to the nonbankruptcy remedy of possession.

Both the congressional goal of encouraging reorganizations and Congress' choice of methods to protect secured creditors suggest that Congress intended a broad range of property to be included in the estate.

## B

The statutory language reflects this view of the scope of the estate. As noted above, § 541(a)(1) provides that the "estate is comprised of all the following property, wherever located: . . . all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U. S. C. § 541(a)(1) (1976 ed., Supp. V).[8] The House and Senate Re-

---

[8] Section 541(a)(1) speaks in terms of the debtor's "interests . . . in property," rather than property in which the debtor has an interest, but this choice of language was not meant to limit the expansive scope of the section. The legislative history indicates that Congress intended to exclude from the estate property of others in which the debtor had some minor interest such as a lien or bare legal title. See 124 Cong. Rec. 32399, 32417 (1978) (remarks of Rep. Edwards); *id.*, at 33999, 34016–34017 (remarks of Sen. DeConcini); cf. § 541(d) (property in which debtor holds legal but not equitable title, such as a mortgage in which debtor retained legal title to service or to supervise servicing of mortgage, becomes part of estate only to extent of legal title); 124 Cong. Rec. 33999 (1978) (remarks of Sen. DeConcini) (§ 541(d) "reiterates the general principle that where the debtor holds bare legal title without any equitable interest, . . . the estate acquires bare legal title without any equitable interest in the property"). Similar statements to the effect that § 541(a)(1) does not expand the rights

**Exhibit 36**

UNITED STATES *v.* WHITING POOLS, INC.          205

198                              Opinion of the Court

ports on the Bankruptcy Code indicate that §541(a)(1)'s scope is broad.[9]   Most important, in the context of this case, §541(a)(1) is intended to include in the estate any property made available to the estate by other provisions of the Bankruptcy Code.   See H. R. Rep. No. 95–595, p. 367 (1977). Several of these provisions bring into the estate property in which the debtor did not have a possessory interest at the time the bankruptcy proceedings commenced.[10]

Section 542(a) is such a provision.   It requires an entity (other than a custodian) holding any property of the debtor that the trustee can use under §363 to turn that property over to the trustee.[11]   Given the broad scope of the reorga-

_____

of the debtor in the hands of the estate were made in the context of describing the principle that the estate succeeds to no more or greater causes of action against third parties than those held by the debtor.   See H. R. Rep. No. 95–595, pp. 367–368 (1977).   These statements do not limit the ability of a trustee to regain possession of property in which the debtor had equitable as well as legal title.

[9] "The scope of this paragraph [§541(a)(1)] is broad.   It includes all kinds of property, including tangible or intangible property, causes of action (see Bankruptcy Act §70a(6)), and all other forms of property currently specified in section 70a of the Bankruptcy Act."   *Id.*, at 367; S. Rep. No. 95–989, p. 82 (1978).

[10] See, *e. g.*, §§543, 547, and 548.   These sections permit the trustee to demand the turnover of property that is in the possession of others if that possession is due to a custodial arrangement, §543, to a preferential transfer, §547, or to a fraudulent transfer, §548.

We do not now decide the outer boundaries of the bankruptcy estate. We note only that Congress plainly excluded property of others held by the debtor in trust at the time of the filing of the petition.   See §541(b); H. R. Rep. No. 95–595, p. 368 (1977); S. Rep. No. 95–989, p. 82 (1978). Although it may well be that funds that the IRS can demonstrate were withheld for its benefit pursuant to 26 U. S. C. §7501 (employee withholding taxes), are excludable from the estate, see 124 Cong. Rec. 32417 (1978) (remarks of Rep. Edwards) (Service may exclude funds it can trace), the IRS did not attempt to trace the withheld taxes in this case.   See Tr. of Oral Arg. 18, 28–29.

[11] The House Report expressly includes property of the debtor recovered under §542(a) in the estate: the estate includes "property recovered by the trustee under section 542 . . . , if the property recovered was merely out of

**Exhibit** 36

nization estate, property of the debtor repossessed by a secured creditor falls within this rule, and therefore may be drawn into the estate.    While there are explicit limitations on the reach of §542(a),[12] none requires that the debtor hold a possessory interest in the property at the commencement of the reorganization proceedings.[13]

As does all bankruptcy law, §542(a) modifies the procedural rights available to creditors to protect and satisfy their liens.[14]  See *Wright* v. *Union Central Life Ins. Co.*, 311

---

the possession of the debtor, yet remained 'property of the debtor.'" H. R. Rep. No. 95–595, p. 367 (1977); see 4 L. King, Collier on Bankruptcy ¶541.16, p. 541–72.10 (15th ed. 1982).

[12] Section 542 provides that the property be usable under §363, and that turnover is not required in three situations: when the property is of inconsequential value or benefit to the estate, §542(a), when the holder of the property has transferred it in good faith without knowledge of the petition, §542(c), or when the transfer of the property is automatic to pay a life insurance premium, §542(d).

[13] Under the old Bankruptcy Act, a bankruptcy court's summary jurisdiction over a debtor's property was limited to property in the debtor's possession when the liquidation petition was filed.  *Phelps* v. *United States*, 421 U. S. 330, 335–336 (1975); *Taubel-Scott-Kitzmiller Co.* v. *Fox*, 264 U. S. 426, 432–434 (1924).  *Phelps*, which involved a liquidation under the prior Bankruptcy Act, held that a bankruptcy court lacked jurisdiction to direct the Service to turn over property which had been levied on and which, at the time of the commencement of bankruptcy proceedings, was in the possession of an assignee of the debtor's creditors.

*Phelps* does not control this case.  First, the new Bankruptcy Code abolished the distinction between summary and plenary jurisdiction, thus expanding the jurisdiction of bankruptcy courts beyond the possession limitation.  H. R. Rep. No. 95–595, pp. 48–49 (1977); see *Northern Pipeline Construction Co.* v. *Marathon Pipe Line Co.*, 458 U. S. 50, 54 (1982) (plurality opinion).  Moreover, *Phelps* was a liquidation situation, and is inapplicable to reorganization proceedings such as we consider here.

[14] One of the procedural rights the law of secured transactions grants a secured creditor to enforce its lien is the right to take possession of the secured property upon the debtor's default.  Uniform Commercial Code §9–503, 3A U. L. A. 211 (1981).  A creditor's possessory interest resulting from the exercise of this right is subject to certain restrictions on the creditor's use of the property.  See §9–504, 3A U. L. A., at 256–257.  Here, we address the abrogation of the Service's possessory interest obtained

Exhibit 36

UNITED STATES *v.* WHITING POOLS, INC.        **207**

198                          Opinion of the Court

U. S. 273, 278–279 (1940).    See generally Nowak, Turnover Following Prepetition Levy of Distraint Under Bankruptcy Code § 542, 55 Am. Bankr. L. J. 313, 332–333 (1981).    In effect, § 542(a) grants to the estate a possessory interest in certain property of the debtor that was not held by the debtor at the commencement of reorganization proceedings.[15]    The Bankruptcy Code provides secured creditors various rights, including the right to adequate protection, and these rights replace the protection afforded by possession.

C

This interpretation of § 542(a) is supported by the section's legislative history.    Although the legislative Reports are silent on the precise issue before us, the House and Senate hearings from which § 542(a) emerged provide guidance. Several witnesses at those hearings noted, without contradiction, the need for a provision authorizing the turnover of property of the debtor in the possession of secured creditors.[16]    Section 542(a) first appeared in the proposed legisla-

---

pursuant to its tax lien, a secured interest.    We do not decide whether any property of the debtor in which a third party holds a possessory interest independent of a creditor's remedies is subject to turnover under § 542(a). For example, if property is pledged to the secured creditor so that the creditor has possession prior to any default, § 542(a) may not require turnover.    See 4 L. King, Collier on Bankruptcy ¶ 541.08[9], p. 541–53 (15th ed. 1982).

[15] Indeed, if this were not the effect, § 542(a) would be largely superfluous in light of § 541(a)(1).    Interests in the seized property that could have been exercised by the debtor—in this case, the rights to notice and the surplus from a tax sale, see n. 4, *supra*—are already part of the estate by virtue of § 541(a)(1).    No coercive power is needed for this inclusion.    The fact that § 542(a) grants the trustee greater rights than those held by the debtor prior to the filing of the petition is consistent with other provisions of the Bankruptcy Code that address the scope of the estate.    See, *e. g.*, § 544 (trustee has rights of lien creditor); § 545 (trustee has power to avoid statutory liens); § 549 (trustee has power to avoid certain postpetition transactions).

[16] See Hearings on H. R. 31 and H. R. 32 before the Subcommittee on Civil and Constitutional Rights of the House Committee on the Judiciary,

**Exhibit** 36

Opinion of the Court                    462 U. S.

tion shortly after these hearings.   See H. R. 6, § 542(a), 95th
Cong., 1st Sess., introduced January 4, 1977.   See generally
Klee, Legislative History of the New Bankruptcy Code, 54
Am. Bankr. L. J. 275, 279–281 (1980).   The section remained
unchanged through subsequent versions of the legislation.

    Moreover, this interpretation of § 542 in the reorganiza-
tion context is consistent with judicial precedent predating
the Bankruptcy Code.   Under Chapter X, the reorganiza-
tion chapter of the Bankruptcy Act of 1878, as amended,
§§ 101–276, 52 Stat. 883 (formerly codified as 11 U. S. C.
§§ 501–676), the bankruptcy court could order the turnover of
collateral in the hands of a secured creditor.   *Reconstruction
Finance Corp.* v. *Kaplan*, 185 F. 2d 791, 796 (CA1 1950); see
*In re Third Ave. Transit Corp.*, 198 F. 2d 703, 706 (CA2
1952); 6A J. Moore & L. King, Collier on Bankruptcy ¶ 14.03,
pp. 741–742 (14th ed. 1977); Murphy, Use of Collateral in
Business Rehabilitations: A Suggested Redrafting of Section
7–203 of the Bankruptcy Reform Act, 63 Calif. L. Rev. 1483,
1492–1495 (1975).   Nothing in the legislative history evinces
a congressional intent to depart from that practice.   Any
other interpretation of § 542(a) would deprive the bankruptcy
estate of the assets and property essential to its rehabilita-
tion effort and thereby would frustrate the congressional pur-
pose behind the reorganization provisions.[17]

_____

94th Cong., 1st and 2d Sess., 439 (1975–1976) (statement of Patrick A.
Murphy); *id.*, at 1023 (statement of Walter W. Vaughan); *id.*, at 1757
(statement of Robert J. Grimmig); *id.*, at 1827–1839 (remarks and state-
ment of Leon S. Forman, National Bankruptcy Conference); Hearings on
S. 235 and S. 236 before the Subcommittee on Improvements in Judicial
Machinery of the Senate Committee on the Judiciary, 94th Cong., 1st
Sess., 125 (1975) (statement of Walter W. Vaughan); *id.*, at 464 (statement
of Robert J. Grimmig).   In general, we find Judge Friendly's careful anal-
ysis of this history for the Court of Appeals, 674 F. 2d 144, 152–156 (1982),
to be unassailable.

[17] Section 542(a) also governs turnovers in liquidation and individual
adjustment of debt proceedings under Chapters 7 and 13 of the Bank-
ruptcy Code, 11 U. S. C. §§ 701–766, 1301–1330 (1976 ed., Supp. V).   See

**Exhibit** 36

UNITED STATES *v.* WHITING POOLS, INC.          209

198                          Opinion of the Court

We conclude that the reorganization estate includes property of the debtor that has been seized by a creditor prior to the filing of a petition for reorganization.

### III
### A

We see no reason why a different result should obtain when the IRS is the creditor.   The Service is bound by § 542(a) to the same extent as any other secured creditor. The Bankruptcy Code expressly states that the term "entity," used in § 542(a), includes a governmental unit.   § 101 (14).   See Tr. of Oral Arg. 16.   Moreover, Congress carefully considered the effect of the new Bankruptcy Code on tax collection, see generally S. Rep. No. 95–1106 (1978) (Report of Senate Finance Committee), and decided to provide protection to tax collectors, such as the IRS, through grants of enhanced priorities for unsecured tax claims, § 507 (a)(6), and by the nondischarge of tax liabilities, § 523(a)(1). S. Rep. No. 95–989, pp. 14–15 (1978).   Tax collectors also enjoy the generally applicable right under § 363(e) to adequate protection for property subject to their liens.   Nothing in the Bankruptcy Code or its legislative history indicates that Congress intended a special exception for the tax collector in the form of an exclusion from the estate of property seized to satisfy a tax lien.

### B

Of course, if a tax levy or seizure transfers to the IRS ownership of the property seized, § 542(a) may not apply. The enforcement provisions of the Internal Revenue Code of 1954, 26 U. S. C. §§ 6321–6326 (1976 ed. and Supp. V), do grant to the Service powers to enforce its tax liens that are

---

§ 103(a).   Our analysis in this case depends in part on the reorganization context in which the turnover order is sought.   We express no view on the issue whether § 542(a) has the same broad effect in liquidation or adjustment of debt proceedings.

