

1   Anthony G. Thomas
    7725 Peavine Peak Court
2   Reno, NV 89523
    Tel:    (408) 640-2795
3   E-mail: atemerald2@gmail.com

4   Debtor In Propria Persona

RECEIVED
AND FILED

2018 DEC 17  AM 11: 55

U.S. BANKRUPTCY COURT
MARY A. SCHOTT, CLERK

5                   **UNITED STATES BANKRUPTCY COURT**

6                       **DISTRICT OF NEVADA - RENO**

7   IN RE:                          ) Case No.    BK-N-14-50333-BTB
                                    ) Case No.    BK-N-14-50331-BTB
8   ANTHONY THOMAS and              ) (Jointly Administered)
                                    )
9   WENDI THOMAS                    ) CHAPTER    7
                                    )
10  AT EMERALD, LLC                 ) APPLICATION FOR ORDER SHORTENING
                                    ) TIME RE: MOTION TO CONTINUE
11          Debtors.                ) HEARING OF 1-8-2019 DUE TO FRAUD
                                    ) UPON THE COURT; DECLARATION OF
12                                  ) ANTHONY THOMAS
                                    )
13                                  ) Date:      Friday December 21st 2018
                                    ) Time:      3:00 pm
14                                  ) Dept.      2
                                    ) Judge:     Hon. Bruce T. Beesley
15  _____ )

16                           **TABLE OF CONTENTS**

| Ex # | Description | # Pg | Pages | |
|------|-------------|------|-------|---|
| | Application for Order Shortening Time - Re: Motion to continue hearing o 1-8-2019 due to fraud upon the Court; Declaration of Anthony Thomas | 9 | 01-09 | |
| 1 | 12-6-2018 Meet and Confer Letter and Preservation Letter from Anthony Thomas to Atty Hartman | 32 | 10-42 | |
| | | 8 | 11-18 | |
| | Exhibit 1 - Jennifer Jodoin Linked in profile listing: | 1 | 19 | |
| | * Director of Land Acquisition-KT Urban Feb.2015- | | | |
| | * KT Properties - Project Manager Jan.2010-Present | | | |
| | * Tersini Construction Inc. Project Mgr 2000-2009 | | | |
| | Exhibit 2 - Jennifer Jodoin Notary Stamp | 1 | 20 | |
| | Exhibit 3 - 9-14-2001 Jodoin Notary Bond Santa Clara | 1 | 21 | |
| | Exhibit 4 - 8-4-201 Jodoin Notary Bond SC County | 1 | | 22 |
| | Exhibit 5 - Exhibit 10 - Emails re: Overstock contract | 6 | 23-28 | |
| | Exhibit 11 - Email from C Perna to Trustee re: contract | 1 | | 29 |
| | Exhibit 11 - Overstock contract | 4 | 30-33 | |
| | Exhibit 12 - Hartman Application for Compensation | 9 | 34-42 | |
| 2 | Hartman's Moving Papers re: Sale of Emerald | 24 | 43-59 | |
| 3 | Law Governing Sale of Estate Assets | 14 | 60-74 | |

- 1 -

| | | | | |
|---|---|---|---|---|
| 4 | Copy of Certified Deposition of Ron Ringsrud | | 107 | 75-182 |
| 5 | Overstock.com Information | | 9 | 183-191 |
| 6. | Ehrenberg v. Roussos (Bankr. C.D. Cal 2015) 541 B.R. 721 | | | 193-207 |
| 7. | Nevada Supreme Court case on Fraud on the Court NC DSH INC. V. GARNER | | 7 | 208-214 |
| 8. | Letter to Hartman  12-17-2018 | | | 215-217 |

- 2 -

1   I Anthony Thomas declare:

2   1.   I am the Debtor in the above captioned action. I am submitting this Declaration
3   in Support of my Application for an Order Shortening Time regarding a Motion to Continue
4   the hearing on the Trustee's Motion to confirm the sale of the Thomas Emerald by auction
5   currently set for 1-8-2019 due to my need to obtain necessary discovery that establishes that
6   the buyer is not in fact a good faith bona fide purchaser for value, but rather is an 18 year
7   employee and personal notary to Ken Tersini, the very party that I allege is the one who
8   committed fraud upon the court in procuring the judgment against me based upon the terms
9   of the oral settlement agreement that does not make any reference to fraud, nor was I
10  properly voir dired by the Judge under the rules governing CCP 664.6, rendering the
11  Judgment against me void. It is further void due to failure to comply with the Statute of
12  Frauds, void due to failure to inform the court of my dyslexia, void due to the false
13  representations that were made to me by my attorney who ceased to act as such as defined
14  under CCP 286, all of which render the resulting Judgment against me as void on it's face,
15  that only requires an inspection of the pleadings in the case and reference to the law to show
16  it's invalidity.

17  2.   The same is true for this Motion, that fails to comply with the 21 day notice
18  provisions referenced in Rule 6004(a), that references Rule 2002, that was not complied with.
19  Indeed the evidence shows that no other creditors of the estate were notified, nor was I
20  notified under the provisions of Rule 2002 of the sale, thereby depriving me of my statutory
21  right under Rule 6004(b) to oppose the sale.

22  3.   On November 29th 2018 as Docket Entries 430-432, Attorney Hartman on
23  behalf of the Trustee filed 24 pages of pleadings (Attached hereto as Exhibit 2, pages 43-59)
24  filed as a Motion to   that is an attempt to secure approval by this Court of the sale of the
25  Thomas Emerald) for a trifling $21,000 to Jennifer Jodoin, who contrary to the assertions
26  made by Mr. Hartman in his Motion papers (attached as pp 43-59) that she is a bona fide
27  purchaser for value is in fact an 18 year employee and personal notary of Ken Tersini, the

28

- 3 -

**APPLICATION FOR AN ORDER SHORTENING TIME-MOTION FOR CONTINUANCE OF 1-8-2019 HRG**

1    party that I allege procured the underlying $5 million judgment in the Santa Clara County

2    Superior Court against me due to fraud upon the Court.  Although this Court has falsely

3    accused me of dishonesty based upon the erroneous belief of the Court that I stipulated to a

4    Fraud  Judgment[1], the facts involved in this matter clearly show who the dishonest parties

5    truly are, in light of the facts that emerge on the face of the record in the pleadings filed with

6    respect to the sale of the Emerald that shows commission of  "Fraud upon the Court" in the

7    form of a collusive sale which proper notice of sale was never given.

8         "2.     Fraud upon the Court is defined in the Demjanjuk v. Petrovsky case:
              "The Special Master set forth the elements of fraud upon the court as
9         consisting of conduct:
         1.     On the part of an officer of the court;
10        2.     That is directed to the "judicial machinery" itself;
         3.     That is intentionally false, wilfully blind to the truth, or is in reckless
11               disregard for the truth;
         4.     That is a positive averment or is concealment when one is under a duty
12               to disclose;
         5.     That deceives the court.
13
              As shown by his description of the third element, and repeated in his
14        opinion, the master held that the intent requirement "is satisfied by proof of
         actual intent to defraud, of wilful blindness to the truth, or of a reckless
15

16    _____

17    [1]   Kenmark Ventures LLC filed a copy of the 10-5-2011 transcript that formed the basis of the
         Stipulated Judgment pursuant to California's Code of Civil Procedure Section 664.6 as Exhibit D
18        to the Adversarial Complaint filed in this Court, Case Number 14-05022-btb, Docket Entry 1 filed
         on 5-13-2014 pp.24-41 of 46.  A cursory review of that document establishes that the Judgment
19        that was procured using that transcript is void on its' face in that it is void due to: A. Failure to
         comply with California's Statute of Frauds (Civil Code Section 1624), that requires a contract
         which by its' terms requires performance beyond one year to be in writing, B. It's void for failure
20        of the Judge to voir dire defendant Thomas as explained in the In re: Assemi Case, and also void
         for failure to notify the Court of my trial lawyer's inability to represent me at trial due to being
21        ordered to appear at his State Bar disciplinary trial on October 11th 2011 when his faxed letter
         request sent on Monday October 3rd was denied by the State Bar Court Judge (evidence of which
22        was presented to the Court and for which counsel Amy Tierre, representing Mr. Tersini and
         Kenmark Ventures in a Washoe County lawsuit against since she was on speakerphone and
23        heard the entire 11-2-2018 hearing before this Court, where Thomas presented both his lawyer's
         fax of October 3rd 2011 sent to the State Bar, along with a copy of the State Bar Judge's
         response also dated October 3rd 2011 that was faxed back to Thomas's lawyer Mr. Morrissey on
24        October 4th, 2011 which resulted in his "ceasing to act" as Thomas's attorney pursuant to
         California's Code of Civil Procedure Section 286, rendering any judgment void.  The judgment is
25        also void due to fraud upon the Court by failure to notify the Court of Mr. Thomas's dyslexia
         condition, and Void due to the Extrinsic fraud perpetrated upon Mr. Thomas that deprived him of
26        his day in Court upon the false representation that he would not be liable for any judgment and
         that his co-defendant Michael Gardiner had agreed to assume all liability.  This fact was brought
27        up in a 2-14-2018 Declaration of Robert A. Machado who represented Mr. Thomas at the
         mandatory pre-trial settlement conference on 9-28-2011, at a time when his lawyer Michael
28        Morrissey could not do so due to State Bar suspension.

                                         - 4 -

1    disregard for the truth." S.M. Report at 185-86, 190 (emphasis added).

2        Demjanjuk v. Petrovsky (1993) 10 F.3d 338 at 348.

3        4.    Here it is evident from the papers filed in the name of the U.S. Trustee, yet

4    (inexplicably) signed by Attorney Hartman, and not by Jeri-Coppa Knudsen herself, that the

5    purported auction and sale of the Thomas Emerald is a complete sham in violation of the

6    statutory notice requirements imposed upon such a sale pursuant to the U.S. Bankruptcy

7    Code Section 363, and Rule 6004 of the Rules of Bankruptcy Procedure that specifically

8    requires that 21 days notice be provided pursuant to Rule 2002, a process that was not

9    complied with here.

10       5.    It seems also irregular that the party executing a declaration regarding which

11   persons were in fact served with notice of the auction do not include any of the creditors of

12   AT Emerald LLC, and only include Ken Tersini, Wayne Silver, which is evidence of bias and

13   collusive bidding.

14       6.    On Thursday December 6th 2018, I sent via e-mail to attorney Hartman, a 32

15   page letter attached as Exhibit 1 that has remained unanswered. The letter was in response to

16   an e-mail that I received from Mr. Hartman, who would not give me a continuance unless I

17   gave him a legitimate reason in writing.  My letter gave in the order of 10 legitimate reasons

18   for seeking a continuance and in light of the irregularities in the sale,  I asked Mr. Hartman to

19   stipulate to facts that would expedite the hearing of the motion and he refused.  I also used

20   that letter to serve as a Preservation Notice sent to all creditors and other parties in this case.

21   In my letter, I pointed out at Exhibit 1, on page 9 of that letter, that according to Ms. Jennifer

22   Jodoin's linked in profile, she has worked for Tersini related companies since 2000.  This

23   negates the claim made in the Trustee's moving papers that she is a bona fide purchaser for

24   value, but rather shows that she is an alter-ego of creditor Tersini's Kenmark Ventures LLC

25   who obtained his judgment against me by means of fraud upon the court and other forms of

26   deception and otherwise illegal conduct.

27       7.    I attached copies of my correspondence regarding the negotiations that I

28                                         - 5 -

1    conducted along with my colleague Chris Perna a VP of a successful Billion dollar

2    Silicon-Valley high-technology company.  On November 19th 2014, Chris Perna me a  copy

3    of the negotiated contract from Overstock.com, a billion dollar plus  in sales entity with

4    marketing worldwide that was e-mailed to the U.S. Trustee Jeri Coppa-Knudsen.  According

5    to the contract that I and Chris Perna negotiated, Overstock would assume all marketing

6    costs, contrary to the assertions made by Hartman where he alleges large up front costs that

7    the estate could not pay.  I therefore need time for Hartman to comply with my request to turn

8    over evidence that substantiates his claim in light of the manifest fraud that has been

9    committed here in failure to notify properly myself and other creditors in favor of Kenmark and

10   Tersini who have corrupted the bidding process and engaged in acts of collusion, apparently

11   under the supervision of both the U.S. Trustee and her attorney Hartman in this matter, whose

12   silence in not responding to my letter of December 6th is inexplicable and deafening.  I wish

13   to note that case authority is clear that refusal to grant a continuance under these

14   circumstances constitutes a deprivation of due process under the U.S. Constitution.

15        8.       I also went to the Santa Clara County Recorder's office and obtained certified

16   copies of Jennifer Jodoin's Notary Bond filings attached as Exhibits to the letter, showing that

17   she registered as a Notary since 9-13-2001, and that her latest Notary Bond filing in 2017 lists

18   Tersini and Kenmark's Cupertino address as her notary address.  Copies of those documents

19   are attached and contained within Exhibit 1 and are incorporated herein by reference.

20        9.       Due to Hartman's refusal to stipulate to these facts and others requested in my

21   12-6-2018 letter (attached as Exhibit to this pleading) and to admit that the notice

22   requirements have not been complied with, I am forced to subpoena those records from

23   Linked in, who indicate a 35-45 day processing time, once served with a domesticated

24   California subpoena that takes more time to obtain.

25        10.      Exhibit 4 is a true and correct copy of the Deposition including the Exhibits

26   totaling 107 pages from expert gemologist Ronald Ringsrud who is an expert who has

27   evaluated 400 Emerald specimens and is aware of multi-million dollar specimens.  Attached to

28                                                      - 6 -

1    his declaration are other expert opinions of other gemologists attesting to the multi-million
2    dollar value of the Thomas Emerald as the world's longest specimen and contains the largest
3    single crystal in the world, even larger than that in the British Museum. The evidence and
4    testimony contained in this Deposition completely refutes those made in the moving papers of
5    the Trustee and those made by the auctioneer, Mr. Hudson Stimmel in his declaration.

6        11.     I seriously question the truth and accuracy of Mr. Stimmels'' declaration based
7    upon the manifest fraud underlying the purported sale, and therefore am demanding all of the
8    call logs of all conversations and phone calls made and received between Hudson Stimmel
9    and Stimmel auctions concerning the sale of the Emerald. I am also requesting the email
10    logs, expense receipts and other documents that corroborate and substantiate the claims
11    made in his declaration, as well as evidence that substantiates his claim that he presented the
12    Emerald at the list of gem trade shows listed in his declaration.

13        12.     Exhibit 2 is a true and correct copy of the 24 page motions papers attached as
14    DE 430 et. al. prepared by Atty Hartman that clearly establishes the applicability of Rule 6004
15    and Rule 2002, and show that the provisions of Rule 2002 requiring 21 days notice were not
16    complied with, thereby depriving me of my right to oppose the sale under Rule 6004(b).
17    Attached hereto as Exhibit 6, is a true and correct copy of the 2009 decision by the U.S.
18    Bankruptcy Court for the Central District of California, located in Los Angeles, CA in the case
19    of In re: Roussos (2009) 217 B.R. 332 where the BK court vacated a judgment in an auction
20    of estate assets more than 11 years after it occurred due to fraud upon the court and
21    irregularities in the sale process as is the case here. I am also attaching as Exhibit 7, a
22    decision of the Nevada Supreme Court on the issue of Fraud upon the Court.

23        13.     Exhibit 3 is a true and correct copy of Rule 6004 that references the 21 day
24    rule contained in Rule 2002 that was not complied with, photocopied from the 2017 edition of
25    the Norton Bankruptcy Rules. This Exhibit also contains a photocopy taken from the 2017
26    Norton Bankruptcy Code Section 363 referenced in Hartman's brief regarding the law
27    governing the sale of Estate assets, provisions of which were violated in this case.

28

- 7 -

1    14.    In light of the above, I am hereby requesting an evidentiary hearing and

2    requesting that this Court subpoena Mr. Tersini and Jennifer Jodoin to establish on the record

3    that Jennifer Jodoin is in fact Mr. Tersini's employee since 2000 and private notary since

4    2001.

5    15.    I am also requesting that this Court allow for an evidentiary hearing to confront

6    and cross-examine all of the allegations made in the Trustee's moving papers as well as

7    requiring that Hartman substantiate his claims made with regard to the Overstock.com

8    contract including all of the e-mail correspondence and revised contracts referenced in his

9    7-15-2015 billing statement submitted and filed before this Court excerpts of which are

10    contained in Exhibit 1 to this pleading[2].

11    16.    Under the circumstances, I am requesting a 90 day continuance of the hearing

12    on this matter in order to be able to obtain admissible evidence that debunks the false claims

13    made in the Trustee's Moving papers. I have already informed the Court of my plan to file

14    papers before the Santa Clara County Superior Court that move to invalidate the void

15    judgment procured against me inter alia by fraud upon the court and other legal principles

16    that render the judgment void on its' face.

17    I declare under penalty of perjury of the laws of the State of California, the State of

18    Nevada and the United States that the foregoing is true and correct.

19

20    Dated:    December 14th 2018    _Tony Thomas_
                                          Anthony G. Thomas
21                                        Debtor In Propria Persona

22

23

24

25    [2]
       Hartman's billing statements reference phone conversations with Tersini's Attorney Wayne Silver
26    regarding the value of the Thomas Emerald. This establishes phone conversations between
       Silver and Hartman regarding Tersini's significant interest in acquiring the Thomas Emerald for
27    himself that he is attempting to finally achieve by means of this fraudulent and illegal collusive
       attempt based upon fraudulent concealment of facts, failure to follow the statutory rules and
28    intentional avoidance of giving proper notice of the sale according to law.

- 8 -

APPLICATION FOR AN ORDER SHORTENING TIME-MOTION FOR CONTINUANCE OF 1-8-2019 HRG

## CERTIFICATE OF SERVICE

I Mick Joseph certify that I am an adult, over the age of 18 years, not a party to the action herein who resides in Washoe County, Nevada. I caused to be served the following documents via e-mail to the following persons as listed below from my e-mail address of mickjoseph@sbcglobal.net as follows:

DOCUMENTS SERVED:

1.  APPLICATION FOR AN ORDER SHORTENING TIME RE: CONTINUANCE OF 1-8-2019 HEARING ON SALE OF EMERALD

as follows:
JEFFREY A. COGAN
jeffrey@jeffreycogan.com, beautausinga@gmail.com, beau@jeffreycogan.com
JERI COPPA-KNUDSON VIA E-MAIL & US MAIL: 3495 Lakeside PMB 62 Dr. Reno,
NV    89509
renobktrustee@gmail.com, jcoppaknudson@ecf.episystems.com
KEVIN A. DARBY
kad@darbylawpractice.com, tricia@darbylawpractice.com, jill@darbylawpractice.com,
hersh@darbylawpractice.com, sam@darbylawpractice.com
JEFFREY L. HARTMAN VIA E-MAIL & US MAIL: 510 W. Plumb Lane Suite B - Reno,
NV 89509
notices@bankruptcyreno.com, sji@bankruptcyreno.com
TIMOTHY A. LUCAS
ecflukast@hollandhart.com
LAURY MILES MACAULEY
laury@macauleylawgroup.com
WILLIAM MCGRANE
ECF-8116edf28c97@ecf.pacerpro.com, mitch.chyette@mcgranellp.com
STEPHANIE T. SHARP
ssharp@rssblaw.com, cobrien@rssblaw.com
WAYNE A. SILVER
w_silver@sbcglobal.net, ws@waynesilverlaw.com
ALAN R. SMITH
mail@asmithlaw.com
STEVEN C. SMITH
ssmith@smith-lc.com, mbrandt@smith-lc.com
AMY N. TIRRE
amy@amytirrelaw.com, admin@amytirrelaw.com
U.S. TRUSTEE - RN - 7,7
USTPRegion17.RE.ECF@usdoj.gov
JOSEPH G. WENT
jgwent@hollandhart.com, vllarsen@hollandhart.com

I declare under penalty of perjury that the foregoing is true and correct.

Dated: December 17th 2018.

Mick Joseph

- 9 -

# EXHIBIT 1

# EXHIBIT 1

**Anthony Thomas**
**7725 Peavine Peak Court**
**Reno, NV 89523**
**Tel: (408) 640-2795**
**E-mail: atemerald2@gmail.com**

**WITHOUT PREJUDICE**

Thursday December 6th 2018.

Mr. Jeffrey L. Hartman, Esq.           Tel:    (775) 324-2800
HARTMAN & HARTMAN                Fax:   (775) 324-1818
510 West Plumb Lane, Suite B
Reno, NV 89509

**VIA E-MAIL: notices@bankruptcyreno.com**

**RE:    RESPONSE TO YOUR E-MAIL OF 12-4-2018 REQUESTING LEGITIMATE
        REASONS FOR CONTINUANCE OF TUESDAY 1-8-2019 AND PRE-
        LITIGATION PRESERVATION NOTICE**

Dear Mr. Hartman:

        This letter is in response to your e-mail dated 12-4-2018 asking me to provide
you with a legitimate reason for seeking a continuance.  My response herein is two-fold,
first to respond to your request as to why I require a continuance to the hearing
currently set for 1-8-2019, but also incorporating within this letter is a preservation
notice directed not only to yourself, but to the Trustee, the auctioneer, Jennifer Jodoin,
her employer Ken Tersini and the Tersini corporate entities that she works for, and any
and all of the creditors of the estate who may or may not have colluded and conspired
with you in your illegal attempt to sell the emerald in conscious violation of the law, all of
whom are being c.c.'d with a copy of this letter and preservation notice contained
herein.

        First, as an accommodation to my work schedule, I have previously requested
that any hearings in this matters be set to a Friday afternoon due to the hardship that
would be imposed on me if I am forced to appear before the Court at any other time.
Yet, despite being aware of this, you chose to set the above hearing for a Tuesday that
you know will put a hardship on me and will force me to take time off from work.

        Second, you continue to take advantage, belittle and deny my dyslexia disability,
even though you know that Judge Beesley finally stated on the record that he believes
that my claim of disability due to dyslexia is true and valid.  My disability causes me to
take more time to read and understand than others without this disability, I require more

-1-

**Exhibit 1**

time to prepare an opposition to your Motion.

Third, you knowingly violated the 21 day rule referenced in Rule 6004 of the Rules of Bankruptcy Procedure, and only notified creditor Tersini of Kenmark Ventures LLC and his lawyer Wayne Silver in collusion with them and to the detriment of other creditors that I am cc'ing in this letter.

Fourth, by violating the 21 day rule, you also violated Rule 6004(b), depriving me of my right to file an Opposition to the sale of the Emerald, that is not owned by me, but 100% of the stock of AT Emerald, LLC is, and my 100% stock is exempt from levy and exempt from liquidation by the Bankruptcy Court. As such, any and all creditors listed are creditors of my estate and not that of AT Emerald, LLC.

Fifth, your buyer is not a disinterested third party that can claim any benefit as a bona fide purchaser for value as a disinterested party, since her linked.com profile (see http://www.linkedin.com/in/jennifer-jodoin-266b71 (attached as Exhibit 1, p.9) clearly shows that she has been working for Tersini since the year 2000, and she has been acting as a Notary for him since 9-13-2001. Attached as Exhibit 2 p.10 is a notary seal signed by the buyer of the Emerald dated November 16th 2012 notarizing the signature of Ken Tersini. If you dispute the authenticity of this Exhibit, I will need time to get a certified copy of this to enter it into evidence in this case. Attached as Exhibit 3, p. 11 is a copy of the buyer's original notary bond filed on 9-13-2001, and attached as Exhibit 4 p. 12 is Jennifer Jodoin's most recent Notary bond filed with the Santa Clara County Recorder's office, that shows her address as a notary as that of Kenmark Ventures LLC on 21710 Stevens Creek Blvd Suite 200 in Cupertino, CA. The buyer Jennifer Jodoin's Linkedin.com profile (Exhibit 1, p.9) states that she worked as Project Manager for Tersini Construction, Inc. From 2000-2009 (10 years), then she worked at KT Properties as Project Manager from January 2010-Present in Cupertino, as well as working at KT Urban as Director of Development Services from February 2015-Present in Cupertino. I am asking you to stipulate to the Linkedin profile as genuine of the buyer Jennifer Jodoin, and your admission that under these facts, she is not a disinterested party who is entitled to any good faith presumptions as a bona fide purchaser for value, but rather acting as an alter-ego of a creditor who you have illegally attempted to sell the emerald to the detriment of myself and all other creditors.

Sixth, in light of your dishonesty and collusion in the auction favoring just one creditor to the detriment of every one else, and despite the fact that you proceeded with the auction, knowing about the fraudulent judgment as evidenced by the letter sent by my now disbarred lawyer on October 3rd 2011 that the Court and Judge Beesley with you and the Trustee who were present were made aware of, and the letter faxed from the State Bar faxed to my lawyer on October 4th ordering him to appear at trial on October 11th, 2011 thus resulting in him "ceasing to act as an attorney" as defined under CCP 286, the resulting settlement agreement on the record made in concealment of these facts was a fraudulent concealment constituting a fraud on the court rendering

-2-

**Exhibit 1**

the judgment procured as a result of the 10-5-2011 purported oral settlement agreement to be void, you are knowingly attempting to take actions under a void judgment, that is a violation of your ethical duties as an attorney and officer of the court and it constitues an act of moral turpitude and dishonesty.

