Advantage ADR Reporting

Exhibit 4

1   MR. SCANLAN: Okay. That's all I

2   have.

3   MR. KAFKA: I'm done. Thank you.

4   THE REPORTER: Joe, do you want a

5   copy?

6   MR. KAFKA: Yes.

7   (Whereupon, the deposition of

8   RONALD RINGSRUD was concluded at 3:19 p.m.)

    _____
    RONALD RINGSRUD

    Date: _____

    --oOo--

    DEPOSITION OF RONALD RINGSRUD                    87

1          I, LISA GLANVILLE, C.S.R. #9932, a

2     Certified Shorthand Reporter in and for the State

3     of California, do hereby certify:

4          That prior to being examined, the

5     witness named in the foregoing deposition was by

6     me duly sworn to testify to the truth, the whole

7     truth, and nothing but the truth;

8          That said deposition was taken before

9     me at the time and place set forth and was taken

10    down by me in shorthand and thereafter reduced to

11    computerized transcription under my direction and

12    supervision, and I hereby certify the foregoing

13    deposition is a full, true and correct transcript

14    of my shorthand notes so taken.

15         I further certify that I am neither

16    counsel for nor related to any party to said

17    action nor interested in the outcome of this

18    action.

19         Witness my hand this _____ day of

20    August, 2010.

21

22

23                    _____
                      LISA GLANVILLE
24                    CSR No. 9932
                      State of California
25


                DEPOSITION OF RONALD RINGSRUD            86


Advantage  ARC  Reporting

**Exhibit 4**

Feb 17 '04  18:52    P.03

## HISTORY OF THE THOMAS EMERALD

To Whom It May Concern:

At the end of the year 2001, a Brazilian group needed financial assistance to continue their mining operations and approached Mr. Anthony Thomas through a mutual acquaintance. The group advised Mr. Thomas that the mine had started to show promising results but they had underestimated the amount of capital and equipment needed to operate in such a remote location deep in the Brazilian jungle. The purpose of the request was to purchase additional equipment, supplies and for working capital.

In the summer of 2001 the mine began to produce emeralds of various size and quality. The miners continued to go deeper and had continued success. In October of 2001 it was requested that Mr. Thomas come to Brazil. Upon his arrival, Mr. Thomas was presented with an emerald now known as the Thomas Emerald. The Emerald was the largest specimen that anyone had ever seen. A description of the Thomas emerald is as follows:

Two emerald crystals intersect at the base and three out of the six hexagonal faces are visible above the matrix. The MAIN crystal is approximately 34 centimeters (34cm) long and 7.4 centimeters (7.4cm) wide; the second is approximately 10 centimeters (10cm) long with the same width. Weight is estimated by calculation is approximately 21,000 carats or 4,200 grams.

Mr. Thomas then flew from Sao Palo Brazil to California, in November 2001,with the emerald in the overhead bin of the plane. Upon arrival in the United States Mr. Thomas declared the gemological specimen he was carrying. The stone has been held in a vault in California ever since.

Very truly yours,

*Anthony Thomas*  /  2 17 04

Anthony Thomas
A T Emerald LLC

STATE OF CALIFORNIA
COUNTY OF SANTA CLARA
SUBSCRIBED AND SWORN TO BEFORE ME
THIS  17  DAY OF FEBRUARY 2004
BY  ANTHONY THOMAS

*William F. Bronner*
NOTARY PUBLIC WILLIAM F. BRONNER

NOTARY PUBLIC STATE OF CA
WILLIAM F. BRONNER
COMM # 1376031  EXP NOV 1, 2005
COUNTY OF SANTA CLARA

WILLIAM F. BRONNER
COMM. NO. 1376031
NOTARY PUBLIC - CALIFORNIA
SANTA CLARA COUNTY
COMM. EXPIRES NOV. 1, 2005

**EXHIBIT**
2
1/15/16 Thomas GM

K0160
**Exhibit 4**

Feb 1 '04   11:53   P 04

# CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT

STATE OF CALIFORNIA
COUNTY OF  SANTA CLARA ss.

On this 17th of February 2004 before me, WILLIAM F BRONNER Notary Public

Personally appeared ANTHENY THOMAS

☐ personally known to me or ☒ proved to me on the basis of satisfactory evidence to be the person/s whose name is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity/ies, and that by his/her/their signature/s on the instrument the person /s or the entity upon behalf of which the person /s acted, executed the instrument
WITNESS my hand and official seal

Signature _William Bronner_

WILLIAM F. BRONNER
COMM. NO 1378031
NOTARY PUBLIC CALIFORNIA
SANTA CLARA COUNTY
COMM. EXPIRES NOV. 1, 2006

WILLIAM F BRONNER NOTARY
Notary Public in and for the State of California
Commission # 1378031  Expiration Nov 1, 2006

Document Name
HISTORY OF THE THOMAS'S    Number of Signers __1__
EMERALD

- 165 -

**Exhibit 4**

KQ161

True copy of Text of Appraisal from Harrison Steele Partners PP  dtd 12/3/06

QUOTE . . .

Harrison Steele Partners P.P.

Date: December 3, 2006

To Whom It May Concern:

APPRAISAL OF EMERALD SPECIMEN

APPRAISER'S EXPERIENCE

I have worked in the field of valuation science, gemology and economics for over 34 years.  This includes studying many emerald crystals; I have learned a great deal from mines in Brazil and Colombia. I have spent a great number of late hours with others who share my interest in emeralds, emerald formations, emerald treatments and emerald valuation.
I have also debated the finer points of emerald growth and formation as affects durability and value based on color, shape, termination, intrusion of other minerals such as calcite, etc.

With my economic experience added to this, and the apparent deflationary times lurking ahead, I judge myself to be more than well-qualified to offer an opinion of the unique 21,000 ct crystal under consideration, known currently as the "Thomas Emerald."

GEMOLOGICAL SPECIFICATIONS AND OPINION OF VALUE

ORIGIN: Brazil.

FORMATION: This is a well-formed hexagonal emerald, resting in a bed of grey-black mica schist. The crystal is approximately 34 cm long. The tone rating is a dark, strongly saturated hue. The color rating is a very slightly yellowish-green and is semi-transparent to opaque.

Two emerald crystals intersect at the base and three out of six hexagonal faces are visible above the matrix. The main crystal is approximately 34 cm long and 7.4 cm wide; the second crystal is approximately 10 cm long with the same width. The weight estimation was done by calculation (the only appropriate method in this case) and yields a result of approximately 21,000 carats, or 4,200 grams. These measurements place this emerald



K0123

- 166 -

**Exhibit 4**

among the largest known specimens in the world, if not the absolute largest. It is, without a doubt, the longest.

SALES MARKET FOR HIGHEST AND BEST USE: Collectors and Museums. It is my opinion that this emerald should not be sold outside of the aforementioned marketplace.

OPINION OF ESTIMATED APPRAISED VALUE: The only comparable emerald crystal now known is the 3,296 gram crystal in the British Museum. This falls 1,204 grams short of the Thomas Emerald. This crystal was valued at $792 million USD in 2001. Considering this and all other determinable variables, including the effects of deflation on Current Value, I can place this specimen within a modal range of approximately $650-750 million US Dollars on the date of this appraisal. This modal range is valid only on the date of signing, and does not include any taxes, auction fees, or other such fees that are sometimes assessed in a monetary exchange.

Dr. Stephen H. Steele
Managing Partner
Harrison Steele Partners
P.O. Box 24841
Chattanooga, TN 37422
HarrisonSteelePartners@Yahoo.com

. . . UNQUOTE

K0124

**Exhibit 4**

EXHIBIT
4
1/17/16  Thomas  6M

# jnh World Forensics, LLC
Specialists in Rare and Unusual Gemstones and Minerals
Member: American Gemological Association,
National Association of Jewelry Appraisers

P.O. Box 90198
Tucson, AZ 85752
(520) 465-0304

Appraisal For: To Whom It May Concern
Proper Market: Collector Auction or Museum
Estimated Appraised Value: $650 million USD
Date: Feb. 22, 2007

## DESCRIPTIVE REPORT AND ESTIMATED APPRAISED VALUE

This specimen is an emerald-in-matrix, with Brazil being its country of origin.
Gemologically and descriptively, we see a well-defined emerald in a matrix of black-grey
mica schist. It is approximately 34 cm in length and 7.4 cm in width for the main, or
outstanding crystal. A second crystal, which veers from the "top" of the main crystal at
an approximate 60-degree angle (the basic angular definition of hexagonal), is
approximately 10 cm. long and 10 cm. in width.

The weight estimation by gemological formula for the entire emerald is approximately
4200 grams, which equates to 21,000 carats. Specimens such as this are generally not
referred to in carat weight, however. This weight makes this particular specimen one of
the world's largest.

The color is a heavily saturated very slightly yellowish-green, with a very dark tone, and
should be considered semi-transparent to opaque, according to Gemological Institute of
America terminology. The overall impression is translucent with patches of transparency
as well as opacity. Three of the six hexagonal faces protrude out from and above the
matrix, while three lie below.

My research verifies this piece to be among the largest known in the world to this date,
(see addendum) and it is certainly unique in other ways; to wit, the clear beryl crystals
occurring to the side of the emerald are unique and beautiful specimens in and of
themselves. Two or three in particular could be called entrancing. The "melt" or "Bielby
Layer" covering the emerald is especially enhancing to the overall sheen and beauty, as
are the patterns found in the clear beryl. The migration of the "green-giving" chromium
and vanadium exclusively into the large emerald crystal is one of nature's wonders.

The overall effect is awe-inspiring. This is an intangible that comes to be appreciated with
a knowledge of what is truly rare and valuable in life, and is precisely why connoisseurs
of the rare will sometimes engage in seemingly outrageous auction bidding wars.
I place the value of this collector's piece at $650 million USD on this date.

Signature of Appraiser _____        date: _Feb. 24 2007_
James R. Lytle, G.G., M.S.

K0146

# Exhibit 4

## ADDENDUM

### SOME COMPARABLES AND OTHER DATA USED TO ARRIVE AT VALUE:

In my 30+ years of buying and selling and appraising gemstones, and my specialty in rough emerald for cutting as well as for sale as specimen items for collectors, I have a plethora of personal files of sales upon which to judge price, i.e., actual sale prices of my own goods as well as many sale prices from some of Colombia and Brazil's largest and busiest dealers. While not at liberty to disclose names, I have been party to many private bidding wars among dealers "behind the scenes" at the internationally-renowned Tucson gem trade shows.

I was personally responsible for examining, maintaining provenance, and pricing the first emerald cut from the *Nuestra Senora de la Atocha* shipwreck find. That stone was relatively small (20 carats), completely opaque, and generally somewhat unattractive, but the owner realized close to $20,000 from the largest stone (<10 carats) cut from that rough.

On October 22, 1989, I appraised a well-formed 77.76 carat emerald crystal belonging to Mel Fisher, for IRS Miami, at $350K USD. (It might have realistically been valued as high as $500K.) Only 40% of that crystal was clear, or transparent. Five or ten crystals of this size could fit into the palm of an adult hand. A stone cutter typically loses about 60-70% of the weight of a clean piece of rough that he cuts. An 80 carat crystal with only 40% facetable material (32 carats) would only yield approximately a ten carat cut stone. If this stone had been cut, it MAY have brought $1,500 per carat, if not for its rarity and uniqueness. While the best interest of the IRS, in this case, would have been served by rejection of such a relatively high valuation, my estimate of value stood.

A random piece of rough from the *Atocha* (tag #3651), weighing 38.22 carats, was appraised at $300,000 USD by an outside appraiser.

I was also involved in several equally unlikely sales and valuations during this time period. Auction results from a Las Vegas showing in 1987, and Christies, New York in 1988, also support seemingly high sale prices. An emerald which was "paid out" to Captain R.D. LeClaire of the Fisher expedition was valued at $500,000. It was approximately 70 carats, but kept losing weight from chipping, as LeClaire carried it in his pocket. Two European bids of $350K were refused. Though well-formed, it was heavily pitted and translucent at best.

In another incident, during a different Christies New York auction, I represented one of Colombia's richest and most successful emerald merchants, who was selling a 13 carat flawless emerald to a well-known man from Geneva, to whom I'll refer as "Mr. H." Mr. H had in tow a partner from Geneva, a Parisian, and a Saudi. Also present was a Mr. Douglas, representing the Fisher interests in the sale of an early astrolabe (a very crude forerunner of the sextant), which had been recovered from the *Atocha*. Only two of these

K0147

**Exhibit 4**

Thomas Emerald Appraisal

items have ever been recovered; both were from the *Atocha*. By appearances, the common buyer might pass it off as maybe a $100-piece of junk. However, the figures actually being discussed were in the range of $250 million USD. Rarity counts.

According to the Gemological Institute of America, the three main factors that constitute value in gemstones are beauty, rarity, and durability. The Thomas Emerald has beauty—certainly to a collector. It is durable, and it is one of the rarest, if not the rarest, crystal of its type in the world.

In standard appraisals, the American Society of Appraisers, International Society of Appraisers, National Association of Jewelry Appraisers, and all other major appraisal organizations agree on three basic types of appraisal: 1) Cost Approach (how much to replace?), 2) Market Data Approach (comparable sales), and 3) Income Approach (rental rates). But, you can't use Cost Approach on a Tiffany piece. It is a signed work of art. And, if it is one of a kind, Market Data is the only approach that comes close. The big problem now is finding an item comparable to, say, the Shroud of Turin. Back to willing buyer, willing seller, basically.

The factor known as "provenance" always figures into sales like these. Was the item owned by a famous person, or is it extremely rare in some other way? The Thomas Emerald has a very high rarity factor based on size and form alone.

Another item of interest, not related to gemstones, but certainly addressing the issue of value, is the recent auction sale of Eric Clapton's main guitar for the past many years, as reported by the *Wall Street Journal*. A used, beaten, mismatched assembly of parts from three different Fender Stratocasters, this should not have sold for more than $1,000 USD. Hammer price, after fees, was nearly $1 million USD. Again, rarity counts.

In 1985, I personally witnessed a dealer refuse an offer of $125K for a 100 carat Columbian crystal in matrix. It was not a good color, and had no clarity. The Thomas Emerald, by contrast, is 21,000 carats, and is by far more beautiful.

Value in cut stones and crystal specimens alike is a logarithmic progression when related to size. A one carat cabochon emerald of commercial quality, in today's market, brings about $20-25 wholesale. An eight to ten carat cabochon emerald of the same quality commands $2,500 and up (wholesale), according to Richard Drucker's *The Guide*, which is the industry-wide standard of current sales and pricing of colored stones.

According to specimen expert Irv Brown, of Fallbrook, CA, collectors look for the same qualities in minerals as they would in art—vivid color and a pleasing sculptural arrangement. He further notes, "A good mineral specimen of a gem crystal can go for ten times more than its cut value." Silver, for example, trades at $4-6 per ounce, typically, but a particularly exquisite piece of wire silver—the mineral in nature—can command hundreds of thousands of dollars.

Page 3

K0148

**Exhibit 4**

Thomas Emerald Appraisal

Of course, a better comparison could be made in the 3,296 gram emerald crystal which was held in the British Museum, Russell Street. Far smaller than the Thomas Emerald, this crystal was reported to have been valued at $792 million USD in 2001. Also reported in 2001, was a find of high quality (good for cutting, not specimen), from La Pita at Maripi, Boyaca, Colombia. As of that date, the value of a "lot" of approximately 3,600 carats was valued at approximately $375 million USD, or about $1,000 per carat. At that time, some individuals were concerned about the (worldwide) economy. Now, if the consistently accurate promulgations of the Hoover-founded Institute for the Study of Cycles are to be believed, the world is moving toward perhaps the worst deflationary period in history within the next five to ten years. These are the times when owning "hard assets" is far and away preferable to owning "cash."

One of the biggest problems in valuing mineral specimens is that owners often refuse to reveal what *they* would value the piece at. In a vault (a small warehouse in size) under the Banco de Colombia, heavily guarded by armed soldiers, is kept the "National Treasures." Row upon row of shelving holds prized emerald crystals. Very few persons have ever been in this vault or seen its treasures.

Peter Keller, curator of the Los Angeles Museum of Natural History during the 1980s, is one who has been inside the vault, and was allowed to photograph many of the emeralds. There are a group of "The Top Five," known only as #1, #2, etc. In a personal, face-to-face meeting with him, he told me that when he asked for an estimate of the bank's valuation of these five, his escort, a high-ranking officer of the bank, refused on "security" grounds. When pressed, he reportedly told Keller, "You are looking at the price of a not-so-small country." He would say nothing more of it. There are other numbered crystals, and #8, a 1,759 carat crystal, can be seen at the Museo del Oro, in Bogota.

Most economists, among others, will tend to remember the Weimar Republic-era wheelbarrow anecdote. Cash had lost so much value that it took cartfuls to purchase the most trivial item. One poor fellow went into a store, leaving his wheelbarrow full of cash outside. Upon returning, he found the large pile of bills scattered about, as someone had stolen his wheelbarrow.

Christies Hong Kong, New York, and other locations, have been reporting increasingly escalating record high gem and mineral sales over the past few years.

The enduring value of a piece such as the Thomas Emerald becomes obvious when considering the above examples.

K0149

**Exhibit 4**

Thomas Emerald Appraisal

## APPRAISER'S BIO:

College-trained in geology, mineralogy, and archeology. Recorded as discoverer of first shamanistic burial find on Monterey Peninsula, S.F. Bay Area Archives (College of San Mateo Library). Two Master's degrees.

Turned to real estate in 1977. Appraised real estate in Los Angeles, 1978-79; attended required college courses for broker's license, before commencing gemological training. Gem dealer for five years prior to earning Graduate Gemology degree at Gemological Institute of America, Santa Monica, 1984. GIA stonecutter training, 1987.

Internationally-recognized emerald consultant/dealer. Published in trade journals; noted as one of three enhancement-detection experts in *Modern Jeweler* magazine, June 1989. Article on detection secrets and tricks published by *Accredited Gemologists Association Quarterly,* Summer/Fall 1998. Lecturer and workshop leader on country-of-origin, emerald formation, treatment-detection, and heat-alteration, for numerous appraisal and gemological organizations since late 1980s. Lead appraiser for Mel Fisher's group ("Treasure Salvors"), 1986-1990. Consulted to GIA Lab on Fisher's *Atocha* (shipwreck salvage) emeralds.

