

RECEIVED
AND FILED

2019 JUL -8  AM 10: 44

~~~~~~~PTCY COURT
MARY A. SCHOTT, CLERK

1  Anthony G. Thomas
   7725 Peavine Peak Court
2  Reno, NV 89523
   Tel :        (408) 640-2795
3  E-mail:      atemerald2@gmail.com

4  Debtor In Propria Persona

5  **UNITED STATES BANKRUPTCY COURT**

6  **DISTRICT OF NEVADA - RENO**

| | |
|---|---|
| 7  IN RE: | ) Case No.   BK-N-14-50333-GS |
| | ) Case No.   BK-N-14-60442-GS |
| 8  ANTHONY THOMAS and | )             (Jointly Administered) |
| | ) |
| 9  WENDI THOMAS | ) CHAPTER 7 |
| | ) |
| 10  AT EMERALD, LLC | ) NOTICE OF MOTION & MOTION FOR |
| | ) JUDICIAL NOTICE OF LAW & FACTS ISO |
| 11      Debtors. | ) RULE 60(b)(4) MOTION TO VACATE |
| | ) VOID 8-22-2014 CONVERSION ORDER |
| 12 | ) |
| 13 | ) Date: _____ |
| | ) Time: _____ |
| 14 | ) Judge:   Hon. Gary Spraker |
| | ) Courtrm:   2 |
| 15 | ) |

16      **PLEASE TAKE NOTE** that at the Date Time and Courtroom noted above, the

17  Debtor Anthony G. Thomas appearing In Propria Persona shall move this Court for an

18  Order taking Judicial Notice of Law & Facts in Support of his concurrently filed Notice of

19  Motion and Motion Vacating this Court's 8-22-2014 Conversion Order that is Void on

20  its's face due to the failure of Judge Beesley to grant a 2 week continuance to allow

21  Debtor to retain legal counsel on behalf of himself and on behalf of his 100% owned

22  LLC, AT Emerald LLC based upon the holding in <u>Powell v. Alabama</u> (1932) 287 U.S.

23  485 as cited herein.

24  Dated:      July 9th 2019.              Respectfully submitted,

25

26

27  Anthony G. Thomas
    Debtor In Propria Persona

28

1

**STATUTORY BASIS FOR MOTION**

2       This Motion for Judicial Notice of Law and Facts in support of the Motion to

3    Vacate the Void 8-22-2014 Conversion order by Judge Beesley is based upon Federal

4    Rules of Evidence  Rule 201 that states:

5    **Rule 201 – Judicial Notice of Adjudicative Facts**

6    **(a)    Scope.**

7            This rule governs judicial notice of an adjudicative fact only, not a legislative fact.

8    **(b)    Kinds of Facts That May Be Judicially Noticed.**

9            The court may judicially notice a fact that is not subject to reasonable dispute
        because it:

10

11          (1)    is generally known within the trial court's territorial jurisdiction; or
            (2)    can be accurately and readily determined from sources whose accuracy
                cannot reasonably be questioned.

12

13   **(c)    Taking Notice.**

        The court:
14          (1)    may take judicial notice on its own; or
            (2)    must take judicial notice if a party requests it and the court is supplied with
15              the necessary information.

16   **(d)    Timing.**

17          The court may take judicial notice at any stage of the proceeding.

18   **(e)    Opportunity to Be Heard.**

19          On timely request, a party is entitled to be heard on the propriety of taking
        judicial notice and the nature of the fact to be noticed. If the court takes judicial
20      notice before notifying a party, the party, on request, is still entitled to be heard.

21   **(f)    Instructing the Jury.**

22          In a civil case, the court must instruct the jury to accept the noticed fact as
        conclusive. In a criminal case, the court must instruct the jury that it may or may
23      not accept the noticed fact as conclusive.

24          In this regard, Debtor Anthony Thomas is submitting 2 Exhibits for which he is

25   requesting that the Court take Judicial Notice of with specific requests that arise from

26   each Exhibit as follows:

27   Exhibit 1:    Transcript of hearing on 8-22-2014

28   Requests:

MOTION FOR JUDICIAL NOTICE IN SUPPORT OF RULE 60(b)4 MOTION TO VACATE VOID JUDGMENT

1  Request 1.1  Take Judicial Notice that Judge Beesley granted the Motion of Debtor's

2  attorneys to withdraw prior to ruling on the Motion to Convert from

3  Chapter 11 to Chapter 7.

4  Request 1.2  Take Judicial Notice that Attorney Smith offered to argue the merits of

5  Debtor's Motion to convert

6  Request 1.3  Take Judicial Notice that Judge Beesley refused to allow Attorney Smith

7  to argue the merits of the Motion.

8  Request 1.4  Take Judicial Notice that on p.28 of 34 of the Transcript of the hearing on

9  8-22-2014 that Debtor Anthony G. Thomas requested a 2 week

10  continuance to seek legal counsel

11  Request 1.5  Take Judicial Notice that Judge Beesley refused to grant Debtor's request

12  for a 2 week continuance to seek legal counsel

13  Request 1.6  Take Judicial Notice that neither Debtor nor AT Emerald LLC were

14  represented by counsel when Judge Beesley ordered the case converted

15  from Chapter 11 to Chapter 7.

16  Exhibit 2 - Case Law of the U.S. Supreme Court - Powell v. Alabama (1932) 287 U.S.

17  45:

18  Request 2.1  Take Judicial Notice of the following proposition of law:

19  "What, then, does a hearing include? Historically and in practice, in our

20  own country at least, it has always included the right to the aid of counsel

21  when desired and provided by the party asserting the right. The right to be

22  heard would be, in many cases, of little avail if it did not comprehend the

23  right to be heard by counsel. Even the intelligent and educated layman

24  has small and sometimes no skill in the science of law. If charged with

25  crime, he is incapable, generally, of determining for himself whether the

26  indictment is good or bad. He is unfamiliar with the rules of evidence. Left

27  without the aid of counsel he may be put on trial without a proper charge,

28  and convicted upon incompetent evidence, or evidence irrelevant to the

1    issue or otherwise inadmissible. He lacks both the skill and knowledge

2    adequately to prepare his defense, even though he have a perfect one.

3    He requires the guiding hand of counsel at every step in the proceedings

4    against him. Without it, though he be not guilty, he faces the danger of

5    conviction because he does not know how to establish his innocence. If

6    that be true of men of intelligence, how much more true is it of the

7    ignorant and illiterate, or those of feeble intellect. If in any case, civil or

8    criminal, a state or federal court were arbitrarily to refuse to hear a party

9    by counsel, employed by and appearing for him, it reasonably may not be

10   doubted that such a refusal would be a denial of a hearing, and, therefore,

11   of due process in the constitutional sense.

12

13   Dated: July 8$^{th}$ 2019.                        Respectfully submitted,

14

15                                                     Anthony G. Thomas
16                                                     Debtor In Propria Persona.

17

18

19

20

21

22

23

24

25

26

27

28

MOTION FOR JUDICIAL NOTICE IN SUPPORT OF RULE 60(b)4 MOTION TO VACATE VOID JUDGMENT

# Exhibit 1

**Exhibit 1**

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEVADA (RENO)

|  |  |
|---|---|
| IN RE:<br><br>ANTHONY THOMAS and<br>WENDI THOMAS,<br><br>        Debtors.<br>. . . . . . . . . . . . . .<br><br>KENMARK VENTURES, LLC,<br><br>        Plaintiff,<br><br>v.<br><br>ANTHONY THOMAS and<br>WENDI THOMAS,<br><br>        Defendants.<br>. . . . . . . . . . . . . . | Case No.  14-50333-btb<br><br>Chapter 11<br><br><br><br><br>Adv. No. 14-05022-btb<br><br><br><br><br><br>300 Booth Street<br>Reno, NV  89509<br><br>Friday, August 22, 1014<br>2:19 p.m. |

TRANSCRIPT OF MOTION TO WITHDRAW AS ATTORNEY OF RECORD WITH
CERTIFICATE OF SERVICE FILED BY ALAN R. SMITH ON BEHALF OF
ANTHONY THOMAS, WENDI THOMAS [13];
MOTION TO WITHDRAW AS ATTORNEY OF RECORD WITH CERTIFICATE OF
RECORD FILED BY  ALAN R. SMITH ON BEHALF OF
ANTHONY THOMAS, WENDI THOMAS [169];
MOTION TO APPOINT TRUSTEE, MOTION TO APPOINT CHAPTER 11 TRUSTEE
FILED BY JOSEPH G. WENT ON BEHALF OF
BEACH LIVING TRUST, JOHN BEACH, AS TRUSTEE [164]
**BEFORE THE HONORABLE BRUCE T. BEESLEY**
**UNITED STATES BANKRUPTCY COURT JUDGE**

APPEARANCES CONTINUED.

| | |
|---|---|
| Audio Operator: | Court ECRO Personnel |
| Transcription Company: | Access Transcripts, LLC<br>10110 Youngwood Lane<br>Fishers, IN 46038<br>(855) 873-2223<br>www.accesstranscripts.com |

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

2

APPEARANCES (Continued):

For the Debtors:            ANTHONY THOMAS, Pro Se
                            WENDI THOMAS, Pro Se
                            7725 Peavine Peak Court
                            Reno, NV  89523


  (Withdrawn)               Law Offices of Alan R. Smith
                            By:  ALAN R. SMITH, ESQ.
                                 HOLLY E. ESTES, ESQ.
                            505 Ridge Street
                            Reno, NV 89501
                            (775) 786-4579


For the Beach Family        Holland & Hart
Trust:                      By:  TIMOTHY LUKAS, ESQ.
                            5441 Kietzke Lane, Suite 200
                            Reno, NV 89511
                            (775) 327-3000


For the U.S. Trustee:       Office of the United States Trustee
                            By:  WILLIAM COSSITT, ESQ.
                            300 Booth Street, Suite 3009
                            Reno, NV  89509


TELEPHONIC APPEARANCES:

For Kenmark                 WAYNE A. SILVER, ESQ.
Ventures, LLC:              333 West El Camino Real, Suite 310
                            Sunnyvale, CA 94807
                            (408) 720-7007




3

1          (Proceedings commence at 2:19 p.m.)

2          THE COURT:  This is -- the first case is Kenmark

3    Ventures, case number 14-05022.  Appearances, please.

4          MR. LUKAS:  Good afternoon, Your Honor.  Tim Lukas on

5    behalf of the Beach Living Trust, the movants/creditors.

6          MS. ESTES:  Holly Estes and Alan Smith on behalf of

7    AT Emerald and the Thomases.  Mr. and Mrs. Thomas are both

8    present in court today, as the Court requested, and I'm also

9    present for our law firm in our --

10          THE COURT:  Motion to withdraw.

11          MS. ESTES:   - later motion to withdraw.  Exactly,

12    Your Honor.

13          THE COURT:  Well, no, your motion to withdraw is

14    granted in both cases.

15          MS. ESTES:  In all three, Your Honor, the adversary,

16    the Thomas case, and the AT Emerald case?

17          THE COURT:  They're all granted.

18          MS. ESTES:  Thank you, Your Honor.

19          THE COURT:  Okay.

20          MR. COSSITT:  Bill Cossitt, Your Honor, Office of the

21    United States Trustee.

22          THE COURT:  So I think the next thing we have is the

23    motion to appoint a trustee.  Appearances, please.

24          Ms. Estes, you don't represent them anymore.

25          MS. ESTES:  Thank you, Your Honor.

MR. LUKAS:  Good afternoon, Your Honor.  Tim Lukas
for the Beach Living Trust and movant for appointment of a
Chapter 11 trustee.

MR. COSSITT:  Bill Cossitt, Office of the United
States Trustee.

THE COURT:  Mr. and Mrs. Thomas?

MR. SILVER:  Wayne Silver for Kenmark Ventures
appearing telephonically.  Thank you, Your Honor.

THE COURT:  Mr. and Mrs. Thomas, you're no longer
represented by counsel.  Please get out of those seats and let
them sit there.  You guys have been allowed to withdraw.

MR. SMITH:  Your Honor, there's one thing I want to
put on the record.  I mean, I -- I know this places the clients
in an uncomfortable position, and we were prepared to argue on
the issue of the appointment of a trustee.  And I don't want
them prejudiced by -- I didn't know how this Court would --
which it would consider first, but I don't want this more
prejudiced by our withdrawal before the hearing.  So --

THE COURT:  I don't think --

MR. SMITH:  -- we're prepared to argue that motion,
if you want.

THE COURT:  You moved to withdraw.  I think you have
every ground to withdraw.  I think your motion was proper.  It
was properly noticed to your clients.  I don't think they are
prejudiced by that withdrawal.

