1  Anthony G. Thomas
   7725 Peavine Peak Court
2  Reno, NV 89523
   Tel:      (408) 640-2795
3  E-mail:   atemerald2@gmail.com

4  Debtor In Propria Persona

RECEIVED
AND FILED

2019 AUG 30  PM 2: 54

U.S. BANKRUPTCY COURT
MARY A. SCHOTT, CLERK

5              **UNITED STATES BANKRUPTCY COURT**

6               **DISTRICT OF NEVADA - RENO**

7  IN RE:                          ) Case No.   BK-N-14-50333-BTB
                                   ) Case No.   BK-N-14-50331-BTB
8  ANTHONY THOMAS and              ) (Jointly Administered)
                                   )
9  WENDI THOMAS                    ) CHAPTER  7
                                   )
10 AT EMERALD, LLC                 ) REPLY BRIEF IN SUPPORT OF MOTION
                                   ) FOR JUDICIAL NOTICE OF LAW &
11          Debtors.               ) FACTS IN SUPPORT OF RULE 60(b)(4)
                                   ) MOTION TO VACATE VOID 8-22-2014
12                                 ) CONVERSION ORDER
                                   )
13                                 ) Date:  September 13th 2019
                                   ) Time:  10:00 a.m.
14                                 ) Dept.:  Courtroom 2
                                   ) Judge: Hon. Gary A. Spraker
15 _____ )

16        Debtor Anthony G. Thomas hereby submits the following Reply Brief in

17 Support of his Rule 60(b)(4) Motion to Vacate Void 8-22-2014 Conversion Order

18 as follows:

19        Even though Debtor had the choice to submit his arguments strictly on the

20 fact that the 8-22-2014 Conversion order is void on its' face, and thus merely

21 requires an inspection of the judgment roll to determine its' invalidity in light of the

22 law that establishes the invalidity as can easily be done in the matter here, Debtor

23 is waiving his attorney-client privilege and has submitted in the accompanying

24 declaration, a detailed disclosure of the e-mail communications between himself

25 and his lawyers that he had engaged to represent both himself and his 100%

26 owned Nevada LLC, AT Emerald LLC, whose rights to speak were illegally taken

27 away in violation of established case law, and the Nevada Rules of Professional

28 Conduct at a critical juncture in the litigation, and in light of the glaring substantive

                                    1

1 and due process violations that resulted in serious harm to both himself and his
2 LLC and the actions of his own counsel and opposing counsel in interfering in the
3 proposed sale motion submitted to this Court on 6-23-2014, and approved by
4 Judge Beesly on 7-21-2014,  but also the serious harm inflicted by the
5 intervention of US Trustee Cossett to orally move not to just appoint a Trustee in
6 this case, but to move to convert Debtor from a Small Business Chapter 11
7 Debtor in Possession case, to a Chapter 7 liquidation case for himself and his
8 LLC.

9 This unlawful act without due process and proper notice and hearing under
10 the law resulted in significant prejudice to both Debtor and his LLC, depriving
11 them of the ability to market and sell the emerald and seek top dollar by pitching
12 the sale to wealthy individuals, and preventing them from realizng the fruits of
13 their negotiating an amazing contract with the billion dollar a year Overstock.com.
14 The record shows that the Overstock.com contract that was negotiated prior to
15 the conversion order was interfered with by none other than Wayne Silver,
16 attorney for the notorious Tersini brothers of Slavery Towers fame, the very
17 parties who have brought shame and ignominiy upon themselves for using slave
18 labor to build their real estate empire and have earned the capitalist pig
19 designation.

20 The Tersini brothers have continued to perpetrate a fraud upon the court
21 from October 5th 2011 when they colluded in the Santa Clara County Superior
22 Court with Debtor's soon to be disbarred counsel Michael Morrissey to pull the
23 wool over Debtor's eyes and enter on the record orally before the Court the terms
24 of a settlement in which debtor did not participate in violation of the rules
25 governing CCP § 664.6 but also by concealing Thomas's dyslexia from the Court,
26 not ever giving Thomas the opportunity to actually read a printed copy of the
27 settlement agreement that was negotiated without Thomas participation and
28 without having any of the terms of the settlement explained to him either by his

1  counsel or the Court.

2      Debtor is submitting the following chronology of facts that is supported by

3  the Court file and records, as well as e-mail correspondence by and between

4  debtor and his lawyers and the proposed buyer of the Thomas Emerald by means

5  of the buy and sell agreement filed for approval by this Court on 6-23-2014, and

6  that was approved by this Court on 7-21-2014.  Before even giving debtor the

7  contemplated 30 day period to consummate the deal, debtor was stripped of his

8  debtor in possession Chapter 11 status and effectively sent to the firing squad to

9  be liquidated, something that the US Trustee crudely alluded to on the transcript

10  of 8-22-2014, something that even Judge Beesley found to be disturbing to hear.

11  **I. TRACY HOPE DAVIS, REGIONAL U.S. TRUSTEE IN SF FILED THE**
12  **MOTION TO CONVERT FILED BY HER TRIAL HEAD COSSETT AND**
   **HER RENO ASSISTANT UST NICK STROZZA UPON THE FACT THAT**
   **THERE WAS NO LIABILITY INSURANCE IN PLACE ON THE**
13  **EMERALD, SOMETHING THAT WASN'T NECESSARY IN LIGHT OF**
   **ITS' SECURE SAFEKEEPING AT THE SARASOTA VAULT AND**
14  **DEPOSITORY**

15      Attached to the concurrently filed Declaration of Anthony G. Thomas are

16  true and correct copies of the specifications of the Sarasota Vault showing the

17  stringent security standards of the Sarasota Vault that did not require obtaining

18  insurance under the circumstances.  Furthermore, there was an agreement

19  between counsel for Debtor and counsel for John Beach to oppose the US

20  Trustee's Motion to Convert, a fact that could have prevented the conversion if

21  Debtor and his LLC had counsel.  Furthermore, it was highly irregular to permit

22  conversion of the case on 8-22-2014, when the actual US Trustee Motion to

23  convert was actually on calendar for 9-13-2014.  On 7-15-2014, John Beach filed

24  a limited opposition to the US Trustee Motion to convert, which should have

25  prevented the Conversion from going forward.

26  **II. FACTS SOUGHT TO BE JUDICIALLY NOTICED RE: MOTION TO**
27  **CONVERT FROM CHAPTER 11 DEBTOR IN POSSESSION CASE TO**
   **CHAPTER 7 LIQUIDATION CASE**

28  4-30-2014    Nick Strozza, Assistant U.S. Trustee and Bill Cossitt, US Trustee

**REPLY BRIEF IN SUPPORT OF RULE 60(b)(4) MOTION**

Trial Lawyer file Motion to Convert case from Chapter 11 to Chapte 7 on behalf of Tracy Hope Davis, Head of Region 19 office in San Francisco on the grounds that Debtor has failed to Obtain Liability Insurance in violation of 11 USC Section 1112(b)(4)©

07-16-2016 Deadline to file Opposition to UST Motion to Convert from Ch. 11 to 7

07-30-2014 Hearing on UST Motion to Convert calendared

05-12-2014 Thomas receives an E-mail with DE27 attached, the UST Motion to Convert from Chapter 11 to 7 for failure to maintain insurance on the Emerald and she states:

"Tony and Wendi, Can you please give me an update on any potential purchase offers on the emerald and on the trip to Florida. I need to know when the trip will take place as well as any imminent potential sales. **I have to draft a reply to the US Trustee's Motion to Convert this case to a case under Chapter 7 of the bankruptcy code tomorrow.** (See Motion attached hereto). As I have discussed earlier, we want to stay in control of the sale of the emerald. If this case is converted, a Chapter 7 trustee will be appointed and be in control of liquidating the emerald.

**06-04-2014 Thomas receives an E-mail from Smith Law Firm Holly Estes stating:**

"I spoke with Joseph Went, attorney for John Beach, yesterday. We are both concerned about the US Trustee's Motion to Convert (attached hereto) currently scheduled for hearing on July 30, 2014. As I have stated in the past, I think that it is important, in order to overcome the US Trustee's position, to come to an agreement with John Beach, the largest secured creditor regarding the insurance. Joseph Went informed me that in order for his client to come to an agreement on the insurance issue, he would like to go to Florida and see the emerald. It is important to have this agreement in advance of the July 30 hearing date so that we have a good position in opposing the US Trustee's motion to convert."

**THE LAW DOES NOT AUTOMATICALLY REQUIRE INSURANCE, INSURANCE IS ONLY REQUIRED FOR "FAILURE TO MAINTAIN APPROPRIATE INSURANCE THAT PRESENTS A RISK TO THE ESTATE OR TO THE PUBLIC"**

Neither provision requiring insurance in this case applies to this case.

Failure to have insurance on the Emerald posed no risk to the public in that the

Emerald was in a first class secured vault in Sarasota Florida, where it had no

interaction with the public.

1    There was no need for liability insurance to be obtained on the emerald,

2  since the emerald posed no risk of injury to anyone, while in the locked vault

3  without even the Vault having access to it.  The only risk to the estate would be

4  as to theft, not liability insurance, and not having theft insurance is not a grounds

5  to convert from chapter 11 to 7.  Arguably, the emerald was more secure without

6  insurance in the secured Saratoga Vault than in some other facility like its' current

7  location in an unsecured garage or other private location without any of the

8  security, alarm, 24 hour video tape and secured facility with specs to deter any

9  form of theft.

10  In re: Jon G. Rosson (2008) - 9th Cir. 06-35724 - 9-24-2008

11    **because a conversion to Chapter 7 takes control of the estate out of the hands of the debtor, it seriously affects substantive rights and may lead to**

12    **irreparable harm to the debtor if immediate review is denied.  See Mason v. Young (In re Young), 237 F.3d 1168, 1173 (10th Cir.2001) (explaining that**

13    **"under Chapter 7, once the debtor's assets have been liquidated, it is virtually impossible to reassemble them, and therefore an order converting**

14    **to Chapter 7 is necessarily more final in nature than an order converting to Chapter 13");6 ?see also In re Firstcent Shopping Ctr., Inc., 141 B.R. 546,**

15    **550 (S.D.N.Y.1992) (holding that "[c]onversion of a bankruptcy case [to Chapter 7] is final and · appealable" and quoting In re Rebeor, 89 B.R. 314,**

16    **320-21 (Bankr.N.D.N.Y.1988) ("[I]mmediate review [i]s necessary to protect Debtor's substantive rights to reorganize in Chapter 13 and to prevent**

17    **irreparable harm through the potential loss of his property sold to good faith purchasers.")).  We therefore hold, in accordance with all other**

18    **courts of which we are aware that have considered the issue,7 that a bankruptcy court order converting a case from one under another chapter**

19    **of the Bankruptcy Code to one under Chapter 7 is a final and appealable order.**

20

21    In this case like that above, Debtor was denied statutorily-guaranteed

22  procedures when the bankruptcy court converted his case without notice and a

23  meaningful hearing

24  **"the bankruptcy court erred by converting his case .... to Chapter 7 without**

25  **notice and a hearing, as required by 11 U.S.C. § 102(1)(A)."**

26  Section 102(1) of the Bankruptcy Code states that:

27    **"[A]fter notice and a hearing", or a similar phrase — (A) means after such notice as is appropriate in the particular circumstances, and such**

28    **opportunity for a hearing as is appropriate in the particular circumstances;**

**REPLY BRIEF IN SUPPORT OF RULE 60(b)(4) MOTION**

but (B) authorizes an act without an actual hearing if such notice is given properly and if — (i) such a hearing is not requested timely by a party in interest; or (ii) there is insufficient time for a hearing to be commenced before such act must be done, and the court authorizes such act.

11 U.S.C. § 102(1); see also id. § 1307(c) (requiring "notice and a hearing" as prerequisite to conversion of a case from Chapter 13 to Chapter 7); cf. Tennant v. Rojas (In re Tennant), 318 B.R. 860, 870 (9th Cir.BAP 2004) (holding that "notice and a hearing" are required even where the bankruptcy court acts pursuant to "its general powers under Section 105(a)"). We have "emphasize[d] that the notice-and-hearing definition in § 102(1) is flexible and sensitive to context."

Law Offices of David A. Boone v. Derham-Burk (In re Eliapo), 468 F.3d 592, 603 (9th Cir.2006).

> "The essential point is that the court should give counsel a meaningful opportunity to be heard." Id. (internal quotation marks omitted).

Here, Rosson correctly points out that the bankruptcy court's initial August 17, 2005 "hearing" on conversion provided him essentially no notice, and no "opportunity to present legal argument and/or evidence." Id. (internal quotation marks omitted). Although various motions to convert the case had been pending for months, those motions were scheduled to be addressed at a September hearing, and Rosson had no notice that conversion to Chapter 7 would be addressed at the August 17 hearing on Harris's motion to withdraw.

The Court in In re Tennant held:

the concept of procedural due process requires a notice and an opportunity to be heard. See Muessel v. Pappalardo (In re Muessel), 292 B.R. 712, 717 (1st Cir. BAP 2003). The term "after notice and a hearing" is defined in Section 102(1):

In this title —

(1) "after notice and a hearing", or a similar phrase —

> (A) means after such notice as is appropriate in the particular circumstances, and such opportunity for a hearing as is appropriate in the particular circumstances; but

> (B) authorizes an act without an actual hearing if such notice is given properly and if —

> > (i) such a hearing is not requested timely by a party in interest;

> > or

> > (ii) there is sufficient time for a hearing to be commenced before such act must be

6

**REPLY BRIEF IN SUPPORT OF RULE 60(b)(4) MOTION**

1    **done, and the court authorizes such act[.]**

2    11 U.S.C. § 102(1).

3    Thus, the concept of notice and a hearing is flexible and depends on what
     is appropriate in the particular circumstance. Great Pacific Money
4    Markets, Inc. v. Krueger (In re Krueger), 88 B.R. 238, 241 (9th Cir. BAP
     1988). A dismissal without notice and an opportunity to be heard would
5    not be appropriate where substantive issues are to be determined, but if a
     case involves only very narrow procedural aspects, a court can dismiss a
6    Chapter 13 case without further notice and a hearing if the debtor was
     provided "with notice of the requirements to be met." Meints, 222 B.R. at
7    872

8    In re: Tennant

9    MOVANT HAS TO SHOW CAUSE WHY CONVERSION IS WARRANTED:

10   The Court in In re: Eck (2010) BK Court CT stated:

11   **Once the movant has established "cause" (as the UST has done
     here), the burden shifts to the Debtor to establish the exceptions**
12   **provided for by Section 1112(b). See 7 Alan N. Resnick & Henry J.
     Sommer, Collier on Bankruptcy ¶ 1112.05 (16 ed. rev. 2009) ("Collier**
13   **on Bankruptcy").**

14   **Once "cause" has been demonstrated, the Court must convert or
     dismiss, unless the Court specifically identifies "unusual**
15   **circumstances . . . that establish that such relief is not in the best
     interest of creditors and the estate." However, absent unusual**
16   **circumstances, the Court must not convert or dismiss a case if (1)
     there is a reasonable likelihood that a plan will be confirmed within a**
17   **reasonable time, (2) the "cause" for dismissal or conversion is
     something other than a continuing loss or diminution of the estate**
18   **coupled with a lack of reasonable likelihood of rehabilitation; and (3)
     there is reasonable justification or excuse for a debtor's act or**
19   **omission and the act or omission will be cured within a reasonable
     time.**

20
     In re Orbit Petroleum, Inc., 395 B.R. 145, 148 (Bankr. D. N.M. 2008)
21   (citations omitted; emphasis in original).

22        Under the circumstances of the case, the Court improperly permitted

23   Debtor's existing counsel to withdraw on only 3 days notice at a critical juncture in

24   the litigation in violation of the Nevada Rules of Professional Conduct, and in

25   violation of the legal principles in Vann v. Shilleh (copy attached to Debtor's

26   Declaration and request for Judicial Notice), as well as the principles enunciated

27   in Laskowitz v. Schellenberger (copy attached to Debtor's declaration for which

28   he seeks judicial notice.

7
**REPLY BRIEF IN SUPPORT OF RULE 60(b)(4) MOTION**

1    Thomas was severely prejudiced both procedurally and substantively by

2   the wrongful order permitting his existing lawyers to withdraw from representation

3   without according him even a 2 week continuance to seek counsel, and in

4   violation of the principles of the Nevada Rules of Professional Conduct that

5   prohibit such a withdrawal when the withdrawal occurs at a critical juncture in the

6   litigation that may severely and  adversely affect the litigants rights as is the case

7   here.

8   The California Court of Appeals in 1946 stated:

9       " There can be little doubt but that in both civil and criminal cases the
        right to a hearing includes the right to appear by counsel, and that
10      the arbitrary refusal of such right constitutes a deprivation of due
        process. (Roberts v. Anderson, 66 F.2d 874; Powell v. Alabama, 287
11      U.S. 45; Cooke v. United States, 267 U.S. 517; Steen v. Board of
        Civil Service Commrs., 26 Cal.2d 716.

12
        Prudential Insurance Co. v. Small Claims Court (1946) 76 Cal. App. 2d 379
13      at 382

14  The U.S. Court of Appeals for the 10th District in Roberts v. Anderson cited above

15   stated:

16      "Where the rights of a citizen depend upon the ascertainment of
        facts, due process of law requires that he be notified of the hearing
17      and be afforded an opportunity to be heard. Webster defined the
        "law of the land" as "a law which hears before it condemns." In
18      Windsor v. McVeigh, 93 U. S. 274, there was a proper notice and
        appearance, but a hearing was denied. The court held the judgment
19      was not entitled to respect in any other tribunal; that when a hearing
        is denied, the notice is ineffectual for any purpose. In McVeigh v.
20      United States, 11 Wall. 259, 267, it was said that

21          "A different result would be a blot upon our
            jurisprudence and civilization."
22
        Other cases to the effect that a denial of a hearing invalidates
23      judgments of courts and decisions of administrative bodies are:
        Brinkerhoff-Faris T. & S. Co. v. Hill, 281 U. S. 673; Goldsmith v. U. S.
24      Board of Tax Appeals, 270 U. S. 117, 123; Moore v. Dempsey, 261
        U. S. 86.
25
        In Atchison, Etc., Ry. Co. v. United States, 284 U. S. 248, it was held
26      that

27          "a fair hearing is a fundamental requirement"

28      of decisions of the Interstate Commerce Commission. In Int. Com.