**Exhibit** 36

greater than those possessed by private secured creditors under state law. See *United States* v. *Rodgers*, 461 U. S. 677, 682–683 (1983); *id.*, at 713, 717–718, and n. 7 (concurring in part and dissenting in part); *United States* v. *Bess*, 357 U. S. 51, 56–57 (1958). But those provisions do not transfer ownership of the property to the IRS.[18]

The Service's interest in seized property is its lien on that property. The Internal Revenue Code's levy and seizure provisions, 26 U. S. C. §§ 6331 and 6332, are special proce-

---

[18] It could be argued that dictum in *Phelps* v. *United States*, 421 U. S. 330 (1975), suggests the contrary. In that case, the IRS had levied on a fund held by an assignee of the debtor for the benefit of the debtor's creditors. In a liquidation proceeding under the old Bankruptcy Act, the trustee sought an order directing the assignee to turn the funds over to the estate. The Court determined that the levy transferred constructive possession of the fund to the Service, thus ousting the bankruptcy court of jurisdiction. *Id.*, at 335–336. In rebutting the trustee's argument that actual possession by the IRS was necessary to avoid jurisdiction, the Court stated: "The levy . . . gave the United States full legal right to the $38,000 levied upon as against the claim of the petitioner receiver." *Id.*, at 337. This sentence, however, is merely a restatement of the proposition that the levy gave the Service a sufficient possessory interest to avoid the bankruptcy court's summary jurisdiction. The proposition is now irrelevant because of the expanded jurisdiction of bankruptcy courts under the Bankruptcy Code. See n. 13, *supra*.

The Court in *Phelps* made a similar statement in discussing the trustee's claim that § 70a(8) of the old Bankruptcy Act, 11 U. S. C. § 110(a)(8) (trustee is vested "with the title of the bankrupt as of the date of the filing of the petition . . . to . . . property held by an assignee for the benefit of creditors"), continued constructive possession of the property in the estate, notwithstanding the prepetition levy. 421 U. S., at 337, n. 8. The Court rejected this claim. It first cited the trustee's concession that the debtor had surrendered title upon conveying the property to the assignee, *ibid.*, and held that, because the debtor did not hold title to the property as of the date of filing, the property was not covered by § 70a(8). The Court went on, however, to state that "the prebankruptcy levy displaced any title of [the debtor] and § 70a(8) is therefore inapplicable." *Ibid.* Because the initial conveyance of the property to the assignee was said to have extinguished the debtor's claim, this latter statement perhaps was unnecessary to our decision.

**Exhibit** 36

UNITED STATES *v.* WHITING POOLS, INC.        211

198                           Opinion of the Court

dural devices available to the IRS to protect and satisfy its
liens, *United States* v. *Sullivan*, 333 F. 2d 100, 116 (CA3
1964), and are analogous to the remedies available to private
secured creditors.    See Uniform Commercial Code § 9–503,
3A U. L. A. 211–212 (1981); n. 14, *supra*.    They are provi-
sional remedies that do not determine the Service's rights to
the seized property, but merely bring the property into the
Service's legal custody.    See 4 B. Bittker, Federal Taxation
of Income, Estates and Gifts ¶ 111.5.5, p. 111–108 (1981).
See generally Plumb, Federal Tax Collection and Lien Prob-
lems (First Installment), 13 Tax L. Rev. 247, 272 (1958).    At
no point does the Service's interest in the property exceed
the value of the lien.    *United States* v. *Rodgers*, 461 U. S., at
690–691; *id.*, at 724 (concurring in part and dissenting in
part); see *United States* v. *Sullivan*, 333 F. 2d, at 116 ("the
Commissioner acts pursuant to the collection process in the
capacity of lienor as distinguished from owner").    The IRS is
obligated to return to the debtor any surplus from a sale.    26
U. S. C. § 6342(b).    Ownership of the property is trans-
ferred only when the property is sold to a bona fide purchaser
at a tax sale.    See *Bennett* v. *Hunter*, 9 Wall. 326, 336 (1870);
26 U. S. C. § 6339(a)(2); Plumb, 13 Tax L. Rev., at 274–275.
In fact, the tax sale provision itself refers to the debtor as
the owner of the property after the seizure but prior to the
sale.[19]    Until such a sale takes place, the property remains
the debtor's and thus is subject to the turnover requirement
of § 542(a).

IV

When property seized prior to the filing of a petition is
drawn into the Chapter 11 reorganization estate, the Serv-
ice's tax lien is not dissolved; nor is its status as a secured
creditor destroyed.    The IRS, under § 363(e), remains enti-

---

[19] See 26 U. S. C. § 6335(a) ("As soon as practicable after seizure of prop-
erty, notice in writing shall be given by the Secretary to the owner of the
property"), and § 6335(b) ("The Secretary shall as soon as practicable after
the seizure of the property give notice to the owner").

**Exhibit** 36

212                    OCTOBER TERM, 1982

                    Opinion of the Court                462 U. S.

tled to adequate protection for its interests, to other rights
enjoyed by secured creditors, and to the specific privileges
accorded tax collectors.   Section 542(a) simply requires the
Service to seek protection of its interest according to the con-
gressionally established bankruptcy procedures, rather than
by withholding the seized property from the debtor's efforts
to reorganize.

The judgment of the Court of Appeals is affirmed.

                                        *It is so ordered.*

**Exhibit** 36

# *West's*

# FEDERAL REPORTER

*Second Series*

*A Unit of the National Reporter System*



## Volume 874 F.2d

*Cases Argued and Determined*

*in the*

**UNITED STATES COURTS OF APPEALS**

**AND**

**TEMPORARY EMERGENCY COURT OF APPEALS**

ST. PAUL, MINN.

WEST PUBLISHING CO.

1989

Exhibit 37

this contract, Transco has made such a showing here.

In addition, we do not see why the make-up of the Trade Board, with equal representatives from labor and management, would always lead to a deadlock, as appellants claim. The collective bargaining agreement at issue in this case governs an entire industry in Connecticut. Because the parties to the agreement, and their representatives on the Trade Board, are in a continuing relationship, we can expect that the members of the Trade Board can rise above their parochial interests to vote in favor of their adversary when the facts call for it. See *Rigby v. Roadway Express, Inc.*, 680 F.2d 342, 344 (5th Cir.1982); cf. *Mitchell*, 451 U.S. at 58, 101 S.Ct. at 1561-62 (grievance panel composed of three representatives from each side); *Hines*, 424 U.S. at 557 n. 2, 96 S.Ct. at 1053 n. 2 (committee composed of equal number of representatives of the parties to the agreement). Under the circumstances, the existence of the Trade Board provision was sufficient to trigger the application of the *Del-Costello* limitations period.

It is true that there are cases that arguably support appellants' claim that a six-year statute of limitations applies here, but they are readily distinguishable because the contracts in those cases lacked applicable private grievance procedures. In *Hoosier*, 383 U.S. at 705, n. 7, 86 S.Ct. at 1113, n. 7, the Court applied the state limitations period because the action there for vacation pay under a collective bargaining agreement closely resembled a state breach of contract claim. In *Hoosier*, however, there was no provision in the collective bargaining agreement for arbitration, see *Reed*, 109 S.Ct. at 628 n. 5, and the Court itself specifically limited *Hoosier's* holding to its own facts, 383 U.S. at 705, n. 7, 86 S.Ct. at 1113, n. 7. Where an agreement has a private dispute resolution mechanism, an action for breach of that agreement is less analogous to a common law breach of contract action than was the agreement in *Hoosier*. Similarly, in *O'Hare v. General Marine Transport Corp.*, 740 F.2d 160, 168 (2d Cir.1984), cert. denied, 469 U.S. 1212, 105 S.Ct. 1181, 84 L.Ed.2d 329 (1985), this court stressed that it was "not even argued" that the dispute between the parties was arbitrable. In *Hoosier* and *O'Hare*, the policies of the federal labor law were not nullified by application of the longer state limitations period the way they would be in cases where private grievance procedures exist. The practicalities of labor-management relations suggest that it would be destructive of the private dispute provisions of a collective bargaining agreement—and therefore of the agreement itself—to allow employees to raise claims of breach of that agreement up to six years after the event.

Plaintiffs' action is barred by the applicable statute of limitations. The judgment of the district court is affirmed.



### In re HOWARD'S APPLIANCE CORP., Debtor.

### SANYO ELECTRIC, INC., Plaintiff–Appellant,

v.

### HOWARD'S APPLIANCE CORP., Defendant–Appellee.

### No. 746, Docket 88–5037.

United States Court of Appeals, Second Circuit.

Argued Feb. 15, 1989.

Decided April 25, 1989.

Creditor sought relief from automatic stay in order to foreclose out security interest in Chapter 11 debtor's inventory. The Bankruptcy Court, Marvin A. Holland, J., 69 B.R. 1015, granted relief, and appeal was taken. The United States District Court for the Eastern District of New York, Leonard D. Wexler, J., 91 B.R. 204, affirmed in part and reversed in part, and

Exhibit 37

IN RE HOWARD'S APPLIANCE CORP. **89**

Cite as 874 F.2d 88 (2nd Cir. 1989)

further appeal was taken. The Court of Appeals, Miner, Circuit Judge, held that, under New Jersey law, constructive trust would be imposed in favor of creditor, given fact that debtor moved inventory from New York to New Jersey without informing creditor, thereby preventing creditor from perfecting its security interest in New Jersey.

Reversed.

1. Bankruptcy ⚖2543

Constructive trust imposed upon property held by debtor at time of filing of bankruptcy petition confers on true owner of property equitable interest in property superior to that of trustee.

2. Trusts ⚖2

As general rule, state law used to determine whether to impose constructive trust on property in debtor's possession is that of state where property is located.

3. Trusts ⚖91

Under New Jersey law, creditor who perfected its security interest in debtor's merchandise in New York was entitled to have constructive trust in merchandise imposed in its favor when debtor moved merchandise to New Jersey without informing creditor, thereby preventing creditor from perfecting its security interest in that state; direction to creditor's traffic department to ship merchandise to New Jersey was not sufficient to place creditor on notice that its goods were being stored in New Jersey.

---

Jeffrey A. Oppenheim, New York City (Kane, Kessler, Proujansky, Preiss & Nurnberg, P.C., New York City, of counsel), for plaintiff-appellant.

Philip Irwin Aaron, Jericho, N.Y. (Andrew C. Morganstern, Allan B. Mendelsohn, Philip Irwin Aaron, P.C., Jericho, N.Y., of counsel), for defendant-appellee.

* Hon. Milton Pollack, United States District Judge, Southern District of New York, sitting by

Before PIERCE and MINER, Circuit Judges, and POLLACK, District Judge.*

MINER, Circuit Judge:

Plaintiff-appellant Sanyo Electric, Inc. ("Sanyo") appeals from the portion of a judgment of the United States District Court for the Eastern District of New York (Wexler, J.) that reversed an order of the United States Bankruptcy Court for the Eastern District of New York (Holland, J.). Sanyo had entered into a security agreement with defendant-appellee Howard's Appliance Corp. ("Howard"), under the terms of which Howard gave Sanyo a security interest in all Sanyo air conditioners ("collateral") possessed or thereafter acquired by Howard. As the agreement required Howard to keep the air conditioners at its store in Nassau County, New York, Sanyo perfected its security interest in New York only. Howard later began to store the air conditioners at a warehouse in New Jersey without informing Sanyo. Approximately six months after it began to warehouse the air conditioners in New Jersey, Howard filed a voluntary Chapter 11 petition with the Bankruptcy Court in the Eastern District of New York; Howard continued thereafter in business as a debtor-in-possession, see 11 U.S.C. § 1107 (1982 & Supp. III 1985).

Although it never filed any financing statements in New Jersey, Sanyo moved for relief from the automatic stay imposed by 11 U.S.C. § 362 (1982 & Supp. III 1985) to enable it to proceed against Howard's inventory. Invoking the doctrine of equitable estoppel, the bankruptcy court determined, *inter alia*, that Sanyo possessed the rights of a holder of a validly perfected security interest in the air conditioners stored in New Jersey, and that Sanyo was entitled to an order vacating the automatic stay or to adequate protection of its interest. *See* 69 B.R. 1015 (Bankr.E.D.N.Y. 1987). The district court reversed this part of the bankruptcy court's order, holding that equitable estoppel was ineffective

designation.

Exhibit 37

against Howard's "strong-arm" powers under 11 U.S.C. § 544 (1982 & Supp. III 1985) as a debtor-in-possession. *See* 91 B.R. 204 (E.D.N.Y.1988). Because we look to 11 U.S.C. § 541 (1982 & Supp. III 1985) to impress a constructive trust in Sanyo's favor, we reverse the judgment of the district court and hold that Sanyo's interest in the collateral is superior to that of Howard.