Seventh, you stated that your reason for not using overstock.com is that they were asking for too much up front money and the estate had no funds to pay it. I am attaching as Exhibit 19, pp.20-23 a copy of the contract with overstock.com that I negotiated and provided to you as an attachment to an e-mail dated 11-19-2014 (Exhibit 19, p. 19) to finalize with them that does not contain any provision for any up-front fees, and to the contrary, it provides that overstock shall pay for all of the marketing costs that a company with $1 Billion in sales can provide. I want you to stipulate to this fact below, and to provide me with all copies of correspondence between yourself and overstock that you reference in your billing statements submitted to the Court in your filing of 7-1-2015 copies of which are attached hereto as Exhibit 12, pp.24-32.

Overstock.com, as a multi-billion dollar capitalized company who could market the emerald worldwide would have been the appropriate means to market any sale of the Emerald as opposed to an unknown local auctioneer with no global market access, whose normal auction prices rarely exceed $10,000 and who has no expertise in selling a one of a kind rare emerald.

I am also attaching to this letter copies of the e-mails between myself and the Trustee showing my negotiations with the CEO of Overstock and facts showing the tentative contract was approved by the Overstock.com board of directors, in e-mails attached as Exhibits 5 - 10, pp. 13-18 dated 10-16-2014, 10-17-2014, 10-21-2014, 11-3-2014, where I disclose that the Overstock.com officials were seeking $200 Million for the emerald.

Eighth, You have a duty to force the Trustee to remove her false allegations against me and my wife where she accuses us of either living in the Portola property or renting out the property and concealing the income from the trustee. If you cannot compel her to do so, you have a duty to resign. You have done neither.

Ninth, you have a duty to prevent fraud on the Court. You did not object to the case law that I cited in my request for Judicial Notice establishing California law that does not require a deed to be recorded for the conveyance to be valid, something that the Judge refused to rule on in violation of his ministerial duty as a Judge and has now stated on the record the false statement that under California law, failure to record renders the conveyance void. You have a duty to correct this mistatement of the law, and if you do believe this false claim to be valid you have a duty to cite the legal authority for the proposition and remind the judge that you believe that my citation of the law in my motion for Judicial notice is correct and that his view of the law is false.

-3-

**Exhibit 1**

Tenth, due to your illegal conduct as noted above, I am requesting that the auctioneer provide all of the receipts, email log, phone call log and correspondence that corroborates his declaration that I believe to be entirely fraudulent and perjured.

In order to facilitate this matter, I am requesting you to stipulate to the following facts that you can either stipulate to or not by checking the appropriate box and e-mailing back to me:

1.    This Auction is subject to Rule 6004 that references the 21 day rule mandating notice to all parties and creditors.

Stipulated to by Atty Hartman:            ___Yes        ___No

2.    Rule 6004 and the 21 day rule that is referenced in Rule 6004 was not complied with.

Stipulated to by Atty Hartman:            ___Yes        ___No

3.    The only creditor that received notice of the sale was Mr. Tersini, Kenmark Ventures and their lawyer Wayne Silver

Stipulated to by Atty Hartman:            ___Yes        ___No

4.    Failure to follow the notice procedures referenced in Rule 6004(a) that mandates service of the Notice of Sale deprived Mr. Thomas of his right under Rule 6004(b) to oppose the sale.

Stipulated to by Atty Hartman:            ___Yes        ___No

5.    Jennifer Jodoin acting as Mr. Tersini's private Notary, and employed since 2000 by Tersini owned companies is not an outside bona-fide purchaser, but a direct agent and/or alter-ego of Tersini and Kenmark Ventures LLC

Stipulated to by Atty Hartman:            ___Yes        ___No

The remainder of this letter constitutes the preservation notice to all parties that may or may not have colluded with you including all creditors, yourself, the Trustee, The Auctioneer and all of your and their agents, employees, affiliates and parties.

As to those of you whom are receiving this letter, you hereby put on notice to "Preserve" all information in soft or hard form, electronic or paper, emails, texts, communications with any all documentation in reference to this matter. I am writing you all this letter referring to the actions to illegally sell the emerald in violation of the bankruptcy rules and in an effort to engage of acts constituting fraud upon the court by

-4-

**Exhibit 1**

means of collusion, including acts that constitute racketeering activity as defined in the U.S. code, and more fully described below.

I know the identity of some, if not all, of the individuals involved who are and have had communication with the individuals involved with these acts of Fraud upon the Court, racketeering and collusion. Some may have been part of these acts from the outset; some may have joined it at a later time; some may have joined and later withdrew; and some may never have joined. But it appears that each and every one of them that knowingly participated in the illegal acts did in fact do so with persons who consciously breached their oaths, and fiduciary duties.

Although I have determined that certain of these individuals may be legally culpable, I realize that others may not be, or may be to a lesser degree, or may be culpable as individuals but not as representatives of the corporate or individual entities they purported to represent, and we know that the overwhelming majority of parties hereby noticed had absolutely nothing whatsoever to do with any of this and, indirectly, are victims themselves. Nevertheless, even the most innocent may have been solicited.

At this point, we merely wish to put everyone on notice that certain federal investigations, and litigation is in the offing and to request all of you to preserve any evidence you may possess, especially electronic evidence. I *consider electronic data to be an important, and perhaps irreplaceable, source of discovery and/or evidence in connection with this matter.* An electronic document printed on paper does not preserve the totality of information which is in the electronic file, and therefore does not suffice to fully preserve evidence.

The laws and rules prohibiting destruction of evidence apply to electronic data with the same force as they apply to other kinds of evidence. The duty to preserve evidence has long been recognized as an essential part of our legal system in that, like perjury, the destruction of evidence strikes at the core of our system of justice. A violation of the duty to preserve may itself be a crime, an independent tort, and/or may result in discovery sanctions. In the case of a prospective party, such sanctions can include an order that the jury may or should draw adverse inferences against any party who has destroyed evidence in anticipation of litigation or the entry of an adverse judgment against said party. These principles should have special application here, where the conduct that likely will be alleged in the prospective litigation could be charged under federal criminal statutes such as:

- attempting or conspiring to possession through a pattern of racketeering activity (see 18 USC §1962(b) and (d));

-5-

**Exhibit 1**

- attempting or conspiring to misappropriate, or misappropriating, assets (see 18 U.S.C. §1832); and

- attempting or conspiring to transport, receive or sell assets having a value exceeding $5,000, or transporting, receiving or selling them (see 18 U.S.C. §§2314 and 2315).

See also 18 U.S.C §1349.

After further investigation, and once litigation arising from these facts is filed whether it be in the U.S. District Court or within the U.S. Bankruptcy Court as an adversarial action, or in some other venue, I will be serving discovery requests on certain individuals seeking electronic data in its native format. The vast majority of you will *not* receive a discovery request and we will only know that you have relevant information if you come forward and tell us. In the meanwhile, I request that the following safeguards against the loss of potentially valuable evidence be maintained until the final resolution of these issues.

**A. With respect to all recipients of this letter:**

1. The following types of electronic data should be preserved:

a.    Copies of all electronic mail and information about electronic mail (including message contents, header information, and logs of electronic mail system usage) sent or received by (I) Ken Tersini, Jennifer Jodoin, any other employees of any Tersini related Company, the Trustee and any and all employees, all employees and principals of the Hartman & Hartman law firm, the auctioneer, any other creditors with whom they have communicated with any creditors or other parties

b.    Copies of all other electronic mail and information about electronic mail (including message contents, header information, and logs of electronic mail system usage) containing information about any of the foregoing individuals, and/or information.

c.    All databases (including all records and fields and structural information in such databases), containing any reference to and/or information about the parties or matters referred to in subparagraphs a and b;

d.    All logs of activity on computer systems, which may have been used to process or store electronic data containing information about Thomas Bankruptcy, Stremmel auctions, and the sale of the emerald.

e.    All word-processing files containing information about the matter described in subparagraphs a, b, c or d above;

f.    With regard to electronic data created by application programs which process

-6-



**Exhibit 1**

financial or accounting information, all electronic data files containing information about Tony Thomas and the Thomas Emerald.

g.      All files containing information from electronic calendars and scheduling programs regarding Thomas, and/or and or anyone affiliated . All electronic data files created or used by electronic spreadsheet programs, where such data files contain information about Thomas and the Thomas Emerald.

**B.**      **With respect to the Individuals identified in Paragraph 1a, I Tony Thomas as an individual and as a private attorney general, requests that the following additional steps be taken:**

1.      Tony Thomas requests that you not dispose of any electronic data storage devices and/or media which may be replaced due to failure and/or upgrade and/or other reasons that may contain electronic data meeting the criteria listed in paragraph 1 above.

2.      With regard to electronic data meeting the criteria listed in paragraph 1 above, which existed on fixed drives attached to stand alone desktop computers or laptops and/or network workstations at the time of this letter's delivery: Tony Thomas requests that you not alter or erase such electronic data, and do not perform other procedures (such as data compression and disk de-fragmentation or optimization routines) which may impact such data, unless a bit-stream copy has been made of such hard drive. Such copies shall be preserved for the duration of this litigation.

3.      Tony Thomas requests that you preserve copies of all application programs and utilities which may be used to process electronic data covered by this letter.

4.      You should maintain an activity log to document modifications made to any electronic data processing system that may affect the system's capability to process any electronic data meeting the criteria listed in paragraph 1 above, regardless of whether such modifications were made by employees, contractors, vendors and/or any other third-parties.

5.      With respect to personal computers used by the individuals identified in Paragraph 1a or their assistants:

a.      As to fixed drives attached to such computers, a bit-stream copy should be made of all electronic data on such fixed drives relating to the above-described subjects and individuals. This bit-stream copy will include all active files and the unallocated space of the hard drive. Such copies

-7-

**Exhibit 1**

should be preserved until this matter reaches its final resolution.

b.    All floppy disks, CDS, DVDs, USB drives, magnetic tapes and cartridges, and other media used in connection with such computers prior to the date of delivery of this letter containing any electronic data relating to the above-described subjects and individuals, should be collected, copied and put into storage for the duration of the prospective legal action.

c.    All data on any handheld devices (*e.g.*, Palm Pilot, Blackberry, iPhone) shall be preserved by creating a bit-stream copy of the device, which copy shall be preserved for the duration of this legal action.

With regard to any subsequent electronic communications from or to the individuals identified in Paragraph 1a or relating to the subjects identified in Paragraph 1b, we ask that all of you take similar steps to preserve them. Remember, while these conspirators were devious, they were not very smart. They left an electronic "paper trail." We are following that trail and want to collect all the available evidence before the guilty parties try to delete and conceal the evidence of their wrongdoing.

We look forward to your cooperation. Please do not hesitate to contact me if you have any questions. If you have any questions or concerns, please do not hesitate to contact me via my e-mail at atemerald2@gmail.com.

Yours truly,

AT EMERALD LLC

Anthony G. Thomas, individually
and on behalf of AT Emerald, LLC

c.c.    all creditors
Jennifer Jodoin
Ken Tersini
Wayne Silver

**Exhibit 1**

# Jennifer Jodoin

Director of Land Acquisition at KT Urban

## Experience

**KT Urban**
Director Of Development Services
February 2015 - Present

**KT Properties**
Project Manager
January 2010 - Present

**Tersini Construction Inc.**
Project Manager
2000 - 2009 (10 years)

**9**

Page 1 of 1

Exhibit 1

**Exhibit 1**

STATE OF CALIFORNIA                              )
                                                 ) ss.
COUNTY OF  SANTA CLARA                           )

     On this 16 day of November , 2012, before me, Jennifer Jodoin , a Notary Public, personally appeared Kenneth S Terini , who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument, and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

     I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing is true and correct.

     WITNESS my hand and official seal.



JENNIFER JODOIN
Commission # 1858885
Notary Public - California
Santa Clara County
My Comm. Expires Aug 24, 2013

Notary Public, State of California

11/07/12
C:\Users\Terri\AppData\Local\Microsoft\Windows\Temporary Internet Files\Content.Outlook\ULR1FEPQ\Second Correcting Amendment 11 7

**Exhibit 2**

# Exhibit 1

Jennifer Jodoin
295 Penn Way,
Los Gatos, CA 95032

DOCUMENT: 15868425

| | | |
|---|---|---|
| | Titles 1 / Pages | 1 |
| Fees | | 7.00 |
| Taxes | | |
| Copies | | |
| AMT PAID | | 7.00 |

BRENDA DAVIS                    RDE # 006
SANTA CLARA COUNTY RECORDER     9/14/2001
Recorded at the request of     8:12 AM
Notary (County Clerk)

# FILED

SPACE ABOVE THIS LINE FOR COUNTY CLERK'S STAMP          SPACE ABOVE THIS LINE FOR RECORDER'S USE ONLY

SEP 13 2001

BRENDA DAVIS, County Clerk-Recorder
Santa Clara County
By _____ Deputy

**SBCA**

## SURETY BONDING COMPANY OF AMERICA

### CALIFORNIA NOTARY PUBLIC BOND

KNOW ALL MEN BY THESE PRESENTS.

BOND No. 21275771N

That we, Jennifer Jodoin _____, as Principal, and SURETY BONDING COMPANY OF AMERICA, a corporation duly licensed to do surety business in the State of California, as Surety, are held and firmly bound unto the State of California, in the sum of Fifteen Thousand ($15,000.00) Dollars, lawful money of the United States of America, to be paid to the State of California, or its assigns, for which payment, well and truly to be made, we bind ourselves and our legal representatives, jointly and severally, firmly by these presents.

Signed and dated this ___31st___ day of ___August___ , 2001.

THE CONDITION OF THE ABOVE OBLIGATION IS SUCH, That whereas, the above bounden Principal was on the ___25th___ day of ___August___ , 2001, duly appointed a Notary Public in the State of California for the term of four years from the date of his commission.

NOW THEREFORE, if the said Principal shall well, truly and faithfully perform all official duties required of him by law, and all such additional duties as may hereafter be imposed on him as such officer by any law of the State of California, then the above obligation to be void, otherwise to remain in full force and virtue.

(Executed under penalty of perjury
as provided in C.C.P. 995.630)

_Jennifer Jodoin_                    Principal

SURETY BONDING COMPANY OF AMERICA

By _Carolyn Bangerd_
     Carolyn Bangerd          Attorney-in-Fact

STATE OF CALIFORNIA
County of Los Angeles

### ACKNOWLEDGMENT

On ___08/31/2001___ before me, Pamela Everett _____, Notary Public, personally appeared Carolyn Bangerd _____ personally known to me (or proved to me on the basis of satisfactory evidence) to be the person whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her authorized capacity, and that by his/her signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

WITNESS my hand and official seal.

Signature _Pamela Everett_
              Pamela Everett

PAMELA EVERETT
Commission # 1294404
Notary Public - California
Los Angeles County
My Comm. Expires Feb 19, 2005

Form B-1074-10-97

97358

73817                                                    32

This is to certify that this is a
true copy of the document
on file in this office.
ATTEST:
_Regina Alemnendres_
CLERK-RECORDER
Santa Clara, CA
- 21  12/04/2018

**Exhibit 3**

# Exhibit 1

 Gmail

**Anthony Thomas <atemerald2@gmail.com>**

## AT EMERALD LLC 14-50331

**JERI COPPA-KNUDSON** <renobktrustee@gmail.com>
To: Anthony Thomas <atemerald2@gmail.com>

Thu, Oct 16, 2014 at 11:34 AM

Mr. Thomas,

As you may recall, I need to file a status report for the Judge by the hearing date of October 29, 2014.

To date, I have not heard from any potential buyers regarding the sale of the emerald. Have you had any contact with them? We may have to consider the possibility that the pending sale may not go through. In that event, a new method of sale must be considered.

Any suggestions would be appreciated.

Sincerely,


Jeri

**JERI COPPA-KNUDSON, TRUSTEE
3495 LAKESIDE DRIVE, PMB #62
RENO, NV. 89509
(775) 329-1528
(775) 329-5320**

**Exhibit 5**

# Exhibit 1

 Gmail

Anthony Thomas <atemerald2@gmail.com>

## AT EMERALD LLC 14-50331

**Anthony Thomas** <atemerald2@gmail.com>                          Fri, Oct 17, 2014 at 12:49 PM
To: JERI COPPA-KNUDSON <renobktrustee@gmail.com>

Dear Jeri,
I should have that information for you mid next week. I also have two other opportunities one is a very large
company that approached me about 6 months ago that will market the Emerald worldwide at no cost to me other
than their commission.They do over 1 billion dollars a year in sales and our known worldwide but their Sale cycle
is much longer. They issued me a contract that was approved by the Board and CEO but I did not sign it
because I didn't want the publicity and I thought the Sale cycle was too long but if this buyer doesn't come
through it's another option. They've already done their due diligence on the Emerald and we're happy with the
appraisals.
Jeri we talked last week about you signing all the lawsuits back to me so that I can continue to represent myself
can we get that process started. I have several more court hearings that I need to appear for. I had to appear for
the LA case on Tuesday the 14th of this last we. I need written approval to continue to do so.
Have a nice weekend
Regards
Tony

[Quoted text hidden]

**Exhibit 6**

# Exhibit 1

 Gmail

**Anthony Thomas <atemerald2@gmail.com>**

## AT EMERALD LLC 14-50331

**JERI COPPA-KNUDSON** <renobktrustee@gmail.com>                    Tue, Oct 21, 2014 at 9:56 AM
To: Anthony Thomas <atemerald2@gmail.com>

Mr. Thomas,

With regard to a potential buyer, any contract agreement must be reviewed, approved and signed by me with subsequent approval by the bankruptcy court by way of Motion and Notice to all creditors with a hearing.

With regard to your inquiry about the various lawsuits, I cannot simply just sign them back to you.  This must be done by way of Motion and Notice to all creditors with a hearing.

Sincerely,

Jeri Coppa-Knudson


[Quoted text hidden]

–
**LAUREL DEVINCENZI, legal assistant to
JERI COPPA-KNUDSON, TRUSTEE
3495 LAKESIDE DRIVE, PMB #62
RENO, NV. 89509
(775) 329-1528
(775) 329-5320**

**Exhibit 7**

# Exhibit 1



**Anthony Thomas <atemerald2@gmail.com>**

## Update
1 message

**Anthony Thomas** <atemerald2@gmail.com>                              Tue, Oct 28, 2014 at 12:53 PM
To: "renobktrustee@gmail.com" <renobktrustee@gmail.com>

Dear Jeri, I've tried to get you an update from the buyer, but the chief financial officer in charge of the sale has
come down with a case of the shingles and has not been in the office for 2 weeks. I have not heard back from
your office on whether you want to move forward with over stock.com proposal to sale the emerald. The person in
charge of their proposal said that he thinks he can get 200 million with their clientele and that their company has
sold items like this in the past. That's what his pitch was to me when I last spoke to him a few months ago. Let
me know if you want their contact information.
Regards
Tony

**Exhibit 8**

# Exhibit 1

 Gmail

**Anthony Thomas <atemerald2@gmail.com>**

## over stock.com

**Anthony Thomas <atemerald2@gmail.com>**                    Mon, Nov 3, 2014 at 1:02 PM
To: "renobktrustee@gmail.com" <renobktrustee@gmail.com>

Dear Jeri, I have a copy of the overstock.com: contract that we negotiated a few months ago and in the contract they agreed to no exclusivity and other key points would you like me to send it to you so you can compare to what they sent you. I would also like to know when you expect to get the appraisal from the appraiser, John Beach attorney said it would be ready on Friday.
Regards
Tony

**Exhibit 9**
# Exhibit 1

 Gmail

Anthony Thomas <atemerald2@gmail.com>

**over stock.com**

JERI COPPA-KNUDSON <renobktrustee@gmail.com>
To: Anthony Thomas <atemerald2@gmail.com>

Tue, Nov 4, 2014 at 9:55 AM

Mr. Thomas,

Yes, please send Jeri a copy of the contract you have.

Thank you.
[Quoted text hidden]
–
**LAUREL DEVINCENZI, legal assistant to**
**JERI COPPA-KNUDSON, TRUSTEE**
**3495 LAKESIDE DRIVE, PMB #62**
**RENO, NV. 89509**
**(775) 329-1528**
**(775) 329-5320**

**Exhibit 10**

**Exhibit 1**

 Gmail                                    **Anthony Thomas <atemerald2@gmail.com>**

## Overstock.com tentative agreement

**Chris Perna** <c_perna@cjpassociates.com>                    Wed, Nov 19, 2014 at 7:25 AM
Reply-To: c_perna@cjpassociates.com
To: renobktrustee@gmail.com
Cc: Anthony Thomas <atemerald2@gmail.com>

Hi Jeri,

Attached is the tentative agreement with Overstock.com regarding the Thomas Emerald.  There were still a few
details left to be worked out from this version.

Thank you,


Chris Perna
CJP Associates, Inc.
Cell 408-316-9674
c_perna@cjpassociates.com


📎 **Exclusive Listing Agreement v3 OSTK-EWC 20140410.docx**
27K

**19**

**Exhibit 11**
# Exhibit 1

## EXCLUSIVE LISTING AGREEMENT

This Exclusive Listing Agreement ("Agreement") is entered into this _____ day of _____, 2014 ("Effective Date") between Overstock.com, Inc. ("Company"), a Delaware corporation with a principal address of 6350 South 3000 East, Salt Lake City, UT 84121 and [LEGAL NAME OF COUNTERPARTY OWNING OR HAVING THE RIGHT TO SELL THE PROPERTY], a [STATE] [corporation/limited liability company/individual] with a principal address of [ADDRESS] ("Seller").

### RECITALS

WHEREAS, Seller owns or has the legal right to sell the property described herein;

WHEREAS, Company operates an internet retail website and advertises and sells various products to consumers;

WHEREAS, Seller is desirous of utilizing Company to advertise, sell and or broker the property identified herein;

NOW THEREFORE, in consideration of the mutual covenants set forth herein, and other good and valuable consideration, the receipt and sufficiency which is hereby acknowledged, the parties agree as follows:

**1. Exclusive Listing.** For the period of one (1) year ("Listing Period"), Seller hereby grants Company the exclusive right to sell, lease, exchange, advertise, solicit or otherwise broker the property described as [DESCRIBE PROPERTY] ("Property") at a price designated by Seller. Seller represents that it will accept a minimum of $[ESTIMATED AMOUNT THAT SELLER WILL ACCEPT] ("Minimum Selling Price") for the Property.

**2. Fee.** If, during the one-hundred twenty (120) day period from the Effective Date, Company, Seller or any third party locates a party who is ready, willing and able to buy, lease or exchange (collectively, "Acquire") the Property, Company shall be entitled to five percent (5%) of the gross proceeds. If, between day one hundred twenty one (121) through day one hundred eighty (180) from the Effective Date, Company, Seller or any third party locates a party who is ready, willing and able to Acquire the Property, Company shall be entitled to three percent (3%) of the gross proceeds. If, between day one hundred eighty one (181) through day three hundred sixty five (365) from the Effective Date, Company, Seller or any third party locates a party who is ready, willing and able to Acquire the Property, Company shall be entitled to one percent (1%) of the gross proceeds. The Fee shall be due and payable from the Seller's proceeds on: (a) if a purchase, the date Seller receives the proceeds; (b) if a lease, the effective date of the lease; (c) if an exchange, the date the exchange is made.

**3. Protection Period.** If, within six (6) months after the expiration of this Agreement, the Property is Acquired by any party who expressed interest in the Property during the Listing Period, Seller agrees to pay the Fee to Company as set forth in Section 2.

**Exhibit 11**

# Exhibit 1

**4. Advertising & Marketing.** Company will use commercially reasonable efforts to market the sale of the Property. Marketing activities may include: homepage (http://www.overstock.com) placement of an ad featuring/depicting the Property, inclusion in Company's marketing emails, inclusion in Company's social media campaigns, inclusion in Company's television commercials, securing industry expert testimonials, merchandising complimentary jewelry pieces along with the Property, public relations outreaches, print advertisements, international marketing outreach efforts, personalized wealth management engagements, arrangement for Property tours. The parties may agree on additional or different marketing efforts. Company may furthermore syndicate images of the Property to third party websites and engage in various marketing concepts as mutually agreed between the parties. Company reserves the right to have an appraiser evaluate the Minimum Selling Price prior to engaging in any marketing efforts. If the appraiser places a value of the Property at more than TWENTY FIVE PERCENT (25%) below the Minimum Selling Price, Company may terminate this Agreement without obligation or cost.

**5. Seller Warranties.** Seller warrants to Company that it owns or has legal, marketable and an established right to sell, lease or exchange the Property. Seller agrees to execute the necessary documents of conveyance. Seller agrees to furnish a buyer with good and marketable title. Seller agrees to fully inform Company regarding Seller's knowledge of the condition of the Property.

**6. Professional Advice.** The Company is a marketing and internet retailing company. Company will not give legal or tax advice regarding the sale of the Property. Seller shall not rely on the Company for a determination regarding the physical or legal condition of the Property. If Seller desires advice regarding (a) legal or tax matters; (b) the physical condition of the Property; (c) this Agreement; or (d) any transaction regarding the Acquisition of the Property, Seller should obtain independent advice.

**7. Publication Rights.** Seller grants Company a nonexclusive, royalty free, worldwide license to use, reproduce, display, distribute and publish the intellectual property associated with the Property with any advertisement, display, promotion or sale of the Property. Seller furthermore grants Company a nonexclusive, royalty free, worldwide, license to use, reproduce, display, distribute, publish, adapt, modify and re-format any and all images, photographs, text, copy, content, descriptions, submissions, video, audio, advertisements, and any other material submitted by Seller to Company ("Materials").