Buyer and seller of emerald rough in bulk since 1982. Have appraised for IRS. Member: National Association of Jewelry Appraisers, American Gemological Association, GIA Alumni Association.

K0150

**Exhibit 4**

**jnh World Forensics, LLC**
Specialists in Rare and Unusual Gemstones and Minerals
P.O. Box 90198
Tucson, AZ 85752
(520) 465-0304
Member: American Gemological Association,
          National Association of Jewelry Appraisers

Date: <u>May 23, 2007</u>

### Addendum to Report on the "Thomas Emerald,"

### Issued February 22, 2007

In what we all hope will be the final addendum on this piece, I must begin by emphasizing that we are **not** appraising, valuing, or reporting on a gemstone; we are reporting on a Rare Natural Work of Art.

To belittle this piece by attempting to guess at its value after having been cut, chopped, and hacked-away at, in order to produce a very large amount of probably commercial stones at best, with maybe a few "zingers" would be the height of foolishness.

Auctions, and the world of collectors (certain persons to whom a few hundred million USD means relatively little) is indeed a strange and rarified place, somewhat difficult to get accustomed to.

In the first place, as I have mentioned in one of my previous addenda, the standard rules of "comparables," "replacement" value, and "income" value (what are you going to do, haul it around the world and charge $5 a head to view it?), just <u>do</u> <u>not</u> <u>apply</u>.

There are still some who, knowing nothing else will indeed try to jam a square peg into a round hole, but, fortunately, they are a dying breed.

In previous sections of this report, I have repeatedly attempted to get this point across, I feel, without complete success.

I will attempt to tie together some "loose ends."

K0151

**Exhibit 4**

One of a kind objects of beauty and rarity command their own prices, and are not subject to the whims of a buyer, a seller, the general public or the IRS.

What is the value of a large image of a can of Campbell's Soup? Especially when it is first offered for sale?

Have you ever noticed the Gemstone Reports (there is a special supplement included with, and separate from, this month's edition of **National Jeweler** magazine, in which prices, quality, attention to detail, etc. are rated for each lab. Pricing by arithmetic average works out to about $100 per carat (or $300 per hour), supply dimensions, clarity, and color grades, and many other pertinent details, but never a price?
That is left to "One Day Only" appraisal events held in malls to move merchandise. The "independent appraiser" is told to look at the price tag and appraise for 30-50% higher.

Another example: what if the Shroud of Turin (or some part of it) were to be matched against an irreputable source of Christ's DNA, and they matched?

Everyone and his brother looks at a question like that and says, "Bull," or "Hogwash," or something similar.

Until they are proven wrong.

Would a 1969 Dodge Charger with a Rebel flag painted on it ever sell for 9.9 million dollars? No. But it did. Of course, the money did not get delivered timely and the deal fell through.

That in no way invalidates its use as a "comp."

Just like the sale by Christie's in St. Moritz of a Bulgari 8.62 ct. ruby ring for 3.6 million USD, and the sale of a pink diamond by Sotheby's Hong Kong for 6.2 million USD last year, where money did change hands.

The high bid for the Harcourt emerald necklace at Christie's London was 2,879,800 USD in 1989.

A 16.38 ct.. cut emerald set in a diamond brooch was sold at Christie's Geneva on May 21, 1992, for 1,589,800 USD.

The high bidder paid 1,149,850 USD for a rectangular cut 10.11 ct. Colombian emerald set in a ring at Christie's Hong Kong.

K0152

**Exhibit 4**

# Ringsrud Gemology

Affiliations: Gemological Institute of America - GIA, American Gem Trade Association - AGTA,
International Colored Stone Association - ICA
Box 1329, Fairfield, Iowa 52556
415 254 2474



## Emerald Report

This report is based on the color nomenclature guidelines of the Colored Stone Grading System
of the Gemological Institute of America (G.I.A.). Other technical guidelines followed are those of
the AGTA – American Gem Trade Association.

This laboratory judges emeralds to the current industry standards of quality. The detailed
description below is a verbal description using current nomenclature. Any deviation from the
quality standards of the colored gemstone industry will be disclosed in a "comments" section.
Further information and disclosures are contained on the reverse of this page.





**Emerald Mineral Specimen:** Hexagonal emerald on bed of grey-black mica schist. The
emerald is approximately 34 cm. Long. The color is a dark tone of a strongly saturated,
very slightly yellowish-Green and is semitranslucent to opaque. This color is considered to
be typical of emeralds from Brazilian localities.

**Measurements:** Two emerald crystals intersect at the base and three out of six hexagonal
faces are visible above the matrix. The main crystal is approx. 34 cm. long and 7.4 cm.
wide; the second crystal is approx. 10 cm. long with the same width. Weight estimated by
calculation is approx. 21,000 carats or 4,200 grams. This measurement places this emerald
crystal as one of the largest, if not THE largest such specimen in the world; it is certainly the
longest.

**Origin:** Brazilian

**Heirloom Value:** Extremely High –This rating addresses the piece's probable ability to
command and maintain its high rarity, beauty and value in the future, generation after
generation.

The items described above have been examined gemologically. The information recorded on this
document represents our interpretation of results obtained from the use of gemological
instruments as well as grading techniques based on the Color Grading System of the Gemological
Institute of America. Document not valid without authorized signature.

Date:_____Mar. 23, 2007_____          Signature_____

K0158

**Exhibit 4**

# Ringsrud Gemology

Box 1329, Fairfield IA 52556
415 254 2474

March 23, 2007

To Whom it may Concern,
Re: 21,000 carat Emerald Rough

In life, one is presented with both noble idealistic causes as well as a myriad
of distractions. True-hearted adherence to the highest and noblest of causes
however, is laudable; even to the extent that it depletes resources meant for
other lesser things. This is the message of the Thomas Emerald – as one
looks upon the beautiful green of the principle crystal one notices near it a
dozen small white crystals. These crystals are beryl, and have no color
because the formation of the large crystal consumed and depleted all of the
vanadium and chromium atoms in the geologic environment during its
formation. Atoms of chromium and vanadium are necessary for the creation
of emerald; they provide the green color. All of these smaller crystals remain
subsidiary to the main emerald crystal; the resources went first and foremost
to it.

Geologic rarity is one of the most overlooked treasures of the planet.
Connoisseurs appreciate the beauty and rarity of any well formed specimen
of almost any mineral. This specimen, being an emerald, and being one of
the largest in the world, is extremely rare and deserves to be the centerpiece
of any museum display or collection. The fact that it tells a story is just more
personality and rarity revealed. Indeed, the green color is often associated
with growth, healing and noblesse oblige.

Ron Ringsrud

K0159

**Exhibit 4**



# Ringsrud Gemology

Telephone 415 254 2474
Box 128, Saratoga, CA 95071   USA

## Emerald Report

This report is based on the color nomenclature guidelines of the Colored Stone Grading System of the Gemological Institute of America (G.I.A.). Other technical guidelines followed are those of the AGTA – American Gem Trade Association.

This laboratory judges emeralds to the current industry standards of quality. The detailed description below is a verbal description using current nomenclature. Any deviation from the quality standards of the colored gemstone industry will be disclosed in a "comments" section. Further information and disclosures are contained on the reverse of this page.





EXHIBIT
6
1|15|10 Thomas 6 rv

**Emerald Mineral Specimen:** Hexagonal emerald on bed of grey-black mica schist. The emerald is approximately 34 cm. Long. The color is a dark tone of a strongly saturated, very slightly yellowish-Green and is semitranslucent to opaque. This color is considered to be typical of emeralds from Brazilian localities.

**Measurements:** Two emerald crystals intersect at the base and three out of six hexagonal faces are visible above the matrix. The main crystal is approx. 34 cm. long and 7.4 cm. wide; the second crystal is approx. 10 cm. long with the same width. Weight estimated by calculation is approx. 21,000 carats or 4200 grams. This measurement places this emerald crystal as one of the largest, if not THE largest such specimen in the world; it is certainly the longest.

**Origin:** Brazilian

**Heirloom Value:** Extremely High – This rating addresses the piece's probable ability to command and maintain its high rarity, beauty and value in the future, generation after generation.

The items described above have been examined gemologically. The information recorded on this document represents our interpretation of results obtained from the use of gemological instruments as well as grading techniques based on the Color Grading System of the Gemological Institute of America. Document not valid without authorized signature.

Date:__September 23, 2009__      Signature _____

ATE0033

**Exhibit 4**

# Jurat

State of California

County of Santa Clara

Subscribed and sworn to (or affirmed) before me on this 23rd day of September, 20 09 by Ronald Kingsrud ——————————————

proved to me on the basis of satisfactory evidence to be the person(s) who appeared before me.

Gardenia Gonzalez    (Notary)
Signature

GARDENIA GONZALEZ
COMM. #1849161
NOTARY PUBLIC - CALIFORNIA
SANTA CLARA COUNTY
My Comm. Expires May 14, 2013

---

## OPTIONAL INFORMATION

**INSTRUCTIONS FOR COMPLETING THIS FORM**
*The wording of all Jurats completed in California after January 1, 2008 must be in the form as set forth within this Jurat. There are no exceptions. If a Jurat to be completed does not follow this form, the notary must correct the verbiage by using a jurat stamp containing the correct wording or attaching a separate jurat form such as this one which does contain proper wording. In addition, the notary must require an oath or affirmation from the document signer regarding the truthfulness of the contents of the document. The document must be signed AFTER the oath or affirmation. If the document was previously signed, it must be re-signed in front of the notary public during the jurat process.*

| DESCRIPTION OF THE ATTACHED DOCUMENT |
|---|
| Emerald Report |
| (Title or description of attached document) |
| |
| (Title or description of attached document continued) |
| Number of Pages 1    Document Date 9/23 |
| |
| (Additional information) |

- State and County information must be the State and County where the document signer(s) personally appeared before the notary public.
- Date of notarization must be the date that the signer(s) personally appeared which must also be the same date the jurat process is completed.
- Print the name(s) of document signer(s) who personally appear at the time of notarization.
- Signature of the notary public must match the signature on file with the office of the county clerk.
- The notary seal impression must be clear and photographically reproducible. Impression must not cover text or lines. If seal impression smudges, re-seal if a sufficient area permits, otherwise complete a different jurat form.
  - ❖ Additional information is not required but could help to ensure this jurat is not misused or attached to a different document.
  - ❖ Indicate title or type of attached document, number of pages and date.
- Securely attach this document to the signed document

2008 Version CAPA v1.9.07  800-873-9865  www.NotaryClasses.com

ATE0034

**Exhibit 4**

## Legal Limitations

The simple philosophy of direct communication and trust between client and purveyor has the immediate effect of negating the need for long legal limitations in small print. Ringsrud Gemology adheres to that philosophy and stands behind our work.

## Emerald Information

Small microscopic fissures are common to emerald due to their crystal nature and current mining methods. Since this is normal for almost all emeralds, small fissures are considered insignificant unless they affect the clarity grade or unless they appear on the surface of more than 15% of the facets of the stone. 15% is 6 or more facets in most emerald cuts (which usually have 41 facets).

In the processing that takes place after cutting and polishing, emerald fissures that reach the surface (if any) are masked with a colorless oil or resin to reduce the visibility of those fissures. This simple and low-tech process is accepted as normal by the gem industry and is called clarity enhancement which may be slight, moderate or significant. Enhancements are industry-accepted processes for fashioning, polishing and finishing a gemstone while 'treatments' are more intense procedures to alter the gemstone appearance which require disclosure to the purchasing public.

The final customer for this stone should note that the above mentioned enhancement affects clarity only. Emerald color is unenhanced and remains natural.

Every gemstone is unique – with its own series of internal and external characteristics. Fissures are counted and their location is taken into account. Cutting and color concentrations are analyzed. The skilled grader takes into consideration the nature, location, and number of these characteristics to assign each stone its clarity grade and degree of enhancement. Color analysis is done by judging color observed through the crown of the stone under controlled lighting conditions.

## Connoisseurship Disclosure

This report is limited, as are all certificates and reports, to objective criteria only. It is only meant to validate the genuineness and quality of the gemstone tested. The allure, timelessness, uniqueness, wholeness, and fineness of a gemstone are out of place on a scientific report and can only be experienced in quiet moments of simple undistracted visual appreciation of the stone. The purpose of the conclusions on the other side of this report is to attest to the genuineness and soundness of the stone, thereby putting the intellect at rest. When viewing the stone with a quiet intellect, a condition is created which allows the mind, heart and senses to deeply enjoy the wholeness and allure of the piece. This is the true definition of connoisseurship. A gem report or certificate is only the first small step towards that; this disclosure seeks to define this limitation.

True connoisseurship of a gem involves not only the intellect but also the heart (or in modern language: not only the left but also the right brain hemispheres; not only the objective but also the subjective). With critical objectivity taken care of by the report, the wholeness of the mind is free to identify with the wholeness of the gem. The definition of allure and wholeness, rather than sought in a dictionary, can be effortlessly experienced by gazing into a fine gem like the one described in this emerald report.

ATE0035

**Exhibit 4**



## Ringsrud Gemology

Telephone 415 254 2474
Box 128, Saratoga, CA 95071   USA

September 23, 2009

To Whom it may Concern,
Re: 21,000 carat Emerald Rough

In life, one is presented with both noble idealistic causes as well as a myriad of distractions. True-hearted adherence to the highest and noblest of causes however, is laudable; even to the extent that it depletes resources meant for other lesser things. This is the message of the Thomas Emerald — as one looks upon the beautiful green of the principle crystal one notices near it a dozen small white crystals. These crystals are beryl, and have no color because the formation of the large crystal consumed and depleted all of the vanadium and chromium atoms in the geologic environment during its formation. Atoms of chromium and vanadium are necessary for the creation of emerald; they provide the green color. All of these smaller crystals remain subsidiary to the main emerald crystal; the resources went first and foremost to it.

Geologic rarity is one of the most overlooked treasures of the planet. Connoisseurs appreciate the beauty and rarity of any well formed specimen of almost any mineral. This specimen, being an emerald, and being one of the largest in the world, is extremely rare and deserves to be the centerpiece of any museum display or collection. The fact that it tells a story is just more personality and rarity revealed. Indeed, the green color is often associated with growth, healing and noblesse oblige.

Ron Ringsrud

ATE0036

**Exhibit 4**



# Certificado

1170/01

This is the evaluation of a block of black schist weighing 23 kg, with a green crystal encrusted in the matrix.

After an intense examination and various tests, the green crystal was identified as a beryl, or natural emerald.

In addition to the solid green crystal, embedded in the schist are some 25 white beryl crystals of no commercial or mineral significance.

Characterized by the natural hexagonal formation of beryl, this emerald crystal measures 61 mm wide (the parallel facets of the hexagon) and one facet is 32 mm in length. Along the length of this crystal, there are two old fractures dividing it into three sections that have filled with the passing of time thus forming one solid rock.

The extremities are covered with schist, and on looking at the left side from the front, there are two crystals at an angle of 45 degrees, that are each 22 mm and 42 mm high with a width of 57 mm between the parallel facets.

The weight of the emerald crystal has been calculated at approximately 4,500 gr. or 22,500 cts. When held up to the light, it shows complete crystallization.

In my 35 years as a professional, I have never encountered anything similar, and due to its uniqueness, there is nothing I can refer to in order to establish a monetary value for this rock. Consequently, it is entirely up to the owner of the crystal and the party interested in purchasing it to establish the crystal's market value.

If I were to quote the commercial value of this stone, it would be superior to the value of the solid block found in the British Museum, Great Russell Street, London, England WC1 which measures 203 x 172 x 160 mm, weighs 3,296 gr. and is worth US$ 792 million (seven-hundred ninety-two million dollars). The specimen in this report, which weighs 1,204 grams (6,020 cts) is more than the rock in the British Museum, I estimate is worth US$ 800 million (eight-hundred million dollars).

As a gemologist and expert in this area, I must emphasize that this piece is a rare find to be admired by all.

São Paulo, November 5th, 2001.

*Dimitri Paraskevopulok*
Expert Appraiser – Gemologo
RG 3.600.656 – CPF 055.745.608-87
T.Del. 01.030 – CCm 8506238-3

Enc. color photograph

EXACTA Peritos / Avaliador Judicial / Gemas e Minerais
Largo do Arouche. 96 - Conjunto 01 - CEP 01219-010
Tel /Fax (55-11) 222-3194 / 221-7512 / 3367-4311
São Paulo - Brasil

K0154

EXHIBIT
8
1/21/10 Th-mas 6M

**Exhibit 4**



TANIA DE FREITAS
Escrevente Autorizada

**OBS. DO 2.° CARTORIO DE NOTAS**
RECONHECIMENTO FEITO NOS TERMOS DO
PROVIMENTO N.° 29/89 DA CORREGEDORIA
GERAL DA JUSTIÇA DO ESTADO DE SÃO PAULO.
ESTE DOCUMENTO PARA PRODUZIR EFEITO NO
BRASIL E PARA VALER CONTRA TERCEIROS,
DEVERÁ SER VERTIDO EM VERNÁCULO E
REGISTRADA A TRADUÇÃO.