1          MR. SMITH:  Okay.

2          THE COURT:  You indicated that you had irreconcilable

3     differences in the way this should be approached.  I think it's

4     probably more dangerous for you to represent their interest at

5     this time given those divergent interests.

6          MR. SMITH:  Okay.  I understand.

7          THE COURT:  So your motion to withdraw is granted.

8          MR. SMITH:  Okay.  Thank you, Your Honor.

9          THE COURT:  Mr. and Mrs. Thomas, please come forward.

10    Please come forward to the podium and state your names.

11         MR. THOMAS:  Tony Thomas.

12         MS. THOMAS:  Wendi Thomas.

13         THE COURT:  Thank you.  You guys can have a seat now.

14         Mr. Thomas, who is -- Mr. -- go ahead and have a

15    seat.

16         Mr. Lukas, go ahead.

17         MR. LUKAS:  I'm sorry, Your Honor.  I missed what you

18    said.

19         THE COURT:  I just had the Thomases introduce

20    themself, and since it's your motion to dismiss, I'm asking --

21    or to appoint a trustee or dismiss, I asked you to go ahead.

22         MR. LUKAS:  Yes, Your Honor.  There are -- Mr. Thomas

23    is present.  He has provided a declaration.  As we pointed out

24    in our reply, most of the declaration can be stricken because

25    it's based totally on -- it's all hearsay, Mr. Clarke said.

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)

6

1 Mr. Clarke is not around.  We know this.  There's nothing in

2 the declaration that shows any compliance with the Court's

3 order.  I think it was docket 142, the sales order, or 140.  It

4 was entered on July 21st.  This sale should have closed long

5 ago.

6          There's indications, even within the declaration --

7 and I'll take that back first.

8          Within the letter that was provided to us, the

9 numerous references of --

10          THE COURT:  That's the letter from Mr. Clarke.  Is

11 that correct?

12          MR. LUKAS:  Yes.

13          THE COURT:  Okay.

14          MR. LUKAS:  From Mr. Clarke that was provided by

15 Mr. Thomas to my client that indicates numerous issues of

16 self-dealing.  Mr. Thomas is going to do this.  Mr. Thomas has

17 been seeing this.  Mr. Thomas and his attorney.  Yet we know

18 from the August 11th date that his attorneys, at least in this

19 case, were not present.  So are there other professionals that

20 were not retained by this debtor?

21          THE COURT:  So which letter are you referring to?

22          MR. LUKAS:  This is docket, Your Honor, 164, and it's

23 the very last page, and it's the exhibit -- the letter dated

24 August 8th.

25          THE COURT:  One second.

1        MR. LUKAS:  And it is the sentence in the -- I think
2   it's the -- looks like the third paragraph.
3        THE COURT:  Docket 164, you said?
4        MR. LUKAS:  Pardon, Your Honor?
5        THE COURT:  Docket 164?
6        MR. LUKAS:  Yes.  I can --
7        THE COURT:  And the attachment you're referring to?
8        MR. LUKAS:  Yes, Your Honor.  It's Exhibit B, it's
9   the letter.
10        THE COURT:  All right.
11        MR. LUKAS:  Specifically what I'm putting down, we
12   had this letter:  I visited the Sarasota Vault with my
13   associate appraiser July 7th, and thereafter evidenced
14   verifiable financial capability via current bank statement,
15   bank confirmation of responsibility letter, to the entire
16   satisfaction of Mr. Thomas and his appointed attorney, who was
17   present at the time.
18        THE COURT:  I see.  Thank you.
19        MR. LUKAS:  We don't know who that was.
20        THE COURT:  Okay.
21        MR. LUKAS:  Clearly wasn't the debtors' counsel -- or
22   the former debtors' counsel in this case, nor, at least as of
23   August 11th, was there any knowledge that, in fact, other than
24   there had been a visit, that there's confirmation the sale was
25   going to go forward, that there was some change in the payment

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)

terms.  The Court will recall when it -- excuse me, when we put
this in the reply, one of the specific provisions within the
sales agreement is that there's supposed to be a setup of a
Wells Fargo account and deposit of funds under Mr. Smith's
name.  Clearly, that can't occur now, and clearly, it has not
occurred yet.

THE COURT:  How do you know this?

MR. LUKAS:  From -- at least from the -- unless it's
changed since August 11th, Your Honor, the representations of
Ms. Estes that she cannot give us any update, there was no
funds on deposit as of that time.

THE COURT:  Okay.  Was there an account?  Ms. Estes,
was there an account opened?

MS. ESTES:  Your Honor, there -- we don't have an
account opened for receiving these funds because we haven't
gotten to the point where we understand the funds would be
incoming.  So we have never received a request from the
purchaser to obtain our wire transfer information or account
information for the funds to come in.  Mr. Smith at my office
has a close banking relationship with our banker, and should we
need an additional account set up, I think it could be done so
relatively quickly.  We don't have one at this time.

THE COURT:  Okay.

MR. SMITH:  To add to that, Your Honor, I've spoken
with my account representative at Wells Fargo Bank, advised him

of this transaction, and told him to be on alert that it may

happen quickly.  He said there was some things he needed to do

to prepare for this.  He told me he would do them, and as soon

as he was advised the money was coming in, that we would get

ready for it.

        THE COURT:  And who is that?

        MR. SMITH:  His name's Randy Fruzza.

        THE COURT:  Okay, go ahead.

        MR. LUKAS:  It's interesting that we talked, just in

this lettre of August 8th, about how is there some genuineness

about what's going on here, that there's a threat of Mr. Clarke

withdrawing.  Then, he would -- then Kyoto [sic] Shipping and

-- what --

        THE COURT:  Receiving.

        MR. LUKAS:  Receiving, sorry, Your Honor.  Would be

in breach of contract of the original sales agreement, which

was previously approved, assuming that all conditions have been

met.  There is no provision under that sales agreement that

allows them to withdraw if we inspected the emerald.  So the

estate could sue them for, if you will, in excess of

$100 million, and they would be responsible.

        What's also troubling about this letter, in the last

portion of it, it doesn't really say they're going to do this.

In that last paragraph, it states: If however, for whatever

reason, you do not inspect this unique    - or do inspect this

10

1  unique, high-quality emerald, then Kyoto [sic] will

2  unfortunately either withdraw from completing payment for the

3  same or have to revisit the Sarasota Vault to re-verify the

4  emerald, which would involve extra cost for the original

5  inspection team and a financial undertaking Koyo will not be

6  held responsible for.

7      Frankly, Your Honor, at 100-plus-million-dollar sale,

8  a couple of airline tickets and access there in Florida is less

9  than the daily accumulated interest on that money.  I think we

10  could have Kyoto [sic] go re-inspect if they wanted to, in

11  threat of being sued for excess of $100 million.  These are all

12  things that I think a trustee and, frankly, a reasonable

13  management would undertake to get this sale closed.

14      When we then look at the declaration, which is the

15  docket 180 of Mr. Thomas, it talks about -- this is an August

16  7th letter, interestingly enough, which why -- when we're here

17  in August 11th about the status of the sale, why it wasn't

18  disclosed then, why, by apparent representation, counsel for

19  the debtor didn't -- former counsel for the debtor didn't know

20  about it -- that talks about the HSBC branch.  So we're dealing

21  with international wire transfers.  We know we're dealing with

22  tax issues.  But they're showing that just below that big

23  redacted portion -- and this is on -- in docket 180, Your

24  Honor, page 5 of 16 -- it says, our financial capability has

25  been demonstrated by current bank tear sheets, confirmation and

11

1  responsibility letters, signed by two senior bank officials.
2  Why haven't those been produced to anybody?  There's no reason
3  that they can't be.  In fact, if you're doing an international
4  wire transfer, I'll submit to the Court you can take judicial
5  notice, you have some pretty big regulatory hoops, since
6  apparently this money is coming from Hong Kong, that require
7  extreme scrutiny.  I don't think Mr. Thomas, frankly, has the
8  capability to do that.  We have retained no professionals in
9  this case for the ability to do that.  We have retained no
10 professionals in this case for the tax issues that are there,
11 which could be huge.  And I know that the plan would be -- and
12 I'm just going to be somewhat, you know, facetious, Your Honor,
13 but $100 million comes in.  We pay off our 6- or $7 million in
14 creditors between the two cases.  And then, we happily go on.
15 Well, I think the IRS, at the point that this comes in, is
16 going to want to make sure they get their share of that.
17          THE COURT:  Well, that's not your job.
18          MR. LUKAS:  It is not my job, Your Honor.
19          THE COURT:  I don't want to hear about the IRS.  They
20 haven't appeared.
21          MR. LUKAS:  There are some -- just some serious
22 implications that if we receive payments from overseas or
23 something like that, that I think would be very problematic.
24 Those are indicia of something that you would consider to be a
25 careful sale.

12

THE COURT:  Well, the way this was structured was you would get your payment from Wells Fargo.  They would open an account at Wells Fargo, you would get paid from Wells Fargo.

MR. LUKAS:  That's correct, Your Honor.

THE COURT:  So I think that's the end of your inquiry into this in terms of that.

MR. LUKAS:  I'm not - I'm just — I'm pointing this out in terms of the estate administration, though, and what a trustee could accomplish for the estate, Your Honor.

THE COURT:  Okay.

MR. LUKAS:  Then, there's an indication in this August 7th letter that funds notwithstanding anything that my client has done, that the chairman of the buyer has blocked funds.  That would be a breach of the agreement.  There's no provision that allows Kyoto [sic] to not do this.  If they've accepted it and shown demonstration — in fact, at the three-day close date, Your Honor, they should have closed before the 1st of August, and they have not done so.

THE COURT:  Okay.

MR. LUKAS:  For all those reasons, I think it's more than justified the other indicia of trustworthiness of many of these documents of why a trustee is well in place.  Even if the trustee's there, it's not to say that Mr. Thomas, who has an extreme vested interest to make sure that the sale close, the trustee wouldn't work with him to get it closed.  But to leave,

13

1   frankly, him in charge at this point would be a disservice to

2   the creditors of this estate.

3            THE COURT:  Okay.  Mr. Cossitt?

4            MR. COSSITT:  Thank you, Your Honor.  I pulled up for

5   both cases, that being the Thomases' case and AT Emerald.  Both

6   are past due for a monthly operating report for July, which was

7   due the 20th of July and was not filed.  And I'm showing both

8   are due for the second quarterly -- second quarter of 2014

9   quarterly fee, which was due July 31st and has not been paid

10  pursuant to the records that I pulled up today.

11            I would also note, Your Honor, it looks like this is

12  a liquidation case, not a reorganization case, and the primary

13  asset, if it exists at all, is going to be sold.  And I think

14  the preferences and presumptions and policies change when you

15  change a Chapter 11 from a reorganization case to a liquidation

16  case.  Now, I understand that that's complicated by the fact

17  that the Thomases are humans and not a business and whether

18  they're -- they're not going to be liquidated in the sense that

19  a business would be liquidated, but —

20            THE COURT:  Let's hope not.

21            MR. COSSITT:  I think when Congress originally

22  drafted these laws, primarily, they were trying to save

23  businesses as one of their primary functions.  And here, what

24  you don't -- what you have is not a business, what you have is

25  a single asset and two individuals.

14

THE COURT: Okay. Mr. Thomas, could you please come forward.

MR. THOMAS: Yes.

THE COURT: And what is your opposition to this motion? Tell me why you're opposing this motion.

MR. THOMAS: I'm opposing this motion because I think that I'm best suited to handle this transaction.

THE COURT: Why is that?

MR. THOMAS: Because I know the most about the emerald, and I can answer all the questions about the emerald for what questions the buyer has to answer. I don't think that a trustee has the expertise in that area to be able to take care of this transaction.

THE COURT: Okay. Anything else?

MR. THOMAS: And I think that my relationships with the buyers from the time that I spent with them going back and forth, I think that we have a good relationship, and I think that it will succeed. I think the transaction will succeed, and there's all indications of that from documents that they've sent me.

THE COURT: Okay. Just stay there.

Ms. Thomas, you're also a party. Would you like to say anything?

MS. THOMAS: I'm not a party to AT Emerald.

THE COURT: No, but you're a party to your individual

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)

15

1  bankruptcy.

2          MS. THOMAS:  Yes.  I did make the payments, I guess,

3  that were processed.  And I didn't know who to turn in the

4  financials to since they said they were withdrawing.

5          THE COURT:  Probably should file them with the

6  clerk's office.