**REPLY BRIEF IN SUPPORT OF RULE 60(b)(4) MOTION**

1   Comm. v. Louis. & Nash. R. R., 227 U. S. 88, 91, it was held that

2           "administrative orders, quasi judicial in character, are
            void if a hearing was denied; if that granted was
3           inadequate or manifestly unfair."

4   The right to a hearing includes the right to the assistance of counsel
    of his own choice, if requested. Cooke v. United States, 267 U. S.
5   517, 537, 45 S. Ct. 390, 69 L. Ed. 767; Powell v. Alabama, 287 U. S.
    45. In the case last cited, the Supreme Court said:

6
            "If in any case, civil or criminal, a state or federal court
7           were arbitrarily to refuse to hear a party by counsel,
            employed by and appearing for him, it reasonably may
8           not be doubted that such a refusal would be a denial of
            a hearing, and, therefore, of due process in the
9           constitutional sense."

10  Roberts v. Anderson (10th Cir. 1933) 66 F.2d. 874 at 876.

11  The dissent of Justice Howard of the Supreme Court of Arkansas, in 1978 is
    applicable in this case:

12
            "First, the right of a litigant to counsel of his choice is so fundamental
13          and basic under American Jurisprudence that prejudice is presumed
            to have resulted without the Court having to indulge in nice and
14          dainty calculations as to the amount of prejudice arising from its
            denial.[3]

15
            FN 3: See: People v. Bryant (1969) 275 Cal.App.2d 215, [although a
16          criminal case] the court held that the deprivation of effective
            counsel is of sufficient constitutional significance to merit
17          reversal even without actual prejudice.

18  McCoy Farms, Inc. v. J M McKee (1978) 263 Ark. 20

19  **CIVIL RIGHT TO COUNSEL**

20          "The United States Supreme Court likewise has recognized the
            indispensability of counsel to fair proceedings in civil cases as well.
21          "Laymen cannot be expected to know how to protect their rights
            when dealing with practiced and carefully counseled adversaries...."
22          (Railroad Trainmen v. Virginia Bar (1964) 377 U.S. 1, 7 [in case
            upholding right of union to provide legal assistance plan for its
23          members].)

24  What the court has termed an "obvious truth" is buttressed by
    empirical studies demonstrating unrepresented litigants rarely prevail
25  in the same types of civil proceedings where those with lawyers often
    do. (See, e.g., Schmertz, The Indigent Civil Plaintiff In The District Of
26  Columbia: Facts And Commentary (1967) 27 Fed.B.J. 235, 243,
    reporting a comparative study of pro. per. and represented civil
27  litigants where the pro. per. litigants were so confounded by the
    procedural complexities that they proved nine times less likely to
28  achieve a settlement, never succeeded in compelling discovery and

9
**REPLY BRIEF IN SUPPORT OF RULE 60(b)(4) MOTION**

1  in no case managed to reach a trial on the merits.) (See also Rubin,
2  Consumers and Courts (1971) p. 109, reporting on a fourcity study
   which found civil defendants with lawyers six times more successful
3  than those unable to obtain counsel.)"

4  Quail v. Municipal Court (1985) 171 Cal.App.3d 572 fn 8 at 593.

5      Debtor and his LLC suffered prejudicial harm as detailed in the declaration

6  of Anthony Thomas filed concurrently herewith and as such the conversion order

7  was void on its' face and subject to collateral attack at any time without any

8  statute of limitations bar.

9

10  Dated:      August 26th 2019.                    Respectfully submitted,

11

12                                                  _____
                                                    Anthony G. Thomas
13                                                  Debtor In Propria Persona

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**REPLY BRIEF IN SUPPORT OF RULE 60(b)(4) MOTION**

1 | Anthony G. Thomas
7725 Peavine Peak Court
2 | Reno, NV 89523
Tel:          (408) 640-2795
3 | E-mail:      atemerald2@gmail.com

4 | Debtor In Propria Persona

5 | **UNITED STATES BANKRUPTCY COURT**

6 | **DISTRICT OF NEVADA - RENO**

7 | IN RE:                                    ) **Case No.   BK-N-14-50333-BTB**
                                          ) **Case No.   BK-N-14-50331-BTB**
8 | ANTHONY THOMAS and                        ) (Jointly Administered)
                                          )
9 | WENDI THOMAS                              ) CHAPTER 7
                                          )
10 | AT EMERALD, LLC                          ) DECLARATION OF ANTHONY G. THOMAS
                                          ) IN SUPPORT OF MOTION FOR JUDICIAL
11 |            Debtors.                      ) NOTICE OF LAW & FACTS IN SUPPORT
                                          ) OF RULE 60(b)(4) MOTION TO VACATE
12 |                                          ) VOID 8-22-2014 CONVERSION ORDER
                                          ) AND IN SUPPORT OF REPLY BRIEF
13 |                                          )
                                          ) Date:  September 13th 2019
14 |                                          ) Time:  10:00 a.m.
                                          ) Dept.:  Courtroom 2
15 |                                          ) Judge: Hon. Gary A. Spraker
                                          )
16 | _____)

17 | I, Anthony G. Thomas declare:

18 | 1.     I am submitting this Declaration in Support of my Reply Brief in

19 | Support of my Rule 60(b)(4) Motion to Vacate Void Order of Conversion dated 8-

20 | 22-2014, and in support of my Motion for Judicial Notice of Law and Facts.

21 | 2.     I am submitting these Exhibits inter alia for the express purpose of

22 | showing that I did suffer actual prejudice as well as my LLC suffered actual

23 | prejudice as a consequence of the void order converting both myself and my LLC

24 | from Chapter 11 to Chapter 7, even though the law presumes prejudice.

25 | 3.     First, I want the Court to take judicial notice of the fact that the

26 | hearing date for the conversion motion was not 8-22-2014, but rather was

27 | originally set for 7-30-2014, but on 7-16-2014, a stipulation was entered by and

28 | between one of my lawyers, Holly Estes and Bill Cossett of the Office of the

1

1  United States Trustee resetting the hearing on the conversion motion to
2  September 13th 2014.

3      4.      The attached e-mails from my counsel show that there was an
4  agreement between my lawyers and the lawyer for John Beach to join together in
5  opposing the US Trustee's Motion to convert the case from Chapter 11 to 7.  See
6  e-mail from Holly Estes dated 5-12-2014 attached hereto and incorporated herein
7  by reference..

8      5.      Although the e-mails show that my lawyers were working on an
9  opposition brief to the US Trustee's Motion, no such opposition was ever filed.
10  By permitting the lawyers to withdraw without filing such an opposition on my and
11  my LLC's behalf, we were unlawfully converted to Chapter 7 liquidation
12  bankruptcy and both myself and LLC suffered irreparable harm as a result.  We
13  lost our debtor in possession status, and the ability to sell our assets and run our
14  affairs without the interference of a trustee, and much worse, without living the
15  nightmare of having to go through personal liquidation of my personal assets and
16  that of the LLC.  The statement by Wayne Silver that it would not have made any
17  difference had the Court granted the 2 week continuance to obtain counsel is
18  patently false.

19      6.      The e-mail correspondence shows that I had 2 buyers for the
20  Thomas Emerald, one from billion dollar per year online seller overstock.com,
21  the other one, that is the subject of the attached emails submitted to the Court on
22  6-23-2014 and approved on 7-22-2014 the sale of which was interfered with by
23  my own lawyers, who unilaterally changed the sale documents, that I forced them
24  to reverse on the docket, their illegal attempt to change the $20 million that was
25  supposed to go into the "AT Emerald Trust Account" under the law firm account
26  to $70 million.  This material change raised alarm bells with my buyer, who
27  combined with the Judge's granting a Motion to drill the vault, also materially
28  interfered with the sale of the Thomas Emerald.  (See Exhibit 2, pp. 31 to 34).

**Declaration of Anthony Thomas ISO Reply to Rule 60(b)(4) MOTION**

7.    Specifically, attached to this Declaration is a true and correct copy of an e-mail I received from the buyer's agent Mr. Clarke dated July 11th 2014 wherein he states:

> "I am to officially place on record that your Lawyer's proposed amendments are a direct contradiction to the content and spirit of the court approved sales and purchase agreement... Therefore please be advised that unless the Sales and Purchase Agreement can be fulfilled strictly under the terms of the original agreement, Koyo Shipping and Trading Corporation will reluctantly be forced to withdraw from any further interest in purchasing the Thomas Emerald Matrix."

In response to Mr. Clarke's E-mail, I sent an email to both Alan Smith and Holly Estes, two of my lawyers where I stated:

> "Dear Alan and Holly: you have officially jeopardized that sale of that Thomas emerald see the attached email. I am instructing you to retract the application order that your firm submitted to the court on July 9th or 10th your firm did this without my consent or knowledge and you've officially jeopardize the sale of the Emerald and I will hold you fully responsible if the sale does not go through, all terms of the signed sales agreement and the court approval were being executed to the T until you interfered."

The e-mail chain also contains an explanation by Holly Estes, where she admits that she changed the proposed order so that instead of $20 million going into the Trust Account administered by her law firm, the number was unilaterally changed by her to $70,000,000, prompting the alarm bells from the buyer's representative David Clarke.

8.    On July 15th 2014, John Beach filed his limited opposition to the US Trustee's Motion to Convert. He cited the unique nature of the transaction in opposing the Motion. This opposition alone, should have prevented the conversion of the case from Chapter 11 to 7.

9.    If I did have legal counsel, or if my previous counsel actually filed an opposition brief, I would have provided my lawyer with the attached documents attached to this Declaration as Exhibit 1 that show that there was very little risk of theft or loss of the Thomas Emerald due to the high security specifications of the Sarasota Vault, where the Thomas Emerald was stored.

3

**Declaration of Anthony Thomas ISO Reply to Rule 60(b)(4) MOTION**

1   Exhibit 1, page 13 is a notarized Safekeeping Receipt, signed by the

2   President James Montoney of the Sarasota Vault of the 21,000 carat emerald

3   appraised at $800 million dollars.

4   The first page of Exhibit 1 is a copy of the Rental Agreement.

5   The following page of Exhibit 1 is a copy of the Mercantile Burglary Alarm

6   Certificate noting the ADT Alarm Service Company servicing the Sarasota Vault.

7   I am also attaching an application for insurance form that I was provided by

8   the Sarasota Vault.  I am submitting this Declaration to show that I was ready

9   willing and able to secure insurance if the Court still insisted that insurance was

10  necessary despite the stringent security features of the Sarasota Vault as

11  highlighted below.  Under these circumstances, if I had proper legal counsel to

12  make the arguments on my behalf, I should not have been converted to chapter 7

13  liquidation on the grounds of not having insurance.

14  The following page of Exhibit 1 is reproduced below to show the extent of

15  the security features of the Sarasota Vault that show the risk of theft or loss due

16  to these specifications was close to nil:

17

18

19

20

21

22

23

24

25

26

27

28

4

1

| SECURITY FEATURES | SARASOTA Vault Depository |
|---|---|
| , State | Sarasota, Florida |
| Elevation Above Sea Level | 22-feet, NON FLOOD ZONE AREA |
| Distance to Water | 1-mile to protected Intercoastal |
| Distance to Police Department | 2-City Blocks ONLY |
| Distance to Fire Department Less Than 1.5-Miles | YES |
| Zoned | Business District |
| Square Area | Approx 5,000-square feet |
| **Exterior Construction Type** | |
| Exterior Walls | 18"-thick, Steel Reinforced Concrete |
| Ceiling | 18"-thick, Steel Reinforced Concrete |
| Floor | 18"-thick, Steel Reinforced Concrete |
| Doors | Steel, Bullet Resistant LEXAN Glass |
| Locks | "dc" Electric Power, Battery Back-up |
| Glass | 1 1/4"-Bullet Resistant LEXAN Glass |
| **Interior Construction Type** | |
| Inner Vault Wall Areas | 18"-thick, Steel Reinforced Concrete |
| Interior Divider Walls | 1/2"-Drywall, 2x4 Construction |
| Main Access Vault Room Doors | 9-hr Bank Type Walk-Thru |
| Main Access Vault Room Door Locks | Combination Locks w/ Time Locks |
| Interior Doors | Solid Core Wood |
| Lighting | Fluorescent |
| Floor Covering | Painted Concrete or Carpet |
| Restrooms | (2) in Office Area |
| **Individual Vault Construction** | |
| Individual Vault Walls | 18"-thick, Reinf. Concrete or 3/8"-Steel |
| Individual Vault Doors | 3-hr Bank Type Walk-Thru or 3/8"-Steel |
| Individual Vault Door Locks | Single Comb. Lock Sets or Double-Keyed |
| **Environmental Control System** | |
| AC and Humidity Controls | YES |
| Multiple Zoned AC, Humidity and Hygrometers | YES |
| Temperature Monitored at | 72-Degrees |
| Humidity Monitored at | 55% |
| **Burglar Alarm System** | |
| Multiple Zone, Touchpad Arming, Battery Back-Up | YES |
| Infrared Motion Detectors | YES |
| Vibration Detectors | YES |
| Smoke-Heat Detectors | YES |
| 24-hr Monitoring by UL Listed Central Station | YES |
| Closed Circuit Video Sys w/ Time-Lapse VCR's | 16-Cameras |
| **Fire Alarm System** | |
| Smoke Detectors | YES |
| Rate of Rise Heat Detectors | YES |
| Manual Pull Stations | YES |
| 24-hr Monitoring by UL Listed Central Station | YES |
| Suppression Sprinkler System | YES, tied to Main Fire Alarm System |
| Fire Extinguishers Throughout | YES |
| Fire Hydrant On Premises | YES |
| **Security Personnel** | |
| Armed Guards On-Premise | YES, Class D, G and W License |
| Security Monitoring Room | YES, Manned During Operating Hours |
| **Entry Procedures** | |
| Interior Entry Man Trap | YES, Entry ONLY Thru Man Trap |
| Signature Card Required | YES |
| Photo ID Required | YES |
| ID Checked Before Entering | REQUIRED |
| Entrants MUST Surrender Drivers License-Passport | REQUIRED |
| Drive In Security Bay & Man Trap | YES |

## Exhibit 1

**Declaration of Anthony Thomas ISO Reply to Rule 60(b)(4) MOTION**

1     10.    The fact that my lawyers were permitted to withdraw at a critical

2  juncture in the litigation without filing the opposition brief left myself and my LLC

3  without counsel to argue the merits of arguing that there was no need to obtain

4  insurance in light of the stringent security features of the Sarasota Vault.

5  Furthermore, if I had legal counsel, they would have been able to hold John

6  Beach's lawyers to their position stated in their limited opposition brief they filed

7  on 7-15-2014, as well as holding them to their agreement to oppose the Trustee's

8  Motion.

9     11,    In any case, it was highly improper to allow the US Trustee Bill

10  Cossett to just orally argue to convert AT Emerald LLC and myself to Chapter 7

11  liquidation bankruptcy, without legal counsel and prior to the actual calendared 9-

12  13-2014 Motion on the matter.

13     12.    Exhibit 3 is a true and correct copy of the Wall Street Journal article

14  published on 6-30-2014, that identified the sales price of $200 million.

15     13.    Exhibit 4 is a true and correct copy of the 9th Circuit 1952 case of

16  Laskowitz v. Schellenberger (1952) 107 F.Supp. 397 for which Debtor

17  respectfully requests that this Court take judicial notice of that states:

18       "Said defendant consents to the withdrawal by a document bearing
its seal filed with the Court. The Court does not consent to the

19       withdrawal of attorneys. Approval would leave a corporate defendant
without representation. Even if a defendant assumes to

20       represent himself, he must either enter his first appearance in the
case in propria persona or be substituted for whoever appeared as

21       his attorney. Defendant appropriately does not offer to do this
because, being a corporation, it is without capacity to either

22       represent others or itself. For authorities discussing the principles
involved, see cases cited to support the following quotation from

23       Cal.Jur. Ten Year Supplement, 1949, Revision, Vol. 9, Sec. 15, p.
448, where the applicable rules are stated as follows:

24

25          "Since a corporation cannot practice law, and can only
act through the agency of natural persons, it follows that

26          it can appear in court on its own behalf only through a
licensed attorney. It cannot appear by an officer of the

27          corporation who is not an attorney, and may not even
file a complaint except by an attorney, whose authority

28          to appear is presumed; in other words, a corporation
cannot appear in propria persona. A judgment rendered

1     in such a proceeding is void."

2 In any event a withdrawal of attorneys is not the proper course. **A substitution of attorneys approved by the Court is**
3 **the method of changing representation.** The purported withdrawal of attorneys is disallowed. [Emphasis added].
4

5   14. Exhibit 5 is a true and correct copy of the California Court of Appeals

6 case of <u>Vann v. Shilleh</u> (1975) 54 Cal.App.3d 192 that Debtor respectfully

7 requests that this Court take judicial notice of.

8   15. Exhibit 6 is a true and correct copy of the Amended Motion to

9 withdraw as attorney filed on 8-19-2019, just 3 days before the hearing to

10 withdraw. This was highly irregular and there was no showing of exigent

11 circumstances in support of the Ex Parte Application for an Order shortening

12 time. Furthermore, it is clear that the withdrawal was done at a critical juncture in

13 the litigation and that contrary to the assertions made in the motion, granting the

14 motion to withdraw without having the law firm prepare the opposition brief to the

15 Trustee's Conversion Motion, resulted in irreparable harm to both myself and my

16 LLC. Also, it is clear that my attorneys concealed the real reason for the dispute

17 between us, namely their attempt to unilaterally change the deal terms for the

18 sale of the Thomas Emerald by having $70 million instead of the agreed upon

19 $20 million transferred into their attorney-client trust account.

20   16. Exhibit 7 is a true and correct copy of my attorney's petition to

21 approve compensation. The relevant billing statements attached to this Exhibit

22 show that my lawyers billed time for reviewing the US Trustee's Motion to

23 convert, yet did not file the opposition to the US Trustee Motion as they promised,

24 which severely prejudiced my and my LLC's rights. Had that motion been filed, it

25 would not have been possible for the conversion to have occurred, and I would

26 not be in the predicament that I have been in since the illegal conversion order

27 made without the benefit of counsel, and without the benefit of the legal

28 opposition brief that my lawyers promised to file but never did before they were

**Declaration of Anthony Thomas ISO Reply to Rule 60(b)(4) MOTION**

1  allowed to withdraw from the case, a withdrawal that was done only 3 days

2  notice, in violation of both my personal as well as the LLC's due process and

3  constitutional rights.