## BACKGROUND

Howard, a retailer of home appliances, began purchasing appliances from Sanyo in March 1984. The parties entered into a security agreement on March 12 of that year, giving Sanyo a security interest in all of the goods possessed or acquired by Howard that were manufactured or sold by, or acquired from, Sanyo. Sanyo was given also an interest in the proceeds from the sale of those goods. The agreement provided that "[t]he collateral will be kept at the debtor's place of business located at the address as shown at the beginning of this agreement; and that there are no other places of business of debtor." At that time, Howard operated only one store, located in Nassau County, New York, the address shown on the agreement. In order to perfect its security interest, Sanyo filed a UCC–1 Financing Statement with the Clerk of Nassau County and the Secretary of State of New York on March 30, 1984.

Howard opened a second store, in April 1984, and a third store, in November 1985, both in Suffolk County, New York. Howard then sold its Nassau County store in March 1986, and began operating exclusively in Suffolk County. The Nassau County store, however, continued to operate under the Howard logo; in fact, Howard continued to advertise the store, holding it out to the public as one of its own retail locations. Although Howard never sent Sanyo written notice of the sale, Joel Stern, an independent sales representative who sold Sanyo merchandise to Howard on a commission basis, "informally learned," either in March or April 1986, that the store had been sold; he apparently communicated this knowledge to Sanyo's credit department. Sanyo, however, never filed a fi-nancing statement with the Clerk of Suffolk County.

From 1981 to 1986, Howard stored all of its inventory at either its Nassau County store or at one of its retail locations in Suffolk County. Early in 1986, however, Howard began renting space in a public warehouse located in New Jersey (the "Donadio warehouse") to store its inventory. In addition, Howard had manufacturers deliver goods directly to the Donadio warehouse. Howard would not sell the products out of the warehouse; instead, it would have items re-shipped from New Jersey to its New York locations on an "as needed" basis. Significantly, Howard never told Sanyo, either orally or in writing, that goods were being stored in New Jersey; nor did Sanyo file any financing statements in that state.

Sanyo's traffic department learned of the New Jersey location in February 1986, when it shipped, via common carrier, a large supply of air conditioners from its New Jersey factory to the Donadio warehouse. Apparently, the common carrier notified Theresa O'Brien, Sanyo's traffic manager, that Howard had instructed it to deliver the goods to New Jersey. Because it was normal procedure for a customer to change the location to which goods are shipped, O'Brien customarily would change the bill of lading to reflect the new destination, but never reported such changes to any other department at Sanyo, including the credit department. O'Brien followed the customary practice here.

Howard filed a voluntary petition for reorganization under Chapter 11 of the Bankruptcy Code, 11 U.S.C. §§ 1101–1174 (1982 & Supp. III 1985), on August 6, 1986. As a result, an automatic stay attached under 11 U.S.C. § 362, which prevented Sanyo from perfecting its security interest in the air conditioners located in New Jersey. By order to show cause dated August 14, 1986, Sanyo moved to lift the stay so that it could foreclose on certain of Howard's inventory, including property stored in Suffolk County and New Jersey, in which it claimed a security interest. Since the date of the filing, Howard has continued to run its

**Exhibit** 37

## IN RE HOWARD'S APPLIANCE CORP. 91
Cite as 874 F.2d 88 (2nd Cir. 1989)

business as a debtor-in-possession under 11 U.S.C. § 1107.

At a hearing held on September 2, 1986 before the bankruptcy court, Michael Howard, the president of Howard, testified that the decision to warehouse in New Jersey was dictated by a shortage of space at his New York locations, and that storage in New Jersey was "advantageous" financially. He testified also that he never sent Sanyo formal written notice that Howard was storing Sanyo's goods in New Jersey and never gave Sanyo such notice by telephone. He testified, however, that he advised independent sales representative Joel Stern, perhaps as early as February 1986, that Howard "probably would be warehousing in New Jersey," and that Stern was advised that the goods actually were going to New Jersey "when the merchandise was ... shipped at a later date, two or three months later." Stern testified that he first became aware that Howard was storing Sanyo inventory in the New Jersey warehouse on approximately August 8, 1986, two days after the filing of the Chapter 11 petition. Ed Toomey, the National Home Credit Manager for Sanyo, testified that Howard never notified Sanyo's credit department. He testified further that he never was informed by Sanyo's traffic department that the goods had been shipped to the Donadio warehouse, and that he first learned of the New Jersey warehouse "two days after the filing of the [Chapter 11] petition when we sent our representatives to take an inventory." [1]

The bankruptcy court issued its decision on February 26, 1987, concluding that "Sanyo has a validly perfected interest in the goods it supplied to" Howard that were stored both at Howard's retail locations in Suffolk County and at the Donadio warehouse in New Jersey. 69 B.R. at 1024. As to the Suffolk County merchandise, the court looked to U.C.C. § 9–401(3) [2] and determined that the financing statements filed with the Clerk of Nassau County and the Secretary of State survived the "consolidation" of Howard's operations in Suffolk County. *Id.* at 1019.

Regarding the merchandise stored at the Donadio warehouse, the court noted that, although Sanyo should have filed a financing statement in New Jersey to perfect its security interest in the collateral, *see* 12A N.J. Stat.Ann. §§ 9–302, 9–401(1)(c) (West Supp.1986),[3] principles of equity had to be considered to determine whether Sanyo has a perfected interest despite its failure to file, *see id.* § 1–103. The court invoked the doctrine of equitable estoppel and, crediting the testimony of Stern and Toomey, found that: Howard "concealed the fact that it was storing the subject inventory in the Donadio warehouse in New Jersey," 69 B.R. at 1022–23; "no highly placed official from Sanyo was ever directly told by" Howard of this fact, *id.* at 1023; Howard "expected that its concealment ... would be relied upon by Sanyo in such a way as to dissuade [Sanyo] from filing a financing statement in New Jersey," *id.*; by concealing this information from Sanyo, Howard in fact "prevented Sanyo from protecting its security interest by filing in New Jersey," *id.*; and because "Sanyo did not become aware that its inventory was being stored in New Jersey until the time in which Howard [ ] filed its Chapter 11 peti-

---

1. The parties stipulated in the bankruptcy court that, as of the end of 1985, the amount of debt owed by Howard to Sanyo was $419,825.64, and that, as of the date of filing, the total amount was $879,986.83. The parties stipulated further that "no inventory has been transferred from New York to New Jersey since the date of the filing."

2. Section 9–401(3) of the Uniform Commercial Code, as adopted by New York, provides:

    A filing which is made in the proper place in this state continues effective even though the debtor's residence or place of business or the location of the collateral or its use, whichever

controlled the original filing, is thereafter changed.

N.Y.U.C.C. Law § 9–401(3) (McKinney Supp. 1989).

3. The bankruptcy court determined that, although Howard has its principal place of business in New York, the law of New Jersey governs the issue of perfection because the collateral is and always has been located in New Jersey. 69 B.R. at 1019–20. *See* 12A N.J.Stat. Ann. § 9–103(1)(b) (West Supp.1986); N.Y. U.C.C. Law § 9–103(1)(b) (McKinney Supp.1989); *see also* J. White & R. Summers, *Uniform Commercial Code* § 23–18, at 966–67 (2d ed. 1980).

Exhibit 37

tion, it had no opportunity to perfect its security interest," *id.* Accordingly, the court concluded that Howard was "estopped from denying the New Jersey perfection of Sanyo's security interest," *id.*, and scheduled a hearing to determine whether Sanyo's interest is adequately protected and, if not, whether the section 362 stay should be vacated.

The district court, in a memorandum and order dated September 23, 1988, affirmed the bankruptcy court's determination regarding Sanyo's security interest in the merchandise stored in Suffolk County, but only as to the merchandise shipped to the Suffolk County locations while Howard also operated its store in Nassau County. Insofar as goods may have been shipped to Suffolk County after the closing of Howard's Nassau County store, the court held that, pursuant to U.C.C. § 9–401(1)(c), Sanyo was required to file a financing statement with the Clerk of Suffolk County to perfect its interest. *See In re Knapp*, 575 F.2d 341, 344 (2d Cir.1978) (proper place for filing determined at time security interest attaches to collateral); *Marine Midland Bank–Eastern Nat'l Ass'n v. Conerty Pontiac-Buick, Inc.*, 77 Misc.2d 311, 317, 352 N.Y.S.2d 953, 961 (Sup.Ct.1974) (security interest attaches when debtor acquires collateral). Concluding that "Sanyo's sales and credit departments had actual knowledge that the Nassau County location had been sold," 91 B.R. at 206, the court rejected Sanyo's estoppel argument and remanded the matter to the bankruptcy court for a determination of which goods were shipped to Suffolk County prior to the sale of the Nassau County store.

Finally, the district court held that, as to the property in Suffolk County acquired after the sale and as to all Sanyo's merchandise stored in New Jersey, the application of equitable estoppel would contravene

the "strong-arm" powers of Howard, in its capacity as a debtor-in-possession.[4] Because a debtor-in-possession generally has the same rights, powers and duties as a trustee, *see* 11 U.S.C. § 1107(a); *In re Vintero Corp.*, 735 F.2d 740, 741 (2d Cir.), *cert. denied*, 469 U.S. 1087, 105 S.Ct. 592, 83 L.Ed.2d 702 (1984), and because a trustee may avoid a lien under section 544(a) even where he possesses actual notice of the lien's existence, the court concluded that "Howard[ ] has the power, just as would a trustee, to avoid Sanyo's unperfected lien," 91 B.R. at 207. The court quoted *In re Brent Explorations, Inc.*, 31 B.R. 745, 749 (Bankr.D.Colo.1983), as authority for the proposition that one of the purposes of providing the debtor-in-possession with the status of an ideal creditor was "to prevent such defenses as estoppel from being raised." The court observed that this determination rests firmly with the "conscious decision by Congress to favor the trustee over unperfected creditors, regardless of the particular equities of the case." 91 B.R. at 208. Sanyo, the court continued, could have protected its interest by taking "precautionary measures" to ensure that the property in fact was delivered to Howard's locations in New York, where Sanyo filed its security interest. *Id.* The court thus concluded that "[t]he doctrine of estoppel cannot prevent Howard[ ] from avoiding Sanyo's interest under section 544(a)." *Id.*

After judgment was entered and Sanyo filed its notice of appeal, the parties, in an effort to resolve the issue remanded to the bankruptcy court, entered a stipulation providing that no merchandise was shipped to Howard in Suffolk County after the sale of the Nassau County store. Consequently, the only issue remaining for this Court to

---

**4.** Section 544 of Title 11 U.S.C. provides in pertinent part:
  (a) The trustee shall have, as of the commencement of the case, and without regard to any knowledge of the trustee or of any creditor, the rights and powers of, or may avoid any transfer of property of the debtor or any obligation incurred by the debtor that is voidable by—

  (1) a creditor that extends credit to the debtor at the time of the commencement of the case, and that obtains, at such time and with respect to such credit, a judicial lien on all property on which a creditor on a simple contract could have obtained such a judicial lien, whether or not such a creditor exists....
11 U.S.C. § 544(a)(1).

**Exhibit** 37

address is the extent of Sanyo's interest in the air conditioners located in New Jersey.

## DISCUSSION

Under section 541 of the Bankruptcy Code, a debtor's legal and equitable interests in property, "as of the commencement of the case," constitute "[p]roperty of the estate," 11 U.S.C. § 541(a)(1). Property in which the debtor holds only legal title and not an equitable interest, however, becomes property of the estate "only to the extent of a debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold," *id.* § 541(d). That is, the bankruptcy estate does not include "property of others in which the debtor ha[s] some minor interest such as a lien or bare legal title," *United States v. Whiting Pools, Inc.*, 462 U.S. 198, 204 n. 8, 103 S.Ct. 2309, 2313 n. 8, 76 L.Ed.2d 515 (1983); *see 4 Collier on Bankruptcy* ¶ 541.13, at 541–75 (15th ed.1989) (estate succeeds only to the title and rights that the debtor possessed); *In re Quality Holstein Leasing*, 752 F.2d 1009, 1012 (5th Cir.1985) (same).

[1] Where the debtor's "conduct gives rise to the imposition of a constructive trust, so that the debtor holds only bare legal title to the property, subject to a duty to reconvey it to the rightful owner, the estate will generally hold the property subject to the same restrictions," *In re Flight Transp. Corp. Securities Litigation*, 730 F.2d 1128, 1136 (8th Cir.1984); *see Georgia Pacific Corp. v. Sigma Service Corp.*, 712 F.2d 962, 968 (5th Cir.1983). Indeed, the Supreme Court has declared that, while the outer boundaries of the bankruptcy estate may be uncertain, "Congress plainly excluded property of others held by the debtor in trust at the time of the filing of the petition," *Whiting Pools*, 462 U.S. at 205 n.