**8. Miscellaneous.**

    **a.    Confidentiality.** During the Term of this Agreement, the parties may exchange Confidential Information, which includes information regarding a party not generally known to the public. Each will treat such Confidential Information as confidential and proprietary both during the Term and for a period of 3 years after the Term. Each party agrees it will: (a) not use the Confidential Information for any purpose other than in performing its obligations under this Agreement; (b) take reasonable precautions to maintain the confidentiality of the Confidential Information; and (c) not disclose or otherwise furnish the Confidential Information to any third party other than such party's employees who need to know the Confidential Information to perform such party's obligations under this Agreement, provided such employees are contractually obligated to such party to maintain the confidentiality of the other party's Confidential Information. Each party agrees to be responsible for the violation of this clause by its employees and agents. Upon the termination or expiration of this

**Exhibit 11**

# Exhibit 1

Agreement, each party shall return or destroy all of the other party's Confidential Information in such party's possession.

     **b.**     **Indemnification.** Seller agrees to indemnify, defend and hold harmless Company against any and all claims, allegations, lawsuits, costs, liabilities and expenses arising out of or related to: (a) Seller breaching any provision of this Agreement; (b) the Property, including but not limited to Seller providing inaccurate, incomplete or misleading information regarding the Property; (c) the Materials, including but not limited to claims alleging copyright, trademark or other intellectual property right; and (d) violation of applicable law, rule, regulation or order concerning Seller, its conduct and/or the Property.

     **c.**     **Limitation of Liability.** Neither party shall be liable to the other party for consequential, special, punitive, indirect or incidental damages. Notwithstanding anything to the contrary, Company shall not be liable to Seller in excess of the Fee that Company is entitled to under this Agreement.

     **d.**     **Law.** This Agreement shall be governed by Utah law, without application of conflicts of law principles. Any and all disputes between the parties shall be resolved exclusively by arbitration before a single arbitrator in Salt Lake City, Utah. The prevailing party shall be entitled to recover its costs, including the costs of arbitration, and reasonable attorney fees from the non-prevailing party.

     **e.**     **Assignment.** Neither party may assign, transfer or otherwise delegate this Agreement or any of its rights or obligations without the prior written consent of the other party.

     **f.**     **Waiver.** The non-enforcement of any right by either party shall not preclude any future enforcement.

     **g.**     **Modifications.** All modifications to this Agreement must be in writing, signed by both parties.

     **h.**     **Severability.** The holding of any provision of this Agreement to be void, invalid or unenforceable shall not affect the validity of the other provisions of this Agreement.

     **i.**     **Survival.** The provisions of this Agreement related to payment of fees, protection period, seller warranties, professional advice and Section 8.

     **j.**     **Entire Agreement.** This Agreement constitutes the complete statement of the terms between the parties with respect to this Agreement's subject matter.

**Exhibit 11**

# Exhibit 1

IN WITNESS WHEREOF, the parties agree to be bound as set forth herein.

OVERSTOCK.COM, INC.                    [NAME]


_____          _____
Name (Signature)                      Name (Signature)


_____          _____
Name (Print)                          Name (Print)


_____          _____
Title                                 Title (if Entity)


_____          _____
Date                                  Date

**Exhibit 11**

# Exhibit 1

1  Jeffrey L. Hartman, Esq., #1607
   **HARTMAN & HARTMAN**                        **E-Filed 7/1/15**
2  510 West Plumb Lane, Suite B
   Reno, Nevada 89509
3  Telephone: (775) 324-2800
   Telecopier: (775) 324-1818
4  notices@bankruptcyreno.com

5  Attorney for Jeri Coppa-Knudson, Trustee

6

7                    **UNITED STATES BANKRUPTCY COURT**

8                          **DISTRICT OF NEVADA**

9  IN RE:                              CASE NO.    BK-N-14-50333-BTB

10 ANTHONY THOMAS and                  CASE NO.    BK-N-14-50331-BTB
   WENDI THOMAS,
11                                      CHAPTER    7
   AT EMERALD, LLC,                     (Jointly Administered)
12
                  Debtors.             **FIRST INTERIM APPLICATION OF**
13                                      **HARTMAN & HARTMAN FOR ORDER**
                                        **ALLOWING COMPENSATION FOR**
14                                      **PROFESSIONAL SERVICES**
                                        **RENDERED AND REIMBURSEMENT**
15                                      **OF EXPENSES INCURRED**

16                                      **Hearing Date:  July 29, 2015**
                                        **Hearing Time: 10:00 a.m.**
17  ─────────────────────────────

18        Hartman & Hartman ("Hartman"), counsel for Trustee Jeri Coppa-Knudson

19  ("Trustee"), hereby makes its First Interim Application ("Application") for an order

20  allowing compensation for professional services rendered, **$24,182.50**, and reimbursement

21  of costs incurred, **$406.42**, for a total of **$24,588.92**.  In support of the Application, Hartman

22  respectfully represents as follows:

23  **Introduction and Background**

24        1.       On March 4, 2014, both Anthony and Wendi Thomas and AT Emerald, LLC

25  ("Debtors"), filed Chapter 11 bankruptcy petitions, under Case Nos. 14-50333-BTB and 14-

26  50331-BTB respectively.

27        2.       Orders granting joint administration of the cases were entered on May 12,

28  2014.  **DEs 63, 32.**

                                        **Exhibit 12**

                                        # Exhibit 1

1    3.    Both cases were converted to Chapter 7 on August 29, 2014.  **DEs 190 and**

2  **57.**

3    4.    Coppa-Knudson was assigned as Chapter 7 trustee in the bankruptcy

4  proceedings and continues to serve in that capacity.

5    5.    Trustee filed her applications to employ Hartman & Hartman as counsel,

6  which motions were granted on October 31, 2014.  **DEs 219, 86.**

7    6.    The professional services rendered by Hartman for which it was necessary to

8  retain said services include, but are not limited to:

9        a.    Advising the Trustee with respect to her rights, powers, duties and

10  obligations under 11 U.S.C. § 704;

11        b.    Advising and representing the Trustee in connection with all

12  applications, motions or adversary proceedings, adequate protection, sequestration, motions

13  for relief from stay, and all other and similar matters which might arise in the administration

14  of this case;

15        c.    Preparation and filing on behalf of the Trustee all reports, pleadings,

16  applications and similar documents, and to assist and represent Applicant in conducting all

17  examinations and investigations necessary and incidental to the administration of the case;

18        d.    Reviewing the claims of creditors and to assist and advise Applicant

19  in connection herewith;

20        e.    Performing any and all other legal services for the Trustee which may

21  be included and necessary to the administration of the case.

22  **Summary of Services Provided**

23    All professional services for which allowance of compensation is requested were

24  performed by Hartman on behalf of the Trustee.

25    By this application, Hartman seeks compensation for professional services rendered

26  and expenses incurred in the case of Anthony Thomas and Wendi Thomas from **September**

27  **23, 2014 to May 31, 2015** in the total amount of **$24,588.92**, of which **$24,182.50**

28  represents professional services provided and **$406.42** represents costs incurred.  Billing

**Exhibit 12**

# Exhibit 1

1  statements outlining the details of Hartman's costs incurred, **Exhibit A**, and fees for services

2  provided, **Exhibits B, C and D** are attached hereto.

3  **Description of Services**

4       To further assist the Court and others in reviewing professional services rendered,

5  Hartman has prepared a summary of the services performed by task:

6       **000 - Out of Pocket Expenses** – Expenses totaling **$406.42** were incurred during

7  this period.  Itemized expenses are shown on **Exhibit A**.

8       **002 - Asset Disposition** – 24.0 hours were expended in this category for a total of

9  **$10,200.00.  Exhibit B**.  As the Court is aware, the relationship between the Thomas case

10  and the AT Emerald case is less than clear.  The AT Emerald case lists as its sole asset an

11  emerald alleged by Thomas to have a value of $200,000,000.  In turn, Thomas claims

12  ownership in the AT Emerald entity.

13       After the Trustee retained Hartman to represent her interests in these two cases, upon

14  Hartman's recommendation, Trustee Coppa-Knudson traveled to Florida to inspect the

15  emerald which is located in a vault ("Florida Emerald").  Having confirmed the existence

16  and the relative size of the Florida Emerald, Hartman has worked with the Trustee in an

17  effort to identify the best possible way of marketing such a unique asset.  Several telephone

18  meetings have been held with Overstock.com and several versions of contracts have been

19  reviewed and discussed with that entity.  In the meantime, Trustee Coppa-Knudson learned

20  of the likely existence of a second emerald currently in the custody of the Santa Clara sheriff

21  ("Santa Clara Emerald").  Attorney Hartman assisted the Trustee in her investigation of the

22  facts and circumstances surrounding the Santa Clara Emerald and has recently filed a

23  motion for turnover from the Santa Clara sheriff in his capacity as the custodian of that

24  emerald.  At this time, the Trustee has no idea of the value of the Santa Clara Emerald.

25       **004 - Case Administration** – **4.4** hours were expended in this category for a total of

26  **$1,870.00.**

27       **010 - Litigation** – **28.5** hours were expended in this category for a total of

28  **$12,112.50.  Exhibit D**.  Much of the time devoted to this category relates to Thomas's

Exhibit 12

# Exhibit 1

1  lawsuit against a law firm who had represented him in litigation over what is believed to be

2  the Florida Emerald. The work involved in this matter is itemized in the time records for

3  litigation. Hartman worked with counsel for the law firm in reaching a proposed resolution

4  of the issues and a motion to approve the settlement agreement was filed with the Court.

5  Mr. Thomas objected to the proposed settlement agreement and the Court conducted an

6  evidentiary hearing on the matter at which Mr. Thomas was placed under oath and testified

7  about his abilities to perform under his proposed purchase offer elicited as a result of the

8  Mickey Thompson case. Mr. Thomas's actions in this matter added significantly to the cost

9  of reaching a final resolution which netted $6,000 for the estate.

10  **Prior Awards of Compensation**

11          There have been no prior awards of compensation to Hartman & Hartman.

12                                   **CONCLUSION**

13          Based upon the foregoing. Hartman & Hartman requests the Court enter an order as

14  follows: approving fees for professional services in the amount of **$24,182.50** and for

15  reimbursement of **$406.42** in costs for a total of **$24,588.92**.

16          DATED: July 1, 2015.

17                                   **HARTMAN & HARTMAN**

18

19                                   /S/ Jeffrey L. Hartman
                                     Jeffrey L. Hartman. Esq.
20                                   Attorney for Jeri Coppa-Knudson. Trustee

21  **Approved**

22

23  /S/ Jeri Coppa-Knudson
    Jeri Coppa-Knudson, Trustee

24

25

26

27

28

Hartman & Hartman
510 West Plumb Lane, Ste. B
Reno, Nevada 89509
(775) 324-2800

**Exhibit 12**
**Exhibit 1**

## HARTMAN & HARTMAN
### *A PROFESSIONAL CORPORATION*

### 510 WEST PLUMB LANE, SUITE B
### RENO, NEVADA 89509
*TELEPHONE  (775) 324-2800*
*TELECOPIER  (775) 324-1818*

COPPA-KNUDSON / THOMAS, ANTHONY and WENDI
First Interim Fee Application
September 23, 2014 to May 31, 2015

| Inv # | Matter # | Hours | Rate | Fees | Expenses | Sub-Total |
|-------|----------|-------|------|------|----------|-----------|
| 6870 | 11049000 | 0.00 | 0.00 | 0.00 | 406.42 | 406.42 |
| 6871 | 11049002 | 24.00 | 425.00 | 10,200.00 | 0.00 | 10,606.42 |
| 6872 | 11049004 | 4.40 | 425.00 | 1,870.00 | 0.00 | 12,476.42 |
| 6873 | 11049010 | 28.50 | 425.00 | 12,112.50 | 0.00 | 24,588.92 |
|  |  | 56.90 |  | 24,182.50 | 0.00 | 24,588.92 |

|  |  |  |  |  | Total | 24,588.92 |

**Exhibit 12**

**28**

**Exhibit 1**

# Exhibit B

**Exhibit 12**

29

# Exhibit 1

## HARTMAN & HARTMAN
### a Professional Corporation

*510 West Plumb Lane, Suite B*
*Reno, Nevada 89509*
*Telephone: (775) 324-2800*

*Telecopier: (775) 324-1818*

June 24, 2015

STATEMENT OF ACCOUNT THROUGH        May 31, 2015

Invoice #:    6871

Jen Coppa-Knudson, Trustee
PMB 62
3495 Lakeside Drive
Reno, Nevada 89509

File #:11049002      Thomas, Anthony and Wendi - ASSET DISPOSITION

LEGAL SERVICES THROUGH        May 31, 2015

| Date | Initials | Description | Hours | Amount |
|---|---|---|---|---|
| 11 /21/14 | JLH | Telephone call from Wayne Silver, attorney for Kenmark, re: the appraisal of the emerald, marketing and the 341 meeting. Follow up with Jeri Coppa-Knudson re: same. | 0.60 | $255.00 |
| 12 /09/14 | JLH | E-mail with Overstock.com representatives re: arranging a conference call to discuss the marketing of the Florida emerald. | 0.20 | $85.00 |
| 12 /16/14 | JLH | Conference call with the Overstock.com people re: marketing the emerald. | 0.70 | $297.50 |
| 01 /05/15 | JLH | Review the marketing services agreement forwarded by Overstock.com and prepare comments for trustee. E-mail to Jeri Coppa-Knudson re: same. | 0.50 | $212.50 |
| 01 /08/15 | JLH | E-mail from Stan Huntenton requesting feed back on the proposed agreement with Overstock.com for marketing the Florida emerald. Review the draft | 1.00 | $425.00 |

**30**
-40-

**Exhibit 12**

# Exhibit 1

marketing services agreement (10 pages) and provide
e-mail comments to Trustee Coppa-Knudson.

| | | | | |
|---|---|---|---|---|
| 01 /09/15 | JLH | Work on the history of the emerald in Santa Clara. | 2.50 | $1,062.50 |
| 01 /12/15 | JLH | Meeting with Alan Smith re: the Thomas case and the various stories about the emerald. Discussed the most recent identification of another emerald in Santa Clara, what is disclosed where, the fire in the home and the insurance claims, etc. Received and reviewed lengthy e-mail and documentation from Dawna Ciluffo re: the Santa Clara emerald, original complaint against Conetto and the complaint against the insurance company for the fire claim and the emeralds supposedly lost in the fire cleanup. | 2.50 | $1,062.50 |
| 01 /28/15 | JLH | Begin work on the Conetto matter utilizing documentation from attorney Dawna Ciluffo in Santa Clara. E-mail from Dawna Ciluffo with contact information for the Santa Clara sheriff's office. | 1.40 | $595.00 |
| 02 /02/15 | JLH | Telephone conference with Detective Quinonez in Santa Clara Sheriff Office re: the 6.4 pound emerald held there subject to some court order for release,. Follow up letter. Telephone conference with Jeri Coppa-Knudson re: same. | 0.70 | $297.50 |
| 02 /03/15 | JLH | E mail from Dawna Ciluffo re: the appraisal of the emerald in custody at the Santa Clara sheriff's office. Begin drafting narrative of the case on how the 6.4 pound emerald came to be in the possession of the Santa Clara sheriff. | 2.80 | $1,190.00 |
| 02 /04/15 | JLH | Continue working on sorting out the history of the emerald located in Santa Clara, trying to distinguish between that and the supposed 'loose' diamonds that were to have been lost in the fire in the Danville house. | 2.20 | $935.00 |
| 02 /16/15 | JLH | Work on the issues related to the additional emerald located in Santa Clara. | 1.70 | $722.50 |
| 04 /09/15 | JLH | Meeting with Jeri Coppa-Knudson to discuss the marketing issues. Reviewed the latest version of the | 1.50 | $637.50 |

**Exhibit 12**

# Exhibit 1

proposal from Overstock.com and addressed those
provisions which continue to remain problematic,
such as the expense allocation, lack of actual
marketing plan details, etc., some type of reserve, etc.

| Date | Init. | Description | Hours | Amount |
|---|---|---|---|---|
| 04/13/15 | JLH | Work on changes to the proposed marketing agreement with Overstock.com per trustee's request. | 1.20 | $510.00 |
| 04/16/15 | JLH | Work on the Santa Clara emerald. | 0.70 | $297.50 |
| 04/17/15 | JLH | Continue working on the turnover motion for the Santa Clara emerald. | 1.00 | $425.00 |
| 04/29/15 | JLH | E-mail from Dawna Ciluffo re: any appearance by estate of Kitchen. Work on the Santa Clara emerald motion for turnover. | 1.20 | $510.00 |
| 05/01/15 | JLH | E-mail from Dawna Ciluffo re: the Santa Clara emerald and declaration filed by Tony Thomas in the prior litigation in Santa Clara County 12-cv-216322. Download and review the declaration for the motion for turnover and make changes to the draft motion. | 0.60 | $255.00 |
| 05/15/15 | JLH | Finalize and forward the draft motion for turnover on the Santa Clara emerald for trustee's review and comment. | 1.00 | $425.00 |

|  |  | TOTAL HOURS | 24.00 |  |
|---|---|---|---|---|
|  |  | TOTAL FEES |  | $10,200.00 |

**TOTAL AMOUNT DUE THIS STATEMENT**          **$10,200.00**

| SUMMARY OF FEES | HOURS | RATE | AMOUNT |
|---|---|---|---|
| Jeffrey L. Hartman | 24.00 | $425.00 | $10,200.00 |

**Exhibit 12**

**Exhibit 1**

# EXHIBIT 2

# EXHIBIT 2

1 | Jeffrey L. Hartman, Esq., #1607
**HARTMAN & HARTMAN**
2 | 510 West Plumb Lane, Suite B
Reno, Nevada 89509
3 | Telephone: (775) 324-2800
Fax: (775) 324-1818
4 | notices@bankruptcyreno.com

5 | Attorney for Jeri Coppa-Knudson, Trustee

6 | **UNITED STATES BANKRUPTCY COURT**

7 | **DISTRICT OF NEVADA**

8 |

9 | IN RE:                          CASE NO.    BK-N-14-50333-BTB

10 | ANTHONY THOMAS and              CASE NO.    BK-N-14-50331-BTB
WENDI THOMAS,
11 |                                 (Jointly Administered)
AT EMERALD, LLC,                CHAPTER    7
12 |
Debtors.            **MOTION FOR ORDER CONFIRMING**
13 |                     **SALE BY AUCTION; REQUEST FOR**
                        **APPROVAL OF PAYMENT OF**
14 |                     **COMMISSION TO STREMMEL**
                        **AUCTIONS**
15 |
                        **Hearing Date:    January 8, 2019**
16 | _____/  **Hearing Time:    2:00 p.m.**

17 |        Jeri Coppa-Knudson ("Trustee"), requests the Court enter an Order Confirming Sale

18 | Of Estate Asset by auction for $21,500 to purchaser Jennifer Jodoin.   The Trustee also

19 | requests approval of a commission to Stremmel Auctions, Inc. in the amount of $3,225 and

20 | reimbursement of costs of $1,231.  This Trustee's Sale Motion is made in accordance with

21 | § 363(b)(1) and F.R.Bankr.P. 6004 and 9014 and is supported by the separately filed

22 | Declaration of Hudson Stremmel.  The Trustee also requests the Court take judicial notice of

23 | the papers and pleadings on file in these jointly administered cases.

24 |                              **FACTS**

25 |        1.       These jointly administered cases were filed as chapter 11 cases on March 4,

26 | 2014.

27 |        2.       Schedule B of the Schedules of Assets and Liabilities ("Schedules"), filed by

28 | AT Emerald listed "one emerald" valued at $200,000,000, stated to be based upon an

Hartman & Hartman
510 West Plumb Lane, Ste. B
Reno, Nevada 89509
(775) 324-2800

- 44 -

**Exhibit 2**

1    appraisal. **DE 1, page 9 of 32**.

2        3.    On April 30, 2014, the United States Trustee ("UST"), filed a Motion

3    Convert To Chapter 7. **DE 27**.

4        4.    On June 23, 2014, the Debtors filed a Motion to Sell Assets Free And Clear

5    Of Liens And Motion To File Purchase And Sale Agreement Under Seal ("Debtors' Sale

6    Motion"). **DE 40**. In that Motion, the Debtors described the asset to be sold as "[A] certain

7    21,000 carat emerald matrix (the "Emerald"). The Emerald is currently located at Sarasota

8    Vault, 640 South Washington Blvd., Ste. 125, Sarasota, Florida, 34236."

9        5.    The Debtors' Sale Motion and related papers were withdrawn from the

10    docket by the Debtors and no hearing was ever conducted.

11        6.    The jointly administered cases were converted to chapter 7 by Order entered

12    August 29, 2014. **DE 57**. Trustee Coppa-Knudson was appointed to administer the cases.

13        7.    On October 2, 2014, the Court approved an administrative expense in the

14    amount of $1,500 advanced by the Beach Living Trust, to enable the Trustee to travel to

15    Florida to inspect the Emerald. **DE 76**. The Trustee traveled to Florida and subsequently

16    brought the Emerald to Reno, Nevada.

17        8.    The Trustee has performed substantial due diligence in her efforts to locate a

18    possible purchaser for the Emerald. Because of the uniqueness of the Emerald, the Trustee

19    considered unconventional methods for marketing the Emerald; for example, a conference

20    was held with Overstock.com because of its wide-ranging market presence. However, an

21    arrangement could not be reached because Overstock.com requested a very substantial

22    marketing expense guarantee, regardless of any success. As the estate is administratively

23    insolvent, no such guarantee was feasible. The Trustee also contacted numerous gemstone

24    exhibitors and similar outlets for possible interest.

25        9.    Ultimately, on October 16, 2017, the Trustee filed her Application To

26    Employ Stremmel Auctions, Inc. ("Stremmel"). **DE 347**. On October 17, the Court entered

27    its Order approving Stremmel's employment. **DE 348**.

28        10.    Stremmel conducted an auction process via the online platform HiBid.

**Exhibit 2**

1   Bidding was accessible beginning on October 30, 2018 until November 15, 2018.  Bidding

2   concluded at 10:00 am PST and the soft close method was utilized. During that time there

3   were 1,408 views, 18 watches, 5 registered bidders and several absentee bids were fielded.

4        11.    On November 15, 2018, bidding for the online auction closed with the

5   highest bid at $21,500.

6        12.    By this Trustee's Sale Motion, she is requesting an order confirming the

7   auction price of $21,500 offered by purchaser Jennifer Jodoin.

8                          **LEGAL DISCUSSION**

9        Sales of estate assets, other than in the ordinary course of business, are governed by

10  § 363(b) and F.R.Bankr.P. 6004.  Notice of hearing on a sale is required.

11       Such use, sale or lease must be based upon a debtor's sound business judgment. The
         business judgment rule "is a presumption that in making a business decision the
12       directors of a corporation acted on an informed basis, in good faith and in the honest
         belief that the action was in the best interests of the company." In re Integrated
13       Resources, Inc., 147 B.R. 650, 656 (Bankr. S.D.N.Y. 1992) (quoting Smith v. Van
         Gorkom, 488 A.2d 858, 872 (Del. 1985)). In connection with decisions related to the
14       use of leases to maximize value of the estate, courts show deference to a debtor's
         sound business decisions. In re Ernst Home Ctr., Inc., 209 B.R. 974, 980 (Bankr.
15       W.D. Wash. 1997).

16  In re Station Casinos, Inc., 2010 Bankr. LEXIS 5447, *7.  The business judgment test

17  applies equally to chapter 7 trustees.

18       Here, the estate owns a unique, one-of-a-kind asset with no readily identifiable

19  market.  In light of the fact that the jointly administered estates are administratively

20  insolvent and, with the limitation of trying to locate likely purchasers, the Trustee and

21  Stremmel have utilized the tools generally available to them to locate a purchaser.

22       The Trustee believes and represents that Jennifer Jodoin is a good faith purchaser for

23  value and further believes Jennifer Jodoin is entitled to the safe harbor protection of

24  § 363(m).

25       The Trustee also requests authority to pay Stremmel Auctions a commission in the

26  amount of $3,225 together with $1,231 as reimbursement for out-of-pocket expenditures.

27                          **CONCLUSION**

28       Based upon the forgoing, the Trustee requests an order confirming the auction sale

Hartman & Hartman
510 West Plumb Lane, Ste. B
Reno, Nevada 89509
(775) 324-2800

- 46 -

3

# Exhibit 2

1 | price of $21,500 to purchaser Jennifer Jodoin. The Trustee also requests authority to pay
2 | Stremmel Auctions, Inc. S3,225 as a commission for the sale, together with $1,231 as
3 | reimbursement for out-of-pocket expenditures.

4 |      DATED: November 29, 2018.

5 |                    **HARTMAN & HARTMAN**

7 |                    /S/ Jeffrey L. Hartman

                   Jeffrey L. Hartman, Esq., for

                   Trustee Jeri Coppa-Knudson

Hartman & Hartman
510 West Plumb Lane, Ste. B
Reno, Nevada 89509
(775) 324-2800

- 47 -

4

**Exhibit 2**

Jeffrey L. Hartman, Esq., #1607
**HARTMAN & HARTMAN**
510 West Plumb Lane, Suite B
Reno, Nevada 89509
Telephone: (775) 324-2800
Telecopier: (775) 324-1818
notices@bankruptcyreno.com

Attorney for Jeri Coppa-Knudson, Trustee

## UNITED STATES BANKRUPTCY COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| IN RE: | CASE NO.   BK-N-14-50333-BTB |
| ANTHONY THOMAS and WENDI THOMAS, | CASE NO.   BK-N-14-50331-BTB |
| AT EMERALD, LLC, | (Jointly Administered) |
| Debtors. | CHAPTER   7 |
| | **DECLARATION OF HUDSON STREMMEL IN SUPPORT OF MOTION FOR ORDER CONFIRMING SALE BY AUCTION; REQUEST FOR APPROVAL OF PAYMENT OF COMMISSION TO STREMMEL AUCTIONS** |
| _____/ | **Hearing Date:   January 8, 2019** **Hearing Time:   2:00 p.m.** |

Hudson Stremmel, under penalty of perjury of the laws of the United States, declares:

1.      I am a representative of Stremmel Auctions, Inc.   I have personal knowledge of the matters stated herein and would testify to the same if called to do so.