PRESUNÇÃO DE VALIDADE, EFICÁCIA OU AUTHENTICIDADE
DO CONTEÚDO DOCUMENTAL.
VÁLIDO PARA SER UTILIZADO SOMENTE NO ESTRANGEIRO
VALID FOR USE ABROAD ONLY
VALABLE POUR ÊTRE UTILISATION A L'ETRANGER
VÁLIDO PARA SER UTILIZADO SOLAMENTE EN EL EXTRANJERO

K0155

**Exhibit 4**

# EXHIBIT <u>5</u>

# EXHIBIT <u>5</u>

WIKIPEDIA

# Overstock.com

**Overstock.com, Inc.** is an American internet retailer headquartered in Midvale, Utah,[1] near Salt Lake City.[2] Patrick M. Byrne founded the company in 1997 and launched the company in May 1999. Overstock.com initially sold exclusively surplus and returned merchandise on an online e-commerce marketplace, liquidating the inventories of at least 18 failed dot-com companies at below-wholesale prices.[3] The company continues to sell home decor, furniture, bedding, and many other goods that are closeout merchandise,[4] however, it also sells new merchandise.[5]

In May 2002, Overstock held an IPO at a per-share price of $13, and after achieving significant growth and profits in some early quarters, achieved a profit of $7.7 million in 2009[6] and reported its first billion-dollar year in 2010. The business started rebranding in early 2011, as "O.co", to simplify and unify its international operations[7] but interrupted this effort a few months later, citing consumer confusion over the new name.[8]

## Overstock.com, Inc.

**overstock.com**
At home with the O.

| | |
|---|---|
| **Type** | Public |
| **Traded as** | NASDAQ: OSTK (ht tps://www.nasdaq.c om/symbol/ostk) Russell 2000 Component |
| **Industry** | Retail |
| **Founded** | 1997 |
| **Headquarters** | Midvale, Utah, United States |
| **Key people** | Patrick Byrne, founder, CEO |
| **Revenue** | ▼ US$ 1.745 billion (2017) |
| **Operating income** | ▼ US$ -46.63 million (2017) |
| **Net income** | ▼ US$ -109.88 million (2017) |
| **Total assets** | ▼ US$ 433.81 million (2017) |
| **Total equity** | ▼ US$ 172.12 million (2017) |
| **Number of employees** | 1,800 (2017) |
| **Website** | www.Overstock.com (https://www.overst ock.com) |

## Contents

**Business model and management**
    Worldstock
    Bitcoin
**Naked short selling campaign**
**See also**
**References**
**External links**

# Business model and management

Part of Overstock.com's merchandise is purchased by or manufactured specifically for the company. Among their products are handmade goods produced for Overstock by workers in developing nations.[9][10] The company also manages the inventory supply for other retailers. In addition to its direct retail sales, Overstock.com began offering online auctions on its website in 2004, known as Overstock.com Marketplace and later O.co Marketplace. This service was retired in July 2011.[11]

**Exhibit 5**

After initially relying solely on word-of-mouth marketing from customers,[12] the company turned to distinctive television advertisements starring German actress Sabine Ehrenfeld.[13][14] Later, they would employ other advertising spokespersons.

In July 2006, John J. Byrne, the father of Overstock's chief executive, resigned from the board of directors after a public airing of the elder Byrne's unhappiness with his son's actions against naked short-selling.[15] In August 2008, Jack Byrne said that after "much initial skepticism" he believed his son was "right all along" about the battle and lawsuits with short-sellers and analysts.[16] In 2010 the elder Byrne returned to the Overstock.com board of directors.

In early 2007, John A. Fisher and Ray Groves resigned from the Overstock board of directors over disagreement with the company's prime broker suit.[17][18]

On January 2, 2008,[19] Overstock announced that cofounder Jason Lindsey had resigned as President, COO, and as a Director of Overstock effective from December 31, 2007. Byrne said Lindsey had "played a decisive role getting [Overstock] back on track" after "I screwed it up a couple years ago".[20] Overstock stock dropped to a four-year low following the announcement,[21] which an analyst for investment bank Broadpoint Capital described as a "key loss".[22]

In 2011, revenues dropped 5 percent over a two-month penalty period imposed by Google. According to the Associated Press, Overstock set up fake websites linking back to its own site. Overstock said it was penalized in part for a practice of encouraging college and university websites to post links to Overstock pages so that students and faculty could receive discounts. As a result of the Google penalty, search results for certain products dropped in Google rankings.[23][24] During the same year, Overstock.com acquired naming rights to the former Oakland–Alameda County Coliseum, renaming it Overstock.com Coliseum.[25] The Coliseum was later rebranded O.co Coliseum, in keeping with Overstock's then-rebranding as O.co (in April 2016, the name O.co Coliseum was dropped in favor of Oakland-Alameda Coliseum).

In 2013, Overstock began promoting increased immigration. Overstock president Jonathan Johnson told the *Los Angeles Times* that his firm had struggled to hire enough computer programmers and software developers to expand the business. "We pay more, and they are still hard to fill", he said. "We need to be more free in letting people in. That helps us solve our border problem. No one goes through the window of a house if they can ring the doorbell and come in the front door."[26]

In 2014, Overstock began developing software that would allow it to distribute corporate stock online instead of using traditional methods like the New York Stock Exchange or NASDAQ.[27]

Overstock.com's Board of Directors on January 9, 2014, was Patrick Byrne, Jonathan E. Johnson III, Allison H. Abraham, Barclay F. Corbus, Samuel A. Mitchell, Stormy D. Simon, Joseph J. Tabacco, Jr. and Dr. Kirthi Kalyanam [28]

Byrne took an indefinite leave of absence in April 2016, because of hepatitis C complications. The general counsel, Mitch Edwards, was named acting CEO.[29] In July 2016, Byrne returned as CEO.

## Worldstock

**Exhibit 5**

In 2001 Overstock set up the Worldstock division, to showcase the work of artisans from around the world.[30][31] By 2006 there were approximately 6,000 producers contributing.[32][33]

## Bitcoin

On January 9, 2014, Overstock.com became the first major retailer to start accepting bitcoin as payments for its goods.[34] In the first 22 hours, they received over 800 orders worth US $126,000 in bitcoin.[35] This represents a 4.33% increase in sales from their normal income of $3 million per day.[36]

As of March 13, 2014, Overstock bitcoin income had shrunk to under 1% of their normal daily cash intake.[37]

In a community interview with social media site Reddit on May 3, 2014, in response to a question to the Overstock CEO Patrick Byrne about the percentage of revenue and transactions paid for in bitcoin, Byrne responded that the percentage was "Tiny. <.1%".[38] In mid-2014 Overstock.com announced that bitcoin sales were averaging $300,000 per month and that the company expected bitcoin sales to add 4 cents to the company's 2014 earnings per share.[39]

On September 14, 2014, Overstock announced it would begin donating 4% of bitcoin revenue to foundations that were advocating for cryptocurrency.[40]

In August 2018, it was reported that Overstock.com shares increased 17% after a "major Chinese equity firm agreed to invest in tZERO, the blockchain subsidiary vying to reshape the investment world through a SEC-regulated alternative trading system (ATS)."tZero is an Overstock.com blockchain subsidiary.[41]

# Naked short selling campaign

The company has received attention stemming from CEO Patrick Byrne's battle against alleged naked short selling of his company's shares. Beginning in 2005, Byrne has contended that a number of companies, including Overstock.com, have been the targets of this practice, which involves selling a stock short but without the usual step of initially borrowing or locating the shares. Byrne alleges that the practice circumvents safeguards of conventional shorting, and has been used in large schemes devised to profit from driving down the prices of companies' shares, in many cases leading to these companies' failure. With Overstock, Byrne contends that the company's longstanding appearance on the Regulation SHO Threshold Security list, an SEC-mandated list showing companies with a high number of "fails to deliver", along with high trading volumes that sometimes surpass total quantity of the company's stock, establish that it has been targeted by this practice.[42] Byrne's campaign has been controversial, including criticism in the financial press that Byrne is seeking to divert attention from Overstock's share price declines and failure to turn a profit.[43] New York Times columnist Joseph Nocera has said in 2006 that, "Except for a few fellow-traveling Web sites, where Mr. Byrne is viewed as a heroic figure, most people who understand the issue or have looked into it think it's pretty bogus."[44] Others have suggested that the problem is real, but that the SEC acts to prevent it and that it does not happen on any scale such as Byrne suggests. SEC Chairman Christopher Cox called abusive naked short selling "a fraud that the commission is bound to prevent and to punish."[45]

# Exhibit 5

Overstock filed a lawsuit against the hedge fund Rocker Partners in 2005, for libel, unfair business practices and tortious interference, saying it colluded with a research firm, Gradient Analytics, in short-selling the company while paying Gradient Analytics to publish negative reports about Overstock.com and supplying pre-publication copies to Rocker. Naked short-selling was not alleged in that suit.[46] In a conference call with analysts in August 2005, a day after the suit was filed, Byrne said that "there's been a plan since we were in our teens to destroy our stock, drive it down to $6–10 ... and even a plan for how the company would then get whacked up." He said that the conspirators were part of a "Miscreants Ball", headed by a "Sith Lord", who he refused to identify but said "he's one of the master criminals from the 1980s." Byrne said the conspiracy included hedge funds, journalists, investigators, trial lawyers, the SEC, and Eliot Spitzer."[47] Gradient Analytics countersued, alleging Byrne waged a smear campaign.[48]

Rocker Partners, renamed Copper River Management, filed a counterclaim against Overstock in November 2007, alleging overstatement of profits, false projections, and misrepresentations about the company's ventures.[49] Copper River also alleges that Byrne tried to silence critics by suing them.[50][51][52][53] A portion of this suit was settled out of court on October 13, 2008, when Overstock.com and Gradient dropped the claims against each other after Gradient retracted allegations that Overstock's reporting methods did not comply with rules established by the FASB, stated they believed Overstock.com complied with GAAP standards, and that three directors were independent according to NASD standards, and apologized.[54][55] Byrne has said the apology and settlement "represents a great step forward in our case",[55] while Copper River's attorney stated that "If somehow this improved Overstock's case, then Gradient would admit to doing something wrong and they haven't.", and that he expected the settlement to help Copper River's case.[56]

On December 8, 2009, it was announced that Copper River had reached an out of court settlement with Overstock. As part of the agreement, Copper River, which closed in December 2008, agreed to pay Overstock $5 million.[57] In a letter to his shareholders, Patrick Byrne said, "The good guys won". Copper River said in a statement that it continued to deny Overstock's allegations. Copper River managing general partner Marc Cohodes said "Although settlement deprives us of the ability to disprove Overstock's case and prosecute our counterclaims, we decided that the litigation costs did not justify passing up a practical way to end four-and-half years of meritless litigation by Overstock."[58][59]

In February 2007, Overstock.com launched a $3.5 billion lawsuit against Morgan Stanley, Goldman Sachs and other large Wall Street firms, alleging a "massive illegal stock market manipulation scheme" involving naked short selling. Among its allegations, Overstock stated that since at least January 2005, naked short selling has accounted for large portions of Overstock stock, in some cases exceeding the 23.4 million total shares outstanding.[60] The lawsuit alleged that this had created "immense downward pressure" on share prices over time. Kerry Fields, associate professor of law and business ethics at the University of Southern California, said, "Byrne may be able to help set new law if he handles this right." Fields said, Byrne's "best approach now is probably to persuade the SEC, which continues to wander around the issue, or the government to serve subpoenas and let them decide whether or not his company was wronged."[61] John Coffee, director of the Center on Corporate Governance at Columbia University Law School, described it as overly ambitious and "extremely unpromising."[60] Two members of the Overstock.com board of directors, John Fisher and Ray Groves, resigned in disagreement over the lawsuit.[62][63]

**Exhibit 5**

In December 2010, all but two of the prime broker defendants settled out of court with Overstock for $4.4 million.[64] That same month, the company filed a motion seeking to amend its lawsuit against the remaining defendants—Goldman Sachs and Merrill Lynch—to include claims of RICO violations. The enhanced claims were based on evidence gained through discovery in the case.[65]

# See also

- E-commerce
- Online auction

# References

1. Christensen, Lisa (October 14, 2016). "Overstock.com Unveils New Headquarters With Flair" (http://www.utahbu siness.com/overstock-unveils-new-headquarters/). *Utah Business*. Retrieved January 28, 2017.

2. The releases; in 2005, the City of Cottonwood Heights incorporated, and "Cottonwood Heights" has since become an accepted postal designation, as well.

3. Glasner, Joanna (November 12, 2001). "Where the Dot-Dead Wind Up" (http://archive.wired.com/techbiz/media/ news/2001/11/48189). *Wired News*. Retrieved March 22, 2008.

4. Kell, John. "Overstock.com's CEO Is Taking a Medical Leave of Absence" (http://fortune.com/2016/04/11/overst ock-ceo-medical-leave/). *Forbes*. Retrieved 20 April 2016.

5. Nocera, Joe (March 10, 2007). "Revisiting Utah and Overstock" (https://www.nytimes.com/2007/03/10/business/ 10nocera.html). *The New York Times*. Retrieved March 22, 2008.

6. "Overstock's brash CEO delivers 1st annual profit" (http://www.deseretnews.com/article/700022150/Overstocks-brash-CEO-delivers-1st-annual-profit.html). *Deseret News*. April 5, 2010.

7. "Overstock FAQs" (https://www.overstock.com/guides/faqs-about-o-co). *Overstock.com*. February 2, 2011. Retrieved February 2, 2011.

8. Musil, Steven (November 14, 2011). "Overstock retreats from O.co name change" (http://news.cnet.com/8301-1 023_3-57324691-93/overstock-retreats-from-o.co-name-change/). *CNET News*. Retrieved November 20, 2011.

9. Glasner, Joanna (June 25, 2004). "Overstocking in Afghanistan" (http://archive.wired.com/techbiz/media/news/2 004/06/63932). *Wired News*. Retrieved March 22, 2008.

10. Dotson, Leslie. "Overstock.com Celebrates One-Year Anniversary of Worldstock, Its Socially Responsible Goods Department" (http://investors.overstock.com/phoenix.zhtml?c=131091&p=irol-newsArticle&ID=834913). *Overstock.com*. Business Wire.

11. Steiner, Ina (July 15, 2011). "Overstock Closes Third-Party Marketplace after Seven Years" (http://www.auctionb ytes.com/cab/abn/y11/m07/i15/s00). *AuctionBytes*. Retrieved March 12, 2012.

12. Covell, Jeffrey (January 1, 2004). "International Directory of Company Histories, Volume 75 (2004)" (http://findarti cles.com/p/articles/mi_gx5202/is_2004/ai_n19123428). *FindArticles.com*. Retrieved March 22, 2008.

13. Stevenson, Seth (February 28, 2005). "What's With That Overstock.com Ad?" (http://www.slate.com/id/211412 8/). *Slate*. Retrieved March 22, 2008.

14. D'Angelo, Jennifer (November 13, 2004). "Oh! Oh! Oh ... It's Another 'Sally' Ad" (http://www.foxnews.com/story/ 0,2933,138216,00.html). *Fox News Channel*. Retrieved March 22, 2008.

15. "Overstock.com chairman mulls stepping down" (http://www.msnbc.msn.com/id/11652266/from/RL.3/). MSNBC. Associated Press. March 3, 2006. Retrieved March 22, 2008.

16. Jack Byrne legendary in insurance circles (http://www.sltrib.com/business/ci_10094559), April 8, 2008, The Salt Lake Tribune

# Exhibit 5

17. Fisher, John (March 23, 2007). "Letter to Patrick Byrne from John A. Fisher, Overstock.com SEC filing" (https://www.sec.gov/Archives/edgar/data/1130713/000110465907013384/a07-6492_1ex99d1.htm). U.S. Securities and Exchange Commission. Retrieved March 21, 2008.

18. Groves, Ray (May 24, 2007). "Letter from Ray Groves to Patrick Byrne" (https://www.sec.gov/Archives/edgar/data/1130713/000110465907042850/a07-15216_1ex99d2.htm). U.S. Securities and Exchange Commission. Retrieved March 22, 2008.

19. Burden, Kirstie (January 2, 2008). "Jason Lindsey Resigns as Director, President, and COO of Overstock.com" (http://investors.overstock.com/phoenix.zhtml?c=131091&p=irol-newsArticle&ID=1090658). Overstock.com. Retrieved March 22, 2008.

20. Sage, Alexandria (January 2, 2008). "UPDATE 1-Overstock.com says co-founder Lindsey resigns" (https://www.reuters.com/article/consumerproducts-SP/idUSN0217285520080103). Reuters. Retrieved March 22, 2008.

21. "Overstock.com At 4-Year Low On COO Resignation" (http://www.tradingmarkets.com/.site/news/STOCK%20ALERT/957425/). RealTimeTraders news. January 4, 2008. Retrieved March 22, 2008.

22. Koort, Robert (January 3, 2008). "Analyst Actions: Monsanto, Overstock.com, Murphy Oil, Digital River" (http://www.businessweek.com/investor/content/jan2008/pi2008013_802926.htm). BusinessWeek. Retrieved March 22, 2008.

23. Paul Foy (December 16, 2011). "Overstock.com unloads goods at Utah auction" (https://finance.yahoo.com/news/overstock-com-unloads-goods-utah-012314856.html). Yahoo! Finance. Associated Press.

24. Efrati, Amir (February 24, 2011). "Google Penalizes Overstock for Search Tactics – WSJ.com" (https://www.wsj.com/articles/SB10001424052748704520504576162753779521700#ixzz1iDkwxDL8). The Wall Street Journal. Retrieved January 1, 2012.

25. Philip Matler, Andrew Ross (April 27, 2011). "New name in Oakland sports: Overstock.com Coliseum" (http://www.sfgate.com/cgi-bin/article.cgi?f=/c/a/2011/04/26/BAJS1J7VNM.DTL). The San Francisco Chronicle.

26. Brian Bennett and Lisa Mascaro, "Immigration bill would spark surge of legal arrivals", L.A. Times, April 13, 2013. http://www.latimes.com/news/nationworld/nation/la-na-legal-immigration-20130414,0,5787920.story

27. Metz, Cade (October 6, 2014). "Overstock.com Assembles Coders to Create a Bitcoin-Like Stock Market" (https://www.wired.com/2014/10/overstock-com-assembles-coders-build-bitcoin-like-stock-market/). Retrieved October 15, 2014.

28. "Leadership" (http://www.overstock.com/leadership). Overstock. Retrieved January 9, 2014.

29. Goldman, David (April 11, 2016). "Overstock CEO Patrick Byrne takes indefinite leave of absence over Hepatitis C complications" (http://money.cnn.com/2016/04/11/technology/overstock-ceo-patrick-byrne/). CNN. Retrieved 25 May 2016.

30. Overstock.com, Press Release (http://investors.overstock.com/phoenix.zhtml?c=131091&p=irol-newsArticle&ID=834913), 2002

31. The Worldstock Story (http://www.overstock.com/?PAGE=staticpopupfull&sta_id=1328)

32. Byrne's War Overstock.com's Patrick Byrne is On a Self-imposed Mission to Save Main Street from Wall Street (http://www.connect-utah.com/article.asp?r=1688&iid=43&sid=3), by Colin Kelly Jr., 4.18.2006

33. Overstocking in Afghanistan (https://www.wired.com/techbiz/media/news/2004/06/63932), by Johanna Glasner, 06.25.04, Wired

34. Metz, Cade (January 9, 2014). "The Grand Experiment Goes Live: Overstock.com Is Now Accepting Bitcoins" (https://www.wired.com/business/2014/01/overstock-bitcoin-live/). Wired. Retrieved January 10, 2014.