7          MS. THOMAS:  Okay.

8          THE COURT:  Okay.  Mr. Cossitt, if that's not

9  correct, will tell you afterwards.  I don't do a lot of filing

10 in my current position --

11         MS. THOMAS:  Okay.  That's all.

12         THE COURT:  -- so I don't really know, so --

13         MS. THOMAS:  Okay.

14         THE COURT:  Okay.

15         So, Mr. Thomas, I have some questions for you.

16         When did you -- have you ever met Mr. -- is it

17 Mr. Bush?  Who are you dealing with?

18         MR. THOMAS:  I'm dealing with David Clarke.

19         THE COURT:  David Clarke.  Have you ever met David

20 Clarke?

21         MR. THOMAS:  Yes.

22         THE COURT:  Where?

23         MR. THOMAS:  I met him in the vault when they showed

24 up to inspect the emerald.

25         THE COURT:  And who was he there with?

16

MR. THOMAS:  He was there with an individual who was there to verify the emerald.

THE COURT:  And what was that individual's name, if you can recall?  If you can't, it's fine.

MR. THOMAS:  I don't recall.

THE COURT:  Okay.  Anybody else?

MR. THOMAS:  Did I meet any —

THE COURT:  Was there anybody else there with Mr. Clarke?

MR. THOMAS:  No.

THE COURT:  Okay.  And what did the individual do to verify the emerald?

MR. THOMAS:  They inspected it and reviewed it and, you know, gave their authority that that — that they agreed to purchase the emerald and that it was what I represented.

THE COURT:  And were you present when that happened?

MR. THOMAS:  Yes.

THE COURT:  Okay.  And how long did that examination take?

MR. THOMAS:  We were maybe at the vault an hour, maybe a little bit more.

THE COURT:  Okay.  And you were in the vault for an hour, watching him do this — or him or her do this?

MR. THOMAS:  Yes.

THE COURT:  Have you ever met Mr. Clarke otherwise?

17

1          MR. THOMAS:  I met him one time, yes.

2          THE COURT:  Where did you meet Mr. Clarke otherwise?

3          MR. THOMAS:  I met him in L.A.

4          THE COURT:  And how did you happen to be introduced

5    to Mr. Clarke?

6          MR. THOMAS:  Through my relationships over in Dubai

7    when I was over in Dubai.

8          THE COURT:  And what does Mr. Clarke do, to the best

9    of your knowledge?

10          MR. THOMAS:  He's a financial guy.

11          THE COURT:  And how do you know that?

12          MR. THOMAS:  He showed me that he worked for Barclay

13    for 30 years, Barclay's.

14          THE COURT:  What did he show you?

15          MR. THOMAS:  Some documentation.

16          THE COURT:  What documentation?

17          MR. THOMAS:  His documentation that he worked for --

18    and this was when I met him in L.A. a few years ago.

19          THE COURT:  Okay.  Few years ago.

20          MR. THOMAS:  Yeah.

21          THE COURT:  Did he give you copies of the

22    documentation?

23          MR. THOMAS:  I don't recall.

24          THE COURT:  Okay.  Have you ever -- have you

25    personally ever had any dealings with international finance?

18

MR. THOMAS:  A little bit.

THE COURT:  Tell me what you've had.

MR. THOMAS:  Well, we -- I was involved in a company with a smart card, where we had different companies that were looking at investing in our product.

THE COURT:  And did any of those companies invest?

MR. THOMAS:  No.

THE COURT:  Okay.  So I have some questions for you, and if it's going to be -- let's see, so other than meeting with Mr. Clarke, have you met with anyone else who is representing the purchaser?

MR. THOMAS:  No.

THE COURT:  Okay.

THE COURT:  So could you print for Mr. Thomas a copy of -- let me see if I can find it here -- a copy of Mr. Clarke's redacted letter.  It's --

MR. LUKAS:  Your Honor, I have a full copy of his declaration, if that helps.

THE COURT:  Yeah.  Could you please hand that to him?

MR. LUKAS:  I can, Your Honor.

THE COURT:  So, Mr. Clarke [sic], take a moment and take a look at that because I have some questions because there's some stuff I don't really understand.

MR. THOMAS:  Okay.

THE COURT:  So Mr. Clarke indicates that he is acting

19

on behalf of Koyo Shipping and Trading Company.  Is that
correct?

       MR. THOMAS:  Yes.  He's the financial chairman for
the company.

       THE COURT:  How do you know that?

       MR. THOMAS:  He sent me documentation, and it's also
stated on the documents that he presented to me at the vault.

       THE COURT:  Okay.  And have you filed any of those
documents with the Court?

       MR. THOMAS:  No, because it had -- I didn't take
those documents from Mr. Clarke when -- that was when he showed
proof of funds, and it had account numbers and all that stuff
on there that I didn't want to be responsible for because some
documents had already been -- that were presented to the Court,
things were -- that were supposed to be sealed got out, like
his name and all that stuff, and then things showed up in the
Wall Street Journal the next day.  So I didn't want to take the
risk of his private information and their banking information
and all their code numbers being released into the public
domain.  So I didn't take those documents from him, but he did
present them to me when we were at the vault.

       THE COURT:  Okay.  So how did -- so what did
Mr. Clarke show you?

       MR. THOMAS:  He showed me all their bank statements.
He showed me --

20

THE COURT:  From where?

MR. THOMAS:  From HSBC Bank.

THE COURT:  HSBC Bank where?

MR. THOMAS:  In Hong Kong.

THE COURT:  Okay.  What else did he show you?

MR. THOMAS:  It had the two bank officers' names on there, and it had their PIN numbers.

THE COURT:  And what is a bank officer PIN number.  I have no idea what that is.

MR. THOMAS:  It's ID, I guess, for the -- that particular bank officer.

THE COURT:  And how do you know that?

MR. THOMAS:  Just from my knowledge of doing a little bit of banking.

THE COURT:  I represented banks for 30 years before going on the bench.  I've never heard of a bank officer PIN number.

MR. THOMAS:  Okay.

THE COURT:  So what PIN numbers have you seen in other cases?

MR. THOMAS:  I just saw them on the documents that were from HSBC.

THE COURT:  That's it?

MR. THOMAS:  Yes.

THE COURT:  Never seen another PIN number?

21

MR. THOMAS:  No.

THE COURT:  Okay.  Did you meet the officers?

MR. THOMAS:  No, they weren't at the vault.

THE COURT:  Okay.  Do you know their names?

MR. THOMAS:  They were on the document, but I didn't write them down.

THE COURT:  So you were shown some documents.

MR. THOMAS:  Yes.

THE COURT:  And it had two signatures on it, correct?  You were shown some documents by Mr. Clarke.

MR. THOMAS:  Yes.  It had the names of the bank officers.

THE COURT:  Not signatures, just their names?

MR. THOMAS:  Just their names and then their PIN numbers, as it was described on the document, and it showed their bank account numbers.

THE COURT:  Okay.  Did you do any due diligence into finding out what Koyo Shipping and Trading Corporation is?

MR. THOMAS:  A little bit.

THE COURT:  What did you do?

MR. THOMAS:  Well, I talked to Mr. Clarke and --

THE COURT:  Anything other than talking to Mr. Clarke?

MR. THOMAS:  No.

THE COURT:  So you just took Mr. Clarke's word for it

22

1    that Koyo Shipping and Trading Company existed?

2          MR. THOMAS:  Yes.  And then, he showed me the

3    documentation from the bank that showed that, you know, what

4    their financial stability was and how much they had in their

5    accounts.  It showed -- it had the balances of both accounts on

6    those documents then.  It was an HSBC document.

7          THE COURT:  How do you know it was an HSBC document

8    and not something else?  Are you generally familiar with HSBC

9    documents?

10         MR. THOMAS:  I'm familiar a little bit with when they

11   do a document like that, that they do it in encrypted and it's

12   in color, you know, it's in different colors.

13         THE COURT:  Well, let's back up.  Are you familiar,

14   generally, with HSBC documents?

15         MR. THOMAS:  A little bit, yes, because I was --

16         THE COURT:  And through what?

17         MR. THOMAS:  -- because I was in Hong Kong, and I met

18   with the managers at HSBC.

19         THE COURT:  When?

20         MR. THOMAS:  In 2007 or '8.

21         THE COURT:  For what purposes?

22         MR. THOMAS:  Because we talked to them about making a

23   loan on the emerald.

24         THE COURT:  And what did they say?

25         MR. THOMAS:  They said that they didn't do loans on

23

1 emeralds.

2          THE COURT:  Okay.

3          MR. THOMAS:  But I did meet with them there.

4          THE COURT:  Okay.  And did they show you anybody's

5 account?  Did they show you any documents similar to what

6 Mr. Clarke showed you?

7          MR. THOMAS:  They did show us documents and how they

8 would be set up, and I also met with Standard Charter [sic]

9 when I was over there.

10          THE COURT:  Okay.  Did you check and see if Koyo

11 Shipping and Trading Corporation is properly incorporated?

12          MR. THOMAS:  I did not.

13          THE COURT:  Did you do a Google search on Koyo

14 Shipping and Trading Company?

15          MR. THOMAS:  No, I have not.

16          THE COURT:  Do you know if they have a website?

17          MR. THOMAS:  I do not.

18          THE COURT:  So really and truly, you're pretty much

19 taking the word of Mr. Clarke?  Is that fair?

20          MR. THOMAS:  Well, I think that the documentation he

21 gave me from HSBC Bank --

22          THE COURT:  But he didn't give you any.  You didn't

23 keep it.

24          MR. THOMAS:  Right, but he did show me the

25 documentation, and --

24

1    THE COURT:  Well -- okay, hang on.  I have a couple
2  more questions.  And when Mr. Clarke informed you he would not
3  work with a Chapter 11 trustee, was that by letter or in
4  writing?  I'm sorry, was that by letter or was that a
5  conversation?
6            MR. THOMAS:  It was both.
7            THE COURT:  Okay.  And did he give you a reason?
8            MR. THOMAS:  He just said that, you know, they have
9  lots of money in their accounts, which he previously showed me,
10 and he says if this transaction gets too complicated, there's
11 lots of other places that they can spend their money.
12           THE COURT:  Has he given you a reason why they have
13 not transferred the money here if they have lots of money in
14 their accounts?
15           MR. THOMAS:  He had asked me for some additional
16 information to give to the bank, which I provided to him
17 yesterday.
18           THE COURT:  And what was that information?
19           MR. THOMAS:  He -- they needed an invoice to present
20 to the bank so that they could release the funds.  So I gave
21 him an invoice.
22           THE COURT:  Anything else?  What -- and you just drew
23 up an invoice?
24           MR. THOMAS:  Yeah.  He said, we need an invoice, you
25 know, made out to us so that we can present it to the bank so

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)

25

1  that they can get everything ready so that they can release the

2  funds.

3         THE COURT:  And did he give you an indication of how

4  long this would take for them to -- and you've sent this to

5  him.

6         MR. THOMAS:  Yes.

7         THE COURT:  And they haven't released the funds?

8         MR. THOMAS:  Well, it was just Friday, and the banks

9  over there where they have their account is in a Muslim country

10 and they're closed on Fridays, so --

11        THE COURT:  Yeah, but today is Thursday.

12        MR. THOMAS:  What's that?

13        THE COURT:  Today is Thursday, six days later.

14        MR. THOMAS:  I just sent the invoice last night.

15        THE COURT:  Oh, I'm sorry.  I'm sorry.  Okay.  Here's

16 what I'm going to do.

17        MR. THOMAS:  And I have a copy of that if you'd like

18 to see it.

19        THE COURT:  I'd like to see it.

20        MR. THOMAS:  And if I could keep it so that it'd be

21 to your view only and not get into the public record.

22        THE COURT:  No, you cannot.

23        MR. LUKAS:  I'd like to see it, too, Your Honor, and

24 have a copy.

25        THE COURT:  You can show it to Mr. --

26

1    MR. THOMAS:  It has the amounts, and we said that we
2    were going to keep all that under seal.
3    THE COURT:  The New York Times published the amount.
4    Yeah.
5    MR. THOMAS:  Not to my understanding.
6    THE COURT:  Well, I read the article.
7    MR. THOMAS:  It didn't say what the purchase price
8    was.
9    THE COURT:  Yes, it did.  It was either The New York
10    Times or The Wall Street Journal.  One or the other did.
11    MR. THOMAS:  My understanding is that they said that
12    this is what the value was stated in the bankruptcy.
13    THE COURT:  All right.
14    MR. THOMAS:  It didn't have the amount.
15    THE COURT:  Everybody in this room knows what the
16    amount is.  I'm not going to suggest that they can disclose it
17    to people, but everybody sitting here knows what the amount is.