4      Specifically, these billing statements show an entry for 5-6-2014 "Review

5  OUST motion to convert case to chapter 7 for not having insurance" Another

6  entry on 6-4-2014 "Review OUST motion to convert case to chapter 7 for not

7  having insurance" 7-15-2014 - 7-16-2014 more than $600 billed regarding the US

8  Trustee's Motions to convert.

9      The above facts show conclusively the prejudice that both myself and my

10  LLC suffered as a consequence of the void conversion order.  I therefore

11  respectfully request that my motion to vacate the void conversion order of 8-22-

12  2014 be granted.

13      I declare under penalty of perjury of the laws of the State of Nevada that

14  the foregoing is true and correct.

15

16  Dated: 8-26-2019.

                          Anthony G. Thomas

17                            Debtor In Propria Persona

18

19

20

21

22

23

24

25

26

27

28

8

**Declaration of Anthony Thomas ISO Reply to Rule 60(b)(4) MOTION**

# Exhibit 1

# Exhibit 1

BOX 545
GK-7

## RENTAL AGREEMENT

**SARASOTA VAULT DEPOSITORY, INC.**

640 S. Washington Blvd., Suite 175
Sarasota, FL 34236
(941) 954-9003

Tenant's Name _Anthony Thomas_

Address _____ Phone 408-640-2795

City _____ State _____ Zip _____

This rental agreement is made between Sarasota Vault Depository, Inc. (landlord) and _Anthony Thomas_ (Tenant)

Tenant hereby rents from the Landlord Box No. _545_ on a _year_ to _year_ basis beginning _5/23_ 20_08_. The rental agreement is automatically renewed until either the Tenant or the Landlord terminates the agreement, as outlined in Paragraph 3 & 5, of the agreement.

1. **Rent.** The rental rate is $ _1800._ per _year_, payable in advance on the first day of each rental month or period. The minimum initial rate period is one _year_; thereafter, automatic renewals are for periods of one, and there will be no refunds if the Tenant terminates prior to the last day of the final period. All fees are due the 1st day of the month due. If paid after the 7th a 10% penalty fee is due.

2. **Keys.** Landlord now delivers to Tenant two keys to the Box. Tenant agrees to immediately notify Landlord if either key is lost and will pay Landlord the cost of replacement and any repairs necessitated by forceful opening of the Safe Deposit Box door. A $30 key deposit for a regular account and a $75 deposit for anonymous account is required to assure the return of both keys. This key deposit will be refunded when Tenant returns both keys & signs out.

3. **Termination.** Tenant agrees that the only way Tenant can terminate this rental agreement is to empty the Box, return both keys, and sign out with no refund of the unused rent. Landlord reserves the right to terminate this agreement upon thirty- (30) days written notice to Tenant. Upon such notice the Landlord will refund the unused rent after Tenant empties the Box, returns both keys and signs out.

4. **Use and Occupancy.** All property kept, stored or maintained in Storage by Lessee shall be at Lessee's sole risk. Lessor not a warehouseman but merely leasing space to Lessee. Lessor shall not be liable for personal injuries, property damage or loss from theft, vandalism, fire, earthquake, flood, water, leakage, wind, rain, dampness, explosion, temperature change, freezing, humidity, leakage, vermin, insects, rodents, damage to or collapse of buildings, lawful seizure from any local, state, or federal agency or any other causes whatsoever, except for losses from occasioned by the willful acts of gross negligence of Lessor and then only up to a maximum of $ 100.00. Lessor carries no insurance, which in any way covers any loss that the Lessee may have or claims through this lease. Lessee should secure its own insurance to protect its property against all perils. Any Insurance, which may be carried by either party, shall be for the sole benefit of the party carrying such insurance. Each party hereby waives its right and the right of its insurer of subrogation against the other party. Tenant has full rights to privacy, and Landlord does not want to know the nature, quantity, quality or value of the Contents of the Box. Tenant agrees that the Contents placed in the Box will be non-hazardous, non-flammable and non-perishable. This agreement is not intended to, nor does it in any way, create a bailment between the parties except in accordance with paragraph 5.

5. **Enforcement.** Tenant understands and agrees that Landlord shall have a lien on the Contents for all rent and other charges due hereunder. Tenant will be in default of this agreement if Tenant fails to pay the rent or other charges when due. Landlord will have the right to deny Tenant access to the Box until the default is cured. If, after reasonable notice is mailed to Tenant, the default should continue for six (6) months past due, Landlord will have the right to force open the Box and remove the Contents which will become the property of the Landlord. Tenant will be responsible for the expenses incurred in the enforcement of the agreement.

6. **Insurance:** Tenant acknowledges that the Landlord does not have custody, and control of the Tenant's Contents and Landlord is Therefore not responsible for the Contents. Tenant accepts all risks or loss to his Contents, including the risk of fire, water, storm, theft, or default by the Tenant. Tenant agrees that he has been advised that no Insurance is carried by the Landlord on Tenants Contents, and that Tenant should Purchase Insurance through Tenants agent.

X _____ Acknowledgement by Tenant

7. **Co-Tenancy.** No one other then the Tenant will have access to the Box, unless the Tenant desires to have Co-Tenants. If more then one Tenant signs this agreement, each will be considered a Co-Tenant, and each Co-Tenant individually will have control of and access to the Box. Landlord will not require more then one Co-Tenant to sign in for access to the Box. Each Co-Tenant will individually have all the rights and obligations of the Tenant listed in this agreement. Each Co-Tenant will be allowed to name individually Co-Tenants. Landlord will consider each Co-Tenant to be the owner of all the Contents and in the event any Co-Tenant dies, the other Co-Tenant will have the right to withdraw all or any part of the Contents.

8. **Miscellaneous.** (a) Tenant agrees to notify Landlord of any change of address, Landlord shall not be held liable for any loss resulting from Tenants failure to notify Landlord as required in this agreement.
   (b) Landlord reserves the right to prevent the withdrawal of the Contents until any application State or Federal tax have been complied with.
   (c) This agreement is the complete agreement between Landlord and Tenant, and any modification must be made in writing and signed by both parties.

In Witness Whereof, this rental agreement has been duly executed this _23_ day of _May_ 20_08_ in _Sarasota_.

**SARASOTA VAULT DEPOSITORY, INC.**

By _____                    _____
Agent for Landlord                    Tenant's Signature

_____        _____    _____
Tenant's Approval of Co-Tenancy    Date    Co-Tenant's Signature

# Exhibit 1



## Underwriters Laboratories Inc. ®

Northbrook, IL    Santa Clara, CA
Melville, NY    Research Triangle Park, NC

A not-for-profit organization dedicated to public safety
and committed to quality service

File No: BP8617    CCN: CVSG
Service Center No:  313
Expires:  11/17/2009
Issued:  11/17/2004

# MERCANTILE

# BURGLAR ALARM SYSTEM CERTIFICATE

**THIS CERTIFIES** that the *Alarm Service Company* is included by Underwriters Laboratories Inc. (UL) in its *Directory* as qualified to use the *UL Listing Mark* in connection with the certificated *Alarm System*. This Certificate is the *Alarm Service Company's* representation that the *Alarm System* including all connecting wiring and equipment has been installed and will be maintained in compliance with requirements established by UL. This Certificate does not apply in any way to the installation of any additional signaling systems, such as; fire, smoke, waterflow, burglary, holdup, medical emergency, or otherwise, that may be connected to or installed along with the Certificated *Alarm System*. This Certificate does not apply in any way to the communication channel  between the protected property and any facility that  monitors signals from the protected property unless the use of a UL listed or  Classified Alarm Transport Company is specified on the Certificate.

**LIMITATION OF LIABILITY:** Underwriters Laboratories Inc. makes no representations or warranties, express or implied, that the *Alarm System* will prevent any loss by fire, smoke, water damage, burglary, hold-up or otherwise,or that the *Alarm System* will in all cases provide the protection for which it is installed or intended. UL may at times conduct inspections of the *Alarm Service Company* including inspections of representative installations made by it. UL does not assume or undertake to discharge any liability of the *Alarm Service Company* or any other party. UL is not an insurer and assumes no liability which may result directly or indirectly from inspection of the equipment, failure of the equipment, failure to conduct inspections, incorrect certification, nonconformity with requirements, failure to discover nonconformity with requirements, cancellation of the Certificate or withdrawal of the *Alarm Service Company* from inclusion in UL's *Directory* prior to the expiration date appearing on this Certificate.

**Alarm System Description:**

System 1 Type: Stockroom          Extent of Protection: 2          Quantity:  1

**Area Covered:** 1ST FLOOR

Notes:  Supervison and Monitoring of openings and closings not required or audited by UL.

*Protected Property:*

**SARASOTA VAULT DEPOSITORY**
**640 WASHINGTON BLVD**
**SUITE #175**
**SARASOTA, FL  34236**

# SN: MR41555521

*Alarm Service Company:*

**ADT SECURITY SERVICES INC**
**SUITE 102**
**6408 PARKLAND DR**
**SARASOTA FL  34243**

_____
Alarm Service Company's Representative

Date  *1- 18* , *05*

© 1998 UL

# Exhibit 1

## SECURITY FEATURES — SARASOTA VAULT Deposit

| | |
|---|---|
| , State | Sarasota, Florida |
| Elevation Above Sea Level | 22-feet, NON FLOOD ZONE AREA |
| Distance to Water | 1-mile to protected Intercoastal |
| Distance to Police Department | 2-City Blocks ONLY |
| Distance to Fire Department Less Than 1.5-Miles | YES |
| Zoned | Business District |
| Square Area | Approx 5,000-square feet |

### Exterior Construction Type

| | |
|---|---|
| Exterior Walls | 18"-thick, Steel Reinforced Concrete |
| Ceiling | 18"-thick, Steel Reinforced Concrete |
| Floor | 18"-thick, Steel Reinforced Concrete |
| Doors | Steel, Bullet Resistant LEXAN Glass |
| Locks | "dc" Electric Power, Battery Back-up |
| Glass | 1 1/4"-Bullet Resistant LEXAN Glass |

### Interior Construction Type

| | |
|---|---|
| Inner Vault Wall Areas | 18"-thick, Steel Reinforced Concrete |
| Interior Divider Walls | 1/2"-Drywall, 2x4 Construction |
| Main Access Vault Room Doors | 9-hr Bank Type Walk-Thru |
| Main Access Vault Room Door Locks | Combination Locks w/ Time Locks |
| Interior Doors | Solid Core Wood |
| Lighting | Fluorescent |
| Floor Covering | Painted Concrete or Carpet |
| Restrooms | (2) in Office Area |

### Individual Vault Construction

| | |
|---|---|
| Individual Vault Walls | 18"-thick, Reinf. Concrete or 3/8"-Steel |
| Individual Vault Doors | 3-hr Bank Type Walk-Thru or 3/8"-Steel |
| Individual Vault Door Locks | Single Comb. Lock Sets or Double-Keyed |

### Environmental Control System

| | |
|---|---|
| AC and Humidity Controls | YES |
| Multiple Zoned AC, Humidity and Hygrometers | YES |
| Temperature Monitored at | 72-Degrees |
| Humidity Monitored at | 55% |

### Burglar Alarm System

| | |
|---|---|
| Multiple Zone, Touchpad Arming, Battery Back-Up | YES |
| Infrared Motion Detectors | YES |
| Vibration Detectors | YES |
| Smoke-Heat Detectors | YES |
| 24-hr Monitoring by UL Listed Central Station | YES |
| Closed Circuit Video Sys w/ Time-Lapse VCR's | 16-Cameras |

### Fire Alarm System

| | |
|---|---|
| Smoke Detectors | YES |
| Rate of Rise Heat Detectors | YES |
| Manual Pull Stations | YES |
| 24-hr Monitoring by UL Listed Central Station | YES |
| Suppression Sprinkler System | YES, tied to Main Fire Alarm System |
| Fire Extinguishers Throughout | YES |
| Fire Hydrant On Premises | YES |

### Security Personnel

| | |
|---|---|
| Armed Guards On-Premise | YES, Class D, G and W License |
| Security Monitoring Room | YES, Manned During Operating Hours |

### Entry Procedures

| | |
|---|---|
| Interior Entry Man Trap | YES, Entry ONLY Thru Man Trap |
| Signature Card Required | YES |
| Photo ID Required | YES |
| ID Checked Before Entering | REQUIRED |
| Entrants MUST Surrender Drivers License-Passport | REQUIRED |
| Drive In Security Bay & Man Trap | YES |

**Exhibit 1**

# SARASOTA VAULT DEPOSITORY

## SAFEKEEPING   RECEIPT

### SAFEKEEPING CERTIFICATE NUMBER-SECURITY CODE:
### SVD*ATHOMEMERLLC*(1)-001

DEPOSITORY NAME: **Sarasota Vault Depository, Inc.**
ADDRESS: **640 Washington Blvd., Suite 175, Sarasota, FL 34236 USA**
OFFICER: **James Montoney, President**
TELEPHONE: **941-954-9003**                    FACSIMILE: **941-330-9583**

DATE OF ISSUE: **July 25, 2008**  DATE OF RELEASE: **Twelve (12) months**

We hereby confirm in accordance with our current lease agreement with our
client, **Anthony G. Thomas DBA AT Emerald LLC.** has deposited with us,
1 Emerald-in-Matrix (see attached list), and this Asset has been placed in our
custodial safekeeping vaults under the Safekeeping Certificate Number-
Security Number: **SVD*ATHOMEMERLLC*(1)-001.**

TOTAL NUMBER OF ITEMS: **One (1)**

TYPE OF ITEMS: **One Emerald-in Matrix weighing approximately 4200
grams (21,000 carats).**

CONDITION: **In accordance with Owner's Condition Report(Copy on file
in Depository).**

ITEM VALUE: **Based upon an appraisal (copy on file in Depository) for
the amount of Eight Hundred Million USD ($ 800,000,000 USD).**

With the authority and signature below, we stand ready to confirm safekeeping
by telephone or facsimile, to any inquiring bank, or authorized representative,
and will transfer this Original Safekeeping Certificate with written approval of
our Client.
For and on behalf of **SARASOTA VAULT DEPOSITORY, INC.**

_James Montoney, President_                    7/25/08
James Montoney, President                            Date

Public Notary

**Exhibit 1**

# Z ZURICH

# WARRANTY APPLICATION FOR JEWELERS BLOCK COVERAGE

The signing and delivery of this application does not obligate the applicant to purchase nor any insurance company to provide jewelers block coverage. However, this warranty shall be a basis for issuing jewelers block coverage. A signed copy of this proposal and any supplemental pages, when applicable, will become part of the policy.

## PLEASE COMPLETE FOR EACH SUBMISSION
### PART A - GENERAL INFORMATION

| | | |
|---|---|---|
| **1) First Named Insured: AT Emerald, LLC** | | |
| **2A) Mailing Address: 16255 Denali Drive** | | |
| **2B) City  Morgan Hill** | **2C) State  Ca** | **2D) Zip Code  95037** |
| **2E) Phone Number (408) 640-2795** | **2F) E-Mail Address  atemerald@gmail.com** | |

**2G) Business Type:** ☐ Corporation  ☒ Limited Liability Corporation  ☐ Limited Liability Partnership  ☐ Partnership ☐ Individual / Sole Proprietor

**3) Does the Applicant own any other Jewelry Businesses not included on this application?** ☐ Yes ☒ No

**3A) If yes, please explain why the coverage is not being submitted at this time:**

**4) Has any insurance company ever canceled, refused to issue, or refused to continue insurance of the type for which you are applying? (Missouri applicants are not required to answer this question.)**
☐ Yes ☒ No

**4A) If yes, please explain:**

**5) Year Business was established or acquired by current owner?** <u>2001</u>

**6) Percentage of sales: Retail** <u>N/A</u>%   **Wholesale** <u>N/A</u>%   **Manufacturing** <u>N/A</u>%

**7) Is Jewelers Block coverage for this Applicant currently written through the Agency?** ☐ Yes   ☒ No

**8) Is the Applicant a member of the Jewelers' Security Alliance?** ☐ Yes   ☒ No

**9) Principle/Executive Officer Information**

| Name | Title |
|---|---|
| Anthony G. Thomas | President |
| | |
| | |
| | |
| | |

9C5710 ED. 11-04                                    1

# Exhibit 1

# PLEASE COMPLETE FOR EACH SUBMISSION

**10) Prior Carrier Information**

| PRIOR CARRIER | PREMIUM |
|---|---|
| None | |
| | |
| | |
| | |
| | |

**11) Loss History - Please list any claims or occurrences that may give rise to a claims within the last 5 years**

| Date of Loss | Amount Paid | Description of loss |
|---|---|---|
| None | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

**11A) Please describe actions taken to minimize a reoccurrence of the above loss(es):**

N/A

**12) General Description/ Comments:**

**21,000 Carate Emerald**

9C5710 ED. 11-04                    2

# Exhibit 1

# PLEASE COMPLETE FOR EACH SUBMISSION

## PART B - POLICY LEVEL COVERAGES AND LIMITS

| | | |
|---|---|---|
| 1A) Property in transit (Shipping) by Armored Car | Limit $  N/A | Prior Year Total shipped Values $ _____ |
| 1B) Property in transit (Shipping) by Registered Mail *(Excess of $25,000 which is covered by USPS)* | Limit $  N/A | Prior Year Total shipped Values excluding amounts under $25,000 $ _____ |
| 1C) Property in transit (Shipping) by Federal Express (FedEx) | Limit $  N/A | Prior Year Total shipped Values $ _____ |
| 1D) Property in transit (Shipping) by United Parcel Service (UPS) | Limit $  N/A | Prior Year Total shipped Values $ _____ |
| 1E) Property in transit (Shipping) by Express Mail | Limit $  N/A | Prior Year Total shipped Values $ _____ |
| 1F) Property in transit (Shipping) by Courier # 1 Name of Courier #1: N/A | Limit $ _____ | Prior Year Total shipped Values $ _____ |
| 1G) Property in transit (Shipping) by Courier # 2 Name of Courier #2: N/A | Limit $ _____ | Prior Year Total shipped Values $ _____ |
| 2) Property in a safe or vault of a Bank, Trust, or Safe Deposit Company (NOT IN YOUR SAFE OR VAULT) Name of institution: | | Limit $  800 Million |
| 3) Property at the premises of another jewelry business (Coverage is secondary) | | Limit $  N/A |
| 4A) Property in the custody of employees, officers, principles or sales representatives while away from the described premises 4B) Number of employees who carry less than $25,000 while away from described premises:  N/A | | Limit $ _____ |

| 4C) Employees who carry $25,000 or more away from described premises | Name: 1)  N/A 2) _____ 3) _____ 4) _____ 5) _____ 6) _____ 7) _____ 8) _____ 9) _____ 10) _____ | Maximum limit for this person $ _____ $ _____ $ _____ $ _____ $ _____ $ _____ $ _____ $ _____ $ _____ $ _____ |
|---|---|---|

| 5) Deductible for the above coverages: ☐ $1,000   ☐ $2,500   ☐ $5,000   ☐ $10,000   ☐ $25,000   ☐ $50,000   ☒ $100,000 |
|---|