10; *see* S.Rep. No. 989, 95th Cong., 2d Sess. 82 *and* H.R.Rep. No. 595, 95th Cong., 2d Sess. 368, *reprinted in* 1978 U.S.Code Cong. & Ad.News 5787, 5868, 6323–24; *see also In re Kennedy & Cohen, Inc.*, 612 F.2d 963, 965 (5th Cir.) (under previous bankruptcy statute, property held by debtor in constructive trust "belongs to the beneficiary and never becomes a part of the bankruptcy estate"), *cert. denied*, 449 U.S. 833, 101 S.Ct. 103, 66 L.Ed.2d 38 (1980).[5] A constructive trust, therefore, "confers on the true owner of the property an equitable interest in the property superior to the trustee's," *Quality Holstein Leasing*, 752 F.2d at 1012; *cf. In re General Coffee Corp.*, 828 F.2d 699, 706 (11th Cir.1987) (constructive trust beneficiary has priority to trust assets over a judicial lienholder or execution creditor), *cert. denied*, — U.S. —, 108 S.Ct. 1470, 99 L.Ed.2d 699 (1988). The reason for this priority is clear: but for the debtor's misconduct, the trust beneficiary would have perfected his security interest in the res of the trust and thus would have prevailed over the debtor as well as the debtor-in-possession.

[2] The existence and nature of a debtor's interest, and correspondingly the estate's interest, in property is determined by state law. *In re FCX, Inc.*, 853 F.2d 1149, 1153 (4th Cir.1988), *cert. denied*, — U.S. —, 109 S.Ct. 1118, 103 L.Ed.2d 181 (1989); *In re N.S. Garrott & Sons*, 772 F.2d 462, 466 (8th Cir.1985); *4 Collier on Bankruptcy* ¶ 541.02[1], at 541–10 to –13. One must look to state law, therefore, to determine whether to impose a constructive trust on property within the debtor's possession. *See, e.g., In re N.S. Garrott & Sons*, 772 F.2d at 467; *Quality Holstein Leasing*, 752 F.2d at 1012. As a general

---

**5.** Although the Ninth Circuit has chosen not to accept "the proposition that the bankruptcy estate is automatically deprived of any funds that state law might find subject to a constructive trust," *In re Lewis W. Shurtleff, Inc.*, 778 F.2d 1416, 1419 (9th Cir.1985) (quoting *In re North American Coin & Currency, Ltd.*, 767 F.2d 1573, 1575 (9th Cir.1985), *cert. denied*, 475 U.S. 1083, 106 S.Ct. 1462, 89 L.Ed.2d 719 (1986)), its approach is not widely accepted, *see, e.g., In re*

*N.S. Garrott & Sons*, 772 F.2d 462 (8th Cir.1985); *Quality Holstein Leasing*, 752 F.2d 1009 (5th Cir.1985); *see also In re General Coffee Corp.*, 828 F.2d 699 (11th Cir.1987). In fact, the Ninth Circuit's view tends to conflict with the Supreme Court's instruction in *Whiting Pools*, 462 U.S. at 205 n. 10, 103 S.Ct. at 2314 n. 10, that the bankruptcy estate "plainly" does not include "property of others held by the debtor in trust at the time of the filing of the petition."

**Exhibit** 37

rule, the law of the situs of the property, and therefore the trust, governs this determination. *See, e.g., In re O.P.M. Leasing Services, Inc.,* 40 B.R. 380, 398–99 (Bankr. S.D.N.Y.), *aff'd,* 44 B.R. 1023 (S.D.N.Y. 1984); *cf. Collier on Bankr.* ¶ 544.02, at 544–13 to –14 (under section 544, "the tendency of the courts is to treat the law of the situs of property at the commencement of the case as governing"); *In re Dennis Mitchell Indus., Inc.,* 419 F.2d 349, 352, 353 n. 10 (3d Cir.1969) (same). Here, there is no dispute that, as the bankruptcy court observed, the property at issue always has been located in New Jersey—the air conditioners were delivered from Sanyo's New Jersey factory to the Donadio warehouse, also in New Jersey, where they have remained as of the commencement of this action. Hence, the law of New Jersey applies.

Under New Jersey law, "a constructive trust should 'be impressed in any case where to fail to do so will result in an unjust enrichment.'" *Stewart v. Harris Structural Steel Co.,* 198 N.J.Super. 255, 486 A.2d 1265, 1271 (Super.Ct., App.Div. 1984) (quoting *D'Ippolito v. Castoro,* 51 N.J. 584, 588, 242 A.2d 617, 619, 38 A.L.R. 3d 672, 677 (1968)). When property has been acquired or retained "in such circumstances that the holder of the legal title may not in good conscience retain the beneficial interest, equity converts him into a trustee," *id.,* 486 A.2d at 1271 (quoting *Beatty v. Guggenheim Exploration Co.,* 225 N.Y. 380, 386, 122 N.E. 378, 380 (1919)); *see Hill v. Warner, Berman & Spitz, P.A.,* 197 N.J.Super. 152, 484 A.2d 344, 352 (Super.Ct., App.Div.1984). The Supreme Court of New Jersey has stated that, in general, "all that is required to impose a constructive trust is a finding that there was some wrongful act, usually, though not limited to, fraud, mistake, undue influence, or breach of a confidential relationship, which has resulted in a transfer of property." *D'Ippolito,* 242 A.2d at 619, 38 A.L.R.3d at 677. In fact, such a trust may arise "even though the acquisition of the property was not wrongful. It arises where the retention of the property would result in the unjust enrichment of the person retaining it." *Id.* (quoting *Scott*

*on Trusts* § 462.2, at 3417 (3d ed. 1967)); *accord Stretch v. Watson,* 5 N.J. 268, 74 A.2d 597, 602 (1950); *Stewart,* 486 A.2d at 1271–72.

[3] In light of the foregoing, we hold that a constructive trust should be imposed in favor of Sanyo. The bankruptcy court's factual findings, which were neither challenged by Howard nor disputed by the district court, call for no less. *See Wien Air Alaska, Inc. v. Bachner,* 865 F.2d 1106, 1108 (9th Cir.1989) (court of appeals reviews bankruptcy court's findings of fact under clearly erroneous standard); *Forsdick v. Turgeon,* 812 F.2d 801, 802 (2d Cir.1987) (same); *see also* 11 U.S.C. Rule 8013 (Supp. V 1987) (findings of fact "shall not be set aside unless clearly erroneous"). It is noteworthy that until approximately six months prior to the filing of its Chapter 11 petition, Howard had always stored its inventory at its Nassau County location, as required by the security agreement, and its Suffolk County stores. While Howard's contentions that the decision to warehouse in New Jersey was "borne of necessity" and "not out of sinister motives" do not fall upon deaf ears, we agree with the bankruptcy court that Howard, in light of its conduct, "acted with the expectation that Sanyo would not perfect its security interest in this inventory by filing a financing statement in New Jersey," 69 B.R. at 1023. Certainly, Howard must have known that, under the terms of the security agreement, it was obligated to keep its Sanyo merchandise at its Nassau County location, and that by storing its inventory in New Jersey, it would frustrate Sanyo's interest in those goods.

We find it significant, too, that Howard never informed Sanyo of the Donadio warehouse, and that Sanyo only learned of the warehouse, through third parties, *after* the filing of the petition, when it was too late to file a financing statement in New Jersey. The direction to Sanyo's traffic department to ship the merchandise to New Jersey was not sufficient to place Sanyo on notice that its goods were being stored in New Jersey. The record establishes that it is common practice for buyers to change

Exhibit 37

## MURPHY DOOR BED CO. v. INTERIOR SLEEP SYSTEMS
Cite as 874 F.2d 95 (2nd Cir. 1989)

shipping destinations and that, as a result of this practice, the traffic department routinely approves such changes, as it did here, without notifying its "principals." Undoubtedly, Howard was aware of this practice. *See Corporacion de Mercado Agricola v. Mellon Bank Int'l*, 608 F.2d 43, 46 (2d Cir.1979) ("Notice to the agent ... is notice to the principal, unless the person giving notice has reason to know that the agent has no duty to or will not transmit the message to the principal.").

Our decision in *Vintero*, 735 F.2d 740, does not conflict with this conclusion. In *Vintero*, we were confronted with a creditor, Corporacion Venezolana de Fomento ("CVF"), that inadvertently had allowed its perfected security interest in a ship to lapse. Significantly, the debtor, Vintero Corporation ("Vintero"), had not engaged in any misconduct that caused CVF to refrain from filing a financing statement. Nevertheless, we held that "although Vintero, as a debtor-in-possession, could exercise the rights of a lien creditor, it obviously was not one." *Id.* at 742. Thus, we stated that "[t]o the extent that other creditors of Vintero are not affected adversely by enforcement of CVF's security interest, there is no reason why such interest should not be enforced." *Id.* Here, however, Sanyo's failure to file is directly attributable to Howard's misconduct. Had Howard informed Sanyo that it was storing merchandise in New Jersey, Sanyo would have had the opportunity to perfect its interest there. Under these circumstances, we are authorized by the law of New Jersey to impress a constructive trust; as the beneficiary of the trust, Sanyo now enjoys a position superior to that of any lien creditor and to any of Howard's other creditors as well.

Finally, we need not concern ourselves with whether section 544 of the Bankruptcy Code would mandate a result contrary to the one we reach today, *see General Coffee*, 828 F.2d at 704–07, since the constructive trust imposed here attached prior to the filing of the Chapter 11 petition. *See Quality Holstein Leasing*, 752 F.2d at 1013–14 & n. 10 (property rights that attached before the petition date supercede

the debtor-in-possession's lien creation under section 544). Indeed, in *General Coffee*, 828 F.2d at 706, in considering the interplay between sections 541 and 544, recognized that the rights of a beneficiary of a constructive trust "prevail over a hypothetical ideal lienholder." *Accord In re Storage Technology Corp.*, 55 B.R. 479, 484 (Bankr.D.Colo.1985).

Accordingly, we hold that, by virtue of a constructive trust imposed pursuant to New Jersey law, Sanyo's interest in the collateral stored by Howard in New Jersey is superior to Howard's interest in that property.

### CONCLUSION

The portion of the district court's judgment from which Sanyo appeals is reversed.



### The MURPHY DOOR BED CO., INC., Plaintiff–Appellee,

v.

### INTERIOR SLEEP SYSTEMS, INC., d/b/a Murphy Beds, etc., Murphy Bed Co. of America, Inc. in Florida, Murphy Bed Co. of America, Inc. in Georgia, and Frank Zarcone, Individually, Defendants–Appellants.

Nos. 727, 837, Dockets 88–7877, 88–9043.

United States Court of Appeals,
Second Circuit.

Argued Feb. 16, 1989.

Decided May 1, 1989.

Manufacturer of wall-beds brought action against former distributor for breach of contract, trademark infringement, and unfair competition. The United States District Court for the Eastern District of New York, Jacob Mishler, J., 687 F.Supp. 754,

Exhibit 37

# *West's*

# FEDERAL REPORTER

*Second Series*

*A Unit of the National Reporter System*



## Volume 955 F.2d

*Cases Argued and Determined*

*in the*

## UNITED STATES COURTS OF APPEALS

### AND

## TEMPORARY EMERGENCY COURT OF APPEALS

ST. PAUL, MINN.

WEST PUBLISHING CO.

1992

Exhibit 38

Before CHOY, SCHROEDER and T.G. NELSON, Circuit Judges.

PER CURIAM:

Douglas Housley appeals the district court's denial of his motion for a new trial and his motion to dismiss the indictment following his conviction on a number of drug manufacturing and trafficking charges. A previous appeal in the same case resulted in an affirmance of his sentence. *See United States v. Housley*, 907 F.2d 920 (9th Cir.1990).

The district court's denial of the motion to dismiss the indictment which he appeals here was published at 751 F.Supp. 1446 (D.Nev.1990). The district court there correctly ruled that the FDA's approval of over-the-counter products containing small amounts of methamphetamine does not require that methamphetamine be excluded from the criminal schedules of controlled substances. This court has already cited the district court's decision with approval. *See United States v. Caperell*, 938 F.2d 975 (9th Cir.1991).

In his appeal from the district court's denial of appellant's motion for a new trial, Housley claims that a new trial is required because of government misconduct during discovery, allegedly knowing use of perjured testimony, and the alleged suppression of exculpatory materials. The appeal is without merit. The district court properly held that there was no sufficient factual support for any of the appellant's charges.

AFFIRMED.



In re **PROFESSIONAL INVESTMENT PROPERTIES OF AMERICA,**
Debtor.

**Robert BRIGGS and Grace Briggs, Plaintiffs-Appellees,**

v.

**Roy W. KENT, Trustee, Estate of Professional Investment Properties of America, Inc., Defendant-Appellant.**

No. 90-35175.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Dec. 3, 1991.

Decided Jan. 30, 1992.

Involuntary bankruptcy petition was filed. Petitioning creditor attempted to impose equitable lien on proceeds in anticipation of sale of debtor's real property by trustee pursuant to deed of trust as security for loan. The Bankruptcy Court ruled that contents of involuntary petition constituted constructive notice of petitioning creditor's interest in real property, but constructive notice came too late to secure interest in position prior to that acquired by trustee. Petitioning creditor appealed. The United States District Court for the Western District of Washington, Robert J. Bryan, J., reversed on ground that language in petition constituted constructive notice of prior claim by creditor. Trustee appealed. The Court of Appeals, T.G. Nelson, Circuit Judge, held that: (1) trustee's strong-arm powers were transferable to purchaser of estate's claim to proceeds from sale of property, and (2) involuntary petition put bankruptcy trustee on sufficient inquiry notice of petitioning creditor's interest under unrecorded instrument so that trustee could not invoke avoidance powers.