2.      Beginning in the second half of 2017, Stremmel Auctions began working with Jeri Coppa-Knudson regarding efforts to market a large specimen Brazilian emerald owned by the bankruptcy estate.

3.      For roughly 14 months we (Stremmel Auctions), have been marketing, advertising, showcasing, reaching out to collectors and experts throughout the country and around the globe with the goal of locating potential purchasers for the emerald specimen.

///

**Exhibit 2**

4.     During that time we have traveled to Tucson, Arizona to take part in the Tucson Gem Show (the largest, oldest and most prestigious gem and mineral show in the world), met with prospective buyers from all over the country, and fielded numerous phone calls and email inquiries from individuals requesting information about the emerald.

5.     Many of the experts we contacted thought the size of the emerald was impressive, but the quality of the gem was regarded as far below satisfactory. As one expert, Brian Greenstone of Greenstone Fine Mineralia stated, "Not a particularly good mineral specimen being that the terminations are destroyed and it's broken in several places. It needs a lot of lab work to make it presentable, and it's hard to tell if the emerald itself is even gemmy enough to be used as cutting rough (most Brazilian emerald is opaque and not usable as gem material)."

6.     What also came into question were the appraisals. Several people laughed at the claims and many said they were completely ridiculous, but unfortunately are rampant in the gem world.  They tend to fool people, i.e. banks, the public and even auction houses.

7.     Carl A. Schutze, managing director/designer at Emeralds International said, "are usually accompanied by ridiculous multi-million dollar retail replacement appraisals (a whole other issue)" and that it could maybe still fetch "pennies per carat."

8.     These types of reactions seemed to be the norm among both experts and collectors, many of whom thought we would be lucky to sell the specimen for more than $1,000.  Jacques van den Berg of MinFind stated, "In my humble opinion, this specimen as presented will not fetch $250."

9.     For the past 14 months, these are the efforts set forth:

* The Emerald was professionally photographed by Asa Gilmore, owner of AG Photo.

* A professional Look Book Catalog was created to email and distribute to our clients and prospective buyers.

* Flyers were professionally made to distribute and mail out.

* Traveled to Tucson several times to be involved with the Tucson Gem Show.

Hartman & Hartman
510 West Plumb Lane, Ste. B
Reno, Nevada 89509
(775) 324-2800

- 49 -

2

**Exhibit 2**

10. Below is a list of the shows attended, where flyers were handed out, and at which the emerald was displayed:

* -J.O.G.S. Gem and Jewelry Show
* -Tucson Gem & Jewelry Show
* -JG&M Expo Tucson Michigan St.
* -Arizona Mineral & Fossil Show/HTCC Inn Suites
* -Pueblo Gem and Mineral Show
* -Howard Johnson Gem and Mineral Show
* -La Quinta Gem and Mineral Show
* -Rapa River Gem and Mineral Show
* -Gem and Jewelry Exchange
* -American Gem Trade Association
* -Tucson Gem and Mineral Show
* -22nd Street Mineral, Fossil & Gem Show
* -AGTA GemFair Tucson
* -Arizona Mineral and Fossil Show / Ramada Limited
* -Executive Inn Mineral, Fossil, Gems & Bead Show
* -The Fine Minerals International Show
* -G&LW Tucson Gem Show - Gem Mall
* -G&LW Tucson Gem Show - Holidome
* -GBM Tucson Show
* -Gem and Jewelry Show on Grant
* -GIGM Shows / Clarion Gem, Mineral and Metaphysical Show
* -GIGM Shows / Globe-X Gem Show
* -Grand Avenue Mineral Show
* -The Rock Show

///
///

**Exhibit 2**

1    11.    Stremmel Auctions contacted virtually everyone, to our knowledge,

2    associated with emeralds via social media.  We contacted all major news organizations and

3    museums, and the University of Nevada Geology Department Gemology department,

4    12.    Experts, museums and institutes in the industry from all over the world were

5    directly contacted. A few of the experts reached are as follows:

6         *    Forrest Snowden - CEO & Co-Founder, Aria Gems Inc.

7         *    Lee Wasson of Lee Wasson & Company, Bogotá Colombia - South

8              America

9         *    Ron Pingenot, specimen investor, Denver Colorado.

10        *    Ron Ringsrind, appraiser

11        *    Bill Stevenson Kennedy Wilson Auction

12        *    Claudia Florian - Natural History Department at Bonhams Auction

13             house

14        *    Nan Summerfield - Doyle Auction house

15        *    Private Asian Investors

16        *    Frederick H Leeds-rare metals investor

17        *    Emerald Expositions-San Juan Capistrano

18        *    International Gem Society

19        *    Blue Nile Gem Consultants - 1.7 million customers

20        *    Lenny Yudkowitz - Owner of Stone House Plus

21        *    Monica Kitt - The Arkenstone

22        *    Brian Greenstone - Owner of Greenstone Fine Mineralia

23        *    Carl A. Schutze - Managing Director/Designer at Emeralds

24             International

25        *    Brian Kosnar - Mineral Classics

26        *    Jacques van den Berg - MinFind

27        *    Dr. John McCormick - University of Nevada, Reno

28        *    University of Nevada, Reno - Geology Department

Hartman & Hartman
510 West Plumb Lane, Ste. B
Reno, Nevada 89509
(775) 324-2800

- 51 -

4

**Exhibit 2**

1        *      University of Nevada, Reno - Keck Museum

2        *      Field Museum Chicago

3        *      The Smithsonian

4        *      Wayne Silver

5        *      Ken Tersini

6    13.    Social media was extremely prevalent for marketing as well and had a

7  tremendous response. Some of the groups that were contacted and reached out are:

8        *      Gemstones Online

9        *      Gemstone Collectors

10       *      Buy/Sale/Swap Gem Mineral Stones

11       *      Rocks, Gemstones, Mineral and Crystals

12       *      Crystal Shop (Gems, Minerals, Wire Wrap, Jewelry, Specimens and

13              Crystal Rough)

14       *      Precious Stones and Gems

15       *      Crystals, Gems, and Healing Stones

16       *      Natural Colombian Emeralds Group

17       *      Gemstones (sell/buy)

18       *      Facebook Marketplace

19    14.    Stremmel Auctions' mailing list was utilized as well as all resources tied to

20  the company, including all major news sources in Nevada and throughout the country.

21    15.    The auction was conducted via the online platform HiBid. Bidding was

22  accessible beginning on October 30, 2018 until November 15, 2018. Bidding concluded at

23  10:00 am PST and the soft close method was utilized. During that time we had 1,408 views,

24  18 watches, 5 registered bidders and fielded several absentee bids.

25    16.    The successful bid was $21,500 to a collector in Silicon Valley. We believe

26  this is not only fair market value, but is on the upper end of the spectrum for a gem of this

27  caliber.

28  ///

**Exhibit 2**

17.    Stremmel Auctions incurred the following expenses in the marketing and auction process:

*    Professional Photography by Asa Gilmore - $200

*    Professional Look Book - $63

*    Flyers and postage - $293

*    Traveling to and from Tucson - $675

DATED:  November 29, 2018.


/S/ Hudson Stremmel
Hudson Stremmel

Hartman & Hartman
510 West Plumb Lane, Ste. B
Reno, Nevada 89509
(775) 324-2800

- 53 -

6

**Exhibit 2**

1 | Jeffrey L. Hartman, Esq., #1607
**HARTMAN & HARTMAN**
2 | 510 West Plumb Lane, Suite B
Reno, Nevada 89509
3 | Telephone: (775) 324-2800
Fax: (775) 324-1818
4 | notices@bankruptcyreno.com

5 | Attorney for Jeri Coppa-Knudson, Trustee

6 | **UNITED STATES BANKRUPTCY COURT**

7 | **DISTRICT OF NEVADA**

8 |

9 | IN RE:                                CASE NO.    BK-N-14-50333-BTB

10 | ANTHONY THOMAS and                   CASE NO.    BK-N-14-50331-BTB
WENDI THOMAS,
11 |                                      (Jointly Administered)
AT EMERALD, LLC,                     CHAPTER    7
12 |
Debtors.                 **NOTICE OF HEARING ON MOTION FOR**
13 |                                      **ORDER CONFIRMING SALE BY**
                                     **AUCTION; REQUEST FOR APPROVAL**
14 |                                      **OF PAYMENT OF COMMISSION TO**
                                     **STREMMEL AUCTIONS**
15 |
                                     Hearing Date:    **January 8, 2019**
16 | _____/        Hearing Time:    **2:00 p.m.**

17 |       **NOTICE IS HEREBY GIVEN** that a paper entitled Motion For Order Confirming

18 | Sale By Auction; Request For Approval Of Payment Of Commission To Stremmel Auctions

19 | ("Motion") has been filed by Jeri Coppa-Knudson, chapter 7 trustee ("Trustee"). In the

20 | Motion, the Trustee requests the Court enter an order confirming the sale of an emerald to

21 | Jennifer Jodoin for $21,500. The Trustee also requests approval of a commission to

22 | Stremmel Auctions, Inc. in the amount of $3,225 and reimbursement of costs incurred by

23 | Stremmel Auctions in the amount of $1,231.

24 |       **NOTICE IS FURTHER GIVEN** that a hearing on the Motion has been scheduled

25 | before a United States Bankruptcy Judge, in the Clifton Young Federal Building, 300 Booth

26 | Street, Reno, Nevada on **January 8, 2019 at 2:00 p.m.**

27 |       **NOTICE IS FURTHER GIVEN** that any opposition must be filed pursuant to the

28 | time limits set forth in Local Rule 9014 for oppositions to a motion. Local Rule 9014(d)

Hartman & Hartman
510 West Plumb Lane, Ste. B
Reno, Nevada 89509
(775) 324-2800

**Exhibit 2**

1  provides as follows:

2      [A]ny opposition to a motion must be filed with the Clerk of the court, and
    service of the opposition must be completed on the movant, no later than
3      fourteen (14) days preceding the hearing date for the motion. The opposition
    must set forth all relevant facts and any relevant legal authority. An
4      opposition must be supported by affidavits or declarations that conform to the
    provisions of subsection (c) of this rule.

5

6  If you do object to the relief requested, you must file a **WRITTEN** response with the court.

7  You *must* also serve your written response on the person who sent you this notice. <u>A paper</u>

8  <u>copy of any response should also be delivered to the Clerk's office identified as "Copy For</u>

9  <u>Chambers" or some similar designation.</u> If you do not file a written response with the court,

10  or if you do not serve your written response on the person who sent you this notice, then:

11      •     The court may *refuse to allow you to speak* at the scheduled hearing; and

12      •     The court may *rule against you* without formally calling the matter at the

13      hearing.

14      **NOTICE IS FINALLY GIVEN** that a copy of the Motion can be obtained upon

15  request from Hartman & Hartman, 510 West Plumb Lane, Suite B, Reno, Nevada 89509, or

16  by calling Hartman & Hartman at 1-775-324-2800.

17      DATED: November 29, 2018.

18                  **HARTMAN & HARTMAN**

19

20                  /S/ Jeffrey L. Hartman
                Jeffrey L. Hartman, Esq., for
                Trustee Jeri Coppa-Knudson

21

22

23

24

25

26

27

28

Hartman & Hartman
510 West Plumb Lane, Ste. B
Reno, Nevada 89509
(775) 324-2800

- 55 -

2

**Exhibit 2**

1  Jeffrey L. Hartman, Esq., #1607
   **HARTMAN & HARTMAN**
2  510 West Plumb Lane, Suite B
   Reno, Nevada 89509
3  Telephone: (775) 324-2800
   Fax: (775) 324-1818
4  notices@bankruptcyreno.com

5  Attorney for Jeri Coppa-Knudson, Trustee

6              **UNITED STATES BANKRUPTCY COURT**

7                    **DISTRICT OF NEVADA**

8

9  IN RE:                          CASE NO.    BK-N-14-50333-BTB

10 ANTHONY THOMAS and              CASE NO.    BK-N-14-50331-BTB
   WENDI THOMAS,
11                                 (Jointly Administered)
   AT EMERALD, LLC,                CHAPTER    7
12
              Debtors.             **MOTION FOR ORDER CONFIRMING**
13                                 **SALE BY AUCTION; REQUEST FOR**
                                   **APPROVAL OF PAYMENT OF**
14                                 **COMMISSION TO STREMMEL**
                                   **AUCTIONS**
15
                                   **Hearing Date:   January 8, 2019**
16 _____/   **Hearing Time:   2:00 p.m.**

17         Jeri Coppa-Knudson ("Trustee"), requests the Court enter an Order Confirming Sale

18 Of Estate Asset by auction for $21,500 to purchaser Jennifer Jodoin.   The Trustee also

19 requests approval of a commission to Stremmel Auctions, Inc. in the amount of $3,225 and

20 reimbursement of costs of $1,231.  This Trustee's Sale Motion is made in accordance with

21 § 363(b)(1) and F.R.Bankr.P. 6004 and 9014 and is supported by the separately filed

22 Declaration of Hudson Stremmel.  The Trustee also requests the Court take judicial notice of

23 the papers and pleadings on file in these jointly administered cases.

24                            **FACTS**

25         1.      These jointly administered cases were filed as chapter 11 cases on March 4,

26 2014.

27         2.      Schedule B of the Schedules of Assets and Liabilities ("Schedules"), filed by

28 AT Emerald listed "one emerald" valued at $200,000,000, stated to be based upon an

Hartman & Hartman
510 West Plumb Lane, Ste. B
Reno, Nevada 89509
(775) 324-2800

                              - 56 -

                                              **Exhibit 2**

1  appraisal. **DE 1, page 9 of 32**.

2      3.      On April 30, 2014, the United States Trustee ("UST"), filed a Motion

3  Convert To Chapter 7. **DE 27**.

4      4.      On June 23, 2014, the Debtors filed a Motion to Sell Assets Free And Clear

5  Of Liens And Motion To File Purchase And Sale Agreement Under Seal ("Debtors' Sale

6  Motion"). **DE 40**.  In that Motion, the Debtors described the asset to be sold as "[A] certain

7  21,000 carat emerald matrix (the "Emerald"). The Emerald is currently located at Sarasota

8  Vault, 640 South Washington Blvd., Ste. 125, Sarasota, Florida, 34236."

9      5.      The Debtors' Sale Motion and related papers were withdrawn from the

10  docket by the Debtors and no hearing was ever conducted.

11      6.      The jointly administered cases were converted to chapter 7 by Order entered

12  August 29, 2014. **DE 57**.  Trustee Coppa-Knudson was appointed to administer the cases.

13      7.      On October 2, 2014, the Court approved an administrative expense in the

14  amount of $1,500 advanced by the Beach Living Trust, to enable the Trustee to travel to

15  Florida to inspect the Emerald. **DE 76**. The Trustee traveled to Florida and subsequently

16  brought the Emerald to Reno, Nevada.

17      8.      The Trustee has performed substantial due diligence in her efforts to locate a

18  possible purchaser for the Emerald.  Because of the uniqueness of the Emerald, the Trustee

19  considered unconventional methods for marketing the Emerald; for example, a conference

20  was held with Overstock.com because of its wide-ranging market presence.  However, an

21  arrangement could not be reached because Overstock.com requested a very substantial

22  marketing expense guarantee, regardless of any success.  As the estate is administratively

23  insolvent, no such guarantee was feasible.  The Trustee also contacted numerous gemstone

24  exhibitors and similar outlets for possible interest.

25      9.      Ultimately, on October 16, 2017, the Trustee filed her Application To

26  Employ Stremmel Auctions, Inc. ("Stremmel"). **DE 347**.  On October 17, the Court entered

27  its Order approving Stremmel's employment.  **DE 348**.

28      10.      Stremmel conducted an auction process via the online platform HiBid.

**Exhibit 2**

1   Bidding was accessible beginning on October 30, 2018 until November 15, 2018.  Bidding

2   concluded at 10:00 am PST and the soft close method was utilized. During that time there

3   were 1,408 views, 18 watches, 5 registered bidders and several absentee bids were fielded.

4       11.    On November 15, 2018, bidding for the online auction closed with the

5   highest bid at $21,500.

6       12.    By this Trustee's Sale Motion, she is requesting an order confirming the

7   auction price of $21,500 offered by purchaser Jennifer Jodoin.

8   **LEGAL DISCUSSION**

9       Sales of estate assets, other than in the ordinary course of business, are governed by

10   § 363(b) and F.R.Bankr.P. 6004.  Notice of hearing on a sale is required.

11       Such use, sale or lease must be based upon a debtor's sound business judgment. The
business judgment rule "is a presumption that in making a business decision the

12   directors of a corporation acted on an informed basis, in good faith and in the honest
belief that the action was in the best interests of the company." In re Integrated

13   Resources. Inc., 147 B.R. 650, 656 (Bankr. S.D.N.Y. 1992) (quoting Smith v. Van
Gorkom, 488 A.2d 858, 872 (Del. 1985)). In connection with decisions related to the

14   use of leases to maximize value of the estate, courts show deference to a debtor's
sound business decisions. In re Ernst Home Ctr., Inc., 209 B.R. 974, 980 (Bankr.

15   W.D. Wash. 1997).

16   In re Station Casinos, Inc., 2010 Bankr. LEXIS 5447, *7.  The business judgment test

17   applies equally to chapter 7 trustees.

18       Here, the estate owns a unique, one-of-a-kind asset with no readily identifiable

19   market.  In light of the fact that the jointly administered estates are administratively

20   insolvent and, with the limitation of trying to locate likely purchasers, the Trustee and

21   Stremmel have utilized the tools generally available to them to locate a purchaser.

22       The Trustee believes and represents that Jennifer Jodoin is a good faith purchaser for

23   value and further believes Jennifer Jodoin is entitled to the safe harbor protection of

24   § 363(m).

25       The Trustee also requests authority to pay Stremmel Auctions a commission in the

26   amount of $3,225 together with $1,231 as reimbursement for out-of-pocket expenditures.

27   **CONCLUSION**

28       Based upon the forgoing, the Trustee requests an order confirming the auction sale

Hartman & Hartman
510 West Plumb Lane, Ste. B
Reno, Nevada 89509
(775) 324-2800

- 58 -

3

**Exhibit 2**

1    price of $21,500 to purchaser Jennifer Jodoin.  The Trustee also requests authority to pay

2    Stremmel Auctions, Inc. S3,225 as a commission for the sale, together with $1,231 as

3    reimbursement for out-of-pocket expenditures.

4            DATED: November 29, 2018.

5                                    **HARTMAN & HARTMAN**

6

7                                    /S/ Jeffrey L. Hartman
                                     Jeffrey L. Hartman, Esq., for
8                                    Trustee Jeri Coppa-Knudson

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Hartman & Hartman
510 West Plumb Lane, Ste. B
Reno, Nevada 89509
(775) 324-2800

**Exhibit 2**

# EXHIBIT 3

# EXHIBIT 3

# NORTON BANKRUPTCY CODE

## 2016–2017 Edition

### William L. Norton III
### Author and Editor-in-Chief

### Issued in October 2016

## with
## Related Legislation
## Legislative History
## Editorial Commentary
## Case Annotations



**THOMSON REUTERS**

*For Customer Assistance Call 1-800-328-4880*

Mat #41742989

BANKRUPTCY CODE                                    **11 U.S.C. § 363**

automatic stay.)

*In re Skinner*, 917 F.2d 444, 21 Bankr. Ct. Dec. (CRR) 49, 23 Collier Bankr. Cas. 2d (MB) 1559, Bankr. L. Rep. (CCH) ¶ 73664 (10th Cir. 1990) (even if facts do not support imposition of sanctions under § 362(h) [now (k)], § 105(a) may permit sanctions for violations of automatic stay.)

*Eleventh Circuit—In re Parker*, 634 Fed. Appx. 770 (11th Cir. 2015) (The Bankruptcy Court did not clearly err in finding that (1) the creditor willfully violated the automatic stay, (2) the debtor was injured by violation of the automatic stay and (3) punitive damages were appropriate. Creditor's small claims action in state court continued despite knowledge of the debtor's bankruptcy filing, including serving the debtor at his work and entry of a state court default judgment. The debtor had to file an adversary proceeding to force the creditor to desist from further activity in the litigation.)

*Lodge v. Kondaur Capital Corp.*, 750 F.3d 1263, 71 Collier Bankr. Cas. 2d (MB) 758, Bankr. L. Rep. (CCH) P 82644, 94 Fed. R. Evid. Serv. 603 (11th Cir. 2014) (Summary judgment in favor of secured creditors for damages due to a stay violation was appropriate where the creditors conceded that they published a foreclosure sale notice in violation of the stay but removed the publication on the same day, and the alleged emotional distress damages were generalized in affidavits from the debtors, without corresponding medical records.)

*Jove Engineering, Inc. v. I.R.S.*, 92 F.3d 1539, 36 Collier Bankr. Cas. 2d (MB) 1270, 96-2 U.S. Tax Cas. (CCH) ¶ 50469, 78 A.F.T.R.2d 96-6250 (11th Cir. 1996) (A stay violation is willful so as to justify a civil contempt award of damages if the violator new of the bankruptcy and intended the conduct that constituted the violation. Violations may exist when they are attributable to a failure to reprogram the computer to prevent tax collection notices from being sent.)

**Research References**

*West's Key Number Digest*
Bankruptcy ⬤→2391 to 2404

*Treatises and Practice Aids*
Norton Bankruptcy Law and Practice 3d, Chapter 43

# 11 U.S.C. § 363

## § 363. Use, sale, or lease of property

(a) In this section, "cash collateral" means cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest and includes the proceeds, products, offspring, rents, or profits of property and the fees, charges, accounts or other

**Exhibit 3**

payments for the use or occupancy of rooms and other public facilities in hotels, motels, or other lodging properties subject to a security interest as provided in section 552(b) of this title, whether existing before or after the commencement of a case under this title.

(b) (1) The trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate, except that if the debtor in connection with offering a product or a service discloses to an individual a policy prohibiting the transfer of personally identifiable information about individuals to persons that are not affiliated with the debtor and if such policy is in effect on the date of the commencement of the case, then the trustee may not sell or lease personally identifiable information to any person unless

(A) such sale or such lease is consistent with such policy; or

(B) after appointment of a consumer privacy ombudsman in accordance with section 332, and after notice and a hearing, the court approves such sale or such lease—

(i) giving due consideration to the facts, circumstances, and conditions of such sale or such lease; and

(ii) finding that no showing was made that such sale or such lease would violate applicable nonbankruptcy law.

(2) If notification is required under subsection (a) of section 7A of the Clayton Act in the case of a transaction under this subsection, then—

(A) notwithstanding subsection (a) of such section, the notification required by such subsection to be given by the debtor shall be given by the trustee; and

(B) notwithstanding subsection (b) of such section, the required waiting period shall end on the 15th day after the date of the receipt, by the Federal Trade Commission and the Assistant Attorney General in charge of the Antitrust Division of the Department of Justice, of the notification required under such subsection (a), unless such waiting period is extended—

(i) pursuant to subsection (e)(2) of such section, in the same manner as such subsection (e)(2) applies to a cash tender offer;

404

**Exhibit 3**

(ii) pursuant to subsection (g)(2) of such section; or

(iii) by the court after notice and a hearing.

(c) (1) If the business of the debtor is authorized to be operated under section 721, 1108, 1203, 1204, or 1304 of this title and unless the court orders otherwise, the trustee may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

(2) The trustee may not use, sell, or lease cash collateral under paragraph (1) of this subsection unless—

(A) each entity that has an interest in such cash collateral consents; or

(B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section.

(3) Any hearing under paragraph (2)(B) of this subsection may be a preliminary hearing or may be consolidated with a hearing under subsection (e) of this section, but shall be scheduled in accordance with the needs of the debtor. If the hearing under paragraph (2)(B) of this subsection is a preliminary hearing, the court may authorize such use, sale, or lease only if there is a reasonable likelihood that the trustee will prevail at the final hearing under subsection (e) of this section. The court shall act promptly on any request for authorization under paragraph (2)(B) of this subsection.

(4) Except as provided in paragraph (2) of this subsection, the trustee shall segregate and account for any cash collateral in the trustee's possession, custody, or control.

(d) The trustee may use, sell, or lease property under subsection (b) or (c) of this section —

(1) in the case of a debtor that is a corporation or trust that is not a moneyed business, commercial corporation, or trust, only in accordance with nonbankruptcy law applicable to the transfer of property by a debtor that is such a corporation or trust; and

(2) only to the extent not inconsistent with any relief granted under subsection (c), (d), (e), or (f) of section 362.

(e) Notwithstanding any other provision of this section, at

405

**Exhibit 3**

any time, on request of an entity that has an interest in property used, sold, or leased, or proposed to be used, sold, or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest. This subsection also applies to property that is subject to any unexpired lease of personal property (to the exclusion of such property being subject to an order to grant relief from the stay under section 362).

(f) The trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if –

(1) applicable nonbankruptcy law permits sale of such property free and clear of such interest;

(2) such entity consents;

(3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(4) such interest is in bona fide dispute; or

(5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

(g) Notwithstanding subsection (f) of this section, the trustee may sell property under subsection (b) or (c) of this section free and clear of any vested or contingent right in the nature of dower or curtesy.