35. Metz, Cade (January 10, 2014). "In First Day With Bitcoin, Overstock Does $126,000 in Sales" (https://www.wired.com/business/2014/01/overstock-bitcoin-sales/). Wired. Retrieved January 10, 2014.

36. Morpheus (January 10, 2014). "Overstock.com increases daily revenue 4.3% by adding bitcoin, first day" (https://web.archive.org/web/20140312225951/http://neomoney.net/?p=383%2F). NeoMoney.net. Archived from the original (http://neomoney.net/?p=383/) on March 12, 2014. Retrieved March 11, 2014.

# Exhibit 5

37. Wilhelm, Alex (March 13, 2014). "Overstock's Bitcoin Purchases Account for Less Than 1% of Revenue, But It's Growing" (https://techcrunch.com/2014/03/12/overstocks-bitcoin-purchases-account-for-less-than-1-of-revenue-but-its-growing/). TechCrunch. Retrieved March 13, 2014.

38. "I'm Patrick Byrne, a pro-freedom supporter of cryptocurrency and school vouchers, early critic of Wall Street, three time cancer survivor, journalist at DeepCapture.com, and CEO and founder of Overstock.com. AMA!" (http s://www.reddit.com/r/IAmA/comments/24kbc0/im_patrick_byrne_a_profreedom_supporter_of/ch7z2hb). Reddit. May 3, 2014. Retrieved May 5, 2014.

39. Chavez-Dreyfuss, Gertrude (August 13, 2014). "Overstock CEO says bitcoin sales to add 4 cents to 2014 EPS" (https://news.yahoo.com/exclusive-overstock-com-ceo-says-bitcoin-sales-add-205625082--finance.html). Reuters/Yahoo! News. Retrieved August 18, 2014.

40. "Overstock to Donate 4% of Bitcoin Revenue to Foundations Advocating Cryptocurrency Adoption" (http://invest ors.overstock.com/mobile.view?c=131091&v=203&d=1&id=1969031). Overstock Investor Portal. September 14, 2014. Retrieved February 19, 2015.

41. https://cointelegraph.com/news/overstock-shares-surge-following-tzero-investment-announcement

42. Burden, Kirstie (December 27, 2007). "Overstock Reappears on the Regulation SHO Threshold List" (https://ww w.reuters.com/article/pressRelease/idUS189862+27-Dec-2007+PRN20071227). PR Newswire. Reuters. Retrieved March 22, 2008.

43. Antilla, Susan (February 21, 2007). "Overstock Blames with Creepy Strategy" (https://www.bloomberg.com/app s/news?pid=20601039&sid=aLDKLcXDf9PU&refer=columnist_antilla). Bloomberg L.P. Retrieved March 22, 2008.

44. Nocera, Joe (June 10, 2006). "New Crusade for Master of Overstock" (https://www.nytimes.com/2006/06/10/busi ness/10nocera.html). The New York Times. Retrieved March 22, 2008.

45. Norris, Floyd (July 14, 2007). "S.E.C. Ends Decades-Old Price Limits on Short Selling" (https://www.nytimes.co m/2007/06/14/business/14sec.html). The New York Times. Retrieved March 22, 2008.

46. Nocera, Joe (February 25, 2006). "Overstock's Campaign Of Menace" (https://query.nytimes.com/gst/fullpage.ht ml?res=9C00E7D91F3EF936A15751C0A9609C8B63). The New York Times. Retrieved March 22, 2008.

47. "The Phantom Menace", by Bethany McLean, Fortune Magazine, Nov. 15, 2005 (http://money.cnn.com/magazi nes/fortune/fortune_archive/2005/11/14/8360711/) Archived (https://web.archive.org/web/20110606065030/http:// money.cnn.com/magazines/fortune/fortune_archive/2005/11/14/8360711/) June 6, 2011, at the Wayback Machine.

48. Adam Tanner (May 8, 2008). "Fiesty Overstock.com CEO sees brighter future" (https://www.reuters.com/article/ us-overstock-interview-idUSN0843217220080509). Reuters. Retrieved 16 October 2016.

49. "Copper River Files Countersuit Vs Overstock, CEO, Directors", by Carol Remond, Dow Jones News Service, November 10, 2007

50. McLean, Bethany (November 28, 2007). "Overstock.com drama spurs lawsuits" (http://money.cnn.com/2007/11/ 28/magazines/fortune/overstock_1128.fortune/?postversion=2007112817). Fortune. Retrieved March 22, 2008.

51. Mitchell, Dan (January 20, 2007). "Flames Flare Over Naked Shorts" (https://www.nytimes.com/2007/01/20/busi ness/20online.html?dlbk). The New York Times. Retrieved March 22, 2008.

52. Boyd, Roddy (January 2, 2007). "Overstock.com Lashes Out at Critics on the Web" (https://web.archive.org/we b/20080229032410/http://www.nypost.com/seven/01022007/business/overstock_com_lashes_out_at_critics_on _web_business_roddy_boyd.htm). New York Post. Archived from the original (http://www.nypost.com/seven/010 22007/business/overstock_com_lashes_out_at_critics_on_web_business_roddy_boyd.htm) on February 29, 2008. Retrieved March 22, 2008.

53. Antilla, Susan (February 11, 2007). "Overstock Blames With Creepy Strategy" (https://www.bloomberg.com/app s/news?pid=20601039&sid=aLDKLcXDf9PU&refer=columnist_antilla). Bloomberg L.P. Retrieved March 22, 2008.

# Exhibit 5

54. Sage, Alexandria (October 13, 2008). "Overstock says settled claims against Gradient" (https://www.reuters.co
m/article/rbssConsumerGoodsAndRetailNews/idUSN1346384320081013). *Business & Finance*. Reuters.
Retrieved October 17, 2008.

55. Beebe, Paul (October 13, 2008). "Overstock.com settles suit with research firm" (https://web.archive.org/web/20
081017114726/http://www.sltrib.com/business/ci_10713775). *The Salt Lake Tribune*. Archived from the original
(http://www.sltrib.com/business/ci_10713775) on October 17, 2008. Retrieved October 17, 2008.

56. "Industry News-Institutional and Traditional Investment News-eVestment – Institutional Investment – Hedge Fund
News – Pension Fund Media Coverage" (http://www.hedgefund.net/publicnews/default.aspx?story=9358).
Hedgefund.net. Retrieved February 7, 2014.

57. "Overstock says it settles with hedge fund" (https://www.reuters.com/article/idCNN0821943720091208?rpc=44).
Reuters. December 8, 2008. Retrieved December 9, 2009.

58. Inc, Overstock (December 8, 2009). "Rocker Pays $5 Million to Overstock.com to Settle Lawsuit" (https://financ
e.yahoo.com/news/Rocker-Pays-5-Million-to-pmews-3555312432.html?x=0&.v=1). *Press Release*. Retrieved
December 8, 2009.

59. "Copper River Partners Settles Lawsuit with Overstock.com, Inc" (http://www.itnewsonline.com/showpmstory.ph
p?storyid=78652). *PR Newswire*. December 9, 2009. Retrieved December 9, 2009.

60. King, Danny (February 3, 2007). "Overstock sues brokers" (http://deseretnews.com/dn/view/0,1249,660192260,0
0.html). *Deseret Morning News*. Retrieved March 22, 2008.

61. Sandoval, Greg (March 28, 2007). "Overstock CEO reflects on Cramer debacle" (https://archive.is/20120710222
214/http://news.cnet.com/Overstock-CEO-reflects-on-Cramer-debacle/2100-1030_3-6171494.html). *CNET News*.
Archived from the original (http://news.cnet.com/Overstock+CEO+reflects+on+Cramer+debacle/2100-1030_3-61
71494.html) on July 10, 2012. Retrieved March 22, 2008.

62. King, Danny (February 24, 2007). "Overstock's Suit Spurs Board Exit" (http://findarticles.com/p/articles/mi_qn41
88/is_20070224/ai_n18638588). *Bloomberg L.P.* Retrieved March 22, 2008.

63. King, Danny (May 25, 2007). "Overstock Director Groves Resigns Because of Broker Lawsuit" (https://www.bloo
mberg.com/apps/news?pid=20601087&sid=act.r0Ed5Gmw&refer=home). *Bloomberg L.P.* Retrieved March 22,
2008.

64. "Form 8-K for OVERSTOCK.COM, INC" (https://web.archive.org/web/20110628202844/http://biz.yahoo.com/e/1
01216/ostk8-k.html). Yahoo. Archived from the original (http://biz.yahoo.com/e/101216/ostk8-k.html) on June
28, 2011. Retrieved November 3, 2013.

65. [1] (https://finance.yahoo.com/news/Overstock-adds-RICO-claim-to-apf-3448406367.html) Archived (https://web.
archive.org/web/20110629044437/https://finance.yahoo.com/news/Overstock-adds-RICO-claim-to-apf-344840636
7.html) June 29, 2011, at the Wayback Machine.

# External links

- Overstock.com (https://www.overstock.com)
- Five-year stock price (https://finance.yahoo.com/q/bc?s=OSTK&t=5y)
- "Overstock.com Rezzes Into Second Life (http://www.ireport.com/docs/DOC-18326)", CNN ireport.com, 2008-
05-02. Retrieved on 2008-05-02.

Retrieved from "https://en.wikipedia.org/w/index.php?title=Overstock.com&oldid=871550461"

This page was last edited on 1 December 2018, at 21:28 (UTC).

Text is available under the Creative Commons Attribution-ShareAlike License; additional terms may apply. By using
this site, you agree to the Terms of Use and Privacy Policy. Wikipedia® is a registered trademark of the Wikimedia

**Exhibit 5**

# EXHIBIT <u>6</u>

# EXHIBIT <u>6</u>

Case Nos.: 2:15–bk–21624–ER and 2:15–bk–21626–ER jointly administered
United States Bankruptcy Court, C.D. California, Los Angeles Division.

# Ehrenberg v. Roussos (In re Roussos)

## 541 B.R. 721 (Bankr. C.D. Cal. 2015)

Decided November 25th, 2015

Ernest M. Robles, United States Bankruptcy Judge

*724 Richard M. Moneymaker, Moneymaker & Moneymaker, David Burkenroad, Jonathan Shenson, Los Angeles, CA, for Debtor.

## AMENDED MEMORANDUM OF DECISION DENYING MOTIONS TO DISMISS

Ernest M. Robles, United States Bankruptcy Judge

At issue is whether a 21–year old bankruptcy sale may be set aside for fraud on the court under Fed. R. Civ. P. 60(d)(3), even in the absence of specific allegations that the fraud reduced the sales price. *725 The fraud alleged here was so serious as to prevent the judicial machinery from performing "in the usual manner its impartial task of adjudging cases that are presented for adjudication."*Anand v. CITIC Corp. (In re Intermagnetics Am., Inc.),*926 F.2d 912, 916 (9th Cir.1991). The Chapter 7 Trustee's Complaint to vacate the sale for fraud on the court states a claim upon which relief can be granted, and the motions to dismiss are denied.

1. [1] This Court has jurisdiction pursuant to 28 U.S.C. §§ 157and 1334and General Order No. 13–05 of the U.S. District Court for the Central District of California.

## I. Facts

2. [2] In the context of a motion to dismiss, all facially plausible allegations in the Complaint are accepted as true. *Ashcroft v. Iqbal,*556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009).

In the early 1980s, August Michaelides partnered with Theodosios Roussos ("Theodosios") and Harry Roussos ("Harry")[3](collectively, the "Roussos Brothers") to purchase two apartment buildings in the greater Los Angeles area: (1) a 20–unit building located at 2727–2741 Abbott Kinney Boulevard, Venice, CA ("Abbot Kinney Property") and (2) a 30–unit building located at 153 San Vicente Boulevard, Santa Monica, CA ("San Vicente Property") (collectively, the "Properties"). Complaint [Doc. No. 1] at ¶ 26.[4]Pursuant to the agreement with the Roussos Brothers, August was to receive a 33 1/3% ownership interest in the Abbot Kinney Property and a 10% ownership interest in the San Vicente Property. *Id.*at ¶ 27.

> 3. Given names are used to distinguish multiple parties with the same surname. No disrespect is intended.
>
> 4. The Trustee filed two identical complaints—one in Harry's case (Adv. No. 2:15–ap–01406–ER) and the other in Theodosios' case (Adv. No. 2:15–ap–01404–ER). Unless otherwise indicated, all citations to the docket refer to Adv. No. 2:14–ap–01406–ER. As the complaints are identical, to avoid confusion the Court refers to the complaint in the singular.

August Michaelides died in 1992. *Id.*at ¶ 28. When his widow Lula Michaelides ("Michaelides") inquired about her pro-rata share of income from the Proper-

**Exhibit 6**

ties, she failed to receive satisfactory responses from the Roussos Brothers. *Id.* at ¶ 29. Michaelides then discovered that the Roussos Brothers had failed to include her husband August on title to the Properties. *Id.*

Michaelides commenced an action to quiet title in the Los Angeles Superior Court ("State Court"). [5]*Id.* at ¶ 30. On March 2, 1994, the State Court entered judgment awarding Michaelides monetary damages and quieting title to the Properties. *Id.* at ¶ 31. On June 15, 1994, the State Court entered an amended judgment ("Amended State Court Judgment") awarding $600,000 in compensatory damages, $400,000 in punitive damages, and $10,000 in costs, and quieting Michaelides' title to the 10% interest in the San Vicente Property and the 33 1/3% interest in the Abbot Kinney Property. *Id.* at ¶¶ 31–32.

> 5. The action, *Lula Michaelides, et al. v. Theodosios Roussos, et al.,* was assigned Case No. BC054809.

The Roussos Brothers retained attorney Robert Beaudry ("Beaudry") to facilitate a conspiracy in which the Properties would fraudulently be transferred out of their names and into the names of corporate entities which they secretly controlled, thereby extinguishing Michaelides' fractional interest. *Id.* at ¶ 33. In furtherance of the conspiracy, Beaudry formed S.M.B. and O.F., both of which were controlled by Harry and Theodosios and their spouses Paula and Christine. *Id.* at ¶¶ 34– ??? 36. The Roussos Brothers then filed individual chapter 11 petitions[6] and filed a motion to sell the Properties to S.M.B. and O.F. free and clear of Michaelides' interest ("Sale Motion"). *Id.* at ¶¶ 37–39. On August 5, 1994, the Bankruptcy Court approved the sale, free and clear of Michaelides' interest ("Sale Order"). *Id.* at ¶ 40 and Exhibit 4. The Sale Order gave S.M.B. and O.F. protection as good-faith purchasers pursuant to § 363(m). *Id.*

> 6. Theodosios and Harry's voluntary chapter 11 petitions were filed on June 14, 1993. The cases were jointly administered. Case No. 1:93–bk–31261–AG pertains to Harry; Case No.

1:93–bk–31265–AG pertains to Theodosios. When the cases were reopened in 2015, new case numbers were assigned: Case No. 2:15–bk–21624–ER pertains to Harry; Case No. 2:15–bk–21626–ER pertains to Theodosios.

In approving the sale, the Bankruptcy Court relied upon declarations submitted by Theodosios and Harry, which falsely stated that the sale was an arms-length transaction; that neither Theodosios or Harry held any interest in S.M.B. and O.F.; and that the Properties were over-encumbered. *Id.* at ¶ 41. The Bankruptcy Court would not have approved the sale had it known that Theodosios and Harry controlled S.M.B. and O.F.; that the Properties were not over-encumbered; and that the sale motion was part of the Roussos Brothers' conspiracy to dispossess Michaelides of her fractional interest. *Id.* at ¶ 42.

On October 19, 1994, the Roussos Brothers executed a grant deed conveying title to the Abbott Kinney Property to O.F. *Id.* at ¶ 45. On November 29, 1994, the Roussos Brothers executed a grand deed conveying title to the San Vicente Property to S.M.B. *Id.* at ¶ 46.

The Roussos Brothers' chapter 11 cases were converted to chapter 7 on May 2, 1995.[7] Both Harry and Theodosios received discharges on January 2, 1996.[8] Michaelides' Amended State Court Judgment was excepted from discharge. *Id.* at ¶ 47. The cases were closed on June 27, 2002.

> 7. [9]*See* Doc. No. 34, Case No. 2:15–bk–21624–ER (order denying confirmation of Harry and Theodosios' joint consolidated second amended plan of reorganization and converting the cases to chapter 7); Doc. No. 12, Case No. 2:15–bk–21626–ER (same order in Theodosios' jointly-administered case). The Court may take judicial notice of documents filed in Harry and Theodosios' bankruptcy cases pursuant to Fed. E. Evid. 201 without converting the motion to dismiss to a motion for summary judgment. *Barron v. Reich,* 13 F.3d 1370, 1377 (9th Cir.1994)(matters of public record may be judicially noticed); *Rose v. Beverly Health & Re-*

**Exhibit 6**

*hab. Servs., Inc.,*356 B.R. 18, 24 (E.D.Cal.2006), *aff'd sub nom. Rose v. Beverly Health & Rehab. Servs., Inc.,*295 Fed.Appx. 142 (9th Cir.2008)(taking judicial notice of bankruptcy court filings in the context of a motion to dismiss).

8. *See*Doc. No. 101, Case No. 2:15–bk–21624–ER (discharge of Harry); Doc. No. 48, Case No. 2:15–bk–21626–ER (discharge of Theodosios).

9. *See*Doc. No. 362, Case No. 2:15–bk–21624–ER (order closing Harry's case); Doc. No. 80, Case No. 2:15–bk–21626–ER (order closing Theodosios' case).

On November 14, 2005, Michaelides conducted Theodosios' judgment debtor examination, during which Theodosios falsely testified that he and his brother Harry were not limited partners of S.M.B.; that he did not know who the limited partners of S.M.B. were; that he had not spoken to any of S.M.B.'s general partners; and that he and Harry had no interest in either S.M.B. or O.F. *Id.*at ¶ 49.

On November 14, 2005, Michaelides filed an alter ego action ("Alter Ego Complaint") in the Los Angeles Superior Court alleging that O.F. and S.M.B. were alter egos of the Roussos Brothers. The Alter Ego Complaint was dismissed. *Id.*at ¶ 50.

On July 20, 2006, Beaudry resigned from the California State Bar with charges pending relating to Beaudry's formation of sham corporations on behalf of his clients. *Id.*at ¶ 51.