18    So show it to Mr. Lukas.
19    MR. LUKAS:  I would like the chance to argue --
20    THE COURT:  You get a chance to argue.
21    MR. THOMAS:  The whole point of having a document
22    sealed was so that this was not released to protect my family.
23    THE COURT:  Show it to Mr. Lukas.  Have you received
24    any threats to your family?
25    MR. THOMAS:  My house was burnt down in 2006.

27

THE COURT:  And what does that have to do with this bankruptcy?

MR. THOMAS:  This all had to do with these emeralds.

THE COURT:  You're the one who decided to be an emerald dealer.

MR. THOMAS:  I understand that, but I didn't know that because I purchased emeralds in 2001, that I would have to be going through all this scrutiny.  It was not my intention or I would have never bought them, you know.  We lost our home over this.  We've had a dog on our property poisoned.  We've lost our horse.

THE COURT:  You are free to dismiss your bankruptcy voluntarily at this moment if you would like.

MR. THOMAS:  No, because I think the purchase is going to go through.  I think it'll be closed within the next two weeks.

THE COURT:  Okay.

MR. THOMAS:  So I would like to have the opportunity --

THE COURT:  Please show that to Mr. Cossitt.

MR. THOMAS:  -- to do that.

MR. COSSITT:  I don't want to see it.

THE COURT:  I want to see it.  I do.  I want to see it.

MR. LUKAS:  I want a copy, and I'll represent to the

28

1  record, Your Honor, we won't publicly disclose the number.  All

2  you have to do is ask us on any of this stuff.  If we had been

3  provided a copy, it would have been so much easier.

4            MR. THOMAS:  And I'd like to say one other thing,

5  Your Honor.  I've been working in Battle Mountain, and I had to

6  do that from the hotel, and they didn't have very good

7  facilities to send that out.  So I did the best I could with

8  the documents that I had.  They didn't have a scanner and all

9  that.  (Indiscernible).

10            THE COURT:  Mr. Cossitt --

11            Anything further from you?

12            MR. THOMAS:  Unless you have any questions for me.

13            THE COURT:  No, thank you.

14            MR. THOMAS:  Could I get two weeks to get counsel?

15            THE COURT:  I'm not deciding at this moment.

16            MR. THOMAS:  Okay.

17            MR. COSSITT:  Your Honor, the facts as represented --

18  or as testified to convince me that this isn't a legitimate

19  offer, couldn't be -- you don't spend anywhere near this amount

20  of money buying something out of a bankruptcy estate without

21  clearing it with the bankruptcy estate first.  Saying that you

22  won't deal with the trustee is a certain sign that it's not a

23  legitimate buyer.  That's just not the way it's done.  It's

24  certainly not the way it's done internationally and not the way

25  it's done for this amount of money.  None of that rings at all

29

1    true.   So the U.S. Trustee would support the conversion of the

2    case to a Chapter 7 so that a trustee could be appointed and

3    take control of the assets.

4            THE COURT:  Mr. Lukas, anything?

5            MR. LUKAS:  Just a couple small points, Your Honor.

6    I think you -- the -- that's elicited many of the relevant

7    points that strain the credibility of this story.  And you

8    touched on a couple of things, and I would just ask -- I went

9    out and did the Google search.  I did -- and the Court could

10   take judicial notice.  When you pop it up, the only thing that

11   does come up is a -- you have a defaulted -- you'll come up

12   with a -- I'll leave it to the Court if you search it.  You'll

13   come up with a Florida corporation that was put in 2010 but

14   it's in default over a year now.  There's nothing else active

15   about this.

16          The other interesting thing that you come up when you

17   do that, Kyoto [sic] Shipping and Trading is you get a big

18   fraud alert, and there's multiple pages that the Court can

19   view, and it has to all deal with Kyoto [sic] Shipping and

20   Trading and HSBC letters.  And on the site, you will see some

21   very official-looking HSBC letters, and in that case, it was -

22   it's ten-billion Euros that are at issue and different accounts

23   and et cetera.  The fact that we have no real documents, we

24   have no real people, I think speaks volumes if this is a real

25   sale.

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)

30

1        I also have to take note of -- I understand

2   Mr. Thomas has told us he's been remote in Battle Mountain.

3   You've seen the invoice that was just there.  That would be

4   more than Mr. Thomas, I'm going to put, is going to make in 100

5   years working in Battle Mountain, yet there's no push to get

6   this sale done.  We have to do it late at night.  That's

7   incongruent.  Those are facts that make no sense.  This is a

8   case I would support the trustee's modification of my motion to

9   make it a Chapter 7.

10        We know he has some asset.  It's in the vault.  I

11  will represent, Your Honor, that we got the vault register

12  forms, and -- if I can put this next in order, Your Honor.

13        THE COURT:  Sure.

14        MR. LUKAS:  I've shown this to the other side.  We --

15  I'll represent for the record, we have not gotten a custodian

16  of records declaration, but this came from counsel for Sarasota

17  Vault.  It does show how many times that vault has been

18  accessed, once in 2008 when it was originally put in and

19  appears to be July 7th, and that's it.  So we know your place

20  freezing this asset or whatever's in this vault -- I don't know

21  if there is something there -- can be taken and it's

22  safeguarded.

23        A couple of queries about the July 7th.  If the Court

24  will recall, and it's in the record, we were supposed to have

25  originally gone there on July 9th, and there was never any

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)

31

objection to us going on the 9th.  The Court will recall we
filed our emergency motion because we received the notice, as
we put in our Exhibit 1 to our motion, from the vault
indicating, oh, you need a key or we've got to drill it.
Debtor never told us about the key.  Debtor apparently was in
Florida and would have been in Florida at the same time we
would have gone down there, but for whatever reason, didn't
want us to go to the vault.

The stories just don't add up.  What does add up is
that there's probably something in the vault, we hope.  What
the value is, I don't know.  And frankly, if it is a discount
of the sales price, if this is a real sale, then I think there
will be more than sufficient funds here for the creditors and
return of potential dividend.  If not, the trustee has a
potential good lawsuit against Kyoto [sic] and can still
collect substantial funds to the benefit of the creditors.  And
I think all those point for the appointment of a trustee in
this case.

And I'm talking about the AT Emerald.  That was the
one in our motion.  Your Honor, the individual case, I -- since
we're not a direct creditor in that, I don't take a position
vis-à-vis that case at this point.

THE COURT:  Okay.  Mr. Thomas, just one question.
What did -- did you buy -- you purchased this emerald, did you
not?

32

1          MR. THOMAS:  Yes.

2          THE COURT:  And what did you pay for it?

3          MR. THOMAS:  20,000.

4          THE COURT:  Why do you think a purchase of $20,000 is

5    worth roughly 1,000 times that much or --

6          MR. THOMAS:  Because four experts in the field

7    appraised the emerald for between 800- and 650 million.  And I

8    provided those appraisals all to Mr. Beach.  And when I entered

9    the emerald into Sarasota Vault, they gave me a safekeeping

10   receipt for $800 million.  So --

11         THE COURT:  Well, I doubt that they valued the

12   emerald.

13         MR. THOMAS:  It says it on the safekeeping receipt.

14         THE COURT:  That's -- but you told them that

15   information.  They didn't come up with that by themselves.

16         MR. THOMAS:  Well, I gave them the appraisals that

17   were from the four different experts.

18         THE COURT:  Right.  And they looked at the number on

19   the appraisal.  They did not value this at 850-.  That's just

20   not how a safe-deposit box works.

21         MR. THOMAS:  Well, they gave me a document that says

22   -- it's a safekeeping receipt, and it says, Mr. Thomas is

23   holding an emerald here valued at this amount.

24         THE COURT:  Right, by you.

25         MR. THOMAS:  Not by me, by individual -- yes.

33

THE COURT:  Nonetheless, I'm going to appoint a
trustee in this case.  I'm going to convert this to a
Chapter 7.  And the reason I'm converting it to a Chapter 7 is
I think you're being scammed.  I've not been involved in a lot
of international transactions, but I have been involved in a
few over the years, both in practice and in court.  And that's
what this letter is, is a scam.

MR. THOMAS:  Can I ask --

THE COURT:  No, you're done.

MR. THOMAS:  -- that you give me two weeks for -- to
just let them ----

THE COURT:  No, I'm not giving you two weeks.  This
letter is a scam.  A legitimate buyer will deal with the
trustee.  This is not a legitimate buyer.  This is not -- you
did no due diligence on this company.  If you had done some due
diligence other than listening to Mr. Clarke, I might do that,
but you did no due diligence.

MR. THOMAS:  I had four other buyers.

THE COURT:  Sir, sit down, be quiet.

I'm ordering that this case is converted, that all --
that both the cases actually are converted to Chapter 7's.  I
would suggest, but I cannot order, that the Office of the
U.S. Trustee appoint a single trustee for both cases.

Thank you very much.  We'll be in recess.

(Proceedings concluded at 2:56 p.m.)

34

**C E R T I F I C A T I O N**

I, Alicia Jarrett, court-approved transcriber, hereby
certify that the foregoing is a correct transcript from the
official electronic sound recording of the proceedings in the
above-entitled matter.

ALICIA JARRETT, AAERT NO. 428    DATE:  August 10, 2018
ACCESS TRANSCRIPTS, LLC

**C E R T I F I C A T I O N**

I, Lisa Luciano, court-approved transcriber, hereby
certify that the foregoing is a correct transcript from the
official electronic sound recording of the proceedings in the
above-entitled matter, and to the best of my ability.

LISA LUCIANO, AAERT NO. 327    DATE:  August 10, 2018
ACCESS TRANSCRIPTS, LLC

ACCESS TRANSCRIPTS, LLC        1-855-USE-ACCESS (873-2223)

# Exhibit 2

Exhibit 2

# UNITED STATES REPORTS

VOLUME 287

---

## CASES ADJUDGED

IN

# THE SUPREME COURT

AT

OCTOBER TERM, 1932

FROM OCTOBER 3, 1932, TO AND
INCLUDING (IN PART) JANUARY 9, 1933

ERNEST KNAEBEL

REPORTER



UNITED STATES

GOVERNMENT PRINTING OFFICE

WASHINGTON : 1933

For sale by the Superintendent of Documents, Washington, D.C.  –  Price $1.50 Buckram

POWELL *v.* ALABAMA.                45

32                          Syllabus.

Section 906 (e) may find proper application on an ordinary appeal, as for example, where the Commissioner's right to assess is challenged because the Statute of Limitations had run, or where, as in *Bowers* v. *New York & Albany Lighterage Co., supra,* the Collector asserts the right to enforce payment by distraint after the statutory bar. It can have no application to what may have been said or done by the Board when undertaking to redetermine a deficiency having no possible relation to the Statute of Limitations.

The literal construction of § 906 (e) proposed by the petitioners would lead to consequences manifestly unjust, if not absurd. When the bond in suit was executed the Statute had extinguished the right of the United States to enforce the tax as such. That Congress thereafter actually intended to release the parties whenever the Board should declare this fact is beyond belief. The thing announced by the Board had no real relation to the obligation of the bond. When possible, every statute should be rationally interpreted with the view of carrying out the legislative intent. We cannot attribute to Congress the purpose necessary to support petitioners' urgence.

*Affirmed.*

————————

OZIE POWELL, WILLIE ROBERSON, ANDY WRIGHT, AND OLEN MONTGOMERY *v.* ALABAMA.

HAYWOOD PATTERSON *v.* SAME.

CHARLEY WEEMS AND CLARENCE NORRIS *v.* SAME.

CERTIORARI TO THE SUPREME COURT OF ALABAMA.

Nos. 98, 99, and 100. Argued October 10, 1932.—Decided November 7, 1932.

1. The rule denying the aid of counsel to persons charged with felony, which (except as to legal questions) existed in England

when our Constitution was formed, was rejected in this country by the Colonies before the Declaration of Independence, and is not a test of whether the right to counsel in such cases is embraced in the guarantee of " due process of law." P. 65.

2. The rule that no part of the Constitution shall be treated as superfluous is an aid to construction which, in some instances, may be conclusive, but which must yield to more compelling considerations whenever they exist. P. 67.

3. The fact that the right of an accused person to have counsel for his defense was guaranteed expressly (as respects the federal Government) by the Sixth Amendment, notwithstanding the presence of the due process clause in the Fifth Amendment, does not exclude that right from the concept " due process of law." Pp. 66–68.

4. The right of the accused, at least in a capital case, to have the aid of counsel for his defense, which includes the right to have sufficient time to advise with counsel and to prepare a defense, is one of the fundamental rights guaranteed by the due process clause of the Fourteenth Amendment. Pp. 68–71.