9C5710 ED. 11-04    3

# Exhibit 1

# PLEASE COMPLETE FOR EACH LOCATION

**PART C – LOCATION INFORMATION  LOCATION # _____**

| | | |
|---|---|---|
| **1) Street Address** | | |
| City | State | Zip Code |

**2) Usual Business Hours:**   Open - _____ ☐ AM ☐ PM    Close – _____ ☐ AM ☐ PM
☐ Appointment Only   ☐ Seasonal

**3) Does the Applicant share the premises with any other business:** ☐ Yes  ☐ No
If no, skip to question 4.

**3A) If Yes, please describe the other business(es) including name(s) and relationship to Applicant: (Please describe thoroughly.)**

**3B)  If yes, who controls entrances/exits, security, controls, and alarm system?**

**3C) If the Applicant shares the premises with any other business, does the Applicant have a separate safe with its own alarm?** ☐ Yes   ☐ No

**3D) If Yes, please describe the Alarm system:**

**3E) If No, please explain:**

**4) Minimum number of employees, officers or owners on premises at any time: _____  . If limit of coverage is less than $150,000, skip to question 5.**

**4A) Does the Applicant agree to have at least 2 employees on premises during business hours (including opening and closing)?** ☐ Yes  ☐ No

**5) Years in business at current location: _____**

**6A) How often does the Applicant perform a physical inventory?**
☐ Weekly   ☐ Monthly   ☐ Bi-Monthly   ☐ Quarterly   ☐ Semi-Annually   ☐ Annually   ☐ Never

| | | |
|---|---|---|
| **7) Date of last Physical Inventory** *(mm/dd/ccyy)*  _____  *(Include all Jewelry)* | **9A) Actual amount of Jewelry**  $ _____ | **DO NOT ROUND** |
| **8) Date of prior Physical Inventory** *(mm/dd/ccyy)*  _____  *(Include all Jewelry)* | **10A) Actual Amount of Jewelry**  $ _____ | **DO NOT ROUND** |

**9) Maximum total value of all jewelry during the last twelve (12) months on premises:**
$ _____

**10) Percentage of Merchandise with a value of less than $100 per item: _____%**

**11) During last 12 months: Estimated average daily amount of other people's jewelry in the Applicant's care, custody, or control on Applicant's property: $ _____**

**12) Does the Applicant maintain detailed records of other people's jewelry?** ☐ Yes   ☐ No

**13) During the last 12 months: Estimated average daily amount of memo/consignment jewelry on Applicant's property: $ _____**

**14) Any Loss Payees?** ☐ Yes   ☐ No  If yes, complete 14A – 14D. If no, skip to section D.

**14A ) Street Address of Loss Payee**

| | | |
|---|---|---|
| **14B) City of Loss Payee** | **14c) State of Loss Payee** | **14D Zip Code of Loss Payee** |

9C5710 ED. 11-04                                    4

# Exhibit 1

# PLEASE COMPLETE FOR EACH LOCATION

## PART D - COVERAGE AND LIMITS AT LOCATION # _____

| | |
|---|---|
| 1) Stock on premises (including property of others) | Limit $ _____ |
| 2.1) Amount to increase Stock Limit during Peak season(s)<br>Start Date *(mm/dd)* _____    Stop Date *(mm/dd)* _____    by | Limit $ _____ |
| 2.2) Amount to increase Stock Limit during Peak season(s)<br>Start Date *(mm/dd)* _____    Stop Date *(mm/dd)* _____    by | Limit $ _____ |
| 2.3) Amount to increase Stock Limit during Peak season(s)<br>Start Date *(mm/dd)* _____    Stop Date *(mm/dd)* _____    by | Limit $ _____ |
| 2.4) Amount to increase Stock Limit during Peak season(s)<br>Start Date *(mm/dd)* _____    Stop Date *(mm/dd)* _____    by | Limit $ _____ |
| 2.5) Amount to increase Stock Limit during Peak season(s)<br>Start Date *(mm/dd)* _____    Stop Date *(mm/dd)* _____    by | Limit $ _____ |
| 3) Deductible for the above coverages:<br>☐ $1,000  ☐ $2,500  ☐ $5,000  ☐ $10,000  ☐ $25,000  ☐ $100,000 | |

## PART E - DISPLAY WINDOW INFORMATION *(If coverage is desired)*

| | |
|---|---|
| 1) Number of Display Windows used for displaying jewelry for window shopping: _____ | |
| 1A) Are the windows made of burglary resistant (NOT laminated safety) glass? ☐ Yes    ☐ No | |
| 1B) Are there showcases inside the window? ☐ Yes    ☐ No | |
| 1C) Is there grillwork covering the windows at all time? ☐ Yes    ☐ No | |
| 1D) Highest Value in a single window during business hours | $ _____ |
| 1E) Total Limit for all window displays during business hours | $ _____ |
| 1F) Is coverage to apply during non business hours? ☐ Yes    ☐ No | |
| 1G) Highest value in a single window during non business hours? | $ _____ |
| 1H) Total Limit for all window displays during non business hours? | $ _____ |
| 1J) Deductible for the above coverages:<br>☐ $1,000  ☐ $2,500  ☐ $5,000  ☐ $10,000  ☐ $25,000  ☐ $50,000  ☐ $100,000 | |

## PART F - SHOW CASE INFORMATION

| |
|---|
| 1) Number of show cases inside premises: _____ |
| 2) Are showcases locked during business hours except when the show case contents are actually being removed or replaced? ☐ Yes    ☐ No |
| 3) What type of locks on each showcase? ☐ No Lock    ☐ Snap lock    ☐ Key Lock    ☐ Other<br>Describe if Other: _____ |

9C5710 ED. 11-04

# Exhibit 1

# PLEASE COMPLETE FOR EACH LOCATION

**PART G - ALARM INFORMATION LOCATION #** _____

| |
|---|
| **1) What type of surveillance is in operation at this location?**<br> ☐ Cameras   ☐ Closed Circuit TV (CCTY) – Monitoring Only<br> ☒ Closed Circuit TV (CCTY) – with Recording   ☐ No Surveillance |
| **2) Which of the following are in operation (select all that apply)**<br> ☐ Metal Roll-down Gates   ☐ Iron Gates or Bars   ☐ Locked Door Buzzer Entry   ☐ Man Trap<br> ☐ Bullet Proof Exterior Glass   ☐ Dedicated Armed Guard   ☐ Dedicated Unarmed Guard |
| **3) Does this location have a U/L BURGLAR ALARM CERTIFICATE with a certificate number beginning with 'MR' or 'BC'?**<br> ☐ Yes - Please complete question 4 (below)   ☐ No - Please complete question 5 (below) |

| 4) UL Certificate Number:<br>_____ | 4A) Certificate Expiration Date (mm/dd/ccyy)<br>_____ |
|---|---|

| |
|---|
| **4B) Alarm Service Company:** <u>ADT AND DEHART</u> |
| **4C) Premises – Extent of Protection**   ☐ 2   ☐ 3   ☐ 4   ☐ Not Shown |
| **4D) Safe #1 – Extent of Protection** ☐ Partial ☐ Complete ☐ Not Shown<br> **Safe #2** (*if applicable*) - Extent of Protection ☐ Partial   ☐ Complete ☐ Not Shown<br> **Safe #3** (*if applicable*) - Extent of Protection ☐ Partial   ☐ Complete ☐ Not Shown<br> **Safe #4** (*if applicable*) - Extent of Protection ☐ Partial   ☐ Complete ☐ Not Shown<br> **Safe #5** (*if applicable*) - Extent of Protection ☐ Partial   ☐ Complete ☐ Not Shown |
| **4E) Vault #1 – Extent of Protection** ☐ Partial ☐ Complete ☐ Not Shown<br><br> **Vault #2** (*if applicable*) - Extent of Protection ☐ Partial   ☐ Complete   ☐ Not Shown<br> **Vault #3** (*if applicable*) - Extent of Protection ☐ Partial   ☐ Complete   ☐ Not Shown<br> **Vault #4** (*if applicable*) - Extent of Protection ☐ Partial   ☐ Complete   ☐ Not Shown<br> **Vault #5** (*if applicable*) - Extent of Protection ☐ Partial   ☐ Complete   ☐ Not Shown |
| **4F) Alarm Transmission Method: (select all that apply)**<br> ☐ Broadband/Internet   ☐ Cellular   ☐ Derived Channel   ☐ Digital Communicator   ☐ Direct Wire<br> ☐ Multiplex   ☐ One-way Radio   ☐ Two-way Radio   ☐ Satellite   ☐ Other<br> Describe if Other: _____ |
| **4G) Line Security:** ☒ Standard   ☐ Not employed |
| **4H) Alarm Investigator Response:**<br> _____ Minutes   _____ Runner(s)   _____ With Keys   _____ Without Keys   ☐ Not Shown |

**Exhibit 1**

Location # _____

---

**5) Alarm Company** <u>ADT AND DEHART</u>

| | |
|---|---|
| **5A) Alarm Company Representative/Contact Name:** _____ | **5B) Phone Number** (_____) _____ |

**5C) Primary Method of Signal Transmission to Central Station:**
☐ Broadband/Internet  ☒ Cellular  ☒ Derived Channel  ☐ Digital Communicator  ☐ Direct Wire
☐ Multiplex  ☐ One-way Radio  ☐ Two-way Radio  ☐ Satellite  ☐ None  ☐ Other
Describe if Other_____

**5D) Backup Method of Signal Transmission to Central Station:**
☐ Broadband/Internet  ☒ Cellular  ☐ Derived Channel  ☐ Digital Communicator  ☐ Direct Wire
☐ Multiplex  ☐ One-way Radio  ☐ Two-way Radio  ☐ Satellite  ☐ None  ☐ Other
Describe if Other _____

**5E) Are Opening and Closing Signal supervised by the Central Station?** ☒ Yes  ☐ No

**5F) Are all accessible openings (doors and windows within 18 feet of the ground) protected by contact sensors?** ☒ Yes  ☐ No

**5G) If No, please explain:** _____

**5H) Please describe areas of the interior that are NOT protected by motion detectors:**
_____
_____
_____

**5I) What equipment is in operation on each safe?**
Safe #1 - ☒ Contact Sensors  ☐ Proximity Device/EVD  ☒ Motion Detector  ☐ None
Safe #2 (*if applicable*) - ☐ Contact Sensors  ☐ Proximity Device/EVD  ☐ Motion Detector  ☐ None
Safe #3 (*if applicable*) - ☐ Contact Sensors  ☐ Proximity Device/EVD  ☐ Motion Detector  ☐ None
Safe #4 (*if applicable*) - ☐ Contact Sensors  ☐ Proximity Device/EVD  ☐ Motion Detector  ☐ None
Safe #5 (*if applicable*) - ☐ Contact Sensors  ☐ Proximity Device/EVD  ☐ Motion Detector  ☐ None

**5J) What equipment is in operation on each vault?**
Vault #1 (*if applicable*) - ☒ Contact Sensors  ☐ Proximity Device/EVD  ☒ Motion Detector  ☐ None
Vault #2 (*if applicable*) - ☐ Contact Sensors  ☐ Proximity Device/EVD  ☐ Motion Detector  ☐ None
Vault #3 (*if applicable*) - ☐ Contact Sensors  ☐ Proximity Device/EVD  ☐ Motion Detector  ☐ None
Vault #4 (*if applicable*) - ☐ Contact Sensors  ☐ Proximity Device/EVD  ☐ Motion Detector  ☐ None
Vault #5 (*if applicable*) - ☐ Contact Sensors  ☐ Proximity Device/EVD  ☐ Motion Detector  ☐ None

**5K) Does the Applicant have a regular maintenance/service contract with the alarm company?**
☒ Yes  ☐ No

**5L) If yes, please indicate frequency of alarm inspection:**
☐ Weekly  ☐ Monthly  ☐ Bi-Monthly  ☐ Quarterly  ☐ Semi-Annually  ☐ Annually  ☐ Other
Describe if Other: _____

---

9C5710 ED. 11-04

7

**Exhibit 1**

# PLEASE COMPLETE FOR EACH LOCATION

## PART H - PREMISES VAULT INFORMATION LOCATION # <u>1</u>

1) Does this premises have one or more 'walk in' vaults? ☒ Yes ☐ No
If yes, please complete the following for each vault.

**VAULT #1**

**1A) Interior dimensions of the Vault**
Height: <u>12 Feet</u> inches          Width: <u>40 Feet</u> inches          Depth: <u>25 Feet</u> inches

**1B)** Thickness of walls (in inches):    ☐ 9in  ☐ 12in  ☒ 18in  ☐ 27in  ☐ Other _____
Reinforced with Reinforcing Bar (aka 'ReBar')? ☒ Yes  ☐ No

Thickness of floors (in inches):    ☐ 9in  ☐ 12in  ☒ 18in  ☐ 27in  ☐ Other _____
Reinforced with Reinforcing Bar (aka 'ReBar')? ☒ Yes  ☐ No

Thickness of ceilings (in inches):  ☐ 9in  ☐ 12in  ☒ 18in  ☐ 27in  ☐ Other _____
Reinforced with Reinforcing Bar (aka 'ReBar')? ☒ Yes  ☐ No

**1C) Construction of Vault**
☐ Modular          Manufacturers Name _____
                        U/L Class  ☐ M  ☐ 1  ☐ 2  ☐ 3
☐ Concrete Block
☒ Poured Concrete
☐ Other              Describe if 'Other'  _____
                                                    _____

**1D) Vault Door Information**
Name of Door Manufacturer:   **National Safe Corp.**
Burglary Rating:                       _____
Thickness of outer door
- excluding bolt work – (inches)   <u>1 ft. 4 inches</u>
Type of Relock device:             _____
Type of Time Lock device:        _____

**1E) What proportion of the total value of property on premises is stored in this vault during non business hours?** _____ %

9C5710 ED. 11-04                                    8

# Exhibit 1

# PLEASE COMPLETE FOR EACH LOCATION

**PART I - PREMISES SAFE INFORMATION:  LOCATION # _____**

---

**1)  Does this premises have one or more Safes?** ☐ Yes ☐ No
    If yes, please complete the following for each Safe.

---

**Safe #1:**

**1A)  Manufacturers Name _____**

---

**1B)  Burglary Rating:** ☐ TL15 ☐ TRTL30 ☐ TRTL15x6 ☐ TL30 ☐ TRTL30x6 ☐ None
    If None, Inner dimensions _____ Height _____ Width _____ Depth
        Outer dimensions _____ Height _____ Width _____ Depth    Weight (lbs) _____

---

**1C) Construction:** ☐ Steel ☐ Composite ☐ Other
    Describe if other _____

---

**1D) Percentage of total values of property on premises stored in this safe during non business hours:**
    _____%

---

**Safe #2:**

**1A)  Manufacturers Name _____**

---

**1B)  Burglary Rating:** ☐ TL15 ☐ TRTL30 ☐ TRTL15x6 ☐ TL30 ☐ TRTL30x6 ☐ None
    If None, Inner dimensions _____ Height _____ Width _____ Depth
        Outer dimensions _____ Height _____ Width _____ Depth    Weight (lbs) _____

---

**1C) Construction:** ☐ Steel ☐ Composite ☐ Other
    Describe if other _____

---

**1D) Percentage of total values of property on premises stored in this safe during non business hours:**
    _____%

---

**Safe #3:**

**1A)  Manufacturers Name _____**

---

**1B)  Burglary Rating:** ☐ TL15 ☐ TRTL30 ☐ TRTL15x6 ☐ TL30 ☐ TRTL30x6 ☐ None
    If None, Inner dimensions _____ Height _____ Width _____ Depth
        Outer dimensions _____ Height _____ Width _____ Depth    Weight (lbs) _____

---

**1C) Construction:** ☐ Steel ☐ Composite ☐ Other
    Describe if other _____

---

**1D) Percentage of total values of property on premises stored in this safe during non business hours:**
    _____%

---

9C5710 ED. 11-04                    9

# Exhibit 1

# PLEASE COMPLETE FOR EACH SUBMISSION
## PART J - WARRANTIES FOR PROPERTY ON ALL DESCRIBED PREMISES AT ALL TIMES DURING NON-BUSINESS HOURS

**Location #1**

1) What is the minimum percentage of property kept in safes or vaults:
      1A) With complete alarm protection? _____%
      1B) With partial alarm protection? _____%
      1C) Without alarm protection? _____%

2) For this location, what is the maximum percentage of property on premises not kept in a locked safe(s) or vault(s) _____%

**Location #2 *(if applicable)***

1) What is the minimum percentage of property kept in safes or vaults:
      1A) With complete alarm protection? _____%
      1B) With partial alarm protection? _____%
      1C) Without alarm protection? _____%

2) For this location, what is the maximum percentage of property on premises not kept in a locked safe(s) or vault(s) _____%

**Location #3 *(if applicable)***

1) What is the minimum percentage of property kept in safes or vaults:
      1A) With complete alarm protection? _____%
      1B) With partial alarm protection? _____%
      1C) Without alarm protection? _____%

2) For this location, what is the maximum percentage of property on premises not kept in a locked safe(s) or vault(s) _____%

**Location #4 *(if applicable)***

1) What is the minimum percentage of property kept in safes or vaults:
      1A) With complete alarm protection? _____%
      1B) With partial alarm protection? _____%
      1C) Without alarm protection? _____%

2) For this location, what is the maximum percentage of property on premises not kept in a locked safe(s) or vault(s) _____%

9C5710 ED. 11-04          10

# Exhibit 1



## Part K -- Fraud Warnings:

**Arkansas:** Any person who knowingly represents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in any application for insurance is guilty of a crime and may be subject to fines and confinement in prison.