Affirmed.

**1. Bankruptcy ⚷3770**

Exceptional circumstances existed to permit Court of Appeals to consider for

Exhibit 38

first time whether trustee strong-arm powers were transferable to purchaser of bankruptcy estate's claim to proceeds from sale of property, where issue presented was purely one of law and did not depend on factual record below, and printed record had been fully developed.

### 2. Federal Courts ⚖611

Generally, appellate court will not consider arguments not first raised before district court unless there are exceptional circumstances; specific exceptional circumstances are as follows: review is necessary to prevent miscarriage of justice; new issue arises while appeal is pending because of change in law; and issue presented is purely one of law and either does not depend on factual record developed below, or pertinent record has been fully developed.

### 3. Bankruptcy ⚖2705

Purchaser of bankruptcy estate's claim to proceeds from sale of property could assert strong-arm powers of trustee to avoid transfer of property of debtor, where trustee sold estate's claim with tacit approval of bankruptcy court, and court ordered estate's interest in appeal terminated and that all responsibility for claim rested with purchaser. Bankr.Code, 11 U.S.C.A. §§ 544, 1123(b)(3)(B).

### 4. Bankruptcy ⚖3787

Question of whether purchaser of bankruptcy estate's claim to proceeds from sale of property had inquiry notice of petitioning creditor's interest under unrecorded instruments so that it could not invoke avoidance powers was question of fact to which clearly erroneous standard of review applied.

### 5. Bankruptcy ⚖2702

Under Washington law, contents of involuntary petition forcing debtors into bankruptcy put bankruptcy trustee on sufficient inquiry notice of petitioning creditor's interest under unrecorded instrument so that trustee could not invoke avoidance powers, and filing of lis pendens was not required. Bankr.Code, 11 U.S.C.A. § 544(a)(3); West's RCWA 4.28.325, 65.08.-070.

### 6. Bankruptcy ⚖2513

State law determines whether trustee is bona-fide purchaser so as to be entitled to prevail over prior transferee who has failed to record.

### 7. Vendor and Purchaser ⚖220

Under Washington law, bona fide purchaser is defined as one who without notice of another's claim of right to, or equity in, property prior to its acquisition of title has paid vendor valuable consideration.

### 8. Bankruptcy ⚖2515

Since strong-arm powers elevate bankruptcy trustee to level of bona fide purchaser, trustee without notice can generally avoid any unrecorded transfer of land in Washington. Bankr.Code, 11 U.S.C.A. § 544(a)(3); West's RCWA 65.08.070.

### 9. Bankruptcy ⚖2515

Bankruptcy trustee does not become hypothetical bona-fide purchaser if he or she has been put on constructive or inquiry notice of prior claim.

### 10. Bankruptcy ⚖2514

Inquiry notice of prior claim was sufficient to preclude bankruptcy trustee from invoking avoidance powers with respect to transfers of debtor's property. Bankr. Code, 11 U.S.C.A. § 544(a)(3).

### 11. Lis Pendens ⚖22(2)

Under Washington law, filing of lis pendens in connection with lawsuit against record title holder of real property gives constructive notice of action to subsequent purchasers and record title holder. West's RCWA 4.28.325.

---

Charles K. Wiggins, Edwards, Wiggins & Hathaway, Seattle, Wash., for defendant-appellant.

Shawn B. Briggs, Briggs & Briggs, Tacoma, Wash., for plaintiffs-appellees.

Appeal from the United States District Court for the Western District of Washington.

Before WRIGHT, THOMPSON and T.G. NELSON, Circuit Judges.

Exhibit 38

**IN RE PROFESSIONAL INV. PROPERTIES OF AMERICA**    **625**
Cite as 955 F.2d 623 (9th Cir. 1992)

T.G. NELSON, Circuit Judge:

In this bankruptcy case, we are asked to decide under Washington law whether the contents of the Briggs' involuntary petition which forced the debtor into bankruptcy put the trustee on sufficient inquiry notice of the Briggs' interest under unrecorded instruments. If so, he may not invoke the avoidance powers provided by 11 U.S.C. § 544. We affirm the district court and hold that the trustee had sufficient notice which precludes the avoidance powers.

## FACTS AND PROCEEDINGS BELOW

In October, 1985, the Briggs lent $50,000 to the debtor, Professional Investment Properties. They received a promissory note and a deed of trust on the debtor's real property as security for the loan. The deed of trust was not recorded.

When the Briggs learned of the debtor's financial difficulties, they filed a petition to force the debtor into involuntary bankruptcy on May 28, 1986. Simultaneously, they filed a Motion for Appointment of Trustee, and the real property became an asset of the bankruptcy estate pursuant to 11 U.S.C. § 541. In anticipation of a sale of the real property by the trustee, the Briggs attempted to impose an equitable lien on the proceeds. The bankruptcy court denied their motion for summary judgment and held that the Briggs were unsecured creditors of the estate.

The Briggs appealed to the district court which remanded for further findings of fact. Specifically, the district court questioned whether the trustee had constructive notice of the Briggs' interest in the real property. On remand, the Briggs presented expert testimony "that the contents of the petition constituted constructive notice of the Briggs' interest in the real property." Nevertheless, the bankruptcy court granted summary judgment in favor of the trustee concluding that "any constructive notice of plaintiffs' interest achieved by filing the original bankruptcy pleadings comes too late to secure their interest in a position prior to that acquired by the trustee."

The district court reversed, reaching the opposite conclusion: "It is the judgment of the court that the quoted language constituted constructive notice of a prior claim by the Briggs."

On March 3, 1990, the trustee appealed the decision of the district court. On August 3, 1990, however, the bankruptcy court approved the trustee's sale of the estate's claim to the proceeds from the sale of the property to Maynard B. Miller.

### I. Transferability of the trustee's "strong arm powers."

[1] Initially, we must decide whether the trustee's strong arm powers are transferable to Miller. The Briggs claim that only the trustee may invoke § 544, discussed hereafter.

[2] First, Miller argues that this court should not discuss the issue because it was not first raised in the district court. Generally, an appellate court will not consider arguments not first raised before the district court unless there were exceptional circumstances. *Villar v. Crowley Maritime Corp.*, 782 F.2d 1478, 1483 (9th Cir. 1986). The specific "exceptional circumstances" that this circuit has identified are as follows: (1) review is necessary to prevent a miscarriage of justice; (2) a new issue arises while an appeal is pending because of a change in the law and (3) the "issue presented is purely one of law and either does not depend on the factual record developed below, or the pertinent record has been fully developed." *Bolker v. C.I.R.*, 760 F.2d 1039, 1042 (9th Cir.1985).

The third exception applies here. The record has been fully developed and the parties do not dispute that the transfer took place, only the attendant legal ramifications. It would serve no purpose to remand this case back to the district court to hear an issue that can be addressed equally as well here. Moreover, the explanation for not arguing the issue before the district court is obvious: it was an issue that did not yet exist.

[3] The Briggs argue specifically that Miller cannot assert the strong arm powers

Exhibit 38

of the trustee. In *Grass v. Osborn*, 39 F.2d 461 (9th Cir.1930), this court held under the old Bankruptcy Act that the trustee's avoidance powers could not be transferred. While the Ninth Circuit has not had occasion to comment on the case since it was decided, the Tenth Circuit has done so recently. In *In re Sweetwater*, 884 F.2d 1323, 1327–28 (10th Cir.1989), the Court noted *Grass* among other cases and determined that it had been superseded by the enactment of the 1978 Bankruptcy Code. *Sweetwater* dealt specifically with 11 U.S.C. § 1123(b)(3)(B) pertaining to settlement and enforcement of a bankruptcy plan "by the debtor, by the trustee, or by a representative appointed for that purpose." It explained that a creditor was not allowed to assert the trustee's strong arm powers when done solely for the benefit of that single creditor. For example, the creditor in *Texas General Petroleum Corp. v. Evans (In re Texas General Petroleum Corp.)*, 58 B.R. 357 (Bankr.S.D.Tex.1986) was denied the power because he was not acting to benefit the plan as a whole and all similarly situated creditors.

We agree with the analysis of the Tenth Circuit. *Grass* has been superseded by statute and is no longer current law. If a creditor is pursuing interests common to all creditors or is appointed for the purpose of enforcement of the plan, he may exercise the trustee's avoidance powers.

Here, the trustee sold the estate's claim to the proceeds from the sale of the property with the tacit approval of the bankruptcy court. The court ordered the estate's interest in the appeal terminated and that all responsibility for the claim rested with Miller. While Miller may be acting on his own, he does so with the apparent blessing of the bankruptcy court and the trustee. Clearly, it was in the estate's interests to resolve its involvement in the dispute. In fact, while it was not argued by Miller, nor was he specifically identified for this purpose, he could best be identified as a representative appointed to enforce the debt in line with section 1123(b)(3)(B).

More importantly, the trustee originally asserted the avoidance powers in the bankruptcy and district courts. To refuse Miller the opportunity to stand in the trustee's shoes would frustrate the obvious wish of the bankruptcy court to end its participation in the matter. In *Texas General Petroleum*, there was no such involvement by the trustee or the bankruptcy court. The creditor was acting independently and for his sole benefit. For these reasons, we hold that Miller may assert the powers of the trustee.

## II. *Constructive or Inquiry Notice.*[1]

### Standard of Review

[4] Generally, the bankruptcy court's findings of facts are reviewed under the clearly erroneous standard and its conclusions of law are reviewed de novo. *Ragsdale v. Haller*, 780 F.2d 794, 795 (9th Cir. 1986). Whether a purchaser has inquiry notice is largely a factual determination. In fact, while the district court applied a *de novo* standard of review, *In re Probasco*, 839 F.2d 1352, 1355 (9th Cir.1988), indicates that with a question of fact such as we have here, a clearly erroneous standard should apply. "We must accept the bankruptcy court's finding that there was no constructive notice unless we are 'left with a definite and firm conviction that a mistake has been committed.'" (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948)). In *Probasco*, the Court noted that the facts did not appear to be in dispute but it applied the clearly erroneous standard anyway because of "judicial economy." We will do likewise.

Finally, the bankruptcy court's conclusions of law are reviewed de novo by the district court and we, in turn, review the district court's decision *de novo*. "Because this court is in as good a position as the district court to review the findings of the bankruptcy court, it independently reviews the bankruptcy court's decision." *Ragsdale*, at 795 (9th Cir.1986).

1.  For purposes of clarity, Miller and the trustee          will hereinafter be referred to as one.

Exhibit 38

IN RE PROFESSIONAL INV. PROPERTIES OF AMERICA    **627**
Cite as 955 F.2d 623 (9th Cir. 1992)

Analysis

**[5]** The bankruptcy trustee holds "strong arm powers" provided by 11 U.S.C. § 544(a)(3) which states the trustee is to be considered:

A bona fide purchaser of all real property ... from the debtor, against whom applicable law permits such transfer to be perfected, that attains the status of a bona fide purchaser and has perfected such transfer at the time of the commencement of the case, whether or not such a purchaser exists.

11 U.S.C. § 544(a)(3).

**[6–8]** State law determines whether a party is a bona fide purchaser. *In re Washburn and Roberts, Inc.*, 795 F.2d 870, 872 (9th Cir.1986). In Washington, a bona fide purchaser is defined as "one who without notice of another's claim of right to, or equity in, the property prior to his acquisition of title, has paid the vendor a valuable consideration." *Miebach v. Colasurdo*, 102 Wash.2d 170, 175, 685 P.2d 1074, 1078 (1984). Washington, which is a race-notice state, generally holds that a bona fide purchaser prevails over a prior transferee who has failed to record. RCW 65.08.070; *Paganelli v. Swendsen*, 50 Wash.2d 304, 308, 311 P.2d 676, 678 (1957). Since the strong arm powers elevate the trustee to a level of a bona fide purchaser, a trustee without notice can generally avoid any unrecorded transfer of land in the State of Washington. *Washburn* at 872.

The Briggs admit that their deed of trust was unrecorded. This case turns on whether the petition itself put the trustee on sufficient inquiry or constructive notice of their prior security interest. *Miebach* stated:

It is a well-settled rule that where a purchaser has knowledge of information of facts which are sufficient to put an ordinarily prudent man upon inquiry, and the inquiry, if followed with reasonable diligence, would lead to the discovery of defects in the title or of equitable rights of others effecting the property in question, the purchaser will be held chargeable with knowledge thereof and will not be heard to say that he did not actually know of them. In other words, knowledge of facts sufficient to excite inquiry is constructive notice of all that the inquiry would have disclosed.