(h) Notwithstanding subsection (f) of this section, the trustee may sell both the estate's interest, under subsection (b) or (c) of this section, and the interest of any co-owner in property in which the debtor had, at the time of the commencement of the case, an undivided interest as a tenant in common, joint tenant, or tenant by the entirety, only if –

(1) partition in kind of such property among the estate and such co-owners is impracticable;

(2) sale of the estate's undivided interest in such property would realize significantly less for the estate than sale of such property free of the interests of such co-owners;

(3) the benefit to the estate of a sale of such property free of the interests of co-owners outweighs the detriment, if any, to such co-owners; and

406

**Exhibit 3**

(4) such property is not used in the production, transmission, or distribution, for sale, of electric energy or of natural or synthetic gas for heat, light, or power.

(i) Before the consummation of a sale of property to which subsection (g) or (h) of this section applies, or of property of the estate that was community property of the debtor and the debtor's spouse immediately before the commencement of the case, the debtor's spouse, or a co-owner of such property, as the case may be, may purchase such property at the price at which such sale is to be consummated.

(j) After a sale of property to which subsection (g) or (h) of this section applies, the trustee shall distribute to the debtor's spouse or the co-owners of such property, as the case may be, and to the estate, the proceeds of such sale, less the costs and expenses, not including any compensation of the trustee, of such sale, according to the interests of such spouse or co-owners, and of the estate.

(k) At a sale under subsection (b) of this section of property that is subject to a lien that secures an allowed claim, unless the court for cause orders otherwise the holder of such claim may bid at such sale, and, if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of such property.

(l) Subject to the provisions of section 365, the trustee may use, sell, or lease property under subsection (b) or (c) of this section, or a plan under chapter 11, 12, or 13 of this title may provide for the use, sale, or lease of property, notwithstanding any provision in a contract, a lease, or applicable law that is conditioned on the insolvency or financial condition of the debtor, on the commencement of a case under this title concerning the debtor, or on the appointment of or the taking possession by a trustee in a case under this title or a custodian, and that effects, or gives an option to effect, a forfeiture, modification, or termination of the debtor's interest in such property.

(m) The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

407

**Exhibit 3**

(n) The trustee may avoid a sale under this section if the sale price was controlled by an agreement among potential bidders at such sale, or may recover from a party to such agreement any amount by which the value of the property sold exceeds the price at which such sale was consummated, and may recover any costs, attorneys' fees, or expenses incurred in avoiding such sale or recovering such amount. In addition to any recovery under the preceding sentence, the court may grant judgment for punitive damages in favor of the estate and against any such party that entered into such an agreement in willful disregard of this subsection.

(o) Notwithstanding subsection (f), if a person purchases any interest in a consumer credit transaction that is subject to the Truth in Lending Act or any interest in a consumer credit contract (as defined in section 433.1 of title 16 of the Code of Federal Regulations (January 1, 2004), as amended from time to time), and if such interest is purchased through a sale under this section, then such person shall remain subject to all claims and defenses that are related to such consumer credit transaction or such consumer credit contract, to the same extent as such person would be subject to such claims and defenses of the consumer had such interest been purchased at a sale not under this section.

(p) In any hearing under this section—

(1) the trustee has the burden of proof on the issue of adequate protection; and

(2) the entity asserting an interest in property has the burden of proof on the issue of the validity, priority, or extent of such interest.

### LEGISLATIVE HISTORY AND COMMENT

## 11 U.S.C. § 363(a)

**House Report (Reform Act of 1978)**

This section defines the rights and powers of the trustee with respect to the use, sale, or lease of property and the rights of other parties that have interests in the property involved. It applies in both liquidation and reorganization cases.

Subsection (a) defines "soft collateral" as inventory, accounts, contract rights, general intangibles, cash, negotiable instruments, documents of title, securities, or chattel paper in which the estate and an entity other than the estate have an interest, such as a lien or a co-ownership interest. The definition is not restricted to property of the estate that is soft collateral on the date of the filing of the petition. Thus, if "hard" collateral is sold, and the proceeds come within the definition of this subsection, then

**Exhibit 3**

# NORTON BANKRUPTCY RULES

## 2016–2017 Edition

**William L. Norton III**
**Author and Editor-in-Chief**

**Issued in October 2016**

**with**
**Related Federal Rules of Civil Procedure**
**Federal Rules of Evidence**
**Official Forms**
**Editorial Commentary**
**Case Annotations**



**THOMSON REUTERS®**

*For Customer Assistance Call 1-800-328-*

**Exhibit 3**

BANKRUPTCY RULES                                    **Rule 6004**

**Rule 6004. Use, Sale, or Lease of Property.**

(a) **Notice of Proposed Use, Sale, or Lease of Property.** Notice of a proposed use, sale, or lease of property, other than cash collateral, not in the ordinary course of business shall be given pursuant to Rule 2002(a)(2), (c)(1), (i), and (k) and, if applicable, in accordance with § 363(b)(2) of the Code.

(b) **Objection to Proposal.** Except as provided in subdivisions (c) and (d) of this rule, an objection to a proposed use, sale, or lease of property shall be filed and served not less than seven days before the date set for the proposed action or within the time fixed by the court. An objection to the proposed use, sale, or lease of property is governed by Rule 9014.

(c) **Sale Free and Clear of Liens and Other Interests.** A motion for authority to sell property free and clear of liens or other interests shall be made in accordance with Rule 9014 and shall be served on the parties who have liens or other interests in the property to be sold. The notice required by subdivision (a) of this rule shall include the date of the hearing on the motion and the time within which objections may be filed and served on the debtor in possession or trustee.

(d) **Sale of Property Under $2,500.** Notwithstanding subdivision (a) of this rule, when all of the nonexempt property of the estate has an aggregate gross value less than $2,500, it shall be sufficient to give a general notice of intent to sell such property other than in the ordinary course of business to all creditors, indenture trustees, committees appointed or elected pursuant to the Code, the United States trustee and other persons as the court may direct. An objection to any such sale may be filed and served by a party in interest within 14 days of the mailing of the notice, or within the time fixed by the court. An objection is governed by Rule 9014.

(e) **Hearing.** If a timely objection is made pursuant to subdivision (b) or (d) of this rule, the date of the hearing thereon may be set in the notice given pursuant to subdivision (a) of this rule.

(f) **Conduct of Sale Not in the Ordinary Course of Business.**

(1) **Public or Private Sale.** All sales not in the

**Exhibit 3**

ordinary course of business may be by private sale or by public auction. Unless it is impracticable, an itemized statement of the property sold, the name of each purchaser, and the price received for each item or lot or for the property as a whole if sold in bulk shall be filed on completion of a sale. If the property is sold by an auctioneer, the auctioneer shall file the statement, transmit a copy thereof to the United States trustee, and furnish a copy to the trustee, debtor in possession, or chapter 13 debtor. If the property is not sold by an auctioneer, the trustee, debtor in possession, or chapter 13 debtor shall file the statement and transmit a copy thereof to the United States trustee.

**(2) Execution of Instruments.** After a sale in accordance with this rule the debtor, the trustee, or debtor in possession, as the case may be, shall execute any instrument necessary or ordered by the court to effectuate the transfer to the purchaser.

**(g) Sale of Personally Identifiable Information.**

**(1) Motion.** A motion for authority to sell or lease personally identifiable information under § 363(b)(1)(B) shall include a request for an order directing the United States trustee to appoint a consumer privacy ombudsman under § 332. Rule 9014 governs the motion which shall be served on: any committee elected under § 705 or appointed under § 1102 of the Code, or if the case is a chapter 11 reorganization case and no committee of unsecured creditors has been appointed under § 1102, on the creditors included on the list of creditors filed under Rule 1007(d); and on such other entities as the court may direct. The motion shall be transmitted to the United States trustee.

**(2) Appointment.** If a consumer privacy ombudsman is appointed under § 332, no later than seven days before the hearing on the motion under § 363(b)(1)(B), the United States trustee shall file a notice of the appointment, including the name and address of the person appointed. The United States trustee's notice shall be accompanied by a verified statement of the person appointed setting forth the person's connections with the debtor, creditors, any other party in interest, their respective attorneys and accountants, the United States trustee, or any person employed in the office of the United States trustee.

**(h) Stay of Order Authorizing Use, Sale, or Lease of**

316

**Exhibit 3**

**Rule 6004**

## Rule 6004. Use, Sale, or Lease of Property.

(a) **Notice of Proposed Use, Sale, or Lease of Property.** Notice of a proposed use, sale, or lease of property, other than cash collateral, not in the ordinary course of business shall be given pursuant to Rule 2002(a)(2), (c)(1), (i), and (k) and, if applicable, in accordance with § 363(b)(2) of the Code.

(b) **Objection to Proposal.** Except as provided in subdivisions (c) and (d) of this rule, an objection to a proposed use, sale, or lease of property shall be filed and served not less than seven days before the date set for the proposed action or within the time fixed by the court. An objection to the proposed use, sale, or lease of property is governed by Rule 9014.

(c) **Sale Free and Clear of Liens and Other Interests.** A motion for authority to sell property free and clear of liens or other interests shall be made in accordance with Rule 9014 and shall be served on the parties who have liens or other interests in the property to be sold. The notice required by subdivision (a) of this rule shall include the date of the hearing on the motion and the time within which objections may be filed and served on the debtor in possession or trustee.

(d) **Sale of Property Under $2,500.** Notwithstanding subdivision (a) of this rule, when all of the nonexempt property of the estate has an aggregate gross value less than $2,500, it shall be sufficient to give a general notice of intent to sell such property other than in the ordinary course of business to all creditors, indenture trustees, committees appointed or elected pursuant to the Code, the United States trustee and other persons as the court may direct. An objection to any such sale may be filed and served by a party in interest within 14 days of the mailing of the notice, or within the time fixed by the court. An objection is governed by Rule 9014.

(e) **Hearing.** If a timely objection is made pursuant to subdivision (b) or (d) of this rule, the date of the hearing thereon may be set in the notice given pursuant to subdivision (a) of this rule.

(f) **Conduct of Sale Not in the Ordinary Course of Business.**

(1) **Public or Private Sale.** All sales not in the

**Exhibit 3**

BANKRUPTCY RULES                                    **Rule 2002**

entered. Appointment may be ordered only on motion of a party in interest.

Subdivision (b) requires those seeking the appointment of an interim trustee to furnish a bond. The bond may be the same one required of petitioning creditors under § 303(e) of the Code to indemnify the debtor for damages allowed by the court under § 303(i).

Subdivision (c) requires that the order specify which duties enumerated in § 303(g) shall be performed by the interim trustee. Reference should be made to Rule 2015 for additional duties required of an interim trustee including keeping records and filing periodic reports with the court.

Subdivision (d) requires turnover of records and property to the trustee selected under § 702 of the Code, after qualification. That trustee may be the interim trustee who becomes the trustee because of the failure of creditors to elect one under § 702(d) or the trustee elected by creditors under § 702(b), (c).

Advisory Committee Note (1991)

This rule is amended to conform to § 303(g) of the Code which provides that the United States trustee appoints the interim trustee. See Rule X-1003. This rule does not apply to the exercise by the court of the power to act sua sponte pursuant to § 105(a) of the Code.

**GENERAL CROSS REFERENCES**
*Code §§ 303(g), 701*

**Research References**

*West's Key Number Digest*
Bankruptcy ⬥3002

*Treatises and Practice Aids*
Norton Bankruptcy Law and Practice 3d §§ 22:14, 22:15, 22:17, 22:18, 77:2

**Rule 2002. Notices to Creditors, Equity Security Holders, Administrators in Foreign Proceedings, Persons Against Whom Provisional Relief Is Sought in Ancillary and Other Cross-Border Cases, United States, and United States Trustee.**

**(a) Twenty-One-Day Notices to Parties in Interest.** Except as provided in subdivisions (h), (i), (l), (p) and (q) of this rule, the clerk, or some other person as the court may direct, shall give the debtor, the trustee, all creditors and indenture trustees at least 21 days' notice by mail of:

(1) the meeting of creditors under § 341 or § 1104(b) of the Code, which notice, unless the court orders otherwise, shall include the debtor's employer identification number, Social Security number, and any other federal taxpayer identification number;

(2) a proposed use, sale, or lease of property of the estate

**Exhibit 3**

other than in the ordinary course of business, unless the court for cause shown shortens the time or directs another method of giving notice;

(3) the hearing on approval of a compromise or settlement of a controversy other than approval of an agreement pursuant to Rule 4001(d), unless the court for cause shown directs that notice not be sent;

(4) in a chapter 7 liquidation, a chapter 11 reorganization case, or a chapter 12 family farmer debt adjustment case, the hearing on the dismissal of the case or the conversion of the case to another chapter, unless the hearing is under § 707(a)(3) or § 707(b) or is on dismissal of the case for failure to pay the filing fee;

(5) the time fixed to accept or reject a proposed modification of a plan;

(6) a hearing on any entity's request for compensation or reimbursement of expenses if the request exceeds $1,000,

(7) the time fixed for filing proofs of claims pursuant to Rule 3003(c); and

(8) the time fixed for filing objections and the hearing to consider confirmation of a chapter 12 plan.

**(b) Twenty-Eight-Day Notices to Parties in Interest.** Except as provided in subdivision (l) of this rule, the clerk, or some other person as the court may direct, shall give the debtor, the trustee, all creditors and indenture trustees not less than 28 days' notice by mail of the time fixed (1) for filing objections and the hearing to consider approval of a disclosure statement or, under § 1125(f), to make a final determination whether the plan provides adequate information so that a **separate disclosure** statement is not necessary; and (2) for filing objections and the hearing to consider confirmation of a chapter 9, chapter 11, or chapter 13 plan.

**(c) Content of Notice.**

**(1) Proposed Use, Sale, or Lease of Property.** Subject to Rule 6004, the notice of a proposed use, sale, or lease of property required by subdivision (a)(2) of this rule shall include the time and place of any public sale, the terms and conditions of any private sale and the time fixed for filing objections. The notice of a proposed use, sale, or lease of property, including real estate, is sufficient if it generally describes the property. The notice of a proposed sale or lease of personally identifiable information under §

92

**Exhibit 3**

363(b)(1) of the Code shall state whether the sale is consistent with a policy prohibiting the transfer of the information.

**(2) Notice of Hearing on Compensation.** The notice of a hearing on an application for compensation or reimbursement of expenses required by subdivision (a)(6) of this rule shall identify the applicant and the amounts requested.

**(3) Notice of Hearing on Confirmation When Plan Provides for an Injunction.** If a plan provides for an injunction against conduct not otherwise enjoined under the Code, the notice required under Rule 2002(b)(2) shall:

(A) include in conspicuous language (bold, italic, or underlined text) a statement that the plan proposes an injunction;

(B) describe briefly the nature of the injunction; and

(C) identify the entities that would be subject to the injunction.

**(d) Notice to Equity Security Holders.** In a chapter 11 reorganization case, unless otherwise ordered by the court, the clerk, or some other person as the court may direct, shall in the manner and form directed by the court give notice to all equity security holders of (1) the order for relief; (2) any meeting of equity security holders held pursuant to § 341 of the Code; (3) the hearing on the proposed sale of all or substantially all of the debtor's assets; (4) the hearing on the dismissal or conversion of a case to another chapter; (5) the time fixed for filing objections to and the hearing to consider approval of a disclosure statement; (6) the time fixed for filing objections to and the hearing to consider confirmation of a plan; and (7) the time fixed to accept or reject a proposed modification of a plan.

**(e) Notice of No Dividend.** In a chapter 7 liquidation case, if it appears from the schedules that there are no assets from which a dividend can be paid, the notice of the meeting of creditors may include a statement to that effect; that it is unnecessary to file claims; and that if sufficient assets become available for the payment of a dividend, further notice will be given for the filing of claims.

**(f) Other Notices.** Except as provided in subdivision (i) of this rule, the clerk, or some other person as the court may direct, shall give the debtor, all creditors, and indenture trustees notice by mail of:

**Exhibit 3**

# EXHIBIT 4

# EXHIBIT 4

*J. n Iyres*

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA?

IN AND FOR THE COUNTY OF SANTA CLARA

KENMARK VENTURES, LLC, a
California limited
liability company,

      Plaintiff,

vs.                                    Case No. 108CV130677

TONY THOMAS, an individual;
ELECTRONIC PLASTICS, LLC, a
Delaware limited liability
company, et al.,

      Defendants.

# CERTIFIED COPY

DEPOSITION OF RONALD RINGSRUD

Date:                 Tuesday, August 10, 2010

Time:                 12:58 p.m.

Location:             MILLER, MORTON, CAILLAT & NEVIS
                      25 Metro Drive
                      7th Floor
                      San Jose, CA 95110

Reported By:          Lisa Glanville
                      CSR #9932

#37101

**Advantage** ARS **Reporting**
**Services, LLC**
*1083 Lincoln Avenue, San Jose, California 95125. Telephone (408) 920-0222, Fax (408) 920-0188*

76

**Exhibit 4**

A P P E A R A N C E S:

For the Plaintiff:        MILLER, MORTON, CAILLAT &
                          NEVIS
                          BY: JOSEPH A. SCANLAN,
                          Attorney at Law
                          25 Metro Drive
                          7th Floor
                          San Jose, CA 95110
                          (408) 292-1765

For the Defendants:       LAW OFFICES OF
                          JOSEPH R. KAFKA
                          BY: JOSEPH R. KAFKA,
                          Attorney at Law
                          1541 The Alameda
                          San Jose, CA 95126
                          (408) 993-6441

Also Present:             Tony Thomas

The Reporter:             ADVANTAGE REPORTING
                          SERVICES
                          BY:   LISA GLANVILLE,
                          CSR 9932
                          1093 Lincoln Avenue
                          San Jose, CA 95125
                          (408) 920-0222


                    --oOo--


              DEPOSITION OF RONALD RINGSRUD               2

Advantage $\mathcal{ARC}$ Reporting

**Exhibit 4**

# INDEX OF EXAMINATION

BY MR. ___                                                      Page

BY MR. Scanlan                          4, 67, 61, 65
                                        46, 76, 84

---oOo---

# INDEX OF EXHIBITS:

THE FOLLOWING EXHIBITS WERE PREVIOUSLY MARKED IN THE PRIOR PROCEEDINGS:

| Plaintiff's Exhibit No. | Description | Page Mentioned |
|---|---|---|
| 2 | History of the Thomas Emerald, Bates stamped KO160 to KO164 | 17 |
| 3 | Document entitled, "The Thomas Emerald," from Christie's dated 12/13/06 | 32 |
| 3 | Descriptive Report and Estimated Appraised Value, Bates stamped KO152 | 43 |
| 4 | Emerald Report, Bates stamped KO146 to KO159 | 35 |
| 5 | Emerald Report, Bates stamped KO036 to KO153 | 35 |
| 5 | Certificate of Origin, Bates stamped KO154 to KO155 | 21 |

---oOo---

DEPOSITION OF RONALD RINGSRUD          3

Advantage Reporting
ARA
Exhibit 4

RONALD RINGSRUD,

1  being first duly sworn by the Certified Shorthand

2  Reporter to tell the truth, the whole truth, and

3  nothing but the truth, testified as follows:

4  EXAMINATION BY MR. SCANLAN:

5  Q   Could I get you to state your full name

6  and spell it for our record, please.

7  A   Ronald Ringsrud. That's

8  R-i-n-g-s-r-u-d.

9  Q   And can I get your business address.

10  A   It is 1470 Sixth Street, Saratoga.

11  Q   All right. And is that -- do you do

12  business out of that address under a name style?

13  A   No. That's my home office. And I've

14  been doing business there for ten years.

15  Q   Okay. Under what name style, if any, do

16  you do business?

17  A   Ronald Ringsrud Company.

18  Q   All right. And if -- that's both your

19  home and your business address that you gave us,

20  correct?

21  A   Yes, right.

22  Q   Before we start the deposition, I'd like

23  to get a feel for your familiarity with it. Have

1  you ever been deposed before?

2      A.  No.

3      Q.  Let me give you just a little bit of an

4  overview of the rules that we will try to go by

5  today to make this go smooth and clean for the

6  record.

7          First, as you can see, everything

8  that we are saying is being taken down in

9  shorthand form by the court reporter.

10     A.  Uh-huh.

11     Q.  Because we are dealing in a verbal

12  medium and not conversationally, it's important

13  that you answer all of my questions audibly

14  rather than with a nod or a gesture or an uh-huh

15  or an huh-uh.  Yes or no is cleaner for the

16  record, and will from time to time remind you if

17  you are gesturing or giving an answer that is

18  perhaps unintelligible.

19          You will be given a booklet or

20  given access to a booklet of your testimony.  You

21  have the right to make changes in your testimony,

22  but it's important that you give your best

23  testimony today, because I have a right to

24  comment if you later change your testimony and

25  draw inferences from the fact it was one thing at

DEPOSITION OF RONALD BANGERD

Advantage ARS Reporting

Exhibit 4

Advantage *ARS* Reporting

Exhibit 4

1   deposition and something else later. So this is

2   important to give you the best answer today. Will

3   you do that?

4      A.  Yes, I will.

5      Q.  Because we're dealing in a verbal

6   medium, it's important that we don't talk over

7   each other. I may ask a question very slowly

8   ponderously, and you know the answer. If

9   halfway through, please wait until I'm finished

10   to start your answer, and likewise I will attempt

11   to do the questions until you're finished with

12   your answer.

13       You don't need to guess the

14   answer to any question, however, you can and must

15   estimate to the extent that you can when I ask

16   for things like dates or amounts. The example

17   that's usually given is if I ask you to estimate

18   the length of this table, based on your

19   experience and knowledge... estimate the

20   estimate. I'll ask you to estimate the length of

21   my dining table at home, you couldn't

22   'cause you've never seen it. So some occasions

23   you can't estimate, many you can, and I may ask

24   for estimates.

25       All right. Let's go to this.

DEPOSITION OF RONALD PENSRUD   9

1    When was the last time you were in contact with

2    Joe Kafka?

3         A    That's Mr. Thomas' lawyer?

4         Q    Yes.

5         A    I received a phone message from him

6    about a week ago.

7         Q    Okay.  And what was that phone message?

8         A    It was dealing with the change of the

9    hour of this deposition.

10        Q    Before that communication, had you ever

11   spoken with or to Mr. Kafka?

12        A    No.

13        Q    Okay.  Other than the communication

14   regarding the change of time, any other

15   communications at any time with Mr. Kafka?

16        A    No.

17        Q    Okay.  I'm going to ask you the same

18   questions for Mr. Thomas.  When was the last time

19   you were in touch with Mr. Thomas?

20        A    This morning.

21        Q    And where did that occur?

22        A    On the phone, getting directions here.

23        Q    Prior to that, when was the last time

24   you spoke with him?

25        A    Oh, about a week ago, after the -- the

                    DEPOSITION OF RONALD RINGSRUD          7

Advantage  ARC  Reporting

Exhibit 4

1   message from Mr. Kafka.

2        Q    And who initiated that, you or him?

3        A    I called him.

4        Q    And what was the content of the

5   conversation?

6        A    I asked him if I would see him or not at

7   the deposition, and I asked him why the date was

8   changed -- or the hour was changed.

9        Q    And what did he say?

10       A    He said it would -- he had something

11  happening here this morning, or something legal

12  happening somewhere this morning, and that it

13  would be better if we met at 1:00.

14       Q    Okay.  Before that, when was the last

15  time you had contact with Mr. Thomas?

16       A    Maybe another week prior to that.

17       Q    And what was the -- again, was this by

18  phone?

19       A    Yes.

20       Q    What was the content of the

21  conversation?

22       A    I was telling him that I was leaving for

23  a vacation, and we talked in general terms about

24  the upcoming deposition.

25       Q    Okay.  What general terms did you

                DEPOSITION OF RONALD RINGSRUD                8

1    discuss?

2         A    Well, I am -- I have -- am not familiar

3    with the Bahia trial except for what I read in

4    the papers.

5         Q    Uh-huh.

6         A    And I wanted -- and I had to learn from

7    Tony what exactly is going on, because there's

8    the Bahia trial, and then there's the -- the

9    issue -- the other issue of the second emerald,

10   and they're kind of tied together, and I was

11   trying to figure out which emerald was -- this

12   was all about.

13        Q    Did you ask him what questions he

14   thought might be asked today?

15        A    No.  But I asked him just in general

16   terms about what -- what -- what is the issue of

17   the trial itself.

18        Q    What did he respond?

19        A    He told me that the -- the Bahia trial

20   has been moved up to the 6th of September, and --

21   and honestly, I'm still not clear if the -- this

22   is a second trial about the Tony Thomas Emerald,

23   and I asked him if that's also going to happen on

24   the 6th, and I believe he said yes.

25        Q    Okay.  Contact with Tony prior to that

                DEPOSITION OF RONALD RINGSRUD          9

Advantage ARc Reporting

**Exhibit 4**

1    time?

2         A    I believe he called me and just told me

3    that about a month ago -- he told me that

4    publicists from -- from a magazine were

5    interested in the Bahia story.

6         Q    Did you discuss the Thomas Emerald in

7    that conversation at all?

8         A    We probably did.  I don't recall what

9    the details.

10        Q    You don't recall what he said or what

11   you said regarding the Thomas Emerald?