In September and December 2014, Michaelides conducted Harry's judgment debtor examination. Harry testified that he had no interest in the Properties or in O.F. and S.M.B. *Id.*at ¶ 53.

In the beginning of 2015, Michaelides discovered that an arbitration action, Case No. BS138099 ("Arbitration Action"), existed between Harry and Theodosios regarding management of the Properties. *Id.*at ¶ 56. On June 19, 2012, Harry and his spouse Christine commenced the Arbitration Action against Theodosios and his spouse Paula. *Id.*In connection with the Arbitration Action, David Haberbush, counsel for the Roussos Brothers, submitted a declaration stating that he had acted as legal counsel with respect to the Roussos Brothers' business operations pertaining to the Properties. *See*Declaration of David Haberbush at 11 (attached to the Complaint as Exhibit 8).

On June 18, 2015, Michaelides informed the United States Trustee ("UST") of the Arbitration Action. *See generally*Ex–Parte Motion to Reopen Chapter 7 Case under 11 U.S.C. § 350(b)[Doc. No. 367, Case No. 2:15–bk–21624–ER]. On July 21, 2015, the UST moved to reopen Harry and Theodosios' chapter 7 cases and to appoint a Chapter 7 Trustee. The Court granted the motion on July 23, 2015. The Chapter 7 Trustee ("Plaintiff") filed the instant Complaints on August 4, 2015.

Based upon the foregoing allegations, Plaintiff seeks to vacate the Sale Order for fraud on the court pursuant to Fed. R. Civ. P. 60(d)(3), and to vacate the grant deeds transferring ownership of the Properties to O.F. and S.M.B. Complaint at ¶¶ 61–68 (second claim for relief). Plaintiff seeks a declaratory judgment, pursuant to 28 U.S.C. § 2201, that the Properties are property of the Roussos Brothers' estates. *Id.*at ¶¶ 58–60 (first claim for relief). Plaintiff seeks to quiet title to the Properties as of August 5, 1994 (the date the Sale Order was entered) pursuant to California Code of Civil Procedure § 761.010. *Id.*at ¶¶ 73–74 (third claim for relief). Plaintiff seeks turnover of the Properties pursuant to Bankruptcy Code § 542. [10]*Id.*at ¶¶ 74–79 (fourth claim for relief). Finally, Plaintiff seeks compensatory and punitive damages for fraud and breach of fiduciary duty against Harry and Theodosios, and seeks compensatory and punitive damages against Paula Roussos, Christine Roussos, O.F., S.M.B., and S.M.B. Management for aiding and abetting breach of fiduciary duty.*Id.*at ¶¶ 80–97 (fifth, sixth, and seventh claims for relief).

10. Unless otherwise indicated, all statutory citations refer to the Bankruptcy Code, 11 U.S.C. §§ 101–1532.

**Exhibit 6**

## Motions to Dismiss

Theodosios and Paula and O.F. Enterprises, L.P.; Liro, Inc.; S.M.B. Investors Associates, L.P.; and S.M.B. Management, Inc. (collectively, "Defendants") move to dismiss the Complaint.[11] Defendants' primary arguments are as follows:

> 11. *See generally* Notice of Motion and Motion to Dismiss Adversary Cases Pursuant to <u>Federal Rule of Civil Procedure 12(b)(6)</u> (filed by Theodosios and Paula Roussos) ("Theodosios MTD") [Doc. No. 22], Notice of Motion and Motion for an Order Dismissing Plaintiff's Claims for Relief Pursuant to Rule 12(b)(6) (filed by O.F. Enterprises, L.P.; Liro, Inc.; S.M.B. Investors Associates, L.P.; and S.M.B. Management, Inc.) [Doc. No. 38], Reply of Defendants Theodosios Roussos and Paula Roussos to Plaintiff's Opposition to Motion to Dismiss ("Theodosios Reply") [Doc. No. 58], and Reply to Trustee's Omnibus Opposition to Motion for an Order Dismissing Plaintiff's Claims for Relief Pursuant to Rule 12(b)(6) (filed by O.F. Enterprises, L.P.; Liro, Inc.; S.M.B. Investors Associates, L.P.; and S.M.B. Management, Inc.) [Doc. No. 59].

> ⁷⁸ • A sale approved by a Bankruptcy Court can be set aside only under Rule 60(b) and not under Rule 60(d)(3). The one-year statute of limitations under Rule 60(b) has expired. Theodosios Reply at 3–5.

> • Even if the sale could be set aside under Rule 60(d)(3), the Complaint fails to allege facts sufficient to support a finding of fraud on the court. At most, the Complaint alleges that fraud occurred against creditors. Fraud against creditors does not amount to fraud on the court per the holdings of *Menchise v. Steffen (In re Steffen),* 464 B.R. 450 (Bankr.M.D.Fla.2012) and *Gekas v. Pipin (In re Met-L-Wood Corp.),* 861 F.2d 1012 (7th Cir.1988). Theodosios Reply at 5–9. Further, the Rule 60(d)(3) claim was not brought within a reasonable time. Theodosios MTD at 11–13.

> • The Complaint fails to allege that the sales price of the Properties was reduced by the Roussos Brothers' conspiracy. Absent an allegation of damages, the Sale Order cannot be set aside. Theodosios MTD at 16–17; Theodosios Reply at 15–18.

> • Plaintiff has not pleaded sufficient new evidence to attack the Sale Order. Plaintiff's request to vacate the Sale Order contradicts public policy in support of the finality of bankruptcy sales. Collateral attacks against sale orders require an exceptional showing which Plaintiff has not met. Theodosios MTD at 20–21.

> • The claims for declaratory relief, fraud, breach of fiduciary duty, aiding and abetting breach of fiduciary duty, and quiet title are barred by the statute of limitations and cannot be tolled by the discovery rule. Theodosios MTD at 9–11; Theodosios Reply at 10–12 and 19–20.

> • Plaintiff lacks standing to pursue the claim for fraud. Theodosios Reply at 12–13.

> • To the extent the Complaint seeks damages based on actions taken by Harry and Theodosios prior to the conversion of their cases to chapter 7, the Complaint violates the discharge injunction entered in Harry and Theodosios' chapter 7 cases. Theodosios MTD at 15; Theodosios Reply at 18–19.

> • The claim for turnover under § 542 fails as a matter of law. The properties as to which Plaintiff seeks turnover are no longer property of the estate in light of the Sale Order. Theodosios MTD at 14–15; Theodosios Reply at 21–22.

> • Plaintiff is judicially estopped from bringing the Complaint because Michaelides raised the same objections to the Sale Motion twenty-one years ago. Plaintiff waived any objections to the sale based on Michaelides' failure to convince the 1994 Bankruptcy Court to sustain her


**Exhibit 6**

objections to the sale. *Theodosios MTD* at 19–20.

# II. Findings and Conclusions

## A. The Complaint States a Claim Upon Which Relief May Be Granted for Fraud on the Court under Fed. R. Civ. P. 60(d)(3)

Fed. R. Civ. P. 60(b) sets forth grounds upon which the Court may relieve a party from a final judgment or order. Rule 60(d)(3) explains that "[t]his rule does not *729 limit a court's power to set aside a judgment for fraud on the court."

Rule 60(d)(3) is a codification of the Court's "inherent power ... to investigate whether a judgment was obtained by fraud." *Universal Oil Products Co. v. Root Ref. Co.,* 328 U.S. 575, 580, 66 S.Ct. 1176, 90 L.Ed. 1447 (1946). "There is no statute of limitations for fraud on the court. And jurisdiction exists to consider such a claim even if there are no adversary parties then present before the court." *Valerio v. Boise Cascade Corp.,* 80 F.R.D. 626, 640 n. 10 (N.D.Cal.1978) *aff'd,* 645 F.2d 699 (9th Cir.1981).

Fraud on the court embraces "only that species of fraud which does or attempts to, defile the court itself, or is a fraud perpetrated by officers of the court so that the judicial machinery can not perform in the usual manner its impartial task of adjudging cases that are presented for adjudication." *Anand v. CITIC Corp. (In re Intermagnetics Am., Inc.),* 926 F.2d 912, 916 (9th Cir.1991). The inquiry must focus upon "whether the alleged fraud harms the integrity of the judicial process":

> '[T]ampering with the administration of justice in the manner indisputably shown here involves far more than an injury to a single litigant. It is a wrong against the institutions set up to protect and safeguard the public, institutions in which fraud cannot

complacently be tolerated consistently with the good order of society. Surely it cannot be that preservation of the integrity of the judicial process must always wait upon the diligence of litigants. The public welfare demands that the agencies of public justice be not so impotent that they must always be mute and helpless victims of deception and fraud.'

*Intermagnetics,* 926 F.2d at 916–917 (citing *Hazel–Atlas Glass Co. v. Hartford – Empire Co.,* 322 U.S. 238, 246, 64 S.Ct. 997, 88 L.Ed. 1250 (1944), *overruled on other grounds, Standard Oil of Cal. v. United States,* 429 U.S. 17, 18, 97 S.Ct. 31, 50 L.Ed.2d 21 (1976)).

As explained by the Ninth Circuit in *United States v. Estate of Stonehill,* 660 F.3d 415, 444– 45 (9th Cir.2011):

> Most fraud on the court cases involve a scheme by one party to hide a key fact from the court and the opposing party. For example, in *Levander* corporate officer testified in a deposition that the corporation had not sold its assets, and a bankruptcy court subsequently entered a judgment against only the corporation. *Levander,* 180 F.3d at 1116–17. It turned out that the corporation had in fact transferred all of its assets to a related partnership. *Id.* We held that the false testimony constituted fraud on the court, and the bankruptcy court was allowed to amend its order to include the partnership as an additional party to the judgment. *Id.* at 1122–23.

Perjury or nondisclosure of evidence may constitute fraud upon the court if "that perjury or nondisclosure was so fundamental that it undermined the workings of the adversary process itself." *Id.* at 445.

The Complaint alleges facts sufficient to state a claim for fraud on the court. The Complaint alleges that the Roussos Brothers, as Chapter 11 debtors-in-possession, obtained court approval of the sale of the Properties to corporate entities they secretly controlled. To obtain approval of the sale, the Roussos Brothers submitted declarations falsely stating that the sale was at



**Exhibit 6**

arms-length and that they had no interest in the pur-chaser entities.

The Roussos Brothers' false declarations made it im-possible for the Bankruptcy Court to "perform in the usual manner its ᵗ⁷³⁰ impartial task of adjudging" the sale motion. *Intermagnetics*, 926 F.2d at 912. The court's impartial review was fatally compromised by its lack of awareness of a crucial fact—that the purported arms-length sale was in reality a sale to entities con-trolled by insiders.

Nothing in the Bankruptcy Code prohibits a sale to in-siders. However, insider sales are subject to "height-ened scrutiny to the fairness of the value provided by the sale and the good faith of the parties in executing the transaction." *In re Family Christian, LLC*, 533 B.R. 600, 622 (Bankr.W.D.Mich.2015). This is because in-siders "usually have greater opportunities for ... ineq-uitable conduct." *Fabricators, Inc. v. Technical Fabrica-tors, Inc. (Matter of Fabricators, Inc.)*, 926 F.2d 1458, 1465 (5th Cir.1991). *See also In re Tidal Const. Co., Inc.*, 446 B.R. 620, 624 (Bankr.S.D.Ga.2009)("[E]ven when par-ties are completely forthright with the facts surround-ing the transfer, § 363 sales to insiders are subject to a higher scrutiny because of the opportunity for abuse."); *Rickel & Associates v. Smith (In re Rickel & As-sociates, Inc.)*, 272 B.R. 74, 100 (Bankr.S.D.N.Y.2002)(same); *In re W.A. Mallory Co., Inc.*, 214 B.R. 834, 837 (Bankr.E.D.Va.1997)(same).

A sale to insiders is fundamentally different from a sale at arms-length. In an arms-length transaction, the asset's exposure to the marketplace insures that the price is reasonable. Insider sales, by their very nature, lack this characteristic. Insiders do not have an in-centive to aggressively market the assets to obtain the highest price. Their incentive is just the opposite– the less marketing, and the lower the price, the better.

"The court's obligation in § 363(b) sales is to assure that optimal value is realized by the estate under the circumstances." *Simantob v. Claims Prosecutor, LLC (In*

*re Lahijani)*, 325 B.R. 282, 288–89 (9th Cir. BAP 2005). As a result of the Roussos Brothers' false declarations, the court could not apply the heightened scrutiny nec-essary to insure that the insider sale yielded optimal value. By preventing the court from applying the cor-rect legal standard, the Roussos Brothers' "perjury ... was so fundamental that it undermined the workings of the adversary process itself." *Stonehill*, 660 F.3d at 445.

Similar to the situation in *Levander v. Prober (In re Levander)*, 180 F.3d 1114 (9th Cir.1999), the perjury was part of a scheme by the Roussos Brothers to "hide a key fact from the court and the opposing party." *Stonehill*, 660 F.3d at 445 (describing *Levander*). In *Levander*, the key hidden fact was that a corporation had transferred its assets to a related partnership that neither the Court nor the parties knew existed. *Levan-der*, 180 F.3d at 1120. As a result of the corporation's perjured statement that the assets had not been trans-ferred, the *Levander* court imposed attorney's fees upon the wrong party. *Id.* The perjury was serious enough to constitute fraud upon the court because there was no way that the court or the parties could be aware of the deception: "[T]he perjury and non-disclosure in the instant case (that the Corporation had transferred its assets to shell entities months before the Corpora-tion testified in depositions that the Corporation's 'as-sets haven't been sold') was not—and could not have been—an issue at the attorneys' fees hearing, as nei-ther the court nor the Levanders knew that the Part-nership existed." *Id.*

The false statements here are at least as serious as those in *Levander*. As was the case in *Levander*, the Bankruptcy Court did not know, and could not have known, that the entities purportedly purchasing the Properties at arms-length were in fact secretly con-trolled by the ᵗ⁷³¹ debtors-in-possession, the Roussos Brothers. As a result of this hidden fact, the adversary process could not function in its normal fashion. No objections were asserted to the sale based on the in-sider status of the purchaser entities. In a normally

**Exhibit 6**

functioning adversary process, proposed sales to insiders frequently generate considerable creditor opposition. For example, in *Family Christian,*the debtors voluntarily withdrew a motion to sell substantially all of their assets to an insider after encountering numerous objections from creditors. 533 B.R. at 607. Even after the debtors obtained court approval of more robust bidding procedures, substantial creditor opposition to the insider bid persisted. *Id.*at 604. *See also Tidal Construction,*446 B.R. at 622(describing creditor objections to an insider sale); *W.A. Mallory Co.,*214 B.R. at 835–36(same).

The Complaint's omission of allegations that the 1994 sales price was materially lower as a result of the fraud does not defeat the fraud on the court claim. In this respect, the Court declines to follow *Menchise v. Steffen (In re Steffen),*464 B.R. 450 (Bankr.M.D.Fla.2012)and *Gekas v. Pipin (In re Met-L-Wood Corp.),*861 F.2d 1012 (7th Cir.1988). Both cases held that it would be fraud against creditors, but not fraud on the court, for a debtor's controlling officer "to use his control to walk off with its [the debtor's] principal assets for a song, shucking off the unsecured creditors in the process." *Met-L-Wood,*861 F.2d at 1019. As rationale for their holdings, *Steffen*and *Met-L-Wood*point to the necessity of finality in bankruptcy sales to maximize the sales price. *Met-L-Wood,*861 F.2d at 1019; *Steffen,*464 B.R. at 459–60.

*Steffen*and *Met-L-Wood*pay insufficient attention to the decreased sale price that inevitably results when debtors collusively sell assets to entities under their secret control. As discussed, debtors in such schemes have no incentive to aggressively market the assets so that the estate obtains optimal value. Therefore, immunizing fraudulent and collusive sales from later attack decreases sale prices. And allowing the court to remain infected by such serious fraud undermines the legitimacy of the bankruptcy sales process, further deterring serious bidders.

Indeed, the Sale Motion suggests that the Properties may not have been adequately marketed.[12]Theodosios' declaration in support of the Sale Motion states that he did not enter into a listing agreement with any real estate brokers, purportedly because each broker demanded exclusivity and Theodosios "wanted the widest possible base of support in marketing" the Properties. Declaration of Theodosios Roussos at ¶ 14 (Complaint, Exhibit 4). The marketing efforts consisted of informal contact with real estate brokers and the distribution of flyers. *Id.*The Sale Motion does not specify how many flyers were distributed or where they were distributed. Once again, the Bankruptcy Court's lack of awareness of the true nature of the sale prevented it from applying the heightened scrutiny that could have brought to light any inadequacies in the marketing process.

> 12. The Sale Motion is attached to the Complaint
> and is therefore properly considered by the Court
> in the context of a motion to dismiss.

Relying upon *Robertson v. Isomedix, Inc. (In re Int'l Nutronics, Inc.),*28 F.3d 965 (9th Cir.1994)and *Stan Lee Media, Inc. v. Conan Sales Co., LLC,*2:11-cv-06861-SVW, Doc. No. 91 (C.D.Cal. Feb. 8, 2012) (unpublished disposition), *aff'd,*546 Fed.Appx. 725 (9th Cir.2013), Defendants contend that the Complaint does not allege facts sufficient to state a claim for fraud on the court. As explained below, those cases do not apply.

In *Nutronics,*the Chapter 7 Trustee rejected two competing offers to purchase the debtor's assets submitted by Isomedix and Radiation Sterilizers, Inc. ("RSI"). *Nutronics,*28 F.3d at 967. The Trustee instructed Isomedix and RSI to submit new bids. *Id.*Upon learning that they were the only two bidders, Isomedix and RSI formed a joint venture and submitted a much lower combined bid, which the Trustee ultimately accepted. *Id.*The Trustee sought and obtained approval of the combined Isomedix/RSI bid from the Bankruptcy Court. *Id.*In so doing, the Trustee expressed no objection to the Isomedix/RSI joint bid. *Id.*

**Exhibit 6**

Twenty-two months after obtaining court approval of the sale to Isomedix/RSI, the Trustee filed an adversary proceeding against Isomedix and RSI seeking to invalidate the sale. *Id.* The Trustee alleged that the combined bid constituted an unlawful business combination in violation of the Sherman Anti–Trust Act. *Id.* The Trustee sought to avoid the sale under § 363(n), which provides that sales may be avoided "if the sale price was controlled by an agreement among potential bidders at such sale." *Id.*

The *Nutronics* court affirmed the dismissal of the Trustee's complaint. *Id.* at 971. The court explained that the Trustee's claim under § 363(n) was more appropriately characterized as a motion for relief from a final order under Rule 60(b)(3). *Id.* at 969. As such, the claim was barred by Rule 60(b)'s one-year statute of limitations. *Id.*

The court found that the claims were also barred by res judicata. *Id.* at 970. In making this finding, the court emphasized that the Trustee was fully aware of the collusive behavior at the time he sought court approval of the sale order:

> Here the Trustee bases his present antitrust claim on collusive behavior of Isomedix and RSI that was known to him at the time he sought confirmation of the sale, and, indeed, the "collusion" was apparent on the face of the bid. If the joint bid was unduly low because of unlawful collusion, and that fact was known to the trustee at the time, then it should have been brought to the attention of the bankruptcy court. There is little purpose in the court's confirming a sale if it has no power or duty to determine whether the terms of sale are in the best interests of the estate. Thus this proceeding confirming the sale was a perfunctory and narrow one only because the Trustee chose not to make it otherwise.