5. In a capital case, where the defendant is unable to employ counsel, and is incapable of making his own defense adequately because of ignorance, feeble-mindedness, illiteracy, or the like, it is the duty of the court, whether requested or not, to assign counsel for him as a necessary requisite of due process of law; and that duty is not discharged by an assignment at such a time and under such circumstances as to preclude the giving of effective aid in the preparation and trial of the case. P. 71.

6. In a case such as this, the right to have counsel appointed, when necessary, is a logical corollary to the right to be heard by counsel. P. 72.

7. In such circumstances, the trial court has power, even in the absence of statute, to appoint an attorney for the accused; and the attorney, as an officer of the court, is bound to serve. P. 73.

224 Ala. 524, 531, 540, reversed.

CERTIORARI, 286 U. S. 540, to review judgments affirming sentences to death based upon convictions for rape. There was one indictment against these petitioners and two other persons. The petitioners were tried in three groups, as shown in the caption, pursuant to an order of severance obtained by the State.

POWELL *v.* ALABAMA.                47

*Mr. Walter H. Pollak,* with whom *Messrs. Carl S. Stern* and *George W. Chamlee* were on the brief, for petitioners.

*Mr. Thomas E. Knight, Jr.,* Attorney General of Alabama, with whom *Mr. Thos. Seay Lawson,* Assistant Attorney General, was on the brief, for respondent.

The phrase " due process of law " antedates the establishment of our institutions. It embodies one of the broadest and most far reaching guaranties of personal and property rights. It is necessary for the enjoyment of life, liberty and property that this constitutional guaranty be strictly complied with. However, it is imperative that this Court under our system of government see that the States be not restricted in their method of administering justice in so far as they do not act arbitrarily and discriminatingly. *Frank* v. *Mangum,* 237 U. S. 309; *Holden* v. *Hardy,* 169 U. S. 366, 389; *Missouri* v. *Lewis,* 101 U. S. 22, 31; *Hurtado* v. *California,* 110 U. S. 516, 535.

A defendant in a criminal case has been accorded due process of law when there is a law creating or defining the offense, a court of competent jurisdiction, accusation in due form, notice and opportunity to answer the charge, trial according to the established course of judicial proceedings, and a right to be discharged unless found guilty. No particular form of procedure is required. The question of due process is determined by the law of the jurisdiction where the offense was committed and the trial was had. *Missouri* v. *Lewis,* 101 U. S. 22; *Hurtado* v. *California,* 110 U. S. 516; *Brown* v. *New Jersey,* 175 U. S. 172; *Jordan* v. *Massachusetts,* 225 U. S. 167; *Rogers* v. *Peck,* 199 U. S. 425; *Garland* v. *Washington,* 232 U. S. 642; *Missouri ex rel. Hurwitz* v. *North,* 271 U. S. 40; *Miller* v. *Texas,* 153 U. S. 535; *Ong Chang Wing* v. *United States,* 218 U. S. 272; *Hodgson* v. *Vermont,* 168 U. S. 262.

Argument for Respondent.          287 U.S.

Here the trials were in accordance with the constitution and statutes of Alabama, the provisions of which are in no way attacked as being unconstitutional. They were conducted in compliance with the rules, practice, and procedure long prevailing in the State. The court of last resort decided these cases in compliance with those rules of appeal and error which they apply in all cases.

Under the laws of Alabama the petitioners were entitled to counsel. Const., Art. 1, § 6. When it appears that a defendant charged with a capital offense has not employed counsel, it is the duty of the court to appoint attorneys for his defense. Code (1923), § 5567. A compliance with this section is shown. At the time of the arraignment there were nine defendants; and while the record does not disclose the number of attorneys practising at the Scottsboro bar, we venture to say that there were not as many as eighteen attorneys at that bar, the number which the court could have appointed under the statute.

If there had been only one defendant, it does not seem plausible to us that he could correctly contend that he had been denied due process of law because the court appointed more than two lawyers to represent him. This was at most, a mere irregularity which would not invalidate a conviction.

The petitioners were represented by counsel from Chattanooga and by two members of the bar of Scottsboro. They were not put to trial until one week after counsel were appointed. The record affirmatively shows that counsel had conferred with them and had done everything that they knew how to do. *Henry Ching* v. *United States,* 264 Fed. 639, cert. den., 254 U. S. 630.

There was no demand or motion made for a continuance. The defendants were represented by capable counsel, one of whom has enjoyed a long and successful prac-

POWELL *v.* ALABAMA.                    49

tise before the courts of Jackson County. Counsel, by
their own statements, show that they not only had time
for preparation of their case, but that they knew and pro-
ceeded along proper lines for a week prior to the trial.

MR. JUSTICE SUTHERLAND delivered the opinion of the
Court.

These cases were argued together and submitted for de-
cision as one case.

The petitioners, hereinafter referred to as defendants,
are negroes charged with the crime of rape, committed
upon the persons of two white girls. The crime is said to
have been committed on March 25, 1931. The indictment
was returned in a state court of first instance on March 31,
and the record recites that on the same day the defend-
ants were arraigned and entered pleas of not guilty.
There is a further recital to the effect that upon the arraign-
ment they were represented by counsel. But no counsel
had been employed, and aside from a statement made by
the trial judge several days later during a colloquy immedi-
ately preceding the trial, the record does not disclose when,
or under what circumstances, an appointment of counsel
was made, or who was appointed. During the colloquy
referred to, the trial judge, in response to a question, said
that he had appointed all the members of the bar for the
purpose of arraigning the defendants and then of course
anticipated that the members of the bar would continue to
help the defendants if no counsel appeared. Upon the
argument here both sides accepted that as a correct state-
ment of the facts concerning the matter.

There was a severance upon the request of the state,
and the defendants were tried in three several groups, as
indicated above. As each of the three cases was called
for trial, each defendant was arraigned, and, having the

OCTOBER TERM, 1932.

indictment read to him, entered a plea of not guilty. Whether the original arraignment and pleas were regarded as ineffective is not shown. Each of the three trials was completed within a single day. Under the Alabama statute the punishment for rape is to be fixed by the jury, and in its discretion may be from ten years imprisonment to death. The juries found defendants guilty and imposed the death penalty upon all. The trial court overruled motions for new trials and sentenced the defendants in accordance with the verdicts. The judgments were affirmed by the state supreme court. Chief Justice Anderson thought the defendants had not been accorded a fair trial and strongly dissented. 224 Ala. 524; *id.* 531; *id.* 540; 141 So. 215, 195, 201.

In this court the judgments are assailed upon the grounds that the defendants, and each of them, were denied due process of law and the equal protection of the laws, in contravention of the Fourteenth Amendment, specifically as follows: (1) they were not given a fair, impartial and deliberate trial; (2) they were denied the right of counsel, with the accustomed incidents of consultation and opportunity of preparation for trial; and (3) they were tried before juries from which qualified members of their own race were systematically excluded. These questions were properly raised and saved in the courts below.

The only one of the assignments which we shall consider is the second, in respect of the denial of counsel; and it becomes unnecessary to discuss the facts of the case or the circumstances surrounding the prosecution except in so far as they reflect light upon that question.

The record shows that on the day when the offense is said to have been committed, these defendants, together with a number of other negroes, were upon a freight train on its way through Alabama. On the same train were seven white boys and the two white girls. A fight took

POWELL *v.* ALABAMA.                    51

place between the negroes and the white boys, in the course of which the white boys, with the exception of one named Gilley, were thrown off the train. A message was sent ahead, reporting the fight and asking that every negro be gotten off the train. The participants in the fight, and the two girls, were in an open gondola car. The two girls testified that each of them was assaulted by six different negroes in turn, and they identified the seven defendants as having been among the number. None of the white boys was called to testify, with the exception of Gilley, who was called in rebuttal.

Before the train reached Scottsboro, Alabama, a sheriff's posse seized the defendants and two other negroes. Both girls and the negroes then were taken to Scottsboro, the county seat. Word of their coming and of the alleged assault had preceded them, and they were met at Scottsboro by a large crowd. It does not sufficiently appear that the defendants were seriously threatened with, or that they were actually in danger of, mob violence; but it does appear that the attitude of the community was one of great hostility. The sheriff thought it necessary to call for the militia to assist in safeguarding the prisoners. Chief Justice Anderson pointed out in his opinion that every step taken from the arrest and arraignment to the sentence was accompanied by the military. Soldiers took the defendants to Gadsden for safekeeping, brought them back to Scottsboro for arraignment, returned them to Gadsden for safekeeping while awaiting trial, escorted them to Scottsboro for trial a few days later, and guarded the court house and grounds at every stage of the proceedings. It is perfectly apparent that the proceedings, from beginning to end, took place in an atmosphere of tense, hostile and excited public sentiment. During the entire time, the defendants were closely confined or were under military guard. The record does not disclose their ages, except that one of them was nineteen; but the

record clearly indicates that most, if not all, of them were youthful, and they are constantly referred to as "the boys." They were ignorant and illiterate. All of them were residents of other states, where alone members of their families or friends resided.

However guilty defendants, upon due inquiry, might prove to have been, they were, until convicted, presumed to be innocent. It was the duty of the court having their cases in charge to see that they were denied no necessary incident of a fair trial. With any error of the state court involving alleged contravention of the state statutes or constitution we, of course, have nothing to do. The sole inquiry which we are permitted to make is whether the federal Constitution was contravened (*Rogers* v. *Peck,* 199 U. S. 425, 434; *Hebert* v. *Louisiana,* 272 U. S. 312, 316); and as to that, we confine ourselves, as already suggested, to the inquiry whether the defendants were in substance denied the right of counsel, and if so, whether such denial infringes the due process clause of the Fourteenth Amendment.

*First.* The record shows that immediately upon the return of the indictment defendants were arraigned and pleaded not guilty. Apparently they were not asked whether they had, or were able to employ, counsel, or wished to have counsel appointed; or whether they had friends or relatives who might assist in that regard if communicated with. That it would not have been an idle ceremony to have given the defendants reasonable opportunity to communicate with their families and endeavor to obtain counsel is demonstrated by the fact that, very soon after conviction, able counsel appeared in their behalf. This was pointed out by Chief Justice Anderson in the course of his dissenting opinion. "They were nonresidents," he said, " and had little time or opportunity to get in touch with their families and friends who were scattered throughout two other states, and time has dem-

POWELL *v.* ALABAMA.                    53

45                          Opinion of the Court.

onstrated that they could or would have been represented
by able counsel had a better opportunity been given by a
reasonable delay in the trial of the cases, judging from the
number and activity of counsel that appeared immediately
or shortly after their conviction." 224 Ala., at pp. 554–
555; 141 So. 201.

It is hardly necessary to say that, the right to counsel
being conceded, a defendant should be afforded a fair op-
portunity to secure counsel of his own choice. Not only
was that not done here, but such designation of counsel
as was attempted was either so indefinite or so close upon
the trial as to amount to a denial of effective and sub-
stantial aid in that regard. This will be amply demon-
strated by a brief review of the record.

April 6, six days after indictment, the trials began.
When the first case was called, the court inquired whether
the parties were ready for trial. The state's attorney re-
plied that he was ready to proceed. No one answered for
the defendants or appeared to represent or defend them.
Mr. Roddy, a Tennessee lawyer not a member of the local
bar, addressed the court, saying that he had not been em-
ployed, but that people who were interested had spoken
to him about the case. He was asked by the court whether
he intended to appear for the defendants, and answered
that he would like to appear along with counsel that the
court might appoint. The record then proceeds:

" The Court: If you appear for these defendants, then
I will not appoint counsel; if local counsel are willing to
appear and assist you under the circumstances all right,
but I will not appoint them.

" Mr. Roddy: Your Honor has appointed counsel, is that
correct?

" The Court: I appointed all the members of the bar
for the purpose of arraigning the defendants and then of
course I anticipated them to continue to help them if no
counsel appears.

" Mr. Roddy: Then I don't appear then as counsel but I do want to stay in and not be ruled out in this case.

" The Court: Of course I would not do that—

" Mr. Roddy: I just appear here through the courtesy of Your Honor.

" The Court: Of course I give you that right; . . ."

And then, apparently addressing all the lawyers present, the court inquired:

" . . . well are you all willing to assist?

" Mr. Moody: Your Honor appointed us all and we have been proceeding along every line we know about it under Your Honor's appointment.

" The Court: The only thing I am trying to do is, if counsel appears for these defendants I don't want to impose on you all, but if you feel like counsel from Chattanooga—

" Mr. Moody: I see his situation of course and I have not run out of anything yet.   Of course, if Your Honor purposes to appoint us, Mr. Parks, I am willing to go on with it.   Most of the bar have been down and conferred with these defendants in this case; they did not know what else to do.

" The Court: The thing, I did not want to impose on the members of the bar if counsel unqualifiedly appears; if you all feel like Mr. Roddy is only interested in a limited way to assist, then I don't care to appoint—

" Mr. Parks: Your Honor, I don't feel like you ought to impose on any member of the local bar if the defendants are represented by counsel.