**Colorado:** It is unlawful to knowingly provide false, incomplete, or misleading facts or information to an insurance company for the purpose of defrauding or attempting to defraud the company. Penalties may include imprisonment, fines, denial of insurance, and civil damages. Any insurance company or agent of an insurance company who knowingly provides false, incomplete, or misleading facts to a policyholder or claimant for the purpose of defrauding or attempting to defraud the policyholder or claimant with regard to a settlement or award payable from insurance proceeds shall be reported to the Colorado Division of Insurance within the department of regulatory agencies.

**Florida:** Any person who knowingly and with intent to injure, defraud, or deceive any insurer submits an application containing any false, incomplete, or misleading information is guilty of a felony of the third degree.

**Kentucky:** Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance containing any materially false information or conceals, for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime.

**New Jersey:** Any person who includes any false or misleading information on an application for an insurance policy is subject to criminal and civil penalties.

**New York:** Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime, and shall also be subject to a civil penalty not to exceed $5,000 and the stated value of the claim for each such violation.

**Ohio:** Any person who, with intent to defraud or knowing that he/she is facilitating a fraud against an insurer, submits an application or files a claim containing a false or deceptive statement is guilty of insurance fraud.

**Oklahoma:** WARNING: Any person who knowingly, and with intent to injure, defraud or deceive any insurer, makes any claim for the proceeds of an insurance policy containing any false, incomplete or misleading information is guilty of a felony.

**Pennsylvania:** Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information or conceals for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime and subjects such persons to criminal and civil penalties.

**All Other States:** Any person who knowingly includes any false or misleading information on an application for an insurance policy commits a fraudulent act and is subject to fines, imprisonment, or other criminal or civil penalties.

9C5710 ED. 11-04                                    11

**Exhibit 1**

# PLEASE COMPLETE FOR EACH SUBMISSION

**Part L - WARRANTIES:**

Each answer on this application shall constitute a warranty (representation in states that do not permit warranties) if a policy should be issued . The pricing of the policy is based upon the information provided by the Applicant on this application. If information provided to us by the Applicant is determined to be false/incorrect, the coverages provided by the policy will be considered null and void.

**Part M - APPLICANT'S STATEMENT:**

The undersigned has read and understands the information and statements in the application, has the authority to submit this application and hereby certifies that the information provided is correct/true.

Anthony G. Thomas

_____
**Applicant's Name (please print)**

_____
**Producer's Name (please print)**

_____
**Applicant's Signature**

_____
**Producer's Signature**

_____
**Title**

( )_____
**Contact Phone number**

_____
**Date**

_____
**Date**

9C5710 ED. 11-04

**Exhibit 1**

# PLEASE COMPLETE FOR EACH LOCATION

**PART G - ALARM INFORMATION LOCATION #** ____

| |
|---|
| **1) What type of surveillance is in operation at this location?**<br>Cameras   ~~Closed Circuit TV (CCTY) – Monitoring Only~~<br>(Closed Circuit TV (CCTY) – with Recording)   ~~No Surveillance~~ |
| **2) Which of the following are in operation (select all that apply)**<br>Metal Roll-down Gates   ~~Iron Gates or Bars~~   Locked Door Buzzer Entry   Man Trap<br>Bullet Proof Exterior Glass   Dedicated Armed Guard   ~~Dedicated Unarmed Guard~~ |
| **3) Does this location have a U/L BURGLAR ALARM CERTIFICATE with a certificate num<br>beginning with 'MR' or 'BC'?**<br>Yes  - Please complete question 4 (below)   No - Please complete question 5 (below |

| **4) UL Certificate Number:** | **4A) Certificate Expiration Date (mm/dd/** |
|---|---|
| | |

| |
|---|
| **4B) Alarm Service Company:** A D T   and Dehart |
| **4C) Premises – Extent of Protection   2   3   4   Not Shown** |

| |
|---|
| **4D) Safe #1 – Extent of Protection   Partial   Complete   Not Shown**<br>   Safe #2 *(if applicable)* - Extent of Protection   Partial   Complete   Not Shown<br>   Safe #3 *(if applicable)* - Extent of Protection   Partial   Complete   Not Shown<br>   Safe #4 *(if applicable)* - Extent of Protection   Partial   Complete   Not Shown<br>   Safe #5 *(if applicable)* - Extent of Protection   Partial   Complete   Not Shown |
| **4E) Vault #1 – Extent of Protection   Partial   Complete   Not Shown**<br><br>   Vault #2 *(if applicable)* - Extent of Protection   Partial   Complete   Not Shown<br>   Vault #3 *(if applicable)* - Extent of Protection   Partial   Complete   Not Shown<br>   Vault #4 *(if applicable)* - Extent of Protection   Partial   Complete   Not Shown<br>   Vault #5 *(if applicable)* - Extent of Protection   Partial   Complete   Not Shown |
| **4F) Alarm Transmission Method: (select all that apply)**<br>Broadband/Internet  (Cellular)(Derived Channel)  Digital Communicator   Direct Wire<br>Multiplex   One-way Radio   Two-way Radio   Satellite   Other<br>Describe if Other: ____ |
| **4G) Line Security:** (Standard)   Not employed |
| **4H) Alarm Investigator Response:**<br>____ Minutes ____ Runner(s) ____ With Keys ____ Without Keys   Not Show |

**Exhibit 1**

# PLEASE COMPLETE FOR EACH LOCATION

Location # _____

**5) Alarm Company** ADT and Dehart

| 5A) Alarm Company Representative/Contact Name: _____ | 5B) Phone Number ( ) _____ |

**5C) Primary Method of Signal Transmission to Central Station:**
Broadband/Internet  Cellular  Derived Channel  Digital Communicator   Direct Wire
Multiplex   One-way Radio   Two-way Radio     Satellite   None    Other
Describe if Other_____

**5D) Backup Method  of Signal Transmission to Central Station:**
Broadband/Internet  Cellular  Derived Channel   Digital Communicator   Direct Wire
Multiplex   One-way Radio    Two-way Radio    Satellite   None    Other
Describe if Other _____

**5E)** Are Opening and Closing Signal supervised by the Central Station?  Yes    No

**5F)** Are all accessible openings (doors and windows within 18 feet of the ground) protected by
sensors?  Yes    No

**5G)** If No, please explain: _____

**5H)** Please describe areas of the interior that are NOT protected by motion detectors:
_____
_____
_____

**5I)** What equipment is in operation on each safe?
Safe #1 -  Contact Sensors   Proximity Device/EVD   Motion Detector   None
Safe #2 (*if applicable*) - Contact Sensors   Proximity Device/EVD   Motion Detector   None
Safe #3 (*if applicable*) - Contact Sensors   Proximity Device/EVD   Motion Detector   None
Safe #4 (*if applicable*) - Contact Sensors   Proximity Device/EVD   Motion Detector   None
Safe #5 (*if applicable*) - Contact Sensors   Proximity Device/EVD   Motion Detector   None

**5J)** What equipment is in operation on each vault?
Vault #1 (*if applicable*) - Contact Sensors   Proximity Device/EVD   Motion Detector   None
Vault #2 (*if applicable*) - Contact Sensors   Proximity Device/EVD   Motion Detector   None
Vault #3 (*if applicable*) - Contact Sensors   Proximity Device/EVD   Motion Detector   None
Vault #4 (*if applicable*) - Contact Sensors   Proximity Device/EVD   Motion Detector   None
Vault #5 (*if applicable*) - Contact Sensors   Proximity Device/EVD   Motion Detector   None

**5K)**  Does the Applicant have a regular maintenance/service contract with the alarm company?
Yes    No

**5L)** If yes, please indicate frequency of alarm inspection:
Weekly   Monthly   Bi-Monthly   Quarterly   Semi-Annually   Annually   Other
Describe if Other: _____

**Exhibit 1**

-27-

# PLEASE COMPLETE FOR EACH LOCATION
## PART H - PREMISES VAULT INFORMATION LOCATION # 1

1) Does this premises have one or more 'walk in' vaults? (Yes)   No
   If yes, please complete the following for each vault.

**VAULT #1**

**1A) Interior dimensions of the Vault**
Height: 12  ~~inches~~ feet     Width: 40 ~~inches~~ Feet     Depth: 25 ~~inches~~ Feet

**1B)** Thickness of walls (in inches):     9in    12in    (18in)    27in    Other ____
Reinforced with Reinforcing Bar (aka 'ReBar')?   (Yes)   No

Thickness of floors (in inches):     9in    12in    (18in)    27in    Other ____
Reinforced with Reinforcing Bar (aka 'ReBar')?   (Yes)   No

Thickness of ceilings (in inches):     9in    12in    (18in)    27in    Other ____
Reinforced with Reinforcing Bar (aka 'ReBar')?   (Yes)   No

**1C) Construction of Vault**
Modular          Manufacturers Name ____
                 U/L Class    M    1    2    3

Concrete Block
(Poured Concrete)
Other            Describe if 'Other'    ____
                                        ____

**1D) Vault Door Information**
Name of Door Manufacturer:  National Safe Corp.
Burglary Rating:            ____
Thickness of outer door
-1  excluding bolt work – (inches)  1FF 4 in
Type of Relock device:      ____
Type of Time Lock device:   ____

**1E)** What proportion of the total value of property on premises is stored in this vault during
non business hours? _____ %

# Exhibit 1

**Exhibit 2**

**Exhibit 2**

M Gmail                                                    **Anthony Thomas <atemerald2@gmail.com>**

## AT Emerald

1 message

**Holly Estes** <estes@asmithlaw.com>                                Thu, Apr 3, 2014 at 2:08 PM
To: atemerald2@gmail.com, wendithomas6@gmail.com, mail@asmithlaw.com

Tony,

I spoke with Beach's counsel today and they would like for us to enter into the attached proposed stipulation. My proposed changes are in red and are subject to proof of the note, security agreement, UCC-1 filings, and calculation on the $540,000.00 pre-petition claim amount. Bill Cossitt, the attorney for the office of the united states trustee sent me an email stating that if we did not insure the emerald, they would be filing a motion to dismiss the case. It is imperative that you take a trip to Florida to all Mr. Beach, his Florida counsel and his gemologist to inspect the emerald. I believe that it will give us the best position to oppose Bill Cossitt's motion. Mr. Beach's counsel has stated that if they are able to inspect the emerald and ensure that the vault is safe, they will side with us in opposing Bill Cossitt's motion to dismiss for lack of insurance. Counsel for Mr. Beach are speaking with him about him paying for your airfare, hotel and an allowance for your trip to Florida, so that there is a zero net financial effect of you taking this trip for his benefit. Please advise when you would be able to take this trip, and what additional consideration if any you would require in order to make it. Please review the attached stipulation as well.

Best,

## *Holly E. Estes, Esq.*

*Law Offices of Alan R. Smith*

*505 Ridge Street*

*Reno, NV 89501*

*Telephone: (775) 786-4579*

*Facsimile: (775) 786-3066*

*Email: estes@asmithlaw.com*

*The information contained in this email is information protected by the attorney-client or the attorney work product privilege. It is intended only for the individual(s) named above and the privileges are not waived by virtue of this message having been sent via electronic mail. If the person actually receiving this email or any other reader of the email is not the named recipient or the employee or agent of the named recipient, any use, dissemination, distribution or copying of the communication is strictly prohibited. If you have received this communication in error, please immediately notify the sender by telephone or email and destroy all versions of this email. Thank you.*

## Exhibit 2

**Subject:** AT Emerald
**From:** "Holly Estes" <estes@asmithlaw.com>
**Date:** 5/12/2014 9:31 AM
**To:** <ars@asmithlaw.com>, <atemerald2@gmail.com>, <wendithomas6@gmail.com>, <mail@asmithlaw.com>

Tony and Wendi,

Can you please give me an update on any potential purchase offers on the emerald and on the trip to Florida. I need to know when the trip will take place as well as any imminent potential sales. I have to draft a reply to the US Trustee's Motion to Convert this case to a case under Chapter 7 of the bankruptcy code tomorrow. (See Motion attached hereto). As I have discussed earlier, we want to stay in control of the sale of the emerald. If this case is converted, a Chapter 7 trustee will be appointed and be in control of liquidating the emerald.

Best,

*Holly E. Estes, Esq.*
*Law Offices of Alan R. Smith*
*505 Ridge Street*
*Reno, NV 89501*
*Telephone: (775) 786-4579*
*Facsimile: (775) 786-3066*
*Email: estes@asmithlaw.com*

*The information contained in this email is information protected by the attorney-client or the attorney work product privilege. It is intended only for the individual(s) named above and the privileges are not waived by virtue of this message having been sent via electronic mail. If the person actually receiving this email or any other reader of the email is not the named recipient or the employee or agent of the named recipient, any use, dissemination, distribution or copying of the communication is strictly prohibited. If you have received this communication in error, please immediately notify the sender by telephone or email and destroy all versions of this email. Thank you.*

Attachments:

Mot Convert [DE 27] 043014.pdf                                          424 KB

# Exhibit 2

**Subject:** FW: 21,000 Carat Thomas Emerald Matrix
**From:** "Holly Estes" <estes@asmithlaw.com>
**Date:** 7/11/2014 3:48 PM
**To:** <ars@asmithlaw.com>, <atemerald2@gmail.com>, <mail@asmithlaw.com>

Tony,

The Order on the Motion to Sell the Thomas Emerald has been withdrawn. It has not been posted to the docket, and it is not, and never has been, a part of the public record.

At the hearing on our Motion to Sell, which you attended, Wayne Silver objected to the sale motion. He stated that several of the time periods for the parties to perform conditions in the original purchase and sale agreement had expired. You heard me state to the court that because several of the time periods set forth in the original purchase and sale agreement have passed, and performance has not occurred, that I would draft an addendum to the original purchase and sale agreement to remedy the timing issues.

After the sale hearing you and I spoke and you requested that I draft the addendum to the purchase and sale agreement, and requested for me to send it to you asap. Pursuant to our discussion, I drafted an addendum to the original purchase and sale agreement. The only changes to the original PSA were the dollar amount to be turned over to our firm's trust account ( originally $20,000,000.00, and now $70,000,000.00), and extension of the deadlines for the parties to perform the conditions under the original purchase agreement (many, if not all, of which had already expired).

I sent you an email with the addendum and the original PSA for your review and approval. You failed to provide me any comment or requested changes to the addendum. Apparently, you reviewed and forwarded the addendum on to David Clarke. I do not have Mr. Clark's email and contact information, and I have never sent him the addendum. If you believed the addendum was incorrect, or that there should have been changes made prior to Mr. Clarke reviewing the same, you should have brought those requested changes to my attention in advance of you sending the addendum on to Mr. Clarke. Any problems caused by the addendum were caused by your, not our, communication with Mr. Clarke.

I have reviewed Mr. Clarke's email below and I am confused as to what he is alleging. If you review both the original purchase and sale agreement and the addendum, you will both see that the only changes are what I have set forth above: (1) a change in the dollar amount to be turned over to our firm's trust account (change from $20,000,000.00 to $70,000,000.00)(this change does not affect the purchaser in any way), and (2) extension of expired deadlines for performance. Accordingly, my addendum is exactly consistent with the parties original intent and the spirit of the original purchase and sale agreement. Frankly, I do not care if they perform under the original purchase and sale agreement, or sign the addendum, so long as they perform. To be clear, the addendum is necessary to have an existing and valid contract because several of the deadlines in the original purchase and sale agreement have expired. As we had discussed previously, this is why it is a good idea to have the purchaser sign the addendum, so that we have a valid and binding purchase agreement. Again, purchaser performance is the main goal here, and all of our firm's efforts have been consistent with that goal.

We request that you call our office asap to set up a meeting for Monday, July 14, 2014, to discuss the tone of your email and our further representation in your cases.

*Holly E. Estes, Esq.*
*Law Offices of Alan R. Smith*
*505 Ridge Street*
*Reno, NV 89501*
*Telephone: (775) 786-4579*
*Facsimile: (775) 786-3066*

**Exhibit 2**

*Email: estes@asmithlaw.com*

***The information contained in this email is information protected by the attorney-client or the attorney work product privilege. It is intended only for the individual(s) named above and the privileges are not waived by virtue of this message having been sent via electronic mail. If the person actually receiving this email or any other reader of the email is not the named recipient or the employee or agent of the named recipient, any use, dissemination, distribution or copying of the communication is strictly prohibited. If you have received this communication in error, please immediately notify the sender by telephone or email and destroy all versions of this email. Thank you.***

**From:** Anthony Thomas [mailto:atemerald2@gmail.com]
**Sent:** Friday, July 11, 2014 8:42 AM
**To:** Alan Smith; Holly Estes
**Subject:** Fwd: 21,000 Carat Thomas Emerald Matrix

Dear Alan and Holly, you have officially jeopardized the sale of that Thomas emerald see the attached email. I am instructing you to retract the application order that your firm submitted to the court on July 9th or 10th your firm did this without my consent or knowledge and you've officially jeopardize the sale of the Emerald and I will hold you fully responsible if the sale does not go through, all terms of the signed sales agreement and the court approval were being executed to the T until you interfered. Holly told me yesterday at 5pm that the judge has not signed the application order,you must immediately go in and retracted the application order before you cause any more harm to the sale of the Emerald. this is at least the fourth error your firm has made in regards to my bankruptcy. Your firm wrote the agreement that was submitted to the buyer and was approved buy you and Holly before you let me sign it and then it was approved by the bankruptcy court any changes should have been made at that time not after it was accepted by the buyer and court approved. I want to know today what your plan is to remedy the situation and if you were successful in retracting the application order that you submitted.
Regards
Tony

---------- Forwarded message ----------
From: "David Charles Clarke" <koyostcasia@gmail.com>
Date: Jul 11, 2014 5:27 AM
Subject: 21,000 Carat Thomas Emerald Matrix
To: "Anthony Thomas" <atemerald2@gmail.com>

Dear Mr. Thomas

STRICTLY PRIVATE AND CONFIDENTIAL

I am in receipt of your communication of the 10th July 2014 relating
to the sale and purchase of the  21,000 carat Thomas Emerald Matrix
the contents of which have been duly noted.
Subsequently I have talked to my Chairman who has categorically refused to accept your lawyer's latest proposed  amendments to the
original Sales and Purchase Agreement.
Furthermore I am to officially place on record that your Lawyer's proposed
amendments are a direct contradiction to the content and spirit of the court approved sales and purchase agreement already legally ratified approving engagement and obligation of the both the participating parties being Seller and Buyer alike.

**Exhibit 2**

Therefore please be advised unless the Sales and Purchase Agreement can be fulfilled strictly under the terms and conditions of the original agreement Koyo Shipping and Trading Corporation will reluctantly be forced to withdraw from any further interest in purchasing the Thomas Emerald Matrix.