*Miebach*, 102 Wash.2d at 175–76, 685 P.2d at 1078 (quoting *Peterson v. Weist*, 48 Wash. 339, 341, 93 P. 519, 519 (1908).

The bankruptcy court found factually that a diligent title search would disclose a bankruptcy filing. Secondly, it found that "a reasonably prudent purchaser of the debtor's property would be placed on notice of the contents of bankruptcy pleadings from the time of their being filed." It determined, as a matter of law, however, that "any constructive notice of plaintiffs' interest achieved by filing the original bankruptcy pleadings comes too late to secure their interest in a position prior to that acquired by the trustee."

It is the Briggs' contention, obviously, that the bankruptcy court was wrong; that the debtor's involuntary petition contained facts sufficient to put the trustee on at least inquiry notice that they had a prior claim. Secondly, they assert that notice simultaneous with filing is sufficient.[2]

**[9]** A trustee does not become a hypothetical bona fide purchaser if she has been put on constructive or inquiry notice. *In re Marino*, 813 F.2d 1562, 1565 (9th Cir. 1987). *McCannon v. Marston*, 679 F.2d 13, 16 (3rd Cir.1982) clarified the distinction by noting, "[t]he reference to the trustee's or creditors' knowledge appears to have originated out of a concern that actual knowledge might affect the trustee's status as a hypothetical lien creditor." *Id.* at 16. *McCannon* pointed out, however, that "Congress was careful to modify the status of bona fide purchasers by inserting the words 'against whom applicable law per-

---

2. The trustee's actual notice is of no consequence. Section 544(a) states that the trustee shall have the rights and powers of a bona fide purchaser "without regard to actual knowledge." *Probasco* and *In re Marino*, 813 F.2d 1562, 1565 (9th Cir.1987) have consequently held that "actual knowledge is irrelevant." *See McCannon v. Marston*, 679 F.2d 13, 16–17 (3rd Cir.1982).

Exhibit 36

mits such transfer to be perfected.'" *Id.* at 17.

**[10]** The trustee argues that inquiry notice is insufficient because it is a species of actual notice which is irrelevant in this context. *See McCannon* note 2. He cites *Sands v. United States,* 198 F.Supp. 880, 884 (W.D.Wash.1960) *aff'd, First Federal Sav. & Loan Ass'n of Bremerton v. United States,* 325 F.2d 481 (9th Cir.1961), which states "actual notice may also consist of implied or inquiry notice."

This explanation directly conflicts with *Marino* which clearly mandated that a trustee may still be held accountable if put on inquiry notice. *Marino* controls, not simply because it is more recent, but because it discusses the relationship of section 544(a)(3) with state property law. Moreover, decisions such as *Probasco* discuss the trustee's notice requirement in terms of a constructive notice that encompasses inquiry notice. "A prudent purchaser inquiring as to the unity of ownership of all three parcels 'might have learned' of Probasco's interest in [the property]." *Id.* at 1356. *See also In re Tleel,* 876 F.2d 769, 772 (9th Cir.1989) (discussing the failure in that case to provide constructive or inquiry notice).

The trustee argues that even if inquiry notice could preclude him from invoking the avoidance powers, the information in the Briggs petition was insufficient to provide such notice. He contends further that any information or notice which he attained after that period did not bear on his status as a bona fide purchaser at the time of filing of the case.[3]

The Briggs Involuntary Creditors' Petition makes one reference to the deeds of trust:

2. The nature and amount of Petitioners' claims are as follows:

[3]. This is true. *In re Gurs,* 27 B.R. 163 (9th Cir.BAP1983) defined a § 544(a)(3) hypothetical bona fide purchaser as one who is without actual knowledge "at the instant the petition is filed," and purchases property from the debtor for value and in good faith. Consequently, we will only discuss the ramifications of the petition itself.

(a) ROBERT BRIGGS: Purchase of various Promissory Notes supposedly secured by assignments of Deeds of Trust with interest-only monthly payments which are now delinquent, some with said Notes have matured and are unpaid, in the aggregate amount of approximately $137,500.

E.R. at 17.

While the bankruptcy court held that this petition came too late to secure the Briggs' position ahead of the trustee's, the district court determined that under Washington law:

this language is sufficient to put an ordinarily prudent person on inquiry of the Briggs' interest in the real property in the form of Deed of Trust. Certainly, the language creates a circumstance which raises a duty to require further inquiry by the trustee to determine if there is a Deed of Trust. A reasonably diligent inquiry would have disclosed the unrecorded deeds of trust.

E.R. at 17–18.

While the bankruptcy court determined as a matter of law that inquiry notice that is simultaneous with filing "comes too late," the district court held that the filing would put the trustee, once appointed, on inquiry notice.

We are persuaded by the district court's holding. There is no practical reason why a trustee should not be put on inquiry notice by the very petition that created his position. A trustee who has not yet been appointed can hardly argue that he has been prejudiced by being charged with notice by the petition. Secondly, there is an abundance of authority making clear that state law determines a bona fide purchaser's status.[4] If the petition satisfies Washington law, the trustee has been put on inquiry notice.

[4]. *See In re Washburn and Roberts,* 795 F.2d at 872; *In re Tleel,* 876 F.2d at 772; *In re Marino,* 813 F.2d at 1565; *In re Torrez,* 63 B.R. 751, 754 (9th Cir.BAP1986), *aff'd* 827 F.2d 1299 (9th Cir.1987).

Exhibit 38

## IN RE PROFESSIONAL INV. PROPERTIES OF AMERICA    629
Cite as 955 F.2d 623 (9th Cir. 1992)

"The burden of establishing that a purchaser had prior notice of another's claim, right, or equity, rests upon the one who asserts such prior notice." *Glaser v. Holdorf,* 56 Wash.2d 204, 209, 352 P.2d 212, 215 (1960) (citations omitted). In *Miebach,* the court noted that because the plaintiff was an experienced businessman and the debtors still had possession of the property, making continuous improvements on it, the plaintiff was on at least inquiry notice of their claim to the property. *Id.* 685 P.2d at 1077–78.

In *Peterson v. Weist,* 48 Wash. 339, 93 P. 519 (1908), the deed delivered to the plaintiff's vendor contained a reservation clause which stated:

Saving and reserving therefrom all the timber of every kind and character now thereon, except cedar, reserving also the right to pass over the premises wherever necessary to remove the timber herein reserved; possession to be given of the timber and roads when A.C. Mowry's time is up upon the timber, viz.: 3 years from Feb. 10, 1902.

*Id.* at 340, 93 P. at 519.

The appellants in *Peterson* conceded they were aware of the reservation but did not know of the time allowed for removal. The court had no sympathy: "If they had no notice of the time allowed for removal of the timber it was solely because they made no inquiry. They could not blindly rely on the statement of their vendors and they made no inquiry from any other source." *Id.* (citations omitted).

This case is similar. The involuntary petition indicated the very people who instigated the bankruptcy proceedings held a deed of trust. This petition should have raised the trustee's suspicions and compelled him to inquire further. Since this was an involuntary petition, the trustee need only have contacted the Briggs to determine their specific interest. In fact,

the trustee had a duty to inquire as to the nature of the Briggs' claim once he was appointed.

The bankruptcy court's findings of fact support this holding even if its conclusions of law do not. The court determined that "a reasonably prudent purchaser of the debtor's property would be placed on notice of the bankruptcy pleadings from the time of their being filed." This statement is consistent with the district court's holding that the petition simultaneously provided notice to the trustee. Consequently, while we adopt the bankruptcy court's findings of fact, we hold that the district court arrived at the correct legal conclusion.

Finally, the trustee argues that pursuant to RCW 4.28.325, the Briggs were required to file a lis pendens with the auditor of the county in which the property was situated.[5]

[11] The filing of a lis pendens in connection with a lawsuit against the record title holder of real property gives constructive notice of an action to subsequent purchasers from the record title holder. *In re Gurs,* 27 B.R. 163, 165 (9th Cir.BAP1983) (citing similar California law). The trustee, however, suggests that this is a *requirement* before he can receive constructive notice. We disagree. Although the statute indicates that filing a lis pendens provides constructive notice to the world, it does not suggest that this is the exclusive method of providing constructive or inquiry notice. *Miebach* indicates that the proper focus is on whether the purchaser has any knowledge or information or facts which would put an ordinarily prudent man upon inquiry. *Id.* 685 P.2d at 1078. The Briggs argue that any lis pendens filed by the Briggs prior to the filing of their involuntary creditor's petition would have been invalid. There was no pending action at that time and an action must be in fact pending for a lis pendens to be valid. *Dun-*

---

5. 4.28.325 reads in relevant part:
   In an action in a United States district court for any district in the State of Washington affecting the title to real property in the State of Washington, the plaintiff, at the time of filing the complaint ... *may* file with the auditor of each county in which the property

is situated a notice of a pendency of the action.... From the time of the filing only shall the pendency of the action be constructive notice to a purchaser or encumbrancer of the property affected thereby ...
(Emphasis added.)

Exhibit 38

*ham v. Tabb,* 27 Wash.App. 862, 866, 621 P.2d 179, 181 (1980). Their argument has logic but we find determinative the fact that the lis pendens was not the only method by which constructive notice could be established. The petition, itself, provided adequate inquiry notice. Once the trustee was appointed, he had a duty to investigate the Briggs' deed of trust.

AFFIRMED.



UNITED STATES of America,
Plaintiff–Appellee,

v.

Wayne Richard ALLEN, Jr.,
Defendant–Appellant.

No. 90–50666.

United States Court of Appeals,
Ninth Circuit.

Submitted Jan. 8, 1992 *.

Decided Jan. 31, 1992.

Defendant was convicted of drug-related charges after the United States District Court for the Southern District of California, Earl B. Gilliam, J., denied defendant's motion to dismiss indictment for outrageous Government conduct. Defendant appealed. The Court of Appeals held that Government's consent to and participation in operation of facility which supplied chemicals used in manufacture of methamphetamine was not neither outrageous nor misconduct.

Affirmed.

* The panel finds this case appropriate for submission without oral argument pursuant to Ninth Circuit Rule 34–4 and Fed.R.App.P. 34(a).

1. Two unconsolidated cases before this panel along with Allen's raise the same issue. *See United States v. Nichols,* Nos. 90–50285, 90–

**1. Criminal Law** ⬤═36.5

Indictment will be dismissed if Government misconduct is so outrageous that it results in violation of due process; unsavory conduct alone will not cause dismissal of indictment. U.S.C.A. Const.Amends. 5, 14.

**2. Constitutional Law** ⬤═257.5
   **Criminal Law** ⬤═36.5

Government's consent to and participation in operation of facility for supply of chemicals used in manufacture of methamphetamine, including the purchase of advertising to generate business, camera surveillance of premises, and use of law enforcement officer as under cover employee of supplier was not misconduct which mandated dismissal of drug-related charges; manufacturers were not denied due process since each could resort to hundreds of supply houses. U.S.C.A. Const.Amends. 5, 14.

Inge Brauer, Brauer & Sharpe, San Diego, Cal., for defendant-appellant.

Randy K. Jones, Asst. U.S. Atty., San Diego, Cal., for plaintiff-appellee.

Appeal from the United States District Court for the Southern District of California.

Before FARRIS, NOONAN and TROTT, Circuit Judges.

PER CURIAM:

Wayne Richard Allen appeals the district court's denial of his motion to dismiss the indictment against him on the ground of outrageous government misconduct.[1] We affirm.

In 1985, one Charles Hill organized Triple Neck Scientific, a chemical supply house patronized by Allen and the source of information that Allen was involved in the manufacture of methamphetamine. At about the same time, Hill contacted the

50209, 90–50286, 90–50319, 90–50320, 90–50322, 90–50323, 90–50349, 956 F.2d 276 (table) (9th Cir.1992); *United States v. DaSilva,* 953 F.2d 1388 (table). The government conduct challenged in those cases is the same conduct that Allen challenges here.

Exhibit 38

# HASTINGS COLLEGE OF THE LAW LIBRARY

## REPORTS OF CASES

DETERMINED IN

# THE SUPREME COURT

OF THE

# STATE OF CALIFORNIA

———

## RANDOLPH V. WHITING
### REPORTER

———

**VOLUME 176**

SAN FRANCISCO
**BANCROFT-WHITNEY COMPANY**
1919

**Exhibit** 39

oved the
state was
88, [144
152 Pac.

showing,
that the
care and
nd hence
or con-
pointed.
that the
ent, may
either of
inted by
s of the
e estate
nd gone
an unfit
ild had
ntended
t person
relating

on thus
ler, and
and the
person
as been
rder in-
e estate.
r not is
nich the
ardship
nce for
a case

neither

[S. F. No. 8213. In Bank.—October 11, 1917.]

ANDREW MARTIN, Petitioner, v. SUPERIOR COURT OF
ALAMEDA COUNTY et al., Respondents.

COMMON LAW AS RULE OF DECISION—CONSTRUCTION OF POLITICAL CODE,
SECTION 4468.—Section 4468 of the Political Code, making the
common law of England the rule of decision in all courts of the
state so far as not repugnant to or inconsistent with the constitu-
tion of the United States or the constitution or laws of this state,
had in contemplation the whole body of common-law jurisprudence
as it stood, influenced by statute at the time when the code section
was adopted, and embraced equity also in its contemplation.