12        A    No.  Just probably general details.

13        Q    Okay.  Rather than going conversation by

14   conversation before that time, prior to the

15   contact you just described, where you generally

16   discussed the Tony Thomas Emerald, did you have

17   any previous contact with Tony relative to the

18   Thomas Emerald?

19        A    I had previous contact probably -- not

20   necessarily in 2009, but before that.  The -- the

21   Thomas Emerald was an issue of possible interest

22   for interested parties interested in buying it,

23   so in one case they contacted me, in one case

24   they contacted Mr. Thomas, and in both case we

25   discussed how should we inform these people about

DEPOSITION OF RONALD RINGSRUD          10

Advantage  *ARo*  Reporting
**Exhibit 4**

the Thomas Emerald and best present it as a

possible sale.

Q    Who were the identity of the two parties

that indicated an interest in purchasing the

stone in or around 2009?

A    Well, actually, that started in 2007. I

believe. Casey DeLoach from Florida.

Q    What part of Florida, do you know?

A    I don't recall.

Q    And Casey, I take it, is a Mr.?

A    Mr. Casey DeLoach.

Q    Okay. Did Mr. -- has Mr. DeLoach ever

seen the emerald, to your knowledge?

A    Yes. He flew out with two partners, one

of two partners, to look at it.

Q    When, to your knowledge, did that occur?

A    2007, I believe.

Q    And do you know whether or not

Mr. Thomas was present to show them the emerald?

A    Yes, he was.

Q    Who was the other buyer that you recall?

A    I'd have to look up his name. It was a

partner of Casey DeLoach.

Q    So the two potential sales, to your

knowledge, are the sales to Mr. DeLoach and to

DEPOSITION OF RONALD RINGSRUD                11

Advantage ADR Reporting

Exhibit 4

- 86 -

his partner?

A    Yes.  They had more than one customer that may have been interested in purchasing that stone.

Q    Was it your understanding that Mr. DeLoach and his partner in connection with their involvement the emerald were acting as brokers for someone else?

A    That's my understanding, yes.

Q    Do you know who they were working for?

A    On one occasion they kept the buyer private, his name and identity private.

Q    Uh-huh.

A    And on one occasion they said that the potential buyer was someone involved in the -- in the Barry Goldwater senate issue.

Q    Barry Goldwater senate issue?

A    Fundraising, yeah.  The stone would have been useful in fundraising.

Q    All right.  Did you ever hear how Mr. DeLoach reacted to the emerald after he viewed it?

A    Yes.

Q    What was his reaction?

A    He was positive.  He was excited and saw

DEPOSITION OF RONALD KINGSRUD

- 87 -

a potential worthy of his time, spend some time.

    Q. Did Mr. DeLoach ever make an offer on the emeralds?

    A. Not an offer, no.

    Q. You hesitated a little bit. Was there talk about what a price might be?

    A. Yes.

    Q. What was that discussion?

    A. They said that they had a customer that could pay several hundred million dollars.

    Q. Okay. Anything more specific or concrete than that?

    A. Just that they maintained the identity of that customer private and that the man had a collection, and that he was considering this as kind of a centerpiece for his collection, and the number maybe three or four hundred million, that's what I recall. No guarantee.

    Q. And to your knowledge, why did this sale not occur to the unnamed individual that was brokered by Mr. DeLoach?

    A. No. No idea.

    Q. You don't know why it didn't come to pass?

    A. Well, I make my living selling emeralds

Advantage ARC Reporting

Exhibit 4

and about one out of every three or four deals

even goes through. It's a very subjective field.

Q  So there were -- there was talk about

200, 300, 400 million dollars as the price, and

then you never hear from them again?

A  We heard from Casey DeLoach.

Q  What was --

A  But they -- the customer might have

changed his mind, or any number of things that --

I'm not --

Q  So they didn't --

A  Was not privy to.

Q  As a result, they didn't make an offer,

DeLoach didn't make an offer?

A  Right.

Q  How about his partner, did his partner

even bring an offer in on the stone?

A  No.

Q  Was price even discussed with his

partner?

A  Only to the extent that we discussed it

with Mr. DeLoach.

Q  Okay. Let me ask you just a couple of

random questions. Have you ever testified in

court as an expert with regard to gems or

DEPOSITION OF RONALD RINGSRUD              15

Advantage ABC Reporting

Exhibit 4

1    gemstones?

2         A    One time.

3         Q    Okay.  When and where was -- well, when

4    was that?

5         A    That was in DeMoines, Iowa.

6         Q    Uh-huh.

7         A    About 15 years ago, maybe ten.

8         Q    Have you ever heard of or met Joseph

9    Tenhagen?

10        A    Yes.

11        Q    Do you know Mr. Tenhagen to be involved

12   in the emerald business?

13        A    Yes.  He purchased a copy of my book.

14        Q    Have you ever spoken with him -- strike

15   that.

16                   What reputation does he enjoy to

17   your view within the industry?

18        A    He is a member of the National

19   Association of Jewelry Appraisers and possibly

20   another organization, and I know of him as a

21   member in good standing.

22        Q    Does he have a reputation for being high

23   or low on appraisals, to your knowledge?

24        A    Since I've never gotten an appraisal

25   from him, I couldn't answer that.

                   DEPOSITION OF RONALD RINGSRUD          15

Advantage    ARo    Reporting
Exhibit 4

1        Q    And again, I'm looking for his

2    reputation, not appraisals that you've seen, just

3    whether the scuttlebutt in the emerald business

4    is take it to Joe Tenhagen if you want a low

5    appraisal, take it to Joe Tenhagen if you want a

6    high appraisal?

7        A    I haven't heard anything about that.

8        Q    Anything else you've heard that

9    negatively reflects on his reputation?

10        A    Nothing negative.

11        Q    Okay.  I want to stop now, go to a

12    different field, and that is to ask you about

13    your relationship with Tony Thomas.  Can you tell

14    me first approximately when you met Mr. Thomas

15    for the first time?

16        A    He called me.  It might have been 2001.

17    I think he had found my name through the

18    internet.

19        Q    Okay.  Prior to -- strike that.

20              What was his first contact with

21    you, in what form?

22        A    He called me on the phone.

23        Q    And what did he say?

24        A    He said -- he asked me if I do reports

25    or appraisals on gemstones or minerals.

                DEPOSITION OF RONALD RINGSRUD        16

Advantage    Reporting

Exhibit 4

1        Q    And you answered yes?

2        A    Yes.

3        Q    What did he tell you then?

4        A    He asked if I could look at a mineral

5   specimen he owned.

6        Q    Okay.  And again, I assume you replied

7   affirmatively, and at some point you actually got

8   to see the Thomas Emerald?

9        A    Yes.

10       Q    Just to recap, prior to 2001, you didn't

11  know Tony Thomas, and you met him in connection

12  with the -- with an appraisal or report on the

13  stone around 2001?

14       A    Yes.

15       Q    Okay.  Did Mr. Thomas tell you anything

16  about how he acquired the stone that he was

17  showing you?

18       A    Yes.  He said he bought it.

19             MR. SCANLAN:  Okay.  Let's go ahead

20  and get this marked as next in order, which I'm

21  going to have to find for you.  I think it's 38.

22  Okay.  Let's go ahead and mark this 38.

23  Actually, wait.  This has already been marked.

24  This is Exhibit 2 to Tony's deposition, so we'll

25  keep the same numbers and not duplicate.

DEPOSITION OF RONALD RINGSRUD     17

Advantage *ARo* Reporting

**Exhibit 4**

1      Q    BY MR. SCANLAN:  Mr. Ringsrud, I'm

2    showing you something that has been marked

3    Exhibit 2 to Mr. Thomas' deposition.  If you

4    would, take a moment just to look at that.

5      A    (Witness reviews document.)

6      Q    Do you -- first of all, do you recognize

7    the signature that appears on that?

8      A    It looks like Tony Thomas' signature.

9      Q    Okay.  And I just want to pick a few

10   things out of it.  In the second paragraph

11   halfway through it says, "Upon his arrival,

12   Mr. Thomas was presented with an emerald now

13   known as the Thomas Emerald."  Strike that.

14             Did Mr. Thomas tell you he

15   purchased it in Brazil?

16     A    Yes, he did.

17     Q    And did he tell you that he brought it

18   back with him immediately after its purchase?

19     A    Yes, he did.

20     Q    Okay.  And did he tell you from whom he

21   had bought the stone?

22     A    Yes.  I understood that he bought it

23   from his emerald mine partners.

24     Q    Okay.  You believe Mr. Thomas was a

25   partner in an emerald mine?

                 DEPOSITION OF RONALD RINGSRUD          18

Advantage  ARS  Reporting

Exhibit 4

1    A    He never discussed it with me very much,

2    but that's what I understood.

3    Q    Okay.  What did Mr. Thomas tell you he

4    had paid for the emerald when he acquired it?

5    A    In 2001?

6    Q    Yes.

7    A    I don't recall him telling me an exact

8    price what he paid.

9    Q    How about an approximate price?

10   A    Well, I know from subsequent history and

11   conversations that it was a number less than

12   $90,000, might have been 50.

13   Q    Okay.  Did you ever hear 20?

14   A    I honestly don't remember.

15   Q    Okay.  As an appraiser of jewels and

16   gemstones, is it important to you to know what

17   the last actual transaction with the stone was as

18   a basis for beginning an appraisal?

19   A    No, not in the case of the stone being

20   purchased in the source country, because in

21   Columbia, where I do a lot of business, it's --

22   it's more important the price that it gets paid

23   in this market here.

24   Q    Do state it is a different way and perhaps

25   in public, sometimes the people in the country

DEPOSITION OF RONALD RINGSRUD          13

Advantage  Reporting
Exhibit 4

1    of origin don't really know what it's worth and

2    sell it for less than what it's worth?  Is that

3    the premise?

4         A    Yes.

5         Q    And is there a standard range that

6    usually occurs; in other words, they'll sell it

7    500 percent below market or 400 percent below

8    market or any rule of thumb?

9         A    There's no standard range.  It's -- it's

10   variable.

11        Q    Okay.  Hearkening back now to the call

12   of 2001 from Tony, did he tell you that he had

13   any other appraisals at that time?

14        A    At some time I did see an appraisal done

15   in Brazil, but my reports, my emerald reports do

16   not include prices.  I validate the natural

17   origin and the rarity and the aesthetics of the

18   stone.  So finding an exact price was not that

19   important to me.

20        Q    Okay.  Let me ask you this, again, sort

21   of out of order:  Are you confident that the

22   Thomas Emerald is an emerald and not a

23   tourmaline?

24        A    Yes.

25        Q    What do you base that on?

DEPOSITION OF RONALD RINGSRUD          20

Advantage  *ARo*  Reporting

**Exhibit 4**

1    A    The color, the matrix, the shape

2    outline.

3    Q    Okay. I'm showing you now a document

4    which has been marked as Exhibit 6 to Tony

5    Thomas' deposition. I ask you to take a look at

6    that just momentarily. First, can you tell me if

7    this is the paperwork from Brazil that you were

8    just testifying about?

9    A    (Witness reviews document.) Yes, it is.

10   Q    Okay. And do you happen to know in your

11   circle of people in the emerald world Dimitri

12   Paraskevopulos?

13   A    No. I had not heard of him before.

14   Q    Okay. Let me ask you this: Would you

15   agree with me that this is a -- an appraisal or

16   report valuing the emerald at $11 million?

17   A    Is the question do I agree that it is a

18   certificate or a report?

19   Q    It's an attempt to place a value on the

20   emerald?

21   A    Yes.

22   Q    Okay. And did you know that Dimitri,

23   man of a thousand syllables in his last name, was

24   one of the sellers?

25   A    No, I did not know.

DEPOSITION OF RONALD RINGSRUD          21

Advantage  ARS  Reporting

Exhibit 4

1      Q    Would you find it irregular for a seller

2    to be providing an appraisal immediately after

3    having sold the item to a third party?

4      A    Would I -- oh, is it irregular?

5      Q    Yes.

6      A    I've seen it done a number of times in

7    this country as well, but I know that some people

8    would call it irregular.

9      Q    It's a poor idea to allow the person who

10   sold it to put the value on it?

11     A    That's very often the reason that second

12   opinions are sought after.

13     Q    Okay.  Now, this is dated November --

14   this being Exhibit 8, is dated November 5th,

15   2001.  Does that refresh your recollection that

16   it must have been late in 2001 that Mr. Thomas

17   contacted you?

18     A    Yes.  Or early 2002.

19     Q    Okay.

20     A    Yes.

21     Q    All right.  Let's talk about

22   something -- strike that.

23            You had Exhibit 8 to the Thomas

24   deposition in your possession when you created

25   your written valuations of the stone?

                    DEPOSITION OF RONALD RINGSRUD          22

Advantage *ARc* Reporting

**Exhibit 4**

1      A    I did get a copy, and I probably had it

2    when I did the report that I wrote.

3      Q    Okay.  Where did Mr. Thomas bring the

4    stone so that you could see it?

5      A    To my house.

6      Q    Okay.  Did you take photographs of it?

7      A    Yes, I did.

8      Q    Okay.  What did you charge Mr. Thomas

9    for looking at the emerald specimen and any

10   reports that you created for him on value?

11     A    About $110, give or take 20.

12     Q    And is that your normal fee for

13   appraisal on an item worth as much as 800

14   million?

15     A    Yes.  My fee is based on time and . . .

16     Q    Is it an hourly charge, $100 an hour,

17   110 an hour?

18     A    Yes.

19     Q    So you spent about --

20     A    It's normal --

21     Q    Okay.  Excuse me.

22     A    It's normal to charge about that much

23   per hour.

24     Q    Okay.  So you spent about one hour

25   looking at the emerald, taking measurements, and

                  DEPOSITION OF RONALD RINGSRUD          23

Advantage  ARC  Reporting

Exhibit 4

1    creating your report?

2         A    Yes.

3         Q    Let me stop for a minute and ask you

4    about emeralds.  The Thomas Emerald is a specimen

5    emerald, correct?

6         A    Yes.

7         Q    Okay.  It's not intended for cutting?

8         A    Correct.

9         Q    Okay.  And so who would -- strike that.

10             Do you deal in both cut emeralds

11   and in rough -- specimen emeralds?

12        A    Yes, I do.

13        Q    Okay.  On how many occasions -- strike

14   that.

15             How many emerald specimens would

16   you say that you have handled in your career on a

17   buy-sell basis?

18        A    About three or 400.

19        Q    Okay.  What's the most valuable specimen

20   emerald you've dealt with?

21        A    That would be the Thomas Emerald.

22        Q    Okay.  So the next most valuable.

23        A    I am -- I was involved in the sale of

24   two emerald crystals on a matrix from Columbia,

25   small emeralds that sold for $230,000.

                   DEPOSITION OF RONALD RINGSRUD        24

Advantage ARC Reporting

Exhibit 4

1       Q     Okay.  So your experience ranges from

2    800 million, the next stop is $230,000?

3       A     Yes.  Although I've witnessed some other

4    very expensive pieces bought and sold.

5       Q     Okay.  And now the pieces we're talking

6    about have no cutting value, this is just

7    specimen; is that correct?

8       A     Yes.

9       Q     Okay.  Have you ever heard of an emerald

10   specimen selling for 800 million dollars?

11      A     No.

12      Q     700 million?

13      A     No.

14      Q     500 million?

15      A     No.

16      Q     A million?

17      A     Yes.

18      Q     Two million?

19      A     Yes.

20      Q     Three million?

21      A     Yes.

22      Q     Ten million?

23      A     Yes.

24      Q     20 million?

25      A     Yes.

DEPOSITION OF RONALD RINGSRUD              25

Advantage  ARC  Reporting

Exhibit 4

1    Q.    Okay.  What is the highest value that

2    you have heard of or seen?

3    A.    About 40 million dollars.

4    Q.    Okay.  That's a factor of one 25th of

5    the 800 million.

6    A.    That's correct.

7    Q.    Okay.  So Mr. Thomas comes to you late

8    2001, early 2002, asks you to do an appraisal.

9    brings the stone to your home, you do it and give

10   him the appraisal.  Did he tell you what he

11   wanted the appraisal for?

12   A.    At the time he -- I don't recall him

13   telling me what he wanted the appraisal for.

14   Q.    Okay.  Did he ever tell you what he

15   wanted it for?

16   A.    Eventually, yes, he wanted it for -- to

17   facilitate documentation and sale of the stone.

18   Q.    In particular connection to the two

19   individuals that you mentioned before or just in

20   general?

21   A.    In general.

22   Q.    After the time period 2002, 2003, did

23   Mr. Thomas approach you again regarding the

24   Thomas Emerald?

25   A.    Yes, he did.

DEPOSITION OF RONALD RINGGRUD                26

Advantage *APS* Reporting

Exhibit 4

1          Q    On one occasion or more than one

2     occasion?

3          A    More than one occasion.

4          Q    Okay.  After you created the appraisal

5     in 2002, 2003, what further contact do you recall

6     from Mr. Thomas?

7          A    I believe it was 2005 or six that he

8     requested a re-doing with a more updated date on

9     the same appraisal, the same report.  I use the

10    word "report" to indicate what I do.  Appraisal

11    usually has a price attached to it.

12         Q    I'm with you.  So you recall doing a --

13    strike that.

14              How many total reports have you

15    done on the Thomas Emerald?

16         A    Two, I believe.

17         Q    Okay.  When Mr. Thomas came back the

18    second time in 2005 or six, he told you he just

19    wanted the report updated?

20         A    Yes.

21         Q    Okay.  We'll get into your reports in

22    just a minute.  I notice in none of the two that

23    I have is a price mentioned.  Did Tony ask you to

24    put a price in or to find somebody who would put

25    a price to the emerald?

              DEPOSITION OF RONALD RINGSRUD          27

Advantage  ARS  Reporting

Exhibit 4

1    A    Yes.

2    Q    What can you tell me in that regard?

3    A    I told him that I knew of an appraiser

4  in Arizona named Jim Lytle, that I respected that

5  man's work and recommended him. And I understand

6  that he went later that year or the next year and

7  did get an appraisal from him.

8    Q    Okay. Prior to you suggesting

9  Mr. Lytle, was Mr. Thomas exerting pressure on

10 you to come up with a number?

11   A    Oh, yeah. He asked if I would, but I --

12 it's not my -- my reports don't certain prices.

13 I was happy to report on its rarity and its

14 usefulness as a collector's piece.

15   Q    But you wouldn't opine as to price?

16   A    It's a -- it was my preference to not

17 put a price on it.

18   Q    Why was that your preference?

19   A    I feel that other people in the business

20 are more qualified than I because I've never --

21 although I am a gemologist and an expert I've

22 never been a member of the National Association

23 of Jewelry Appraisers or the ASA or any of the

24 other appraisal societies, so I thought I would

25 leave that to them.

DEPOSITION OF RONALD RINGSRUD                         25

Advantage ARs Reporting

Exhibit 4

1      Q    Mr. Thomas wanted a price with your

2  report, you wouldn't do that.  How was Mr. Lytle

3  initially contacted?

4      A    By telephone.

5      Q    And who initiated the call to him?

6      A    Tony Thomas.

7      Q    Okay.  Were you present when Tony called

8  him?

9      A    No.

10     Q    From any source do you know what the

11 substance of the conversation between Tony Thomas

12 and Jim Lytle was?

13     A    No.

14     Q    What, if anything, did you tell

15 Mr. Lytle about the Thomas Emerald?

16     A    I told him that I had never seen a

17 bigger emerald crystal, and that although there

18 may have been other emerald crystals that are

19 bigger, I doubted to Mr. Lytle that any other

20 crystal would be longer than that particular one.

21     Q    Anything else?

22     A    I told him that because of that rarity

23 and uniqueness, I thought it was worthy of -- of

24 his time.  I told him he might be interested to

25 see it.

DEPOSITION OF RONALD RINGSRUD           29

Advantage $\mathcal{ARc}$ Reporting

**Exhibit 4**

1    Q  And do you know whether or not Mr. Lytle

2  ever saw the Thomas Emerald?

3    A  I'm not sure. I do not know.

4    Q  Okay. Would you find it irregular to

5  issue an opinion of value if you had not actually

6  seen the stone?

7    A  No.

8    Q  An 800 million dollar stone travels

9  through the appraisal channel without -- can be

10  appraised without being seen?

11    A  As long as the measurements, the degree

12  of transparency, the color and more than one

13  photograph is available, a lot of jewelry gets

14  appraised that way, also.

15    Q  What else did you tell Mr. Lytle, if

16  anything?

17    A  I can't recall. I asked him about his

18  family. That's what I remember.

19    Q  Okay. Did you ever in your

20  conversations with Mr. Lytle suggest a value,

21  whether exactly or generally, for example,

22  hundreds of millions of dollars?

23    A  No.

24    Q  You -- okay. You never expressed where

25  you thought the appraisal should come in to

DEPOSITION OF RONALD RINGSRUD    30

Advantage ARS Reporting

Exhibit 4

Mr. Lytle?

2    A.   No.  All I told him was that -- that I

3  had heard from Mr. Thomas and read in this report

4  here (indicating), Exhibit 8, that the British

5  Museum, had a value of 800 million on a very

6  large similar sized emerald from Brazil.

7    Q.  Have you ever seen that emerald?

8    A.  No.

9    Q.  The Crown Emerald?  Do you know if it's

10  comparable to the Thomas Emerald?

11    A.  Being that it's large and from Brazil,

12  that, to me, is comparable.  What would be

13  interesting to know is the degree of

14  transparency, but all of those large, large

15  crystals are either semi-transparent or

16  semi-opaque.

17    Q.  Did you ever tell Mr. Lytle that the

18  purpose for the appraisal was to give on

19  potential buyers of the stone?

20    A.  No.  But I think that was assumed to be

21  the case.

22    Q.  Why do you say that?

23    A.  Many appraisals -- many buyers request

24  or demand appraisals from more than one source.

25    Q.  Okay.  I'm showing you now a document

DEPOSITION OF RONALD KINGSTON    31

Advantage ARS Reporting

Exhibit 4

1   that is marked as Exhibit 3 to Mr. Thomas'

2   deposition.  And if you take a look at that,

3   please.

4        A    (Witness reviews document.)

5        Q    Can you tell me if you've ever seen

6   Exhibit 3 to the Thomas deposition before?

7        A    (Witness reviews document.)  Yes, I

8   believe I have seen it --

9        Q    When did you see it?

10       A    -- in different form.  In 2007.

11       Q    Okay.  How did you get it?

12       A    It was in the material that we presented

13  to Mr. Casey DeLoach.

14       Q    Okay.  Let me ask you this:  You

15  referred to a time when Tony flew out to Florida

16  to meet with Mr. DeLoach?

17       A    They flew to here.

18       Q    To here?

19       A    To Reno, actually.

20       Q    Okay.  Do you know approximately when

21  that was?

22       A    I believe it was 2007.

23       Q    Again, going back to Exhibit 3, the

24  source of that document coming into your

25  possession was Tony Thomas, correct?

                    DEPOSITION OF RONALD RINGSRUD        32

Advantage  ARS  Reporting

**Exhibit 4**

1        A    Yes.

2        Q    Okay.  And Mr. Thomas also provided you

3    the other two documents that we've discussed?

4        A    Yes.

5        Q    He didn't e-mail them to you, he gave

6    them to you personally?

7        A    Oh, he might have e-mailed them.

8        Q    Okay.  Were you in the habit of e-mail

9    communication with Tony?

10       A    Yes.

11       Q    Okay.  Going again to Exhibit 3 there in

12   front of you, when you saw that, did it concern

13   you that this was an excerpt as opposed to not

14   the report itself?

15       A    No.  You asked me if I saw it, and I

16   didn't see it in this form, but I did see this,

17   the Harrison Steele appraisal.

18       Q    What form did you see it in?

19       A    It had a different font size.  It had a

20   logo at the top, I believe.  That's all I

21   remember.

22       Q    Okay.  Did you provide any of the three

23   documents before you to Mr. Lytle?

24       A    I'm -- I believe I supplied my appraisal

25   copy to Mr. Lytle, and Mr. Thomas had supplied

                 DEPOSITION OF RONALD RINGSRUD        33

Advantage  A⅃Rᴄ  Reporting

**Exhibit 4**

1  the other material.

2       Q    Do you know how that was done, whether

3  it was in person or by mail?

4       A    By mail, I believe.

5            MR. SCANLAN:  Could I get you to

6  mark that on the side so I can find it.

7       Q    BY MR. SCANLAN:  Do you know what --

8  strike that.

9            Do you know what documents

10  Mr. Lytle had from Tony as opposed to from you

11  when he prepared his appraisal?

12       A    You're asking me a lot of questions

13  about something five years ago.  I can only guess

14  and say that -- well, let me ask you to repeat

15  the question.

16       Q    Yeah.  I'm looking for here's Mr. Lytle

17  sitting in Arizona, he's getting ready to

18  appraise an emerald, and he starts off with some

19  information presumably.  You sent him your

20  report?

21       A    Uh-huh.

22       Q    So he had that information.  I'm looking

23  now for anything else that you knew that he had

24  regarding the Thomas Emerald preparatory to his

25  appraisal.

                DEPOSITION OF RONALD RINGSRUD          34

Advantage    ARC    Reporting

**Exhibit 4**

1      A   I don't know what else he might have

2  had.

3      Q   Okay.  Have you ever heard of Harrison

4  Steele Partners before?

5      A   Yes.

6      Q   Okay.  In what context?

7      A   Jim Lytle told me --

8      Q   Told --

9      A   -- that he exists and is another

10  professional that was recommended by Jim.

11      Q   Do you know why that need came about; in

12  other words, a report from you, an appraisal from

13  Lytle, now we're looking for three, did anybody

14  explain why?