# Id.

The facts of *Nutronics* bear little relation to the facts of the present case. The Trustee's complaint in *Nutronics* did not even assert a claim for fraud on the court. The *Nutronics* court based its decision upon Rule 60(b)(not Rule 60(d)(3)), and upon the fact that the Trustee was precluded from asserting the collusion claim as a result of his failure to do so previously. In determining that the Trustee's complaint could be characterized only as a motion under Rule 60(b), the *Nutronics* court implicitly concluded that whatever fraud may have occurred was not serious enough to constitute fraud on the court.

The Court notes that the fraud alleged in *Nutronics* was far less serious than the fraud alleged here. It is unclear whether the bankruptcy court that approved the sale to the Isomedix/RSI joint venture was aware of the fact that Isomedix and RSI had submitted separate higher competing bids before submitting a lower combined bid. The court, however, was aware of the essential facts of the sale, including the identity of the purchasers, the fact that the purchasers had submitted a joint bid, and the sales price.

In the present case, the court was not aware of an essential fact of the sale—namely, that the purchaser entities, purportedly acquiring the Properties at arms-length, were in fact under the secret control of the debtors-in-possession, the Roussos Brothers. Even more damaging, the court's lack of awareness was a direct result of the false declarations submitted by the Roussos Brothers.

Contrary to Defendants' contention, *Nutronics* does not stand for the proposition that a bankruptcy sale may be attacked only under Rule 60(b), and never under Rule 60(d)(3). Such a reading would eviscerate the Court's broad equitable powers to cleanse itself of fraud and would render Rule 60(d) meaningless, at least with respect to bankruptcy sales.

**Exhibit 6**

*Stan Lee Media* is likewise inapposite. In *Stan Lee*, Chapter 11 debtor-in-possession Stan Lee Media, Inc. ("SLMI") obtained bankruptcy court approval of a settlement with creditor Conan Sales Company, LLC ("CSC"). *Stan Lee*, 2:11–cv–06861–SVW, Doc. No. 91, at *3. SLMI sought the agreement so that its intellectual property assets would not be foreclosed upon by CSC. *Id.* Under the agreement, SLMI assigned its IP assets to CSC in exchange for a $275,000 payment. *Id.*

Ten years later, SLMI, facing seller's remorse, moved to invalidate the court-approved settlement agreement, asserting fraud on the court. *Id.* at *9. As the basis for its fraud on the court claim, SLMI alleged that (1) its shareholders had not received notice of the proposed settlement; (2) one of its attorneys, Arthur Lieberman, held a financial interest in adverse party CSC; (3) the settlement motion had not disclosed the true value of the assets; (4) the stipulation approving the settlement was not signed by a legally authorized representative; and (5) the settlement was not approved by the board. *Id.*

The *Stan Lee* court rejected SLMI's arguments. The court explained that SLMI's shareholders were not entitled to notice of the settlement agreement. *Id.* at *7. It acknowledged that attorney Lieberman may have been conflicted, but pointed out that the agreement was negotiated by another attorney, Klausner, with the full support of the creditor's committee. *Id.* at *7–8. The court further noted that there was no evidence that Klausner had acted other than in the best interests of the creditor's committee. *Id.* at *10. The evidence showed that Klausner had negotiated an arms-length agreement on the committee's behalf. *Id.*

The facts of *Stan Lee* are nothing like those of the present case. In contrast to *Stan Lee*, the sale in the present case was not at arms-length and the debtors-in-possession concealed that fact from the Bankruptcy Court. The debtors-in-possession were not acting in the best interests of the estate, as opposed to Klausner,

whom the *Stan Lee* court found acted in the best interests of the creditor's committee.

The Court rejects Theodosios' contention that the Rule 60(d)(3) claim for relief is barred for not being brought within a reasonable period of time. "There is no statute of limitations for fraud on the court." *Valerio v. Boise Cascade Corp.*, 80 F.R.D. 626, 640 n. 10 (N.D.Cal.1978) *aff'd*, 645 F.2d 699 (9th Cir.1981). Even if a statute of limitations did apply, the Complaint alleges that Michaelides did not discover the fraud until 2015. Complaint at ⁓ ⁓ ⁓ ¶ 56.[13] The UST did not discover the fraud until June 18, 2015, shortly before filing the motion to reopen. The Chapter 7 Trustee, the real party in interest, was appointed shortly after the Court granted the motion to reopen, and discovered the fraud upon being appointed. Therefore, the Complaint was brought within a reasonable time.

> 13. The Complaint alleges that Michaelides discovered the arbitration action—which provides evidence of Harry and Theodosios' control of S.M.B. and O.F.—"in the beginning of 2015." Complaint at ¶ 56. Defendants' contention that the fraud was discovered in 2005 misreads the Complaint. First, the Chapter 7 Trustee was not even appointed until 2015 and therefore could not have discovered the fraud in 2005. Second, the Complaint alleges that Michaelides conducted a judgment debtor examination of Theodosios in 2005, and that Theodosios falsely stated that he had no interest in O.F. and S.M.B. Therefore, even if Michaelides' knowledge in 2005 could imputed to the Trustee (which it cannot be), Michaelides had no knowledge of the fraud in 2005.

The Court rejects Theodosios' argument that the fraud on the court claim was irrevocably abandoned by the previous Chapter 7 Trustee when the cases were closed in 2002. Section 554(c) provides that "any property scheduled under section 521(a)(1) of this title not otherwise administered at the time of the closing of a case is abandoned to the debtor and administered for purposes of section 350 of this title." Harry and

**Exhibit 6**

casetext

Theodosios did not schedule the claim for fraud on the court, so section § 554(c) does not apply. The fraud on the court claim remains property of the estate pursuant to § 554(d), which provides that "property of the estate that is not abandoned under this section and that is not administered in the case remains property of the estate."

At oral argument, Harry asserted that under Rule 60(d)(3), the Court could not set aside the Sale Order because Rule 60(d)(3) refers only to setting aside judgments, not orders. Harry pointed to Rule 60(b)'s provision for relief from a "final judgment, order, or proceeding," and suggested that the omission of "order" in Rule 60(d)(3) was an intentional limitation upon the Court's power.

Harry's argument misapprehends the Court's broad-ranging equitable powers to cleanse itself of fraud under Rule 60(d)(3). Courts have spoken with clarity and firmness on this issue: "The power to unearth [fraud upon the court] is the power to unearth it effectively. Accordingly, a federal court may bring before it by appropriate means all those who may be affected by the outcome of its investigation.... No doubt, if the court finds after a proper hearing that fraud has been practiced upon it, or that the very temple of justice has been defiled, the entire cost of the proceedings could justly be assessed against the guilty parties." *Universal Oil Products Co. v. Root Ref. Co.,* 328 U.S. 575, 580, 66 S.Ct. 1176, 90 L.Ed. 1447 (1946).

Adopting Harry's argument would render bankruptcy courts impotent against the machinations of fraudsters. Much of the business of a Bankruptcy Court is conducted through orders rather than judgments. For example, a chapter 11 plan, which can permanently alter the rights of creditors and in many cases substantially reduce the value of their claims, is confirmed through an order, not a judgment.

## B. The Fifth Claim for Relief (Fraud) and Sixth Claim for Relief (Breach of Fiduciary Duty) are Dismissed with Leave to Amend

The fifth and sixth claims for relief seek compensatory and punitive damages against Harry and Theodosios, based upon *735 Harry and Theodosios' procurement of the August 5, 1994 Sale Order, and subsequent transfer of the Properties to O.F. and S.M.B. on October 19 and November 29, 1994. Harry and Theodosios' cases were converted to chapter 7 on May 2, 1995. Both Harry and Theodosios received discharges on January 12, 1996.

Harry and Theodosios' personal liability for any wrongful actions associated with procuring the Sale Order was terminated by the January 12, 1996 discharge. The period under which the discharge could be revoked under § 727(e)(1) expired on January 12, 1997. The period under which the discharge could be revoked under § 727(e)(2) expired on June 27, 2002, the date the cases were closed. Section 727(e) is a statute of repose and, as such, its deadlines are not subject to equitable tolling. *See Elliott v. Weil (In re Elliot),* 529 B.R. 747, 754 (9th Cir. BAP 2015) ("We agree with the First Circuit BAP that, based upon the logic of the Supreme Court's decision in *Kontrick,* § 727(e) is both Congress's grant to, and limitation on, a bankruptcy court's subject matter jurisdiction over discharge revocation actions. Section 727(e) is a nonwaivable statute of repose, and its time limits are not subject to tolling such that the failure to commence a § 727(d) adversary proceeding within the time period specified in § 727(e) deprives the bankruptcy court of jurisdiction to adjudicate that action.").

Plaintiff attempts to avoid the effect of the discharge injunction by arguing that the Court should modify the date of the order for relief under § 348(b). Section 348(b) provides that "[u]nless the court for cause orders otherwise," the date of the order for relief in a converted case is the date upon which the case was converted. As applied to the present case, § 348(b) means that the date of the order for relief in Harry

and Theodosios' chapter 7 bankruptcies was May 2, 1995 (the date the chapter 11 cases were converted to chapter 7). Consequently, unless the date of the order for relief is modified "for cause," the chapter 7 discharge expunges Harry and Theodosios' liability for the conduct associated with procuring the Sale Order, since that conduct occurred preconversion. *See, e.g., In re Toms,*229 B.R. 646, 653 (Bankr.E.D.Pa.1999)("Thus, when a bankruptcy case is converted to chapter 7 from chapters 11, 12 or 13, section 727(b) renders dischargeable all debts which arose before the date of conversion").

At least one court has modified the date of the order for relief to prevent the debtors from receiving a discharge of debts accrued post-filing but pre-conversion. The court in *In re Morris,*155 B.R. 422, 431 (Bankr.W.D.Tex.1993)reasoned that modifying the date was appropriate because the debtors converted solely to discharge $100,000 in post-petition gambling debts.[14]However, Plaintiff cites no authority—and the Court has found none—in which cause existed to modify the date of the order for relief nineteen years after the debtors' discharge and thirteen years after the closing of the cases. Such retroactive modification of the date would be inconsistent with the finality of the discharge, exemplified by § 727's strict limitations on discharge revocation. [736] The consequences of retroactive modification of the date of the order for relief are greater than those of invalidating the Sale Order. Modifying the date would re-establish the enforceability of debts that have long been discharged. Such modification would affect numerous parties, most of whom are not before the Court.

14. Other courts addressing the issue failed to find sufficient cause to modify the date. *See, e.g., In re Toms,*229 B.R. 646, 657 (Bankr.E.D.Pa.1999)(although debtor's conversion would discharge law firm's fees, the conversion from chapter 13 to chapter 7 was not in bad faith because the chapter 13 case had no reasonable likelihood of success); *Rosenberg v. Corio (In re Corio),*No. ADV. 07-1899, 2008 WL 4372781

(D.N.J. Sept. 22, 2008)(debtor's conversion from chapter 13 to chapter 7 shortly after creditors had obtained stay-relief to pursue entry of a state court judgment was not in bad faith).

The Court finds that, as a matter of law, § 348(b) may not be invoked to modify the date of the order for relief nineteen years after discharge and thirteen years after case closing. As a result, the discharge injunction bars Plaintiff from seeking to recover against Harry and Theodosios' personal, non-estate property with respect to the fraud and breach of fiduciary duty claims.

However, the discharge injunction does not prevent Plaintiff from naming Harry and Theodosios as nominal parties provided it is clear that Plaintiff will not seek to collect against their personal assets. *See Rader v. Carson (In re Rader),*488 B.R. 406, 415 (9th Cir. BAP 2013)("In *Munoz,*the court was faced with determining whether the discharge injunction would be violated if a party sought to establish liability against a debtor solely for the purpose of pursuing payment from a third party. The court in *Munoz*decided it would not, and stated that '[w]here the purpose of the action is to collect from a collateral source, such as insurance or the UEF [Uninsured Employers Fund], and the plaintiff makes it clear that it is not naming the debtor as a party for anything other than formal reasons, no bankruptcy court order is necessary.' ").

The Court also finds that Plaintiff has failed to sufficiently plead that the claims for fraud and breach of fiduciary duty are not barred by the statute of limitations. Under California law, an action based on fraud accrues on the date the Plaintiff discovers the facts constituting the fraud. California Code of Civil Procedure §§ 337and 338(d). The "discovery rule" "postpones accrual of a cause of action until the plaintiff discovers, or has reason to discover, the cause of action." *Fox v. Ethicon Endo–Surgery, Inc.,*35 Cal.4th 797, 27 Cal.Rptr.3d 661, 110 P.3d 914, 920 (2005). "In order to rely on the discovery rule for delayed accrual of a cause of action, '[a] plaintiff whose complaint shows

**Exhibit 6**

on its face that his claim would be barred without the benefit of the discovery rule must specifically plead facts to show (1) the time and manner of discovery *and* (2) the inability to have made earlier discovery despite reasonable diligence.' " *Id.* at 920–21 (internal citations omitted).

The Complaint contains extensive allegations regarding Michaelides' attempts to uncover the fraud and breach of fiduciary duty, but does not contain sufficient allegations showing that Plaintiff, the Trustee, exercised the required diligence. Michaelides' actions cannot be imputed to the Trustee.

Finally, the Court rejects Defendants' argument that the Trustee lacks standing to pursue the fraud and breach of fiduciary claims. Defendants invoke the Wagoner Rule, a Second Circuit doctrine holding that the Trustee lacks standing to assert claims predicated upon injury to creditors. In *CarrAmerica Realty Corp. v. Nvidia Corp.,* 302 Fed.Appx. 514, 517 (9th Cir.2008), *as amended* (Jan. 22, 2009), *as amended* (Mar. 10, 2009), the Ninth Circuit declined to follow *Wagoner:*

> The Creditors argue that Trustee standing is barred under *Shearson Lehman Hutton, Inc. v. Wagoner,* 944 F.2d 114, 120 (2d Cir.1991) ('A claim against a third party for defrauding a corporation with the cooperation of management accrues to creditors, not to the guilty corporation.'
>
> ⸳⸳⸳ ). However, the *Wagoner* rule has been much criticized and we decline to follow it. *See In re Senior Cottages of Am., LLC,* 482 F.3d 997, 1003–04 (8th Cir.2007) (listing authorities rejecting *Wagoner* and concluding that the *in pari delicto* defense has nothing to do with trustee standing).

## C. The Seventh Claim for Relief (Aiding and Abetting Breach of Fiduciary Duty) is Dismissed with Leave to Amend

The Court finds that the Complaint fails to sufficiently show that the claim for aiding and abetting breach of fiduciary duty is not barred by the statute of limitations. Therefore, the seventh claim for relief is dismissed with leave to amend.

As opposed to the fraud on the court claim—as to which there is no statute of limitations—a claim for aiding and abetting breach of fiduciary duty is subject to a statute of limitations of either three or four years, depending on the specific circumstances of the breach. *See generally Schneider v. Union Oil Co.,* 6 Cal.App.3d 987, 993, 86 Cal.Rptr. 315 (Ct.App.1970) (discussing different statutes of limitation that may apply to a claim for breach of fiduciary duty).

Although it may be inferred from the context in which the Complaint was filed that the Trustee became aware of the fiduciary breach sometime after he was appointed in 2015, the Complaint does not specifically allege the precise date of awareness. The Complaint also fails to sufficiently allege that the Trustee exercised due diligence in attempting to discover the facts, as is necessary to equitably toll the statute of limitations. [15] *Fed. Election Comm'n v. Williams,* 104 F.3d 237, 240–41 (9th Cir.1996).

> 15. As stated previously, the Complaint contains extensive allegations as to Michaelides' attempts to uncover the fraud and breach of fiduciary duty. Michaelides' actions cannot be imputed to the Trustee.--------

The Court also notes that, by virtue of § 524(a)(3), the Trustee's recovery against non-debtor spouses Paula and Christine must be limited to those spouses' "separate property and any pre-bankruptcy community property not included in the estate." *Sanwa Bank California v. Chang,* 87 Cal.App.4th 1314, 1318–19, 105

**Exhibit 6**

Cal.Rptr.2d 330, 333 (2001). As explained by the *San-wa Bank* court, although § 524(a)(3) is "not a discharge of personal liability for the non-filing spouse," it does prevent "recovery, by a creditor holding a community claim, of after-acquired community property." *Id.*

## D. The Fourth Claim for Relief (Turnover Under § 542) States a Claim Upon Which Relief May Be Granted

Section 542 provides: "[A]n entity, other than a custodian, in possession, custody, or control, during the case, of property that the trustee may use, sell or lease under section 363 of this title, ... shall deliver to the trustee, and account for, such property or the value of such property, unless such property is of inconsequential value or benefit to the estate." The "property" referred to in § 542 "is generally understood to mean 'property of the estate,' as defined in section 541." 5 *Collier on Bankruptcy* ¶ 542.02[2] (16th ed. rev.2015).

Assuming that the allegations set forth in the Complaint are true, as the Court must in the context of a motion to dismiss, the Properties remain property of the estate. The Sale Order, having been procured by fraud on the court, is void *ab initio. See America's Servicing Co. v. Schwartz–Tallard,* 438 B.R. 313, 320 (D.Nev.2010)(holding that an order obtained through fraud on the court is void *ab initio*). As a result, the estate was never divested of its interest in the Properties. The cases cited by Defendants holding that turnover could not be invoked subsequent to a § 363 sale do not apply as those cases did not involve a void Sale Order procured through fraud on the court.