" The Court: That is what I was trying to ascertain, Mr. Parks.

" Mr. Parks: Of course if they have counsel, I don't see the necessity of the Court appointing anybody; if they haven't counsel, of course I think it is up to the Court to appoint counsel to represent them.

POWELL *v.* ALABAMA.          55

" The Court: I think you are right about it Mr. Parks and that is the reason I was trying to get an expression from Mr. Roddy.

" Mr. Roddy: I think Mr. Parks is entirely right about it, if I was paid down here and employed, it would be a different thing, but I have not prepared this case for trial and have only been called into it by people who are interested in these boys from Chattanooga. Now, they have not given me an opportunity to prepare the case and I am not familiar with the procedure in Alabama, but I merely came down here as a friend of the people who are interested and not as paid counsel, and certainly I haven't any money to pay them and nobody I am interested in had me to come down here has put up any fund of money to come down here and pay counsel. If they should do it I would be glad to turn it over—a counsel but I am merely here at the solicitation of people who have become interested in this case without any payment of fee and without any preparation for trial and I think the boys would be better off if I step entirely out of the case according to my way of looking at it and according to my lack of preparation of it and not being familiar with the procedure in Alabama, . . ."

Mr. Roddy later observed:

" If there is anything I can do to be of help to them, I will be glad to do it; I am interested to that extent.

" The Court: Well gentlemen, if Mr. Roddy only appears as assistant that way, I think it is proper that I appoint members of this bar to represent them, I expect that is right. If Mr. Roddy will appear, I wouldn't of course, I would not appoint anybody. I don't see, Mr. Roddy, how I can make a qualified appointment or a limited appointment. Of course, I don't mean to cut off your assistance in any way—Well gentlemen, I think you understand it.

" Mr. Moody: I am willing to go ahead and help Mr. Roddy in anything I can do about it, under the circumstances.

" The Court: All right, all the lawyers that will; of course I would not require a lawyer to appear if—

" Mr. Moody: I am willing to do that for him as a member of the bar; I will go ahead and help do anything I can do.

" The Court: All right."

And in this casual fashion the matter of counsel in a capital case was disposed of.

It thus will be seen that until the very morning of the trial no lawyer had been named or definitely designated to represent the defendants. Prior to that time, the trial judge had " appointed all the members of the bar " for the limited " purpose of arraigning the defendants." Whether they would represent the defendants thereafter if no counsel appeared in their behalf, was a matter of speculation only, or, as the judge indicated, of mere anticipation on the part of the court. Such a designation, even if made for all purposes, would, in our opinion, have fallen far short of meeting, in any proper sense, a requirement for the appointment of counsel. How many lawyers were members of the bar does not appear; but, in the very nature of things, whether many or few, they would not, thus collectively named, have been given that clear appreciation of responsibility or impressed with that individual sense of duty which should and naturally would accompany the appointment of a selected member of the bar, specifically named and assigned.

That this action of the trial judge in respect of appointment of counsel was little more than an expansive gesture, imposing no substantial or definite obligation upon any one, is borne out by the fact that prior to the calling of the case for trial on April 6, a leading member of the local bar accepted employment on the side of the prosecution

POWELL *v.* ALABAMA.    57

and actively participated in the trial. It is true that he said that before doing so he had understood Mr. Roddy would be employed as counsel for the defendants. This the lawyer in question, of his own accord, frankly stated to the court; and no doubt he acted with the utmost good faith. Probably other members of the bar had a like understanding. In any event, the circumstance lends emphasis to the conclusion that during perhaps the most critical period of the proceedings against these defendants, that is to say, from the time of their arraignment until the beginning of their trial, when consultation, thoroughgoing investigation and preparation were vitally important, the defendants did not have the aid of counsel in any real sense, although they were as much entitled to such aid during that period as at the trial itself. *People ex rel. Burgess* v. *Risley,* 66 How. Pr. (N. Y.) 67; *Batchelor* v. *State,* 189 Ind. 69, 76; 125 N. E. 773.

Nor do we think the situation was helped by what occurred on the morning of the trial. At that time, as appears from the colloquy printed above, Mr. Roddy stated to the court that he did not appear as counsel, but that he would like to appear along with counsel that the court might appoint; that he had not been given an opportunity to prepare the case; that he was not familiar with the procedure in Alabama, but merely came down as a friend of the people who were interested; that he thought the boys would be better off if he should step entirely out of the case. Mr. Moody, a member of the local bar, expressed a willingness to help Mr. Roddy in anything he could do under the circumstances. To this the court responded, "All right, all the lawyers that will; of course I would not require a lawyer to appear if—." And Mr. Moody continued, "I am willing to do that for him as a member of the bar; I will go ahead and help do any thing I can do." With this dubious understanding, the trials immediately proceeded. The defendants, young, igno-

rant, illiterate, surrounded by hostile sentiment, haled back
and forth under guard of soldiers, charged with an atro-
cious crime regarded with especial horror in the commu-
nity where they were to be tried, were thus put in peril of
their lives within a few moments after counsel for the
first time charged with any degree of responsibility began
to represent them.

It is not enough to assume that counsel thus precipi-
tated into the case thought there was no defense, and ex-
ercised their best judgment in proceeding to trial without
preparation.   Neither they nor the court could say what
a prompt and thoroughgoing investigation might disclose
as to the facts.   No attempt was made to investigate.   No
opportunity to do so was given.   Defendants were im-
mediately hurried to trial.   Chief Justice Anderson, after
disclaiming any intention to criticize harshly counsel who
attempted to represent defendants at the trials, said:
" . . . the record indicates that the appearance was rather
*pro forma* than zealous and active . . . "   Under the cir-
cumstances disclosed, we hold that defendants were not
accorded the right of counsel in any substantial sense.
To decide otherwise, would simply be to ignore actualities.
This conclusion finds ample support in the reasoning of
an overwhelming array of state decisions, among which
we cite the following: *Sheppard* v. *State,* 165 Ga. 460,
464; 141 S. E. 196; *Reliford* v. *State,* 140 Ga. 777; 79
S. E. 1128; *McArver* v. *State,* 114 Ga. 514; 40 S. E. 779;
*Sanchez* v. *State,* 199 Ind. 235, 246; 157 N. E. 1; *Batchelor*
v. *State,* 189 Ind. 69, 76; 125 N. E. 773; *Mitchell* v. *Com-
monwealth,* 225 Ky. 83; 7 S. W. (2d) 823; *Jackson* v.
*Commonwealth,* 215 Ky. 800; 287 S. W. 17; *State* v. *Col-
lins,* 104 La. 629; 29 So. 180; *State* v. *Pool,* 50 La. Ann.
449; 23 So. 503; *People ex rel. Burgess* v. *Risley,* 66 How.
Pr. (N. Y.) 67; *State ex rel. Tucker* v. *Davis,* 9 Okla. Cr.
94; 130 Pac. 962; *Commonwealth* v. *O'Keefe,* 298 Pa. 169;

POWELL *v.* ALABAMA.          59

148 Atl. 73; *Shaffer* v. *Territory*, 14 Ariz. 329, 333; 127 Pac. 746.

It is true that great and inexcusable delay in the enforcement of our criminal law is one of the grave evils of our time. Continuances are frequently granted for unnecessarily long periods of time, and delays incident to the disposition of motions for new trial and hearings upon appeal have come in many cases to be a distinct reproach to the administration of justice. The prompt disposition of criminal cases is to be commended and encouraged. But in reaching that result a defendant, charged with a serious crime, must not be stripped of his right to have sufficient time to advise with counsel and prepare his defense. To do that is not to proceed promptly in the calm spirit of regulated justice but to go forward with the haste of the mob.

As the court said in *Commonwealth* v. *O'Keefe*, 298 Pa. 169, 173; 148 Atl. 73:

"It is vain to give the accused a day in court, with no opportunity to prepare for it, or to guarantee him counsel without giving the latter any opportunity to acquaint himself with the facts or law of the case.

.     .      .   .     .        .

"A prompt and vigorous administration of the criminal law is commendable and we have no desire to clog the wheels of justice. What we here decide is that to force a defendant, charged with a serious misdemeanor, to trial within five hours of his arrest, is not due process of law, regardless of the merits of the case."

Compare *Reliford* v. *State,* 140 Ga. 777, 778; 79 S. E. 1128.

*Second.* The Constitution of Alabama provides that in all criminal prosecutions the accused shall enjoy the right to have the assistance of counsel; and a state statute requires the court in a capital case, where the defendant

60          OCTOBER TERM, 1932.

Opinion of the Court.                    287 U.S.

is unable to employ counsel, to appoint counsel for him.
The state supreme court held that these provisions had
not been infringed, and with that holding we are powerless
to interfere.   The question, however, which it is our duty,
and within our power, to decide, is whether the denial of
the assistance of counsel contravenes the due process
clause of the Fourteenth Amendment to the federal
Constitution.

If recognition of the right of a defendant charged with
a felony to have the aid of counsel depended upon the
existence of a similar right at common law as it existed
in England when our Constitution was adopted, there
would be great difficulty in maintaining it as necessary to
due process.   Originally, in England, a person charged
with treason or felony was denied the aid of counsel,
except in respect of legal questions which the accused
himself might suggest.   At the same time parties in civil
cases and persons accused of misdemeanors were entitled
to the full assistance of counsel.   After the revolution of
1688, the rule was abolished as to treason, but was other-
wise steadily adhered to until 1836, when by act of
Parliament the full right was granted in respect of felonies
generally.   1 Cooley's Const. Lim., 8th ed., 698, *et seq.*,
and notes.

An affirmation of the right to the aid of counsel in
petty offenses, and its denial in the case of crimes of the
gravest character, where such aid is most needed, is so
outrageous and so obviously a perversion of all sense of
proportion that the rule was constantly, vigorously and
sometimes passionately assailed by English statesmen and
lawyers.   As early as 1758, Blackstone, although recog-
nizing that the rule was settled at common law, denounced
it as not in keeping with the rest of the humane treat-
ment of prisoners by the English law.   " For upon what
face of reason," he says, " can that assistance be denied

POWELL *v.* ALABAMA.    61

to save the life of a man, which yet is allowed him in prosecutions for every petty trespass?" 4 Blackstone 355. One of the grounds upon which Lord Coke defended the rule was that in felonies the court itself was counsel for the prisoner. 1 Cooley's Const. Lim., *supra.* But how can a judge, whose functions are purely judicial, effectively discharge the obligations of counsel for the accused? He can and should see to it that in the proceedings before the court the accused shall be dealt with justly and fairly. He cannot investigate the facts, advise and direct the defense, or participate in those necessary conferences between counsel and accused which sometimes partake of the inviolable character of the confessional.

The rule was rejected by the colonies. Before the adoption of the federal Constitution, the Constitution of Maryland had declared "That, in all criminal prosecutions, every man hath a right . . . to be allowed counsel; . . ." (Art. XIX, Constitution of 1776). The Constitution of Massachusetts, adopted in 1780 (Part the First, Art. XII), the Constitution of New Hampshire, adopted in 1784 (Part I, Art. XV), the Constitution of New York of 1777 (Art. XXXIV), and the Constitution of Pennsylvania of 1776 (Art. IX), had also declared to the same effect. And in the case of Pennsylvania, as early as 1701, the Penn Charter (Art. V) declared that "all Criminals shall have the same Privileges of Witnesses and Council as their Prosecutors"; and there was also a provision in the Pennsylvania statute of May 31, 1718 (Dallas, Laws of Pennsylvania, 1700–1781, Vol. 1, p. 134), that in capital cases learned counsel should be assigned to the prisoners.

In Delaware, the Constitution of 1776 (Art. 25), adopted the common law of England, but expressly excepted such parts as were repugnant to the rights and privileges contained in the Declaration of Rights; and the Declaration of Rights, which was adopted on September

11, 1776, provided (Art. 14), "That in all Prosecutions for criminal Offences, every Man hath a Right . . . to be allowed Counsel, . . ." In addition, Penn's Charter, already referred to, was applicable in Delaware. The original Constitution of New Jersey of 1776 (Art. XVI) contained a provision like that of the Penn Charter, to the effect that all criminals should be admitted to the same privileges of counsel as their prosecutors. The original Constitution of North Carolina (1776) did not contain the guarantee, but c. 115, § 85, Sess. Laws, N. Car., 1777 (N. Car. Rev. Laws, 1715–1796, Vol. 1, 316), provided ". . . That every person accused of any crime or misdemeanor whatsoever, shall be entitled to council in all matters which may be necessary for his defence, as well to facts as to law; . . ." Similarly, in South Carolina the original Constitution of 1776 did not contain the provision as to counsel, but it was provided as early as 1731 (Act of August 20, 1731, § XLIII, Grimke, S. Car. Pub. Laws, 1682–1790, p. 130) that every person charged with treason, murder, felony, or other capital offense, should be admitted to make full defense by counsel learned in the law. In Virginia there was no constitutional provision on the subject, but as early as August, 1734 (c. VII, § III, Laws of Va., 8th Geo. II, Hening's Stat. at Large, Vol. 4, p. 404), there was an act declaring that in all trials for capital offenses the prisoner, upon his petition to the court, should be allowed counsel.