Please accept this e-mail as formal notice and for your file purposes hard copy will be supplied in due course.

Yours sincerely

David C Clarke
Finance Director
Koyo Shipping & Trading Corporation

**Exhibit 2**

**-34-**

# Exhibit 3

# Exhibit 3

# THE WALL STREET JOURNAL.

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers visit http://www.djreprints.com.

https://blogs.wsj.com/bankruptcy/2014/06/30/giant-emerald-for-sale-after-owner-loses-battle-for-an-even-bigger-one/

BANKRUPTCY BEAT

# Giant Emerald for Sale After Owner Loses Battle for an Even Bigger One

*By Katy Stech*
Jun 30, 2014 12:32 pm ET

A Nevada man who once tried—unsuccessfully—to prove that he owned the world's biggest emerald is putting a gem that he actually owns on the block: a 21,000-carat emerald that's locked in a Florida vault.



Anthony Thomas, who filed for bankruptcy in March after losing his battle for the 840-pound Bahia Emerald, has already found a buyer for his 50-pound emerald.

This 2008 file photo provided by the Los Angeles County Sheriff's Department shows the so-called Bahia Emerald.
*ASSOCIATED PRESS*

But Mr. Thomas's financial problems are a side story in the scarcely believable history of the Bahia Emerald, which has torn friends apart, sat underwater after Hurricane Katrina and kept teams of lawyers busy in court fighting over who owns it.

Not Mr. Thomas, a state judge recently determined.

In court papers, Mr. Thomas said his smaller emerald is worth more than $200 million but refused to say how much the potential buyer has offered. His lawyers, who did not return several messages, blacked out the purchase price in the five-page sale agreement filed to the U.S. Bankruptcy Court in Reno.

8/13/2019 5:34 P

**Exhibit 3**

-36-

"Disclosure of the actual purchase price for the emerald poses a risk to my family and I," Mr. Thomas said in court papers.

The proposed buyer, Koyo Shipping And Trading Corp., could not be reached either.

Mr. Thomas said the sale money will be enough to pay off their more than $6.3 million in debt, including a 2007 loan for smartcard-technology company that he managed and that no longer exists. Mr. Thomas said that he and his wife are unemployed.

Mr. Thomas is one of many people who have claimed ownership of the Bahia Emerald since it was discovered in Brazil in 2001. The gem, which is rumored to have protruding shards of forest green gem as round as "a man's thigh," once appraised for $925 million.

Mr. Thomas was in Sao Paulo shortly after the discovery to look for emeralds that could be used as collateral to borrow money for businesses. He said he bought the Bahia Emerald for $60,000, but the gem never arrived in the mail.

Mr. Thomas shrugged it off as local corruption and later heard that it had been jackhammered into pieces.

In reality, the gem's journey---as told by National Geographic---included a stint at an abandoned gas station in California and another spell somewhere in New Orleans where it sat submerged after the 2005 hurricane. It was also involved in a $197 million banking deal with Bernard Madoff. However, Mr. Madoff was arrested just two days before the transaction was to be completed.

Mr. Thomas reentered the picture in 2008 when he heard the Los Angeles County Sheriff's department had the emerald. In the lawsuit he filed to claim it, Mr. Thomas argued that the sale papers that proved he bought it for $60,000 had burned down in a 2006 house fire.

At least two judges haven't believed Mr. Thomas's tale.

Mr. Thomas and his wife, Wendi, filed for bankruptcy on March 4, near the end of the ownership dispute. Several weeks before the filing, a Los Angeles judge ruled that Mr. Thomas didn't own the Bahia Emerald, but Mr. Thomas's lawyer said he needed time to look for any legal options that remained. When a person files for bankruptcy, his or her legal disputes is usually stayed.

So who owns the Bahia Emerald? That's still unclear.

*Write to Katy Stech at katy.stech@wsj.com. Follow her on Twitter at @KatyStech.*

8/13/2019 5:34 PM

**Exhibit 3**

**Correction**: An earlier version of this post incorrectly stated that the Bahia emerald weighs 600 pounds. It weighs about 840 pounds.

**Share this:**  http://on.wsj.com/1z2tmiR

Copyright ©2017 Dow Jones & Company, Inc. All Rights Reserved

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers visit http://www.djreprints.com.

**Exhibit 3**

8/13/2019 5:34 P

# Exhibit 4

# Exhibit 4

**107 F. Supp. 397**

**LASKOWITZ et al.**
**v.**
**SHELLENBERGER et al.**

**No. 12258-T.**

**United States District Court S. D. California, C. D.**

**September 27, 1952.**

TOLIN, District Judge.

The Court is asked to permit withdrawal of R. Welton Whann, Esq., John C. Allen, Esq., and Robert M. McManigal, Esq. as attorneys for Craft Furniture Mfg. Co., a corporation. They are the only attorneys of record for said defendant. The case is at issue.

Said defendant consents to the withdrawal by a document bearing its seal filed with the Court. The Court does not consent to the withdrawal of attorneys. Approval would leave a corporate defendant without representation. Even if a defendant assumes to represent himself, he must either enter his first appearance in the case *in propria persona* or be substituted for whoever appeared as his attorney. Defendant appropriately does not offer to do this because, being a corporation, it is without capacity to either represent others or itself.

For authorities discussing the principles involved, see cases cited to support the following quotation from Cal.Jur. Ten Year Supplement, 1949, Revision, Vol.

[107 F. Supp. 398]

9, Sec. 15, p. 448, where the applicable rules are stated as follows:

> "Since a corporation cannot practice law, and can only act through the agency of natural persons, it follows that it can appear in court on its own behalf only through a licensed attorney. It cannot appear by an officer of the corporation who is not an attorney, and may not even file a complaint except by an attorney, whose authority to appear is presumed; in other words, a corporation cannot appear *in propria persona*. A judgment rendered in such a proceeding is void."

In any event a withdrawal of attorneys is not the proper course. A substitution of attorneys approved by the Court is the method of changing representation. The purported withdrawal of attorneys is disallowed.



**Exhibit 4**

# REPORTS OF CASES

### DETERMINED IN

# THE COURTS OF APPEAL

### OF THE STATE OF CALIFORNIA

---

DECEMBER 23. 1975. TO JAM ARY 30. 1976

---

**ROBERT E. FORMICHI**
*Reporter of Decisions*

---

# VOLUME 54 - 3d

**San Francisco**
BANCROFT-WHITNEY COMPANY
**1976**

**Exhibit 5**

HEADNOTES

**Classified to California Digest of Official Reports, 3d Series**

**(la, lb) Continuance § 2—Grounds—Discretion.**—In a breach of contract action against a corporation and its individual shareholder, in which defendants' attorney withdrew from the case on the Friday preceding a Monday court date, based on the individual defendant's refusal to accept the settlement negotiated by the attorney, the trial court abused its discretion in denying defendants' motion for continuance to retain an attorney, where defendants did not know the attorney would withdraw from the case and had no time to procure a new attorney over the weekend, and where the trial court made no effort to analyze the situation in which the individual defendant found himself, but based its denial on a policy against continuances, without considering whether the case before it justified a departure from that salutary policy.

> [See **Cal.Jur.3d,** Actions, § 179; **Am.Jur.2d,** Continuance, § 13.]

**(2)  Continuance § 1—Discretion.**—A denial of a request for a continuance constitutes an abuse of discretion where the ruling is arbitrary, capricious, and contrary to the interests of justice under all the circumstances.

**(3)  Continuance § 2—Grounds—Substitution of Counsel.**—While a litigant may not demand a continuance by engaging counsel just prior to a trial date without a showing of any necessity for change of counsel, a necessary substitution of counsel just prior to trial may justify the granting of a continuance.

**(4)  Attorneys at Law § 16—Attorney-Client Relationship—Substitution of Attorneys and Termination of Relationship.**—The right of counsel to withdraw from pending litigation is not absolute. Accordingly, the withdrawal of an attorney representing a corporation and an individual in a breach of contract action, who withdrew on the Friday preceding a Monday court date, on the ground of the individual defendant's refusal to accept a settlement negotiated by the attorney, was not ethical and constituted an improper abandonment of his client.

**(5)  Corporations § 46—Actions by and Against Corporations—Representation by Counsel.**—In a breach of contract action against a corporation and its individual shareholder, in which the attorney

[Dec. 1975]

**Exhibit 5**

representing defendants improperly withdrew from the case on the Friday preceding a Monday court date, and the trial court denied defendants' motion for a continuance to engage a new attorney, it was error for the trial court to compel the individual defendant to represent the corporate defendant in the action, as a corporation cannot represent itself in court, either in propria persona or through an officer or agent who is not an attorney. Furthermore, the court's action in permitting the individual defendant to appear in propria persona could not be justified by the fact that the court later found the individual defendant to be the alter ego of the corporation, where the individual defendant was allowed to act in such capacity for the corporation prior to the time the court examined the issue of whether he was the alter ego of the corporation.

**(6)  Constitutional Law § 102—Due Process—Counsel in Civil Proceedings.**—There is a constitutional basis for the right to counsel in noncriminal proceedings and, in its narrowest definition, it is the right to appear by counsel in any adversary proceeding in which the adversary party has the benefit of the right to counsel.

---

Counsel

Philip Mirecki for Defendants and Appellants.

James A. Irwin and Mark A. Treadwell for Plaintiffs and Respondents.

---

Opinion

**KINGSLEY, Acting P. J.**—Defendants Shilleh and Savoir Parking Service, Inc. (Savoir) appeal from a judgment against them, entered after a trial by the court in an action for breach of contract. The sole ground urged for reversal is that the trial court compelled the defendants to appear by defendant Shilleh, a nonlawyer, appearing in propria persona and refused to grant defendants a continuance to secure new counsel. For the reasons set forth below, we reverse the judgment.

> Respondents Vann and Cutter filed a complaint against appellants, Shilleh and Savoir, on July 18, 1972. Appellants answered their

[Dec. 1975]

**Exhibit 5**

complaint with counsel identified as "The Law Office of Max Fink." Trial was set for August 19, 1974. Attorneys for both sides began settlement negotiations.

On August 16, 1974, the Friday before the Monday set for trial, a form entitled "Substitution of Attorneys" executed by appellants Shilleh and Savoir, and Law Offices of Max Fink, by R. Stephen Duke was filed with the court clerk.

The circumstances leading to the substitution were as follows: On the Thursday night preceding trial, defendant telephoned his attorney to refuse to accept the settlement agreement that the two opposing attorneys had worked out. The next day, August 16, Friday, the attorney substitution was filed and, according to respondents' own language, defendants' attorney, Stephen Duke, "withdrew from the case by permission of the court." Respondents also alleged that the reason that defendants' attorney, Stephen Duke, withdrew from the case was that defendants were dilatory in "withdrawing from the agreement" that both counsel had worked out to settle the case. After trial, the court stated in its findings of fact and conclusions of law that defendant Shilleh appeared in propria persona "after the motion of attorney Stephen Duke to withdraw from the case was granted by the court."[1]

On August 19, the following Monday morning, the matter was called for trial. Defendant Shilleh did not appear in court the morning of trial and Mr. Duke moved for a continuance before Judge Stothers, in Department SW "A" so that Mr. Shilleh could get a new attorney. Mr. Duke stated that defendant could not "get a new attorney in an hour or two hours' time."

Counsel for the plaintiffs also asked for a continuance, on the ground that he reasonably had assumed that the case was to be settled and, therefore, was not fully prepared for trial. The trial court refused the request for a continuance made on Shilleh's part, saying:

"**THE COURT:** Counsel, 1 appreciate your concern for your former client. However, the Court, as I have indicated, operates under the policy of no continuance, and, in addition to that, your man, your former client, has been apprised of the date of this trial and I see no grounds for him to continue this matter merely by failing to appear and substituting on the

---

[1]Mr. Shilleh had declared that his attorney told him that he was going to ask to be relieved as his attorney just preceding the day the case was to be tried.

[Dec. 1975]

**Exhibit 5**

morning of trial. Anyone can get a continuance under that theory. We cannot proceed in that manner; otherwise, our calendar would very shortly be in a horrible mess, and it's in excellent condition due to the fact that we've had to take a hard line on these continuances." He also denied the plaintiffs' request for a substantial continuance but did allow them one hour to prepare for trial.

When the case was called for trial, an hour later, before a different judge (Judge Kennedy) in a different department, defendant Shilleh was present. He requested a continuance to get a new attorney and that request was peremptorily denied.[2]

Trial was held on August 19 by a judge without a jury. Appellant acted as his own attorney. The trial court found that appellant corporation, Savoir Parking Service, Inc., was the alter ego of appellant Shilleh, and that appellants owed respondents $10,876.85 for breach of contract. The defendants' cross-complaint was dismissed. Defendants filed a notice of appeal.

I

(1a) Appellants argue that the superior court abused its discretion by denying defendants' motion for continuance to retain an attorney.

We agree. (2) A denial of a request for a continuance constitutes an abuse of discretion where the ruling is arbitrary, capricious, and contrary to the interests of justice under all the circumstances. *(Kalmus v. Kalmus* (1951) 103 Cal.App.2d 405 [230 P.2d 57].) (3) It cannot be held that litigants in all cases may demand a continuance by engaging counsel just prior to a trial date, where there is no showing of any necessity for any change of counsel, but a necessary substitution of counsel just prior to trial may justify the granting of a continuance, in some cases. *(Berger v. Mantle* (1936) 18 Cal.App.2d 245 [63 P.2d 335].) (1b) For reasons we shall discuss, the facts before us justified the granting of a continuance.

---

[2]"MR. SHILLEH: I am here to ask for a continuance because I have to get another attorney.

"THE COURT; All right. Was that taken up in Department A this morning?

"MR. MORGAN: Yes, Your Honor. The former attorney for Mr. Shilleh presented an argument for a continuance at that time, and it was denied, and the court ordered that we be prepared to go to trial at 1:30.

"THE COURT: Very well. The motion is denied."

[Dec. 1975]

# Exhibit 5

In the case at bench, by respondents' own admission, appellants' attorney withdrew from the case. Plaintiffs contend that the withdrawal by Mr. Duke, on the eve of trial, was due to the fact that Mr. Shilleh had been dilatory in communicating his rejection of the negotiated settlement and had, thus, "acted in bad faith." The record does not support that allegation. All that appears in the record before us is the following statement by Mr. Duke.

"The circumstances are this, Your Honor: As Mr. Morgan indicated, we thought we had the case settled and I negotiated in good faith based upon Mr. Shilleh's acceptance at one point. And then he called me late Thursday to say he rejected the settlement. He just felt he could not accept it—"

(4) The right of counsel to withdraw from pending litigation is not absolute. Although Mr. Duke may well have been irked to see a settlement that he had negotiated fail of consummation, his withdrawal, for that personal reason on the very eve of trial was not ethical. Subdivision (2) of rule 2-111 of the Rules of Professional Conduct provides: "(2) In any event, a member of the State Bar shall not withdraw from employment until he has taken reasonable steps to avoid foreseeable prejudice to the rights of his client, including giving due notice to his client, allowing time for employment of other counsel, delivering to the client all papers and property to which the client is entitled, and complying with applicable laws and rules."[3]

It was the duty of the trial court to see that Mr. Shilleh was protected, so far as possible, from the consequences of Mr. Duke's improper abandonment of his client.

Where an attorney withdraws from a case the Friday before the Monday morning of a trial, the party ordinarily does not have sufficient time to procure counsel, and unless the party actually had sufficient advance warning that his attorney intended to withdraw, the circumstances justified granting a continuance. It has been held that where a party has stated his case to his attorney and the attorney doesn't show up because of an illness in the family, and the party first ascertains this fact on the morning of the day of trial, and he cannot procure oth^r counsel, a continuance should be granted. *(Thompson* v. *Thornton* (1871) 41 Cal.

---

[3]Although rule 2-111 did not come into force until after the events herein involved, it states a long-accepted principle of professional conduct. (See rule 2-110(A)(2) of the Disciplinary Rules of the American Bar Association.)

[Dec. 1975]

**Exhibit 5**

626.) Although it is true that a party cannot substitute himself in propria persona and also insist on a continuance *(Agnew* v. *Parks* (1963) 219 Cal.App.2d 696 [33 Cal.Rptr. 465]), in the case at bar it is clear that appellant did so by necessity after his attorney withdrew and a request for a continuance was denied.

The cases cited us by counsel and disclosed by our own research in which a denial of a continuance was upheld, do not negate our position that the continuance should have been granted here.

Although *Flynn* v. *Fink* (1923) 60 Cal.App. 670 [213 P. 716] held that a litigant does not have an absolute right to change his counsel and get a continuance, the attorneys there were substituted five days before trial and the case implies that the litigant sought the substitution of attorneys. In the case before us the attorney sought to withdraw, and it does not appear that the litigant wanted to change his counsel.

In *Maynard* v. *Bullis* (1950) 99 Cal.App.2d 805 [222 P.2d 685], the attorney withdrew from trial months before the trial date, and even though plaintiff consulted eight attorneys who refused to take the case, the plaintiff in that case had ample time to procure counsel. In *Fejer* v. *Paonessa* (1951) 104 Cal.App.2d 190 [231 P.2d 507], the defendant also had "ample time to employ counsel who could have familiarized themselves with the case." In *Agnew* v. *Parks, supra,* (1963) 219 Cal.App.2d 696, plaintiff herself told the judge a full week in advance that her attorney was unavailable, and plaintiff knew months before that the attorney whom she wanted refused the case.

In *Estate of Dargie* (1939) 33 Cal.App.2d 148 [91 P.2d 126], the facts are also distinguishable because in the *Dargie* case the newly changed counsel had a general knowledge of the matter before the court. In *Estate of Bollinger* (1905) 145 Cal. 751, 752 [79 P. 427], "appellant had been given every opportunity to employ counsel if he so desired."

All the above cases are to be distinguished from the case before us, because, in the instant case, appellant did not know his attorney would withdraw from the case prior to the preceding Thursday night or Friday before a Monday court day, and he had no time to procure a new attorney over the weekend.

As we have indicated, the presiding judge made no effort to analyze the situation in which Mr. Shilleh found himself. The denial by Judge

[Dec. 1975]

**Exhibit 5**

Stothers was peremptory and based solely on a policy against contin-uances, without considering whether the case before it justified a departure from that salutary policy. Defendant was entitled to the exercise of an informed discretion; the record does not evidence any attempt to exercise any discretion.