ID.—SUING IN FORMA PAUPERIS — POWERS OF ENGLISH COURT.—The
power to remit fees was one of the inherent powers of the English
courts quite independently of statute.

SUING IN FORMA PAUPERIS—POWERS OF SUPERIOR COURT.—The power in
this state to admit suitors in forma pauperis exists in our courts of
general jurisdiction without statute.

ID.—JUSTICES' COURTS—CONSTRUCTION OF SECTION 91, CODE OF CIVIL
PROCEDURE.—It is quite plain that the legislature by this section,
recognizing the power of courts of record to admit suitors in forma
pauperis expressly conferred the power upon inferior courts of
limited jurisdiction with the design to save all question.

ID.—POWERS OF COURT NOT CURTAILED BY STATUTE.—Statutes, such as
section 4295 of the Political Code, and other general statutes dealing
with the collection and disposition of fees, have reference only to
cases where the court has not remitted the fees and are neither
individually nor collectively susceptible of the construction that they
were designed to deny to the courts the exercise of their inherent
power to remit fees.

ID.—SUFFICIENCY OF FACTS—ATTORNEY'S CONTINGENT INTEREST.—In-
formation and belief of the judge that an attorney has a contingent
interest or fee dependent on the outcome of the litigation does not
justify refusal of permission to sue in forma pauperis in a proper
case.

ID.—RIGHT TO JURY TRIAL.—One who is permitted to sue without pay-
ment of court fees is not by their remission deprived of his right
to a trial by jury.

ID.—ENTITLING MOTION PAPERS.—A notice of motion for leave to
further prosecute in forma pauperis is not misleading because
entitled as a notice of motion "for leave to sue."

ID.—USE IN PETITION OF TERM "FORMA PAUPERIS."—The use in the
moving papers of the term forma pauperis sufficiently identifies

**Exhibit** 39

the motion to be made, although those words are not found in any statute.

ID.—RIGHT TO PROSECUTE ACTION.—One who has paid the original filing fees on commencing an action is not thereby debarred from the right to apply for a remission of subsequent fees.

ID.—AFFIDAVIT OF MERITS.—An affidavit of merits is not a prerequisite to a motion for leave to prosecute an action *in forma pauperis.*

APPLICATION for Writ of Mandate to be directed against the Superior Court of the County of Alameda. Hon. T. W. Harris, Judge.

The facts are stated in the opinion of the court.

Elwin B. Carson, and C. A. Linn, for Petitioner.

D. C. Dutton, for Respondents.

Alden Ames, for Legal Aid Society, *Amicus Curiae.*

HENSHAW, J.—Plaintiff commenced this action in the superior court of the county of Alameda against Ergo A. Majors, to recover damages for the death of plaintiff's minor daughter, alleged to have been occasioned by the wrongful acts of Ergo A. Majors. After the commencement of this action this petitioner, who is a day laborer, married and the father of ten minor children, all of whom are living and dependent upon him for support, sought leave of the court to be allowed to prosecute his action *in forma pauperis.* His application was supported by an affidavit to the effect that, saving for his chose in action, he was not possessed of more than $25, and that no one saving himself was interested in the successful prosecution of the action. The superior court denied his application. He sought by mandate from the court of appeal to secure an order directed to the superior court of Alameda County compelling the latter court to grant his application. The court of appeal declined to issue the mandate, assigning no reasons for its order refusing to issue the writ. It was in effect a dismissal. Application then being made by petitioner to this court, an alternative writ of mandate was issued.

The fundamental question thus presented is of the right of the petitioner to proceed with the prosecution of his action in the superior court *in forma pauperis,* and therefore without

Exhibit 39

nd in any

inal filing
from the

rerequisite
*auperis.*

directed
a. Hon.

1 in the
Ergo A.
's minor
rongful
of this
and the
and de-
court to
-is. His
ect that,
of more
-ested in
or court
he court
court of
t his ap-
nandate,
the writ
made by
late was

right of
action in

without

the payment in advance of the legal fees. Certain minor subsidiary questions are raised by respondents, going to the asserted insufficiency of the papers filed in support of the application made to the superior court, but the principal answer of respondents is based upon our laws and their construction of those laws. Thus it is pointed out that by section 631 of the Code of Civil Procedure, "Trial by jury may be waived by the several parties to an issue of fact in actions arising on contract, or for the recovery of specific real or personal property. . . . 5. By failing, at the beginning of each day's session, to deposit with the clerk the jury fees and, if there be any, the mileage for such day."

Further, that the statutes of 1871–72 (Stats. 1871–72, p. 188) declare that in civil cases the party in whose favor verdict is rendered, before the same shall be entered, shall pay the jury fees, and that if in any trial in a civil case the jury be for any cause discharged without finding a verdict, the fees of the jury shall be paid by the party who demanded the jury. Still further, that section 4295 of the Political Code forbids state, county, and township officers from performing any service for which fees may be required (saving in proceedings on *habeas corpus*) without prepayment of such fees, excepting from the operation of this law only the state and any county, city, city and county, public officer, board, or body acting in his or its official capacity, and that only upon the payment by any person of the fees required by law is it made the duty of the officer to perform the required services. And, finally, we are referred to a rule of the superior court of the county of Alameda to the following effect:

"In the trial of a civil action by a jury, each party is required daily, during the trial, at or before the case is called for trial each day, to deposit with the clerk the amount of money necessary to pay the jury fees, including mileage for such day and one-half of the reporter's fees. Out of the money so deposited the clerk shall pay the reporter's fees. The jury fees shall be paid out of the moneys deposited by the party who is required by the statutes of this state to pay the same. All moneys not required to be paid out pursuant to this rule shall be returned by the clerk to the party depositing the same."

We have thus been at pains to set forth all of the written laws which respondents present, since it is by virtue of these laws that they insist that the order of the superior court of

Exhibit

Alameda County refusing to grant petitioner's application was well founded. Indeed, they go further and assert that by virtue of these laws the court had no power to grant the application. Herein their argument is that the right of one so to commence, and having commenced to prosecute, his action *in forma pauperis* is a right unknown to the common law; it exists only by virtue of statute and goes no further than the statute permits; that in the English law it owed its origin solely to statute. Next (so runs respondents' argument) our adoption of the English common law as the basis of our jurisprudence was an adoption of *lex non scripta*, the immemorial usage and custom out of which grew the common-law system, and, therefore, the English statutes, however ancient, form no part of the body of that law. Finally, the argument is that under the English law the authority of the court to waive fees under a pauper's application rested wholly upon statute and formed no part of the inherent common-law power of those courts. From this the conclusion is advanced, as being unescapable and controlling in the matter, that as our statutes have not in terms, nor yet by necessary implication, vested our courts with power to waive fees upon such poor man's petition, it cannot be done.

Little need be said as to the meaning of the language of our Political Code (section 4468), which makes the common law of England, so far as it is not repugnant to nor inconsistent with our constitution and laws, the rule of decision in all the courts of this state. Learned, indeed exhaustive, discussions of the matter will be found in 8 Cyc. 366, and the note in 30 (1913 ed.) Am. & Eng. Ann. Cas. 1222, 1252, [Ann. Cas. 1913E, 1222, 1252]. But as the matter seems to be seriously pressed upon the attention of this court, under the statement that we have not distinctly defined the meaning of this section of the Political Code, and as it is further said that our decisions adverting to the matter (such as *People v. Vasquez,* 9 Cal. App. 548, [99 Pac. 982]; *Ex parte Karlson,* 160 Cal. 382, [Ann. Cas. 1912D, 1334, 117 Pac. 447]; *Peters v. Peters,* 156 Cal. 34, [23 L. R. A. (N. S.) 699, 103 Pac. 219]; *City of Pasadena v. Superior Court,* 157 Cal. 794, [21 Ann. Cas. 1355, 109 Pac. 620]; *Estate of Sutro,* 155 Cal. 733, [102 Pac. 920]; *McDaniel v. Cummings,* 83 Cal. 518, [8 L. R. A. 575, 23 Pac. 795]; *Estate of Fair,* 132 Cal. 534, [84 Am. St. Rep. 70, 60 Pac. 442, 64 Pac. 1000]), point to the

Exhibit 39

conclusion that the language of the section of the Political
Code above mentioned is to be construed as referring solely
to the *lex non scripta*, the common law unmodified by statute,
it is here proper to say that such a view of our decisions is
completely mistaken. It would be strange, indeed, if our
legislature should have designed to limit the applicability of
the code section to the ancient and frequently most barbarous
rules and customs of the common law, and in so doing refuse
to take into account the mitigation of their harshness and the
broadening of the rules themselves which followed the succes-
sive enactments of the English statutes. To the contrary, we
hold that our legislature in its use of the phrase "common
law" had in contemplation the whole body of that jurispru-
dence as it stood, influenced by statute, at the time when the
code section was adopted. And more than that, that it em-
braced also in its contemplation the great handmaiden and
coadjutor of the common law, equity. And in exemplification
of this we need but refer to the language of this court in *Katz
v. Walkinshaw,* 141 Cal. 116, [99 Am. St. Rep. 35, 64 L. R. A.
236, 70 Pac. 663, 74 Pac. 766]. Manifestly no harm can be
done by this construction of the language of the code, since
that language itself limits the applicability of the common-law
system to such of its rules and principles as are not repugnant
to nor inconsistent with the spirit of our own law. And if
we needed further support than that given by pure reason
on so plain a proposition, it can be found in the similar con-
struction which the supreme court of the United States has
put upon the language of one of its own statutes, "saving to
suitors in all cases the right of a common-law remedy where
the common law is competent to give it." The supreme court
of the United States construes this language not to be limited
to remedies as they existed at common law, but to embrace
such substituted remedies as might be provided by statute, and
still further, to such relief as equity might afford, equity being
for this purpose considered as a branch of the common law.
(*North Pacific Steamship Co.* v. *Industrial Accident Commis-
sion,* 174 Cal. 346, [163 Pac. 199]; *Knapp, Stout & Co.* v.
*McCaffrey,* 177 U. S. 638, [44 L. Ed. 921, 20 Sup. Ct. Rep.
824].)

But quite independently of this determination, there is still
the controlling fact that the power of the English common-law
courts to remit fees on petition *in forma pauperis* did not have

**Exhibit** 39

its origin in any statute, but was in fact exercised as one of the inherent powers of the courts themselves, quite independently of statute. And this one would naturally expect to find since, imperfect as was the ancient common-law system, harsh as it was in many of its methods and measures, it would strike one with surprise to be credibly informed that the common-law courts of England shut their doors upon all poor suitors who could not pay fees, until parliament came to their relief. Even greater would be the reproach to the system of jurisprudence of the state of California if it could be truly declared that in this twentieth century, by its codes and statutes, it had said the same thing, and yet this is precisely the position which respondents to this application take.

Respondents do cite certain authorities, such as *Hoey* v. *McCarthy*, 124 Ind. 466, [24 N. E. 1038]; *Campbell* v. *Chicago & Northwestern Ry. Co.*, 23 Wis. 490; 11 Cyc. 200, where it is declared that this power rests upon statute, and therefore cannot be exercised saving under the statute. An examination satisfies us that this error in the declaration of these courts and others has arisen from a misconstruction of the language of Blackstone's Commentaries. He declares as follows: "And paupers, that is, such as will swear themselves not worth five pounds, are, by statute (Stats. 11 Hen. VII, c. 12), to have original writs and *subpoenas gratis*, and counsel and attorney assigned them without fee; and are excused from paying costs, when plaintiffs, by the statute (Stats. 23 Hen. VIII, c. 15), but shall suffer other punishment at the discretion of the judges. And it was formerly usual to give such paupers, if nonsuited, their election either to be whipped or pay the costs: though that practice is now disused." It will be noted that Blackstone does not found the existence of the power upon statute. He is merely discussing the exercise of the power under existing statutes, which is of course a wholly different matter. But a very brief review will establish that the power was an existent power, recognized and exercised before the enactment of these or other acts of parliament. Thus says Marshall in his "Law of Costs in all Suits and Proceedings in Courts of Common Law" (page 347): "With a view to enable such poor persons as have not ability to pay the expenses incidental to the prosecution of an action to enforce their rights, they may, upon such inability being shown, be admitted to sue *in forma pauperis*. When so admitted the

plaintiff
entitled
render
as rega
common
to pay
enter th
  In the
p. 1093,
behalf o
charged
paupers
court ag
to asses
suffered
election.
1254, the
plaintiff
cation to
be made
plaintiff
his assoc
court to
the chief
c. 12, an
In the le
Manning
in the St
that act,
would sw
the office
court the
that the
tiff was c
*dente lite*
J., added
charged.
is that th
*pauperis*,
ported b
Those dec
have beer