15      A   Yes.

16      Q   Who did?

17      A   The potential buyer that Mr. DeLoach

18  had.  And may I add that the meeting with

19  Mr. DeLoach might have been 2006.

20      Q   Got you.

21      A   Mr. DeLoach's buyer requested more than

22  one -- more than two appraisals or reports.

23      Q   Let's take a look now at what's been

24  marked as Exhibit 5 to the Thomas deposition.

25      A   (Witness reviews document.)

DEPOSITION OF RONALD RINGSRUD        35

Advantage  ARC  Reporting

**Exhibit 4**

1        Q    You're the author of Exhibit 5, correct?

2        A    Yes.

3        Q    Please note the date, March 23rd, 2007,

4    at the bottom.

5        A    Yes.

6        Q    That was the date on which you signed

7    Exhibit 5, correct?

8        A    That is.

9        Q    I'm sorry, did we get an answer?

10        A    I replied that is.

11        Q    Okay.

12        A    So it's a yes.

13        Q    I have another report from you dated in

14    2009.  Those are the only two that I have.  Is it

15    your belief that there is a report from you that

16    predates Exhibit 5; in other words, is closer to

17    the 2001, 2002 time frame?

18        A    Yes, there is.

19        Q    And are you in possession of that?

20        A    It may be on the hard drive of a

21    computer in my garage that -- the computer's old

22    and broken, but I could look for it in my current

23    hard drive if you ask me for it.

24        Q    That would be wonderful, and we do ask

25    you to do that.

                    DEPOSITION OF RONALD RINGSRUD        36

Advantage 𝒜ℛ𝒮 Reporting

**Exhibit 4**

1    A    Okay.

2    Q    Thank you.  Not having the benefit of

3  having that first report here, is it your

4  recollection that the first report of 2001, 2002,

5  was in substantially the same from as Exhibit 5?

6    A    It was.

7    Q    Okay.  Was it identical?

8    A    The photo would have been the same.

9    Q    Okay.

10    A    The wording would have been very similar

11  or identical.

12    Q    Okay.  Is it your recollection that

13  Exhibit 5 was created for a specific purpose in

14  other words, the buyers were putting around

15  March 23, 2007?

16    A    Yes.

17    Q    Okay.  Who did Tory Thomas tell you

18  owned the Thomas Emerald?

19    A    He said that he owned it.

20    Q    He said that in 2003?  Or 2001, 2002,

21  when he first contacted you?

22    A    Yes.

23    Q    And likewise, did he continue to

24  represent that he owned it when you prepared

25  Exhibit 5?

DEPOSITION OF RONALD RINGSRUD                    37

Advantage ARS Reporting

Exhibit 4

1    A    Five.  Yes, he did.

2    Q    And continuously through this date?

3    A    Yes.

4    Q    Okay.  Let's go ahead and take a look at

5    this.  This has been marked previously as

6    Exhibit 6 to the Thomas deposition.

7    A    (Witness reviews document.)

8    Q    First of all, the foundation, you've

9    seen Exhibit 6 before, correct?

10   A    Yes.

11   Q    And you're its author?

12   A    Correct.

13   Q    And it's your signature that appears at

14   the bottom of the first page?

15   A    Yes.

16   Q    And you prepared and signed this on or

17   around September 23rd, 2009?

18   A    Correct.

19   Q    Do you recall there being a reason for

20   creating this new report, like the one before it

21   you said was in response to the Suns of Buyers,

22   was this in response to some event that you can

23   remember?

24   A    All I remember is that I moved my office

25   back to Saratoga from Tows, and we got the

- 113 -

DEPOSITION OF RONALD RINGSRUD                    38

updated location of my address.

1     Q   Is that the reason, to your belief, that

2 Exhibit 6 was created, just to take off the

3 previous address in Iowa?

4     A   I -- this -- 2009 was a year ago. It's

5 that reason or something that I don't recall.

6     Q   Okay. Did Tony ask you to create

7 Exhibit 6 -- strike that.

8     Did anyone ask you to create

9 Exhibit 6 to assist in a lawsuit?

10     A   That might have been the reason.

11     Q   There you go. Do you now recall

12 Mr. Thomas coming to you and saying quick, we

13 need you to ratify your previous reports?

14     A   That happens a lot in my business.

15 People like reports that are on a recent date.

16 So the answer is yes.

17     Q   Again, trying to refresh your

18 recollection, do you have a recollection of

19 Mr. Thomas calling up and saying we need to

20 update the report for the purposes of court?

21     A   He may have used those words, but I

22 don't remember.

23     Q   Okay. There is a jurat -- if you look

24 at the second page of Exhibit 6, there is a jurat

25        DEPOSITION OF RONALD RINGSRUD      39

Advantage *ARS* Reporting

Exhibit 4

Advantage ARS Reporting

Exhibit 4

1    that appears there where you have your signature

2    notarized, correct?

3

4        A.    Yes.

5        Q.    I noted that that wasn't in the previous

6    report, Exhibit 5.   Is there a reason that you

7    executed and attached a jurat to the report?

8        A.    I remember some detectives from Santa

9    Clara County coming by the house and asking me

10   questions, and it might have been then that this

11   was required either by them or Mr. Thomas or

12   somebody.

13       Q.    You indicated you were contacted by the

14   sheriff or the police?

15       A.    Detectives.

16       Q.    When was that?

17       A.    About a year ago.

18       Q.    Were they inquiring about the stone or

19   about your appraisals?

20       A.    About both.

21       Q.    Do you recall the name of either?

22       A.    No.

23       Q.    And so it's your recollection that

24   because somehow the police had become involved a

25   jurat was necessary on your part?

        A.    That's what I recall.

                DEPOSITION OF RONALD RINGSRUD

                            - 115 -

                                                    40

1    Q    Okay.  Do you remember Tony asking you

2    to attach a jurat for court purposes?

3    A    He might have.  Either he or the

4    detectives asked me to do that, so --

5    Q    One of the two?

6    A    Right.

7    Q    Okay.  I also note that page three of

8    the -- of Exhibit 6 has some legal limitations,

9    emerald information, and connoisseurship

10    disclosure.  That wasn't on the previous report.

11    Is there a reason that you attached it to

12    Exhibit 6?

13    A    It's on the back of the first page of

14    the report.  And those limitations are usually

15    referring to faceted stones, and it's just a

16    rephrasing of limitations that appear on many

17    emerald reports from other companies as well.

18    Q    Have you and Mr. Thomas ever engaged in

19    any business ventures together?

20    A    No.

21    Q    Okay.  And you don't consider the

22    brokering of the stone to Mr. DeLoach to have

23    been a business venture between you and Tony?

24    A    If a sale would have resulted, I would

25    say that was a business venture.

DEPOSITION OF RONALD RINGSRUD          41

Advantage A R C Reporting

Exhibit 4

1    Q    Okay.  Did you have a written contract
2  with Mr. Thomas regarding your services?

3    A    No.

4    Q    Did you have an agreement with him
5  regarding your compensation in the event that you
6  procured a buyer for the store?

7    A    Not a specific agreement, no.

8    Q    So you were going to buy and sell it and
9  then work out what your part of it was?

10    A    He paid me for my time, and there was an
11  unspoken agreement that I would be compensated
12  additionally.

13    Q    Five percent, ten percent?

14    A    Those are numbers that you hear a lot
15  that is customary in the gem business.

16    Q    And that was your expectation, that if
17  it sold, you'd get a five or a ten percent
18  commission?

19    A    Yes.

20    Q    Okay.  We talked about one occasion
21  before where Mr. Thomas paid you $110 or so for
22  the first report in 2001, 2002.  Did you charge
23  additional sums for two reports that follow in
24  2007 and 2009?

25    A    Yes.

DEPOSITION OF RONALD RINGSRUD                    42

1          Q     Okay.  And again, about $110?

2          A     Not for an update.

3          Q     Okay.

4          A     It was probably less.

5          Q     Okay.  How much were you paid or

6    reimbursed with regard to your efforts on --

7    surrounding the sale to DeLoach and/or his

8    partner, through them?

9          A     I don't recall.

10         Q     Order of magnitude, more than $100?

11         A     He paid my travel expenses.  So yes.

12         Q     Which included what, where did you go?

13         A     To Reno.

14         Q     Anywhere else?

15         A     No.

16         Q     Okay.  And you recall DeLoach passing on

17   the deal because his customer didn't want to go

18   through with it?

19         A     Right.  Customers, plural.

20         Q     Let's go ahead and ask you to take a

21   look at Exhibit 4 to the Thomas deposition.

22         A     (Witness reviews document.)

23         Q     My first question to you is if you've

24   ever seen that before.

25         A     Yes, I have.

                    DEPOSITION OF RONALD RINGSRUD          43

Advantage  ARS  Reporting

Exhibit 4

1    Q    Approximately when did you see it?

2    A    Approximately in 2007 or eight.

3    Q    Okay.  Did you have any discussions with

4  Mr. Lytle about that report?

5    A    Yes.  I asked him about his -- some of

6  his additional experience mentioned in his

7  biography.

8    Q    So you asked him to add to it with other

9  information about his experience?

10    A    No.

11    Q    Okay.  Let me see if I can get this.  At

12  some point, on your introduction, Mr. Lytle is

13  retained by or commissioned by Mr. Thomas to

14  write an appraisal for the Thomas Emerald.  Did

15  you see a draft or a copy of the report from

16  JN --

17    A    H.

18    Q    -- H Forensic -- World Forensics?

19    A    I saw a copy after it was made.

20    Q    Okay.  You didn't see a draft or

21  preliminary?

22    A    I don't remember.

23    Q    Did you make any suggestions to

24  Mr. Lytle about changing Exhibit 4?

25    A    I don't recall asking him to change

Exhibit 4

1    anything.

2        Q    Have you and Mr. Lytle discussed any

3    aspect of the Thomas Emerald in the last year?

4        A    No.

5        Q    When was the last time you recall being

6    in touch with Mr. Lytle?

7        A    Two and a half years ago at the 2008

8    Tucson Gem Show.

9        Q    Okay.  And no communication since then?

10       A    Correct.

11       Q    When you received pay for the reports,

12   were you paid by check?

13       A    I assume -- I don't remember.  I assume

14   I was.  I may have been paid in cash.

15       Q    Did you ever see a check written on Tony

16   Thomas' bank account given to you, whether it's

17   for the report or for your travel reimbursement?

18       A    I don't remember seeing it, but I would

19   have to guess that yes, I did.  I probably

20   deposited it.

21       Q    Did you ever see a check written on the

22   bank account of AT Emeralds, LLC?

23       A    I don't recall.

24       Q    Have you been asked to testify at the

25   trial in this matter by Mr. Thomas?

DEPOSITION OF RONALD RINGSRUD                46

Advantage $\mathcal{ARC}$ Reporting

**Exhibit 4**

1    A    Yes.

2    Q    When did that occur?

3    A    A long time ago.  Maybe half a year ago

4    or maybe more.

5    Q    And what did Mr. Thomas tell you that

6    he -- what testimony did he tell you that he

7    wanted to extract from you in this case?

8    A    He said they would ask me about the

9    reports that I wrote and -- and he said they

10    would ask me about how collectors' pieces get

11    valuated in the gem industry.  That's what I

12    remember.

13    Q    And this was Tony telling you that's

14    what the focus of the questioning would be?

15    A    Yes.  Because I had -- I didn't meet his

16    lawyer until today.

17    Q    Did Tony Thomas ever tell you that the

18    emerald had been taken out of his possession and

19    control through court order?

20    A    No.

21    Q    Did Mr. Thomas ever tell you that he had

22    used the emerald to pledge as security for a

23    loan?

24    A    I may have heard something about that.

25    Q    What do you recall on that topic?

DEPOSITION OF RONALD RINGSRUD                46

Advantage ARS Reporting

Exhibit 14

1    A    I recall something about a loan from

2    someone in Hong Kong to finance the technology

3    company that he was -- or his friend was involved

4    in.  It's kind of a vague recollection, but

5    that's all I remember.

6    Q    When you refer to his friend, who are

7    you referring to?

8    A    I don't know.

9    Q    Michael Gardener?

10    A    I don't know.

11    Q    Okay.  Did you ever meet this friend?

12    A    No.

13            MR. SCANLAN:  All right.  We've

14    been going at it for an hour and ten, let's take

15    a five-minute break.  The next thing to finish, I

16    just want to check over my notes, so let's come

17    back at quarter after with the idea that we're

18    going to be finishing up in the next few minutes.

19            THE WITNESS:  Okay.

20            (Whereupon, a recess was taken.)

21            MR. SCANLAN:  All right.  We're

22    back on the record.

23    Q    BY MR. SCANLAN:  Mr. Ringsrud, I have

24    just a few more questions for you.  Has Tony

25    Thomas told you that he has had an offer to

DEPOSITION OF RONALD RINGSRUD                47

Advantage  ARC  Reporting

Exhibit 4

purchase the emerald, which offer was received

within the last two years?

A    No.

Q    Okay.  Has he ever told you that he

believes he missed an opportunity to sell the

emerald because it was under court order in

Florida?

A    He never told me anything about that.

Q    In connection with any of the marketing

work that you did with Mr. Deloach and/or his

partner, was an individual named Lori Pocinelli

Stern involved in the marketing at all?

A    Not that I recall, no.

MR. SCANLAN:  Okay.  That's all I

have.

MR. KAFKA:  Okay.  I have a few

questions for you.

EXAMINATION BY MR. KAFKA:

Q    Something that we haven't covered, and

I'd like to find out if you can tell me a bit

about your background.  So why don't you tell me

what your education is.

A    I graduated from University of South

Dakota and then studied gemology at the

DEPOSITION OF RONALD RINGSRUD

-123-

48

Advantage ARC Reporting

Exhibit 4

1    Gemological Institute of America in Santa Monica,
2    California in 1980.
3              I took numerous advanced courses
4    in gemology and seminars.  And I've contributed
5    to and written articles for the only gemological
6    peer reviewed journal called Gems and Gemology
7    Magazine, published by the GIA Gemological
8    Institute of America.
9              I was the featured speaker on the
10   subject of emeralds at the 1991 International
11   Gemological Symposium held in Los Angeles.  That
12   event was put on by the GIA, also.  And I
13   recently published a book called, "Emeralds, A
14   Passionate Guide," which is a complete story of
15   emeralds in 23 chapters.
16        Q    Okay.
17        A    And the book has already been translated
18   into Italian and Spanish and will come out in
19   Russian in a year or two.  And I'm frequently
20   invited to speak at gemological in the United
21   States and in Europe.
22        Q    Okay.  Do you happen to have a CV with
23   you.  I noticed you were carrying a bag.  Do you
24   have a CV in there?
25        A    No.  I can send you one.

                    DEPOSITION OF RONALD RINGSRUD         49

Advantage  A-RS  Reporting

Exhibit 4

1        Q    Okay.  If you wouldn't mind doing that.

2    I can give you my fax number.  I think we

3    e-mailed one another.

4        A    E-mail, uh-huh.

5        Q    Okay.  I'll get one to Mr. Scanlan if he

6    wants one.  What was your degree at University of

7    South Dakota?

8        A    BA in Spanish and Psychology.

9        Q    Okay.  So after that you had to find a

10   way to make a living?

11       A    You have a firm grasp of that situation.

12       Q    I have a similar BA, so I went to law

13   school.  Okay.  And what year did you graduate?

14       A    From University of South Dakota?

15       Q    Uh-huh.

16       A    1973.

17       Q    Okay.  And then when you did your

18   studies in Santa Monica, at that institute -- did

19   you receive a degree there?

20       A    Yes.  The GG degree.  That stands for

21   Graduate Gemologist.

22       Q    Okay.  So I think we've covered your

23   educational background in gems.  Then when did

24   you start actually working in the field?

25       A    In late 1983.

                    DEPOSITION OF RONALD RINGSRUD        50

Advantage ARc Reporting

Exhibit 4

1    Q    And can you give us kind of an overview?

2    I know you don't have to go year by year, but

3    give us kind of an overview of what you've been

4    doing for the past 27 years in the field.

5    A    All 27 years I've earned my living

6    buying and selling emeralds.  It's kind of a

7    narrow specialty, but somebody has to do it.  I

8    travel to Brazil and Columbia and do a lot of the

9    trade shows and selling events in the gem

10    industry.  But there was never a year that I did

11    anything else but buy and sell emeralds.

12                And as a graduate gemologist, I

13    get asked to do certificates and emerald reports,

14    emerald consultations and repairs on problem

15    stones or broken stones.  And for me, it's like a

16    new business, a new side business, to have self

17    published a book and learning how to publish and

18    market a book like that

19    Q    Okay.  Thank you.  Could you tell me a

20    little bit more just what you mean by buying and

21    selling emeralds?  I'm not really familiar with

22    what you mean.  You are trying to buy --

23    A    I'm a wholesaler.

24    Q    A wholesaler, okay.

25    A    And the word supplier is also

DEPOSITION OF RONALD RINGSRUD              51

Advantage  ARc  Reporting

Exhibit 4

appropriate. Supplier refers to a wholesaler

that goes to the source country. Suppliers

sometimes sell to other wholesalers, and the

people I sell to are generally jewelers and other

wholesalers, which means other dealers like

myself. So I do not sell very much to the

private customers. Occasionally private

customers require -- bring in special stone or

something, and I will sell to a private customer,

but most of my sales are wholesale sales to the

industry.

Q       So if I'm understanding correctly,

you're actually traveling to Brazil and Columbia

to buy these emeralds from the source?

A       I travel six times a year every year to

South America, but mainly Columbia. My -- my

trips to Brazil were not as profitable, and it's

farther to go, so I've specialized in Columbian

emeralds.

Q       Okay. And you buy from the source,

then?

A       Yes.

Q       Just --

A       I buy from the source.

Q       You buy from the source. From some

DEPOSITION OF RONALD RINGSRUD                           52

1 miner, some kind of a --

2   A Yes.  In downtown Bogota, Columbia, the

3 capitol of Columbia, is where the emeralds get

4 marketed, they get cut and marketed and exported

5 right there.  So I'll by from the cutters or the

6 exporters or even the miners who come to Bogota

7 to sell their stones.

8   Q Okay.  Thank you.  And then you will

9 then bring them into the United States, and at

10 some point you're going to sell them to a -- did

11 you say a supplier?

12   A I am the supplier.  I sell them to

13 wholesalers or jewelers.

14   Q You're the supplier, pardon me, and you

15 sell them to a wholesaler or a jeweler.  You're

16 not selling out to the public?

17   A Right.

18   Q Okay.

19   A You could also call me a wholesaler.

20 That's apt.

21   Q Okay.  Thank you.

22   A And in 1993, I purchased a second home

23 in Bogota, Columbia to be more comfortable when

24 I'm down there.

25   Q Okay.  Well, as a layman, I would say

      DEPOSITION OF RONALD RINGSRUD   53

Advantage   Reporting

Exhibit 4

1    you're a brave man to want to live down there.

2    It's just --

3        A    I'm the only -- I'm the only emerald

4    dealer from this country that bought a house

5    there and made it so much a part of my life.

6        Q    Okay.  So fair to say when you're doing

7    your purchasing at the source down there in

8    Columbia, you have to have a judgment as to what

9    these emeralds are worth as you're looking at

10    them?

11        A    Yes.

12        Q    And how do you go about that, just

13    generally?

14        A    It's experience based on repeated

15    looking at gemstones.  For example, there are

16    some of us who can instantaneously pick out a

17    synthetic emerald from a pile of emeralds, and

18    it's just a deeply engrained knowledge based on

19    experience that allows us to do that.  And my

20    judgment of price and value and rarity is also a

21    subjective skill based on experience.

22        Q    Okay.  Are you comfortable with telling

23    me the range that you work in, the low dollar

24    value that you buy and the high value?

25        A    I buy mainly faceted gemstones from $200

                    DEPOSITION OF RONALD RINGSRUD                54

Advantage ARo Reporting

**Exhibit 4**

1    per carat up to $15,000 per carat.

2        Q    Okay.  And just so I touch on this,

3    you -- about how often, let's say in the last ten

4    years, in the last ten years about how often have

5    you been contacted on average to do something

6    like a report, an appraiser -- appraisal or some

7    kind of an examination for someone to put a value

8    on an emerald?

9        A    I get contacted about 30 or 40 times a

10    year for an emerald report, and about a similar

11    amount of times I get asked for my verbal opinion

12    on the value of something.

13        Q    Okay.  So fair to say, then, that 30 to

14    40 times every year on average last ten years

15    you've actually written reports on emerald

16    values, or however you put the terminology?

17        A    Emerald reports.

18        Q    Reports?

19        A    My reports do not contain values in the

20    reports.

21        Q    Got you.  Okay.  So you're doing

22    reports, and can you -- is there a general

23    category or a general description of the types of

24    organizations that are contacting you for these

25    reports?

DEPOSITION OF RONALD RINGSRUD            55

1      A    It's very often other dealers or jewelry

2    stores.  And if the emerald is mounted in gold,

3    if the emerald becomes a jewelry piece, then I do

4    have a format in which I give a retail

5    replacement value of the whole jewelry piece.

6    It's the approximate retail replacement value,

7    the price you would find that same jewelry piece

8    if you had to run downtown and buy it at the

9    store or at the mall.

10      Q    Uh-huh, thank you.  Is any of this work

11    done for like insurance companies or --

12      A    Occasionally I do insurance company

13    replacement work because a stone breaks or is

14    lost, and I have to find a similar size, similar

15    quality emerald to replace that stone.

16      Q    All right.  And what is your typical

17    charge for a report, this kind of report I've

18    just been asking you about?

19      A    Eighty to $120.

20      Q    And that's based on your time of -- is

21    your time about 100, 110 an hour?

22      A    Approximately, yes.

23      Q    Okay.  Thank you for that background.

24    So whenever it was, about two oh one or two oh

25    two, when you were contacted by Tony Thomas about

                DEPOSITION OF RONALD RINGSRUD        56

Advantage  Reporting

Exhibit 4

1    this Thomas Emerald, did you feel like you were

2    sufficiently qualified to be able to do a report?

3        A    Yes.

4        Q    And why is that?

5        A    Because my frequent visits to the gem

6    shows and mineral shows puts me in contact with a

7    lot of rough emerald specimens.

8        Q    Okay.  The emerald, the Thomas Emerald

9    here, can we just -- a general size description,

10    it's about the size of a briefcase?  Does that

11    kind of work as a description?

12        A    It's -- it's large.  It's about a foot

13    and a half long or longer and about six to eight

14    inches diameter, which, being emerald, would give

15    it a weight of about 60 pounds.  Well, all I

16    remember is it was heavy, 40 to 60 pounds I would

17    say.

18        Q    Okay.  And then I'm putting that in

19    relation to these rough emeralds you've looked --

20    you looked at before the Thomas Emerald.  Had you

21    seen ones this comparable size?

22        A    Yes.

23        Q    Oh, okay.  About how many, if you can

24    give me an estimate?

25        A    Maybe -- maybe about ten or 12.  They

DEPOSITION OF RONALD RINGSRUD                57

Advantage  $\mathcal{ARo}$  Reporting

**Exhibit**c4

Exhibit 4
Advantage Reporting
- 133 -

DEPOSITION OF RONALD KINGSBURY                    58

1      were all smaller, but comparable still.

2      Q.   Okay.  On any of those ten or 12 that

3      you had seen or dealt with, had you written a

4      report on them?

5      A.   No.

6      Q.   Okay.  And just so I recall, in your

7      business you have run across specimen types of

8      emeralds that went to size 40 million?  Is that

9      what you've experienced?

10      A.   Yes.  My answer was in reference to

11      specimens in general, not necessarily emeralds.

12      For example, there was a aquamarine specimen that

13      sold for -- for a vast amount of money because of

14      its rarity.  It's all based on geological rarity.

15      Q.   I'm not sure what you're telling me.

16      Aquamarine is a color?

17      A.   Aquamarine is a variety of gemstone.

18      It's actually in the family of beryl, which

19      contains emerald as well.  Emerald and aquamarine

20      are cousins in the same family --

21      Q.   Okay.

22      A.   -- of beryl.  And emerald is green.

23      Aquamarine is blue.  And there are collectors

24      that collect gold or diamond specimens.

25      sapphire.  A ruby on matrix could cost well over

50 million, 40 million.

Q    Okay.  And you are aware of some, I guess, community of buyers out there, collectors that will spend this kind of money?

A    Yes.

Q    All right.  And how does one get in touch with such people, if you know?

A    It's a very closed community that only by careful observation at the gem shows do you find out who the big buyers are.

Q    Okay.  These heavyweight buyers would go to gem shows and purchase specimens --

A    Yes.

Q    -- for tens of millions?

A    Yes.  And sometimes they don't purchase for themselves.  Sometimes they represent other collectors elsewhere.

Q    Okay.  All right.  Thanks.  The emerald that sits in the British Museum, is that called the Crown Emerald?  I thought I heard someone say that.

A    I heard Mr. Scanlan say that.

Q    Okay.  You don't know --

A    I don't know what it's called.

Q    Okay.  Have you ever seen a picture of

DEPOSITION OF RONALD RINGSRUD                59

Advantage  ARo  Reporting

Exhibit 4

1    it?

2         A    If I have, I've forgotten any picture of

3    it.

4         Q    Okay.  And do you know how it came to

5    have a value placed on it?

6         A    I think the museum itself put that value

7    on it.

8         Q    I see.  Okay.  Let me ask you a few

9    topics, jumping around topics at this point,

10   okay.  During your various communications with

11   Tony Thomas in whatever format, personal, phone,

12   e-mail, what have you, have you come to -- come

13   to hear of something called AT Emerald?

14        A    Yes, I have.

15        Q    And what do you understand AT Emerald to

16   be?