## E. The Quiet Title Action is Not Time–Barred

"Since there is no statute of limitations governing quiet title actions as such, it is ordinarily necessary to refer to the underlying theory of relief to determine which statute applies." *Muktarian v. Barmby,* 63 Cal.2d 558, 47 Cal.Rptr. 483, 407 P.2d 659 (1965). Plaintiff's quiet title action is predicated upon the action to vacate the sale for fraud on the court. As explained above, there is no statute of limitations for actions asserting fraud on the court. Even if the Court were to impose a timeliness requirement on the fraud on the court claim, the Court finds Plaintiff discovered the fraud in 2015 and that accordingly, the claim is timely. Consequently, Plaintiff's quiet title action is not time-barred.

Defendants' reliance upon *McCaslin v. Hamble n ,* 37 Cal.2d 196, 231 P.2d 1 (1951) is misplaced. In *McCaslin,* the defendant acquired title to property through a tax deficiency sale. 37 Cal.2d at 197, 231 P.2d 1. The original owners sought to quiet title against the defendant. *Id.* at 197–98, 231 P.2d 1. The *McCaslin* court found that under § 175 of the Revenue and Taxation code, title to property acquired in a tax deficiency sale was entitled to a conclusive presumption of validity unless the deed was challenged within one year. *Id.* at 198, 231 P.2d 1. The facts of *McCaslin* do not apply to the case at hand.

## F. Michaelides' Previous State Court Litigation Does Not Support Dismissal of the Complaint

Defendants devote substantial space to describing previous state court litigation between Michaelides and themselves. The Court takes judicial notice of the documents submitted in connection with the state court litigation but finds those documents to be of minimal relevance in determining the instant motions to dismiss. Quite simply, Michaelides is not the real party in interest in this action; the Chapter 7 Trustee is.

Defendants' argument that the Complaint must be dismissed on the grounds of judicial estoppel and waiver suffer from the defect of imputing Michaelides' actions to the Chapter 7 Trustee. The extent to which Michaelides may or may have waived her claims, or

# Exhibit 6

the extent to which Michaelides may or may not be judicially estopped, has no bearing upon the Chapter 7 Trustee's ability to bring this action. The Trustee is independent of Michaelides and is not bound by her actions.

Defendants' contention that the Trustee "is being used as a tool to do [Michaelides'] bidding," Theodosios MTD at 22 n.5, is not well taken. The Trustee retained special litigation counsel only after he conducted an independent evaluation of the action and concluded that it had merit. *See generally* Verification of Complaint, signed by Chapter 7 Trustee Howard M. Ehrenberg [Doc. No. 1]. Unsubstantiated and incendiary allegations that the Trustee is acting in bad faith serve no purpose and are of no assistance to the Court in adjudicating the issues posed by the Complaint.

## III. Conclusion

For the foregoing reasons, the Trustee's Complaint states claims for relief to vacate the Sale Order for fraud on the court under Fed. R. Civ. P. 60(d)(3), to quiet title under California Code of Civil Procedure § 761.010, for declaratory relief under 28 U.S.C. § 2201, and for turnover under Bankruptcy Code § 542. The claims for relief for fraud, breach of fiduciary duty, and aiding and abetting breach of fiduciary duty are dismissed with leave to amend.

___

**EXHIBIT 7**

**EXHIBIT 7**

**Exhibit 7**

Search FindLaw

CASES & CODES    PRACTICE MANAGEMENT    JOBS & CLE    NEWSLETTERS    BLOGS    LEGAL TECHNOLOGY

Forms    Lawyer Marketing    Corporate Counsel    Law Students    JusticeMail    Reference

FindLaw    Caselaw    Nevada    NV Supreme Ct.    NC DSH INC v. GARNER

# NC DSH INC v. GARNER

Print                                    Font size:    ^    A    Reset

FindLaw Career Center

Select a Job Title
Attorney
Corporate Counsel
Academic
Judicial Clerk
Summer Associate
Intern
Law Librarian

Search Jobs | Post a Job | Careers Home

View More

## Supreme Court of Nevada.

**NC–DSH, INC., a Nevada Corporation d/b/a Valley Hospital Medical Center, Appellant, v. Clark L. GARNER, Individually, as Special Administrator of the Estate of Carole L. Garner, Deceased, and as Special Administrator of the Estate of Bobby John Garner, Deceased; Steven G. Garner; Rhonda V. Schwantes; and Aaron K. Garner, Respondents.**

### No. 49029.

### Decided: October 29, 2009

BEFORE THE COURT EN BANC.Tuverson & McBride and Eric K. Stryker, Las Vegas, for Appellant. Crockett & Myers and J.R. Crockett Jr. and Richard W. Myers, Las Vegas, for Respondents.
OPINION

Valley Hospital appeals from an order vacating a stipulated final judgment under NRCP 60(b) for fraud on the court. The fraud was committed by Lawrence Davidson, the lawyer who brought this malpractice case for the Garner family, plaintiffs below. Without the knowledge or approval of his clients, Davidson settled their case for $160,000, forged the necessary settlement papers, and disappeared with the money. Because Davidson was the Garners' agent, albeit a faithless one, the district court conditioned its order on the Garners giving Valley Hospital credit for the $160,000 against any eventual recovery they might make. Out both its $160,000 and the litigation peace it expected in return, Valley Hospital appeals.

Valley Hospital characterizes Davidson's misconduct as "intrinsic fraud." It argues that the district court should have ruled the Garners' motion untimely, because it was not filed within six months of the stipulated judgment being entered as NRCP 60(b)(3) requires; further, that the Garners should have proceeded by independent action, not motion, to set aside the judgment. The Hospital also maintains that Davidson had actual and apparent authority to settle the Garners' claims: Unlike the Garners, who chose Davidson as their lawyer, Valley Hospital and its lawyer had no choice but to deal with Davidson; it is bad policy and unfair, the Hospital argues, to visit the consequences of an opposing party's lawyer's fraud on innocent parties like Valley Hospital and its lawyer, who took all reasonable steps to document a valid, enforceable settlement. Finally, the Hospital argues that the district court erred in not finding that the Garners ratified the settlement.

We reject Valley Hospital's arguments and affirm. The district court found that Davidson committed "fraud upon the court," which is not subject to NRCP 60(b)(3)'s six-month limitations period. Murphy v. Murphy, 103 Nev. 185, 186, 734 P.2d 738, 739 (1987). Although true fraud on the court is rare and requires "egregious misconduct," Occhiuto v. Occhiuto, 97 Nev. 143, 146 n. 2, 625 P.2d 568, 570 n. 2 (1981) (quoting United States v. International Telephone & Tel. Corp., 349 F.Supp. 22, 29 (D.Conn.1972)), the district court did not abuse its discretion in finding such fraud by Davidson here. Nor were its findings that Davidson lacked authority and the Garners did not ratify the settlement clearly erroneous. Finally, while the Hospital argues the Garners' motion was untimely because not made within six months of entry of judgment, it did not establish prejudicial delay.

DISCUSSION

The Garners brought their motion to set aside the stipulated judgment under NRCP 60(b). As amended

**Exhibit 7**

effective January 1, 2005, NRCP 60(b) largely replicates Fed.R.Civ.P. 60(b), as written before the
Federal Rules' 2007 revisions.[1] Like its federal counterpart, NRCP 60(b) has two separate provisions
that address fraud.   The first is NRCP 60(b)(3), which provides, "On motion and upon such terms as
are just, the court may relieve a party . from a final judgment, order, or proceeding for . fraud (whether
heretofore denominated intrinsic or extrinsic), misrepresentation or other misconduct of an adverse
party."   The second provision addressing fraud appears in NRCP 60(b)'s "savings clause."   The
savings clause says, "This rule does not limit the power of a court to entertain an independent action to
relieve a party from a judgment, order, or proceeding, or to set aside a judgment for fraud upon the
court." [2]   While a motion under NRCP 60(b)(3) must be made "not more than 6 months after the
proceeding was taken or the date that written notice of entry of the judgment or order was served,"
NRCP 60(b) does not specify a time limit for motions seeking relief for " fraud upon the court."

NRCP 60(b)(3) does not apply

   Valley Hospital argues that Davidson's fraud was "intrinsic" not "extrinsic" to the stipulated
judgment.   In its view, this makes the fraud remediable, if at all, only under NRCP 60(b)(3), or by
independent action.  This argument is flawed, on multiple levels.

Labeling the basis for the Garners' motion "intrinsic" rather than "extrinsic" fraud does not bring it
within NRCP 60(b)(3) or make NRCP 60(b)(3)'s six-month limitations period apply.   Ever since its
1981 amendment to import the parenthetical phrase—"(whether heretofore denominated intrinsic or
extrinsic)"—from its federal model, NRCP 60(b)(3) has applied to both intrinsic and extrinsic fraud.
See Carlson v. Carlson, 108 Nev. 358, 362 n. 6, 832 P.2d 380, 383 n. 6 (1992); Occhiuto, 97 Nev. at
146 n. 2, 625 P.2d at 570 n. 2.[3] The 1981 amendment to NRCP 60(b)(3) abrogated the older cases like
Gilbert v. Warren, 95 Nev. 296, 299, 594 P.2d 696, 698 (1979), and Manville v. Manville, 79 Nev. 487,
489–90, 387 P.2d 661, 662 (1963), to the extent they relied on the distinction between intrinsic and
extrinsic fraud to decide whether a motion fell under NRCP 60(b)(3) and its six-month deadline.   See
11 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2868 (2d
ed. 1995) (noting that the distinction between extrinsic and intrinsic fraud "rests on clouded and
confused authorities, its soundness as a matter of policy is very doubtful, and it is extremely difficult to
apply") (footnote omitted).

More germane: NRCP 60(b)(3) by its terms only applies to fraud "of an adverse party."   The district
court found that neither Valley Hospital nor its lawyer had any knowledge of or complicity in
Davidson's fraud.  Davidson victimized them, equally with the Garners.  NRCP 60(b)(3) and its six-
month limitations period thus do not apply, because the Garners' motion was not based on "fraud
(whether . intrinsic or extrinsic), misrepresentation or other misconduct of an adverse party." NRCP
60(b)(3) (emphasis added).   Other courts, applying like rules to like facts, have so held, and we read
our rule no differently.  McKinney v. Boyle, 404 F.2d 632, 633–34 (9th Cir.1968) (holding that where
the movant's lawyer and nonparty wife committed fraud in concluding his case, the motion did not
involve fraud "of an adverse party," taking it outside Fed.R.Civ.P. 60(b)(3) and its one-year time limit);
Flowers v. Rigdon, 101 Ohio App.3d 172, 655 N.E.2d 235, 236 (1995) (holding that, while "[f]raud,
inter partes, without more, should not be a fraud upon the court, but redress should be left to a motion
under [the Ohio counterpart to NRCP] 60(b)(3) or to the independent action," a lawyer who defrauds
his clients by stipulating to a bogus judgment concluding their claims commits a "fraud upon the
court") (quotation omitted); see Latshaw v. Trainer Wortham & Co., Inc., 452 F.3d 1097, 1102 (9th
Cir.2006) (holding that "[s]ubsection (b)(3) permits relief only when the fraud was committed by 'an
adverse party' ").

The Garners were not required to file an independent action

   Nor does it make a difference that the Garners proceeded by motion in the underlying case instead of
filing an independent action.  "A party is not bound by the label he puts on his papers.   A motion may
be treated as an independent action or vice versa as is appropriate."  Wright, Miller & Kane, supra, §
2868 (footnote omitted).  Also, this court has already interpreted NRCP 60(b)'s "savings clause" to
permit a party seeking to vacate a judgment because of fraud on the court to "proceed by motion or
[to] bring an independent action," Murphy v. Murphy, 103 Nev. 185, 186, 734 P.2d 738, 739 (1987);
he or she just may not pursue both remedies simultaneously.   Goodyear Tire & Rubber Co. v. H.K.
Porter Company, 521 F.2d 699, 700 (6th Cir.1975), cited with approval in Murphy, 103 Nev. at 186,
734 P.2d at 739.  If anything, comity and efficiency make a "motion in the court that rendered the
judgment" the preferred and "normal procedure to attack a judgment" for fraud on the court.  Wright,
Miller & Kane supra, § 2868 (noting that "[d]enial of relief [by motion] in th[e rendering] court will bar
an independent equitable action in another court, unless the denial was on a ground that precluded
reaching the merits of the motion, or the circumstances have changed") (footnotes omitted).   See also
United States v. Beggerly, 524 U.S. 38, 47, 118 S.Ct. 1862, 141 L.Ed.2d 32 (1998) (interpreting
Fed.R.Civ.P. 60(b) and holding that "under the Rule, an independent action should be available only to
prevent a grave miscarriage of justice," which is a "demanding standard").

# Exhibit 7

Lawyer fraud may constitute a "fraud upon the court" pursuant to NRCP 60(b)'s savings clause

The question thus comes down to whether lawyer fraud in connection with a stipulated final judgment can qualify as a "fraud upon the court" under NRCP 60(b)'s savings clause. The district court found that Davidson committed a "fraud upon the court" when he signed and submitted a stipulated judgment for dismissal with prejudice to the court, which the court then signed and entered, terminating the Garners' claims.

"Fraud upon the court" has been recognized for centuries as a basis for setting aside a final judgment, sometimes even years after it was entered. Hazel–Atlas Glass Co. v. Hartford Co., 322 U.S. 238, 245, 64 S.Ct. 997, 88 L.Ed. 1250 (1944) (discussing "the historic power of equity to set aside fraudulently begotten judgments" and canvassing cases and treatises and vacating a judgment entered nine years earlier), overruled on other grounds by Standard Oil Co. v. United States, 429 U.S. 17, 18, 97 S.Ct. 31, 50 L.Ed.2d 21 (1976). It is, of course, true that "in most instances society is best served by putting an end to litigation after a case has been tried and judgment entered." Id. at 244, 64 S.Ct. 997.

For this reason, a final judgment, once entered, normally is not subject to challenge. However, the policy of repose yields when "the court finds after a proper hearing that fraud has been practiced upon it, or the very temple of justice has been defiled." Universal Oil Co. v. Root Rfg. Co., 328 U.S. 575, 580, 66 S.Ct. 1176, 90 L.Ed. 1447 (1946). "[A] case of fraud upon the court [calls] into question the very legitimacy of the judgment." Calderon v. Thompson, 523 U.S. 538, 557, 118 S.Ct. 1489, 140 L.Ed.2d 728 (1998). Put another way, "[w]hen a judgment is shown to have been procured" by fraud upon the court, "no worthwhile interest is served in protecting the judgment." Restatement (Second) of Judgments § 70 cmt. b (1982).

The problem lies in defining what constitutes "fraud upon the court." Obviously, it cannot mean any conduct of a party or lawyer of which the court disapproves; among other evils, such a formulation "would render meaningless the [time] limitation on motions under [Rule] 60(b)(3)." Kupferman v. Consolidated Research & Mfg. Corp., 459 F.2d 1072, 1078 (2d Cir.1972) (Friendly, J.), cited with approval in Occhiuto, 97 Nev. at 146 n. 2, 625 P.2d at 570 n. 2, and Murphy, 103 Nev. at 186, 734 P.2d at 739. The most widely accepted definition, which we adopt, holds that the concept

embrace[s] only that species of fraud which does, or attempts to, subvert the integrity of the court itself, or is a fraud perpetrated by officers of the court so that the judicial machinery cannot perform in the usual manner its impartial task of adjudging cases . and relief should be denied in the absence of such conduct.

Demjanjuk v. Petrovsky, 10 F.3d 338, 352 (6th Cir.1994) (citing 7 Moore's Federal Practice § 60.33 (2d ed.1978)) (now at 12 Moore's Federal Practice, § 60.21[4][a] (3d ed.2009)); Kupferman, 459 F.2d at 1078 (noting the Second Circuit adopted Moore's formulation); In re Intermagnetics America, Inc., 926 F.2d 912, 916 (9th Cir.1991) (also adopting Moore's formulation); see Occhiuto, 97 Nev. at 146 n. 2, 625 P.2d at 570 n. 2 (citing this section of Moore's but without referring to the passage quoted in Demjanjuk).

An attorney is an officer of the court. "Where a judgment is obtained by fraud perpetrated by an attorney acting as an officer of the court, the judgment may be attacked for fraud on the court." In re Tri–Cran, Inc., 98 B.R. 609, 616 (Bankr.D.Mass.1989). The Supreme Court has long recognized the damage that lawyer dishonesty can inflict on courts and litigants:

[W]here an attorney fraudulently or without authority assumes to represent a party and connives at his defeat; or where the attorney regularly employed corruptly sells out his client's interest to the other side,—these, and similar cases which show that there has never been a real contest in the trial or hearing of the case, are reasons for which a new suit may be sustained to set aside and annul the former judgment or decree, and open the case for a new and a fair hearing.

United States v. Throckmorton, 98 U.S. 61, 66, 25 L.Ed. 93 (1878). See Savage v. Salzmann, 88 Nev. 193, 195, 495 P.2d 367, 368 (1972) (citing Throckmorton and noting that fraud on the court involves situations where, as a result of the fraud, a "party is kept away from the court by . such conduct as prevents a real trial upon the issues involved").

In addition to his duties to his clients, a lawyer also owes a duty of "loyalty to the court, as an officer thereof, [that] demands integrity and honest dealing with the court. And when he departs from that standard in the conduct of a case he perpetrates fraud upon the court." Demjanjuk, 10 F.3d at 352 (citing 7 Moore's Federal Practice, supra, § 60.33) (now at 12 Moore's Federal Practice, § 60.21[4][a]; see Restatement (Second) of Judgments § 70(l)(a) (stating the general rule that "a judgment in a contested action may be avoided if the judgment . [r]esulted from corruption of . the attorney for the party against whom the judgment was rendered"). Although not present in all fraud on the court cases, attorney involvement in the fraud is a signal characteristic of many. Demjanjuk, 10 F.3d at 352 (noting that "[c]ases dealing with fraud on the court often turn on whether the improper actions are

**Exhibit 7**

those of parties alone, or if the attorneys in the case are involved"); Eastern Financing Corp. v. JSC
Alchevsk Iron, 258 F.R.D. 76, 85 (S.D.N.Y.2008) (analyzing Hazel–Atlas, Kupferman, and H. K. Porter
Co. in these terms).