The original Constitution of Connecticut (Art. I, § 9) contained a provision that "In all criminal prosecutions, the accused shall have the right to be heard by himself and by counsel"; but this constitution was not adopted until 1818. However, it appears that the English common law rule had been rejected in practice long prior to 1796. See Zephaniah Swift's "A System of the Laws of the State of Connecticut," printed at Windham by John

POWELL *v.* ALABAMA.                63

Byrne, 1795–1796, Vol. II, Bk. 5, " Of Crimes and Punishments," c. XXIV, " Of Trials," pp. 398–399.*

The original Constitution of Georgia (1777) did not contain a guarantee in respect of counsel, but the Constitution of 1798 (Art. III, § 8) provided that " . . . no person shall be debarred from advocating or defending his cause before any court or tribunal, either by himself or counsel, or both." What the practice was prior to 1798 we are unable to discover. The first constitution adopted by Rhode Island was in 1842, and this constitution contained the usual guarantee in respect of the assistance of counsel in criminal prosecutions. As early as 1798 it was provided by statute, in the very language of the Sixth Amendment to the Federal Constitution, that " In all criminal prosecutions, the accused shall enjoy the right . . . to have the assistance of counsel for his defence;

---

* This ancient work, consisting of six books, has long been out of print. A copy of it is preserved in the locked files of the Library of Congress. The following extract from the pages cited is both interesting and instructive:

" The attorney for the state then proceeds to lay before the jury, all the evidence against the prisoner, without any remarks or arguments. The prisoner by himself or counsel, is then allowed to produce witnesses to counteract and obviate the testimony against him; and to exculpate himself with the same freedom as in civil cases. We have never admitted that cruel and illiberal principle of the common law of England that when a man is on trial for his life, he shall be refused counsel, and denied those means of defence, which are allowed, when the most trifling pittance of property is in question. The flimsy pretence, that the court are to be counsel for the prisoner will only highten our indignation at the practice: for it is apparent to the least consideration, that a court can never furnish a person accused of a crime with the advice, and assistance necessary to make his defence. This doctrine might with propriety have been advanced, at the time when by the common law of England, no witnesses could be adduced on the part of the prisoner, to manifest his innocence, for he could then make no preparation for his defense. One cannot read without horror and astonishment, the abominable maxims of law, which de-

64          OCTOBER TERM, 1932.

. . ." An Act Declaratory of certain Rights of the People of this State, § 6, Rev. Pub. Laws, Rhode Island and Providence Plantations, 1798. Furthermore, while the statute itself is not available, it is recorded as a matter of history that in 1668 or 1669 the colonial assembly enacted that any person who was indicted might employ an attorney to plead in his behalf. 1 Arnold, History of Rhode Island, 336.

It thus appears that in at least twelve of the thirteen colonies the rule of the English common law, in the respect now under consideration, had been definitely rejected and the right to counsel fully recognized in all

prived persons accused, and on trial for crimes, of the assistance of counsel, except as to points of law, and the advantage of witnesses to exculpate themselves from the charge. It seems by the ancient practice, that whenever a person was accused of a crime, every expedient was adopted to convict him and every privilege denied him, to prove his innocence. In England, however, as the law now stands, prisoners are allowed the full advantage of witnesses, but excepting in a few cases, the common law is enforced, in denying them counsel, except as to points of law.

"Our ancestors, when they first enacted their laws respecting crimes, influenced by the illiberal principles which they had imbibed in their native country, denied counsel to prisoners to plead for them to anything but points of law. It is manifest that there is as much necessity for counsel to investigate matters of fact, as points of law, if truth is to be discovered.

"The legislature has become so thoroughly convinced of the impropriety and injustice of shackling and restricting a prisoner with respect to his defence, that they have abolished all those odious laws, and every person when he is accused of a crime, is entitled to every possible privilege in making his defence, and manifesting his innocence, by the instrumentality of counsel, and the testimony of witnesses."

The early statutes of Connecticut, upon examination, do not seem to be as clear as this last paragraph would indicate; but Mr. Swift, writing in 1796, was in a better position to know how the statutes had been interpreted and applied in actual practice than the reader of today; and we see no reason to reject his statement.

POWELL *v.* ALABAMA.    65

criminal prosecutions, save that in one or two instances
the right was limited to capital offenses. or to the more
serious crimes; and this court seems to have been of the
opinion that this was true in all the colonies.   In *Holden*
v. *Hardy*, 169 U. S. 366, 386, Mr. Justice Brown, writing
for the court, said:

"The earlier practice of the common law, which denied
the benefit of witnesses to a person accused of felony, had
been abolished by statute, though so far as it deprived
him of the assistance of counsel and compulsory process
for the attendance of his witnesses, it had not been
changed in England.   But to the credit of her American
colonies, let it be said that so oppressive a doctrine had
never obtained a foothold there."

One test which has been applied to determine whether
due process of law has been accorded in given instances
is to ascertain what were the settled usages and modes of
proceeding under the common and statute law of England
before the Declaration of Independence, subject, however,
to the qualification that they be shown not to have been
unsuited to the civil and political conditions of our an-
cestors by having been followed in this country after it
became a nation.   *Lowe* v. *Kansas*, 163 U. S. 81, 85.
Compare *Murray's Lessee* v. *Hoboken Land & Improve-
ment Co.*, 18 How. 272, 276–277; *Twining* v. *New Jersey*,
211 U. S. 78, 100–101.   Plainly, as appears from the fore-
going, this test, as thus qualified, has not been met in the
present case.

We do not overlook the case of *Hurtado* v. *California*,
110 U. S. 516, where this court determined that due proc-
ess of law does not require an indictment by a grand
jury as a prerequisite to prosecution by a state for mur-
der.   In support of that conclusion the court (pp. 534–
535) referred to the fact that the Fifth Amendment, in
addition to containing the due process of law clause, pro-

vides in explicit terms that "No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a grand jury, . . .", and said that since no part of this important amendment could be regarded as superfluous, the obvious inference is that in the sense of the Constitution due process of law was not intended to include, *ex vi termini*, the institution and procedure of a grand jury in any case; and that the same phrase, employed in the Fourteenth Amendment to restrain the action of the states, was to be interpreted as having been used in the same sense and with no greater extent; and that if it had been the purpose of that Amendment to perpetuate the institution of the grand jury in the states, it would have embodied, as did the Fifth Amendment, an express declaration to that effect.

The Sixth Amendment, in terms, provides that in all criminal prosecutions the accused shall enjoy the right "to have the assistance of counsel for his defense." In the face of the reasoning of the *Hurtado* case, if it stood alone, it would be difficult to justify the conclusion that the right to counsel, being thus specifically granted by the Sixth Amendment, was also within the intendment of the due process of law clause. But the *Hurtado* case does not stand alone. In the later case of *Chicago, Burlington & Quincy R. Co.* v. *Chicago*, 166 U. S. 226, 241, this court held that a judgment of a state court, even though authorized by statute, by which private property was taken for public use without just compensation, was in violation of the due process of law required by the Fourteenth Amendment, notwithstanding that the Fifth Amendment explicitly declares that private property shall not be taken for public use without just compensation. This holding was followed in *Norwood* v. *Baker*, 172 U. S. 269, 277; *Smyth* v. *Ames*, 169 U. S. 466, 524; and *San Diego Land Co.* v. *National City*, 174 U. S. 739, 754.

POWELL *v.* ALABAMA.          67

Likewise, this court has considered that freedom of speech and of the press are rights protected by the due process clause of the Fourteenth Amendment, although in the First Amendment, Congress is prohibited in specific terms from abridging the right. *Gitlow* v. *New York*, 268 U. S. 652, 666; *Stromberg* v. *California*, 283 U. S. 359, 368; *Near* v. *Minnesota*, 283 U. S. 697, 707.

These later cases establish that notwithstanding the sweeping character of the language in the *Hurtado* case, the rule laid down is not without exceptions. The rule is an aid to construction, and in some instances may be conclusive; but it must yield to more compelling considerations whenever such considerations exist. The fact that the right involved is of such a character that it cannot be denied without violating those " fundamental principles of liberty and justice which lie at the base of all our civil and political institutions " (*Hebert* v. *Louisiana*, 272 U. S. 312, 316), is obviously one of those compelling considerations which must prevail in determining whether it is embraced within the due process clause of the Fourteenth Amendment, although it be specifically dealt with in another part of the federal Constitution. Evidently this court, in the later cases enumerated, regarded the rights there under consideration as of this fundamental character. That some such distinction must be observed is foreshadowed in *Twining* v. *New Jersey*, 211 U. S. 78, 99, where Mr. Justice Moody, speaking for the court, said that " . . . it is possible that some of the personal rights safeguarded by the first eight Amendments against National action may also be safeguarded against state action, because a denial of them would be a denial of due process of law. *Chicago, Burlington & Quincy R. Co.* v. *Chicago*, 166 U. S. 226. If this is so, it is not because those rights are enumerated in the first eight Amendments, but because they are of such a nature that they are included in

the conception of due process of law." While the question has never been categorically determined by this court, a consideration of the nature of the right and a review of the expressions of this and other courts, makes it clear that the right to the aid of counsel is of this fundamental character.

It never has been doubted by this court, or any other so far as we know, that notice and hearing are preliminary steps essential to the passing of an enforceable judgment, and that they, together with a legally competent tribunal having jurisdiction of the case, constitute basic elements of the constitutional requirement of due process of law. The words of Webster, so often quoted, that by "the law of the land" is intended "a law which hears before it condemns," have been repeated in varying forms of expression in a multitude of decisions. In *Holden* v. *Hardy,* 169 U. S. 366, 389, the necessity of due notice and an opportunity of being heard is described as among the "immutable principles of justice which inhere in the very idea of free government which no member of the Union may disregard." And Mr. Justice Field, in an earlier case, *Galpin* v. *Page,* 18 Wall. 350, 368–369, said that the rule that no one shall be personally bound until he has had his day in court was as old as the law, and it meant that he must be cited to appear and afforded an opportunity to be heard. "Judgment without such citation and opportunity wants all the attributes of a judicial determination; it is judicial usurpation and oppression, and never can be upheld where justice is justly administered." Citations to the same effect might be indefinitely multiplied, but there is no occasion for doing so.

What, then, does a hearing include? Historically and in practice, in our own country at least, it has always included the right to the aid of counsel when desired and provided by the party asserting the right. The right

POWELL *v.* ALABAMA.            69

to be heard would be, in many cases, of little avail if it
did not comprehend the right to be heard by counsel.
Even the intelligent and educated layman has small and
sometimes no skill in the science of law.  If charged with
crime, he is incapable, generally, of determining for him-
self whether the indictment is good or bad.  He is unfa-
miliar with the rules of evidence.  Left without the aid
of counsel he may be put on trial without a proper charge,
and convicted upon incompetent evidence, or evidence
irrelevant to the issue or otherwise inadmissible.  He
lacks both the skill and knowledge adequately to prepare
his defense, even though he have a perfect one.  He
requires the guiding hand of counsel at every step in the
proceedings against him.  Without it, though he be not
guilty, he faces the danger of conviction because he does
not know how to establish his innocence.  If that be true
of men of intelligence, how much more true is it of the
ignorant and illiterate, or those of feeble intellect.  If in
any case, civil or criminal, a state or federal court were
arbitrarily to refuse to hear a party by counsel, employed
by and appearing for him, it reasonably may not be
doubted that such a refusal would be a denial of a hear-
ing, and, therefore, of due process in the constitutional
sense.

The decisions all point to that conclusion.  In *Cooke* v.
*United States,* 267 U. S. 517, 537, it was held that where
a contempt was not in open court, due process of law re-
quired charges and a reasonable opportunity to defend or
explain.  The court added, " We think this includes the
assistance of counsel, if requested, . . ."  In numerous
other cases the court, in determining that due process was
accorded, has frequently stressed the fact that the de-
fendant had the aid of counsel.  See, for example, *Felts* v.
*Murphy,* 201 U. S. 123, 129; *Frank* v. *Mangum,* 237 U. S.
309, 344; *Kelley* v. *Oregon,* 273 U. S. 589, 591.  In *Ex
parte Hidekuni Iwata,* 219 Fed. 610, 611, the federal dis-

Opinion of the Court.          287 U.S.