## II

**(5)** Appellants argue that Savoir, a corporation, was improperly forced to appear in propria persona. We agree. A corporation cannot represent itself in court, either in propria persona or through an officer or agent who is not an attorney. (*Paradise* v. *Nowlin* (1948) 86 Cal.App.2d 897 [195 P.2d 867]; *Himmel* v. *City Council* (1959) 169 Cal.App.2d 97 [336 P.2d 996].) Under these circumstances a withdrawal of attorneys is improper. (See *Laskowitz* v. *Shellenberger* (1952) 107 F.Supp. 397.) It was error to compel Shilleh to represent Savoir.

Nor can the court's action in permitting Mr. Shilleh to appear in propria persona be justified by the fact that the court later found Mr. Shilleh to be the alter ego of the corporation. A decision of whether a corporation is the alter ego of its shareholder is a decision for the trial court, and certain requirements must be found before the corporate entity will be disregarded. (*Arnold* v. *Browne* (1972) 27 Cal.App.3d 386 [103 Cal.Rptr. 775].) In the case before us Mr. Shilleh was allowed to act in propria persona for the corporation prior to the time the court examined the issue of whether he was the alter ego of the corporation.

Respondents argue without citation that Savoir was not an indispens-able party to the case, and therefore the judgment against Shilleh in his individual capacity must stand. Even if Savoir corporation were to be regarded only as a necessary party, rather than as an indispensable party, it is still mandatory to join the parties, where it is possible or practicable to do so. (*Bank of California* v. *Superior Court* (1940) 16 Cal.2d 516, 523 [106 P.2d 879].) Therefore, Savoir should have been represented by an attorney.

## Ill

Plaintiffs argue that denial of a continuance is not a deprivation of due process of law. But the right to a hearing includes the right to appear by counsel. (*Mendoza* v. *Small Claims Court* (1958) 49 Cal.2d 668, 673 [321

[Dec. 1975]

**Exhibit 5**

P.2d 9].)   **(6)** There is a constitutional basis for the right to counsel in noncriminal proceedings and, in its narrowest definition, it is the right to appear by counsel in any adversary proceedings in which the adversary party has the benefit of the right to counsel. *(Fallis* v. *Dept, of Motor Vehicles* (1968) 264 Cal.App.2d 373, 383 [70 Cal.Rptr. 595].) Therefore, appellants were constitutionally entitled to counsel. However, in view of our holding that we reverse on the grounds that the denial of the continuance was an abuse of discretion, and in view of the fact that we reverse on the grounds that Shilleh improperly represented Savoir, we need not also decide whether the court denied to defendants a constitutional right to due process of law.

The judgment is reversed.

Dunn, J., and Jefferson (Bernard), J., concurred.

[Dec. 1975]

# Exhibit 5

**Exhibit 6**

**Exhibit 6**

1 | ALAN R. SMITH, ESQ.
Nevada Bar No. 1449
2 | HOLLY E. ESTES, ESQ.
Nevada Bar No. 11797
3 | Law Offices of Alan R. Smith
505 Ridge Street
4 | Reno, Nevada 89501
Telephone (775) 786-4579
5 | Facsimile (775) 786-3066
**Email: mail@asmithlaw.com**
6 |
Attorney for Debtors/Defendants
7 | ANTHONY THOMAS and WENDI
THOMAS
8 |

*ELECTRONICALLY FILED*
*August 19, 2014*

9 | UNITED STATES BANKRUPTCY COURT

10 | DISTRICT OF NEVADA

11 | —ooOoo—

12 | In Re:

Case No.  BK-N-14-50333-BTB
Case No.  BK-N-14-50331-BTB

13 | ANTHONY THOMAS and
WENDI THOMAS,

Chapter 11 Cases

14 |

[Jointly Administered]

15 | AT EMERALD, LLC,

16 |

17 |

18 |         Debtors,
_____/

Adv. Pro. No. 14-05022

19 | KENMARK VENTURES, LLC,

20 |         Plaintiff,

**AMENDED MOTION TO WITHDRAW
AS ATTORNEY OF RECORD**

21 | vs.

22 | ANTHONY  THOMAS  and  WENDI
THOMAS,

Hearing Date: OST Pending
Hearing Time: OST Pending

23 |

24 |         Defendants.
_____/

25 |         ALAN R. SMITH, ESQ., of the Law Offices of Alan R Smith (hereinafter "Movant"),

26 | moves this Court to allow him to withdraw as attorney of record for Debtors ANTHONY

27 | THOMAS and WENDI THOMAS and Debtor AT EMERALD, LLC, (hereinafter "Debtors"),

28 | in the above-entitled matter pursuant to Rule 166 of the Supreme Court Rules of the State of Nevada

Law Offices of
ALAN R. SMITH
505 Ridge Street
Reno, Nevada  89501
(775) 786-4579

H:\Thomas\Adv. Thomas v Kenmark Ventures\Mot (Amd) WD 081914-dlg.wpd

**Exhibit 6**

1    and Nevada Rules of Professional Conduct 1.16. This Motion is made and based upon the following

2    Points and Authorities, and the pleadings and papers on file in this case.

3                              **POINTS AND AUTHORITIES**

4              Supreme Court Rule of Professional Conduct 1.16, made applicable by Local Rule IA 10-

5    6(b) and (e), provides that:

6                    No attorney may withdraw after appearing in a case except by
                    leave of Court after notice has been served on the affected client and
7                    opposing counsel.

8              Movant has appeared on behalf of the Debtors in the above captioned matter and therefore

9    brings this Motion for leave to withdraw as their counsel of record. Movant's withdrawal is not

10   expected to cause any delay in these proceedings.

11             Nevada Supreme Court Rule 1.16, made applicable by Local Rule 1A 10-6, provides as

12   follows:

13                   (b)    Except as stated in paragraph (c), a lawyer may withdraw
                    from representing a client if:
14
                          (1)    withdrawal can be accomplished without material adverse effect on
15                               the interests of the client;

16                        . . .

17                        (6)    The representation will result in an unreasonable financial burden on
                                the lawyer or has been rendered unreasonably difficult by the client;
18                              or

19                        (7)    Other good cause for withdrawal exists.

20
              In the case, Debtors have failed substantially to fulfill various obligations to Movant as
21
     specified in the agreement between those parties. Specifically, Debtors have refused to communicate
22
     timely and effectively with Movant. Further, Movant and the Debtors have come to an impasse
23
     regarding certain aspects of Movant's representation that Movant believes cannot be overcome.
24
     Movant believes that because of the difference of opinion as how best to proceed in this case, he can
25
     no longer effectively represent the Debtors. As a result an adversarial relationship has developed,
26
     and Movant has sought this withdrawal.
27
              Movant believes that his withdrawal as counsel for Debtors will not adversely affect Debtors.
28

Law Offices of
ALAN R. SMITH
505 Ridge Street
Reno, Nevada 89501
(775) 786-4579    H:\Thomas\Adv. Thomas v Kenmark Ventures\Mot (Amd) WD 081914-dlg.wpd

-52-

**Exhibit 6**

1 Movant has provided reasonable written warning to Debtors of his intention to withdraw because

2 of their failure to communicate and the disagreements between the parties.  As a result, there is good

3 cause for Movant's withdrawal as counsel of record.

4     WHEREFORE, it is respectfully requested that this Court enter its order permitting the

5 immediate withdrawal of The Law Offices of Alan R. Smith, as attornies of record for the Debtors,

6 and that all further pleadings and correspondence with regard to this matter be forwarded to Debtors

7 at their last known address as follows:

8     AT Emerald, LLC
    c/o Anthony & Wendi Thomas

9     7725 Peavine Peak Court
    Reno, NV 89523

10

11     Anthony & Wendi Thomas
    7725 Peavine Peak Court
    Reno, NV 89523

12

13

14     **DATED** this 19th day of August, 2014.

15                       LAW OFFICES OF ALAN R. SMITH

16                       */s/ Alan R. Smith*

           By_____

17                     ALAN R. SMITH, ESQ.
                    Attorney for Debtor

18

19

20

21

22

23

24

25

26

27

28

Law Offices of
ALAN R. SMITH
505 Ridge Street
Reno, Nevada  89501
(775) 786-4579

H:\Thomas\Adv. Thomas v Kenmark Ventures\Mot (Amd) WD 081914-dkt.wpd     3

**Exhibit 6**

1    **CERTIFICATE OF MAILING**

2    Pursuant to FRCP 5(b), I hereby certify that I am an employee of the Law Offices of Alan

3    R. Smith, and that on this day I deposited for mailing at Reno, Nevada, and sent via email, a true and

4    correct copy of the attached document addressed as follows:

5    AT Emerald, LLC
     c/o Anthony & Wendi Thomas
6    7725 Peavine Peak Court
     Reno, NV 89523
7    atemerald2@gmail.com
     wendithomas6@gmail.com
8
     Timothy A. Lukas, Esq.
9    Holland & Hart, LLP
     5441 Kietzke Lane, 2nd Floor
10   Reno, NV 89511
     tlukas@hollandhart.com
11
     Kevin A. Darby, Esq.
12   Darby Law Practice, Ltd.
     4777 Caughlin Parkway
13   Reno, NV 89519
     kevin@darbylawpractice.com
14
     Stefanie T. Sharp, Esq.
15   Robison, Balaustegui, Sharp & Low
     71 Washington Street
16   Reno, NV 89503
     ssharp@rbsllaw.com
17
     Wayne A. Silver, Esq.
18   333 W. El Camino Real, Ste. 310
     Sunnyvale, CA 94087
19   w_silver@sbcglobal.net

20   Amy N. Tirre, Esq.
     Law Offices of Amy N. Tirre, APC
21   3715 Lakeside Dr., Ste. A
     Reno, NV 89509
22   amy@amyttirrelaw.com

23   Joseph G. Went, Esq.
     Holland & Hart, LLP
24   9555 Hillwood Drive, 2nd Floor
     Las Vegas, NV 89134
25   jgwent@hollandhart.com
                                              /s/ Debra L. Goss
26   Dated: August 19, 2014          By:_____
                                              Debra L. Goss, Employee
27

28

Law Offices of
ALAN R. SMITH
505 Ridge Street
Reno, Nevada 89501
(775) 786-4579        H:\Thomas\Adv. Thomas v Kenmark Ventures\Mot (Amd) WD 081914-dig.wpd

**Exhibit 6**

# Exhibit 7

# Exhibit 7

1  ALAN R. SMITH, ESQ.
   Nevada Bar No. 1449
2  HOLLY E. ESTES, ESQ.
   Nevada Bar No. 11797
3  Law Offices of Alan R. Smith
   505 Ridge Street
4  Reno, Nevada 89501                          *ELECTRONICALLY FILED*
   Telephone (775) 786-4579                      *October 7, 2014*
5  Facsimile (775) 786-3066
   **Email: mail@asmithlaw.com**
6

7

8                  UNITED STATES BANKRUPTCY COURT

9                       DISTRICT OF NEVADA

10                          —ooOoo—

11  In Re:                              Case No.  BK-N-14-50331-BTB

12  AT EMERALD, LLC,                    Chapter 7

13                                      **FIRST AND FINAL APPLICATION BY
                                        ATTORNEY FOR DEBTOR TO**
14                                      **APPROVE COMPENSATION
            Debtor,                     (ALAN R. SMITH)**
15
                                        Hearing Date:  December 17, 2014
16                                      Hearing Time:  10:00 a.m.
17  _____/

18         Alan R. Smith, Esq., of the Law Offices of Alan R. Smith (hereinafter "Applicant"),

19  submits this first and final application for compensation for professional services rendered

20  and reimbursement of costs incurred pursuant to 11 U.S.C. § 330(a) (the "Application").

21  This fee application is based on the entire case file, the points and authorities contained

22  herein, and any oral argument that the Court may entertain.

23         1.     Applicant was the attorney for Debtor herein, and makes this first and final

24  application for an allowance of compensation for professional services rendered, and for

25  reimbursement for actual and necessary costs and expenses incurred by him in the

26  administration in the estate of AT EMERALD, LLC. In March, 2014, Debtor retained the

27  Law Offices of Alan R. Smith to provide bankruptcy advice and a Petition for Relief Under

28  Chapter 11 was filed on March 4, 2014 [DE 1]. The employment of the Law Offices of Alan

Law Offices of
ALAN R. SMITH
505 Ridge Street
Reno, Nevada  89501
(775) 786-4579    H:\AT Emerald\Fees\Fee App ARS 100714-dlg.wpd

**Exhibit 7**

-56-

1   R. Smith, as counsel for Debtor was approved by the Court by order entered on March 27,

2   2014 [DE 19]. On May 12, 2014, the Court entered its Order Approving Motion For Joint

3   Administration [DE 32], jointly administering the above-referenced case with the case of

4   Anthony Thomas and Wendi Thomas, Case No. BK-N-14-50333-BTB. The withdrawal of

5   employment of the Law Offices of Alan R. Smith, Esq., as counsel for Debtor was approved

6   by the Court by Order entered on August 26, 2014 [DE 187]. On August 29, 2014, the Court

7   entered its Order Granting Motion To Convert Case From Chapter 11 To Chapter 7 [DE 57].

8      2.     All services for which compensation is requested by Applicant were performed

9   for and on behalf of the Debtor and not on behalf of any committee, creditor, or other person,

10   and were necessary to the administration of the Debtor's estate. The services performed are

11   summarized for the Court's convenience as follows:

| APPLICANT: ALAN R. SMITH, ESQ.,OF THE LAW OFFICES OF ALAN R. SMITH | | | |
|---|---|---|---|
| TERMS OF EMPLOYMENT:<br>ALAN R. SMITH, ESQ. ATTORNEY ............................. $500/HOUR (ARS)<br>HOLLY E. ESTES, ESQ. ATTORNEY ............................. $300/HOUR (HEE)<br>DEBRA L. GOSS, PARALEGAL ................................ $150/HOUR (DLG)<br>ROANNA M. BONALDI, LEGAL ASSISTANT ....................... $130/HOUR (RMB) | | | |
| FIRST AND FINAL APPLICATION | | LEGAL FEES | $40,883.00 |
| | | EXPENSES | $1,518.03 |
| | | TOTAL | $42,401.03 |
| PERIOD COVERED: MARCH 3, 2014 TO SEPTEMBER 30, 2014 | | | |
| FEES & EXPENSES PREVIOUSLY REQUESTED: | | | -0- |
| FEES & EXPENSES PREVIOUSLY AWARDED: | | | -0- |
| CASE STATUS: CHAPTER 11 VOLUNTARY PETITION FILED ON MARCH 4, 2014. CASE CONVERTED TO A CHAPTER 7 ON AUGUST 29, 2014. | | | |
| PROSPECT FOR PAYMENT OF FEE/COST AWARD: DEBTOR'S ESTATE SHOULD HAVE SUFFICIENT FUNDS AVAILABLE TO PAY FEE/COST AWARD(S) FROM SALE OF EMERALD. | | | |
| TASKS - HOURS - FEES - EXPENSES SUMMARY FOR APPLICATION | | | |
| TASK NO. | WORK CATEGORY | HOURS | FEES |
| B110 | PRE-BANKRUPTCY / CASE ADMINISTRATION | 60.10 | $ 16,188.00 |
| B120 | ASSET ANALYSIS & RECOVERY | 0.00 | $ 0.00 |

Law Offices of
ALAN R. SMITH
505 Ridge Street
Reno, Nevada 89501
(775) 786-4579

H:\AT Emerald\Fees\Fee App ARS 100714-dig.wpd

- 2 -

-57-

**Exhibit 7**

| B130 | ASSET DISPOSITION | 62.5 | | |
| B140 | RELIEF FROM STAY PROCEEDINGS | 0.00 | | |
| B150 | MEETING OF CREDITORS | 0.00 | $ | |
| B160 | FEE/EMPLOYMENT APPLICATIONS | 7.70 | $ | |
| B170 | FEE/EMPLOYMENT OBJECTIONS | 0.00 | $ | 0.00 |
| B210 | BUSINESS OPERATIONS | 1.60 | $ | 208.00 |
| B220 | EMPLOYEE BENEFITS/PENSIONS | 0.00 | $ | 0.00 |
| B230 | FINANCING / CASH COLLATERAL | 0.00 | $ | 0.00 |
| B235 | LEASES/ASSUMPTIONS/REJECTIONS | 0.00 | $ | 0.00 |
| B310 | CLAIMS ADMINISTRATION & OBJECTIONS | 7.40 | $ | 2,220.00 |
| B320 | PLAN AND DISCLOSURE STATEMENT | 0.00 | $ | 0.00 |
| B350 | POST-CONFIRMATION | 0.00 | $ | 0.00 |
| | TOTALS | 139.70 | $ | 40,883.00 |
| | ITEMIZED EXPENSES | | | |
| | FILING FEES | | $ | 1,216.60 |
| | PHOTOCOPIES | | $ | 277.75 |
| | POSTAGE | | $ | 7.68 |
| | FACSIMILE | | $ | 0.00 |
| | PACER | | $ | 0.00 |
| | AT&T CONFERENCE CALLS/LONG DISTANCE | | $ | 0.00 |
| | MESSENGER SERVICES | | $ | 0.00 |
| | ELECTRONIC RESEARCH LEXIS NEXIS | | $ | 0.00 |
| | OTHER/RENO CARSON MESSENGER SERVICE | | $ | 16.00 |
| | TOTAL EXPENSES | | $ | 1,518.03 |
| | SUPPLEMENTAL LEGAL FEES | | $ | 0.00 |
| TOTAL FEES AND EXPENSES INCURRED THIS APPLICATION | | | $ | 42,401.03 |
| | PREVIOUSLY AWARDED FEES AND COSTS | | $ | 0.00 |
| | LESS PAYMENTS  ( REQUEST APPROVAL TO APPLY) | | $ | 5,000.00 |
| | SUBTOTAL FEE REQUEST AND COST REIMBURSEMENT | | $ | 37,401.03 |
| | LESS COURTESY DISCOUNT/CREDIT | | $ | 0.00 |

Law Offices of
ALAN R. SMITH
505 Ridge Street
Reno, Nevada  89501
(775) 786-4579

H:\AT Emerald\Fees\Fee App ARS 100714-dlg.wpd         - 3 -

Exhibit 7

-58-

| TOTAL DUE | $ 42,401.03 |
|---|---|

3.    No previous orders have been entered by the Court approving compensation to Applicant.

4.    Applicant seeks compensation for the period March 3, 2014, through September 30, 2014, for professional services rendered in the amount of $40,883.00 and reimbursement of necessary costs and expenses incurred in the amount of $1,518.03 (for a total of $42,401.03, less the pre-petition retainer of $5,000.00). Applicant seeks approval to apply the monies held in Applicant's trust account and paid by the Debtors pre-petition of $5,000.00, leaving a balance due of $37,401.03. These services are more fully set forth in the monthly billing statements **(Exhibit "A")**, billing task summary **(Exhibit "B")**, and cost itemization **(Exhibit "C")** attached hereto and incorporated herein.