**Exhibit** 39

Case 14-50333-btb    Doc 426    Entered 10/16/18 11:49:15    Page 56 of 61

plaintiff is exempt from the payment of court fees, and he is entitled to the service of counsel, and of an attorney, who render their services without reward.  This privilege, so far as regards the exemption from court fees, was conceded at common law; for where the plaintiff swore that he was unable to pay for entering his pleadings, the officer was bound to enter them *gratis.*''

In the case of *Mounford* v. *Pate*, 82 Eng. Rep., Full Reprint, p. 1093, S. C., 1 Keble's Rep. 913, the motion was made on behalf of a plaintiff applying *in forma pauperis* to be discharged of costs ''there being none at common law and paupers thereby discharged.''  Discussion followed, and ''the court agreed with Twisden that the continual practice being to assess costs, the plaintiff (*in forma pauperis* who has suffered nonsuit) must pay them or submit to be whipt at election.''  In *Brunt* v. *Wardle*, 133 Eng. Rep., Full Reprint, 1254, the principal question before the justices was whether a plaintiff upon the institution of his action must make application to sue *in forma pauperis*, or whether such order could be made after the commencement of the action to enable a plaintiff to prosecute it *in forma pauperis*.  Tindal, C. J., and his associate justices held that it was within the power of the court to make the order after the commencement of the action, the chief justice saying: ''After all, is the Stats. 11 H. VII, c. 12, anything more than confirmatory of the common law? In the learned report of the Serjeants' case by my brother Manning, p. 41, note (d), a case is referred to that occurred in the Stats. 15 Ed. IV, twenty years before the passing of that act, from which it appears that at common law if a party would swear that he could not pay for entering his pleadings, the officer was bound to enter them *gratis;* and that in this court there was a presignator *pur les poers*.  It seems to me that the proper conclusion for us to come to is, that this plaintiff was entitled to be admitted to sue *in forma pauperis, pendente lite,* and that the rule must be discharged,'' and Maule, J., added: ''I am also of opinion that this rule should be discharged.  The objection to the order of my brother Coltman is that the court has no power to admit a party to sue *in forma pauperis, pendente lite;* and the objection is sought to be supported by the recent decisions in the court of exchequer. Those decisions, however, are open to the observations which have been already made—that they were cases relating to

**Exhibit** 39

costs, and that the attention of the court does not appear to have been called to the undoubted common-law authority of the court to admit parties to sue *in forma pauperis.* The authority cited by my lord from the Serjeants' case shows that so early as the Stats. 15 Ed. IV it was the established practice to admit a party to sue *in forma pauperis:* and various instances are to be found in the books of parties being so admitted after the commencement of the suit.'' This case, decided so recently as 1841, may well be regarded as conclusive in its construction of the common law of England and controlling upon our section of the code making that law the basis of our jurisprudence, and this quite apart from any consideration of the modifications of the common law of England worked by acts of parliament.

It is pointed out that our Code of Civil Procedure (section 91) makes express provision for the right of a suitor in a justice court to prosecute such an action *in forma pauperis,* while no such express provision of our statute is made applicable to our courts of record. Thus section 91 of the Code of Civil Procedure declares that the payment of fees in advance ''shall not be exacted from parties who may prove to the satisfaction of the presiding justice that they have a good cause of action and that they are not of sufficient pecuniary ability to pay the legal fees.'' Again we say that it would be an unmerited reproach cast upon the legislative branch of our state government to hold that it meant to permit a suitor to prosecute his action *in forma pauperis* in a justice court, where the amount involved could not be large nor the consequences of the litigation great, and yet designed to forbid such a poor suitor from prosecuting his action according to the laws of the land in a court of record, where rights might and could be all-important and his recovery of the utmost consequences. No such reproach justly attaches. It is quite plain that the legislature, recognizing the power of courts of record to admit suitors *in forma pauperis,* designed to save all question in the case of inferior courts not exercising common-law jurisdiction, and that it is for this reason that the power which exists in our courts of general jurisdiction without statute is expressly conferred upon the inferior courts of limited jurisdiction.

With the power in our superior courts thus declared, to admit suitors to commence or having commenced to prosecute their actions *in forma pauperis* in all proper cases, the next

Exhibit 39

176 Cal.

ppear to
iority of
~is. The
lows that
ied prac-
l various
being so
his case,
s conclu-
and and
, law the
any con-
England

(section
in a jus-
~is, while
pplicable
of Civil
e ''shall
isfaction
f action
pay the
merited
governe-
ecute his
amount
the liti-
r suitor
the land
l be all-
ces. No
he legis-
o admit
n in the
sdiction.
exists in
xpressly
ion.
ared, to
rosecute
he next

consideration is whether or not the legislature has by its enactments designed to curtail that power. Quite aside from the question as to the power of the legislature to do this thing, it is obvious that only the plainest declaration of legislative intent would be construed as even an effort to do this thing. We find no such expressed intent. All of the statutes dealing with the payment and prepayment of fees, such as section 4295 of the Political Code, are general in their nature and have to do with the orderly collection and disposition of the fees, payment or prepayment of which is prescribed by law. Neither individually nor collectively are they even susceptible of the construction that the design of the legislature was to deny to the courts the exercise of their most just and most necessary inherent power. They have applicability to all cases where the court has not, in the exercise of that power, remitted the payment of the fees on behalf of a poor suitor, and in every instance the court's order to this effect is sufficient warrant to every officer charged with the collection of fees to omit the performance of that duty in the specified case.

Our next consideration is the narrow one of objections urged by respondents to the sufficiency of the petitioner's moving papers addressed to the superior court. Certain of these appear in the verified return of the judge of that court. The plaintiff's verified petition before the superior court declared that no person other than himself had any interest in the successful prosecution of the action. The judge's return declares that he had information and belief to the effect that the attorneys for the plaintiff had a contingent interest, being a contingent fee, in the successful outcome of the litigation, and that for this added reason the plaintiff's application was refused. But if it be conceded that issue was here joined upon the direct averment of plaintiff's petition, something more is required as to the nature, source, origin, and soundness of the court's belief, before its order can be upheld on this ground. This showing is not made. Yet in view of the fact that the attorneys for the plaintiff were before the superior court, it could most easily have been made. Next it is said that plaintiff was not remediless, since the order of the court refusing to grant his application deprived him merely of his right to a trial by jury, but left open to him the trial of his cause without a jury. Little need be said to show the inadequacy of such a response. Where the suitor was allowed to

**Exhibit** 37

prosecute *in forma pauperis*, all the rights which were open
to him upon the payment of fees were open to him by virtue
of the order, and every officer was required to perform his
duty without the payment of fees as fully as though the
legal fees had been paid. Precisely as anciently such a
plaintiff *in forma pauperis* was entitled to prosecute his
action "after the course of the common law," so in this state
he is equally entitled to prosecute his action under our con-
stitution and laws, and the right of trial by jury is one of
the most important of these. Therefore we will not say that
a suitor who can pay court fees shall have his trial by jury
and the suitor who cannot pay court fees must be content to
go to trial without a jury. The law does not say this, and
we will not read such a declaration into the law.

Respondents' final contention is that petitioner's moving
papers before the superior court were defective. (1) They
were entitled "Notice of Motion for Leave to Sue *in Forma
Pauperis*," whereas in fact it was not a motion for leave to
sue, but a motion for leave further to prosecute the action
*in forma pauperis*. Suffice it here to say that the misnomer
could have misled, and in fact did mislead, nobody. (2) The
moving papers were imperfect in not defining what was
meant by the request "for permission to prosecute the above-
entitled action *in forma pauperis*," since the phrase "*in
forma pauperis*" is not used in the statutes of this state. But
we cannot yield acquiescence to the suggestion that the
learned judge or the learned attorneys for the defendant did
not fully understand the meaning of this Latin phrase so
frequently employed in the common law. (3) The moving
papers are said to be deficient in failing to specify the remis-
sion of just what fees was sought by plaintiff. It seems
quite manifest that he sought, as he had the right to seek,
the remission of all fees exacted by law. (4) It is said that
there was a failure to show that the application was season-
ably made. What we are to understand by this is not made
plain. We have shown, and indeed quoted from the deci-
sions showing, that the right to prosecute *in forma pauperis*
was fully recognized with the right to *commence* an action
*in forma pauperis*. The right here sought is the right to
prosecute after the plaintiff had paid the original filing fees
for the commencement of the action. Certainly by having
paid this first fee he did not debar himself of the right to

**Exhibit** 39

were open
by virtue
rform his
hough the
ly such a
secute his
this state
r our con-
is one of
t say that
d by jury
content to
this, and

's moving
(1) They
*in Forma*
r leave to
he action
misnomer
(2) The
vhat was
he above-
rase *"in*
ite. But
that the
dant did
hrase so
moving
ie remis-
It seems
to seek,
said that
season-
et made
he deci-
*pauperis*
n action
right to
ng fees
having
right to

make future application for a remission of subsequent fees. (5) The application was accompanied by an affidavit of merits made by plaintiff and declaring "that he has stated the facts of his said suit to said C. A. Linn, Esq., attorney at law, and is advised that he has a good, sufficient, and just cause of action against the defendant." Such cases as *Nickerson* v. *California Raisin Co.*, 61 Cal. 268, *People* v. *Larue*, 66 Cal. 235, [5 Pac. 157], and *Jensen* v. *Dorr*, 9 Cal. App. 18, [98 Pac. 45], are relied on in support of the deficiency of this affidavit of merits. The cases are in point, but to support such an application as this, an affidavit of merits going to the justice and sufficiency of the cause of action is not called for by our law, nor was it called for by the common law. At common law the unfortunate suitor whose cause of action proved to be nonmeritorious stood liable to be "whipt." Further, we are advised that the attention of the superior court was not in any way directed to this asserted insufficiency in the affidavit of merits. An amended affidavit could and would doubtless have been filed. Moreover, the case was at issue on matters of fact, and there was a sufficient showing in the complaint at least of a meritorious cause of action. Therefore, while the court may call for a sufficient affidavit of merits, or indeed for any other form of satisfactory evidence before issuing its order allowing an action to be *commenced in forma pauperis*, the need of such supporting affidavit becomes very much less when, as in this case, the action has been brought and is at issue on its facts. Nor would such a defective affidavit of merits justify the court in refusing to the poor suitor the relief sought, if in all other respects he was entitled to it, without at least giving him an opportunity to present an affidavit measuring up to the requirements of the law.

For these reasons we hold that the court erred in refusing to grant the order prayed for. Let mandate issue accordingly.

Melvin, J., Lawlor J., Lorigan, J., and Angellotti, C. J., concurred.

SHAW, J.—I concur in the judgment and in all of the opinion of Mr. Justice Henshaw except the statements to the effect that the "common law of England," referred to

**Exhibit** 39

in section 4468 of the Political Code as the rule of decision
in this state where not repugnant to or inconsistent with our
written law, includes that law "as it stood influenced by
statute, at the time when the code section was adopted,"
that is, on April 13, 1850. (Stats. 1850, p. 219.) This
proposition, as the opinion shows, is not necessary to the
decision, for the right to sue *in forma pauperis* existed at
common law in England before any statutes regulatory
thereof were enacted. In 1850 there were in England, I
have no doubt, many general acts of parliament in force
which no one would claim were adopted as parts of our law
by the act of our legislature. The statement of what is
included by that section needs more qualification and elabo-
ration than is given to it in the main opinion. I think it
inadvisable to attempt to state any rule on the subject, ex-
cept in cases where it is necessarily involved.

Sloss, J., concurred.

[S. F. No. 7535.    Department One.—October 13, 1917.]

JOHN G. KLUMPKE, Appellant, v. ALL PERSONS, etc.,
Respondents.

HUSBAND AND WIFE—DEED—CONSIDERATION—SUFFICIENCY OF EVIDENCE.
In this action brought under the McEnerney Act to declare and
establish plaintiff's title to a parcel of land, wherein certain per-
sons claiming to be the devisees of the deceased wife of the plain-
tiff appeared and opposed the plaintiff's claim, it is held the evi-
dence is sufficient to support the finding that the real considera-
tion for the deed from the husband to the wife under which the
defendants claimed ownership was love and affection only is sup-
ported by the evidence.

APPEAL—UPHOLDING OF FINDINGS—GROUNDS.—Where the memorandum
filed in the court below as to its views concerning the insufficiency
of the evidence to support the findings does not purport to state
all the reasons therefor, on appeal the findings will be upheld if
there is any reasonable ground upon which they can be supported.

APPEAL from a judgment of the Superior Court of the
City and County of San Francisco. George A. Sturtevant,
Judge.

The facts are stated in the opinion of the court.

R. H. (

McCute
Loewy,
Responder

SHAW,
McEnerne
of land i
devisees o
plaintiff,
The judg
the prope
thereof. '
The fin
was acquir
prior to h
ruary, 188
conveyed
stated a c
was no cor
that he an
her death,
continued
using it as
duly proba
to respond
same.
Appellan
the deed w
dence. We
Klumpke
wife. In h
that the lar
In many ot
the course
either expr
land was th
other hand,
not intende
by him to c

**Exhibit** 39