17        A    All I know is that about a year or two

18   ago, Tony asked me to -- to change my e-mails to

19   him to Tony at AT Emerald dot com or dot org,

20   something like that.

21        Q    I see.  And has he on any occasion told

22   you that the owner of the Thomas Emerald is

23   something called AT Emerald?

24        A    He probably has, because I understand

25   that -- that that's -- that's who he's been

                    DEPOSITION OF RONALD RINGSRUD         60

Advantage  $\mathcal{ARo}$  Reporting

**Exhibit 4**

1    working through all this time.

2        Q    Okay.  So you've had the understanding

3    that the legal or true owner of the Thomas

4    Emerald is the entity called AT Emerald?

5            MR. SCANLAN:  Objection.  Misstates

6    previous testimony.

7        Q    BY MR. KAFKA:  You can answer.

8        A    I just understand that Tony owns the

9    emerald, and his company is AT Emerald.

10       Q    Okay.

11       A    So I assume that they're the same thing.

12       Q    Are you saying that you have reason to

13   believe the emerald is owned by AT Emerald and

14   Tony runs or owns the company?

15       A    I'm not -- I'm not saying that.  I'm

16   saying that Tony and AT Emerald, it's probably

17   his corporation, and he probably runs it through

18   there.

19       Q    Runs the emerald through there?

20       A    All of his emerald or jewelry dealings.

21       Q    Okay.  There was some discussion about

22   the appraisal done by Dimitri P down in Brazil?

23       A    Uh-huh.

24       Q    Right?  That was one of the exhibits you

25   looked at?

                DEPOSITION OF RONALD RINGSRUD        61

Advantage *ARC* Reporting

**Exhibit 4**

1    A    Yes.

2    Q    And Mr. Scanlan implied that Dimitri was

3    one of the sellers of the Thomas Emerald.  Do you

4    remember that?

5    A    I remember that.

6    Q    Do you know if Dimitri ever had any

7    ownership, or was he -- pardon me.  Let's start

8    over.  Strike that.

9         Do you know if Dimitri P was a

10   seller of that emerald?

11   A    No, I don't know.

12   Q    You don't know one way or the other?

13   A    No.

14   Q    Okay.

15   A    I think I said I understood he bought it

16   from his partners.

17   Q    There was a reference to a partner.  I

18   think that you were saying that you had -- I

19   think what you said was you thought Tony bought

20   it from some partners of his in a mine -- mine

21   down in Brazil?

22   A    That's what I --

23   Q    Is that what you're saying?

24   A    -- said, yeah.

25   Q    And do you know if Tony had partners in

DEPOSITION OF RONALD RINGSRUD

a mine down in Brazil?

2    A    Yes, I understood that from Tony.

3    Q    Okay. That's what you thought he was

4 telling you?

5    A    Yes.

6    Q    You don't have any other way of knowing

7 if he was a partner in a mine --

8    A    No.

9    Q    -- right?

10    A    No.

11    Q    Do you know the names of any of the

12 so-called partners?

13    A    No.

14    Q    Okay. Okay. Well, let me ask you this:

15 From what I understood your testimony this

16 afternoon was that you recommended that Tony

17 Thomas have Jim Lytle do an actual appraisal on

18 the Thomas Emerald?

19    A    Yes.

20    Q    And to paraphrase your reasoning, you

21 felt that he was someone with the experience

22 to be able to do it, and he actually did

23 appraisals?

24    A    Yes. I -- I did. I met him at least

25 ten years ago at the Tucson Gem Show, and Lytle

1    is from Tucson.

2        Q    And you had then sort of known him,

3    then, over those ten years?

4        A    Yes.

5        Q    Okay.

6        A    Uh-huh.

7        Q    Had you had business dealings with him?

8        A    No.  We share a fascination with the

9    Atocha emeralds, which were emeralds recovered

10   from a shipwreck off the coast of Florida, and we

11   share a general gemological interest in emeralds

12   in general.

13       Q    Okay.  All right.  And if I recall your

14   testimony, you did not tell him what you thought

15   the Thomas Emerald was worth before he did his

16   appraisal?

17       A    No.

18       Q    You didn't whisper in his ear you think

19   it's worth something like what the one in the

20   British Museum is worth?

21       A    No -- I knew he knew about the

22   British Museum, because they look for

23   comparables, appraisers look for comparables all

24   over the place, but I leave that to the

25   appraisers to put prices.

         DEPOSITION OF RONALD RINGSRUD          5

Advantage *ARQ* Reporting

Exhibit 4

1  Q    Okay.  Thank you.  And then how did Tony

2  Thomas get to Mr. Steele, do you know?

3  A    He got to Mr. Steele through Mr. Lytle.

4  Q    Okay.  Had you known Mr. Steele?

5  A    No.

6  Q    Okay.  So in other words, you didn't

7  recommend that Tony Thomas go to Mr. -- let me

8  get his name here.

9  A    Harrison Steele.

10  Q    Mr. Harrison Steele for another

11  appraisal?

12  A    No.

13  Q    That was on advice of Mr. Lytler.

14  A    It was on Mr. Lytle's advice, correct.

15  Q    And if I understand the picture here,

16  this Casey -- what was his last name?

17  A    Deloach.

18  Q    Deloach.  Casey Deloach had potentially

19  someone who wanted to buy it, and that person

20  needed at least three appraisals?

21  A    Exactly.

22  Q    Okay.

23  A    That's correct.

24  Q    And at the end of the day the sale never

25  went through for reasons you don't know?

DEPOSITION OF RONALD RINGSRUD                       65

Advantage AQR Reporting

- 140 -

Exhibit 4

1    A    Correct.

2    Q    I guess did Tony Thomas do something to

3    scuttle that sale or not make it happen or

4    interfere with it, to your knowledge?

5    A    No.

6    Q    Okay. Okay. So you, you're still

7    currently in business?

8    A    Yes.

9    Q    And you run a business down in Saratoga,

10   is that it?

11   A    That's correct.

12   Q    And we have you being in Iowa for

13   just -- we talked outside, for like a year?

14   A    One year in 2007, approximately.

15   Q    And we talked that was some adventure to

16   have your kids go to school for a year, and your

17   wife said we need to go back to California?

18   A    I hoped to stay there for two years, but

19   it ended up being one year.

20            MR. KAFKA: Okay. Okay. I don't

21   have any more questions. Thank you.

22            MR. SCANLAN: Okay. Now's the part

23   where we go to recross. Mr. Kafka's questions

24   have raised some questions in my mind, or

25   suggested some.

DEPOSITION OF RONALD RINGSRUD                    65

FURTHER EXAMINATION BY MR. SCANLAN:

Q    During our break, did you discuss -- or strike that.

At any time before today, did you discuss the issue of the identity of AT Emerald, LLC and its ownership interest with anyone?

A    No.

Q    Okay.  You recall that Mr. Thomas used the words "AT Emerald" to you?

A    Yes.

Q    Okay.  In what connection?

A    To change the e-mail address.

Q    Okay.  Before that, you'd been sending it to his personal address?

A    Yes.  Well, actually, before that, I had been sending it to the address of the technology company that he was involved in.

Q    The bankrupt Electronics Plastics?

A    I have no idea what the technology company did or does.

Q    Okay.  Got it.  Did you discuss AT Emerald at all during the break with either Mr. Thomas or Mr. Kafka?

A    Yes.

Q    What did you talk about?

DEPOSITION OF RONALD RINGSRUD                67

Advantage *ARC* Reporting

**Exhibit 4**

1      A    He said they -- they asked me if AT

2    Emerald, if I knew about AT Emerald, and I said I

3    only know it as -- as one of his companies.

4    Mr. Thomas is involved -- was involved with a

5    chip that reads cards.  He's also involved in

6    something else.  He also has a construction

7    company.

8              It's kind of confusing to me, so I

9    don't -- I know Tony Thomas also had the AT

10   Emerald company, but it's all kind of a blur

11   together to me.  I know that Tony Thomas owned --

12   or is involved in all those things, but I know

13   that AT Emerald is his company.

14     Q    And as you sit here today, you have no

15   idea whether Mr. Thomas or AT Emerald is the

16   legal owner of the Thomas Emerald?

17     A    Do I know whether --

18     Q    Who owns the stone, Mr. Thomas, or AT

19   Emerald?

20     A    I have no idea.

21     Q    Okay, great.

22     A    Let me qualify that.  My company is a

23   sole proprietorship.  I never took business

24   courses in college at all, and I'm not clear on

25   the delineations of and limitations of ownership

DEPOSITION OF RONALD RINGSRUD              68

Advantage $\mathcal{ARC}$ Reporting

**Exhibit 4**

and how it relates to the company. I assume that
it's Tony Thomas' emerald. Whether or not it was
his company owning it or himself, it's all news
to me.

Q    Okay.

A    Does that make it clear?

Q    It surely does. Let me go, then, to a
different area, and I'm glad that Mr. Kafka
talked to you about specimens, and you
differentiated between emeralds and aquamarines.
It makes me need to ask you the following
question: Number one, what is the largest
specimen emerald you have ever written an appraisal
on?

A    The Thomas Emerald.

Q    Okay.

A    Outside of that, I don't recall.

Q    Okay. Have you ever done any other
appraisals of specimen emeralds besides the
Thomas Emerald?

A    Yes.

Q    Okay. Approximately how many?

A    Maybe 20.

Q    And the highest value among those
specimens that you looked at?

DEPOSITION OF RONALD RINGSRUD                    69

Exhibit 4

1        A    I never put values on my --

2        Q    Okay.  So you just wrote reports?

3        A    -- specimen appraisals.

4        Q    Largest size in carats of uncut specimen

5   emeralds that you have written reports for,

6   besides the Thomas Emerald?

7        A    Outside of the Thomas Emerald, 6,000

8   carats.

9        Q    And that was a specimen stone?

10       A    Yes.

11       Q    And do you know what that sold for

12   ultimately?

13       A    No, I don't.

14       Q    Who owned it, to your recollection?

15       A    A Columbian man owned it.

16       Q    So you just did a report on that.

17   What's the highest price that you are aware of

18   that has been brought by a specimen Columbian

19   emerald?

20       A    I have heard of around 50 million.

21       Q    Okay.  Now, when I asked that question

22   before, you indicated 40 million.  We're talking

23   about emerald specimen stones.

24       A    Yes.

25       Q    What emerald specimen stone sold for 50

                  DEPOSITION OF RONALD RINGSRUD          70

Advantage  ARo  Reporting

Exhibit 4

million dollars?

    A    Something that Victor Carranza owned in Columbia, and I'm only -- you asked me what I heard, and that's -- that's the only detail I can give.

    Q    Let me ask it a different way, then. Based on your own personal knowledge, having read about a sale or been at a sale to confirm it in a way to you that you feel comfortable with, what's the highest price that you know of for a Columbian specimen emerald?

    A    Well, outside of that 40 or 50 million dollar piece, just ten million.

    Q    And what is that stone called?

    A    It's an asking price on an emerald that is 1,000 carats.

    Q    Okay. And let's talk about completed sales. An asking price is just that until somebody says I'll take it. How about completed sales of specimen emeralds, largest dollar amount?

    A    Part of the mystery of the mineral community is that they don't talk about the final price of a -- of many of these sales that go on. I know the asking price of a couple of important

DEPOSITION OF RONALD RINGSRUD    71

Advantage    Reporting

Exhibit 4

1    emeralds was ten million dollars.

2        Q    Okay.  How about completed sales, the

3    highest completed sale you're aware of?

4        A    I know they sold, but --

5        Q    Oh, they did?

6        A    -- maybe -- yes, they did.  But maybe

7    they went down 20 percent, I don't know.

8        Q    Or 40 or 50 or 90?

9        A    It's wide open.

10        Q    Have you ever appraised, as distinct

11    from giving a report on, a specimen emerald?

12        A    Yes.  Oh, no.  You said appraised --

13        Q    Yes.

14        A    -- as opposed to giving a report on?

15        Q    Right.

16        A    No.

17        Q    Okay.  So it is a true statement that

18    you have appraised, placed a price upon, zero

19    specimen emeralds?

20        A    Yes.

21        Q    Okay.

22        A    Although I buy and sell them.  I've

23    given verbal opinions, but not written

24    appraisals.

25        Q    Aside from your involvement with the

                    DEPOSITION OF RONALD RINGSRUD            72

Advantage  ARS  Reporting

Exhibit 4

1    Thomas Emerald, did you and Mr. Thomas conduct

2    any other transactions, he sold and you

3    purchased, or you sold and he purchased any other

4    gemstones?

5        A    No.

6        Q    And since you haven't been in business

7    with him, aside from writing the report and

8    renewing it and your efforts related to DeLoach,

9    you had no other dealings with Mr. Thomas?

10       A    Correct.

11       Q    We talked about the British stone that

12   is supposedly worth 700 million dollars.  I think

13   you were asked, maybe not, have you ever seen

14   that stone?

15       A    No.

16       Q    Not a picture of it?

17       A    If I did, I forgot.

18       Q    Okay.  All right.  A lot of things

19   besides the raw size go into valuing a specimen

20   emerald, correct?

21       A    Yes.

22       Q    Color?

23       A    Color.

24       Q    Clarity?

25       A    Transparency.  Form.

DEPOSITION OF RONALD RINGSRUD                73

Advantage        Reporting

Exhibit 4

Advantage *AR* Reporting

Exhibit 4

1    Q   Is there any way that you can -- scratch
     that.

2

3    Q   How did you come to know of the
     British stone?

4

5    A   I saw it in the Exhibit 2, when it was
     shown to me --

6

7    Q   Okay.

8    A   -- back in 2001 or two.

9    Q   So on your first report, you had that
     information?

10

11   A   Yes.

12   Q   Are you aware that Mr. Thomas was the
     source of that information to Dimitri of the many
     syllable name?

13

14

15   A   No.

16   Q   Are you familiar with the fact that
     Mr. Dimitri last name P produced an appraisal
     before the one in front of you for $400,000?

17

18

19   A   I'm not familiar with that, either.

20   Q   Okay. Mr. Thomas did not provide you
     with an appraisal from Dimitri with less than the
     value expressed in the exhibit there before you?

21

22

23   A   That is correct, he did not provide me.

24   Q   Okay. And just as we're wrapping up

25   here, I'm trying to seal off possibilities. You

DEPOSITION OF RONALD RINSRUD

1   currently have no opinion of the monetary value

2   of the emerald we've been talking about?

3   A.   No.  The GIA will say what I say, that

4   the value of a specimen is based on rarity and

5   attractiveness to a customer and whatever a buyer

6   and seller agree upon, that is the value of the

7   stone.

8   Q.   Okay.  So you don't -- you currently

9   don't have an opinion, you've never had an

10  opinion up until this point, of the monetary

11  value of the stone?

12  A.   Correct.  I -- I expressed the opinion

13  that it's rare, collectible and special, but I

14  don't give a price.

15  Q.   Okay.  And you haven't been asked to

16  provide an appraisal, as distinct from a report,

17  by Mr. Thomas or his Counsel?

18  A.   I told him way at the beginning that my

19  reports do not contain values.

20  Q.   So it's a fair statement for me to

21  assume that neither of them have asked you to

22  prepare an opinion of monetary value for the

23  Thomas Emerald?

24  A.   Yes, that's fair to say that.

25       MR. SCANLAN:  All right.  That's

         DEPOSITION OF RONALD RINGSRUD

Advantage A R R Reporting

Exhibit 4

75

1    all I have for my questioning. I do have a

2    document here for you, which is a subpoena to our

3    trial, which is set in October.

4              Joe, you're back up.

5         MR. KAFKA: I have just a few

6    questions. It looks like he's busy reading the

7    trial subpoena.

8         THE WITNESS: (Witness reviews

9    document.) Uh-huh. October 12th. Okay.

10

11   FURTHER EXAMINATION BY MR. KAFKA:

12   Q   Okay. So I'm coming to understand

13   through my client that you have looking at --

14   you've looked at another emerald that he had

15   about 20,000 carats in size?

16   A   Yes.

17   Q   Do you remember that?

18   A   Yes. I refer to that as the second

19   emerald.

20   Q   The second emerald?

21   A   Yeah.

22   Q   Okay.

23   A   Yeah, the Thomas Emerald, the second

24   emerald and the Bahia.

25   Q   Okay. And so you provided a report on

                              DEPOSITION OF RONALD RINGSRUD    76

Advantage   Reporting
Exhibit 4

the second emerald?

    A    Yes, I did.

    Q    And that was -- that was for Tony and another lawyer, not me?

    A    No.  It was just for Tony.

    Q    Just for Tony, okay.  And then earlier in your testimony you were talking about I think being available for a trial; is that right?  Some lawyer has talked to you about being available for a trial?

    A    It's kind of confusing.

    Q    It is.

    A    But, yes, I -- I'm -- I'm -- I knew I was involved with this trial and --

    Q    When you say --

    A    And somebody called me asking about the Bahia, but he got less interested in me when I said I never saw it in person.

    Q    So to kind of make it clear, you know, for our record, I never asked you to come to this case concerning the Thomas Emerald to be a witness, right?

    A    That's correct.

    Q    You've now been subpoenaed by Mr. Scanlan to come to the trial, right?

               DEPOSITION OF RONALD RINGSRUD      77

Advantage ARo Reporting

Exhibit 4

1        A    Yes.

2        Q    And on the second emerald, the 20,000

3    one in size, you have been asked by some other

4    lawyer to go down to Los Angeles for that trial;

5    is that right?

6        A    I don't think I have yet.

7        Q    Okay.

8        A    Have I?  I mean, it's kind of confusing.

9        Q    There's --

10       A    I didn't get a physical written

11   subpoena, but I -- I was -- I was going to go

12   down to Los Angeles for something.

13       Q    All right.

14       A    And then they changed the date of it.

15       Q    All right.  That's all right.

16       A    But they changed it to September 8th,

17   which is the same day as the Bahia trial, so --

18       Q    So we have your answer.

19       A    I'm confused.  You know, they're kind of

20   lumping together.

21       Q    They are.  I think Mr. Scanlan and I

22   understand that what you're talking about has to

23   do with Bahia in Los Angeles and what we're

24   talking about here with the Thomas Emerald is our

25   case.

                    DEPOSITION OF RONALD RINGSRUD          78

Advantage  ARC  Reporting

Exhibit 4

1          A     Okay.

2          Q     Okay.

3          A     I'm sorry about the confusion, but I'm a

4    busy man and --

5          Q     And there's three emeralds here to keep

6    track of.

7          A     -- very old.

8          Q     Okay.  So before today, have you talked

9    to Mr. Scanlan here about any of these topics?

10         A     No.

11         Q     Have you talked to his client,

12   Mr. Tersini, any about any of these topics?

13         A     No.

14         Q     And just to be clear, there's Dimitri

15   P's appraisal for around $400,000, right, and

16   there's also his for the hundreds of millions,

17   right?

18         A     I just heard about them today, yes.

19         Q     Okay.

20         A     What about that?

21         Q     Would that man's opinions about value

22   have anything to do with your -- with your

23   opinion about this -- the Thomas Emerald's

24   qualities of rarity and those things?

25         A     I doubt it very much.  His opinion seems

                    DEPOSITION OF RONALD RINGSRUD              79

Advantage  ARC  Reporting

Exhibit 4

1    to precede my opinion.

2        Q    Have you heard of any offers to buy the

3    Thomas Emerald?

4        A    Tony says that somebody wants it, but

5    it's vague.  I haven't heard of any specific

6    offers.

7                MR. KAFKA:  Okay.  All right.

8                (Whereupon, Mr. Thomas conferred

9    with Mr. Kafka off the record.)

10                MR. KAFKA:  All right.  Sorry.

11    Something else came up.  We're trying to get a

12    super duper clear record.  Are you ready?

13                THE WITNESS:  Yes.

14        Q    BY MR. KAFKA:  On the second emerald,

15    the 20,000 one, did you actually do an appraisal

16    with a dollar amount?

17        A    Yes, I did.

18        Q    Okay.  Thanks.  What do you recall that

19    number being, if you do?

20        A    It was $100 a carat, or something like

21    that.  We can look it up.  It's somewhere, but

22    that emerald was subsequently altered, which

23    nullifies my dollar amount or my appraisal or

24    anything on my report.

25                MR. KAFKA:  Okay.  That's basically

                DEPOSITION OF RONALD RINGSRUD          80

Advantage  ARC  Reporting

Exhibit 4

1      all I wanted to get clarified on the record here.

2                    THE WITNESS:  Yeah.

3                    MR. KAFKA:  I'm done.

4                    MR. SCANLAN:  Okay.  And this keeps

5      getting narrower and narrower, so bare with us.

6      I wanted to talk to you about the second emerald.

7

8              FURTHER EXAMINATION BY MR. SCANLAN:

9          Q     How did you come -- strike that.

10                    How did Tony Thomas introduce you

11     to the second emerald?

12         A     He came to my house for a report and a

13     photograph of it.

14         Q     And what did he tell you?

15         A     He came with Kinetto, and I remember

16     Tony saying that he's going to pay me for that

17     report, 'cause he's buying it from Mr. Kinetto.

18         Q     Okay.  And you created a written

19     appraisal for the stone, correct?

20         A     Yes.

21         Q     And it was $100 a carat and a 20,000

22     carat stone, so, rough and dirty, two million?

23         A     Yes.

24         Q     What makes the Thomas Emerald -- strike

25     that.

                    DEPOSITION OF RONALD RINGSRUD            81

Advantage A-R-C Reporting

Exhibit 4

Advantage A[DR] Reporting

Exhibit 4

1    Exhibit 6, you refer to the high rarity of the

2    Thomas stone, correct?

3        A    Yes.

4        Q    The reason that I ask you about the

5    second stone is now Mr. Thomas, one individual,

6    has a 20,000 carat emerald, a 21,000 carat

7    emerald and claims to an 850 pound emerald. How

8    rare are they?

9        A    They're rare because of their color and

10   form. And the emeralds from Brazil often come

11   out very large, but in the case of the Thomas

12   Emerald, it has a very beautiful aesthetic form

13   that museums or collectors look for.

14       Q    Okay.

15       A    The second emerald had that to a lesser

16   degree, and the Bahia emerald, I haven't seen it

17   except for bad photographs of it, so I don't

18   know.

19       Q    Okay. Through your testimony, and I'm

20   not sure exactly how it went, Mr. Thomas came to

21   you, he said he had a buyer for the second stone?

22       A    No.

23       Q    Okay. He came to you, he said he was

24   going to buy the second stone?

25

    DEPOSITION OF RONALD RINGSRUD                    82

- 157 -

1    A    That's what I remember.

2    Q    He was going to buy it?

3    A    Yes, from Kinetto.

4    Q    K-o-n-e-t-t-o?

5    A    K-i-n-e-t-t-o I would venture.

6    Q    Who is that?  I'm not familiar with the

7    name.

8    A    I believe they were partners --

9    Q    Okay.

10    A    -- at the time.

11    Q    And -- okay, I've got it.  The reason

12    you valued the second stone at two million --

13    strike that.

14          You provide the appraisal for the

15    second stone.  What happens next?  Do you know if

16    the sale is consummated?

17    A    No, I don't know.  I didn't see any

18    official announcements or documents, but . . .

19    Q    And Tony never told you there was a

20    transaction involving that sale of the second

21    stone?

22    A    Just his transaction.  He bought it from

23    Kinetto is what I understand.

24    Q    Okay.  And do you know if he paid the

25    two million dollar appraised price for it?

DEPOSITION OF RONALD RINGSRUD          83

Advantage $\mathcal{ARe}$ Reporting

**Exhibit** 4

1   A    I don't know.

2   Q    Do you know where the second stone is

3 today?

4   A    No.

5   Q    Did Mr. Thomas first present this second

6 stone to you at or about the time he first

7 presented the Thomas Emerald?

8   A    Well, again, that's ten years ago. It

9 was either at the same time or a year later. I

10 don't remember.

11   Q    And did he, Mr. Thomas, tell you how

12 he too had gotten possession of this stone?

13   A    No, he didn't.

14       MR. SCANLAN:  All right.  That's

15 all I've got.

16       MR. KAFKA:  I have a couple, 'cause

17 there may be some confusion in the air.

18

19 FURTHER EXAMINATION BY MR. KAFKA:

20   Q    All right.  This -- all right.  When you

21 did the appraisal on the second emerald, did you

22 understand that it was being appraised so Tony

23 Thomas could pay two million to Mr. Kingsrud?

24   A    I didn't have that understanding --

25   Q    All right.

       DEPOSITION OF RONALD RINGSRUD   84

Advantage ARS Reporting

Exhibit 4

1   A      -- no.

2          MR. KAFKA:  That's all I have.

3

4          FURTHER EXAMINATION BY MR. SCANLAN:

5   Q      What understanding did you have?

6   A      That he was buying the stone from, or

7   had already bought the stone from Mr. Kinetto,

8   one of those two.

9          MR. SCANLAN:  Could you read back

10  the last two questions and answers, the one from

11  Mr. Kafka and then mine.

12         (Whereupon, the record was read by

13  the court reporter.)

14         BY MR. SCANLAN:  Is the reason you

15  answered Mr. Kafka's question no because you

16  don't know about the price, the two million

17  dollars?

18  A      Is the reason I answered Mr. Kafka's

19  question no --

20  Q      Okay.  Let me --

21  A      -- because I --

22  Q      -- start in again.  My confusion is

23  caused by the fact that I had the same question

24  answered differently back to back with only one

25  variable.  So why don't I not try and recreate

DEPOSITION OF RONALD LANGSNER

Advantage ARC Reporting

Exhibit 4

65