In this case, Davidson obtained Valley Hospital's lawyer's signature on the stipulated judgment and
presented it to the district judge, who signed and entered it as the final judgment in the case, forever
concluding the Garner family's wrongful death claims.   In so doing, Davidson acted as an officer of the
court and misrepresented a fraudulent settlement to the district court judge as genuine.   Other courts,
confronted with like facts, have found fraud on the court, egregious enough to justify vacating the
judgment and allowing the claims to proceed.   Southerland v. Irons, 628 F.2d 978, 980 (6th Cir.1980),
aff'g, Southerland v. County of Oakland, 77 F.R.D. 727 (E.D.Mich.1978) (upholding order vacating
stipulated judgment for fraud on the court, where the plaintiff's lawyer fraudulently misrepresented the
status of his fee and responsibility for liens); Huffman v. Delacruz, 719 So.2d 385, 385–86
(Fla.Dist.Ct.App.1998) (upholding order vacating a stipulated dismissal for fraud on the court where
the plaintiff's attorney signed the settlement stipulations without his client's permission and forged his
client's signature on the settlement check, reprinting the passage from United States v. Throckmorton,
98 U.S. at 65–66, as the basis for its holding); Flowers v. Rigdon, 101 Ohio App.3d 172, 655 N.E.2d
235, 236 (1995) (upholding order vacating a stipulated judgment on the basis the plaintiff automobile
accident victims' attorney perpetrated a "fraud on the court" by falsely informing defendants that he
had authority to settle, by forging plaintiffs' signature on the entry of dismissal, release, and settlement
check, and by keeping settlement proceeds for himself); see McKinney v. Boyle, 404 F.2d 632, 634
(9th Cir.1968) (reversing for evidentiary hearing in case alleging fraud by the plaintiff's attorney in
cahoots with the plaintiff's wife to settle his case and keep the money while the plaintiff was in prison;
decided under the "catchall" clause in Fed.R.Civ.P. 60(b)(6) (which Nevada has not adopted, so "fraud
on the court" not expressly addressed)); General Med. P.C. v. Horizon/CMS Health Care Corp., No. 96–
72624, 2009 WL 1447346, at *5 (E.D.Mich. May 21, 2009) (vacating a stipulated judgment under new
Fed.R.Civ.P. 60(d)(3) for fraud on the court where " the failure to disclose material facts resulted in
[the] court placing its imprimatur on a consent judgment, the primary purpose of which was to ambush
a non-party").

The lawyer's authority as agent did not extend to Davidson's fraud

    We recognize the substantial countervailing argument that a client who hires a lawyer establishes an
agency relationship and that, ordinarily, the sins of an agent are visited upon his principal, not the
innocent third party with whom the dishonest agent dealt.   Rothman v. Fillette, 503 Pa. 259, 469 A.2d
543, 545 (1983); Flowers v. Rigdon, 655 N.E.2d at 237–38 (Jones, P.J., dissenting).   However, courts
"do not treat the attorney-client relationship as they do other agent-principal relationships . when the
question is whether a settlement agreed to by the attorney binds the client."   Grace M. Giesel, Client
Responsibility for Lawyer Conduct: Examining the Agency Nature of the Lawyer–Client Relationship,
86 Neb. L.Rev. 346, 348 (2007).   While a lawyer has apparent authority to handle procedural matters
for a client, "[m]erely retaining a lawyer does not create apparent authority in the lawyer" to settle his
client's case.   Restatement (Third) of the Law Governing Lawyers § 27 cmt. d (2000); see id. § 22(1).
In Passarelli v. J–Mar Development, 102 Nev. 283, 720 P.2d 1221 (1986), we held that a lawyer's
professional and psychiatric disintegration due to substance abuse justified an order vacating the final
judgment against his client after the lawyer failed to appear for trial.   If a lawyer's addictive disorder
can justify vacating a judgment against his neglected client, notwithstanding the imposition on his
adversary, a lawyer's criminal conduct should permit a claim to relief from judgment by a victimized
client as well.

Valley Hospital makes much of the fact that the Garners' retainer agreement included a paragraph
entitled "power of attorney" that gave Davidson the power to sign releases "for and on behalf of the
client."   This argument is a nonstarter, however, because Davidson did not use the power of attorney
to carry out his fraud.   Davidson forged each of the Garner family member's signatures in original ink
on the release, even going so far as to steal a notary stamp from a neighboring office and forging the
notary's signature on the release. Furthermore, the retainer agreement containing the power of
attorney provided, "settlement of the claim will not be made without client's consent."   Based on these
facts and the testimony it heard from the Garner family members, the district court expressly found
that Davidson accomplished his fraud without the express, implied, or apparent authority of his
clients.   This finding is supported by substantial evidence, which we may not disregard.   See NRCP
52(a) (providing that "[f]indings of fact shall not be set aside unless clearly erroneous, and due regard
shall be given to the opportunity of the trial court to judge the credibility of the witnesses").[4]

The district court proceeded properly

    A party seeking to vacate a final judgment based on fraud upon the court bears a heavy burden.   It is
only after "a proper hearing," Universal Oil Co., 328 U.S. at 580, 66 S.Ct. 1176, in which the fraud has
been established by "clear and convincing evidence," Occhiuto, 97 Nev. at 146 n. 2, 625 P.2d at 570 n.

- 212 -

**Exhibit 7**

2, that relief can be granted.   Even then, the motion "is addressed to the sound discretion of the trial court."  Id.

The district judge in this case conducted an evidentiary hearing and entered specific and adequate findings of fact and conclusions of law.   He viewed this as "a terrible case . one of the worst cases I have seen in my . years on the bench."   He knew Davidson as "a talented lawyer, talented practitioner, talented trial lawyer," who "had tr[ied] a jury trial or two here."   In his view, "everybody—was—bamboozled, including the court, by Mr. Davidson."   Recognizing the concern with two innocent victims, one of whom hired the dishonest agent, the court fashioned a remedy that credited Valley Hospital with the $160,000 Davidson stole against any eventual recovery by the Garners.   But the district court stopped there, declining to penalize the Garners with the loss of the right to adjudicate their claim for their father's alleged wrongful death by reason of their lawyer's fraud:

[W]e lawyers, judges, and practitioners alike are very . concerned about how our profession is perceived.   We're very proud of what we believe is an honorable profession and—we're very concerned when something like this happens.   It hurts us all.   It really does.

The district judge's finding that the court, equally with the Garners, the Hospital, and the Hospital's lawyer, was defrauded by Davidson, and its conclusion that this fraud was intolerable and justified vacating the stipulated judgment the court had signed, were well within its discretionary authority to decide.

Ratification and laches

    Two additional points bear discussion.   First, citing Navrides v. Zurich Insurance Company, 5 Cal.3d 698, 97 Cal.Rptr. 309, 488 P.2d 637, 640 (1971), Valley Hospital urges us to find the Garners ratified the fraud by attempting to negotiate for a settlement involving new funds of an equal amount after the fraud came to light, effectively doubling Valley Hospital's outlay but concluding their claims for the $160,000 Davidson disappeared with.   While a client can ratify a lawyer's unauthorized act, see Restatement (Third) of the Law Governing Lawyers § 26(3), the district court found the facts did not support ratification here.   Unlike the defrauded client in Navrides, who sued to enforce the unauthorized settlement, Navrides, 97 Cal.Rptr. 309, 488 P.2d at 640, the Garners consistently protested it as fraudulent.   The district court's finding of no ratification was not clearly erroneous.

    Second, and of greater concern, the Garners learned of Davidson's misconduct from the State Bar of Nevada within weeks of the court entering the stipulation and order of dismissal, yet they waited almost 18 months before filing their NRCP 60(b) motion.   During this time, they cooperated with the federal government in its criminal prosecution of Davidson and with the State Bar in its disbarment proceeding against him, and submitted a claim to the Nevada State Bar's Client Security Fund, for which they received $6,834. 56.

Federal authority holds that "[t]here is no time limit on setting aside a judgment on th[e basis of fraud on the court], nor can laches bar consideration of the matter."   11 Wright, Miller & Kane supra, § 2870 (footnotes omitted).   Other authority suggests "due diligence" is required, at least in discovering the underlying facts.   Restatement (Second) of Judgments, § 70(2)(a) (1982).   See also Matter of Harrison Living Trust, 121 Nev. 217, 112 P.3d 1058 (2005) (applying equitable estoppel and due diligence principles to bar a motion to vacate a motion to set aside a void judgment under NRCP 60(b)(4)); Manville v. Manville, 79 Nev. 487, 387 P.2d 661 (1963) (declining to address laches but holding that an independent suit to vacate a divorce decree was barred by the statute of limitations where the plaintiff waited more than six years to sue her ex-husband, alleging fraud upon the court in presenting the plaintiffs identical twin sister to testify in the underlying divorce).   Our Nevada cases have held that a party who seeks relief from a judgment based on fraud upon the court is not subject to NRCP 60(b)'s six-month limitation period and that there is "no time limitation."   Price v. Dunn, 106 Nev. 100, 104, 787 P.2d 785, 787 (1990) (allowing motion even though 19 months had passed between entry of judgment and application to vacate); see Murphy, 103 Nev. at 185–86, 734 P.2d at 739 (allowing application "[n]early a year" after judgment was entered); Savage v. Salzmann, 88 Nev. 193, 495 P.2d 367 (1972) (remanding order dismissing independent action to vacate judgment filed 16 months after judgment was entered).

This case does not require us to decide how far concern for the integrity of the court in a case involving fraud on the court will take a party who delays seeking relief.   Davidson did not settle this case until discovery was well underway, and the record on appeal shows that, despite the district court's affording the parties the opportunity to brief, argue, and present live evidence on the Garners' NRCP 60(b) motion, Valley Hospital made no argument or showing that specific testimony or evidence had been lost or that it did not learn of Davidson's fraud at or about the same time the Garners did.   While Valley Hospital did argue that the Garners were subject to the six-month limitation applicable to NRCP 60(b)(3) motions, it did not assert laches or establish prejudice.   Indeed, among the arguments it tendered to the district court was that until Davidson's criminal proceedings ran their course, it was

**Exhibit 7**

premature for the court to proceed with the Garners' NRCP 60(b) motion, because restitution might be ordered at Davidson's sentencing.    Under these circumstances, the district court did not err in failing to deny the Garners relief based on the 18 months that elapsed between entry of the judgment and the NRCP 60(b) motion.

Accordingly, we affirm the order of the district court.

FOOTNOTES

1.    Nevada's version of Rule 60(b) differs from its federal analog in two respects:  (1) Nevada shortens the time limit for bringing a motion under subparagraphs (1)-(3) from one year to six months; and (2) Nevada did not adopt the "catchall" provision in Fed.R.Civ.P. 60(b)(6), which allows "any other reason that justifies relief" as a basis for a Federal Rule 60(b) motion.    The 2005 amendment to NRCP 60(b) added this final sentence from the then-existing version of Fed.R.Civ.P. 60(b): "Writs of coram nobis, coram vobis, audita querela, and bills of review and bills in the nature of a bill of review, are abolished, and the procedure for obtaining any relief from a judgment shall be by motion as prescribed in these rules or by an independent action."   See ADKT No. 276 (Order Amending the Nevada Rules of Civil Procedure, July 26, 2004) (making the changes effective on January 1, 2005).   A modernized version of this provision is now Fed.R.Civ.P. 60(e).

2.    Before its 2007 amendment, Fed.R.Civ.P. 60(b) was identical to the language quoted from NRCP 60(b) in the text.   The 2007 revision of the Federal Rules rewords Fed.R.Civ.P. 60(b)(3) slightly and moves the "savings clause" to new Fed.R.Civ.P. 60(d)(1) (addressing independent actions but not the grounds therefor) and Fed.R.Civ.P. 60(d)(3), which states, "This rule does not limit a court's power to . set aside a judgment for fraud on the court."   The commentary states these revisions are to style only, not substance.

3.    Price v. Dunn, 106 Nev. 100, 104, 787 P.2d 785, 787 (1990), which cited pre–1981 cases for the relevance of the distinction between intrinsic and extrinsic fraud, was incorrect in doing so as it failed to reference the 1981 amendments and cases interpreting them.   Price otherwise remains good law.

4.    Davidson was disbarred and criminally prosecuted.   He victimized other clients in addition to the Garners, including David Siegenthaler and Tonya LaBeaux.   Another district court judge granted Mr. Siegenthaler relief from the judgment in that case.   In an unpublished order, a panel of this court affirmed the order of yet a third district court judge declining to vacate a settlement Davidson entered, which Valley Hospital cites (despite SCR 123) as a basis for reversal in this case.   LaBeaux v. Devia, Docket No. 44795, 122 Nev. 1696, 178 P.3d 774 (Order of Affirmance, July 6, 2006).   Although the distinctions are not entirely satisfactory, LaBeaux differs from this case in two important respects: (1) Davidson used the form of power of attorney to sign his name in a representative capacity on LaBeaux's release, which led the district judge in LaBeaux to find apparent authority supported the settlement; and (2) this court reviews a district court's determination in this setting for abuse of discretion, Occhiuto, 97 Nev. at 146 n. 2, 625 P.2d at 570 n. 2, meaning the question on appeal is not how this court would have ruled as an original matter on the facts presented, but whether the district court abused its discretion in ruling as it did.   While "this discretion is a legal discretion" and cannot justify a legally impermissible result, Cook v. Cook, 112 Nev. 179, 181–82, 912 P.2d 264, 265 (1996), holding that facts permit an order vacating a stipulated judgment does not mandate vacatur.   Cf. Shammas v. Shammas, 9 N.J. 321, 88 A.2d 204, 210–11 (1952) (Brennan, J.).

By the Court, PICKERING, J.:

We concur: HARDESTY, C.J., and PARRAGUIRRE, DOUGLAS, CHERRY, SAITTA, and GIBBONS, JJ.

| | |
|---|---|
| RESEARCH THE LAW | Cases & Codes / Opinion Summaries / Sample Business Contracts / Research An Attorney or Law Firm |
| MANAGE YOUR PRACTICE | Law Technology / Law Practice Management / Law Firm Marketing Services / Corporate Counsel Center |
| MANAGE YOUR CAREER | Legal Career Job Search / Online CLE / Law Student Resources |
| NEWS AND COMMENTARY | Law Commentary / Featured Documents / Newsletters / Blogs / RSS Feeds |
| GET LEGAL FORMS | Legal Forms for Your Practice |
| ABOUT US | Company History / Media Relations / Contact Us / Privacy / Cookies / Advertising / Jobs |
| FIND US ON | |

Copyright © 2018, Thomson Reuters. All rights reserved.

**Exhibit 7**

EXHIBIT 8

EXHIBIT 8

Exhibit 8

**Anthony Thomas**
**7725 Peavine Peak Court**
**Reno, NV 89523**
**Tel: (408) 640-2795**
**E-mail: atemerald2@gmail.com**

**WITHOUT PREJUDICE**

Monday December 17th 2018.

Mr. Jeffrey L. Hartman, Esq.          Tel:   (775) 324-2800
HARTMAN & HARTMAN                        Fax:   (775) 324-1818
510 West Plumb Lane, Suite B
Reno, NV 89509

**VIA E-MAIL: notices@bankruptcyreno.com**

**RE:    NO RESPONSE TO MY E-MAIL OF 12-6-2018**

Dear Mr. Hartman:

        This letter is to confirm that I responded to your e-mail with my letter dated 12-6-2018,
that gave in the order of 10 reasons why I need a continuance, a need that is now even more
necessary in light of your completely ignoring the questions and concerns that I raised in my
32 page letter including the fact that you are claiming that the auction was done in accordance
with the law, yet there was no compliance with Rule 2002 referenced in Rule 6004 that
governs the use and sale of estate property that requires 21 days notice to myself and all
other creditors, something that was not done.  Yet the Auctioneer did in fact notice both Mr.
Tersini and his lawyer Wayne Silver.

        I also provided a copy of the purported buyer Jennifer Jodoin's Linked in profile that
clearly shows that she has been working for Tersini related companies since 2000 and has
been working as Ken Tersini's private notary, which is evidence of collusion in the bidding
process as no other creditors other than Tersini were notified of the sale according to the
Declaration of the Auctioneer, which also begs the question: Doesn't the law require the sale
and the notices be provided by the Trustee in this matter?  And isn't it strange that the
Trustee did not sign any of the pleadings to support the sale of the Emerald?  I am requesting
that you consent to a continuance in light of these facts that evidence non-compliance with the
notice rules and evidence of collusion in the bidding process by selling the Thomas Emerald
to a party that has been shown to have procured the underlying judgment *inter alia* by fraud
upon the Court.

        Your failure to stipulate to basic facts in this matter and your refusal to grant a
continuance, indeed your complete silence as to the issues raised in my 12-6-2018 letter to
you appears to be evidence of guilt on your part, you do have an obligation to respond to the
serious issues raised in my December 6th 2018 letter, and your non-response is completely
unprofessional and unacceptable.

Exhibit 8

Your failure to respond and your failure to grant a continuance under these facts constitutes a deprivation of my and AT Emerald's Due Process Rights under the U.S. Constitution, as well as a deprivation of the due process rights of all other creditors of the Estate who were not notified according to law of the sale of the Thomas Emerald, thereby rendering the sale null and void and in violation of statutory requirements that are requisite to a valid sale.

Your silence leaves me no option but to seek an order of this Court granting a continuance as well as requesting an evidentiary hearing including subpoening the records of Auctioneer Stimmel, as well as your records regarding the Overstock.com contract negotiations including providing the copies of the revised contracts that you claim in your 7-1-2015 billing statements imposed large up front costs, none of which are evidenced in the draft contract approved by Overstock.com's board of directors and forwarded to the Trustee by e-mail on 11-19-2014, a copy of which is included in my 32 page letter to you of 12-6-2018. I am also requesting that the Court subpoena both Mr. Ken Tersini and Jennifer Jodoin so as to confirm on the record that Jennifer Jodoin is not a bona fide purchaser but in fact is an alter-ego and employee of Ken Tersini and the Tersini companies including Kenmark Ventures LLC.

Please comply with the terms of the Preservation Notice included in my 12-6-2018.

Govern yourself accordingly.

Yours truly,

AT EMERALD LLC

/s/ _Tony  Thomas_

Anthony G. Thomas, individually
and on behalf of AT Emerald, LLC

-2-

pg. 217

Exhibit 8