trict judge enumerated among the elements necessary to due process of law in a deportation case the opportunity at some stage of the hearing to secure and have the advice and assistance of counsel.   In *Ex parte Chin Loy You,* 223 Fed. 833, also a deportation case, the district judge held that under the particular circumstances of the case the prisoner, having seasonably made demand, was entitled to confer with and have the aid of counsel. Pointing to the fact that the right to counsel as secured by the Sixth Amendment relates only to criminal prosecutions, the judge said, "  . . . but it is equally true that that provision was inserted in the Constitution because the assistance of counsel was recognized as essential to any fair trial of a case against a prisoner."   In *Ex parte Riggins,* 134 Fed. 404, 418, a case involving the due process clause of the Fourteenth Amendment, the court said, by way of illustration, that if the state should deprive a person of the benefit of counsel, it would not be due process of law.   Judge Cooley refers to the right of a person accused of crime to have counsel as perhaps his most important privilege, and after discussing the development of the English law upon that subject, says: "With us it is a universal principle of constitutional law, that the prisoner shall be allowed a defense by counsel." 1 Cooley's Const. Lim., 8th ed., 700.   The same author, as appears from a chapter which he added to his edition of Story on the Constitution, regarded the right of the accused to the presence, advice and assistance of counsel as necessarily included in due process of law.   2 Story on the Constitution, 4th ed., § 1949, p. 668.   The state decisions which refer to the matter, invariably recognize the right to the aid of counsel as fundamental in character. E. g., *People* v. *Napthaly,* 105 Cal. 641, 644; 39 Pac. 29; *Cutts* v. *State,* 54 Fla. 21, 23; 45 So. 491; *Martin* v. *State,* 51 Ga. 567, 568; *Sheppard* v. *State,* 165 Ga. 460, 464; 141 S. E. 196; *State* v. *Moore,* 61 Kan. 732, 734; 60 Pac. 748;

POWELL *v.* ALABAMA.          **71**

*State* v. *Ferris,* 16 La. Ann. 424; *State* v. *Simpson,* 38 La. Ann. 23, 24; *State* v. *Briggs,* 58 W. Va. 291, 292; 52 S. E. 218.

In the light of the facts outlined in the forepart of this opinion—the ignorance and illiteracy of the defendants, their youth, the circumstances of public hostility, the imprisonment and the close surveillance of the defendants by the military forces, the fact that their friends and families were all in other states and communication with them necessarily difficult, and above all that they stood in deadly peril of their lives—we think the failure of the trial court to give them reasonable time and opportunity to secure counsel was a clear denial of due process.

But passing that, and assuming their inability, even if opportunity had been given, to employ counsel, as the trial court evidently did assume, we are of opinion that, under the circumstances just stated, the necessity of counsel was so vital and imperative that the failure of the trial court to make an effective appointment of counsel was likewise a denial of due process within the meaning of the Fourteenth Amendment. Whether this would be so in other criminal prosecutions, or under other circumstances, we need not determine. All that it is necessary now to decide, as we do decide, is that in a capital case, where the defendant is unable to employ counsel, and is incapable adequately of making his own defense because of ignorance, feeble mindedness, illiteracy, or the like, it is the duty of the court, whether requested or not, to assign counsel for him as a necessary requisite of due process of law; and that duty is not discharged by an assignment at such a time or under such circumstances as to preclude the giving of effective aid in the preparation and trial of the case. To hold otherwise would be to ignore the fundamental postulate, already adverted to, "that there are certain immutable principles of justice which inhere in the very idea of free government which

no member of the Union may disregard." *Holden* v. *Hardy, supra.* In a case such as this, whatever may be the rule in other cases, the right to have counsel appointed, when necessary, is a logical corollary from the constitutional right to be heard by counsel. Compare *Carpenter & Sprague* v. *Dane County,* 9 Wis. 274; *Dane County* v. *Smith,* 13 Wis. 585, 586. *Hendryx* v. *State,* 130 Ind. 265, 268–269; 29 N. E. 1131; *Cutts* v. *State,* 54 Fla. 21, 23; 45 So. 491; *People* v. *Goldenson,* 76 Cal. 328, 344; 19 Pac. 161; *Delk* v. *State,* 99 Ga. 667, 669–670; 26 S. E. 752.

In *Hendryx* v. *State, supra,* there was no statute authorizing the assignment of an attorney to defend an indigent person accused of crime, but the court held that such an assignment was necessary to accomplish the ends of public justice, and that the court possessed the inherent power to make it. "Where a prisoner," the court said (p. 269), "without legal knowledge, is confined in jail, absent from his friends, without the aid of legal advice or the means of investigating the charge against him, it is impossible to conceive of a fair trial where he is compelled to conduct his cause in court, without the aid of counsel. . . . Such a trial is not far removed from an *ex parte* proceeding."

Let us suppose the extreme case of a prisoner charged with a capital offense, who is deaf and dumb, illiterate and feeble minded, unable to employ counsel, with the whole power of the state arrayed against him, prosecuted by counsel for the state without assignment of counsel for his defense, tried, convicted and sentenced to death. Such a result, which, if carried into execution, would be little short of judicial murder, it cannot be doubted would be a gross violation of the guarantee of due process of law; and we venture to think that no appellate court, state or federal, would hesitate so to decide. See *Stephenson* v. *State,* 4 Ohio App. 128; *Williams* v. *State,* 163 Ark. 623,

POWELL *v.* ALABAMA.        73

45                            BUTLER, J., dissenting.

628; 260 S. W. 721; *Grogan* v. *Commonwealth*, 222 Ky.
484, 485; 1 S. W. (2d) 779; *Mullen* v. *State*, 28 Okla. Cr.
218, 230; 230 Pac. 285; *Williams* v. *Commonwealth*,
(Ky.), 110 S. W. 339, 340.   The duty of the trial court to
appoint counsel under such circumstances is clear, as it
is clear under circumstances such as are disclosed by the
record here; and its power to do so, even in the absence of
a statute, can not be questioned.   Attorneys are officers of
the court, and are bound to render service when required
by such an appointment.   See Cooley, Const. *Lim.*, *supra*,
700 and note.

The United States by statute and every state in the
Union by express provision of law, or by the determina-
tion of its courts, make it the duty of the trial judge, where
the accused is unable to employ counsel, to appoint coun-
sel for him.   In most states the rule applies broadly to all
criminal prosecutions, in others it is limited to the more
serious crimes, and in a very limited number, to capital
cases.   A rule adopted with such unanimous accord re-
flects, if it does not establish, the inherent right to have
counsel appointed, at least in cases like the present, and
lends convincing support to the conclusion we have
reached as to the fundamental nature of that right.

The judgments must be reversed and the causes re-
manded for further proceedings not inconsistent with this
opinion.

*Judgments reversed.*


MR. JUSTICE BUTLER, dissenting.

The Court, putting aside—they are utterly without
merit—all other claims that the constitutional rights of
petitioners were infringed, grounds its opinion and judg-
ment upon a single assertion of fact.   It is that petitioners
" were denied the right of counsel, with the accustomed
incidents of consultation and opportunity of preparation
for trial."   If that is true, they were denied due process

of law and are entitled to have the judgments against them reversed.

But no such denial is shown by the record.

Nine defendants including Patterson were accused in one indictment, and he was also separately indicted. Instead of trying them *en masse,* the State gave four trials and so lessened the danger of mistake and injustice that inevitably attends an attempt in a single trial to ascertain the guilt or innocence of many accused. Weems and Norris were tried first. Patterson was tried next on the separate indictment. Then five were tried. These eight were found guilty. The other defendant, Roy Wright, was tried last and not convicted. The convicted defendants took the three cases to the state supreme court where the judgment as to Williams was reversed and those against the seven petitioners were affirmed.

There were three painstaking opinions, a different justice writing for the court in each case. 224 Ala. 524, 531, 540; 141 So. 215, 195, 201. Many of the numerous questions decided were raised at the trial and reflect upon defendants' counsel much credit for zeal and diligence on behalf of their clients. Seven justices heard the cases. The chief justice, alone dissenting, did not find any contention for the accused sufficient in itself to warrant a reversal but alluded to a number of considerations which he deemed sufficient when taken together to warrant the conclusion that the defendants did not have a fair trial. The court said (p. 553): "We think it a bit inaccurate to say Mr. Roddy appeared only as *amicus curiae.* [This refers to a remark in the dissenting opinion.] He expressly announced he was there from the beginning at the instance of friends of the accused; but not being paid counsel asked to appear not as employed counsel, but to aid local counsel appointed by the court, and was permitted so to appear. The defendants were represented as shown by the record and pursuant to appointment of the

POWELL *v.* ALABAMA.                    75

court by Hon. Milo Moody, an able member of the local
bar of long and successful experience in the trial of crimi-
nal as well as civil cases.  We do not regard the repre-
sentation of the accused by counsel as *pro forma*.  A very
rigorous and rigid cross-examination was made of the
state's witnesses, the alleged victims of rape, especially in
the cases first tried.  A reading of the records discloses why
experienced counsel would not travel over all the same
ground in each case."

The informality disclosed by the colloquy between court
and counsel, which is quoted in the opinion of this Court
and so heavily leaned on, is not entitled to any weight.
It must be inferred from the record that Mr. Roddy at
all times was in touch with the defendants and the people
who procured him to act for them.  Mr. Moody and
others of the local bar also acted for defendants at the
time of the first arraignment and, as appears from the
part of the record that is quoted in the opinion, thereafter
proceeded in the discharge of their duty, including con-
ferences with the defendants.  There is not the slightest
ground to suppose that Roddy or Moody were by fear
or in any manner restrained from full performance of
their duties.  Indeed, it clearly appears that the State,
by proper and adequate show of its purpose and power
to preserve order, furnished adequate protection to them
and the defendants.

When the first case was called for trial, defendants' at-
torneys had already prepared, and then submitted, a mo-
tion for change of venue together with supporting papers.
They were ready to and did at once introduce testimony
of witnesses to sustain that demand.  They had procured
and were ready to offer evidence to show that the de-
fendants Roy Wright and Eugene Williams were under
age.  The record shows that the State's evidence was
ample to warrant a conviction.  And three defendants
each, while asserting his own innocence, testified that he

OCTOBER TERM, 1932.

Butler, J., dissenting.                    287 U.S.

saw others accused commit the crime charged.  When
regard is had to these and other disclosures that may have
been and probably were made by petitioners to Roddy
and Moody before the trial, it would be difficult to think
of anything that counsel erroneously did or omitted for
their defense.

If there had been any lack of opportunity for prepara-
tion, trial counsel would have applied to the court for
postponement.  No such application was made.  There
was no suggestion, at the trial or in the motion for a new
trial which they made, that Mr. Roddy or Mr. Moody
was denied such opportunity or that they were not in
fact fully prepared.  The amended motion for new trial,
by counsel who succeeded them, contains the first sugges-
tion that defendants were denied counsel or opportunity
to prepare for trial.  But neither Mr. Roddy nor Mr.
Moody has given any support to that claim.  Their
silence requires a finding that the claim is groundless, for
if it had any merit they would be bound to support it.
And no one has come to suggest any lack of zeal or good
faith on their part.

If correct, the ruling that the failure of the trial court
to give petitioners time and opportunity to secure counsel
was denial of due process is enough, and with this the
opinion should end.  But the Court goes on to declare
that " the failure of the trial court to make an effective
appointment of counsel was likewise a denial of due proc-
ess within the meaning of the Fourteenth Amendment."
This is an extension of federal authority into a field
hitherto occupied exclusively by the several States.  Noth-
ing before the Court calls for a consideration of the
point.  It was not suggested below, and petitioners do
not ask for its decision here.  The Court, without being
called upon to consider it, adjudges without a hearing an
important constitutional question concerning criminal
procedure in state courts.

U. S. *v.* SHREVEPORT GRAIN & EL. CO.    **77**

45                            Syllabus.

It is a wise rule, firmly established by a long course of decisions here, that constitutional questions—even when properly raised and argued—are to be decided only when necessary for a determination of the rights of the parties in controversy before it.  Thus, in the *Charles River Bridge case,* 11 Pet. 420, the Court said (p. 553): "Many other questions, of the deepest importance, have been raised and elaborately discussed in the argument.  It is not necessary, for the decision of this case, to express our opinion upon them; and the Court deem it proper to avoid volunteering an opinion on any question involving the construction of the constitution where the case itself does not bring the question directly before them, and make it their duty to decide upon it."  And see *Davidson* v. *New Orleans,* 96 U. S. 97, 103, *et seq.  Hauenstein* v. *Lynham,* 100 U. S. 483, 490.  *Blair* v. *United States,* 250 U. S. 273, 279.  *Adkins* v. *Children's Hospital,* 261 U. S. 525, 544.

The record wholly fails to reveal that petitioners have been deprived of any right guaranteed by the Federal Constitution, and I am of opinion that the judgment should be affirmed.

MR. JUSTICE MCREYNOLDS concurs in this opinion.

————

UNITED STATES *v.* SHREVEPORT GRAIN & ELEVATOR CO.

APPEAL FROM THE DISTRICT COURT OF THE UNITED STATES FOR THE WESTERN DISTRICT OF LOUISIANA.

No. 19.  Argued October 19, 1932.—Decided November 7, 1932.

1. Section 2 of the Food and Drugs Act punishes shipment in interstate or foreign commerce of any article of food which is misbranded; and § 8 declares that such an article in package form shall be deemed to be misbranded if the quantity of the contents be not plainly and conspicuously marked on the outside of the package,