5.    The services provided by Applicant have been segregated into the following categories and are summarized as follows:

(A)    **Pre-Bankruptcy / Case Administration (B100/B110)**

Applicant provided services in initiating Debtors' Chapter 11 case and strategizing with Debtors, communicating with the Office of the United States Trustee, and advising Debtors in connection with preparation of Debtors' Petition, Statements and Schedules, amendments thereto, IDI documents and compliance with the U.S. Trustee's guidelines. Applicant also provided services with regard to the emerald, motions to convert, dismiss, appoint a trustee, and compel. Applicant also provided services in withdrawing from the case.

The time spent in connection with case administration is as follows:

| | Hours | Fees |
|---|---|---|
| Alan R. Smith, Esq. | 3.10 | $1,550.00 |
| Holly E. Estes, Esq. | 41.40 | 12,420.00 |
| Debra L. Goss, Paralegal | 9.50 | 1,425.00 |
| Roanna M. Bonaldi, Legal Assistant | 6.10 | 793.00 |
| | 60.10 | $16,188.00 |

Law Offices of
ALAN R. SMITH
505 Ridge Street
Reno, Nevada  89501
(775) 786-4579

H:\AT Emerald\Fees\Fee App ARS 100714-dlg.wpd

- 4 -

-59-

**Exhibit 7**

**(B)    Asset Disposition (B130)**

Applicant provided services with regard to selling the asset of the Debtor, an emerald.

The time spent in connection with asset disposition is as follows:

|  | Hours | Fees |
|---|---|---|
| Alan R. Smith, Esq. | 14.00 | $7,000.00 |
| Holly E. Estes, Esq. | 44.90 | 13,470.00 |
| Debra L. Goss, Paralegal | 1.00 | 150.00 |
| Roanna M. Bonaldi, Legal Assistant | 3.00 | 390.00 |
|  | 62.90 | $21,010.00 |

**(C)    Fee and Employment Applications (B160)**

Applicant's law firm has prepared an application to employ himself, as Attorney for the Debtor-in-Possession, in addition to preparing this application for compensation.

The time spent in preparing the employment application (through September 30, 2014) is as follows:

|  | Hours | Fees |
|---|---|---|
| Holly E. Estes, Esq. | 0.80 | $240.00 |
| Debra L. Goss, Paralegal | 6.00 | 900.00 |
| Roanna M. Bonaldi, Legal Assistant | 0.90 | 117.00 |
|  | 7.70 | $1,257.00 |

**(D)    Business Operations (B210)**

Applicant assisted the Debtor with matters concerning its monthly operating reports and related issues.  The time spent in connection with business operations is as follows:

|  | Hours | Fees |
|---|---|---|
| Roanna M. Bonaldi, Legal Assistant | 1.60 | $208.00 |

**(E)    Claims Administration (B310)**

Applicant provided legal services to the Debtor in advising the Debtor concerning the claim of John Beach.  The time spent is as follows:

///

///

Law Offices of
ALAN R. SMITH
505 Ridge Street
Reno, Nevada  89501
(775) 786-4579

H:\AT Emerald\Fees\Fee App ARS 100714-dlg.wpd

- 5 -

**Exhibit 7**

|  | Hours | Fees |
|---|---|---|
| Holly E. Estes, Esq. | 7.40 | $2,220.00 |

**TOTAL FEES - All (139.70 hrs):   $39,713.00 (Blended Rate: $292.65/hour)**

A complete and detailed description of the legal services performed by Applicant are set forth in the itemized billing statements attached hereto (**Exhibit "A"**).

6.    Prior to filing of the petition (March 4, 2014), the Debtor paid to the Law Offices of Alan R. Smith a retainer of $5,000.00 for commencement of the Chapter 11 case. The payment is being held in Applicant's trust account pending this Court's order approving the requested attorneys' fees and authorizing Applicant to apply the payment(s) to the outstanding balance. Applicant has not entered into any agreement with any other person or entity for the sharing of compensation received or to be received in connection with the services rendered in this case.

7.    The rates of compensation of attorneys and supporting personnel agreed to by the Debtor are as follows: Alan R. Smith, Esq. ("ARS") - $500.00 per hour; Holly E. Estes, Esq., ("HEE") - $300 per hour; Debra L. Goss, Paralegal ("DLG") - $150.00 per hour and Roanna Bonaldi, Legal Assistant ("RMB") - $130.00 per hour. Applicant believes that these rates are within the normal hourly rates charged by other professionals and paraprofessionals for the type of services involved in this case, and believes that the compensation sought herein is reasonable.

8.    Alan R. Smith, Esq. was admitted to the Nevada Bar in 1979.

///
///
///
///
///
///
///
///

Law Offices of
**ALAN R. SMITH**
505 Ridge Street
Reno, Nevada  89501
(775) 786-4579

H:\AT Emerald\Fees\Fee App ARS 100714-dlg.wpd

- 6 -

**Exhibit 7**

1       WHEREFORE, Applicant requests that the Court enter its order approving and

2    awarding this first and final request for compensation for professional services rendered in

3    the amount of $40,883.00 and reimbursement of necessary costs and expenses incurred in the

4    amount of $1,518.03 (for a total of $42,401.03, less the pre-petition retainer of $5,000.00).

5    Applicant seeks approval to apply the monies held in Applicant's trust account and paid by

6    the Debtor pre-petition $5,000.00, leaving a balance due of $37,401.03.

7       DATED this 7th day of October, 2014.

8

9                     LAW OFFICES OF ALAN R. SMITH

                         By:      */s/ Alan R. Smith*

10                            ALAN R. SMITH, ESQ.

                            Attorney for Debtor

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Law Offices of
ALAN R. SMITH
505 Ridge Street
Reno, Nevada 89501
(775) 786-4579

H:\AT Emerald\Fees\Fee App ARS 100714-dkg.wpd     - 7 -

**Exhibit 7**

# Exhibit "A"

**Exhibit 7**

| Apr-24-14 | [Claims Administration] Draft email to Joe Went re follow up on revised proposed stip and order for adequate protection. | 0.20 | 60.00 | HEE |
| | [Business Operations] Review March 2014 monthly operating report, redact confidential information. | 0.40 | 52.00 | RMB |
| Apr-30-14 | [Case Administration] Review email from Joe Went re stipulation and order for adequate protection; print attached revised stipulation. | 0.20 | 60.00 | HEE |
| | [Claims Administration] Review most recent draft stipulation and order with Beach Trust; save draft; mark redline proposed changes to same. | 0.30 | 90.00 | HEE |
| | [Claims Administration] Draft email to Joe Went and Tim Lukas copy clients re attached redline proposed changes to most recent draft of stip and order for adequate protection. | 0.20 | 60.00 | HEE |
| May-06-14 | [Case Administration] Review OUST motion to convert case to chapter 7 for not having insurance. | 0.20 | 60.00 | HEE |
| | [Case Administration] Review OUST Motion to Designate Case As Small Business Case. | 0.20 | 60.00 | HEE |
| May-07-14 | [Case Administration] Conference with Holly E. Estes, Esq. re:  hearing on Motion For Joint Administration; Prepare Order Approving Motion For Joint Administration for attorney review; Finalize and lodge with Court. | 0.50 | 75.00 | DLG |
| May-12-14 | [Case Administration] Draft email to Tony and Wendi Thomas requestion information on trip to Florida, immenant sale of the emerald and information on Motion to convert case to chapter 7. | 0.20 | 60.00 | HEE |
| | [Case Administration] T/c with Tony Thomas re Trip to Florida; discuss Joseph Went's requested stipulation for adequate protection and confirmation of trip and drop dead date for trip to florida; Discuss potential sale of emerald and OUST's motion to convert case to one under chapter 7. | 0.20 | 60.00 | HEE |

# Exhibit 7

|  |  |  |  |  |
|---|---|---|---|---|
|  | [Claims Administration] Review email from Joe Went re stipulation for adequate protection and trip to Florida 5/25; Draft email to Tony and Wendi Thomas requesting information on trip to Florida and confirming 5.25 deadline. | 0.20 | 60.00 | HEE |
| May-13-14 | [Claims Administration] Review email from Joe Went re most recent form of draft adequate protection stipulation and trip to Florida on May 25; Review attached proposed stipulation. | 0.20 | 60.00 | HEE |
|  | [Claims Administration] Draft email to Joe Went re his draft proposed stipulation for adequate protection and trip to Florida on May 25; Discuss prior agreement of langauge for trip to Florida in stipulation; outline requested changed langauge that would be agreeable in stipulated agreement. | 0.20 | 60.00 | HEE |
|  | [Case Administration] Draft notice of entry of order approving motion for joint administration. | 0.50 | 65.00 | RMB |
| May-30-14 | [Business Operations] Review April 2014 monthly operating report, redact confidential information and finalize report. | 0.40 | 52.00 | RMB |
| Jun-04-14 | [Case Administration] Review OUST motion to convert case to chapter 7; draft email to Tony and Wendi Thomas re t/c with Joesph Went and need for trip to Florida with John Beach; discuss stip to adequate protection and John Beach's position as to insurance on the emerald. | 0.20 | 60.00 | HEE |
|  | [Claims Administration] T/c with Joseph Went re trip to Florida and stip for adequate protection. | 0.20 | 60.00 | HEE |
| Jun-10-14 | [Asset Disposition] Review Purchase Agreement and comments re: same (.5); Work on motion to approve sale (.7). | 1.20 | 600.00 | ARS |
|  | [Asset Disposition] Review email from Tony Thomas re draft purchase agreement and request for court approval. | 0.20 | 60.00 | HEE |
|  | [Asset Disposition] T/c with ARS re t/c with | 0.20 | 60.00 | HEE |

# Exhibit 7

| Invoice #: | 7634 | | | Page 25 | September 30, 2014 |

| Jul-15-14 | [Case Administration] T/c with Tim Lukas re opposition to OUST motion to dismiss and motion to convert case. | 0.20 | 60.00 | HEE |
| | [Case Administration] t/c with Bill Cossitt re continuing hearings on OUST motions to convert and designate case. | 0.20 | 60.00 | HEE |
| | [Case Administration] Call Linda Bowser and Linda Duffy request new hearing date about thirty days out for continued hearings on OUST motions L/m. | 0.20 | 60.00 | HEE |
| | [Case Administration] Draft stipuation to continue hearing on OUST's motion to convert case to chapter 7. | 0.30 | 90.00 | HEE |
| | [Case Administration] Draft stipulation to continue hearing on OUST's motion to designate case small business case. | 0.30 | 90.00 | HEE |
| Jul-16-14 | [Case Administration] T/c with Linda Bowser re new hearing date on OUST's Motion to Designate Case and OUST's motion to convert case. | 0.20 | 60.00 | HEE |
| | [Case Administration] Finalize stipulations to continue hearings on OUST's motion to designate case and OUST's motion to convert by adding continued to hearing date and time. | 0.20 | 60.00 | HEE |
| | [Case Administration] Review email from Bill Cossitt re attached signatures on stipulations to continue hearings; MTG with RMB requesting filing stipulations and creating and lodging orders thereon. | 0.20 | 60.00 | HEE |
| | [Asset Disposition] Review email from Tim Lukas requsting up date on sale; draft reply email re same. | 0.20 | 60.00 | HEE |
| | [Asset Disposition] Draft email to Tony Thomas requesting information on sale of emerald; status. | 0.20 | 60.00 | HEE |
| | [Case Administration] Draft order approving stipulation to continue hearing on US TRustee's motion to designate case as small business. | 0.50 | 65.00 | RMB |

# Exhibit 7

Invoice #: 7654                                                                September 30, 2014

|  |  |  |  |  |
|---|---|---|---|---|
|  | [Case Administration] Draft order approving stipulation to continue hearing on US Trustee's motion to convert case to chapter 7. | 0.50 | 65.00 | RMB |
| Jul-17-14 | [Case Administration] Review June clinet billing statement; mark corrections to be made. | 0.20 | 60.00 | HEE |
|  | [Case Administration] Review email from Joseph Went re request for hearing on shortened time to drill lock on Sarasota vault storing emerald; draft reply stating do not agree to shortened time and believe the motion is premature. | 0.20 | 60.00 | HEE |
|  | [Case Administration] Draft email to Tony Thomas requesting information as to whether he will be available to take a trip to Florida on August 12 to open vault for 2004 PMK examination. | 0.20 | 60.00 | HEE |
|  | [Asset Disposition] Draft email to Tony Thomas requesting update on sale; draft email to Tony Thomas requesting status update and reminder of upcoming status hearing on sale of emerald; request update and status report by Friday July 18, 2014. | 0.20 | 60.00 | HEE |
| Jul-18-14 | [Case Administration] Draft certificate of service for stipulation to continue hearings on US Trustee's objections to debtor's claims of exemptions and US Trustee's motion to designate case as small business case. | 0.40 | 52.00 | RMB |
| Jul-21-14 | [Asset Disposition] Strategize with Holly E. Estes, Esq. re: sale. | 0.30 | 150.00 | ARS |
|  | [Asset Disposition] Draft follow up email to Tony Thomas requesting status update for scheduled status hearing on motion to sell the emerald. | 0.20 | 60.00 | HEE |
|  | [Asset Disposition] Mtg with ARS to discuss status hearing on sale today; draft email to Tony Thomas re risk of trustee; need status update; Call Tony to request update and report possible trustee if no progress to report; L/M re same. | 0.30 | 90.00 | HEE |

**Exhibit 7**

Case 14-50333-gs   Doc 547   Entered 09/03/19 15:20:55   Page 78 of 79
Case 14-50331-gs   Doc 79   Entered 10/07/14 15:16:08   Page 35 of 52

Invoice #:      7634                           Page   27                    September 30, 2014

| | | | | |
|---|---|---|---|---|
| | [Asset Disposition] Prepare for and attend status hearing on motion to sell; give court status report; discuss changes to be made to order; continue hearing ten days. | 0.80 | 240.00 | HEE |
| | [Asset Disposition] Revise order on motion to sell consistent with the Judge's request in open court at the status hearing today. | 0.20 | 60.00 | HEE |
| | [Asset Disposition] Draft email to Wayne Silver requesting reivew and sign revised order on motion to sell.  attach same for review. | 0.20 | 60.00 | HEE |
| | [Case Administration] Organize attny notes from hearings on motion to sell.; [Asset Disposition] | 0.20 | 60.00 | HEE |
| | [Asset Disposition] Review reply email from Wayne Silver re signed revised proposed order on motion to sell; Scan and save; Lodge order with court; Call Linda Bowser to inform her that new order should be in her inbox for judge to review and sign. | 0.50 | 150.00 | HEE |
| | [Asset Disposition] Draft email to Tony Thomas explaining what occurred at continued hearing today and informing him of continued hearing date on motion to sell. | 0.20 | 60.00 | HEE |
| Jul-22-14 | [Case Administration] Draft email to RMB requesting to find correspondce to vault re emerald and further order of the court. | 0.20 | 60.00 | HEE |
| | [Asset Disposition] Review email from Tony Thomas re sale of emerald; buyer traveling last week; to hear this week on when purchase to close; draft reply re same. | 0.20 | 60.00 | HEE |
| | [Case Administration] Draft notice of entry of order approving stipulation to continue hearing on US Trustee's Motion To Designate Case As Small Business. | 0.40 | 52.00 | RMB |
| | [Case Administration] Draft notice of entry of order approving stipulation to continue hearing on US Trustee's motion to convert case to chapter 7. | 0.40 | 52.00 | RMB |
| Jul-23-14 | [Case Administration] Review motion to | 0.30 | 90.00 | HEE |

# Exhibit 7

## CERTIFICATE OF SERVICE

I Paul S. Mula II certify that I am an adult, over the age of 18 years, not a party to the action herein who resides in Santa Clara County, California. On August 26th 2019 I caused to be served the following documents via e-mail to the following persons as listed below from my e-mail address of pauly_p_78@yahoo.com as follows:

DOCUMENTS SERVED:

DECLARATION OF ANTHONY THOMAS; REPLY BRIEF

as follows:
JEFFREY A. COGAN
jeffrey@jeffreycogan.com, beautausinga@gmail.com, beau@jeffreycogan.com
JERI COPPA-KNUDSON VIA E-MAIL & US MAIL: 3495 Lakeside PMB 62 Dr. Reno, NV    89509
renobktrustee@gmail.com, jcoppaknudson@ecf.episystems.com
KEVIN A. DARBY
kad@darbylawpractice.com, tricia@darbylawpractice.com, jill@darbylawpractice.com, hersh@darbylawpractice.com, sam@darbylawpractice.com
JEFFREY L. HARTMAN VIA E-MAIL & US MAIL: 510 W. Plumb Lane Suite B - Reno, NV 89509
notices@bankruptcyreno.com, sji@bankruptcyreno.com
TIMOTHY A. LUCAS
ecflukast@hollandhart.com
LAURY MILES MACAULEY
laury@macauleylawgroup.com
WILLIAM MCGRANE
ECF-8116edf28c97@ecf.pacerpro.com, mitch.chyette@mcgranellp.com
STEPHANIE T. SHARP
ssharp@rssblaw.com, cobrien@rssblaw.com
WAYNE A. SILVER
w_silver@sbcglobal.net, ws@waynesilverlaw.com & VIA U.S. MAIL:
643 Bair Island Rd. Suite 403 - Redwood City, CA 94063
ALAN R. SMITH
mail@asmithlaw.com
STEVEN C. SMITH
ssmith@smith-lc.com, mbrandt@smith-lc.com
AMY N. TIRRE
amy@amytirrelaw.com, admin@amytirrelaw.com
U.S. TRUSTEE - RN - 7,7
USTPRegion17.RE.ECF@usdoj.gov
JOSEPH G. WENT
jgwent@hollandhart.com, vllarsen@hollandhart.com

I declare under penalty of perjury that the foregoing is true and correct.

Dated: August 26th 2019.

Paul S. Mula II